UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------

**07 CRIM 1170**

UNITED STATES OF AMERICA

    -v-

JOSEPH P. COLLINS,

          Defendant.

------------------------------------x

**INDICTMENT**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 1 8 2007
```

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, Bank Fraud, And Money Laundering, To Make False Filings With The SEC, And To Make Material Misstatements To Auditors)**

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1.   At certain times relevant to this Indictment, Refco, Inc. was a Delaware corporation with its principal place of business in New York, New York.  Starting from at least the mid-1990s, the business of Refco, Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets. Refco, Inc. held its initial public offering ("IPO") of common stock on or about August 10, 2005.  Prior to on or about August 10, 2005, Refco, Inc.'s predecessor entities were privately held. Refco, Inc. and its predecessor entities are referred to herein collectively as "Refco."

2.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately held Delaware corporation that held a substantial ownership interest in Refco.

3.   At all times relevant to this Indictment, Refco was represented by a large, well-known law firm (the "Law Firm").  At all times relevant to this Indictment, the Law Firm maintained offices throughout the United States and the world, including New York, New York.

4.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, was a partner at the Law Firm.  At all times relevant to this Indictment, COLLINS served as the principal outside counsel to Refco and RGHI and, indeed, brought Refco with him as a client when he joined the Law Firm in 1994. As such, COLLINS worked closely with executives and officers of both companies, providing them with legal advice and services with regard to a wide range of matters.  At all times relevant to this Indictment, Refco was the most significant client of JOSEPH P. COLLINS, the defendant, and he billed more time to matters for Refco than he did to matters for any other client and generated more fees for the Law Firm through his work for Refco than he did through any other client.  From in or about 1997 through in or about 2005, COLLINS's relationship with Refco resulted in at least approximately $40 million in fees being invoiced by the Law Firm to Refco.

2

5.   At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At certain times relevant to this Indictment, Bennett also owned between 24.5 percent to 100 percent of RGHI and served as President and Chief Executive Officer of RGHI.  As a result of his ownership interest in RGHI, at all times relevant to this Indictment, Bennett also had a substantial indirect ownership interest in Refco.

6.   At certain times relevant to this Indictment, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco.  Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004.

7.   At certain times relevant to this Indictment, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, Grant was the President of Refco.  At certain times relevant to this Indictment, Grant also had a direct ownership interest in RGHI.  As a result of his ownership interest in RGHI, at certain times relevant to this Indictment, Grant held a significant indirect ownership interest in Refco.

3

8.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft was the fourth largest bank in Austria.   At various times relevant to this Indictment, it indirectly held a substantial ownership interest in Refco and made investments in Refco through affiliates it controlled. The bank and its various subsidiaries and affiliates are referred to collectively herein as "BAWAG".

**THE SCHEME TO DEFRAUD**

9.   From at least as early as in or about 1997 through in or about October 2005, JOSEPH P. COLLINS, the defendant, together with Phillip R. Bennett, Robert C. Trosten, Tone N. Grant, and others known and unknown, schemed to hide the true financial health and economic structure of Refco, including the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in Refco, from Refco's banks, counterparties, auditors, investors and potential investors.   In furtherance of this scheme, COLLINS, Bennett, Trosten, Grant, and others known and unknown, made and caused to be made false and fraudulent statements to Refco's banks, counterparties, auditors, investors, and potential investors, and made and caused to be made false public filings with the United States Securities and Exchange Commission ("SEC").

4

10.   JOSEPH P. COLLINS, the defendant, as Refco's
principal outside counsel, actively participated in this scheme
to hide the true financial health of Refco and to conceal BAWAG's
economic interest in Refco.  Acting hand-in-hand with Bennett,
COLLINS made affirmative misrepresentations, material omissions,
and told deceptive half-truths, all to assist Bennett's scheme to
steal more than $2.4 billion from potential investors and
lenders.  These misrepresentations, omissions, and half-truths --
as well as misrepresentations, omissions, and half-truths told by
coconspirators that COLLINS confirmed and furthered -- were
believed by Refco's investors and lenders in part because
COLLINS's status as a partner with a well-known law firm and as
Refco's long-time counsel gave them confidence that such
representations were truthful, accurate, and complete.
Furthermore, COLLINS documented and caused to be documented
transactions that concealed the existence of the large, material
debt owed to Refco by RGHI.  COLLINS's and the Law Firm's role in
documenting these fraudulent transactions helped third parties
gain comfort in participating in them.  Furthermore, in meetings,
telephone calls, and correspondence, COLLINS lied about this debt
and the existence of these and other transactions -- as well as
other matters relating to Refco's financial health -- to Refco's
banks, investors, potential investors, and their advisers.
COLLINS also knowingly negotiated and drafted fraudulent

agreements and public filings that resulted in the investment of more than $2.4 billion in Refco by banks, investors, and the public. COLLINS also schemed with Bennett to conceal from potential investors the size of the investment BAWAG had made in Refco. As a result of COLLINS's lies on behalf of Refco, COLLINS and Bennett were able to achieve the ultimate objective of the scheme, that is, obtaining, through fraud: the sale of approximately 57 percent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to private investors in 2004; the acquisition of approximately $800 million of bank financing in 2004; and the August 2005 IPO of stock in Refco, in which the public purchased approximately $583 million of Refco common stock.

### Origins Of Refco's Financial Problems

11. In or about the mid-1990s, Refco was wholly owned by RGHI. As of in or about early 1997, RGHI owed Refco at least approximately $106 million. Starting later in or about 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business. In response to these losses, at various times between in or about May 1997 and in or about October 2005, Refco transferred losses from Refco to RGHI in an effort to hide Refco's true liabilities and thereby seek, among other things, to defraud potential purchasers into buying the firm at a price that

6

would pay off the accumulated debt and ensure a profit to Refco's owners.  This practice resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion, which was carried on Refco's books as a receivable from RGHI (the "RGHI Receivable").

12.  For example, in or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1") lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was ultimately forced to use customer funds taken from the unregulated segments of Refco's business to cover the loss.

13.  Recognizing that public acknowledgment of the actual loss amount would threaten Refco's continued existence, Refco falsely represented to the public that Refco had not sustained significant losses as a result of Customer 1's losses when in fact it had lost in excess of $90 million.  In fact, with the assistance and knowledge of JOSEPH P. COLLINS, the defendant, Refco had assumed at least $71 million of debt owed by Customer 1 from the trading losses. Refco then transferred that debt to RGHI, thereby making it appear on Refco's books as a $71 million receivable from RGHI.

14.  At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco had sustained significant losses in connection with the trading activities of its customers; knew that senior Refco management and others known and unknown had lied to the public and others about Refco having sustained such losses; and knew that such losses were transferred from Refco to RGHI.

## BAWAG Invests In Refco

15.  By the end of 1998, significant customer and other losses sustained by Refco placed Refco in a precarious financial condition and caused Refco management to seek an infusion of capital from BAWAG, a long-time Refco customer. In a transaction that closed in or about 1999 and that JOSEPH P. COLLINS, the defendant, and others negotiated and documented, BAWAG purchased a ten percent ownership interest in Refco for approximately $95 million and lent Refco approximately $85 million of additional capital in return for an additional ten percent economic interest in Refco.

16.  At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that, even with the infusion of capital provided by BAWAG in 1999, RGHI continued to owe Refco hundreds of millions of dollars. Indeed, in or about 1999, COLLINS received information that RGHI owed Refco at least approximately $252 million.

8

## Hiding The RGHI Receivable

17.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis with a fiscal year-end on the last day of February, as JOSEPH P. COLLINS, the defendant, knew.  Among the items the auditors examined each year were "related party transactions" and, in particular, transactions between and among Refco and members of Refco's management and owners.  As COLLINS also knew, Refco and RGHI were related parties.

18.   In order to hide the size of the large and growing RGHI Receivable from, among others, Refco's auditors, Refco carried out a series of transactions in order temporarily to pay down all or part of the RGHI Receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Refco.  The transactions were carried out in order to hide the existence of the related party RGHI Receivable and the underlying causes of its existence from Refco's auditors, banks, investors, potential investors, and others.

19.   In or about 1998 and 1999, these transactions were undocumented.  However, beginning in or about 2000, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm working at his direction, were responsible for drafting the legal

documents that effectuated the transactions that Refco used to pay down, temporarily, all or part of the RGHI Receivable over Refco's fiscal year-ends and replace it with a receivable from one or more other entities not related to Refco (the "Round Trip Loan Transactions"). In summary, these year-end transactions were carried out in the following approximate amounts during the 2000 to 2003 period:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2000 | $310 million |
| Feb. 2001 | $450 million |
| Feb. 2002 | $625 million |
| Feb. 2003 | $650 million |

20. These transactions followed a standard pattern. For example, in or about 2000, JOSEPH P. COLLINS, the defendant, along with senior Refco management and other attorneys at the Law Firm who were working at COLLINS's direction, caused the following transactions to occur with several customers for the purpose of paying down a portion of the RGHI Receivable over the February 2000 year-end. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which RGHI then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers approximately $310 million. As a result, it appeared on Refco's books and records that Refco had approximately $310 million in receivables from the Three Customers, and the debt from RGHI

10

appeared to be reduced by approximately $310 million. In or about March 2000, the transactions were reversed, with Refco lending approximately $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers was memorialized in loan agreements, prepared by the Law Firm's attorneys at COLLINS's direction, between Refco, RGHI and the Three Customers, similar to the agreements that follow:

    a.    On or about February 25, 2000, through a loan document prepared at COLLINS's direction, Refco Capital Markets, Ltd., a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million. The loan was to be repaid on March 9, 2000.

    b.    On or about the same day, February 25, 2000, through a loan document prepared by COLLINS and another Law Firm attorney, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000. The loan agreement for this loan was executed by Phillip R. Bennett on behalf of RGHI. The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco

11

Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

        c.    On or about the same day, Phillip R. Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.  The letter of guaranty signed by Bennett was prepared by a Law Firm attorney.

        d.    On or about the same day, Phillip R. Bennett signed a letter of indemnity to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that Refco Group, Ltd. would defend and indemnify Customer 2 against any claims brought against Customer 2, or with respect to any loss suffered by Customer 2, as a result of Customer 2's loan to RGHI.  The letter of indemnity signed by Bennett was prepared by COLLINS and another Law Firm attorney.

      21.    At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco's fiscal year ended the last day of February, and that the fiscal year-end Round Trip Loan Transactions described above had the effect of paying down, temporarily, all or part of a large receivable owed to Refco by RGHI.

      22.    In addition to the customer Round Trip Loan Transactions, Refco also engaged in undocumented year-end

transactions with BAWAG, in which BAWAG lent hundreds of millions of dollars to RGHI, which it then used to pay down its obligation to Refco (the "BAWAG Round Trip Loan Transactions"). At the same time, Refco lent to BAWAG a large amount of money. As a result, it appeared on Refco's books and records that Refco had hundreds of millions of dollars in receivables from BAWAG, while the RGHI Receivable appeared to be reduced. After Refco's fiscal year-end, the transactions were reversed. In summary, these BAWAG Round Trip Loan Transactions were carried out in the following approximate amounts during the 2000 to 2004 period:

| Date | Approximate BAWAG Round Trip Loans to RGHI |
|------|--------------------------------------------|
| Feb. 2000 | $300 million |
| Feb. 2001 | $300 million |
| Feb. 2002 | $300 million |
| Feb. 2003 | $250 million |
| Feb. 2004 | $250 million |

### BAWAG Invests Further in Refco

23.    Because Refco continued to falter financially, Refco management sought additional infusions of capital, turning again to BAWAG for assistance. To that end, in or about July 2002, Refco, with the assistance of JOSEPH P. COLLINS, the defendant, entered into an agreement with BAWAG whereby BAWAG agreed to provide Refco with the needed capital infusions in exchange for the right to receive proceeds of a future sale of

Refco. Specifically, under the terms of the agreement (called
the "Proceeds Participation Agreement" or "PPA"), BAWAG promised
to make capital contributions to Refco at or about Refco's fiscal
year-ends in 2003, 2004, and 2005 in exchange for a percentage of
any proceeds paid in connection with a sale or public offering of
Refco (identified in the agreement as the "Participation Right").
The percentage of proceeds BAWAG was entitled to under the terms
of the PPA increased with each periodic contribution of capital.
Alternatively, the PPA gave BAWAG the right to convert the
Participation Right into ownership shares of Refco upon making
the payments to Refco as specified in the PPA. The agreement
also contemplated that RGHI would guarantee Refco's performance
under the terms of the PPA and otherwise secure the Participation
Right. Under the terms of the PPA and related agreements, as
COLLINS well knew, Refco agreed to use $350 million of the
purchase price for the Participation Right to pay down the
ballooning debt owed to Refco by RGHI. In accordance with the
terms of the PPA, BAWAG made two contributions to Refco totaling
approximately $467,480,000. In return, BAWAG received the right
to approximately 27.2 percent of the proceeds of the sale of
Refco and, together with BAWAG's existing economic interest in 20
percent of Refco, possessed the economic rights to approximately
47 percent of the proceeds of the sale of Refco.

24.  Having negotiated, drafted, and caused to be
drafted the PPA, JOSEPH P. COLLINS, the defendant, was familiar
with all of the terms of the PPA, including the economic interest
BAWAG had in Refco through the right conferred upon BAWAG to
participate in the proceeds of a sale or public offering of Refco
-- or convert its Participation Right into ownership shares of
Refco -- as well as RGHI's role guaranteeing Refco's performance
and securing BAWAG's Participation Right under the PPA.  COLLINS
was also aware that the PPA required Refco to execute amended
corporate documentation to reflect the existence of the PPA and
that incorporated certain terms of the PPA.

25.  Indeed, as contemplated by the PPA, JOSEPH P.
COLLINS, the defendant, drafted and caused to be drafted,
simultaneously with the drafting of the PPA, the two agreements
through which RGHI, a party related to Refco, agreed to guarantee
the performance of Refco under the PPA and to secure BAWAG's
Participation Right.  As part of the drafting of the PPA, the Law
Firm's attorneys also prepared amended corporate documentation
for Refco that reflected the existence of the PPA and
incorporated into the governance of Refco some of its terms.

26.  As set forth in paragraph 23 above, under the
terms of the PPA, BAWAG made two contributions to Refco totaling
approximately $467,480,000.  At the time of the payments, under
the terms of the PPA, BAWAG had the right to convert this

Participation Right into ownership shares in Refco.  Also as a result of the payments, Refco and BAWAG executed Refco's amended corporate documentation that had been prepared as part of the PPA.  As set forth in paragraph 32 below, COLLINS helped conceal this amended corporate documentation from potential investors in Refco, thereby hiding the terms of the PPA from them.

27.  As further set forth in paragraphs 32, 36, 37, 39 and 41 below, JOSEPH P. COLLINS, the defendant, schemed generally with Phillip R. Bennett to conceal the existence of the terms of the PPA from potential investors in Refco because COLLINS and Bennett knew such terms were material to potential investors. Through affirmative misrepresentations and omissions, COLLINS and others concealed from Refco's potential investors: (1) the terms of the Participation Right conferred upon BAWAG under the PPA and the resulting obligation Refco would have to BAWAG upon the sale or public offering of Refco; (2) the role that RGHI, a related party to Refco, played in guaranteeing and securing BAWAG's Participation Right; (3) BAWAG's ability to convert its Participation Right into ownership shares in Refco; (4) the existence of at least $350 million in related party debt owed from RGHI to Refco in or about 2002, less than half of which was disclosed in Refco's audited 2002 financial statements; and (5) that Refco required an infusion of more than $450 million in cash from BAWAG to conduct its business.

## The Fraudulent Leveraged Buyout Transaction

28. As contemplated by the PPA, Refco management made efforts to sell Refco soon after the PPA was executed. In or about 2003, Refco hired an investment bank ("Investment Bank A") to assist in selling the Company. Refco asked Investment Bank A to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested. After these initial efforts to sell Refco failed, Refco directed Investment Bank A to look for other purchasers for the company with the understanding that it would later hold an IPO.

29. In or about 2003, Refco, assisted by JOSEPH P. COLLINS, the defendant, began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout (the "LBO") was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million in cash; simultaneously, Refco sold approximately $600 million in notes and obtained approximately $800 million in financing from a syndicate of banks. When the transaction was completed, RGHI was left with a 43 percent ownership interest in Refco.

30. In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm represented both Refco and RGHI. In relation to this representation, COLLINS drafted and negotiated representations that appeared in documents and correspondence provided to Thomas H. Lee Partners and discussed the transaction with persons representing Thomas H. Lee Partners. In such documents, correspondence, and discussions, COLLINS made representations relating to the financial condition of Refco, among other matters, that COLLINS knew to be false and misleading and omitted information necessary to make his statements concerning the same not misleading. For example, among other things, COLLINS concealed from Thomas H. Lee Partners the existence of the terms of the PPA.

31. In connection with the LBO transaction, Phillip R. Bennett, through RGHI, purchased from BAWAG the Participation Right that BAWAG had previously obtained in connection with the PPA. Bennett acquired the Participation Right by purchasing all of the stock of the BAWAG entity that owned the Participation Right. According to agreements drafted, and terms negotiated by, JOSEPH P. COLLINS, the defendant, the purchase price for this acquisition was approximately $676 million. The purchase price was paid partly out of proceeds of the LBO transaction paid to RGHI.

18

**Lies To Thomas H. Lee Partners**

**Lies about the PPA and payments to BAWAG**

32.    In connection with the negotiations with Thomas H. Lee Partners, by no later than in or about March 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, in addition to agreeing to conceal from Thomas H. Lee Partners the terms of the PPA, also agreed to conceal that Bennett, through RGHI, was planning to pay approximately $676 million to purchase the Participation Right from BAWAG, including using approximately $566 million from the proceeds of the LBO transaction. Accordingly, Bennett and COLLINS both took affirmative steps to conceal the existence of the terms of the PPA and of the agreements relating to RGHI's acquisition of the Participation Right for the stated reason that investors would pay less money for Refco if they were aware of such terms.  Such steps included, but were not limited to, Bennett and COLLINS making false representations directly to Thomas H. Lee Partners, and COLLINS himself specifically directing others not to disclose information relating to RGHI's buyout of the Participation Right from BAWAG. Furthermore, when asked by Thomas H. Lee Partners to further amend the corporate documentation for Refco, COLLINS prepared new amended corporate documentation that fraudulently concealed the fact that previous corporate documentation had been executed by

19

BAWAG and Refco as part of the PPA, as set forth in paragraph 26 above.

33.   JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett made similar misrepresentations to Thomas H. Lee Partners that misled Thomas H. Lee Partners about the amount of money that BAWAG was to receive at the closing of the LBO transaction. Specifically, COLLINS and Bennett represented that BAWAG was receiving many hundreds of millions of dollars less than the approximately $952 million that BAWAG was to receive for its various interests in Refco and the approximately $390 million that BAWAG was to receive as repayment of the overdraft discussed in paragraph 37 below.

### Lies about related party debt and related party transactions

34.   JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and others also made affirmative representations and drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives to believe that RGHI owed Refco no more than approximately $108 million, all of which amount COLLINS and Bennett knowingly and falsely represented to Thomas H. Lee Partners would be repaid by the time the LBO transaction closed.  In fact, by the time the LBO transaction closed, COLLINS knew that RGHI actually owed Refco at least $1 billion (which had been hidden from Refco's auditors through the Round Trip Loan Transactions), and that even after the LBO, RGHI would continue

20

to owe Refco at least $300 million.  Accordingly, COLLINS
continued to help Bennett conceal the existence of this related
party debt by documenting and causing to be documented year-end
and quarter-end Round Trip Loan Transactions similar to those
described above in the following approximate amounts at the same
time that COLLINS was negotiating the terms of the LBO
transaction:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2004 | $720 million |
| May 2004 | $700 million |

35.  In connection with the LBO transaction, Refco
caused its audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  As
JOSEPH P. COLLINS, the defendant, well knew, those audited
financial statements were false and misleading in that they,
among other things, hid the size of the related party RGHI
Receivable, which at the end of January 2004 was, but for the
Round Trip Loan Transactions, at least $1 billion, whereas the
financial statements falsely and misleadingly reported that there
was no related party debt, and that the "$105 million due from
related parties, included in loans receivable at February 28,
2003, was received by February 29, 2004."

36.  As part of the LBO, Thomas H. Lee Partners made
numerous inquiries to JOSEPH P. COLLINS, the defendant, and

Phillip R. Bennett, about the existence of related party transactions involving Refco. COLLINS and others made representations and drafted documents (or caused other Law Firm attorneys to draft documents), and negotiated contract terms that concealed from Thomas H. Lee Partners and its representatives the following related party transactions, among others, which Thomas H. Lee Partners and its representatives asked be disclosed:

       a.   The Round Trip Loan Transactions, which included documented loans made simultaneously by Refco to customers and by the same customers to RGHI at Refco's fiscal year-end and quarter-ends that, taken together, effectuated a related party transaction between Refco and RGHI;

       b.   The guarantees from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to guarantee the repayment of hundreds of millions of dollars in loans that customers made to RGHI, a related party, in connection with the Round Trip Loan Transactions;

       c.   The indemnification agreements from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to indemnify customers making loans to RGHI, a related party, against claims made against them, or losses suffered by them, in connection with such loans;

d.    Payments made by RGHI to Refco in connection with the Round Trip Loan Transactions in order to pay down, temporarily, the receivable owed to Refco by RGHI; and

e.    The agreements through which RGHI agreed to guarantee the performance of Refco under the terms of the PPA and to secure BAWAG's right to participate in the proceeds of the future sale of Refco under the same agreement.

### Lies about $500 million in working capital at Refco

37.    JOSEPH P. COLLINS, the defendant, and others also drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives into believing that Refco possessed approximately $500 million in excess working capital.

a.    Under contract terms that COLLINS negotiated, Refco was required to deposit $500 million in working capital it purportedly possessed into a segregated account at BAWAG until the LBO transaction closed, at which time the money was to be distributed to Bennett's company, RGHI.

b.    In reality, as COLLINS well knew, the segregated account established at BAWAG for purposes of holding the $500 million was not working capital, but was funded by, among other sums, an overdraft from BAWAG totaling approximately $390 million.

c.    At closing, COLLINS furthered this misrepresentation by approving closing documents that falsely

23

reported that the $500 million in purportedly excess working capital would be transferred to an RGHI account at a bank other than BAWAG, when in fact, as COLLINS well knew, the $500 million was going to remain at BAWAG and be used, in part, to repay the $390 million overdraft.   COLLINS knew that if the true nature of these payments had been disclosed, Thomas H. Lee Partners would have learned of the existence of the terms of the PPA, the large capital infusions Refco received under the terms of the PPA, the large payments being made to BAWAG, and that $390 million of the $500 million that had been represented to Thomas H. Lee Partners as excess working capital and profits of Refco was in fact money borrowed from BAWAG.

### Lies To The Bank Syndicate

38.   At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $800 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco's borrowing from a bank syndicate.

39.   In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and misleading information to be provided to the bank syndicate, including HSBC Bank USA, N.A., that was raising the approximately

$800 million in loans for Refco as part of the LBO transaction and its representatives:

a.    Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

b.    Refco's audited financial statements for the fiscal year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 35;

c.    Representations that Refco had not suffered significant historical customer losses; and

d.    Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

**Lies To The Note Purchasers**

40.    At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $600 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco selling 9% Senior Subordinated Notes due 2012 to private investors (the "LBO Notes").

41.    In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and

misleading information to be provided to the underwriters and
purchasers of the LBO Notes and their advisers:

       a.   Contract documents relating to the LBO
transaction that failed to disclose the guaranty and indemnity
agreements that Bennett entered into in connection with the Round
Trip Loan Transactions;

       b.   Refco's audited financial statements for the
year ended February 29, 2004, containing the same false and
misleading statements described above in paragraph 35;

       c.   Representations that Refco did not suffer
significant historical customer losses; and

       d.   Omissions relating to the terms of the PPA
and the planned payment of $952 million to BAWAG in connection
with the LBO transaction.

### RGHI's Continued Debt To Refco After The LBO

    42.  RGHI used the proceeds of the fraudulent LBO
transaction in part to pay down a portion of the approximately
more than $1 billion RGHI owed to Refco at the time of the
transaction.  Even after the proceeds were applied in this
manner, however, RGHI continued to owe Refco a substantial sum.
Indeed, after the transaction proceeds were applied, RGHI owed
Refco more than at least approximately $300 million, as JOSEPH P.
COLLINS, the defendant, well knew.

## Securities Fraud in Connection with the Fraudulent Leveraged Buyout Transaction

43.    The LBO transaction included Refco raising approximately $600 million through the sale of the LBO Notes. The LBO Notes were sold privately pursuant to an offering circular, which provided prospective purchasers of the LBO Notes material information about Refco's business and finances.  Refco completed the sale of the LBO Notes in or about August 2004.

44.    JOSEPH P. COLLINS, the defendant, advised Refco in connection with the sale of the LBO Notes.  To that end, COLLINS participated in the drafting of the offering circular that was provided to prospective purchasers of the LBO Notes.

45.    Specifically, JOSEPH P. COLLINS, the defendant, participated in drafting two sections of the offering circular entitled "Risk Factors" and "Certain Relationships and Related Transactions," among other sections.

46.    The "Risk Factors" section purported to warn potential investors about myriad risks relating to Refco's business, including, among other things: indebtedness and cash flow needs; credit risks; and conflicts of interest on the part of controlling members of Refco, including Bennett.

47.    As JOSEPH P. COLLINS, the defendant, well knew, the "Risk Factors" section of the offering circular contained material misstatements and omissions.  COLLINS was aware at the time that he participated in the drafting of the offering

27

circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Bennett, Refco's Chief Executive Officer.  Furthermore, COLLINS knew that Refco, in connection with the quarter-end and year-end Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers.  The offering circular was materially misleading and omissive, as COLLINS knew, because it failed to disclose risks posed to Refco's business by: (1) Refco being owed hundreds of millions of dollars by a related party, RGHI, that was solely owned and operated by Bennett; and (2) Refco periodically incurring hundreds of millions of dollars in obligations guaranteeing and indemnifying the performance of a related party, RGHI, that was solely owned and operated by Bennett.

48.   The "Certain Relationships and Related Transactions" section of the offering circular included a discussion of various agreements and documents relating to the LBO transaction.  Specifically, that section disclosed, among other things: various ownership interests and rights in Refco that would exist after the LBO was completed; the existence of a management agreement between Refco and an affiliate of Thomas H.

Lee Partners pursuant to which Refco would pay the affiliate for consulting services and indemnify the same; and an agreement that would entitle management, after the close of the LBO transaction, to receive ownership interests in Refco.

49.    As JOSEPH P. COLLINS, the defendant, well knew, the "Certain Relationships and Related Transactions" section of the offering circular contained material misstatements and omissions.  COLLINS was aware at the time that he participated in the drafting of the offering circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Phillip R. Bennett, Refco's Chief Executive Officer.  Furthermore, COLLINS knew that Refco, in connection with the quarter-end and year-end Round Trip Loan Transactions, regularly loaned hundreds of millions of dollars to third parties that, in turn, were obligated to loan equal amounts simultaneously to RGHI, an entity controlled by Bennett. Finally, COLLINS knew that Refco, again in connection with the Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers.  As COLLINS well knew, RGHI's indebtedness to Refco, the loan transactions that involved Refco's loaning hundreds of millions

of dollars through third party customers, and the
indemnifications and guaranties that Refco extended with regard
to RGHI's performance in relation to those loans were all related
party transactions.  As COLLINS understood, they were related
party transactions both because RGHI and Refco were related
parties through RGHI's ownership interest in Refco and also
because Bennett was simultaneously an officer of Refco and an
owner-officer of RGHI.  COLLINS knew that these related party
transactions ought to have been disclosed in the "Certain
Relationships and Related Transactions" section and yet omitted
them from that section when participating in its drafting.

### Refco Plans to Offer Notes Publicly and Take Refco Public

50.  At all times during the negotiations relating to
the LBO transaction, JOSEPH P. COLLINS, the defendant, understood
that Refco planned to register approximately $600 million of
senior subordinated notes under the Securities Act of 1933
("Securities Act") and to offer to exchange them for the LBO
Notes issued at the time of the LBO transaction.  The
registration of notes permitted them to be traded publicly.
Refco registered the notes under the Securities Act (the
"Registered Notes") on or about April 6, 2005, pursuant to a Form
S-4 registration statement filed with the SEC.

51.  At all times during negotiations of the LBO
transactions, JOSEPH P. COLLINS, the defendant, also understood

that Phillip R. Bennett and others intended to sell a portion of Refco to the public through an IPO of stock sometime after the LBO transaction closed.  The IPO occurred on or about August 10, 2005.

52.  During the entire period after the close of the LBO transaction and while efforts were being made to register the Registered Notes and to accomplish Refco's IPO, Refco's finances continued to be manipulated through quarter-end and year-end Round Trip Loan Transactions designed to hide the existence and size of the RGHI Receivable from Refco's auditors and investors. JOSEPH P. COLLINS, the defendant, continued to be responsible for drafting, or causing to be drafted, the documents that effectuated the transactions. COLLINS, along with other Law Firm attorneys acting at COLLINS's direction, drafted documents for the quarter- and year-end Round Trip Loan Transactions, similar to those described above, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Aug. 2004 | $485 million |
| Nov. 2004 | $545 million |
| Feb. 2005 | $345 million |
| May 2005 | $450 million |

53.  In addition, in February 2005, Refco engaged in an additional BAWAG Round Trip Loan Transaction in the amount of approximately $250 million.

54.    From in or about 2000 until in or about October 2005, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted documents for at least 17 separate Round Trip Loan Transactions -- effecting loans from Refco to RGHI, through third party customers, of more than approximately $5.5 billion -- each of which concealed the existence of the large related party debt owed from RGHI to Refco from Refco's investors, potential investors, banks, and auditors.

## Refco's Public Filings And Publicly Traded Securities

55.    In connection with the upcoming IPO, Refco filed registration statements on Forms S-4 and S-1 with the SEC on or about April 6, 2005, and August 8, 2005, respectively.  Each form required the disclosure of, among other things: (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco.  These disclosures were required in order to apprise investors of, among other things, potential conflicts of interest by management.

56.    The Form S-4 registration statement was based on the offering circular that JOSEPH P. COLLINS, the defendant, helped draft in connection with Refco's sale of the LBO Notes in or about August 2004.  The Form S-4 registration statement, like the offering circular, contained sections entitled "Risk Factors" and "Certain Relationships and Related Transactions."  The Form

32

S-4 registration statement likewise contained the material
misstatements and omissions included in the offering circular, as
described in paragraphs 47 and 49 above.  In addition to those
material misstatements and omissions, the Form S-4 registration
statement also contained Refco's audited financial statements,
which likewise failed to reflect any of the related party
transactions described above, including the debt owed to Refco
from RGHI.

        57.  JOSEPH P. COLLINS, the defendant, also
participated in the drafting of Form S-1 registration statement.
Among other sections, COLLINS helped draft the section entitled
"Risk Factors."  Refco was required in this section to discuss
the most significant factors that might make an investment in
Refco common stock speculative or risky.  As COLLINS well knew,
this section of the Form S-1 registration statement contained
material misstatements and omissions because it failed to
disclose that: (1) Refco was owed hundreds of millions of dollars
by a related party, RGHI, that was solely owned and operated by
Bennett; and (2) as part of the Round Trip Loan Transactions,
Refco periodically incurred hundreds of millions of dollars in
obligations guaranteeing and indemnifying the performance of a
related party, RGHI, that was solely owned and operated by
Bennett.  Despite his participation in the drafting of the "Risk
Factors" section, COLLINS did not include these significant

undisclosed additional risk factors.  In addition to those
material misstatements and omissions, the Form S-1 registration
statement also contained Refco's audited financial statements,
which likewise failed to reflect any of the related party
transactions, including the debt owed to Refco from RGHI.

### Refco's August 2005 IPO

58.  On or about August 10, 2005, the public bought
approximately $583 million of Refco's common stock.  Following
the IPO, Refco's common stock was listed on the New York Stock
Exchange under the ticker symbol "RFX."

### End Of Quarter Round Trip Loan Transaction In August 2005

59.  In or about late August 2005, after the completion
of its IPO, Refco engaged in a final Round Trip Loan Transaction
in the amount of approximately $420 million with a Refco customer
that temporarily transformed all or part of the RGHI Receivable
into a receivable from that customer.  On or about August 31,
2005, after the end of Refco's second quarter, the approximately
$420 million Round Trip Loan Transaction was reversed.

### Refco's Public Disclosure Of Related Party Debt

60.  In or about early October 2005, an employee of
Refco who was not a coconspirator discovered that a receivable
from RGHI of approximately $430 million existed on Refco's books.
This discovery was brought to the attention of the audit
committee of Refco's board of directors, which demanded repayment

34

of the debt by Phillip R. Bennett.  Bennett repaid Refco

approximately $430 million on or about October 10, 2005, having

received an emergency loan in that approximate amount from BAWAG.

61.  On or about October 10, 2005, Refco issued a press

release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

62.  Following Refco's announcement, the market price

of Refco stock plummeted, resulting in an aggregate decline in

shareholder value and market capitalization of more than

approximately $1 billion.

63.  On or about October 17, 2005, Refco, Inc. and

twenty-three of its subsidiaries or affiliates filed a petition

in bankruptcy in the United States Bankruptcy Court for the

Southern District of New York.  Refco's common stock was

subsequently delisted by the New York Stock Exchange.

35

**THE CONSPIRACY**

64.   From at least as early as in or about 1997 up to
in or about October 2005, in the Southern District of New York
and elsewhere, JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, Robert C. Trosten, Tone N. Grant, and others known and
unknown unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States, namely: (a) to commit
fraud in connection with the purchase and sale of securities
issued by Refco, in violation of Sections 78j(b) and 78ff of
Title 15, United States Code, and Section 240.10b-5 of Title 17,
Code of Federal Regulations; (b) to make and cause to be made
false and misleading statements of material fact in reports and
documents required to be filed with the SEC under the Securities
Exchange Act of 1934 (the "Exchange Act"), and the rules and
regulations promulgated thereunder, in violation of Title 15,
United States Code, Sections 78o(d) and 78ff; (c) to make and
cause to be made false statements in a registration statement
filed under the Securities Act, in violation of Title 15, United
States Code, Section 77x; (d) to commit wire fraud, in violation
of Section 1343 of Title 18, United States Code; (e) to make and
cause to be made false statements and omissions to Refco's
auditors, in violation of Title 15, United States Code, Sections

36

78m and 78ff, and Title 17, Code of Federal Regulations, Section
240.13b2-2; (f) to commit bank fraud, in violation of Section
1344 of Title 18, United States Code; and (g) to commit money
laundering, in violation of Section 1957(a) of Title 18, United
States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

65.   It was a part and object of the conspiracy that
JOSEPH P. COLLINS, the defendant, and others known and unknown
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons and
entities, in connection with the purchase and sale of notes

37

issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

66.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

67.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

**Wire Fraud**

68.   It was further a part and object of the conspiracy
that JOSEPH P. COLLINS, the defendant, and others known and
unknown unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, all in violation of Title 18, United States Code,
Section 1343.

**Material Misstatements To Auditors**

69.   It was further a part and object of the conspiracy
that Phillip R. Bennett, being an officer and director of Refco,
an issuer obligated to file reports pursuant to section 15(d) of
the Exchange Act and with a class of securities registered
pursuant to section 12 of the Exchange Act, unlawfully, willfully
and knowingly, directly and indirectly, and with the assistance
of JOSEPH P. COLLINS, the defendant, (a) made and caused to be
made materially false and misleading statements; and (b) omitted
to state, and caused others to omit to state, material facts
necessary in order to make statements made, in light of the
circumstances under which they were made, not misleading to

39

accountants in connection with (i) audits, reviews and
examinations of the financial statements of Refco required to be
made under the Exchange Act; and (ii) the preparation and filing
of documents and reports required to be filed with the SEC
pursuant to rules and regulations promulgated by the SEC, in
violation of Title 15, United States Code, Section 78m, and Title
17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

70.  It was further a part and object of the conspiracy
that JOSEPH P. COLLINS, the defendant, and others known and
unknown unlawfully, willfully and knowingly, would and did
execute, and attempt to execute, a scheme and artifice to defraud
a financial institution and to obtain moneys, funds, credits,
assets, securities and other property owned by, and under the
custody and control of, a financial institution, whose deposits
were insured by the Federal Deposit Insurance Corporation, by
means of false and fraudulent pretenses, representations and
promises, all in violation of Title 18, United States Code,
Section 1344.

### Money Laundering

71.  It was further a part and object of the conspiracy
that certain members of Refco management, with the assistance of
JOSEPH P. COLLINS, the defendant, in an offense involving and
affecting interstate and foreign commerce, unlawfully, willfully

40

and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

72.    Among the means and methods by which JOSEPH P. COLLINS, the defendant, and his coconspirators would and did carry out the conspiracy were the following:

a.    Refco management, with the full knowledge of JOSEPH P. COLLINS, the defendant, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, transferred losses incurred by Refco to Bennett's company, RGHI.

c.    JOSEPH P. COLLINS, the defendant, helped Refco management conceal the size and related party nature of debt owed by RGHI to Refco by effectuating Round Trip Loan Transactions on behalf of Refco over fiscal year-end and fiscal quarter-end periods to move the RGHI Receivable to one or more Refco customers.

41

d.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, caused Refco to file materially false and fraudulent statements with the SEC.

e.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, helped Refco management make and cause to be made material false statements and omissions to Refco's auditors.

f.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and their coconspirators concealed from Thomas H. Lee Partners and its representatives the size of the related party debt owed to Refco by RGHI, associated related party transactions, and the terms of Refco's relationship with, and obligations to, BAWAG;

g.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten and their coconspirators, used facilities of interstate commerce, including the use of interstate telephone calls, email, and interstate wire transfers, in furtherance of the objects of the conspiracy.

### Overt Acts

73.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about 1997, Refco management, with the full knowledge of JOSEPH P. COLLINS, the defendant,

42

misrepresented to the public the size of customer losses for which Refco was responsible.

b.  On or about February 26, 2001, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett executed a guaranty letter on behalf of Refco that JOSEPH P. COLLINS, the defendant, prepared regarding an approximately $200 million loan from a Refco customer to RGHI.

c.  On or about February 26, 2001, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett executed an indemnity letter on behalf of Refco that JOSEPH P. COLLINS, the defendant, prepared regarding an approximately $200 million loan from a Refco customer to RGHI.

d.  On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

e.  On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

43

f.    By no later than in or about March 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, agreed to conceal the terms of the PPA from Thomas H. Lee Partners and to conceal RGHI's approximately $676 million buy out of BAWAG's right to participate in a sale of Refco under the terms of that agreement.

g.    During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, misled a representative of Thomas H. Lee Partners about the nature and size of the receivables owed to Refco by related parties at the time the LBO transaction was being negotiated.

h.    During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, concealed from a representative of Thomas H. Lee Partners the role of Phillip R. Bennett in guaranteeing and indemnifying loans made by third parties to RGHI in connection with period-end and year-end Round Trip Loan Transactions.

i.    In or about April 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett met with representatives of Thomas H. Lee Partners in New York, New York and made misrepresentations relating to the financial condition of Refco to those representatives.

j.    On or about April 13, 2004, JOSEPH P. COLLINS caused an email to be sent from the Chicago, Illinois offices of

44

the Law Firm to New York, New York attaching a document
containing misrepresentations relating to the financial condition
of Refco.

k.    On or about May 6, 2004, JOSEPH P. COLLINS,
the defendant, caused two emails to be sent from the New York,
New York offices of the Law Firm to a representative of Thomas H.
Lee Partners located in Texas that concealed the existence of the
terms of various agreements, including agreements concerning
related party transactions, the disclosure of which was requested
by Thomas H. Lee Partners.

l.    In or about June 2004, JOSEPH P. COLLINS, the
defendant, directed others not to disclose RGHI's planned
approximately $676 million buyout from BAWAG of its Participation
Right under the PPA.

m.    On or about June 7, 2004, JOSEPH P. COLLINS,
the defendant, caused an email to be sent from the New York, New
York office of the Law Firm to representatives of Thomas H. Lee
Partners in Texas that concealed the existence of the terms of
various agreements, including agreements concerning related party
transactions, the disclosure of which was requested by Thomas H.
Lee Partners.

n.    On or about February 23, 2005, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed a guaranty letter on behalf of Refco that was

45

prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

o.    On or about February 23, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

p.    On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

q.    On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

(Title 18, United States Code, Section 371.)

46

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

74.   The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

75.   From at least as early as in or about 1997 through in or about 2004, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

47

sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

76.   The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

77.   From at least as early as in or about 1997 through in or about October 2005, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of

48

business which operated and would operate as a fraud and deceit
upon persons and entities, in connection with the purchase and
sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

### COUNT FOUR

### (False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

78.   The allegations contained in paragraphs 1 through
63, 72 and 73 of this Indictment are repeated and realleged as if
fully set forth herein.

79.   On or about July 19, 2005, in the Southern
District of New York and elsewhere, JOSEPH P. COLLINS, the
defendant, unlawfully, willfully, and knowingly made and caused
to be made statements in a report and document required to be
filed with the SEC under the Exchange Act, and the rules and
regulations promulgated thereunder, which statements were false
and misleading with respect to material facts, to wit, COLLINS
and others caused Refco to submit, and aided and abetted the
submission of, in New York, New York, to the SEC in Washington,
D.C., Refco's annual report on Form 10-K.

(Title 15, United States Code, Sections 78o(d) and 78ff;
Title 17, Code of Federal Regulations, Section 240.15d-2;
and Title 18, United States Code, Section 2.)

49

## COUNTS FIVE AND SIX

### (False Filing With The SEC – Securities Act)

The Grand Jury further charges:

80.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

81.  On or about the dates specified below, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, COLLINS and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x; and Title 18, United States Code, Section 2.)

50

## COUNTS SEVEN THROUGH TEN

### (Wire Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

83.  On or about the dates set forth below, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| SEVEN | April 13, 2004 | Email from Chicago, Illinois office of the Law Firm to New York, New York attaching clean and marked versions of April 13, 2004 letter to Phillip R. Bennett from Thomas H. Lee Partners |
| EIGHT | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning indemnifications |
| NINE | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning material contracts |

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| TEN | June 7, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas and representatives of the bank syndicate and LBO Note purchasers |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT ELEVEN

### (Bank Fraud)

The Grand Jury further charges:

84.   The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

85.   On or about August 5, 2004, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC Bank USA, N.A., and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC Bank USA, N.A., whose deposits were insured by the Federal Deposit Insurance

52

Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE THROUGH TEN

86.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five and Six of this Indictment; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine and Ten of this Indictment, JOSEPH P. COLLINS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to at least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses.

53

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE AND ELEVEN

87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18, United States Code, Section 1344, as alleged in Counts One and Eleven of this Indictment, JOSEPH P. COLLINS, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses, including but not limited to at least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses.

## SUBSTITUTE ASSETS PROVISION

88.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

54

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982 and Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said

defendant up to the value of the forfeitable property described

above.

   (Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
             United States Code, Section 2461.)


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

55