UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                 :

UNITED STATES OF AMERICA,      :

           vs.                   :     **ECF Case**

JOSEPH P. COLLINS,           :     No. 07 Cr. 1170 (LBS)

           Defendant.       :

------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT JOSEPH P. COLLINS' PRE-TRIAL MOTIONS</u>



1114 AVENUE OF THE AMERICAS, NEW YORK, N.Y. 10036-7798

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

FACTUAL AND PROCEDURAL BACKGROUND.......................................... 1

    The Indictment ........................................................................................... 4

POINT I         THE GOVERNMENT SHOULD BE REQUIRED
                TO PRODUCE A BILL OF PARTICULARS ..................................... 6

    A.     The Government Should Be Required to
           Particularize its Forfeiture Allegations ............................ 6

    B.     The Government Should Be Required To
           Particularize Its Fraud Allegations.................................... 10

POINT II       THE RESULTS OF THE POLYGRAPH EXAMINATION
                SHOULD BE ADMITTED INTO EVIDENCE.................................. 12

    A.     The Proffered Polygraph Evidence Is Admissible
           under *Daubert v. Merrell Dow Pharmaceuticals* ............... 13

         1.     The Proffered Evidence is Relevant ....................... 14

         2.     The Proffered Evidence is
               Admissible Under Rule 702 and *Daubert*................ 15

             a.     The Control Question Polygraph Technique is
                  Scientifically Valid and Has Been Rigorously Tested................ 16

             b.     The Science of Polygraphy Has Been Subjected
                  to Extensive Peer Review and Publication .................. 17

             c.     Polygraphy is Known to Have a Low Error Rate ........................ 18

             d.     Well-Established Standards Govern
                  the Use of the Polygraph Technique............................ 18

             e.     The Control Question Technique is
                  Accepted in the Relevant Scientific Community.......................... 19

    B.     Case Law Supports the Admission of this Polygraph Evidence.......................... 19

POINT III      THE GOVERNMENT SHOULD BE REQUIRED TO
                PRODUCE *BRADY* MATERIAL IMMEDIATELY AND
                *GIGLIO* AND 3500 MATERIAL AT LEAST
                TWO MONTHS BEFORE TRIAL ..................................................... 20

    A.     *Brady* Material Should Be Produced Immediately ............................ 20

    B.     The Government Should Be Required To Produce
           *Giglio* Material At Least Two Months Before Trial........................... 23

    C.     The Government Should Be Required To
           Produce 3500 Material Two Months Before Trial............................. 24

CONCLUSION................................................................................................. 27

# TABLE OF AUTHORITIES

**Page**

## CASES

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................... 21, 22, 25, 27

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ....................................... *passim*

*DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006) ......................................................... 22

*Frye v. United States*, 293 F. 1023 (D.C. Cir. 1923) ....................................................... 14

*In re United States (Coppa)*, 267 F.3d 132 (2d Cir. 2001) .............................................. 25

*Kyles v. Whitley,* 514 U.S. 419 (1995) ............................................................................. 25

*Lee v. Martinez*, 136 N.M. 166 (2004) ........................................................................... 20

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) .............................................................. 22

*Meyers v. Arcudi*, 947 F. Supp. 581 (D. Conn. 1996) .................................................... 14

*United States v. All Funds on Deposit at: Citigroup Smith Barney*, No. 06 Civ. 3730 (NGG), 2007 WL 2687660 (E.D.N.Y. Sept. 10, 2007) ........................................... 8

*United States v. All Assets of Blue Chip Coffee, Inc.,* 836 F. Supp. 104 (E.D.N.Y. 1993) .............................................................................................................. 9

*United States v. Bellomo*, 944 F. Supp. 1160 (S.D.N.Y. 1996) ...................................... 14

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................. 12

*United States v. Black*, 526 F. Supp. 2d 870 (N.D. Ill. 2007) .................................... 9, 14

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ...................................... 11, 12

*United States v. Caine*, 270 F. Supp. 801 (S.D.N.Y. 1967) ........................................... 11

*United States v. Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004) .................................... 14

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) ................................................. 8

*United States v. Cordoba*, 104 F.3d 225 (9th Cir. 1997) ................................................ 14

*United States v. Crumby*, 895 F. Supp. 1354 (D. Ariz. 1995) ................................ 17, 18, 19, 20

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) .............................................. 10

*United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996) ........................................ 11

*United States v. Galbreth*, 908 F. Supp. 877 (D.N.M. 1995) .............................. *passim*

*United States v. Grammatikos*, 633 F.2d 1013 (2d Cir. 1980) ......................................... 7

*United States v. Hayward*, 05 Cr. 390 (SHS) .............................................................. 26

*United States v. Ianniello*, 621 F. Supp. 1455 (S.D.N.Y. 1985) ..................................... 7

*United States v. Konefal*, 566 F. Supp. 698 (N.D.N.Y. 1983) ...................................... 11

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995) .................................................... 14

*United States v. Lech*, 895 F. Supp. 582 (S.D.N.Y. 1995) ............................................ 14

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356
(S.D.N.Y. Dec. 29, 2000) ...................................................................................... 11, 12, 26

*United States v. Mango*, No. 96 Cr. 632, 1997 WL 222367
(N.D.N.Y. May 1, 1997) ...................................................................................................... 11

*United States v. Messina*, 131 F.3d 36 (2d Cir. 1997) ........................................................ 13, 14

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................ 11

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974) ........................................................ 26

*United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989) ................................................ 19, 20

*United States v. Posado*, 57 F.3d 428 (5th Cir. 1995) .................................................................. 14

*United States v. Rigas,* 02 Cr. 1236 (LBS) ................................................................................ 26

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008)....................................................... 22, 24

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ...................................................... 21, 22

*United States v. Rodriguez,* 538 F. Supp. 2d 674 (S.D.N.Y. 2008).............................................. 22

*United States v. Rogers*, 617 F. Supp. 1024 (D. Colo. 1985) ............................................... 10, 11

*United States v. Santos*, 128 S. Ct. 2020 (2008) .......................................................................... 9

*United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005) .......................................... 9

*United States v. Smith*, 869 F.2d 348 (7th Cir. 1989) ................................................................. 18

*United States v. Strawberry*, 892 F. Supp. 519 (S.D.N.Y. 1995) ............................................... 25

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) ................................................................ 12

*United States v. Warshak*, No. 06 Cr. 0111 (SAS), 2008 WL 2078072
(S.D. Ohio May 13, 2008) .................................................................................................... 9

*United States v. Wittig*, No. 03-40142-JAR, 2007 WL 1875677
(D. Kan. June 27, 2007)........................................................................................................ 9

## STATUTES

18 U.S.C. § 3500.............................................................................................................................. 1

18 U.S.C. § 981................................................................................................................................ 8, 9

18 U.S.C. § 982................................................................................................................................ 8, 9

28 U.S.C. § 2461.............................................................................................................................. 8

Fed. R. Civ. P. 9 .............................................................................................................................. 10

Fed. R. Crim. P. 7 ........................................................................................................................... 7, 10

Fed. R. Crim. P. 32.2 ....................................................................................................................... 8, 10

Fed. R. Evid. 702 ......................................................................................................... 1, 14, 15, 16, 20

**TABLE OF AUTHORITIES**
**(continued)**

<u>**Page**</u>

Fed. R. Evid. 401 ............................................................................................................... 15, 18

Defendant Joseph Collins respectfully submits this Memorandum of Law in support of his pre-trial motions.  For the reasons that follow, Collins seeks (1) a bill of particulars with respect to the forfeiture and fraud allegations of the indictment; (2) to admit the results of a polygraph examination, pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); and (3) production of *Brady* material and early production of material required to be disclosed pursuant to *Giglio* and 18 U.S.C. § 3500.

## FACTUAL AND PROCEDURAL BACKGROUND

Collins, a partner at the law firm Mayer Brown, stands accused of aiding and abetting a major fraud carried out by one his principal clients, the commodities brokerage firm known as Refco.  While the allegations in the case are complex and wide-ranging, the central question that they present is straightforward:  Did Collins know that Refco was carrying an undisclosed inter-company debt of some $1.1 billion, owed to the company by its corporate parent?  The government charges that Collins knew about this debt, and that he helped to hide it from the purchasers of the company and its shares.

The Refco fraud was discovered in or about October 2005, just several months after an initial public offering of Refco's stock, when a review of Refco's books revealed an undisclosed receivable from Refco's former corporate parent in the amount of approximately $430 million. Indictment ¶¶ 60-63.  Refco collapsed shortly after announcing that its publicly filed financial statements for the fiscal years 2002 through 2005 were unreliable.  The company's stock-price plummeted, customers emptied their accounts and, within a week, Refco filed for bankruptcy.

On the heels of Refco's collapse, the United States Attorney for the Southern District of New York, the Commodity Futures Trading Commission, the Securities and Exchange Commission and the court-appointed Bankruptcy Examiner for the Refco debtors, among others, launched intensive parallel investigations.  Phillip Bennett, Refco's Chief Executive Officer and

President, was arrested on October 11, 2005, based in part on information provided by high-ranking Refco executive Santo Maggio, who was already cooperating with the government. Transcript, *United States v. Tone Grant*, No. 05 Cr. 1192 (NRB) ("Grant Tr.") at 1604. Robert Trosten, Refco's former Chief Financial Officer, also began cooperating in October 2005 and, like Maggio, proffered substantial information to the government about others involved in the fraud. Grant Tr. at 773-74, 11-29, 1132-35.

Bennett was indicted on November 10, 2005. In late October 2006, the government filed a superseding indictment expanding the charges against Bennett and adding Trosten as a defendant (after he apparently turned down the government's pre-indictment offer of a cooperation agreement). Grant Tr. 774-75. In January 2007, the government secured a second superseding indictment that added a further defendant, former Refco president Tone Grant. An initial trial date for a joint trial against all three defendants was set for October 9, 2007. Transcript of Pre-Trial Conferences, *United States v. Bennett*, 05 Cr. 1192 (NRB), Nov. 11, 2006 at 11, Jan. 19, 2007 at 3.

During the approximately 18 months in which the government's investigation was in its most intense phase and in which the government secured two superseding indictments and prepared to proceed to trial against three defendants, there was no indication whatsoever that Collins was either a target or a subject of any aspect of the government's investigation. To the contrary, the government specifically advised Collins' counsel that Collins was at most a witness. Declaration of Jonathan Bach, dated June 27, 2008 ("Bach Decl.") ¶ 4.

Collins gave his full cooperation to the investigators, making himself available for two extensive interviews. In April 2006, he voluntarily agreed to be interviewed by representatives of the CFTC, SEC and the United States Attorney's Office. At that interview, he answered

questions about many of the principal subject areas addressed in the current indictment.  Bach Decl. ¶¶ 3, 5.  On February 16, 2007, Collins was interviewed by counsel for the Bankruptcy Examiner and again voluntarily provided answers to questions about the principal matters at issue in this case.  Bach Decl. ¶ 6.  Neither of these interviews had the effect of changing his status in the eyes of the prosecutors.  The government continued to attend to its trial preparations and, for months, offered no indication that Collins was anything other than a witness in its investigation.  Bach Decl. ¶ 7.

On May 31, 2007, the government first advised counsel for Collins that he was a potential target of its investigation.  Bach Decl. ¶ 8.  In response, and as part of a larger effort to demonstrate to the government that Collins was innocent, defense counsel had Collins submit to a polygraph examination on the principal issue the government had identified as the basis for its contemplated charges:  Collins' alleged knowledge of Refco's $1.1 billion inter-company debt and its concealment.  Barry Colvert, a veteran FBI polygrapher with years of experience, administered the examination.  Colvert's Affidavit is submitted herewith and includes his examination report, which details his procedures and the specific questions posed.  In essence, Collins was asked if he was aware of the $1.1 billion inter-company debt or knew that it had been concealed from Refco's counterparty in a leveraged buy-out transaction.  At the conclusion of the polygraph examination, Colvert reported that Collins not only passed the examination, but did so with flying colors.  Colvert's report and all related materials were supplied to the government.  In addition, counsel advised the government that Collins was prepared to submit to a further polygraph examination, by a polygrapher of the government's choice.  Bach Decl. ¶¶ 9-11.

**The Indictment**

On December 18, 2007, Collins was indicted on charges of aiding and abetting the commission of securities fraud, wire fraud, bank fraud and false filing with the SEC, and for conspiracy to commit those and other offenses.  The indictment spans a period of some eight years – "from at least as early as 1997" until Refco's collapse in October 2005.  Indictment ¶ 9. It also covers numerous transactions of varying complexity in which Collins, through his legal work, is claimed to have helped execute or cover up Refco's fraud.

Among other things, the indictment concerns the partial leveraged buyout of Refco in August 2004 by Thomas H. Lee Partners ("Lee"), a major private equity group, which purchased a majority ownership interest in Refco in anticipation of taking the company public.  Indictment ¶¶ 28-29.  The indictment describes how Refco management defrauded Lee into buying a company that, because of its concealed $1.1 billion inter-company debt, was in reality insolvent. Indictment ¶¶ 11, 35, 42.

The indictment traces the origin of Refco's inter-company debt back to the 1997 Asian Financial Crisis, when a number of Refco's customers defaulted on their obligations to the company causing Refco to suffer large losses.  Indictment ¶¶ 11-14.  The indictment further describes how Bennett, Trosten and Maggio orchestrated an elaborate scheme by which Refco's unconsolidated parent company assumed these and other subsequent losses, and Refco used a succession of short-term loan transactions to hide the resulting receivable from its auditors. Indictment ¶ 14, 17-19, 22.  The $430 million debt discovered in October 2005 was merely the remnant of the far larger $1.1 billion debt from the time of the Lee deal.  Indictment ¶¶ 42-43, 60.

The indictment alleges, in broad strokes, that Collins knew about this massive inter-company debt, knew that there would still be a substantial inter-company debt remaining after the sale to Lee, and aided Refco management in hiding the debt in order to effect a fraudulent sale of an insolvent company. The indictment describes numerous corporate transactions in which Refco, allegedly aided and abetted by Collins, carried out its fraud from 1997 through 2005, including:

- Refco's handling of a 1997 loss associated with an unidentified Refco customer including the settlement of that customer's debt to Refco. Indictment ¶¶ 11-13.

- Refco's handling of unspecified losses involving additional unspecified Refco customers, of which Collins allegedly had knowledge. Indictment ¶¶ 11, 14.

- "Round-Trip Loan" transactions between Refco and various unspecified parties, on an annual and then quarterly basis, spanning a period from 1998 through 2005; the indictment alleges that Collins and Mayer Brown assisted Refco with 17 such transactions. Indictment ¶¶ 17-22, 34, 52.

- Other Refco loan transactions with an Austrian Bank known as BAWAG, undertaken on at least an annual basis between 2000 and 2005. Indictment ¶¶ 21, 53.

- BAWAG's 1999 purchase of an equity interest in Refco, in which Mayer Brown represented the company. Indictment ¶¶ 15, 16.

- BAWAG's 2002 purchase of a right to participate in the proceeds of a sale of Refco. Indictment ¶¶ 23-27.

- Phillip Bennett's buyout of BAWAG's right to participate in the proceeds of a sale of Refco. Indictment ¶ 31.

- The 2004 leveraged buyout transaction with Lee. Indictment ¶¶ 28-32, 34-37.

- A 2004 sale of notes in connection with the leveraged buyout. Indictment ¶¶ 43-47.

- Transactions with the syndicate of banks that provided financing for the leveraged buyout. Indictment ¶ 38.

- The public registration of the 2004 note issue. Indictment ¶¶ 50-56.

- The 2005 initial public offering of Refco's stock. Indictment ¶¶ 57-63.

The indictment alleges that Collins and Mayer Brown represented Refco with respect to at least 24 of these transactions. Many of the transactions, particularly those associated with the leveraged buyout, are highly complex, involving multiple counterparties, regulatory authorities, law firms, accountants and other consultants.

Significantly, the indictment does not allege that Collins received even a single dollar as a result of the fraud, nor does it allege that any proceeds of the fraud moved through his accounts. Nevertheless, the indictment seeks forfeiture of "all property that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to at least $2.4 billion," and forfeiture of "any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses, including but not limited to at least $800 million." Indictment ¶¶ 86-87. By letter dated February 6, 2008, we asked the government to identify the specific property that it seeks in forfeiture, and the theory on which it believes that property to be forfeitable. Bach Decl. ¶ 13 & Ex. C ¶ 18. The government declined to produce any information in response to these requests. Bach Decl. ¶ 15 & Ex. D.

## POINT I

### THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE A BILL OF PARTICULARS

#### A.    The Government Should Be Required to Particularize its Forfeiture Allegations

Conspicuously absent from the indictment is any allegation that Collins personally pocketed even a single dollar from the proceeds of the Refco fraud. His lack of participation in the fruits of the fraud is particularly noteworthy in a case in which the government has shown that every other defendant obtained tens, if not hundreds, of millions of dollars by participating in the alleged conspiracy. *See* Grant Tr. at 1388-89 (Bennett received hundreds of millions of

dollars from the fraud), 1054-55 (Trosten received over $46 million), 2549-54 (Grant received $16 million), 1966 (Maggio received over $13 million). Nor is there any allegation that proceeds of the Refco fraud at any time passed through Collins' accounts or were otherwise under his control.

Notwithstanding Collins' lack of receipt of any proceeds of the fraud, and notwithstanding the lack of any allegation in the indictment that any of his currently held funds or property can be traced back to the proceeds of the fraud, the government nevertheless seeks forfeiture from him in the amount of "at least" $2.4 billion with respect to Counts One through Ten of the indictment, and in the amount of $800 million with respect to Counts One and Eleven. Indictment ¶¶ 86-88.

Because neither the legal basis for these forfeiture claims, nor the specific property subject to forfeiture, can be discerned from the indictment, the government should be required to respond to a defense request for further particulars. Bach Decl. ¶¶ 14-15. In short, the government should be required to identify the specific property subject to forfeiture and state why it is forfeitable.

Rule 7(c)(2) of the Federal Rules of Criminal Procedure precludes entry of a judgment of forfeiture "unless the indictment or the information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute." Fed. R. Crim. P. 7(c)(2). Where the forfeiture allegations of an indictment are vague or incomplete, a bill of particulars is appropriate. *United States v. Ianniello*, 621 F. Supp. 1455, 1479 (S.D.N.Y. 1985) (Weinfeld, J.) (requiring bill of particulars where "indictment goes no further than the statement that all property acquired in violation of law may be subject to forfeiture"); *United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980) (relying in part on a bill of

particulars in affirming a judgment of criminal forfeiture challenged for alleged noncompliance with Rule 7); *cf. United States v. All Funds on Deposit at: Citigroup Smith Barney*, No. 06 Civ. 3730 (NGG), 2007 WL 2687660, at *12 (E.D.N.Y. Sept. 10, 2007) (recognizing amendment of the pleadings as an appropriate remedy where the Government makes vague and incomplete allegations of civil forfeiture under 18 U.S.C. § 981).

Moreover, it is axiomatic that forfeiture is appropriate only where a defendant possesses funds or property that can be traced back to the proceeds of a crime—that is, a nexus between the crime and the property subject to forfeiture must be alleged and set forth in the charging document with sufficient clarity as a precondition to any recovery. Fed. R. Crim. P. 32.2(b) (to obtain forfeiture of specific property, the government must "establish[] the requisite nexus between the property and the offense").

The government relies principally on two statutory provisions in seeking forfeiture here: 18 U.S.C. §§ 981(a)(1)(C) and 982. Indictment ¶¶ 86-87. Both provisions specifically limit forfeiture to property traceable to the proceeds of a crime. *See* 18 U.S.C. § 981(a)(1)(C) (limiting the scope of property subject to forfeiture to "[a]ny property, real or personal, which constitutes or is derived from *proceeds traceable* to a violation of" certain specified crimes) (emphasis added);[1] 18 U.S.C. § 982(a)(2) ("The court, in imposing sentence on a person convicted of a violation of, or a conspiracy . . . affecting a financial institution . . . shall order that

---

[1]      *See also* 18 U.S.C. § 981(a)(2)(A) (defining "proceeds" as "property of any kind *obtained directly or indirectly, as the result of the commission of the offense* giving rise to forfeiture, and *any property traceable thereto* . . . not limited to the net gain or profit realized from the offense") (emphasis added). Although § 981 "authorizes only civil forfeitures, the forfeitable property it describes is made subject to criminal forfeiture by the Civil Asset Forfeiture Reform Act of 2000 ('CAFRA')," codified at 28 U.S.C. § 2461(c). *United States v. Capoccia*, 503 F.3d 103, 115 (2d Cir. 2007).

the person forfeit to the United States any property *constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of* such violation") (emphasis added).[2]

Numerous courts have affirmed that only property that constitutes or is derived from the proceeds of a crime can satisfy the strict nexus requirement set forth in Rule 32.2 and in 18 U.S.C. §§ 981 and 982.  *See, e.g., United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005) (noting that in evaluating forfeiture claims under § 982, courts must determine whether there is a "sufficient nexus" between the property and the offense); *United States v. Warshak*, No. 06 Cr. 0111 (SAS), 2008 WL 2078072, at *16 (S.D. Ohio May 13, 2008) (affirming jury verdict of criminal forfeiture on the ground that there was a "substantial nexus" between the assets and the offenses of conviction); *United States v. Wittig*, No. 03-40142-JAR, 2007 WL 1875677, at *6 (D. Kan. June 27, 2007) (noting that § 981(a)(1)(C) permits only forfeiture of property "that constitutes or is derived from proceeds traceable to" specific unlawful activity); *see also United States v. Black*, 526 F. Supp. 2d 870, 888 (N.D. Ill. 2007) (distinguishing monies forfeitable under § 981(a)(1)(C) from amounts that were merely "involved in" criminal offenses); *United States v. All Assets of Blue Chip Coffee, Inc.,* 836 F. Supp. 104, 107 (E.D.N.Y. 1993) (same).

Because the defendant cannot ascertain from the indictment the funds that are subject to forfeiture, let alone an alleged nexus of those funds to the alleged crime, the government should be compelled to provide a bill of particulars spelling out its theory of forfeiture and specifying the property purportedly subject to forfeiture.

---

[2]     The scope of property subject to forfeiture is even more limited under § 982 than it is under § 981(a)(1)(C).  Unlike § 981(a)(1)(C), Section 982 includes no definition of the term "proceeds" and thus under the rule of lenity must be understood as limited to "profits" from the crime (as opposed to all receipts from the crime).  *United States v. Santos*, 128 S. Ct. 2020, 2024-25 (2008).

**B.    The Government Should Be Required To
Particularize Its Fraud Allegations**

As set forth above, this is a criminal prosecution of immense scope, covering a period of approximately eight years and more than 20 separate corporate transactions. The indictment, however, is written in broad strokes and, while accusing Collins generally of aiding and abetting the fraud, fails to state with particularity the specific false representations or omissions that he allegedly made or aided and abetted others in making.

The government's production of more than 12 million pages of documents, stored on more than 30 separate electronic databases, only exacerbates the problem. *See* Transcript of Pre-Trial Conference, *United States v. Collins*, 07 Cr. 1170 (LBS), June 10, 2008 at 6-9. It is impossible for defense counsel to distill from this massive amount of material exactly what specific misrepresentations or omissions Collins should prepare to defend. Given the dimensions of this prosecution and the complexity of the subject matter, the government should be required to identify the specific misrepresentations and omissions that it will seek to establish at trial. Where the indictment alleges a broad crime – such as the fraud and conspiracy alleged here – the government must particularize the charge to a degree that might not be necessary for crimes of more limited scope. *See United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, the Court has authority to order the government to provide further particulars.

It is well settled that, in fraud cases, the indictment must set forth the precise misstatements or other conduct constituting the alleged fraud. *See United States v. Rogers*, 617 F. Supp. 1024, 1029 (D. Colo. 1985) ("General allegations of false statements . . . are not sufficient.  [A] criminal case should not differ from any civil matter where allegations of fraud and misrepresentations must be pleaded with particularity under Fed. R. Civ. P. 9(b)."); *see also*

10

*United States v. Gabriel*, 920 F. Supp. 498, 508 (S.D.N.Y. 1996) (Rakoff, J.) ("The greater

particularization of such specifications, mandated in a civil proceeding by Rule 9(b) of the Rules

of Civil Procedure, is provided in a criminal case . . . by the requisite responses to a bill of

particulars.").

      Accordingly, "[c]ourts consistently order the filing of particulars directed to the details of

misrepresentations or fraudulent acts."  *United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL

8356, at *7 (S.D.N.Y. Dec. 29, 2000) (Pauley, J.) ; s*ee also, e.g.*, *United States v. Bortnovsky*,

820 F.2d 572, 574–75 (2d Cir. 1987) (abuse of discretion for district court to deny particulars for

dates of fake burglaries and identity of allegedly fraudulent documents); *United States v.

Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (Scheindlin, J.) (granting bill of particulars

for identity of false and misleading insurance claims); *United States v. Caine*, 270 F. Supp. 801,

806 (S.D.N.Y. 1967) (Mansfield, J.) (defendant charged with mail fraud entitled to bill of

particulars detailing "each and every pretense, representation and promise by the defendant

claimed to have been falsely fraudulent" and "each and every representation in the alleged

advertisement which is charged to have been false and misleading"); *United States v. Konefal*,

566 F. Supp. 698, 703 (N.D.N.Y. 1983) (ordering bill of particulars because government had not

alleged what statements it contended were false or the material facts which it contended

defendants concealed); *United States v. Mango*, No. 96 Cr. 632, 1997 WL 222367, at *12–13

(N.D.N.Y. May 1, 1997) (requiring the government to provide particulars concerning, among

others, the name of every agency that the defendant and co-conspirators schemed to defraud,

every false representation made to an agency concerning various topics, including the party who

made the representation, the date on which it was made, to whom it was made, and each co-

conspirator who knew the representation to be false); *Rogers*, 617 F. Supp. at 1029 (requiring the

government to "reveal the substance, date, time, and place of each false statement or concealment and the persons involved"); *United States v. Trie*, 21 F. Supp. 2d 7, 21–22 (D.D.C. 1998) ("A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . . The government must provide information as to exactly what the false statements are, what about them is false, who made them, and how [defendant] caused them to be made.").

A bill of particulars is especially appropriate in cases where, as here, there is voluminous discovery – more than 12 million pages of documents – and particularization will allow defense counsel to "prioritize their review of the discovery material produced by the Government and to focus on the preparation of their respective defenses." *Lino*, 2001 WL 8356, at *9; *see also Bortnovsky*, 820 F.2d at 575 (bill of particulars not avoided "merely by providing mountains of documents to defense counsel who were left unguided"); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (Sand, J.) ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.").

For the foregoing reasons, the government should be required to identify each and every misrepresentation or material omission that Collins allegedly made or aided and abetted others in making.

## POINT II

### THE RESULTS OF THE POLYGRAPH EXAMINATION SHOULD BE ADMITTED INTO EVIDENCE

Collins submitted to a polygraph examination conducted by a veteran FBI polygrapher. The polygraph examination was designed to determine whether Collins was aware of Refco's

$1.1 billion intercompany debt and its concealment from Lee. Collins was asked three questions designed to precisely address the central issue raised by the government:

1)    At the time of the sale of Refco stock to Thomas Lee, were you aware that the inter-company debt was being concealed from him?

2)    At the time of the sale of Refco stock to Thomas Lee, had you been told there was over a billion dollars in inter-company debt?

3)    At the time of the sale of Refco stock to Thomas Lee, did you tell anyone that there was over a billion dollars in inter-company debt?

Colvert Aff., Ex. B, at 2. He answered all three questions in the negative and, according to the polygraph examination report, without any indication of deception. Colvert Aff., Ex. B, at 3.

The defense requests an opportunity to present expert testimony at trial, including an explanation of polygraph procedure and evaluation methodology and an interpretation of the results of the polygraph examination administered to Collins. The expert witness will not testify as to a personal opinion that Collins told the truth, but rather is expected to testify that the scientifically obtained results of the polygraph indicate truthfulness with respect to the relevant questions. If the Court determines that an evidentiary hearing is necessary pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the defense would be prepared to introduce testimony regarding Colvert's qualifications and experience, the scientific basis for and reliability of polygraph evidence, and other criteria pertaining to the admissibility of scientific evidence under the Federal Rules of Evidence.

### A.    The Proffered Polygraph Evidence Is Admissible under *Daubert v. Merrell Dow Pharmaceuticals*

The admissibility of polygraph evidence after *Daubert* remains an open question in the Second Circuit. *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) ("[W]e have not decided whether polygraphy has reached a sufficient state of reliability to be admissible under

13

Rule 702."); *United States v. Kwong*, 69 F.3d 663, 668-69 (2d Cir. 1995).[3]  Before *Daubert*, the

standard enunciated in *Frye v. United States*, 293 F. 1023 (D.C. Cir. 1923), controlled the

admissibility of scientific evidence in federal courts, precluding evidence based on a scientific

technique that was not "generally accepted" in the relevant scientific community.  *Frye* involved

"a crude precursor to the modern polygraph machine," *Daubert*, 509 U.S. at 585, and played a

significant role in excluding polygraph evidence from federal trials despite subsequent advances

in polygraph technology and techniques.  *Daubert* established that Rule 702 of the Federal Rules

of Evidence, the rule governing expert testimony, superseded the *Frye* standard in favor of a

"flexible" inquiry in which the trial judge functions as the gatekeeper to "ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert,* 509 U.S. at

589, 595.

        In general, since *Daubert* courts in the United States have become more open to

admitting polygraph evidence.  *See, e.g.*, *United States v. Cordoba*, 104 F.3d 225, 227 (9th Cir.

1997) (holding that a per se rule against the introduction of polygraph evidence is inconsistent

with *Daubert*); *United States v. Posado*, 57 F.3d 428 (5th Cir. 1995) (ruling that the Fifth

Circuit's per se rule against the admission of polygraph evidence did not survive *Daubert*).

## 1.      The Proffered Evidence is Relevant

        The starting point for the admissibility inquiry is the instruction that "[a]ll relevant

evidence is admissible, except as otherwise provided" by the United States Constitution or

---

[3]        In most of the Second Circuit district court cases in which the court declined to admit the
polygraph evidence, the questions asked in the polygraph examination were irrelevant or ambiguous as to
the main facts at issue.  *See United States v. Canter*, 338 F. Supp. 2d 460, 464 (S.D.N.Y. 2004) (Marrero,
J.); *United States v. Bellomo*, 944 F. Supp. 1160, 1165 (S.D.N.Y. 1996) (Kaplan, J.); *United States v.
Lech*, 895 F. Supp. 582, 585 (S.D.N.Y. 1995) (Sotomayor, J.).  One case held, prior to *Messina*, that
*Daubert* had no effect on the admissibility of polygraph evidence, *United States v. Black*, 831 F. Supp.
120, 122 (E.D.N.Y. 1993), and in only one *civil* case did the court decline to admit polygraph evidence
after conducting a hearing at which experts testified, *Meyers v. Arcudi*, 947 F. Supp. 581 (D. Conn. 1996).

federal statute or rule.  *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 402).  This broad

standard of admissibility is further expanded by the fact that "[t]he Rules' basic standard of

relevance . . . is a liberal one," because Rule 401 provides that, to be relevant, evidence need

only have " 'any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence.' "  *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401).

Under Rule 401's relevance standard, there can be no doubt that the anticipated expert

testimony is relevant.  The expert is anticipated to testify that Collins passed, with "an

extraordinarily low probability of deception," a polygraph examination in which he was posed

questions about his knowledge of the fundamental fraud alleged in this case.  *See* Colvert Aff. ¶

2, Ex. B, at 2.  The questions posed during the examination cut to the very heart of the issue and

will aid the jury in considering the fundamental question of Collins' state of mind.  Indeed, the

evidence will show that the probability that Collins lied in his answers to the polygraph questions

is less than one percent.  Colvert Aff., Ex. B, at 3 (using a Johns Hopkins University Applied

Physics Laboratory scoring algorithm).

### 2.    The Proffered Evidence is Admissible Under Rule 702 and *Daubert*

Rule 702 of the Federal Rules of Evidence allows a qualified expert witness to testify

regarding scientific knowledge when such "scientific, technical, or other specialized knowledge

will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R.

Evid. 702.  For knowledge to be "scientific," it must be "derived by the scientific method" and

"supported by appropriate validation."  *Daubert*, 509 U.S. at 590.  In other words, it must meet a

"standard of evidentiary reliability."  *Daubert*, 509 U.S. at 590.  Although the additional

requirement that the evidence "assist the trier of fact" is essentially concerned with relevance,

where scientific evidence is involved this requirement may be satisfied where there is "a valid scientific connection to the pertinent inquiry," meaning it must be scientifically valid with respect to the purpose for which it is offered. *Daubert*, 509 U.S. at 591-92.

In making an admissibility determination pursuant to Rule 702, the court may consider:

1)   Whether the theory or technique can be and has been tested. *Daubert*, 509 U.S. at 593.

2)   Whether the theory or technique is subject to peer review and publication. *Daubert*, 509 U.S. at 593.

3)   The known or potential rate of error. *Daubert*, 509 U.S. at 594.

4)   The existence and maintenance of standards to control the technique's operation. *Daubert*, 509 U.S. at 594.

5)   The degree of acceptance of the technique within the relevant scientific community. *Daubert*, 509 U.S. at 594.

In this case, these factors weigh in favor of the admission of the polygraph evidence at issue.

### a.    The Control Question Polygraph Technique is Scientifically Valid and Has Been Rigorously Tested

The polygraph is the principal instrument used in psychophysiology, a recognized specialty of psychology that is concerned with the measurement of physiological responses due to psychological states or stimuli. *United States v. Galbreth*, 908 F. Supp. 877, 882-83 (D.N.M. 1995). Colvert examined Collins using the Modified General Question Test, a variant of the "control question" method of polygraph examination. Colvert Aff. ¶ 2. This method involves a comparison of the subject's response to certain "control questions," designed to elicit a strong reaction, with the subject's response to questions directly pertinent to the specific inquiry. Colvert Aff. ¶ 3; *see also Galbreth*, 908 F. Supp. at 884, 896 (describing expert testimony that the control question technique is the "most widely used and accepted polygraph technique" and ruling polygraph evidence admissible after a case-specific inquiry as to its reliability); *United*

*States v. Crumby*, 895 F. Supp. 1354, 1363-65 (D. Ariz. 1995) (holding that control question polygraph evidence is admissible in some circumstances). Through this comparison of the subject's physiological responses to the two sets of questions, the polygrapher can measure the likelihood that the subject is answering the relevant questions deceptively. Colvert Aff. ¶ 3; *Galbreth*, 908 F. Supp. at 884.

Given the opportunity at a pretrial *Daubert* hearing, the defense would present evidence showing that the control question polygraph technique has been studied extensively in recent years, Colvert Aff. ¶ 3, and that the technique is "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590. "Laboratory and field studies have been conducted to test the scientific hypothesis underlying the probable lie control question technique," and "[t]hese studies were conducted scrupulously in accordance with the scientific method." *Galbreth*, 908 F. Supp. at 885. Indeed, "the science of polygraphy has been subjected to vigorous scientific testing and the assumptions underpinning the science have been deeply analyzed by those in the field of polygraphy and psychophysiology." *Crumby*, 895 F. Supp. at 1359.

### b. The Science of Polygraphy Has Been Subjected to Extensive Peer Review and Publication

*Daubert* instructs that "[t]he fact of publication (or lack thereof) in a peer reviewed journal . . . will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594. Given the opportunity at a pretrial *Daubert* hearing, the defense would demonstrate that "[t]here have been hundreds of articles published on the traditional probable lie control question technique," many of which were subject to peer review or other scientific scrutiny. *Galbreth*, 908 F. Supp. at 891; *see also Crumby*, 895 F. Supp. at 1359 ("[T]he science of polygraphy and its underlying scientific principles have been subjected to extensive peer

review and publication.").  These articles have appeared in such esteemed publications as *Law and Human Behavior*, *The Journal of Applied Psychology*, and *Psychophysiology*.  Colvert Aff. ¶ 4.

### c.      Polygraphy is Known to Have a Low Error Rate

As the court found in *Crumby*, "the error rates in the field of polygraphy are extremely low, especially when compared to other more inexact forensic sciences."  *Crumby*, 895 F. Supp. 1360.  Indeed, polygraph examinations have an accuracy rate of ninety to ninety-five percent, with the likelihood of error higher with respect to false indications of deception than for false indications of truth.  *Crumby*, 895 F. Supp. at 1359-60; *Galbreth*, 908 F. Supp. at 885-87, 891-92; Colvert Aff. ¶ 5.  The evidence the defense expects to present will demonstrate that polygraph accuracy well exceeds the Rule 401 "more probable or less probable" relevance standard, and that the polygraph is at least as reliable as other forms of expert evidence regularly admitted by courts.  *Cf. United States v. Smith*, 869 F.2d 348, 353-54 (7th Cir. 1989) (affirming, in a case cited favorably in *Daubert* for its consideration of error rates, *see* 509 U.S. at 594, the admissibility of spectrographic voice identification evidence where an expert testified that studies existed showing error rates as varied as .31% to .53% and 62.7% to 83.33%); *see also Smith*, 869 F.2d at 353 (comparing the evidence at issue in *Smith* to polygraph evidence, stating that "[p]olygraph (lie detector) test results long have been admissible in this circuit under the sound discretion of the trial judge, provided that this discretion is not abused").

### d.      Well-Established Standards Govern the Use of the Polygraph Technique

The polygraph community maintains standards to control the operation of the control question polygraph technique.  Colvert Aff. ¶ 6.  For example, "[i]n the federal sector, in order to practice as a polygraph examiner for an agency, an individual must attend a polygraph school,

usually the Department of Defense Polygraph Institute [or in the case of Colvert, the U.S. Army Military Police School and the F.B.I. Academy], and must receive a certificate before he can administer polygraph tests."  *Galbreth*, 908 F. Supp. at 892.  The American Polygraph Association accredits polygraph schools according to strict criteria and publishes the standards of practice and code of ethics for the industry, and a number of states have extensive polygraph licensing regulations.  Colvert Aff. ¶6.  At a pretrial *Daubert* hearing, the defense would present evidence regarding industry regulation and standards, including the objectivity of scoring methods.  *See Galbreth*, 908 F. Supp. at 888.

e.    **The Control Question Technique is<br>Accepted in the Relevant Scientific Community**

The final non-controlling factor mentioned by the *Daubert* court is "general acceptance" in the scientific community.  Although this factor is not a prerequisite for admissibility, "it now appears that there is general acceptance [among psychophysiologists] of the control question polygraph technique when it is administered by a qualified examiner."  *Galbreth*, 908 F. Supp. at 892.  Acceptance is even greater among autonomic psychophysiologists and polygraphers.  *See* Colvert Aff. ¶7; *Galbreth*, 908 F. Supp. at 892; *Crumby*, 895 F. Supp. at 1360.  Many federal, state, and local law enforcement agencies rely extensively on the control question polygraph technique.  Colvert Aff. ¶ 7; *United States v. Piccinonna*, 885 F.2d 1529, 1532 (11th Cir. 1989) (en banc); *Galbreth*, 908 F. Supp. at 885.  In fact, Colvert continues to provide polygraphy services to the United States Department of Justice from time to time in connection with criminal investigations and prosecutions.  Colvert Aff. ¶ 1.

**B.    Case Law Supports the Admission of this Polygraph Evidence**

Even before *Daubert*, courts began to consider the polygraph to be sufficiently "generally accepted" to recognize that a per se rule against the admission of polygraph evidence is

19

untenable.  *See Piccinonna*, 885 F.2d at 1532 (11th Cir. 1989) (en banc) (reexamining and rejecting the per se rule, due in part to "tremendous advances . . . in polygraph instrumentation and technique" and extensive use of the polygraph by government agencies).  Since *Daubert* the courts have become more open.  Among the most thorough examinations of polygraph admissibility under Rule 702 are the *Galbreth* and *Crumby* cases, both of which analyzed the *Daubert* factors in great detail and concluded that polygraph testimony was admissible, at least on a limited basis.  *See also Lee v. Martinez*, 136 N.M. 166 (2004) (conducting a *Daubert* analysis and concluding that "the control question polygraph examination is sufficiently reliable to satisfy" New Mexico's Rule 11-702.).  Indeed, "[t]he remedy for the opponent of polygraph evidence is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation."  *Lee*, 136 N.M. at 181; *see also Daubert*, 509 U.S. at 596.  At a pretrial *Daubert* hearing, the defense will establish that the requirements for the admissibility of polygraph evidence have been met in this case and that Collins is entitled to have such evidence considered by the jury.

**POINT III**

**THE GOVERNMENT SHOULD BE REQUIRED
TO PRODUCE *BRADY* MATERIAL IMMEDIATELY
AND *GIGLIO* AND 3500 MATERIAL AT
LEAST TWO MONTHS BEFORE TRIAL**

**A.    *Brady* Material Should Be Produced Immediately**

During the approximately 18-month period in which the government's investigation of the Refco fraud was in its most intense phase, the government debriefed numerous witnesses, including high-ranking Refco insiders who admitted their participation in the fraud, and pressed them for information about the involvement of others.  *See supra* at 1-2; Bach Decl. ¶¶ 2-4. Former Refco senior officers Trosten and Maggio, for example, were among the witnesses

cooperating with the government and subject to extensive questioning, as were, presumably, numerous others.[4]  Throughout this period, the government was well aware that Collins had served as Refco's principal outside counsel and that his law firm had assisted in preparing legal documents for some of the key transactions involved in the fraud.  Assuming the investigation took its natural course, numerous witnesses were likely asked about Collins as part of the government's fact-finding effort, just as Collins himself was questioned extensively by the government, not only about his own role but also about the role of others.

Apparently the witnesses interviewed by the government, at least during this substantial phase of its investigation, did not implicate Collins in the fraud and responded to government questions in a way that led the government to conclude that he was only a witness and neither a subject nor a target of its investigation.  Indeed, even as the government developed the wealth of information that enabled it to file two superseding indictments and to prepare to bring several defendants to trial, it did not advise defense counsel that Collins was anything other than a witness.  It was only at the end of May 2007, when all other defendants were on the verge of trial, that the government advised defense counsel that there had been a shift in its thinking and that Collins had become a potential target of its investigation.  Bach Decl. ¶ 8.

*Brady* and its progeny require the government to disclose material information favorable to the defendant, "either because it is exculpatory, or because it is impeaching."  *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *see Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Giglio*, 405 U.S. 150

---

[4]    According to his testimony at the Grant trial, former Refco CFO Robert Trosten was questioned by the government in October and November 2005 about who else knew or was told about various aspects of the fraud.  Grant Tr. at 1126, 1129, 1132-35.  Similarly, former Refco senior officer Santo Maggio testified that he was questioned by the government in early October 2005.  *See, e.g.*, Grant Tr. at 1604, 1970.  Both Trosten and Maggio have entered into cooperation agreements with the government.

(1972). The government cannot avoid its *Brady* obligations simply because exculpatory information has not been committed to writing, but must advise the defense of any oral statements made to the government that tend to be exculpatory or that can be used to impeach government witnesses. *Rodriguez*, 496 F.3d at 225-28 (where the government fails to write down material false statements made by a cooperating witness, it is obligated to disclose them as *Brady* material nonetheless). More fundamentally, as the Second Circuit has recently clarified, the government has an obligation to produce evidence that tends to suggest that a defendant is not culpable, even if other evidence, gathered from other sources or at a different point of the investigation, suggests otherwise. *United States v. Rittweger*, 524 F.3d 171, 181-82 (2d Cir. 2008).

*Brady* information, moreover, must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *Rodriguez*, 496 F.3d at 226. It must be disclosed "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *Rodriguez*, 496 F.3d at 226; *see also Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (the defense may be unable to assimilate information from late disclosures into its case); *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) ("The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an 'opportunity for use.'"); *United States v. Rodriguez,* 538 F. Supp. 2d 674, 678 (S.D.N.Y. 2008) (Sweet, J.) (danger of late disclosure is that defense may not have enough time to investigate and that new information throws existing preparation and strategies into disarray).

Evidence suggesting that Collins had no role in the crime, or that others involved in the crime were either unaware of his role or failed to describe it when debriefed by the government,

is material to the defense, and the government should be required to produce it immediately so that the defense can meaningfully assimilate the information and use it to prepare for trial. Unless the government discloses the identities of individuals who, when asked, failed to inculpate Collins or to identify him as a participant in the crime, the defense will be unable to make use of such information in preparing for trial. Evidence subject to immediate production should include, among other things, statements made by witnesses who originally failed to inculpate Collins in debriefing sessions, but who later made statements that tended to inculpate him.

B.    **The Government Should Be Required To Produce** *Giglio* **Material At Least Two Months Before Trial**

By letter dated February 20, 2008, the government advised defense counsel that it does not intend to produce *Giglio* material until one week before trial. Bach Decl. ¶ 16. Such a short time frame is unacceptable in a case of this complexity and will greatly burden the defense by requiring it to parse through voluminous amounts of new material at a time when it will already be preoccupied with its final preparations for trial.

As the Court is well aware, this case involves multiple complex corporate transactions spanning an eight year period. More than 12 million pages of documents have been produced so far, stored in more than 30 separate electronic databases. The government's offer to produce *Giglio* material merely one week before trial deprives the defense of a reasonable opportunity to follow up on any leads included in such material. Simply performing additional database searches will be quite time-consuming, as will the need for more proactive forms of follow-up investigation. The government has already assembled most if not all of the relevant *Giglio* material in connection with its preparation for the Grant trial and would suffer no prejudice by having to make an earlier disclosure here.

In *Rittweger*, the Second Circuit recently disapproved of the government's decision to withhold a cooperator's grand jury testimony, which was favorable to the defendant, until the week prior to trial, noting that the government had produced substantial discovery months earlier but withheld until the eve of trial the evidence it knew the defense would be most interested in. *Rittweger*, 524 F.3d at 180-82.

For these reasons, we respectfully request that the Court require the government to produce *Giglio* material at least two months before trial.

### C. The Government Should Be Required To Produce 3500 Material Two Months Before Trial

By letter dated February 20, 2008, the government advised defense counsel that it does not intend to produce 3500 material by a set date before trial, but rather intends to produce such material on a witness-by-witness basis approximately one week before each witness's respective testimony at trial. Bach Decl. ¶ 16. The government's proposed approach should be rejected as impractical and as unduly burdensome to the defense given the demands of this case. Instead, the government should be required to produce all 3500 material by a set date two months before trial.

The volume of 3500 material in this case is anticipated to be enormous. For one witness alone, for example, there will be more than 4,000 pages. Grant Tr. 2209, 2022 (describing volume of 3500 material for government witness Santo Maggio, including, among other things, approximately 400 pages of handwritten notes). Nothing prevents the government from producing such material, in an orderly fashion, well in advance of trial. Indeed, the government already assembled much if not all of the relevant 3500 material in preparing for the Grant trial. The government's proposal to hold on to such material until the last minute and then dump it on defense counsel, immediately prior to and in the midst of trial, serves no purpose other than to

unnecessarily burden the defense, and perhaps delay the trial.  Under the government's proposed

schedule, the defense will have no choice but to attempt to assimilate thousands of pages of new

information during the press of trial, when it will have many other difficult tasks to handle and

no meaningful opportunity to follow up on new leads included in such material.

Moreover, no purpose is served by such delayed disclosure.  This is not a case in which

any witness faces danger once his or her identity becomes known; indeed, the government has

already agreed to produce a witness list at least one month in advance of trial.  *See United States*

*v. Strawberry*, 892 F. Supp. 519, 528 (S.D.N.Y. 1995) (Parker, J.) ("Although the Government is

not obligated to turn over 3500 material…before the relevant witness has testified, there is no

reason for the Government to withhold the material for purposes of delay or without good

reason.").[5]

Requiring the government to produce all 3500 material two months before trial would

also help promote orderly process, as major evidentiary issues could be raised and resolved

through motions *in limine* before trial begins.  Indeed, this is a case that, in many respects, is

likely to turn on the vagaries of circumstantial evidence, as the defense is not aware of any

particular document that constitutes a "smoking gun" document or of any insider to the fraud

who will testify unequivocally that Collins was a participant in the scheme.  Production of 3500

---

[5]    To the extent that certain 3500 material is also subject to disclosure as *Brady* (including *Giglio*) material, disclosure of such statements should be governed by the Court's ruling regarding *Brady* material.  *See, e.g., In re United States (Coppa)*, 267 F.3d 132, 145-46 (2d Cir. 2001) (district court has authority to order pretrial disclosure of 3500 material when disclosure is constitutionally mandated under *Brady* or *Giglio*).  Where there is some doubt about whether a prospective witness statement is merely 3500 material or is materially exculpatory or impeaching in light of the complex factual allegations in this case, the information should be disclosed along with other *Brady* material.  As the Supreme Court has cautioned, "[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence….[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure. This is as it should be."  *Kyles v. Whitley,* 514 U.S. 419, 439 (1995) (internal citations and quotations omitted).

material two months before trial will allow both sides to have the benefit of the Court's

evidentiary rulings before opening statements are presented to the jury.

It is well recognized that early production of 3500 material "promote[s] sound trial

management and…preserve[s] the integrity of the proceeding," *Lino*, 2001 WL 8356, at *16,

and is therefore in the interest of all parties as well as the Court.  Indeed, the Second Circuit has

recognized the importance of access to statements of prospective witnesses in trial preparation,

particularly in complex cases such as this one:

> [I]n most criminal cases, pretrial disclosure will redound to the benefit of
> all parties, counsel, and the court.  Indeed, sound trial management would
> seem to dictate that Jencks Act material should be transmitted prior to
> trial, especially in complex cases, so that those abhorrent lengthy pauses at
> trial to examine documents can be avoided.

*United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974).

The government's proposed schedule delaying its 3500 production until the eve or midst

of trial differs dramatically from the practice followed in other cases of similar complexity in this

district.  For example, in the Adelphia case, *United States v. Rigas,* 02 Cr. 1236 (LBS), the

government agreed to produce 3500 material six weeks in advance of trial.  Bach Decl. ¶ 18

Similarly, in *United States v. Hayward*, 05 Cr. 390 (SHS), a three-week securities fraud trial

before Judge Stein involving substantially less material than exists here, the government agreed

to produce 3500 material approximately three weeks before trial.  Bach Decl. ¶ 18.

Accordingly, in this highly complex case involving numerous witnesses and volumes of

witness statements, the government should be required to produce 3500 material two months

before trial.

## CONCLUSION

For the foregoing reasons, Collins respectfully requests that the Court issue an order

granting his motions and requiring the government (1) to produce further particulars regarding

the forfeiture allegations of the indictment and the false statements or omissions allegedly made by Collins or by others whom he allegedly aided and abetted; (2) to admit the results of a polygraph examination or to hold a hearing to consider the admissibility of such evidence; and (3) to produce *Brady* material immediately and *Giglio* and 3500 material at least two months in advance of trial.

Dated: June 27, 2008
     New York, New York

                                        COOLEY GODWARD KRONISH LLP

                                        By: _____
                                             William J. Schwartz (WJS 8462)
                                             Jonathan P. Bach (JPB 9710)

                                        1114 Avenue of the Americas
                                        New York, NY 10036
                                        Phone: (212) 479-6000
                                        Fax:    (212) 479-6275

                                        *Attorneys for Defendant Joseph P. Collins*

*Of Counsel*:

Daniel M. Hibshoosh (DH 8959)
Timothy M. Kerr (TK 3979)
Kathleen E. Cassidy (KC 0630)

27