UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
     -v-                                  :
                                          :    07 Cr. 1170 (LBS)
JOSEPH P. COLLINS,                        :
                                          :
                    Defendant.            :
                                          :
------------------------------------------------------x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT COLLINS'S PRETRIAL MOTIONS


                              MICHAEL J. GARCIA,

                              United States Attorney for the
                              Southern District of New York,
                              Attorney for the United States
                                    of America

Neil M. Barofsky
Christopher L. Garcia
Assistant United States Attorneys,

       - Of Counsel -

# TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    The Defense Requests For a Bill Of Particulars, Information and Legal Theories with Respect to Forfeiture, and Additional Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Bills of Particulars Are Not Warranted In This Case . . . . . . . . . . . . . . . . . . . . 11

        1.    The Government's Fraud Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            (a)    Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            (b)    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    The Government's Forfeiture Allegations . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    The Polygraph Evidence Should Not Be Admitted, and No Hearing Is Required to Make Such Determination . . . . . . . . . . . . . . . . . . . . . 21

        1.    The Proffered Polygraph Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.    The Legal Principles Governing Expert Testimony . . . . . . . . . . . . . . . 22

        3.    Polygraph Evidence Is Not Sufficiently Reliable To Be Admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        4.    The Circumstances of Collins's Polygraph Examination Further Demonstrate Its Inadmissibility . . . . . . . . . . . . . . . . . . . . . . 29

        5.    The Extreme Prejudice To The Government Would Outweigh Any Conceivable Relevance Of The Polygraph Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    C.    <u>Brady</u>, <u>Giglio</u>, and 3500 Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# TABLE OF AUTHORITIES

## CASES

Collins v. Bennett,
  2004 WL 951362 (W.D.N.Y. Apr. 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23, 24

Frye v. United States,
  293  F. 1013 (D.C. Cir. 1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Giglio v. United States,
  405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Kyles v. Whitely,
  514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

Lee v. Martinez,
  136 N.M. 166 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Meyers v. Arcudi,
  947 F. Supp. 581 (D. Conn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 29, 30, 32

Monsanto v. United States,
  2000 WL 1206744 (S.D.N.Y. Aug. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Republic National Bank of New York v. Eastern Airlines,
  639 F. Supp. 1410 (S.D.N.Y. 1986), aff'd, 815 F.2d 232 (2d Cir. 1987) . . . . . . . . . . . . .  24

United States v. Andrews,
  381 F.2d 377 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

United States v. Bagley,
  473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

United States v. Battaglia,
  2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

United States v. Bellomo,
  263 F. Supp.2d 561 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13, 15

United States v. Bellomo, ,
    944 F. Supp. 1160 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Benavidez-Benavidez,
    217 F.3d 720 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Bentham,
    414 F. Supp. 2d 472 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Bin Laden,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

United States v. Bin Laden,
    2001 WL 66314 (S.D.N.Y. Jan. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Black,
    831 F. Supp. 120 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Booth,
    1999 WL 1192317 (S.D.N.Y. Dec. 14, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Bortnovsky,
    820 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16, 17

United States v. Bortnovsky,
    879 F.2d 30 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Caine,
    270 F. Supp. 801 (S.D.N.Y. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Canter,
    338 F. Supp. 2d 460 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Cephas,
    937 F.2d 816 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Cimino,
    31 F.R.D. 277 (S.D.N.Y. 1962), aff'd, 321 F.2d 509 (2d Cir. 1963) . . . . . . . . . . . . . . . . . 11

United States v. Clark,
    1987 WL 13273 (S.D.N.Y. June 30, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Conley,
    2002 WL 252766 (S.D.N.Y. Feb. 21, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Cordoba,
104 F.3d 225 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Cordoba,
991 F. Supp. 1199 (C.D. Cal. 1998), aff'd, 194 F.3d 1053 (9th Cir. 1999) . . . . . . . . . 28, 29

United States v. Crumby,
895 F. Supp. 1354 (D. Ariz. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. D'Angelo,
2004 WL 315237 (E.D.N.Y. Feb. 18, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Davidoff,
845 F.2d 1151 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Dominguez,
902 F. Supp. 737 (S.D. Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Duverge Perez,
295 F.3d 249 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Galbreth,
908 F. Supp. 877 (D. New Mex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Gluzman,
154 F.3d 49 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Guerrerio,
670 F. Supp. 1215 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Gutierrez-Flores,
1994 WL 558034 (S.D.N.Y. Oct. 11, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Henry,
861 F. Supp. 1190 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Hernandez,
2001 WL 674133 (S.D.N.Y. June 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Hernandez,
2003 WL 102623 (N.D. Tex. Jan. 8, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

United States v. Ianniello,
621 F. Supp. 1455 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Jacques Dessange, Inc.,
    2000 WL 280050 (S.D.N.Y. March 14, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Jakobetz,
    955 F.2d 786 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Jones,
    2000 WL 1448640 (S.D.N.Y. Sept. 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Konefal,
    566 F. Supp. 698 (N.D.NY 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Kwong,
    69 F.3d 663 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32

United States v. LaMorte,
    744 F. Supp. 573 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Lea,
    249 F.3d 632 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Lech,
    895 F. Supp. 582 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32

United States v. Lino,
    2001 WL 8356 (S.D.N.Y. Dec. 29, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 41

United States v. Malinsky,
    19 F.R.D. 426 (S.D.N.Y. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Mango,
    1997 WL 222367 (S.D.N.Y. May 1, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Manzano,
    946 F. Supp. 1141 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Matos-Peralta,
    691 F. Supp. 780 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. McDuffie,
    2002 WL 654136 (S.D.N.Y. Apr. 18, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Messina,
    131 F.3d 36 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Muyet,
    945 F. Supp. 586 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

United States v. Nachamie,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

United States v. Nixon,
    418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

United States v. O'Connor,
    2008 WL 921036 (N.D.N.Y. Apr. 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

United States v. Percan,
    1999 WL 13040 (S.D.N.Y. Jan. 13, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

United States v. Percevault,
    490 F.2d 126 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

United States v. Pettigrew,
    77 F.3d 1500 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

United States v. Pimentel,
    2001 WL 185053 (E.D.N.Y. Jan. 22, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

United States v. Pitner,
    969 F. Supp. 1246 (W.D. Wash. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

United States v. Posado,
    57 F.3d 428 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 30

United States v. Prince-Oybo,
    320 F.3d 494 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

United States v. Ramirez,
    1995 WL 918083 (S.D. Tex. Nov. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29, 30

United States v. Rea,
    958 F.2d 1206 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

United States v. Rigas,
    258 F.Supp.2d 299 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 17

United States v. Rittweger,
    524 F.3d 171 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 38

vi

United States v. Rodriguez,
   496 F.3d 221 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 38

United States v. Ruggiero,
   100 F.3d 284 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

United States v. Saldarriaga,
   179 F.R.D. 140 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 30

United States v. Savarese,
   2002 WL 265153 (S.D.N.Y. Feb. 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

United States v. Scheffer,
   523 U.S. 303 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 29, 32, 33

United States v. Sherlin,
   67 F.3d 1208 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 34

United States v. Shvarts,
   90 F. Supp.2d 219 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

United States v. Spy Factory,
   960 F. Supp. 684 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 16

United States v. Sturtz,
   648 F. Supp. 817 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

United States v. Swayze,
   378 F.3d 834 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

United States v. Torres,
   901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

United States v. Trie,
   21 F.Supp.2d 7 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

United States v. Varacalli,
   2004 WL 992493 (S.D.N.Y. May 5, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

United States v. Velasquez,,
   1997 WL 414132 (July 23, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

United States v. Vilar,
   2008 WL 2531195 (S.D.N.Y. June 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

United States v. Villanueva Madrid,
    302 F. Supp. 2d 187 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 39

United States v. Williams,
    181 F. Supp.2d 267 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

United States v. Williams,
    583 F.2d 1194 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## STATUTES, RULES & OTHER AUTHORITIES

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

18 U.S.C. § 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Fed. R. Crim. P. 7(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 20, 21

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                            :
UNITED STATES OF AMERICA                    :
                                            :
   -v-                                      :
                                            :        07 Cr. 1170(LBS)
JOSEPH P. COLLINS,                          :
                                            :
                                            :
                          Defendant.        :
                                            :
------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT COLLINS'S PRETRIAL MOTIONS

The Government respectfully submits this Memorandum of Law in opposition to

defendant Joseph P. Collins's motions requesting that the Court: (1) order the Government to

produce bills of particulars regarding the fraud and forfeiture allegations contained in the

Indictment; (2) admit the results of a polygraph examination into evidence or hold a hearing to

determine the admissibility of such evidence; (3) order the Government to provide discovery

relief by producing Brady material immediately and Giglio and 3500 material at least two

months before trial.  For the reasons set forth below, the motion for bills of particulars should be

denied and the defendant's application to admit the results of the polygraph test into evidence

should be denied without a hearing.  As to Collins's demands with respect to various discovery,

although as a legal matter the Government has no obligation to do so, it proposes that it produce

Giglio material one week before trial and 3500 material at least one week prior to the witness's

anticipated testimony.[1]  The Government is unaware of the existence of any Brady material.

---

[1]  The Government will make every effort to complete early production of the materials
and information set forth above on the dates indicated.  However, the Government requests leave
from the Court to supplement it productions if and when additional information and witnesses
are discovered, as inevitably occurs, during the final days of trial preparation, and, indeed,

## I. BACKGROUND

**A.    The Indictment**

On December 18, 2007, a grand jury sitting in the Southern District of New York returned Indictment 07 Cr. 1170 ("Indictment") against the defendant, Joseph P. Collins.  The Indictment charges Collins, a partner at a large, well-known law firm who formerly served as principal outside counsel to Refco, a financial services company, and Refco Group Holdings, Inc. ("RGHI"), which held an ownership interest in Refco, in eleven different counts.  The Indictment includes one count of conspiracy to commit wire fraud, bank fraud, and money laundering, to make false statements in filings with the SEC, and to make material misstatements to auditors (Count One); one count of securities fraud in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group, Ltd., LLC and Refco Finance, Inc. (Count Two); one count of securities fraud in connection with the purchase and sale of the common stock of Refco, Inc. (Count Three); one count of making false statements in a filing with the SEC under the Exchange Act by causing Refco to submit, and aiding and abetting Refco in the submission of, its annual report on Form 10-K (Count Four); two counts of making false statements in filings with the SEC under the Securities Act by causing Refco to submit, and aiding and abetting Refco in the submission of, forms S-4 and S-1 (Counts Five and Six); four counts of wire fraud in connection with defrauding Thomas H. Lee Partners ("Lee"), which paid $500 million as part of its Leveraged Buyout ("LBO") of Refco in August 2004 (Counts Seven through Ten); and one count of bank fraud in connection with defrauding HSBC Bank USA, N.A. (Count Eleven).  The Indictment sets forth in painstaking detail, in 53 pages

_____

during the trial itself.

2

and 85 paragraphs (not including the forfeiture allegations), the frauds with which Collins is charged.

While the charged conduct spans from the late 1990s to October 2005, Collins is charged with a single core fraud of hiding the true financial health and economic structure of Refco so that Refco would appear to be more profitable than it was.  As described in the Indictment:

> 9.  From at least as early as in or about 1997 through in or about October 2005, JOSEPH P. COLLINS, the defendant, together with Phillip R. Bennett, Robert C. Trosten, Tone N. Grant, and others known and unknown, schemed to hide the true financial health and economic structure of Refco, including the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in Refco, from Refco's banks, counterparties, auditors, investors and potential investors.  In furtherance of this scheme, COLLINS, Bennett, Trosten, Grant, and others known and unknown, made and caused to be made false and fraudulent statements to Refco's banks, counterparties, auditors, investors, and potential investors, and made and caused to be made false public filings with the United States Securities and Exchange Commission ("SEC").

> 10. JOSEPH P. COLLINS, the defendant, as Refco's principal outside counsel, actively participated in this scheme to hide the true financial health of Refco and to conceal BAWAG's economic interest in Refco.  Acting hand-in-hand with Bennett, COLLINS made affirmative misrepresentations, material omissions, and told deceptive half-truths, all to assist Bennett's scheme to steal more than $2.4 billion from potential investors and lenders.  These misrepresentations, omissions, and half-truths -- as well as misrepresentations, omissions, and half-truths told by coconspirators that COLLINS confirmed and furthered -- were believed by Refco's investors and lenders in part because COLLINS's status as a partner with a well-known law firm and as Refco's long-time counsel gave them confidence that such representations were truthful, accurate, and complete.  Furthermore, COLLINS documented and caused to be documented transactions that concealed the existence of the large, material debt owed to Refco by RGHI.  COLLINS's and the Law Firm's role in documenting these fraudulent transactions helped third parties gain comfort in participating in them.  Furthermore, in meetings, telephone calls, and correspondence, COLLINS lied about this debt and the existence of these and other transactions -- as well as other matters relating to Refco's financial health -- to Refco's banks, investors, potential investors, and their advisers. COLLINS also knowingly negotiated and drafted fraudulent agreements and public filings that resulted in the investment of more than $2.4 billion in Refco by banks, investors, and the public.  COLLINS also schemed with Bennett to conceal from potential investors the size of the investment BAWAG had made in Refco.  As a result of

COLLINS's lies on behalf of Refco, COLLINS and Bennett were able to achieve the ultimate objective of the scheme, that is, obtaining, through fraud: the sale of approximately 57 percent of Refco to a group headed by Thomas H. Lee Partner in 2004; the sale of approximately $600 million of notes to private investors in 2004; the acquisition of approximately $800 million of bank financing in 2004; and the August 2005 IPO of stock in Refco, in which the public purchased approximately $583 million of Refco common stock.

(Indictment ¶¶ 9-10).

The Indictment, in great detail, sets forth the early origins of Refco's financial problems in the mid-1990's, including the losses of a specific customer (Victor Neiderhoffer, described in the Indictment as "Customer 1"). (Indictment ¶¶ 11-12). The Indictment further details how Refco moved these losses to RGHI, a related party, so that they appeared on Refco's books and records as a receivable, thus disguising their true nature. (Indictment ¶¶ 11, 13). The Indictment then sets forth how Collins had knowledge of these fraudulent transactions. (Indictment ¶ 14).

As to the mechanics of the fraud, the Indictment sets forth how Collins knew about each of the year- and quarter-end loan transactions in which Refco moved the growing debt owed to Refco by RGHI off of its books and onto the books of willing customers, (Indictment ¶¶ 17-21), how Collins assisted Refco in entering into a Proceeds Participation Agreement ("PPA") with BAWAG, an Austrian Bank complicit in the fraud, an agreement that was later concealed from investors (Indictment ¶¶ 23-26), and how Collins schemed generally with Phillip R. Bennett, the former President and Chief Executive Officer of Refco, to conceal the terms of the PPA, the role of RGHI in the PPA, BAWAG's ability to convert its Participation Right under the PPA into ownership shares of Refco, the existence of $350 million in related party debt owed from RGHI to Refco in  or about 2002, and that Refco required an infusion of

more than $450 million in cash from BAWAG to conduct its business.  (Indictment ¶¶ 27, 30, 32, 36, 37).

The Indictment next gives a detailed recitation of Collins's participation in the fraudulent LBO (Indictment ¶¶ 28-31), including his role in furthering lies told to LBO participants, such as: Lee (Indictment ¶¶ 32-37), the bank syndicate (Indictment ¶¶ 38-39), and the note purchasers (Indictment ¶¶ 40-41).  With respect to each LBO participant, the Indictment specifically sets forth lies that Collins is alleged to have told or knowingly aided and abetted. For ease of reference in some instances, the subject of specific lies are even set forth in headings. (See, e.g., Indictment at 19-23) (concerning Lee and setting forth headings such as "Lies about the PPA and payments to BAWAG"; "Lies about related party debt and related party transactions"; "Lies about $500 million in working capital at Refco").  In other instances, the lies are set forth in bullet-point fashion. (See, e.g., Indictment ¶¶ 39, 41).

Indeed, the Indictment provides considerable specificity with regard to Collins's participation in the LBO fraud.  For example, with regard to the notes that were sold to investors in order to finance the LBO, the Indictment alleges, among other things, that Collins helped prepare the "Certain Relationships and Related Transactions" section of the offering circular pursuant to which the notes were offered and that the section failed to disclose myriad related party transactions in which Refco engaged, of which Collins was aware, and which constituted material information for the purchasers of the notes. (Indictment ¶¶ 47-49).[2]  The resulting fraudulent sale of these notes raised $600 million in financing for the LBO.  (Indictment ¶ 43).

_____

[2]  The Indictment also alleges that Collins participated in the drafting of the "Risk Factors" section of the same offering circular and spells out precisely the information that was omitted from that section of which Collins was aware and which should have been included to make the offering circular not materially misleading and omissive. (Indictment ¶¶ 44-47).

The Indictment is no less specific with respect to the fraudulent conduct attributable to Collins for the period after the LBO and leading up to the Refco's initial public offering ("IPO"). (Indictment ¶¶ 50-54). For example, the Indictment alleges that during this period Collins continued to be responsible for the drafting of the documents used to manipulate Refco's finances for the quarter- and year-end round-trip loan transactions. (Indictment ¶¶ 52, 54).[3]

Additionally, the Indictment provides great specificity with regard to Collins's participation in the preparation of false and misleading registration statements on Forms S-4 and S-1 that Refco used to publicly register notes and common stock, respectively. (Indictment ¶¶ 55-57). The form S-4 included fraudulent information drawn from the offering circular prepared by Collins in connection with the sale of notes to finance the LBO. (Indictment ¶ 56). Additionally, Collins participated in the drafting of the Form S-1, which contained material misstatements in its "Risk Factors" section similar to the misstatements contained in the offering circular Collins helped prepare. (Indictment ¶ 57).

The public subsequently purchased $583 million of Refco's common stock on August 10, 2005, the date of the IPO. (Indictment ¶ 58). Soon thereafter, in October 2005, the $430 million RGHI receivable was discovered, and Bennett repaid this debt with an emergency

---

[3]   From in or about 2000 through in or about October 2005, Collins drafted and caused to be drafted the documents for approximately 17 separate round trip loan transactions totaling approximately $5.5 billion dollars, all while the existence of the large related party debt owed from RGHI to Refco was being concealed from Refco's unwitting investors, potential investors, banks, and auditors. (Indictment ¶ 54). In complaining about the complexity of this case, Collins has repeatedly underscored that Collins is alleged by the Government to have represented Refco and/or RGHI in approximately 24 separate transactions that were involved in the fraud. (See, e.g., Memorandum of Law In Support of Defendant Joseph P. Collins' Pre-Trial Motions (cited herein as "Br.") at 6). As alleged in the Indictment, however, the 17 round trip loan transactions followed a standard pattern, (Indictment ¶ 20), which means that by that one metric, at least, this case is not nearly as complicated as suggested.

loan from BAWAG.  (Indictment ¶ 60).  After Refco disclosed this matter to the public in a press release (Indictment ¶ 61), Refco's stock plummeted (Indictment ¶ 62), and Refco filed for bankruptcy. (Indictment ¶ 63).

Finally, the Indictment sets forth the detailed means and methods of the conspiracy, including means and methods in which Collins's participation is specifically alleged (Indictment ¶ 72(a)-(g)), as well as the overt acts carried out by Collins in furtherance of the scheme.  (Indictment ¶ 73(a)-(q)).

With regard to forfeiture, the Indictment provides notice that the Government seeks $2.4 billion in forfeiture with respect to Counts One through Ten of the Indictment and that the Government seeks $800 million in forfeiture with respect to Count Eleven.  (Indictment ¶¶ 86-87).

## B.    Discovery

The Government has provided substantial discovery to the defense pursuant to its obligations under Federal Rule of Criminal Procedure 16(a).   In particular, the defense has been provided with records obtained by the Government from Refco (including hard drives and email accounts of Refco employees); Mayer Brown, the law firm where Collins worked during his involvement in the fraud; Refco customers who loaned RGHI hundreds of millions of dollars at year- and quarter-end periods in order to hide the RGHI receivable; the underwriters of the August 2005 IPO; Refco's auditors; Lee; and other entities.  Almost all of the discovery has been provided in electronic format and is searchable.

The source of the overwhelming majority of the discovery has been documents previously obtained by the Securities and Exchange Commission (the "SEC") during its own

investigation of the Refco matter.  The Government has taken an "open file" approach to discovery, essentially turning over to the defendants all of the documents it has received from the SEC.

While this approach has resulted in a large number of electronic files and documents provided to the defense, the Government has taken several steps to help guide Collins through this material.  On January 2, 2008, approximately two weeks after Collins's initial appearance and arraignment before the Court, the Government provided Collins with more the 250 pertinent grand jury exhibits.  Furthermore, on February 20, 2008, the Government provided Collins with a collection of approximately 500 documents that the Government marked for exhibits in the trial of Collins's coconspirators Phillip Bennett, Robert Trosten (formerly Refco's chief financial officer), and Tone Grant (a past president of Refco), United States v. Phillip R. Bennett, et alia, 05 Cr. 1192 (NRB).[4]  On April 24, 2008, just a week after a guilty verdict was returned against coconspirator Tone Grant,[5] the Government additionally provided Collins with a collection of the approximately 550 exhibits that had been admitted at trial, many of which had previously been provided as marked exhibits.  Among other things, the exhibits included the forensic analysis used by the Government at trial to explain, in simple terms, various aspects of the accounting frauds committed at Refco.  Finally, from the outset of this case, the Government has offered to assist Collins's attorneys in their efforts to focus on the most relevant documents.

---

[4]  At the time, trial was scheduled to begin March 17, 2008 but was later adjourned to March 24, 2008.

[5]  On February 15, 2008, coconspirator Bennett pleaded guilty to a 20-count indictment without the benefit of a plea agreement.  On July 3, 2008, the Honorable Naomi Reice Buchwald sentenced Bennett to 16 years' imprisonment.  On February 20, 2008, Robert Trosten pleaded guilty pursuant to a plea agreement and awaits sentencing.  On April 17, 2008, Grant was convicted on all five counts with which he was charged and, like Trosten, awaits sentencing.

Counsel accepted this offer, and on July 30, 2008, the Government and counsel had a lengthy

meeting during which the Government discussed the discovery in the case in detail.

**C.     The Defense Requests For a Bill Of Particulars, Information and Legal Theories with Respect to Forfeiture, and Additional Discovery**

By letter dated February 6, 2008, Collins requested that the Government provide a

detailed bill of particulars on twelve enumerated topics seeking a broad array of evidentiary

detail about the charges set forth in the Indictment.  (Exhibit C to the Bach Decl.).  Without

specifically requesting a bill of particulars, Collins also requested that the Government identify

the proceeds that are alleged to be subject to forfeiture and explain the legal theories with respect

to which the money sought is forfeitable as to Collins.  (Id.).  In the same letter, Collins

additionally requested that 3500 material be provided two months in advance of trial and that the

Government disclose Brady and Giglio information, without specifying a date for such

production.  (Id.).

By letter dated February 20, 2008, the Government, citing the detailed allegations

contained in the Indictment, declined to provide Collins with a bill of particulars regarding the

allegations contained therein or to respond to their request for information relating to forfeiture

on the ground that the provision of such details are not required by law.  (Exhibit D to the Bach

Decl.).  The Government advised Collins that it was unaware of the existence of any Brady

information and that, consistent with the schedule for pre-trial discovery established in United

States v. Bennett, et alia, 05 Cr. 1192 (NRB), it would provide Giglio material one week before

the commencement of trial and 3500 material the week before a witness is to testify.  (Id.)  In

order to further assist Collins in his preparation for trial, the Government, although under no

legal obligation to do so, offered to provide the defendant with a preliminary witness list, list of coconspirators, and 404(b) notice 30 days in advance of trial.  (Id.).[6]

In the instant motion, Collins seeks a bill of particulars relating to the fraud allegations that identifies "each and every misrepresentation or material omission that Collins allegedly made or aided and abetted others in making." (Memorandum of Law In Support of Defendant Joseph P. Collins' Pre-Trial Motions (cited herein as "Br.") at 12).[7]  Collins reiterates his request for information relating to forfeiture, now styled as a request for a bill of particulars, as well as the immediate disclosure of Brady material and the disclosure of Giglio material two months in advance of trial.  Consistent with his February 6, 2008 letter, Collins requests that the Court require the Government to produce 3500 material two months in advance of trial.[8]

---

[6]  Collins already has access to the witness list and list of coconspirators from United States v. Phillip R. Bennett, et alia, 05 Cr. 1192 (NRB), because those documents were publicly filed.

[7]  To the extent that Collins sought other particulars in its February 6, 2008 that do not fall within the ambit of this broad request, the Government understands that such particulars are no longer sought.

[8]  Collins apparently does not seek the production of a list of coconspirators, a witness list, or 404(b) notice on a schedule more expedited than the one proposed by the Government which calls for such production 30 days in advance of trial.  Naturally, with respect to these disclosures, as with respect to the Government's disclosure of Giglio and 3500 material, the Government requests leave from the Court to supplement such disclosures after the such deadlines have passed due to the inevitable discovery of additional information and witnesses during the final days of trial preparation, and, indeed, during the trial itself.

## II. ARGUMENT

**A.    Bills of Particulars Are Not Warranted In This Case**

**1.    <u>The Government's Fraud Allegations</u>**

*(a)    **Applicable Legal Principles***

The proper scope and function of a bill of particulars is to "identify with sufficient particularity the nature of the charge" in order to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense.  <u>United States</u> v. <u>Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990); Fed. R. Crim. P. 7(f).

Due to the nature of criminal proceedings, a defendant has a right to be apprized only "'of the <u>essential</u> <u>facts</u> of the crime for which he has been indicted.'" <u>United States</u> v. <u>Sturtz</u>, 648 F. Supp. 817, 820 (S.D.N.Y. 1986) (emphasis added) (quoting <u>United States</u> v. <u>Salazar</u>, 485 F.2d 1272, 1278 (2d Cir. 1973)); <u>see</u> <u>United States</u> v. <u>Guerrerio</u>, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987) ("The purpose of a bill of particulars is to apprise defendants of the essential elements of the crimes with which they are charged.").  If so apprized, a defendant is not entitled to obtain – through a bill of particulars – a listing of each and every act, statement or event that the Government will prove at trial.  <u>See</u>  <u>United States</u> v. <u>Henry</u>, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (a request for "all acts in which [the defendant] participated" is improper as it "attempts to force the Government to particularize all of its evidence") (citing <u>United States</u> v. <u>Cephas</u>, 937 F.2d 816, 823 (2d Cir. 1991)); <u>United States</u> v. <u>Matos-Peralta</u>, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).[9]

---

[9]    Disclosure of such detail is improper as it allows a defendant to tailor his or her own testimony and/or defense to explain away the Government's case.  <u>See</u> <u>United States</u> v. <u>Cimino</u>, 31 F.R.D. 277, 279 (S.D.N.Y. 1962), <u>aff'd</u>, 321 F.2d 509 (2d Cir. 1963).

Accordingly, the Government is not required to (a) "particularize all of its evidence," United States v. Cephas, 937 F.2d at 823; Torres, 901 F.2d at 234 ("acquisition of evidentiary detail" not function of particulars motion); (b) disclose the manner in which the crimes charged were committed, United States v. Andrews, 381 F.2d 377, 378 (2d Cir. 1967); Torres, 901 F.3d at 233-34 (demands for "whens" and "wheres" and "by whoms" improper); or (c) provide the defendant with a preview of the Government's case or legal theories. United States v. Muyet, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996).

It has long been settled that the purpose of the bill of particulars "is to inform the defendant as to the crime for which he must stand trial, not to compel disclosure of how much the government can prove and how much it cannot or to foreclose the government from using proof it may develop as the trial approaches." United States v. Malinsky, 19 F.R.D. 426, 428 (S.D.N.Y. 1956); see United States v. Bellomo, 263 F. Supp.2d 561, 580 (E.D.N.Y. 2003). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). As this Court has held in the context of conspiracy allegations:

> As a general rule, the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly. It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts. . . . Details as to how the conspiracy was formed, or when each participant entered it, need not be revealed before trial.

United States v. Booth, 1999 WL 1192317, at *9 (S.D.N.Y. Dec. 14, 1999) (quotations omitted).

In addition "[i]f the information the defendant seeks is to be found in the indictment . . ., no bill of particulars is required." <u>Bellomo</u>, 263 F. Supp.2d at 580.  Moreover, in determining whether more particulars are necessary, courts assess <u>all</u> of the information provided to the defense – not just that contained in the indictment.  If the information the defendant seeks is provided in some alternate form – such as discovery, or statements or correspondence from the Government – no bill of particulars should be ordered.  <u>Bortnovsky</u>, 820 F.2d at 574; <u>United States</u> v. <u>Spy Factory</u>, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997).

The test is whether the information sought is necessary, not whether it is helpful. <u>United States</u> v. <u>Percan</u>, 1999 WL 13040, at *5 (S.D.N.Y. Jan. 13, 1999).  And the ultimate question is whether the indictment and/or other information provided is sufficient "to permit the Defendants to conduct a meaningfully directed investigation of the relevant facts and circumstances and be prepared to respond to the charges."  <u>United States</u> v. <u>Bin Laden</u>, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000).

### *(b)* *Discussion*

Collins seeks a bill of particulars relating to the Government's fraud allegations because, he claims, the Indictment is "written in broad strokes" and "fails to state with particularity the specific false representations or omissions that he allegedly made or aided and abetted others in making." (Br. at 10).  Even a cursory review of the 53 pages of fraud allegations in the Indictment makes it difficult to perceive how Collins could lodge such a complaint.  Indeed, just a quick skim of the Indictment makes plain that the Indictment provides Collins with sufficient notice of the lies and omissions he is alleged to have made and aided and abetted to adequately assist him in his preparation for, and to prevent surprise at, trial.

As an initial matter, the Indictment specifies many of the lies and omissions with great specificity. For example, with respect to the LBO that closed in August of 2004 by which Lee acquired an interest in Refco, Collins is alleged to have concealed or told lies about (or aided and abetted such concealment and lies): (1) the terms of an agreement between Refco and BAWAG called the PPA or Proceeds Participation Agreement and payments made to BAWAG to purchase rights under that agreement (Indictment ¶¶ 32-33); (2) the existence of $1 billion in related-party debt and various specified related-party transactions (Indictment ¶¶ 34-36); and (3) the existence of $500 million in excess working capital at Refco (Indictment ¶ 37). The Indictment further specifies several parties to whom such lies and omissions were made, (see, e.g., Indictment at 19-24 (discussing "Lies To Thomas H. Lee Partners"), 24-25 (discussing "Lies To Bank Syndicate"), and 25-26 ("Lies to Note Purchasers")), and also when such lies and omissions were made, (see, e.g., Indictment ¶ 32 ("In connection with the negotiations with Thomas H. Lee Partners, by no later than in or about March 2004 . . .")). The Indictment even specifies myriad ways that Collins participated in lies that were told as part of the scheme, (see, e.g., Indictment ¶ 34 (alleging that Collins caused to be documented transactions that concealed the related-party debt)), and several documents that contained such lies and omissions (see, e.g., Indictment ¶ 36 (alleging that such lies and omissions were contained in, among other things, the contract documents relating to the LBO)).

Indeed, in connection with the securities fraud allegations, the Indictment identifies documents that contained relevant lies and omissions (see, e.g., ¶¶ 56-57 (alleging omissions in Forms S-4 and S-1 filed with the SEC on April 6, 2005 and August 8, 2005, respectively)); specifies lies or omissions contained therein (see, e.g., Indictment ¶ 57

14

(specifying omissions in the "Risk Factors" section of the S-1)); and specifies Collins's role with respect to those documents (see, e.g., Indictment ¶ 57 (alleging that Collins participated in the drafting of the "Risk Factors" section of the S-1).

These are just some of the examples of lies and omissions in which Collins is alleged to have participated. The Indictment contains the same level of specificity with regard to other alleged lies and omissions. As such, the Indictment clearly provides far more specificity with respect to the crimes alleged than is required by law. See Bellomo, 263 F. Supp.2d at 580 ("[i]f the information the defendant seeks is to be found in the indictment . . ., no bill of particulars is required." ); United States v. Rigas, 258 F.Supp.2d 299, 305 (S.D.N.Y. 2003) ("The government is not obligated to go further and provide specific information regarding the Defendants' alleged role in various aspects of the scheme").
It certainly provides Collins with adequate notice of the charges against him[10] and, indeed, really provides him with the information he seems to seek through a bill of particulars.

Of course, in addition to the lengthy, detailed Indictment in this case, the Government has made discovery available to him in forms that further show his application for a bill of particulars is meritless. Not only has the Government produced the bulk of the documents in this case in electronic form so that they can be uploaded into a searchable database, but the Government has also provided discreet collections of the most pertinent documents, whether

---

[10]   Collins's own submission belies the ambiguity and generality that he claims afflicts the Indictment and plainly demonstrates that the Indictment provides him with sufficient notice of the charges against him. For example, Collins acknowledges that the Indictment contains allegations "that Collins knew about [the undisclosed inter-company debt of $1.1 billion], and that he helped to hide it from the purchasers of the company and its shares," (Br. at 1), and further identifies, with references to the relevant paragraphs in the Indictment, transactions, "aided and abetted by Collins," that carried out such fraud. (Br. at 5).

through the production of Grand Jury exhibits or marked and admitted exhibits from the trial of

coconspirator Tone Grant, that provide further particularization.  For example, the Indictment

alleges four counts of wire fraud.  The Indictment specifies the dates of the wires, the form of the

wires (emails), and that they were between the offices of Collins's law firm and representatives

of Lee.  Undoubtedly, with this identifying information, it has not been difficult for Collins and

his counsel to identify the four emails in question from the discreet set of grand jury exhibits

provided to them.  Because, additionally, the information that Collins seeks is readily available

from the targeted discovery the Government has provided, no bill of particulars is necessary.

See Bortnofsky, 820 F.2d at 574; Spy Factory, 960 F. Supp. at 690-91.  Of course, the

Government has further offered to provide defense counsel with a list of exhibits to be used at

his trial 30 days in advance of the trial date, providing further reason why a bill of particulars is

unnecessary.

        None of the cases Collins cites supports a contrary result.  Two of the cases cited

appear to support the rather uncontroversial proposition that, in a case alleging false statements

under 18 U.S.C. § 1001, an indictment should provide a defendant with notice of the false

statements that attributed to him.  See  United States v. Trie, 21 F.Supp.2d 7, 13, 21-22 (D.D.C.

1998); United States v. Konefal, 566 F. Supp. 698, 702-03 (N.D.NY 1983).  This is not a false

statements case, but one might at least perceive how Collins would try to rely on such cases if

the Indictment here failed to specify any of the misrepresentations and omissions attributable to

Collins.  Of course, as demonstrated *supra*, the Indictment provides such detail.

        Indeed, the indictments in the cases cited by Collins plainly did not provide the

level of specificity contained in the Indictment in this case.  See, e.g., United States v. Lino,

2001 WL 8356, *6-7 (S.D.N.Y. Dec. 29, 2000) (although law enforcement officer was accused of abuse of position for having leaked law enforcement information, the indictment did not describe what information was leaked); United States v. Nachamie, 91 F. Supp. 2d 565, 575 (S.D.N.Y. 2000) (Government ordered to identify false and misleading statements made by defendants, which apparently were not identified in the indictment).  Put differently, to the extent that the cases call for indictments to specify misrepresentations and omissions, see United States v. Caine, 270 F. Supp. 801, 806 (S.D.N.Y. 1967) (requiring the Government to specify the representations alleged to be false), such specification is provided in the Indictment in this case.

To the extent the courts in the cases cited by Collins rejected claims by the Government that the discovery produced provided sufficient particularization, the Government in those cases appear not to have taken measures similar to the measures taken in this case to guide the defendant to pertinent materials.  See Bortnovsky, 820 F.2d at 575; Nachamie, 91 F.Supp.2d at 570-71; United States v. Mango, 1997 WL 222367, *8-10 (S.D.N.Y. May 1, 1997).  As this Court has noted, defendants ought not be permitted "to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government when the Indictment, discovery, and other information provided by the government adequately notify the Defendants of the charges against them."  Rigas, 258 F.Supp.2d at 305.

Nor is this case of such a scope that the argument for a bill of particulars is especially compelling.  While the case involves conduct spanning eight years, unlike several of the cases cited by Collins, this case does not involve a worldwide conspiracy, Bin Laden, 92 F.Supp.2d at 234-35, multiple defendants, Lino, 2001 WL 8356, at *1 (indictment named 23 defendants); or a participant only tangentially involved in the fraud. See Nachamie, 91

F.Supp.2d at 570-71.  Nor is this a RICO case, which often involve allegations of such broad scope that there is a special obligation to provide particularization.  See United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (noting that in RICO cases "[w]ith the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charges to a degree that might not be necessary in the prosecution of crimes of more limited scope."); see, e.g., Lino, 2001 WL 8356, at *1 (bill of particulars granted where indictment contained RICO allegations relating to the securities of twelve companies and the operations of six brokerage firms).  This a single-defendant case involving a the principal lawyer for a single financial services firm and its parent company who was intimately involved in the business of the company and who is alleged to have made misrepresentations or omissions to a handful of readily specified victims.

In sum, given the heavily detailed "speaking" Indictment, the mostly searchable discovery provided to the defense, the Grand Jury Exhibits, the production of Government Exhibits marked and admitted in United States v. Phillip R. Bennett, et alia, 05 Cr. 1192 (NRB), no bill of particulars is warranted here.  As described above, the Government has already gone well beyond its obligations to provide specific information relating to the charges contained in the Indictment.  Collins's claim that "[i]t is impossible for defense counsel to distill from [the discovery] exactly what specific misrepresentations or omissions Collins should be prepared to defend," (Br. at 10), is simply without foundation and should be rejected.  Given the specificity in the Indictment, Collins is plainly fishing for information relating to how the Government will prove Collins's participation in the lies and omissions set forth in the Indictment, which is a level

18

of evidentiary detail to which he is not legally entitled.  Accordingly, his application for a bill of particulars with respect to the fraud allegations in the Indictment should be denied.

### 2.    The Government's Forfeiture Allegations

Collins additionally seeks an order requiring the Government to particularize its forfeiture allegations.[11]  Specifically, he seeks an order requiring the Government to specify the property it seeks to forfeit and the legal theory or theories upon which the Government seeks such forfeiture.  Collins's application should be denied with respect to both types of particulars.

The Indictment provides Collins with sufficient notice of the property that the Government seeks to forfeit from him.  As specified in the Indictment, the Government seeks a money judgment in the amount of $2.4 billion with regard to Counts One through Ten of the Indictment and $800 million with respect to Count Eleven of the Indictment.  (Indictment  ¶¶ 86-87).  The Indictment further specifies how these sums relate to the fraud with which Collins is charged.  Specifically, $2.4 billion represents the amount of money fraud victims paid in connection with the LBO and the IPO combined (approximately $600 million by note purchasers in the LBO, $800 million by banks in the LBO, $500 million by Lee in the LBO, and $583 million by the public in the IPO), and $800 million relates to the money paid by banks in connection with the LBO fraud.  (Indictment ¶ 10).  Additionally, the forfeiture allegations cite and track the language of the statutes under which forfeiture is being sought, thereby providing notice to Collins of the legal basis for the forfeiture.  No more is required.  See Fed. R. Crim. P.

---

[11]    Collins asserts that the Indictment in this case does not contain "any allegation that Collins personally pocketed even a single dollar of proceeds from the Refco fraud."  (Br. at 6). As the Court noted in response to a similar assertion by counsel at Collins's initial appearance and arraignment, Collins's relationship with Refco, his most significant client, resulted in at least approximately $40 million in fees being invoiced by his law firm to Refco during the period of the alleged fraud.  (Indictment ¶ 4).

32.2(a) (requiring that indictment provide notice merely that "the government will seek forfeiture of property as part of any sentence in accordance with the applicable statute"); United States v. LaMorte, 744 F. Supp. 573, 577 (S.D.N.Y. 1990) ("It is improper to use a bill of particulars to compel the Government to . . . preview its evidence or legal theory."); United States v. Varacalli, 2004 WL 992493, at *2 (S.D.N.Y. May 5, 2004) (denying application for bill of particulars identifying legal theory for forfeitures identified in indictment). Indeed, the Government is entitled to take discovery to identify specific forfeitable property even after conviction. See Fed. R. Crim. P. 32.2(b)(3).

The only case that Collins cites in which a court granted a bill of particulars on the ground that the indictment was not sufficiently specific is inapposite. In United States v. Ianniello, 621 F. Supp. 1455 (S.D.N.Y. 1985), the district court granted defendant's motion for a bill of particulars but in circumstances where the indictment went "no further than the statement that all property acquired in violation of law may be subject to forfeiture." 621 F. Supp. at 1479. Here, of course, the Indictment sets forth the amount of money sought to be forfeited, how that money relates to the fraud with which the defendant is charged, and the statutory bases for the forfeiture.

That said, the Government will provide the defendant with information concerning particular properties it intends to forfeit within 60 days of trial, by which time it will have placed a *lis pendens* against any and all real properties sought to be forfeited and will otherwise have filed the appropriate seizure warrants. Naturally, the Government reserves the right to supplement whatever particulars it provides up to and even after any conviction is obtained. See Fed. R. Crim. P. 32.2(b)(3). The Government respectfully submits that such a

schedule is more than adequate to provide Collins with notice given that the information is not necessary for trial preparation and would only be relevant at sentencing.  Fed. R. Crim. P. 32.2(b)(1).

**B.    The Polygraph Evidence Should Not Be Admitted, and No Hearing Is Required to Make Such Determination**

Collins's proposed polygraph evidence should be precluded without a hearing. The Second Circuit has made clear that polygraph evidence is inadmissible pursuant to Rule 702 of the Federal Rules of Evidence because it is <u>not</u> "the product of reliable principles and methods," and therefore will <u>not</u> "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Furthermore, even if the polygraph evidence were admissible under Rule 702, it should nonetheless be excluded pursuant to Federal Rule of Evidence 403, because any minimal probative value the evidence may have is substantially outweighed by its prejudicial effect.  As set forth below, the Second Circuit has additionally made clear that there is no requirement that a hearing be held before polygraph evidence may be excluded.

**1.    The Proffered Polygraph Evidence**

Collins seeks to offer the expert testimony of Barry Colvert, who administered a polygraph examination to Collins on June 26, 2007, regarding events that had occurred almost three years prior to the administration of the test.  Collins did not provide notice to the Government that he was undergoing a polygraph examination, so the Government had no opportunity to observe or participate in the examination.  According to Collins, Colvert will offer his expert opinion, pursuant to Federal Rule of Evidence 702, that Collins's answers of "no" to

21

the following three questions "indicate truthfulness" and demonstrate "an extraordinarily low probability of deception" (Br. at 13, 15)[12]:

> (1) At the time of the sale of REFCO stock to Thomas Lee, were you aware that the intercompany debt was being concealed from him?;

> (2) At the time of the sale of REFCO stock to Thomas Lee, had you been told there was over a billion dollars in inter-company debt?; and

> (3) At the time of the sale of REFCO stock to Thomas Lee, did you tell anyone that there was over a billion dollars in inter-company debt?[13]

### 2.    The Legal Principles Governing Expert Testimony

The admissibility of expert testimony in the federal courts is governed by the Supreme Court's 1993 ruling in <u>Daubert</u> v. <u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). In <u>Daubert</u>, the Court rejected what had previously been known as the "<u>Frye</u>" test, which held that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community. <u>Frye</u> v. <u>United States</u>, 293

---

[12]   It is unclear what Collins is proposing as Colvert's testimony. The "indicate truthfulness" language does not appear in Colvert's affidavit or report, and the "extraordinarily low probability of deception" appears only in his affidavit. (Colvert Aff. ¶ 2). Colvert's report indicates a finding that Collins's answers were "not indicative of deception," and that one test revealed a result of "No Deception Indicated....Probability of Deception is less than 0.01." (Ex. B to Colvert Aff. at 3). As indicated below, none of this testimony is admissible.

[13]   As discussed *infra*, these questions have erroneous factual assumptions and seem carefully tailored to assure a "non-deceptive" response.

22

F. 1013, 1014 (D.C. Cir. 1923). In <u>Daubert</u>, the Supreme Court held that the Federal Rules of Evidence had superseded the <u>Frye</u> test and therefore governed the admissibility of expert testimony in a federal trial. 509 U.S. at 587. The Court found that Federal Rule of Evidence 702 requires that the subject of an expert's testimony must be "scientific . . . knowledge." <u>Id</u>. at 588-90. In addition, the Court found that Rule 702 and principles of relevancy require that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." <u>Id</u>. at 591-92. Although the Supreme Court did not set forth a definitive checklist, it made certain "general observations" to aid trial judges in making this determination. A trial judge should determine:

(1)     whether a theory or technique can be and has been tested;

(2)     whether the theory or technique has been subjected to peer review and publication;

(3)     the known or potential rate of error;

(4)     the existence and maintenance of standards controlling the technique's operation; and

(5)     the degree of general acceptance within the relevant scientific community.

<u>Id</u>. at 593-94.

Importantly, the Court noted that throughout his or her analysis, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules," <u>id</u>. at 595, including Rule 403, which "permits the exclusion of relevant

evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .'" Id.

    **3.**     **Polygraph Evidence Is Not Sufficiently Reliable To Be Admitted**

        It has long been the rule in the Second Circuit that polygraph evidence is not admissible. Collins contends that there is some ambiguity in the Circuit since the Supreme Court's 1993 Daubert ruling and that either the testimony should be admitted or a hearing conducted to fully consider the issue. Collins is incorrect. As a threshold matter, Daubert did not alter the standard for admissibility in the Second Circuit. Even prior to Daubert, the Second Circuit abandoned the strict Frye "general acceptance" standard for evaluating scientific evidence and adopted the more permissive approach of the Federal Rules of Evidence. See, e.g., United States v. Williams, 583 F.2d 1194 (2d Cir. 1978); United States v. Jakobetz, 955 F.2d 786, 794 (2d Cir. 1992). Under essentially the same standard subsequently adopted by the Supreme Court in Daubert, the Second Circuit twice sustained district court rulings excluding polygraph evidence for lack of demonstrated reliability. See United States v. Rea, 958 F.2d 1206, 1224 (2d Cir. 1992) (stating that "[t]his court has intimated in the past that the results of polygraph examinations are not admissible in this Circuit" and finding "no abuse of discretion" where district court "did not believe polygraph tests were sufficiently reliable to warrant the admission of the results in evidence"); United States v. Bortnovsky, 879 F.2d 30, 35 (2d Cir. 1989) (affirming exclusion of polygraph evidence on motion for new trial). See also United States v. Clark, 1987 WL 13273, at *2 (S.D.N.Y. June 30, 1987) ("The law in this circuit is clear. Polygraph examinations are viewed by the court of appeals with suspicion and are inadmissible."); Republic National Bank of New York v. Eastern Airlines, 639 F. Supp. 1410,

1419 (S.D.N.Y. 1986) (granting motion for summary judgment where polygraph results were the only evidence that might raise genuine issue of material fact because "such results are generally inadmissible in federal court"), aff'd, 815 F.2d 232 (2d Cir. 1987).

        Courts in the Second Circuit -- and other circuits -- have been just as hostile to polygraph evidence after Daubert as they were before Daubert, rejecting polygraph evidence without a need for any type of hearing because such evidence was unreliable and misleading. As Judge Spatt of the Eastern District of New York wrote only a few months after Daubert, "Nothing in Daubert changes the rationale set forth in Rea and Bortnovsky. The polygraph test is simply not sufficiently reliable to be admissible." United States v. Black, 831 F. Supp. 120, 123 (E.D.N.Y. 1993). Other similar rulings followed. See, e.g., United States v. Ruggiero, 100 F.3d 284, 292 (2d Cir. 1996) ("we have previously intimated that such 'lie-detector' tests are generally not admissible in federal court because of their questionable accuracy"); United States v. Kwong, 69 F.3d 663, 668 (2d Cir. 1995) (declining to hold that polygraph results were admissible under Rule 702, because the testimony at issue "would not likely 'assist the trier of fact,'" and affirming exclusion of evidence under Rule 403); United States v. Manzano, 946 F. Supp. 1141, 1141 (S.D.N.Y. 1996) (amending prior order to "cure any impression that the . . . Court found that polygraph evidence is sufficiently reliable to justify its admission in court proceedings"; "great weight of authority is to the contrary"); Meyers v. Arcudi, 947 F. Supp. 581, 584-90 (D. Conn. 1996) (evidence excluded under Daubert analysis without hearing); United States v. Saldarriaga, 179 F.R.D. 140, 140 (S.D.N.Y. 1998) (stating the holdings of both Judge Martin and Judge Knapp that "[n]o polygraph evidence should be admitted after a defendant has obtained a favorable one which was taken without notice to the Government");

25

United States v. Bellomo, 944 F. Supp. 1160, 1164 (S.D.N.Y. 1996) ("polygraph evidence never

has been admitted in a federal trial in this Circuit, even in the three years since Daubert"); United

States v. Lech, 895 F. Supp. 582, 585 (S.D.N.Y. 1995) (even assuming admissibility under Rule

702, excluding polygraph evidence under Rule 403 because its "prejudicial value . . .

substantially outweighs its probative value").

        The long-standing view of courts within the Second Circuit regarding the

unreliability of polygraph evidence was subsequently confirmed by the United States Supreme

Court.  In 1998, the Court found that "there is simply no consensus that polygraph evidence is

reliable" and ruled that polygraph evidence may be held inadmissible without a hearing.  United

States v. Scheffer, 523 U.S. 303, 309 (1998).  In Scheffer, which Collins fails to cite, the

Supreme Court held that Military Rule of Evidence 707, which makes polygraph evidence

inadmissible in court-martial proceedings, does not unconstitutionally abridge the right to

present a defense under the Sixth Amendment of the Constitution.  The Court's decision was

based on a finding that "there is simply no way to know in a particular case whether a polygraph

examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best

polygraph exams." Id. at 312.  The Court stated that "the scientific community remains

extremely polarized about the reliability of polygraph techniques" and that scientific field studies

suggest the accuracy rate is "'little better than could be obtained by the toss of a coin,' that is, 50

percent," ultimately ruling that Rule 707 was not unconstitutional.  Id. at 309-10.  In concluding

that polygraph examinations are unreliable and that a rule of evidence excluding their

admissibility does not violate the Constitution, the Supreme Court in Scheffer relied, in part, on

United States v. Messina, 131 F.3d 36, 42 (2d Cir. 1997), in which the Second Circuit reiterated

that "we have not decided whether polygraphy has reached a sufficient state of reliability to be admissible under Rule 702 of the Federal Rules of Evidence."

Since Scheffer, the courts within the Second Circuit have adhered to the Supreme Court's findings regarding the unreliability of polygraph evidence. See, e.g., United States v. Duverge Perez, 295 F.3d 249, 253-54 (2d Cir. 2002) (finding no abuse of discretion from the district court's refusal to admit polygraph evidence in connection with the defendant's sentencing); United States v. O'Connor, 2008 WL 921036, at *2 (N.D.N.Y. Apr. 2, 2008) ("it is well-settled that polygraph evidence is unreliable"); United States v. Bentham, 414 F. Supp. 2d 472, 473 (S.D.N.Y. 2006) ("Polygraph tests, for example, are so unreliable as to be inadmissible in most courts."); United States v. Canter, 338 F. Supp. 2d 460, 463 (S.D.N.Y. 2004) ("While the Second Circuit has reserved deciding whether polygraph technology is sufficiently reliable evidence to be admissible under Rule 702 in light of Daubert, both the Second Circuit and its district courts have consistently expressed serious doubt as to the reliability of such evidence, even after Daubert."); Collins v. Bennett, 2004 WL 951362, at *5 (W.D.N.Y. Apr. 13, 2004) ("the 'traditional rule' in the Second Circuit is that polygraph results are inadmissible"); United States v. D'Angelo, 2004 WL 315237, at *27 (E.D.N.Y. Feb. 18, 2004) ("Polygraphs are insufficiently reliable even for use as impeachment, let alone as affirmative evidence."); Monsanto v. United States, 2000 WL 1206744, at *5 (S.D.N.Y. Aug. 24, 2000) (polygraph results "are considered unreliable and are not admissible in court").

Other Circuits have similarly affirmed District Court decisions not to admit evidence of polygraph evidence based on, among other arguments, the lack of reliability of such testing and the danger of unfair prejudice as a result of the use of such evidence and without a

27

hearing. See, e.g., United States v. Swayze,378 F.3d 834, 837(8th Cir. 2004) ("When two witnesses contradict each other, juries, not polygraph tests, determine who is testifying truthfully."); United States v. Prince-Oybo, 320 F.3d 494, 500 (4th Cir. 2003) (Daubert did not change the law that polygraph evidence is per se inadmissible; no hearing is necessary). Although, as Collins indicated, more than ten years ago the Fifth and Ninth Circuits reversed district court decisions excluding polygraph evidence under the traditional rule and remanded for Daubert hearings, see United States v. Posado, 57 F.3d 428, 436 (5th Cir. 1995); United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997), the district court in each case, upon remand, conducted a thorough and complete Daubert hearing and determined that the polygraph evidence was unreliable and prejudicial and therefore inadmissible under Rules 702 and 403.  See United States v. Ramirez, 1995 WL 918083, at *4-*5 (S.D. Tex. Nov. 17, 1995); United States v. Cordoba, 991 F. Supp. 1199, 1208 (C.D. Cal. 1998), aff'd, 194 F.3d 1053 (9th Cir. 1999).

Despite Collins's statement that "[s]ince Daubert the courts have become more open" (Br. at 20), the Government is aware of only two reported federal decisions in the country, both from 1995, in which polygraph evidence was admitted, both of which are cited by Collins. See United States v. Galbreth, 908 F. Supp. 877 (D. New Mex. 1995) (permitted in tax evasion trial); United States v. Crumby, 895 F. Supp. 1354 (D. Ariz. 1995) (permitting testimony in bank robbery trial only on fact of polygraph examination and ultimate result, but not on specific questions and answers).[14]  Significantly, however, both of these decisions came before the

---

[14]    Collins also cites Lee v. Martinez, 136 N.M. 166 (2004), for the proposition that "Case Law Supports the Admission of this Polygraph Evidence."  (Br. at 19). This case, however, deals with New Mexico state law, which includes a rule of evidence (N.M.R.E. 11-707) that specifically contemplates admission of polygraph examinations.  Obviously the Federal Rules of Evidence contain no such rule, nor has the federal system followed New Mexico's approach to polygraph results.

Supreme Court's decision in <u>Scheffer</u>, which discussed in great detail the unreliability of polygraph evidence.  Since the Supreme Court's decision in <u>Scheffer</u>, no federal court – based upon the Government's research – has ruled that polygraph evidence may be admitted at trial, or even that a <u>Daubert</u> hearing must be held before a determination can be made to exclude polygraph evidence for lack of reliability.  Certainly Collins has cited no such cases.  The Government submits that the Court should follow the conclusions of the Supreme Court and the Second Circuit regarding the questionable reliability of polygraph evidence and preclude the introduction of or reference to Collins's polygraph evidence at trial, without a hearing.

    **4.**      **The Circumstances of Collins's Polygraph Examination Further Demonstrate Its Inadmissibility**

       The Court should exclude the proffered polygraph evidence first and foremost because it is unreliable under any circumstance, and therefore irrelevant and inadmissible under Rule 702.  As the case law reviewed above makes clear, polygraph examinations have not been proven to be accurate in "real life" situations, as opposed to laboratory settings, <u>e.g.</u>, <u>Scheffer</u>, 523 U.S. at 309-10 & n.6; <u>Ramirez</u>, 1995 WL 918083, at *2; <u>United States</u> v. <u>Pitner</u>, 969 F. Supp. 1246, 1251 (W.D. Wash. 1997); the known or potential error rate for polygraphy is undetermined, <u>e.g.</u>, <u>Ramirez</u>, 1995 WL 918083, at *2; <u>Meyers</u>, 947 F. Supp. at 587; <u>Cordoba</u>, 991 F. Supp. at 1204; and polygraphy has not been generally accepted in the relevant scientific community, including the FBI, for courtroom fact determination, <u>e.g.</u>, <u>Meyers</u>, 947 F. Supp. at 588; <u>Pitner</u>, 969 F. Supp. at 1251; <u>Cordoba</u>, 991 F. Supp. at 1204-05.  As the Supreme Court concluded after a thorough review of the issue, "there is simply no consensus that polygraph evidence is reliable."  <u>Scheffer</u>, 523 U.S. at 309.

Additionally, the specific circumstances of Collins's polygraph examination render this evidence even more unreliable. First, Collins did not provide the Government with notice that he was taking a polygraph, nor did he permit the Government the opportunity to observe or participate in the examination. Collins therefore knew that he would only have to disclose the results of that examination if favorable. By taking the polygraph examination in this risk-free environment, Collins substantially reduced the threat to himself and thereby increased his ability to beat the test. Both Judges Martin and Knapp have held that the results of polygraph examinations taken without notice to the Government should be precluded as a matter of law, without any hearing. Saldarriaga, 179 F.R.D. at 140; accord United States v. Pettigrew, 77 F.3d 1500, 1515 (5th Cir. 1996); Posado 57 F.3d at 435; United States v. Sherlin, 67 F.3d 1208, 1216-17 (6th Cir. 1995); Meyers, 947 F. Supp. at 589.[15]

Second, the polygraph examination in this case is unreliable because there is no assurance that Collins did not use countermeasures to defeat the test. We have been informed by counsel that Colvert failed to use an "activity monitor" during his examination of Collins. Thus, there is no way to be sure that Collins's answers were truthful, because polygraph tests are much more easily defeated without an activity monitor. See Ramirez, 1995 WL 918083, at *2. For this reason as well, the polygraph examination in this case is of highly questionable validity and should be excluded from evidence.

Third, the nature of the three questions presented to Collins render the results inadmissible. The first question was: "At the time of the sale of REFCO stock to Thomas Lee,

---

[15]  Although Collins offered to take another test, as noted in United States v. Dominguez, 902 F. Supp. 737, 740 (S.D. Tex. 1995), "each successive test becomes progressively less reliable because the subject becomes accustomed to the process" (quoting defense witness expert).

were you aware that the inter-company debt was being concealed from him?"  This question is inherently unreliable.  As Collins and his attorneys well knew prior to the test, the LBO involved a merger and purchase agreement (not a straight stock sale), and was with the artificial entity, Thomas H. Lee Partners, not Thomas Lee himself.[16]  Accordingly, the question is basically meaningless, as was Collins's answer, because Collins could honestly answer that he was not aware of any deception involving the sale of stock in Refco to Thomas Lee (personally), since no such sale ever occurred.  Similarly unhelpful is the second question: "At the time of the sale of REFCO stock to Thomas Lee, had you been told there was over a billion dollars in inter-company debt?"  While the actual amount of the RGHI debt to Refco was in excess of $1 billion, we anticipate that the evidence at trial, including notes written in Collins's own hand, will show that Collins had full knowledge of a $1 billion debt.  (A copy of the notes are attached as Exhibit A).  Obviously, Collins could have had full knowledge of a $1 billion debt, yet truthfully give an answer of "No" to the question posed, which asked about his knowledge of a debt that was "over" $1 billion.  Furthermore, the way the question was posed, Collins may have been told something very similar, but not in the exact words framed in the question (e.g, "inter-company debt"), and still be able to provide a technically true "No" answer.  The third question, which relies on similar language, is similarly defective.

Accordingly, based on the general unreliability of polygraph examination, exacerbated by the specific circumstances of the polygraph examination administered to Collins here, Collins's polygraph evidence should be held inadmissible under Rule 702.

---

[16]  Mr. Lee was involved in the negotiations but was not the lead negotiator.

**5.      The Extreme Prejudice To The Government Would Outweigh
Any Conceivable Relevance Of The Polygraph Evidence**

Even if Collins's polygraph results were reliable and admissible under Rule 702,

the polygraph evidence should nonetheless be precluded under Federal Rule of Evidence 403,

because its probative value, if any, is substantially outweighed by its prejudicial effect.  See

Kwong, 69 F.3d at 668 (excluding polygraph evidence because its probative value was

substantially outweighed by the danger of unfair prejudice, confusion of the issues, and

misleading the jury); Lech, 895 F. Supp. at 584 (same).  Indeed, as a general matter, the specter

of unfair prejudice, confusion of the issues, and misleading the jury renders polygraph evidence

inadmissible under Rule 403 of the Federal Rules of Evidence in virtually every case. The

introduction of polygraph evidence poses a serious danger "that juries might be misled, and give

'excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise . . .

.'" United States v. Lea, 249 F.3d 632, 639 (7th Cir. 2001) (quoting Scheffer, 523 U.S. at 313-

14) (precluding polygraph evidence because any minimal probative value polygraph evidence

may have is substantially outweighed by its prejudice).  As the Supreme Court noted in Scheffer,

"[a] fundamental premise of our criminal trial system is that 'the jury is the lie detector.'"

Scheffer, 523 U.S. at 313.  "[T]he aura of infallibility attending polygraph evidence [could] lead

jurors to abandon their duty to assess credibility and guilt."  Id. at 313-14. See Meyers, 947 F.

Supp. at 589 (collecting cases rejecting polygraph evidence under Rule 403 because of its "aura

of infallibility"); see also United States v. Benavidez-Benavidez, 217 F.3d 720 (9th Cir. 2000)

(affirming exclusion of polygraph evidence on Rule 403 grounds in light of the special risk that

the jury might give excessive weight to the polygrapher's conclusions).

In addition, as the Supreme Court in <u>Scheffer</u> noted, the admission of polygraph evidence undermines the interest the judicial system has in avoiding collateral litigation over "issues other than the guilt or innocence of the accused" that prolongs criminal proceedings and distracts the trier of fact from its "central function of determining guilt or innocence." 523 U.S. at 314. The Court specified that,

> [a]llowing proffers of polygraph evidence would inevitably entail assessments of such issues as whether the test and control questions were appropriate, whether a particular polygraph examiner was qualified and had properly interpreted the physiological responses, and whether other factors such as countermeasures employed by the examinee had distorted the exam results. <u>Such assessments would be required in each and every case</u>.

<u>Id</u>. (emphasis added).

The specific circumstances of Collins's polygraph create even further risk of unfair prejudice to the Government. As discussed above, the questions posed to Collins were inherently prejudicial due to their ambiguous phrasing and inaccurate content, and the examination was also infirm because it lacked an activity monitor.

Additionally, taken three years after the events that were the subject of the questions asked, Collins's examination does not provide a window into his intent at the time of those events but rather only an insight into what Collins has been able to convince himself about his intent during the passage of those years. As recognized by a district court in Texas, "a polygraph test does not determine the truth of facts based upon a respondent's answers, but rather the respondent's belief about the facts." <u>United States</u> v. <u>Hernandez</u>, 2003 WL 102623, at *2 (N.D. Tex. Jan. 8, 2003). In <u>Hernandez</u>, the court rejected polygraph evidence because the polygraph examination was taken more than 27 months after the events, and therefore the

defendant had 27 months to convince himself of a version of facts that may not be the truth.  The district court noted that the defendant's beliefs 27 months after the facts "do not inform the facts as they existed."  <u>Id</u>.  Similarly, here Collins took the polygraph in June 2007, nearly three years after the August 4, 2004 LBO transaction.  Accordingly, Collins had nearly three years to convince himself that the answers to his questions were truthful.  Because of the amount of time that has passed, whether a polygrapher can detect deception when Collins answered questions in 2007 about his state of knowledge in 2004 is entitled to very little weight and poses great dangers of misleading and confusing the jury.

Indeed, in an analogous situation, the Sixth Circuit affirmed the district court's refusal to admit the results of a defendant's polygraph examination.  <u>Sherlin</u>, 67 F.3d at 1216-17.  In <u>Sherlin</u>, the defendant took the stand at trial and offered the polygraph results to support his testimony.  Without reaching the Rule 702 issue, the district court and the Sixth Circuit found that the proffered evidence failed to satisfy Rule 403 for two reasons: (i) because "use of a polygraph solely to bolster a witness' credibility is 'highly prejudicial,' especially where credibility issues are central to the verdict"; and (ii) because the defendant, like Collins, unilaterally took the polygraph examination, rendering the test results to have "extremely dubious probative value" "because the defendant would have no adverse interest at stake in the polygraph."  <u>Id</u>. at 1217 (quotation omitted).

Like <u>Sherlin</u>, this is a case where credibility issues will be central to the verdict and where the defendant would be seeking to admit the results of a polygraph examination solely

to bolster his own credibility.[17]  Given the recognized unreliability of polygraph examinations, Collins should not be allowed to introduce such evidence in this case.

In sum, the relevance of the purported evidence is specious, at best.  At best, Colvert could testify that Collins did not show signs of deception when answering certain ambiguous and inaccurate questions about Collins's conduct.  The relevance of such proof is far outweighed by the confusion it would cause the jury and the unfair prejudice it would cause the Government.  Because polygraph evidence is inherently flawed and unreliable, and because the examination results proffered in this case are particularly defective, this Court should exclude the evidence based on the decisions of courts that have excluded polygraph evidence without a hearing and on the decisions of other courts that have held such hearings and reached the same result.

**C.    Brady, Giglio, and 3500 Materials**

Collins urges the Court to compel the Government to produce Brady material immediately and to produce Giglio and 3500 material two months before trial.  For the reasons set forth below, the Court should deny Collins's motion and adopt the Government's proposed schedule of producing Brady material as it arises, Giglio material one week before trial, and 3500 material one week prior to the witness's scheduled testimony.

Collins has asked the Court to order the Government to produce Brady material "immediately."  (Br. at 20).  The Second Circuit addressed the timing and disclosure requirements of Brady and Giglio material in United States v. Coppa, a case in which the defendants similarly moved to compel the Government to disclose, far in advance of trial, all

---

[17]  Obviously, the hearsay rules would otherwise prevent Collins from offering the answers to the polygraph questions absent his own testimony.

exculpatory and impeachment evidence in its possession.  267 F.3d 132, 136 (2d Cir. 2001).  In

Coppa, the district court ordered such early disclosure, in reliance on its prior decision in United

States v. Shvarts, 90 F. Supp.2d 219 (E.D.N.Y. 2000).  In Shvartz, the District Court had held

that the Due Process Clause of the Fifth Amendment required the Government, post-indictment,

to disclose immediately all exculpatory and impeachment evidence once those materials had

been requested by a defendant.  See Coppa, 267 F.3d at 135-37.  The Second Circuit reversed,

holding that the District Court exceeded its authority by ordering the immediate disclosure of all

exculpatory and impeachment materials.  The Circuit held that, pursuant to Brady and its

progeny, the timing of such disclosure must be "no later than the point at which a reasonable

probability . . . exist[s] that the outcome [of the trial] would have been different [than] if an

earlier disclosure had been made."  Id. at 142.  Moreover, since a Brady violation may only be

determined retrospectively, id. at 140, the Court concluded that it is the prosecutor, and not the

court, who must make the pre-trial assessment as to whether such a "reasonable probability"

exists.  Id. at 143.  "[A]s long as a defendant possesses Brady evidence in time for its effective

use, the government has not deprived the defendant of due process of law simply because it did

not produce the evidence sooner."  Coppa, 267 F.3d at 144.[18]

---

[18]     In Coppa, the Second Circuit expressly recognized that Brady material "includes
not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach
the credibility of a government witness."  Coppa, 267 F.3d at 139 (citing Giglio v. United States,
405 U.S. 150 (1972)).  However, the Second Circuit explained that only material evidence must
be disclosed under Brady.  As the Court noted, evidence is "material" if there is a reasonable
probability that, had the evidence been disclosed to the defense, the outcome of the proceeding
would have been different.  Id.  "A 'reasonable probability' is a probability sufficient to
undermine confidence in the outcome."  Id. at 141 (quoting United States v. Bagley, 473 U.S.
667, 682 (1985)).  Thus, only evidence that is material, as defined by the reasonable probability
test set forth in Bagley, must be disclosed under Brady.  See Coppa, 267 F.3d at 141 ("the
current Brady law . . . imposes a disclosure obligation narrower in scope than the obligation to
disclose all evidence favorable to the defendant") (citing Kyles v. Whitely, 514 U.S. 419, 437

Here, the Government has already advised defense counsel that it recognizes its continuing obligation to provide exculpatory materials pursuant to <u>Brady</u> v. <u>Maryland</u>, and that, to date, the Government is not aware of any such exculpatory evidence with respect to the defendant. Consistent with this Office's usual practice, the Government will advise the defense promptly of any such information if and when such information comes to light. However, in light of the Government's good faith representations and its clear understanding of the applicable law, as this Court has repeatedly found, there is no present need for the Government to be directed to comply with its <u>Brady</u> obligations. <u>See</u> <u>United States</u> v. <u>Villanueva Madrid</u>, 302 F. Supp. 2d 187, 193 (S.D.N.Y. 2003).[19]  Collins cites no authority to the contrary.[20]

_____

(1995)) (internal quotation marks omitted).

[19]    Collins's application for immediate production of <u>Brady</u> material is clearly animated by the belief that such material must exist if it took the Government 18 months to indict him. (Br. at 20-21). This belief is predicated solely on surmise and speculation about the Government's investigation. In response, the Government reiterates that it is aware of its obligations under <u>Brady</u> and will satisfy those obligations in accordance with the dictates of <u>Brady</u> and its progeny. Regardless of whatever surprise it may cause defense counsel, the Government reiterates that it is currently unaware of the existence of any <u>Brady</u> material.

Furthermore, we do not respond to the assumptions Collins makes in his brief about the Government's view of his guilt during certain periods of the investigation because they are wholly irrelevant to the issues raised in his motions. We nevertheless note that we dispute several of the factual assumptions made by Collins and his counsel concerning the Government's view of his guilt at various times during the investigation.

[20]    Neither of the cases upon which Collins principally relies supports hi application for an order compelling the immediate disclosure of <u>Brady</u> material. The Second Circuit's decision in <u>United States</u> v. <u>Rodriguez</u>, 496 F.3d 221 (2d Cir. 2007), concerned the Government's obligation to disclose potential <u>Brady</u> evidence elicited during a witness interview when the witness's statements were not recorded in writing. 496 F.3d at 222. The Government understands the import of <u>Rodriguez</u> to its <u>Brady</u> obligations and is unaware of any <u>Brady</u> material, whether in written or oral form. Similarly, the Government understands the import of the holding in <u>United States</u> v. <u>Rittweger</u>, 524 F.3d 171 (2d Cir. 2008) concerning the scope of the disclosure requirement. Neither, case, however, affects the dictates of <u>Coppa</u> with respect to the timing of disclosure. <u>See</u> <u>Rodriguez</u>, 496 F.3d at 226 (<u>Brady</u> material must be produced in

Collins also urges the Court to compel disclosure of all <u>Giglio</u> material two months before trial. (Br. at 23-24). While the Second Circuit in <u>Coppa</u> did acknowledge that a District Court might retain discretion to "order pretrial disclosures as a matter of sound case management" in certain instances, 267 F.3d at 146, District Courts in this Circuit have routinely denied motions such as the one made here, holding instead that <u>Giglio</u> "impeachment" information is properly disclosed either when the witness is called to testify at trial or just prior to such testimony if additional time is reasonably required to review the material. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Hernandez</u>, 2001 WL 674133, at *3 (S.D.N.Y. June 15, 2001); <u>United States</u> v. <u>Pimentel</u>, 2001 WL 185053, at *5 (E.D.N.Y. Jan. 22, 2001); <u>United States</u> v. <u>Jones</u>, 2000 WL 1448640, at *2 (S.D.N.Y. Sept. 28, 2000); <u>United States</u> v. <u>Jacques Dessange, Inc.</u>, 2000 WL 280050, at *7-9 (S.D.N.Y. March 14, 2000). Here, the Government has indicated that it intends to provide <u>Giglio</u> material one week before trial, which is the same schedule that the Government proposed and which was adopted by Judge Buchwald for the trial of Collins's coconspirators, Phillip Bennett, Robert Trosten, and Tone Grant earlier this year.

Collins's reliance on <u>United States</u> v. <u>Rittweger</u>, 524 F.3d 171 (2d Cir. 2008) for the proposition that the production of <u>Giglio</u> one week in advance of trial is insufficient is misplaced. While it is true that the court in <u>Rittweger</u> expressed discomfort with the fact that the Government in that case had disclosed the grand jury testimony of a cooperating witness just a week prior to trial, 524 F.3d at 180, the court's concern stemmed from the fact that the testimony contained <u>Brady</u> material and not impeachment material. <u>Id</u>. at 180-81. As another court in this

_____

time for it to be used effectively at trial).

District has explained in rejecting a demand for pre-trial disclosure of impeachment material,

such a distinction makes all the difference:

> The Court believes that "impeachment" information is properly
> disclosed when the witness is called to testify at trial.  There is no
> requirement that the Government disclose information pertaining to
> the credibility of a witness before the witness testifies.  The
> defendants fail to recognize the distinction between direct
> exculpatory information and impeachment material.  Direct
> exculpatory information often becomes part of the defense's direct
> case and provides theories of defense.  Additional time may be
> needed for the defense to make effective use of such information.
> The Government indicates that it recognizes this need and will turn
> over all direct exculpatory Brady material well before trial should
> information surface in their preparation.  In contrast, impeachment
> material has a more narrow, specific use -- to attack the credibility
> of a witness on cross-examination.  No extended pretrial
> investigation and preparation of such material is necessary for its
> effective use.  This type of material need not be turned over by the
> prosecution before trial.

United States v. Velasquez,, 1997 WL 414132, at *6-7 (July 23, 1997) (citations omitted).

Indeed, as the Supreme Court long ago concluded: "Generally, the need for evidence to impeach

witnesses is insufficient to require its production in advance of trial."   United States v. Nixon,

418 U.S. 683, 701 (1974).

Accordingly, the courts in this District have routinely found the disclosure of

Giglio material up to one week before trial to provide more than sufficient time for the effective

use of such material, see Villanueva Madrid, 302 F. Supp. 2d at 193-94 (ordering Giglio material

one week before trial); United States v. Gutierrez-Flores, 1994 WL 558034 at *3 (S.D.N.Y. Oct.

11, 1994) (deeming it sufficient that Government produce impeachment material at least "one day

prior to the day the witness is called to testify on direct examination"),  and have routinely denied

39

applications for earlier disclosure.  See, e.g., United States v. McDuffie, 2002 WL 654136, at *1 (S.D.N.Y. Apr. 18, 2002) (rejecting application for disclosure of Giglio material 30 days in advance of trial and noting that "as for Giglio material, there is no general right of pre-trial discovery because such material 'ripens into evidentiary material for purposes of impeachment only if and when the witness testifies at trial.'"); United States  v. Savarese, 2002 WL 265153, *2-3 (S.D.N.Y. Feb. 22, 2002) (denying motion for immediate production of exculpatory, impeachment and § 3500 material); United States v. Conley, 2002 WL 252766, at *2-3 (S.D.N.Y. Feb. 21, 2002) (denying motion for immediate production of exculpatory and impeachment material); United States v. Williams, 181 F. Supp.2d 267, 297-98 (S.D.N.Y. 2001) (rejecting defendant's request for an order compelling early disclosure of all Brady, Giglio and Jencks Act material in murder case).

Finally, Collins seeks an order compelling the Government to produce 3500 material two months in advance of trial.  (Br. at 24-25).  As this Court has noted, the production of 3500 material is not required until a witness has testified on direct examination.  United States v. Bin Laden, 2001 WL 66314, at *1 (S.D.N.Y. Jan. 26, 2000); see also United States v. Gluzman, 154 F.3d 49, 51 (2d Cir. 1998) ("The Government is only required to provide [3500] materials before cross-examination, not in advance of opening statements."); United States v. Vilar, 2008 WL 2531195 (S.D.N.Y. June 22, 2008) (noting that 18 U.S.C. § 3500 "'prohibits a District Court from ordering the pretrial disclosure of witness statements'"); United States v. Battaglia, 2008 WL 144826, at *2 (S.D.N.Y. Jan. 15, 2008) (noting same).  Indeed, as the cases cited by Collins acknowledge, the Government cannot be compelled to provide 3500 material on

an earlier schedule.  See United States v. Percevault, 490 F.2d 126, 131-132 (2d Cir. 1974); Lino, 2001 WL 8356, at *16.

Here, the Government proposes to produce 3500 material one week prior to the witness's scheduled testimony.  This is the same proposal that the Government made and which was adopted by Judge Buchwald for the trial of Collins's coconspirators Phillip Bennett, Robert Trosten, and Tone Grant earlier this year.[21]  The Government further proposes to produce 3500 material for its cooperating witnesses, including Santo Maggio and Robert Trosten, on the same schedule that it will produce Giglio material, i.e., one week in advance of trial.  Given that the material will include Maggio's and Trosten's testimony from the Grant trial and that Maggio and Trosten were subject to extensive cross-examination in that case, the production of his 3500 material on such a schedule should provide Collins's attorneys with sufficient time to review it before their testimony, which is not anticipated to be at the beginning of the trial.  No other witness's 3500 material is of a comparable length.

---

[21] Collins notes that the Government agreed to provide 3500 material six weeks in advance of trial in the Adelphia case.  That case, however, was of such a scope and complexity that it was tried in four-and-a-half months.  The parties anticipate that the trial in this case will last four to six weeks.

## **CONCLUSION**

Collins's motion for a bills of particulars, to admit polygraph evidence, and to compel certain discovery should be denied.

Dated: New York, New York
         August 1, 2008

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney
                              Southern District of New York


                        By: _____/s/_____
                              NEIL M. BAROFSKY
                              CHRISTOPHER L. GARCIA
                              Assistant United States Attorneys

Refco / Refco Grp
Litn

7/12/04  JF Earl Meland          312. 269.  8012

① Appreciate Cogent
   — other payments
   — separate items  — separate letter
       — 65th bd
       — ins payments

② Reps and Waraties on fee deal
   — based on economics
   — in particular
       — debt of RGN I
       — #1B Payme

MB02294194

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP