UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
:
UNITED STATES OF AMERICA,           :
                                    :
            vs.                     :    **ECF Case**
                                    :
JOSEPH P. COLLINS,                  :    No. 07 Cr. 1170 (LBS)
                                    :
            Defendant.              :
                                    :
------------------------------------X


**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT JOSEPH P. COLLINS'S PRE-TRIAL MOTIONS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

POINT I        THE GOVERNMENT SHOULD BE REQUIRED
TO PRODUCE A BILL OF PARTICULARS .......................................................... 1

     A.      The Government's Forfeiture Theory Remains
Vague And Further Particulars Should Be Provided ............................................. 1

     B.      The Government Should Be Required To Identify All Alleged
Misrepresentations And Omissions That It Will Seek To Prove At Trial .............. 3

POINT II       THE RESULTS OF THE POLYGRAPH
EXAMINATION SHOULD BE ADMITTED INTO EVIDENCE ......................... 5

     A.      The Second Circuit Has Not Barred The Use Of
Polygraph Evidence, And A Daubert Hearing Is
Necessary To Determine Its Admissibility In This Case ....................................... 5

     B.      The Polygraph Examination Administered
In This Case Produced Reliable Results ................................................................ 6

     C.      The Results Of The Polygraph Examination Are Relevant,
And Their Admission Would Not Be Unfairly Prejudicial .................................... 9

POINT III      THE GOVERNMENT SHOULD BE REQUIRED TO
PRODUCE GIGLIO AND 3500 MATERIAL AT LEAST
TWO MONTHS BEFORE TRIAL ........................................................................ 11

CONCLUSION ............................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) .................. 5, 6, 10-11

*Meyers v. Arcudi,* 947 F. Supp. 581 (D. Conn. 1996) .................. 10

*United States v. Battaglia,* 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .................. 12

*United States v. Bentham,* 414 F. Supp. 2d 472 (S.D.N.Y. 2006) .................. 5

*United States v. Bin Laden,* 92 F. Supp. 2d 225 (S.D.N.Y. 2000) .................. 4

*United States v. Bin Laden,* 2001 WL 66314 (S.D.N.Y. Jan. 26, 2000) .................. 12

*United States v. Bortnovsky,* 820 F.2d 572 (2d Cir. 1987) .................. 4

*United States v. Caine,* 270 F. Supp. 801 (S.D.N.Y. 1967) .................. 4

*United States v. Canter,* 338 F. Supp. 2d 460 (S.D.N.Y. 2004) .................. 5

*United States v. Conley,* 2002 WL 252766 (S.D.N.Y. Feb. 21, 2002) .................. 14

*United States v. Coplan,* No. 07 Cr. 453 (SHS) .................. 12

*United States v. Cordoba,* 104 F.3d 225 (9th Cir. 1997) .................. 6

*United States v. Duverge Perez,* 295 F.3d 249 (2d Cir. 2002) .................. 5

*United States v. Ebbers,* No. 02 Cr. 1144 (BSJ) .................. 12

*United States v. Ferguson,* No. 06 Cr. 137 (D. Conn.) .................. 13

*United States v. Gil,* 297 F.3d 93 (2d Cir. 2002) .................. 13

*United States v. Gluzman,* 154 F.3d 49 (2d Cir. 1998) .................. 12

*United States v. Gutierrez-Flores,* 1994 WL 558034 (S.D.N.Y. Oct. 11, 1994) .................. 14

*United States v. Hernandez,* 2001 WL 674133 (S.D.N.Y. June 15, 2001) .................. 14

*United States v. Jacques Dessange, Inc.,* 2000 WL 280050
 (S.D.N.Y. March 14, 2000) .................. 14

*United States v. Jones,* 2000 WL 1448640 (S.D.N.Y. Sept. 28, 2000) .................. 14

*United States v. Kwong,* 69 F.3d 663 (2d Cir. 1995) .................. 10

*United States v. Lech,* 895 F. Supp. 582 (S.D.N.Y 1995) .................. 10

## TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Mango*, No. 96 Cr. 327, 1997 WL 222367
 (N.D.N.Y. May 1, 1997) .................................................................................................. 4

*United States v. McDonald*, 2002 WL 2022215 (E.D.N.Y. Aug. 6, 2002) ......................... 13

*United States v. McDuffie*, 2002 WL 654136 (S.D.N.Y. Apr. 18, 2002) ............................ 14

*United States v. Messina*, 131 F.3d 36 (2d Cir. 1997) ......................................................... 5

*United States v. Pimentel*, 2001 WL 185053 (E.D.N.Y. Jan. 22, 2001) ............................. 14

*United States v. Posado*, 57 F.3d 428 (5th Cir. 1995) ........................................................ 6

*United States v. Rigas*, No. 02 Cr. 1236 (LBS) ................................................................. 12

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) .................................................. 13

*United States v. Saldarriaga*, 179 F.R.D. 140 (S.D.N.Y. 1998) .......................................... 9

*United States v. Savarese*, 2002 WL 265153 (S.D.N.Y. Feb. 22, 2002) ........................... 14

*United States v. Scheffer*, 523 U.S. 303 (1998) ......................................................... 5, 6, 10

*United States v. Stein*, No. 05 Cr. 888 (LAK) ................................................................... 12

*United States v. Vilar*, 2008 WL 2531195 (S.D.N.Y. June 22, 2008) ............................... 12

*United States v. Villanueva Madrid*, 302 F. Supp. 2d 187 (S.D.N.Y. 2003) ..................... 14

*United States v. Volpe*, No. 05 Cr. 390 (SHS) ................................................................... 12

*United States v. Williams*, 181 F. Supp. 2d 267 (S.D.N.Y. 2001) ..................................... 14

## FEDERAL STATUTES

Fed. R. Crim. P. 32.2(b)(4) ..................................................................................................... 2

Defendant Joseph Collins respectfully submits this reply memorandum in support of his pretrial motions.

## POINT I

## THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE A BILL OF PARTICULARS

### A. The Government's Forfeiture Theory Remains Vague And Further Particulars Should Be Provided

The indictment in this case includes forfeiture allegations seeking the seizure of funds and property in excess of two billion dollars. Yet nowhere does it state the basis for such forfeiture, nor does it identify any nexus between the proceeds of the alleged crimes and any funds or property currently belonging to Collins. Indeed, the indictment is absolutely silent as to whether or how Collins received any financial benefit from the fraud.

The government offers no elucidation in its response brief. It merely states that it has tracked the language of the relevant forfeiture statutes and is not required to provide any further information. Govt. Br. 19. What remains missing is any explanation of how Collins, a lawyer who merely earned his partnership draw at his law firm, allegedly partook in the proceeds of the fraud. Faced with the government's continued silence, Collins cannot meaningfully begin to prepare a defense to charges that threaten to deprive him of everything he owns.

The government's footnote reference to approximately $40 million in legal fees that Collins's law firm, Mayer Brown, invoiced to Refco, Govt. Br. 19 n. 11, is a red herring that sheds no light on the question of forfeiture. Those fees relate to work performed for Refco on numerous matters over numerous years, including many matters distinct from the alleged fraud. The government's forfeiture allegations, on the other hand, relate solely to proceeds from two transactions, the LBO and the IPO, Govt. Br. 19, both of which occurred toward the end of Mayer Brown's representation of Refco and have nothing to do with the bulk of fees billed in

earlier years. Moreover, although the indictment describes the proceeds of the fraud as including $800 million paid by banks and $1.6 billion paid by purchasers and investors, nowhere does it state that these proceeds were used to pay Mayer Brown's fees or that Collins, as one of hundreds of Mayer Brown partners, received any portion of these proceeds as part of his individual partnership draw.

The defense is thus left guessing whether the government will make an argument based on Collins's partnership income in late 2004 and 2005 – which was based on his work for numerous clients other than Refco and, in any event, was infinitesimal compared to the billions of dollars the government seeks – or whether it will allege that, apart from his law firm compensation, Collins's independently received proceeds from the fraud. Neither the indictment nor any discovery the defense has reviewed so far suggests that Collins independently received even a single dollar from the alleged fraud. If the government intends to prove that he did, it should provide particulars now. If, on the other hand, the government intends to prove that any financial benefit he received came indirectly in the form of his partnership draw, it should provide particulars as to how the proceeds of the fraud found their way to Mayer Brown and then ultimately to Collins.

Finally, the government argues as if the particulars underlying its theory of forfeiture can be provided to the defense post-trial, if necessary. Specifically, the government claims that the issue of forfeiture arises only at sentencing and thus need not affect trial preparation. Govt. Br. 20-21. This matter cannot be brushed off so lightly. The same jury that decides the issue of guilt may well be called upon to decide factual issues relevant to forfeiture. *See* Fed. R. Crim. P. 32.2(b)(4) ("Upon a party's request in a case in which a jury returns a verdict of guilty, the jury must determine whether the government has established the requisite nexus between the property and the offense committed by the defendant."). In the event of a jury determination, forfeiture

2

proceedings would need to commence almost immediately after a verdict is returned. The government should therefore be required to state, well before a jury is impaneled, the basis for the forfeiture allegations in the indictment, and any alleged nexus between the proceeds of the crime and any funds or property currently belonging to Collins.

**B.    The Government Should Be Required To Identify All Alleged Misrepresentations And Omissions That It Will Seek To Prove At Trial**

As set forth in the indictment and further elaborated on in the government's brief, this is a case of vast proportions concerning numerous corporate transactions and related legal work over the course of eight years. The complexity of the subject matter – reflected in more than 12 million pages of documents produced in discovery – cannot be overstated. Many of the transactions at issue were extensively negotiated and documented, and involved flurries of drafts, related correspondence, telephone calls and email exchanges among numerous parties, including, but not limited to, a major commodities brokerage exchange and its affiliates, a major private equity firm, various unrelated corporate entities both domestic and foreign, institutional lenders and investment banks, a major Austrian bank and several of its affiliates, hedge fund managers and commodities brokerage customers, investors in stocks and bonds, securities regulators, commodities regulators, accountants and tax consultants, and multiple law firms.

In an effort to meaningfully limit our focus and make the defense task manageable, we asked the government to provide a bill of particulars setting forth the specific misrepresentations and omissions that it will actually attempt to prove at trial. The government declined our request and continues to resist such disclosure on the ground that "many" aspects of the fraud are already described in the indictment while others can be "readily" discerned from documents produced in discovery. Govt. Br. 14, 16.

We do not dispute that the government has already provided substantial information, but its efforts fall short of the disclosure that is required. It does not suffice for the government to

3

provide particulars as to "many" aspects of the fraud, but to remain silent as to others. Nor is it fair for the government to assume that the defense can compensate for the government's lack of specific notice by combing through the massive discovery and attempting to guess what the government will contend at trial. It is precisely in a case of this scope and complexity that meaningful particularization is required. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (bill of particulars not avoided "merely by providing mountains of documents to defense counsel who were left unguided"); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (Sand, J.) ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.").

We are not asking the government to lay out or particularize its evidence. Our request is narrowly tailored and calls only for notice of the misrepresentations and omissions that are said to constitute the fraud. We are entitled to this information under the case law. *See* Def. Br. 10-12 (discussing authorities); *United States v. Caine*, 270 F. Supp. 801, 806 (S.D.N.Y. 1967) (Mansfield, J.) (defendant charged with mail fraud entitled to bill of particulars detailing "each and every representation in the alleged advertisement which is charged to have been false and misleading"); *United States v. Mango*, No. 96 Cr. 327, 1997 WL 222367, at *12–*13 (N.D.N.Y. May 1, 1997) (requiring particulars concerning, among other things, every alleged false representation).

Accordingly, in order to avoid unfair surprise and unnecessary preparation as to numerous aspects of the transactions that the government has no intention of raising at trial, the Court should direct the government to produce a bill of particulars setting forth the specific misrepresentations and omissions that Collins allegedly made or aided and abetted others in making.

POINT II

THE RESULTS OF THE POLYGRAPH
EXAMINATION SHOULD BE ADMITTED INTO EVIDENCE

A.   The Second Circuit Has Not Barred The Use Of Polygraph Evidence, And
     A *Daubert* Hearing Is Necessary To Determine Its Admissibility In This Case

The government misstates the law when it claims that the Second Circuit "has made clear" that polygraph evidence is inadmissible. Govt. Br. 21. When it last addressed the issue more than ten years ago, the Second Circuit made no such ruling. Instead, it left the issue open. Specifically, the Second Circuit stated that it has "not decided whether polygraphy has reached a sufficient state of reliability to be admissible under Rule 702 of the Federal Rules of Evidence." *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997); *see United States v. Scheffer*, 523 U.S. 303, 311 (1998) (noting that issue is undecided in Second Circuit).

In the ten years since *Messina*, there have been significant advances in polygraph technology, including advances based on the use of computers and digital algorithms that have enhanced the ability of the examiner to capture very minute variations in a subject's physiological responses. Supplemental Affidavit of Barry D. Colvert ("Supp. Colvert Aff.") at ¶2. Yet it appears that no court in this Circuit since *Messina* has undertaken a significant review of the polygraph's reliability or an analysis of the *Daubert* factors bearing on its admissibility.[1] *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). An evidentiary hearing is required to consider recent advances in the field and to determine whether the examination

---

[1]   The cases the government cites in its brief are no exception. Most concern the state of polygraph technology as it existed more than ten years ago before the Second Circuit left the issue open in *Messina*. *See* Govt. Br. 24-25. Although the government cites some cases of more recent vintage, Govt. Br. 27, none revisits the issue of reliability in any depth. For example, *United States v. Bentham*, 414 F. Supp. 2d 472, 473 (S.D.N.Y. 2006), concerns sweat-patch testing for cocaine and mentions polygraphs only in passing. In other cases cited by the government, the court declined to admit polygraph evidence in part because the questions asked were found to have been ambiguous or irrelevant to the core issues in dispute. *See United States v. Canter*, 338 F. Supp. 2d 460, 463 (S.D.N.Y. 2004); *United States v. Duverge Perez*, 295 F.3d 249, 253-54 (2d Cir. 2002). As discussed *infra*, no such ambiguity exists here, and the examination directly addressed the central issue in the case. *See, infra*, at Section II B & C.

5

conducted in this case is sufficiently reliable to be admitted into evidence. This is precisely the type of factual inquiry the Supreme Court had in mind in *Daubert* when it authorized district court judges to serve as gatekeepers in determining the reliability of scientific evidence. Indeed, two Circuits have recognized that a *per se* rule excluding polygraph evidence without an appropriate factual inquiry would be contrary to *Daubert*. *United States v. Posado*, 57 F.3d 428, 434 (5th Cir. 1995); *United States v. Cordoba*, 104 F.3d 225, 227-28 (9th Cir. 1997).

The Supreme Court's treatment of the issue in *Scheffer*, also decided more than a decade ago, is not to the contrary. Nowhere in *Scheffer* does the Supreme Court hold that district courts should disregard *Daubert* or forego appropriate inquiry under Rule 702. *Scheffer* concerned a provision of the Military Rules of Evidence prohibiting the use of polygraph evidence. The Supreme Court declined to overturn the rule, holding only that defendants do not enjoy a broad constitutional right to present polygraph evidence. 523 U.S. at 305. *Scheffer* did nothing to alter the way in which federal district courts applying *Daubert* and the Federal Rules of Evidence should determine the admissibility of similar evidence. We are not arguing in favor of a broad constitutional right to admit polygraph evidence. We are simply arguing that, under a standard application of the Federal Rules of Evidence, Collins is entitled to a hearing to determine whether the results of his polygraph examination are sufficiently reliable to be admitted under Rule 702.

**B.    The Polygraph Examination Administered In This Case Produced Reliable Results**

The government points to several aspects of Collins's polygraph examination that it claims are flawed. For example, it observes that no "activity monitor" was used during the examination to rule out the possibility that Collins was flexing his muscles in an effort to defeat the test. Govt. Br. 30. A hearing will show that the absence of such a device is of no consequence in this case. The examiner took other appropriate measures to safeguard against the

6

possibility of any such manipulation, including positioning Collins where he could be directly observed. Had the examiner observed any movement, he would have marked it on his charts at the time of occurrence and taken it into consideration in the scoring process. As the examination proceeded, the examiner observed no movements that would have affected the examination results. Collins's polygraph examination data show no sign of an attempt to control breathing or of any abrupt or sudden changes in electro-dermal or cardiovascular activity that would appear to be out of the norm. And nothing in Collins's charts shows any significant changes in his response patterns that would suggest the use of muscular or other countermeasures to defeat the test. Supp. Colvert Aff. ¶3. Significantly, in response to questions about his knowledge of the fraud, Collins gave answers that were scored as having a less than 0.01 probability of deception – the lowest score possible in the current algorithm used to administer the test. Supp. Colvert Aff. ¶4. Whatever concerns might be raised about the reliability of polygraph examination results that are at or near the margin would not be relevant here.

The government also raises objections based on the wording of the questions posed. Mere semantic distinctions such as those offered by the government should not affect polygraph results. The operative inquiry is whether the question essentially addresses the bottom line issue. If the terms used in the questions are basically the same in the subject's mind as the terms that should have been used, the polygraph results should be unaffected. Supp. Colvert Aff. ¶5. Thus, in the context of this case about concealed debt, the difference between a sale, on the one hand, and a sale and merger, on the other, Govt. Br. 30-31, does not meaningfully change the substance of the question concerning whether Collins concealed the existence of inter-company debt from Lee. Similarly, the subtle distinction between the individual, Thomas H. Lee, and the entity, Thomas H. Lee Partners, Govt. Br. 31, is of no consequence in the context of this case. Thomas

H. Lee was himself deeply involved in the transaction. More importantly, all the parties typically referred to his entity by using his proper name.[2]

The government claims that the phrase "over a billion dollars in inter-company debt" does not allow for the possibility that Collins was aware of only $1 billion in inter-company debt, which would equally implicate him in the fraud. Govt. Br. 30-31.[3] Significantly, in pressing its argument, the government ignores the fact that the first of the three questions posed to Collins, to which he gave a non-deceptive response, concerned the existence of *any* concealed inter-company debt, regardless of the actual amount. Supp. Colvert Aff. ¶5.

In any event, a hearing would show that semantic niceties of the type urged by the government do not affect polygraph results. A polygraph examination will detect variations in physiological responses as long as the questions posed hit upon the fundamental concepts associated with the issue in the subject's mind, regardless of the particular words that are used. Supp. Colvert Aff. ¶5. The difference between "one billion" and "over a billion," for example, is irrelevant where the core issue is whether the subject was aware of a fraud of that approximate magnitude. Supp. Colvert Aff. ¶5. The difference between Thomas H. Lee and Thomas H. Lee Partners is similarly irrelevant where the core issue is whether inter-company debt was concealed from Refco's counterparty in the deal. Supp. Colvert Aff. ¶5.

The government's subtle parsing of the questions should not detract from the fact that they go directly to what the indictment contends is the heart of the fraud. Defense counsel designed these questions based on pre-indictment discussions with the government in which the

---

[2]   During the Grant trial, even the government posed questions to witnesses using the name Thomas Lee to refer to the entity Thomas H. Lee Partners. *See, e.g.*, Grant Tr. 1310, 2330. There was no confusion as to whom the government was referring.

[3]   To substantiate the possibility that Collins had knowledge of an even $1 billion in inter-company debt, the government attaches one page of handwritten notes to its brief, which refer to a "$1 B figure." *See* Govt. Br. 31. But nothing in the notes suggests that this is a reference to inter-company debt.

government identified its primary areas of concern. Among other things, the government advised defense counsel that it believed Collins was aware of $1.1 billion in inter-company debt. Had the government advised defense counsel that it believed Collins was aware of only $1 billion and not $1.1 billion in inter-company debt, defense counsel would have asked the examiner to pose a different question. In any event, after sharing the results of the polygraph examination with the government, defense counsel offered it an opportunity to conduct its own polygraph examination of Collins, in which it would have been free to pose questions that corrected any perceived semantic flaws. Bach Decl. ¶11.[4]

C.  **The Results Of The Polygraph Examination Are Relevant, And Their Admission Would Not Be Unfairly Prejudicial**

Collins conclusively passed a polygraph examination in which he was asked whether he was aware that inter-company debt had been concealed from Lee. Evidence of his performance on the test is plainly relevant to the fundamental issue in dispute. Moreover, the evidence to be submitted at a *Daubert* hearing will establish to a great level of confidence – Collins received the best score one can possibly receive on a state-of-the art polygraph examination – that Collins's answers were not deceptive. Supp. Colvert Aff. ¶4.

The government argues, however, that even if Collins's polygraph results are relevant and reliable, they should be excluded under Rule 403, because the jury may simply accept the polygraph results at face value and abandon its own duty to assess guilt. Govt. Br. 32-35. This concern is unjustified.

---

[4] The government argues that polygraph evidence should be excluded on the ground that the defense did not provide prior notice to the government that the examination was taking place. Govt. Br. 30. The one Southern District of New York case that the government cites in support of this proposition, *United States v. Saldarriaga*, 179 F.R.D. 140 (S.D.N.Y. 1998) (WK), does not appear to have involved a situation like the one here in which the defense provided notice to the government of the examination results and copies of all related materials well before any indictment was returned, and offered the government the opportunity to conduct its own polygraph examination of the defendant.

9

In *Scheffer*, a majority of the Supreme Court (through concurring and dissenting opinions) rejected the view that polygraph evidence should be excluded out of fear that it might unduly sway jurors. 523 U.S. 303, 318-19 (Kennedy, J., concurring) ("[I]t seems the principal opinion overreaches when it rests its holding on the additional ground that the jury's role in making credibility determinations is diminished when it hears polygraph evidence. I am in substantial agreement with Justice Stevens' observation that the argument demeans and mistakes the role and competence of jurors in deciding the factual question of guilt or innocence."); 523 U.S. at 337 (Stevens, J., dissenting) ("[F]ear that the average jury is not able to assess the weight of this testimony reflects a distressing lack of confidence in the intelligence of the average American."). As Justice Stevens observed:

> research indicates that jurors do not 'blindly' accept polygraph evidence, but that they instead weigh polygraph evidence along with other evidence. Cavoukian & Heslegrave, The Admissibility of Polygraph Evidence in Court: Some Emprical Findings, 4 Law and Human Behavior 117, 123, 127028, 130 (1980) (Hereinafter Cavoukian & Heslegrave); *see also* Honts & Perry 366-367. One study found that expert testimony about the limits of polygraph '*completely eliminated* the effect of the polygraph evidence' on the jury. Cavoukian & Heslegrave 128-29 (emphasis added).

523 U.S. at 337 n.26 (Stevens, J., dissenting).[5]

If admitted in this case, polygraph evidence would be only one part of a larger, four to six week trial. Like all other evidence, testimony regarding the administration and scoring of the test would be subject to cross-examination. The charts and materials supplied to the government would allow other examiners to scrutinize the administration of the test and to agree or disagree with the result reached by the examining polygrapher. As the Supreme Court stated in *Daubert*:

---

[5] Significantly, the only cases within this Circuit that the government cites for the proposition that polygraph evidence would be overly prejudicial and confuse the jury come to this conclusion based on the ambiguity of the questions, not the nature of the polygraph evidence. *See* Govt. Br. 32-34 (citing *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995); *United States v. Lech*, 895 F. Supp. 582, 584-85 (S.D.N.Y 1995); *Meyers v. Arcudi*, 947 F. Supp. 581, 589 (D. Conn. 1996)).

> Respondent expresses apprehension that abandonment of 'general acceptance' as the exclusive requirement for admission will result in a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions. In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

509 U.S. at 595-96.

This approach is applicable to any proposed Rule 403 analysis. It would be sheer speculation to argue that the jury should not know of the polygraph results because the jurors would somehow be mentally or emotionally unable to assess them in the same manner they consider other evidence. Testimony about the administration and results of the test would certainly be less confusing than testimony about, for example, proper suspension-bridge construction, or the disputed toxicity of particular chemical agents, or DNA hypotheses. And such testimony would be no more distracting than the testimony of, say, an impeachable co-conspirator whose entire past history is at issue. On the other hand, the probative value of the proffered polygraph evidence is indisputable and outweighs any claimed prejudice. Rule 403 does not support excluding this key evidence from consideration by the jury.

## POINT III

### THE GOVERNMENT SHOULD BE REQUIRED TO PRODUCE *GIGLIO* AND 3500 MATERIAL AT LEAST TWO MONTHS BEFORE TRIAL

The government's proposal that *Giglio* material be disclosed one week before trial and 3500 material (for the vast majority of its witnesses) in the midst of trial ignores the enormity of

11

the task facing the defense and constitutes nothing less than an oppressive schedule.[6] In this extraordinarily complicated case, the only purpose served by such an extreme delay in disclosure is to disadvantage the defense. The government fails to articulate how it could possibly be in the interest of justice or consistent with the goal of a fair trial to make the defense wait until after opening statements and, in some cases, until the middle of trial to find out what most of the government's witnesses are anticipated to say. There is no conceivable justification for its position.[7]

Such a schedule is also contrary to that used in other complex financial cases in this district. In these cases, the defense is routinely provided with 3500 material well before trial and certainly well before having to present an opening statement. See Def. Br. at 26; *United States v. Rigas*, No. 02 Cr. 1236 (LBS) (3500 material produced six weeks before trial); *United States v. Ebbers*, No. 02 Cr. 1144 (BSJ) (single defendant, six week trial, in which 3500 material was produced five weeks before trial); *United States v. Volpe*, No. 05 Cr. 390 (SHS) (single defendant securities fraud trial that lasted less than two weeks with 3500 material produced three weeks before trial); *United States v. Stein*, No. 05 Cr. 888 (LAK) (complex tax case in which 3500 material was produced two months before scheduled trial); *United States v. Coplan*, No. 07 Cr. 453 (SHS) (complex tax case in which 3500 material is to be produced six weeks before

---

[6] The government has also proposed producing a witness list, a list of coconspirators, 404(b) notice, and a list of trial exhibits 30 days before trial. Govt. Br. 10 n. 8, 16. We reserve the right to request earlier production of this information and will address such scheduling issues at the next pretrial conference.

[7] Needless to say, this is not a case in which there is any threat of violence or even one in which the identity of witnesses is unknown. By contrast, all of the cases cited by the government for the proposition that 3500 material need not be turned over until the last minute are cases involving violence or threats of violence. See Govt. Br. at 40, citing *United States v. Bin Laden*, 2001 WL 66314 (charges arising from embassy bombings in Kenya and Tanzania); *United States v. Gluzman*, 154 F.3d 49 (2d Cir. 1998) (defendant charged with her husband's murder); *United States v. Battaglia*, 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) (racketeering, extortion, witness tampering charges). Although the government cites one recent financial fraud case for the proposition that 3500 material need not be disclosed in advance of a witness's testimony, it neglects to point out that in that case the government actually agreed to provide all 3500 material at least two weeks before trial. See *United States v. Vilar*, 2008 WL 2531195, at *4 (S.D.N.Y. June 22, 2008) (investment adviser charged with fraud and related charges).

trial); *cf. United States v. Ferguson*, No. 06 Cr. 137 (D. Conn.) (reinsurance fraud trial in which 3500 material was produced over seven weeks before trial); *United States v. McDonald*, 2002 WL 2022215 (E.D.N.Y. Aug. 6, 2002) (fraud trial in which 3500 material was produced four weeks before trial).[8]

By contrast, the government's unorthodox proposal in this case – under which some disclosure will be delayed until as late as week five of a six week trial – amounts to trial by sandbag, with the defense continuing to learn the case even after it has opened and witnesses have taken and left the stand. The defense will be forced not only to give an opening statement without access to key information, but also to cross-examine witnesses with no notice of what other witnesses, with knowledge of similar subjects, might later say.[9]

The sheer volume of material that the government intends to produce on the eve or in the midst of trial shows just how impractical and unfair the government's proposed schedule would be. For example, there will be more than 4000 pages of *Giglio* and 3500 material for

---

[8] The government attempts to distinguish *Rigas* on the ground that the trial lasted more than four months. Govt. Br. 41 n. 21. The present case, however, involves the same volume and complexity of material – indeed, the alleged conspiracy is of even greater duration. Moreover, the length of the *Rigas* trial is largely attributable to the fact that there were four separate defendants, each of whom had counsel who vigorously cross-examined the government's witnesses. Collins's trial will be shorter, not because the case is simpler or the witnesses' prior statements less complicated or important, but because he is the sole defendant. The burden to prepare will be no less demanding on the defense. Indeed, in many ways, the burden of preparation for a single defendant, whose counsel must cross-examine witnesses continuously on a daily basis, is greater than the burden of preparation for a defendant in a joint trial, whose counsel can share responsibility with counsel for other defendants and has more time to prepare between witnesses. In addition, the shorter the trial, the less of a burden it is for the government to have all 3500 material organized and produced before the trial begins.

[9] The Second Circuit clearly disfavors last minute disclosure of critical information, including Brady material. *See United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002) ("We have emphasized that disclosure of critical information on the eve of trial is unsafe for the prosecution: 'When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.'") (quoting *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001)); *United States v. Rodriguez*, 496 F.3d 221, 228 (2d Cir. 2007) ("If the material proves to be the sort that occasions investigation by the defense (an appraisal better made by the defendant's attorney than by the Government's), failure to disclose before trial may either deny the defendant the benefit of the disclosure (and perhaps raise doubt about the accuracy of the verdict), or require a mid-trial adjournment, to the great inconvenience of the court, the jury, and all participants. And, if, as in this case, a question of law arises concerning the disclosure obligation, pretrial disclosure gives counsel the opportunity to research the issue and present authorities to the court.").

cooperating witness Santo Maggio alone, including approximately 400 pages of handwritten notes. Grant Tr. 2209, 2022.[10] A large volume of material will presumably be produced for other witnesses as well. It is inconceivable that the defense will be able to meaningfully make use of this material in the limited time provided, and especially unrealistic to expect it to do so in the midst of an extremely complicated trial. The government's proposal to produce 3500 material for cooperating witnesses Maggio and Trosten one week before trial does not alleviate that burden. *See* Govt. Br. 41. Given the massive amount of material for these two witnesses alone (thousands of pages), there is no way the defense will have assimilated it before trial begins. Even assuming the defense had no other pressing tasks during the week before trial than to sit at leisure and review this material, the task would be daunting – requiring intake of what is anticipated to be approximately 1000 pages of dense material a day. Once the trial begins, the defense will have even less time to review or absorb the material it receives on a rolling basis.

Finally, having access to *Giglio* and 3500 material only at the last minute limits the ability of defense counsel to raise anticipated evidentiary issues in an orderly way through well-briefed motions *in limine*. For all of these reasons, the government should be required to produce *Giglio* and 3500 material at least two months before trial.[11]

---

[10] The government cites several cases for the proposition that *Giglio* material need not be turned over until the eve of trial. These cases are not complex financial cases of the type at issue here. *See* Govt. Br. at 38-41, citing *United States v. Hernandez*, 2001 WL 674133 (S.D.N.Y. June 15, 2001) (narcotics conspiracy in which government was required to produce *Giglio* material two weeks before trial); *United States v. Pimentel*, 2001 WL 185053 (E.D.N.Y. Jan. 22, 2001) (murder and gun charges arising from gang-related murder); *United States v. Jones*, 2000 WL 1448640 (S.D.N.Y. Sept. 28, 2000) (narcotics conspiracy); *United States v. Villanueva Madrid*, 302 F. Supp. 2d 187 (S.D.N.Y. 2003) (narcotics, money laundering and bank fraud charges); *United States v. Gutierrez-Flores*, 1994 WL 558034 (S.D.N.Y. Oct. 11, 1994) (cocaine possession and distribution charges); *United States v. McDuffie*, 2002 WL 654136 (S.D.N.Y. Apr. 18, 2002) (stolen checks and money orders); *United States v. Savarese*, 2002 WL 265153 (S.D.N.Y. Feb. 22, 2002) (organized crime, robbery, false insurance claims, transporting and trafficking in stolen and counterfeit goods); *United States v. Conley*, 2002 WL 252766 (S.D.N.Y. Feb. 21, 2002) (pump-and-dump scheme, resolved by plea); *United States v. Williams*, 181 F. Supp. 2d 267 (S.D.N.Y. 2001) (gang murder, narcotics trafficking, racketeering); *United States v. Jacques Dessange, Inc.*, 2000 WL 280050 (S.D.N.Y. March 14, 2000) (conspiracy involving false visa applications and related charges, resulting in approximately ten-day trial).

[11] The government notes that the schedule it now proposes is the same schedule that it followed in the recent trial of Refco co-conspirator Tone Grant. Govt. Br. 38, 41. The Grant trial was not only of shorter duration than

## CONCLUSION

For the foregoing reasons and those stated in our opening brief, Collins respectfully requests that the Court issue an order granting his motions and requiring the government (1) to produce further particulars regarding the forfeiture allegations of the indictment and the false statements or omissions allegedly made by Collins or by others whom he allegedly aided and abetted; (2) to admit the results of a polygraph examination or to hold a hearing to consider the admissibility of such evidence; and (3) to produce *Giglio* and 3500 material at least two months in advance of trial.

Dated: August 22, 2008
   New York, New York

COOLEY GODWARD KRONISH LLP

By: _____
   William J. Schwartz (WJS 8462)
   Jonathan P. Bach (JPB 9710)

1114 Avenue of the Americas
New York, NY 10036
Phone: (212) 479-6000
Fax:   (212) 479-6275

*Attorneys for Defendant Joseph P. Collins*

*Of Counsel:*

Daniel M. Hibshoosh (DH 8959)
Timothy M. Kerr (TK 3979)
Kathleen E. Cassidy (KC 0630)

---

this trial is anticipated to be, but was, we believe, also far less complex and far less dependent on circumstantial evidence. The fact that Judge Buchwald declined in another case (for reasons not cited by the government and unknown to us) involving different circumstances to grant the relief sought here should not bind this Court. The question here is what will produce a fair and efficient trial of this defendant on this indictment.