UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :

UNITED STATES OF AMERICA,          :

      - v. -                         :       S1 07 Cr. 1170 (RPP)

JOSEPH P. COLLINS,              :

                Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


 

 


PREET BHARARA
United States Attorney for the Southern
District of New York


CHRISTOPHER L. GARCIA
Assistant United States Attorney

     - Of Counsel -

**TABLE OF CONTENTS**

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Collins's Role in the Refco Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B. Collins's Role with Respect to the Four Aspects of the Fraud . . . . . . . . . . . . . . . . . . . 5

       1. Collins Lies to Hide the PPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       2. Collins Lies to Conceal Money Owed to Refco by RGHI . . . . . . . . . . . . . . . . . . . . . 9

       3. Collins Lies to Conceal Related Party Guarantees and Indemnities . . . . . . . . . . . . . . 13

       4. Collins Helps Mislead the LBO Participants to Believe that Refco Has $500 Million in Excess Working Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C. The Fraud Succeeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II. Collins's Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III. The Presentence Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.  Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       1. Collins Played a Primary and Indispensable Role in the Fraud . . . . . . . . . . . . . . . . . 27

       2. Collins Was Aware of the Underlying Accounting Fraud and His Conduct Otherwise Caused the Theft of $2.4 Billion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

       3. Collins Personally Benefitted from the Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       4. Collin's Role in the Fraud as Compared to the Roles of Coconspirators Already Sentenced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B. History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

C. Application of Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    1. Endangering Solvency and Financial Security Enhancement . . . . . . . . . . . . . . . . . . . . 39

    2. Use of a Special Skill/Abuse of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    3. Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D. The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

E. The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . . . . . . . 48

F. The Need To Provide Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

III. Forfeiture Is Appropriate In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

A. Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    1. In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    2. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    3. Property Subject to Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    1. Basis For Proposed Money Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    2. Forfeiture is an Appropriate Sanction in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

UNITED STATES OF AMERICA,         :

   - v. -                              :       S1 07 Cr. 1170 (RPP)

JOSEPH P. COLLINS,              :

              Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Joseph P. Collins, currently scheduled for December 17, 2009, and in response to the defendant's sentencing memorandum dated November 18, 2009 (cited herein as "Br.").

On July 10, 2009, after a nine-week trial, a jury convicted Collins of five of the fourteen counts with which he was charged. The counts of conviction plainly reflected the jury's conclusion that Collins was culpable for securities and wire frauds perpetrated in connection with the leveraged buyout of Refco by Thomas H. Lee Partners in 2004 and in connection with sale of common stock by Refco in 2005.[1] Put differently, the jury convicted Collins for his participation in a breathtaking fraud that resulted in the theft of billions of dollars from thousands of victims.

In a sentencing memorandum that grossly understates the central and indispensable role

---

[1] The jury found Collins guilty of conspiracy (Count One), securities and wire fraud in connection with the leveraged buyout of Refco by Thomas H. Lee Partners in 2004 (Counts Two, Six and Nine) and securities fraud in connection with the sale of common stock by Refco in 2005 (Count Three).

Collins played in this scheme and ignores any number of aggravating factors that make Collins compare unfavorably to his coconspirators, Collins asks for a non-custodial sentence. (Br. 1, 44). Because Collins played a pivotal role in the Refco fraud and because, unlike his coconspirators, he traded on his law license to secure the success of the fraud and then perjured himself at trial, the Government respectfully requests that the Court impose a sentence on par with the 10-year sentence imposed upon coconspirator Tone N. Grant.

## RELEVANT FACTS

### I.     Collins's Role in the Refco Fraud

#### A.     Overview

As the trial evidence demonstrated, Collins played a central role in four critical aspects of Refco's fraudulent efforts to achieve a sale of the company to Thomas H. Lee Partners in 2004 and to the public in 2005. First, Collins helped conceal the Proceeds Participation Agreement ("PPA"), the disclosure of which would have revealed that, among other things: (1) the Austrian bank BAWAG[2] had a large, otherwise undisclosed interest in Refco through a related entity called DF Capital Inc. ("DF Capital"); and (2) Refco Group Holdings, Inc. ("RGHI"), which held an ownership interest in Refco, owed Refco at least $350 million in 2002, a figure substantially larger than what was reported in Refco's financial statements for related party debt for the same period. Second, Collins lied about the amount of money RGHI owed to Refco in 2004, which totaled more than $1 billion, and about how much money RGHI would owe to Refco after the leveraged buyout ("LBO") of Refco by Thomas H. Lee Partners was completed (claimed to be

---

[2]BAWAG is the abbreviation for Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft, which was the fourth largest bank in Austria during the charged conspiracy period.

zero but really totaling hundreds of millions of dollars). Third, Collins hid the existence of indemnities and guarantees used in connection with certain year-end round trip loan transactions, which in turn concealed the full extent of the related party debt owed to Refco by RGHI. Finally, Collins lied about the segregation of $500 million in purportedly excess working capital.

The evidence at trial demonstrated that each of these aspects of the fraud was necessary to achieve a private sale of Refco in 2004 and a sale of the company to the public in 2005. Had Thomas H. Lee Partners, the bond purchasers or banks participating in the financing of the LBO, or the investing public been aware of any one of these aspects of the fraud, the LBO and, ultimately, the public sale of the company would have been jeopardized. (See e.g., Tr. 974-75, 999-1000, 1006-07, 1013-15). Of course, taken together, these different aspects represented a concerted, broad-based, and multi-faceted effort that ensured that the participants in the LBO and the investing public would be swindled out of $2.4 billion.

The evidence at trial also showed that Collins was deeply and actively involved in each of these four aspects of the fraud. As discussed in greater detail below, Collins planned and schemed with Bennett to conceal the PPA. He drafted and disseminated documents that contained false representations about the PPA, the related party debt owed by RGHI to Refco, the indemnities and guarantees, and the $500 million in purportedly excess working capital. He even fabricated a document as part of his efforts to conceal the PPA.

The evidence at trial further demonstrated that Collins's involvement in each of these aspects was critical to the success of the fraud. On a fundamental level, Collins's involvement was indispensable because the fraud had to be accomplished through legal documents and negotiations and Refco needed a lawyer on the inside of the fraud who: (1) would keep the

3

company's secrets regardless of the information requested of him by those acquiring the company; and (2) would be unburdened by the ethical obligation of a lawyer not to commit crimes, including on behalf of a client.

But Collins was not just any lawyer, and that Refco's lies and misrepresentations came from Collins had independent significance. Collins's reputation and long experience with company meant that his statements about the company carried extra credibility. Likewise, the involvement of his law firm Mayer Brown – an internationally recognized law firm – gave potential investors in the company confidence that representations made by Refco were truthful, accurate, and complete. (Tr. 941-42).

Collins's motives for participating in these different aspects of the fraud were as straightforward as his importance was to their success. As the evidence at trial demonstrated, Refco was Collins's most significant client. From 1998 through 2005, Collins billed $36 million in fees to Refco. (Tr. 3107; GX 1255). Over the same period, he billed a mere $10 million to his next largest clients. (GX 1255). Put differently, during this period, Collins billed 3.5 times more to Refco than his next largest clients. Moreover, while Collins had between 40 and 60 clients other than Refco during this period, most years he invoiced more time to Refco than to all of his other clients combined. (GX 1257, 1262). As both common sense dictates and the evidence at trial demonstrated, these billings mattered to Collins's compensation. For example, memoranda circulated to Mayer Brown partners in the years 2000 through 2002 made plain that "the most important compensation criterion" for determining partner compensation was "demonstrated professional excellence, as demonstrated by the ability to attract, retain, add value to, or expand profitable client relationships." (GX 7121, 7122, 7123; *see also* Tr. 3319-20).

4

And Collins had another, equally compelling reason to lie in connection with the private and public sale of the company: self-preservation. By the time of the LBO, Collins had spent several years helping Refco lie, cheat and steal. As detailed below, he had lied to the public on behalf of Refco by telling *Chicago Tribune* reporter Greg Burns that Refco suffered no losses in connection with reversals suffered by trader Victor Niederhoffer when he knew that was not true. He helped hide a substantial portion of the related party debt owed by RGHI to Refco by documenting year-end loan transactions. He drafted indemnities and guarantees in connection with those loan transactions even though he knew they were in violation of the credit agreements that Refco had through JPMorgan Chase bank. Telling the truth about the indemnities or guarantees or the true size of the RGHI receivable or the PPA risked prompting questions about the origin of the RGHI receivable, how it was concealed, and the financial condition of the company that would lead back to his own role, historically, in concealing Refco's financial problems.

Because the Court is familiar with the trial record, a detailed recounting of Collins's involvement in each aspect of the fraud is undoubtedly unnecessary. What follows is a brief reprise of some of the critical evidence establishing Collins's pivotal role in each aspect of the fraud.

**B.    Collins's Role with Respect to the Four Aspects of the Fraud**

**1.    Collins Lies to Hide the PPA**

Collins played a central role in Refco's efforts to conceal the PPA. As the evidence at trial demonstrated, innumerable requests were made of Refco that called for the disclosure of the PPA. (*See e.g.*, Tr. 1624-27). Collins lied directly and repeatedly to conceal its existence. When

Jay Tabor, one of the lawyers who represented Thomas H. Lee Partners, asked in a telephone conversation in March 2004 for Collins to identify parties, if any, that possessed options to obtain equity interests in Refco, Collins replied that none existed when, in fact, the PPA provided BAWAG with the option to convert its interest in the proceeds of the sale of Refco into an equity stake in the company. (*Compare* GX 700 and Tr. 1610-11 *with* GX 1504 (Section 1.01)). When Refco was to confirm that it had disclosed all of its material contracts and indemnification obligations, Collins sent memoranda to Tabor stating that Refco confirmed that all such agreements had been disclosed, even though Collins knew that the PPA was not disclosed and even though he knew, among other things, that it contained an obligation on the part of Refco to indemnify DF Capital.[3] (*Compare* GX 705, GX 706 *with* GX 1504 (Section 11.01)). When Mayer Brown, under Collins's supervision, drafted disclosure schedules to the Equity Purchase and Merger Agreement ("EPMA") – the principal legal document governing the sale of a 57-percent stake in Refco to Thomas H. Lee Partners – the PPA was nowhere listed, even though it clearly should have been included on schedules relating to the capitalization of the company, third party consents, related party arrangements, and material contracts. (Tr. 1344-57, 1627, 1686-96; GX 1005.3). And when Thomas H. Lee Partners asked for the then-current limited liability agreement of the company to be provided – an agreement that Collins knew included references to the PPA and DF Capital – Collins made a new limited liability agreement out of whole-cloth that was cleansed of any references to the PPA or DF Capital and sent that to Thomas H. Lee Partner's representatives instead. (*Compare* GX 501-O (executed copy of

---

[3]As the Court will recall, DF Capital was the BAWAG-related entity that was a party to the PPA with Refco.

6

"Fourth Amended and Restated Limited Liability Company Agreement of Refco Group Ltd.,
LLC" referencing DF Capital and the PPA) *with* GX 710 (copy of "Fourth Amended and
Restated Limited Liability Company Agreement of Refco Group Ltd., LLC" without reference to
DF Capital or PPA)).

As the trial evidence showed, Collins engaged in these machinations for only one reason:
to ensure that as high a price as possible was extracted in connection with the LBO. As Bennett
explained during an April 7, 2004 meeting that only he and Collins attended on behalf of Refco,
Refco refused to disclose the PPA not for any innocent or lawful reason but because doing so
would "drive down price" and "'complicate' the deal." (Tr. 2037-2040; GX 3535-6). Of course,
Collins knew exactly why disclosure of the PPA and related documents would drive down the
price and complicate the deal. Having drafted the PPA, Collins knew that the PPA granted to
BAWAG a substantial interest in Refco that had not been disclosed to Lee and that Refco
received hundreds of millions of dollars for the sale of those interests. Likewise, Collins knew
that a side letter to the PPA reflected that in 2002 RGHI owed Refco at least $350 million, which
was far in excess of what was reported in the company's financial statements (*Compare* GX 1503
(Section 11.1) *with* GX 6005 (reflecting that Refco was owed $179 million by related parties as
of February 2002) and GX 6006 (reflecting that Refco was owed $105 million by related parties
as of February 2003)). The disclosure of the PPA would have caused participants in the LBO to
ask questions – questions about why Refco gave BAWAG such a large interest in Refco; why
Refco needed an infusion of hundreds of millions of dollars from BAWAG; why the related party
debt owed by RGHI to Refco so large; and why Refco's financial statement disclosures about
related party debt were inaccurate. (*See, e.g.*, Tr. 1685-86). These questions were strings that, if

7

tugged, threatened to unravel the fraud and reveal the true financial condition of Refco. Bennett and Collins could not let these questions be answered, so they made sure that they would not be asked by concealing the PPA.

Indeed, Collins took radical measures to ensure that the PPA would not be disclosed to Thomas H. Lee Partners. Most significantly, he hid the PPA from the other Mayer Brown partners working on the LBO. As the Court will recall from trial, in the weeks leading up to the LBO, Refco made efforts to buy back various interests held in the company by people other than Bennett. These interests included the approximately 27-percent interest held by DF Capital under the terms of the PPA. Collins handled the buyback of the DF Capital interest himself and instructed one of the lawyers representing BAWAG in connection with the buyback of the DF Capital interest, Jason Berger of the law firm McDermott Will & Emery, not to speak with his Mayer Brown colleagues about the DF Capital interest, even though some of those colleagues were working with Berger on another LBO-related BAWAG transaction. (Tr. 1842). When Berger inadvertently made reference to the buyback of the DF Capital interest to other Mayer Brown lawyers like partners Gail Saracco and Angela Lang, he was promptly scolded by Collins and warned not to repeat the error. (Tr. 1842-55). Collins was so concerned to keep the existence of the PPA secret, he even warned Berger at the closing of the buyback of the PPA interest to "never speak of this again." (Tr. 1912; DX 3538-2(R)). Collins wanted to make sure that his colleagues and the representatives of Thomas H. Lee Partners would never know that the PPA ever existed.

The centrality of Collins's role is reflected in the tenor of his communications with Bennett. When Collins's colleague Angela Lang asked Collins about there being "apparently

another very large transaction that I didn't know about," (GX 1813), Collins sent an email to

Bennett explaining that: "McDermott screwed up big time and disclosed the DFC deal to

everyone on our side. I will fill you in and believe that the reprecussions [sic] can be limited."

(GX 1954). This is not the language of a peripheral player whose involvement was limited to

the passive acceptance of directions provided by others. This is the language of a primary mover

identifying a threat to the success of the conspiracy and expressing the initiative to make sure that

the threat was controlled.

Indeed, it is worth noting that, with respect to the plan to conceal the PPA at least, Collins

was more in the know than some other members of the conspiracy. For example, cooperating

witness Santo Maggio played absolutely no role in the scheme to conceal the PPA and was not

even aware of that aspect of the fraud. (Tr. 2350-2351).

### 2.    Collins Lies to Conceal Money Owed to Refco by RGHI

Collins similarly played a central role in concealing the amount of money that RGHI

owed to Refco. As the Court knows from trial, Refco's financial statements for the period

immediately preceding the LBO indicated that Refco was owed approximately $105 million in

related party debt at year-end February 28, 2003 and further that such money was received by

Refco by year-end February 29, 2004. (GX 6006, 6007). Of course, what was real and what was

contained in Refco's financial statements were not the same, as Collins knew. Indeed, as the

evidence at trial demonstrated, Collins was aware for years that Refco hid the true amount of

money RGHI owed to Refco from auditors and others. For one thing, he drafted the side letter to

the PPA that reflected that in 2002 RGHI owed Refco at least $350 million, which was far in

excess of what was reported in the company's financial statements, as Collins knew. (*Compare*

9

GX 1503 (Section 11.1) *with* GX 3012 (offering memorandum in Collins's name containing

financial statements for year-end February 2002)). Moreover, in the summer of 2002, Robert

Trosten, then the CFO of Refco, discussed with Collins the true size of the debt owed by RGHI

to Refco, $700 million, which was, again, hundreds of millions of dollars greater than what was

reported in the company's financial statements. (Tr. 422-23; GX 3013, 3014).

At the same time, Collins and lawyers working at his direction documented loans in the

hundreds of millions of dollars that were plainly part of the effort to hide the true size of the debt

RGHI owed Refco. The loans followed a standard pattern. Just before the end of the fiscal year,

Refco would loan hundreds of millions of dollars to customers who would simultaneously loan

the same amount of money to RGHI. The customers assumed no risk for the loans made to

RGHI because Refco guaranteed and indemnified RGHI's performance. All of the loans were

then reversed just a few says after the end of the fiscal year. The customer received a guaranteed

profit because the interest paid to the customer for making the loan to RGHI was higher than the

interest paid on the loan from Refco to the customer; the customer made money essentially for

having done nothing because there was no risk in the transaction. Mayer Brown documented

these loans each year starting in 2000 in amounts that grew larger every year. In 2000, these

transactions resulted in loans to RGHI of $310 million. In 2001, the figure grew to $450 million.

In 2002, the amount climbed to $625 million. By 2003, the number reached $650 million. And

by February 2004, during the period when Collins was assisting Refco in negotiating the terms of

the LBO, Mayer Brown documented loans to RGHI totaling $720 million. Collins knew that

these loans were part of a scheme to pay down, temporarily over year-end, the amount of money

RGHI owed Refco because: (1) he knew that the amount of money owed by RGHI to Refco

10

exceeded what was reported in Refco's financial statements; and (2) he knew that there was no other plausible explanation for them. Undoubtedly, it was because Collins appreciated the purpose and significance of these transactions to Refco that he had his firm documented them year-in and year-out even though he knew that the guarantees and indemnities associated with the transactions were in violation of the terms of a large credit facility that Refco maintained through JPMorgan Chase.

Of course, that Collins knew that the true amount of money RGHI owed to Refco was far greater than what was in the company's financial statements is also reflected in his interactions with Earl Melamed, a lawyer with the firm Neal Gerber & Eisenberg. The Court will recall that in addition to buying back BAWAG's interests in Refco, Bennett also made efforts to acquire certain interests held in Refco by Thomas Dittmer, a former shareholder of RGHI. Melamed represented Dittmer in connection with those negotiations. As the testimony showed at trial, Bennett spoke candidly with Melamed about the true financial condition of Refco, including the amount of debt owed by RGHI to Refco, in an attempt to drive down the price that Bennett would have to pay to acquire Dittmer's interest. On at least two occasions, Melamed confronted Collins about the amount of money that RGHI owed Refco. As reflected in notes taken by Collins himself, Melamed talked to Collins in July 2004 about the "debt of RGHI" being a "$1B figure." (GX 327). Later, in August 2004, Melamed spoke to Collins about how RGHI owed Refco more than $1 billion and bout how $300 million of such debt would remain even after the close of the LBO. (Tr. 2847-52, 55-59). Indeed, the agreement that governed the buyout of Dittmer's interest – an agreement that Collins negotiated – included a chart in an appendix that indicated that the "Remaining Indebtedness of RGHI after consummation of transactions under

11

THL agreement" would be "$300,000,000." (GX 923). In his conversations with Melamed, Collins never denied that RGHI actually owed Refco more than $1 billion, nor did he deny that hundreds of millions of dollars in such debt would remain even after the close of the LBO. Rather, he negotiated contract language with Melamed stating that the appendix to the Dittmer buyout agreement was true and accurate – the same appendix that contained information about how $300 million in debt would remain even after the close of the LBO. (Tr. 2847-52, 55-59; GX 913, GX 923).

Of course, Collins did not share this information with Thomas H. Lee Partners and the other participants in the LBO. Rather, he lied repeatedly about the size of the debt owed by RGHI and the amount that would remain after the LBO. When Jay Tabor asked Collins in March 2004 about debt owed to Refco, Collins responded that there was no debt owed to Refco other than what customers owed the company in the ordinary course of business. Collins did not include the approximately $900 million in receivables owed by RGHI that was not disclosed in the company's financial statements. (Tr. 1606-07; GX 700). When Collins helped draft the April 2004 letter of intent, the letter included the understandings that: (1) as of 2004, RGHI owed Refco only $108 million; (2) such amount would be fully paid down by the close of the LBO; (3) there would be no debt owing to Refco by RGHI after the close of the LBO. (GX 1003 (stating that "any existing shareholder loans will be terminated prior to Closing" and "all existing agreements, contracts or arrangements between the Company and the Sellers or their affiliates will be terminated"), GX 3010 (draft letter of intent circulated by Collins)). As set forth above, Collins knew that these were all lies.

Of course, that Collins would lie about the size of the debt owed to Refco by RGHI was

not surprising; it was not the first time that Collins had lied and schemed in an effort conceal Refco's true financial condition. Years earlier, in 1999, Collins insisted to a reporter for the *Chicago Tribune*, trial witness Greg Burns, that Refco took no losses in connection with reversals suffered by customer Victor Niederhoffer. (Tr. 2605-2606; GX 132 (May 19, 1999 article by reporter Greg Burns indicating that a company spokesman insisted that the company suffered no losses in connection with Niederhoffer, echoing statements made by Grant in 1997); GX 302 (handwritten notes of Collins reflecting a conversation with Bennett and in house counsel in which they discussed "Greg Barnes" and "standing by Grant comments"); GX 133-R (testimony from trial of Tone Grant identifying Collins as the spokesman in the May 19, 1999 article who insisted that Refco suffered no losses). Collins insisted that Refco had not suffered any losses even though he drafted the agreements in 1997 that shifted the losses to Refco by releasing Niederhoffer of the obligation to repay Refco for the losses. (Tr. 4292-96; *see e.g.*, GX 3017). Likewise, in 2003, when Santo Maggio threatened to expose the truth about Refco – that it was "a piece of shit" and "a house of mirrors" – if he and the company were not jointly represented by Collins in connection with investigations relating to the short-selling of stock in a company called Sedona, Collins acceded to Maggio's request, thereby preserving the scheme to conceal the true financial condition of Refco of which he was a part. (Tr. 2316).

### 3.    Collins Lies to Conceal Related Party Guarantees and Indemnities

Collins likewise played a key role in the concealment of the indemnities and guarantees relating to the loan transactions described above. Obviously, Collins knew of the existence of indemnities and guarantees – indemnities and guarantees that obligated Refco to insure the performance of RGHI to the tune of hundreds of millions of dollars – because he and lawyers at

13

Mayer Brown working at his direction drafted them. Yet, when Jay Tabor asked him to disclose any arrangements between Refco on the one hand and RGHI, Bennett, or affiliates of Bennett on the other, Collins replied that he confirmed with Bennett that none existed other than Bennett's compensation arrangements. (Tr. 1611-14; GX 700). When Mayer Brown prepared the disclosure schedules to the EPMA, none of the indemnities or guarantees were included in those schedules, even though they should have appeared, at a minimum, in the disclosure schedules for interests of officers and directors and material contracts. (Tr. 1357, 1385-90; GX 1005.3 (Sections 3.12, 3.15)). As several witnesses testified at trial, knowledge of indemnities and guarantees in the hundreds of millions of dollars obligating Refco to insure performance by RGHI, a related party, would have affected their views of the financial condition of Refco and would have affected their decision to invest in Refco. (*See, e.g.*, Tr. 1012-15, 1178-79, 2727-28).

Of course, Collins had good reasons not to disclose the guarantees and indemnities. First, disclosure would have undermined efforts to sell Refco, which was the ultimate objective of the fraud. (Ind. ¶ 8). As important, disclosure would likely have led the participants in the LBO to ask questions about them – about what they were for and why Refco engaged in them – that would undoubtedly have led to the discovery of the round trip loan transactions and, ultimately, the true amount of debt owed by RGHI to Refco.

### 4.    Collins Helps Mislead the LBO Participants to Believe that Refco Has $500 Million in Excess Working Capital

Collins also played a pivotal role in misleading participants in the LBO into believing that Refco possessed $500 million in excess working capital. Collins participated in multiple conversations that made clear that Thomas H. Lee Partners understood from Refco that the company had $500 million in excess working capital – excess money that the company did not

14

need to use to operate its business. (GX 320, GX 325). Accordingly, he helped draft language in the April 2004 Letter of Intent that reflected this understanding. (GX 1003; 3010). He also personally drafted the language in the EPMA by which this money would be set aside in a segregated account until closing so that Thomas H. Lee Partners could test Refco's representation that the money was truly excess cash and not needed to run the business. (*Compare* GX 1805 *with* GX 1005.1 (Section 5.9); *see also* GX 1005.1 (Section 3.22)).

But as the evidence at trial also demonstrated, Collins knew that this $500 million in purported excess working capital was really comprised of a $390 million overdraft from BAWAG bank. Collins knew this because he personally approved a funds flow memorandum designating that the $390 million contained in the segregated account be wired to an RGHI account at BAWAG to repay an overdraft from BAWAG. (GX-1609). Indeed, this funds flow memorandum, which Thomas H. Lee Partners did not see, contradicted a separate funds flow memorandum that *was* provided to Thomas H. Lee Partners that showed the full amount of the purported $500 million in excess working capital going to an RGHI account at JPMorgan Chase. (GX 1005.88). Moreover, Collins knew that this was not excess cash in any real sense because Earl Melamed relayed to him his conversation with Bennett, in which Bennett told him that at the end of the transaction there would be no transfer of a purported $500 million in excess cash but rather a journal entry executed by the company to pay down a portion of the RGHI receivable that had not been disclosed to Thomas H. Lee Partners and the other potential investors in Refco. (Tr. 2849-50).

C.    **The Fraud Succeeds**

Collins's lies and machinations were, of course, ultimately successful. Based on these

lies, in August 2004 Refco was able to raise more than $1.9 billion: $510 million from Lee; $600 million through the sale of notes; and $800 million in long term bank financing. Only a year later, Refco raised an additional $583 million through the sale of common stock to investors. As was demonstrated by testimony at trial, participants in these transactions would not have invested in Refco had they known about the true state of Refco's financial condition.

As would be expected in a fraud of this scope, the victims included individuals from all backgrounds and walks of life. As the Court knows from trial, the list of victims included the sophisticated private equity fund Thomas H. Lee Partners, charitable organizations like the Gates Foundation, individual investors like Russell Schaub, who lost all of his investment in the IPO, large pension funds like TIAA Cref, which lost millions of dollars of its pension investments, and banks such as HSBC.

The losses suffered by Collins's victims remains impressive. More than $2.4 billion was stolen from victims in 2004-2005 ($512 million from Lee + $600 million from bond holders + $800 million in bank debt + $583 million from the IPO). This sum of course does not even include the more than $1 billion that Collins helped raise in the revolving lines of credit sponsored by JPMorgan Chase even though he knew that Refco regularly violated the terms of the agreements governing those lines of credit by entering into the guarantees and indemnities that he drafted. Even more staggering are the *actual* loss numbers. Even after all of Refco's assets were liquidated, and after hundreds of millions of dollars were forfeited by BAWAG and returned to victims, the losses still total nearly $1.5 billion, with Refco's creditors still short approximately $820 million, Lee $170 million and the IPO victims approximately more than

$500 million.[4]

## II.     Collins's Trial Testimony

During trial, Collins testified on his own behalf for a total of five days, half of which was spent on direct examination. During his testimony, Collins disputed essentially every allegation against him. In response to the Government's evidence, Collins attempted to offer innocent explanations for his conduct, including claimed failures of recollection, assertions of inattention to detail, and accusations that the Government's witnesses lied. Having tried to meet squarely virtually all of the allegations lodged against him, having been contradicted in almost full measure by the testimony of other witnesses and an extensive documentary record, and having been convicted nevertheless, the jury plainly found that Collins's testimony was not truthful. Put differently, this is not a case where the jury could have convicted Collins despite crediting his testimony.

Indeed, Collins repeatedly gave false testimony about matters material to the outcome of the trial. For example, as the Court is aware, the parties vigorously disputed Collins's knowledge concerning the size of the receivable owed by RGHI to Refco and for good reason: knowledge that the receivable owed by RGHI to Refco was higher than reported in the company's financial statements, was more than $1 billion, and would remain even after the completion of the LBO would plainly satisfy the knowledge elements of the several of the securities, wire and bank fraud charges filed against Collins. Collins's testimony was clear on this point. Collins, in a manner that cannot possibly be attributed to confusion, mistake, or faulty memory, denied that he knew the true size of the RGHI receivable in 2004 or at any previous time. (*See, e.g.*, Tr. 3495-96,

---

[4]These numbers were provided to us by counsel for the victims.