3570-72, 3637, 4285, 4286, 4478). As set forth above, the Government's evidence that Collins knew the true size of the RGHI receivable included, among other things, Earl Melamed's testimony about discussions he had with Collins about the true size of the receivable (including notes of a July 2004 conversation in Collins's handwriting), the Dittmer buyout agreement that specified that $300 million of the receivable would remain after the close of the LBO, Trosten's conversation with Collins in 2002 about the true size of the receivable, and Collins's involvement in the round trip loan transactions from 2000 through 2005. Collins's testimony and the Government's evidence were in direct conflict.

Likewise, the parties vigorously disputed whether Collins knowingly participated in efforts to conceal the indemnities and guarantees used in connection with the round trip loan transactions. The evidence at trial showed that Collins was asked to disclose agreements like the indemnities and guarantees and that the failure to disclose them affected the decision of others to participate in the LBO. This meant that Collins had only one defense regarding the indemnities and guarantees: to claim that he did not know about them. And this is precisely the tack that Collins took during his testimony. (*See, e.g.*, Tr. 4238-39). He claimed that he was not aware of the existence of the indemnities and guarantees at the time of the LBO or the IPO. But Collins's testimony was flatly contradicted by mountains of documentary evidence presented at trial, including Collins's handwritten notes relating to phone conversations concerning the indemnities and guarantees, draft mark ups of the round trip loan documents, and time records and billing information, that refuted Collins's testimony.

Collins's testimony regarding the PPA was equally riddled with falsehoods material to the outcome of the trial. In response to overwhelming evidence both that knowledge of the PPA

would have affected the investment decisions of the LBO participants and that Collins and

Bennett entered into an agreement not to disclose the PPA, Collins deployed the only defense he

could: he claimed that he believed that the agreement did not need to be disclosed and offered

several bases for this purported belief. Of course, the documentary evidence at trial starkly

contradicted these claims.

For example, Collins claimed that the PPA was an agreement between RGHI and DF

Capital and that Refco was not a party to the agreement. (*See generally* Tr. 3648-61). He made

this claim even though Refco signed the agreement and RGHI did not; Refco gave DF Capital

right to a portion of the proceeds of a sale of Refco and RGHI did not; Refco gave DF Capital the

option to convert its right to participate in the proceeds of a sale of Refco into shares of Refco

and RGHI did not; and Refco issued an indemnification to DF Capital under the terms of the

agreement and RGHI did not. (GX 1504). The covenants, representations, and other obligations

imposed upon Refco under the terms of the agreement numbered in the dozens, as the

Government demonstrated on cross-examination (GX 1504-Y), and yet Collins claimed that

Refco was not a party to the agreement.

In further support of his claim that the PPA was really an agreement with RGHI, Collins

lied about the nature of a guarantee that RGHI conferred to DF Capital for the performance of

Refco under the PPA. Collins testified on re-cross-examination as follows:

> Q. Mr. Collins, under the proceeds participation agreement, under the terms of the
> agreement itself Refco had obligations of performance, correct?
> A. That is correct.
> Q. There was also a guarantee affiliated with that agreement, correct?
> A. That is correct.
> Q. And we've seen a bunch of guarantees in this case. A guarantee is something
> that says if the person who has the obligation in the first instance can't perform,
> then someone else will come in and perform on behalf of that person, correct?

A. It's late in the hour. You don't need a lecture on the number of different types of guarantees. There's guarantees of performance, payment; there's -- you know, if you point me to a particular guarantee, I'll talk about it.

Q. Mr. Collins, we have the time for you to be as accurate as you can be.

A. My recollection of the guarantee that was part of the PPA was that it was absolute, unconditional guarantee of payment and performance. There was no obligation whatsoever for any default. *The party who had the guarantee could just go straight to Refco Group Holdings.*

THE COURT: If it so determined.

THE WITNESS: If it so determined, right.

THE COURT: But what about under the terms of the PPA as it's referred to? Was there an obligation under the PPA for the parties to make a payment and receive payment under the PPA? In other words, was there an obligation between Refco and the DF Capital that Refco would make payment first?

THE WITNESS: No, your Honor.

THE COURT: There was no obligation under the contract for Refco to make payment?

THE WITNESS: There was an obligation, your Honor, but it had no money to satisfy that obligation.

(Tr. 4501-02) (emphasis added). Of course, the guarantee made plain that it was not the case that Refco "could just go straight to Refco Group Holdings." Rather, the "effectiveness" of the guarantee was "subject to the condition that DFI shall have given five business days' notice to the Guarantor [RGHI] that a demand for performance of the Obligations has been made and that the Company [Refco] has failed to perform such Obligations within three business days thereafter." (GX 1504) (bates number MB02069389)).

Collins also claimed on direct examination that the PPA did not need to be disclosed because it was effectively nullified by the June 8, 2004 signing of a document called the Reversion Rights Agreement. (Tr. 3772-76). But even that agreement explicitly contemplated that the PPA would be in effect until the closing of the buyback of the DF Capital interest, which did not occur until August 4, 2004. (DX 501 (Section 2.2) (referring to "the Proceeds Participation Agreement in existence immediately prior to the DFC Closing"). Indeed, John

20

Sullivan, a lawyer with McDermott Will & Emery who negotiated the buyback of the DF Capital interest on BAWAG's behalf, testified during trial that he understood that all of his client's rights under the PPA were in effect until August 4, 2004. (Tr. 2082, 2088). Indeed, after extensive cross-examination, even Collins had to admit that his testimony on direct simply was not accurate. (Tr. 4430-32).

Collins also claimed that the PPA did not need to be disclosed because the signing of the June 8, 2004 Reversion Rights Agreement assured that the PPA would be terminated prior to the close of the LBO. Collins rested this claim on language in the recitals section of the agreement that read: "WHEREAS . . . Desana will sell to RGHI and RGHI will purchase from Desana, prior to the Merger Closing, all of the outstanding stock of DFC." (DX 501). But as the Government demonstrated on cross-examination, these recitals were not incorporated into the rest of the document. As the defendant knew from having drafted other agreements on behalf of Refco that explicitly incorporated recitals into the main agreement, (1504-S (Section 1)), the recitals in the Reversion Rights Agreement were not binding.

The Government respectfully submits that there can be no doubt that Collins's testimony cited immediately above – as well as other portions of his testimony too numerous to include here – amount to clear instances of perjury.

III.    **The Presentence Investigation Report**

In connection with Collins's sentencing, the Probation Office has prepared a Presentence Investigation Report (the "PSR") which calculates Collins's Sentencing Guidelines offense level as 49, calling for a Sentencing Guidelines at the statutory maximum, 85 years' imprisonment, calculated as follows:

21

- A base offense level of 7 pursuant to § 2B1.1(a).  (PSR ¶ 98).

- An increase by 30 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(P) because the loss amount directly attributable to the defendant's criminal conduct was more than $400,000,000.  (PSR ¶ 99).

- An increase by 6 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(C) because the offense involved more than 250 victims.  (PSR ¶ 100).

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(9)(C) because the offense involved sophisticated means.  (PSR ¶ 101).

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(14)(C) because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, and the offense (i) substantially jeopardized the safety and soundness of a financial institution; and (ii) substantially endangered the solvency or financial security of an organization that was, during the time of the offense, (a) a publicly traded company; and (b) had 1,000 or more employees.  (PSR ¶ 102).

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.3 because the defendant abused a position of public or private trust and used a special skill in a manner that significantly facilitated the commission or concealment of the offense.  (PSR ¶ 104).

As the Probation Office indicates, the Government also believes that the defendant's offense level should be increased by two levels pursuant to U.S.S.G. § 3C1.1 because the defendant attempted to obstruct justice through perjured testimony at trial.  *See* U.S.S.G. § 3C1.1

22

(calling for an upward adjustment of two levels where "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; and (ii) a closely related offense."). The Probation Office deferred to the Court to determine the applicability of this enhancement. (PSR ¶ 105).

Collins has no criminal history points. As the top offense level under the Sentencing Guidelines is 43, Collins's advisory Guidelines sentencing range is life imprisonment. However, because the statutory maximum is a term of years rather than life imprisonment, Collins's Guidelines range is the statutory maximum of 85 years' imprisonment.

## DISCUSSION

### I.    Applicable Law

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). Indeed, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims" *United States* v. *Booker*, 543 U.S. at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. §

24

3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id.* Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113.

## II.    Analysis

For the reasons discussed below, Collins's conduct, weighed in view of the factors set forth in Section 3553(a), warrants a sentence of imprisonment on par with the sentence imposed upon Tone N. Grant.

### A.    <u>The Nature and Circumstances of the Offense</u>

The crimes Collins committed with Bennett, Grant and others were, simply put, breathtaking. Collins helped trick investors and lenders out of billions of dollars and, even today, the uncompensated losses, without considering the thousands of Refco employees who lost their jobs, amounts to nearly $1.5 billion. Unlike some other large frauds in our nation's history, the fraud here was not simply one where loss was calculated by the drop in the stock price as a result of disclosure of the criminal conduct (i.e., market capitalization reduction) and where there can be an argument that factors unrelated to Collins's conduct resulted in the losses. Here, the $2.4

25

billion loss figure (which, as discussed above, is only a portion of the total amount of money that others were tricked into advancing to Refco) directly and demonstrably resulted from lies told personally by Collins and Bennett to the victims of this fraud. The offense conduct was serious, multi-faceted, costly to individual and institutional investors across the country, and damaging to investor confidence in general. By any measure – the seriousness and extent of the illegal conduct, the amount of losses, the impact on the victims of the offense – the defendant's conduct was, simply put, egregious.

In asking that the Court impose a non-custodial sentence, Collins counters with three arguments. He contends he "did not plan or initiate any aspect of the fraud" but rather played merely "a secondary role" in it. (Br. 1, 37-38). He argues that he "acted without knowledge of the underlying accounting fraud." (Br. 2, 27-33). And he asserts that he did not "personally profit or even attempt to profit from" the fraud. (Br. 1, 33-34). In making these arguments, Collins focuses much of his efforts on attempting to distinguish his conduct from that of his coconspirators, like Bennett.

As set forth in more detail below, these arguments suffer three principal deficits. First, they minimize Collins's role in a way that does not find support in the record and that suggests a gap in culpability of a size that is similarly inconsistent with the record. Indeed, Collins ignores completely one critical aspect in which his conduct was more grave than his coconspirators, namely, he was acting as a lawyer. As important, whatever difference in culpability may exist between Collins and one or more of his coconspirators, Collins's conduct plainly rises to a level that demands a significant sentence of incarceration.

26

### 1.   Collins Played a Primary and Indispensable Role in the Fraud

Collins's claim that he "did not plan or initiate any aspect of the fraud" but rather played "a secondary role," (Br. 1, 37), is both inconsistent with the trial record and grossly understates Collins's role in the fraud.  For example, Collins, with Bennett, was very much at the center of planning and initiating the scheme to conceal the PPA.  As set forth in more detail above, it was Bennett and Collins, sitting side-by-side, who explained (Bennett speaking) to John Sullivan, one of the lawyers for BAWAG, that the PPA was not being disclosed to Thomas H. Lee Partners because to do so would "drive the price down" and "'complicate' the deal."  In a subsequent meeting with both Sullivan and Jason Berger, another BAWAG lawyer, it was Collins, sitting again side-by-side with Bennett, who testily insisted that the PPA would not be disclosed even though Berger raised with him several reasons why it should have been.  (Tr. 1802-09, 2064).  It was Collins who kept the PPA secret from his colleagues.  And when BAWAG's lawyers inadvertently made reference to the buyback of the PPA interest to one of those colleagues, it was Collins who advised Bennett that "McDermott screwed up big time" and that "reprecussions [sic] can be limited" and then promptly scolded Berger, warning him not to do it again.  (Tr. 1854-55; GX 1954).  To say that Collins was not part of the planning or initiation of the concealment of the PPA simply blinks reality.

Likewise, with respect to all aspects of the fraud, Collins's role was primary, not secondary.  Collins was not merely some scrivener who drafted documents by light of a banker's lamp in an otherwise dark room far from the victims of the fraud.  He was on the front lines of the fraud, lying directly to the victims and their representatives.  Accordingly, when Jay Tabor spoke with Collins in March 2004 and asked him questions that should have prompted the

disclosure of the PPA, the indemnities and guarantees, and the true size of the receivable owed by RGHI to Refco, Collins – and Collins – alone lied. And when Tabor asked for a then-current copy of Refco's Limited Liability Company Agreement, it was Collins who made up a phony document that omitted references to the PPA and DF Capital. Collins was plainly a central part of the fraud and primary player in it.

Indeed, more than being a primary participant, he was an *indispensable* one. Put simply, the Refco fraud could not have occurred without the defendant – without a lawyer who was willing to sacrifice his profession's ethics to commit a crime. Two small examples illustrate the point. When Dittmer's lawyers resisted Bennett's offer to buy Dittmer out unless Dittmer received a representation from Bennett concerning the accuracy of the financial information he provided about the company, including that $300 million in related party RGHI debt would remain after the LBO closed, Refco needed a lawyer who would be willing to negotiate such a representation at the same time that he was telling lawyers for investors in the LBO that the RGHI related party debt would be zero after the LBO. Without a lawyer willing to compromise his ethics in such a way – without a lawyer willing to participate in a fraud – Dittmer's interest may not have been bought out, the LBO may not have occurred, and the LBO investors (and public investors later) might not have been victimized.

Likewise, when BAWAG's lawyers expressed the view that the representations and warranties in the EPMA called for the disclosure of the PPA, the language of the EPMA was changed such that BAWAG did not have to stand by them, paving the way for the completion of the buyout of the PPA interest. (Tr. 1816-27). Refco needed a lawyer involved in the transaction who was willing to work out language that accomplished BAWAG's removal while at the same

28

time being aware that his client, who *was* standing behind the representations and warranties, was committing a fraud by doing so. Without a lawyer willing to participate in a crime in this way, BAWAG's interests may not have been bought out, the LBO may not have happened, and, again, the LBO investors (and public investors later) might not have been victimized.

### 2. Collins Was Aware of the Underlying Accounting Fraud and His Conduct Otherwise Caused the Theft of $2.4 Billion

Collins's contention that he deserves a non-custodial sentence because he "acted without knowledge of the underlying accounting fraud," (Br. 2, 27-33), is similarly faithless to the record. As set forth in detail above, the Government proved at trial that Collins knew that the related party debt owed by RGHI to Refco was greater than what was reported in its financial statements and to the investors in the LBO the investing public. The Government's evidence that Collins knew the true size of the RGHI receivable included, among other things, Earl Melamed's testimony about discussions he had with Collins about the true size of the receivable, Collins's handwritten notes of one of the conversations, the Dittmer buyout agreement that specified that $300 million of the receivable would remain after the close of the LBO, Trosten's conversation with Collins in 2002 about the true size of the receivable, and Collins's involvement in the round trip loan transactions from 2000 through 2005.

Collins's extensive discussion of the "meaning of the verdict" and whether there is a possibility that the jury convicted Collins without finding that he was aware of the "underlying accounting fraud" is, simply put, a red herring. First, the Government introduced overwhelming evidence that Collins possessed such knowledge. This evidence was sufficient to support a verdict and certainly sufficient for the Court to rely on it for the purposes of sentencing. Indeed, even assuming, *arguendo*, that the jury did not find that Collins was aware of the true size of the

29

RGHI receivable, there is no reason why the *Court* could not find that he was aware of the true size of the RGHI receivable for purposes of sentencing.  Second, and as important, Collins still would have been convicted of participating in a massive fraud that accomplished the theft of $2.4 billion.  As indicated above, potential investors in Refco would have wanted to know about the PPA, the indemnities and guarantees, and the $500 million in purportedly excess working capital because – individually and taken together – they constituted information that would have affected their investment decisions.  Indeed, as set forth in the Indictment, the private and public sale of Refco was the "ultimate objective" of the scheme with which Collins was charged, (Ind. ¶ 8), and his lies about the PPA, indemnities and guarantees, and the $500 million in purportedly excess working capital all helped ensure that the objective was reached.

### 3.    Collins Personally Benefitted from the Fraud

Finally, Collins's contention that he did not "personally profit or even attempt to profit from" the fraud is of limited help to him.  (Br. 1, 33-34).  There is no question that other participants in the scheme profited more from their participation in the scheme – and in some cases substantially more.  But that others profited more than Collins does not meant that Collins did not profit at all.  As set forth above, Collins benefitted from his participation in the scheme because Refco was his by far his largest and most significant client, which plainly and positively affected his compensation, not to mention his standing in the legal community.  The fact that some of Collins's Refco billings were for "legitimate legal work," (Br. 33), is irrelevant because if Collins was willing to do Refco's illegitimate work, Refco obviously was going to give him its legitimate work to do.  Put differently, doing the illegitimate work enabled Collins to keep Refco's legitimate work.

### 4.    Collins's Role in the Fraud as Compared to the Roles of Coconspirators Already Sentenced

Indeed, Collins's culpability for the fraud is not nearly as disparate from the culpability of his coconspirators as Collins suggests.  A comparison of his role in the fraud to that of Tone Grant, who was sentenced to 10 years' imprisonment by the Honorable Naomi Reice Buchwald, is instructive.

Until 1999, Grant was an officer of Refco who also held a 24.5 ownership interest in the company.  During his time at Refco, he was aware of and participated in the fraud to conceal the true financial condition of Refco.  This meant, among other things, that he lied directly and personally to investors in Refco and others, including *Chicago Tribune* reporter Greg Burns in 1997, about whether Refco took losses as a result of Victor Neiderhoffer.  Like Collins, he knew that Refco suffered losses in connection with Niederhoffer and that those losses were shifted to RGHI.  He also knew about other losses (greater in size) that Collins does not appear to have known about and other ways that Refco expanded the RGHI debt (*e.g.*, through fraudulently shifting company expenses from Refco to RGHI and manipulating the interest rate owed on the debt owed by RGHI) of which Collins seems to have been similarly unaware.

In 1999, although Grant continued to have an ownership interest the company, he left management.  That same year, Collins was interviewed by *Chicago Tribune* writer Greg Burns and insisted that Refco suffered no losses in connection with Niederhoffer, even though, as both Collins and Grant knew, the company had.  During the next several years, Grant knew about the fraud occurring at Refco through his continued contact with Bennett.  His ownership interest in the company increased to 50 percent in connection with the buyout of Thomas Dittmer.  But Grant had no day-to-day role in the management of the company.  Bennett managed the company

during this period.

During the period that Grant was no longer with management, Collins and Mayer Brown took a direct role in concealing the debt owed to Refco by RGHI by drafting the documents used in connection with the round trip loan transactions. These documents included, among other things, the indemnities and guarantees that were in violation of the terms of the credit facility with JPMorgan Chase with respect to which Collins also did work.

In 2004 and 2005, Grant had no active role in accomplishing the sale of the Company. As the Court will remember from trial, Thomas H. Lee Partners dealt exclusively with Bennett. Neither Grant, nor Dittmer, nor BAWAG – each of whom had interests in the company that Bennett had to buy back – dealt directly with Thomas H. Lee Partners or any of its representatives. Grant's involvement boiled down to his signing the EPMA and agreeing to stand by its representations and warranties. He was paid $16 million in and around the time of the LBO with the potential of receiving $275 million when the company went public (Grant never received this money).

At the same time, Collins and Mayer Brown continued to draft the documents used in the round trip loan transactions on an even more frequent basis (quarter-end in addition to year-end). Of course, Collins was on the front lines of the fraud at this point, lying directly and repeatedly to the representatives of Thomas H. Lee Partners in documents and conversations, making a phony limited liability company agreement, making sure that other lawyers at Mayer Brown did not know about the PPA interest, which he and Bennett decided they would not be disclosed. At all relevant times, Grant, while a lawyer by training, was not practicing law.

Undoubtedly, there are ways in which a comparison of Grant's and Collins's roles is

favorable to Collins. Grant was an owner-officer of the company who made (and had the potential to make) more money in connection with the fraud. In the beginning of the conspiracy period – between 1997 and 1999 – he was far more involved in the fraud.

There are other ways, however, in which the comparison is not favorable to Collins. While Grant knew the fraud continued after he left the company and from time to time had conversations with Maggio and Trosten where he encouraged their efforts in connection with the fraud, he was not active in the fraud the way Collins was through his participation in the round trip loan transactions. More important, Collins's involvement in lying on behalf of the company was far greater than Grant's during the period the LBO was being negotiated and after.

Additionally, and critically important, Collins's role as the lawyer in this fraud sets him apart from Grant (and all of his coconspirators) in a way, the Government respectfully submits, that should result in harsher punishment, not lesser punishment. The Second Circuit recently affirmed that whether a lawyer uses his status as a lawyer to commit a crime is a factor to be considered at sentencing. In *United States* v. *Stewart*, 2009 WL 3818860 (2nd Cir. Nov. 17, 2009), the Second Circuit refused to affirm Stewart's sentence and remanded the case for further sentencing proceedings because the district court failed to make a finding as to whether Stewart committed perjury at trial. The Second Circuit additionally expressed concern that the district court did not adequately consider whether her use of her training and status as a lawyer warranted a higher sentence. Noting that Stewart had argued that "she did no more than serve as zealous advocate for her client," the Circuit observed that such belief "if indeed she harbored it, gave her no license to violate the law." *Id*. at *50. The court continued:

> The [district] court did not, however, explain how and to what extent the sentence
> reflected the seriousness of the crimes of conviction in light of the fact that

> Stewart was engaged as a member of the bar when she committed them.
>
> ****
>
> The question therefore remains whether, because she was an experienced and
> dedicated lawyer acting as such when she broke the law in the manner that she
> did, her punishment should have been greater than it was.

*Id.* The Circuit made clear the import of such an inquiry by noting that the sentence previously

imposed "tested the boundaries" of a reasonable sentence in light of the fact that, among other

things, "Stewart used her privileged status as a lawyer to facilitate her violation of the law." *Id.*

at *50.

Among the participants in the Refco conspiracy, Collins stood alone as someone who

used his status as a lawyer to commit his crimes. Tone Grant attended law school and practiced

law early in his career but did act in the capacity of a lawyer – or use his status as a lawyer – in

connection with the fraud. Indeed, Collins is distinguishable from his coconspirators because he

alone abused the trust that society places in lawyers. And he abused that trust not just by

carrying out technical legal tasks. He was no mere scrivener. He was not someone relegated to

working behind the scenes. Rather, he lied directly to others, as a public face for the company.

He fabricated documents. He attempted to exert control over others, like Jason Berger, to make

sure that they did not reveal the criminal conduct in which he was participating. And the trust

that he abused was the type of trust reserved for the very best of the legal profession. Because of

Collins's stature and long history with the company, and the involvement of his internationally

recognized law firm, his statements on behalf of the company carried particular credibility with

the victims of the fraud.

The Government respectfully submits that Collins deserves a significant sentence of

incarceration – far in excess of the non-custodial sentence he seeks – because he, unlike any of the other participants in the fraud, "used [his] privileged status as a lawyer to facilitate [his] violation of the law." *United States* v. *Stewart*, 2009 WL 3818860, at *50. Indeed, when Collins's more active role in the fraud in 2004 and 2005 is considered in addition to his status as a lawyer both at the time of the fraud and when (as discussed below) he perjured himself at trial (Grant did not testify at his trial) – the Government respectfully submits that a sentence on par with the one imposed upon Tone Grant is an appropriate sentence for Collins.

### B.    History and Characteristics of the Defendant

Bulk of Collins's brief is devoted to a discussion of his personal history, his professional reputation and achievements, and his charitable good works. (Br. 3-24, 35-37, 39). While it is certainly appropriate for the Court to consider these matters in fashioning a just sentence, the weight they are accorded, if any, must considered against the backdrop of his criminal conduct.

For example, the weight given to testimonials to the defendant's character and honesty must be tempered by the reality that Collins spent several years lying, cheating, and stealing on behalf of Refco. Collins began lying on behalf of Refco in the 1990s, telling the *Chicago Tribune* that Refco did not suffer losses in connection with Victor Niederhoffer's trading reversals when he knew that Refco did. He drafted loan documents used in connection with the round trip loan transactions that were used to disguise the extent of the receivable owed by RGHI. He did this even though, for example, he knew that the associated guarantees and indemnities violated the terms of credit agreements that he negotiated on behalf of the company. During 2004 and 2005, he seized countless opportunities to lie for Refco in connection with the private and public sales of the company. And then he lied, under oath, during the trial in this

35

matter. Whatever experience the people writing letters on his behalf had of the defendant, trial presented an unflattering reality that was starkly different. This simply is not a case where it can be said that the defendant's offense conduct was in some way aberrant or representative of so brief a lapse in judgment that perhaps it is appropriate to give significant weight to an otherwise blameless life. The defendant's demonstrated capacity for lying on behalf of Refco over an extended period of time – and then for lying on his own behalf on the witness stand – renders such testimonials to his honesty hollow.

Likewise, paeans to his reputation and stature in the legal community deserve limited, if any, weight given that he built that reputation in part on the work he did for Refco. Refco was Collins's largest client by far. It was the client he staked his name on and was the client that, undoubtedly, paved the way for him to become chair of ABA's Committee on Derivatives and Futures Law and of the Chicago Bar Associations's Committee on Commodities Law and to teach graduate classes at The Illinois Institute of Technology's Kent School of Law. (Br. 6). Of course, to the extent Collins's success was built upon Refco's, it bears reminding that Refco was only a "success" because of the criminal conspiracy that convinced the world that it was financially healthier that it was. This was a criminal conspiracy that Collins participated in over the course of years. Certainly, any credit he deserves for his professional achievements must be discounted for the fact that those achievements were built upon a client whose own success was propped up by the defendant's criminal conduct.

Indeed, plaudits for his professional reputation deserve particularly little credit given that Collins's conduct cuts at the very fabric of the legal profession. In his work on behalf of Refco, Collins compromised his ethics and his law license to commit fraud. It would be a strange irony

to give him credit for his standing in the legal community when he treated the core currency of that community – integrity – so cheaply.

Testimonials from lawyers at Mayer Brown who are currently colleagues deserve especially little weight for obvious reasons. It is worth noting additionally that while several current employees of Mayer Brown have submitted letters vouching for his integrity, "including those who worked with him on Refco matters," conspicuously absent are letters from Angela Lang and Gail Saracco, the two Mayer Brown partners with whom Collins worked most closely on the LBO.

Finally, the Government agrees with the defendant that his good works, which are substantial, obviously should be considered by the Court, especially his commitment to working personally in service of others, including his family.

### C.   <u>Application of Sentencing Guidelines</u>

Although no longer binding upon the Court, the United States Sentencing Guidelines represent the considered judgment of the United States Sentencing Commission, a body of experts drawn from all areas of the legal profession, specifically created to determine the appropriate sentence in particular types of cases. As Judge Lynch has recognized, it is important for "rational judges [to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004); *see also id.* (acknowledging the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and

37

enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record"). Both the *Booker* and *Crosby* courts stressed the continuing significance of the Guidelines under the new sentencing framework.

In this case, the sentence called for by the Sentencing Guidelines is obviously a significant marker of the seriousness of the offenses committed by Collins. As noted above, Collins has an offense level of 49, even before any adjustment for obstruction of justice, six levels above the highest offense level in the Guidelines. The Guidelines therefore call for a sentence of life imprisonment. *See* U.S.S.G. § Ch. 5, Pt. A. Because Collins is not charged with any offense that carries a maximum term of life imprisonment, his Guideline Range is computed by adding the applicable statutory maximums on all counts of conviction, which results in a Guideline Sentence of 85 years' imprisonment. *See* U.S.S.G. § 5G1.2(d). While the Guidelines themselves are certainly not controlling, the fact that Collins's advisory range is literally off the charts (and significantly so) obviously reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to his conduct.

Collins raises only two objections to the Probation Office's calculation of his offense level and leaves unaddressed the Government's position, articulated in the Presentence Investigation Report (PSR ¶ 105), that there should be an additional enhancement for obstruction of justice.[5] The Government respectfully submits that Collins's objections are without merit and

---

[5]Collins does not object to the loss or victim-related enhancements applied by the Probation Office. Nor, apparently, does Collins object to the application of the enhancement for sophisticated means, although he seems to object to some of the reasons the Probation Office believes it applies. Calculating just those enhancements and adjustments with respect to which Collins lodges no objection, one arrives at an adjusted offense level of 45 (7 (base offense level) + 30 (loss enhancement) + 6 (victim enhancement) + 2 (adjustment for sophisticated means). Put differently, even if Collins's objections concerning enhancements and adjustments were well-