that a two-level enhancement for obstruction of justice is warranted in this case.[6]

### 1.     Endangering Solvency and Financial Security Enhancement

Collins's objection to the application of the enhancement for his having jeopardized the

safety and soundness of a financial institution or having substantially endangered the solvency or

financial security of Refco is groundless.  (Br. 26 n.3 (citing Appendix A)).  Collins's objection

both lacks factual support and is based on an incomplete reading of U.S.S.G. § 2B1.1(b)(14)(B).

Section 2B1.1(b)(14)(B) provides for a four-level increase on one of two grounds.  First,

such an increase is warranted if an offense "substantially endangered the safety and soundness of

a financial institution."[7]  The Application Note relating to this provision includes a non-

exhaustive list of factors to be considered by the Court in determining whether an offense had

such an impact on a financial institution.  Among other things, the Court is to consider whether

the financial institution became insolvent as a result of the offense.  U.S.S.G. § 2B1.1, cmt.

_____

founded (they are not), Collins would still face an advisory Guidelines range of life
imprisonment.

[6]Collins also objects generally to the application of November 1, 2009 edition of the
Guidelines Manual without explaining how the application of that edition would result in a
harsher sentence than would result from the application of the Guidelines Manual in effect at the
time of his offense or providing any authority whatsoever that the application of the November 1,
2009 edition of the Guidelines Manual would violate the *ex post facto* clause of the Constitution.
(Br. 26 n.3 (citing Appendix A)).  If a court determines that use of the Guidelines Manual in
effect on the date of sentencing would violate the *ex post facto* clause, then it is to use Guidelines
Manual in effect on the date the offense of conviction was committed. U.S.S.G. § 1B1.11(b)(1).
When this happens and a defendant has been convicted of more than one crime, the Court is to
use the Guidelines Manual in effect at the time the later offense was committed. *Id.*, cmt. n.2.
Here, the latest offense of conviction occurred October 2005. (*See, e.g.*, Indictment ¶ 78).  The
Guidelines Manual in effect in October 2005 was the 2004 edition.  Even a cursory comparison
of the 2004 and 2009 editions of the Guidelines Manual shows that Collins's adjusted offense
level would be the same under either version.

[7]Collins does not dispute that Refco was a financial institution.

39

n.12(A). Collins fastens on this factor and cites the testimony of Robert Trosten at trial that Refco had a negative net worth in 1999. Collins then claims that the adjustment pursuant to U.S.S.G. § 2B1.1(b)(14)(B) cannot be applied to him because Refco's negative net worth in 1999 occurred "for reasons having nothing to do with Collins." (Br. 26 n.3 (citing Appendix A)). But this claim is factually inaccurate. Trosten testified that Refco had a negative net worth once you factored the related party receivable owed to Refco by RGHI into the calculation. As indicated at trial, Collins had some role in creating the RGHI receivable as early as 1997 when he drafted the legal document that assigned the Niederhoffer losses to RGHI. (Tr. 363, 774-84; GX 416), an act that was a part of the overall conspiracy. Accordingly, Collins's offense conduct did contribute to the insolvency of Refco and U.S.S.G. § 2B1.1(b)(14)(B) should apply because his offense "substantially endangered the safety and soundness of a financial institution."

Section 2B1.1(b)(14)(B) also applies to Collins because his offense conduct "substantially endangered the solvency or financial security" of Refco, which is a separate ground upon which U.S.S.G. § 2B1.1(b)(14)(B) can be imposed – one that Collins completely ignores. The enhancement can be applied for conduct that "substantially endangered [] solvency or financial security" of a company where the company "(I) was a publicly traded company; or (II) had 1,000 or more employees." This enhancement "reflects the Commission's determination that such an offense undermines the public's confidence in the securities and investment market much in the same manner as an offense that jeopardizes the safety and soundness of a financial institution undermines the public's confidence in the banking system. This prong also reflects the likelihood that an offense that endangers the solvency or financial security of an employer of this size will similarly affect a substantial number of individual victims, without requiring the

40

court to determine whether the solvency or financial security of each individual victim was substantially endangered." U.S.S.G., App. C, amend. 647. The Application Note includes a non-exhaustive list of factors to be considered by the Court in determining whether an offense had such an impact on a company, including whether the company filed for bankruptcy protection, "suffered a substantial reduction in the value of its equity securities," "substantially reduced its workforce," "substantially reduced its employee pension benefits," and/or became "delisted from its primary listing exchange." *See* U.S.S.G. § 2B1.1, cmt. n.12(B)(ii). Refco was publicly traded, had over 1,000 employees, was delisted from the New York Stock Exchange, and was put out of business, with all the attendant consequences for its employees, as a result of the disclosure of the RGHI receivable. Because Collins helped conceal the RGHI receivable, an act that enabled Refco to become a public company in the first place, such conduct "endangered the solvency or financial security" of Refco and warrants a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(14)(B).[8]

### 2. Use of a Special Skill/Abuse of Trust

Collins's objection to an enhancement for special skill is equally meritless. Citing no legal support, Collins baldly asserts that the "special skill" adjustment that U.S.S.G. § 3B1.3 provides cannot be applied because it is duplicative of the "sophisticated means" enhancement applicable under U.S.S.G. § 2B1.1(b)(9)(C). (Br. 26 n.3 (citing Appendix A)). Collins is wrong.

The "special skill" adjustment and the "sophisticated means" enhancement are not

---

[8]Because U.S.S.G. § 2B1.1(b)(14)(C) provides that the cumulative adjustment of U.S.S.G. § 2B1.1(b)(14) and U.S.S.G. § 2B1.1(b)(2)(C) (relating to the total number of victims) is eight levels, and because Collins is subject to a six level enhancement under U.S.S.G. § 2B1.1(b)(2)(C), Collins's sentence may only be increased by an additional two levels under U.S.S.G. § 2B1.1(b)(14).

dupicative because they have two distinct purposes and address two different concerns for punishment. "The purpose of the special skill enhancement is to punish those criminals who use their special talents to commit crime. In contrast, the sophisticated means . . . enhancement[ is] designed to target criminals who engage in complicated criminal activity . . . ." *United States* v. *Rice*, 52 F.3d 843, 851 (10th Cir. 1995). Accordingly, the "special skill" adjustment applies even where the offense committed is not particularly complex or intricate because it is blameworthy for a person – like a lawyer – to use a special skill to commit crime even if the crime is a simple one. Conversely, the "sophisticated means" enhancement applies to complicated criminal schemes because it is blameworthy for a person to commit or conceal a crime through complexity and intricacy even if no "special skill" is utilized. Just because Collins used his special skill as a lawyer to commit his offenses and his offenses were also complicated and intricate, does not mean that these enhancements involve duplicative punishment. It means that his offenses had separate features – use of a special skill on the one hand and deployment of complexity and intricacy on the other – that merit separate measures of punishment. Indeed, this is undoubtedly why the Guidelines do not proscribe the application of both enhancements even though in many circumstances the Guidelines will do so if there is overlap. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n.8(C) (stating that "if the conduct that forms the basis for an enhancement [for sophisticated means] is the only conduct that forms the basis for an adjustment under § 3C1.1 (Obstruction of Justice), do not apply the adjustment under § 3C1.1").

Additionally, an adjustment pursuant to U.S.S.G. § 3B1.3 is also appropriate because Collins abused a position of trust in connection with his crimes. Section 3B1.3 applies when a defendant "abuse[s] a position of public or private trust . . . in a manner that significantly

42

facilitated the concealment of the offense." U.S.S.G. § 3B1.3  As mentioned above, the Second

Circuit in the *Stewart* case recently affirmed the importance of considering whether an attorney

has committed his crime by using his "privileged status as a lawyer to facilitate [his] violation of

the law." *United States* v. *Stewart*, 2009 WL 3818860, at *50 & n.37 (advising the district court

of its discretion to consider the application of U.S.S.G. § 3B1.3 at resentencing on the ground

that Stewart had abused a position of trust).  Collins clearly abused a position of trust when he

repeatedly lied to potential Refco investors and their representatives.

### 3.    Obstruction of Justice

In addition to the application of the sentencing enhancements and adjustments outlined in

the PSR and above, the Government respectfully submits that an additional two-level adjustment

pursuant to U.S.S.G. § 3C1.1 should be applied for obstruction of justice in connection with

Collins's perjured testimony at trial.

The law relating to the imposition of an adjustment for obstruction of justice on the basis

of perjured testimony at trial is well-settled.  A defendant commits perjury for the purposes of

U.S.S.G. § 3C1.1 when he "gives false testimony concerning a material matter with the willful

intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."

*United States* v. *Dunnigan*, 507 U.S. 87, 93 (1993).  In determining whether to apply U.S.S.G. §

3C1.1 on the basis of perjured testimony, a district court must make independent findings based

on a review of the record.  *See id.* at 96 .  "While it is preferable for a district judge to address

each element of the alleged perjury in a separate and clear finding . . . . it is sufficient . . . if . . .

the court makes a finding . . . that encompasses all of the factual predicates for a finding of

perjury."  *Id.*

43

The Government respectfully submits that there can be no doubt that Collins repeatedly gave false testimony under oath at trial in a manner that was not the result of confusion, mistake, or faulty memory but part of an intentional and willful effort to affect the jury's understanding of material issues and, ultimately, the outcome of the trial. In section II of the Background section above, the Government outlines just some of the many examples of perjury that are replete in the transcript of Collins's testimony. The examples cover a wide-range of issues but they all have certain features in common that are demonstrative of perjury.

First, in each instance, Collins's testimony was directly contradicted by overwhelming evidence. In several instances, Collins's testimony lacked even facial credibility. Collins's testimony even contradicted itself at times.

Second, in each instance, Collins plainly intended his testimony. This was plain in part from the clarity of the answers he gave on direct examination. Collins did not equivocate when he denied that he knew the true size of the RGHI receivable in 2004 (or at any previous time), or when he claimed that we was not aware of the existence of the indemnities and guarantees at the time of the LBO (or the IPO), or when he claimed that he believed that the PPA did not need to be disclosed for various reasons. His testimony on these matters was by no means brief, but rather quite full. There is no risk that his answers were somehow blurted out or that they reflect inadvertent remarks. On the contrary, Collins's testimony on these points was stated firmly, clearly, and repeatedly.

Indeed, Collins's testimony was clearly the result of considerable deliberation. As the Court knows, the defendant spent a considerable amount of time preparing his testimony from trial. This was obvious from his manner on direct examination. And, indeed, the defendant

testified about the extent of his preparation, which included being prepared not only by his own counsel with the Cooley law firm but also by three lawyers with the Williams & Connolly law firm, which represents Mayer Brown in connection with civil litigation brought against that firm in connection with Collins's conduct. (Tr. 4408). While such extensive preparation is to be expected and is perfectly appropriate, such preparation also reduces the likelihood that Collins's statements were somehow the result of confusion, mistake, or faulty memory. Indeed, the Government respectfully submits that Collins's direct testimony was obviously the product of considerable deliberation.

Also, it cannot be forgotten that Collins is himself a lawyer who is a product of a top-flight legal education and who practiced at the highest levels of the legal profession, a profession in which attention to detail and care with words is paramount. There is simply no doubt that Collins meant what he said when he testified.

Third, in each instance, the testimony was material. As the Court knows, the following were all matters that were vigorously disputed at trial: whether Collins knew of the existence and size of the RGHI receivable, whether Collins knowingly participated in efforts to conceal related party transactions, whether the PPA was required to be disclosed, and Collins's knowledge concerning the true nature of the $500 million in purportedly excess working capital. These matters were vigorously disputed because their resolution was material to the outcome of the trial. Indeed, these issues directly concerned the elements of the charges against Collins. As a lawyer in his own right and someone well prepared for his trial, there can be no doubt that he appreciated the significance of the resolution of these issues to the trial.

Put simply, the Government respectfully submits Collins gave false testimony concerning

45

material matters with the willful intent to provide that testimony, warranting a two-level

adjustment for obstruction of justice.

### D.    The Need To Afford Adequate Deterrence

One of the factors the Court must consider in imposing sentence under Section 3553(a) is

the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. §

3553(a)(2)(B). The Government submits that a substantial term of imprisonment is necessary,

and indeed vital, to achieve the goal of general deterrence in this case.

The need for a significant sentence for purposes of general deterrence is probably best

demonstrated by the positions taken by the defendant throughout this case and now at sentencing.

From opening to summation, the defendant made it one of his primary themes at trial – if not his

primary theme – that he should be treated differently because he is a lawyer. The trial was rife

with the suggestion that somehow a lawyer's relationship with, and obligations to, his client

somehow make the demarcation of right and wrong – of legal and illegal – murky, confused, or

simply different than it is for non-lawyers. And now, at sentencing, Collins characterizes his

conduct as having merely "crossed a line by following a client's instruction." (Br. 37; *see also*

Br. 39 ("He was a lawyer found to have crossed the line in service to his client"). But as the

Second Circuit has recently reminded us, the obligation to be a zealous advocate for a client does

not confer upon the lawyer a licence to violate the law. *See United States* v. *Stewart*, 2009 WL

3818860, at *50 (noting that Stewart had argued that "she did no more than serve as zealous

advocate for her client" and observing that such belief "if indeed she harbored it, gave her no

license to violate the law."). To the extent that there are corporate lawyers who like Collins

believe that the line between right and wrong, legal and illegal is somehow obscured by their

status as a lawyer, such lawyers need to know that they are wrong and to be incentivized to locate and stay on the right side of that line. A significant sentence of incarceration will serve that end.

Indeed, given the nature of Collins's conduct, a significant term of imprisonment is necessary. Collins did not creep or barely cross the line between right and wrong. He blew past that line through repeated lies over a period of years in relation to a multi-faceted scheme that resulted directly in the theft of $2.4 billion all the while enjoying the benefits of being a lawyer at a top firm, with all of the associated perquisites of compensation and reputation. As discussed below, it is difficult to find many cases involving conduct by a lawyer that was as egregious as Collins's and that resulted in the theft of as much money. This will be a benchmark case for lawyer professionals who are tempted to perpetrate frauds on behalf of their clients. If Collins receives the non-custodial sentence he seeks, not only will there be no incentive for lawyers to avoid committing the same crimes at the same level as Collins did, there will be no incentive for lawyers contemplating much less egregious, but no less unlawful, conduct to stay on the right side of the law.

Finally, the goal of general deterrence in this case is important to the integrity of the capital markets. As the Court knows, the Director of Enforcement for the United States Securities and Exchange Commission has submitted a letter in connection with Collins's sentencing that underscores the importance of meeting the goal of general deterrence in this case:

> Financial frauds such as Refco's can call into question the integrity of the nation's capital markets. When those frauds are actively and knowingly assisted by attorneys or other professionals, the damage can be especially severe. The Commission and investors rely on such gatekeepers. In many instances, questionable practices and attempted frauds have been thwarted by professionals who refused to countenance their clients' wrongful conduct. In contrast, Collins not only failed to stop his client's fraud, but actively assisted in it. Even though he was a partner in one of the nation's largest and most sophisticated law firms,

Collins made sure that Refco's reports did not disclose the massive related party indebtedness and the pervasive related party transactions of which he was well aware. His involvement in Refco's filings with the Commission gave the company's disclosures to potential investors a veneer of legitimacy. The negative impact of his misconduct on the public's perception of the integrity of the securities markets cannot be denied and should be considered in determining his sentence.

(Ltr. of Robert S. Khuzami dated October 8, 2009 (attached hereto as Exhibit A)).

### E.     The Need To Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).

Although securities fraud prosecutions are by no means rare in this District, it is difficult to find a case involving conduct similar to Collins's, namely, where an outside lawyer to a company, or any lawyer, was so centrally involved in a fraud of such mammoth scope. Indeed, Collins, looking outside this District, claims to have found two cases involving similar conduct in which lawyers received sentences of probation and one-year respectively and argues that he should receive a similar sentence. But the conduct that resulted in the convictions of the lawyers in those cases is not remotely similar to the actions Collins took on behalf of Refco. Indeed, far from avoiding unwarranted sentencing disparities, imposing a sentence on Collins similar to the sentences imposed in those cases would *create* unwarranted sentencing disparities because those defendants will have received a sentence similar to Collins for obviously less culpable conduct.

The conduct of Mark Kipnis that was at issue in the Hollinger International case does not bear even faint resemblance to Collins's conduct. Kipnis was convicted for his role in drafting

48

sham non-competition agreements in February 2001 that effected a transfer of $5.5 million to certain Hollinger International executives. *United States* v. *Black*, 530 F.3d 596, 599 (7th Cir. 2008). Collins's conduct was exponentially worse by every conceivable measure. Collins was involved in a multi-faceted conspiracy that spanned years. Over those years Collins lied on behalf of the company and engaged in sham transactions that dwarfed the ones at issue in the Kipnis case in size and significance: The round trip loan transactions were used to hide related party receivables in the hundreds of millions of dollars in order to, among other things, steal hundreds of million of dollars in revolving lines of credit from the group of banks led by JP Morgan Chase. Of course, those differences do not even account for Collins's conduct in 2004 and 2005 during which time he lied repeatedly and directly in conversations and documents to potential investors like Thomas H. Lee Partners about issues as varied as the size of the related party receivable, the existence of the PPA, the indemnities and guarantees, and the $500 million in purported excess working capital. And while Kipnis helped accomplish the theft of $5.5 million from Hollinger International and its shareholders, Collins helped accomplish the theft of $2.4 billion from the participants in the LBO and the investing public. Kipnis received probation. That Collins suggests he should be treated the same is obviously misguided.

The conduct of Robert Graham in the AIG case is similarly distinguishable. Graham was convicted of having drafted documents relating to a single sham re-insurance contract that enabled AIG to publicly report higher loss reserves. *United States* v. *Ferguson*, 553 F.Supp.2d 145, 150 (D. Conn. 2008). In breadth, depth, duration, and every other way, Collins's conduct was worse than Graham's by an enormous margin. And while the loss amount applicable in the Graham case was large – approximately between $500 million and $600 million – the type of

loss was qualitatively and materially different from the type of loss Collins caused. The loss attributed to Graham was loss in market capitalization suffered as a result of the disclosure of the fraud. *United States* v. *Ferguson*, 584 F.Supp.2d 447, 449-50, 452-56 (D. Conn. 2008). The loss calculation was based on statistical analyses of the potential effect of disclosure on share price that attempted to filter out potentially unrelated causes for the drop, among other things. But here, the losses suffered are born from straight-out theft, as opposed to a more theoretical calculation of reduction in market capitalization. Here, Collins lied directly, personally, and repeatedly knowing that he would be tricking people out of billions of dollars. Graham received a sentence of a year in prison. As with Kipnis, that Collins suggests he should be treated the same is obviously misguided.

Of course, Collins is also distinguishable from both Kipnis and Graham in one other significant way. It appears that neither Kipnis nor Graham perjured themselves at trial. As mentioned above, the Second Circuit recently held in the *Stewart* case that the district court procedurally erred at sentencing by declining to find whether she committed perjury at trial. In so holding, the Second Circuit stated forcefully that "whether Stewart lied under oath at her trial is directly relevant to whether her sentence was appropriate in light of Section 3553(a)" because "[a]ny cover-up or attempt to evade responsibility by a failure to tell the truth upon oath or affirmation at her trial would compound the gravity of her crime." *United States* v. *Stewart*, 2009 WL 3818860, at *51. Because Collins lied under oath at trial, he compounded the gravity of his crime, distinguishing himself from Kipnis and Graham and demanding a significantly greater sentence.

50

**F.**    **The Need To Provide Restitution**

Based on a thorough review of possible bases and methods for including restitution in Collins's sentence and provided that the Court grants the Government's application (discussed below) that the Court enter and make a part of Collins's sentence a Preliminary Order of Forfeiture, the Government has concluded that sentencing the defendant to restitution is unnecessary and inappropriate in this case.

First, forfeiture provides an adequate mechanism to distribute to the victims the proceeds of the defendants' crimes.  Once assets have been judicially forfeited, the Attorney General has authority to distribute these assets to victims, as set forth in 21 U.S.C. 853(i).  Because the Government will be seeking entry of a money judgment in the amount of $2.4 billion that is greater than the total amount of assets possessed by the Refco defendants and because the money recovered to fulfill this money judgment ultimately will go to victims, including restitution in the Collins's sentence would not increase the total compensation received by the victims of the Refco fraud.

Second, including restitution in Collins's sentence is not appropriate in this case.   Title 18, United States Code, Section 3663A makes restitution mandatory for crimes against property under Title 18, including offenses committed by fraud or deceit.  However, that section does not apply where "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3).  Where either of these conditions are met, a court may decline to make an

51

order of restitution "[t]o the extent that the court determines that the complication and

prolongation of the sentencing process resulting from the fashioning of an order of restitution . . .

outweighs the need to provide restitution to the victims." 18 U.S.C. § 3663(a)(1)(B)(ii). Here

the need to provide compensation to Collins's victims using the mechanism of restitution is low

because, as discussed above, they will receive compensation for their loss through the remission

of forfeited funds.  To the extent, if any, that a need for a judgment of restitution does exist, it is

outweighed by the complication and burden of identifying all of the victims of the fraud and

calculating their loss amounts.  These calculations will be time consuming given that they

require, among other things, tracing the purchase and sale over time of 60 million shares of

common stock issued in Refco's IPO and over $600 million in debt securities.  Moreover, the

Government has not yet been able to acquire the data set from which such calculations could be

made.  The Government anticipates that it ultimately may be possible to make some of these

calculations, in connection with the remission process, but delaying sentencing until these

calculations are complete would unduly burden and prolong the sentencing process.

Accordingly, the Court should decline to make an order of restitution against Collins.

It should be noted that Judge Buchwald, in connection with the sentencings of Phillip

Bennett and Tone Grant, followed the procedure specified above, namely, Judge Buchwald

entered preliminary orders of forfeiture and declined to order restitution.

## III.    Forfeiture Is Appropriate In This Case

For the reasons set forth below, the Government respectfully submits that the Court

should enter a Preliminary Order of Forfeiture (which will be submitted shortly under separate

cover), finding Collins liable for a personal money judgment in the amount of $2.4 billion.

A.    **Applicable Legal Principles**

1.    **In General**

Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rising to the forfeiture allegations in an Indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. Although a court may enter a preliminary order of forfeiture prior to sentencing, the court must orally order the forfeiture at the time of sentencing. *See* Fed. R. Crim. P. 32.2(b).

2.    **Burden of Proof**

Criminal forfeiture is "an aspect of sentencing." *Libretti* v. *United States*, 516 U.S. 29, 49 (1995). Because fact-finding at sentencing is established by a preponderance of the evidence, the preponderance of the evidence standard applies to criminal forfeiture. *United States* v. *Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999). Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying the proposed personal money judgment listed in the Preliminary Order of Forfeiture.

### 3.     Property Subject to Forfeiture

The forfeiture statute pertaining to securities fraud and wire fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation." 18 U.S.C. § 981(a)(1)(C).[2]

In addition to seeking forfeiture of specific property that constitutes or is derived from proceeds traceable to a crime, the Government may obtain a money judgment against the defendant to recover the amount of the crime proceeds. *E.g.*, *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond); Fed. R. Crim. P. 32.2

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *E.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (defendant convicted of food stamp fraud was properly sentenced to a forfeiture money judgment equal to the entire loss amount paid by the government, without subtracting the amount of cash that the defendant shared with the food stamp beneficiary; "Because the statute [18 U.S.C. § 981(a)(2)(A)] directs that 'proceeds' are not limited to net profits from the crime, and because any proceeds directly traceable to food stamp fraud are subject to forfeiture, the district court did not commit error by entering a forfeiture order equal to the entire loss

---

[2]     Although Section 981 is a civil forfeiture provision, 28 U.S.C. § 2461 provides that criminal forfeiture is mandated where federal law provides for civil forfeiture but there is no parallel criminal forfeiture provision. Section 2461 further provides that "[t]he procedures [in 21 U.S.C. § 853] apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section [relating to burdens of proof and presumptions] applies only in cases in which the defendant is convicted of a violation of such Act."

amount."); *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme."); 18 U.S.C. § 981(a)(2)(A) ("In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.").

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *E.g.*, *United States* v. *Day*, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008) (amount of money judgment is not limited to "those assets in the defendant's possession at the time forfeiture is ordered") (citing cases); *United States* v. *Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006) (forfeiture judgment may be entered for the full amount of criminal proceeds, even if the defendant is unable to satisfy the judgment at the time of sentencing; otherwise, defendants would be able to "dissipate those proceeds and avoid liability for the ill-gotten gains"); *United States* v. *Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (district court may order the defendant to forfeit a sum of money equal to the drug proceeds that he earned but did not retain); *United States* v. *Casey*, 444 F.3d 1071, 1074-76 (9th Cir. 2006) (because forfeiture is mandatory, a defendant who has already spent the proceeds of his drug offense must pay a money judgment; otherwise he will have been allowed to enjoy the fruits of his crime, which would be inconsistent with the remedial purpose of the statute); *United States* v. *Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4-5 (S.D.N.Y. Oct. 24, 2007) ("Where a

defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money

judgment against the defendant is effectively an *in personam* judgment in the amount of the

forfeiture order.").

In cases involving continuing schemes and conspiracies, the amount involved in the entire

scheme is forfeitable. *See United States* v. *Hasson*, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003)

(in money laundering case, court may not impose a forfeiture order based on a money laundering

offense with which defendant was not charged or for which he was acquitted, but if defendant is

convicted of a conspiracy, the forfeiture may be based on amounts defendant conspired to

launder, including amounts derived from uncharged substantive conduct, or substantive counts

for which he has been acquitted).  Furthermore, "co-conspirators are liable jointly and severally

to forfeit the reasonably foreseeable proceeds of their criminal activity."  *United States* v.

*Coleman Commercial Carrier, Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002); *see also United

States* v. *Fruchter*, 411 F.3d 377, 383-84 (2d Cir. 2005) (affirming imposition of joint and

several liability for all proceeds reasonably foreseeable to defendant in RICO case, including

proceeds derived from acquitted conduct); *United States* v. *Benevento*, 836 F.2d 129, 130 (2d

Cir. 1988) (affirming imposition of joint and several liability on defendant under 21 U.S.C. §

853(a)(1) rather than limiting forfeiture to property acquired solely or wholly by defendant).

In fraud cases involving a continuing scheme, this means that the defendant is liable for

the full amount derived from the scheme, even if he is charged with and convicted of only a few

substantive counts. *See United States* v. *Boesen*, 473 F. Supp. 2d 932, 952 (S.D. Iowa 2007) (in

a fraud case, forfeiture is imposed because the defendant has been convicted of perpetrating a

scheme; it does not matter how many executions of that scheme were alleged in the indictment;

hence a defendant convicted of 82 substantive counts of health care fraud must forfeit the proceeds of the entire scheme, not just the proceeds involved in the 82 counts on which he was convicted); *United States* v. *Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007) (citing *Boesen* and noting that if a defendant is convicted of mail or wire fraud, or any other offense of which a scheme is an element, he is liable for the proceeds of the entire scheme).

### B.    Discussion

#### 1.    Basis For Proposed Money Judgment

The Government seeks the entry of a Preliminary Order of Forfeiture imposing upon Collins a personal money judgment in the amount of $2.4 billion, representing proceeds of the conspiracy and substantive securities and wire fraud offenses of which he was convicted. This $2.4 billion amount was established by evidence at trial, which clearly demonstrated that the co-conspirators obtained from their victims at least $2.4 billion in the LBO and the IPO as part of the conspiracy of which Collins was convicted. Because it was reasonably foreseeable to Collins that entering into the conspiracy of which he was convicted would result in the conspirators obtaining $2.4 billion from their victims, Collins is responsible for that entire amount. *See Fruchter*, 411 F.3d at 383-84; *Hasson*, 333 F.3d at 1279 n.19.

It was for these very reasons that District Judge Naomi Reice Buchwald sentenced Collins's coconspirator Tone Grant to a money judgment in the amount of $2.4 billion:

> "[C]oconspirators are liable jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity. To hold otherwise would encourage strategic behavior on the part of coconspirators to hide funds and thwart the purpose of the criminal forfeiture statute."
> *United States v. Coleman Commercial Carrier Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002). To the extent that Grant argues that the full loss amount was not reasonably

> foreseeable to him, the evidence at trial refutes any such
> suggestion.
>
> The case law makes clear that proceeds refers to gross
> proceeds. The basis for the $2.4 billion dollar judgment
> was clearly established at trial. It is the sum of the amount
> invested by Thomas H. Lee during the leveraged buyout,
> the private debt offering accompanying the buyout, and the
> initial public offering of Refco.

*United States* v. *Grant*, No. S4 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 (S.D.N.Y. Sept. 25,

2008).

### 2.    Forfeiture is an Appropriate Sanction in this Case

Collins's arguments against forfeiture are meritless. First, he argues that he should not be

subject to a money judgment because he did not receive any proceeds from the crimes charged.

As set forth above, Collins and his coconspirators are "liable jointly and severally to forfeit the

reasonably foreseeable proceeds of their criminal activity," *Grant*, 2008 WL 4376365, at *2, not

individually liable only for the proceeds that each of them personally received. Collins's reliance

on *United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007), is misplaced. As the Second Circuit

explains on the very page cited in Collins's sentencing memorandum, the result in *Capoccia* was

dictated by the fact that the government did not seek to forfeit the funds as proceeds of a

conspiracy: "Where the conviction itself is for . . . engaging in a conspiracy . . . the government

need only establish that the forfeited assets have the 'requisite nexus,' Fed. R. Crim. P.

32.2(b)(1), to that [conspiracy]. As we have explained, however, Capoccia's conviction under

Count One is not a [conspiracy]." *Id.* at 118; *see also id.* at 118 n.19 (noting that the government

did not argue that the assets it sought to forfeit were proceeds of the charged conspiracy, which

commenced after the transactions of which the assets were proceeds).

Collins's argument that the Government abandoned its intention to seek forfeiture by not identifying any specific assets subject to forfeiture 60 days before trial is similarly meritless. The Government is not seeking to forfeit specific assets; it is seeking a money judgment. Accordingly, the Government's decision not to identify specific assets before trial in no way suggested that the Government was abandoning its intention, clearly set forth in the Indictment, to forfeit "at least $2.4 billion in United States currency." (Ind. at 55.)

Neither did the Government's decision not to request a jury finding on forfeiture at trial suggest that the Government was abandoning its intention to seek forfeiture. Collins argues that this robbed him of his opportunity to have a jury determination on forfeiture under Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure. However, the text of that rule omitted from Collins's memorandum makes clear that it was *his* burden, not the Government's to request a jury determination, if he wanted one. Fed. R. Crim. P. 32.2(b)(4) ("*Upon a party's request in a case in which a jury returns a verdict of guilty,* the jury must determine whether the government has established the requisite nexus between the property and the offense committed by the defendant") (emphasis added). Moreover, Rule 32.2(b)(4) does not give a defendant a right to a jury determination concerning the amount of a money judgment, only the forfeitability of specific assets. *See United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005); *United States v. Galestro*, No. 06-CR-285 (ARR), 2008 WL 2783360, at *11 (E.D.N.Y. July 15, 2008).

The Eight Amendment also does not preclude the imposition of a $2.4 billion money judgment. The Supreme Court has held that a forfeiture violates the Eighth Amendment only if it "is grossly disproportionate to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1988). The Supreme Court did not articulate a definition of gross

59

disproportionality, but guidance may be found in the Court's analysis. Among the factors that the Court identified as relevant were (a) the defendant's level of culpability as reflected in the calculation of his Sentencing Guidelines range for imprisonment and fine; (b) whether the defendant fit into the class of persons for whom the statute was principally designed; (c) the maximum statutory sentence and fine that could have been imposed; and (d) the nature of the harm caused by the defendant's conduct. *See id.* at 338-39; *United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003).

Applying the *Bajakajian* factors in this case, it is clear that a $2.4 billion money judgment is not grossly disproportionate to the gravity of Collins's offense. As established at by evidence presented at trial, Collins was integrally involved both in setting up the fraudulent LBO and IPO transactions that resulted in a $2.4 billion loss and concealing this fraud from the victims who lost $2.4 billion. His criminal conduct included drafting and reviewing documents used to mislead investors in Refco and personally lying to some of these investors. Similarly, he had email wired on his behalf in furtherance of this fraud. These emails contained false statements about facts centrally related to the fraud, including the letter of intent that had false statements about related party debt and related party transactions (Count Six) and schedules to the Thomas H. Lee purchase agreement that omitted various material facts (Count Nine). Finally, he engaged in the conspiracy that, because of its complexity and scope, could not have been accomplished by any one individual acting alone. Accordingly, Collins fits exactly into the class of persons for whom the securities fraud, wire fraud, and conspiracy statutes were principally designed. The sentence and fine recommended by the Guidelines reflect his level of culpability and are substantial: life imprisonment and up to $4.8 billion. The statutory maxima are greater still: a

combined 85 years. Finally, the nature of the harm caused by Collins was devastating and clearly financially commensurate with the proposed forfeiture, which seeks forfeiture only of the investor losses directly attributable to the LBO and IPO.

The gravity of Collins's offense is in stark contrast to *Bajakajian*, in which the defendant's offense was failure to report exported currency. As the Supreme Court noted, "there was no fraud on the United States and [the defendant] caused no loss to the public fisc. Had crime gone undetected, the government would have been deprived only of the information that $357,144 had left the country." *Bajakajian*, 524 U.S. at 2039. Similarly, in *United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997), the court held that a $1.3 million forfeiture was grossly disproportionate to the gravity of a defendant's offense where the amount represented proceeds of a conspiracy in which the defendant was "clearly a secondary figure" and the defendant "reaped little benefit." 115 F.3d at 602. Collins, however, played a major role in the fraudulent scheme at Refco. Accordingly, it is not grossly disproportionate to hold him and his coconspirators jointly and severally liable for the money that they obtained from their victims. *See e.g., United States v. Rudaj*, No. 04 Cr. 1110 (DLC), 2006 WL 1876664, at *8 (S.D.N.Y. July 5, 2006) (holding four coconspirators jointly and severally liable for a money judgment of $5,755,000 based on income received by the RICO enterprise, rather than income received by individual coconspirators was not grossly disproportionate); *United States v. Bollin*, 264 F.3d 391, 418-19 (4th Cir. 2001) (making minor participant jointly and severally liable for full amount of forfeiture judgment is not constitutionally excessive); *United States v. Peters*, 257 F.R.D. 377, 390 (W.D.N.Y. 2009) (preliminary order of forfeiture for money judgment of over $23 million obtained by defendant's company from victim bank as part of conspiracy to commit bank fraud,

wire fraud, and mail fraud was not grossly disproportionate); *United States v. Warshak*, No. 1:06-CR-00111, 2008 WL 2705044, at *5 (S.D. Ohio 2008) (making defendants jointly and severally liable for $459 million money judgment did not violate the Excessive Fines Clause in light of the scope, duration and sophistication of the consumer fraud scheme).

## <u>CONCLUSION</u>

The Government respectfully submits that, for the reasons explained above, Collins should be sentenced to a term of imprisonment on par with the sentence imposed upon Tone N. Grant.

Dated:  New York, New York
        December 5, 2009

                              Respectfully submitted,


                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                    By: _____/s/_____
                              CHRISTOPHER L. GARCIA
                              Assistant United States Attorney
                              (212) 637-1022