UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
UNITED STATES OF AMERICA              :   07 Cr. 1170 (RPP)
                                      :
        vs.                           :
                                      :
JOSEPH P. COLLINS,                    :
                                      :
        Defendant.                    :
------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## JOSEPH P. COLLINS'S MOTION FOR A NEW TRIAL

Defendant Joseph Collins respectfully submits this memorandum of law in support of his motion for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, on the ground of newly discovered evidence.

## PRELIMINARY STATEMENT

One of the most fiercely contested issues at the trial of this case was the timing of a conversation between government witness Jay Tabor and defendant Joseph Collins, in which Collins was said to have hidden the existence of the Proceeds Participation Agreement by not mentioning it in response to Tabor's questions. Tabor, a partner at Weil Gotshal & Manges, the firm that represented TH Lee in the leveraged buy-out transaction, testified that their conversation took place in March 2004, while Collins testified that he had no discussions with Tabor until approximately mid-April. The difference in timing was crucial because the essence of Collins's defense was that he spoke to Tabor only *after* he had been told by his client that an agreement had been reached with TH Lee to exclude "upstream" agreements from disclosure in connection with the due diligence process, and that he therefore believed in good faith that the Proceeds Participation Agreement did not have to be disclosed.

This issue consumed a huge amount of trial time. Recognizing its centrality, the government called Tabor back as one of only two witnesses in its rebuttal case and had him testify solely with respect to the date of his alleged notes of the conversation. It then emphasized the importance of the issue in its summation, stating that Collins "couldn't talk himself around this March conversation with Jay Tabor. Because if you believe Jay Tabor, it is over. The defendant is guilty." Tr. 4718. In its rebuttal summation, it continued, "Tabor wasn't lying when he got on that stand. And he told you about his notes and he told you what was in those notes and what the dates was [sic].... He knows, he's confident that that's [the] date that he spoke with the defendant on." Tr. 5061-62. The government thus formulated the issue as a key

credibility contest between Tabor and Collins, who testified in his own defense. On the first day of its deliberations, the jury asked for all of Tabor's testimony.

Since the trial, a wealth of new evidence has been produced by the Weil Gotshal law firm that had previously been withheld on grounds of privilege and was thus unavailable to the defense. *See* Declaration of Kathleen Cassidy, dated December 4, 2009 ("Decl."). The new evidence – which includes numerous internal Weil Gotshal emails and handwritten notes – makes clear that the conversation could not have taken place in March, and thus confirms Collins's account as opposed to Tabor's. Had the defense had access to the same evidence at trial, it could have effectively cross-examined Tabor, either when he was first called as a witness or when he came back to deliver what was intended to be a *coup-de-grace* as part of the government's rebuttal case. The new evidence is dispositive and would have put the issue to rest, establishing Collins's credibility on perhaps the central issue in the case – whether he had a good faith justification for non-disclosure of the Proceeds Participation Agreement.

In the discussion that follows, we first summarize the trial record. We then summarize the new evidence. We then set out the legal basis, under Rule 33, for a new trial.

I. **THE TRIAL RECORD**

A. <u>**The Government's Case-in-Chief**</u>

The government contended at trial that Collins hid the Proceeds Participation Agreement from TH Lee and its attorneys as part of a scheme to defraud TH Lee. The principal pillar of this aspect of its case was Tabor's testimony that he had a conversation with Collins in March 2004 in which Collins lied by telling him that there were no agreements that fell within the categories he was inquiring about. This was the most salient instance, if not the only instance, in the course of the entire eight-week trial in which the government was able to present evidence of what it claimed was a direct, overt misrepresentation by Collins in a conversation with another party,

2

and thus took on added significance in a case in which Collin's own credibility as a witness was at issue.

When first called as a witness, Tabor testified at length about the conversation. Tr. 1216-50. He testified that he was "positive" it had occurred in March. Tr. 1460. As the government framed questions, it repeatedly reiterated the supposed March date of the call. Tr. 1217-19, 1226-31, 1235-41, 1248-50. Tabor testified that, during the call, he asked Collins about some "specific diligence follow-up questions," Tr. 1218, including questions about any agreements Refco had with its affiliates or with other parties that conferred rights to acquire equity in Refco. Tr. 1226-27. Tabor testified that, in response to this inquiry, Collins denied there were any such agreements. Tr. 1227. Tabor further testified that, based on what he now knows, it is his opinion that Collins should have disclosed the Proceeds Participation Agreement during their March call. Tr. 1230-31.

On cross-examination, the defense immediately sought to establish that the call could not have taken place in March. Defense counsel elicited from Tabor that none of his detailed time records for the month of March includes even a single reference to any communication with Collins, even though the entries refer to communications with other individuals. Tr. 1476; DX 301.

On redirect examination, the government elicited that Tabor was "sure" that the conversation took place in March, notwithstanding the lack of any corroborating time entry. Tr. 1603. Significantly, the government also introduced into evidence a difficult-to-read copy of Tabor's alleged handwritten notes of the call, and asked Tabor to read the date inscribed in the margin. Decl. Ex. B. With the document up on the screen so the jury could see it, Tabor read his own handwritten date, testifying "[i]t's definitely 'March' and '04,' but I did scribble a little bit

3

the date. I believe it's the 23rd." Tr. 1605. Tabor then recounted the substance of the conversation and testified that he would have expected to be told about the Proceeds Participation Agreement in response to the questions he posed. Tr. 1611, 1625-27.

On re-cross examination, defense counsel returned to the issue of the date of the call, confronting Tabor with a prior inconsistent statement to the United States Attorney's Office in which he indicated that he was uncertain whether the call had taken place in March. Tr. 1642; Decl. Ex. P at p. 5 (3500 material in which Tabor is noted as stating that the call was "possibly" in March).

### B.    The Defense Case

Collins testified at length about the Proceeds Participation Agreement, admitting that he did not disclose it and explaining his reasons for not doing so. Chief among his reasons was that it was his understanding, as communicated to him by his client and confirmed in other documents, that sometime after March the parties had agreed to eliminate "upstream" agreements from the scope of disclosure. Collins testified that he did not speak with Tabor until April and responded to his inquiries only after having been informed by his client that an agreement had been reached between the principals to exclude upstream agreements from any required disclosure.[1] This aspect of the chronology is crucial in that no such agreement had been reached in March, when Tabor and the government claimed the call took place.

---

[1]    There was undisputed testimony at trial that TH Lee was told about other upstream agreements, which were neither addressed in due diligence nor scheduled in any of the Lee deal documents. In particular, TH Lee principal Scott Schoen testified that he knew from conversations with Phil Bennett that $75-100 million of the proceeds from the Lee deal were to be paid to Thomas Dittmer, and that $400 to $500 million of the proceeds were to be paid to Bawag. He testified that he did not pursue diligence on these items or ask to see copies of the documents. Tr. 1104-09. Additionally, there was documentary evidence indicating that upstream agreements had been eliminated from the list of outstanding diligence requests. GX 706, GX 707.

4

Specifically, Collins testified that he first met and spoke to Tabor in April, in connection with meetings concerning a Letter of Intent, a legal document that set the road map for the deal going forward. Tr. 3694-95. Directly contradicting Tabor, he denied ever speaking to Tabor in March. Tr. 3695, 3708-09. He further testified that he did not speak with Tabor about due diligence matters until later in April, and introduced his time records as well as his notes of an April 19, 2004 call with Tabor to corroborate his account. Tr. 3706-07, 3695; Decl. Ex. Q (DX 1075). He testified that, as set forth in his April 19 notes, it was not until that date that he was asked to become involved in the due diligence process and was told that Weil Gotshal had previously been working directly with Refco's general counsel and with Refco's investment bank, Credit Suisse First Boston, to get answers to its diligence requests. Tr. 3707-09; Decl. Ex. Q ("Diligence. Operating through CSFB/Company/Dennis [Klejna, General Counsel of Refco]. Needs to move more quickly. JPC to be a point person.").

Collins testified that, in communications with Tabor that took place after April 19, he did not disclose the Proceeds Participation Agreement because he understood from a conversation with Phil Bennett, Refco's Chief Executive Officer, that the principals of TH Lee and Refco had agreed to exclude "upstream" agreements from the scope of disclosure, so long as Bennett agreed to sign a covenant confirming that he was the sole owner of Refco's parent company, RGHI. Tr. 3713-16. Collins testified that he considered the Proceeds Participation Agreement to be an "upstream" agreement because the only remaining obligation it imposed at the time of the sale to TH Lee was an obligation of Refco's parent company (as opposed to an obligation of Refco itself) to pay out proceeds from the sale of Refco to an entity called DF Capital. Tr. 3720.

C.   **The Government's Rebuttal Case**

Following Collins's direct contradiction of Tabor's testimony concerning the date of the call, Tabor was recalled as one of only two witnesses in the government's rebuttal case, solely

5

with respect to the issue of when his call with Collins took place. Through his testimony, the government introduced a better photocopy of his alleged notes of the call, which made clear that a March date was inscribed in the margin. Tr. 4637-38; Decl. Ex. C. Tabor testified that the "M" in "March" is more apparent in the new document and that the specific date "has a 2 in front of it. It's 20-something, but I can't tell you for sure." *Id.* On cross-examination, Tabor testified that "[i]t appears to be the 20-something. It could be a 3. I'm just not sure." Tr. 4639. He also admitted that he had no corresponding time entry on March 23. *Id.*

By recalling Tabor in rebuttal, after Collins had testified that he had never met or communicated with him in March, the government was trying to do more than simply establish the timing of the conversation: it was trying to paint Collins, who testified in his own defense, as a liar. The government used the date inscribed on the notes as an unassailable touchstone of credibility and thus to undermine Collins's credibility as a whole.

### D. Summations

The timing of the conversation between Tabor and Collins reemerged as a key theme during summations. In its opening summation, the government argued that Tabor's notes clearly bore the date March 23, 2004, and that Collins was lying when he testified that no conversations took place until April. Tr. 4718-19. The government further argued that, because the conversation took place in March, Collins's testimony that he spoke with Tabor only after learning from his client that upstream agreements had been negotiated out of the scope of disclosure, should not be credited:

> Now, let me go back to the March 2004 conversation between the defendant and Jay Tabor, the one where the defendant lied to Tabor saying that there were no agreements or arrangements giving anyone an option to get ownership stake in Refco. Even if the defendant accurately described the PPA as not being an agreement involving Refco, which he didn't, and even if what he told you at [sic] whereas clause in the reversion rights agreement was true, which it wasn't, he still has a problem, because even those bogus explanations can't explain away his lie

6

> to Jay Tabor in March. Tabor asked about any options out there, any options to give anyone the right to a stake in Refco, regardless of who the agreement or arrangement was between or involved. Forget about upstream and downstream. Even in the defendant's world, those concepts don't apply to his conversation with Jay Tabor. And remember that conversation was in March, long before June 8th when the reversion rights agreement was signed.

Tr. 4717-18. The government highlighted the significance of the timing of the conversation, arguing that Collins "couldn't talk himself around this March conversation with Jay Tabor. Because if you believe Jay Tabor, it is over. The defendant is guilty. And the defendant knows that." Tr. 4718. It further argued that Collins tried to "turn the table" on this "undeniably criminal conversation" by accusing Tabor of lying and testifying that it was "absolutely impossible that he ever spoke to Jay Tabor anytime in March 2004." *Id.* The government repeated several times that Tabor's notes were dated March 23, 2004, presenting this fact as irrefutable proof that the conversation indeed took place at that time, and that Collins had therefore blatantly fabricated his account:

> And what about Tabor's notes? What about Government Exhibit 700-O, the ones with the March 23rd, 2004 date on the top? The defendant would have you believe that Tabor fabricated these notes, that they're somehow phony, to get him, to frame him. Now ask yourselves, why would the defendant suggest something so way out that Jay Tabor fabricated these notes?

Tr. 4719; *see also* Tr. 4697. The government argued that the "March" conversation was "devastating proof" of Collins's guilt. Tr. 4719.

The defense responded by summarizing the evidence suggesting that the call could not have taken place in March, despite the apparent dating of Tabor's notes. Tr. 4959-65. Defense counsel suggested that the notes were misdated, but had no evidence to explain how or why any misdating might have occurred. Tr. 4961. Defense counsel explained the significance of the issue to the jury as follows:

> [H]ere's why this is important. Joe Collins does not get involved in due diligence in this case until a letter of intent in April. He is not the point man. They want

7

> you to believe he's the point man in March, an [sic] becomes the point man in this phone call. He becomes the point in April at the time that upstream transactions are being negotiated out of the case, at a time when he believes he does not have to turn over the proceeds participation agreement or tell them about it. And Jay Tabor says, he looks at his notes – and I don't know whether he has a memory or doesn't have a memory – notes say March. And I suggest that his notes are wrong.

*Id.*

In its rebuttal summation, the government ignored many of the arguments that defense counsel had made with respect to other aspects of the case, but focused again on the timing of this conversation – again emphasizing that it was insurmountable evidence that Collins, who testified in his own defense, was a liar, because of the clear dating of Tabor's notes: "Mr. Schwartz talked about Jay Tabor's notes. You saw Jay Tabor testify from that witness stand. Compare his testimony to that of the defendant, both the first time he was here and the second time he was here. Who do you think was lying, the defendant or Jay Tabor? Jay Tabor wasn't lying when he got on that stand. And he told you about his notes and he told you what was in those notes and what the dates was [sic]. . . . He knows, he's confident that that's [the] date that he spoke with the defendant on." Tr. 5060-61.

On the first day of its deliberations, the jury requested a transcript of Tabor's testimony, explicitly asking for his testimony from both the government's direct case and its rebuttal case. Court Ex. 8. Several days later, while still deliberating, the jury requested copies of the Weil Gotshal time records, including Tabor's, that had been introduced into evidence. Court Ex. 32; DX 301. Following several more days of deliberation, the jury returned a verdict of guilty on five of fourteen counts.

## II.  THE NEWLY DISCOVERED EVIDENCE

In the course of ongoing civil litigation after the trial concluded, TH Lee affirmatively waived a privilege it had previously asserted before and during the trial. As a result, Weil

8

Gotshal, as TH Lee's counsel, produced numerous documents that had previously been withheld and had thus been unavailable to Collins.[2] Decl. ¶¶ 2-3. These documents include numerous emails exchanged among Tabor and other Weil Gotshal attorneys during March 2004 which eliminate the possibility that Tabor talked to Collins during this period, despite his testimony at trial. These documents also include additional handwritten notes by Tabor, which raise grave doubts about the reliability of any dates inscribed on his notes. Had the defense been equipped with this evidence at trial, it would have been able to establish that (1) the conversation took place in April and not in March, (2) Collins's credibility as a whole was affirmed, not undermined, by his direct contradiction of Tabor on this point, and (3) the chronology corroborates Collins's principal defense theme that he had what he believed to be a principled basis for not disclosing the Proceeds Participation Agreement when he spoke to Tabor in April.

### A.      Internal Weil Gotshal Emails From March 2004

Newly produced emails exchanged among Tabor and his colleagues at Weil Gotshal describe in minute detail the work being performed or considered by Weil Gotshal during this period and make clear that Tabor had no conversations with Collins in March 2004. Instead, these emails show that from mid to late March, the Lee deal was at a virtual stand-still with no due diligence taking place. They show that to the extent that any further requests for information were being considered during this period, the requests were to be made directly to Refco's General Counsel, Dennis Klejna, or to Refco's Investment Bank, Credit Suisse First Boston ("CSFB"). There is no contemplation or discussion of any communication whatsoever with

---

[2]    The Weil Gotshal firm represented Tabor and his partner, James Westra, in connection with their role as witnesses at the trial. The Weil Gotshal firm also represented the TH Lee witnesses at the trial. Weil Gotshal continues to represent its own partners and TH Lee in related civil litigation.

9

Collins or with any of his colleagues at Mayer Brown. It is quite apparent that Refco's outside counsel is not yet involved.

Copies of the key emails are attached to an attorney declaration accompanying this memorandum. Highlights of their contents are described below:

- On March 17, Tabor emails his colleagues telling them that representatives of TH Lee will be meeting tomorrow with CSFB to discuss due diligence issues. He states, "tomorrow's meeting will determine whether much of the diligence data that has been requested will be quickly forthcoming from Refco. If that data does not appear to be quickly forthcoming, the Lee people may ask us to put 'pencils down' until more information is produced by Refco." Decl. Ex. E.

- On March 20, Tabor's colleague James Westra, also a witness at trial, reports to the group on the meeting between TH Lee and CSFB. He advises that CSFB is preparing information that it will share with TH Lee on March 23. He further advises that, until further information is received from CSFB, all other work is at a standstill: "There is nothing more for us to do at the moment, but we should stand by to be able to analyze the response which CSFB gives this week." Decl. Ex. F. This email makes clear that Tabor would not have spoken to Collins about due diligence issues on March 23, as he and the government claimed at trial. It shows that at that time Weil Gotshal was essentially on hold while TH Lee awaited further information from CSFB.

- On March 22, Westra emails Tabor summarizing a prior conversation with Refco's General Counsel, Dennis Klejna, regarding an SEC investigation. Westra

10

specifically instructs Tabor to gather further information from CSFB. Decl. Ex. G. Collins is mentioned nowhere in this email – a fact which confirms Collins's testimony that Tabor did not raise the issue of an SEC investigation with him until April 19, Tr. 3707-12, and undermines Tabor's testimony that he discussed the issue with Collins on March 23, Tr. 1250.

- In fact, subsequent emails on March 22 show that Tabor, instead of making any inquiries of CSFB or of anyone else for that matter, delegated responsibility for the task to his colleague Conrad Bahlke. Bahlke advises Tabor and Westra that he will follow up with CSFB. Tabor advises that he will be traveling for the next couple of days – apparently to work on other matters. Decl. Exs. H, I.

- On March 25 – two days after Tabor's purported March 23 call with Collins – Tabor sends an email to Bahlke and Westra to see if CSFB has provided any information in response to diligence requests concerning the SEC investigation. He writes, "I assume we've still gotten no response on the SEC inquiry point? If no, it might make sense to do a follow up email to CSFB to inquire about the status." Decl. Ex. J. Significantly, there is no mention of Collins, even though Tabor testified at trial that he had raised the SEC investigation issue with Collins on March 23. Tr. 1250. In fact, as is plain from the face of this email, instead of suggesting any follow up with Collins, Tabor suggests that Bahlke only follow up with CSFB. If Tabor spoke with Collins on or about March 23, as he testified at trial, it is remarkable that there is no reference to such a conversation in this email.

11

- On March 26, Tabor receives an email from his colleague Daniel Gewirtz, advising that a representative of TH Lee wants to know "how much time our additional diligence might take if we were to get fully up and running. I told him that it was partly a function of our discussions with Refco's general counsel and whether further discussion with other business people in the organization needed to take place, but that if we had all the documents needed, that it shouldn't take more than a week." Decl. Ex. K. This email underscores that Weil Gotshal is more or less on hold during this period, awaiting further instructions from TH Lee about whether to go forward with more active due diligence. It also shows that discussions were being contemplated with Refco's general counsel and with Refco business people. Conspicuously absent is any mention of any discussion with Collins or anyone else at Mayer Brown.

- Also on March 26, Tabor emails Westra reporting that TH Lee wants know how much legal due diligence would have to be done if Lee decides go "full speed ahead" with the deal. He reports to Westra that TH Lee has been told that "we still need to have the conversation with the general counsel to go through our diligence list." He writes that it "sounds like the Lee guys just want to make sure we're geared up if they decide to push this next week." Decl. Ex. L. This email makes clear that any contemplated discussion about legal due diligence would take place with Refco's general counsel. It directly contradicts Tabor's testimony that he discussed various substantive legal due diligence issues with Collins on or about March 23. This email also makes clear that Weil Gotshal remains on hold

12

while TH Lee is deciding whether to go forward. It is inconceivable that Tabor would have had a conversation with Collins under these circumstances.

- On March 27, Tabor emails Westra informing him that he told a representative of TH Lee that Weil Gotshal is ready "to jump on things as quickly as necessary when they give us the 'go ahead' to do so." Tabor reports that he also discussed with TH Lee having a conversation with Refco's general counsel to "go through" the "diligence list." There is no mention of Refco's outside counsel. Decl. Ex. M.

- On March 29, Bahlke emails Tabor asking if he can be involved in an anticipated call with Refco's general counsel, Dennis Klejna. He asks if "we should be billing sensitive until we are going full-bore again." Tabor responds, "I think you should participate in the call with Klejna." Decl. Ex. N. Again, there is no mention of any communication with Collins. Klejna appears throughout this period to be the contact person for legal due diligence purposes.

- Also on March 29, Tabor emails TH Lee regarding an issue that he suggests should be discussed directly with Phil Bennett. Significantly, he states, "with respect to the possible existence of an agreement by Bennett to share proceeds, we did see a press article from 2000 (attached) speculating about a possible contingent pay-out right by former owners. We have asked (in our 2/27) follow-up request to see the documents that govern the relationship among the owners of Refco – these were not included in the data room. This is one of the matters on which we plan to follow up during tomorrow morning's call with Dennis Klejna."

13

Decl. Ex. O. This email makes clear that, at the end of March, when attention turns to the possibility of an agreement involving a payout of proceeds, Weil Gotshal is not looking to Collins for answers – he is nowhere on their radar screen, nor mentioned anywhere in their communications. Instead, they are dealing directly with Bennett and Refco's general counsel. It also makes clear that the issue of a possible upstream proceeds pay-out agreement was raised before Collins became involved in any discussions. This evidence directly corroborates the principal theme of Collins's defense – that his active involvement in the due diligence process and in the Lee deal going forward took place only after he understood that Bennett had reached a resolution with TH Lee to exclude upstream agreements from any required disclosures. It is critical evidence of innocence. The defense should have had it at trial.

The import of this detailed email correspondence speaks for itself. These emails eliminate any possibility that Tabor spoke to Collins in March 2004. They make clear that Weil Gotshal had been told to hold off from pursuing further diligence during this period while TH Lee considered its options. They also make clear that any legal due diligence inquiries contemplated at the time or in the near future were to be pursued with Refco's in-house general counsel, Dennis Klejna, or with Refco's investment bank, CSFB. Collins is nowhere in the picture. This is overwhelming proof that Tabor was either mistaken or speaking falsely when he testified that he was "positive" the call with Collins took place in March. It shows that a miscarriage of justice took place when the government, in this central part of its case, vouched for the accuracy of Tabor's recollection to brand Collins as a flagrant liar on the witness stand and to present what it claimed was tell-tale proof of his guilt. Like the defense, the government

14

did not have the benefit of these emails, or the insight they provide, either prior to or during the trial.

### B. Handwritten Notes Taken By Tabor

At the time of trial, the defense had an incomplete set of Tabor's handwritten notes from the Refco transaction. Approximately 100 out of a total of approximately 260 pages had been redacted either in whole or in part. Decl. ¶ 4. As such, it was impossible for the defense to gain a clear sense of what Tabor's practices were with respect to putting dates on his notes. The defense had no idea, for example, what dates, if any, appeared among the 100 pages of redacted material.

Now that a complete unredacted set of notes has been produced, a pattern is clear: Tabor typically does not inscribe any dates on his notes of meetings or telephone calls. *See* Decl. ¶ 5, Ex. A. Indeed, among the 260 pages of notes produced, the notes of only four conversations appear to bear any dates at all. Decl. ¶ 5. Significantly, Tabor associates three of these conversations with Joseph Collins.[3] It appears that what might well have happened is that, in an effort to reconstruct events, Tabor went back after the fact and assigned what he thought were correct dates to conversations that he did not date at the time they took place. The defense argued at trial that Tabor made a mistake in dating his notes, but did not have evidence at the time to explain how or why a mistake might have occurred. Now it is apparent that, because Tabor typically does not date his notes, any dating would be an aberrant act requiring some

---

[3]    It is interesting that the only conversations Tabor testified about in detailing his interactions with Collins all have notes that bear dates, despite his general practice of not dating his notes. The three conversations he testified about include (1) the purported March 23, 2004 conversation discussed throughout this brief, Tr. 1216-50, Decl. Exs. B, C; (2) a March 30, 2004 call which he thinks, but is not certain, that Collins participated in, even though Collins's name does not appear anywhere in his notes or time records relating to that call, Tr. 1251-62, Decl. Ex. D; and (3) a conversation with Collins about an SEC investigation that did not take place until May 4, 2004, Tr. 1378-79, Decl. Ex. D.

15

explanation. The defense could have quite plausibly argued that Tabor made a mistake in dating his notes after his recollection of events had faded. That would explain why he told the United States Attorney's Office, with his dated notes in front of him which appear to have been scribbled over, that the call with Collins only "possibly" took place in March. Decl. Ex. P at p. 5.

In any event, the new evidence would have been instrumental to the defense at trial in rebutting the government's argument that Collins was plainly lying because Tabor's notes bear a clear March date. The trump card that the government played by recalling Tabor in its rebuttal case and having him introduce a new photocopy of his notes, with a clearer image of the scribbled March date, could have been handled effectively through cross-examination establishing that Tabor generally does not date his notes and appears to have had a special reason, arising at some other point, for dating the conversations he associated with Collins. The new evidence would have also allowed the defense to cast doubt on the accuracy of Tabor's recollection, which he testified was partially informed by the date written on his notes. Tr. 1605-06.

### III. UNDER THESE CIRCUMSTANCES, RULE 33 PROVIDES FOR A NEW TRIAL

A district court has discretion to grant a new trial on the basis of newly discovered evidence when the "interests of justice so require." Fed. R. Crim. P. 33. Rule 33 enables a district court to order a new trial "to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

Evidence qualifies as newly discovered if it could not have been discovered through the exercise of due diligence before or during trial. *United States v. Gallego*, 191 F.3d 156, 161 (2d Cir. 1999). This includes evidence previously withheld on grounds of privilege, as is the case here. *See United States v. Josleyn*, 206 F.3d 144, 148 (1st Cir. 2000) (newly discovered evidence

used to support defendants' motion for a new trial included materials from a related civil litigation, previously "shield[ed] from disclosure through the attorney-client privilege"). The discovery of new evidence justifies a new trial where the evidence is sufficiently material to create a probability of acquittal. *Gallego,* 191 F.3d at 161.

Significantly, courts have granted new trials under Rule 33 where newly discovered evidence demonstrates the "inaccuracy" of a key prosecution witness's "testimony about the sequence and timing of events" – especially where the inaccuracy has implications with respect to larger issues of credibility as a whole. *United States v. Arroyo,* 301 F. Supp. 2d 217, 229 (D. Conn. 2004); *see also United States v. McLaughlin,* 89 F. Supp. 2d 617, 627-28 (E.D. Pa. 2000) (granting new trial where newly discovered disbursement journals and bank statements "further demonstrated" that government witness was incorrect; new evidence both refuted direct testimony by the witness and supported a key aspect of defendant's defense); *United States v. Ortiz,* Crim. A. No. 92-00592-01, 1993 WL 131329, at *8 (E.D. Pa. Apr. 23, 1993) (granting new trial where newly discovered post-arrest photograph of defendant "corroborate[d] the testimony of defendant's witnesses and contradict[ed] the testimony of [the prosecution's witnesses]").

The wealth of newly discovered evidence in this case is sufficiently significant to justify a new trial under these standards. It concerns the most central issue at trial – whether Collins had a good faith basis for non-disclosure of the Proceeds Participation Agreement. And it goes directly to the heart of what was argued to be a key test of witness credibility – whether Collins, who testified in his own defense, was lying when he described a sequence of events that appeared to be directly contradicted by the date inscribed on Tabor's notes.

17

Equipped with this evidence at the time of trial, the defense could have very effectively challenged Tabor's credibility and corroborated Collins's opposing version of the relevant chronology. The newly produced emails corroborate Collins's testimony, as reflected in his own handwritten notes, that it was not until April 19 that he was first contacted about legal due diligence issues, at which point he was informed that Weil Gotshal had previously been working directly with Refco's general counsel and with Refco's investment bank on outstanding diligence items. Indeed, one of the newly produced emails shows that the issue of an agreement involving a pay-out of proceeds was discussed by TH Lee and Refco before Collins or anyone else at Mayer Brown was actively involved. Decl. Ex. O. This email corroborates the principal theme of Collins's defense – that he understood, from communications with his client, that issues relating to upstream agreements were being discussed among the principals themselves and that such agreements were eventually negotiated out of the scope of disclosure.

Corroboration on all of these fronts would likely have made a strong impression on the jury and buttressed Collins's credibility as a witness. Instead, deprived of this evidence, the defense was subject to ridicule, as the prosecution seized on the date inscribed in Tabor's notes to argue in summation that Collins had offered nothing more than a bold, transparent fabrication: "The defendant would have you believe Tabor fabricated these notes, and they're somehow phony, to get him, to frame him. Now ask yourselves, why would the defendant suggest something so way out that Jay Tabor fabricated these notes?" Tr. 4719.

Collins took the important step of testifying on his own behalf, putting his own credibility behind his entire defense. The date inscribed on Tabor's notes gave the government an easy opportunity to make him out as a liar so the jury would reject his testimony and therefore his defense as a whole. After recalling Tabor in its rebuttal case to drive home its point about the

date of his notes, the government argued to the jury, "if you believe Jay Tabor, it is over. The defendant is guilty." Tr. 4718. The new evidence, unavailable to the defense at the time, would have made a crucial difference.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant a new trial.

Dated: New York, New York
December 4, 2009

Respectfully submitted,

COOLEY GODWARD KRONISH LLP

By: _____
William J. Schwartz (WJS 8462)
Jonathan P. Bach (JPB 9710)
Reed A. Smith (RS 3652)
Kathleen E. Cassidy (KC 0630)

1114 Avenue of the Americas
New York, New York 10036
Phone: (212) 479-6000
Fax:    (212) 479-6275

19