UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                :

UNITED STATES OF AMERICA,          :

     - v. -                         :       S1 07 Cr. 1170 (RPP)

JOSEPH P. COLLINS,              :

              Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL

PREET BHARARA
United States Attorney for the Southern
District of New York

CHRISTOPHER L. GARCIA
Assistant United States Attorney

     - Of Counsel -

## TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  The Newly Discovered Emails And Handwritten Notes Do Not Warrant a New Trial  . . . . 11

   A.  The Newly Discovered Evidence Is Not Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      1.  The Handwritten Notes Have No Relevance Whatsoever to the Timing of the
          Diligence Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      2.  The Email Evidence Is Consistent with Tabor's Testimony . . . . . . . . . . . . . . . . . . . . 13

      3.  The Timing of the Diligence Call Was of Limited Significance at Trial  . . . . . . . . . . 15

   B.  The Newly Discovered Evidence Is Cumulative of Other Evidence at Trial  . . . . . . . . . 15

   C.  The Newly Discovered Evidence Would Not Have Resulted in an Acquittal . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

UNITED STATES OF AMERICA,           :

    - v. -                                   :         S1 07 Cr. 1170 (RPP)

JOSEPH P. COLLINS,               :

                 Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL

        The Government submits this memorandum of law in response to the motion of Joseph P. Collins ("Collins" or "defendant"), dated December 4, 2009, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Having previously argued in summation and in his sentencing submission that the central issue at trial was the concealment of the related-party debt owed by RGHI to Refco – the "hole"– the defendant takes an entirely different tack for purposes of the instant motion.  The defendant now claims that the concealment of the Proceeds Participation Agreement ("PPA") – or, more specifically, the timing of a single conversation during which the defendant failed to disclose its existence – was the central issue at trial.  This shift in focus apparently results from the defendant's recent discovery of evidence purportedly bearing on the latter of these issues.  But the evidence is both immaterial to the issue and cumulative of evidence available to, and used by, the defendant at trial.  Moreover, the evidence, even if given the importance the defendant ascribes to it, would hardly have made a different verdict likely, a showing the defendant must, but cannot, make.  The evidence relates to the testimony of a single witness regarding the timing of a single conversation that concerns only

one of several different aspects of fraudulent conduct – including the concealment of the hole – that the Government proved the defendant perpetrated through the testimony of nearly twenty witnesses over five weeks and the admission into evidence of more than 450 exhibits. The Government respectfully submits that for these reasons, as amplified below, the defendant's application should be denied.

## PRELIMINARY STATEMENT

Collins seeks a new trial on the basis of a handful of newly discovered emails addressed to or by Jay Tabor ("Tabor") concerning due diligence in March 2004 as well as certain newly discovered handwritten notes of his. Collins claims that the emails "make[] clear" that a due diligence call in which Tabor asked the defendant questions that called for the disclosure of the PPA "could not have taken place in March [2004]," (Br. 2), even though Tabor's notes of the conversation, which were admitted into evidence at trial, are dated "March 23, '04." (GX 700, 700-O, attached hereto as Ex. A). In an effort to deal with the inconvenient fact that Tabor's notes of the conversation are dated "March 23, '04," Collins further claims that the newly discovered handwritten notes "raise grave doubts" about the reliability of the date inscribed on the admitted notes. (Br. 9). Specifically, he claims that the newly discovered notes provide evidence that Tabor dated the notes admitted at trial sometime after they were written, when his recollection about the date was mistaken. (Br. 15-16).

Collins's application is entirely without merit. As an initial matter, the evidence upon which Collins relies is not what he purports it to be. For example, the emails he cites are not remotely "dispositive" of when the due diligence call between the defendant and Tabor occurred. (Br. 2). This is a gross mischaracterization of the content of the emails. As the defendant notes

elsewhere in his brief, the emails merely provide evidence that diligence requests were directed

in part to the company's general counsel and the company's investment bank in March 2004 and

that the diligence process slowed during that period.  (Br. 9, 14).  The emails nowhere indicate

that Collins was excluded from the diligence process in March 2004 and they certainly do not

"eliminate any possibility that Tabor spoke to Collins in March 2004." (Br. 14).  They simply are

not inconsistent with – and do not contradict – Tabor's testimony or the notes admitted at trial.

Likewise, there is absolutely nothing – nothing – about the newly discovered handwritten notes

that support Collins's conjecture that the notes admitted at trial were backdated by Tabor with

the wrong date.  Put differently, the newly discovered emails and notes are not material to the

question of when the diligence call occurred and do not have any impeachment value.

Even assuming, *arguendo*, that the newly discovered emails and notes are minimally

probative of the date that the diligence call occurred, they are plainly cumulative of other

evidence admitted and elicited at trial.  For example, defense counsel cross-examined Tabor with

an email substantially similar to the emails he relies upon in connection with the instant motion.

(DX 314, attached hereto as Ex. B).  And Tabor testified to the essential points that the newly

discovered emails establish, namely, that diligence slowed in March 2004 and that people other

than Collins were also involved in handling diligence questions on the part of Refco.  (Tr. 1603,

1615).

As important for the purposes of the instant motion, defense counsel cross-examined

Tabor extensively at trial on the issue of the timing of the call with evidence that was

considerably more probative than the newly discovered emails and notes, including Tabor's own

time records, which were bereft of any mention of a diligence call involving the defendant in

March 2004.  In short, the newly discovered emails and notes that Collins cites would have added nothing to the defenses's cross-examination of Tabor or to the trial record.

Finally, whatever their value, the newly discovered emails and notes would not have created even a remote possibility of an acquittal.  The Government introduced ample evidence additional to Tabor's testimony demonstrating that Collins knew that he was engaged in a fraudulent scheme to hide the PPA and that the PPA was not being concealed for any legitimate purpose.  Moreover, the Government introduced overwhelming evidence of Collins's participation in three other, separate aspects of the broader scheme to achieve a sale of Refco through fraud.  In light of the multitude of documents and other witnesses that demonstrated Collins's knowing involvement in the scheme to hide the PPA – as well as his knowing participation in three other, separate aspects of Refco's efforts to achieve a fraudulent sale of the company – the handful of newly discovered emails and notes upon which Collins relies would not likely have resulted in an acquittal.

## BACKGROUND

During approximately five weeks of trial testimony in its affirmative case, the Government presented overwhelming evidence that the defendant played a central role in four critical aspects of Refco's fraudulent efforts to achieve a sale of the company to Thomas H. Lee Partners ("THL") in 2004 and to the public in 2005.  The evidence demonstrated that the defendant helped Refco: (1) conceal the PPA; (2) lie about the amount of money RGHI owed to Refco; (3) hide the existence of certain indemnities and guarantees; and (4) lie about the segregation of $500 million in purportedly excess working capital.  As the Government argued in its summation, the defendant's participation in any one of these aspects of the Refco fraud was

sufficient to sustain a conviction against the defendant.  (Tr. 4689).

With regard to the PPA, the Government presented testimony from multiple witnesses – eight in all[1] – and introduced numerous documents establishing the defendant knowingly assisted Refco in fraudulently concealing the PPA.  The Government introduced evidence that Collins fabricated and provided to THL a limited liability company agreement that was cleansed of any references to the PPA when the limited liability company agreement actually in effect at the time contained such references.  (*Compare* GX 710 *with* GX 501-O).  The Government also presented evidence of a conversation that Collins participated in that made clear that the PPA was not being concealed for any legitimate reason but because doing so would "drive down the price" and "'complicate' the deal."  (Tr. 2037-40; GX 3535-6).  Additionally, the Government introduced evidence showing that Collins kept the existence of the PPA secret from his colleagues at Mayer Brown.  (Tr. 1842-55).  Indeed, Collins's knowledge that he was engaged in a fraud to conceal the PPA was perhaps best demonstrated by his instruction to one of the BAWAG lawyers working on the buyback of the PPA interest by Refco's CEO and shareholder Phillip Bennett ("Bennett"): "Let's never speak of this again." (Tr. 1912).

One of the eight witnesses that the Government called to provide evidence regarding the scheme to conceal the PPA was Jay Tabor, a lawyer with the firm Weil Gotshal & Manges ("Weil"), which advised THL in connection with the leveraged buyout ("LBO") of Refco. Among other things, Tabor testified about a telephone call he had with the defendant on March 23, 2004 in which he asked the defendant to, among other things, identify parties, if any, that

---

[1]These witnesses included Jay Tabor, George Stephanakis, Scott Schoen, James Westra, Robert Trosten, Jason Berger, John Sullivan, and Joshua Hochberg.

5

possessed options to obtain equity interests in Refco.[2]  Collins replied that none existed when, in

fact, the PPA provided BAWAG with the option to convert its interest in the proceeds of the sale

of Refco into an equity stake in the company.  (*Compare* GX 700 and Tr. 1226-29, 1610-11 *with*

GX 1504 (Section 1.01)).  Tabor further testified that the conversation ended with an agreement

that Collins would set up a future call with Dennis Klejna ("Klejna"), Refco's general counsel,

and Robert Trosten ("Trosten"), Refco's CFO, to follow up on a number of the diligence points

they discussed as well as to discuss a then-ongoing investigation by the Securities and Exchange

Commission ("SEC").  (Tr. 1250).  Tabor subsequently testified that this future call occurred on

March 30, 2004, as corroborated by a set of Tabor's handwritten notes dated "March 30, 2004"

reflecting a "Diligence Call" with "Dennis Klejna" and "Rob Trosten" in which some of the

same topics discussed during the March 23rd call were discussed as was the SEC inquiry. (Tr.

1251; Tabor 3536-5, attached hereto as Ex. C).[3]

    The defense made the timing of the call with Collins an issue at trial.  Collins claimed

that he did not have a conversation with Tabor concerning due diligence in March 2004.  Rather,

he asserted that he had his first call with Tabor concerning due diligence sometime in April 2004

– after he had a conversation in which Bennett advised him that he wanted to limit the scope of

diligence to exclude the disclosure of so-called "upstream" agreements, *i.e.*, agreements

involving and affecting only Refco's shareholders and not Refco.[4]  Collins further alleged that

---

[2]This call is referred to herein as the "diligence call."

[3]Tabor testified that the defendant participated in the call, although he is not listed in the
notes as one of the participants.  (Tr. 1250-53).

[4]Collins's account of this conversation – both as to if the conversation happened and
what the timing of it may have been – was uncorroborated at trial.

the PPA was one such agreement.  The defense endeavored to establish that the call with Tabor occurred after the conversation with Bennett to support the theory that Collins believed that the PPA did not need to be disclosed in response to the diligence questions Tabor asked him because it was an "upstream" agreement.

Accordingly, defense counsel cross-examined Tabor extensively about the timing of this conversation with Collins, attacking both his recollection of the timing of the conversation and his motives for testifying generally. The defense confronted Tabor with his time records for work performed in connection with the LBO.  During one lengthy stretch of cross-examination, counsel for Collins walked Tabor through every entry for the month of March, eliciting testimony that no calls or conversations with the defendant were reflected anywhere in those records. (Tr. 1459-70; DX 301, attached hereto as Ex. D[5]).  Defense counsel additionally confronted Tabor with an agent's notes of an interview of him, which notes included the notation "Possibly March 04" in reference to a "Telephon[*sic*] call w/ JC about DD," in an effort to suggest that Tabor's recollection about the timing of the due diligence call was not firm.  (Tr. 1476-77, 1642-43; Cassidy Decl. Ex. P at 5).  Generally, defense counsel attacked Tabor's credibility on the basis of an agreement between THL and Weil that preserved THL's right to sue Weil under certain circumstances. (Tr. 1458-59, 1649-51).

Defense counsel also cross-examined Tabor more generally with evidence that in March 2004 Tabor worked on diligence issues with people other the defendant.  For example, defense counsel confronted Tabor with an email exchange evidencing an effort by Weil and THL to work

_____

[5]Because DX 301 is more than 200 pages in length, the Government has included only those portions of the exhibit utilized during cross-examination.  Obviously, the Government is happy to provide the Court with the other pages of the exhibit if the Court wishes to have them.

7

with Refco's investment bank, Credit Suisse First Boston ("CSFB"), to set up a March 30th diligence call with Klejna.  Collins was not involved in the exchange, nor was he mentioned in it as someone who was supposed to facilitate the call or participate in it.  (Tr. 1478-80; DX 314, attached hereto as Ex. B).  During his testimony, Tabor conceded that he worked with CSFB on diligence matters in March 2004 and that the diligence process had slowed during that period. (Tr. 1603, 1615).

Defense counsel's extensive cross-examination regarding the diligence call enabled the Government on redirect examination to introduce into evidence Tabor's notes of the conversation as a prior consistent statement.  (Tr. 1604).  Tabor testified that the words "March" and "'04" definitely appeared in the top left-hand corner of the notes and that he believed the date noted was the 23rd.  (Tr. 1605; GX 700).  He also testified generally about the conversation reflected in the notes.  He testified that the call began with an assurance by Collins that he would push to get responses to THL's outstanding diligence requests.  (Tr. 1606; GX 700).  He testified about the different topics discussed during the call, which included debt owed to and by Refco, the rights of parties to obtain an equity interest in Refco, and related party agreements and arrangements. (Tr. 1606-07, 1610-14; GX 700).  He further testified that the call ended with an agreement that Collins would help set up a future conference call with Klejna and Trosten to go over remaining diligence questions.  (Tr. 1615-16; GX 700).

On re-cross-examination, Tabor additionally testified that he had an independent recollection that the diligence call occurred in March 2004 and that he was not reliant on the notes for that recollection. (Tr. 1642).

As the Court is aware, the defendant took the stand in his own defense.  Through cross-

examination, it was established that the PPA was, in fact, an agreement both involving and affecting Refco, given that Refco was a party to the agreement with the attendant rights and obligations associated with being a party to the agreement. (GX 1504-Y). Accordingly, the PPA was by no metric an "upstream" agreement the disclosure of which was somehow exempted.

In a brief rebuttal case, the Government recalled Tabor not as some *coup-de-grace* for its case, (Br. 2), but merely to admit a clearer color copy of the original notes, which the Government only secured later during trial, to put to rest the defendant's attempted impeachment of his testimony. Those notes plainly reflected the date "March 23, '04." (GX 700-O, attached hereto as Ex. A).

In both its main and rebuttal summations, the Government made clear that the defendant's efforts to conceal the PPA was but one of many ways the defendant helped achieve the sale of Refco through fraud. As the defendant has noted in connection with sentencing, the Government argued in both summations that Collins's participation in lies concerning the amount of money RGHI owed to Refco, the indemnities and guarantees, and the $500 million in purportedly excess working capital were all separate and independent bases for finding the defendant culpable. (Tr. 4689, 5007-08).

In the defense summation, counsel began by making clear defendant's view at the time that the central issue at trial was the hole. Defense counsel started:

> Now, let me tell you a little bit about what I'm going to say to you, where I'm going to go. I want to talk to you for a few minutes about some overarching issues in the case to keep in mind as I talk about the rest of my summations, some of which I discuss with you in my opening in some detail, some of which I didn't. I'm then going to discuss the crime. I'm going to take you to the scene of the crime, the hole, and we are going to spend some time looking into that hole and finding out what Joe Collins was told about and whether he knew right at the beginning. I'll talk about proceeds participation agreements later. I'll talk about

9

back-to-back loans later.  I am going to talk about what this case is about at the beginning.  And that's the hole and the three witnesses who came here to say they told him about it.  Right at the beginning.  Because without that knowledge, there is no crime.

(Tr. 4832-33).  As promised, defense counsel later in his summation returned to argument about the PPA.  He addressed specifically the timing of the diligence call with Tabor, arguing, among other things, that the absence of an entry for the conversation in Tabor's time records showed that Tabor was in error in recalling that the conversation occurred in March 2004. (Tr. 4960).

## ARGUMENT

### I.    Applicable Law

Rule 33 of the Federal Rules of Criminal Procedure provides that a district court may grant a defendant's motion for a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a). "Because motions for a new trial are disfavored in this Circuit, the standard for granting such a motion is strict," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and such a motion may be granted "only *in the most extraordinary circumstances*."  *United States* v. *Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (emphasis in original).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. There must be a real concern that an innocent person may have been convicted."  *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted).  Accordingly, a motion pursuant to Rule 33 based on newly discovered evidence may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." *United States* v. *Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).  The defendant bears the burden on a motion pursuant to Rule 33 and such burden must be "sustained not as a matter of speculation but as a

demonstrable reality." *United States ex rel. Darcy* v. *Handy*, 351 U.S. 454, 462 (1956) (internal citations omitted).

## II.    The Newly Discovered Emails And Handwritten Notes Do Not Warrant a New Trial

### A.    <u>The Newly Discovered Evidence Is Not Material</u>

#### 1.    *The Handwritten Notes Have No Relevance Whatsoever to the Timing of the Diligence Call*

The newly discovered handwritten notes are simply irrelevant to the question of when the diligence call between the defendant and Tabor occurred.  The defendant points to nothing in the content of the new notes – no statement, no notation of any kind – that contradicts or is inconsistent with Tabor's testimony at trial that the diligence call occurred in March 2004. Rather, the defendant claims that the new notes show that Tabor did not, as a practice, date notes of conversations contemporaneously and that, accordingly, the notes of the diligence call must have been dated *post hoc* by Tabor "after his recollection of events had faded" because he "had a special reason, arising at some other point, for dating the conversations he associated with Collins." (Br. 16).  This obviously and grossly speculative claim finds support in neither facts nor logic.

First, the newly discovered notes do not establish anything about Tabor's note taking practices.  As the defendant concedes, the newly discovered materials include notes of a conversation that are dated that involve someone other than the defendant.  (Br. 15; Cassidy Decl. Ex. D at WGM-Supp-P 00017049).  Conversely, the materials also include notes of a conversation with the defendant that are undated.  (Cassidy Decl. Ex. A at WGM-Supp-P 00017273).  The notes show neither that Tabor had a practice of not dating notes of conversations nor that he engaged in some scheme to date notes of conversations involving the

defendant. The most that can be said about Tabor's practices with respect to dating notes of conversations is that Tabor was inconsistent, and such inconsistency provides absolutely no factual foundation for defendant's bald surmise that Tabor dated notes of conversations with the defendant long after they occurred.

Indeed, the notes of the calls on March 23rd and 30th – and logic – show the absurdity of the defendant's claim. If Tabor was involved in some *post hoc* effort to backdate the notes because he "had a special reason, arising at some other point, for dating the conversations he associated with Collins," (Br. 16), he obviously would have written "March 23, '04" more clearly. Likewise, in addition to dating the notes of his March 30, 2004 conversation with the defendant, Tabor would have penned Collins's name into the notes as one of the people who participated in the conversation (the notes reflect only the names of Klejna and Trosten). He did neither of these things because, plainly, he did not engage in any scheme to backdate notes of conversations with the defendant or otherwise create a record of having spoken with the defendant about diligence issues in March 2004.[6]

Nothing else about the notes suggests backdating. One could imagine what such evidence might be. For example, there is no claim (because there can be none) that the ink used

---

[6]Indeed, for Tabor to have engaged in such a scheme to backdate notes, he would have had to have anticipated the relevance of dating the notes as such. Of course, the relevance of the date of the notes stems entirely from Collins's claim that he had a conversation with Bennett in April 2004 in which Bennett told him that "upstream agreements" were exempted from disclosure. There is no evidence that Tabor knew of Collins's claim concerning this purported conversation with Bennett and, indeed, it would have been impossible for him to anticipate: There is no evidence of the purported conversation – documentary or otherwise – apart from Collins himself. Put differently, there is no evidence that Tabor had any reason to backdate his notes to March 2004. Indeed, in light of his time records, which do not reflect any call with the defendant in March 2004, it is entirely implausible to think that he would have backdated his notes to that time period.

to date the notes of the diligence call were of a different color than the ink used to jot down the substance of the conversation. Simply put, because the newly discovered handwritten notes provide no evidence that Tabor dated notes of conversations with the defendant after the conversations occurred when "his recollection of events had faded" – and because nothing about the notes are inconsistent with Tabor's testimony and the trial evidence – they have no relevance whatsoever to the issue of the timing of the diligence call.

### 2.    *The Email Evidence Is Consistent with Tabor's Testimony*

A new trial is not warranted additionally because the newly discovered emails are consistent with Tabor's testimony and, therefore, immaterial to the issue of when the diligence call between the defendant and Tabor occurred. The defendant's claims notwithstanding, the newly discovered emails are not evidence that the call occurred in April 2004, nor do they disprove that the call occurred in March 2004. (Br. 2 ("The new evidence is dispositive and would have put the issue [of when the call occurred] to rest")). At best, the emails show that Tabor and others at Weil made requests for information of Klejna and CSFB, (Br. 9, 14), but such evidence is not inconsistent with requests also being made of the defendant. Put differently, they do not "eliminate any possibility that Tabor spoke to Collins in March 2004." (Br. 14).

The limited value of the newly discovered email evidence is perhaps best understood by considering what it is not. One can easily imagine the type of email evidence that would truly contradict Tabor's testimony and, as a result, be material to the issue of the timing of the diligence call. An email dated after March 2004 stating that Tabor had not yet had contact with the defendant would tend to disprove that the call occurred in March 2004 and impeach Tabor's

recollection. Likewise, an email from late March 2004 reflecting an understanding on the part of Tabor that he was not to direct inquiries to the defendant would likewise tend to contradict his testimony and notes. But the email evidence on which the defendant's application turns is nothing of this sort. It does not contradict – and is in no way inconsistent with – Tabor's testimony that he spoke to the defendant in March 2004.

Indeed, the newly discovered emails are fundamentally consistent with Tabor's testimony and notes. The newly discovered emails reflect that THL and Weil were waiting on responses to diligence questions as late as March 17th. (*See*, *e.g.*, Cassidy Decl. Ex. E ("Apparently, tomorrow's meeting will determine whether much of the diligence data that has been requested will be quickly forthcoming from Refco.")). Additionally, they reflect that as of March 22nd, THL and Weil wanted to learn more about an ongoing SEC investigation that Klejna and Trosten had previously been reticent to discuss, (Cassidy Decl. Exs. G-I), and that there was an effort to set up a call with Klejna on March 30th to discuss the SEC investigation and other diligence requests. (Cassidy Decl. Exs. N-O).

Tabor's notes of the March 23, 2004 call with the defendant fit neatly within this timeline. For example, the notes reflect the same interest on the part of Weil and THL to obtain answers to outstanding diligence requests, as Tabor secures from the defendant at the outset of the call an assurance that he will push to obtain responses to THL's diligence requests. (Tr. 1606; GX 700). Tabor's notes similarly reflect a desire to obtain answers about the SEC's then-ongoing investigation of Refco, as the call ends with an agreement that the defendant will help set up a future conference call with Klejna and Trosten to discuss the investigation as well as other outstanding diligence questions. (Tr. 1615-16; GX 700). Of course, Tabor's notes further

reflect that this follow-up conversation occurred on March 30, 2004, just as the newly discovered

email evidence indicates.  (Tr. 1251; Tabor 3536-5, attached hereto as Ex. C).[7]  The newly

discovered emails simply are not material to the timing of Tabor's diligence call with the

defendant given that they do not contradict his testimony but rather are consistent with it.

### 3. *The Timing of the Diligence Call Was of Limited Significance at Trial*

The value of the newly discovered evidence to the defense is further limited by the fact

that the timing of the diligence call was not nearly as significant as the defendant now claims.

The defendant made the timing of the call an issue at trial because he claimed that he discussed

diligence matters with Tabor only after he had an understanding that Refco and THL had reached

an agreement that "upstream agreements" were exempted from disclosure.  The whole relevance

of the timing of the call, therefore, turned on the assumption that the PPA was such an upstream

agreement. But through cross-examination of the defendant, it was established that the PPA was,

in fact, an agreement both involving and affecting Refco, given that Refco was a party to the

agreement with the all of the associated rights and obligations.  (GX 1504-Y).  Accordingly, the

PPA was by no metric an "upstream" agreement the disclosure of which was somehow

exempted.  This meant, in turn, that the defendant was obligated to disclose it to Tabor during

the diligence call – whether that call occurred in March, April, May, June, or at anytime.

Accordingly, the new evidence is not material both because it does not contradict Tabor's

testimony and because the issue for which it would have been used was not nearly as significant

---

[7]Because Tabor 3536-5 is a lengthy document, the Government has included in Exhibit C
only those portions that are notes of the March 30, 2004 call.  The Government is happy to
provide the Court with the remaining portions if it wishes to have them.

as the defendant makes it out to be.[8]

**B.      The Newly Discovered Evidence Is Cumulative of Other Evidence at Trial**

Even assuming, *arguendo*, that the newly discovered emails and notes are minimally probative of the date that the diligence call occurred, they are plainly cumulative of other evidence admitted and elicited at trial.  First, the defendant had available to him at trial – and his defense counsel utilized – email evidence similar to the newly discovered emails upon which the instant motion turns.  For example, defense counsel cross-examined Tabor with an email chain dated March 29, 2004. (Tr. 1479-80; DX 314, attached hereto as Ex. B).  The chain began with an email from Paul Kromwyck, a representative of CSFB, addressed to Tabor and another lawyer at Weil named Conrad Bahlke and carbon-copying Max Strasburg, who worked at THL. (DX 314, attached hereto as Ex. B).  The email reflected an effort by CSFB to set up a diligence call on March 30, 2004 with Klejna.  (*Id.*).  The email chain neither involves nor mentions the defendant.  (*Id.*). In this regard, it is substantially similar to the newly discovered emails upon which the defendant relies which make essentially the same point, *i.e.*, that Weil and THL did not work exclusively with the defendant regarding diligence matters in March 2004.  (*Compare* DX 314, attached hereto as Ex. B, *with* Cassidy Decl. Exs. N-O (Emails from March 29, 2004 that do not reference the defendant and concern efforts to set up the call with Klejna for March 30th)).  Defense counsel used the email chain to make the same point that he claims he would

---

[8]To be sure, the Government made argument in its summations that the diligence call occurred in March 2004 and relied on Tabor's testimony concerning the same.  But as the portions of the summation quoted in defendant's brief make clear, (Br. 6-7), the Government's focus was to rebut defendant's claim about the significance of the purported agreement exempting the disclosure of "upstream agreements."  Any suggestion by the defendant that the *Government* made an issue of the timing of the call has the events that occurred at trial exactly backwards.

have made with the newly discovered emails.  Specifically, he used the email to suggest that

Tabor was working with CSFB on diligence matters in March 2004 and not the defendant.  (Tr.

1479-80).  The newly discovered emails are plainly cumulative of this evidence.

Second, Tabor testified to the essential facts contained in the newly discovered email

evidence.  Tabor volunteered on redirect examination that people other than the defendant were

involved in providing answers to diligence questions in March 2004.  (Tr. 1603).  He also

volunteered that diligence slowed in March 2004.  (Tr. 1615 ("Well, during the latter half of

March 2004, we weren't really doing much for Refco, because we had done the first stage of

diligence, we're waiting to get confirmation of other things")).  These are the essential points

that the newly discovered emails make.  Accordingly, the newly discovered emails are only

cumulative of Tabor's testimony.[9]

More significantly, defense counsel was able at trial to cross-examine Tabor on his

recollection of the timing of the diligence call with evidence far more probative than the newly

discovered emails and notes.  For example, counsel confronted Tabor with his time records for

work performed in connection with the LBO.  During one lengthy stretch of cross-examination,

counsel for Collins walked Tabor through every entry for the month of March, eliciting

testimony that no calls or conversations with the defendant were reflected anywhere in those

records. (Tr. 1459-70; DX 301, attached hereto as Ex. D).  Defense counsel's use of the time

records was plainly far more compelling than any use of the emails could ever be.  As was

suggested during cross-examination, Tabor had both an incentive and duty to keep accurate time

records and, by extension, possibly to include details about having spoken to the defendant.  No

---

[9]Indeed, because the newly discovered emails are consistent with Tabor's testimony, they *corroborate* his testimony and can hardly be said to be impeachment evidence.

17

such incentive or duty applied to the newly discovered emails.  Indeed, while defense counsel

made no mention of DX 314 in his summation, he argued specifically that the absence of an

entry for the conversation in Tabor's time records showed that Tabor was in error in recalling

that the conversation occurred in March 2004. (Tr. 4960).

Likewise, defense counsel also confronted Tabor with an agent's notes of an interview of

Tabor, which notes included the notation "Possibly March 04" in reference to a "Telephon[*sic*]

call w/ JC about DD," in an effort to suggest that Tabor's recollection about the timing of the

due diligence call was not firm.  (Tr. 1476-77, 1642-43; Cassidy Decl. Ex. P at 5).  A prior

statement by Tabor directly concerning the timing of the diligence call with the defendant was

plainly more probative than a series of emails that, plainly put, talk around the defendant's

involvement in diligence.

Finally, defense counsel attacked Tabor's credibility on the basis of an agreement

between THL and Weil that preserved THL's right to sue Weil under certain circumstances. (Tr.

1458-59, 1649-51).  Obviously, such motive and bias evidence is far more powerful than the

emails upon which the defendant relies, which speak not to motive but talk past the issue of the

defendant's involvement in diligence.

Put simply, the newly discovered emails and notes upon which the instant motion relies

would have added nothing to the defenses's cross-examination of Tabor or to the trial record.

### C.    <u>The Newly Discovered Evidence Would Not Have Resulted in an Acquittal</u>

Whatever their value, the newly discovered emails and notes would not have created

even a remote possibility of an acquittal.  The Government's case-in-chief consumed

approximately five weeks and 3200 transcript pages and consisted of nearly 20 witnesses and

more than 450 exhibits.  With regard to the defendant's participation in a scheme to conceal the

PPA, the Government introduced overwhelming evidence of the defendant's guilt, including the

testimony of eight witnesses and numerous documents that demonstrated, among other things,

that the defendant supplied THL with a phony limited liability company agreement, concealed

the existence of the PPA from his own partners, and knew that the real reason for concealing the

PPA was to extract a higher price from THL.  To claim that "[t]he principal pillar of this aspect

of the case was Tabor's testimony that he had a conversation with Collins in March 2004," (Br.

2), is a gross overstatement and nothing more than an effort to set up a straw man for the newly

discovered evidence to knock down.  The Government introduced ample evidence apart from

Tabor's testimony about the timing of the diligence call to establish that the defendant was

culpable in connection with the scheme to conceal the PPA.

Moreover, the Government introduced overwhelming evidence of the defendant's

participation in three other, separate aspects of the broader scheme to achieve a sale of Refco

through fraud, including concealment of the hole, concealment of the indemnities and guaranties,

and lies regarding the purportedly excess working capital.  The Government's evidence

concerning the defendant's knowing participation in these aspects of the fraud – as well as in the

concealment of the PPA – is briefly summarized in the Government's sentencing submission and

that summary is respectfully incorporated herein.  (*See* Gov't Sent. Mem. 2-16).  In light of this

evidence, the handful of newly discovered emails and notes upon which Collins relies would not

likely have resulted in an acquittal.

Indeed, the cases cited in defendant's brief show what type of outcome-changing

evidence typically merits the grant of a new trial motion – evidence completely unlike that which

the defendant relies upon in making the instant motion.  In *Arroyo*, a two-day felon-in-possession of a firearm case, the Government's case turned exclusively on the testimony of two law enforcement witnesses.  *See United States* v. *Arroyo*, 301 F. Supp. 2d 217, 226 (D. Conn. 2004) ("[i]f the jury disbelieved these officers, then there was literally no evidence of Arroyo's guilt").  The officers testified that their encounter with the defendant lasted approximately 17 seconds.  It was discovered after trial that a police radio transmission relating to the incident clearly established that the encounter took more than two minutes, directly contradicting the officers' accounts and establishing that the accounts were "fundamentally false or inaccurate." *Id*. at 229 n.3.  Likewise, in *Ortiz*, the Government's case turned entirely on the testimony of two police officers who witnessed a hand-to-hand drug sale. *See United States* v. *Ortiz*, 1993 WL 131329, at *2 (Apr. 23, 1993 E.D. Pa.).  The officers testified that the person they observed conducting the sale was wearing a white t-shirt with a design on it.  After trial, a post-arrest photo of the defendant was uncovered showing that the defendant was wearing a plain white t-shirt the night of the sale, "directly contradict[ing] their testimony."  *Id*. at *9.  In *McLaughlin*, a tax evasion case, the district court found that the defendant's outside accountant, a Government witness at trial, *perjured* himself when he said that a certain bank account of the defendant's was concealed from him, as demonstrated by statements for the account that included notations by the accountant.  *See United States* v. *McLaughlin*, 89 F. Supp. 2d 617, 621-25, 627-28 (E.D. Pa. 2000).

*Arroyo*, *Ortiz* and *McLaughlin* are plainly distinguishable from this case. They are precisely the types of cases where the grant of a Rule 33 application may be appropriate on the basis of newly discovered evidence tending to impeach the only witnesses to disputed facts: the

20

guilt of the defendants in those cases turned *entirely* on the testimony of the witnesses about those facts, and the newly discovered evidence directly contradicted that testimony. Here, the defendant's conviction did not turn on Tabor's testimony, and the newly discovered evidence does not contradict his testimony, directly or indirectly. As a result, it is highly improbable – indeed, impossible to imagine – that the jury's verdict would have been different if the defense had been able to cross-examine Tabor with the newly discovered email and note evidence.

## CONCLUSION

In sum, the newly discovered evidence upon which defendant's instant motion relies is immaterial, cumulative, and would not likely have resulted in an acquittal if it had been admitted. *See United States v. Alessi*, 638 F.2d at 479. Nor can it be said that the newly discovered email and note evidence gives rise to "a real concern that an innocent person may have been convicted." *United States* v. *Canova*, 412 F.3d at 349. Accordingly, because he has not satisfied the heavy burden that must be met to warrant resort to the extraordinary remedy of disturbing a jury's verdict, the Government respectfully submits that Collins's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 should be denied.

Dated:  New York, New York
          December 28, 2009

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

                         By: _____/s/_____
                              CHRISTOPHER L. GARCIA
                              Assistant United States Attorney
                              (212) 637-1022