UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA

            v.

JOSEPH P. COLLINS

                    Defendant.
-----------------------------------------------------X

07 Cr. 1170 (RPP)

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On December 4, 2009, Defendant Joseph P. Collins moved pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial on the grounds of newly discovered evidence.  The newly discovered evidence consists of documents, emails and handwritten notes of Weil, Gotshal & Manges LLP ("Weil Gotshal") attorneys to which Weil Gotshal's client, Thomas H. Lee Partners ("T.H. Lee"), waived privilege in civil litigation presently being litigated in another part of this Court.  On December 28, 2009, the Government submitted its memorandum of law in opposition to Defendant's motion for a new trial ("Gov't Mem.").  On January 7, 2010, Defendant submitted a letter in further support of his motion for a new trial ("Def. Reply").  Defendant having waived his right to oral argument on this motion by letter dated January 20, 2010, no oral argument was heard.  For the reasons discussed herein, Defendant's motion is denied.

<u>I.  Legal Standard</u>

A motion for a new trial based on newly discovered evidence should be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal."  <u>United States v. Alessi</u>,

638 F.2d 466, 479 (2d Cir. 1980).  In order for Defendant to prevail on his motion, there

must be "a real concern that an innocent person may have been convicted."  United States

v. Canova, 412 F.3d 331, 349 (2d Cir. 2005).  In evaluating a Rule 33 motion based on

newly discovered evidence, a court must "exercise great caution" and order a new trial

"only *in the most extraordinary circumstances*."  United States v. Zagari, 111 F.3d 307,

322 (2d Cir. 1997) (quoting United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993))

(emphasis in originals).  Here, the Government does not contend that Defendant could

have discovered the new evidence before or during trial.  Therefore, the outcome of

Defendant's motion turns on whether the newly discovered evidence is material and

whether its admission would probably have led to an acquittal.

## II.  Discussion

Defendant's counsel contends that "[h]ad the defense been equipped with this

evidence at trial, it would have been able to establish that (1) the conversation [between

Jay Tabor and Defendant] took place in April [2004] not in March, (2) Collins's

credibility as a whole was affirmed, not undermined by his direct contradiction of Tabor

on this point, and (3) the chronology corroborates Collins's principal defense theme that

he had what he believed to be a principled basis for not disclosing the Proceeds

Participation Agreement when he spoke to Tabor in April." (Memorandum of Law in

Support of Joseph P. Collins's Motion for a New Trial ("Def. Mem.") at 9.)  The

Proceeds Participation Agreement ("PPA") (Government Exhibit ("GX") 1504) was a

July 2002 Agreement between Refco Group Ltd., LLC ("Refco") and D.F. Capital, Inc.

("DFC"), an affiliate of BAWAG Overseas, Inc. ("BAWAG"), which was a member of

Refco and owner of ten percent of Refco's equity.

A.   The newly discovered evidence is not material because it does not cast doubt on the reliability of Mr. Tabor's testimony.

Defendant's newly discovered evidence supporting its Motion for a New Trial consists of complete copies of Tabor's handwritten notes as well as emails sent and received by attorneys at Weil Gotshal.  (Declaration of Kathleen E. Cassidy dated Dec. 4, 2009, Exs. A, E-O.)[1]  They are not sufficient support to grant the motion.

First, review of the handwritten notes of Mr. Tabor shows nothing inconsistent with his testimony at trial.  The notes consist of an assemblage of generally undated to do lists, notes of telephone conferences dated March 23, 2004 and March 30, 2004, scratch sheets and telephone memos from the period December 2003 to August 2004, covering a wide variety of fact and legal issues which Weil Gotshal was investigating as part of its due diligence of Refco and of its negotiation and closing of an Equity Purchase and Merger Agreement whereby Weil Gotshal's client, T.H. Lee, acquired a majority interest in Refco.  (Cassidy Decl., Ex. A.)

On their face, the notes establish very little and certainly not that the conversation took place in April not March or that Defendant's credibility was affirmed or corroborated.  Nor in the light of the doubts raised by defense counsel during cross-examination of Tabor's recollection of his conversation with Defendant in March, 2004, would the handwritten notes be further reason to "raise grave doubts about the reliability of any dates inscribed on his notes" as the defense asserts.  (Def. Mem. at 9.)  Indeed the dating of the conversation with Defendant, about which Tabor testified, was a fact issue raised by the defense during cross-examination.

---

[1]   Defendant submitted two declarations in support of his motion for a new trial, dated Dec. 4, 2009 and January 5, 2010, both submitted by Kathleen E. Cassidy.  Because the documents attached to the two Cassidy declarations are labeled with continuous lettering, for convenience, the Cassidy declarations are hereinafter collectively referred to as "Cassidy Decl."

The remaining new evidence submitted by Defendant consists of emails, principally between attorneys at Weil Gotshal relating to separate aspects of the due diligence issues being investigated at Weil Gotshal, and do not contradict Mr. Tabor's testimony about his telephone conversation with Defendant on March 23, 2004. Defendant testified that the conversation in which he did not disclose the PPA occurred in April because Philip Bennett, CEO of Refco, told him he did not want the PPA disclosed in April.[2]  Neither in the handwritten notes nor in the emails is there any other mention of Defendant in March 2004.  But the emails do not, as defense asserts, "make clear that Tabor had no conversations with Collins in March 2004" or that the deal "was at a virtual stand-still" with no due diligence taking place (Def. Mem. at 9), nor do they show that "to the extent that any further requests for information were being considered during this period, the requests were to be made directly to Refco's General Counsel, Dennis Klejna, or to Refco's Investment Bank, Credit Suisse First Boston ("CSFB")."  (Id. at 9.)  Tabor testified on direct examination that he did not remember the exact date of his telephone conversation with Defendant but did remember it was one of two conversations in March and preceded a March 30, 2004 conversation which was reflected in Tabor's billing records (Defense Exhibit ("DX") 301)[3] as well as in his own handwritten notes of that conversation.

Defense counsel cross-examined Tabor extensively at trial about the date of his March 2004 conversation with the Defendant, pointing out that for each entry in his

---

[2]     Tabor was not shown to have knowledge of this claim by the Defendant and thus had no reason to date his notes to March as defense suggests might have occurred.

[3]     DX 301 is a 226 page invoice for Weil Gotshal fees for professional services incurred from February to July, 2004 in connection with Weil Gotshal's representation of T.H. Lee in its acquisition of a majority ownership share of Refco.  DX 301 is attached to the papers in this motion as Cassidy Decl., Ex. R, but for convenience is cited herein as "DX 301."

billing records (DX 301) for the month of March 2004, Tabor had made no entry for the alleged conversation with the Defendant.  (Trial Transcript (hereinafter "Tr.") at 1459-70.)  Tabor was also confronted with a government agent's notes of a pretrial interview with him referencing "possibly March 04" as to a telephone call with Collins about due diligence.  (Cassidy Decl., Ex. P; Tr. at 1476-77.)  Defense counsel also cross-examined Tabor suggesting that his testimony was motivated by Weil Gotshal's and his own possible liability in civil litigation over Refco's demise.  (Tr. at 1451-59, 1649-52.) Although the cross-examination raised doubts about Tabor's memory that the alleged conversations took place in March, it did not cause him to change his testimony and the Government was able to admit his notes of the conversation dated March 23, 2004 as a prior consistent statement.  (GX 700; Tr. at 1604.)[4]

Tabor's day notes contained in Weil Gotshal billing records to T.H. Lee, which were available to the defense at trial, reflect for each day the nature of Tabor's interaction with representatives of his client, T.H. Lee, other lawyers at Weil Gotshal, representatives of CSFB and other persons and law firms questioned during the course of due diligence and other preparations for the proposed transaction.  (DX 301.)

Contrary to defense contentions, the newly discovered emails do not provide evidence that the March 23, 2004 telephone conversation did not take place, nor would these emails have enabled the defense to establish that the conversation took place in April not on March 23, 2004, as defense asserts (Def. Mem. at 9).

It is true, as defense argues, (i) that there is no evidence showing that the Defendant set up the March 30, 2004 call with Dennis Klejna and others (Def. Reply at

---

[4]     Although the Government on rebuttal did display the March 23 notes to the jury, it was for Tabor to clarify the date which was unclear on the earlier exhibit admitted in evidence and did not involve lengthy testimony.

2); (ii) that Tabor, on March 26, 2004, informed Jim Westra, the partner at Weil Gotshal in charge of the potential transaction, that when Max Strasberg of T.H. Lee called Dan Gerwitz of Weil Gotshal to determine how much more due diligence Weil Gotshal would have to do and how long it would take, Gerwitz had reminded Strasberg that Weil Gotshal needed to have a conversation with Refco's general counsel (Klejna) to go through Weil Gotshal's due diligence list (Def. Mem. at 12-13; see Cassidy Decl., Exs. K, L); and (iii) that on March 27, 2004, Strasberg told Tabor he would arrange such a call after Tabor reminded Strasberg that Weil Gotshal needed to have a conversation with Dennis Klejna in order to go through the standard due diligence list and confirm any materials that were missing from the data room (Cassidy Decl., Ex. M).  But the newly discovered emails do not contradict Tabor's notes dated March 23, 2004, showing that, during his conversation with Defendant, Tabor also asked Defendant to set up such a call with Klejna.  The fact that Tabor asked others to arrange a call with Klejna does not preclude Tabor having made a similar request of the Defendant on March 23, 2004, as reflected in Tabor's notes from that date.  The newly discovered emails merely corroborate Weil Gotshal's need, as of March 27, 2004, to have a conversation with Refco's general counsel (Klejna) "which [Weil Gotshal] discussed with the Lee guys a couple of weeks ago."  (Id., Ex. L.)

Defense counsel in their reply letter also maintain that the emails (Id., Exs. H, I) show that on March 22, 2004, Tabor delegated the follow-up on the discussion of the pending SEC inquiry to Conrad Balke of Weil Gotshal (See also Id., Exs. J, L, M) and argue that if Tabor had raised the issue on March 23, 2003 with Defendant, one would expect that fact to appear in these emails.  (Def. Reply at 3.)  This argument loses sight of

several pertinent observations.  First, the fact that Tabor delegated responsibility to Balke for a follow-up does not mean he would not make a similar request of Defendant the following day.  Second, Tabor's responsibilities in the transaction involved far more than the follow-up discussion of the SEC inquiry.  Weil Gotshal's billing records reflect that Tabor acted as quarterback to the Weil Gotshal team.  He recorded twice the time on the matter than any other attorney and was engaged in many other aspects of the proposed transactions.  (See DX 301 at 2-4.)  Westra testified that "[Tabor] is somebody who took the laboring oar on a number of important parts of this transaction and to whom I delegated a lot of responsibility" which included meetings and conversations with Mr. Collins, which Westra was not a part of.  (Tr. at 1778-79.)

Next, the emails do not constitute the full extent of Tabor's or other Weil Gotshal's attorneys' communications.  Review of Weil Gotshal billing records reflect that in March 2004, Tabor principally used telephone calls, not emails, to report to Westra as well as to contact other Weil Gotshal attorneys, CSFB and T.H. Lee executives.  (DX 301.)

Furthermore, Westra testified that Dennis Klejna was not the lawyer working on the proposed transaction but was responsible for regulatory compliance and litigation. (Tr. at 1658.)  And, Tabor's notes of the conversation with Defendant on March 23, 2004 are consistent with inquiries of a lawyer working on different aspects of the proposed transaction than merely litigation and regulatory compliance.  DX 301 reflects that on March 9 and 10, 2004, Tabor and Westra began their review of the Defendant's draft Transaction Documents.  Weil Gotshal's billing records reflect that on March 9 2004, Tabor began his review of draft Transaction Documents drafted by the Defendant (See

GX 1616 (dated March 4, 2004); DX 301 at 19-20 (records for 3/10/04)), and beginning

on March 17, Tabor worked on Debt Financing Structure, a structure memorandum for

inclusion in the draft Letter of Intent (DX 301 at 25 (records for 3/17/04)).  Tabor's notes

of the alleged March 23, 2004 conversation with Defendant are consistent with separate

inquiries primarily relevant to those aspects of the transaction which do not explore

regulatory and litigation inquiries.  (Cassidy Decl., Ex. C.)  Tabor's March 23, 2004 notes

state on the first page "Joe will to push to get responses to our open requests" and then

covered the next numbered categories pertinent to aspects of the proposed transaction,

separate from litigation and regulatory compliance, under headings such as "debt,"

"customer Ks" (contracts), "JV" (joint ventures), "Ks / arrangements with Phil/RGHI,"

"non-competes," etc. and, on the last page, state "Joe to arrange for call with Dennis K.

and Rob T. as well to go over remaining diligence q[uestion]s – To be scheduled

separately."  (Id.)  Tabor's notes of a March 30, 2004 telephone call with Dennis Klejna,

Rob Trosten and Phillip Bennett cover essentially the same topics and the SEC inquiry.

(Gov't Mem., Ex. C.)  Thus, the inquiries covered by the notes dated March 23 were

separate and apart from the regulatory and litigation inquiries to be made of Klejna, and

on March 30, with Bennett present, there were responses to many of the inquiries that

Tabor had previously raised with Defendant, as recorded in Tabor's March 23 notes.

     For the reasons stated, contrary to defense's assertion, the newly discovered

emails and handwritten notes do not represent material new evidence inconsistent with

the March 23, 2004 date appearing on Tabor's notes of a call with Defendant, nor are

they inconsistent with Tabor's trial testimony about the date of his call with Defendant.

B.     The newly discovered evidence would have been merely cumulative in
light of other Government evidence and would not have led to an aquittal

Review of the trial transcript leads to the conclusion than any cross-examination by the defense based on the newly discovered evidence would be merely cumulative of the cross-examination previously conducted and would lead to no different conclusion. More importantly, the timing of the Defendant's conversation with Tabor (i.e., whether it occurred in March or April 2004) was not the significant point in the trial that defense counsel contends.  (Def. Mem. at 9.)  Indeed, the Defendant's oral statement to Tabor would have the same effect on the jury's evaluation of the Government's evidence of the Defendant's intentional non-disclosure of the PPA (GX 1504) and a side letter agreement between the parties on the same date (GX 1503) regardless of whether Defendant's oral statement was made in April or in March 2004.

The evidence which led principally to Defendant's conviction was his admitted intentional determination to not disclose the existence of the PPA, based on his claim it was an "upstream" agreement of Refco Group Holding, Inc. ("RGHI"), which, until the closing of the T.H. Lee deal in August 2004, owned a 90% interest in Refco.  Defendant as outside corporate counsel to Refco, was the lawyer mainly responsible for the negotiation and drafting of T.H. Lee's agreement to acquire a majority interest in Refco from RGHI.  Pursuant to the PPA, DFC (an affiliate of Refco's other owner, BAWAG), had made two significant cash infusions into Refco totaling $467 million at the end of Refco's fiscal year on February 28, 2003 and in the Fall of 2003, causing DFC to become entitled to receive 27.2% of the proceeds of any sale of Refco.  (Tr. at 482, 490-91; GX 1503; GX 1504.)  In Article 11 of the PPA, Refco indemnified DFC and held it harmless for any damages.  RGHI, as the only owner of Refco (other than BAWAG, an affiliate of

DFC), guaranteed Refco's performance in a separate instrument attached as a schedule to

the PPA.  (GX 1504-S.)

The Equity Purchase and Merger Agreement ("EPMA") (GX 1005.1, *et seq*.),

pursuant to which T.H. Lee would purchase a 57% interest in Refco from RGHI, was

dated as of June 8, 2004.  In section 3.3 of that agreement, RGHI's Representations and

Warranties included the following pertinent language.

> Exhibit A hereto sets forth a true, complete and correct list of all of the members of the Company [Refco] immediately preceding the execution and delivery of this Agreement and the number of Membership Interests owned by each such Member.  Except for this Agreement and as described in Schedule 3.3, there are no other agreements, written or oral, between the Company or any Subsidiary and any holder of its respective equity interests, relating to the acquisition, disposition or voting of its equity interests.  There are no outstanding subscriptions, options, warrants, calls, commitments or any other agreements of any character obligating the Company or any Subsidiary to issue any equity interests at any time or under any circumstances, including conversion of debt into equity . . . except as disclosed in Schedule 3.3.

(GX 1005.1.)  Needless to say, the PPA between Refco and BAWAG'S affiliate, DFC,

was an outstanding option or commitment obligating Refco to issue an equity interest and

was not disclosed on Schedule 3.3.

Section 3.12 of the EPMA contained a Representation and Warranty that "except

as set forth on Schedule 3.12, since March 1, 2003, no officer, manager, director, or

member of the Company . . . or any Affiliate of any such officer, director, member or

other equity holder, has had, either directly or indirectly, a material interest in any

contract or agreement to which the Company . . . is a party."  (Id.)  DFC was an affiliate

of BAWAG, which in turn was an owner of Refco, from February 27, 2003.  (GX

501-O.)

Section 3.15 contained a similar representation that except as set forth on schedule 3.15, "neither the Company nor any Subsidiary is a party to or bound by any: . . . agreement which contains restrictions with respect to any of the Membership Interests; . . . [or] any contract, arrangement or understanding that relates to the future disposition or acquisition of material assets or properties, or any merger or business combination."  (GX 1005.1.)  The PPA between Refco and DFC did relate to the future disposition of material assets or any merger or business combination.

Exhibits at trial showed that the PPA and related agreements were not disclosed on any of the schedules to the EPMA.

In a lengthy direct examination, Defendant testified that on April 19, 2004, he intentionally did not disclose the PPA prior to the signing of the EPMA because he had had an uncorroborated conversation with Philip Bennett, Refco's and RGHI's Chief Executive Officer, about the list of outstanding legal due diligence requests attached to the Letter of Intent (GX 1003, Ex. C) in which he was told by Bennett that Bennett "wasn't prepared to turn over upstream agreements; that Lee was buying Refco Group and that they didn't need to know anything about the owners of Refco Group Holdings or the other requested information.  That was their personal business."  (Tr. at 3714; see also id. at 3708-15.)  Defendant then explained that, between May 13 and May 16, 2004, Bennett was able to obtain agreement from T.H. Lee that it wouldn't conduct upstream due diligence provided Mr. Bennett agreed in the Security Holders Agreement, a related agreement to the EPMA (GX 1005.7), that at the closing he was the sole owner of RGHI. (Tr. at 3715-16.)

During his direct testimony, Defendant took the position that the PPA, the parties to which were DFC and Refco, was an upstream agreement.  The Defendant was asked the following questions:

Q.      When you say "upstream," are you referring to items at the owner or Holdings level, referring to Defense Exhibit 1021?

A.      Yes.  Anything above Refco Group Ltd. would be considered upstream.

Q.      If we were to draw a line right here, upstream would be things above the line?

A.      Correct.

                                *       *       *

Q.      Just to be clear, Mr. Collins, referring again to [DX] 1021, Lee was buying Refco Group Ltd., correct?

A.      That's correct.

Q.      Was Mr. Bennett prepared to allow due diligence with respect to Refco Group Ltd.?

A.      Yes, he was.

Q.      That was the company that Lee was buying?

A.      Correct.

Q.      Was Lee buying Refco Group Holdings, Inc.?

A.      No, it wasn't.

Q.      Was Mr. Bennett prepared to allow due diligence with respect to Refco Group Holdings, Inc.?

A.      No, he was not.

Q.      Did that make sense to you, Mr. Collins?

A.      Yes, it made eminent sense.  It is often the case -- if GE was selling a subsidiary to IBM, they wouldn't allow IBM to do due diligence on GE's

parent.  They would allow diligence to the sub[sidiary] that was being sold and any companies owned by that sub[sidiary].

(Tr. at 3713-14.)  The direct examination went on to show that RGHI's agreements with Grant, a 50% shareholder, and Dittmer (a prior owner with rights to redeem and to participate in future appreciations in value) were upstream agreements.  (Tr. at 3716-17, 3723-25.)

The Defendant's position during lengthy direct examination on the subject that the PPA was an upstream agreement of RGHI (Tr. at 3648-62) strained belief and came apart when on cross-examination the Government put the PPA on the display panel and had the Defendant circle Refco's name as it appeared on the Exhibit. (Tr. at 4075-97; GX 1504-Y).

The circles made crystal clear:  (i) that Refco signed the PPA and RGHI did not; (ii) that Refco gave DFC right to a portion of any sale of Refco and RGHI did not; and (iii) that Refco, not RGHI, gave DFC the option to convert the proceeds from sale into shares of Refco.

The circles on the PPA also made clear all the obligations in the PPA were Refco's, including a guaranty of its obligations to, and an indemnification of, DFC.  At that point, Defendant testified that the PPA was an upstream agreement because "[RGHI's] guarantee that was part of the PPA was [an] absolute, unconditional guarantee of payment and performance.  There was no obligation whatsoever for any default.  The party who had the guarantee could just go straight to Refco Group Holdings."  (Tr. 4501.) This was clearly false testimony because under the terms of RGHI's guaranty, DFC had to give "five business days notice to the Guarantor that a demand for performance of the Obligations has been made and that the Company [Refco] has failed to perform such

Obligations within three business days thereafter." (GX 1504 at Tab 6 (Guaranty

Agreement between RGHI and DFC dated July 12, 2002 attached to the PPA).) The

Court then asked the Defendant:

> Q.    In other words, was there an obligation between Refco and the DF Capital that Refco would make payment first?
>
> A.    No, your Honor.
>
> Q.    There was no obligation under the contract for Refco to make payment?
>
> A.    There was an obligation, your Honor, but it had no money to satisfy that obligation.

(Tr. at 4502.) Earlier on his direct examination, however, Defendant had testified that in

April 2004, he understood that Refco had $500 million in excess cash available to

distribute to RGHI. (Tr. at 3699-701.) Additionally, the Letter of Intent drafted by the

Defendant and Tabor in April 2004 set forth that Refco had $500 million in excess cash,

which, upon closing, was not needed for operations and would be distributed to RGHI.

(Tr. at 3700-01; GX 1003.) Obviously, the Defendant couldn't have an understanding

that there was $500 million excess cash in Refco and also that Refco had no money to

satisfy its obligation to DFC.

On direct examination, Collins also took the position that the PPA did not need to

be disclosed because it was effectively nullified by a Reversion Rights Agreement. (DX

501; Tr. at 3836, 3841-51.) The Reversion Rights Agreement was signed as of June 8,

2004, the same date as the EPMA, by RGHI, BAWAG, Desana Foundation, Alinea

Holding GmbH, and Bennett and Grant. The Reversion Rights Agreement contained as

recitals:

> WHEREAS Desana is the sole shareholder of DF Capital Inc., a Delaware Corporation ("DFC") and Alinea is the sole shareholder of BAWAG

> Overseas, Inc., a Delaware corporation . . .; WHEREAS, pursuant to a Purchase Agreement (the "DFC Purchase Agreement"), to be executed prior to the Merger Closing, by and among RGHI, Desana, Bennett and Grant, Desana will sell to RGHI, and RGHI will purchase from Desana, prior to the Merger Closing, all of the outstanding stock of DFC.

(DX 501.)  The Defendant testified that he did not believe the PPA needed to be disclosed to T.H. Lee under the Representations and Warranties Section 3.3 of the EPMA because the "reversion rights agreement had been entered into before [the EPMA] had been signed, nullifying the rights of DF Capital under the proceeds participation agreement and thereby taking off the table the PPA."  (Tr. at 3834.)  After a lunch break, the Defendant focused on the whereas clauses of the Reversion Rights Agreement highlighting the significance of Desana "will" sell not "may" sell (Tr. at 3841) and that the whereas clause bound the parties to sell and purchase.  Defendant took this position even though there was no provision in the Reversion Rights Agreement incorporating the whereas clauses as obligations under the agreement and even though he had previously negotiated the PPA with BAWAG's attorneys which did include such an incorporation provision in the terms of the contract.  He admitted that the actual DFC purchase agreement had not been signed as of June 8, 2004, the date of the Reversion Rights Agreement.  (Tr. at 3841; See GX 1116 (July 29, 2004 email attaching Draft DFC Purchase Agreement dated "as of the ___ day of August 2004").)  He also testified that since in his mind the PPA had been "taken off the table," the Representations in Section 3.12 of the EPMA did not require the disclosure of the PPA.  (Tr. at 3843-51.)

But the Reversion Rights Agreement did not cancel the PPA agreements.  Its express terms – referring to the buyout of DFC by RGHI as "to be executed" – contemplated the PPA would remain in effect until the date of the closing of the EPMA

and closing of the buyout by RGHI of DFC's interest in Refco on the same date, which did not occur until August 4, 2004. (DX 501.) BAWAG's attorneys and Defendant agreed that RGHI would first receive money under the EPMA and thereafter pay it to Desana Foundation (the sole shareholder of DFC) to consummate RGHI's purchase of DFC shares. Accordingly, the Defendant was forced to admit on cross-examination that the PPA was in effect from the signing of the EPMA to closing. (Tr. at 4430-32.) And, it was clear that the Defendant's intentional non-disclosure of the PPA violated the Representations and Warranties of Refco in Sections 3.3, 3.5, 3.12 and 3.15 of the EPMA, which Defendant had participated in drafting.

There was additional evidence that Defendant's actions were intended to defraud T.H. Lee and Weil Gotshal. On May 13 and May 19, 2004, Adam Nelson of Weil Gotshal sent emails to Defendant attaching lists of outstanding due diligence items, "already discussed," in particular, as item 4 of the May 13 list "Constituent documents of the Members of Refco Group Ltd., LLC / documentation evidencing the merger of Refco Group Holdings, Inc. and Refco Group Holdings LLC" (GX 706), which includes the LLC agreements of Refco (Tr. at 1308-09), and as item 1 of the May 19 list "Amended LLC Agreement for Refco Group Ltd., LLC evidencing removal of Refco Group Holdings, LLC and indicating current managers" (GX 707). On June 2, 2004, Defendant sent Mr. Tabor a memorandum attaching a Fourth Amended and Restated Limited Liability Company Agreement of Refco Group Ltd., LLC. (GX 710.) It included its date, January 1, 2003, but was unsigned. However, on June 8, 2004, Defendant sent Mr. Nelson a fax stating "Here is the signature page for the Fourth Amended LLC Agreement." (Tr. at 1321; GX 502.) In the Fourth Amended and Restated Limited

Liability Company agreement sent by Defendant to Tabor in on June 2, there is no mention of either DFC or the PPA.

However, early in the trial Holger Steinbom, a representative of BAWAG, produced an executed Fourth Amended and Restated LLC Agreement for Refco dated February 27, 2003 (Tr. at 266-67; GX 501-O), which contained references to both DFC and the PPA (See GX 501-O at 3, 4).  Since the signature page of GX 710 purported to be signed on January 1, 2003 and since GX 710 did not reflect the existence of DFC or the PPA as reflected in GX 501-O, it was clear to the jury that Defendant had provided Tabor and T.H. Lee with a phony Fourth Amended and Restated LLC Agreement for Refco which had been cleansed of any reference to DFC or the PPA.  Because DFC and the PPA were not disclosed in the documents provided to T.H. Lee by Defendant and because the two large cash infusions into Refco from DFC totaling $467 million (see Tr. at 490-91) were not disclosed in Refco's consolidated financial statements for the fiscal years ending February 28, 2003 and February 29, 2004 (GXs 6006, 6007 (see Consolidated Statements of Changes in Members' Equity)), T.H. Lee was prevented from discovering the existence or source of these large cash infusions, which together exceeded 20% of the $2.25 billion purchase price T.H. Lee paid for a majority ownership share in Refco.

There was other evidence that Defendant's actions were intended to defraud the acquirers of Refco.  Early drafts of the EPMA provided that both RGHI and BAWAG make the Representations and Warranties in Section 3 of the EPMA.  During negotiations of the EPMA, BAWAG's attorneys told the Defendant that the PPA had to be disclosed pursuant to those representations and warranties.  As testified to by Jason Berger, a

lawyer with McDermott Will & Emery representing BAWAG, Defendant disagreed and subsequently BAWAG avoided making the representation by arranging to have itself removed as making these representations and warranties in the EPMA. (Tr. at 1802-09, 2064.)  Thus, the jury had notice that an attorney faced with the same disclosure problem as Defendant was of the opinion that the representations and warranties in the EMPA called for disclosure of the PPA.

The jury also had evidence that Bennett had requested that Defendant keep the PPA and its negotiations secret from the other lawyers at Mayer Brown who were working on the EPMA, that Defendant scolded BAWAG's attorney, Jason Berger, for making reference to the PPA in conversations with a Mayer Brown attorney who was working on the EPMA.  (Tr. at 1851-55.)  The jury also had evidence that the Defendant had reported by email to Bennett that BAWAG's attorney "screwed up big time and disclosed the DFC deal to everyone on our side.  I will fill you in and believe that the repercussions can be limited."  (GX 1954.)  No reasonable juror could believe that if the PPA was an "upstream agreement" of RGHI and had been nullified, as Defendant contended, there would be harm in disclosing the PPA to other Mayer Brown attorneys working on the EPMA.  As for Defendant's claim that Mr. Bennett did not want to disclose the PPA because it revealed BAWAG's agreement to an acceptable lower purchase price, disclosure of the PPA agreement with a redaction of the price figure would have complied with Bennett's objection (as Tabor pointed out) and would have satisfied the disclosure provision of the EPMA.  (Tr. at 1356.)

The jury also heard evidence that Defendant was guilty of other non-disclosure of material facts to the purchasers.  A few days prior to the closing of the EPMA, Defendant

was made aware that RGHI owed $1.1 billion to Refco.  Earl Melamed, an attorney for

Dittmer, who negotiated with Mr. Bennett the terms of Bennett's purchase of Dittmer's

remaining interest in RGHI, testified that in August 2004, he told Defendant, who was

drafting Bennett's agreement with Dittmer, that Bennett had told him that RGHI owed

Refco $1.1 billion and that as a result, a $500 distribution of "excess cash" to RGHI

contemplated by the EPMA documents would not occur.  (Tr. at 2848-50.)  Mr. Melamed

testified that he told the Defendant that he had learned from Bennett that the $500 million

"excess cash" was not "excess cash" to be distributed, but would be used to pay down

$1.1 billion in inter-company debt by a log book entry.  (Tr. at 2849-50.)  As a result, the

cash payment Dittmer received at closing in fulfillment of RGHI's obligations to Dittmer

was reduced to $21.75 million, and even after reduction of inter-company debt at the

closing of the EPMA, RGHI would still owe Refco $300 million.  (Tr. at 2847-52, 2855-

59; GX 923.)  As corroboration, the Government entered in evidence the Dittmer

Agreement, which Defendant drafted with Melamed, reflecting in its Appendix that the

$300 million in RGHI debt to Refco would remain after the closing with T.H. Lee and the

lenders.  (GX 913; GX 923; Tr. at 2847-52, 2855-59.)  Accordingly, the jury had written

corroboration that Defendant knew RGHI would still owe Refco $300 million as well as

evidence from Melamed that the inter-company debt was far larger than disclosed on the

2004 year end financials, which was confirmed by the back-to-back loan transactions that

Mayer Brown handled for Refco.

The clearest evidence supporting Defendant's knowledge of the inter-company

debt owed by RGHI to Refco relates back to the signing of the PPA in 2002 and a side

letter agreement with DFC (GX 1503), drafted by Defendant, reflecting that RGHI owed

Refco at least $350 million in July 2002, an amount far in excess of the $179 million

owed by related parties as reflected in Refco's financial statements for February 2002.

(Tr. at 410-11, 445-46; GX 6005.)  Other evidence was Mr. Trosten's testimony that he

had told Defendant in the summer of 2002 that the debt RGHI owed Refco was, in fact,

$700 million.  (Tr. at 422-23.)  Furthermore, as Refco's outside corporate counsel,

Defendant was aware of the very large short term back-to-back loan transactions which

took place at each fiscal year end and were repaid a week or so after the fiscal year end.

These short back-to-back fiscal year end loans grew as follows:

| Exhibit Numbers | Fiscal Period[5] | Duration[6] | Total Amount | Customer(s) |
|---|---|---|---|---|
| GX 2000.1 GX 2000.2 GX 2000.3 | Year End 2000 | 2/25-3/9/00 | $310 million | CIM Ventures, Inc. EMF Core Fund, Ltd. CS Land Management LLC |
| GX 2001.1 GX 2001.2 | Year End 2001 | 2/23-3/6/01 | $450 million | CIM Ventures, Inc. Delta Flyer Fund LLC |
| GX 2002.1 GX 2002.2 GX 2002.3 | Year End 2002 | 2/25-3/4/02 | $625 million | Beckenham Trading Company, Inc. Delta Flyer Fund LLC Liberty Corner Capital Strategies LLC |
| GX 2003.1 GX 2003.2 | Year End 2003 | 2/21-3/4/03 | $650 million | Delta Flyer Fund LLC Liberty Corner Capital Strategies LLC |
| GX 2004.1 | Year End 2004 | 2/20-3/4/04 | $720 million | Liberty Corner Capital Strategies LLC |
| GX 2004.3 | End of Q1 2005 | 5/27-6/7/04 | $700 million | Liberty Corner Capital Strategies LLC |

Each back-to-back loan to a customer was accompanied by a loan of equal

amount to RGHI on the same terms except at a slightly higher rate and required that the

proceeds be lent to RGHI and contained guarantees by Refco that RGHI would repay the

borrower-lender.

---

[5]     Refco's fiscal year closed at the end of February each year.
[6]     The exact duration of the short term loan agreements sometimes varied slightly among loans at the end of the same fiscal period.  Where this is the case, the duration period listed reflects the longest duration across all short term loans, i.e., the earliest loan date coupled with the latest repayment date.

The Defendant's claim that he failed to disclose the back-to-back loans to T.H. Lee because he forgot about them and the evidence presented by Defendant that he did little legal work on the loans were beside the point.  The back-to-back loans were cookie cutter loans, all containing the same terms and only different parties, dates and interest rates, and Defendant had negotiated the pattern agreement with the law firm Davis Polk. He was the partner in charge of the Refco account who received Refco's requests to prepare the back-to-back short term loans (see, e.g., GXs 304, 312, 351, 352) that are reflected on Mayer Brown's bills, which Defendant approved (see GXs 1200-B, 1200-C, 1200-E, 1200-F, 1200-G, 1200-H).  Furthermore, the 2004 back-to-back loans totaling $720 million and $700 million were too large and too close in time for a reasonable juror to believe the Defendant had forgotten them during the negotiation of the EPMA.  They had been drafted by Mayer Brown in late February 2004 and again at the end of the first quarter on May 30, 2004 (GX 2004.1, GX 2004.3), during the time the EPMA was negotiated and entered into in final form as of June 8, 2004.

Accordingly, the Defendant did not need to be "told" (Tr. at 3618) that the purpose of the back-to-back short term loans at fiscal years end was to reduce on Refco's and RGHI's books the amounts owed by RGHI to Refco.  It was obvious to a corporate lawyer under these circumstances that the transactions would serve that purpose on Refco's fiscal year end statements.  This evidence was sufficient for a jury to conclude that Defendant had to be aware that the RGHI debt to Refco was being reduced for fiscal year purposes by a temporary loan to a customer who would simultaneously loan to RGHI, that the likely extent of the "hole" owed by RGHI to Refco during the negotiation of the EPMA was understated in its financial statements by at least $720 million, and that

the back-to-back loans made thereafter in 2004 and 2005 were to achieve the same results.  (GXs 2004.4, 2004.5, 2004.6, 2005.1, 2005.2, 2005.3.)

> C.   Additional Argument Noted at Sentencing

At sentencing, the Defendant raised a ground for appeal under 18 U.S.C. § 3143(b)(1)(B) in connection with his application for continued release on bail pending appeal, namely, the Court's failure to share immediately a note from the jury foreman with trial counsel in the afternoon of July 9, 2009, and the Court's subsequent interview of a juror with a court reporter but not counsel present.  Though not addressed by the parties in the instant motion, if this ground for appeal were meritorious, it would constitute a ground for a new trial.  Therefore, the issue is addressed briefly here.

On further reflection, the Court does not believe that the circumstances merit a new trial under Rule 33 because the Court was faced with exigent circumstances.  There had been disruptive noise in the jury room on the afternoon of July 8, 2009, the tenor of which could be heard by persons in the back of the courtroom, and a marshal had entered the jury room and told the jury to quiet down.  (See Tr. at 5338-46.)  Early the next day, the Court received a note (Court Ex. 46) from the foreman which indicated that two juror participants were at fault (Tr. at 5402-04), a note from one of the jurors (Court Ex. 45) and a later note from the foreman (Court Ex. 48) that that juror was trying to trade his vote on a count or counts with other jurors (Tr. at 5408-11, 5419-20).  Further disruptions of the jury could occur if the Court failed to take prompt action to make sure the juror knew trading votes was improper and must not be engaged in.  Under these circumstances, this Court was under various pressures.  To engage in discussions of the note with counsel for the Government and defense would take significant time as had

22

earlier discussions of the foreman's notes. (See Tr. 5346-400.) It had been a lengthy trial for the jurors as well as for counsel and the Court. The time pressure and exigent circumstances were enhanced by the media's coverage of the trial and the presence of the press in the courtroom during the afternoon of July 9, 2009. The possibility of a hung jury could become enhanced if further estrangement occurred. Thus, it was important to interview the juror promptly in order to prevent further jury disruptions. As the transcript of the juror conversation and a subsequent note from the jury indicate, the Court's action in not immediately divulging the note to counsel and interviewing the juror promptly, together with its response to the foreman's notes, did not result in any prejudice to either side and jury deliberations proceeded smoothly, without further disruption. Accordingly, the Court believes these events did not result in any prejudice to either side that would require a new trial pursuant to Federal Rule of Criminal Procedure 33.

## III. Conclusion

For the reasons stated herein, Defendant has not demonstrated that the newly discovered Weil Gotshal notes and emails are material, let alone that their admission into evidence at trial would probably have led to an acquittal. United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980). Therefore, Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is denied.

IT IS SO ORDERED.

Dated: New York, New York
       March 2, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this opinion were faxed to:

William J. Schwartz
Jonathan Paul Bach
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY 10036
Fax: 212-479-6275

Christopher L. Garcia
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
Fax: 212-637-2452