UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                     :
UNITED STATES OF AMERICA,
                                     :
          -vs.-
                                     :
JOSEPH P. COLLINS                         **07 CR 1170 (RPP)**
                                     :
                    Defendant.
                                     :

------------------------------------ X


**SENTENCING MEMORANDUM**
**ON BEHALF OF JOSEPH P. COLLINS**




1114 AVENUE OF THE AMERICAS, NEW YORK, N.Y. 10036-7798

# **TABLE OF CONTENTS**

Page No.

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ................................................................... 1

I.  PERSONAL AND PROFESSIONAL HISTORY ................................................. 3

    A.  Family Upbringing and Education ................................................ 3

    B.  Military Service and Professional Development ................................ 5

    C.  Family ..................................................................................... 7

    D.  Community Service and Good Works ............................................ 10

    E.  Professional Life at Mayer Brown ............................................... 16

    F.  Life Today ............................................................................... 24

II.  SENTENCING CONSIDERATIONS:
    GROUNDS FOR DEPARTURE AND VARIANCE ...................................... 26

    A.  The Meaning of the Verdict ...................................................... 27

    B.  The Lack of Any Intended or Actual Personal Financial Gain ........... 33

    C.  Charitable and Good Works ....................................................... 35

    D.  Limited Role ........................................................................... 37

III.  THE 3553(A) FACTORS ALL COUNSEL
    IN FAVOR OF A LENIENT SENTENCE ............................................... 39

    A.  History and Characteristics of the Defendant ............................... 39

    B.  Nature and Circumstances of the Offense .................................... 39

    C.  Need To Reflect Seriousness of the Offense ................................. 40

    D.  Need to Provide Adequate Deterrence and Protect the Public ........... 40

    E.  The Kinds of Sentences Available ............................................... 41

    F.  Need to Avoid Unwarranted Sentencing Disparities ........................ 42

IV.  THE PROBATION DEPARTMENT'S RECOMMENDATION ............................... 42

A.     Analysis of § 3553(a) ........................................................................ 42

B.     Forfeiture is not an Appropriate Sanction in this Case ...................................... 43

CONCLUSION ............................................................................................ 44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006),
   *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008) ........................................................ 27, 36-37, 40, 41

*United States v. Bajakajian*,
   524 U.S. 321 (1998) ................................................................................................. 44

*United States v. Blarek*,
   7 F. Supp. 2d (E.D.N.Y. 1998) ................................................................................ 34

*United States v. Broderson*,
   67 F.3d 452 (2d Cir. 1995) ...................................................................................... 34

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005) ..................................................................................... 36

*United States v. Capoccia*,
   503 F.3d 103 (2d Cir. 2007) ..................................................................................... 44

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ................................................................................. 7, 40

*United States v. Graham*,
   No. 06 Cr. 137 (D. Conn. Apr. 30, 2009) ........................................................... 37, 38

*United States v. Greene*,
   249 F. Supp. 2d 262 (S.D.N.Y. 2003) ..................................................................... 36

*United States v. Kipnis*,
   No. 05 Cr. 727 (N.D. Ill. Dec. 10, 2007) ................................................................ 38

*United States v. Regan*,
   699 F. Supp. 36 (S.D.N.Y. 1988) ............................................................................ 44

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996) ...................................................................................... 36

*United States v. Somerstein*,
   20 F. Supp. 2d 454 (E.D.N.Y. 1998) ....................................................................... 36

*United States v. Van Brocklin*,
   115 F.3d 589 (8th Cir. 1997) ................................................................................... 44

*United States v. Williams,*
    524 F.3d 209 (2d Cir. 2008).................................................................27

STATUTES AND RULES

18 U.S.C. § 981(a)(1)(C) ..........................................................................43

18 U.S.C. § 3553(a) ........................................................................ passim

Fed. R. Crim. P. 32.2(b)(4) .....................................................................44

We respectfully submit this memorandum on behalf of our client, Joseph Collins, in anticipation of his sentencing. The Probation Department has recommended a sentence of seven years of imprisonment. For the reasons that follow, we respectfully submit that such a substantial term of incarceration is well beyond that necessary to fulfill the goals of sentencing in this particular case. We urge the Court to consider imposing a non-custodial sentence.

## PRELIMINARY STATEMENT

This case arises out of the collapse of Refco, formerly one of the world's leading commodities brokerage firms, following revelations that its principals had engaged in a massive accounting fraud. A first series of prosecutions brought against Refco insiders – including former CEO Phillip Bennett, former CFO Robert Trosten, former President Tone Grant, and former senior officer Santo Maggio – resulted in convictions, either following guilty pleas or after trial, principally on the theory that these individuals had touted Refco to potential purchasers and investors as a successful and thriving enterprise when, in fact, it had accumulated approximately $1.1 billion in inter-company debt and thus had a deep financial "hole." These defendants all benefitted personally from the fraud by receiving vast personal fortunes, and in some cases stood to receive even hundreds of millions of dollars more.

Joseph Collins, who was not advised that he was a subject of government investigation until well after these other defendants had been indicted, stands in an altogether different category in terms of his relative culpability. Even accepting the government's theory of the case, he did not plan or initiate any aspect of the fraud, nor did he personally profit or even attempt to profit from it. Rather, in his capacity as Refco's outside counsel, he had at most an entirely secondary role: he provided legal assistance on transactions that his client conceived and designed. His lack of any intended or actual personal financial gain distinguishes him from

nearly all white collar offenders prosecuted in this district and from each white collar case referred to in the Presentence Report.

Joseph Collins testified for more than five days at trial, explaining his role in the various transactions at issue. He denied that he was aware of the underlying accounting fraud at Refco, but admitted that he had not disclosed certain documents in the context of the TH Lee and related transactions, including the Proceeds Participation Agreement and various "round-trip" loan documents, and he gave reasons to explain why he had not made the disclosures. Although we do not know from the verdict exactly what the jury concluded about his role or level of involvement in the fraud, the government argued forcefully, both to the jury and to the Court, that Joseph Collins could be found guilty of the crimes charged even if he was not aware of his client's accounting fraud. It argued that it would suffice for the jury to find that he wrongfully failed to disclose certain documents, even without knowledge of the existence of Refco's deep financial hole. This point is crucial for sentencing purposes. If Joseph Collins was acting without knowledge of the underlying accounting fraud, then his actions, even if giving rise to some level of culpability, are of far lesser magnitude and must be seen in an altogether different light from that of other Refco defendants.

Joseph Collins has led an exemplary life marked by love of family, devotion to his church, military service, a reputation for professional excellence and integrity, and an extraordinary commitment to helping others less fortunate than himself. His history of charitable and good works – which goes well beyond simply contributing funds – provides a true sense of

his character and of his deep ethical calling.[1]  We respectfully ask the Court to consider these aspects of his personal history in fashioning an appropriate sentence.

## I.      PERSONAL AND PROFESSIONAL HISTORY

### A.      <u>Family Upbringing and Education</u>

Joseph Collins, age 59, was born in Chicago, the eldest of seven children.  His father was the Controller of Catholic Cemeteries for the Archdiocese of Chicago, and his mother was a teacher and homemaker.

Religious faith and instruction were fundamental to life in the Collins home.  Three of Joe's uncles were Catholic priests.  The children attended mass every morning before school, and the family worshipped together at the end of every day.  (M.B. Collins Letter, Tab 22.)  Joe's wife, Mary Pat Collins, writes that Joe's parents "led the family by example.  They worked hard, instilled faith in their children and most importantly a sense of duty – duty to family, to school and to country."  (M.P. Collins Letter, Tab 1.)

Joe's parents believed deeply in the importance of education and encouraged their children to excel in school.  All of the Collins children attended Catholic grammar schools, high schools and colleges.  As the eldest of seven, Joe was keenly aware of the financial burden this placed on his parents.  He worked, saved and sought scholarship assistance to help defray the costs of his own education.  In the eighth grade, he sold subscriptions to the diocesan newspaper, earning a scholarship to a local preparatory seminary.  After two years in the seminary high

---

[1]      We are submitting under separate cover dozens of letters to the Court from family, friends, colleagues and clients of Joe Collins, many of which are cited in this Memorandum.  We also append to this Memorandum, as Appendix A, a copy of a submission we made to the Probation Department in response to the initial draft of its Presentence Report.  Please note that the paragraph numbers in our letter to the Probation Department refer to that draft of the Presentence Report which was not circulated to the Court.  We have penciled in new paragraph numbers keyed to the paragraphs in the final Presentence Report, which was received by the Court.

school, he decided against joining the priesthood and transferred to the Dominican-run Fenwick High School. In high school, he caddied and worked as an usher at local sporting and cultural events, trying to save as much as he could for college.

He was a diligent student. His younger brother Austin – today a Catholic priest and a professor at the University of Notre Dame – recalls that Joe "continually and unfailingly raised the bar for what it meant to be dedicated to one's studies." (A. Collins Letter, Tab 2.) His hard work led to academic success. He was encouraged to apply to a number of leading Catholic colleges, and ultimately chose to attend the College of the Holy Cross, a Jesuit liberal arts college in Worcester, Massachusetts.

The values that informed Holy Cross's educational mission, in particular the Jesuit commitment to the service of others, had a profound effect on Joe's thinking and development. He not only flourished academically, but took on a leadership role in the life of the college. Among other honors, he was selected by the Dean and the President of Holy Cross as one of only two student representatives on its highest governing body, the Educational Policy Committee. Ted Wells, a nationally renowned trial lawyer and co-chair of the litigation department at the Paul Weiss law firm, was a fellow-member of the freshman class and worked closely with Joe on matters of student government. He writes that at Holy Cross "Joe exhibited great character, integrity and a passion for helping others. He was a top student academically, but he did not just stay in his room and study, he spent countless hours working on student government issues to improve the lives of his fellow students." (T. Wells Letter, Tab 96.) At the same time, Joe strove to contribute to the cost of his education. In his freshman year, he worked on the college grounds maintenance crew, and during his vacations he built and delivered burial vaults to Chicago area cemeteries.

4

Many of the most significant relationships in Joe Collins's life originate with his experiences at Holy Cross. Father James Bresnahan, a long-time friend of the Collins family, first met Joe Collins in a seminar on ethics and the law which he taught as a visiting professor at the college. (J. Bresnahan Letter, Tab 107.) Joe Collins's close friend Father James Hayes, who testified in his support at the trial, was a classmate, and now serves as the Rector and Chaplain of the College of the Holy Cross. (J. Hayes Letter, Tab 97.) In such relationships, and in the wider circle of Holy Cross alumni, Joe Collins found a second extended family to which he feels lasting gratitude and loyalty, and which he has sought to repay through his financial generosity to Holy Cross and his long-standing involvement in alumni affairs.

**B.    Military Service and Professional Development**

At Holy Cross, Joe Collins joined the Air Force ROTC at a time when military service, and the ROTC in particular, were reviled on campuses throughout the country. As William J. Cook remembers, Joe Collins "wore his uniform proudly at a time when there was great disaffection with the military on campus, even at a politically moderate school such as Holy Cross." (W. Cook Letter, Tab 135.) Another classmate, Dennis Tuffin, writes that "[w]hen many forsook military service, me included, Joe stood firm . . . not with bitterness or rancor, but with a careful considered dignity and respect for others. It was impressive then and it impresses me today." (D. Tuffin Letter, Tab 94.)

In his junior year, Joe Collins made the decision to become a lawyer. He was accepted by New York University as a Root Tilden Scholar. This highly selective public interest scholarship was awarded to only a handful of students each year, in recognition of their demonstrated commitment to public service and academic excellence. In the summer following graduation Joe married Mary Pat, his high-school sweetheart, and the couple moved to New York. While Joe studied, Mary Pat taught at a Harlem parochial school, and earned extra money

5

babysitting for the children of faculty members.  In furtherance of his commitment to the Root

Tilden program, Joe completed internships with the Legal Assistance Foundation of Chicago and

with the New York State Office of the Special Prosecutor.

On Joe's graduation from law school, he and Mary Pat returned briefly to Chicago, where

Joe worked as an associate at the Schiff Hardin law firm until called to active Air Force duty.

Through the Air Force Honors Program, Joe served for two years as a lawyer in the Pentagon,

working first for the General Counsel of the Air Force, handling government contract matters,

and then on a special project for the Secretary of Defense, analyzing arms sales to Iran.  He was

released from active duty in mid-1977 having achieved the rank of Captain, and remained an

officer in the Air Force Reserves for the next five years until 1982.

On his return to Schiff Hardin, Joe built a successful practice as a regulatory lawyer in

the rapidly expanding field of derivatives and financial services law.  He worked hard and made

partner earlier than was usual, and went on to serve several terms on Schiff Hardin's elected

management committee.  In 1994, he was approached with an offer to start a derivatives group at

Mayer Brown.  The firm's size and its international reach presented excellent opportunities for

his practice, and he accepted the offer.

At Mayer Brown, Joe's practice thrived.  He was highly-regarded by his clients,

colleagues and peers and was active in the service of the profession, serving as Chair of the

ABA's Committee on Derivatives and Futures Law and of the Chicago Bar Association's

Committee on Commodities Law, and teaching graduate classes at The Illinois Institute of

Technology's Kent Law School.  Until this case, his professional record was unblemished.  He

remained a partner at Mayer Brown until July 2009, when he tendered his resignation following

his conviction.

Throughout this same period, Joe Collins lived a quiet, unassuming life in suburban Chicago, devoting himself to his family and to the service of others. The many friends and neighbors who have written to the Court in Joe Collins's support know him as a person of exemplary character, a modest man of deep religious faith, a loyal and trustworthy friend, and a true asset to the community. Their letters recount Joe Collins's good works on behalf of the underprivileged in his community, his unfailing kindness and generosity, and their firm belief in his fundamental honesty and integrity. Scott Wenner, who has been friends with Joe Collins since they were law school classmates almost 40 years ago, echoes many others when he describes Joe Collins as a "role model . . . whose honesty and trustworthiness remain unchallenged in the belief of those who know him." (S. Wenner Letter, Tab 101.)

### C.    Family

Despite the many demands of Joe's career and his considerable professional accomplishments, family always came first. He has been a constant, devoted presence in the lives of his wife, children, grandchildren and of the extended Collins family, many of whom attended every day of his eight week trial.

Joe and Mary Pat have been married for thirty-seven years. They have three sons, each a mature, successful adult, and five grandchildren. Christopher Collins, age 33, is a lawyer employed as an associate at Vedder Price in Chicago. He and his wife Dina Schomer Collins have four children, Christopher Jr., Brooke, Luke and Jack, ranging in age from two to eight years old. Brendan Collins, age 31, and Patrick Collins, age 28, both live in Manhattan and work in investment banking. Madeline, the Collins's youngest grandchild, was born to Brendan and his wife Christine in 2008.

Joe's and Mary Pat's marriage, in the words of Joe's brother Austin, is a "true partnership." (A. Collins Letter, Tab 2.) Christopher Collins observes that "[a]s a husband I

7

could not have asked for a better role model than my Dad." (C. Collins Letter, Tab 3.) When
Mary Pat chose to pursue a graduate degree in education, Joe spent his evenings taking care of
their young children, handled household chores, and used his weekends to catch up at the office.
He made the time to coach his sons' athletic teams and to work as a classroom volunteer at
Patrick's pre-school and his sons' high school. He has supported Mary Pat through times of
trouble, including her personal struggles in the aftermath of her father's death following a
lengthy battle with cancer. And he remains invaluable in helping to care for Mary Pat's mother,
who suffers from debilitating symptoms of Alzheimer's disease, and for her sister, who is
developmentally disabled.

Mary Pat's mother is physically frail and profoundly disoriented. She no longer knows
her children, and has tried to run away from home. Mary Pat writes that "caring for my mother
is a labor of love but also filled with frustration and sadness. Joe's support has been invaluable"
to her in handling the practical problems and the emotional stresses presented by her mother's
disease. (M.P. Collins Letter, Tab 1.) Mary Pat writes, for example:

> When I knew Joe's trial was approaching and I would be away
> from Chicago for a length of time, Joe helped me make a plan of
> support services for my mom and sister . . . . Joe was facing the
> most difficult challenge of his own life yet he saw clear enough to
> help me make a plan. I believe this speaks volumes for my
> husband.

(M.P. Collins Letter, Tab 1.)

Joe's sons describe their father as a quiet, gentle man, "never one to lecture or preach"
who "led by example everyday of his life." Patrick remembers that, even when his father was
commuting weekly between New York and Chicago – billing, on average, close to 2500 hours a
year for Mayer Brown – he "was there for everything: sporting events, back-to-school nights,
school plays; in fact he never missed a single football game, home or away, from the time I

played my first game in sixth grade until the time I played my last my senior year of college."

(P. Collins Letter, Tab 5.)  Brendan recalls that when he was cut from his high school basketball

team, and was playing in a small church league, his father "was the only parent who would show

up for the games."  (B. Collins Letter, Tab 4.)  Joe's hard work, devotion and generosity of spirit

made a deep impression on his sons.  Today, as they face the challenges of raising their own

families, they are still filled with admiration for their father and they look to him as a model of a

life lived faithfully and well.

Characteristically, when Joe's sister Ellen was divorced as a young mother, Joe stepped

in to support Ellen and her children Meghan and Kevin Mocogni.  Joe and Mary Pat opened their

home to Ellen, Meghan and Kevin, treating the children as they would their own.  Meghan

considers herself  "like a daughter" to Joe and Mary Pat.  She writes that, looking back on her

childhood:

> my uncle Joe is in just about every memory . . . .  He came to my
> high school basketball games, cross-country and track meets.
> Every family vacation, spring break, Christmas break and summer
> vacation Joe was there.  He is the busiest person that I know and
> yet he never missed a family vacation, barbeque or holiday . . . .
> Joe and Mary Pat have been there for my older brother and I
> through all the major milestones of our lives.

(M. Mocogni Letter, Tab 7.)  Kevin Mocogni, now a young lawyer in Chicago, explains that

"Joe, after my mother, has had the biggest impact on my life."  Joe and Mary Pat "became a

second set of parents with whom I celebrate birthdays, graduations, holidays and all special

occasions.  They have provided me with a level of love and support that few others could ever

hope for."  (K. Mocogni Letter, Tab 6.)  Ellen Mocogni writes that she is thankful to her brother

"for all he has done to help my children become the wonderful adults they are today."  (E.

Mocogni Letter, Tab 8.)

Joe is now the devoted grandfather of five and deeply involved in the lives of his young grandchildren.  Christopher and Dina Collins's family, in particular, live close to Joe and Mary Pat, and their four children see their grandfather several times a week.  Dina describes how her father-in-law has always been eager to help out with the children's care and how much they love to spend time with their grandfather.  (D. Collins Letter, Tab 9.)

To the wider Collins family, Joe Collins has been a friend, a trusted advisor and a consistent source of strength and comfort.  Brothers, sisters, in-laws, cousins, nieces and nephews have submitted letters to the Court relating the contributions that Joe has made in their own lives.  Austin Collins describes the attentiveness and compassion with which Joe supported the family through the deaths of their parents and of Mary Pat's father, managed end-of-life decisions on behalf of his ninety-three year old aunt, and continues to care for the needs of Mary Pat's mother.  (A. Collins Letter, Tab 2.)  They admire the kindness that he has consistently shown to them, and the work that he has done for others in the community.  While the family has always respected Joe Collins for his academic and professional success, it is his generosity and his graciousness as a human being that inspire their love and gratitude.

### D.   Community Service and Good Works

In keeping with his faith and the precepts of his education, Joe has consistently committed his time, energy and financial resources to the service of his community.  As his brother Austin puts it, "Joe not only takes his religion seriously, he lives it in the best and most productive way possible.  Joe walks the talk."  (A. Collins Letter, Tab 2.)  While, as we discuss below, Joe is a generous donor to charitable causes, his commitments go substantially beyond institutional giving.  He repeatedly has given his own time and energy to help bring about direct, tangible change in the lives of others.

Those who have come to know Joe through his good works in the community know that he can be relied upon to help others in need, even when the personal costs are significant. When Christopher Collins was in his senior year at Loyola Academy, the school's guidance counselors turned to Joe Collins as a potential foster parent for Christopher's classmate and friend Stephen Lake. Stephen was living with his mother, a single-parent and an alcoholic, who was incapable of taking care of her adolescent son. Unless a suitable home could be found for Stephen, he would become a ward of the state and would be removed from Loyola. Joe discussed the matter with Mary Pat and their sons. Mary Pat admits that she was initially reluctant to take on this added responsibility, but ultimately she agreed with Joe that Stephen should come to live with them for the remainder of the school year. (M.P. Collins Letter, Tab 1.)

Stephen was a troubled young man, and the experience was challenging for the Collins family. But for Stephen Lake it was transformative:

> Almost immediately I went from living in an environment of fear and abuse to living in a warm and loving home. Mr. Collins provided for my care and support, a selfless and heroic act in and of itself. But he also provided me with the kind of role model I'd never had; knowing him changed the entire trajectory of my life.

(S. Lake Letter, Tab 31.) Joe treated Stephen as a member of the family. He was given his share of family chores to perform and was included in family events. In addition, Joe mentored Stephen in his studies, helped him to prepare for his SATs, and took him to visit prospective colleges. When Stephen had first come to live with the Collins family, he was unsure whether he would even be able to attend college, but with Joe's support and guidance, Stephen obtained a place at Holy Cross Junior College and then transferred to and graduated from Notre Dame. He is now a successful, stable adult, working for the Chicago Board of Trade/CME Group.

No less important than the academic coaching and encouragement that Joe provided, Stephen writes that:

> I also learned from Mr. Collins how to treat people. First and
> foremost, the way that he and Mrs. Collins treated me was
> remarkable . . . . But the way Mr. Collins treated others also made
> an impression on me. Although he was a high-powered lawyer, he
> would accord everyone the same dignity and respect.
>
> * * *
>
> Most importantly, coming as I did from a broken and dysfunctional
> home, Mr. Collins showed me what a true family man looked like.
>
> * * *
>
> Put simply, without Mr. Collins's extreme generosity and inspiring
> example, I would not be where I am today – Indeed I don't know
> where I would be.

*Id.*

Joe has also been an active participant in LINK Unlimited, an educational sponsorship program serving economically disadvantaged African American youth from the Chicago area. Azmera Berhe was one child whose life was changed for the better because of Joe's personal commitment to LINK. Azmera's family are refugees from civil war in Eritrea, who arrived "in this country without a dime to their name or a relative or friend to show them the way." As a LINK sponsor, Joe made a four-year commitment to contribute to the cost of private, secondary education for Azmera, and to act as her mentor. Azmera writes:

> Joseph not only mentored me but I became almost like a daughter
> and truly felt they incorporated me into their family. I was
> included and welcomed with open arms in many family occasions
> such as Thanksgiving, Christmas and weddings. Joseph came to
> my home. He met my family. We shared meals of Eritrean food.
> He greatly admired my parents. Joseph introduced me to a life
> where hard work, passion and dedication were what determined
> success in life rather than being a victim of circumstance.

(A. Berhe Letter, Tab 32.)

For Azmera's sixteenth birthday, Joe and Mary Pat took her to visit New York City.

12

> Joseph took the time out of his work schedule to show me around.
> During the summer when most sponsors disconnected from their
> students, Joseph and his wife continued to stay in touch and be a
> part of my life by calling, visiting, inviting me to dinner and taking
> me to baseball games . . . . All this confirmed that I sincerely
> meant as much to them as they meant to me. I was not a charity
> case or a tax write off but someone they loved and truly cared
> about.

*Id.*

Joe's obligations to the LINK program ended when Azmera moved on to college, but his

support for her efforts continued throughout her college years. The first package that Azmera

received at college was from Joe and Mary Pat Collins. It contained a new laptop computer.

Azmera recently graduated from the University of Illinois with a bachelors degree in

Community Health and intends to pursue graduate studies in Optometry. "Joseph," she writes,

"has had an amazing and beneficial impact on my life. I know I will always have his support and

love as I plan my future." *Id.*

Since 1997, the Collins have been active supporters of Boys Hope/Girls Hope of Illinois

("BH/GH"), a residential scholarship program serving at-risk children from Chicago's poorest

neighborhoods. BH/GH provides participants with a safe home, free private secondary

education, and financial support and counseling through high school and college. The Collins

were first introduced to the program when their son Christopher chose to spend a year working

as a BH/GH house-parent. Mary Pat serves as an unpaid volunteer program coordinator at

BH/GH and as a mentor and tutor to the students. Joe not only supports BH/GH financially, but

also gives his time to counsel BH/GH students and graduates. Patrick Hughes, executive director

of BH/GH, writes that Joe and Mary Pat are "the kind of supporters you can count on to help our

scholars when they need it most." (P. Hughes Letter, Tab 34.)

13

Unsurprisingly, Joe is also a committed supporter of the College of the Holy Cross and an active fund-raiser on behalf his alma mater. Again, he has focused his efforts to support educational opportunities for students who would otherwise be unable to attend Holy Cross. He served as the Mid-West chair of the college's Raise High the Cross Campaign, the most successful in the college's history, committing "countless hours" to fund-raising for Holy Cross's needs-based scholarship programs. (S. Lovelette Letter, Tab 40.)

In addition to financial support and fund-raising, Joe is an active participant in alumni affairs and is deeply loyal to his fellow alumni. His classmates Dennis Tuffin and Patrick Connolly write of how, decades after graduation, Joe extended his hand to help them when they found themselves in personal difficulties. (D. Tuffin Letter, Tab 94; P. Connolly Letter, Tab 104.) Indeed, even during the trial of this case, Joe Collins travelled to Los Angeles to attend funeral services for a Holy Cross classmate, and took the time to share remembrances with others, such as Mr. Tuffin, who were unable to attend. (D. Tuffin Letter, Tab 94.)

Father Michael McFarland, the President of the College, observes that notably, notwithstanding the verdict against him, Joe Collins still retains the respect of his Holy Cross alumni. He writes: "The Holy Cross family is very tight-knit; but like any group of intense high-achievers, they can be hard on themselves and one another. What is most striking is that everyone who has spoken to me about Joe continues to profess unwavering faith in Joe's decency and integrity, even in the face of the findings against him." (M. McFarland Letter, Tab 37.)

Joe has also donated substantial time and financial support to Loyola Academy, where his sons attended high school. The Collins have been consistent supporters of Loyola's tuition assistance, academic support and athletic programs. (*See* R. Bueter Letter, Tab 44; F. Amato

14

Letter, Tab 35; J. Arimond Letter, Tab 42; C. Simon Letter, Tab 46; J. Sweeney Letter, Tab 36.)

They take an active role in organizing fund-raising events on behalf of the school and, once

again, have "dedicated countless hours and resources to make these events a huge success." (J.

H. Murnane Letter, Tab 41.)

In addition to these programs and institutions, Joe has been a generous donor to many

other charitable and educational causes including NYU Law School, The University of Notre

Dame, Dominican University, Providence St. Mel School and Chicago Jesuit Academy.  As

shown in the following chart, between 1997, the first year of the charged conspiracy, and 2007,

when Joe first learned that his life would be changed forever by an indictment, his annual

charitable donations often approached or exceeded 10% of his after-tax income – a very

significant percentage by any standard.

| Year | Net Income After Taxes (Adjusted Gross Income minus Total Tax) | Charitable Deductions | Charitable Deductions as % of Net Income After Taxes |
|------|------|------|------|
| 1997 | $   678,910 | $  45,144 | 6.65% |
| 1998 | $   860,687 | $  71,960 | 8.36% |
| 1999 | $   901,699 | $  74,802 | 8.30% |
| 2000 | $   995,905 | $  77,004 | 7.73% |
| 2001 | $   970,823 | $  91,085 | 9.38% |
| 2002 | $1,088,556 | $104,892 | 9.64% |
| 2003 | $1,132,699 | $105,855 | 9.35% |
| 2004 | $1,315,288 | $126,762 | 9.64% |
| 2005 | $1,106,814 | $143,746 | 12.99% |
| 2006 | $1,086,906 | $137,343 | 12.64% |
| 2007 | $1,057,143 | $  87,989 | 8.32% |

Joe has given these gifts discreetly, without asking for public acknowledgment.  As his brother Austin states, "Joe is a very self-effacing person.  He is not boastful of his generosity and I know of it only from others and from direct observation."  (A. Collins Letter, Tab 2.)  Tom Fitzgerald of Loyola Academy writes that Joe Collins "has always been reluctant to accept any credit for providing monetary or tutorial resources" to Loyola.  (T. Fitzgerald Letter, Tab 43.)  Similarly, Father James Hayes writes that "Joe would never draw attention" to his gifts and work on behalf of Holy Cross.  (J. Hayes Letter, Tab 97.)

Austin and Mary Pat Collins recount a vivid example of this same quality of character.  In the mid-nineties, Patrick Collins had a classmate Tommy, whose mother died of a drug overdose.  Tommy's family was unable to afford the costs of the funeral, which the entire school attended in a show of support.  Joe quietly paid for the funeral himself.  Until Joe's pastor brought it to her attention, even Mary Pat was unaware of Joe's generosity.

### E.    Professional Life at Mayer Brown

At Mayer Brown and among the community of lawyers and professionals in the field of futures and derivatives law, Joe had a reputation as an honest, dedicated and knowledgeable practitioner.  Lawrence Hunt, Joe's counterpart as the head of the derivatives practice at the Sidley Austin law firm, writes that Joe was "probably the most knowledgeable technical lawyer in the derivatives area – certainly among the top three."  (L. Hunt Letter, Tab 89.)  Long-time client Thomas Konopiots calls Joe the "best person to consult for honest, unvarnished legal advice within the futures business."  (T. Konopiots Letter, Tab 79.)  Part of the reason for Joe's success was his tireless work ethic.  He was consistently among the firm's hardest working partners, delivering a "level of service that few could rival."  (H. Gonzalez Letter, Tab 50; *see also* F. Blanchfield Letter, Tab 53.)

Joe was known to his Mayer Brown partners as a selfless and generous partner. Debora de Hoyos, Managing Partner of the firm during Joe's tenure and a witness at trial, described Joe's approach to his responsibilities as practice leader:

> Joe was fair-minded and supportive of the people in his group. He made a great effort to make sure the firm was treating his people fairly. From my experience, he didn't overreach, but he wanted to make sure the lawyers in his practice area received what he believed was appropriate – whether it was in recommending compensation for the partners in his group or working out a flexible work schedule for one of the several women in his group that wished to work part-time. Notably, Joe was in the very small group of partners who never asked for anything for himself.

(D. de Hoyos Letter, Tab 49.) Jim Holzhauer, until recently Chairman of the Firm and a member of its management committee, also took note of Joe's conduct in presenting to the committee on behalf of his group: "Joe always advocated for increases in the compensation of the others in his group, and did not push for himself although he was fully deserving." (J. Holzhauer Letter, Tab 48.) Joe shared credit and created work for others rather than seeking credit and compensation for himself. As a result, Joe's partners perceived him as "uniformly generous, constructive and sharing." (J. Kravitt Letter, Tab 66.)

Despite his long hours and the demands of commuting between New York and Chicago weekly, Joe was generous in his willingness to lend advice or expertise to others. Mayer Brown partner Francis Blanchfield appreciated Joe's attention to his small Charlotte office, noting that Joe "has been unfailingly generous in giving our office the benefit of his intellect, judgment and experience on both client and administrative matters. He has not hesitated to fly to Charlotte whenever we have asked to help build our office's practice." (F. Blanchfield Letter, Tab 53.) Joe's generosity extended to the legal community beyond his firm. Not only did Joe serve at various times on bar association committees, including as Chair of the ABA Business Law Section Committee on Derivatives and Futures Law (P. Pantano Letter, Tab 91), he always took

17

the time to engage with a colleague who had a question. Frederick White, a fellow Chicago-based commodities lawyer who competed with Joe for business, recalls that Joe was "one of the very few lawyers in our field whom I could always call when I had a question about securities or commodities law, even though we were active competitors." (F. White Letter, Tab 93.)

Joe's generosity has also been evident in the interest he takes in mentoring and educating young lawyers, in the process instilling in them the virtues of hard work, client service, and professionalism. Lisa Dunsky, now an Associate General Counsel at the Chicago Mercantile Exchange and a witness at trial, was one of the young lawyers who benefitted from Joe's mentoring and example early in her career. Dunsky first met Joe when she was a summer associate at Mayer Brown, and immediately "sensed that Joe was someone who I could pattern myself after as a professional because of his integrity, work ethic and respect for other people." Dunsky attributes her development as a lawyer in large part to the responsibility, challenges and support she received under Joe's tutelage. Yet Dunsky credits Joe with far more than simply giving her opportunities for good work experience: "Joe is one of the handful of special people in my life who showed me how to do things the right way and helped me make my life something much better than it otherwise would have been. Some people might say that Joe has been a mentor to me, but it's much more than that: Joe has shown me by example how to be a good lawyer and, more importantly, how to be a good person." (Dunsky Letter, Tab 54.)

Joe is regarded within the legal community as an honest man, whose ethics and integrity have consistently met the highest professional standards over decades of practice. Mayer Brown partners who have written to the Court in support of Joe cite their own interactions with him as well as his reputation among the firm's lawyers as evidence of his integrity. Debora de Hoyos, the Managing Partner during the time Joe was an active partner, writes:

> In a law firm, if someone holds doubts about the integrity,
> character or conduct of one of their partners, the Managing Partner
> is highly likely to hear of it. I never heard such criticism of Joe.
> On the contrary, to me, and, to the best of my knowledge,
> throughout the firm, Joe Collins had a reputation for the highest
> integrity and for being exactly the kind of partner one wants to
> have in a law firm to embody the highest professional standards:
> excellent on the law; dedicated to client service; collaborative and
> collegial with fellow lawyers; supportive of those who relied on
> him for leadership.

(D. de Hoyos Letter, Tab 49.)  Similarly, Jim Holzhauer, previously the firm's General Counsel

as well as its Chairman, holds Joe in high regard: "among the lawyers [he] has worked with and

known at Mayer Brown, and worked with at other leading firms," he ranks Joe "at the top in

integrity, professionalism and ethical conduct." (J. Holzhauer Letter, Tab 48.)  Hector Gonzalez,

a Mayer Brown partner and former Assistant United States Attorney in the Southern District of

New York, who spent ten years as a state and federal prosecutor before joining Mayer Brown,

sums up the prevailing view of Joe among his colleagues:

> Joe is, simply put, a good man. During the ten years that I have
> known and worked with Joe, I never had reason to call into
> question the settings on his moral compass. Joe has never given
> me the slightest reason to question his integrity. It is also fair to
> say that I am not alone in holding that opinion. Within the firm,
> both among lawyers and staff, Joe has a reputation for honesty,
> integrity and fair play.

(H. Gonzalez Letter, Tab 50.)

Lawyers who worked closely with Joe on client matters, including those who worked

with him on Refco matters, share their partners' high opinion of his ethics and integrity, and

several of them have written to offer specific examples.  Howard Roin is a litigation partner at

Mayer Brown who Joe often brought in on litigation matters for his clients, usually brokerage

firms.  Roin writes that "[o]ur clients often were accused of misconduct. Joe always made it

clear that he expected our defense to meet the highest legal and ethical standards. Knowing Joe,

I would have been shocked at even a hint of impropriety, and in all of the years I worked with Joe I saw no such thing." (H. Roin Letter, Tab 58.) Vincent Connelly, a former Assistant United States Attorney in Chicago where he was Chief of Special Prosecutions, is a senior partner who worked closely with Joe on litigation matters for Refco. He describes working on a "bet the ranch" case for Refco about 10 years ago, which was such a significant matter that Refco made contingency plans to shut down its office if the plaintiff prevailed at the trial. He consulted Joe throughout the trial and found that Joe consistently offered only ethical and responsible advice; "never did he seek even a border-line advantage for the client if it wasn't well within the appropriate boundaries of proper advocacy." (V. Connelly Letter, Tab 51.) In this instance, as in the many others in which Joe sought Connelly's assistance on Refco matters, Joe "always evidenced complete integrity and never suggested any course of action that would even arguably fall into a gray area." Connelly writes:

> Prior to working at Mayer Brown, I was a federal prosecutor in Chicago for ten years. I don't think that experience provides me with any special insight into human nature but along with the following 20 years as a while collar criminal defense practitioner it at least affords me a filter to observe lawyers who try to do the right thing and those who don't. Throughout the hundreds of times Joe and I had to make decisions and plan a course of action, he always was guided by doing what was proper and above-board.

*Id.* Mayer Brown partner David Bloom shares this view – he sought out Joe's expertise on a variety of matters over the years, and found Joe's advice to be "meticulous and conservative, with an emphasis on careful readings of regulatory requirements and on-going compliance efforts." (D. Bloom Letter, Tab 63.)

Regulators who dealt with Joe agree that, in their experience, his representation of his clients was always ethical and honest. Joseph Harrison first came to know Joe in his role as the General Counsel of the National Futures Association, the regulatory body for the futures

industry, and their relationship continued after Harrison returned to practice at Sidley Austin in the area of commodity futures. Harrison writes of his "utmost respect" for Joe, who "zealously pursued the interests of his clients while maintaining the highest levels of professional integrity. Joe could always be counted on to argue forcefully and skillfully for his clients' positions in an honest and professional manner." (J. Harrison Letter, Tab 86.) Marshall Hanbury, a former partner and a friend, first met Joe when he was serving as General Counsel of the Commodity Futures Trading Commission. He observed Joe in that setting, and subsequently in bar association meetings, negotiations with opposing counsel and regulators, and in client consultations. Hanbury's judgment after nearly 25 years of observation is that Joe is "honest, scrupulous, upstanding and straightforward." (M. Hanbury Letter, Tab 55.)

Joe's clients, many of whom have written letters to the Court on his behalf, report that Joe has counseled them through all manner of legal and regulatory issues ethically and responsibly through many years of service. John Mussar, who has relied on Joe as outside counsel for 29 years, first at Chicago Grain and Financial Futures and later at TENCO, Inc., described Joe's approach: "On occasion the firm had the need to call in Joe to assist us in dealing with situations that involved rule infractions due to the conduct of individuals doing business with us. In each case, Joe's concern was to shut down the activity, control the financial risk and to notify the appropriate regulatory authorities. Joe's approach was to bring in the regulatory people early in the process and to make them aware of the situation and the steps being taken by the firm to correct the situation." (J. Mussar Letter, Tab 70.)

Joe's careful approach and previously unblemished reputation attracted major institutional clients. R.J. O'Brien & Associates, the largest independent futures brokerage in the United States and the oldest Futures Commission Merchant in the industry, relied upon Joe as

outside counsel for over 20 years. Gerald Corcoran, the CEO of R.J. O'Brien (and formerly the CFO and the COO), writes that, "I worked closely with Joe over a myriad of legal needs for those 20 years. In all of my dealings with Joe, I found his counsel to be accurate, reliable, timely and always with the highest level of integrity." (G. Corcoran Letter, Tab 75.) Another client of Joe's for the past several decades is the firm now known as TD Ameritrade. The founder of TD Ameritrade, Joe Ricketts, explains that he retained Joe in the late 1970s as the young company was expanding. As Ameritrade grew, their legal issues became more complex. Ricketts recounts that "[f]or almost 20 years, Joe Collins thoughtfully guided us through these issues with skill and care.... Based on my personal experience with Joe Collins over many years, I believe him to be an honorable and moral man who has made great contributions to both his clients and the community." (J. Ricketts Letter, Tab 71.) Former CFO and COO of TD Ameritrade, Randy MacDonald, who has known Joe since 2000, states: "Based on fifteen years as Chief Financial Officer of three different public companies, I can say without hesitation that Joe always exhibited the highest standards of decorum and integrity." (R. MacDonald Letter, Tab 73.) A number of other clients who have worked closely with and relied upon Joe for years have written letters attesting to his sound judgment and their firmly held opinions of his honesty and integrity. (*See* J. Peter Rickets Letter, Tab 72; M. Lane Letter, Tab 74; R. Beckwith Letter, Tab 76; H. Tilney Letter, Tab 77; R. Lerner Letter, Tab 78; T. Konopiots Letter, Tab 79; R. Goldberg Letter, Tab 80; D. Goldberg Letter, Tab 81; S. Dorman Letter, Tab 82; G. Schaumburg Letter, Tab 83; J. Santelli Letter, Tab 84; P. Yang Letter, Tab 85.)

Timothy Burke, formerly an audit manager and partner at Arthur Andersen, often worked with Joe when Joe was a partner at Schiff Hardin. In his letter, Burke shares a story that encapsulates the type of lawyering Joe is known for among his clients and his colleagues at

Mayer Brown and in the industry. During an audit of a commodity broker for National Futures Association ("NFA") registration purposes, Andersen uncovered a major regulatory issue. Burke sought Joe's advice. Together, they reviewed the findings and determined to take the issue to the NFA. Their meeting with the NFA resulted in action against the client, which was denied registration and barred from the industry. (T. Burke Letter, Tab 87.) In another instance, this time involving Refco, Joe supported the position Andersen took with respect to a regulatory issue. Burke attributes Refco's decision to change their procedures to Joe's support on the issue. This, writes Burke, is "the Joe Collins I know. I had direct experience with Joe. He cares about industry regulation. He cares about protecting the public and he cares about doing what is right." *Id.* This, too, is the Joe Collins known to his partners and industry colleagues, and to the many clients Joe has loyally and honestly served for decades.

Notwithstanding the substantial achievements and reputation Joe enjoyed in his career, he remained the same humble, generous, self-effacing person professionally as he is in his personal life. Joe is known to all as a notably and fundamentally decent person, considerate of everyone no matter his or her position at the firm. Peter Schultz, a Mayer Brown associate who worked with Joe for many years, writes: "Joe was noteworthy in the amount of consideration and respect he showed to everyone working on his team, from junior and senior associates (I was both) and fellow partners to paralegals and administrative staff. I have worked with a number of attorneys during my career, and Joe's decency truly is remarkable." (P. Schultz Letter, Tab 59.) Surrell Richards, Joe's secretary in the New York office for the past ten years, echoes the same sentiment: "What sets him apart is the way he treats everyone – from the partners to the little guy....He treats everyone with the utmost respect." (S. Richards Letter, Tab 56.)

23

Several of Joe's co-workers describe how he has gone out of his way to accommodate the individual circumstances of people working with him, including advocating on their behalf to the firm. As Debora de Hoyos notes, Joe advocated for the women in his practice group who wanted to work part-time schedules. (D. de Hoyos Letter, Tab 49.) Peter Schultz also describes how Joe's concern for his personal situation helped him remain at the firm:

> A couple of years ago I informed Joe that I was thinking of leaving the firm to reevaluate my career path. Joe knew that I had recently been diagnosed with diabetes. Joe went to the firm and convinced them to enter into an arrangement with me where I would work reduced hours from my home and still retain my medical insurance through the firm.

(P. Schultz Letter, Tab 59.) Karen Radatz, Joe's secretary in Chicago for 13 years, writes of Joe's "inordinate kind[ness], particularly with my absences due to family issues" (K. Radatz Letter, Tab 64); while Surrell Richards, Joe's New York secretary, recalls two occasions on which Joe interceded with the firm on her behalf. (S. Richards Letter, Tab 56.) Joe's sincere concern for others is simply part of his nature, as many friends and family members have attested.

## F.   Life Today

Since leaving the practice of law in 2007 Joe has devoted his time to his family and to the service of his community. For the past two years, while preparing for his defense of this case, Joe has worked several days a weeks as a volunteer tutor at Chicago Jesuit Academy, a full-scholarship middle school in a rough neighborhood on Chicago's West Side. Nearly all of the school's students come from minority single-parent families and almost all live at or below the poverty line. When he is not actively tutoring students, Joe willingly turns his hand to office work, sweeping up, organizing supplies or whatever else would assist with the work of the school.

24

Matthew Lynch, the school's president, describes Joe Collins as:

> one of our most reliable volunteers and effective tutors. Joe is
> unfailingly kind, self-effacing and generous. He graciously does
> whatever job needs doing – whether it's cleaning up a mess, filing
> or carefully tutoring a child in need. During the past two years,
> Joe has done it all quietly and thoughtfully.

(M. Lynch Letter, Tab 33.) Mr. Lynch also points out that there would be far easier and more comfortable volunteer opportunities open to Joe Collins:

> We are far from his house, and we're in a neighborhood that most
> Chicagoans do their best to avoid . . . . The neighborhood that
> surrounds our school struggles under the weight of material
> poverty, drugs, gangs and violence. While Joe has been a
> volunteer, I have had a volunteer mugged while walking to our
> building at 9:00 a.m.; two of my students – who are brothers –lost
> their biological father when he was shot less than four blocks from
> our school; and this past summer, one of our former students was
> killed when the car in which he was riding was broadsided by a
> van fleeing an armed robbery . . . . There are safer places to
> volunteer, but in my opinion Joe is here with us because he
> believes in what we do and wants to help.

*Id.*

Joe Collins's willingness to give of himself and help others is potentially of great benefit to the community. If harnessed appropriately, his skills and energies could be used, at many levels, for a variety of useful purposes. Joseph Harrison, a friend of Joe's who was formerly a partner at the Sidley Austin law firm and General Counsel of the National Futures Association, has used the later years of his career and his semi-retirement to work for a variety of not-for-profit organizations. Among other things, he has served as President of Amate House, which establishes and supports communities of recent college graduates who each give a year of full-time service, and currently serves as Chairman of Economic Growth Initiative for Haiti. He writes that:

> There are thousands of not-for-profit organizations pursuing a wide
> range of extremely useful missions. I know from my own

experience that many of them would be helped enormously by a
person like Joe.

He has also advised the Court that he would be willing to accept, informally or formally under an

appointment by the Court, the responsibility to "help Joe find organizations where his talents can

be applied to do real good in the world and to supervise Joe in the performance of such service

for as long as may be necessary." (J. Harrison Letter, Tab 86.)

## II.    SENTENCING CONSIDERATIONS: GROUNDS FOR DEPARTURE AND VARIANCE

Sentencing is governed by 18 U.S.C. § 3553(a), which directs the sentencing court to

consider a number of factors in fashioning a reasonable and appropriate sentence. We believe

there are a number of circumstances, all recognized under § 3553(a), that mitigate the conduct at

issue and that distinguish this case not only from most other white collar criminal cases, but also

from the other Refco prosecutions that have been brought in this district.[2]  In the discussion that

follows, we present these circumstances as grounds for departure and variance.[3]

Specifically, we respectfully ask that the Court take into account the significant

possibility consistent with the jury's verdict that, even if criminally culpable for certain aspects

of his conduct, Joseph Collins was not aware of and did not participate in the accounting fraud

perpetrated by other Refco defendants. We also respectfully ask that the Court take into account

Joseph Collins's lack of any intended or actual personal financial gain, his relatively secondary

---

[2]    We plan to appeal the conviction in this case and intend nothing in this submission to be
an admission of wrongdoing by Joseph Collins. Nevertheless, we respect the verdict for
purposes of sentencing. This memorandum is intended to emphasize that, even if one
accepts the verdict, the conduct at issue can be understood as meaningfully different from
and well outside the heartland of typical white collar fraud cases.

[3]    We do not here undertake an analysis of the relevant Guidelines calculation, but rather
refer the Court to Appendix A of this memorandum, which sets forth our response to
Presentence Report and its application of the Guidelines. We point the Court in
particular to pages 8 through 15 of Appendix A.

culpability as someone who neither initiated nor devised any aspect of the fraud, his otherwise impeccable character, his strong history of charitable and good works, and the dire collateral consequences of his criminal conviction, including the end of his profession as a lawyer and the economic hardship that he and his family are anticipated to endure.

In *United States v. Cavera*, the *en banc* Second Circuit explained that district courts have "very wide latitude" in deciding proper punishment for a particular offense and defendant. *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). In particular, the Second Circuit has focused on the broad discretion afforded to sentencing courts in dealing with the controversial application of loss enhancements in financial crimes, holding that even given a particular amount of loss, "there is a wide variety of culpability amongst defendants," warranting "different sentences based on the factors identified in § 3553(a). *Id.* at 192. *See also United States v. Adelson*, 441 F. Supp. 2d 506, 512  (S.D.N.Y. 2006) (noting "harm that guideline calculations can visit on human beings if not cabined by common sense"), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008). The Second Circuit has also recently noted that "[s]o long as factors considered by the sentencing court are not inconsistent with those listed in § 3553(a) and are logically applied to the defendant's circumstances, we afford deference to the court's broad discretion in imposing a sentence within a statutory range." *United States v. Williams*, 524 F.3d 209, 216 (2d Cir. 2008) (internal quotations and citations omitted). Ultimately, a sentencing Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

A.    **The Meaning of the Verdict**

It is difficult to know from the verdict itself exactly what conclusions the jury reached with respect to Joseph Collins's role in the underlying fraud. The government presented a broad case that included several separate theories as to what he might be held responsible for, based on

separate aspects of his conduct.  The counts of conviction do not readily make clear which specific theories the jury accepted or rejected, or which object of the conspiracy they found him to have shared with other conspirators.  The jury's failure to reach a verdict with respect to 9 of the 14 counts adds to the confusion.

The thrust of the government's prosecution in all of the other Refco cases has been that Refco engaged in a massive accounting fraud, which it hid from potential purchasers and investors.  In essence, Refco touted itself to the public as a successful and profitable enterprise when, in fact, it was ridden with inter-company debt and fundamentally insolvent.  Bennett, Maggio, Trosten and Grant – all former officers of Refco – were convicted on the theory that they had participated in that fraud:  together they hid the fact that Refco had a huge "hole," a debt of approximately $1.1 billion owed to it by its parent that was not disclosed in its financial statements.  The hiding of this hole might be described as the main Refco fraud.  When a portion of the hidden debt was eventually discovered in October 2005, Refco's collapse soon followed and investors lost approximately $2.4 billion.

It is unclear, however, whether the jury in reaching its verdict found Joseph Collins to have engaged in this main aspect of Refco's fraud.  The government went to great pains in its summations to point out to the jury that it could convict Joseph Collins even if it were to find that he was not aware of Refco's financial hole.  Indeed, one of its principal themes at trial – if not its principal theme – was that Joseph Collins was guilty of conspiracy and fraud simply by virtue of the fact that he had decided not to disclose certain documents, such as the Proceeds Participation Agreement or indemnities and guarantees associated with "round trip" loans – regardless of whether he was aware of the underlying accounting fraud.  Consider this portion of

the government's rebuttal summation – the final presentation the jury heard before beginning its

deliberations:

> And, ladies and gentlemen, and this is important, this is not a case
> only about the hole.  As Mr. Goldin told you during his
> summation, there are four, four sets of lies in this case.  Each one
> by itself its own crime, each a crime standing on its own legs.
>
> First, there were lies about the proceeds participation agreement.
> You don't need to know anything about the hole in order to know
> that the defendant lied about the proceeds participation agreement.
>
> Second, the defendant's lies about indemnities and guarantees used
> in connection with the round trip loans.  You don't need to know
> that there was a hole to find that he committed a fraud there. . . .
>
> Third, lies about segregating the $500 million in excess cash.
> Again, you don't need to know about the hole.  All you need to
> know is that there was a statement made that there was going to be
> $500 million in excess cash.

Tr. at 5007-08 (June 29, 2009).

This rebuttal was a direct response to the defense summation in which we had

summarized extensive documents and testimony tending to show that Joseph Collins was not

aware of Refco's financial hole and that, in fact, Refco's CEO Phillip Bennett had misled him to

believe that Refco was actually quite profitable.

Similarly, in arguments before the Court concerning how the jury should be instructed

with respect to the charged crimes, the government was vehement in maintaining that the

question of Collins's guilt should not be tied to his knowledge of the underlying accounting

fraud and knowledge of the hole, and urged the Court to revise its instructions to provide for

other, alternative bases of culpability.  For example, since a fundamental question for the jury

was whether Joseph Collins's actions were in furtherance of the "scheme" charged in the

indictment, the Court was particularly concerned about how to define the scheme for the jury in

its charge.  Defense counsel referred the Court to Paragraph 7 of the Superseding Indictment,

which describes the scheme in terms of the main accounting fraud, including the concealment of Refco's "true financial health and economic structure" and "the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in Refco." The government repeatedly took the position, however, that Collins's guilt could be based on different aspects of his conduct and that there were other aspects of the scheme that did not involve hiding Refco's true financial condition. Thus, the government advised the Court: "The problem with paragraph seven is that it's not complete. The indictment alleges all sorts of objects and purposes, beyond what's in paragraph seven." Charging Conf. Tr. at 5083, (June 29, 2009). Earlier, the government had sounded the same theme: "The problem with the way it reads now is that it's limited to a fraudulent scheme relating to concealing the true financial condition of Refco. And this is something we discussed last week. The indictment goes beyond the scheme to conceal the true financial condition of Refco." *Id.* at 4907. In another instance, the government stated, "Paragraph 7 is neither complete nor accurate as a description of the charged fraud, which encompasses allegations beyond paragraph 7." June 29, 2009 email from AUSA Christopher Garcia to Defense Counsel and Court Clerks. In short, the government vigorously opposed a charge that would have made it clear that to be convicted of conspiracy the jury would have to conclude that Collins knew of the financial condition of Refco. Having insisted that the jury not be charged that way, the government cannot now maintain that that is what the verdict meant.

At trial, Joseph Collins testified for more than five days, explaining his role in the various transactions at issue and the information that had or had not been provided to him by his client. He denied that he was aware of the underlying accounting fraud, but admitted that he had not disclosed certain documents in the context of the TH Lee and related transactions, including the Proceeds Participation Agreement and various "round trip" loan documents, and gave reasons to

explain why he had not made the disclosures.  Although we do not know whether the jury

concluded that Collins was aware of Refco's financial hole, there is a significant possibility in

light of the evidence and the government's argument that it did not.  Quite a few government

witnesses testified about the non-disclosure of the Proceeds Participation Agreement.  Others

testified about the non-disclosure of documents related to the "round trip" loans.  Although

Collins admitted in his testimony that he had not disclosed these documents, the jury might not

have accepted his explanations.  It might well have accepted the government's position as

advanced in its summations and found that Collins was criminally responsible for failing to

disclose certain documents, without knowing about the existence of the hole in the company.

Such acts are simply not of the same magnitude as the crime of covering up a massive

accounting fraud.

The importance of this point cannot be overstated for sentencing purposes.  If Joseph

Collins was acting without knowledge of Refco's financial hole and the underlying accounting

fraud designed to conceal that hole, then his actions, even if giving rise to some level of

culpability, are of far lesser magnitude and must be seen in an altogether different light from that

of other Refco defendants: his relative culpability should not be seen as anywhere close to that of

Bennett, Grant, Maggio or Trosten.  Although portions of the "offense conduct" section of the

Presentence Report read as if the jury found that Joseph Collins was aware of and helped hide

the hole, neither the verdict nor the government's position at trial directly or necessarily support

that conclusion.  We respectfully submit that the result would be too harsh if Joseph Collins were

sentenced as if he were a knowing participant in this main aspect of the fraud.

Joseph Collins was a senior partner at the Mayer Brown law firm when the government's

investigation began in October 2005.  Having been advised at first that he was only a witness in

31

the investigation, he cooperated with the government in the Spring of 2006 by participating in a day-long interview conducted by representatives of the United States Attorney's Office, the United States Securities and Exchange Commission, and the CFTC.  Approximately ten months later, in February 2007, he participated in a day-long interview conducted by counsel for the Refco Bankruptcy Examiner.  Apparently none of the government's cooperating witnesses had by that point implicated him in the fraud, even though they had been working extensively with the government (in Maggio's case for well over a year).

When in July 2007 the government first advised Joseph Collins, through his counsel, that he was a potential target – approximately 22 months after their investigation of Refco had begun – we immediately arranged for him to take a polygraph examination on the key issues relating to the accounting fraud, which we then understood to be the gravamen of the case.  He passed the examination, the only one he has ever taken.  The results indicated that he was truthful in stating that he was not told about Refco's $1.1 billion inter-company debt and that he was not aware that any inter-company debt had been concealed from TH Lee.  Indeed, the polygraph examiner, a veteran FBI polygrapher, concluded that Joseph Collins had passed the exam with flying colors – he had registered at the absolute bottom of the scale, it being impossible to have achieved a better score.  App. A, Ex. A (Declaration of Jonathan Bach and Polygrapher's Affidavits and Report).  While Judge Sand ruled, in the context of a pretrial motion, that the results of the polygraph examination were not admissible at trial, we respectfully submit that those results may be considered in sentencing, where the rules of evidence do not apply, particularly since the verdict leaves open the question of whether Joseph Collins knew about and participated in the main accounting fraud perpetrated by the other Refco defendants.

We do not undertake here to recite every fact that might be taken to show that Joseph Collins was not aware of the underlying accounting fraud. Rather, we append to this memorandum a copy of a letter that we submitted to the Probation Department that underscores the ways in which Collins was kept in the dark about some of the main aspects of his client's fraud and, at times, even misled to believe that Refco was financially sound. We respectfully urge the Court to review that submission, particularly pages 8 though 15, and ask that it be incorporated as part of this sentencing memorandum as the defense's response to the Presentence Report. *See* Appendix A, pp. 8-15.

### B.      The Lack Of Any Intended Or Actual Personal Financial Gain

Unlike the vast majority of defendants convicted of white collar crimes, Joseph Collins never set out to profit personally, and did not profit personally, from any of the crimes with which he was charged. The only income he received as a lawyer throughout the eight-year period at issue was his ordinary partnership draw – an income that was well within the norm for professionally-established senior lawyers at his and other major law firms. He received no remuneration from Refco or any of the conspirators as a result of the fraud. The lack of a financial motive and of any intended or actual personal financial gain puts this case well outside the heartland of typical fraud cases.

Unable to point to a direct financial motive, the government presented evidence that Joseph Collins's law firm, Mayer Brown, billed Refco approximately $36 million during the years in question – a fact recited in the presentence report. PSR ¶ 22. But the overwhelming majority of these bills were for legitimate legal work, having nothing to do with the particular transactions at issue in this case. In any event, the $36 million did not go into Joseph Collins's pocket. It was used to cover firm expenses and salaries with the remainder distributed among

hundreds of partners. Throughout the period of the alleged conspiracy, it represented less than

1% of the fees that Mayer Brown received. App. A, Ex. B (Chart).

At the trial, the managing partner of the Mayer Brown law firm who was directly

involved in compensation decisions explained that the amount of Joseph Collins's individual

partnership draw was not dependent on his representation of Refco. App. A, Ex. C (Tr. of D. de

Hoyos at 3253-57 (June 16, 2009)). Indeed, one of the government's witnesses testified that

there was no correlation whatsoever between the fees Refco paid to the law firm and the draw

that Joseph Collins individually received. App. A, Ex. D (Tr. 3143-45 (June 16, 2009)).

Undisputed empirical evidence also backs this up: it shows that Joseph Collins's partnership

draw increased even in years when Refco paid less in fees. App. A, Ex. E (Chart).

The lack of financial motive and of any personal financial gain separates Joseph Collins

from the other Refco offenders who either already have or will be sentenced, as well as from the

vast majority of white collar offenders who appear in this district for sentencing. Bennett made

or stood to make in excess of $1 billion as a result of his participation in the fraud, Grant in

excess of $200 million, Trosten in excess of $70 million and Maggio in excess of $20 million.

These numbers tell a stark tale when compared to the lack of evidence showing any illicit gain

by Joseph Collins. As an outside lawyer, Collins helped Refco with a range of legal transactions,

but he was not a beneficiary of the fraud. He should not be sentenced as severely as the other,

more direct participants who victimized others in order to enrich themselves. *United States v.*

*Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (downward departure based in part on lack of

personal gain); *United States v. Blarek*, 7 F. Supp. 2d 192, 211 (E.D.N.Y. 1998) (granting

downward departure where defendants' criminal acts "were not ones of pure personal greed or

avarice"); *see also* cases cited *infra* Section II D.

34

### C.   Charitable and Good Works

Far from demonstrating the desire for personal gain characteristic of most white collar offenders, Joseph Collins has been selfless in giving to others. He has given a very substantial portion of his income to charitable causes and non-profit institutions, but more importantly he has personally and directly intervened in the lives of others and found time and energy to help those in need.

As discussed at greater length above and in numerous letters to the Court, Joseph Collins's commitment to helping others extends well beyond institutional charitable giving. *See supra* pp. 10-15 and pp. 24-25. Among other things, he has personally mentored and even taken into his own family the children of others, who have been the victims of unfortunate circumstances. The beneficiaries of his guidance and care include not only his sister's children, Meghan and Kevin Mocogni, who looked to Joe as a father figure after their mother's divorce, but also include Azmera Berhe, a teenage girl from war-torn Africa who came to Chicago as a refugee, and Stephen Lake, a troubled and difficult young man who had been scarred by his mother's alcoholism. *See supra* pp. 9-13 (*see also* M. Mocogni Letter, Tab 7; K. Mocogni Letter, Tab 6; A. Berhe Letter, Tab 32; S. Lake Letter, Tab 31.) All of these individuals have recounted to the Court how they have been profoundly helped and influenced by Joe and inspired by his example to lead productive, caring lives of their own. Needless to say, Joe could have easily found an excuse not to get involved; he had a very busy law practice and three growing children of his own. His willingness to give of himself is a reflection of his deep sense of his own ethical calling, instilled in him since his childhood in a close and devout family, which has repeatedly led him to perform acts of kindness for others.

Joseph Collins's reputation as someone willing to devote his time and energy for the benefit of others is well known. Community leaders who know him, including directors of

charitable organizations and administrators at his children's schools, know that he and his family

can consistently be relied upon to provide support where others might be less inclined.  His work

for the Boys Hope/Girls Hope, a program that helps at-risk children from Chicago's poorest

neighborhoods, and his volunteer work over the past two years at a private school serving poor

and low-income families on Chicago's West Side, are further examples of his commitment to

helping others. *See supra* pp. 13, 24-25 (*see also* P. Hughes Letter, Tab 34; M. Lynch Letter,

Tab 33.)

In addition, Joseph Collins has consistently shown great generosity to charitable and

educational institutions over the years.  Although it is not uncommon for professionals of Joe's

stature to contribute to charity, we submit that his level of contribution goes well beyond that of

the vast majority of his peers, totaling roughly 10% of his after-tax income. See *supra* pp. 15-16.

It is well-recognized that a defendant's charitable and good acts can be a ground for

downward departure or variance. *See United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005)

(affirming significant downward departure based upon defendant's good works); *United States v.*

*Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming downward departure based in part on

defendant's "participat[ion] to a large degree in legitimate [charitable] fund raising efforts");

*United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (defendant, a foster parent,

entitled to downward departure for charitable works); *United States v. Somerstein*, 20 F. Supp.

2d 454, 463 (E.D.N.Y. 1998) (downward departure based in part upon defendant's numerous

acts of charity); *Adelson*, 441 F. Supp. 2d at 513-14 (noting that the defendant's "good deeds

were not performed to gain status or enhance his image, " that "[m]ost of them were unknown to

all but a few people until the time of his sentencing," and that "if ever a man is to receive credit

for the good he has done, and his immediate misconduct assessed in the context of his overall life

36

hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance").

### D.    <u>Limited Role</u>

Even accepting the government's theory of this case, Joseph Collins did not plan, design or initiate any aspect of the fraud.  His participation was at most entirely secondary.  Although he provided legal assistance with respect to various transactions entered into by Refco, the transactions were all devised by Bennett, Maggio and others at Refco.

For example, Collins did not devise or negotiate the "round trip" loans that Refco engaged in at its fiscal year-end.  Rather, Bennett and Maggio devised these loans and handled them on their own for two years before Collins became involved.  Additionally, it was Bennett, not Collins, who negotiated the principal terms of the agreements between Refco and BAWAG, and between Refco and TH Lee.  It was also Bennett, not Collins, who negotiated directly with Marshall Eisenberg and Earl Melamed in arranging for the buy-out of Thomas Dittmer's interest in Refco – Collins was not included in the key meeting, even when it was just down the street from his law firm on a day when he was there.  App. A, Ex. F (Tr. 2913-15 (June 15, 2009), Tr. 3946-48 (June 22, 2009)).

In light of the verdict, Collins's role should be considered in the context of cases involving other lawyer-defendants who, while not initiating, planning or benefitting from a fraud, nevertheless crossed a line by following a client's instructions.  For example, in 2008, Robert Graham, former Assistant General Counsel of General Reinsurance Corporation, was convicted following trial for his role in a bogus reinsurance transaction that his employer entered into with AIG to falsely inflate AIG's loss reserves and thereby mislead AIG's investors.  *United States v. Graham*, No. 06 Cr. 137 (D. Conn.).  Graham was said to have drafted the contracts to document the sham transactions and then to have hidden evidence from auditors and regulators,

and was convicted of all 16 counts charged against him. The court sentenced Graham to one year in prison, even though his guidelines, as here driven by the loss amount, called for life imprisonment. The court emphasized that "an important factor here that is different from so many other corporate fraud prosecutions is that Mr. Graham did not personally gain in a direct way from his criminal conduct, and his motivation was not one of obtaining direct personal gain." The court also noted that Graham "did not have as active and central a role" as some of the other participants. App. A, Ex. G (Sentencing Tr. at 64-69, *United States v. Graham*, No. 06 Cr. 137 (D. Conn. Apr. 30, 2009)).

Similarly, Mark Kipnis, General Counsel of Hollinger International, was accused of participating in a scheme in which senior executives funneled money from Hollinger through the use of sham non-compete agreements. *United States v. Kipnis*, No. 05 Cr. 727 (N.D. Ill.). Kipnis had drafted and signed the fake non-compete agreements on behalf of Hollinger and then presented them to the board without flagging them as related-party transactions. He was sentenced to six months of home confinement, five years of probation, and 275 hours of community service. He had not personally benefitted from the fraud. The Court noted that Kipnis "did not receive a penny" and that he was "the least culpable person in this scheme" in imposing a sentence significantly more lenient than the 30-37 months the Court determined was his Guidelines range. App. A, Ex. H (Sentencing Tr. at 336-39, *United States v. Kipnis*, No. 05 Cr. 727 (N.D. Ill. Dec. 10, 2007)).

Even accepting the entirety of the government's case, Joseph Collins's sentence should reflect his limited role and his far less direct involvement than the Refco insiders who planned and benefited from the fraud.

### III.   THE 3553(a) FACTORS ALL COUNSEL IN FAVOR OF A LENIENT SENTENCE

Although most of the relevant considerations for imposing a non-Guidelines sentence pursuant to 3553(a) have already been discussed, an analysis tying these considerations to individual § 3553(a) factors is provided below.

#### A.   History and Characteristics of the Defendant

Section 3553(a) directs the sentencing court to consider "the history and characteristics of the defendant," a factor that strongly favors lenient treatment in this case.

Setting aside his role as Refco's outside counsel, Joseph Collins has led a morally exemplary life, impeccable in all respects, with a conscientious ethical core manifest in a long history of good works and charitable acts toward others less fortunate than himself. He has never been motivated by greed or excessive self-interest, but rather has led a relatively humble life, regularly donating a substantial portion of his income and energy to various non-profit institutions and philanthropic causes. Prison is unnecessary to add discipline to a life such as his, which to this point has been filled mainly by long hours of hard work and devotion to his family. He served his country in the military at a time when the military was in disfavor on college campuses, and he has served as a role model to many, ranging from adolescents in search of a father figure to young lawyers looking for professional mentors, inspiring all of them with his integrity, kind treatment of others and warm caring nature.

#### B.   Nature and Circumstances of the Offense

The offenses in question are unique among white collar crimes in that Joseph Collins never obtained, or set out to obtain, any personal financial gain. Nor did he initiate or devise any aspect of the fraud. He was a lawyer found to have crossed the line in service to his client, although there is substantial evidence that his client hid from him some of the most significant

39

aspects of the fraud, including the true financial condition of Refco. Although we cannot know

what the jury actually concluded, if his crime consisted of failing to disclose certain documents,

without knowledge of the larger accounting fraud, he should be punished far less severely than

the other Refco offenders. Joseph Collins appears to have been used as the instrument of others

who gained or stood to gain tens or hundreds of millions of dollars. His sentence should reflect

his limited role.

### C.    Need To Reflect Seriousness of the Offense

Section 3553(a)(2)(A) advises the sentencing court to consider the need "to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense." The Guidelines in this case are driven to a great extent by the high total loss amount

associated with the main accounting fraud, even though it is unclear whether the jury concluded

that Joseph Collins knew about and participated in that aspect of the fraud. If his crimes

consisted instead of a lawyer's malfeasance in not disclosing certain documents, then they are far

less serious and should be punished accordingly. *See Cavera*, 550 F. 3d at 192 ("[A] district

court may find that even after giving weight to the large or small financial impact, there is a wide

variety of culpability amongst defendants and, as a result, impose different sentences based on

the factors identified in § 3553(a)"); *Adelson*, 441 F. Supp. 2d at 512 (noting the "utter travesty

of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as

the harm that guidelines calculations can visit on human beings if not cabined by common

sense").

### D.    Need to Provide Adequate Deterrence and Protect the Public

Section 3553(a)(2)(B)&(C) directs the sentencing court to consider the need "to afford

adequate deterrence to criminal conduct" and "to protect the public from further crimes of the

defendant." These factors also counsel in favor of lenient treatment. Joseph Collins presents no

meaningful risk of recidivism and no threat to the public whatsoever. Having sought no personal financial gain in connection with the charged crimes, there is nothing to suggest that he would ever wrongfully seek to deprive others of money or property in any other context. His strong history of charitable works indicates that his presence in his local community, far from being a risk to the public, is a considerable boon to the community.

Moreover, even without a prison term, Joseph Collins faces a panoply of collateral consequences stemming from his conviction that, put simply, will wreak havoc with the remainder of his professional and economic life. At age 59, he will be banned from his profession – his life for over 35 years, and the only profession he has ever known. In addition, he faces civil lawsuits that threaten to bankrupt him and his family. His professional future and earning power are all but destroyed as a result of his conviction.

These severe collateral consequences are enough to deter anyone in his position from engaging in similar misconduct. *Cf. Adelson*, 441. F. Supp. 2d at 514 ("[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."). The combination of the loss of his law license, his age, the significant financial and regulatory penalties he faces, and the virtually complete deprivation of any future employment opportunities relating to his lifelong profession makes the collateral consequences of his conviction unusually severe.

### E.    The Kinds of Sentences Available

Section 3553(a)(3) directs the Court to consider the kinds of sentences available. Among the various sentencing options available to the Court are such non-custodial alternatives as probation or supervised release. We respectfully submit that such options merit serious consideration in the particular circumstances of this case, particularly when combined with the requirement of community service. As discussed above, Joseph Collins has a strong history of

41

giving of himself to help others, and his skills and energy are potentially of great benefit to the

community. Other retired attorneys, such as his friend Joseph Harrison, a former Sidley Austin

partner and General Counsel of the National Futures Association, have been able to use their

knowledge and experience for the benefit of many not-for-profit organizations and other

worthwhile causes. Mr. Harrison has personally volunteered to assist the Court in finding

meaningful community service alternatives through which charitable and not-for-profit

organizations could benefit from Joseph Collins's assistance. (J. Harrison Letter, Tab 86.)

### F.   Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) advises the sentencing court to consider "the need to avoid

unwarranted sentencing disparities among defendants with similar records who have been found

guilty of similar conduct." Under this admonition, Joseph Collins should be treated no more

severely than other lawyer defendants who have been found to have crossed the line in service to

their clients without seeking any personal financial gain of their own, and whose clients were

principally responsible for designing and devising the fraud. *See* discussion of cases *supra*

Section II D.

## IV.   THE PROBATION DEPARTMENT'S RECOMMENDATION

### A.   Analysis of § 3553(a)

The Probation Department has recommended a very substantial prison term. But, in

providing its "justification" for that recommendation, PSR at pp. 42-43, it does not appear to

have taken into account certain salient aspects of the conduct at issue that feature prominently in

the analysis called for by § 3553(a). For example, the Probation Department does not discuss the

lack of any intended or actual personal financial gain – a critical factor that distinguishes this

case from nearly all other white collar crimes prosecuted in this district. While the Probation

Department refers to Bernard Madoff, Bernard Ebbers, John Rigas and Marc Dreier, among

others, under any objective analysis Joseph Collins, who never set out to obtain any personal financial gain as a result of the fraud and who did not design or devise the scheme, simply does not belong in the same category as these other offenders. As discussed above, other sentencing courts have recognized that far more lenient sentences are appropriate where a lawyer serving a client crosses the line while seeking no personal gain for himself.

Moreover, the Probation Department apparently takes the jury's verdict to mean that Joseph Collins was aware of and participated in his client's underlying accounting fraud. *See* PSR at p. 42 ("A jury found the defendant guilty of conspiring with other individuals to commit the above crimes *in an effort to hide the financial health and poor economic structure of Refco.*") (emphasis added). But, as we explain above, the jury's verdict cannot be read as directly supporting that conclusion – especially in light of its failure to reach a verdict on nine counts and of the government's vigorously asserted position, presented to both the Court and the jury, that Joseph Collins could be found guilty of the crimes charged even without knowledge of the underlying accounting fraud. Joseph Collins should not be punished as if he shared all of the same knowledge and all of the same objects as the Refco insiders who were primarily responsible for the fraud.

### B.    Forfeiture is not an Appropriate Sanction in this Case

The Probation Department recommends forfeiture as one of the sanctions to be imposed in this case. PSR at pp. 42, 46. Forfeiture is not appropriate because Joseph Collins did not receive any proceeds from the crimes charged and thus has no proceeds to forfeit. *See* 18 U.S.C. § 981(a)(1)(C) (limiting forfeiture to property that "constitutes or is derived from proceeds traceable to a violation"); *United States v. Capoccia*, 503 F.3d 103, 118 (2d Cir. 2007) (reversing forfeiture order where funds were not proceeds of crimes of conviction and therefore lacked the

requisite nexus to the offenses of conviction); *United States v. Regan*, 699 F. Supp. 36, 39

(S.D.N.Y. 1988) (finding no grounds for forfeiture where defendant never received proceeds).

Indeed, the government itself appears to have abandoned any intention to seek forfeiture.
Although the government advised the Court in pre-trial briefing that it would provide notice at
least 60 days before trial of any particular assets subject of forfeiture, no such notice was ever
provided. (*See* Gov't's Mem. of Law in Opp'n to Def. Collins's Pretrial Mots. at 20.)
Moreover, at the conclusion of the trial, the jury was excused without any renewed indication by
the government that it intended to pursue forfeiture. As a result, Collins was not presented with
an opportunity to exercise his right to have the jury "determine whether the government has
established the requisite nexus between the property and the offense committed by the
defendant." Fed. R. Crim. P. 32.2(b)(4).

Finally, in light of the fact that Joseph Collins received no proceeds from the crimes
charged, imposing forfeiture in the staggering amount alleged in the superseding indictment – at
least $2.4 billion – would violate the Excessive Fines Clause of the Eighth Amendment. *United
States v. Bajakajian*, 524 U.S. 321, 328 (1998) ("A punitive forfeiture violates the Excessive
Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."); *see also
United States v. Van Brocklin*, 115 F.3d 589, 601-02 (8th Cir. 1997) (invalidating $1.3 million
forfeiture order under the Eighth Amendment where defendant received little pecuniary benefit
and was motivated primarily out of 'misguided loyalty' to corporate president, not for personal
economic gain).

## CONCLUSION

For the foregoing reasons, we respectfully urge the Court to consider imposing a non-
custodial sentence that would consist, among other things, of an extensive period of community

service under a term of probation or supervised release, along the lines outlined in Joseph H.

Harrison's letter to the Court.  (*See* Harrison Letter, Tab 86.)

Dated: New York, New York
      November 18, 2009

                  COOLEY GODWARD KRONISH LLP

By:
                  William J. Schwartz (WJS 8462)
                  Jonathan P. Bach (JPB 9710)
                  Reed A. Smith (RS 3652)
                  Kathleen E. Cassidy (KC 0630)

            1114 Avenue of the Americas
            New York, New York 10036
            Phone: (212) 479-6000
            Fax:   (212) 479-6275