ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

      -v-

JOSEPH P. COLLINS,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

    :
    :   **INDICTMENT**
    :
    :   S2 07 Cr. 1170 (LAP)
    :
    :
    :

## COUNT ONE

### (Conspiracy To Commit Securities Fraud, Wire Fraud, And Bank Fraud, And To Make False Filings With The SEC)

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1.   At certain times relevant to this Indictment, Refco, Inc. was a financial services company, incorporated in Delaware, with its principal place of business in New York, New York. Refco, Inc. held its initial public offering ("IPO") of common stock on or about August 10, 2005. Prior to that, Refco, Inc.'s predecessor entities were privately held. Refco, Inc. and its predecessor entities are referred to herein collectively as "Refco."

2.   At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately held Delaware corporation that existed primarily for the purpose of holding a

1

substantial ownership interest in Refco.

3.   At all times relevant to this Indictment, Refco was regularly represented by a large, international law firm (the "Law Firm").  At all times relevant to this Indictment, the Law Firm maintained offices throughout the United States and the world, including New York, New York.

4.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, was a lawyer and partner at the Law Firm.  At all times relevant to this Indictment, COLLINS served as the principal outside counsel to Refco and RGHI, which were consistently COLLINS's most significant clients.  In that role, COLLINS provided Refco and RGHI's corporate leadership with legal advice and services with regard to a wide range of matters.

5.   At certain times relevant to this Indictment, Phillip R. Bennett ("Bennett"), a co-conspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At certain times relevant to this Indictment, Bennett also owned between 24.5 percent and 100 percent of RGHI and served as President and Chief Executive Officer of RGHI.  As a result of his ownership interest in RGHI, at all times relevant to this Indictment, Bennett also had a substantial indirect ownership interest in Refco.

2

6.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft was the fourth largest bank in Austria.  At various times relevant to this Indictment, it indirectly held a substantial ownership interest in Refco and made investments in Refco through affiliates it controlled.  The bank and its various subsidiaries and affiliates are referred to collectively herein as "BAWAG".

## THE SCHEME TO DEFRAUD

7.   From at least as early as in or about 1997 through in or about October 2005, JOSEPH P. COLLINS, the defendant, together with Bennett, and others known and unknown, schemed to hide the true financial condition and economic structure of Refco - including the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in Refco - from Refco's banks, counterparties, auditors, investors, and potential investors.  In furtherance of this scheme, COLLINS and others known and unknown made and caused to be made false and fraudulent statements to Refco's banks, counterparties, auditors, investors, and potential investors, and made and caused to be made false public filings with the United States Securities and Exchange Commission ("SEC").

3

8.   JOSEPH P. COLLINS, the defendant, as Refco's principal outside counsel, participated in this scheme to hide the true financial condition of Refco and to conceal BAWAG's economic interest in Refco.  Along with other co-conspirators, COLLINS made affirmative misrepresentations, material omissions, and told deceptive half-truths in furtherance of the scheme. Furthermore, COLLINS documented and caused to be documented transactions that concealed the existence of the large, material debt owed to Refco by RGHI.  Furthermore, COLLINS lied about this debt and the existence of these and other transactions - as well as other matters relating to Refco's financial condition - to Refco's banks, investors, potential investors, and their advisers.  COLLINS also knowingly negotiated and drafted fraudulent agreements and public filings that resulted in the investment of more than $2.4 billion in Refco by banks, private investors, and the investing public.  COLLINS also schemed with Bennett to conceal from potential investors the size of the investment BAWAG had made in Refco.  As a result of COLLINS's lies on behalf of Refco, COLLINS, Bennett, and others known and unknown, were ultimately able to achieve through fraud: (i) the sale of approximately 57 percent of Refco to a group headed by Thomas H. Lee Partners in 2004, in exchange for approximately $500 million from Thomas H. Lee Partners, approximately $600

million from notes sold to private investors, and approximately $800 million from a syndicate of bank lenders; and (ii) the August 2005 IPO in which the public purchased approximately $583 million of Refco common stock.

### Refco's Financial Losses

9.   In or about the mid-1990s, Refco was wholly owned by RGHI.  As of in or about early 1997, RGHI owed Refco a debt of at least approximately $106 million.  In or about 1997, Refco incurred a series of substantial losses that threatened the continued viability of Refco's business.  In response to these losses, at various times between in or about 1997 and in or about October 2005, Refco transferred its losses to its parent company, RGHI, in an effort to hide them from, among others, potential purchasers of Refco.  This practice swelled RGHI's debt to Refco, eventually increasing it to more than $1 billion, which was carried on Refco's books as a receivable from RGHI (the "Related Party Debt").

10.   For example, in or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1") lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco ultimately used customer funds taken from the unregulated segments of Refco's

business to cover the loss.  Recognizing that public acknowledgment of the actual loss amount would threaten Refco's continued existence, Refco falsely represented to the public that it had not sustained significant losses as a result of Customer 1's losses, and Refco transferred the loss off of its own books by increasing the Related Party Debt.

11.  At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco had sustained significant losses in connection with the trading activities of its customers and knew that senior Refco management and others known and unknown had lied to the public and others about Refco having sustained such losses.

### BAWAG Invests In Refco

12.  By the end of 1998, significant customer and other losses suffered by Refco placed Refco in a precarious financial condition and caused Refco management to seek an infusion of capital from BAWAG, a long-time Refco customer.  In a transaction that closed in or about 1999 and that JOSEPH P. COLLINS, the defendant, and others negotiated and documented, BAWAG purchased a ten percent ownership interest in Refco for approximately $95 million and lent Refco approximately $85 million of additional capital in return for an additional ten percent economic interest in Refco.

13.   At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that, even with the infusion of capital provided by BAWAG in 1999, RGHI continued to owe Refco hundreds of millions of dollars.

## Hiding The Related Party Debt

14.   Throughout the period covered by this Indictment, as JOSEPH P. COLLINS, the defendant, knew, Refco's books were audited by independent auditors on an annual basis with a fiscal year-end on the last day of February.   Among the items the auditors examined each year were "related party transactions" and, in particular, transactions between and among Refco and members of Refco's management and owners.   As COLLINS also knew, Refco and RGHI were related parties.

15.   In order to hide from, among others, Refco's auditors, the size of the large and growing Related Party Debt, Refco regularly carried out a series of transactions around the time of its fiscal year-end that temporarily paid down all or part of the Related Party Debt and replaced it with a receivable from one or more entities not related to Refco (the "Round Trip Loan Transactions").   The Round Trip Loan Transactions were carried out in order to hide the Related Party Debt and the underlying causes of its existence from Refco's auditors, banks, investors, potential investors, and others.

16.   In or about 1998 and 1999, the Round Trip Loan Transactions were undocumented.  However, beginning in or about 2000, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm working at his direction, drafted legal documents to effectuate the Round Trip Loan Transactions.  In summary, the Round Trip Loan Transactions were carried out in the following approximate amounts during the 2000 to 2003 period:

| Date | Approximate Amount Of Loans |
|------|------------------------------|
| February 2000 | $310 million |
| February 2001 | $450 million |
| February 2002 | $625 million |
| February 2003 | $650 million |

17.   The Round Trip Loan Transactions followed a standard pattern.  Specifically, just before Refco's fiscal year-end, Refco would loan an amount of money - namely, the amounts set forth in the preceding paragraph - to one or more of its customers.  Those customers, in turn, would loan an identical or nearly identical amount of money to RGHI.  RGHI, in turn, would use that money to pay down its debt to Refco.  As a result of this circular series of transactions (the "Customer Round Trip Loan Transactions"), it would temporarily appear on Refco's books and records that some or all of the amount owed to Refco by RGHI was, instead, owed to Refco by its customers.

8

However, mere weeks later, after Refco's fiscal year-end had passed, the transactions were reversed. Refco would lend money to RGHI, thus reinstating the Related Party Debt from RGHI to Refco that the Round Trip Loan Transactions had temporarily concealed. RGHI would, in turn, use the money from Refco to settle its debt to Refco's customers. And Refco's customers would, in turn, use the money from RGHI to settle their debt to Refco.

18. In addition to the Customer Round Trip Loan Transactions, Refco also engaged in similar, but undocumented Round Trip Loan Transactions in which BAWAG was used as the conduit instead of Refco's customers (the "BAWAG Round Trip Loan Transactions"). As with the Customer Round Trip Loan Transactions, the purpose was to conceal RGHI's debt to Refco at Refco's fiscal year-end. In summary, these BAWAG Round Trip Loan Transactions were carried out in the following approximate amounts during the 2000 to 2004 period:

| Date | Approximate Amount of BAWAG Loans |
| --- | --- |
| February 2000 | $300 million |
| February 2001 | $300 million |
| February 2002 | $300 million |
| February 2003 | $250 million |
| February 2004 | $250 million |

## BAWAG Invests Further In Refco

19.   Because Refco continued to falter financially, Refco management turned again to BAWAG for capital infusions. To that end, in or about July 2002, Refco, represented by JOSEPH P. COLLINS, the defendant, entered into an agreement with BAWAG whereby BAWAG agreed to provide Refco with capital infusions in exchange for the right to receive proceeds from any future sale of Refco.   Specifically, under the terms of the agreement (called the "Proceeds Participation Agreement" or "PPA"), BAWAG agreed to make capital contributions to Refco at or about Refco's fiscal year-ends in 2003, 2004, and 2005 in exchange for the right to a percentage of any proceeds of a sale or public offering of Refco (identified in the agreement as the "Participation Right").   Alternatively, the PPA gave BAWAG the right to convert the Participation Right into ownership shares of Refco upon making the payments to Refco as specified in the PPA.   The agreement also contemplated that RGHI would guarantee Refco's performance under the terms of the PPA and otherwise secure BAWAG's Participation Right.   Under the terms of the PPA and related agreements, Refco agreed to use $350 million of the money received from BAWAG to pay down a portion of the ballooning Related Party Debt owed by RGHI to Refco.

20.   In accordance with the terms of the PPA, BAWAG made two payments to Refco totaling approximately $467,480,000. In return, BAWAG received the right to approximately 27.2 percent of the proceeds of any sale of Refco, or the right to obtain ownership shares of Refco.  Together with BAWAG's previously obtained economic interest in 20 percent of Refco, BAWAG possessed the economic rights to approximately 47 percent of the proceeds of any sale of Refco.

21.   Having negotiated, drafted, and supervised the drafting of the PPA, JOSEPH P. COLLINS, the defendant, was aware of the terms of the PPA, including BAWAG's right to participate in the proceeds of a sale or public offering of Refco – or to convert its Participation Right into ownership shares of Refco – as well as RGHI's role guaranteeing Refco's performance and securing BAWAG's Participation Right under the PPA.  COLLINS was also aware that the PPA required Refco to execute amended corporate documentation that would reflect the existence of the PPA and incorporate certain of the PPA's terms.

22.   Indeed, as contemplated by the PPA, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted, simultaneously with the drafting of the PPA, the two agreements through which RGHI agreed to guarantee the performance of Refco under the PPA and to secure BAWAG's Participation Right.  As

11

part of the drafting of the PPA, COLLINS and the Law Firm's
attorneys also prepared amended corporate documentation for
Refco that reflected the existence of the PPA and incorporated
some of the PPA's terms.  Refco executed this amended corporate
documentation.  As set forth in paragraph 27 below, COLLINS
subsequently helped conceal this amended corporate documentation
from potential investors in Refco, thereby hiding the terms of
the PPA from them.

      23.  As further set forth below, JOSEPH P. COLLINS,
the defendant, schemed with Bennett, and others known and
unknown, to conceal the terms and existence of the PPA from
potential investors in Refco because COLLINS, Bennett, and their
co-conspirators knew that the terms and existence of the PPA
would likely reveal to the potential investors the true
financial condition of Refco, including the existence and size
of the hidden Related Party Debt.

## The Fraudulent Leveraged Buyout Transaction

      24.  As contemplated by the PPA, Refco management
began efforts to sell Refco soon after the PPA was executed.

      25.  In or about 2003, Refco, assisted by JOSEPH P.
COLLINS, the defendant, began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's
possible purchase of a controlling stake in Refco as part of a

leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout (the "LBO") was structured as follows: Thomas H. Lee Partners, through an affiliate, paid approximately $500 million in cash in exchange for a 57 percent ownership interest in Refco; simultaneously, Refco sold approximately $600 million in notes and obtained approximately $800 million in financing from a syndicate of banks.  When the transaction was completed, RGHI was left with a 43 percent ownership interest in Refco.

26.  JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm, represented both Refco and RGHI in connection with the LBO transaction.  COLLINS drafted and negotiated representations that appeared in documents and correspondence provided to Thomas H. Lee Partners and discussed the transaction with persons representing Thomas H. Lee Partners.  In these documents, correspondence, and discussions, COLLINS made representations about the financial condition of Refco, among other matters, that COLLINS knew to be false and misleading and that omitted information necessary to make his statements concerning the same not misleading.

### Lies To Thomas H. Lee Partners About The PPA

27.  In connection with the negotiations with Thomas H. Lee Partners, by no later than in or about April 2004, JOSEPH

13

P. COLLINS, the defendant, Bennett, and others known and unknown, agreed to and did conceal from Thomas H. Lee Partners the existence and terms of the PPA, as well as the payment of approximately $676 million that Bennett arranged to make to BAWAG upon completion of the LBO in order to resolve BAWAG's rights under the PPA.  In order to accomplish this, Bennett, COLLINS, and others known and unknown, made false representations directly to Thomas H. Lee Partners, and COLLINS himself specifically directed others not to disclose information relating to the PPA.  Furthermore, when asked by Thomas H. Lee Partners to further amend the corporate documentation for Refco, COLLINS prepared new amended corporate documentation that fraudulently concealed the existence of then-operative corporate documentation that referenced the PPA.

### Lies To Thomas H. Lee Partners About Related Party Debt And Related Party Transactions

28.  JOSEPH P. COLLINS, the defendant, Bennett, and others known and unknown, also made affirmative representations and drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives to believe that RGHI owed Refco no more than approximately $108 million, all of which amount COLLINS and Bennett knowingly and falsely represented to Thomas H. Lee Partners would be repaid by the time the LBO transaction closed.  In fact, by the time the LBO transaction

14

closed, COLLINS knew that the Related Party Debt - which had been hidden from Refco's auditors through the Round Trip Loan Transactions - was at least $1 billion, and that even after the LBO, RGHI would continue to owe Refco hundreds of millions of dollars.  Accordingly, COLLINS continued to help Bennett conceal the existence of this related party debt by documenting and causing to be documented year-end and quarter-end Round Trip Loan Transactions similar to those described above in the following approximate amounts at the same time that COLLINS was negotiating the terms of the LBO transaction:

| Date | Approximate Amount of Loans |
|------|------------------------------|
| February 2004 | $720 million |
| May 2004 | $700 million |

29.  In connection with the LBO transaction, Refco caused its audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  As JOSEPH P. COLLINS, the defendant, well knew, those audited financial statements were false and misleading in that they, among other things, hid the size of the Related Party Debt, which at the end of January 2004 was, but for the Round Trip Loan Transactions, at least $1 billion.

30.  As part of the LBO, Thomas H. Lee Partners made numerous inquiries to JOSEPH P. COLLINS, the defendant, Bennett,

and others, about the existence of related party transactions involving Refco.  COLLINS and others made representations and drafted documents, or caused other Law Firm attorneys to draft documents, and negotiated contract terms that concealed from Thomas H. Lee Partners and its representatives the following related party transactions, among others, which were required to be disclosed: (a) the Round Trip Loan Transactions; (b) guarantees associated with the Round Trip Loan Transactions, whereby Refco guaranteed RGHI's repayment of the loans that it received from Refco's customers; (c) indemnification agreements associated with the Round Trip Loan Transactions, whereby Refco indemnified its customers against claims made against them, or losses suffered by them, in connection with the transactions; and (d) agreements associated with the PPA in which RGHI agreed to guarantee Refco's performance under that agreement and to secure BAWAG's right to participate in the proceeds of the future sale of Refco.

### Lies To Thomas H. Lee Partners About $500 Million In Working Capital At Refco

31.  JOSEPH P. COLLINS, the defendant, Bennett, and others known and unknown, also misled Thomas H. Lee Partners and its representatives into believing that Refco possessed approximately $500 million in excess working capital, and negotiated contract terms pursuant to which that money would be

placed in a segregated account at BAWAG and distributed to Bennett's company, RGHI, at the closing of the LBO transaction. In reality, as COLLINS well knew, the $500 million that was placed in the segregated account at BAWAG was not excess working capital, but was funded by, among other sums, an overdraft from BAWAG totaling approximately $390 million.

32.   In order to conceal this misrepresentation, JOSEPH P. COLLINS, the defendant, approved closing documents that falsely reported that the money in the segregated account would be transferred at the closing of the LBO transaction to an RGHI account at a bank other than BAWAG.  These representations were consistent with the fiction that the money in the account originated as excess working capital and was being distributed to RGHI.  In fact, as COLLINS well knew, the $500 million in the segregated account was going to remain at BAWAG and be used, in part, to repay the $390 million overdraft that had created it.

## Lies To The Bank Syndicate

33.   At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $800 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco's borrowing from a bank syndicate that included HSBC Bank USA, N.A. (the "Bank Syndicate").  In

connection with that aspect of the LBO transaction, COLLINS, Bennett, and others known and unknown caused the following false and misleading information to be provided to the Bank Syndicate:

a.    Contract documents that failed to disclose the guaranty and indemnity agreements associated with the Round Trip Loan Transactions;

b.    Refco's audited financial statements for the fiscal year ended February 29, 2004, which contained the same false and misleading statements described above in paragraph 29; and

c.    Omissions relating to the terms of the PPA and the planned payment to BAWAG in connection with the LBO transaction.

### Lies To The Note Purchasers

34.    At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $600 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco selling 9% Senior Subordinated Notes due 2012 to private investors (the "LBO Notes"). In connection with that aspect of the LBO transaction, COLLINS, Bennett, and others known and unknown, caused the following false and misleading information to be provided to the underwriters and purchasers of

the LBO Notes and their advisers:

      a.   Contract documents that failed to disclose the guaranty and indemnity agreements associated with the Round Trip Loan Transactions;

      b.   Refco's audited financial statements for the year ended February 29, 2004, which contained the same false and misleading statements described above in paragraph 29; and

      c.   Omissions relating to the terms of the PPA and the planned payment to BAWAG in connection with the LBO transaction.

### RGHI's Continued Debt To Refco After The LBO

35.   RGHI used a portion of the proceeds of the fraudulent LBO transaction to pay down some of the more than approximately $1 billion Related Party Debt that existed at the time of the transaction.  Even after the proceeds were used in this manner, however, RGHI continued to owe Refco hundreds of millions of dollars, as JOSEPH P. COLLINS, the defendant, well knew.

### Securities Fraud In Connection With The Fraudulent Leveraged Buyout Transaction

36.   The $600 million in LBO Notes that helped fund the LBO transaction were sold privately pursuant to an offering circular that purported to provide prospective note purchasers with all material information about Refco's business and

finances.  Refco completed the sale of the LBO Notes in or about August 2004.

37.  JOSEPH P. COLLINS, the defendant, advised Refco and RGHI in connection with the sale of the LBO Notes, and participated in drafting the offering circular that was provided to prospective note purchasers.  Specifically, COLLINS participated in drafting two sections of the offering circular entitled "Risk Factors" and "Certain Relationships and Related Transactions," among other sections.

38.  The "Risk Factors" section purported to warn potential note purchasers about risks relating to Refco's business, including, among other things: indebtedness and cash flow needs; credit risks; and conflicts of interest on the part of controlling members of Refco, including Bennett.  As JOSEPH P. COLLINS, the defendant, well knew, the "Risk Factors" section of the offering circular contained material misstatements and omissions.  Specifically, COLLINS knew that this section of the offering circular was materially misleading and omissive because it failed to disclose risks posed to Refco's business by: (1) Refco continuing to be owed hundreds of millions of dollars by RGHI - a related party that was solely owned and operated by Bennett - even after the LBO transaction closed; and (2) Refco periodically incurring hundreds of millions of dollars in

20

obligations guaranteeing and indemnifying the performance of
RGHI in connection with the Round Trip Loan Transactions.

39.   The "Certain Relationships and Related
Transactions" section of the offering circular included a
discussion of various agreements and documents relating to the
LBO transaction.  As JOSEPH P. COLLINS, the defendant, well
knew, the "Certain Relationships and Related Transactions"
section of the offering circular contained material
misstatements and omissions.  Specifically, COLLINS knew that
this section of the offering circular was materially misleading
and omissive because it failed to disclose the following related
party transactions: (1) RGHI's continuing debt of hundreds of
millions of dollars to Refco even after the LBO transaction
closed; (2) Refco's regular practice of making indirect loans of
hundreds of millions of dollars to RGHI through the Round Trip
Loan Transactions; and (3) Refco's regular practice of extending
indemnifications and guaranties on RGHI's behalf in connection
with the Round Trip Loan Transactions.  As COLLINS understood,
the foregoing were related party transactions both because RGHI
and Refco were related parties through RGHI's ownership interest
in Refco and also because Bennett was simultaneously an officer
of Refco and an owner-officer of RGHI.  COLLINS knew that these
related party transactions ought to have been disclosed in the

"Certain Relationships and Related Transactions" section and yet omitted them from that section when participating in its drafting.

## Refco Plans To Offer Notes Publicly And Take Refco Public

40.   At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that Refco planned to register approximately $600 million of senior subordinated notes under the Securities Act of 1933 ("Securities Act") and to offer to exchange them for the LBO Notes issued at the time of the LBO transaction.   The registration of notes permitted them to be traded publicly. Refco registered the notes under the Securities Act (the "Registered Notes") on or about April 6, 2005, pursuant to a Form S-4 registration statement filed with the SEC.

41.   At all times during negotiations of the LBO transaction, JOSEPH P. COLLINS, the defendant, also understood that Bennett and others intended to sell a portion of Refco to the public through an IPO of stock after the LBO transaction closed.   The IPO occurred on or about August 10, 2005.

42.   During the entire period after the close of the LBO transaction and while efforts were being made to register the Registered Notes and to accomplish Refco's IPO, Refco's finances continued to be manipulated through quarter-end and

year-end Round Trip Loan Transactions designed to hide the existence and size of the Related Party Debt from Refco's auditors and investors.   JOSEPH P. COLLINS, the defendant, continued to be responsible for drafting, or causing to be drafted, the documents that effectuated the transactions, which occurred on the approximate dates and in the approximate amounts that follow:

| Date | Approximate Amount Of Loans |
|------|------------------------------|
| August 2004 | $485 million |
| November 2004 | $545 million |
| February 2005 | $345 million |
| May 2005 | $450 million |

    43.   In addition, in February 2005, Refco engaged in an additional BAWAG Round Trip Loan Transaction in the amount of approximately $250 million.

    44.   In total, from in or about 2000 until in or about October 2005, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted documents for at least 17 separate Round Trip Loan Transactions - effecting more than approximately $5.5 billion in loans from Refco to RGHI through third-party customers - designed to conceal the existence of the Related Party Debt from Refco's investors, potential investors, banks, and auditors.

**Refco's Public Filings And Publicly Traded Securities**

45.   In connection with its offer to exchange registered notes for the LBO notes and its IPO, Refco filed registration statements on Forms S-4 and S-1 with the SEC on or about April 6, 2005, and August 8, 2005, respectively.   Each form required the disclosure of, among other things: (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco.   These disclosures were required in order to apprise investors of, among other things, potential conflicts of interest by management.

46.   The Form S-4 registration statement was based on the offering circular that JOSEPH P. COLLINS, the defendant, helped draft in connection with Refco's sale of the LBO Notes in or about August 2004.   The Form S-4 registration statement, like the offering circular, contained sections entitled "Risk Factors" and "Certain Relationships and Related Transactions." The Form S-4 registration statement likewise contained the material misstatements and omissions included in the offering circular, as described in paragraphs 38 and 39 above.   In addition to those material misstatements and omissions, the Form S-4 registration statement also contained Refco's audited financial statements, which likewise failed to reflect any of

24

the related party transactions described above, including the
Related Party Debt.

      47. JOSEPH P. COLLINS, the defendant, also
participated in the drafting of the Form S-1 registration
statement. Among other sections, COLLINS helped draft the
section entitled "Risk Factors." Refco was required in this
section to discuss the most significant factors that might make
an investment in Refco common stock speculative or risky. As
COLLINS well knew, this section of the Form S-1 registration
statement contained material misstatements and omissions because
it failed to disclose that: (1) Refco was owed hundreds of
millions of dollars by RGHI, a related party that was solely
owned and operated by Bennett; and (2) as part of the Round Trip
Loan Transactions, Refco periodically incurred hundreds of
millions of dollars in obligations guaranteeing and indemnifying
the performance of RGHI. Despite his participation in the
drafting of the "Risk Factors" section, COLLINS did not include
these significant undisclosed additional risk factors. In
addition to those material misstatements and omissions, the Form
S-1 registration statement also contained Refco's audited
financial statements, which likewise failed to reflect any of
the related party transactions, including the Related Party
Debt.

## Refco's August 2005 IPO

48.   On or about August 10, 2005, approximately $583 million of Refco's common stock was sold to the public in an IPO.  Following the IPO, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

## End Of Quarter Round Trip Loan Transaction In August 2005

49.   In or about late August 2005, after the completion of its IPO, Refco engaged in a final Round Trip Loan Transaction in the amount of approximately $420 million for the purpose of concealing the Related Party Debt.

## Refco's Public Disclosure Of The Related Party Debt

50.   In or about early October 2005, an employee of Refco discovered the Related Party Debt, which then totaled approximately $430 million.  The discovery was brought to the attention of the audit committee of Refco's board of directors, which demanded repayment of the debt by Bennett.  Bennett obtained an emergency loan from BAWAG and used it to repay Refco approximately $430 million on or about October 10, 2005.

51.   On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal
> review a receivable owed to the Company by
> an entity controlled by Phillip R. Bennett,
> Chief Executive Officer and Chairman of the
> Board of Directors, in the amount of
> approximately $430 million. Mr. Bennett
> today repaid the receivable in cash,

26

including all accrued interest. Based on the
results of the review to date, the Company
believes that the receivable was the result
of the assumption by an entity controlled by
Mr. Bennett of certain historical
obligations owed by unrelated third parties
to the Company, which may have been
uncollectible. The Company believes that all
customer funds on deposit are unaffected by
these activities. Independent counsel and
forensic auditors have been retained to
assist the Audit Committee in an
investigation of these matters.

52.  Following Refco's announcement, the market price
of Refco stock plummeted, resulting in an aggregate decline in
shareholder value and market capitalization of more than
approximately $1 billion.

53.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

54.  From at least as early as in or about 1997 up to
in or about October 2005, in the Southern District of New York
and elsewhere, JOSEPH P. COLLINS, the defendant, Bennett, and
others known and unknown willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States, namely: (a) to commit

fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (c) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; and (d) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

55.  It was a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements

of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## False Statements In SEC Filings - Securities Act

56.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, and others known and unknown willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

57.   It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent

pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Bank Fraud

58.  It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.

### Overt Acts

59.  In furtherance of the conspiracy and to effect the illegal objects thereof, JOSEPH P. COLLINS, the defendant, and others known and unknown, committed the following acts, among others, in the Southern District of New York and

elsewhere:

a.   On or about May 18, 1999, JOSEPH P. COLLINS, the defendant, participated in a telephone call with a newspaper reporter concerning Customer 1 and whether Refco hae sustained losses related to his Customer 1's accounts.

b.   In or about February 2000, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2000 Round Trip Loan Transactions to be prepared.

c.   In or about February 2001, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2001 Round Trip Loan Transactions to be prepared.

d.   In or about February 2002, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2002 Round Trip Loan Transactions to be prepared.

e.   In or about 2002, JOSEPH P. COLLINS, the defendant, participated in a telephone call with Refco's chief financial officer concerning the Related Party Debt.

f.   In or about 2002, JOSEPH P. COLLINS, the defendant, participated in drafting the PPA and related agreements.

g.   In or about February 2003, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2003 Round Trip Loan Transactions to be prepared.

       h.   In or about February 2004, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2004 Round Trip Loan Transactions to be prepared.

       i.   On or about April 7, 2004, JOSEPH P. COLLINS, the defendant, met with lawyers for BAWAG and discussed the issue of disclosure of the PPA to Thomas H. Lee Partners.

       j.   In or about April 2004, JOSEPH P. COLLINS, the defendant, and Bennett met with representatives of Thomas H. Lee Partners in New York, New York and discussed issues relating to Refco's financial condition.

       k.   On or about May 6, 2004, JOSEPH P. COLLINS, the defendant, caused two emails to be sent from New York, New York to a lawyer for Thomas H. Lee Partners, making representations about what had been produced to Thomas H. Lee Partners in due diligence.

       l.   On or about May 13, 2004, JOSEPH P. COLLINS, the defendant, met with lawyers for BAWAG and discussed the issue of disclosure of the PPA to Thomas H. Lee Partners.

       m.   On or about June 2, 2004, JOSEPH P. COLLINS, the defendant, caused an email to be sent to a lawyer representing Thomas H. Lee Partners, attaching revised corporate documentation for Refco that COLLINS had recently drafted.

       n.   On or about June 6, 2004, JOSEPH P. COLLINS,

the defendant, sent an email to other lawyers at the Law Firm, responding to an inquiry about BAWAG's expected proceeds from the LBO.

       o.   In or about April, May, and June 2004, JOSEPH P. COLLINS, the defendant, participated in drafting the purchase agreement that would effectuate the LBO.

       p.   On or about June 15, 2004, JOSEPH P. COLLINS, the defendant, sent an email to Bennett in connection with an inquiry made by a lawyer at the Law Firm concerning BAWAG's expected proceeds from the LBO.

       q.   On or about July 12, 2004, JOSEPH P. COLLINS, the defendant, participated in a telephone conversation with a lawyer who represented a former owner of RGHI concerning a proposal to have RGHI purchase that former owner's remaining interest.

       r.   On or about July 30, 2004, JOSEPH P. COLLINS, the defendant, reviewed a memorandum detailing the flow of funds relating to the LBO.

       s.   On or about August 3, 2004, JOSEPH P. COLLINS, the defendant, participated in a telephone conversation with a lawyer who represented a former owner of RGHI concerning a proposal to have RGHI purchase that former owner's remaining interest.

t.    In or about February 2005, JOSEPH P. COLLINS, the defendant, caused the documentation associated with the year 2005 Round Trip Loan Transactions to be prepared.

u.    In or about May 2005, JOSEPH P. COLLINS, the defendant, caused the documentation associated with quarter-end Round Trip Loan Transactions to be prepared.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

60.    The allegations contained in paragraphs 1 through 53, and 60 of this Indictment are repeated and realleged as if fully set forth herein.

61.    From at least as early as in or about 1997 through in or about 2004, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc., manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

62.  The allegations contained in paragraphs 1 through 53, and 60 of this Indictment are repeated and realleged as if fully set forth herein.

63.  From at least as early as in or about 1997 through in or about October 2005, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of the common

stock of Refco, Inc., manipulative and deceptive devices and
contrivances, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by: (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts necessary
in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons
and entities.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNTS FOUR AND FIVE

### (False Filing With The SEC – Securities Act)

The Grand Jury further charges:

64.  The allegations contained in paragraphs 1 through
53, and 60 of this Indictment are repeated and realleged as if
fully set forth herein.

65.  On or about the dates specified below, in the
Southern District of New York and elsewhere, JOSEPH P. COLLINS,
the defendant, willfully, and knowingly made and caused to be
made, in a registration statement filed with the SEC under the
Securities Act, untrue statements of material facts and omitted

36

to state material facts required to be stated therein and
necessary to make the statements therein not misleading, to wit,
COLLINS and others caused, aided, and abetted Refco's submission
in New York, New York, to the SEC in Washington, D.C., of the
following Forms:

| Count | Approximate Date | Form |
|---|---|---|
| FOUR | April 6, 2005 | S-4 |
| FIVE | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x; and Title 18, United
States Code, Section 2.)

## COUNTS SIX THROUGH NINE

### (Wire Fraud)

The Grand Jury further charges:

66.  The allegations contained in paragraphs 1 through
53, and 60 of this Indictment are repeated and realleged as if
fully set forth herein.

67.  On or about the dates set forth below, in the
Southern District of New York, JOSEPH P. COLLINS, the defendant,
willfully, and knowingly, having devised and intending to devise
a scheme and artifice to defraud and to obtain money and
property by means of false and fraudulent pretenses,
representations and promises, transmitted and caused to be
transmitted by means of wire communication in interstate and
foreign commerce, the following writings, signs, signals, and

37

sounds for the purpose of executing such scheme and artifice:

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| SIX | April 13, 2004 | Email from Chicago, Illinois office of the Law Firm to New York, New York attaching clean and marked versions of April 13, 2004 letter to Bennett from Thomas H. Lee Partners |
| SEVEN | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning indemnifications |
| EIGHT | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning material contracts |
| NINE | June 7, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas and representatives of the bank syndicate and LBO Note purchasers |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TEN

### (Bank Fraud)

The Grand Jury further charges:

68. The allegations contained in paragraphs 1 through 53, and 60 of this Indictment are repeated and realleged as if fully set forth herein.

69. On or about August 5, 2004, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown willfully and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a

38

financial institution, to wit, HSBC Bank USA, N.A., and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC Bank USA, N.A., whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney