Cabdcol1
                              Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          07 Cr. 1170 (LAP)

5   JOSEPH P. COLLINS,

6              Defendant.

7   ------------------------------x
                                          October 11, 2012
8                                         10:10 a.m.
    Before:
9
                    HON. LORETTA A. PRESKA,
10
                                          District Judge
11
                          APPEARANCES
12
    PREET BHARARA
13       United States Attorney for the
         Southern District of New York
14  BY:  HARRY A. CHERNOFF
         MICHAEL A. LEVY
15       EDWARD A. IMPERATORE
            Assistant United States Attorneys
16
    COOLEY LLP
17       Attorneys for Defendant
    BY:  WILLIAM SCHWARTZ
18       JONATHAN BACH
         LAUREN GERBER LEE
19
              – also present –
20
    Kathryn Searles
21  Robert Clark,
         Postal Inspectors, U.S. Postal Inspection Service
22
    Gary Smith,
23       Paralegal, U.S. Attorney's Office

24

25

Cabdcol1
                              Trial

1              (Trial resumed; jury not present)

2              THE COURT:  Are we ready to bring the jurors in,

3    ladies and gentlemen?

4              MR. LEVY:  Your Honor, we have one small problem.  Not

5    to lay blame, but the defense did something with the technical

6    equipment and as a result we no longer have pictures on your

7    screen or the witness' screen.

8              THE COURT:  All right.  Give him the hard copy.

9              MR. LEVY:  He has the hard copy and that is good

10   enough.

11             THE COURT:  All right.  If we get here earlier we can

12   avoid these tech issues.

13             May we bring the jurors in, please?

14             At least send your tech people in earlier.

15             MR. LEVY:  We didn't.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Cabdcol1
                          Trial

 1              THE CLERK:  Jury entering.

 2              (Jury present)

 3              THE COURT:  Off the record.

 4              (Discussion off the record)

 5    SCOTT ALAN SCHOEN,

 6    resumed by the Government, testified further as follows:

 7              THE COURT:  Good morning, all.

 8              Ladies and gentlemen, we continue with the direct

 9    examination of Mr. Schoen.

10              Mr. Levy.

11              MR. LEVY:  Thank you, your Honor.

12    DIRECT EXAMINATION (Resumed)

13    BY MR. LEVY:

14    Q.  Good morning, Mr. Schoen.

15    A.  Good morning.

16    Q.  Yesterday we were talking about the EPMA, which I believe

17    you said was the final contract between Thomas H. Lee Partners

18    and Refco and RGHI to accomplish this transaction, is that

19    right?

20    A.  Yes, that's right.

21    Q.  And we walked you through some of the provisions of the

22    EPMA, is that right?

23    A.  Yes.

24    Q.  Now, upon the signing of the contract, the execution of the

25    contract, is that it?  Was the deal done at that point?

Cabdcol1                        Schoen - direct

1   A.   No.

2   Q.   When was the deal actually closed?

3   A.   The deal closed in -- I think it was August 5th, 2004.

4   Q.   And do you have in front of you the timeline -- give me one

5   moment and I can figure it out -- which is Government Exhibit

6   825?

7   A.   Yes.

8   Q.   Do you have a copy of it in front of you?

9   A.   I do.

10  Q.   You do, all right.

11          Does that accurately reflected on there the

12  transaction closing August 5, 2004?

13  A.   That's correct.

14  Q.   Now, if we could put Government Exhibit 835 on the screen,

15  which was that summary of the proceeds of the deal.

16          And this mentioned that in the neighborhood of

17  $1.8 billion in cash would be coming from Thomas H. Lee

18  Partners and from the various lenders, is that right?

19  A.   Yes.

20  Q.   So some of that money was going to be borrowed, right?

21  A.   Correct.

22  Q.   At the end of the day, when the deal was finally closed,

23  how much was borrowed?

24  A.   $1.4 billion.

25  Q.   What were the sources of that borrowing?

1   A.  There was $800 million senior debt, or bank debt, and $600

2   million of notes, sometimes called bonds, which are junior

3   debt.  They have higher interest rates but they are junior in

4   terms of their preferences if there is a problem with the

5   company in terms of getting paid back.

6   Q.  Just quickly, what does that mean to be junior debt, as

7   opposed to senior debt?

8   A.  It just means if there is ever a time when debt is going to

9   be repaid, the senior debt gets repaid first.

10  Q.  So if there were issues and a company was unable to pay all

11  of its debt, senior debt gets repaid first and junior debt has

12  to wait in turn, essentially?

13  A.  That's correct.  That's why junior debt typically charges a

14  higher interest rate; it has more risk.

15  Q.  Now, at the time -- let me put the timeline back up, 825.

16          At the time the EPMA was signed, had the lenders

17  already been found and had they committed to this transaction?

18  A.  We had commitments from senior bank lenders to underwrite

19  the bank debt, although they had to go out and sell it to a --

20  they had the right to sell it to a broader group of banks,

21  bring in a large group of banks to participate in the loan.

22  And they had provided us back stock commitments to the bonds,

23  to the notes, but we had not yet sold any notes to any note

24  investors.

25  Q.  So were there presentations that needed to be made to these

1   various potential lenders?

2   A.  Yes.  That's one of the important things that happens

3   between the signing of the contract and the closing is we go

4   out and we arrange or sell the debt financing.

5   Q.  Were there written materials that were provided to the

6   potential lenders?

7   A.  Yes.

8   Q.  Do you have in front of you what's been marked for

9   identification as Government Exhibit 1008?

10  A.  Yes.

11  Q.  Just briefly, can you describe what Government Exhibit 1008

12  is?

13  A.  It's titled "Lenders Presentation," and it is the materials

14  that were used in the meetings that we had with the banks and

15  with the potential noteholders.

16          MR. LEVY:   your Honor, the government offers

17  Government Exhibit 1008.

18          MR. BACH:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 1008 received in evidence)

21  BY MR. LEVY:

22  Q.  All right.  This says, "Refco Lenders' Presentation," and

23  there is a date on it, July 12, 2004, is that right?

24  A.  Yes.

25  Q.  So that is roughly a month after the EPMA was signed and

1    roughly a month before the transaction actually closed, is that

2    right?

3    A.   Approximately.

4    Q.   What was the purpose of preparing these materials?

5    A.   We worked with the company, with the management, to provide

6    potential lenders all the information that they needed to

7    decide whether they wanted to make a loan to the company to

8    help us finance the transaction.

9    Q.   The date on this, does that refer to a specific meeting?

10   A.   Yes, it does.

11   Q.   And who was that meeting with?

12   A.   It was organized by the investment banks that were helping

13   us raise the debt, but it was a meeting between the management

14   team of Refco and potential lenders.

15   Q.   Where did that meeting take place?

16   A.   It was somewhere in midtown New York.  I don't recall.

17   Q.   Mr. Collins was not present at that meeting, is that right?

18   A.   I don't believe so, no.

19   Q.   What types of information are presented in this document?

20         And maybe as you are saying that, if we could scroll

21   through.

22   A.   Two types.  One is the kind of information that we've

23   talked about before, which is descriptive information about the

24   business, its historical performance, its management team, its

25   industry, and then there is also detailed information about the

1  terms of the proposed debt financing.

2  Q.  Could we please turn to page 53.

3  A.  OK.

4  Q.  At the top it says, "Risk Management Overview," is that

5  right?

6  A.  Yes.

7  Q.  And then if you go down to the first bolded bullet point,

8  it says, "Historical risk and loss experience has been

9  approximately $1 million over the preceding five years."

10       In the course of your negotiations with Refco, had

11  Refco's management made that claim to you?

12  A.  Yes.

13  Q.  Do you remember specifically who at Refco's management made

14  that claim to you?

15  A.  I believe it was in the offering materials that were

16  originally presented to us, and it was also repeated by both

17  Mr. Bennett and Mr. Trosten.

18  Q.  What did you understand that to mean, that historical risk

19  and loss experience has been approximately $1 million over five

20  years?

21  A.  I understood it to mean that the company had been very good

22  about executing on its business for customers.  We knew that it

23  had traded billions and billions of dollars of transactions on

24  behalf of customers, or executed on behalf of customers, and it

25  suffered very small losses.

Cabdcol1                      Schoen - direct

1    Q.   During the course of your negotiations with the due

2    diligence in this transaction, did anyone ever tell you that

3    Refco had actually suffered hundreds of millions of dollars in

4    losses over the preceding years?

5    A.   No.

6    Q.   Did anyone tell you that Refco had simply pushed those

7    losses off of its own books and onto RGHI's books?

8    A.   No.

9    Q.   Could you turn two pages, to page 55.

10        This says, "Historical Financial Performance, Robert

11   Trosten - Chief Financial Officer."

12        Is this the beginning of a section that Mr. Trosten

13   presented at the meeting?

14   A.   Yes.

15   Q.   And did he actually present this live at the meeting?

16   A.   He did.

17   Q.   During that presentation, did either Mr. Trosten or this

18   document inform the potential lenders that Refco owed more

19   than $1 billion in related party debt -- I'm sorry, Refco was

20   owed more than $1 billion in related party debt by RGHI?

21   A.   No.

22   Q.   Were Refco's financial statements provided to the potential

23   lenders at any point in connection with this transaction?

24   A.   Yes, they were.

25   Q.   Did those financial statements reveal to the potential

Cabdcol1                    Schoen - direct

1    lenders that Refco was owed more than $1 billion in related

2    party debt by RGHI?

3    A.  No.

4    Q.  Did either Mr. Trosten or this document or anything else

5    that you are aware of inform the potential lenders that even

6    after the transaction closed, even after all the proceeds that

7    we've described, RGHI would still owe Refco hundreds of

8    millions of dollars in related party debt?

9    A.  No.

10   Q.  Were you aware at the time of this meeting that Refco was

11   owed more than a billion dollars in related party debt and

12   would be owed hundreds of millions even after the transaction

13   closed?

14   A.  I was not.

15   Q.  So did you realize that anything was being hidden from the

16   potential lenders?

17   A.  No.

18   Q.  Do you have in front of you what's been marked for

19   identification as Government Exhibit 5008?

20   A.  Yes.

21   Q.  What is Government Exhibit 5008?

22   A.  This is the offering circular for the notes, the junior

23   debt that I described earlier.

24   Q.  So the document that we were just looking at, the

25   presentation, was for which portion of the debt that we've been

Cabdcol1                          Schoen - direct

1    talking about?

2    A.   It's called the bank meeting, but actually potential note

3    investors were able to participate in part of that meeting as

4    well.

5    Q.   So that was for -- that presentation we just looked at was

6    for both of the banks that were going to lend the 800 million

7    and the noteholders that were going to purchase the 600

8    million?

9    A.   That's correct.

10   Q.   This document, 5008, only relates to the 600 million that

11   were going to be sold in bonds or notes?

12   A.   Yes.

13            MR. LEVY:  Your Honor, the government offers

14   Government Exhibit 5008.

15            MR. BACH:  No objection.

16            THE COURT:  Received.

17            (Government's Exhibit 5008 received in evidence)

18            MR. LEVY:  All right.  Mr. Smith, could you please

19   expand just the title area, essentially, of that document.

20            Thank you.

21   Q.   This says, "Confidential offering circular, $600 million,

22   Refco," and then below that it says, "9 percent senior

23   subordinated notes due 2012."

24            Is that right?

25   A.   Yes.

Cabdcol1                          Schoen - direct

1   Q.  Who buys these notes or bonds?  Who are the investors?

2   A.  They are typically institutional investors.

3   Q.  What does that mean?

4   A.  They are large pools of money who are in the business of

5   investing in this kind of debt and are experts at it.

6   Q.  Do you have the actual hard copy of 5008 in front of you?

7   A.  Yes, I do.

8   Q.  And is that document more than 200 pages long?

9            THE COURT:  Are you going to ask him to weigh it?

10  A.  It appears to be, yes.

11  Q.  All right.  What type of information is provided in that

12  document?

13  A.  Again, there is detailed information about the company, its

14  business, its historical performance, its management team, its

15  industry.  There is information about potential risks that the

16  company faces so that investors are aware and fully informed

17  about risks as well as opportunities.  The audited financials

18  are included in the offering circular, and the detailed terms

19  of the notes themselves, the loans that these investors are

20  being asked to make to the company.

21  Q.  This is what is commonly known as a disclosure document, is

22  that right?

23  A.  Yes.

24  Q.  It gives investors information about what they may be

25  investing in?

1   A.  The intent is to give them all the relevant information

2   that they need to make an investment decision.

3   Q.  Could you please turn to page F1.

4           And, Mr. Smith, if you could bring up that that

5   paragraph.  Thank you.

6           This says, "Index to Consolidated Financial

7   Statements."

8           Were Refco's financial statements attached to this

9   offering circular we have been looking at?

10  A.  Yes, in the F pages.

11  Q.  Why?

12  A.  It is part of the disclosure that enables investors to be

13  fully informed before they make an investment decision.

14  Q.  Did this offering circular inform the potential noteholders

15  that Refco at that point in time was owed more than $1 billion

16  in related party debt by RGHI?

17  A.  No.

18  Q.  Did this offering circular inform the potential note

19  holders that even after this transaction closed Refco would be

20  owed hundreds of millions of dollars in related party debt from

21  RGHI?

22  A.  No.

23  Q.  Were you aware of either of those things at the point that

24  this document was prepared?

25  A.  I was not.

Cabdcol1                    Schoen - direct

1    Q.  So did you realize that anything was being hidden from the

2    potential investors in the notes?

3    A.  No.

4    Q.  All right.  We can put that document to the side.

5         You said the closing on this transaction was August 5,

6    2004, is that right?

7    A.  That is correct.

8    Q.  What happens at a closing?

9    A.  All of the documentation that has been assembled for the

10   transaction, so you start with the contract but there is an

11   awful lot of other documentation, but the most important

12   documentation relating to the purchase and sale of the debt,

13   documentation relating to the purchase and sale of the equity,

14   all of that documentation is assembled and it's signed by the

15   parties at the closing.  And then what happens is that the

16   buyers buy and the sellers sell.  So essentially the money is

17   funded; the money is borrowed from the banks and the

18   noteholders.  The cash comes in.  We invest our equity.  And

19   that cash is used for the various purposes described in the

20   transaction, essentially to buy the company, to buy the

21   interest in the company.

22   Q.  Do you remember if you were physically present at the

23   closing on this deal?

24   A.  I was not.

25   Q.  What is a closing binder?

Cabdcol1                    Schoen - direct

1   A.   A closing binder is a reference to what is usually formed

2   as a bound document after the closing, where the attorneys take

3   all the documents that are assembled on a table during the

4   course of the closing and they put them into a giant book or

5   several books so that they are all in one place in a bound

6   binder.

7   Q.   Who gets the copies once they are created?

8   A.   The attorneys typically get copies of them, and we normally

9   get a set as well as investors and then keep them in our

10  offices.

11  Q.   When is the closing binder typically prepared, how long

12  does it take?

13  A.   Within the weeks or months after the closing, depending on

14  how fast the lawyers are moving and how fast the printer is

15  moving.

16  Q.   Once you get the closing binder for a deal that's now done,

17  do you typically sit down and review what's in it?

18  A.   No.  We typically put it on a shelf.

19  Q.   You testified earlier that you had a conversation with

20  Phillip Bennett in which he told you that after various

21  expenses RGHI was going to clear, was going to net about

22  $1.4 billion in proceeds from this transaction, is that right?

23  A.   After various expenses and payoffs, that the remainder for

24  Mr. Bennett and Mr. Grant, as the 100 percent owners of RGHI,

25  $1.4 billion.

1   Q.  Do you recall who initiated that conversation on that

2   subject between you and Mr. Bennett?

3   A.  My partner David Harkins and I initiated the conversation.

4   Q.  Why did you ask Mr. Bennett about that?

5   A.  We were was most interested in assuring ourselves that

6   Mr. Bennett's portion of the transaction, the amount of money

7   he was taking out and putting in his pocket, as compared to the

8   amount that he was investing back in as our partner, that we

9   had a real commitment from him.  Just as an example, if he was

10  taking a billion dollars out and reinvesting $5 million, we

11  wouldn't have felt that was a very strong vote of confidence.

12  In this case we believed that he was reinvesting more than

13  two-thirds of his share of the sale back into the company.

14  Q.  So how much Mr. Bennett chose to take out in cash and how

15  much he chose to reinvest in the company was something that was

16  important to Thomas H. Lee Partners?

17  A.  It was.

18  Q.  Do you recall when this conversation on this topic took

19  place?

20  A.  I believe it was -- I believe it was prior to the signing

21  of the contracts.  So it was in early June.

22  Q.  Now, Mr. Collins was not a participant in this

23  conversation, is that right?

24  A.  He was not.

25  Q.  During that conversation did you ask Mr. Bennett how the

Cabdcol1                          Schoen - direct

1    $1.4 billion was going to be split between Mr. Bennett and his

2    co-owner, Mr. Grant?

3    A.   I did.

4    Q.   What did Mr. Bennett tell you on that subject?

5    A.   He told me that even though they were 50/50 owners, that

6    because we and he both wanted Mr. Grant to sell out his entire

7    position, while Mr. Bennett was going to stay in, that he had

8    to pay Mr. Grant a premium.  And so the split was going to be

9    closer to 800 million for Mr. Grant and 600 million for

10   Mr. Bennett.

11   Q.   Did that split make sense to you?

12   A.   It did.

13   Q.   Why?

14   A.   It is essentially paying a premium for control and for

15   buying Mr. Grant out.

16   Q.   As of the closing, do you recall having an understanding as

17   to whether or not Mr. Bennett was going to provide you with the

18   actual contract that he had with Mr. Grant to accomplish this

19   split?

20   A.   I believe we requested it.  I was informed sometime within

21   a day or two prior to the closing that rather than seeing that

22   contract, or that agreement, that we would get representations

23   and warranties from Mr. Bennett and Mr. Grant regarding

24   termination of Mr. Grant's interest in the company.

25            MR. BACH:  Judge, again, can we know who the speaker

Cabdcol1                         Schoen - direct

1    was?

2              THE WITNESS:  I was informed by my counsel.

3              THE COURT:  All right.  Here's the deal.  You get to

4    ask on your cross-examination.  OK?

5              All right.

6              MR. LEVY:  Thank you, your Honor with.

7              MR. BACH:  Judge.

8              THE COURT:  Sir.

9              MR. BACH:  The concern is just a hearsay concern.

10             THE COURT:  OK.  Mr. Levy, keep an eye on it, please.

11             MR. LEVY:  I will, your Honor.  Thank you.

12   BY MR. LEVY:

13   Q.  Going back to your last answer, was it your expectation

14   that -- by the time of the actual closing, was it your

15   expectation that you were going to be provided with this

16   agreement between Mr. Bennett and Mr. Grant, or that you were

17   going to accept his representations?

18   A.  I understood that we were not going to receive the

19   agreement and we were going to accept the representations

20   instead.

21   Q.  Now, as you sit here today, have you in fact seen the

22   agreement between Mr. Bennett and Mr. Grant?

23   A.  I have.

24   Q.  Did it provide that Mr. Grant was going to get $800 million

25   in cash at the closing, as you were told?

1    A.  No.

2    Q.  How much did the agreement that you've now seen show

3    Mr. Grant was going to receive in cash at the closing?

4    A.  $4 million.

5    Q.  Do you have in front of you Government Exhibit 1005.28?

6    A.  Yes.

7    Q.  Is that the agreement that you have now seen between

8    Mr. Grant and Mr. Bennett dividing up the proceeds of this

9    transaction?

10   A.  Yes.

11           MR. LEVY:  Your Honor, the government offers

12   Government Exhibit 1005.28 pursuant to stipulation.

13           MR. BACH:  No objection.

14           THE COURT:  Received.

15           (Government's Exhibit 1005.28 received in evidence)

16           MR. LEVY:  Mr. Smith, could you bring up the top just

17   sort of third.  Exactly.  Thank you.

18   Q.  This says, "Stock Purchase Agreement.  This stock purchase

19   agreement, dated as of August 2, 2004" -- I am going to pause

20   for a second.

21           That is three days before the closing on the Thomas H.

22   Lee Partners' transaction, is that right?

23   A.  Yes.

24   Q.  It says, "This agreement is between Phillip R. Bennett, the

25   buyer, and Tone N. Grant, the seller."

Cabdcol1                        Schoen - direct

1              And you've seen this agreement -- you've read through

2     this agreement since the transaction, is that right?

3     A.   That is correct, since the bankruptcy.

4     Q.   Since the bankruptcy.  You had no idea about the existence

5     of this agreement or at least the terms of this agreement prior

6     to Refco going bankrupt?

7     A.   I had no idea about the terms of this agreement.

8              MR. BACH:  Objection.

9              THE COURT:  Sir.  I'm sorry, sir?

10             MR. BACH:  I'm sorry.  He rephrased -- I think he

11    caught himself and rephrased the question in a compound way.

12             MR. LEVY:  I will be happy to ask it again, your

13    Honor.

14    BY MR. LEVY:

15    Q.   Were you aware of the -- let me back up.

16             You were aware that there was an agreement between

17    Mr. Grant and Mr. Bennett, at least according to what you had

18    been told by Mr. Bennett, is that right?

19    A.   That is correct.

20    Q.   Had you ever seen this agreement itself, this document,

21    prior to Refco going bankrupt in October of 2005?

22    A.   No.

23    Q.   In fact, was the first time that you saw this agreement,

24    this actual document, when a prosecutor from the U.S.

25    Attorney's Office showed it to you?

Cabdcol1                    Schoen - direct

1    A.  That's correct.

2    Q.  Can you please turn to page 2.

3         Do you see on this second page where it says, "Cash

4    Amount"?

5    A.  Yes.

6    Q.  It says, "Cash amount means $4 million dollars plus the

7    estimated tax amount."  Is that right?

8    A.  Yes.

9    Q.  At any point before this transaction closed, were you

10   aware -- by "this transaction," I mean Thomas H. Lee Partners'

11   investment -- were you aware that Mr. Grant was not getting

12   $800 million at the time of the closing and in fact was getting

13   $4 million plus an estimated tax amount?

14   A.  No.

15   Q.  If you had known that, if you had known that Mr. Grant was

16   getting $4 million at the closing, would you have been

17   surprised by that?

18   A.  I would have been shocked.

19   Q.  Why?

20   A.  There are a number of reasons.  First, it would have been

21   directly contrary to what I had been expressly told by

22   Mr. Bennett.  Second, it would have raised the question of

23   where all the cash was going, and it would have made no sense.

24   And it would have absolutely led to all kinds of further

25   discussion and inquiry, and probably would have led quickly to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Cabdcol1                    Schoen - direct

1    the end of the deal, to the deal not happening.

2    Q.  When you say it's inconsistent with what you understood

3    about the deal, what do you mean by that?  Why is this number

4    so shocking?

5    A.  Well, if Mr. Grant owned 50 percent of the company and was

6    being paid $4 million, then we -- I didn't understand then and

7    I don't understand now where all the billion-four went.

8    Q.  As you sit here today, do you know whether the defendant,

9    Mr. Collins, knew that Mr. Grant was only getting $4 million in

10   up-front cash from this deal?

11   A.  I don't know.

12   Q.  Do you have in front of you what's been marked as

13   Government Exhibit 805?

14   A.  Yes.

15            MR. LEVY:  Your Honor, the government offers

16   Government Exhibit 805 pursuant to the stipulation about the

17   authentic records of Mayer Brown.

18            MR. BACH:  No objection.

19            THE COURT:  Received.

20            (Government's Exhibit 805 received in evidence)

21            MR. LEVY:  Can we put up the first -- yes, exactly,

22   that part.

23            It looks like we cut some off.

24            (Pause)

25            I think the only part I think we need is where it says

Cabdcol1                          Schoen - direct

1    "Original Message" at the top, everything down through the

2    second original message.  So about half of what's up there now.

3            Right.  Thank you.

4    Q.  Let's look at the middle message on here.

5            This is an embedded chain of e-mail messages, is that

6    right?

7    A.  Yes.

8    Q.  And the message in the middle says it's from a woman named

9    Angela Lang, is that right?

10   A.  That's correct.

11   Q.  And it is to Joseph Collins, is that right?

12   A.  Yes.

13   Q.  And the date on that is June 3, 2004?

14   A.  That is correct.

15   Q.  And the subject is regarding "Grant Agreement," is that

16   right?

17   A.  Yes.

18           MR. LEVY:  Your Honor, at this point the government

19   would move to admit a stipulation, Government Exhibit 780-S,

20   and I would ask to be allowed to read that.

21           THE COURT:  Fact?

22           MR. LEVY:  Fact stipulation.

23           THE COURT:  The same rules, ladies and gentlemen.

24   This is evidence for your consideration, and you must regard

25   these facts that are set out in the stipulation as true.

1        Mr. Levy.

2        MR. LEVY:  And it says that the parties agree in 2004,

3   Angela Lang and Alan Van Dyke were Joseph Collins' law partners

4   at the law firm of Mayer, Brown, Rowe & Maw.

5        This e-mail says from Ms. Lang says:

6        "Thanks.  Also, Alan and I would like to schedule a

7   time to talk in detail with you and Phil regarding exactly how

8   the funds will be moved in connection with the transaction

9   (including the reason why Grant is getting such a low up-front

10  cash payment, based on our understanding of the deal between

11  them).  Alan thinks it's important from a tax perspective to

12  make sure that he really understands all of the pieces in the

13  puzzle before we sign agreements, and I would like to learn

14  this info from a corporate perspective as well.  Does that

15  sound OK?  Alan and I are both generally free tomorrow, so we

16  would work around your and Phil's schedule.  Thanks, Angela."

17       Above that Mr. Collins' reply is:  "Good.  I will get

18  us on Phil's schedule."

19       Is that right?

20  A.  Yes.

21       MR. LEVY:  OK, you can take that exhibit down.

22  Q.  Now, you said -- let's put the Grant agreement back up.

23       You said you never saw this before the actual

24  transaction, is that right?

25  A.  I did not.

Cabdcol1                          Schoen - direct

1   Q.  Do you recall any of your various advisors, any of Thomas

2   H. Lee Partners' various advisors in this transaction, such as

3   the law firms and the various other firms, ever mentioning this

4   agreement to you prior to closing?

5   A.  I think, as I said, we had a discussion about them telling

6   me that we were not going to see it but that we were going to

7   rely on reps and warranties instead.

8   Q.  Have you since discovered that this document, Government

9   Exhibit 1005.28, did in fact get assembled into that closing

10  binder that you received weeks and months later and put on the

11  shelf?

12          MR. BACH:  Objection.

13          THE COURT:  Sir.

14          MR. BACH:  It assumes facts not in evidence.

15          THE COURT:  What?  That it was in effect then?  What?

16          MR. BACH:  The end of the question, Judge.

17          THE COURT:  Mr. Levy.

18          MR. LEVY:  I can re-ask the series of questions that

19  led up to that question.

20          THE COURT:  Go ahead.  Do it the long way.

21  BY MR. LEVY:

22  Q.  When you got the binder, the closing binder, what did you

23  say you did with it?

24  A.  Put it on a shelf.

25          MR. LEVY:  Is that the end of the question that

Cabdcol1                          Schoen - direct

1    Mr. Bach was objecting to?

2              THE COURT:  I thought it was when, when did you get

3    it.

4              MR. LEVY:  Oh.

5    Q.  When do you recall getting the closing binder?

6    A.  I don't even recall getting it.  It was delivered to our

7    offices and an administrative staff person put it on a shelf.

8    Q.  Have you since discovered that this document was somehow

9    included in that closing binder that was delivered to your

10   offices and that an administrative assistant put on a shelf?

11             MR. BACH:  Objection to "somehow."

12             MR. LEVY:  I can remove the word "somehow" from the

13   question.

14             THE COURT:  Go ahead.

15   Q.  The same question removing the word "somehow."

16   A.  Can you repeat the question, please?

17   Q.  Certainly.  Have you since discovered that this document

18   was included in the closing binder that was delivered to your

19   offices and filed by an administrative assistant on a shelf?

20   A.  I learned that when the U.S. -- when the representative

21   from the U.S. Attorney's Office showed it to me.

22   Q.  Since Refco's bankruptcy, have you investigated how this

23   document managed to make it into the closing binder without

24   your having seen it or found out about it?

25   A.  We did investigate that, yes.

Cabdcol1                    Schoen - direct

1   Q.  Have you been able to figure out how this document made it

2   into the closing binder?

3               MR. BACH:  Objection.  Hearsay.

4               MR. LEVY:  If the answer to it is not going to involve

5   any assertion whatsoever about what he was told.

6               THE COURT:  OK.

7   Q.  Have you been able to figure out how this document made it

8   into the closing binder without you knowing about it?

9   A.  We have not.  We have no idea.

10  Q.  You're positive that you never saw it?

11  A.  I'm certain.

12  Q.  Again, why are you positive that you never saw this

13  document during the course of the transaction?

14  A.  I'm certain because if I had seen it, as I said, it would

15  have shocked me and I think it would have shocked my team.  And

16  I feel confident it would have blown the deal, but at a minimum

17  it would have led to an awful lot of discussion about what we

18  didn't understand about the transaction.

19  Q.  All right.  Now, focusing on the time of the closing.  And

20  we can take this exhibit down.

21              Focusing now on the time of the closing, August 5th,

22  prior to actually closing on this transaction to invest in

23  Refco on August 5, 2004, were you ever told at any point prior

24  to that that Refco was owed more than $1 billion in related

25  party debt by RGHI?

Cabdcol1                    Schoen - direct

1    A.  I was not.

2    Q.  If you had been told that, would it have mattered to you?

3    A.  Yes.

4    Q.  Why?

5    A.  I can go down the same list of reasons:  All the way from a

6    complete different understanding of the situation of the

7    transaction than the one that I had.  It would have clearly

8    meant that I had been directly lied to on something very

9    substantial in the transaction.  And it also would have raised

10   all kinds of questions about what Refco's historical financial

11   performance actually had been, whether it had been profitable,

12   what the genesis was of this loan.

13   Q.  Prior to closing on this transaction in August of 2004,

14   were you ever told at any point that Refco suffered hundreds of

15   millions of dollars in customer losses since 1997?

16   A.  No.

17   Q.  Did Refco's financial statements reflect that Refco had

18   suffered hundreds of millions in customer losses since 1997?

19   A.  No.

20   Q.  If you had been told that, would that have mattered to you?

21   A.  Yes.  Very much.

22   Q.  Why?

23   A.  The same set of reasons.  But the most important is --

24   actually, all of them are important.  Being lied to is

25   important.  Everything here is important.

 1          But, fundamentally, if this company which we believed
 2   had performed so well based on the historical financials we had
 3   been shown in fact historically had lost very large sums of
 4   money on a regular basis, we would have had a very different
 5   view of the business and certainly no interest in investing in
 6   it.
 7   Q.  Prior to August 5, 2004, when you actually closed on this
 8   transaction, at any point prior to that did anyone tell you
 9   that Refco had entered into an agreement called a Proceeds
10   Participation Agreement pursuant to which a BAWAG-related
11   company had invested more than $400 million in exchange for
12   receiving a share of the proceeds from the sale of Refco?
13   A.  No.
14   Q.  If you had been told about that type of arrangement, would
15   that have mattered to you?
16   A.  Yes.
17   Q.  Why would that type of arrangement have mattered to you?
18   A.  For the same set of reasons.  We would have had very
19   serious questions about the historical financial performance of
20   the company and why it needed an infusion of $400 million, what
21   had happened to that $400 million.
22          Again, we would have been -- it would have been a very
23   different set of circumstances in terms of ownership and the
24   right to proceeds from the story that we had been told.  And in
25   addition to that, we also had, I believe, in those agreements

Cabdcol1                    Schoen - direct

1   an approval right on the part of the BAWAG entity, and so we

2   thought we were signing a binding contract and didn't need

3   additional consents from another party and there was someone

4   else who still had a right to approve.  All of those things

5   would have mattered.

6   Q.  As long as we are getting to consent, at no point prior to

7   August 5, 2004 were you told that there was another

8   BAWAG-related entity that needed to consent to this

9   transaction?

10  A.  That's correct.

11  Q.  And you touched on this at the tail end of your last

12  answer, but why does that matter?  Why would it have mattered

13  to you that this other entity needed to consent to your

14  transaction?

15  A.  When you sign a binding contract, you believe that you are

16  acquiring certain rights as well as taking on certain

17  obligations.  The rights you believe you are acquiring or

18  contracting for when you sign a contract are the rights to

19  proceed with the transaction.  And if in fact there was another

20  approval that is required and we were unaware of it, then we

21  actually had not acquired the rights in exchange for the

22  burdens or obligations that we were taking on; we had not

23  acquired the rights that we felt we had to actually invest in

24  the company.

25  Q.  Are there times when Thomas H. Lee Partners invests in

Cabdcol1                        Schoen - direct

1   companies when there is some consents out there required by

2   some third party that hasn't been obtained yet?

3   A.   Yes.

4   Q.   Can you give me an example of when that might come up?

5   A.   An example could be if we were buying a company that was

6   currently publicly traded, even if you contracted with the

7   company and its representatives to purchase it, that is almost

8   always then subject to a shareholder vote and so there are

9   consents.  But you are making a judgment when you sign that

10  contract about the likelihood of success about what leverage

11  you have.

12          So it is information.  It doesn't automatically mean,

13  in terms of consent approval, that you wouldn't have proceeded,

14  but we had never spoken to BAWAG once in our lives.  And so if

15  there was a consent from someone that we didn't know about and

16  we didn't know what their point of view would be on it, to take

17  on all of the work, incur all the expense, dedicate all the

18  time that we did to push forward to a closing not knowing about

19  the requirement of that consent, that's the problem.

20  Q.   Are there sometimes provisions are put in place to make the

21  buyer whole if the consent ultimately isn't granted?

22  A.   Yes.  In a public-company transaction there are sometimes

23  what are called reverse breakup fees where some of the buyers'

24  costs are covered if the seller -- in that case, a public

25  company, so the public shareholders don't approve the

Cabdcol1                         Schoen - direct

1    transaction.  There are various mechanisms that can be put in

2    place to protect the buyer.

3    Q.  So there are things that are done if you know there is a

4    consent that is needed?

5    A.  Sometimes.

6    Q.  At any point prior to closing on this transaction in August

7    of 2004, did anyone tell you that that $500 million in

8    supposedly excess cash didn't actually exist?

9    A.  No.

10   Q.  At any point prior to closing on this transaction, did

11   anyone tell you that the $500 million in supposedly excess cash

12   was actually borrowed money that had been put into a segregated

13   account by Refco?

14   A.  No.

15   Q.  If you had known that, that there was no excess cash and

16   that in fact what was put in the segregated account was just

17   borrowed money, would that have mattered?

18   A.  Yes.

19   Q.  Why?

20   A.  That also would have blown the deal.  The litany is

21   similar.  It would have been that we would have been lied to

22   quite specifically on something very substantial in the

23   transaction.  It would have raised serious questions about the

24   historical performance of the company, which had been described

25   and shown to us as having generated that excess cash over the

Cabdcol1                          Schoen - direct

1    previous number of years.  And so our understanding of the

2    business would have been radically different, in addition to no

3    longer having any trust in the people that we were dealing

4    with.

5    Q.  All right.  Let's switch subjects to what happened after

6    the closing.

7         After the closing, how much of Refco did Thomas H. Lee

8    Partners own?

9    A.  We and our affiliates owned 57 percent of the company.

10   Q.  Did you personally take on any role at Refco?

11   A.  I did.

12   Q.  What role?

13   A.  I joined the board of directors of Refco.

14   Q.  What is a board of directors?

15   A.  The board of directors are representatives of the

16   shareholders who oversee the management of the company.  They

17   don't run the company, but the management reports to the board

18   of directors as the representatives of the shareholders.

19   Q.  Did either you or anybody else at Thomas H. Lee Partners

20   take on any role in the day-to-day operations of Refco?

21   A.  No.

22   Q.  Was anybody from Thomas H. Lee Partners put in a managerial

23   position at Refco?

24   A.  No.

25   Q.  Did Phillip Bennett stay on as CEO?

439

Cabdcol1                        Schoen - direct

1    A.  He did.

2    Q.  Did Santo Maggio stay on in his role as the senior Refco

3    executive?

4    A.  Yes.

5    Q.  Did Robert Trosten stay on as Chief Financial Officer?

6    A.  He did not.

7    Q.  Why not?

8    A.  We had come to the conclusion during the course our

9    diligence that the complexity of the business, the scale of the

10   business, and the hopeful path to ultimately have it become a

11   public company, a public stock company, were skill sets that

12   were really beyond his capabilities and that we needed an

13   upgrade or a stronger, more experienced chief financial

14   officer.  We informed Mr. Bennett of that view.  He actually

15   agreed with us, or told us he agreed with us, anything.  So the

16   intention was that after we completed the transaction, that we

17   would proceed to search for a new Chief Financial Officer.

18   Q.  And after the transaction, did you in fact search for a new

19   chief financial officer?

20   A.  We did.

21   Q.  Do you remember how long that took?

22   A.  I believe that we hired a new chief financial officer in

23   either December or January.

24   Q.  Do you remember the new -- I'm sorry.  December of 2004?

25   A.  '4 or January of 2005.  I'm sorry.

Cabdcol1                        Schoen - direct

1    Q.  And who did you hire?

2    A.  His name is Gerald Scherer, S-c-h-e-r-e-r.

3    Q.  Did Refco continue to use Joseph Collins and Mayer Brown

4    for some of its legal work?

5    A.  Yes.

6    Q.  Did Refco also use Weil, Gotshal, who I think you said had

7    historically been Thomas H. Lee Partners' attorneys for some of

8    Refco's legal work?

9    A.  Yes, we used both.

10   Q.  Do you recall earlier this morning you looked at a

11   confidential offering memorandum relating to the sale of notes

12   to investors?

13   A.  Yes.

14   Q.  At the time that those notes were issued, were they

15   registered?

16   A.  They were not.

17   Q.  Did there come a point when those notes were registered?

18   A.  Yes.  By their terms on the basis in which they were sold,

19   we were obligated to register them within six months of the

20   closing.  And "register" means to file with the Securities and

21   Exchange Commission and have them become publicly traded.

22   Q.  What does that mean, have them become publicly traded?

23   What is benefit of registering notes with the Securities and

24   Exchange Commission?

25   A.  When securities are publicly registered and publicly

Cabdcol1                         Schoen - direct

1    traded, they are freely tradable.  It becomes -- they are more

2    liquid, and so the holders of those securities can either keep

3    them or sell them to other buyers over an exchange on a running

4    basis.

5    Q.  If they are not registered, what does that prevent them

6    from -- the owners of those notes from doing?

7    A.  There are various restrictions on their ability to sell

8    them.

9    Q.  What is the process for registering those notes?

10   A.  You form -- you draft and file a registration statement

11   with the Securities and Exchange Commission, providing them

12   information -- first, the SEC but ultimately when it passes or

13   blesses it, ultimately you put the information out into the

14   public domain about the company.  So that when the securities

15   trade publicly, other public investors who might buy them in

16   the future and those who hold them will have again all the

17   information that they need about the company.

18   Q.  Does this registration statement that gets filed, how would

19   you get ahold of it if you were a regular investor?

20   A.  It is publicly available.

21   Q.  If you know, can you pull it down from the Internet?

22   A.  I think there are a lot of ways to get them these days but

23   I'm not sure.

24   Q.  OK.  Do you have in front of you Government Exhibit 5007?

25   A.  Yes.

Cabdcol1                         Schoen – direct

1   Q.  Is that the registration statement that was filed to

2   register the notes involved in this transaction?

3   A.  Yes.

4           MR. LEVY:   your Honor the government offers

5   Government Exhibit 5007.

6           MR. BACH:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 5007 received in evidence)

9           MR. LEVY:  All right.  Let me see how much -- that

10  seems about right.

11          Thank you.

12  Q.  This says "Securities and Exchange Commission," and it is

13  entitled "Form S-4," is that right?

14  A.  Yes.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CABPCOL2                    Schoen - direct

1    BY MR. LEVY:

2    Q.  And below that it says Registration Statement Under the

3    Securities Act of 1933, right?

4    A.  That's correct.

5    Q.  And then below that it says, Refco Group Limited, LLC;

6    Refco Finance, Inc.  This is the document that was -- that was

7    filed to register the notes?

8    A.  Yes.

9    Q.  And could you please turn to Page 6.

10           MR. LEVY:  And if we could just expand the top third

11   down through the title.  That's good.

12   Q.  This says Prospectus in the left corner; is that right?

13   A.  Yes.

14   Q.  And is that consistent with what you were saying that this

15   is, a disclosure document for potential investors in these

16   notes; is that right?

17   A.  That's correct.

18   Q.  How did this disclosure document that was filed with the

19   SEC compare to the offering circular that we looked at earlier

20   this morning when the notes were originally sold?  How did the

21   information in the two documents compare?

22   A.  The information is very similar.  This document has been

23   reviewed by the SEC, and so there may be places where, and

24   there normally are places where the SEC asks for additional

25   information or additional disclosure to make sure the public

1    investors get all the information that they need.

2    Q.  Could you turn to Page F1 of this registration statement?

3    A.  Okay.

4    Q.  Were Refco's financial statements attached to this

5    registration statement?

6    A.  They were.

7    Q.  Why?

8    A.  Same reason as in the offering circular.  This is providing

9    potential investors, both current and in the future, with all

10   the information that they need about the company so that they

11   can evaluate their investment interest.

12   Q.  Did this S-4 registration statement inform potential

13   investors in the notes that prior to Thomas H. Lee Partners'

14   investment, Refco had been owed more than $1 billion in

15   related-party debt by RGHI?

16   A.  It did not.

17   Q.  Did this S-4 registration statement inform potential

18   investors that even after the transaction, after this was being

19   filed, Refco was still owed hundreds of millions of dollars in

20   related-party debt by RGHI?

21   A.  No.

22   Q.  Were you aware of either of those two things at the time

23   that this registration statement was filed with the SEC?

24   A.  I was not.

25   Q.  Did you realize that anything was being hidden or omitted

CABPCOL2                    Schoen - direct

1    in this document?

2    A.  No.  I signed this document as a member of the board of

3    directors, and I would never have done that if I knew that

4    anything was being hidden.

5    Q.  All right.  You can put this document to the side.

6              Did there come a time when Refco engaged in something

7    called an initial public offering?

8    A.  Yes.

9    Q.  Is that sometimes called an IPO?

10   A.  Yes.

11   Q.  Can you please explain what an initial public offering or

12   an IPO is?

13   A.  An IPO is a registration of the stock of the company and a

14   sale of some of the stock, and following an IPO, the stock of

15   the company would be publicly registered and freely tradeable.

16   Q.  When you say publicly registered and freely tradeable, at

17   that point, who can buy Refco stock?

18   A.  Anyone.

19   Q.  When did Refco hold its initial public offering?

20   A.  August of 2005.

21   Q.  When a company holds an initial public offering, or an IPO,

22   is there a document that needs to with filed first with the

23   Securities & Exchange Commission?

24   A.  Yes.  The process is the same as the one I described with

25   the bonds.  There's a registration statement and an offering

CABPCOL2                        Schoen - direct

1   prospectus that gets filed with the SEC and viewed and is used

2   as the basis for the sale of the stock.

3   Q.  Do you have in front of you what's been marked as

4   Government Exhibit 5006?

5   A.  Yes.

6   Q.  Is that the registration statement that you were talking

7   about that got filed with Refco's IPO?

8   A.  Yes.

9           MR. LEVY:  Your Honor, the government offers

10  Government Exhibit 5006?

11          MR. BACH:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 5006 received in evidence)

14  Q.  Let's just look at the top half of this cover page.  Again,

15  it says Securities and Exchange Commission.  It's form S-1,

16  Registration Statement Under the Securities Act of 1933, and

17  below that it says, Refco, Inc.  Why Refco, Inc.?  I think

18  we've been seeing Refco Group Limited in reference to this

19  company previously?

20  A.  The company converted from an LLC, a limited liability

21  company, to a C-Corp. or taxable corporation.

22  Q.  Same company, though?

23  A.  Yes, it's just a change in corporate form.

24  Q.  Could you please go two pages further into the document.

25  And this refers to $25 million in shares of common stock of

1   Refco, Inc.; is that right?

2   A.  No, that's not correct.  It's 25 million shares, not

3   $25 million.

4   Q.  I'm sorry.  I misspoke.  25 million shares.  Is that the

5   approximate number that was actually sold to the public?

6   A.  Yes.

7   Q.  Do you remember whether that number changed at all?

8   A.  I don't believe it did.

9   Q.  And the date on this document is August 8th of 2005; is

10  that right?

11  A.  Yes.

12  Q.  Was this document prepared and reviewed by Refco's lawyers

13  before it was filed with the SEC?

14  A.  It was.

15  Q.  Do you have in front of you what's been marked for

16  identification as Government Exhibit 359?

17  A.  I do.

18        MR. LEVY:  Your Honor, the government offers

19  Government Exhibit 359, subject to the stipulation concerning

20  the authenticity of certain records.

21        THE COURT:  Received.

22        (Government's Exhibit 359 received in evidence)

23        MR. LEVY:  Okay.  Do we have 359 available to put up

24  on the screen?  And if we could, Mr. Smith, if you could expand

25  the top half, I think that would be great.

CABPCOL2                          Schoen – direct

1   Q.  This says, again, form S-1, Registration Statement Under

2   the Securities Act of 1933, and there's handwriting on this; is

3   that right?

4   A.  Yes.

5   Q.  Up top there are initials JPC, and then it says

6   October 28th of 2004; is that right?

7   A.  Yes.

8   Q.  And below that says "only changed pages are attached"; is

9   that right?

10  A.  That's correct.

11          MR. LEVY:  And, Mr. Smith, if you could pull back, and

12  we could just very slowly scroll through this document.

13  Q.  And there are handwritten notes on the remaining pages of

14  this document; is that right?

15  A.  That's correct.

16          MR. LEVY:  Okay.  Thank you.  We can take that down

17  and put that to the side.

18  Q.  And can we put back up on the screen Government

19  Exhibit 5006, the form S-1 that we were looking at a moment

20  ago.  Could you please turn to Page F1 of this document?

21  A.  Okay.

22  Q.  Fair to say this is a relatively thick document; is that

23  right?

24  A.  Yes, it is.

25  Q.  More than a hundred pages, at least?

1   A.  More than a hundred pages.

2   Q.  Were Refco's -- I'll wait a second until you get there.

3   A.  Okay.

4   Q.  Were Refco's financial statements attached to this

5   registration statement?

6   A.  Yes.

7   Q.  Did this S-1 registration statement inform potential

8   purchasers of Refco stock that prior to Thomas H. Lee Partners'

9   transaction, Refco had been owed more than $1 billion by RGHI?

10  A.  It did not.

11  Q.  Did it inform potential purchasers of Refco's stock that

12  even as this was being filed, Refco was owed hundreds of

13  millions of dollars in related-party debt from RGHI?

14  A.  No.

15  Q.  Were you aware, at the point that this was filed in August

16  of 2005, that either of those things were true?

17  A.  No.

18  Q.  Did you sign this document?

19  A.  I did.

20  Q.  Would you have signed it if you had known that there was

21  anything being hidden from potential investors?

22  A.  Absolutely not.

23  Q.  All right.  We can put that to the side.

24          When did Refco actually issue its shares of stock to

25  the public?  When was the IPO?

CABPCOL2                    Schoen - direct

1   A.  It was in August of 2005.  I don't recall the exact date.

2   I think August 11th, but I'm not certain.

3   Q.  And you said it was 25 million shares that were sold to the

4   public?

5   A.  That's correct.

6   Q.  What was the price per share on that offering?

7   A.  $22 per share.

8   Q.  Did Thomas H. Lee sell some of its own shares in Refco on

9   that day?

10  A.  We did.

11  Q.  How much did Thomas H. Lee Partners take in, in total, from

12  the IPO?

13  A.  About $200 million.

14  Q.  Did Thomas H. Lee Partners sell all of its shares in Refco

15  on that day?

16  A.  No.

17  Q.  What percentage of its shares did Thomas H. Lee Partners

18  sell in the IPO?

19  A.  We sold more than 20 percent, and kept more than 80 percent

20  of our stock.

21  Q.  Why did you keep more than 80 percent of your Refco stock

22  at that time?

23  A.  Two reasons.  One, the most important reason, is that we

24  believed that the company had a very bright future, and that

25  the shares would continue to appreciate.  And we hoped to sell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    our other shares in the years to come at higher prices.

2              The other is that typically an IPO's new investors

3    don't like to see the inside investors selling their entire

4    position.  It's the same way that I mentioned earlier we

5    wouldn't have felt comfortable if Mr. Bennett would have sold

6    almost all of his position and only keeping a small position.

7              But the most important reason was we just believed

8    there was a long-term opportunity for stock appreciation and

9    value of the company.

10   Q.  Did Refco's stock, in fact, go up after that first day?

11   A.  It did.

12   Q.  What was the highest share price that Refco stock ever got

13   to?

14   A.  The stock traded publicly for a couple of months, and the

15   highest price was, I think, $31 a share.

16   Q.  What was Thomas H. Lee Partners' remaining stock, that

17   80 percent, more than 80 percent that Thomas H. Lee Partners

18   kept, what was that worth at the peak?

19   A.  We kept something over 50 million shares, something over

20   $1.5 billion for our remaining position.

21   Q.  Did there come a time when Refco's stock price dropped

22   significantly?

23   A.  There did.

24   Q.  What month was that?

25   A.  That was in October of 2005.

CABPCOL2                        Schoen - direct

1   Q.  How many months -- Well, when we say significantly, what

2   did it drop to in October of 2005?

3   A.  To zero.

4   Q.  How many months was that after the initial public offering?

5   A.  Just a couple of months since the public offering.

6   Q.  Was that drop in response to Refco's announcement of the

7   discovery of related-party debt owed to Refco?

8   A.  Yes.

9   Q.  When and how did you first learn of this issue?

10  A.  I first learned of it through a phone call I received on

11  the evening of October 4th, 2005.  I remember the date well

12  because it was my older son's birthday, and I'd taken him down

13  the street to get an ice cream cone.  And I got a call from the

14  head of the audit committee of the board of directors informing

15  me of a major problem.

16  Q.  Could I stop you for a moment there, and could you explain

17  to the jury what an audit committee of a board of directors is?

18  A.  Yes.  So I referenced earlier that the board of director is

19  a group of individuals tasked with representing the

20  shareholders and having management report to them.  It included

21  both insiders, people from our company who were shareholders,

22  management in the form of Mr. Bennett, and also, we bring in

23  outside or independent directors who have no financial

24  relationship to us or the company and who can provide

25  additional oversight for shareholders.

1          And in this case, we had three independent directors,

2    and they were also placed on an audit committee.  The board of

3    directors has committees that do certain tasks.  The audit

4    committee's job is to work with the outside auditors, the

5    certified public auditors who -- who review the financial

6    statements of the company and issue the audits that we talked

7    about yesterday.

8          They work with the auditors and the management of the

9    company to make sure that the financial statements are being

10   properly prepared, that the audits are thorough, and that the

11   disclosure that the company is putting out into the public

12   domain is accurate.

13   Q.  And so on October 4th, I think you said?

14   A.  Yes.

15   Q.  You were out getting an ice cream cone with your son.  You

16   got a call from the head of the audit committee?

17   A.  Yes.

18   Q.  What did he tell you?

19   A.  He told me that he had been called by the chief financial

20   officer, Gerald Sherer that we had hired earlier that year, and

21   Mr. Sherer told him that he had discovered that the company

22   still was owed $430 million by RGHI; that there was a large

23   related-party debt outstanding.

24   Q.  What did you do upon being given this news?

25   A.  After I caught my breath, I hung up the phone, called our

1   counsel to get advice on how to proceed.  I reached out to

2   Mr. Sherer, did not -- I think I spoke to him briefly, and I

3   reached out to Mr. Bennett.

4   Q.  Where did Mr. Bennett tell you he was at the time?

5   A.  I didn't get through to him.  He called me back.  He was in

6   Asia, I think in Japan, but I think it was Asia.  It was either

7   Japan or China.

8   Q.  And what happened on that conversation with Mr. Bennett

9   that night?

10  A.  He said a few things.  First, he said it was simply a

11  matter of disclosure, and that he could explain everything.

12  Second, he said that he was in -- I'm sorry, I can't recall now

13  if it was Japan or China, but I think it was Japan, but he had

14  meetings.  It was the following morning in Japan or China.

15  That he had meetings that day, and he would get on a plane as

16  soon as those meetings were over, and fly back immediately to

17  the U.S.  And we agreed that we would meet in his offices on

18  Thursday morning because it would take him the day on Wednesday

19  to get back.

20  Q.  So this conversation that you had was Tuesday, October 4th?

21  A.  Tuesday night, that's right.

22  Q.  So in between that conversation and this planned meeting on

23  Thursday, what did you do on Wednesday?

24  A.  We spent a lot of time with our counsel.  We informed the

25  rest of the board of directors, and we tried to learn as much

CABPCOL2                    Schoen - direct

1   as we could, as well, by talking to the CFO about what he had

2   discovered.

3           We were trying to get an understanding of how this

4   could have happened, what it was, what we knew about where it

5   came from.  We didn't know much.  Why we hadn't known about it,

6   so forth.  And to plan our course of action so we can conduct

7   ourselves in the right way in the interests of the stakeholders

8   in the company.

9   Q.  Did you, in fact, have that meeting with Mr. Bennett on

10  Thursday, October 6th, 2005?

11  A.  We did, Thursday morning in his office in New York.

12  Q.  Who was at that meeting?

13  A.  Thomas H. Lee, whose name is on the door, was on the board

14  of directors, as well, of the company.  David Harkins, who was

15  president of Thomas H. Lee Partners, myself, and Jim Westra,

16  who was our chief outside counsel from Weil Gotshal.

17  Q.  What happened in that meeting?

18  A.  We asked Mr. Bennett to explain to us what this was, what

19  the origin of it was, why we were not aware of it, and he

20  attempted to explain it.

21  Q.  What do you mean by "he attempted to explain it"?

22  A.  Well, nothing that he said was very persuasive.  It was --

23  We knew that there wasn't going to be an explanation that made

24  any sense, and so he spent an hour trying to convince us that

25  everything was going to be okay.  And we told him that we

1    wanted him to come and meet with the board of directors later

2    that afternoon and then we left.

3    Q.   What happened next?

4    A.   We were, at this point, if you can imagine pressing your

5    foot to the accelerator.  We were on 24/7 trying to work with

6    lawyers, trying to work with the board, trying to understand

7    how to move as quickly as possible to get all the information

8    out and to act appropriately as a consequence.

9            But the next important event was a meeting where

10   Mr. Bennett came to the board of directors later that afternoon

11   at the offices of Weil Gotshal, and he tried to provide his

12   explanation to the board of directors.

13   Q.   Do you remember what he said?

14   A.   I don't remember the details.  I do know that he

15   specifically said that he thought it was simply a matter of

16   disclosure, and that it could be fixed with disclosure.  He

17   also said that he was prepared to undertake steps to try to

18   repay it on a very rapid basis.

19   Q.   What was the board's reaction to that?

20   A.   The board told him two things.  One, that he was not to go

21   back to his office, and we actually took some steps to secure

22   his office.  And we told him, and we encouraged him, that it

23   would be wise for him, if he could, to find a way to repay the

24   receivable.  I think we also suggested to him, although it's

25   not our position to provide advice, but we suggested to him

1    that he should retain counsel.

2    Q.   Did Mr. Bennett say where he was going to get the money to

3    repay this loan?

4    A.   I don't recall if he said at that meeting, where he was

5    going to get the money, I don't think so.

6    Q.   Do you remember him telling you subsequently where he was

7    going to get the money?

8    A.   I believe he did.

9    Q.   What did he say?

10   A.   We had a subsequent meeting with him on Saturday.  Do you

11   want me to jump to that or --

12   Q.   Just on the subject of what he said about where he would

13   get the money to repay the loan.

14   A.   I think he told us on Saturday that he believed he could

15   arrange for the repayment of the loan by Monday morning, and

16   that he was working with BAWAG to get a loan to do that.

17   Q.   All right.  Now, after the board met with Mr. Bennett, did

18   the board meet with anybody else in Refco management?

19   A.   I think, at this point, the audit committee both had --

20   excuse me.  The board had its outside counsel, Weil Gotshal.

21   We also had -- the audit committee had retained its own

22   counsel.  We had meetings, I don't recall if it was Thursday,

23   but I think it might have been Friday, with Mr. Maggio, who, as

24   I mentioned earlier, was one of the top two or three executives

25   in the company.  And he came and met with the board.

1   Q.  What did Mr. Maggio tell the board?

2   A.  He essentially threw his hands up in the air and said, I

3   did it; it's all a big fraud.  I admit it.  The whole thing is

4   a house of cards, and then he said -- he threw himself on the

5   mercy of the board.  He said, Take me down, save Phil.  The

6   company needs Phil Bennett in order to survive, and so he kind

7   of -- he threw himself in front of the bus.  He said, I'll take

8   the hit, save Phil.

9   Q.  Did the board accept that offer from Mr. Maggio?

10  A.  We did not.

11  Q.  Why not?

12  A.  Because it was apparent, at that point, that both of them

13  were engaged in a large crime.

14  Q.  What did the board do with respect to Mr. Bennett's and

15  Mr. Maggio's positions as active managers of Refco?

16  A.  As of Saturday, after meeting with other senior managers of

17  the company to inform them of our plans, as of Saturday, we

18  met.  We had Mr. Bennett come with counsel to meet with the

19  board, and we informed him that we were putting him and

20  Mr. Maggio on leave.  So we were relieving them of their duties

21  and installing two other executives as the CEO, chief executive

22  officer, and executive of Refco.

23  Q.  Over the weekend, did you participate in plans to disclose

24  to the public what had been discovered?

25  A.  We did.  We were working around the clock with plans to do

1  a handful of things.  One, to inform the key managers of the

2  company around the globe about what had happened and what we

3  were doing about it, about the change in leadership, about what

4  was likely to come early next week when we made our public

5  disclosure.

6          We had work we had to do to reach out to regulators,

7  including some of the exchanges on which the company did

8  business.  We had to reach out to the Securities & Exchange

9  Commission.  The company had now registered bonds and stock

10 registered through the SEC, and we reached out to the New York

11 Stock Exchange.

12         We also spent the weekend drafting a disclosure, now

13 that we'd been able to assemble a fuller understanding of what

14 had happened, so that we could provide the public with

15 information as to what happened as fully as we possibly could.

16 Q.  When you say disclosure, is it commonly referred to as a

17 press release?

18 A.  Yes.  It was a press release that was issued just before

19 the market opened on Monday morning, the 10th.

20 Q.  Was an individual named Dennis Klejna involved in those

21 conversations over the weekend about what to do next?

22 A.  Yes.

23 Q.  Who is Dennis Klejna?

24 A.  He was Refco's inside counsel; so in order -- he was a

25 full-time employee of Refco and was Refco's top lawyer, inside

CABPCOL2                     Schoen - direct

1    the company.

2    Q.  Okay.  It was he their general counsel?

3    A.  General counsel.

4    Q.  Have you seen an e-mail between Joseph Collins and Dennis

5    Klejna that was sent over that weekend?

6    A.  I have.

7           MR. LEVY:  Your Honor, pursuant to stipulation

8    concerning the authenticity of certain documents, the

9    government offers Government Exhibit 840.

10          THE COURT:  Received.

11          (Government's Exhibit 840 received in evidence)

12          MR. LEVY:  All right.  And I think we can bring up

13   from original message -- not the very top, but where it says

14   original message.  We'll just leave the internal e-mail in this

15   chain.  Yeah, that's good.

16   Q.  All right.  This is an e-mail chain that you have in front

17   of you; is that right?

18   A.  Yes.

19   Q.  And we're reading one of the messages in that chain; is

20   that right?

21   A.  That's correct.

22   Q.  And it says it is from Joseph Collins to Dennis Klejna,

23   Sunday, October 9th of 2005; is that right?

24   A.  That's correct.

25   Q.  And is that that weekend that we were just discussing just

1    before Refco was about to make its public announcement?

2    A.  Yes, that's correct.

3    Q.  And it says, "Subject:  Script for communications with

4    regulators and SROs"; is that right?

5    A.  Yes.

6    Q.  What's an SRO?

7    A.  I'm sorry, I don't recall.

8    Q.  And it said, "Dennis, Set forth below is a script which can

9    be used in speaking with the relevant regulators and SROs on

10   Monday morning."  Monday morning was when you said you had

11   planned to make all of these various disclosures?

12   A.  Yes.

13   Q.  "Obviously, this is a draft and subject to further revision

14   based upon the results of your further investigation and

15   discussions today."

16           And if we jump to No. 4, it says -- this is

17   Mr. Collins' writing, "There was no material impact on Refco's

18   financial statements.  While the filing with the SEC scheduled

19   for later this week will be delayed, this is a matter of

20   caution to allow the completion of the review.  No financial

21   report filing at a regulated sub will be delayed."

22           No. 5 says, "There was no impact whatsoever on the

23   financial statements for businesses of Refco's regulated

24   subsidiaries."  All right.  We can put that to the side.

25           Did Refco issue a press release the next day?

CABPCOL2                    Schoen - direct

```
 1   A.  We did.
 2   Q.  Did you participate in drafting it?
 3   A.  Yes.
 4   Q.  Did you tell the public that there was no material impact
 5   on Refco's financial statements?
 6   A.  We did not.
 7   Q.  You said something different?
 8   A.  Yes, we said something different.
 9   Q.  Do you have in front of you the government exhibit that's
10   been marked for identification as Government 1012?
11   A.  Yes.
12   Q.  Is that the press release that you issued on Monday
13   morning?
14   A.  It is.
15            MR. LEVY:  Your Honor, the government offers
16   Government Exhibit 1012.
17            THE COURT:  1012, Mr. Bach?  Press release.
18            MR. BACH:  No objection.
19            THE COURT:  Received.
20            (Government's Exhibit 1012 received in evidence)
21   Q.  All right.  This is the press release that was issued by
22   Refco on Monday morning?
23   A.  Yes.
24            MR. LEVY:  And can we actually start a little bit
25   higher up there from what we're expanding, meaning can we
```

1   capture the title as well in those first two paragraphs?

2   Q.  And could you please read to the jury what Refco actually

3   told the public in its press release on Monday morning?

4   A.  Yes.  Refco -- The title is "Refco announces undisclosed

5   affiliate trans.  New York, October 10th, PR Newswire First

6   Call.  Refco, Inc. today announced that it had discovered,

7   through an internal review, a receivable owed to the company by

8   an entity controlled by Phillip R. Bennett, chief executive

9   officer and chairman of the board of directors, in the amount

10  of approximately $430 million.  Mr. Bennett today repaid the

11  receivable in cash, including all accrued interest.

12          "Based on the results of the review to date, the

13  company believes that the receivable was the result of the

14  assumption by an entity controlled by Mr. Bennett of certain

15  historical obligations owed by unrelated third parties to the

16  company, which may have been uncollectible.  The company

17  believes that all customers' funds on deposit are unaffected by

18  these activities.  Independent counsel and forensic auditors

19  have been retained to assist the audit committee in an

20  investigation of these matters.

21          "This receivable from the entity controlled by

22  Mr. Bennett was reflected on the company's prior period

23  financials, as well as on the company's May 31, 2005, balance

24  sheet.  The receivable was not shown as a related-party

25  transaction in any such financials.  For that reason, and after

1    consultation by the audit committee with the company's

2    independent accountants, the company determined on October 9th,

3    2005, that its financial statements, as of, and for the periods

4    ended, February 28th, 2002, February 28th, 2003, February 28th,

5    2004, February 28th, 2005, and May 31, 2005, taken as a whole,

6    for each of Refco, Inc., Refco Group Limited, LLC, and Refco

7    Finance, Inc., should no longer be relied upon."

8    Q.  So what you told the public was that the financial

9    statements were potentially inaccurate and should not be relied

10   on?

11   A.  That's correct.

12   Q.  All right.  We can take that down.  This was issued on

13   Monday?

14   A.  Yes, Monday morning.

15   Q.  What happened to Refco's stock price when this press

16   release was issued?

17   A.  Over the course of the day Monday, the stock price dropped

18   from $31 a share to $17 a share, and the company was inundated

19   with phone calls from investors trying to understand what

20   happened.

21   Q.  What happened the next day, on Tuesday?

22   A.  Tuesday morning, the New York Stock Exchange announced that

23   it would not open the stock for trading; so that the

24   shareholders could not buy and sell the stock of the company.

25   There was a news commentator who went on CNN, I think, or CNBC,

1    stated that he thought that the company was now in default on

2    its debt covenants; so in default on its debt.

3             News came out that Mr. Bennett was arrested at his

4    home, as a result of this, and the information flowing out into

5    the marketplace, customers began asking for their money back in

6    droves.  We had what is often called a run on the bank.  We

7    think of the equivalent if you had a broker's account at

8    Merrill Lynch and found out it was ripe with fraud, your first

9    thought would be, I ought to get my money out of Merrill Lynch

10   and put it somewhere else.

11            Well, the customers were calling like crazy, and we

12   were paying them back their money as fast as we could.  Over

13   the course of the day Tuesday, the stock went almost all the

14   way to zero.

15   Q.  When you issued the press release, making this public

16   disclosure, were you aware that this was a potential or even

17   likely result?

18   A.  We were aware that it was a very real possibility,

19   potentially likely.

20   Q.  What happened through the rest of the week?

21   A.  We continued to be inundated with redemption requests,

22   customers who wanted their money back.  Through the course of

23   the day Wednesday and by the close of the market on Wednesday,

24   over the course of Tuesday and Wednesday, we had returned well

25   in excess of a billion dollars of funds back to customers who

CABPCOL2                        Schoen - direct

1   requested it.

2            We concluded by the end of the afternoon Wednesday,

3   after the market closed, that we had run out of money, that we

4   had no more cash.

5   Q.  And so what happened?

6   A.  So we announced, and I don't recall today whether it was

7   Wednesday after the market closed or whether it was Thursday

8   morning, but I think we announced Thursday morning that we were

9   no longer in a position to honor any customer redemption

10   requests.

11            The stock, of course, was not trading.  When I

12   mentioned earlier that it went to zero on Tuesday, the New York

13   Stock Exchange did open it for trading on Tuesday afternoon,

14   and that's when it went from 17 to zero.

15            And what happened after Thursday was the company, with

16   no more money, started preparing for bankruptcy filing, and I

17   believe filed for bankruptcy the following Monday.

18   Q.  What happened to the value of the Refco shares that were

19   owned by Thomas H. Lee Partners and all of the shareholders out

20   in the public?

21   A.  It went to zero.

22   Q.  What happened to the value of Thomas H. Lee's investment

23   overall on this transaction?  What kind of losses were

24   suffered?

25   A.  We invested about $500 million originally.  As I mentioned

1    earlier today, we got about $200 million back from the sale of

2    a small portion of our shares in the IPO, in the public stock

3    offering, and the rest of our shares were worthless.  So we

4    lost -- we never got back $300 million of the 500 that we

5    invested.

6         The other way I looked at it is before we announced

7    the fraud and the stock was at 31, our remaining shares were

8    worth a billion five.  And if I take that into 200 million, our

9    total value was a billion-seven, we wound up with just the 200

10   million and lost a billion-five in value over the course of

11   that week.

12        MR. LEVY:  Your Honor, may I have a moment to consult

13   with counsel?

14        THE COURT:  Yes.

15        MR. LEVY:  I have no further questions, your Honor.

16        THE COURT:  Thank you.  Shall we take a quick break,

17   ladies and gentlemen?  All righty.  I know that some of you

18   ladies and gentlemen wrote on your exhibits.  We certainly want

19   to keep whatever notes you want.  Thankfully, we have prepared

20   folders for you by juror number.

21        If you will put your exhibits into the folders, they

22   will be kept for you.  You can keep them at your chair, and

23   we'll just pick them up every night and put them up on the desk

24   so that they'll be retained for you.  You don't have to worry

25   about losing them, and you don't have to take them into the

1    jury room with you.  Please follow the same rules.  Don't

2    discuss the case among yourselves, and I look forward to seeing

3    you shortly.  Thank you for your attention.

4             THE DEPUTY CLERK:  All rise.  You can leave your

5    exhibits on your chairs and take your folders out with you when

6    you exit the jury room.  Thank you, folks.

7             (Jury exits)

8             THE COURT:  You may step down, sir.

9             (Witness temporarily excused)

10            THE COURT:  Anything else on the record?

11            MR. LEVY:  No, your Honor.

12            THE COURT:  Okay.  Off the record.

13            (Discussion held off the record)

14            (Recess taken)

15            (Jury enters) (Witness resumes the stand)

16            THE COURT:  Ladies and gentlemen, I forgot to thank

17   you this morning for being so prompt.  It really helps us get

18   rolling and get our work done.  So thank you for your

19   consideration.  I'm sure it was the enticement of coffee and

20   tea.

21            JUROR:  Absolutely.

22            JUROR:  It helped.

23            THE COURT:  We try.  Won't you be seated, ladies and

24   gentlemen.  We now proceed to the cross-examination of

25   Mr. Schoen.  Mr. Bach.

1              MR. BACH:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    BY MR. BACH:

4    Q.  Good morning, Mr. Schoen.

5    A.  Good morning.

6    Q.  Mr. Schoen, before the end of your direct examination, the

7    prosecutor asked you about a press release that was made to the

8    public on October 10th; do you remember that?

9    A.  Yes.

10   Q.  And in that press release, an announcement was made that

11   events at Refco would have an impact on Refco's financial

12   statements, correct?

13   A.  Yes.

14             MR. BACH:  And that press release, can we put it up on

15   the board, please?  Government Exhibit 1012.

16   Q.  That press release, if we can refer to the language in the

17   second paragraph, halfway down says that "The company

18   determined on October 9th, 2005, that its financial statement,

19   as of, and for the periods ended February 28, 2002,

20   February 28, 2003, February 28, 2004, February --

21             THE COURT:  Do you want it taken down?  Slowly.

22             MR. BACH:  I'm sorry, Judge.

23   Q.  -- "February 28th, 2002, February 28th, 2003,

24   February 28th, 2004, February 28, 2005, and May 31, 2005, taken

25   as a whole, for each of the Refco, Inc., Refco Group Limited,

470

1    LLC, and Refco Finance, Inc. should no longer be relied upon,"

2    correct?

3    A.  Yes.

4    Q.  And that determination, according to the press release, was

5    made the day before on Sunday, October 9th, correct?

6    A.  Yes.

7    Q.  And that determination was made at the board meeting on

8    Sunday, October 9th, correct?

9    A.  I don't recall.  I believe so.

10   Q.  Okay.  And that board meeting was at 4:00 in the afternoon

11   on Sunday on October 9th, correct?

12   A.  I don't recall.

13   Q.  Let me see if I can refresh your recollection.

14           MR. BACH:  May I approach?

15           THE COURT:  Yes, sir.  You don't have to ask.

16   Q.  Let me show you what's been marked for identification as

17   Defense Exhibit 231 and ask you if that refreshes your

18   recollection that the board meeting was at 4:00 on --

19           MR. SCHWARTZ:  Could the Court ask Mr. Bach to speak

20   up?

21   Q.  And let me ask if that refreshes your recollection that the

22   board meeting was at 4:00 on Sunday, October 9th?

23           MR. LEVY:  Your Honor, if possible, could we could see

24   a copy?

25           MR. BACH:  I'll show Mr. Levy.

1   A.  That's what this says, yes.

2           THE COURT:  Sir, counsel is not asking you to read the

3   document.  He's asking whether, after looking at the document,

4   you say, ahh, yes, now, I remember it was at 4:00.

5   A.  I have no recollection of the timing, other than reading

6   this document.

7   Q.  Okay.  Do you recognize this document?

8   A.  No.

9   Q.  Is this the board minutes of --

10          MR. LEVY:  Objection.

11  Q.  -- of the board meeting?

12          MR. LEVY:  He said he doesn't recognize the document.

13          THE COURT:  Are you able to answer that question, sir?

14  A.  I don't recognize the document.

15  Q.  Before the board meeting on Sunday, October 9th, no

16  determination had been made about whether the events at Refco

17  would have an impact on its financial statements, correct?

18  A.  I don't have any recollection of the timing.

19  Q.  And can we look at Joe Collins' e-mail, Government Exhibit

20  840?  I need to ask the government to pull that up.

21          MR. BACH:  And can you blow up the top of that

22  document?

23  Q.  Mr. Schoen, that's a document that the government showed

24  you during your direct examination?

25  A.  Yes.

CABPCOL2                      Schoen - cross

1    Q.   An e-mail Joe Collins sent to Dennis Klejna?

2    A.   That's correct.

3    Q.   And the time on the e-mail is 2:00, 2:02, correct?

4    A.   I see -- Am I looking in the wrong place?  Oh.  Oh, I see.

5    At the top, yes.

6    Q.   Go down.  You can see that Joe's e-mail to Dennis Klejna is

7    at 1355; do you see that?

8    A.   That's correct, that's 1:55 in the afternoon.

9    Q.   That's right.  That's shortly before 2:00?

10   A.   Yes.

11   Q.   And that was before 4:00 on Sunday October 9th, correct?

12   A.   Yes.

13   Q.   And, sir, you don't know what conversations Joe Collins was

14   having with Mr. Klejna leading up to this e-mail, correct?

15   A.   No, I don't.

16   Q.   You don't know what guidance Mr. Klejna gave him, if any,

17   about what to write in this e-mail, correct?

18   A.   I don't.

19   Q.   And Joe Collins says in this e-mail, if you look at the top

20   paragraph, he says, "Obviously, this is a draft"?

21   A.   Yes.

22   Q.   And "subject to further revision based upon the results of

23   your further investigation and discussions today," correct?

24   A.   That's what it says.

25   Q.   And you, sir, over that weekend, were developing an

1   understanding of some of the facts, as best you could, correct?

2   A.  I was, along with the rest of the board of directors, yes.

3   Q.  And Joe Collins wasn't present at those meetings, correct?

4   A.  I don't believe so.

5   Q.  And you hadn't shared with him the facts that you were

6   learning, correct?

7   A.  I don't think so.

8   Q.  And here, he notes that he's offering this script, but it's

9   based -- it's subject to further results, further

10  investigations that Mr. Klejna and others were pursuing,

11  correct?

12  A.  That's what it says.

13  Q.  Now, going back a couple of years, Mr. Schoen, back to the

14  end of 2003, that's when you and TH Lee began to look at Refco,

15  correct?

16  A.  Yes.

17  Q.  And you were introduced to Refco through an investment bank

18  called Credit Suisse First Boston?

19  A.  Yes.

20  Q.  And you know from your experience that Credit Suisse First

21  Boston is a very reputable investment bank?

22  A.  Yes.

23  Q.  And they presented Refco to you?

24  A.  They did.

25  Q.  They prepared some written materials for you with the

CABPCOL2                    Schoen - cross

1   company's management?

2   A.  Yes.

3   Q.  And they arranged for you to meet the company's management?

4   A.  Yes.

5   Q.  And there were meetings in January where you actually sat

6   down with Mr. Bennett, Mr. Trosten, Mr. Maggio and others,

7   correct?

8   A.  Yes.

9   Q.  And you learned some information about Refco's performance

10  financially?

11  A.  Yes.

12  Q.  How it had done historically?

13  A.  Yes.

14  Q.  And Mr. Bennett and Mr. Trosten took you through that,

15  correct?

16  A.  At the meeting in January, Mr. Bennett and Mr. Trosten took

17  us through it.

18  Q.  And one of the things you like to do when you sit down with

19  the management of a company that you're looking at, is you like

20  to get a feel for those managers personally, correct?

21  A.  Yes.

22  Q.  You want to see if they inspire a certain level of

23  confidence, correct?

24  A.  Yes.

25  Q.  You want to see if these are men that you can trust, right?

CABPCOL2                    Schoen – cross

1   A.  That's one of the things that we do.

2   Q.  Yes.  And so as you sit across the table, you more or less

3   form an impression of them; you begin to size them up, correct?

4   A.  Yes.

5   Q.  And at this stage, in January, when you were meeting with

6   Mr. Bennett and Mr. Trosten and Mr. Maggio, there were no

7   lawyers in the room, right?

8   A.  No.

9   Q.  And after that meeting, you and Thomas H. Lee continued to

10  move forward and continued to explore the possibility of this

11  transaction, correct?

12  A.  We did.

13                (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And in February you told Credit Suisse First Boston that

2   you were prepared to consider paying more money to purchase

3   Refco, right?

4   A.  Yes.

5   Q.  Earlier in November you had put one potential price on the

6   table, correct?

7   A.  Yes.

8   Q.  But in February you raised your bid, so to speak, correct?

9   A.  Yes.

10  Q.  And part of the reason you raised your bid is you had been

11  impressed by what you heard from Mr. Bennett and Mr. Trosten

12  when they met with you?

13  A.  Part of the reason we raised our bid was we had been

14  impressed by Mr. Bennett, yes.

15  Q.  And in February you began what you've described as due

16  diligence, correct?

17  A.  I think we began due diligence back when we received the

18  initial information in December.  We accelerated or increased

19  our level of due diligence after the meeting in January.

20  Q.  Thank you.  And in February was when you began to hire

21  outside firms and outside consultants to assist you in the due

22  diligence, correct?

23  A.  I don't remember the exact timing.  I believe that we had

24  work -- some level of work done by our outside lawyers Weil,

25  Gotshal right from the beginning, just confidentiality

Cabdcol3                          Schoen – cross

1    agreements and so forth.  So I don't recall when we started

2    doing more with outside parties.

3    Q.  KPMG did accounting due diligence, correct?

4    A.  They did.

5    Q.  That means looking at the company's financial records, its

6    historical financial performance, correct?

7    A.  Yes.

8    Q.  You hired them in February, correct?

9    A.  I don't recall when we first hired them to work for us.

10   Q.  In any event, you do recall that you hired a number of

11   firms, KPMG and a number of other firms, to come in and help

12   you?

13   A.  Yes, I do.

14   Q.  And these were firms that you believed to be among the best

15   in their class for the kind of work that you were asking them

16   to do?

17   A.  Yes.

18   Q.  And you wanted them to take a very careful look at Refco

19   because you had an important decision to make about whether to

20   buy them, correct?

21   A.  We hired them to do work for us for that reason, yes.

22   Q.  And KPMG is one of the largest accounting firms in the

23   world, correct?

24   A.  That's correct.

25   Q.  And they spent a great deal of time looking at the books

Cabdcol3                    Schoen - cross

1  and the records and the entries in Refco's financial

2  statements, right?

3  A.  I don't know how much time but I believe that they spent a

4  considerable amount of time, yes.

5  Q.  And they spent a considerable amount of time talking to

6  Refco's own outside auditors, Grant Thornton, correct?

7  A.  They did.

8  Q.  And they reported to you that they were comfortable with

9  the numbers that they saw being reported in the financial

10  statements, correct?

11             MR. LEVY:  Objection.  Hearsay.

12             THE COURT:  Mr. Bach.  Hearsay?

13             MR. BACH:  It is not being offered for the truth.

14             THE COURT:  What is it being offered for, then,

15  please?

16             MR. BACH:  To show that a statement was made by KPMG

17  that they were comfortable with the numbers.  We are not saying

18  that these numbers were numbers that anyone should be

19  comfortable with.

20             THE COURT:  I thought that you were offering it for

21  the fact that they were comfortable.

22             MR. BACH:  That they reported to Mr. Schoen that they

23  were comfortable.

24             MR. LEVY:  Which is irrelevant.

25             THE COURT:  Why does that differ?

1          MR. BACH:  It is his state of mind, Judge.

2          MR. LEVY:  Why is his state of mind relevant?

3          THE COURT:  You are really going to have to speak up

4     if you want to be taken down.

5          MR. LEVY:  I'm sorry.  Your Honor, I don't see why his

6     state of mind is relevant, at least in this context.

7          MR. BACH:  I will rephrase the question.

8          THE COURT:  Sir.

9     BY MR. BACH:

10    Q.  Nothing that KPMG said to you caused you to refers course

11    and to stop pursuing this transaction, correct?

12    A.  That's correct.

13    Q.  You hired -- in addition to KPMG, you hired a firm known as

14    McKenzie, correct?

15    A.  Yes.

16    Q.  They were a big and sophisticated firm, correct?

17    A.  Yes.

18    Q.  You hired a firm called Sandler O'Neill, correct?

19    A.  Yes.

20    Q.  That's a well-known investment firm, specializing in

21    financial service companies?

22    A.  Yes.

23    Q.  You hired Marsh & McLennan, correct?

24    A.  Yes.

25    Q.  And all of these firms helped you take a close look at

Cabdcol3                         Schoen – cross

1    Refco to assist your decision-making process in connection with

2    a potential purchase of that company, correct?

3    A.  That's correct.

4    Q.  And you spent, or Thomas H. Lee spent in the neighborhood

5    of approximately $10 million on its own and on the due

6    diligence efforts of all of these firms, correct?

7    A.  That is correct.

8    Q.  And is it fair to say, sir, that the due diligence that you

9    performed with respect to Refco was among the most extensive

10   due diligence that you have ever done?

11   A.  In my experience, yes.

12   Q.  And you, sir, have worked on about a hundred deals in your

13   time at Thomas H. Lee, correct?

14   A.  Fewer than that.  My reference yesterday was to how many

15   deals Thomas Lee as a whole company had done, but I had worked

16   on dozens of deals.

17   Q.  And the due diligence here was as expensive as the due

18   diligence on any deal you've worked on before?

19   A.  Yes.

20   Q.  And all of these firms that you relied on to help you were

21   sophisticated, professional firms, correct?

22   A.  Yes.

23   Q.  And none of them came to you and said don't buy this

24   company?

25   A.  That is correct.

Cabdcol3                        Schoen – cross

1   Q.  And despite the millions of dollars you spent and the teams

2   of professionals, none of them found a fraud, correct?

3   A.  That is correct.

4   Q.  And in addition to hiring all of these outside firms and

5   spending all of this money, you contacted people on Wall Street

6   to get a sense of what they knew and thought of Mr. Bennett,

7   correct?

8   A.  Yes.  That was part of our diligence.

9   Q.  And those reports, the reports from those people, came back

10  very positive, correct?

11  A.  Yes.

12  Q.  They said nice things about Mr. Bennett, correct?

13  A.  To the best of my recollection.

14  Q.  And you hired private investigators to investigate

15  Mr. Bennett, correct?

16  A.  Yes.

17  Q.  And those reports didn't come back with any indication of

18  any reason not to go forward, correct?

19  A.  That is correct.

20  Q.  And one of the things that you learned in conducting the

21  due diligence was that over the years Refco had been buying a

22  number of companies, correct?

23  A.  Yes.

24  Q.  You learned that they had bought a company called

25  Lind-Waldock?

1   A.  It is Lind-Waldock, yes.

2   Q.  And you learned that there were seven, eight or nine other

3   acquisitions that Refco had made?

4   A.  I don't recall the number but, yes, there were a number of

5   them.

6   Q.  And it gave you some comfort that this was a company that

7   could afford to make continuous acquisitions, that it could

8   afford to buy a number of companies?

9   A.  Yes.

10  Q.  That is a sign of good financial health usually when a

11  company can afford to do that, correct?

12  A.  Yes.

13  Q.  And here you believed that it was?

14  A.  We believed it was an attractive part of the company's

15  story, that it had been able to acquire other businesses as

16  well as to grow organically and grow its own business.

17  Q.  OK.  As you did this due diligence, you continued to sit

18  down with Mr. Bennett on a number of occasions, correct?

19  A.  We had meetings with him.  We had phone calls.  Yes.

20  Q.  And with Mr. Trosten?

21  A.  Yes.

22  Q.  And you maintained a level of confidence in him, correct?

23  A.  In whom?

24  Q.  In Mr. Bennett.

25  A.  In Mr. Bennett, yes.

1    Q.  And in Mr. Trosten?

2    A.  I think I mentioned earlier that we became convinced over

3    time Mr. Trosten was not -- did not have all the capabilities

4    we needed.

5    Q.  That is later, over time, correct?

6    A.  I just can't recall the timing now.  I'm sorry.

7    Q.  And along the way you met a lawyer named Dennis Klejna?

8    A.  Yes.

9    Q.  And you learned that Mr. Klejna had been the director of

10   enforcement at the U.S. Commodity Futures Trading Commission?

11   A.  That is correct.

12   Q.  And that means that he was the federal official in charge

13   of making sure that people who traded in commodities followed

14   the rules, correct?

15   A.  I believe so.

16   Q.  And you understood that he was the chief lawyer inside

17   Refco?

18   A.  Yes.  He was the general counsel.

19   Q.  And when you were considering buying Refco, you thought it

20   was a good sign that a lawyer with his credentials was at the

21   helm of Refco's Legal Department, correct?

22   A.  Yes, we did.

23   Q.  And you thought it reflected well on Mr. Bennett that he

24   had hired Mr. Klejna to serve in that role, correct?

25   A.  Yes.

Cabdcol3                     Schoen - cross

1   Q.  One thing you learned as you looked at Refco was that

2   before Mr. Bennett took over the company Refco had a checkered

3   past?

4   A.  Yes.

5   Q.  And that was under its former owner, correct?

6   A.  That was our understanding.

7   Q.  And that was a man named Tom Dittmer, correct?

8   A.  Yes.

9   Q.  And you learned that when Mr. Bennett took over, he brought

10  Dennis Klejna on board, correct?

11  A.  Yes.

12  Q.  And it was your impression that Mr. Klejna had done a very

13  good job in cleaning up Refco on the regulatory front, correct?

14  A.  Yes, it was.

15  Q.  And you and your colleagues at T. H. Lee were impressed by

16  Mr. Klejna's knowledge of the company's details and of its

17  business, correct?

18  A.  I believe so.

19  Q.  And you believed that Mr. Klejna was a man -- a lawyer with

20  great capability, correct?

21  A.  Yes.

22  Q.  And you believed he had an extremely positive impact on the

23  company, correct?

24  A.  Yes.

25  Q.  And you still believe that to this day?

Cabdcol3                    Schoen - cross

1    A.  I do.

2    Q.  And Mr. Klejna worked inside Refco under Mr. Bennett as his

3    chief lawyer the whole time, sir, that you were involved with

4    Refco, correct?

5    A.  That is correct.

6    Q.  Now, I was asking you before about meetings in January.

7          You received more information in March, correct?

8    A.  I think we received more information as we went along, so I

9    don't have a specific recollection of what was received in

10   March.

11   Q.  OK.  In March you received more written materials and more

12   presentations from Credit Suisse First Boston, correct?

13   A.  I just don't recall timing.  As I said, we continued to

14   receive information throughout the due diligence process.

15   Q.  OK.  Let me show you what's been marked for identification

16   as Defense Exhibit 164.

17          By the way, you didn't meet Mr. Collins in January,

18   correct?

19   A.  No.

20   Q.  You didn't meet him in February, correct?

21   A.  No.

22   Q.  You didn't meet him in March, correct?

23   A.  I didn't meet him in person.  I may have been on a phone

24   call with him.  I just don't recall.

25   Q.  The first time you met him was in April, correct?

Cabdcol3                          Schoen - cross

1   A.  Face-to-face, yes.

2   Q.  But in March you were continuing to get information from

3   Mr. Bennett and from Credit Suisse, correct?

4   A.  I believe so.

5            MR. BACH:  May I approach?

6            THE COURT:  Yes, sir.  You don't have to ask.

7            MR. BACH:  Thank you, your Honor.

8            THE COURT:  You do have to walk fast, though.

9   Q.  Mr. Schoen, you have before you what's been marked for

10  identification as Defendant Exhibit 164.

11  A.  OK.

12  Q.  Do you recognize that document, sir?

13  A.  Yes, I do.

14  Q.  Is this a presentation that CSFB gave to Thomas H. Lee in

15  connection with discussions about Refco?

16  A.  Yes.

17           MR. BACH:  We offer it.

18           MR. LEVY:  No objection, your Honor.

19           THE COURT:  Received.

20           (Defendant's Exhibit 164 received in evidence)

21  BY MR. BACH:

22  Q.  And, sir, I asked you a couple of moments ago if you

23  remembered receiving more information in March.  This makes it

24  clear that you did, correct?

25  A.  Yes, it does.

Cabdcol3                    Schoen - cross

1   Q.  And one of the things you learned in March when you were

2   meeting with Refco's management and with Credit Suisse First

3   Boston, one of the things you were told was that Refco had $500

4   million of extra cash, correct?

5   A.  Yes.

6           MR. BACH:  Can we open up to page 3 of the document?

7   Q.  And the people who told you that, the people who told you

8   about the $500 million of extra cash, were Refco's management

9   and Credit Suisse First Boston, correct?

10  A.  That's correct.

11          MR. BACH:  Can we highlight the fourth bullet down

12  that says "Free Cash Flow."

13  Q.  Do you see, sir, it says, "Free cash flow during this

14  period totaled approximately $500 million as evidenced by the

15  analysis in Appendix 3?"

16  A.  Yes.

17  Q.  So CSFB gave you a written analysis to support this

18  statement that there was $500 million in cash, correct?

19  A.  That's correct.

20  Q.  Can we flip to Appendix 3?

21          This is the analysis that was presented to you and

22  your colleagues at T. H. Lee by Credit Suisse, correct?

23  A.  Yes, that's correct.

24  Q.  And there is a figure towards the right end of the document

25  that's not quite 500 million but it is 499 plus change,

Cabdcol3                          Schoen - cross

 1  correct?

 2  A.  498 plus change, but, yes, close to 500 million.

 3  Q.  Your eyes are better than mine.

 4          And you reviewed that in March, correct?

 5  A.  Yes.

 6  Q.  OK.  Can we go back to page 3.

 7          Also in March there were discussions about shareholder

 8  loans, correct?

 9  A.  Yes.

10  Q.  And, again, this is before you had met or talked to Joe

11  Collins, correct?

12  A.  Again, I had not met him.  I don't recall if I was on any

13  phone calls with him.  I'm just trying to be accurate.  I have

14  no recollection --

15          THE COURT:  Counsel, you have to let him finish.  The

16  court reporter is good but he isn't that good.

17          THE WITNESS:  Thank you.

18  A.  I have no recollection of that.

19  Q.  But your first -- and I appreciate that, Mr. Schoen -- your

20  first specific recollection of actually talking to him comes in

21  April at a meeting --

22  A.  That's correct.

23  Q.  OK.  But in March, when you sat down with Mr. Bennett and

24  Credit Suisse First Boston, there is discussion about Refco's

25  history of shareholder loans, correct?

1    A.  Yes.

2    Q.  And you were given information about the amounts associated

3    with those loans, correct?

4    A.  Yes.

5    Q.  Would you highlight the third bullet point, please.

6            You were told that "As of fiscal year end 2000,

7    shareholder loans totaled $228 million, as of year end 2004 the

8    balance will be zero inclusive of ordinary course operating

9    distributions."

10           Correct?

11   A.  Yes.

12   Q.  And by "shareholder loans," that's another way of talking

13   about the related-party debt, correct?

14   A.  Yes.

15   Q.  And you were being told that as of fiscal year end 2000,

16   the amount of related-party debt was $228 million, correct?

17   A.  Yes.

18   Q.  You were also told that it was going to be zeroed out

19   completely?

20   A.  Yes.

21   Q.  OK.  And you understand, sir, that the figure you were

22   given, the 228 million, was a figure as of the fiscal year end,

23   correct?

24   A.  I believe so.

25   Q.  And typically that's the number that appears on the

Cabdcol3                        Schoen - cross

1   financial statement, the number as of the fiscal year end,

2   correct?

3   A.  Yes.  I believe this number did.

4   Q.  OK.  And numbers on financial statements -- withdrawn.

5           A financial statement is a snapshot in time; it gets

6   the numbers as they appear at the end of the year, correct?

7   A.  A balance sheet is a snapshot in time.  The income

8   statement is a measurement of performance over time.

9   Q.  OK.  But the numbers in the statements can rise and fall

10  during the course of the year depending on what happens at the

11  company and how the company performs, the numbers in the

12  balance sheets, correct?

13  A.  That is correct.

14  Q.  And so if $228 million is reported on the balance sheet, it

15  could have been higher or lower at an earlier point in the

16  year, correct?

17  A.  Yes.

18  Q.  So Mr. Bennett and Credit Suisse First Boston told you that

19  these related-party debts, these shareholder loans would be

20  eliminated, correct?

21  A.  That is correct.

22  Q.  And that was before you remember meeting Mr. Collins in

23  April, correct?

24  A.  That is correct.

25  Q.  And when you had these discussions with Credit Suisse First

Cabdcol3                        Schoen - cross

1    Boston, this was not the first time in your career you had come

2    across shareholder debt in a company that you were considering

3    acquiring, correct?

4    A.  I think that's correct.

5    Q.  There is -- let's define some terms.

6           Shareholder debt, or related-party debt, are debts or

7    obligations between companies in the same group, correct?

8    A.  Can you repeat the question, please?

9    Q.  Sure.  You referred to a group of companies as a family.

10   Do you remember that?

11   A.  Yes.

12   Q.  And shareholder debt or related-party debt are debts

13   between companies in the same family, correct?

14   A.  Not necessarily.

15   Q.  OK.  But if a company in a family borrows money from

16   another company in the family, that's a related-party debt,

17   correct?

18   A.  To clarify what I said earlier when I was talking about the

19   family, I was talking about all of the 100 percent-owned

20   subsidiaries of Refco, the parent.  And in that case, debts

21   between those entities, if it was entities within the Refco

22   family, would typically be called intercompany debt.

23   Q.  OK.  Thank you.  So let's talk about intercompany debt,

24   then.

25          Debts between companies in the same family are known

Cabdcol3                    Schoen - cross

1   as intercompany debt, correct?

2   A.  Yes.

3   Q.  And that's different from third-party debt, correct?

4   A.  Yes.

5   Q.  Or what's otherwise known as ordinary debt, right?

6   A.  I don't know that term.

7   Q.  Let's stick with third-party debt.

8           Third-party debt is when you go and borrow money from

9   a bank, for example, right?

10  A.  Yes, as an example.

11  Q.  And it is when a company borrows money from an unaffiliated

12  entity, correct?

13  A.  If it is unrelated third-party debt, yes.

14  Q.  OK.  So third-party debt, you can go outside of the family

15  of companies and borrow it from some independent source,

16  correct?

17  A.  If it is unrelated third-party debt, yes.

18  Q.  That's what unrelated third-party debt is, correct?

19  A.  Yes.

20  Q.  That is different from intercompany debt, which is when you

21  stay within the family, correct?

22  A.  Yes.

23  Q.  OK.  And there is nothing, Mr. Schoen, surprising about the

24  existence of intercompany debt or shareholder loans in a

25  privately-held company, correct?

Cabdcol3                    Schoen - cross

1   A.   That's correct, although those are different things that

2   you referred to.

3   Q.   OK.  But Thomas H. Lee over the years has taken a lot of

4   private companies and taken them public, correct?

5   A.   We've invested in them and subsequently taken them public,

6   yes.

7   Q.   OK.  And in these transactions you have seen on a number of

8   occasions that there is a history of debt between, say, parents

9   and subs, correct?

10  A.   It is a very general question.  I don't know how to answer

11  it.  I believe I've seen all kinds of things, sir.  I'm trying

12  to be responsive but I don't know --

13  Q.   I appreciate it and I'm asking you things that are direct.

14        Here you believed that there was a history of

15  shareholder loans among Refco entities that had been fully

16  disclosed to you, correct?

17  A.   Again, when you said "among Refco entities," it was between

18  Refco and the holding company that owned 90 percent of its

19  stock.

20  Q.   Here you were told about a history of loans between Refco

21  and the holding company, and you believed that the full amount

22  of those loans had been fully disclosed to you, correct?

23  A.   I did.

24  Q.   OK.  You had discussions with Mr. Bennett about that,

25  right?

1   A.  Yes.

2   Q.  And he walked you through, right?

3   A.  Yes.

4   Q.  And you took him at his word, correct?

5   A.  Well, we believed him.  We also obviously reviewed the

6   statements with Mr. Trosten.  We had conversations with the

7   auditors.  We had meetings with First Boston.  But, yes, we

8   believed him.

9   Q.  And by the time you got to April, people from Thomas H. Lee

10  and the firms that it had been working with had spent hundreds

11  of hours doing due diligence on Refco?

12  A.  Yes.

13  Q.  And you decided to move the transaction forward to the next

14  step, correct?

15  A.  We did.

16  Q.  And you decided that it was time to put a legal document

17  together that would set forth the intention of the parties

18  going forward, correct?

19  A.  Yes.

20  Q.  That's the Letter of Intent, correct?

21  A.  That is correct.

22  Q.  And there were meetings in April to discuss the content of

23  the Letter of Intent, correct?

24  A.  Yes.

25  Q.  And that's a legal document generally prepared by lawyers,

Cabdcol3                     Schoen - cross

1  correct?

2  A.  It is.  I think I stated yesterday that it is nonbinding,

3  but it was prepared with the assistance of attorneys.

4  Q.  Yes.  And it was in connection with the preparation of that

5  document that you first met Joe Collins in April, correct?

6  A.  It was -- we prepared it before I met Joe Collins.  We

7  presented it to Mr. Collins and Mr. Bennett.

8  Q.  So when you say "we," you and your lawyers actually drafted

9  the first draft of this document, correct?

10  A.  Yes.  It was drafted as a proposal.

11  Q.  OK.  And you and your lawyers did that on your own before

12  you showed it to anyone outside of --

13  A.  We did.

14  Q.  OK.  Then you sent it over to Mr. Collins and Mr. Bennett

15  so that they could take a look at it, correct?

16  A.  We -- yes.

17  Q.  OK.  And your lawyers, sir, were lawyers at a firm called

18  Weil, Gotshal, correct?

19  A.  That is correct.

20  Q.  And that included a man name Jim Westra?

21  A.  Yes.

22  Q.  And Jay Tabor?

23  A.  That is correct.

24  Q.  And they worked with you in preparing the first draft of

25  the Letter of Intent?

1    A.  Yes.

2    Q.  And once you and Mr. Westra and Mr. Tabor were satisfied

3    with what you had drafted, you sent it over to Mr. Bennett and

4    Mr. Collins?

5    A.  That is correct.

6    Q.  And then you got together at two meetings to discuss it,

7    correct?

8    A.  Yes.

9    Q.  And those meetings were on April 9 and April 15 in 2004?

10   A.  I think I said yesterday I know they were in early April; I

11   don't recall the exact dates.

12   Q.  OK.  And you and Mr. Bennett were present at those

13   meetings?

14   A.  Yes.

15   Q.  Your lawyers from Weil, Gotshal, Mr. Tabor and Mr. Westra,

16   were present at those meetings?

17   A.  Yes.

18   Q.  Mr. Collins was present at those meetings?

19   A.  Yes.

20   Q.  Credit Suisse -- representatives of Credit Suisse First

21   Boston were present at those meetings?

22   A.  I don't recall.

23   Q.  And Sandler O'Neill was present at those meetings, correct?

24   A.  I don't recall.

25   Q.  Let me see if I can refresh your recollection.

Cabdcol3                    Schoen - cross

1   A.  OK.

2   Q.  Mr. Schoen, I'm showing you what's been marked for

3   identification as Defense Exhibit 230, and I'm going to ask you

4   whether this refreshes your recollection about whether Credit

5   Suisse First Boston and Sandler O'Neill attended the meetings?

6           Why don't you take a moment to give it a look.

7           THE COURT:  Mr. Schoen, counsel is asking you the same

8   type of question as the last time; that is, after reading

9   whatever this is, do you now say, ah, yes, I recall the answer

10  to that question?

11          (Pause)

12  A.  Other than reading the document, I don't recall it.

13  Q.  That's all right.  This is an e-mail that you received,

14  Mr. Schoen, on or about April 14, 2004?

15  A.  Yes.

16          MR. BACH:  We offer it.

17          MR. LEVY:  If I could have just one second to look at

18  it?  I don't think there is an objection, your Honor.

19          THE COURT:  Yes.

20          (Pause)

21          MR. LEVY:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 230 received in evidence)

24          MR. BACH:  Can I put it up on the board?

25          If you could blow up right in the middle there where

Cabdcol3                      Schoen - cross

1   it says "CSFB."

2   Q.  Do you see that?  It says, "CSFB wants to get going at

3   10:30 tomorrow."

4   A.  Yes.

5   Q.  And if you go up to the top, Ms. O'Connor, you will see

6   that some of the e-mail addresses up there say "Sandler

7   O'Neill."

8         Do you see that, Mr. Schoen?

9   A.  Yes.

10  Q.  And when you got together at the first meeting in April --

11  we can take that down -- one of the purposes was to take some

12  of the business terms that you and Mr. Bennett had been

13  discussing in March, in February and put them in the form of a

14  legal document, correct?

15  A.  Yes.

16  Q.  And there were items that you had discussed before meeting

17  with Mr. Collins that you now wanted to put in legal form,

18  correct?

19  A.  Discuss with whom?

20  Q.  Discuss with CSFB, with Mr. Bennett in meetings without

21  Mr. Collins present, correct?

22  A.  We didn't discuss the terms of this proposal with them

23  before we provided it to them.

24  Q.  No.  But you -- in March, you had discussed the

25  $500 million in extra cash?

Cabdcol3                      Schoen - cross

1    A.  Yes.

2    Q.  And you had discussed the existence of shareholder loans,

3    correct?

4    A.  Yes.

5    Q.  And you had discussed how they would be zeroed out,

6    correct?

7    A.  Yes.

8    Q.  And you discussed all of that before you met Mr. Collins,

9    correct?

10   A.  Yes.

11            MR. BACH:  Could we put up on the board Government

12   Exhibit 825?

13   Q.  This is a chronology that the government showed you on

14   direct examination, correct?

15   A.  Yes, that's correct.

16   Q.  OK.  And there is no entry here for March, correct?

17   A.  That's correct.

18   Q.  But in March, that's when you sat down with Mr. Bennett and

19   CSFB and discussed this $500 million and the history of

20   shareholder loans, correct?

21   A.  Yes.

22   Q.  And at these two meetings in April, you recall that

23   Mr. Collins participated?

24   A.  That is my recollection.

25   Q.  But you don't recall anything specific he said, right?

Cabdcol3                    Schoen - cross

1    A.  I don't.

2    Q.  Nothing stands out in your mind today?

3    A.  No.

4    Q.  And Mr. Bennett at these meetings continued to maintain

5    that Refco had $500 million in extra cash, right?

6    A.  Yes.

7    Q.  He had said that before, right?

8    A.  Yes.

9    Q.  And he was standing by it now, correct?

10   A.  Yes.

11   Q.  And when Mr. Bennett spoke at this meeting, he spoke

12   plainly and clearly, correct?

13   A.  I don't have a specific recollection of his speaking either

14   way, but he did speak.

15   Q.  And you remember being able to understand what he was

16   saying, correct?

17   A.  Yes.

18   Q.  And Joe Collins was sitting in the same room and would have

19   heard Mr. Bennett say the same things that you heard him say,

20   correct?

21   A.  Yes.

22   Q.  And you don't know, sir, if Mr. Bennett ever told Joe

23   Collins anything different, right?

24   A.  I don't.

25   Q.  And you don't know if Mr. Bennett and Mr. Trosten hid from

Cabdcol3                    Schoen - cross

1   Joe Collins what they were actually planning and plotting with

2   respect to this $500 million, correct?

3   A.  I don't, no.

4   Q.  And there was also discussion at these two April meetings

5   about eliminating the shareholder loans, correct?

6   A.  Yes.

7   Q.  And how there would be none, none whatsoever at the

8   closing, correct?

9   A.  Yes.

10  Q.  Again, Mr. Collins would have heard the same things that

11  you heard at that meeting, correct?

12  A.  Yes.

13  Q.  He would have heard that Refco had at that point

14  approximately $120 million in outstanding shareholder loans,

15  correct?

16  A.  I think that it was 105 million.

17  Q.  105 million.  And he would have heard that the clearly

18  stated plan was to zero that out by the time that the sale to

19  your company occurred, correct?

20  A.  I think we were told it actually had been zeroed out as of

21  the end of February but we just didn't have the financial

22  statements yet.

23  Q.  But he heard the same things that you were told --

24  A.  Yes.

25  Q.  And you testified that at no point in time did anyone ever

1   tell you or disclose to you that Refco actually had

2   intercompany debt of more than a billion dollars, correct?

3   A.  That is correct.

4   Q.  And as you sit here today you don't know whether Joe

5   Collins was ever told that Refco had intercompany debt of more

6   than one billion dollars?

7   A.  I don't know if Mr. Collins knew.

8   Q.  And you don't know whether his clients had systematically

9   and repeatedly hidden things from him, correct?

10  A.  I don't know.

11  Q.  And other than these two meetings in April, you never met

12  with Mr. Collins again?

13  A.  I did not.

14  Q.  After April -- the deal closed in August, 2004, correct?

15  A.  Yes.

16  Q.  You didn't meet with Mr. Collins at any time after those

17  two meetings and the closing of the deal on August 2004,

18  correct?

19  A.  I don't believe so.

20  Q.  And after August 2004, you joined the board of Refco?

21  A.  Yes.

22  Q.  And you stayed with Refco up until the time it collapsed,

23  on October 2005?

24  A.  That is correct.

25  Q.  And you didn't meet with Mr. Collins even once during that

1    entire period?

2    A.  I don't believe so.

3    Q.  And the two times you did meet with him in April, you don't

4    recall a single word he said?

5    A.  That is correct.

6    Q.  You were asked some questions on direct examination about

7    representations and warranties in the final contract.  Do you

8    remember that?

9    A.  Yes.

10   Q.  And that was -- that final contract was prepared after

11   April, correct?

12   A.  Yes.

13   Q.  And you knew that Joe Collins was the principal lawyer on

14   the other side of this deal, right?

15   A.  Yes.

16   Q.  But you never sat down and discussed any of those

17   representations or warranties with him, correct?

18   A.  No.  That was my counsel's job.

19   Q.  OK.

20           MR. BACH:  One moment, your Honor.

21           THE COURT:  Yes, sir.

22           (Pause)

23           MR. BACH:  Can we show on the screen Government

24   Exhibit 835?

25   Q.  Now, very briefly, Mr. Schoen, this is a chart that the

1    government showed you yesterday and introduced into evidence;

2    correct?

3    A.  Yes.

4    Q.  And the title of it is "Letter of Intent," correct?

5    A.  Yes.

6    Q.  And immediately under that it says, "What RGHI would

7    receive from the proposed deal," correct?

8    A.  Yes.

9    Q.  Now, the Letter of Intent actually spoke of what the

10   sellers would receive from the proposed deal, correct?

11   A.  Yes.

12   Q.  And the sellers were RGHI and BAWAG, correct?

13   A.  Yes.

14   Q.  And this chart doesn't mention BAWAG, correct?

15   A.  Yes.  It is not on my chart but that is correct.

16   Q.  It really should be retitled what the sellers would receive

17   from the proposed deal, correct?

18   A.  I think that would be more accurate, yes.

19   Q.  As you testified yesterday, this chart doesn't reflect all

20   of the expenses that would have to be paid out of the large

21   sums here pursuant to the terms of the Letter of Intent,

22   correct?

23   A.  That is correct.

24   Q.  There were hundreds of millions of dollars of expenses that

25   RGHI would have to pay pursuant to the Letter of Intent,

1   correct?

2   A.  No, they were not expenses.  There were hundreds of

3   millions of dollars of outstanding debt that had to be paid

4   off.

5   Q.  To be clear, that is not the intercompany debt we are

6   talking about?

7   A.  No, that is right.  That was debt to U.S. banks.

8   Q.  That was debt that was specifically mentioned in the

9   footnotes of the Letter of Intent, correct?

10  A.  Yes, it is.

11  Q.  And that is not reflected anywhere here in the government's

12  chart, correct?

13  A.  Correct.

14  Q.  Now, after the two meetings in April, you went on to meet

15  with Phil Bennett many more times, correct?

16  A.  Yes.

17  Q.  You had very direct contact with him personally?

18  A.  Yes.

19  Q.  And that's from April through August, correct?

20  A.  Yes.

21  Q.  And then for another year after Thomas H. Lee had bought

22  Refco, correct?

23  A.  That is correct.

24  Q.  You and he were on the Board of Directors together, right?

25  A.  Yes.

Cabdcol3                    Schoen - cross

1   Q.  He was the CEO of the company while you were the lead

2   person from Thomas H. Lee on the board, correct?

3   A.  I didn't have a title as lead person, but I was one of the

4   senior people from Thomas H. Lee on the board.

5   Q.  Thank you.  And often you and Mr. Bennett had lunch or

6   dinner together?

7   A.  We had dinner on a couple of occasions.  We had lunch on

8   more occasions.

9   Q.  And often you met with him with just the two of you,

10  correct?

11  A.  Yes.

12  Q.  OK.  And over time you developed great confidence in him?

13  A.  I did.

14  Q.  And you felt he was someone you could trust?

15  A.  Yes.

16  Q.  Now, one feature of the agreement that you made with

17  Mr. Bennett to buy Refco involved him continuing to be a

18  co-owner, correct?

19  A.  That is correct.

20  Q.  You were prepared, and you wanted him, to continue to be a

21  co-owner of the company, correct?

22  A.  It was one of the most important parts of the transaction.

23  Q.  That's right.  You insisted that Mr. Bennett be a co-owner,

24  right?

25  A.  To be fair, he -- that's what he wanted and we wanted.  So

1   "insisted" is not quite the right characterization.

2   Q.  I withdraw it and I accept your recharacterization.

3           According to the terms of the deal, Mr. Bennett was to

4   be the sole person who held any interest in RGHI after the deal

5   closed, right?

6   A.  That is correct.

7   Q.  Thomas H. Lee was going to own 57 percent of Refco, right?

8   A.  Yes.

9   Q.  And RGHI was going to own the remaining 43 percent of

10  Refco, right?

11  A.  Yes.

12  Q.  And Mr. Bennett was going to be the only guy who owned that

13  43 percent, right?

14  A.  That is correct.

15  Q.  And one of the things that you wanted to make sure of was

16  before the deal closed, that he had bought out anyone else who

17  had any interest in RGHI so that he would be the only guy when

18  the deal closed, right?

19  A.  As of the closing, yes.

20  Q.  OK.  And Mr. Bennett gave you, in writing, his personal

21  covenant that that would take place, correct?

22  A.  That is correct.

23  Q.  OK.  And that was in a document called the Security Holders

24  Agreement, correct?

25  A.  You would have to refresh my recollection.  I'm sorry.

Cabdcol3                          Schoen – cross

```
 1    Q.  OK.  Absolutely.
 2              Let me show you what's been marked Defendant's Exhibit
 3    206, for identification.
 4              And, Mr. Schoen, I should have -- it is a big
 5    document.  I should have referred you to a particular page.
 6    Page 36, sir.
 7              (Pause)
 8    A.  Yes.
 9    Q.  Do you recognize this document?
10    A.  Yes, I do.
11    Q.  Is this a Security Holders Agreement dated August 5, 2004,
12    between New Refco Group Limited and other parties?
13    A.  Yes.
14              MR. BACH:  We offer it, Judge.
15              MR. LEVY:  No objection, your Honor.
16              THE COURT:  Received.
17              (Defendant's Exhibit 206 received in evidence)
18              MR. BACH:  Ms. O'Connor, if we could put Section 10.10
19    of page 36 on the board.
20    Q.  Mr. Schoen --
21    A.  Yes.
22    Q.  -- this agreement, the Security Holders Agreement, was
23    dated on the same day as the closing of the leveraged buyout of
24    Refco, correct?
25    A.  Yes.
```

Cabdcol3                    Schoen - cross

1   Q.  And it was designed that way so that all of these

2   agreements would be executed together -- all of these

3   agreements would take place together on the same day, correct?

4   A.  That is correct.

5   Q.  OK.  And if you look at Section 10.10, that's entitled

6   "Bennett Ownership of RGHI."  Do you see that?

7   A.  Yes.

8   Q.  And it says:  "Effective as of the closing date, Bennett is

9   the sole owner of RGHI."  Correct?

10  A.  Yes.

11  Q.  And it says:  "Bennett hereby covenants and agrees that,

12  during the term of this agreement, he at all times will

13  continue to directly own, of record and beneficially, all of

14  the outstanding capital stock of RGHI, that he will not pledge

15  or otherwise permit his shares of the capital stock of RGHI to

16  be encumbered in any manner and that he will not grant any

17  proxy or otherwise transfer voting power or economic rights of

18  ownership or enter into any voting agreement with respect to

19  capital stock of RGHI."

20          Correct?

21  A.  Yes.

22  Q.  And this was a critical provision for you, correct?

23  A.  Yes.

24  Q.  And you expected Mr. Bennett to comply with this in full?

25  A.  Yes.

1    Q.  And that means that you expected him to go and buy out any

2    other interests at the RGHI level before his deal with you

3    closed, correct?

4    A.  At the time of closing, yes.

5    Q.  And you knew, sir, that there were some other interests and

6    obligations at the RGHI level, correct?

7    A.  I believe that we understood that there were some other

8    things to be paid off, yes.

9    Q.  And when I say "the RGHI level," I just want to be clear.

10   There is -- Refco is an operating company, correct?

11   A.  Refco is the company we invested in, yes.

12   Q.  Refco is the company that Thomas H. Lee bought the

13   57 percent in?

14   A.  That is correct.

15   Q.  But above Refco there were two companies that owned Refco,

16   right?  There was Refco Group Holdings, Inc.?

17   A.  On the chart, which I think we shared, we walked through

18   yesterday, RGHI was shown to own 90 percent and a BAWAG entity

19   was shown to have owned 10 percent.

20   Q.  That's at the ownership level above Refco, correct?

21   A.  It is above Refco on the chart, yes.

22   Q.  Those weren't the companies that Thomas H. Lee was buying,

23   right?

24   A.  No.

25   Q.  You were buying the company at the bottom of the chart,

1    Refco, right?

2    A.   That's correct.

3    Q.   And when I refer to the RGHI level or the ownership level,

4    will you understand that what I mean is those two companies

5    depicted on the chart up above Refco?

6    A.   Yes.

7    Q.   OK.  Now, there came a time that you had a phone call with

8    Mr. Bennett because you wanted an understanding of how the

9    proceeds from the deal would be used, correct?

10   A.   Yes.

11   Q.   And you weren't asking him for a very detailed

12   understanding; you were asking him to give you what you

13   considered a businessman's understanding or a Reader's Digest

14   version, correct?

15   A.   Yes.

16   Q.   And that means, Mr. Bennett, tell me generally but I don't

17   need all the details, correct?

18   A.   That's correct.

19   Q.   And that's because you had that covenant by which he had

20   personally guaranteed that he would eliminate all the other

21   interests, correct?

22   A.   We had that covenant and he was reinvesting $400 something

23   million of stock back into the deal.

24   Q.   OK.  And you didn't need all of the details as long as you

25   got the Reader's Digest version, right?

Cabdcol3                          Schoen - cross

1    A.   That's correct.

2    Q.   Because you had your deal, right?

3    A.   And we weren't dealing with those other entities, that is

4    right.

5    Q.   And you had your covenant, correct?

6    A.   Yes.

7    Q.   And you didn't need to do any due diligence at the RGHI or

8    ownership level because you had that covenant, correct?

9    A.   Yes, and because we weren't transacting with that company.

10   Q.   Right.  You were just transacting with Refco, the company

11   at the bottom of the chart, correct?

12        (Pause)

13   A.   To clarify, yes, that's correct, but our partner in the

14   transaction going forward was going to be RGHI.  And so we

15   didn't care about -- and, clearly, as shown in the Securities

16   Agreement and in other places, we cared about who our partner

17   was.

18   Q.   Yes.  And that's why you called Mr. Bennett on the phone

19   and you asked him to give you a businessman's understanding of

20   what he was going to do with the proceeds from the deal; that's

21   one of the reasons, correct?

22   A.   That's one of the reasons.

23   Q.   And you had this phone call with Mr. Bennett on June 3rd,

24   2004, correct?

25   A.   I believe that's when it was.

1    Q.  And that was before that final contract was signed?

2    A.  Yes.

3    Q.  And you were on this call and your colleague Dave Harkins

4    was on the call, too, correct?

5    A.  Yes, that's correct.

6    Q.  And there were no lawyers on the call, right?

7    A.  No, there were not.

8    Q.  Your lawyers, Mr. Westra, Mr. Tabor, they were not on that

9    call?

10   A.  They were not.

11   Q.  Joe Collins wasn't on that call?

12   A.  No.

13   Q.  But you and Mr. Harkins spoke to Mr. Bennett over the

14   phone, correct?

15   A.  Yes.

16   Q.  And you had -- you could do this over the phone because you

17   weren't asking him to show you any documents, right?

18   A.  We did it over the phone because it was the most convenient

19   thing to do.

20   Q.  OK.  And you talked to him and said give me a businessman's

21   version of what's going to happen with the proceeds, correct?

22   A.  That's correct.

23   Q.  And it was a pleasant conversation?

24   A.  Yes, it was.

25   Q.  And you were satisfied after the call that Mr. Bennett had

Cabdcol3                          Schoen - cross

1    told you what there was to be told, correct?

2    A.  We were satisfied.

3    Q.  The call gave you a great deal of comfort, correct?

4    A.  Yes.

5    Q.  OK.  Let me show you what's been marked for identification

6    as Defense Exhibit 2008.

7         That's an e-mail that you wrote on June 3rd, the day

8    before you signed the final contract agreement, right?

9    A.  Yes.

10             MR. BACH:  We offer it.

11             MR. LEVY:  If I could have one second just to look at

12   it?

13             THE COURT:  Yes, please.

14             (Pause)

15             MR. LEVY:  I mean, it is clearly hearsay but we don't

16   object, your Honor.

17             THE COURT:  Received.

18             (Defendant's Exhibit 2008 received in evidence)

19             MR. BACH:  Ms. O'Connor, could you please put it up on

20   the board.  And could you blow up the date at the top.

21   Q.  June 3rd, 2004; correct, Mr. Schoen?

22   A.  Yes.

23   Q.  And you are the author of this e-mail?

24   A.  Yes.

25   Q.  And you're sending this e-mail to a number of your

Cabdcol3                          Schoen - cross

1   colleagues TH Lee?

2   A.  Yes.

3   Q.  And you're sending it to your lawyers at Weil, Gotshal,

4   right?

5   A.  That's correct.

6   Q.  That's Mr. Westra and Mr. Tabor?

7   A.  Yes.

8          MR. BACH:  And let's blow up the text of the e-mail.

9   Q.  The subject of it, by the way, is Phil Bennett, right?

10  A.  Yes.

11  Q.  And you write -- can we blow up the text?

12         You write:  "Dave" -- that's Mr. Harkins, right?

13  A.  Yes.

14  Q.  "Dave and I had an excellent conversation with Phil this

15  morning.  We both have a great deal of comfort that we now

16  understand how the S Corp." -- the S Corp. is RGHI, correct?

17  A.  Yes.

18  Q.  "we now understand how the S Corp. has paid its taxes, how

19  the proceeds are being applied" -- that's the proceeds from the

20  deal, correct?

21  A.  Yes.

22  Q.  "and where Phil will wind up.  I would be happy to walk any

23  of you through it when you have a chance.  Scott."

24         Correct?

25  A.  Yes.

1          MR. BACH:  Now, you could take that down.

2     Q.  Let's talk about what was said during that phone call.

3          You and Mr. Bennett discussed an interest held by Tom

4     Dittmer, correct?

5     A.  Yes.

6     Q.  Tom Dittmer was the former owner of Refco who Mr. Bennett

7     bought the company from, correct?

8     A.  That was my understanding, yes.

9     Q.  And he was the former owner who you understood had a

10    "checkered" past, right?

11    A.  Yes.

12    Q.  And you expected that Mr. Bennett would pay whatever it

13    needed to buy out Mr. Dittmer so that Mr. Bennett would be the

14    only person holding an interest in RGHI at the time the deal

15    closed, correct?

16    A.  Yes.  My understanding from -- should I reference my

17    conversation with Mr. Bennett, or not?  I just want to be

18    accurate.

19    Q.  Yes.  That's what I am asking you.

20    A.  OK.  My understanding was that Mr. Dittmer, when he sold

21    the company to Mr. Bennett, retained a contingent right to

22    receive a portion of proceeds from a future sale, and

23    Mr. Bennett told us in our conversation that that was one of

24    the uses of the money that was coming to RGHI, it was going to

25    be to pay off that contingent interest.

1  Q.  Thank you.  And he told you that Mr. Dittmer would be

2  getting approximately 75 to $100 million to buy out that

3  contingent interest, correct?

4  A.  That's my recollection, yes.

5  Q.  OK.  And you didn't object, right?

6  A.  No.

7  Q.  And you understood that there is a contract, or a legal

8  document, that memorialized Mr. Dittmer's continuing interest?

9  A.  I assumed so.

10  Q.  You knew there was a contract, correct, Mr. Schoen?

11  A.  As I said, I assumed so.

12       (Pause)

13       I don't believe I ever saw it.  That's why I'm not

14  telling you that I knew it, but I may have seen it.

15       (Pause)

16  Q.  And, Mr. Schoen, you testified on a prior occasion as

17  follows:

18  "Q  And you understood that Dittmer had a contractual right to

19  those proceeds?

20  "A  That's what he told us, yes."

21  A.  Yes.

22  Q.  Does that refresh your recollection that Mr. Bennett told

23  you that there was a contract here?

24  A.  Again, my answer was that I assumed that was the case, and

25  I think that that prior testimony confirms that I was told that

1  was the case.  But I never actually saw it, which is why I said

2  I don't know if there was a contract.

3  Q.  So you never actually saw it, right?

4  A.  Correct.

5  Q.  And you never asked Mr. Bennett to see it, right?

6  A.  I did not.

7  Q.  OK.  And that's because you weren't binding the companies

8  at the ownership or parent level, right?

9  A.  That's because all other interests, including

10  Mr. Dittmer's, were terminated, according to our contract, with

11  RGHI as of the closing.

12  Q.  Right.  And that was your main interest, to make sure that

13  all those other interests were terminated, right?

14  A.  That is correct.

15  Q.  So you didn't need to see any of the paperwork, any of the

16  legal paperwork at the RGHI or the ownership level, correct?

17  A.  For the transactions that were described to us, no.

18  Q.  And when you closed the deal and bought 57 percent of

19  Refco, there was a document called a flow of funds memo,

20  correct?

21  A.  That is correct.

22  Q.  And that flow of funds memo is a memo that shows how the

23  funds are going to flow from the deal, correct?

24  A.  Yes.  It shows who gets paid what.

25  Q.  OK.  And you didn't expect to see this payment to

1    Mr. Dittmer on that flow of funds memo, correct?

2    A.   That is correct.

3    Q.   And that's because, again, it was at the ownership or RGHI

4    level, correct?

5    A.   That's correct.  We were sending money to RGHI, and then

6    they were applying it to deal with their obligations.

7    Q.   Now, did you tell your lawyers at Weil, Gotshal about what

8    you had learned from Mr. Bennett about this Dittmer buyout?

9    A.   Yes.

10   Q.   Which lawyer did you tell, Mr. Westra or Mr. Tabor or

11   another lawyer?

12   A.   I believe both of them.

13   Q.   OK.  And what was their reaction?

14   A.   I don't recall.

15   Q.   And after learning that Mr. -- after being told that

16   Mr. Dittmer would receive approximately 75 million or $100

17   million, neither you nor your lawyers caused that fact to be

18   disclosed in any of the legal paperwork for the bond offering,

19   right?

20   A.   The bond investors also were not investing in RGHI.

21   Q.   Right.  They were not investing in the companies at the

22   ownership or the RGHI level, right?

23   A.   They were lending money to Refco.

24   Q.   That's the company at the bottom of the chart, right?

25   A.   That is correct.

Cabdcol3                    Schoen - cross

1   Q.  And so you saw no need and your lawyers saw no need to

2   disclose this Dittmer transaction in the bond disclosures,

3   correct?

4   A.  Our disclosure was very clear that RGHI was 100 percent

5   owned by Mr. Bennett, and so this other information was

6   irrelevant.  It was prior to the closing --

7   Q.  It was also irrelevant for purposes of the initial public

8   offering, right?

9   A.  That's correct.

10  Q.  It was not disclosed in the filings and the registration

11  statements for the initial public offering, correct?

12  A.  That is correct.  The initial public offering disclosure

13  was regarding Refco.

14  Q.  Now, Mr. Bennett also told you in this phone call that

15  BAWAG, an Austrian bank, was going to get money from the

16  proceeds of this transaction, right?

17  A.  That is correct.

18  Q.  You already knew that BAWAG owned 10 percent of Refco,

19  right?

20  A.  Yes.

21  Q.  And that they were going to get money as a result of that

22  interest, right?

23  A.  That's correct.

24  Q.  But he told you that in fact BAWAG was going to get even

25  more money, correct?

1  A.  Yes.

2  Q.  They were going to get more money beyond their stock

3  interest, correct?

4  A.  Yes.

5  Q.  He told you that he was going to give BAWAG proceeds of

6  between -- additional proceeds of between 400 and $500 million,

7  correct?

8  A.  He did not say he was going to give it to BAWAG.  He was

9  repaying a loan is what he told us.

10  Q.  OK.  He told you that BAWAG had loaned him and Mr. Grant

11  between 400 and $500 million, correct?

12  A.  No.  He told us that BAWAG had loaned them a smaller amount

13  of money when they purchased the company from Mr. Dittmer and

14  that with accrued interest, that the outstanding balance on the

15  loan was between 400 and $500 million.

16  Q.  So he told you that from the proceeds, 400 or 500 million

17  would go to BAWAG to repay the loan, including interest?

18  A.  That's correct.

19  Q.  And you didn't object?

20  A.  No.

21  Q.  You didn't ask to see any of the loan documents?

22  A.  No.

23  Q.  You didn't ask for a single piece of paper relating to that

24  loan, correct?

25  A.  That is correct.

522

Cabdcol3                           Schoen – cross

Q.  And that's because these were RGHI or parent-level

obligations, correct?

A.  That is because the loan was being paid off as of the

closing, and we weren't doing business with BAWAG either going

forward.  At the moment that we were investing in the company,

we were invested in Refco.

             (Continued on next page)

CABPCOL4                    Schoen - cross

1   BY MR. BACH:

2   Q.  And these loans were not held at the Refco level, correct?

3   A.  That's what we were told.

4   Q.  And you did not receive them as having any impact

5   whatsoever on Refco, correct?

6   A.  That's correct.

7   Q.  And you did not expect to see this 400 or $500 million

8   going to BAWAG on the flow of funds memo?

9   A.  That's correct.

10  Q.  Now, did you tell your lawyers at Weil Gotshal about the

11  400 or $500 million that Mr. Bennett would use to pay back the

12  loan to BAWAG?

13  A.  Yes.

14  Q.  Which lawyer did you tell?

15  A.  Same two lawyers, Mr. Westra and Mr. Tabor.

16  Q.  And do you have -- And what did they say?

17  A.  I don't recall.

18          MR. LEVY:  Objection.

19  A.  Excuse me.

20  Q.  Did they voice any objection?

21          MR. LEVY:  Objection.

22          THE COURT:  Sustained.

23  Q.  And this 400 or $500 million was not something that was

24  disclosed in the bond offering in which public investors bought

25  bonds in Refco, right?

CABPCOL4                         Schoen – cross

1    A.   That's correct.

2    Q.   And it was not disclosed in any of the registrations or

3    other filings in connection with the IPO, in which the public

4    purchased stock in Refco, correct?

5    A.   That's correct.

6    Q.   Now, Mr. Schoen, let's just talk about all the money that

7    you understood BAWAG would be receiving in connection with this

8    leveraged buyout transaction.  You understood that $191 million

9    would be going to BAWAG to purchase its 10 percent equity

10   interest in Refco, correct?

11   A.   That's correct.

12   Q.   And you understood -- and were told that, in addition to

13   that $191 million, there was another half billion or 400 to

14   $500 million that was being used to pay back a loan to BAWAG?

15   A.   That's correct.

16   Q.   And you understood that there was going to be $500 million

17   that was going to be held in a segregated account at BAWAG for

18   the benefit of RGHI, correct?

19   A.   Yes.

20   Q.   And you knew all of that before you signed the deal with

21   Mr. Bennett, correct?

22   A.   Yes.

23   Q.   And you knew that BAWAG was a related party for purposes of

24   the LBO transaction, correct?

25   A.   Yes, they were a 10 percent owner of the company.

CABPCOL4                        Schoen - cross

1   Q.  And knowing all of that, you went ahead and signed the

2   deal, correct?

3   A.  Yes.

4   Q.  And you understood that, with respect to the $500 million,

5   that BAWAG itself was entitled to a portion of that money,

6   correct?

7   A.  Yes.

8   Q.  Because they were one of the sellers, right?

9   A.  That's correct.

10  Q.  And they had 10 percent interest, equity interest, correct?

11  A.  Yes.

12  Q.  Okay.  And the way you dealt with Mr. Bennett on this

13  transaction is not inconsistent with the way that you've

14  interacted and dealt with CEOs in other deals that you've done

15  throughout your history, correct?

16  A.  It's quite consistent.

17  Q.  Okay.  As a matter of practice, you normally don't do due

18  diligence on a chief executive officer's personal finances,

19  correct?

20  A.  That's correct.

21  Q.  You have never asked -- In all of your time at TH Lee,

22  you've never asked for a CEO's tax returns, correct?

23  A.  Correct.

24  Q.  And you've never investigated a CEO's business dealings,

25  right?

CABPCOL4                        Schoen - cross

1   A.  Oh, yes, we have.

2   Q.  Well, let's see.

3            MR. CHERNOFF:  Can we have a sidebar, your Honor?

4            MR. BACH:  Objection, I didn't finish this.

5            MR. LEVY:  May we get a page reference on the prior

6   testimony?

7            MR. BACH:  Sure.

8            MR. LEVY:  Before he just launches into it?

9            THE COURT:  Sure.  Go ahead.

10           MR. BACH:  Page 248, a proceeding on September 24,

11  2008.

12           THE COURT:  Let's make it easy, kids.

13           MR. BACH:  Why don't I just stand right next to

14  Mr. Levy.

15           THE COURT:  Why don't you just let him look at it

16  first, and then just go, assuming there's no objection.

17           MR. BACH:  Thank you.

18  Q.  Mr. Schoen, you have previously testified under oath in a

19  prior proceeding that "I have been in the business since 1986.

20  We have looked at hundreds and hundreds of companies.  We have

21  invested in and acquired more than a hundred businesses over

22  the past 25 years, and we have never once asked for personal

23  tax returns from the CEO of the company or done a personal

24  investigation of his other business dealings."  That was your

25  testimony, correct?

1   A.   That was my testimony, yes.

2   Q.   In your experience, Mr. Schoen, CEOs are not keen on

3   sharing the details of their personal finances if they don't

4   have to, correct?

5   A.   I can't make a general statement.  As I said, we've never

6   asked for it.

7   Q.   There's no reason to ask for information about their

8   personal finances if they have no impact on the company you're

9   acquiring, right?

10  A.   I think I stated previously, and just to clarify or expand,

11  we do background checks on the senior executives of the

12  companies that we invest in and those background checks would

13  involve investigators having some feedback to us on the general

14  business reputation of other dealings.  It's the specific

15  financial diligence on the executives that we've never done.

16  Q.   Okay.  And your investigators did some background checks on

17  Mr. Bennett, right?

18  A.   Yes.

19  Q.   But you didn't do any specific financial due diligence on

20  his other business dealings, correct?

21  A.   That's correct.

22  Q.   Okay.  And his personal finances, as you understood it, had

23  no impact whatsoever on the companies you were buying, correct?

24  A.   To clarify, and I have testified to this with you, as well,

25  his personal finances, to the extent of my understanding of how

1  much money he had and was taking out of the company versus how

2  much money he was reinvesting back into the company, was very

3  relevant to us, but that was it.

4  Q.  Understood.  And that's why you wanted the Reader's Digest

5  or the businessman's understanding?

6  A.  Correct.

7  Q.  But beyond that, you didn't feel you needed to see anything

8  further?

9  A.  Correct.

10         MR. BACH:  Judge, would this be a good time for a

11  lunch break?

12         THE COURT:  I think it is.  Ladies and gentlemen,

13  let's take a lunch break out into the sun.  Would you please,

14  to the extent you've put your exhibits in your folders, leave

15  them on your seats, please.  Take your books with you into the

16  jury room.  Please remember not to discuss the case among

17  yourselves or with anyone else or do any research on the case.

18  And most of all, have a wonderful lunch, and I'll look for the

19  weather report when you return.  Thank you.  So sorry, 2:15,

20  please.  Have a lovely lunch.  Thank you for your attention

21  this morning, ladies and gentlemen.

22         (Jury exits)

23         MR. LEVY:  Your Honor, just a couple of quick issues.

24         THE COURT:  Won't you be seated.

25         MR. LEVY:  I don't think it matters that the witness

CABPCOL4                        Schoen - cross

1    is in here for this.

2            THE COURT:  All right.  You're going to get stuffed in

3    the hall again, Mr. Schoen.  We promise we won't leave you

4    there.  Thank you.

5            (Witness temporarily excused)

6            THE COURT:  Mr. Levy?

7            MR. LEVY:  I think we may have some misunderstanding

8    between our two tables on what is allowed in terms of prior

9    consistent and inconsistent statements.  The e-mail that was

10   put in as defense Exhibit 208 is pure bolstering.  The

11   defendant had said nothing inconsistent with it.  That, I

12   suppose I could have objected to, if I wanted to.

13           About two minutes later, the defense decides to just

14   launch into reading a prior consistent piece of testimony that

15   Mr. Schoen had given, without giving us a page reference,

16   without giving us a chance --

17           THE COURT:  Why are we doing that, Mr. Bach?  You know

18   better than that.

19           MR. BACH:  Judge, it was inconsistent.  He said that

20   he had never personally -- He said he had investigated CEOs.

21   So I read him testimony that said that he hadn't.

22           MR. LEVY:  Not that one, your Honor.  The one he read

23   before that was perfectly consistent --

24           MR. BACH:  Well, he said --

25           THE COURT:  One at a time, kids.

1          MR. BACH:  Okay.

2          THE COURT:  Topic?

3          MR. LEVY:  I'm trying to remember.  It was consistent

4    so it didn't really matter, but it would bolster --

5          THE COURT:  Mr. Bach, you really have to give the page

6    reference or help out.  You really can't just launch into it.

7    Right?

8          MR. BACH:  You are absolutely right, your Honor.  And

9    I will absolutely do that, and I appreciate it.

10          THE COURT:  All right.

11          MR. LEVY:  One other issue, you Honor.  I think we're

12   prepared to say that we're on notice of any defense exhibits

13   that came in last time.  One of the ones that came in this

14   time, Defense Exhibit 206 --

15          THE COURT:  How many pages was that?

16          MR. LEVY:  It's about a 50-page exhibit that got

17   handed to us.  Now, I think it is something that actually came

18   in last time as a government exhibit.  If I understand what it

19   is, I think it may have been a portion of the closing binder,

20   but the fact of the matter is if we're getting handed something

21   on the fly and I don't have a clue what it is and it wasn't

22   introduced as a defense exhibit at the last trial, we just

23   can't react to that.  So if we could ask that we be given those

24   things in advance so we know what it is.

25          MR. SCHWARTZ:  Your Honor, we respectfully decline to

1    give the government our cross-examination exhibits while a

2    witness is on direct before they call them.  I have tried many

3    cases.  I have never known that to be the practice.

4             MR. LEVY:  We can take a ten-minute break every time

5    they give us a 50-page document to see if we can figure out

6    what it is, but that seems like --

7             THE COURT:  Okay.  But nevertheless, they don't have

8    to give them to you ahead.  Anything else, kids?

9             MR. LEVY:  Nope.  Thank you.

10            THE COURT:  We're off the record.

11            (Whereupon a luncheon recess was taken)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N

 2                         2:21 P.M.

 3           THE COURT:  Good afternoon, ladies and gentlemen.  May

 4   we bring the jurors in?

 5           MR. CHERNOFF:  Yes, your Honor.

 6           THE COURT:  Thank you.

 7           (Witness resumes stand)

 8           (Jury enters)

 9           THE COURT:  Good afternoon, ladies and gentlemen of

10   the jury.  Thank you for being so prompt.  What's the weather

11   report?

12           JUROR:  Beautiful.

13           JUROR:  Fabulous.

14           THE COURT:  I'm so glad.  Is it as warm as it feels?

15           JUROR:  Only in the sun.

16           THE COURT:  Well, when you stand by the window, you

17   can really feel the heat.  So, oh, good, I'm really glad.  I

18   hope you had a good lunch.

19           JUROR:  Yes.

20           THE COURT:  Welcome back.  Thank you again, and won't

21   you be seated.  We continue with the cross-examination of

22   Mr. Schoen.

23           MR. BACH:  May I proceed?

24           THE COURT:  Yes, sir.

25           MR. BACH:  Thank you.
```

CABPCOL4B                    Schoen – cross

1    CROSS-EXAMINATION (Continued)

2    BY MR. BACH:

3    Q.  Mr. Schoen, you testified this morning about a point in

4    time when the stock of Refco hit its peak; do you remember

5    that?

6    A.  Yes.

7    Q.  Can you give us a ballpark figure of what Mr. Bennett's

8    holdings were worth when the stock hit its peak?

9    A.  About $1 billion.

10   Q.  You also testified this morning about a phone call with

11   Mr. Bennett, where he told you that Tone Grant was getting

12   hundreds of millions of dollars from the deal; do you remember

13   that?

14   A.  Yes.

15   Q.  And you testified that you later learned when you saw the

16   agreement, that Mr. Grant was only getting $4 million upfront,

17   correct?

18   A.  Yes.

19   Q.  And you explained that that came to you as a complete

20   surprise?

21   A.  Yes.

22   Q.  And it would have caused you seriously to halt in your

23   tracks and reconsider the deal?

24   A.  Yes.

25   Q.  And you testified that you had asked for it, asked to see a

1    copy of the agreement before the deal closed, but had a

2    conversation with your lawyers in which they told you it was

3    something you weren't going to get to see, correct?

4    A.  Yes.

5    Q.  And when a deal closes, there is something called the

6    closing, right?

7    A.  Yes.

8    Q.  And there's something called a pre-closing, correct?

9    A.  Often, yes.

10   Q.  Okay.  And in simple terms, and I know I'm going to

11   oversimplify here, that's when all of the important documents

12   are laid out on a table for the different parties to sign and

13   look at so that they can close the deal, correct?

14   A.  Yes.

15   Q.  Did your lawyers tell you that they had been informed that

16   the --

17            MR. LEVY:  Objection, before he even asks the

18   question, your Honor.

19            THE COURT:  Mr. Bach?

20   Q.  Did your lawyers tell you --

21            THE COURT:  No, no.

22            MR. LEVY:  Objection.

23            THE COURT:  It's a hearsay objection?

24            MR. LEVY:  Yes.  He's going to ask a question that he

25   can't possibly answer.

CABPCOL4B                        Schoen – cross

1              MR. BACH:  I think the answer is going to be no.

2              THE COURT:  Why are we asking the question if we're

3       looking --

4              MR. BACH:  Because this is a very important factor.

5       Can we have a sidebar?

6              THE COURT:  Sure, but don't tell me it's an important

7       factor means the rules don't apply.

8              MR. BACH:  Okay.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Gents?

3          MR. SCHWARTZ:  Your Honor, there are a lot of people's

4    testimony in this case is going to be impeached, including the

5    lawyers at Weil Gotshal, who we contend there's evidence to

6    show knew before they told him that it --

7          THE COURT:  Off the record.

8          (Off the record.)

9          MR. SCHWARTZ:  We contend there is evidence to show, I

10   believe the government disputes it, that Weil Gotshal was

11   informed by Mayer Brown, he said that they told him two days

12   before the closing that he wasn't going to get the document.

13        We contend there's evidence to show that Weil Gotshal

14   was told by Mayer Brown, significantly before that, that the

15   document would be produced at the closing.  We contend there's

16   evidence to show that it was, in fact, produced at the closing,

17   and that Weil Gotshal then put it into the closing binder,

18   which made its way to his office, into their offices.  They all

19   claim never to have known.  They all claim it wasn't produced

20   to them.

21        He's testified -- If you want to talk about hearsay,

22   he's already testified that Weil Gotshal told him it wasn't

23   going to be produced at the closing.  They offered that for the

24   truth of the matter asserted.  All we want to do is to be able

25   to say, they didn't tell him that.  They had been told by Mayer

1    Brown that it was going to be produced at the closing.

2              THE COURT:  So it's double hearsay?

3              MR. SCHWARTZ:  Excuse me?

4              THE COURT:  Did your lawyers tell you that Mayer Brown

5    told them?

6              MR. SCHWARTZ:  That's fine.

7              THE COURT:  No, no.  It's double hearsay.

8              MR. SCHWARTZ:  No, did your lawyers tell you that it

9    was going to be -- that it appeared on a closing checklist

10   submitted by Mayer Brown prior to the closing.

11             THE COURT:  I don't see how you get this question out

12   because, obviously, you're looking to solicit here for the

13   truth of the --

14             MR. SCHWARTZ:  It's on the closing checklist.  We do

15   that subject to connection.

16             MR. LEVY:  But it's hearsay.  You're right.  If the

17   closing checklist is coming in at some time, that's fine.  I

18   just don't understand the question, did your lawyers tell you

19   what somebody else told them that.

20             THE COURT:  I don't see how you get the hearsay in if

21   you have the closing checklist.

22             MR. SCHWARTZ:  The hearsay is the closing checklist,

23   correct?

24             THE COURT:  No, the hearsay is, did your lawyers tell

25   you.

1             MR. SCHWARTZ:  If the answer to that is, no, it comes

2        to impeach the lawyers who are claiming -- People are wanting

3        to recover in this case because everybody got sued, as your

4        Honor well knows, and they have a document, the lawyers

5        received a document we contend at the closing of this matter

6        that he just said was the smoking gun to a fraud.

7             THE COURT:  Okay.

8             MR. SCHWARTZ:  And so that gives people motives.

9             THE COURT:  Sure, but you're allowed to argue that.  I

10       just don't see how you ask the guy for the hearsay.

11            MR. BACH:  Can I just chime in briefly?

12            THE COURT:  Only if you do it quietly.

13            MR. BACH:  Sometimes I'm too quiet; sometimes I'm too

14       loud.

15            THE COURT:  Three little pigs.

16            MR. BACH:  They asked the question, did your lawyers

17       tell you.

18            MR. LEVY:  That's not the question I asked.

19            MR. BACH:  I just want to respond in kind.  Did your

20       lawyers tell --

21            THE COURT:  No, no, that's not one of the rules

22       either.

23            MR. LEVY:  It's also not the question I asked.  Did

24       you have an understanding as to whether you were going to see

25       it or not.  I tried not to elicit the hearsay.

1          MR. SCHWARTZ:  But their understanding is based on the

2     hearsay, and then he said my lawyers told me that.

3          MR. LEVY:  I don't recall whether he said that.

4          THE COURT:  But that's not a rule either.  Just like

5     it's very important, it's not a rule either.  I don't see how

6     you get to this question.

7          MR. SCHWARTZ:  Okay.

8          THE COURT:  All right, kids.  Thanks.

9          (Continued on next page)

1          (In open court)

2          THE COURT:  Sir?

3   Q.  Mr. Schoen, before the break I was asking you questions

4   about the Tone Grant agreement?

5   A.  Yes.

6   Q.  Okay?  Did you know, sir, that Mayer Brown produced that

7   document at the closing for this transaction?

8   A.  No.

9   Q.  All right.

10          THE COURT:  I'm sorry, Mr. Bach.  In light of the

11  question, at the end of the case, one of the things I'm going

12  to tell you is if in a question a lawyer assumes certain facts

13  and, in the whole of the evidence there is no support for the

14  fact and the witness says no, then you can't assume the fact to

15  be true.  But it's the whole evidence in the entire case.  But

16  that's the instruction, and you'll get it again at the end of

17  the case.  Mr. Bach?

18  Q.  Your lawyers at Weil Gotshal were at the closing, correct?

19  A.  Yes.

20  Q.  And lawyers from the Mayer Brown firm were at the closing,

21  correct?

22  A.  I believe so.  I wasn't there.

23  Q.  And your lawyers prepared a big binder known as a closing

24  binder, correct?

25  A.  I don't know who prepared it.

1    Q.  But a closing binder was prepared, correct?

2    A.  Yes.

3    Q.  And that's a big binder that includes all of the important

4    documents from the closing, correct?

5    A.  Yes.

6    Q.  Typically, the buyer's lawyers prepare the closing binder,

7    correct?

8    A.  I don't know.

9    Q.  Okay.  And a copy of that binder was delivered to your --

10   to TH Lee, correct?

11   A.  Yes.

12   Q.  And that binder had this document in it, the Grant

13   agreement, correct?

14   A.  Yes.

15   Q.  It was sitting in your offices, correct?

16   A.  Yes.

17   Q.  And you testified that you first saw it when the United

18   States Attorney's Office showed it to you, correct?

19   A.  That's correct.

20   Q.  But it was sitting in your office in the closing binder

21   well before then, correct?

22   A.  That's my understanding.

23   Q.  And your lawyers at Weil Gotshal had a copy of that closing

24   binder, too?

25   A.  I believe so.

CABPCOL4B                    Schoen - cross

1   Q.  And their copy had the Grant agreement inside it, too,

2   right?

3   A.  Yes.

4   Q.  And in your copy of the closing binder, the Grant agreement

5   was listed on the table of contents, correct?

6   A.  I think so.

7   Q.  And there came a time -- So Mr. Schoen, all that you or

8   your lawyers would have had to do would be open the closing

9   binder to the table of contents, and you would have seen that

10  document there, correct?

11  A.  Yes.

12  Q.  And a year after the closing, there was an initial public

13  offering in this case, right?

14  A.  Yes.

15  Q.  And you would assume, sir, that for purposes of that public

16  offering, your lawyers at Weil Gotshal would have gone through

17  all the documents to make sure that anything important would be

18  disclosed, correct?

19  A.  I assume that they would make sure that the company was

20  disclosing everything that we believed we knew was important.

21  Q.  And the lawyers at Weil Gotshal were lead counsel on that

22  IPO, correct?

23  A.  Yes.

24  Q.  And no disclosure was made of this agreement, correct?

25  A.  That's correct.

1    Q.  And just to be clear, the closing binder had been delivered

2    prior to the IPO, correct?

3    A.  Yes.

4    Q.  Now, you involved the Weil Gotshal law initially in the

5    process when you began looking at Refco, correct?

6    A.  Yes, we engaged them at the outset.

7    Q.  Okay.  And they were responsible, among other things, for

8    doing what's known as legal due diligence, correct?

9    A.  Yes.

10   Q.  And that means looking at legal contracts and other legal

11   documents, among other things?

12   A.  Yes.

13   Q.  And there was a data room, a room set up at Credit Suisse

14   First Boston for that purpose, correct?

15   A.  Yes.

16   Q.  And that's a room where lots of documents were put so that

17   people who were thinking about buying Refco could take a look

18   at them?

19   A.  Yes.

20   Q.  And your lawyers at Weil Gotshal went into that document

21   data room and look a look at the documents, correct?

22   A.  They looked at what was there, yes.

23   Q.  Did Weil Gotshal ever tell you that they'd seen a reference

24   in that data room to a Proceeds Participation Agreement between

25   the company and DF Capital, dated July 12th, 2002?

1   A.   No.

2   Q.   Did your lawyers at Weil Gotshal ever tell you that they

3   considered that a minor point to keep track of?

4   A.   They never told me anything about that.

5   Q.   Did your lawyers at Weil Gotshal ever tell you that they

6   considered asking for a copy of the document after they saw the

7   reference?

8           MR. LEVY:   Objection, your Honor.   I think given the

9   first two answers --

10          THE COURT:   Sustained.

11  Q.   Now, Mr. Schoen, you testified that PPA was not disclosed

12  to you at the time of the transaction, correct?

13  A.   That's correct.

14  Q.   And, sir, you were not aware at the time of the transaction

15  of what legal steps, if any, were taken to eliminate the rights

16  and obligations under the PPA, correct?

17  A.   That's correct.

18  Q.   You were not aware of discussions and legal arrangements,

19  if any, undertaken by Joe Collins and lawyers at the McDermott

20  Will law firm to extinguish the rights and obligations under

21  the PPA?

22          MR. LEVY:   Your Honor, objection to this line, given

23  the answer to the first question in this line.

24          THE COURT:   Sustained.

25  Q.   You were not aware, sir, that the rights and obligations

 1   under the PPA were, in fact, extinguished?

 2            MR. LEVY:  Objection, your Honor.

 3            THE COURT:  Sustained.

 4   Q.  Sir, as you sit here today, you don't know whether if you

 5   had seen the PPA at the time of the transaction, it would have

 6   had any impact on your view of the transaction, right?

 7   A.  I gave my views earlier, but of course, it's speculation

 8   because I didn't know about it.

 9   Q.  So as you sit here today, you can't say one way or the

10   other whether it would have had any impact on your view of the

11   transaction?

12   A.  I believe I testified as to my opinion.

13   Q.  I'm just asking you, sir, for an answer.

14   A.  I don't know because it didn't happen.

15   Q.  As you sit here today, you don't know one way or the other

16   whether it would have had any impact on your view of the

17   transaction?

18   A.  I don't know.

19   Q.  Now, after the deal closed, TH Lee entered into a

20   side-letter agreement with Mr. Bennett relating to certain

21   adjustments, correct?

22   A.  Could you repeat the question?

23   Q.  Sure.  After the LBO closed, TH Lee entered into a

24   side-letter agreement with Mr. Bennett?

25   A.  Yes.

1   Q.  Can you tell the jury what a side letter is, Mr. Schoen?

2   A.  It's just an agreement that's not included in the main

3   documents.

4   Q.  And you've seen the side letters in the context of numerous

5   transactions you've been involved in?

6   A.  Yes.

7   Q.  Nothing unusual about a side letter, right?

8   A.  No.

9   Q.  Now, Mr. Schoen -- One moment.  Mr. Schoen, a lot of

10  lawsuits were filed after Refco collapsed, right?

11  A.  Yes.

12  Q.  And with no intention whatsoever to embarrass you.  You've

13  been among the people who have been sued, correct?

14  A.  We've been sued, and we've sued others, yes.

15  Q.  And you have been asked to testify a number of times in

16  various other matters and proceedings?

17  A.  That's correct.

18  Q.  Okay.  And in those proceedings, you've been represented by

19  a number of law firms, correct?

20  A.  Yes.

21  Q.  Including Weil Gotshal, correct?

22  A.  Yes.

23  Q.  And that's the same law firm that represented you in the

24  LBO transaction, correct?

25  A.  Yes.

CABPCOL4B                    Schoen - cross

1   Q.  And lawyers from the Weil Gotshal firm have been witnesses
2   in those same proceedings, correct?
3   A.  In some of them, yes.
4   Q.  Okay.  And at times, you and the lawyers that you had at
5   Weil Gotshal had been represented by the same counsel, correct?
6   A.  I believe so.
7   Q.  In other words, some of the lawyers who have prepared you
8   to testify have also prepared some of the Weil Gotshal lawyers
9   that you worked with to testify, correct?
10  A.  I believe that's correct.
11  Q.  And when I'm referring to preparation, that simply means
12  when you testify, you don't come in cold, right?
13  A.  It's your term, but yes.
14  Q.  And you sit down in the room with lawyers and look at
15  documents and refresh yourself, correct?
16  A.  Yes.
17  Q.  Refresh your recollection.  And sometimes the lawyers ask
18  you questions that they anticipate, correct?
19  A.  Yes.
20  Q.  And you've met with the prosecutors in this case, correct?
21  A.  Yes.
22  Q.  And they asked you questions, correct?
23  A.  Yes.
24  Q.  And you mentioned a moment ago that TH Lee has sued other
25  parties, correct?

1    A.  Yes.

2    Q.  And one of the parties that TH Lee has sued is the Mayer

3    Brown law firm, correct?

4    A.  That's correct.

5    Q.  And those are civil lawsuits, right?

6    A.  Yes.

7    Q.  Those are lawsuits for money, correct?

8    A.  Yes.

9    Q.  And, sir, I don't want you to get into any financial

10   amounts here, but one of the things that Thomas H. Lee has done

11   is it's had to pay settlements, correct?

12   A.  Yes.

13   Q.  And at one point, Thomas H. Lee entered into something

14   called a tolling agreement with its law firm, Weil Gotshal,

15   correct?

16   A.  Yes.

17   Q.  And that's essentially an agreement that reserved Thomas H.

18   Lee's rights to sue Weil Gotshal if it chose to do so, correct?

19   A.  It did.

20   Q.  And there came a point when Weil Gotshal -- Again, I don't

21   want to talk about amounts, but there came a point when Weil

22   Gotshal agreed to pay money to Thomas H. Lee to resolve any

23   outstanding dispute, correct?

24   A.  Weil Gotshal made a contribution to one of the settlements.

25   Q.  And that was after you approached Mr. Westra and asked him

1    to do that, correct?

2    A.   That's correct.

3    Q.   And in connection with that, TH Lee gave the Weil Gotshal

4    law firm what's known as a release, releasing them from any

5    further liability, correct?

6    A.   That's correct.

7    Q.   And you described that as -- Okay.  And, sir, you

8    understood that payment to be an investment in a relationship

9    going forward?

10   A.   That's correct.

11   Q.   What do you mean by that, sir?

12   A.   We had a long-standing relationship with Weil Gotshal.  We

13   were both, unfortunately, involved in the long story that we've

14   been discussing the last two days about the demise of Refco.

15   We incurred very substantial legal fees in the course of

16   defending the lawsuits and the course of pursuing other

17   lawsuits, and Weil was working for us, and so we asked them to

18   make a contribution to help defray our expenses as an

19   investment in the relationship.

20   Q.   And when you say an investment in the relationship, you're

21   referring to the relationship going forward into the future?

22   A.   That's correct.

23   Q.   Because you contemplate a continuing relationship with Weil

24   Gotshal?

25   A.   We have one, yes.

1   Q.  Okay.  In fact, Weil Gotshal has been the counsel for

2   Thomas H. Lee in a number of deals since the collapse of Refco,

3   correct?

4   A.  That's correct.

5   Q.  And Mr. Westra, your lawyer on the TH Lee deal, has been

6   the lead counsel on a number of those deals, correct?

7   A.  Yes.

8   Q.  And has Mr. Tabor been involved in any of those deals?

9   A.  Not to my knowledge.

10  Q.  Okay.  And when you met with Mr. Westra and talked to him

11  about money, about the investment in the future, you also spoke

12  to him about how matters would be staffed going into the

13  future, correct?

14  A.  I think so, yes.

15  Q.  To your knowledge, did anyone at TH Lee request that

16  Mr. Tabor not be staffed on any more deals?

17  A.  Absolutely not.

18  Q.  Now, you worked very closely with Mr. Bennett for a period

19  of over a year, correct?

20  A.  Yes.

21  Q.  You met with him many times?

22  A.  Yes.

23  Q.  And you developed great confidence in him?

24  A.  Yes.

25  Q.  You learned about his reputation in the field, right?

1    A.   Yes.

2    Q.   And you developed your own sense of him from your

3    interactions, correct?

4    A.   Yes.

5    Q.   And, sir, you have a lot of experience in dealing with

6    businessmen, correct?

7    A.   Yes.

8    Q.   And you pride yourself on the ability to look someone in

9    the eye and know whether he's honest, correct?

10   A.   Usually.

11   Q.   And at times, at times over the months that you were

12   involved with Refco, issues would arise and Mr. Bennett was

13   able to allay your concerns, correct?

14   A.   That's correct.

15   Q.   He was always able to make you feel comfortable, correct?

16   A.   Up until the discovery of the related-party loan, that's

17   correct.

18   Q.   Let me rephrase.  Up until October 2005, when that loan was

19   discovered by Mr. Sherer, he was always able to make you feel

20   comfortable when issues arose, correct?

21   A.   Yes.

22   Q.   Okay.  We spoke earlier about how a letter of intent was

23   signed in April, correct?

24   A.   April 2004.

25   Q.   April 2004.  April 19th, correct?

1    A.  Yes.

2    Q.  Okay.  You have a colleague named Scott Jaeckel, correct?

3    A.  Yes.

4    Q.  And at some point after the letter of intent was signed,

5    Mr. Jaeckel expressed to you that he was tossing and turning at

6    night wondering how to get more comfort about the $500 million,

7    correct?

8    A.  I believe he sent an e-mail to that effect.

9    Q.  Let me show you defense Exhibit 226.  Mr. Schoen, let me

10   know when you're done taking a quick look.

11   A.  I'm done.

12   Q.  This is an e-mail to you and others from Mr. Jaeckel dated

13   April 28th, 2004, correct?

14   A.  Yes.

15          MR. BACH:  We offer it into evidence.

16          MR. LEVY:  No objection, your Honor.

17          THE COURT:  Received.

18          (Defendant's Exhibit 226 received in evidence)

19          MR. BACH:  Miss O'Connor, could you put it up on the

20   screen.

21   Q.  Mr. Schoen, this e-mail is dated April 28th, correct?

22   A.  Yes.

23          MR. BACH:  And, Miss O'Connor, if you could blow up

24   and highlight the middle paragraph that begins "I spent the

25   night."

1  Q.  And it says, this is from your colleague Mr. Jaeckel to

2  you, correct?

3  A.  To me and others, yes.

4  Q.  To you and other people at TH Lee, right?

5  A.  Yes.

6  Q.  And he says, "I spent the night tossing and turning,

7  wondering how we can get more comfort on the $500 million of

8  excess cash.  DVH" -- that's David Harkins, correct?

9  A.  Yes.

10  Q.  -- "suggested we put KPMG on the case."  KPMG was the big

11  accounting firm that you hired to do your accounting due

12  diligence, right?

13  A.  That's correct.

14  Q.  So David Harkins "suggested we put KPMG on the case.  I'm

15  happy to do that, but not optimistic that they'll get very far.

16  Thoughts?"  Do you see that?

17  A.  Yes.

18  Q.  Did TH Lee put KPMG on the case?

19  A.  I don't recall the details of what we did.

20  Q.  Did Thomas H. Lee investigate any further after Mr. Jaeckel

21  raised these concerns?

22  A.  I don't recall how we developed comfort.

23  Q.  Did you bring Mr. Jaeckel's concerns to the attention of

24  your lawyers at Weil Gotshal?

25  A.  I don't recall the details of our conversations.

1   Q.  Did you ever ask your lawyers at Weil Gotshal to tell Joe
2   Collins that concerns had arisen about the $500 million after
3   the letter of intent was signed?
4   A.  I don't have any recollection of that.
5   Q.  And after you received this e-mail from Mr. Jaeckel, you
6   continued to meet with Mr. Bennett, correct?
7   A.  Yes.
8   Q.  And you continued to trust him, correct?
9   A.  Yes.
10  Q.  And Mr. Jaeckel ultimately signed off on the deal with
11  Refco?
12  A.  Mr. Jaeckel joined the board of directors and also signed
13  the registration statement, as I did.
14  Q.  As you did, too, correct?
15  A.  Yes.
16  Q.  And a reference to the 500 million was included in the
17  filings for the initial public offering, correct?
18  A.  That's correct.
19  Q.  And despite Mr. Jaeckel's concerns, you maintained full
20  confidence in Mr. Bennett and his integrity and his honesty,
21  correct?
22  A.  Yes.
23  Q.  Until October 2005?
24  A.  Yes.
25  Q.  Okay.  There also came a time when you got a tip from

1    someone who's been referred to as "Deep Throat," correct?

2    A.  Not by me.

3    Q.  KPMG referred to the tipster as Deep Throat, correct?

4    A.  Again, not to me.

5    Q.  Okay.  But you've heard of Deep Throat in connection with

6    this transaction, correct?

7    A.  I've seen an e-mail that KPMG referred to a tip -- a

8    tipster as Deep Throat.

9    Q.  And the tip was from a contact that TH Lee had at Bear

10   Stearns, correct?

11   A.  That's correct.

12   Q.  And the nature of this tip was that Refco had somehow been

13   hiding losses, correct?

14   A.  Not Refco, one of its European subsidiaries.

15   Q.  The loss -- What you heard was that one Refco entity was

16   sloughing off losses onto another Refco entity that wasn't

17   consolidated for accounting purposes, correct?

18   A.  I don't recall that they were both Refco entities.  I think

19   it was to an unconsolidated entity.

20   Q.  You recall, sir, that the tip -- Well, let's just back up a

21   step.  The person who gave this tip was an individual named

22   Brad Reifler, correct?

23   A.  The tip -- The person who called me, told me he had

24   received the tip from an individual named Brad Reifler.

25   Q.  The person who called you was the contact at Bear Stearns?

1    A.  That's correct.

2    Q.  And he had gotten information from a Brad Reifler, correct?

3    A.  Yes.

4    Q.  And the nature of the tip was that losses were being taken

5    from one entity and sloughed off onto another, correct?

6    A.  No, not were being.  The nature was in the past there had

7    been some losses in one unconsolidated European entity, that it

8    was moved to another for tax purposes.

9    Q.  So what you learned was that in the past there had been

10   instances where losses suffered by one Refco entity had been

11   moved off the books of that entity to another?

12   A.  To an unconsolidated entity, that was the tip that I

13   received.

14   Q.  Yes.  That was the substance of the tip, right?

15   A.  Yes.

16   Q.  And that was so that the losses, which you heard -- was

17   that that was so that the losses wouldn't appear on the books

18   of the consolidated entity, correct?

19   A.  I didn't hear an explanation as to why.

20   Q.  And --

21   A.  Excuse me.  What I was told that they were being moved to

22   minimize tax liabilities.

23   Q.  And you brought this to the attention of KPMG?

24   A.  We had conversations with our counsel and with KPMG about

25   the tip.

1   Q.  And KPMG suggested a bunch of steps that might be taken to

2   investigate further, correct?

3   A.  Let me just clarify my statement, if I could, please,

4   because I got a little confused.  I was told about the purpose

5   of minimizing tax liabilities at a later date.  I'm sure you

6   can come to that later if you want to.  I just wanted to

7   clarify my testimony.

8           So I didn't know the purpose at the time, and we

9   communicated with KPMG before we had a chance to provide them

10  with any of the information about the details requesting

11  possible procedures that we might undertake if we wanted to

12  investigate further.

13  Q.  So you learned about this purported tax purpose at a later

14  date?

15  A.  I did.  I apologize for the confusion.

16  Q.  That's fine.  And when you first heard about it, what you

17  heard about was the sloughing off of losses from one entity?

18  A.  That's correct.

19  Q.  And this issue arose before TH Lee signed the final

20  contract, right?

21  A.  That's correct.

22  Q.  And you've said a moment ago you discussed it with your

23  lawyers, correct?

24  A.  We did.

25  Q.  Did you ask them to communicate to Joe Collins that

CABPCOL4B                         Schoen - cross

1    information had been received which suggested that losses were

2    being sloughed from one entity to another?

3    A.   I don't believe so.

4    Q.   KPMG prepared a list of steps that could be taken to

5    investigate further, correct?

6    A.   I think I just testified to that, yes.

7    Q.   Okay.  And TH Lee did not take those steps, correct?

8             MR. LEVY:  Objection, your Honor.  I apologize.  It

9    may require a sidebar to articulate the objection.

10            THE COURT:  All right.  Miss Reporter.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CABPCOL4B                        Schoen – cross

1              (At the side bar)

2              MR. LEVY:  Your Honor, I've let this line of

3     questioning go because I have in my head a theory of relevance

4     that it's not objectionable, but to the extent it's going to

5     stray over, for no relevant purpose, into the supposed

6     negligence of TH Lee.  The negligence of the victim in a fraud

7     case is of no moment at all.  Up until the point where he

8     started asking about things they didn't do -- I don't want to

9     volunteer where I think they may be going with this that would

10    be relevant, maybe they're not going there, but I know what's

11    happening with this next question that is suggesting that TH

12    Lee somehow was negligent and didn't do stuff.

13             MR. SCHWARTZ:  No.  What TH Lee does is, instead of

14    following these procedures, it's about his confidence in

15    Bennett.  They don't follow KPMG's procedures.  He instead goes

16    to see Bennett, and Bennett persuades him that there's nothing

17    wrong here, and that's exactly the point we're trying to make

18    here, that even faced with the allegation of precisely the kind

19    of wrongdoing that took place here, Bennett was able to

20    convince him there was no fraud.

21             MR. LEVY:  That's fine.  I thought that's where they

22    were going.  I don't understand what the relevance, though, is

23    KPMG suggested that you did these things and --

24             MR. BACH:  I'm not going any further.  I just asked

25    him one question.  I don't know if he answered.

1          THE COURT:  We're not going anywhere.

2          MR. BACH:  I don't know if he answered it.

3          MR. LEVY:  If we move forward --

4          MR. SCHWARTZ:  Your Honor, if the answer is they

5    didn't do it, it's relevant to the same point, which is that --

6    not to the fact that he's negligent, but to the fact that

7    Bennett is so persuasive he doesn't take the steps that are

8    indicated by --

9          THE COURT:  All right.

10         MR. LEVY:  That's fine.  The answer has been given.

11         MR. SCHWARTZ:  Has the answer been given?

12         MR. BACH:  I just want to repeat, you said a moment

13   ago that --

14         THE COURT:  There actually is no answer recorded to

15   that question.

16         MR. SCHWARTZ:  I think that's your objection -- when

17   you objected.

18         MR. LEVY:  I thought he had actually answered anyway.

19   I still, frankly, don't see why that bears on that.  It just

20   suggests negligence.  If the question is what did you do, why

21   can't it just be I talked to them --

22         THE COURT:  I understand Bennett is persuasive

23   argument.  If at some point you want me, later on, to tell

24   them, you know, the victim's negligence is of no moment, that's

25   all fine.

1          MR. BACH:  I don't want to suggest the victim is being

2     negligent here.  I don't think they were.

3          THE COURT:  I just said that I thought that the

4     announced purposes was relevance.

5          MR. BACH:  Yes.

6          THE COURT:  In order to guard against -- I'm talking

7     about charge now at some point in the future --

8          MR. SCHWARTZ:  Yes.

9          THE COURT:  -- if you want to ask, you can ask.

10         MR. LEVY:  Okay.  Thank you.

11         MR. SCHWARTZ:  Thank you, Judge.

12         MR. BACH:  So I'm going to ask that one question.

13         THE COURT:  How much longer?

14         MR. BACH:  I'm in the final sections.  I think I have

15    about 30 minutes.

16         THE COURT:  Okay.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2     Q.  Before the break, I asked whether TH Lee had followed any

3     of the steps recommended by KPMG.  Did it?

4     A.  We did not.

5     Q.  What TH Lee did do was talk to Mr. Bennett, correct?

6     A.  No, we did more than that.

7     Q.  You had a face-to-face meeting with Mr. Bennett after you

8     heard about this tip, correct?

9     A.  I just answered we did more than that.  The first thing

10    that we did is we spoke to KPMG.  Shall I continue?

11    Q.  I don't mean to cut you off, but if there's more --

12    A.  We spoke to KPMG, and we concluded that the entity in

13    question had been fully consolidated into Refco Europe during

14    the periods in question, and the tip, on its face, didn't make

15    any sense, which is why we didn't pursue any of the potential

16    procedures.  We then had a face-to-face meeting with

17    Mr. Bennett.

18    Q.  You decided that this merited a face-to-face meeting with

19    Mr. Bennett, correct?

20    A.  Somebody called us and accused him of doing something

21    wrong.  We thought it was appropriate, as our future partner,

22    that we should have a conversation with him and tell him about

23    it.

24    Q.  And you and Mr. Harkins met with him, correct?

25    A.  Mr. Lee and Mr. Harkins and I met with him, yes.

1    Q.  And that was in New York at his office?

2    A.  That's correct.

3    Q.  And, sir, let me show you what's been marked for

4    identification as Defense Exhibit 211.

5    A.  I'm familiar with it.

6    Q.  This is an e-mail that you sent to some of your colleagues

7    at TH Lee and to your lawyer at Weil Gotshal on May 30th, 2004,

8    correct?

9    A.  Yes.

10            MR. BACH:  We offer it.

11            MR. LEVY:  No objection, your Honor.

12            THE COURT:  Received.

13            (Defendant's Exhibit 211 received in evidence)

14            MR. BACH:  Can we blow up the --

15   Q.  Well, Mr. Schoen, at the top of the document we see that

16   you're the author, correct?

17   A.  Yes.

18   Q.  And to the right we see who you're sending this to,

19   correct?

20   A.  Yes, that's correct.

21   Q.  It's Mr. Jaeckel and others at TH Lee, as well as Jim

22   Westra and Jay Tabor both of Weil Gotshal, correct?

23   A.  Yes.

24   Q.  And the subject is Royce, correct?

25   A.  Yes.

1    Q.  And that was the code name that everyone was using for

2    Refco, correct?

3    A.  Correct.

4    Q.  But the feeling at TH Lee was that Refco was a Rolls Royce,

5    correct?

6    A.  No comment.  I think that was CSFB's term.

7    Q.  Thank you.  The top paragraph which you wrote says, "No

8    worries.  If there is a meeting with Phil Tuesday, it will be

9    me, DVH and THL."  That's you, Mr. Harkins and Mr. Lee,

10   correct?

11   A.  Yes.

12   Q.  "As always, I feel so much better after talking with Phil

13   that I am not sure we should go see him anyway."  Correct?

14   A.  Yes.

15   Q.  You had such confidence in Mr. Bennett that you felt that

16   there was really no need to talk to him about this at all,

17   correct?

18   A.  Actually.  It was a combination of my confidence in

19   Mr. Bennett and the fact of what we had already learned about

20   the details of the tip that had been sent our way didn't make

21   sense on their face, and the fact that the person in question

22   who had provided the tip to our contact at Bear Stearns hadn't

23   worked at Refco in more than five years.

24        So at this point, we had -- we were giving little

25   credence to the tip, but it was also we had confidence in

1    Mr. Bennett.

2    Q.  And you had already spoken to him on the phone about this

3    matter, correct?

4    A.  I don't recall.

5    Q.  In any event, Mr. Schoen, you went and met face-to-face

6    with Mr. Bennett, along with your colleagues, correct?

7    A.  Yes, we did.

8    Q.  He gave you an explanation, correct?

9    A.  Yes.

10   Q.  Okay.  And after that conversation, you went away confident

11   that you had no reason to be concerned, correct?

12   A.  Yes.

13   Q.  That was after the face-to-face meeting with Mr. Bennett,

14   correct?

15   A.  Yes.

16   Q.  Now, by the way, after Refco collapsed, you met personally

17   with Brad Reifler, that's the ultimate tipster, and with

18   Mr. Dittmer, correct?

19   A.  No.

20   Q.  Didn't they approach and have a meeting about buying Refco?

21   A.  They approached us, and they had a meeting with Mr. Lee and

22   Mr. Harkins.  I did not attend.

23   Q.  Okay.

24   A.  When I say "they," I was referring to the contact at Bear

25   Stearns and Mr. Reifler.  I think it was his cousin.

1   Q.  Okay.  If you were at the meeting, I don't intend to

2   inquire.

3   A.  All right.

4   Q.  Now, there were times in your work with Mr. Bennett that

5   you felt something should have been disclosed that he hadn't

6   disclosed to you, correct?

7   A.  Yes.

8   Q.  And you would sit and talk to him when those situations

9   arose, correct?

10  A.  That's correct.  When we had differences, we talked openly

11  about them.

12  Q.  And sometimes you would meet with him face-to-face to

13  discuss those differences, correct?

14  A.  Sometimes.

15  Q.  Okay.  And some of those conversations took place after TH

16  Lee had purchased its interests in Refco, correct?

17  A.  Yes.

18  Q.  Okay.  And one of those matters involved, you learned that

19  money had been paid to employees from the LBO proceeds that had

20  not been disclosed to you before, correct?

21  A.  That's correct.

22  Q.  The LBO closed in August 2004, correct?

23  A.  Yes.

24  Q.  But Mr. Bennett had never disclosed that to you before the

25  LBO closed?

CABPCOL4B                      Schoen - cross

1      THE COURT:  The money payment, right?

2      MR. BACH:  The money payments, correct.

3  A.  My recollection is that those were incentive payments on

4  the sale that were paid by Mr. Bennett and not by Refco.

5  Q.  Yes, but you felt that that was something that he should

6  have told you about, correct?

7  A.  I did.

8  Q.  And you went down to New York to meet with him face-to-face

9  about this?

10  A.  Yes.

11  Q.  Just you and he, right?

12  A.  That's right.

13  Q.  And Mr. Collins wasn't at that meeting?

14  A.  Nope.

15  Q.  And he wasn't at the meeting about the Deep Throat tip,

16  right?

17  A.  No.

18  Q.  Okay.  And after you met with Mr. Bennett, you were

19  satisfied that you could move forward with him and go to an

20  IPO, correct?

21  A.  Yes.

22  Q.  Okay.  And you concluded that it was simply a difference of

23  opinion about disclosure, a judgment call, correct?

24  A.  That's correct.

25  Q.  People disagree about disclosures all the time, correct?

1    A.  They do.

2    Q.  And you thought his judgment was wrong, right?

3    A.  Yes.

4    Q.  But you didn't think at the time that there was any evil

5    motive behind it, correct?

6    A.  That's correct.

7    Q.  Do you still believe that, Mr. Schoen?

8    A.  I haven't really given it so much thought.  I don't believe

9    a lot of what I was told by Mr. Bennett over the course of the

10   years.

11   Q.  Prosecutors showed you some documents, including materials

12   prepared by CSFB, that showed that over the years -- or that

13   state that over the years, Refco had minimal customer losses;

14   do you remember that?

15   A.  Yes.

16   Q.  And that was important to you, as you were considering in

17   investing in Refco?

18   A.  Yes.

19   Q.  And before the deal closed, you learned that Refco had

20   suffered $42 million in trading losses in connection with the

21   account of a customer named Victor Niederhoffer?

22   A.  That's correct.

23   Q.  And that did not shake your confidence in Mr. Bennett,

24   correct?

25   A.  I believe that occurred in 1997.  We were looking at the

1   previous five years when we referenced, for less than $1

2   million of trading losses that we discussed earlier, and that

3   was our focus, was the business since Mr. Bennett had invested

4   and acquired it.

5   Q.  So none of this caused you to pause and the sense of

6   confidence that you had?

7   A.  That was old news before the period of time we were

8   investigating.

9   Q.  And would you say that between the first time you met

10  Mr. Bennett and the last time you spoke with him, in

11  October 2005, that you had hundreds of conversations with him?

12  A.  At least dozens, possibly hundreds.

13  Q.  Okay.  Some were over the phone but some were face-to-face?

14  A.  Yes.

15  Q.  And you now know that he lied to you in quite a number of

16  those interactions, correct?

17  A.  Yes.

18  Q.  And until October of 2005, you never once suspected that he

19  was lying to you, correct?

20  A.  That's correct.

21  Q.  And I think it's fair to say that, in your mind, he's a

22  pretty good liar?

23  A.  The most compelling liar I ever caught.

24  Q.  I mean, he absolutely straight-faced lied to you, correct?

25  A.  I no longer know which of the things he told me were true

CABPCOL4B                    Schoen - cross

1    and which weren't.  The company doesn't even have financials;

2    so.....

3    Q.  So even in October 2005 when he was in Asia, we don't

4    remember which Japan or China, he's still perfectly cool when

5    he's talking about the discovery of $400 million of

6    related-party receivables, correct?

7    A.  Yes.

8    Q.  He's maintaining his composure in trying to talk to you,

9    correct?

10   A.  He was.

11   Q.  He wasn't acting as if the whole world were suddenly coming

12   down?

13   A.  Not at first.

14   Q.  Okay.  Now, Mr. Schoen, you have a degree from Yale and two

15   degrees from Harvard, correct?

16   A.  Yes.

17   Q.  One is a business degree, one is a law degree, and you are

18   a very experienced and sophisticated businessman?

19           MR. LEVY:  Your Honor, I object just because that was

20   a couple of questions all rolled into one.  There's several

21   questions.

22           MR. BACH:  I don't want to embarrass Mr. Schoen, but I

23   have to ask him these questions.

24           THE COURT:  He's already blushing; so let's get on

25   with it.

1   A.  I hate to ask you to repeat the question.

2   Q.  Let's take them one at a time.  You have a degree from

3   Yale?

4   A.  Yes.

5   Q.  You have two degrees from Harvard?

6   A.  I do.

7   Q.  One is a business degree?

8   A.  Yes.

9   Q.  One is a law degree, correct?

10  A.  Yes.

11  Q.  And you've been very successful in the world of business?

12  A.  I've been very fortunate, yes.

13  Q.  And TH Lee, as you see it, has a pretty powerful reputation

14  in the world of business, correct?

15  A.  Yes.

16  Q.  And you've had the good fortune to meet hundreds of CEOs

17  and business leaders of major corporations throughout your

18  career, right?

19  A.  Yes.

20  Q.  You've met highly reputable lawyers and bankers, correct?

21  A.  Yes.

22  Q.  And highly reputable businessmen, right?

23  A.  Yes.

24  Q.  And up until October 2005, you would characterize

25  Mr. Bennett as the single-most impressive businessman you have

1   ever met in your life, correct?

2   A.  As of that time, that was true, in my opinion.

3   Q.  Up until that time, in your opinion, he was the most

4   talented and capable business executive that you had ever dealt

5   with in your career?

6   A.  That was my opinion at the time.

7   Q.  And not just impressive in terms of his business

8   capability, but you felt, up until that time, that he was

9   impressive in terms of his integrity, correct?

10  A.  Yes.  I wouldn't have done business with him otherwise.

11  Q.  And you felt he was impressive in terms of his honesty,

12  correct?

13  A.  Yes.

14  Q.  You were completely convinced of his capabilities, his

15  integrity and his honesty, correct?

16  A.  Yes.

17  Q.  And so were your colleagues who were working with you,

18  correct?

19          MR. LEVY:  Objection.

20          MR. BACH:  I'll withdraw it.

21  Q.  The day that Refco went public with an IPO was a proud day,

22  correct?

23  A.  Yes.

24  Q.  Where you and Mr. Bennett went to the floor of the New York

25  Stock Exchange together on that day, correct?

1    A.   We did, along with our team.

2    Q.   And you and he rang the bell to open the New York Stock

3    Exchange that day, correct?

4    A.   Actually, he rang the bell.

5    Q.   He got to ring it, okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Mr. Schoen, let me show you what have been marked for

2   identification as Defense Exhibit 216 and Defense Exhibit 219.

3          You recognize those, sir, correct?

4   A.  Yes.

5          MR. BACH:  We offer them.

6          MR. LEVY:  No objection.

7          THE COURT:  Received.

8          (Defendant's Exhibits 216 and 219 received in

9   evidence)

10          MR. BACH:  Ms. O'Connor, would you put Exhibit 216 up

11   on the board?

12   Q.  That is a picture of that morning on the floor of the New

13   York Stock Exchange, correct?

14   A.  That's correct.

15   Q.  Who do we see here, Mr. Schoen?

16   A.  George Taylor is on the left, Scott Jaeckel on the right,

17   and then myself and Mr. Bennett in the middle.

18   Q.  And could we see -- Ms. O'Connor, could you blow up Exhibit

19   219.

20          This is a picture of the same day, correct?

21   A.  Yes.

22   Q.  OK.  And you understood, Mr. Schoen, that having the

23   principal of Thomas H. Lee, in fact, having yourself stand next

24   to Mr. Bennett, gave him credibility, correct?

25   A.  I hadn't thought of it that way, but, sure, yes, it does.

1    I hope so.

2    Q.  And while working with him up until October 2005, during

3    the period in which you thought he was the most impressive

4    businessman you had ever met, you and he put a prospectus

5    together for this initial public offering, correct?

6    A.  Refco management and ourselves did put a prospectus

7    together, which I think I testified to earlier.

8    Q.  And it turned out that that prospectus contained a lot of

9    false statements about Refco's financial health, correct?

10   A.  Yes, I believe so.

11   Q.  And you did not realize that at the time, correct?

12   A.  No.

13   Q.  And you and Thomas H. Lee worked with Refco to put those

14   documents together, right?

15   A.  Yes.

16   Q.  And you had no idea that they were false, right?

17   A.  That's correct.

18   Q.  You had no inkling that they contained any lies?

19   A.  I wouldn't have signed the registration statement if I

20   thought it wasn't true.

21   Q.  And he was using your reputation, Thomas H. Lee's

22   reputation to put that paperwork together?

23   A.  I don't know how to respond to that question.

24   Q.  You worked with him on the board, right?

25   A.  Yes.

1    Q.  He was the CEO, correct?

2    A.  Yes.

3    Q.  He represented --

4           THE COURT:  Counsel, we get the idea.

5           MR. BACH:  OK.

6    Q.  Is it fair to say, Mr. Schoen, that your association with

7    Mr. Bennett has in the end proven unpleasant?

8    A.  Yes.

9           MR. BACH:  I have no further questions.

10           THE COURT:  Thank you.

11           How long?

12           MR. LEVY:  Probably five minutes or so.

13           THE COURT:  All right.  We will do the five minutes

14   and then take a break.

15           Is that all right, ladies and gentlemen?

16           Thank you, counsel.

17   REDIRECT EXAMINATION

18   BY MR. LEVY:

19   Q.  Mr. Schoen, you talked for a moment on cross-examination

20   about lawsuits that were filed in the wake of this collapse, is

21   that right?

22   A.  Yes.

23   Q.  You mentioned that Thomas H. Lee and you yourself

24   personally had been sued, is that right?

25   A.  Yes.

Cabdcol5                    Schoen - redirect

1   Q.  Did Thomas H. Lee Partners also sue others?

2   A.  Yes, we did.

3   Q.  You mentioned that there were settlements in which Thomas

4   H. Lee had to make payments, right?

5   A.  Yes.

6   Q.  Were there settlements in which Thomas H. Lee Partners

7   received payments?

8   A.  Yes, there were.

9   Q.  As you sit here today, are there lawsuits still pending

10  against you?

11  A.  All of the lawsuits have been resolved.

12  Q.  Do you have any financial interest in how this case works

13  out at all?

14  A.  None whatsoever.

15  Q.  You talked during your cross-examination about this

16  telephone conversation that you had with Phillip Bennett in

17  June of 2004 in which you asked him for the Reader's Digest

18  version of where the money was going to go, is that right?

19  A.  Yes.

20  Q.  You wanted I think you said a businessman's overview of

21  where the money was going, correct?

22  A.  That's correct.

23  Q.  And that was the conversation in which Mr. Bennett told you

24  that Mr. Grant would be getting $800 million, is that right?

25  A.  That is correct.

1   Q.  And ultimately you were comfortable not getting the

2   documentation on that, is that right?

3   A.  Yes.

4   Q.  You were told about it, is that right?

5   A.  That's correct.

6   Q.  In that conversation I believe there was a discussion of

7   how much Mr. Dittmer, who was a former owner of Refco, would be

8   getting out of this -- out of the proceeds, is that right?

9   A.  Yes, that's correct.

10  Q.  And what was the number again?  What did Mr. Bennett tell

11  you Mr. Dittmer was going to be getting?

12  A.  I believe it was between 75 and $100 million.

13  Q.  I think you testified on direct examination that although

14  you weren't told what percentage that was, what percentage

15  Mr. Dittmer was entitled to, you had sort of a rough idea in

16  your head what percentage it must be given the numbers you were

17  told?

18  A.  Given the math, I thought it was less than 10 percent.

19  Q.  If you had known at that point that Mr. Dittmer had a

20  contractual right to 25 percent of the proceeds, would that $75

21  million have made any sense to you?

22  A.  It would not.

23  Q.  Why not?

24  A.  Because that would have implied that the whole business was

25  worth $300 million.

Cabdcol5                          Schoen - redirect

1   Q.  What would your question have been if you found out that

2   Mr. Dittmer was entitled to 25 percent of the total proceeds

3   but was only getting $75 million?

4   A.  It would have made it apparent that everything we had been

5   told wasn't true; the numbers didn't add up.

6   Q.  Now, you didn't ask for the documents with respect to what

7   Mr. Dittmer was going to be paid, is that right?

8   A.  No.

9   Q.  But you did ask the question and you were told about, is

10  that right?

11  A.  Yes.

12  Q.  You mentioned a loan -- in the same conversation,

13  Mr. Bennett told you about a loan that was going to be paid

14  back to BAWAG, is that right?

15  A.  That is correct.

16  Q.  What did he tell you about when that loan had been made?

17  A.  He told us it had been made in 1999, when he and Mr. Grant

18  acquired the business from Mr. Dittmer.

19  Q.  Who had the money been loaned to, according to Mr. Bennett?

20  Was the loan to Refco or RGHI?

21  A.  No.  That was a loan to RGHI, his holding company, he told

22  us, so that his holding company could make the investment and

23  acquire the stock of Refco.

24  Q.  This is what he told you, is that right?

25  A.  That's right.  It is what he told us.

Cabdcol5                    Schoen – redirect

1    Q.  Had you ever seen anything to suggest whether or not that

2    is true?

3    A.  No.  I don't know what is true anymore in this case.

4    Q.  That loan was not -- withdrawn.

5            It was clear that was something relating to 1999;

6    that's what you were told?

7    A.  That's what we were told.

8    Q.  And it was a loan; is that what you were told?

9    A.  That's correct.

10   Q.  Mr. Bennett did not tell you on that conversation about a

11   2002 Proceeds Participation Agreement in which a BAWAG-related

12   entity made an investment in Refco, is that right?

13   A.  That's correct.  He did not.

14   Q.  This loan we are talking about is something completely

15   different from that?

16   A.  Completely different.

17   Q.  You didn't ask for the documentation on that loan that

18   Mr. Bennett told you existed from BAWAG, is that right?

19   A.  That's correct.

20   Q.  But he told you about it.  You knew about it.  You

21   discussed it with him.

22           Is that right?

23   A.  Yes.

24   Q.  OK.  These were the things that were -- this is what

25   prompted you to have the conversation to find these things out,

1   is that right?

2   A.  Again, the focus was on what his proceeds ultimately would

3   be as our partner, how much money he was taking out and how

4   much money he was investing back into the company.

5   Q.  And these are the things that you were told, that knowing

6   about them, having been told about them, you were comfortable

7   not getting the documentation?

8   A.  That's correct.

9   Q.  Nobody at any point ever told you about a Proceeds

10  Participation Agreement in which a BAWAG-related entity made a

11  $400-plus-million investment in exchange for participating in

12  the proceeds of the sale, is that right?

13  A.  Not until after the bankruptcy.

14  Q.  OK.  Finally, I think you testified on cross-examination

15  that the best you could do was speculate about the impact on

16  the deal if you had known of the PPA at the time, if it had

17  been disclosed, is that right?

18  A.  That's correct.

19  Q.  Is it clear to you that it's something that would have been

20  significant to you?

21          MR. BACH:  Objection.  Leading.

22  Q.  Would it have been significant to you if you had known

23  about it -- let me see if I can be clearer in my question.

24          Was your testimony that you didn't know whether or not

25  it would have changed the deal, tanked the deal, ended the

Cabdcol5                     Schoen - redirect

1   deal; is that what you meant by your testimony or not?

2              MR. BACH:  Objection, Judge.

3              THE COURT:  Sustained.

4   Q.  What did you mean by -- let me just ask you:  Would it have

5   mattered to you to know about the PPA?

6   A.  I believe it would have mattered greatly.  I testified

7   earlier today that there were a number of reasons why I believe

8   it would have mattered greatly.  Both the infusion of hundreds

9   of millions of dollars into Refco that I was unaware of would

10  have changed our view about the financial performance of Refco.

11  The fact that we had been lied to on something of -- really

12  lied to about anything, but lied to about something very

13  important and large a transaction would have mattered a lot.

14  And then some of the terms of that PPA, which I subsequently

15  read, I believe, and I testified earlier, would have been very

16  important to me.  But, again, it is speculation because I

17  didn't have it at the time.  I don't know what would have

18  happened.

19             MR. LEVY:  I have no further questions, your Honor.

20             THE COURT:  Thank you.

21             Recross.  How long?

22             MR. BACH:  Extremely brief.

23             THE COURT:  Go.

24             MR. BACH:  But I have to find it.

25             THE COURT:  What?

1            MR. BACH:  One second.

2            (Pause)

3    RECROSS-EXAMINATION

4            MR. BACH:  I refer the government to the proceeding

5    May 20, 2009, page 1011 to 1012.

6            (Counsel conferred)

7    BY MR. BACH:

8    Q.  Mr. Schoen, you testified in a prior proceeding in this

9    matter on May 20, 2009, correct?

10   A.  I don't recall but I am sure you can refresh my memory.

11   Q.  You recall testifying at a prior proceeding in this matter,

12   you just don't recall the date?

13   A.  That's correct.

14   Q.  And you have no reason to doubt it was on May 20, 2009,

15   correct?

16   A.  Correct.

17   Q.  And you testified under oath, correct?

18   A.  Yes.

19   Q.  And, sir, you testified under oath that -- well, you were

20   asked questions about the PPA in that proceeding, correct?

21   A.  Again, I don't recall.

22   Q.  OK.  But you testified under oath, "It is quite possible

23   that it would ultimately have no impact on our view of the

24   transaction, but without actually being aware of it, we

25   couldn't even make that judgment."

1                    MR. LEVY:  Your Honor, I'm not sure it is at all clear

2     what the "it" is that Mr. Bach just read.

3                    THE COURT:  Generally we do Q/A, Q/A.

4                    MR. BACH:  OK.

5     BY MR. BACH:

6     Q.  Let me read to you -- sir, in a prior proceeding, on or

7     about May 20, 2009, were you asked this question and did you

8     give this answer, under oath?

9     "Q  Why would it have been important to know that an entity had

10    the right to block the sale if it was below the purchase price

11    regardless of what that minimum purchase price was?

12    "A  Well, it could have had an impact on our view of the

13    negotiation of the transaction and our understanding of the

14    parties' needs and objectives and who was pulling the strings,

15    but it also just would have been important to understand what

16    the history was that led to those arrangements.  It's quite

17    possible that it would ultimately have no impact on our view of

18    the transaction, but without actually being aware of it, we

19    couldn't even make that judgment."

20                    Were you asked that question and did you give this

21    answer?

22    A.  I believe so.

23                    MR. BACH:  No further questions.

24                    THE COURT:  Any redirect?

25                    MR. LEVY:  No.  Thank you, your Honor.

1           THE COURT:  You may step down, sir.  Thank you.

2           (Witness excused)

3           THE COURT:  Ladies and gentlemen, let's take a quick

4   break.  Would you follow the normal instructions:  Exhibits on

5   the chairs.  Books in your room.  Please don't discuss the case

6   or do any research.  See you in a couple of minutes.

7           Thank you for your attention.

8           (Jury not present)

9           THE COURT:  Anything else on the record, counsel?

10          MR. LEVY:  Nothing, your Honor.

11          THE COURT:  Off the record.

12          (Discussion off the record)

13          (Recess)

14          (Jury present)

15          THE COURT:  And won't you be seated.

16          We continue with the government's case.

17          MR. IMPERATORE:  Your Honor, the government calls

18   Russell Schaub.

19          THE COURT:  Thank you.

20          Sir.

21    RUSSELL SCHAUB,

22       called as a witness by the government,

23       having been duly sworn, testified as follows:

24          THE CLERK:  Please be seated.

25          State your full name and spell your last name slowly

Cabdcol5

1    for the record.

2              THE WITNESS:  Russell Schaub, S-c-h-a-u-b.

3    DIRECT EXAMINATION

4    BY MR. IMPERATORE:

5    Q.  Good afternoon, Mr. Schaub.

6    A.  Good afternoon.

7    Q.  Where do you live?

8    A.  I live in Port Washington in New York.

9    Q.  Mr. Schaub, what do you do for a living?

10   A.  I'm an investment manager.

11   Q.  Do you personally invest in the stock market?

12   A.  I do.

13   Q.  How long have you been doing that?

14   A.  For over 25 years.

15   Q.  When investing in the stock market, what types of

16   information do you rely upon in making your investment

17   decisions?

18   A.  Well, I typically go online and read Wall Street Journal,

19   New York Times, Barron's, other publicly-available information,

20   except when I am investing in initial public offerings in which

21   case I will look at the company's prospectus.

22   Q.  Mr. Schaub, what is an initial public offering?

23   A.  An initial public offering is when a company is privately

24   held but then it makes a determination that it wants to offer

25   additional shares or sell certain shares to the general public.

Cabdcol5                        Schaub - direct

1   Q.   And what is a prospectus?

2   A.   A prospectus is a line of financial information and

3   management text that describes -- it is produced by the

4   corporation, and it describes the company's line of business,

5   its target market.  It has a lot of financial information,

6   revenues of the company, expenses of the company and then its

7   projections and balance sheet information.  It also describes

8   the opportunities that the company sees as well as risks for

9   the investment.

10   Q.   Mr. Schaub, when investing in an initial public offering,

11   why do you rely upon a prospectus?

12   A.   Well, the company is trying to raise significant amounts of

13   money, and it's produced by the company and it's stating here's

14   what we're trying to do as a business and with your money.  And

15   it also provides financial information that is produced by that

16   same company.  And it is the most accurate source of

17   information that is out there.

18   Q.   Specifically, what kinds of financial information do you

19   look at when you are reviewing and relying on a prospectus?

20   A.   Well, the financial information will be historical income

21   statements and balance sheets of the company.  The income

22   statement has the revenues of the company and as well as the

23   expenses of the company and the income of the company.

24   Revenues minus expenses is the income.  And then it provides

25   the balance sheet, which is the assets and liabilities of the

```
 1   company.
 2   Q.  Mr. Schaub, did you purchase in an initial public offering
 3   of Refco?
 4   A.  Yes, I did.
 5   Q.  Was that in August of 2005?
 6   A.  It was.
 7   Q.  And what exactly was being offered to investors in that
 8   initial public offering?
 9   A.  Well, Refco was offering up shares of its company.  If you
10   buy shares in an initial public offering it is like owning a
11   little piece of the company, and it was being made available to
12   the general public.
13   Q.  How did you first become interested in Refco?
14   A.  I was notified through my stockbroker, Charles Schwab.
15   Q.  What's Charles Schwab?
16   A.  Charles Schwab is a stockbroker.  When individuals want to
17   buy or sell shares, equities in companies, it's difficult to do
18   it by themselves; they go through a stockbroker.  And you tell
19   the stockbroker I want to buy a certain amount of shares.  You
20   have your money in an account, they take the money and they
21   exchange it for shares.  They are providing transaction
22   services for you.
23   Q.  What does one do to become a Charles Schwab customer?
24   A.  Well, you typically have to authenticate yourself, show
25   some type of identification that you are who you say you are,
```

Cabdcol5                        Schaub - direct

1    and then send in a check.  That check clears, there is money in

2    your account, and then you are free to buy and sell shares.

3    Q.  Now, at the time that you first learned of Refco through

4    Charles Schwab, what business did you understand Refco to be

5    involved in?

6    A.  Well, they were providing transaction services for large

7    corporations and large hedge funds.  They were providing

8    clearinghouse services to the exchange -- to exchange-traded

9    derivatives.  They were providing services that helped

10   corporations and hedge funds manage their risk.

11   Q.  When you say "clearinghouse services," what do you mean by

12   that?

13   A.  They were handling the transaction.  Just like Charles

14   Schwab for me as an individual broker was handling a

15   transaction, Refco was handling foreign exchange transactions,

16   forward contracts for corporations that would enable the

17   corporations to trade up with counterparties, but they were

18   handling the transaction, not necessarily taking the risk of

19   the transaction.

20   Q.  And before you made a decision to invest in Refco, did you

21   receive any information about Refco?

22   A.  Yes.  I received their prospectus.

23   Q.  Mr. Schaub, would you please take a look at what's been

24   marked as Government Exhibit 5009?

25   A.  Yes.

1          MR. IMPERATORE:  Mr. Smith, if you could pull that up,

2     please.

3     Q.  Do you recognize this document?

4     A.  I do.

5     Q.  What is this?

6     A.  This is the prospectus that I reviewed on Refco prior to my

7     public offering.

8          MR. IMPERATORE:  The government offers 5009.

9          MR. SCHWARTZ:  No objection.

10         THE COURT:  Received.

11         (Government's Exhibit 5009 received in evidence)

12    BY MR. IMPERATORE:

13    Q.  Now, I would like to focus on the first page of this

14    prospectus.

15         Mr. Smith, if we could please highlight the first

16    paragraph, and blow that up.

17         What was the price at which the stock was being

18    offered?

19    A.  $22 per share.

20    Q.  Now, if we could take a look down at the bottom of this

21    first page, if we could blow up the bottom half, what was --

22    this prospectus is dated August 10th of 2005, is that correct?

23    A.  Yes.

24    Q.  And when you received this prospectus, did you focus on any

25    particular portions of it?

1  A.  Yes.  I focused on the sections pertaining to the business

2  strategy of the company, its lines of business.  I focused on

3  the income statements of the business, which were the revenues

4  and expenses, and net operating income of their business.  I

5  focused on the balance sheet.  And I focused on the sections of

6  the report detailing what they perceived as their opportunities

7  as well as the risks of the investment.

8  Q.  Let's turn now to page 1 of this prospectus.

9          If we could please blow up the first paragraph.

10          Here it says -- there is a heading that says

11  "Prospectus Summary" and below that another heading that says

12  "Our Company."  Correct?

13  A.  Yes.

14  Q.  I am going to read a portion of the section below "Our

15  Company."

16          Mr. Smith, if you could please blow up that paragraph.

17          It says here:  "We are a leading independent provider

18  of execution and clearing services for exchange-traded

19  derivatives and a major provider of prime brokerage services in

20  the fixed income and foreign exchange markets."

21          Now, Mr. Schaub, does that accurately describe what

22  you understood Refco's business to be?

23  A.  Yes, it does.

24  Q.  Could you describe sort of in plain English what that

25  means?

1    A.   Sure.  This was taking place in 2005.  In the late '90s and

2    early 2000s, there was a lot of big corporate growth,

3    globalization, and corporations needed to manage their risk for

4    foreign exchange purposes.  They were borrowing lots of money.

5    So there were a lot of fixed income products and currency.  So

6    what Refco would provide is the transaction services that

7    enabled corporations to manage that part of their business.

8    Q.   Now, I think you said a moment ago that you rely on

9    financial information when making investment decisions, is that

10   right?

11   A.   Yes.

12   Q.   Did financial information about Refco appear in this

13   prospectus?

14   A.   It did.

15   Q.   If we could turn to page 3 of this prospectus, please.

16        Midway down the page, there is a heading that says

17   "Our Business."  If we could blow that up, please?

18        Below that, there is a heading that says "Derivatives

19   Brokerage & Clearing."

20        Now, if we could just turn to the top of the very next

21   page, please, which is a continuation of this section.

22   Mr. Smith, if you could highlight the very first sentence of

23   this page.  Thank you.

24        It says here:  "From fiscal year 2000 through fiscal

25   year 2005, our derivatives brokerage & clearing net revenues

Cabdcol5                        Schaub – direct

1   and operating profit have grown at compound annual growth rates

2   of 24.3 percent and 33.3 percent, respectively."

3          Do you see that, Mr. Schaub?

4   A.  I do.

5   Q.  When you made your investment decision, did you rely on

6   this section?

7   A.  I did.

8   Q.  And what significance did it have for you?

9   A.  Well, for one thing, this growth rate over this five/six

10  year period is extraordinarily high.

11         Two, it's great to have revenues growing fast.  It

12  means there are clients who actually want to buy your products

13  and your services.  But, you know, sometimes you see companies

14  that have rapid revenue growth but their income isn't growing.

15  It means that they're spending lots of money to generate that

16  revenue.  In this case, revenues are growing really, really

17  fast but their profits are growing even faster, which means

18  they only have to spend, let's say, one dollar to generate $2,

19  as opposed to spending $3 to get $2, which means revenue is

20  growing but your income is going down.  So the fact that profit

21  was growing even faster but both numbers were high was a great

22  thing.

23  Q.  Now, let's take a look at the next section on page 4, the

24  same page.  It's called, "Prime Brokerage/Capital Markets."  At

25  the bottom it says here, "From fiscal year 2000" –– I'm sorry,

1    Mr. Smith, if you could please expand this?

2              "From fiscal year 2000 through fiscal year 2005, our

3    prime brokerage/capital markets net revenues operating profit

4    have grown at compound annual growth rates of 26.0 percent and

5    38.2 percent, respectively."

6              Do you see that, Mr. Schaub?

7    A.   I do.

8    Q.   Did you review this information when you looked at the

9    prospectus?

10   A.   I did.

11   Q.   And did you rely on it?

12   A.   I did.

13   Q.   What significance did this section have for you?

14   A.   Well, similarly, the prospectus described two key

15   businesses of Refco.  And just like the first one, this second,

16   which is their prime brokerage business, revenues were growing,

17   revenues were growing extraordinarily fast over a sustained

18   five-year period, but even more importantly the income was

19   growing even faster.

20   Q.   If we could take a look now at page 59 of this prospectus.

21             Mr. Schaub, what appears on this page of the document?

22   A.   This is the income statement.  It's the revenues and

23   expenses of the company broken down by their lines of business.

24   Q.   And when you were deciding whether to invest, did you

25   review the information contained on this page?

Cabdcol5                     Schaub - direct

1    A.  I did.

2    Q.  And does this table convey some of the financial

3    information that we talked about a few moments ago?

4    A.  Yes, it does.

5    Q.  Did you rely on the information that's contained in this

6    table?

7    A.  I did.

8    Q.  Now, from reviewing this prospectus, what conclusions did

9    you draw, if any, about the financial condition of Refco?

10   A.  That it was profitable.  It was profitable over a multiyear

11   period.  That its revenues were growing and its income was

12   growing.  It seemed that it was -- that the financial results

13   were stable and growing.  It would be an ongoing concern.  And

14   that, coupled with the lines of business it was in, made it an

15   attractive investment.

16   Q.  If we could turn now to page 117.

17           Mr. Smith, if you could focus on the top half of this,

18   please.

19           This is a section with a heading that reads "Certain

20   Relationships and Related Party Transaction," is that right?

21   A.  Yes.

22   Q.  Did you review this section when you looked at this

23   prospectus?

24   A.  I did.

25   Q.  What did you use this section of the prospectus for?

Cabdcol5                          Schaub - direct

1   A.   Well, this is another part of the prospectus that puts the

2   detailed risks of the investment.   I prefer not to invest in a

3   company that has material related-party transactions.

4   Related-party transactions means that the senior officer of the

5   company or someone on the board besides having a position with

6   Refco has a position with another company that Refco is doing

7   business with.

8          And you prefer to make investments in companies where

9   their revenue is being generated by doing business with third

10  parties, where there is no conflict of interest or possible

11  conflict of interest.   If you have a relationship with a

12  related party, the related party may favor this other business

13  in the contract that's being negotiated, and so that could be a

14  risk.

15  Q.   What conclusions did you draw about Refco from reviewing

16  this section?

17  A.   I read it and I did not see any material risks here.

18  Q.   And, now, were the representations made in this section

19  important to you?

20  A.   They were.

21  Q.   Why is that?

22  A.   Well, because I was reading the prospectus not just to see

23  about the lines of business but to see what were the risks of

24  the business, and one of the risks could be some improper

25  related-party transaction.

1    Q.   Now, at the time that you were reviewing this prospectus,

2    were you aware that a related party actually owed Refco

3    hundreds of millions of dollars?

4    A.   No, I was not.

5    Q.   Is that disclosed in this prospectus?

6    A.   No, it's not.

7    Q.   In considering whether to invest, is that something that

8    would have been important for you to know?

9    A.   Absolutely.

10   Q.   Why is that?

11   A.   As I said, it is a huge potential conflict of interest.

12   Q.   And at the time that you reviewed this prospectus, were you

13   aware that Refco had guaranteed hundreds of millions of dollars

14   in loans made by a third party to a related party of Refco?

15   A.   No, I was not.

16   Q.   Is that disclosed in this prospectus?

17   A.   No, it is not.

18   Q.   In considering whether to invest, is that something that

19   would have been important to you?

20   A.   Yes, it would have been.

21   Q.   And why is that?

22   A.   Well, similarly, that's a huge potential conflict of

23   interest.  You would never want to expose yourself to that type

24   of exposure as an investor.

25   Q.   Now, there came a time when you invested in Refco, is that

1   correct?

2   A.  Yes.

3   Q.  How did you go about making your investment?

4   A.  I made that investment through my stockbroker, Charles

5   Schwab.

6   Q.  Mr. Schaub, I would like you to take a look at what's been

7   marked as Government Exhibit 10A.

8           Mr. Smith, if you could pull that up, please.

9           I'm sorry.  Do you have that in front of you, Mr.

10  Schaub?

11  A.  I have the paper version, yes.

12  Q.  OK.  Do you recognize this document?

13  A.  Yes, I do.

14  Q.  And what is it?

15  A.  This is my transaction statement from Charles Schwab for

16  the purchase of shares in Refco.

17          MR. IMPERATORE:  The government offers 10A.

18          MR. SCHWARTZ:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 10A received in evidence)

21  BY MR. IMPERATORE:

22  Q.  Mr. Smith, if you could please bring forward the middle

23  section?  Thank you.

24          Now, is this a statement, Mr. Schaub, that you

25  received directly from Charles Schwab?

Cabdcol5                        Schaub - direct

1    A.  Yes.

2    Q.  And does this accurately reflect your investment in Refco?

3    A.  Yes, it does.

4    Q.  Let's take a look beginning at the left side of the chart.

5         Mr. Smith, if you could please highlight the name

6    "Refco Inc."

7         Mr. Schaub, is this the Refco that you invested in in

8    2005?

9    A.  Yes, it is.

10   Q.  Now, if we take a look about two columns over, there is a

11   column called "Bought" and a symbol "RFX."  Do you see that?

12   A.  Yes.

13   Q.  What is RFX?

14   A.  RFX is the -- it is called a ticker symbol.  Refco traded

15   on the New York Stock Exchange.  Most companies, if not all

16   companies, on the Stock Exchange had a three-letter ticker.

17   That was the abbreviated form of Refco, RFX.

18   Q.  Now, directing your attention to the next column, it says

19   "Trade Date 8/10/05."  Do you see that?

20   A.  Yes, I do.

21   Q.  What is that date?

22   A.  That is the date that I agreed to purchase the 200 shares

23   of Refco.

24   Q.  And underneath that there is an entry that says "Settlement

25   Date" 8/16 of '05.  Do you see that?

1    A.  Yes, I do.

2    Q.  What does that date signify?

3    A.  That's the date where Charles Schwab took the cost of the

4    200 shares -- in this case, $4,400 -- and in exchange sent me

5    an electronic certificate for 200 shares of Refco.

6    Q.  Now, drawing your attention to the next row.  The quantity

7    noted here is 200.  Is that the number of shares that you

8    purchased?

9    A.  Yes, it is.

10   Q.  And the price is $22, is that correct?

11   A.  Yes.

12   Q.  So at the end of the row, what is the total purchase price

13   of your shares?

14   A.  $4,400.

15   Q.  And, by the way, when you decided to invest, how many

16   shares of Refco did you initially try to purchase?

17   A.  Probably a thousand shares.

18   Q.  And were you ultimately able to purchase a thousand?

19   A.  No.  There was so investor demand, the company was viewed

20   as so attractive they had more people wanting to buy the shares

21   than they were offering to the public.

22   Q.  Now, after you invested in Refco, did you keep an eye on

23   your investment?

24   A.  Yes, I did.

25   Q.  How did you do that?

Cabdcol5                         Schaub - direct

1   A.  Well, it's quite easy through that ticker RFX, going online

2   and typing that in, the results are in the newspapers, Wall

3   Street Journal, New York Times every day.

4   Q.  What was your view of how Refco's stock performed

5   initially?

6   A.  Well, initially the stock performed great.  That same day

7   that I bought the shares, it closed up 25 percent.  So my $4400

8   turned into over $5,000 in one day.  So, one, I was happy.

9   Two, I was a little disappointed I didn't get the thousand

10  shares.  I was feeling good that I had made the right

11  investment decision.

12  Q.  Did there come a time in October 2005 when Refco made a

13  public announcement?

14  A.  Yes.

15  Q.  And what was that announcement?

16  A.  They disclosed this related-party transaction about that,

17  the debt, the $400 million of debt, and the stock price just

18  plummeted.

19  Q.  Was that something that you had seen anything about in the

20  prospectus?

21  A.  No.

22  Q.  And when the price of your stock plummeted, did you still

23  have all of your shares?

24  A.  Yes, I did.

25  Q.  Did there come a time -- I'm sorry.  Withdrawn.

1          Mr. Schaub, were you ever able to sell your stock in

2    Refco?

3    A.   Yes.

4    Q.   And you had bought it at $22 a share, is that correct?

5    A.   Correct.

6    Q.   I'd like you to take a look at what's in front of you as

7    Government Exhibit 10B.  Do you recognize this document?

8    A.   Yes, I do.

9    Q.   And what is Government Exhibit 10B?

10   A.   This is a similar transaction statement from my stockbroker

11   Charles Schwab, only it represents when I sold my 200 shares of

12   Refco.

13          MR. IMPERATORE:  The government offers 10B.

14          MR. SCHWARTZ:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 10B received in evidence)

17          MR. IMPERATORE:  Mr. Smith, if you could please pull

18   forward the middle part of this document?  Thank you.

19   Q.   Mr. Schaub, just directing your attention to the left side

20   here.  You see the name "Refco Inc."  Is that the company whose

21   shares that you sold?

22   A.   Yes.

23   Q.   And if we move a couple of columns over, we see the column

24   "Sold" with the symbol "RFXCQ."  Do you see that?

25   A.   Yes, I do.

Cabdcol5                          Schaub - direct

1   Q.   What is RFXCQ?

2   A.   Well, that, similarly, is the transaction ticker for Refco,

3   but the New York Stock Exchange, like other exchanges, has

4   rules on companies that can be listed on the Exchange.  And one

5   of those, the stock price can't go below a certain number; and,

6   two, it has to be deemed as a viable going concern, which means

7   they expect the company to remain in business.  Since the stock

8   price was now below a dollar and they no longer viewed Refco as

9   a business that was an ongoing concern, it was delisted from

10  the Stock Exchange and its ticker was changed.

11  Q.   Does that mean it was no longer trading on the Stock

12  Exchange?

13  A.   You were able to sell the securities but not through the

14  main New York Stock Exchange.

15  Q.   Now, if we go to the next column over, we see "Trade Date

16  4/26/06."  What does that date signify?

17  A.   That's the date when I entered into my agreement to sell

18  the 200 shares that I held.

19  Q.   And immediately below that we see "Settlement Date

20  5/01/06."  What is the significance of that date?

21  A.   That's when my stockbroker Charles Schwab took the 200

22  shares away from me and in exchange I received the cash for

23  those shares.

24  Q.   Now, if we go to the next row below, we see the quantity,

25  200.   Is this the amount of shares that you sold?

1   A.   Yes.

2   Q.   And the next column over, it says "Price," 50 cents?

3   A.   Correct.

4   Q.   What does that signify?

5   A.   That's the price that I sold each share at.  So I had

6   bought the shares for $22; I was selling each one a few months

7   later for 50 cents.

8   Q.   And then the next column over we see "Principal $100."  Do

9   you see that?

10   A.   Yes, I do.

11   Q.   And what does that signify?

12   A.   That's how much cash I sold the shares for.  I had paid

13   $4,400 for them, and a few months later I received $100 back.

14   Q.   But did you take away $100 from the sale of your Refco

15   shares?

16   A.   No.  I still had to pay my stockbroker, Charles Schwab, for

17   handling the sale.  So that took away $90.

18   Q.   So was your net loss about $4,300?

19   A.   Yes.

20   Q.   Mr. Schaub, what was your reaction to having lost this

21   money?

22   A.   Well, I was angry, very angry.  It's one thing to invest

23   and make a mistake or for markets to turn out a little bit

24   differently than you anticipated, but in this case I lost an

25   enormous sum of money for me not because I made a wrong

Cabdcol5                          Schaub – direct

 1   decision but because it appeared like there was massive fraud

 2   in the company.  Basically, someone stole my money.

 3              MR. IMPERATORE:  I have no further questions, your

 4   Honor.

 5              THE COURT:  Thank you.

 6              Cross-examination, please.

 7   CROSS-EXAMINATION

 8   BY MR. SCHWARTZ:

 9   Q.  Good afternoon, Mr. Schaub.

10   A.  Good afternoon.

11   Q.  You don't know Joe Collins, correct?

12   A.  Correct.

13              MR. SCHWARTZ:  No further questions.

14              THE COURT:  Thank you.

15              No redirect, I don't guess?

16              MR. IMPERATORE:  No, your Honor.

17              THE COURT:  Thank you.

18              You may step down, sir.  Thank you.

19              (Witness excused)

20              MR. CHERNOFF:  Your Honor, the government calls

21   Francisco Duque.

22              THE COURT:  Thank you.

23              (Pause)

24              Come right on in, sir.  Step up.

25    FRANCISCO DUQUE,

Cabdcol5

1          called as a witness by the government,

2          having been duly sworn, testified as follows:

3               THE CLERK:  Please be seated.

4               State your full name for the record and spell your

5     last name.

6               THE WITNESS:  Francisco Duque, D-u-q-u-e.

7               THE COURT:  Thank you.

8               Mr. Chernoff.

9               MR. CHERNOFF:  Thank you, your Honor.

10    DIRECT EXAMINATION

11    BY MR. CHERNOFF:

12    Q.  Good afternoon, Mr. Duque.

13    A.  Good afternoon.

14    Q.  Sir, where do you work?

15    A.  I work for a company called Bessemer Trust.

16    Q.  Could I ask you if you could pull your chair a little

17    closer to the microphone so that I can hear you.  Thank you.

18               And what do you do at Bessemer Trust, sir?

19    A.  I am an investment analyst in the equities department.

20    Q.  Equities meaning you research stocks?

21    A.  Correct, yes.

22    Q.  I want to turn back to the year 2005.

23               Where were you working at that time?

24    A.  I worked for a company called TIAA-CREF.

25    Q.  That's T-I-A-A dash C-R-E-F?

Cabdcol5                        Duque - direct

1    A.  Yes.

2    Q.  And, sir, what does that stand for?

3    A.  It's called the Teachers Insurance and Annuity in the

4    College Retirement Equities Fund.

5    Q.  And, sir, what does TIAA-CREF do?

6    A.  It is a company that manages pension money for

7    universities, hospitals, and some government entities.

8    Q.  When you say it manages pension funds, those are for any

9    employees of universities, hospitals or government agencies

10   that work with TIAA-CREF?

11   A.  Yes.

12   Q.  And what was your job at TIAA-CREF in 2005?

13   A.  I was also an equities analyst there analyzing investments

14   in the financial services industry.

15   Q.  In making -- in analyzing stocks, are you making

16   recommendations to your employer as to what stocks to invest

17   pension money in?

18   A.  Yes.  That was part of the job, yes.

19   Q.  And what are the factors that you consider and evaluate in

20   deciding to make these pension investments?

21   A.  The financial health of the company, the prospects for

22   growth, the industry they operate in, profitability.  Those are

23   some of the main factors.

24   Q.  Did there come a time when TIAA-CREF invested in the

25   initial public offering of Refco?

Cabdcol5                              Duque - direct

```
1    A.  Yes.

2    Q.  And did you work on that investment decision with

3    TIAA-CREF?

4    A.  I did, yes.

5    Q.  What was your role in the decision making process?

6    A.  I did some analysis of the company based on their

7    prospectus at the time before the company went public and

8    looked at the financial statements, analyzed the industry --

9    the business discussion that they presented there, and we had a

10   meeting with the management of the company.  And then based on

11   all those -- on those factors, we decided to make an investment

12   in the company.

13   Q.  Sir, over the course of your career, is it fair to say you

14   have reviewed hundreds of investments?

15   A.  Yes.

16   Q.  Also fair to say, sitting here today, you don't remember

17   specifically reading the Refco prospectus at that time?

18   A.  Correct, yes.

19   Q.  Is it your practice to always review a prospectus before

20   you recommended an investment to the pension funds?

21   A.  Especially during the IPO process, yes.

22   Q.  And what is it you look for when you review prospectuses in

23   the context of an IPO?

24   A.  Primarily the financial statements of the company, the

25   management discussion about the business, the disclosure about
```

1   the risks associated with the investment and with the

2   operations of the company.  I think those are the three main

3   areas.

4   Q.  Related-party debt, is that something that's important to

5   you when you consider an investment?

6   A.  Yes.  It is one of the factors, yes.

7   Q.  How is that important?

8   A.  If a company has a large asset or a large liability that is

9   related to one of the members of management or a family member

10  or somebody who is connected to the company, I think you want

11  to understand what are the conditions or what are the risks

12  associated with that related-party position or transaction.

13  Q.  Now, as a representative of TIAA-CREF, were you sometimes

14  also -- did you sometimes also have the opportunity to meet

15  with senior management before making an investment on behalf of

16  the pension funds?

17  A.  Yes.  Frequently, yes.

18  Q.  And so you had many such meetings?

19  A.  Correct, yes.

20  Q.  You are aware from prior statements that you had given that

21  you had such a meeting with Mr. Bennett, the management from

22  Refco?

23  A.  Yes.

24  Q.  And fair to say that sitting here today you no longer

25  remember what was talked about at that meeting in 2005?

Cabdcol5                      Duque - direct

1    A.  I no longer remember the details, no.

2    Q.  Did there come a time when TIAA-CREF made an investment in

3    Refco's IPO?

4    A.  Yes.

5    Q.  And after that investment was made, did you monitor it

6    going forward?

7    A.  I did.  Yes.

8    Q.  And how did you do that?

9    A.  It was mainly observing the stock price in the market, and

10   it would have been also looking at the financial statements and

11   all the earnings announcements from the company but there

12   wasn't a lot of time between the IPO and the end of the

13   process.

14   Q.  And after you invested TIAA-CREF's funds in Refco, what was

15   your initial view of how the company's stock price was doing?

16   A.  What I remember is that it performed relatively well

17   compared to other companies.  It was doing well, yes.

18   Q.  Did there come a time when the share price of Refco

19   declined dramatically?

20   A.  Yes.

21   Q.  And in the time between TIAA-CREF's initial investment and

22   that drop in the stock price, had TIAA-CREF been buying and

23   selling shares of Refco from time to time?

24   A.  Yes, the company had bought and sold additional shares.

25   Q.  After that dramatic drop in the stock price, do you

1    remember a time when Refco's stock was suspended from trading?

2    A.  Yes, I do.

3    Q.  And what does that mean?

4    A.  It means that the shares are no longer traded on the Stock

5    Exchange because there is some irregularity or so that the

6    company should not be publicly traded.

7    Q.  At the time that Refco's stock was suspended, did TIAA-CREF

8    still own shares of Refco?

9    A.  We did, yes.

10   Q.  What happened to the value of those shares?

11   A.  They had to be written off, written down to zero.

12   Q.  Sir, I'm just going to walk up to you what's been marked

13   for identification as 3526-5.  Oh, you have it before you with

14   that marking, too.

15          And in preparation for your testimony today, did you

16   receive a document from lawyers for TIAA-CREF?

17   A.  I did, yes.

18   Q.  And does that document refresh your recollection as to how

19   much money TIAA-CREF lost on the Refco investment?

20   A.  Yes, it does.

21   Q.  What was the total amount that TIAA-CREF lost in this

22   investment?

23   A.  $17.1 million.

24   Q.  Finally, Mr. Duque, you don't know Joseph Collins here at

25   the table, do you?

1    A.   I do not.

2              MR. CHERNOFF:   No further questions, your Honor.

3              THE COURT:   Thank you.

4              Cross-examination, counsel.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. SCHWARTZ:  Thank you Mr. Duque.  I have no

2      questions for you.

3            THE COURT:  You may step down, sir.  Thank you.

4      Gentlemen?

5            MR. CHERNOFF:  Shall we begin with the read back?

6            MR. IMPERATORE:  Your Honor, at this point, the

7      government would read back the prior testimony of Santo Maggio.

8            THE COURT:  Thank you.  And who's going to --

9            MR. IMPERATORE:  And the government calls Jordan

10     Goodman.  Your Honor, the government would suggest a sidebar

11     just for a moment.

12            MR. CHERNOFF:  While the witness goes.

13            THE COURT:  Sure.  Miss Reporter, if you would,

14     please.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Cabdcol5                          Duque - direct

1                  (At the side bar)

2                  MR. CHERNOFF:  I'm sorry.  We forgot to mention this,

3       but our plan was to offer all the exhibits for this read back

4       in advance so we can save time and not offer them during the

5       testimony.

6                  MR. SCHWARTZ:  We have already consented to that.

7                  THE COURT:  Cool.

8                  MR. CHERNOFF:  I just wanted to put that on the

9       record.

10                 MR. SCHWARTZ:  And we'll do the same thing before the

11      cross, and your Honor, we've decided not to use --

12                 THE COURT:  Different person?

13                 MR. SCHWARTZ:  We're going to use the same person.  It

14      just makes more sense.

15                 THE COURT:  Okay.  Is this Goodman person -- Off the

16      record.

17                 (Discussion held off the record.)

18                 (Continued on next page)

19

20

21

22

23

24

25

1                    (In open court)

2         JORDAN R. GOODMAN,

3              called as a witness by the Government,

4              having been duly sworn, testified as follows:

5              THE COURT:  Ladies and gentlemen, as you heard at the

6    outset of the case, we are going to be reading the testimony of

7    a witness who is deceased.  Mr. Goodman is going to be reading

8    the witness' responses from a prior proceeding.  Counsel?

9    DIRECT EXAMINATION

10   BY MR. IMPERATORE:

11   Q.  Good afternoon, Mr. Goodman.

12   A.  Good afternoon.

13   Q.  Mr. Goodman, what do you do for a living?

14   A.  I'm a criminal investigator with the U.S. Attorney's Office

15   in the Southern District of New York.

16   Q.  Have you reviewed a transcript of testimony given at a

17   prior proceeding by Santo Maggio?

18   A.  I have.

19   Q.  Today I'm going to be reading the questions asked at that

20   proceeding, and I'd ask that you read Mr. Maggio's answers to

21   those questions.  Is that okay?

22   A.  Yes.

23   Q.  Okay.  Let's begin.

24   "Q. Good afternoon, Mr. Maggio.

25   "A. Good afternoon.

1   "Q. Mr. Maggio, how old are you?

2   "A. 57.

3   "Q. Where do you live, Mr. Maggio?

4   "A. Naples, Florida.

5   "Q. What was your highest level of education, Mr. Maggio?

6   "A. Two years of college, but my fourth semester of college I

7   didn't finish.  I withdrew in my fourth semester of college.

8   "Q. Did you graduate?

9   "A. No.

10  "Q. What college did you attend?

11  "A. Hunter College here in Manhattan.

12  "Q. Mr. Maggio, what did you do after you attended Hunter

13  College?

14  "A. I went to work on Wall Street.

15  "Q. Mr. Maggio, where did you go to work on Wall Street?

16  "A. The first firm I went to work for was Loeb Rhodes.

17  "Q. Approximately when was that, Mr. Maggio?

18  "A. That was on 44 Wall Street.

19  "Q. And approximately when was that, Mr. Maggio?

20  "A. I'm sorry, sir.  It was 1971.

21  "Q. When you went to work for Loeb Rhodes, Mr. Maggio, what was

22  your job?

23  "A. I was working in the -- they called it the cage or the

24  cashier's department.  Basically, it was an area where you

25  would receive and deliver stock.  Back in 1971, all securities

CABPCOL6                    Goodman/"Maggio" - direct

were in paper form, not paper entry form, but regular pieces of

certificates.  So we would receive and deliver those

certificates and count them, make certain that the receipts we

were getting were correct, versus the money that was being

charged to us.

"Q. How long did you do that job at Loeb and Rhodes,

approximately?

"A. Only for a couple of months.

"Q. What did you do next?

"A. Went to a firm called Walston & Company, located in lower

Manhattan on Water Street.

"Q. And what was Walston & Company?

"A. Walston & Company was a brokerage house.

"Q. What did you do at Walston & Company?

"A. Walston & Company, I was first put in the corporate bond

department.  Very similar to what I was doing at Loeb Rhodes

with stocks, we were doing with bonds, receiving the bonds,

delivering the bonds.  We would clip coupons.  Back in the '70s

all bonds were in bearer forms.  Bearer meaning whoever held

the bond owned the bond.  So there would be little coupons

attached, and twice a year you would have to clip the coupon,

send it to whoever the issuer was, and they would send you a

check.

        So we would clip coupons.  Then later on, at Walston,

I became a troubleshooter for corporate bonds.  Any problems

1    that there were in deliveries with branch offices and with

2    other brokerage firms, I would what's called troubleshoot them.

3    Research the problem and try to rectify it.

4    "Q. Just to be clear, Mr. Maggio, when those coupons were being

5    clipped off the bond and being sent to the issuer, what did

6    that relate to?  What payments were received in --

7    "A. Those were interest payments.

8    "Q. So, Mr. Maggio, after working at Walston, where did you go

9    next?

10   "A. Excuse me, sir?

11   "Q. Where was your next place of employment, Mr. Maggio?

12   "A. I went to a firm called Tucker Anthony and RL Day, which

13   became John Hancock Securities, which became Tucker Anthony

14   again.

15   "Q. What did you do at Tucker Anthony?

16   "A. Similar position that I had at Walston and also Loeb, Loeb

17   Rhodes.  I originally worked in the cashier's department, but

18   soon after that, we started what they called a stock loan

19   department and I was moved to stock loan.

20   "Q. Mr. Maggio, what was the stock loan department?

21   "A. Stock loan is a department that borrows and lends stocks.

22   The reason why you would need to borrow a stock is, is if you

23   sold a stock that you didn't own, you would still have to make

24   delivery to the person you sold it to.  So you would go out and

25   borrow the stock from another brokerage firm or from a bank or

1   from an ERISA account and make delivery on that stock.

2   "Q. Mr. Maggio, you can sell a stock you don't own; is that

3   right?

4   "A. Absolutely.  It's called shorting.

5   "Q. So if you sell a stock you don't own, what do you have to

6   do?

7   "A. You still have to make delivery on that stock.  You are

8   required to make delivery within a certain period of days.

9   "Q. How does that relate to stock loans?

10  "A. Well, the stock loan department would lend out the stocks

11  that they had.  So Tucker Anthony had customers who had stocks

12  who owned stocks on margin, and so you could lend the stocks to

13  another brokerage firm and they would give you money.  You

14  would invest the money, but at least that would facilitate the

15  person who sold the stock short.

16  "Q. To make delivery on that stock?

17  "A. Yes.

18  "Q. What did you do after Tucker Anthony?

19  "A. After Tucker Anthony, myself and two other gentlemen

20  started the firm called Inland Consultants Corp.

21  "Q. Approximately what year did you and these colleagues begin

22  Inland Consultants Corp.?

23  "A. Approximately 1978.

24  "Q. What was the business of Inland Consultants Corp.?

25  "A. Inland Consultants basically was in the stock loan

business.  The difference being was that instead of acting as a

principal to the transaction, we acted as an agent, a finder.

We would tell a Merrill Lynch to loan stock to Goldman Sachs,

as opposed to when I was doing stock loans for Tucker Anthony.

Merrill Lynch would have to loan the stock to Tucker Anthony,

who would then have to loan the stock to Goldman Sachs.

"Q. When you were working at Inland Consultants Corp.,

Mr. Maggio, did you do anything illegal during that job?

"A. Yes.

"Q. What did you do?

"A. We bribed set people at brokerage firms to come to Inland

to borrow stocks.

"Q. Was that illegal?

"A. Yes.

"Q. Why?

"A. Well, I was bribing -- we were bribing people to borrow

stocks from us at a rate that was less beneficial to the firms

that they were working for.  To me, I believe that is illegal.

          We were also laundering money.  In order to pay these

people off in cash, we would go outside to -- I don't know if

you call it a money launderer, but somebody who would give us

cash, and we would give them a check and they would charge us a

10 percent fee.  To me, that's tax evasion.

"Q. How did you get the cash to pay the bribes again?

"A. There would be some person that would take a check; so we

1  would give them a check for $10,000.  He would give us

2  $9,000 in cash, and he would give us a bill so, on our books

3  and records, it would look like we had a bill to support the

4  check that we wrote out.

5  "Q. Why did you do that?  Why did you engage in that whole

6  process?

7  "A. Why?  So we could pay off the people, or we could bribe the

8  people to borrow from us.

9  "Q. Mr. Maggio, did you change jobs, did you -- Withdrawn.

10        Did you leave Inland Consultants Corp.?

11 "A. Yes.

12 "Q. When, approximately?

13 "A. I think it was '82 or '83.

14 "Q. Where did you go?

15 "A. I went to a firm called -- at that time, it was called

16 McMahon, Brafman & Morgan.

17 "Q. At -- I'm sorry.  "What did you do at McMahon, Brafman &

18 Morgan?

19 "A. At McMahon we started a securities lending area.

20 "Q. What did the securities lending area do?

21 "A. Basically the same thing as stock loan, but they tried to

22 change the image and called it securities lending.  What we did

23 is cover -- borrow to cover the shorts of the company.  Like I

24 said before, sometimes traders can sell stock without an owner;

25 so we had to borrow to cover those short sales.  We would lend

1   out securities.  Any long securities that they owned, we would

2   lend them out so we could get increased leverage.

3   "Q. How long were you with that company?

4   "A. Two or three years.

5   "Q. And does that bring us to approximately 1985?

6   "A. Yes.

7   "Q. Where did you go to work in 1985?

8   "A. In 1985, I went to work for Refco Securities.

9   "Q. What was Refco Securities?

10  "A. Refco Securities was a broker/dealer governed by the SEC.

11  Members, I think, at the time of the New York Stock Exchange

12  and the NASD.

13  "Q. Mr. Maggio, just generally, what is a broker/dealer?

14  "A. A broker/dealer is a firm that transacts in securities,

15  equities and bonds that can deal with customers if they are so

16  registered to do that, and are governed by certain agencies

17  such as the Securities and Exchange Commission.

18  "Q. I think you mentioned the Securities and Exchange

19  Commission, NASD; is that also right?  What was the NASD?

20  "A. The NASD is a self-regulatory body that is National

21  Association of Securities Dealers.  That is an organization

22  that looks after all broker/dealers that are members of that

23  organization.

24          The NASD looks after, meaning makes certain that they

25  are in compliance with the regulations that a broker/dealer

1    must adhere to.

2    "Q. I think you also mentioned something called a New York

3    Stock Exchange; is that right?

4    "A. Yes.

5    "Q. Did they have a role regulating the broker/dealer that was

6    Refco Securities?

7    "A. Yes.  At that time, when Refco Securities was a broker --

8    was a New York Stock Exchange member, they were the key, what

9    they call SRO, self-regulatory organization, and they had a

10   role regulating Refco Securities.

11   "Q. I think you mentioned, Mr. Maggio, that as a broker/dealer,

12   Refco Securities dealt in both something called equities and

13   something called bonds, right?

14   "A. Yes.

15   "Q. Simply put, what are equities?

16   "A. An equity is basically a security that represents a share

17   of a company.

18   "Q. So a stock, Mr. Maggio?

19   "A. Yes.

20   "Q. What did you do when you first arrived at Refco Securities,

21   Mr. Maggio?

22   "A. My sole purpose for being hired by Refco was to lend out

23   their long positions and to cover their short positions.

24   "Q. Mr. Maggio, I'm just going to ask you to take one step back

25   there.  When you say long positions and short positions, just

1   what do you mean by that?

2   "A. What I mean by long position is if I go out and buy 100

3   shares of IBM, I now own 100 shares of IBM.  And on Wall Street

4   the lingo would be called they're long IBM, which means I own

5   it; I'm long it.  If you go out and sell IBM, you don't own it;

6   you're short IBM.  The same way as I said you can short stock

7   without actually owning it.

8   "Q. Mr. Maggio, just remind us what were you doing with respect

9   to long positions on the one hand and short positions on the

10  other?

11  "A. When I went to Refco Securities, I believe the sole

12  business was proprietary trading and what I mean by that is

13  they didn't have any customers.  They didn't deal with many

14  customers and most of their money was made by trading for their

15  own account.

16        So he would only -- the chief trader would only get a

17  certain amount of money to work with, let's say 20 million.

18  Well, normally, if you are a mutual fund, you pay $20 million

19  worth of stock and that's what you have, 20 million worth of

20  stock.  But when you lend out securities, you have the ability

21  to leverage that, to make it much bigger.  So if I can lend out

22  $20 million worth of stock and get 15 million cash for that,

23  well, now he has $15 million he can trade.  If I can buy that,

24  he buys that, and I can lend that out.  He's got another 12

25  million.

1          You could make that 20 million worth of stock

2     somewhere close to 70 million or $80 million on the short side

3     a little bit different.  He would go out and sell stocks short,

4     and then it would be our job to go ahead and go on the street

5     to make certain that we can borrow it so he can facilitate

6     delivery.

7     "Q. Mr. Maggio, were you promoted after you arrived at Refco

8     Securities?

9     "A. Yes.

10    "Q. What were some of the different jobs that you had after you

11    were promoted?

12    "A. At Refco?

13    "Q.  Yes, at Refco, Mr. Maggio.

14    "A. At Refco Securities, I became president in, I believe it

15    was, 1991.  I was senior vice president of Refco Group.  I then

16    became an executive vice president in Refco Group.  I was a

17    director and vice president of Refco Capital Markets.  I was

18    then president of Refco Capital Markets.  I was also directors

19    of various Refco subsidiaries, such as Refco Singapore, Refco

20    SA, and I think maybe even Forstmann-Leff.

21    "Q. During your time at Refco, did you ever meet someone named

22    Joseph Collins?

23    "A. Yes.

24    "Q. Who was Joseph Collins?

25    "A. Joseph Collins was an attorney, an outside attorney that

1    Refco used.

2    "Q. What law firms did he work at during the time that you were

3    employed by Refco?

4    "A. When I first was employed by Refco, I believe he was at a

5    firm called Schiff Hardin, and then after that, he left Schiff

6    Hardin and went to Mayer Brown.

7    "Q. We'll come back to that, Mr. Maggio.  Did you hold any

8    professional licenses while you were at Refco?

9    "A. Yes.

10   "Q. What licenses did you hold while you were at Refco?

11   "A. Series 3, which is basically a registration to transact in

12   commodities and futures.

13           Series 4, which is a registered options principal.

14           Series 7, which is a general securities license.

15           Series 8, which is a branch office license.

16           Series 24, which is general principal.

17           And a Series 63, which is sort of like a blue sky,

18   which gives me the ability to register in any state.

19   "Q. Who issued those licenses to you, Mr. Maggio?

20   "A. The NASD.

21   "Q. What is the status of those licenses?

22   "A. I believe they are terminated.

23   "Q. Mr. Maggio, in connection with your work at Refco, did you

24   commit any crimes?

25   "A. Yes.

1    "Q. Generally speaking, what types of crimes did you commit?

2    "A. I helped defraud investors, shareholders to the tune of

3    over $2 billion -- 2 billion.

4    "Q. Did you participate in transactions that were designed to

5    hide the existence of monies owed to Refco by RGHI?

6    "A. Yes.

7    "Q. Were those transactions documented?

8    "A. Yes.

9    "Q. For what years were they documented, Mr. Maggio?

10   "A. I believe they were documented from 2000 to 2005.

11   "Q. Did anyone assist you in documenting those transactions

12   during that period, Mr. Maggio?

13   "A. Yes.

14   "Q. Who?

15   "A. Joe Collins at Mayer Brown.

16   "Q. Now, Mr. Maggio, did you also commit crimes with respect to

17   your personal taxes?  I really only want to hear now about any

18   crimes regarding personal taxes.

19   "A. Personal taxes?

20   "Q.  Yes.

21   "A. Yes.

22   "Q. What crime did you commit with respect to your personal

23   taxes?

24   "A. I failed to report income earned in New York State for a

25   period of four years, four or five years.  I received a

1   corporate apartment from Refco that I did not declare on my

2   taxes.  I received airfare, be it commercial or private, to my

3   home in Florida from Refco, and I did not declare it on my

4   taxes.  I also sometimes used my entertainment, such as dinners

5   and stuff, personally that the company paid for, and I did not

6   declare them on my taxes.

7   "Q. Mr. Maggio, did you commit perjury while you were employed

8   at Refco?

9   "A. Yes.

10  "Q. More than once, Mr. Maggio?

11  "A. Yes.

12  "Q. Mr. Maggio, when did you leave Refco?

13  "A. October 10th, 2005.

14  "Q. Did you leave Refco voluntarily, Mr. Maggio?

15  "A. No.  I was given an indefinite leave of absence.

16  "Q. When were you put on the leave or given a leave of absence

17  by Refco, Mr. Maggio?

18  "A. I believe it was sometime on that weekend, just before

19  October 10th.  Sorry.  So it was either the 7th, 8th, 9th or

20  10th.

21  "Q. October 10th, was that a Monday?

22  "A. I believe it was either on Friday or Saturday before, right

23  before that.  So that would be the 7th or the 8th.

24  "Q. Were you given an indefinite leave of absence?"

25          THE COURT:  "Why"?

1    "Q. I'm sorry.  "Why were you given an indefinite leave of

2    absence, Mr. Maggio?

3    "A. Because the company was discovering the fraud that Refco --

4    sorry, RGHI was hiding hundreds of millions of dollars of debt.

5    "Q. Mr. Maggio, you mentioned the date Monday, October 10th.

6    Where were you on Monday, October 10th, immediately after

7    having been put on leave?

8    "A. I was at the U.S. Attorney's Office at Saint Andrews Plaza.

9    "Q. Why were you at the U.S. attorney's office, Mr. Maggio?

10   "A. I was there to cooperate.

11   "Q. Why were you attempting to cooperate with the government on

12   October 10th of 2005?

13   "A. I was hoping that I would get some sort of leniency at

14   sentencing.

15   "Q. Mr. Maggio, did you enter into a cooperation agreement?

16   "A. Yes, sir.

17   "Q. In connection with that agreement, did you plead guilty?

18   "A. Yes.

19   "Q. To what crimes did you plead guilty, Mr. Maggio?

20   "A. Four counts of felony; one was conspiracy to commit a

21   felony, two securities frauds and one wire fraud.

22   "Q. Mr. Maggio, what is the total term of imprisonment that you

23   face in connection with having pled guilty to those crimes?

24   "A. 65 years.

25   "Q. Mr. Maggio, did you sign a cooperation agreement?

1    "A. Yes.

2    "Q. What are your obligations under the cooperation agreement

3    that you signed?

4    "A. My obligations are to cooperate with the U.S. Attorney's

5    Office, to testify if they need me, and to tell the truth.

6    "Q. Mr. Maggio, in connection with pleading guilty, did you

7    face any financial penalties?

8    "A. Yes, sir.

9    "Q. What financial penalties did you face?

10   "A. I forfeited everything I own, everything, every asset,

11   cash, cars, properties.  I think the total was close to 23

12   million.

13   "Q. What do you live on now, Mr. Maggio?

14   "A. I live on my wife's income.

15   "Q. Has your wife been successful?  Do you have a good living

16   now?

17   "A. My wife worked at -- on Wall Street also, several jobs.

18   She's done extremely well over -- in her life, and she has

19   enough money for both of us to live on.

20   "Q. Now, Mr. Maggio, you said that you forfeited certain

21   assets; is that correct?

22   "A. Yes.

23   "Q. Do you currently have any assets that were bought with the

24   Refco money that you had earned?

25   "A. Yes.

1   "Q. What assets are those?

2   "A. I have a 26-foot Glacier Bay boat.  I have an equity

3   membership in a golf club.  I have a horse partnership, and she

4   has also some wine that we bought back.

5   "Q. Mr. Maggio, you said that she has.  How is it that you have

6   those items that you have bought with Refco money originally?

7   "A. She went out and she bought it back.

8   "Q. Who is 'she'?

9   "A. I'm sorry.  'She' is my wife bought it back from the, I

10  guess, the marshal service, the marshal's office.

11  "Q. With her money that she made during the course of her

12  career?

13  "A. Yes.

14  "Q. Now, Mr. Maggio, we talked about your obligations under the

15  plea agreement that you signed.  What is your understanding as

16  to what the government's obligations are under that plea

17  agreement?

18  "A. My understanding is that the government will provide some

19  sort of letter to the judge at sentencing.  I believe it's

20  called a 5K letter.

21  "Q. And what is a 5K letter?

22  "A. 5K letter is a letter that the prosecutor or the U.S.

23  Attorney's Office will provide to a judge at sentencing to just

24  explain exactly how I cooperated and maybe ask for leniency as

25  it relates to whatever guidelines that the judge must follow.

CABPCOL6                    Goodman/"Maggio" - direct

1    "Q. And who decides what sentence you will get, Mr. Maggio?

2    "A. The judge.

3    "Q. Does the government decide?

4    "A. No.

5    "Q. And if you get that letter from the government, what is the

6    highest sentence that you can get?

7    "A. 65 years.

8    "Q. What is the lowest sentence that you can get?

9    "A. Probation.

10   "Q. And what is your hope, Mr. Maggio?

11   "A. I hope for probation.

12   "Q. Mr. Maggio, has anyone promised that you would get such a

13   sentence?

14   "A. No.

15   "Q. Now, Mr. Maggio, what happens if you violate any of the

16   terms of your agreement?

17   "A. If I violate any of the terms of my agreement, they are not

18   obligated, meaning they -- I'm sorry, the U.S. Attorney's

19   Office are not obligated to provide such 5K letter.

20   "Q. What happens to your plea agreement if you violate the

21   terms of your agreement?  Do you get your plea back?

22   "A. No.  I cannot -- I cannot withdraw my plea.  My plea is my

23   plea.  I am guilty.

24   "Q. Mr. Maggio, what happens if you lie to the government?

25   "A. If I lie to the government?  They will not provide the 5K

1    letter.  I will not have that letter at sentencing, and I will

2    face that 65 years.

3    "Q. And what if you perjure yourself or lie when testifying,

4    Mr. Maggio?

5    "A. If I perjure myself or lie while I'm testifying, well, then

6    not only will they not provide the 5K letter at sentencing, but

7    I'm subject to perjury charges.

8    "Q. And can you be charged with obstruction of justice?

9    "A. Yes.

10   "Q. And if your agreement is torn up, Mr. Maggio, what's the

11   maximum term of imprisonment you face?

12   "A. 65 years.

13   "Q. Now, Mr. Maggio, are you involved or have you been involved

14   in any other lawsuits relating to Refco?

15   "A. Yes.

16   "Q. With whom?

17   "A. There are several, by creditors, by investors, by TH Lee.

18   Those are three that I'm aware of.

19   "Q. Are those suits ongoing?

20   "A. Yes, they're active.

21   "Q. How about with respect to the SEC, Mr. Maggio, have you had

22   any matters with the SEC or the Securities & Exchange

23   Commission as a result of your conduct at Refco?

24   "A. Yes.

25   "Q. What is the status of that matter?

1    "A. That was settled with the SEC.

2    "Q. What was the -- What were the terms of your settlement with

3    the Securities & Exchange Commission?

4    "A. They barred me for life from -- from working in the

5    securities and investing business again.

6    "Q. Mr. Maggio, was there any monetary penalty associated with

7    your settlement with the Securities & Exchange Commission?

8    "A. No.  All may assets were forfeited to the U.S. government.

9    "Q. Now, Mr. Maggio, you said before that you met

10   Mr. Collins -- excuse me.  Now, Mr. Maggio, you said before

11   that you met Mr. Collins when you were working at Refco; is

12   that right?"

13             THE COURT:  Excuse me, Mr. Imperatore.  Are you going

14   to a different topic now?

15             MR. IMPERATORE:  Yes, your Honor.

16             THE COURT:  This might be a good time to break.  Is

17   that all right with you?

18             MR. IMPERATORE:  That's fine, your Honor.

19             THE COURT:  All right.  Ladies and gentlemen, let's

20   break for the day.  Now, would you follow the normal rules,

21   leave your folders on your chairs, take your notebooks with

22   you.  Please don't discuss the case among yourself or with

23   anyone else.  Please do not do any research on the case.  Your

24   coffee will be waiting for you at 9:30 in the morning.  Let's

25   be as prompt as we were today, please.  You were great.  See

CABPCOL6                    Goodman/"Maggio" – direct

1    you in the morning.  Enjoy the nice weather.

2                    JUROR:  Good night.

3                    THE COURT:  Good night.  Have a nice evening.  Thank

4    you for your attention today.

5                    (Jury exits)

6                    THE COURT:  Gilbert, you'll give us the high sign?

7                    THE DEPUTY CLERK:  Yes.

8                    THE COURT:  You may step down.  Anything else on the

9    record, friends?

10                   MR. CHERNOFF:  No, your Honor, just if there's

11   anything, your Honor wants to let the jury know that tomorrow

12   we'll be doing this all day; so --

13                   THE COURT:  Oh, good.  So they should bring food with

14   them.

15                   MR. CHERNOFF:  It's about eight hours.  I think we'll

16   get to Mr. Schwartz's cross, but the entire time of the -- we

17   think we have about eight hours more of this to go because, for

18   the witness, it took over three days.  We, of course, have

19   taken out what we could, but --

20                   THE COURT:  Okay.  Counsel, you all have been copied

21   on this letter from Lori, L-o-r-i, Martin from the Wilmer Hale

22   firm saying that Wilmer Hale represents various Credit Suisse

23   and other folks and informing us that they will be invoking

24   their attorney/client privilege.  So once you've had a chance

25   to look at it, let me know if there's anything we need to do

CABPCOL6                     Goodman/"Maggio" – direct

1    about it.  Thank you.

2              MR. CHERNOFF:  Thank you, your Honor.

3              MR. LEVY:  Thank you, your Honor.

4              (Adjourned to October 12, 2012, at 10:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    SCOTT ALAN SCHOEN

 4    Direct By Mr. Levy . . . . . . . . . . . . . 408

 5    Cross By Mr. Bach  . . . . . . . . . . . . . 469

 6    Redirect By Mr. Levy . . . . . . . . . . . . 576

 7    Recross Mr. Bach . . . . . . . . . . . . . . 583

 8    RUSSELL SCHAUB

 9    Direct By Mr. Imperatore . . . . . . . . . . 586

10    Cross By Mr. Schwartz  . . . . . . . . . . . 605

11    FRANCISCO DUQUE

12    Direct By Mr. Chernoff . . . . . . . . . . . 606

13    JORDAN R. GOODMAN

14    Direct By Mr. Imperatore . . . . . . . . . . 615

15                    GOVERNMENT EXHIBITS

16    Exhibit No.                          Received

17     1008     . . . . . . . . . . . . . . . . . 411

18     5008     . . . . . . . . . . . . . . . . . 416

19     1005.28  . . . . . . . . . . . . . . . . . 424

20     805  . . . . . . . . . . . . . . . . . . . 427

21     5007     . . . . . . . . . . . . . . . . . 442

22     5006     . . . . . . . . . . . . . . . . . 446

23     359  . . . . . . . . . . . . . . . . . . . 447

24     840  . . . . . . . . . . . . . . . . . . . 460

25     1012     . . . . . . . . . . . . . . . . . 462
```

5009  . . . . . . . . . . . . . . . . . . . . 590

10A  . . . . . . . . . . . . . . . . . . . . 598

10B  . . . . . . . . . . . . . . . . . . . . 602

DEFENDANT EXHIBITS

Exhibit No.                                    Received

164  . . . . . . . . . . . . . . . . . . . . 486

230  . . . . . . . . . . . . . . . . . . . . 497

206  . . . . . . . . . . . . . . . . . . . . 508

2008  . . . . . . . . . . . . . . . . . . . 514

226  . . . . . . . . . . . . . . . . . . . . 552

211  . . . . . . . . . . . . . . . . . . . . 563

216 and 219  . . . . . . . . . . . . . . . . 574