CAFDCOL1                         Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                              07 Cr. 1170 (LAP)

5    JOSEPH P. COLLINS,

6              Defendant.

7    ------------------------------x
                                              October 15, 2012
8                                             9:35 a.m.

9    Before:

10                    HON. LORETTA A. PRESKA,

11                                            District Judge

                          APPEARANCES
12
     PREET BHARARA
13        United States Attorney for the
          Southern District of New York
14   BY:  HARRY A. CHERNOFF
          MICHAEL A. LEVY
15        EDWARD A. IMPERATORE
             Assistant United States Attorneys
16
     COOLEY LLP
17        Attorneys for Defendant
     BY:  WILLIAM SCHWARTZ
18        JONATHAN BACH
          LAUREN GERBER LEE
19
             – also present –
20
     Kathryn Searles
21   Robert Clark,
          Postal Inspectors, U.S. Postal Inspection Service
22
     Gary Smith,
23        Paralegal, U.S. Attorney's Office

24

25

CAFDCOL1                     Trial

1              (Trial resumed; jury and defendant not present)

2              THE COURT:  Good morning, counsel.  How are you?

3              MR. LEVY:  Good morning, your Honor.

4              MR. SCHWARTZ:  Your Honor, the defendant is not here

5    at the moment but waives his presence for the pretrial --

6              THE COURT:  Yes.  Thank you.

7         Counsel, I know you wanted to discuss the objections

8    that we started talking about on Friday.  Where would you like

9    to begin, please?

10             MR. SCHWARTZ:  Your Honor, I'm not sure I have very

11   much to add to what I said on Friday.  But in particular, with

12   respect to the piece of the transcript that is at 2365, the

13   question and answer starting at line 24 going through line 1 on

14   2366, our objection to that, as I stated, was both relevance

15   and hearsay.

16        I would note for the Court that later on in the same

17   witness, a similar answer was given.  Mr. Bach moved to strike

18   the answer, and Judge Sand struck the answer at 2552.  I guess

19   that is earlier on.

20             THE COURT:  Twenty?

21             MR. SCHWARTZ:  2553.

22             THE COURT:  23, do you mean?  23 or 25?

23             MR. SCHWARTZ:  It is 25.

24             THE COURT:  OK.

25             MR. SCHWARTZ:  52.  I guess that is later.

893

1          THE COURT:  Yes.  That was my confusion.

2          MR. SCHWARTZ:  Mine, too.  Sorry, your Honor.

3          THE COURT:  If we could do numbers we would be

4     doctors.

5          MR. SCHWARTZ:  At line 8, in response to a question

6     where he gave a fairly long answer, he says at line 8, "Even

7     clients who did not know the structure of Refco were leery of

8     that transaction and backed out of that transaction."

9          And, "Objection, Judge.

10         "The last sentence is stricken."

11         We think that is a similar kind of thing, your Honor.

12    This is the state of mind of somebody who was not present

13    testifying about the state of mind.  It is not relevant, and to

14    the extent it is relevant it is unfairly prejudicial, and it is

15    hearsay.

16         With respect to --

17         THE COURT:  Could I -- let me just hear what the

18    government has to say on this one.  I'm too easily confused by

19    doing two at once.

20         MR. LEVY:  Your Honor, as to the hearsay problem, I

21    think that was solved by Judge Sand's instruction, and we would

22    satisfied with a similar instruction from your Honor that it is

23    not coming in for its truth.

24         With respect to relevance, it is a fairly limited

25    statement that the defense had no -- I won't say had no

1   objection to, but certainly didn't preserve their objection to

2   when the next day they didn't take it up.

3          It is a fairly limited statement in which Mr. Maggio

4   essentially explains the actions that follow, that this company

5   had reservations and pulled out and as a result he had to go

6   find other people.

7          I think in his going and finding other people, or

8   other companies to do these transactions, it is relevant that

9   he knew that this was something that he had to be careful

10  about.  I think he makes that point at other points in his

11  testimony, that he had to be careful about who was in and who

12  was out on this thing because on their face these documents

13  gave some suggestion that there was -- that there was something

14  fishy afoot.

15         THE COURT:  The "he" in that sentence who had to be

16  careful is?

17         MR. LEVY:  Is Mr. Maggio, that that is his

18  understanding when he is going in and selecting lawyers to work

19  on it and when he is going and selecting companies to

20  participate in it, that these documents make people nervous.

21         There can be an instruction that Mr. Maggio's belief

22  that these documents make people nervous, at least in this

23  context, is not coming in for its truth but just for that

24  purpose of explaining what he did.

25         It is one sentence, and it was certainly not so

CAFDCOL1                     Trial

1   problematic in the first trial that they felt the need even to

2   seek it to be stricken even when they were having --

3          THE COURT:  Yeah, yeah, yeah.

4          MR. SCHWARTZ:  Your Honor, this is a case in which

5   your Honor heard the opening statement, and we believe the

6   testimony will bear it out -- certainly the cross-examination

7   of this witness will bear it out -- that nobody ever told

8   Mr. Collins the illegal purpose of these loans, and that he

9   only saw two-thirds of the transaction.  That somebody else

10  felt nervous, which is hearsay, even with an instruction, your

11  Honor, is really unfairly prejudicial.

12         If the government wants to make an argument that this

13  is obvious from its face, they should make the argument that it

14  is obvious from its face.  Mr. Maggio's recounting of what

15  somebody else told somebody at Refco who told it to him is

16  absolutely way out of the park.

17         THE COURT:  Anything else on this one?

18         MR. LEVY:  Not from the government, your Honor.  Thank

19  you.

20         THE COURT:  All right.  I'll permit it with a limiting

21  instruction for the reaction of the conspiracy to these two

22  entities having severe reservations about doing these

23  transactions further.

24         If you would like to -- do you want the same

25  instruction that was given on, or something similar, on page

CAFDCOL1                         Trial

1    2366?

2              MR. SCHWARTZ:  We would like an instruction that at

3    least says, your Honor, as well in addition to what Judge Sand

4    said, that you may not consider for the truth that they

5    actually felt this way, only for Mr. Maggio's state of mind.

6              MR. LEVY:  We don't have an objection to that, your

7    Honor.

8              (Pause)

9              THE COURT:  Thank you.  With respect to the material

10   on -- is it 2377?  What is the other one, Mr. Schwartz?

11             MR. SCHWARTZ:  It is 2378, lines 2 to 7, your Honor.

12             THE COURT:  2 to 7?

13             MR. SCHWARTZ:  Nope.  That leaves out the question.

14   I'm sorry.  It's 2377.

15             THE COURT:  Right.  Starting at 24?

16             MR. SCHWARTZ:  Right, through the answer I just

17   recited.

18             (Pause)

19             THE COURT:  And the objection, sir?

20             MR. SCHWARTZ:  Again, your Honor, this is Mr. Maggio's

21   state of mind.  It is unfairly prejudicial.  It should not be

22   imputed in any way to the defendant's state of mind.

23             If your Honor is inclined to go against us, we would

24   like a limiting instruction to that effect.

25             (Pause)

1          THE COURT:  I think I'm not clear as to why it is

2     objectionable as to Mr. Maggio's state of mind with respect to

3     these transactions.

4          MR. SCHWARTZ:  Your Honor, I would argue that -- I

5     understand the relevance, but I would argue that it is unfairly

6     prejudicial because of the central defense argument in the case

7     again, which is that Mr. Collins was unaware of the third leg

8     and Mr. Maggio was testifying that from, as far as I'm

9     concerned, all you need to see is two of them.  And if your

10    Honor, as I said, is inclined to permit the testimony, we would

11    ask that a limiting instruction be that you cannot impute

12    Mr. Maggio's state of mind to Mr. Collins.

13         THE COURT:  Why is that necessary, please?

14         MR. SCHWARTZ:  Because the government is going to

15    argue from this, from Mr. Maggio's state of mind, that the

16    defendant knew, everybody knows, that Mr. Maggio told you,

17    ladies and gentlemen, that when he saw the two legs he was

18    concerned about giving them out to anybody else at Refco.

19    Don't you think Mr. Collins had the same feeling as Mr. Maggio?

20         THE COURT:  Mr. Levy.

21         MR. LEVY:  If I may, your Honor?

22         Mr. Maggio is one of the co-conspirators in this case,

23    so it sort of puts this on different footing from what we had

24    been talking about in the rest of the trial.  I'm sure that in

25    closing the defense will make the argument that Mr. Maggio knew

1   about all three legs, and their position is that Mr. Collins

2   only knew about two of the legs and their position is that that

3   puts Mr. Collins on different footing from Mr. Maggio.

4            But Mr. Maggio, as a co-conspirator saying these

5   things on their face reads and I knew it as a co-conspirator,

6   talking about his state of mind, which is something we do need

7   to prove, the co-conspirator's state of mind in the conspiracy,

8   I don't see why this is a problematic statement at all.

9            MR. SCHWARTZ:  You can't prove someone's state of mind

10  by somebody else's state of mind.

11           THE COURT:  Well, it goes without saying.  I don't see

12  why an instruction is necessary here.  The only thing Maggio is

13  saying in his answer, "Because I figured if they took a look at

14  it, somebody in my firm with anything up here would take a look

15  at the documents and realize that they were back-to-back loan

16  documents with a group guarantee to a company outside the

17  consolidating group, and they would have questioned it and

18  could have raised concerns to Dennis or somebody else."

19           It doesn't have anything to do with anybody else's

20  statement.

21           MR. SCHWARTZ:  Your Honor, I've made my argument.

22           THE COURT:  OK.  The objection is overruled, and I see

23  no need for any kind of limiting instruction.

24           Anything else, friends?

25           MR. LEVY:  Your Honor, I would just like to note that

1    we are coming close to the point where a ruling on the

2    Berger/Sullivan -- well, I think a ruling overall on whether or

3    not lay opinion testimony and the opinion of Mr. Trosten --

4            THE COURT:  OK.  I guess I thought that the government

5    had adjusted its position on the lay opinion in light of its

6    not asking Mr. Schoen for his opinion as to whether or not the

7    PPA had to be disclosed.

8            MR. LEVY:  I think that's right, your Honor.  I think

9    at this point what we plan to do with all of the witnesses,

10   save for Mr. Trosten and Mr. Berger, we do not intend to ask

11   any of those witnesses is it your opinion that this should have

12   been disclosed, is it your opinion that this was a fraud.

13           Mr. Trosten will say, I believe, that I was engaged in

14   a fraud, I had criminal intent.  But he is a co-conspirator; he

15   has to be allowed to say that.

16           And Mr. Berger will say -- he will not even testify,

17   assuming he doesn't slip up -- I believed the things that I

18   told Mr. Collins.  He will just say I had a meeting with

19   Mr. Collins at which I told him the PPA needed to be disclosed

20   for the following reasons.

21           THE COURT:  But the defense doesn't object to that

22   testimony?

23           MR. LEVY:  I think that's right.

24           I will warn you that in prepping it gets awfully hard

25   for him not to say I told Mr. Collins that I felt the PPA

1   needed to be disclosed.  I'm hoping he won't say that, but I

2   think it is a minor variance in the wording that can easily be

3   dealt with in an instruction.

4           MR. SCHWARTZ:  I assume we will be able to explore the

5   evolution of Mr. Berger's state of mind after he makes that

6   statement from Mr. Berger to Mr. Collins.

7           MR. LEVY:  I don't believe we are putting anything in

8   about Mr. Berger's state of mind.  We are putting in words that

9   were spoken by Mr. Berger to Mr. Collins.  He will not say I

10  believe this to be true.  He will just say I told Mr. Collins,

11  and I think they should be absolutely precluded from getting

12  into anything having to do with Mr. Berger's state of mind.

13          MR. BACH:  Judge, Mr. Berger is making the

14  statement -- and I understand the government is trying to limit

15  this very carefully, but it is nevertheless a statement of his

16  state of mind.  He's telling his opinion to Mr. Collins at a

17  meeting.

18          And what happened here is that, assuming Mr. Berger's

19  account is true, he stated his opinion at time one.  What

20  happened is at time two, time three, time four steps are taken

21  that cause Mr. Berger to change his view so that he is inclined

22  to go forward with the transaction without disclosure of the

23  PPA.  And we have to -- in order to get the facts out, we have

24  to be able to have some latitude in showing what actually

25  happened in the course of conduct here between Mr. Collins and

CAFDCOL1                         Trial

1     the McDermott, Will attorney.  It is fundamental to our

2     defense.

3            Otherwise -- otherwise -- the jury just sees time one

4     and gets a very truncated picture of what the facts are, and it

5     is misleading without being complete and put in full context.

6            MR. LEVY:  Your Honor, if there is some conversation I

7     am unaware of later on in which Mr. Berger expresses his

8     opinion on this transaction to Mr. Collins at time two, three

9     or four, I think we would probably be OK with that.  If there

10    are things that Mr. Collins observed, facts that he would have

11    known about, I don't think, without knowing exactly what they

12    are, that we would have a problem with that.  But trying to

13    draw some inference about what Mr. Berger's state of mind was

14    or asking him directly what his state of mind was is completely

15    irrelevant.

16           If they want to -- I mean, it will be clear that

17    Mr. Berger didn't come off a misrepresentation.  But as an

18    example of a question they should not be allowed to ask, they

19    should not be allowed to ask Mr. Berger did you know that a

20    lawyer, even if he's not participating in a fraud, has to come

21    off of a representation that he believes that there is a fraud

22    afoot.  If Mr. Collins knew that, that's fine.  Mr. Collins can

23    testify that I knew that and so when I observed Mr. Berger

24    staying on the thing I had a perception.  But asking Mr. Berger

25    that question is not relevant to anything other than trying to

1    draw the inference that Mr. Berger thought there was no fraud,

2    which is irrelevant.

3            THE COURT:  I guess I didn't think that's where

4    Mr. Bach was going and I didn't think he said -- I didn't think

5    he intimated he was going to ask him that question.

6            What it sounded like he was going to say -- and,

7    Mr. Bach, correct me if I am wrong -- I thought you were then

8    going to ask -- proposing to ask Mr. Berger whether or not the

9    subsequent just preclosing agreements in which BAWAG, among

10   other things, approved the transaction changed his opinion.

11   That's where I thought you were going.

12           Am I wrong on that?

13           MR. BACH:  Well, I think that's the gist.  I don't

14   know that I'll put it precisely that way.  But I think that the

15   government intends to ask certain questions of Mr. Berger

16   beyond --

17           THE COURT:  No kidding.  Do you think?

18           MR. BACH:  They are going to elicit that BAWAG came

19   off the representation.  They're going to elicit a statement

20   from Mr. Berger that he felt the representation couldn't be

21   maintained without disclosure of the PPA --

22           MR. LEVY:  We are not.

23           MR. BACH:  And then they're going to -- they're not

24   going to elicit that BAWAG came off the representation?

25           MR. LEVY:  We are.  That fact was observable to

CAFDCOL1                    Trial

1    Mr. Collins.  What the reason for it was was not observable to

2    Mr. Collins so we are not going to ask that question.

3           MR. BACH:  So they are going to imply, imply, that

4    Jason Berger became comfortable because his client was taken

5    off the representation.  That's what they are going to suggest.

6           And we have to be able to show that there was an

7    entire course of conduct and an entire set of legal agreements

8    well beyond coming off the rep -- and the government has

9    admitted in its papers this these agreements extinguished the

10   rights and interests under the PPA, they wiped them out.  And

11   then it is that set of agreements that we need to be able to

12   explore with Mr. Berger, put them in context, so the jury

13   understands what happened here.

14           It is classic, classic --

15           THE COURT:  The difference -- I don't see how you are

16   precluded from bringing out the facts of these subsequent

17   agreements.

18           What I'm struggling with is the opinion question.  If

19   nobody -- and I told you the other day, my sense is that no one

20   ought to be asked for his opinion as to whether or not the PPA

21   should or should not have been disclosed.  There is sufficient

22   facts out here and the explanations certainly of Mr. Schoen

23   were sufficiently clear and simple that the jury can make up

24   its mind.

25           MR. BACH:  Judge, from what I'm hearing, it sounds

1    like we have a central concept here that we're all agreeable.

2    We've all agreed, more or less, and we will have to see how the

3    contours play out.  It is very hard in the abstract to figure

4    out exactly how this is going to play.  We haven't heard the

5    government's direct.

6            But I hear exactly what the Court is saying, that

7    there is a hesitation to ask, you know, what was your opinion

8    with respect to disclosure of the PPA.  But aside from asking

9    that question in the jugular --

10           THE COURT:  In the jugular?

11           MR. BACH:  Yes.

12           -- both sides are entitled to elicit conduct, and

13   we'll have to see in the contours whether that conduct needs to

14   be explained --

15           THE COURT:  When you are talking about Mr. Berger's

16   client cutting off the representations, are you again talking

17   about the subsequent agreements or are you talking about --

18           MR. BACH:  No.  They come off the representation in

19   the final deal contract with Thomas H. Lee.

20           THE COURT:  Which representations?

21           MR. BACH:  All of the representations.  They are no

22   longer really an active party to that agreement at the time the

23   deal closes.  They are merged into RGHI.

24           THE COURT:  By what we've been talking about is the

25   subsequent agreements which are really preclosing agreements?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAFDCOL1                    Trial

1            MR. BACH:  Right.  So everything is being repped

2     through RGHI and BAWAG comes off the reps.

3            But apart from that, there are various other legal

4     agreements that are put into place between Mayer Brown and

5     McDermott, Will to address the PPA.  And there are a number of

6     legal agreements and contracts that are designed essentially to

7     eliminate all of the rights and interests in the PPA.  And I

8     believe that all of that is relevant here, because it goes to

9     the question of whether the PPA had any effect --

10           THE COURT:  Who did those documents?

11           MR. BACH:  Joe Collins and all the lawyers at

12     McDermott, Will and some of the Austrian lawyers representing

13     BAWAG.

14           THE COURT:  And when you discuss those -- I mean, how

15     are you proposing -- you are proposing to discuss those with

16     Mr. Berger.  So how do you propose to discuss them?

17           MR. BACH:  It is hard to say in detail.  I will need

18     to listen to the direct.  But I'm mindful of what the Court

19     seems to be saying, that we shouldn't say did you think there

20     was a fraud; we shouldn't say did you think that the PPA had to

21     be disclosed.  But there is going to be some play in the joints

22     about getting not just did this happen but why did this happen,

23     why are you taking this step, could you explain to the jury --

24     you know, classic kind of explanation of his perceptions at the

25     time to explain the course of conduct to the jury.  We have to

1     be able to --

2              THE COURT:  What does that mean, "his perception"?

3              MR. BACH:  His -- what he saw, what he did, what he

4     did with Mr. Collins.  And I might need, depending on his

5     answers, for him to explain why he did this or why he did that,

6     what he thought it was addressing, and why the lawyers spent

7     time on this.  That's kind of -- the jury can't understand

8     these very complex legal developments without some narration

9     beyond the documents themselves.

10             I'm not planning to go to the next plane and say, you

11    know, pose the big question, because, you know, the Court

12    doesn't want us to go there and the government doesn't want us

13    to go there.  But I think we are going to have to see in the

14    course of this examination how clear it is or isn't without

15    some explanatory answers or questions so that we are able to

16    present the fact here.  That's what we want to do.

17             THE COURT:  OK.  The facts are one thing, but the

18    question though and I think what has to be avoided is having

19    Mr. Berger make the jury's decision for him.

20             MR. BACH:  Absolutely.

21             THE COURT:  That is my great concern here.

22             MR. LEVY:  Your Honor, look, I don't know exactly what

23    Mr. Bach is proposing to ask, but I'm troubled by what he's

24    suggesting.  I think one of the documents, as an example, your

25    Honor, is that your Honor recalls that the EPMA contains a

1    number of representations, and our position is that those

2    representations were false because the PPA was not disclosed.

3          One of the arguments they made at the last trial --

4    they will probably make at this one -- is that there is an

5    agreement called the Reversion Rights Agreement that was

6    executed just before the EPMA.  Mr. Collins' position is that

7    extinguished the PPA so that they no longer needed to disclose

8    it and as a result the representations in the EPMA were not --

9          THE COURT:  Operative.

10         MR. LEVY:  -- false.

11         If he wants to ask Mr. Berger did you sign this

12   document, did you draft this document, was it done on X date,

13   does it have the following words, that's fine.  We have been

14   asking our witnesses similar questions.

15         If he wants to say why did you do that, or did that

16   document extinguish the PPA, that is being offered not as some

17   sort of an explanatory -- here is what Jason's Berger's motive

18   was.  His motive is of no consequence whatsoever.  It is being

19   offered because they are hoping to get an answer that's helpful

20   for showing --

21         THE COURT:  You can't ask -- we agree, you can't ask,

22   did it extinguish the PPA, right?

23         MR. BACH:  Right.  That's a legal opinion, anyway.

24         THE COURT:  Yes, right.

25         What about the "why" question?  What is his answer to

 1    why did you do it, Mr. Bach?

 2              MR. BACH:  I don't know that I will put it in

 3    precisely those terms.  But what I'm talking about, Judge, is

 4    when Mr. Schoen was on the stand, they asked him questions like

 5    what was the purpose.  And they asked him questions that are

 6    designed really to help the jury put in context what's

 7    happening here.  And --

 8              THE COURT:  I thought those questions really went

 9    toward materiality.

10              MR. BACH:  And they might well go to materiality here,

11    too, because certainly our argument is that what has happened

12    here, one of the effects of these legal -- this whole set of

13    legal transactions is to render the PPA material.  I mean,

14    that's exactly what happened here, Judge.  The concern was

15    raised, and all these lawyers together, the evidence is going

16    to be very clear at this trial, went to work and prepared all

17    of these agreements to zap the PPA of any material effect.

18              THE COURT:  I don't think he can say that.

19              MR. BACH:  I'm not asking him that.  That's for

20    summation.  That's for summation.

21              And I think rather than us trying to figure out what

22    the nuances are here and now, the Court should police the

23    examination, you know, in realtime.

24              I get what the Court is saying, and I --

25              THE COURT:  What is the answer to why did you do it?

CAFDCOL1                        Trial

1    If the answer is to zap the PPA, that can't be permitted;

2    right?

3               MR. SCHWARTZ:  Your Honor, I normally don't like to do

4    tag team so I apologize.

5               THE COURT:  Thank God.

6               MR. BACH:  He is the one person I defer to, Judge.

7               MR. SCHWARTZ:  You know, the view on lay testimony is

8    that if it is based on the witness' perception at the time and

9    that it explains to the jury what's going on and helps them

10   determine a fact in issue, then you can elicit lay testimony.

11              THE COURT:  But it is always subject to 403.

12              MR. SCHWARTZ:  That I can completely understand.

13              THE COURT:  In this instance, my great fear is the

14   fear of unfair prejudice in allowing these lawyers to mouth off

15   and to essentially take over what the jury is supposed to

16   decide.  That is my fear, and that is, in my view, the

17   weightiest concern here.  There might be some marginal

18   relevance to saying that and, thus, some probative value, but

19   the possible unfair prejudice far outweighs that.  And the

20   concepts we are talking about here are not so difficult in

21   terms of the distribution of the funds and the right to veto

22   the transaction.

23              You know, Mr. Schoen was pretty clear about why these

24   were important concepts to him.  And the legal documents, with

25   the help of you wonderful lawyers, when you point out what they

1    say, that allows you to make your argument.

2            My recollection from the last trial was there was

3    some -- a little bit of instruction to the jury about contract

4    interpretation, what you have to do with the whereas clause,

5    etc., etc., but it does not seem to me that these are such

6    surgeon-like problems, to take your analogy, Mr. Schwartz, that

7    the jury should suffer the danger of having its role usurped by

8    these experts.

9            MR. SCHWARTZ:  Your Honor, I completely understand the

10   Court's rationale, as I think Mr. Bach does.  Mr. Berger's --

11           THE COURT:  I leave it to you to beat it into him,

12   Mr. Schwartz.

13           MR. SCHWARTZ:  Mr. Berger is going to state, by

14   repeating his testimony, what his concerns are.  The only thing

15   that we want to be able to elicit -- and we can certainly take

16   this up before we cross-examine him with the Court -- is how

17   the two sides dealt with concerns that he expressed to

18   Mr. Collins.

19           THE COURT:  What does that mean?

20           MR. SCHWARTZ:  It is as simple as that, that he took

21   steps to deal with the concerns that he expressed.

22           THE COURT:  That who had expressed?  That Schoen?

23           MR. SCHWARTZ:  That Mr. Berger had expressed.

24           That's the only thing we're trying to do here, so the

25   jury understands that the subsequent steps that were taken deal

1   with concerns that he expressed that they are going to elicit.

2   That's classic cross-examination.  It is not going to go into a

3   legal opinion.  We are not going to go close to that.

4           MR. BACH:  And I'm assuming when they question they

5   are not going to say did you have a concern, because right

6   there that's projecting a state of mind to the jury, that

7   they're going to be -- I'm presuming they're going to be very

8   careful on their direct so that we're not in a position where

9   they got to do it and we didn't.

10          I think we should revisit all of this after the

11  direct, because it will be much clearer then about what the

12  state of the record is and all of this won't be so abstract.

13          MR. LEVY:  Your Honor, just two quick points on this.

14          No point in hiding the ball on what we're going to do

15  with Mr. Berger on that period of time.  We are going to say

16  what did you say to Mr. Collins in that meeting.  We won't even

17  ask him whether he truly believed it, but just what did you

18  say.  And then subsequently we'll ask him, essentially, did you

19  suggest in the course of negotiating the EPMA that BAWAG be

20  taken off of the representation.  We will not ask him why, the

21  answer to why, which he gave at the last trial is because we

22  didn't think those representations were true and we didn't want

23  to make them.  We are not going to ask him that question at

24  this trial.

25          It was observable to Mr. Collins that BAWAG was asking

1    to come off the representations, and we will argue the

2    inference that he knew why.  But Mr. Berger's unexpressed

3    reason for doing it is of no consequence, much as his

4    unexpressed reason for doing anything is of no consequence.

5    That is our position.

6             MR. BACH:  Judge, that's --

7             MR. SCHWARTZ:  That's not so.

8             MR. BACH:  First of all, it is a misleading argument.

9    It is a misleading argument.  Going off the reps does not

10   absolve lawyers of considering the basic question of whether

11   they can go forward with a deal and make money for their

12   clients if they believe something illegal is happening.

13   Lawyers can't do that.  Going off the reps is neither here nor

14   there with respect to that question.  And that's what Judge

15   Sand and Judge Patterson instructed the last jury.

16            It's a misleading argument that they want to make,

17   that BAWAG went off the reps and that should have been a

18   warning sign to Joe Collins, when these lawyers are every day

19   working hard, moving forward, and trying to make this deal

20   happen, without reservation.  That's what they're doing.

21            THE COURT:  I don't know what the latter part of that

22   means.

23            MR. BACH:  What it means is is that if I know a crime

24   is afoot and I'm a lawyer, going off the reps doesn't allow me

25   to continue to work on the deal and push it forward for my

CAFDCOL1                          Trial

1    client.

2              THE COURT:  I understand that, but that's not the end

3    of the story, either.

4              MR. BACH:  That's right.  And they want to argue to

5    this jury that you can infer from going off the reps that BAWAG

6    lawyers were somehow distancing themselves.

7              THE COURT:  I hear you.  Hold that thought.

8              Mr. Reporter, we might ask you for that later on.

9              The jury is ready.  May we bring them in?

10             Do you people need to go out?

11             MR. CHERNOFF:  No, your Honor.  We just wanted to make

12   the Court aware that the defense knows our witness who is doing

13   the read back, Investigator Goodman, took seriously ill over

14   the weekend.

15             THE COURT:  Probably because you people wore him into

16   the ground.

17             MR. CHERNOFF:  We probably did.

18             THE COURT:  Who is doing it?

19             MR. CHERNOFF:  So Inspector Clark will be subbing.

20             THE COURT:  Come on up, sir.

21             OK.  May we bring the jurors in?

22             (Continued on next page)

23             (Pause)

24             (Jury present)

25             THE COURT:  Won't you be seated, ladies and gentlemen.

CAFDCOL1                     Trial

1            We continue with the direct examination of Mr. Maggio.

2            Mr. Imperatore.

3            MR. IMPERATORE:  Your Honor, the government calls

4    Inspector Robert Clark.

5            THE CLERK:  Will you please stand and raise your right

6    hand.

7     ROBERT CLARK,

8        called as a witness by the government,

9        having been duly sworn, testified as follows:

10           THE CLERK:  Please be seated.

11           State your full name and spell your last name slowly

12   for the record.

13           THE WITNESS:  Robert Clark, C-l-a-r-k.

14           THE COURT:  Ladies and gentlemen, Inspector Clark is

15   going to be reading Mr. Maggio's testimony in the same manner

16   that Mr. Goodman did last week.

17           Mr. Imperatore.

18           MR. IMPERATORE:  Your Honor, would the Court elicit

19   Mr. Clark's -- the reason why Mr. Clark is on the stand versus

20   Mr. Goodman, or should I ask questions to bring that out?

21           THE COURT:  I'm told, ladies and gentlemen, that poor

22   Mr. Goodman got ill.  So we don't want him here spreading it

23   around, so Inspector Clark is stepping in for him.

24           Go ahead, sir.

25   DIRECT EXAMINATION

Cafdcol1                        Clark - direct

1    BY MR. IMPERATORE:

2    Q.  Good morning, Inspector Clark.

3    A.  Good morning.

4    Q.  Inspector Clark, where are you employed?

5    A.  United States Postal Inspection Service.

6    Q.  What is your title there?

7    A.  United States Postal Inspector.

8    Q.  How long have you been there?

9    A.  Since May of 2012.

10   Q.  Inspector Clark, I'm going to ask that we pick up at page

11   2348, line 5.

12           Just let me know when you are ready to begin.

13   A.  I'm ready.

14   "Q  Mr. Maggio, between 2000 and 2003, did Refco acquire any

15   companies?

16   "A  Yes.

17   "Q  What companies?

18   "A  They acquired several companies, Lind-Waldock being

19   probably the largest, Main Street Trading, a few smaller firms,

20   some introducing brokers, Riefler Trading.

21   "Q  Did you talk to Mr. Bennett about these acquisitions?

22   "A  Yes.

23   "Q  What did he say about these acquisitions from 2000 to 2003?

24   "A  One, the biggest thing he told me, was that we needed to

25   buy revenues.

Cafdcol1                          "Maggio – direct

1    "Q   What does that mean, Mr. Maggio?

2    "A   Well, we weren't doing -- we weren't making enough money,

3    and so Phil said we need to, you know, acquire firms so that we

4    can buy revenues to make the firm look better to sell.

5    "Q   And, Mr. Maggio, if you were having money difficulties, how

6    could you buy the firms in the first place?

7    "A   Basically what we did was we used customer funds to

8    purchase the company, and then we'd also look at the company to

9    see if they had any funds that we could -- that we could

10   utilize to help pay for their own purchase.

11   "Q   Mr. Maggio, did you think that as a result of these

12   acquisitions Refco was in good financial shape?

13   "A   No.

14   "Q   Why not?

15   "A   Well, they still had -- the nonrelated party receivable

16   from Refco Group Holdings was only getting bigger; wasn't

17   getting smaller, wasn't being paid down with revenues, just

18   getting bigger.  So the problem itself was getting bigger.  The

19   revenues that we were making weren't nearly enough to

20   substantiate the firm looking good for a potential acquirer."

21            THE COURT:  A little more slowly, if you would,

22   Inspector.

23            THE WITNESS:  Sorry.

24            THE COURT:  Thank you.

25            THE WITNESS:  (Reading)

Cafdcol1                    "Maggio - direct

1   "A  So we were padding the revenues.  We were coming up with

2   false -- making false trades, charging false interest rates in

3   order to make the firm look better for a possible acquisition.

4   So the firm financially was in no better shape.  In fact, the

5   firm was in worse shape because the hole was getting bigger.

6   "Q  And, Mr. Maggio, from 2000 to 2003, did you talk to anyone

7   about the failings and the other schemes that you were engaged

8   in?  Did you talk to Mr. Bennett and to Mr. Grant about them?

9   A.  Oh, yes.

10  "Q  What did you say to them and what did they say to you

11  during this period?

12  "A  There was continuing stress at the time, trying to meet

13  settlement and trying to find enough counterparties to fail to.

14  And there was no end in sight.  The hole was getting bigger.

15  Refco wasn't -- wasn't making enough money to bite, to earn its

16  way out of the hole.  And so my -- I was seriously concerned

17  about the long-term or even the short-term survival of the

18  company.  I spoke to Phil and I spoke to Tone, separate

19  conversations, and their plan was that they were going to sell

20  the firm; that somewhere along the line, that there would be

21  someone to come in if we -- if we do well, to buy the firm

22  lock, stock and barrel.

23  "Q  And when you say if you do well, what do you mean by if you

24  do well?

25  "A  We have a -- I'm sorry.  Do well, meaning we showed enough

1    revenues on the books.

2    "Q   And if you showed enough revenue on the books, false

3    revenues, somebody would come buy the company and that would

4    bail you out?

5    "A   That's correct.

6    "Q   Now, Mr. Maggio, you mentioned before that a portion of

7    Refco had been sold to BAWAG in 1999.  Do you recall that?

8    "A   Yes.

9    "Q   Between 1999 and 2004, were you aware if BAWAG acquired any

10   additional interest in Refco?

11   "A   Not at the time.

12   "Q   In that period 1999 to 2004, had you heard of something

13   called a Proceeds Participation Agreement?

14   "A   The proceeds participation agreement?  No.

15   "Q   Did you know about a company called DF Capital?

16   "A   No.

17   "Q   Do you ever discuss those matters with Mr. Bennett?

18   "A   No.

19   "Q   Beginning in 2001, Mr. Maggio, did the amount of money owed

20   by RGHI to Refco still exist?

21   "A   Yes.

22   "Q   And in 2001, who at Refco told you how much debt from RGHI

23   to Refco had to be paid down through the round robins?

24   "A   Rob Charleston.

25   "Q   How did the process begin in 2001, the process of the round

1   robins?

2   "A  Sometime in –– sometime in early February or late January,

3   Rob –– Mr. Charleston would give us a –– give me a preliminary

4   figure, how much they needed to pay down, you know, for year

5   end.  And he would give me that number, and then I would

6   proceed to line up the customers ––

7           MR. IMPERATORE:  I'm sorry, Inspector Clark, if I

8   could just stop you there?

9           There is an error in the transcript, your Honor?

10          THE COURT:  Sir.

11          MR. IMPERATORE:  "Charleston" should read "Trosten" on

12  page 2351.  And I would ask –– I will just go back and we'll

13  begin the questions at line 10:

14  "Q  And in 2001, who at Refco told you how much debt from RGHI

15  to Refco had to be paid down through the round robins?

16  "A  Rob Trosten.

17  "Q  How did the process begin in 2001, the process of the round

18  robins?

19  "A  Sometime in –– sometime in early February or late January,

20  Rob –– Mr. Trosten would give us a –– give me a preliminary

21  figure, how much they needed to pay down, you know, for year

22  end.  And he would give me that number, and then I would

23  proceed to line up the customers to transact those round robin

24  transactions that we saw before.  Then also Mr. Trosten would

25  tell me, direct me where –– whose accounts to credit at what

1    companies, because RGHI had accounts not only at Refco Capital

2    Corp. but they also had accounts at RCM.  So he would give me

3    the number, and he would direct me how to credit those RGHI

4    accounts.  And of course, when we unwound it, the reverse would

5    happen.

6    "Q  And, Mr. Maggio, when it came to documented transactions,

7    who did Refco contact?

8    "A  Mayer Brown.

9    "Q  And who on behalf of Refco contacted Mayer Brown?

10   "A  David Weaver.

11   "Q  Mr. Maggio, just taking a look at Government Exhibits

12   2001.1(a) through 2001.1(f) and 2001.2(a) through 2001.2(f).

13   "A  Yes, sir.

14   "Q  What are those documents, Mr. Maggio?

15   "A  Those represent loan documents for the round robin

16   transactions for fiscal year end 2001.

17   "Q  Mr. Maggio, if you could just take a quick look at those

18   documents and tell us the customers that were involved and what

19   were the amounts of the loans involved in 2001?

20   "A  CIM Ventures for 250 million and Delta Flyer for 200

21   million.

22   "Q  So it's a total of 450 million, Mr. Maggio?

23   "A  That was documented, yes.

24   "Q  Over year end, is that right?

25   "A  Over fiscal year end February 28, 2001.

1    "Q   And, Mr. Maggio, are there indemnities and guarantees

2    associated with these documents?

3    A.   Yes.

4    "Q   Incidentally, Mr. Maggio, do you know if Mr. Trosten signed

5    any documents in connection with the round robins this year?

6    "A   I believe he did.  I haven't gone through this, but I know

7    one year he did.

8    "Q   Mr. Maggio, the year that he did, do you know the

9    circumstances surrounding why he signed the document?

10   "A   No.

11   "Q   You know, Mr. Maggio, do you know if Mr. Collins had any

12   direct contact with any of the customers in 2001?

13   "A   Yes.

14   "Q   Directing your attention to Government Exhibit 4003,

15   Mr. Maggio.

16            "Mr. Maggio, what's the date of this letter?

17   "A   February 16, 2001.

18   "Q   Is that right before a fiscal year end?

19   "A   Yes.

20   "Q   Who signed the letter?

21   "A   Jim Ricketts.

22   "Q   And who's he?

23   A.   Jim is the treasurer of CIM Ventures and also the treasurer

24   of Ingram Micro."

25            And looking up towards the top, Mr. Smith.

1          "And who is the letter directed to?

2     "A   The letter is directed to Joe Collins.

3     "Q   It starts, Per the arrangements made with Bob Monk.

4          "Who is Bob Monk?

5     "A   Bob Monk is an attorney who works at Mayer Brown.

6     "Q   Attached are the executed signature pages for the two loan

7     agreements and the signed promissory note for CIM Ventures,

8     Inc. transactions with Refco Capital Markets and Refco Group

9     Holdings, Inc.

10         "Do you see that?

11    "A   Yes.

12    "Q   And in the second paragraph it reads, It is planned that

13    Refco Capital Markets will deposit the loan proceeds in CIM's

14    account -- there's a number -- at RCM on February 23, 2001."

15         If you could just highlight that, please, Mr. Smith,

16    that paragraph.

17         "CIM will then fax the letter to RCM instructing them

18    to move funds to RGHI with a 15-basis point uplift in the

19    interest rate.  RCM will then withdraw the funds from CIM's

20    account and deposit the funds to RGHI's account, thereby

21    completing the back to back loan transaction.  The steps will

22    be reversed on March 6, 2001.  RCM will transfer the CIM

23    spread.

24         "Is that the interest rate spread, Mr. Maggio?

25    "A   Excuse me?

1    "Q   Is that the interest rate spread?

2    "A   Yes.   The 15 basis points is, yes, sir.

3    "Q   On the transaction to CIM's Royal Bank of Canada account.

4           "Mr. Maggio, is that an accurate description of the

5    round robin that occurred with CIM Ventures in 2001?

6    "A   Yes.

7    "Q   Now, Mr. Maggio, do you know if Mr. Collins personally

8    reviewed the round robin documents in 2001?

9    "A   Yes.

10   "Q   Directing your attention to Government Exhibit 352."

11          The parties have stipulated that the handwriting on

12   this document is Mr. Collins'.

13          "Mr. Maggio, just looking up at the memorandum on the

14   front, it says, 'Mayer, Brown & Platt' on top.  Do you see

15   that?

16   "A   Yes."

17          Mr. Smith, if you would highlight that, please, in the

18   top left corner.  Thank you.

19   "Q   And what's the date?

20   "A   February 21, 2001.

21   "Q   You mentioned who Mr. Weaver is.  Who is Nick Mascio?

22   "A   Nick Mascio is a salesman who works for Peter McCartney on

23   the government desk at Refco Securities.

24   "Q   And it's from Mr. Collins.  Do you see that?

25   "A   Yes.

Cafdcol1                        "Maggio - direct

1    "Q   And, Mr. Maggio, who is Delta Flyer?

2    "A   Delta Flyer was a small fund managed by Eric Flanagan, so

3    it's a customer of Refco.

4    "Q   And was Delta Flyer one of the customers involved in the

5    round robin in 2001?

6    A.   Yes.

7    "Q   And if you could just look at points five and six inserted,

8    do you see that?

9    "A   Yes.

10   "Q   And, again, this is the handwriting of Mr. Collins.  It

11   says, Refco Group, Limited, LLC, guaranteed and RGL indemnity

12   letter.  Do you see that?

13   "A   Yes.

14   "Q   Were guarantees and indemnities involved in the round

15   robins in 2001?

16   A.   Yes.

17   "Q   And, Mr. Maggio, if you could just take a look at the page

18   ending 5649.  And do you see an edit that appears at the bottom

19   of the page?

20   "A   Yes."

21        And Mr. Smith, if you could highlight that, please, at

22   the very bottom.

23   "Q   What's the edit?

24   "A   Crossed out Phil Bennett's name and put Rob Trosten's name,

25   and they crossed out Phil's title and they put the title in of

1    Rob.

2    "Q  Mr. Maggio, just quickly look at that document.  There are

3    edits in other places in the document?

4    "A  Yes.

5    "Q  And, for example, Mr. Maggio, if you could just look at the

6    page ending at the bottom, 680.

7            "And, now, Mr. Maggio, did Mayer Brown draft all the

8    documents used in connection with the customer round robins in

9    2001?

10   "A  Yes, sir.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. IMPERATORE:

2    "Q. Directing your attention to Government Exhibit 1200C,

3    Mr. Maggio, what is this document?

4    "A. It's a bill for Mayer Brown to Refco.

5    "Q. What's the date of this Bill?

6    "A. March 19, 2001.

7    "Q. And is that after fiscal year-end 2001?

8    "A. Yes.

9    "Q. All right.  Mr. Smith, if you could just highlight the

10   first paragraph.

11            This is for professional services rendered from

12   February 1st, 2001, through February 28th, 2001, in connection

13   with the following.  Do you see that?

14   "A. Yes.

15   "Q. And if you could just turn to Page 8 of the document,

16   there's an entry for Refco Capital Markets; do you see that?

17   "A. Yes.

18   "Q. What does it say in the description for Refco Capital

19   Markets?

20   "A. Preparation and review of UCC filings and acknowledgments;

21   conferences regarding back-to-back CIM loans; preparation of

22   execution documents --

23            THE COURT:  "Copies."  I'm sorry.  Forgive me.  I was

24   reading off the bill.

25   "A. -- consultation regarding liberty loans and prior

1    practices; preparation of Patriot loan documents; reviewing

2    closing documents regarding Okara and Dondero matter;

3    preparation and guarantee for the Patriot loans and preparation

4    of the Delta loan documents.

5    "Q. Mr. Maggio, was there a round-robin conducted with BAWAG in

6    2001 as well?

7    "A. Yes.

8    "Q. Mr. Maggio, please take a look at government

9    Exhibit 1750.01B.  What is that, Mr. Maggio?

10   "A. This is a customer ledger activity report for RGHI on Refco

11   Capital Corp.'s books.

12   "Q. So this is an account that RGHI held at Refco Capital

13   Corporation, right?

14   "A. Yes.

15   "Q. And, Mr. Maggio, if you could just take a quick look at

16   Page 3 of the document.  Mr. Maggio, taking a look at Page 3 of

17   this customer ledger report from Refco Group Holdings, Inc. do

18   you see an entry for 2-26-2001 or entries for 2-26-2001?

19   "A. Yes.

20   "Q. Do you see two wire transfers from First Union Bank?

21   "A. Yes.

22   "Q. What are the total amounts of those transfers?

23   "A. One was for 225 million and one was for 75 million.

24   "Q. And, Mr. Maggio, what did that represent?

25   "A. That represents the round-robin, the loan that BAWAG made

1    to RGHI.

2    "Q. And so that amount was 300 million made on February 26th,

3    2001?

4    "A. Yes.

5    "Q. And was it reversed, the transaction, Mr. Maggio?

6    "A. Well, 225 million was part of the round-robin.  75 million

7    was not, and it was reversed, yes.

8    "Q. And, Mr. Maggio, turning to the year 2002.  In 2002 were

9    there round-robins?

10    "A. Yes, sir.

11    "Q. And did you get the numbers for the amount of the pay-down

12    from Mr. Trosten?

13    "A. Yes.

14    "Q. And do you know if Mr. Weaver contacted Mayer Brown in

15    order to pull the documents together for the round-robin?

16    "A. Yes.

17    "Q. Mr. Maggio, take a look, if you would, at Government

18    Exhibit 4018.  There are two e-mails here; is that right,

19    Mr. Maggio?

20    "A. Yes.

21    "Q. If you could just look down at the bottom half of the

22    e-mail.

23         And, Mr. Smith, if we could just get the signature as

24    well.  Thank you.

25         This is from David Weaver.  It's dated January 18th,

1    2002.  It's to Joseph Collins, and it's cc'd to you,

2    Mr. Maggio; is that right?

3    "A. Yes.

4    "Q. And if you could look at the second paragraph, it says, 'In

5    addition, I need to have new loan agreements drafted between

6    RCM' -- that's Refco Capital Markets, right?

7    "A. Yes.

8    "Q. -- 'and CIM, and CIM and RGHI.'  Is RGHI, Refco Group

9    Holdings, Inc.?

10   "A. Yes.

11   "Q. 'the dates of the loans would be February 25th, 2002;

12   March 4th, 2002.  RCM will then send $250 million at a rate of

13   1.8 percent with a group guarantee, and CIM will lend RGHI $250

14   million at a rate of 2.10 percent with a guarantee from RGL.'

15   Is that Refco Group, Limited?

16   "A. Yes.

17   "Q. 'Right of offset and indemnity letter.'  Do you see that?

18   "A. Yes.

19   "Q. 'All these documents could be found in the files from last

20   year.  I believe Bob Monk worked on that.'

21        Mr. Maggio, did that describe the round-robins that

22   were going to happen, in part, in 2002?

23   "A. Yes.

24   "Q. This document is forwarded on from Mr. Collins to Paul

25   Koury; do you see that?

1    "A. Yes.

2    "Q. If we could just scroll up, please.  And what does

3    Mr. Collins say to Mr. Koury?

4    "A. 'Paul, please proceed to prepare the necessary documents.'

5    "Q. If we could highlight that, please, Mr. Smith.  Thank you.

6           And who is Paul Koury?

7    "A. Paul Koury is an attorney who works for Joe at Mayer Brown.

8    "Q. Mr. Maggio, if you could take a look at Government

9    Exhibit 4007.  What is the letterhead on this document,

10   Mr. Maggio?

11   "A. Mayer Brown.

12   "Q. What is the date of the document, if you can tell?

13   "A. January --

14   "Q. I'm sorry.  Do you see the fax line up there?

15   "A. January 28th.

16   "Q. And who is it from and who is it to?

17   "A. It is from Joe Collins to Paul Koury.

18   "Q. So this is a fax from Mr. Collins to Mr. Koury.  Let's take

19   a look at the attached information, Mr. Maggio.  If you could

20   turn to the next page.  It's dated January 22nd, 2002, and if

21   we could blow up the text of this, please.

22           'Joe, per David Weaver's request, please find attached

23   the marked-up documents for the -- for next Refco back-to-back

24   loans to CIM.  Please provide amended documents to David and me

25   as soon as possible.'  Do you see that?

1    "A. Yes.

2    "Q. Mr. Maggio, if you could just take a look at Government

3    Exhibit 4006, please?

4    "A. Excuse me, sir?

5    "Q. Government Exhibit 4006, Mr. Maggio?

6    "A. I have it, sir.  Thank you.

7    "Q. Mr. Maggio, this appears to be a series of two e-mails; is

8    that right?

9    "A. Yes.

10   "Q. If we could just focus on the bottom e-mail.  Who is this

11   e-mail from?

12   "A. Paul Koury.

13   "Q. And who is it to?

14   "A. Joe Collins.

15   "Q. What does it refer to?

16   "A. It refers to the draft of the CIM documents.

17   "Q. It says, 'Joe, attached please find drafts of the following

18   new loan documents.'  Do you see that?

19   "A. Yes.

20   "Q. Are loan agreements involving Refco Capital Markets and

21   Refco Group Holdings and CIM included?

22   "A. Yes.

23   "Q. These are for proposed round-robins; is that right?

24   "A. Yes.

25   "Q. There are also drafts of a guarantee and indemnity from

1   Refco Group, Limited, mentioned here?

2   "A. Yes.

3   "Q. This e-mail is forwarded on from Mr. Collins to Mr. Koury.

4   What does Mr. Collins say to Mr. Koury?  If we could highlight

5   this, please?

6   "A. 'Paul, these documents are fine.  Please try to have them

7   converted to Word format so that they are easier to transmit to

8   the client and others.'

9   "Q. Now, Mr. Maggio, we've been looking at documents for

10  round-robins proposed to CIM for 2002.  Did CIM ultimately

11  participate in the round-robins in 2002?

12  "A. No.

13  "Q. What happened?

14  "A. I believe that CIM or Ingram Micro had severe reservations

15  about doing these transactions further with Refco.

16          THE COURT:  Ladies and gentlemen, these statements

17  should not be considered by you for the truth of the statements

18  that these entities had reservations, but only for Mr. Maggio's

19  state of mind, and his and the other co-conspirators' reaction

20  to the statements.  So you may not consider the statement for

21  the truth of the statement.  Counsel.

22  "Q. Mr. Maggio, did you find other customers to participate

23  after CIM Ventures backed out?

24  "A. Yes.

25  "Q. Who contacted Mayer Brown to draft up the documents for the

CAFPCOL2                    "Maggio" - direct

1    customers that were participating in 2002?

2    "A. David.

3    "Q. And did he contact Mayer Brown?

4    "A. Yes.

5    "Q. Drawing your attention to Government Exhibit 312.

6           Mr. Maggio, in 2002, who were the customers that

7    participated in the round-robin?

8    "A. Liberty Corner, Delta Flyer.

9    "Q. Mr. Maggio, what is the date of this document?

10   "A. February 12.

11   "Q. At the bottom, do you see it says 'Group guarantee and

12   right of offset'?

13   "A. Yes.

14   "Q. Did the round-robins in 2002 involving guarantees and right

15   of offset?

16   "A. Yes.

17   "Q. Mr. Maggio, if we can now just take a look at Government

18   Exhibit 4011.  Mr. Maggio, this is dated February 13th, 2002;

19   do you see that?

20   "A. Yes.

21   "Q. What letterhead is this on?

22   "A. Excuse me?

23   "Q. What letterhead is this on?

24   "A. This is on Mayer Brown.

25   "Q. Who is this memorandum to?

1    "A. It is to David Weaver.

2    "Q. Who is it from?

3    "A. From Joe Collins and Paul Koury.

4    "Q. It says, 'Regarding 2002 loan documents.'

5          Mr. Maggio, what does this e-mail reflect, or what

6    does this memo reflect?

7    "A. Basically, it is reflecting the documents that Mayer Brown

8    was sending to David for the loan agreements, for the Delta

9    Flyer and for the Liberty Corner transactions.

10   "Q. Mr. Maggio, turn the page.  Was there another customer

11   involved in the transactions for 2002?

12   "A. Yes.  Beckenham Trading.

13   "Q. It says 'BTC document'?

14   "A. Yes.

15   "Q. And what does that stand for?

16   "A. Beckenham Trading.

17   "Q. With regard to the three sets of round-robin documents that

18   are being conveyed by this memorandum, are there loan

19   agreements from Refco Capital Markets to the customer?

20   "A. Yes.

21   "Q. Are there loan agreements from the customer to RGHI that

22   are simultaneous in time?

23   "A. Yes.

24   "Q. All right.  Are there guarantees and indemnities that take

25   customer risk away?

CAFPCOL2                        "Maggio" - direct

1    "A. Yes.

2    "Q. With respect to each of these three sets of round-robin

3    documents, what is the fee that is being paid to the customer

4    for participation in the round-robin?

5    "A. Each is different.  I believe it's 25 basis points.

6    "Q. It may be different, but it is a certain percentage of the

7    interest rate?

8    "A. Yes.

9    "Q. Mr. Maggio, if you would take a look at Government

10   Exhibit 2002.1A through F, 2002.2A through F and 2002.3A

11   through F.

12   "A. Yes, sir.

13   "Q. What are these documents?

14   "A. These documents reflect the loan documents, the round-robin

15   loan documents that we used for the three clients, Liberty

16   Corner, Beckenham Trading and, I believe, Delta Flyer.

17   "Q. Mr. Maggio, looking at those loan agreements, can you tell

18   us how much money was involved in each of these three

19   round-robin transactions?

20   "A. Well, for Beckenham Trading it was 125 million, for Delta

21   Flyer it is 175 million, and for Liberty Corner, it's 325

22   million.  So that would be 625 million.

23   "Q. Now, Mr. Maggio, the round-robins in 2002 were 625 million,

24   the customer round-robins.  Do you remember what they were back

25   in 2001?

1    "A. Oh, was it 450 or 510?  I don't recall, sir.

2    "Q. I think you said 450.

3    "A. Yes.

4    "Q. So that was an increase of $175 million; is that right?

5    "A. For the document -- for the documented ones, yes.

6    "Q. Mr. Maggio, why is it that the size of the customer

7    round-robins was increasing?

8    "A. Because the hole was getting bigger.  The interest income

9    alone, the interest expense at RGHI alone was significant

10   enough just to increase the hole.  That doesn't count the phony

11   trades that might have put in the account that year to make the

12   hole bigger.

13   "Q. Again, Mr. Maggio, who drafted the loan documents for this

14   $625 million -- I'm sorry.

15           Again, Mr. Maggio, who drafted the loan documents for

16   this $625 million in loans?

17   "A. Mayer Brown.

18   "Q. Showing you Government Exhibit 1200E --

19   "A. Give me a second.

20   "Q. Mr. Maggio, is this a bill from Mayer Brown?

21   "A. Yes.

22   "Q. For what period of time?

23   "A. For March 2002 -- excuse me.

24           From February 1, 2002, through February 28, 2002.

25   "Q. And if you can just turn to Page 6 of this bill.  What does

1   the description for Refco Capital Markets read on Page 6?

2   "A. 'Preparation of loan, guaranty and indemnity agreements

3   between Refco, Delta Flyer, Liberty Corner and Beckenham

4   Trading; preparation of closing list index; reviewing closing

5   set; advice regarding handling of Beckenham changes and

6   revision of loan documents.'

7   "Q. Mr. Maggio, did Refco also engage in a BAWAG round-robin in

8   2002?

9   "A. Yes.

10  "Q. Do you recall how much that round-robin was valued at with

11  BAWAG?

12  "A. I believe it was 210 million.

13  "Q. Do you recall specifically?

14  "A. No, sir.

15  "Q. Mr. Maggio, directing your attention to Government

16  Exhibit 2025; do you see that?

17  "A. Yes, sir.

18  "Q. Does that refresh your recollection as to what the amount

19  was?

20  "A. Yes.

21  "Q. What was it?

22  "A. 210 million.

23  "Q. Mr. Maggio, this is an e-mail from you -- from Thomas

24  Hackl -- I'm sorry, from Carol Williams.  Who is that?

25  "A. Carol Williams was my secretary.

1    "Q. What was the date of this e-mail?

2    "A. February 21, 2002.

3    "Q. Who was it addressed to?

4    "A. It is addressed to Thomas Hackl.

5    "Q. And you were cc'd on this; is that right?

6    "A. Yes.

7    "Q. Is Ms. Williams sending this on your behalf?

8    "A. She sent it on behalf of me.

9    "Q. It says, 'Good morning, Thomas,' and it refers in the first

10   paragraph to a wire of $300 million; do you see that?

11   "A. Yes.

12   "Q. What is that?

13   "A. That is the money that BAWAG was lending RGHI.  It also

14   gives the instruction to where the money was coming from.

15   "Q. Mr. Maggio, were there round-robins again in 2003?

16   "A. Yes.

17   "Q. Directing your attention to Government Exhibit 4012 and

18   4013.  Looking at Government Exhibit 4012, again, a series of

19   e-mails, and if you could just bring up the bottom portion.

20   This is an e-mail from Mr. Koury to you.

21        I'm sorry.  Mr. Smith, if you would just highlight the

22   portion that goes up through the 'to' and 'from' fields.

23        This is an e-mail from Mr. Koury to you, Mr. Maggio;

24   is that right?

25   "A. Yes, and to David Weaver.

1   "Q. What is being forwarded to you under the cover of this

2   e-mail from Mr. Koury?

3   "A. I'm sorry?

4   "Q. What is being forwarded to you under the cover of this

5   e-mail from Mr. Koury?

6   "A. The loan documents for Delta Flyer.

7   "Q. It says, 'DavidWeaver@GSSconsulting.org'; do you see that?

8   "A. Yes.

9   "Q. Why is Mr. Weaver receiving this e-mail at that address in

10  2003?

11  "A. David left the firm, and Rob Trosten hired him as a

12  consultant.  Part of his responsibility, or what I gave him,

13  was to handle the loan documents for fiscal year end.

14  "Q. This e-mail is forward on to Mr. Collins; is that right?

15  "A. Yes.

16  "Q. If you could just scroll up, please.  And is 4013

17  substantially similar set of e-mails, Mr. Maggio?

18  "A. Yes.

19  "Q. If we could turn to 4013, please.

20          What is the subject matter of that e-mail?

21  "A. Subject matter is the same as the forwarding of Liberty

22  Corner loan documents.

23  "Q. Okay.  Mr. Maggio, directing your attention to Government

24  Exhibit 2003.1A through F, and 2003.2A through F.  Do you

25  recognize these documents?

1   "A. Yes.

2   "Q. What are they?

3   "A. They are loan documents for fiscal year end 2003.

4   "Q. Mr. Maggio, just looking at these two documents, what was

5   the value of the loans involved in the round-robin for 2003?

6   "A. 650 million.

7   "Q. Is that greater than the prior year?

8   "A. Yes.

9   "Q. Mr. Maggio, there are guarantees and indemnities associated

10  with these documents; is that right?

11  "A. Yes, sir.

12  "Q. I'm showing you Government Exhibit 1200F.  Mr. Maggio, this

13  is another bill for services rendered for the period ending

14  February 28th, 2003.

15          Can you just take a look at Page 17, Mr. Maggio.

16  Mr. Maggio, whose name is up in the right-hand corner of this

17  bill?

18  "A. Joe Collins.

19  "Q. Do you know why Joe Collins' name is in the right-hand

20  corner of the bill?

21  "A. Because he was the lawyer in charge of Refco.

22  "Q. It says under Refco Capital Markets, the first entry is,

23  'Review of the loan agreements.'

24          Then, Mr. Maggio, later it says, 'Conferences

25  regarding preparation of loan with Liberty to $500 million and

1   loan with Delta for $150 million'; do you see that?

2   "A. Yes.

3   "Q. Was there also a round-robin with respect to BAWAG in 2003?

4   "A. Yes, sir.

5   "Q. Was that for $250 million, Mr. Maggio?

6   "A. Yes.

7   "Q. We can pull that down.

8           Mr. Maggio, the round-robins, did they occur again in

9   2004?

10  "A. Yes.

11  "Q. In prior years, Mr. Weaver initiated the contact; is that

12  right?

13  "A. Yes.

14  "Q. Who initiated contact in 2004?

15  "A. I did.

16  "Q. Why did you initiate contact in 2004?

17  "A. Because David no longer worked at Refco, and I couldn't

18  trust anybody else to go to Mayer Brown to draft documents.

19  "Q. Who did you contact?

20  "A. Paul.

21  "Q. Paul Koury?

22  "A. Yes.

23  "Q. Now, Mr. Maggio, why were you not comfortable going to

24  anybody else in your own firm to talk to Mayer Brown about

25  these documents?

1    "A. Because I figured if they took a look at it, somebody in my

2    firm with anything up here would take a look at the documents

3    and realize that they were back-to-back loan documents with a

4    group guarantee to a company outside the consolidated group,

5    and they would have questioned it and could have raised

6    concerns to Dennis or someone else.

7              So I was concerned that somebody in my firm would blow

8    the whistle.  So I decided to go directly to Mayer Brown, and I

9    knew that Mayer Brown knew the documents and wouldn't say

10   anything because they had done the documents before and because

11   I trusted them.

12   "Q. Mr. Maggio, you've indicated previously that you trusted

13   going to Mr. Collins, but here, you're contacting Mr. Koury.

14   Why did you feel comfortable talking to Mr. Koury about these

15   documents?

16   "A. Because Paul worked for Joe, and that if Paul went to Joe

17   and said, 'You know what, I feel uncomfortable,' I feel Joe

18   would just tell him to shut up.

19   "Q. Mr. Maggio, you mentioned during your testimony earlier

20   that Mr. Grant and Mr. Bennett referred to a plan to sell the

21   company; do you recall that?

22   "A. Yes.

23   "Q. What was the status of that plan in 2003?

24   "A. In 2003, the company decided to retain an investment banker

25   to see if there were any interested buyers in Refco.

1    "Q. Who was the investment banker?

2    "A. Credit Suisse First Boston.

3    "Q. Did you discuss with Mr. Bennett why the services of Credit

4    Suisse First Boston were retained?

5    "A. Yes.

6    "Q. What did Mr. Bennett say?

7    "A. Prior to that, we had a company called Allen & Company,

8    which didn't do such a good job of promoting us.

9              Credit Suisse First Boston was the premiere investment

10   banker at the time, and he felt strongly that they would be

11   able to find somebody to buy all of Refco.

12   "Q. What was the purpose in trying to find someone to buy all

13   of Refco, according to Mr. Bennett?

14   "A. The purpose was if somebody bought all of Refco and paid

15   more than what the receivable was for RGHI, then they would be

16   able to sort of clear the decks, and there would be no more

17   receivable, and the firm would no longer be in debt.

18   "Q. Did you provide information to CSFB, Mr. Maggio?

19   "A. Yes.

20   "Q. Did you participate in the presentations?

21   "A. Yes.

22   "Q. Did you provide untruthful information?

23   "A. Yes.

24   "Q. Did you disclose the true size of the amount of money RGHI

25   owed to Refco?

1   "A. No.

2   "Q. Why not?

3   "A. If CSFB saw what the true size of the hole was, then the

4   company would not be worth as much as the firm needed or Phil

5   and Tone and Tom needed -- or Phil and Tony, excuse me, to get

6   out of their debt.

7   "Q. When you say the debt, you mean the debt owed from RGHI to

8   Refco?

9   "A. Yes.  Over a billion dollars.

10  "Q. Was a potential buyer found by Credit Suisse First Boston?

11  "A. Yes.

12  "Q. Who was that potential buyer?

13  "A. TH Lee.

14  "Q. Did you participate in presentations to TH Lee?

15  "A. Yes.

16  "Q. Did you tell the truth to TH Lee about the amount of size

17  of money owed to RGHI from Refco?

18  "A. No.

19  "Q. Did you tell the truth to Lee about the round-robin

20  transactions that Refco was engaged in annually at that time?

21  "A. No.

22  "Q. Did you lie about other things to Thomas H. Lee?

23  "A. Yes.

24  "Q. Now, did you express any concerns to Mr. Bennett about

25  Thomas H. Lee being a potential acquirer of the company?

1    "A. Yes.

2    "Q. What concerns did you express to Mr. Bennett?

3    "A. Well, originally, the plan was to sell the firm to another

4    financial company such as a UBS or a JP Morgan, and they were

5    going to buy a hundred percent of the company, which would

6    completely wipe out the debt of RGHI.

7          However, with TH Lee, they are a private equity firm.

8    One was that they weren't buying a hundred percent of the

9    company; two was that the amount of money coming in wouldn't

10   nearly wipe out -- wouldn't wipe out the debt of RGHI; three,

11   TH Lee's modus operandi was to take the company as a private

12   equity company and to flip it, either to sell it to someone

13   else or to go IPO.

14         And in that situation, with them owning a percentage

15   of Refco, there would be a tremendous amount of pressure on us

16   to build up the revenues that they weren't making, and there

17   would be a lot of scrutiny, and I was very concerned about

18   that.

19   "Q. Mr. Maggio, you mentioned earlier round-robins.  There were

20   round-robin transactions for fiscal year ended February 2004;

21   is that right?

22   "A. Yes.

23   "Q. What was the status of the Lee transaction in

24   February 2004?  Had negotiations begun?

25   "A. Yes.

1    "Q. Do you recall how much the round-robin for 2004 was?

2    "A. I believe it was 700-plus million.  I don't really recall.

3    "Q. Does it refresh your recollection, Mr. Maggio, to hear

4    $720 million?

5    "A. Yes.

6    "Q. Mr. Maggio, that round-robin in February 2004 of 720

7    million during the negotiations of the Lee transaction, who

8    documented that transaction?

9    "A. Mayer Brown.

10   "Q. Do you know who was representing Refco in connection with

11   the Lee transaction in February 2004?

12   "A. Yes.

13   "Q. Who?

14   "A. Joe Collins from Mayer Brown.

15   "Q. Was there also a round-robin of $250 million with BAWAG in

16   February of 2004?

17   "A. Yes.

18   "Q. Mr. Maggio, did anything change with respect to the

19   frequency of the round-robins after 2004?

20   "A. Yes.

21   "Q. What happened?  What changed?

22   "A. Instead of doing it once a year, every fiscal year end, we

23   were now doing it every quarter.  Meaning, if you analyze that,

24   four times a year.

25              In addition to that, we also did one on the calendar

1    year end, December of 2004.  So the frequency was once every

2    three months with one added in for close of business

3    December 31st, 2004.

4    "Q. Mr. Maggio, at whose direction did the frequency of the

5    round-robins increase?

6    "A. Phil Bennett.

7    "Q. Did Mr. Bennett tell you why the frequency of the

8    round-robins had to increase?

9    "A. Yes.

10   "Q. What did he say?

11   "A. He said the increased scrutiny by the Lee people, and

12   because of our S-4 filing, which is the filing for the bonds.

13   That was the reason why we needed to do it on a quarterly

14   basis.

15   "Q. Mr. Maggio, there are a series of documents before you and

16   I'm going to list them.

17           Government Exhibit 2004.1A through F, Government

18   Exhibit 1200G, Government Exhibit 1750.04B, Government

19   Exhibit 2004.3A through F, Government Exhibit 2004.4A through

20   F, Government Exhibit 2004.5A through F, Government

21   Exhibit 2004.6A through F, Government Exhibit 2005.1A through

22   F, Government Exhibit 2005.1A2, Government Exhibit 2005.2A

23   through F, and Government Exhibit 2005.3A through F.

24           It's a large stack of documents, Mr. Maggio.  Do those

25   documents include, among other things, the round-robin

1    transactions or documents for the round-robin transactions that

2    happened beginning February 2004 and continuing afterwards?

3    "A. Yes, sir.

4    "Q. Now, Mr. Maggio, with regard to the May 2004 round-robin,

5    was that with Liberty Corner again?

6    "A. Yes, sir.

7    "Q. Was that round-robin for approximately $700 million?

8    "A. I have to go get it.

9    "Q. 2004.1A -- or excuse me?

10   "A. That is February.

11   "Q. 2004.3A.

12   "A. 2004.3A?

13   "Q. Yes.  I think it's up on the screen, Mr. Maggio.

14   "A. That would be easier for me.  Thank you.  Yes, sir.

15   "Q. Mr. Maggio, at the time of the May round-robin, what was

16   the status of the Lee transaction at that time?

17   "A. I believe, at that time, they had come to some sort of

18   agreement in principle.

19   "Q. Were negotiations ongoing?

20   "A. Yes.

21   "Q. Now, Mr. Maggio, I want to talk to you a little bit about

22   the Lee deal.

23        And we can take that down.  Thank you.

24        What was your understanding as to the nature of the

25   Lee deal, Mr. Maggio?

1    "A. That Lee was going to purchase, I think it was 53 or

2    57 percent of the company; that Phil Bennett was going to keep

3    his equity in the company; and that the firm was going to

4    borrow approximately a billion four, 800 million and 600

5    million.

6    "Q. Mr. Maggio, you mentioned before that you expressed concern

7    to Mr. Bennett about an acquirer that was only buying a portion

8    of the company.  Did Mr. Bennett say anything in response to

9    that?

10   "A. Yes.

11   "Q. What did he say?

12   "A. He said, 'Sandy, the only way -- the only way we're going

13   to be able to get through this, it appears, is that we're going

14   to have to resell the company or we're going to have to go IPO.

15   And the Lee people will help us do it.  They'll give us the

16   discipline to do it.'

17   "Q. When you say 'only way...to get through this,' what do you

18   mean?

19   "A. It means the RGHI debt, the huge hole that RGHI had at

20   Refco.

21   "Q. Mr. Maggio, did you talk to Mr. Bennett about conditions

22   that Thomas H. Lee Partners put on the deal?

23   "A. Yes.

24   "Q. What conditions did Lee put on the deal?

25   "A. The borrowing or the leveraging, so that we had to go out

1   and borrow a billion four.  Phil had to retain equity.  The

2   board of managers re-signing all the managers; board of

3   directors meetings.  Those were some of the restrictions.

4   "Q. Did Mr. Bennett tell you anything about restrictions

5   regarding Mr. Grant and Mr. Dittmer?

6   "A. Yes.

7   "Q. What did Mr. Bennett tell you?

8   "A. He told me that Thomas Lee did not want to have any other

9   partners other than Phil, and that they would have to buy out

10  the remaining shareholders.

11  "Q. Did Mr. Bennett talk to you about how discussions with

12  Mr. Grant and Mr. Dittmer's representatives were going?

13  "A. Yes.

14  "Q. What did he say?

15  "A. Phil was very upset and disturbed about the fact that he

16  wasn't getting any cooperation.  And he told me that Tone and

17  Tom were being totally unrealistic as it relates to the true

18  value of this company because of the huge hole, and that the

19  company was just a piece of garbage and that he needs to get

20  them on board.

21  "Q. Did he say this in approximately April or May of 2004?

22  "A. Yes.

23  "Q. Did he tell you what he was going to do to remind them, if

24  anything, about the true financial condition of the company?

25  "A. Well, he was going to meet with them.  He was going to meet

with Tom or his representative, and he was meeting with Tone

Grant.  And he was going to give them the lay of the land, so

to speak.

"Q. Now, Mr. Maggio, do you remember an issue arising about

$500 million in excess cash being a requirement of the Lee

deal?

"A. I vaguely remember it.  Yes, sir.

"Q. Mr. Maggio, did your company have $500 million in excess

cash in 2004?

"A. No, sir.  We had no excess cash.

"Q. Now, Mr. Maggio, did there come a time during negotiations

with the Lee team or the Lee firm when Mr. Bennett came to you

with a problem regarding allegations of losses being hidden in

an offshore account?

"A. Yes.

"Q. What did Mr. Bennett say to you?

"A. Phil told me that someone sent a letter to the TH Lee

people saying that Refco was hiding losses, previous losses

offshore somewhere, and that Phil was very upset that somebody

sent the letter.

        We tried to figure out who it was.  We couldn't.  He

said he was going to -- This was early in the morning.  He was

running up to the Lee people to talk to them.

"Q. Did you understand that this was concerning an offshore

entity in London?

1  "A. Yes.  I believe ROL, Refco Overseas, Limited.

2  "Q. Now, Mr. Maggio, did you talk to Mr. Bennett after this

3  meeting?

4  "A. Yes.

5  "Q. What did he say after this meeting?

6  "A. 'I took care of it.'  He told them -- he told me he told

7  them that it was nothing more than a disgruntled employee, and

8  he was going to -- you know, they bought it.

9  "Q. Mr. Maggio, you mentioned before that part of the Lee

10 transaction involved debt being provided by banks.  Do you

11 recall that?

12 "A. Yes.

13 "Q. Please take a look at Government Exhibit 1008.  Mr. Maggio,

14 do you see that document?

15 "A. Yes.

16 "Q. What is it?

17 "A. It is a senior security credit facility that we presented

18 for the TH Lee deal.

19 "Q. Mr. Maggio, did you participate in writing information for

20 that document?

21 "A. Yes.

22 "Q. Did you participate in the meeting that related to that

23 document?

24 "A. Yes.

25 "Q. Did you lie in both that document and in meetings?

1    "A. Excuse me, sir?

2    "Q. Did you lie in both that document and in the meetings?

3    "A. Yes, sir.

4    "Q. Was Mr. Collins present at the bank meeting?

5    "A. Excuse me?

6    "Q. Was Mr. Collins present at that bank meeting?

7    "A. I don't recall.

8    "Q. Mr. Maggio, were you also involved in preparation of

9    information relating to the offering of notes?

10   "A. Yes, sir.

11   "Q. Just take a quick look at Government Exhibit 5008.  Do you

12   recognize that document, Mr. Maggio?

13   "A. Yes.

14   "Q. What is it?

15   "A. It's the offering circular for the 600 million senior

16   subordinated notes.

17   "Q. Did you provide inaccurate information for purposes of

18   compiling that document?

19   "A. Accurate?  No.

20   "Q. Inaccurate?

21   "A. Yes, sir.

22   "Q. Mr. Maggio, please take a look at Government Exhibit 1411.

23   Mr. Maggio, do you recognize that document?

24   "A. Yes, sir.

25   "Q. What is it?

1    "A. It is the offering memorandum for the senior security

2    credit notes.

3    "Q. Mr. Maggio, what was the purpose of this document?

4    "A. This was part of the leveraged buyout for the Lee deal.

5    "Q. Mr. Maggio, does this document contain lies?

6    "A. Yes.

7    "Q. Did you provide untruthful information for the purposes of

8    compiling this document?

9    "A. Yes.

10   "Q. Mr. Maggio, in connection with the leveraged buyout, were

11   you also asked to fill out something called a director's and

12   officer's questionnaire?

13   "A. Yes.

14   "Q. What is that?

15   "A. It is a questionnaire for regulatory purposes for when you

16   file an S-4.

17   "Q. And if you could take a look at Government Exhibit 2115,

18   please?

19   "A. Yes.

20   "Q. Do you have it, Mr. Maggio?

21   "A. Yes, sir.

22   "Q. What is that?

23   "A. That is the D and O questionnaire.

24   "Q. Mr. Maggio, did you sign this document?

25   "A. Yes, sir.

1   "Q. Does it contain untruthful information?

2   "A. Yes, sir.

3   "Q. Does it contain untruthful information about your

4   involvement in something called a profits participation plan?

5   "A. Yes, sir.

6   "Q. Why is the information concerning the profits participation

7   plan untrue?

8   "A. It --

9   "Q. I direct your attention to Page 5, Mr. Maggio.  There is a

10  section there for annual compensation.  Do you see that?

11  "A. Yes, sir.

12  "Q. Is that accurate or inaccurate?

13  "A. Inaccurate.

14  "Q. How is it inaccurate?

15  "A. Because it doesn't show the -- what is called the profits

16  participation that we had, which is basically above and beyond

17  the compensation that was received.

18  "Q. Do you know what the purpose of that profits participation

19  plan was, Mr. Maggio?

20  "A. Yes.

21  "Q. What was it?

22  "A. To disguise the true expenses of the firm.  Profits

23  participation was treated almost like a dividend.  If you made

24  compensation, it will be treated as expense.  Therefore, it

25  artificially increases the net revenues of the company.

1   "Q. Mr. Maggio, did you disclose in this document the 7 million

2   loan forgiveness from 2002?

3   "A. No.

4   "Q. Did you expect to get additional payments at the conclusion

5   of the leveraged buyout transaction?

6   "A. Yes.

7   "Q. Did you disclose that in this document?

8   "A. No.

9   "Q. Looking at Page 20 -- if we could just blow that up,

10  please -- it says, 'General Information.  Are you aware of any

11  material facts concerning the business and the operations of

12  the company which is not disclosed in the offering circular

13  provided to you or which you believe may be inaccurately stated

14  therein?'  Do you see that?

15  "A. Yes, sir.

16  "Q. You checked 'no'; do you see that?

17  "A. Yes, sir.

18  "Q. Mr. Maggio, was that truthful?

19  "A. No, I did not disclose the RGHI loan.

20  "Q. Mr. Maggio, you talked about ratings agency presentations

21  in the context of the credit facility earlier.  Did you also

22  participate in presentations to rating agencies in connection

23  with the leveraged buyout?

24  "A. Yes, sir.

25  "Q. Did you lie in that capacity or in that connection?

1   "A. Excuse me?

2   "Q. Did you lie in that connection?

3   "A. Yes, sir.

4   "Q. Showing you Government Exhibit 2123, Mr. Maggio, do you

5   recognize that document?

6   "A. Yes, sir.

7   "Q. Mr. Maggio, what is the date of this letter?

8   "A. June 18, 2004.

9   "Q. Who was it to?

10  "A. It is to me.

11  "Q. What is the subject?

12  "A. The subject is the redemption of the profits participation

13  interest.

14  "Q. Just looking at the second paragraph, I guess, the last

15  sentence, it says, 'Consistent with the valuations associated

16  with the proposed transaction, the consideration due you in

17  respect of the redemption is a total of $8,379,590.'  Do you

18  see that?

19  "A. Yes, sir.

20  "Q. What are the numbers that appear below that?

21          And if we could scroll down, please.

22          Is that a breakdown of that amount?

23  "A. Yes, sir.

24  "Q. Mr. Maggio, did you disclose this information in your D and

25  O questionnaire?

1    "A. No.

2    "Q. Was that wrong?

3    "A. Yes.

4    "Q. The leveraged buyout, was it completed?

5    "A. Yes, sir.

6    "Q. Did you receive a large payment in connection with that

7    leveraged buyout being completed?

8    "A. Yes.

9    "Q. Was it approximately $5.7 million?

10   "A. Yes, sir.

11   "Q. Now, after the leveraged buyout, Mr. Maggio, did Refco

12   Group Holdings, Inc. still owe money to Refco?

13   "A. Yes.

14   "Q. What happened at the end of August 2004 with respect to the

15   related-party receivable that was owed by RGHI to Refco?

16   "A. It was decreased somewhat, but --

17   "Q. At whose direction?

18   "A. At Phil's.

19   "Q. Was it through a round-robin transaction again?

20   "A. Yes.

21   "Q. Was Liberty Corner a customer?

22   "A. Yes.

23   "Q. Was it for $485 million?

24   "A. Yes.

25   "Q. Mr. Maggio, this was after the Lee transaction closed; is

1   that correct?

2   "A. Yes.  This was over quarter end August 31st, 2004, after

3   the Lee transaction.

4   "Q. Why did Refco have to engage in a round-robin transaction

5   after the close of the Lee transaction?

6   "A. Because it still had a huge hole, even after the

7   transaction.  The Lee transaction was not going to totally

8   eliminate the debt.

9   "Q. Now, Mr. Maggio, was there another round-robin in November

10  of 2004?

11  "A. I believe there was.

12  "Q. Was that by Liberty Corner again?

13  "A. Yes.

14  "Q. Was that in the amount of $545 million?

15  "A. Yes, sir.

16  "Q. How did that come about?

17  "A. Excuse me?

18  "Q. How did that come about?

19  "A. I was directed by Phil to do another round-robin.

20  "Q. Mr. Maggio, was there a round-robin in December 2004?  You

21  mentioned before that there was -- that there was for the

22  calendar year ended December 2004?

23  "A. Yes.

24  "Q. Was the customer for that also Liberty Corner?

25  "A. Yes.

1    "Q. Was that for $550 million?

2    "A. Yes, sir.

3    "Q. Mr. Maggio, previously you testified that Mayer Brown had

4    documented round-robin transactions.  Did Mayer Brown or did

5    you document the December 2004 round-robin transaction?

6    "A. Excuse me?

7    "Q. Did you or Mayer Brown document the December 2004

8    round-robin transaction?

9    "A. I don't recall the December 2004.

10   "Q. Mr. Maggio, why was a round-robin done in December 2004?

11   "A. Phil said that they were contemplating going on a calendar

12   year end.  They were contemplating the fiscal year end to go on

13   calendar year end.

14   "Q. So why did the round-robin have to happen?

15   "A. Because if they were going to change their fiscal year end,

16   he wanted to make certain that the RGHI loan was not shown at

17   that time.

18   "Q. By December of 2004, after the Lee transaction had closed,

19   was there new management in the company?

20   "A. Excuse me?  In December?

21   "Q. Yes.

22   "A. Yes.  We had a board of directors.

23   "Q. What was the status of Mr. Trosten at that time?

24   "A. In December?

25   "Q. Yes.

1    "A. He left the firm.

2    "Q. He had left previously?

3    "A. He left previously and Refco hired a new CFO, a Gerry

4    Sherer.

5    "Q. You mentioned, Mr. Maggio, that there was a new board of

6    managers.  Who was on this new board of managers?

7    "A. The board of managers were the existing managers, myself,

8    Mr. Sherer, Mr. Klejna, Mr. Murphy and Mr. Sexton.  And we

9    reported to the board of directors -- excuse me, as well as

10   Mr. Bennett.

11   "Q. Mr. Maggio, if you could take a look at Government

12   Exhibit 2120.  Do you recognize that, Mr. Maggio?

13   "A. Yes.

14   "Q. What is it?

15   "A. This is the January presentation at the board of managers,

16   made to the board of directors.

17   "Q. Did you help compile that document?

18   "A. Yes.

19   "Q. Did it contain false and inaccurate information?

20   "A. Yes.

21   "Q. Why?

22   "A. We had to phony up the revenues.  One, we doctored the

23   amount of volume.  We also changed the amount of revenues by

24   doing transactions that were illegal.

25   "Q. Mr. Maggio, you said that Mr. Bennett was on the board; is

1   that right?

2   "A. He was on the board of managers.  I don't know if he was on

3   the board of directors.

4   "Q. Who were you trying to lie to in compiling the information

5   for this presentation?

6   "A. The board of directors.

7   "Q. Which people on that board particularly?

8   "A. The Lee people, Mr. Schoen, and Mr. Jaeckel.

9   "Q. Now, Mr. Maggio, was there another round-robin transaction

10  again in fiscal year end 2005?

11  "A. Yes.

12  "Q. That was with Liberty Corner?

13  "A. Yes.

14  "Q. Was that for over $300 million?

15  "A. 335 million.

16  "Q. Mr. Maggio, in connection with the round-robin in February

17  of 2005, was Mr. Weaver still with Refco, the firm?

18  "A. No.

19  "Q. So who reached out to have the round-robin documented for

20  February 2005?

21  "A. I did.

22  "Q. Who did you contact?

23  "A. Paul Koury.

24  "Q. Were you successful in getting in touch with Mr. Koury?

25  "A. At first, I wasn't.

1    "Q. If we could please bring up for Mr. Maggio, Government

2    Exhibit 4015.

3          Mr. Maggio, do you recognize that document?

4    "A. Yes.

5    "Q. Mr. Maggio, this is a chain of e-mails.  If we can take a

6    look at the bottom e-mail, it says -- and if we could scroll

7    down, please.  I'm sorry.  Thank you.

8          It says, 'From:  Joseph P. Collins; dated:

9    February 23rd, 2005.  Please call Sandy Maggio.'

10          Do you see that?

11   "A. Yes.

12   "Q. You said initially, Mr. Maggio, that you reached out to

13   Paul Koury but were unsuccessful in reaching him; is that

14   right?

15   "A. Yes.

16   "Q. What did you do after you were unsuccessful in reaching

17   Mr. Koury?

18   "A. I talked to Joe Collins, and I told Joe that I needed a set

19   of documents for fiscal year end, but I can't get ahold of

20   Paul.  And Joe said, 'I will get him.  Don't worry.'

21   "Q. Then Mr. Koury responds.  It says, 'Paul Koury,

22   February 23rd, 2005,' and it's directed to Mr. Collins.  And it

23   says, 'I just spoke to Sandy.  He needs me to draft a side

24   letter agreement to the loan agreements between Refco and

25   Liberty that I just drafted and got executed.  He wants me to

1    revise the amount from $335 to 345 million.'

2              Do you see that?

3    "A. Yes.

4    "Q. Mr. Maggio, why did you need to increase the amount of the

5    round-robin from 335 million to 345 million in February of

6    2005?

7    "A. There were two reasons.  Rob Trosten wasn't around; so the

8    information that was being put together was put together by

9    Phil, and he was wrong.

10              The second reason was that we needed to increase the

11   revenues for fiscal year end.  And so in order to increase the

12   revenues for fiscal year end, we charged RGHI, increasing their

13   receivable, creating income for Refco Group.  So the receivable

14   went from 335 to 345.

15   "Q. Mr. Maggio, this is in February of 2005.  Was there again a

16   round-robin in May 2005?

17   "A. I believe so, yes.

18   "Q. Showing you Government Exhibit 2152; do you recognize that?

19   "A. Yes.

20   "Q. What is it?

21   "A. It is an e-mail from Paul saying that attached is the

22   amended documents for the round-robin transaction for

23   February 2005.  I'm sorry, sir, I read that wrong.  It is for

24   May 2005, not February.

25   "Q. Mr. Maggio, there's two e-mails here, right?

CAFPCOL2                          "Maggio" - direct

1   "A. That is correct.

2   "Q. The bottom e-mail is from Mr. Koury to himself, regarding

3   the February 2004 round-robin; is that right?

4   "A. That is correct.

5   "Q. And the amendment made thereto; is that right?

6   "A. Correct.

7   "Q. Now, the follow-up e-mail -- and if we could just scroll

8   up, please -- it is from you to Mr. Koury saying, 'Give me a

9   call.'

10          If we could just highlight that, please.

11          Do you see that?

12  "A. Yes.  The reason --

13  "Q. Go ahead.

14  "A. The reason why it was showing February is because I took an

15  old e-mail, so I didn't have to look up his e-mail address, and

16  I just spotted it and replied, using that as opposed to typing

17  in his entire e-mail address.

18  "Q. Were you asking Mr. Koury to call you because you wanted

19  Mayer Brown to prepare the round-robin documents for May 2005?

20  "A. Yes.

21  "Q. Could you take a look at Government Exhibit 2156, please.

22  Do you recognize that?

23  "A. Yes.  Yes, sir.

24  "Q. What is it?

25  "A. 2156 is the e-mail from Paul to me saying that please find

1    the attached documents in connection with the Liberty Corner

2    loans, 450 million for both dated May 25th, 2005, and maturing

3    on June 5th, 2005.

4    "Q. Mr. Maggio, this is an e-mail from Mr. Koury to you; is

5    that right?

6    "A. Yes.

7    "Q. What is being forwarded on here?

8    "A. The round-robin documents for May of 2005.

9    "Q. The date of this e-mail is May 20th, 2005; is that right?

10   "A. Right.

11   "Q. And who is cc'd on this document?

12   "A. Joe Collins, Ross Pazzol and Peter Schultz.

13   "Q. If we could highlight that, please.

14           Mr. Maggio, were round-robin documents ultimately

15   executed for May 2005?

16   "A. Yes.

17   "Q. Did they have guarantees and indemnities associated with

18   them?

19   "A. Yes.

20   "Q. Was there also a round-robin concerning BAWAG at this time?

21   "A. Yes.

22   "Q. Now, Mr. Maggio, if you would look at Government

23   Exhibit 2027.  Do you recognize that?

24   "A. Yes.

25   "Q. What is it?

CAFPCOL2                    "Maggio" - direct

1   "A. This is a promissory note on a short-term loan that BAWAG

2   gave to Refco Group Holdings over fiscal year end, beginning on

3   and maturing on March 8th, 2005, for 250 million.

4   "Q. So, Mr. Maggio, what is this round-robin for?  This is for

5   fiscal year end 2005; is that right?

6   "A. Yes, February 28, 2005.

7   "Q. Why is there any documentation associated with this

8   round-robin for BAWAG when previously you testified there

9   weren't?

10  "A. Prior to this, BAWAG was a shareholder at Refco.  They

11  didn't require documentation.  Now they were no longer a

12  shareholder of Refco, and they wanted a promissory note.

13  "Q. Thank you, Mr. Smith.  You can take that down now.

14          Mr. Maggio, you spoke earlier about acquisitions made

15  by Refco before the LBO; do you recall that?

16  "A. Yes.

17  "Q. Were acquisitions made by the company after the LBO?

18  "A. Yes.

19  "Q. Do you recall the acquisition of a company called Cargill?

20  "A. Yes.

21  "Q. What was that?

22  "A. Cargill was a large commodities firm located, based in

23  Chicago.

24  "Q. And what was the status of the cash flow problem that Refco

25  had historically in 2005?

1    "A. Well, they were still using customer funds to fund the

2    company.  Although there was significant cash coming in, the

3    firm was still very concerned about customer funds.  We were no

4    longer failing, but we were still using customer monies to fund

5    the day-to-day operations.  That was true in 2004 and 2005.

6    "Q. Mr. Maggio, how was Refco able to acquire Cargill if it had

7    a cash flow problem like you have described?

8    "A. Two reasons.  We used the present customer funds that we

9    had to acquire.  We also, when we did our calculation about the

10   amount of capital and purchase price of Cargill, we took a look

11   and saw all the accounts that they had and noticed that they

12   had hundreds of millions of dollars in cash for customers that

13   were unregulated; so we were allowed to tap into that.

14          So the simultaneous transaction, what it did was we

15   were able to purchase the company on one day and acquire the

16   customer funds on the same day we purchased it.  Thereby, the

17   company was bought with their own customer funds.

18   "Q. Did you use, in part, the customer monies that Refco had or

19   had access to?

20   "A. Part of it, yes.

21   "Q. Now, Mr. Maggio, in February of 2005, did you see

22   Mr. Collins outside of work?

23   "A. I believe I did, yes.

24   "Q. Where did you see him outside of work?

25   "A. I saw him at a charity event in Manhattan for Chai

1   Lifeline.

2   "Q. And showing you Government Exhibit 2155, Chai Lifeline

3   Awards Dinner, February 8th, 2005.  Do you see that?

4   "A. Yes, sir.

5   "Q. You saw Mr. Collins at that event; is that right?

6   "A. Yes.

7   "Q. Why were you at that event?

8   "A. I was being honored for an award, an achievement award.

9   "Q. Mr. Maggio, why was Mr. Collins at that event?

10  A.  They bought a table.  Mayer Brown bought a table as part of

11  that affair.

12  "Q. Mr. Smith, if we can take that down.  Thank you.

13          Mr. Maggio, you mentioned something called an S-4

14  registration statement.  Did you do any work in connection with

15  the S-4 registration statement for Refco?

16  "A. Yes, sir.

17  "Q. Again, just basically, what was the purpose of the S-4

18  registration statement?

19  "A. The S-4 registration statement is a statement that you must

20  file with Securities and Exchange Commission to borrow money,

21  and this was related to the leveraged buyout and Lee.

22  "Q. Showing you Government Exhibit 5007, what is this,

23  Mr. Maggio?

24  "A. This is the offering statement for the -- This is the S-4

25  filing for the bonds that we were selling due to the Lee deal.

1  "Q. Did this relate to the conversion of the privately offered

2  notes into publicly registered ones?

3  "A. Yes.

4  "Q. Did you contribute financial information to this document?

5  "A. Yes, sir.

6  "Q. Was it false?

7  "A. Yes, sir.

8  "Q. Now, Mr. Maggio, did Refco ultimately move towards an

9  initial public offering of Refco stock?

10  "A. Yes.

11  "Q. Was that something that both you and Mr. Bennett wanted to

12  do?

13  "A. I wasn't necessarily crazy about it, but Mr. Bennett

14  definitely wanted to do it.

15  "Q. What did Mr. Bennett say about why he wanted to do it?

16  "A. Because this was the only way we'd be able to get out of

17  the hole.  If we sold stock, then he would have publicly traded

18  stock, and someday he would be able to sell his stock and,

19  hopefully, we could get out of the hole.

20  "Q. Why were you not crazy about the idea?

21  "A. Because that would incur even more scrutiny as it relates

22  to now the SEC looking at us, and other regulators.

23  "Q. Mr. Maggio, if you would take a look at Government

24  Exhibit 2116.  Did you have to fill out another questionnaire

25  in connection with the IPO?

1   "A. Yes.  I think it was for the filing of an S-5, maybe, but

2   it is a filing for an IPO.  You need to fill other, another D

3   and O.

4   "Q. Do you mean the S-1, Mr. Maggio?

5   "A. S-1, I apologize.

6   "Q. Mr. Maggio, what is 2116?

7   "A. Excuse me?

8   "Q. What is Government Exhibit 2116 before you?

9   "A. That is the D and O questionnaire.

10  "Q. In connection with the IPO; is that right?

11  "A. Yes, sir.

12  "Q. Did it contain similar lies to the ones that were in the

13  leveraged buyout questionnaire?

14  "A. Yes.

15  "Q. Mr. Maggio, you talked before about this profits

16  participation interest that you were owed; do you remember

17  that?

18  "A. Yes.

19  "Q. Did you find out, at some point, that other people were

20  getting more money out of the profits participation plan than

21  you were?

22  "A. Yes.

23  "Q. What did you do?

24  "A. Joe Murphy, who was my equal on the futures side, was

25  getting a larger piece in the profits participation plan.

1           I went to Phil -- this was coordinating with what was

2     going on with Sedona at the time, with the investigation -- and

3     I told him I wanted to be made at least equal to what Joe was,

4     and he agreed.

5     "Q. Showing you Government Exhibit 2124, do you recognize that?

6     "A. Yes.

7     "Q. What is it?

8     "A. That is the letter that Phil sent me regarding my increase

9     in the profits participation plan.

10    "Q. Mr. Maggio, the date of this is July 25th, 2005.  Do you

11    see that?

12    "A. Yes.

13    "Q. And the subject is, Redemption of Profits Partnership

14    Interest.  Do you see that?

15    "A. Yes.

16    "Q. Mr. Maggio, it says, 'Further to our letter to you dated

17    June 18th, 2004, in which we gave notice of our intention to

18    acquire your profits participation interest, we are writing to

19    confirm modifications of the terms of that repurchase

20    arrangement.  Specifically:

21           '1.  The aggregate amount payable to you with respect

22    to that interest will be increased to 13.6 million,

23    approximately.'

24           Do you see that?

25    "A. Yes."

1          MR. IMPERATORE:  Mr. Smith, you can take that down,

2     please.

3          May I have a moment, your Honor?

4          THE COURT:  Yes, sir.

5          MR. IMPERATORE:  Your Honor, we have about 11 or 12

6     pages left on direct.  Would this be a convenient time for the

7     Court to break or should we continue?

8          THE COURT:  Is there any reason not to finish the

9     direct?

10          MR. IMPERATORE:  I see no reason not to, your Honor.

11          THE COURT:  All right.  Is that all right with you,

12     ladies and gentlemen?  And we'll take a break then.  Thank you.

13     Yes, sir.

14     BY MR. IMPERATORE:

15     "Q. Did you receive any additional money at the completion of

16     the IPO?

17     "A. Yes.

18     "Q. Was that approximately $9 million?

19     "A. Excuse me?

20     "Q. How much was it, approximately?

21     "A. I don't recall, sir.

22     "Q. Was it a few million dollars, Mr. Maggio?

23     "A. Yes.

24     "Q. Now, Mr. Maggio, you mentioned an S-1 registration

25     statement for the initial public offering.  Do you recall that?

1    "A. Yes.

2    "Q. Did you contribute information to that?

3    "A. Yes.

4    "Q. Did you contribute untruthful information to that S-1

5    registration statement?

6    "A. Yes.

7    "Q. Just quickly, showing you Government Exhibit 5009, what is

8    this, Mr. Maggio?

9    "A. This is the offering memorandum of the common stock

10   offering of Refco.

11   "Q. Mr. Maggio, you said that you contributed untruthful

12   information.  Was that financial information?

13   "A. Yes.

14   "Q. And if we could please bring up Page 102 of this document.

15           Now, Mr. Maggio, do you see your biography there,

16   about a third of the way down the page?

17   "A. Yes.

18   "Q. It says, 'Santo Maggio has served as executive vice

19   president of Refco Group and president.'

20           And it continues at the very end, it says, 'Mr. Maggio

21   holds an accounting degree from Hunter College, City University

22   of New York.'  Do you see that?

23   "A. Yes, sir.

24   "Q. Was that true?

25   "A. No.  I brought it to the attention of the people who put

1   this together and told them I was very upset, and all along, I

2   gave them what my true bio was.

3   "Q. Did this inaccurate biography appear in other documents?

4   Did you find that out also?

5   "A. Yes.

6   "Q. Mr. Maggio, was the IPO actually happening?  Did the

7   initial public offering occur?

8   "A. Yes.

9   "Q. After the initial public offering occurred, was there still

10   a related-party debt owed from RGHI to Refco?

11   "A. Yes.

12   "Q. So on August 2005, what happened, Mr. Maggio?

13   "A. We did another round-robin transaction.

14   "Q. And was that round-robin transaction with Liberty Corner?

15   "A. Yes.

16   "Q. That was for $420 million?

17   "A. Yes.

18   "Q. Who did the documentation for this round-robin in August of

19   2005?

20   "A. I did.

21   "Q. Why did you do it?

22   "A. It was easier for me to do the documentation myself, as

23   opposed to trying to track someone down at Mayer Brown.  And I

24   just did it.

25   "Q. Now, Mr. Maggio, you mentioned earlier during your

CAFPCOL2                    "Maggio" - direct

1   testimony about Refco's efforts to manipulate income and pad

2   revenue.  Do you remember that?

3   "A. Yes, sir.

4   "Q. Did revenue padding continue?

5   "A. Yes.

6   "Q. How did it continue in late 2005?

7   "A. Two ways.  One was journal entries.  One was because Refco

8   Group Holdings had such a large debt that they owed interest

9   on, we increased the interest rate to 36 percent.

10  "Q. Mr. Maggio, drawing your attention to August and

11  September 2005, did you start getting questions from anyone

12  inside Refco at that time?

13  "A. Yes.

14  "Q. Who did you start receiving questions from?

15  "A. Peter James.  He was the new controller of Refco Capital

16  Markets.

17  "Q. When was Mr. James' hired by Refco?

18  "A. Summer of 2005.

19  "Q. Had he been informed about the fraud that had been

20  occurring at Refco?

21  "A. No.

22  "Q. So when he started asking questions, what kinds of

23  questions did he start asking you?

24  "A. The first question was on -- I believe, on the receivable

25  by RGHI and the short-term loan we made to Liberty Corner.

CAFPCOL2                        "Maggio" - direct

1          And then the next set of questions was about the

2     extremely high interest rate that RGHI was paying on their

3     loan.

4     "Q. Did Mr. James uncover or find the existence of the

5     receivable?

6     "A. Yes.

7     "Q. And did he confront you about that?

8     "A. Yes.

9     "Q. When he confronted you about it, what did you do?

10    "A. Basically, I told him it was none of his business, but then

11    I went to talk to Phil.

12    "Q. What happened next?

13    "A. What happened next was that Phil said he was going to talk

14    to Gerry and everything would be straightened out.

15    "Q. Who is Gerry?

16    "A. Gerry Sherer.  I'm sorry.  Who was now the CFO.

17    "Q. When was Mr. Sherer hired?  It was after the leverage

18    buyout transaction?

19    "A. He was hired in January of 2005, after the IPO.

20    "Q. Had he been included in the loop on the fraud?

21    "A. No.

22    "Q. Mr. Maggio, let me draw your attention to the week of

23    October 3rd, 2005.  What happened early on in that week?

24    "A. Dennis Klejna came to my office and told me that there was

25    a major problem, and that Gerry Sherer had uncovered something

1    and was going to call an emergency meeting for the board.

2    "Q. I'm sorry, what was the name?  Who told you this?

3    "A. Mr. Dennis Klejna, who was general counsel of Refco.

4    "Q. Mr. Maggio, when this happened, where was Mr. Bennett?

5    "A. Mr. Bennett was in Asia on a business trip.

6    "Q. What did you do after Mr. Klejna came to you?

7    "A. I desperately tried to each Phil.  U.S. cell phones do not

8    work in Japan.  So I finally found him through one of the Refco

9    employees in Tokyo, and I was able to reach him.

10   "Q. What did you say Mr. Bennett when you reached him?

11   "A. I told Gerry that -- I told him that Gerry was going to go

12   in front of the board, and he said something to the effect

13   that, 'Oh, he was going to wait until I came back before we did

14   this, so we can discuss this.  All right.  They're going to

15   find out what's going on.  I'm going to go to jail.'

16   "Q. And what did you say to him?

17   "A. I told them that -- to get a grip and to -- the first thing

18   he must do is call Scott Schoen, and that it's better that he

19   hear about this situation from you as opposed to a third party;

20   Scott Schoen being one of the representatives from Lee who was

21   on the board of directors.

22           And then Phil said, yes, he was going to do that.  And

23   then he said I need to do something about the debt.

24           (Continued on next page)

25

1   "Q  And when he said 'the debt,' which debt was that?

2   "A  The debt was the debt that RGHI had on the books at Refco.

3   And I -- he said, well, maybe BAWAG could lend me the money.

4           "I said, would you want me to call Thomas Hackl and

5   see if he can structure something?

6           "And he said, yes, why don't you do that.  In the

7   meantime, I'll start making my way back to New York.

8   "Q  And, again, this is the debt than RGHI owed to Refco, is

9   that right?

10  "A  Yes.

11  "Q  And did you have a conversation with Mr. Hackl?

12  "A  Yes, I did.  I spoke to Mr. Hackl.  I told him that Phil --

13  there was a disclosure issue on our filings.  Phil needs to

14  borrow approximately $400 million on what is now considered, if

15  you take all the stock that he owned, a billion dollars worth

16  of stock that was worth -- that's what the stock was selling

17  for, the worth of all the stock selling for on the New York

18  Stock Exchange.

19          "Thomas said, Well, we've had worse issues.  I'll talk

20  to -- I'll talk to BAWAG and I'll get back to you.

21  "Q  And, Mr. Maggio, what was the purpose of this money that

22  you were going to try and get from BAWAG?  What was it going to

23  be used for?

24  "A  It was going to be used to pay off the Refco Group

25  Holdings' loan at Refco Group, Limited.

1   "Q   Did Mr. Hackl get back to you?

2   "A   Yes, he did.  He got back to me, told me that there

3   shouldn't be any problem; that someone is going to contact him,

4   meaning Phil Bennett, I think his name was Mr. Sari, and so the

5   process of him getting a loan was in the works.

6   "Q   Drawing your attention to Wednesday, October 5th.  What

7   happened that evening?

8   "A   Mr. Bennett finally arrived from New York -- I mean, from

9   Tokyo, and I met him at the Marriott Hotel right by the World

10  Financial Center, World Trade Center, early evening in the bar.

11  And we had a drink and we just discussed the issue.

12  "Q   And what was Mr. Bennett's demeanor at this time?

13  "A   Mr. Bennett was -- you know, I've rarely seen him like

14  this.  He seemed to be distraught.  He seemed to -- he was very

15  concerned about his meeting with the Board of Directors.  He

16  was very concerned about his family and what is his wife going

17  to say.

18          "And I told him, I said, listen, I can't do it.  You

19  have to be strong.  You have to go there.  You have to come up

20  with a plan.  And that's the way we left it.

21  "Q   What happened the next day, Thursday?

22  "A   Phil had the meeting with the Board of Directors.  And he

23  came back, passed by my office, and he said, well, Sandy, you

24  bet the wrong horse.

25          "And I spoke to Dennis Klejna that afternoon, and I

1    told him that I would like to speak to the Board of Directors

2    myself.  I told Dennis that I would try to do everything

3    possible in my power so that they could not disclose the

4    exactly -- the fraud that was going on.  And I said, I want to

5    speak to the board.

6    "Q  And did you talk to the board on Friday morning, the next

7    day?

8    "A  Yes.  Early next morning I spoke to the Board of Directors,

9    and I told them in a nutshell certain aspects of the fraud that

10   was going on, the RGHI loan, the receivable.  I told them that

11   if they removed Phil Bennett, that the firm was going to go

12   bankrupt; that it would be -- there's too many people, too many

13   banks, too many customers who trust Phil.  And the moment that

14   he's gone, the firm will -- all the customers will withdraw

15   their money.  The banks will cut their credit lines.  The

16   clearing course would go ahead and put further restrictions on

17   him.  And the bank -- the firm will be bankrupt, bankrupt by

18   the end of the week.

19   "Q  And so what did you propose to the board?

20   "A  I proposed that what they should do is to keep Phil and to

21   make me the scapegoat, that there were too many people at the

22   firm that depended on him.  And where were these people going

23   to get jobs, like Carol, who worked for me, or Karen, who

24   worked for Phil, secretaries?  And I said, please, make me a

25   scapegoat.  I don't care, all right, but you got to save Phil

Cafdcol3                          "Maggio - direct

1   because that's the only way to save this firm.

2   "Q  Now, Mr. Maggio, you said that you told the board about the

3   balance that was owed from RGHI to Refco.  Were you entirely

4   truthful during this meeting?

5   "A  No.

6   "Q  Did you tell them about the interest rate or did you lie

7   about the interest rate?

8   "A  Yes.

9   "Q  Did you disclose the --

10  "A  I didn't lie.  I just didn't tell them.

11  "Q  You failed to tell them about the interest rate?

12  "A  Yes, sir.

13  "Q  And did you disclose generally the revenue padding that you

14  had participated in?

15  "A  Yes.

16  "Q  Now, Mr. Maggio, what happened on Friday, October 7th?

17  What happened after this meeting, Mr. Maggio, with the board?

18  "A  What happened with the board?

19  "Q  What happened after your meeting with the board?

20  "A  I went back to the office.  I asked Dennis Klejna whether

21  or not I needed to take some personal articles out of the

22  office, because I was assuming at that point that they were

23  going to -- that they were going to terminate me.  He said he

24  couldn't get permission to do that.

25          "I left the office.  I went to -- I went to visit an

1   attorney, and I think that evening I got notice that I was

2   temporarily put on a leave of absence.

3   "Q   And, Mr. Maggio, over the course of your testimony the past

4   few days, you mentioned that you lied to a number of

5   individuals and entities during your time at Refco, is that

6   right?

7   "A   Yes.

8   "Q   Now, have you testified about every lie you've ever told?

9   "A   No.

10  "Q   And is that because you were only answering the questions I

11  asked you?

12  "A   Yes.

13  "Q   Mr. Maggio, what did Refco do on October 10, 2005?

14  "A   Refco I think made a press release or announcement about

15  the 400-some-odd million-dollar receivable.  They had announced

16  the suspension of myself and also Phil Bennett.

17  "Q   And, Mr. Maggio, where were you on Monday, October 10,

18  2005, when this announcement was made?

19  "A   I was in the -- I was at the U.S. Attorney's Office at St.

20  Andrew's Plaza.

21  "Q   And, Mr. Maggio, did you lie on that day?

22  "A   No.

23  "Q   No further questions."

24          THE COURT:  OK.  Ladies and gentlemen, we've concluded

25  the direct examination of Mr. Maggio, so this might be a nice

Cafdcol3                          "Maggio – direct

1    time to have a break.

2             Would you follow the normal instructions.  Leave any

3    exhibits here.  Take your books with you.  Please do not

4    discuss the case.

5             I look forward to seeing you in a few minutes.

6             Good morning.

7             THE CLERK:  All rise.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (Jury not present)

2             THE COURT:  Anything else on the record, friends?

3             MR. SCHWARTZ:  Your Honor.

4             THE COURT:  Sir.

5             MR. SCHWARTZ:  Before we begin to read, I'm going to

6      offer the exhibits we offered through him.

7             In addition, I want to offer Defense Exhibit 2, which

8      was offered through another witness before he testified but was

9      shown to him.  It was offered through Mr. Trosten.

10            THE COURT:  OK.  Anybody care?

11            MR. CHERNOFF:  That's fine with us.

12            (Counsel conferred)

13            MR. SCHWARTZ:  Your Honor, I have for the Court the

14     redacted version.

15            THE COURT:  Thank you.  Of?

16            MR. SCHWARTZ:  Of what's coming up.

17            THE COURT:  Cool.  How long do we think the

18     testimony -- off the record.

19            (Discussion off the record)

20            (Recess)

21            (Jury not present)

22            THE COURT:  Won't you be seated, friends.

23            May we bring the jurors in, please?

24            Off the record.

25            (Discussion off the record)

Cafdcol3                         "Maggio - direct

 1          THE CLERK:  Jurors entering.

 2          (Jury present)

 3          THE COURT:  Thank you.  Won't you be seated.

 4          Mr. Imperatore.

 5          MR. IMPERATORE:  Your Honor, the government at this

 6   time offers all the government exhibits covered by Mr. Maggio's

 7   testimony.

 8          THE COURT:  Thank you.  You will give the court

 9   reporter a list, right?

10          MR. IMPERATORE:  Yes, your Honor.

11          THE COURT:  Thank you.

12          Cross-examination, Mr. Schwartz.

13          MR. SCHWARTZ:  Your Honor, before we begin, the

14   defense offers Defense Exhibit 2, Defense Exhibit 713 and

15   Defense Exhibit 737.

16          THE COURT:  Received.

17          (Defendant's Exhibits 2, 713 and 737 received in

18   evidence)

19          THE COURT:  Yes, sir.

20   CROSS-EXAMINATION

21   BY MR. SCHWARTZ:

22   Q.  Good morning, Inspector Clark.

23   A.  Good morning.

24   Q.  I see you have been able to maintain your health during the

25   reading of the direct.

Cafdcol3                         Clark - cross

1    A.  Yes, sir.

2    Q.  Shall we read some cross?

3    A.  I don't have anything in front of me.

4           THE COURT:  Here you go.  Here is one for you.  You

5    can have mine.

6           THE WITNESS:  Thank you.

7           (Pause)

8           MR. SCHWARTZ:  (Reading)

9    "Q  Mr. Maggio, in 2002 you testified before a jury, correct?

10   "A  Yes.

11   "Q  At a trial here in New York?

12   "A  Yes.

13   "Q  About Refco?

14   "A  Yes.

15   "Q  You took an oath to tell the truth as a witness?

16   "A  Yes.

17   "Q  And you looked at the jury and you proceeded to lie under

18   that oath, correct?

19   "A  Yes.

20   "Q  You lied not only to the jury but to the judge who was

21   presiding over the case?

22   "A  Yes.

23   "Q  You lied to the lawyer who was asking you questions, right?

24   "A  Yes.

25   "Q  And not just one lie, sir, more than one lie, right?

 1   "A   Yes.

 2   "Q   And Joe Collins was not representing you in that matter,

 3   right?

 4   "A   No.

 5   "Q   And no one caught you lying in that proceeding, sir,

 6   correct?

 7   "A   Correct.

 8   "Q   You were never asked to withdraw your testimony or charged

 9   with perjury, right?

10   "A   Correct.

11   "Q   So you lied to another jury in 2004, correct?

12   "A   Yes.

13   "Q   And that again was here in New York, right?

14   "A   Yes.

15   "Q   You took the oath again?

16   "A   Yes.

17   "Q   You swore to tell the truth?

18   "A   Yes.

19   "Q   And you violated it?

20   "A   Yes.

21   "Q   Different jury, but you lied to them again; you told lies

22   again, right?

23   "A   Yes.

24   "Q   Mr. Collins was not representing you, had nothing to do

25   with that case, right?

Cafdcol3                              "Maggio - cross

1    "A   Yes.

2    "Q   And you also lied under oath in something called

3    depositions, right, sir?

4    "A   Yes.

5    "Q   And depositions are proceedings outside of a courtroom but

6    they're still under the supervision of a court, right?

7    "A   Yes.

8    "Q   And you've lied in at least several depositions without

9    Mr. Collins being your counsel, correct?

10   "A   That's not true.

11   "Q   That's not true?  You've told the truth in those

12   depositions?

13   "A   No.  Excuse me.  I misunderstood the question.  Could you

14   repeat that question?

15   "Q   Sure.  You've lied in at least several depositions without

16   Mr. Collins being your counsel?

17   "A   And also in a deposition with Mr. Collins as my counsel.

18   "Q   Answer my question, sir.

19          "Several depositions that had nothing to do with Joe

20   Collins, you lied, correct?

21   "A   Yes.

22   "Q   Took an oath for those depositions?

23   "A   Yes.

24   "Q   A court reporter taking down your testimony?

25   "A   Yes.

1    "Q  And you proceeded to say things that weren't true, right?

2    "A  Yes.

3    "Q  You did that, sir, with a number of different lawyers

4    representing you, right?

5    "A  Yes.

6    "Q  You mentioned Mr. Weinberg, but you've lied under oath with

7    other attorneys, correct?

8    "A  Yes.

9    "Q  And you've lied under oath many times, right?

10   "A  Yes.

11   "Q  More times than you can put a number on, sir, correct?

12   "A  Yes.

13   "Q  You lied in a deposition concerning Genira, right?

14   "A  Yes.

15   "Q  One concerning Trade Winds, right?

16   "A  Yes.

17   "Q  And one concerning Carlin Equities, right?

18   "A  Yes.

19   "Q  And in none of those was Joe Collins involved?

20   "A  Yes.

21   "Q  And in those proceedings, Mr. Maggio, you lied on your own

22   initiative, right?

23   "A  Yes.

24   "Q  You didn't have a lawyer whispering in your ear and telling

25   you how to lie, correct?

Cafdcol3                              "Maggio - cross

1    "A   Yes.

2    "Q   You lied, in fact, without telling your lawyers that you

3    were lying, right?

4    "A   Yes.

5    "Q   They had preparation sessions with you before you

6    testified, right?

7    "A   Yes.

8    "Q   Asked you the same questions on the same topics that you

9    were about to be examined about under oath, right?

10   "A   Yes.

11   "Q   And in those preparation sessions you looked at them

12   face-to-face and did not tell them the truth, right?

13   "A   Yes.

14   "Q   And just to be clear, sir, you were lying independently of

15   any lawyer's advice in those proceedings, correct?

16   "A   The proceedings without Mr. Collins?

17   "Q   Yes.

18   "A   Yes.

19   "Q   You were lying all by yourself, right?

20   "A   Yes.

21   "Q   You've testified that in 1993 back at the CFTC you went to

22   Joe Collins so that he could teach you how to lie, right?

23   "A   I didn't say that.

24   "Q   Well, you said, I went to Joe, I was concerned, I was

25   petrified, had these issues.  I said, Joe, here are the issues.

Tell me what to do.  And you said he proceeded to tell you how

to misdirect, I think was your word, how to misdirect the

regulators, right?  Wasn't that your testimony?

"A  Yes.

"Q  But, sir, you were perfectly capable of lying on your own

without a lawyer's advice, correct?

"A  Yes.

"Q  You're perfectly capable of lying to regulators like the

CFTC on your own without a lawyer's advice, correct?

"A  At that time, no.

"Q  At that time, no, because at that time you were an innocent

waiting to be initiated into the world of lies; is that why?

"A  That was the first time that I was in a situation like

that, the previous depositions, and the previous depositions I

was not in that position.

"Q  Let me understand:  Before you even set foot in Refco,

before you even met Mr. Bennett, you worked for a company

called Inland Consulting, right?

"A  Yes.

"Q  You committed bribes there, right?

"A  Yes.

"Q  Money laundering, right?

"A  Yes.

"Q  Tax evasion?

"A  Yes.

Cafdcol3                          "Maggio - cross

1   "Q  You arranged the books so it would look like the checks you

2   were writing on the bribes were legitimate, right?

3   "A  Yes.

4   "Q  You were able to do all that before you met Mr. Collins,

5   right?

6   "A  Yes.

7   "Q  And before your CFTC proceeding, you helped execute a plan

8   to siphon out $25 million of customer money, right?

9   "A  Yes.

10  "Q  That was supposed to be in a safe place, right?

11  "A  Yes.

12  "Q  That's what the customers were told, right?

13  "A  Yes.

14  "Q  You created false documents to perpetuate that fraud,

15  right?

16  "A  Yes.

17  "Q  You took steps to hide what you were doing from regulators,

18  like the CME, when they asked for the documents, right?

19  "A  Yes.

20  "Q  And you're telling us that when you walked into Joe

21  Collins' office, or when you met with him in 1993, at that

22  point you needed advice from him on how to lie?

23  "A  Yes.

24  "Q  Because you couldn't tell a fib or cheat on your own; is

25  that your testimony, sir?

Cafdcol3                          "Maggio - cross

1   "A   Sir, that was the first time I was being deposed in a

2   situation like that.  I was told to trust him, and I did.

3   "Q   And, sir, you have lied perfectly well in many other

4   proceedings without a lawyer giving you any tips, right?

5   "A   Yes.

6   "Q   Perfectly well in many other proceedings without Joe

7   Collins teaching you how to lie, right?

8   "A   Yes.

9   "Q   You consider yourself a good liar, don't you?

10  "A   I'm sorry.  I didn't hear you, sir.

11  "Q   You consider yourself a good liar?

12  "A   Yes.

13  "Q   You lied on a regular basis as part of your day-to-day work

14  for Refco?

15  "A   Yes.

16  "Q   That's what you got paid for at Refco, right?

17  "A   Yes.

18  "Q   To tell lies, right?

19  "A   Yes.

20  "Q   That's why you got the stay-put bonus, right?

21  "A   Yes.

22  "Q   Mr. Bennett wanted you to stay put so you could lie for

23  him, right?

24  "A   Yes.

25  "Q   You lied to auditors, right?

Cafdcol3                          "Maggio – cross

1    "A   Yes.

2    "Q   Joe Collins didn't need to teach you how to lie to

3    auditors, did he?

4    "A   No.

5    "Q   You lied to auditors repeatedly, right?

6    "A   Yes.

7    "Q   And that's because you needed them to bless financial

8    statements, right?

9    "A   Yes.

10   "Q   You needed them to give credibility to Refco's financial

11   statements to the outside world, right?

12   "A   Yes.

13   "Q   You hid the truth from them, right?

14   "A   Yes.

15   "Q   And that was so that you could use them in representing

16   Refco to the outside world, right?

17   "A   Yes.

18   "Q   You also lied to rating agencies, right?

19   "A   Yes.

20   "Q   You needed them to rate Refco for outside investors, right?

21   "A   Yes.

22   "Q   You never told them about the hole, right?

23   "A   Hole?   Meaning the RGHI receivable?

24   "Q   Let's talk about the hole.   'Hole' is a word that you've

25   used, sir, right?

1    "A   Yes.

2    "Q   You've used it throughout your testimony, right?

3    "A   Yes.

4    "Q   RGHI, the parent company, had a big debt that it owed to

5    Refco Group, Limited, right?

6    "A   Yes.

7    "Q   That was a debt that kept growing, right?

8    "A   Yes.

9    "Q   Sometimes called intercompany debt or shareholder loans,

10   right?

11   "A   Related party debt.

12   "Q   Related party debt.  And the hole is that large portion of

13   it that was not disclosed, correct?

14   "A   Yes.

15   "Q   That's how you used the term, right, sir?

16   "A   Yes.

17   "Q   You didn't tell these rating agencies about the hole?

18   "A   No.

19   "Q   And you lied repeatedly to investment banks as well,

20   correct?

21   "A   Yes.

22   "Q   CSFB, you describe as the premier investment bank, right?

23   "A   One of the premier investment bankers, yes.

24   "Q   You were able to lie to them successfully, right?

25   "A   Yes.

1  "Q  And, again, you needed that bank to add credibility to

2  Refco in dealings with the outside world, right?

3  "A  Yes.

4  "Q  These were all outside professional firms and institutions,

5  right?

6  "A  Yes.

7  "Q  Not employed directly by Refco, right?

8  "A  Yes.

9  "Q  They have their own buildings and offices outside of Refco?

10  "A  Yes.

11  "Q  And they have to go through you, sir, and others at Refco

12  to get the information they need to do their work and present

13  Refco?

14  "A  Yes.

15  "Q  You and others at Refco decide what information to give

16  them and what information not to give them, right?

17  "A  Yes.

18  "Q  These outside firms are -- have -- when you dealt with

19  those outside firms, you dealt with a range of experienced and

20  sophisticated professionals, right?

21  "A  Yes.

22  "Q  Who had spent many years in the business world, right?

23  "A  Yes.

24  "Q  And you successfully lied to them, correct?

25  "A  Yes.

1   "Q  And they took the false information that you gave them and
2   passed it on to the outside world, right?
3   "A  Yes.
4   "Q  You have used these innocent outside firms to help carry
5   out Refco's fraud?
6   "A  Yes.
7   "Q  And you hid critical facts from them, sir -- critical facts
8   from them?
9   "A  Excuse me, sir?
10  "Q  You hid critical facts from them?
11  "A  Yes.
12  "Q  Mr. Maggio, you even lied successfully to some of your
13  close personal friends?
14  "A  As relates to work, as it relates to business.
15  "Q  Rich Casa, for example?
16  "A  That's correct, yes.
17  "Q  Close personal friend of yours that worked at Chemical
18  Bank, right?
19  "A  Yes.
20  "Q  There was a crisis in 1997, and you needed millions of
21  dollars, right?
22  "A  Yes.
23  "Q  And you called him up and told him a lie?
24  "A  Yes.
25  "Q  He didn't question what you were telling him, right?

Cafdcol3                          "Maggio – cross

1    "A   No.

2    "Q   You've lied to your coworkers at Refco?

3    "A   Yes.

4    "Q   You've lied to numerous investors, right?

5    "A   Yes.

6    "Q   You've lied to the IRS?

7    "A   Yes.

8    "Q   To the National Association of Securities Dealers?

9    "A   Yes.

10   "Q   To hedge funds?

11   "A   Yes.

12   "Q   To the United States Attorney's office?

13   "A   Yes.

14   "Q   To numerous counterparties at various contractual

15   obligations that Refco had, right?

16   "A   Yes.

17   "Q   In fact, you lied on a daily basis for a period of over

18   five years to people that Refco owed money, right?

19   "A   Yes.

20   "Q   And, sir, you have lied successfully even when you're under

21   intense scrutiny?

22   "A   I didn't get the last part, please.

23   "Q   You have managed to lie even when you are under intense

24   scrutiny?

25   "A   I don't quite understand the question.

1    "Q  Well, in 2004 a firm called Thomas H. Lee took over a

2    majority interest at Refco, right?

3    "A  Yes.

4    "Q  Mr. Trosten was no longer the Chief Financial Officer,

5    right?

6    "A  He left, I think, in September of 2004.

7    "Q  And a new Chief Financial Officer came in who knew nothing

8    about the fraud, right?

9    "A  Yes.

10   "Q  And there was at this point a board overseeing the company

11   that had people from Thomas H. Lee on it, right?

12   "A  Yes.

13   "Q  And there's something called an Audit Committee on that

14   board, right?

15   "A  Yes.

16   "Q  And those are outside independent professionals who come in

17   to oversee the audit process, correct?

18   "A  Yes.

19   "Q  And they can demand to see information, correct?

20   "A  Yes.

21   "Q  And all of these people, the new CFO, the Audit Committee,

22   the board were there watching what was happening at Refco,

23   correct?

24   "A  Yes.

25   "Q  You told Mr. Bennett that you were concerned that the

1  scrutiny would increase once Lee took over the company, right?

2  "A  Yes.

3  "Q  Yet you continued to commit fraud right under their noses

4  for the next 15 months without being detected?

5  "A  Yes.

6  "Q  You lied to Refco's board, right?

7  "A  Yes.

8  "Q  Even after the fraud was discovered?

9  "A  Yes.

10  "Q  Even after the wrongdoing was found, you continued to play

11  with the truth, right?

12  "A  I didn't disclose all of the fraud that was going on at

13  Refco at the time in front of the board.

14  "Q  Didn't disclose most of it, right?

15  "A  Oh, I disclosed about the receivable, and that was most of

16  it, sir.

17  "Q  You lied to the board about a number of things, right?

18  "A  I did not tell the entire truth at the board.

19  "Q  And, sir, we've been talking about lies, but you have also

20  created fake and bogus documents, right?

21  "A  What do you mean by fake and bogus documents, sir?

22  "Q  Well, you were asked by BAWAG at one point to set up a set

23  of completely fictitious accounts?

24  "A  It wasn't documents, sir.  It was an account on Refco, and

25  the answer is yes.

1    "Q   Using a computer?

2    "A   Using a computer.

3    "Q   So you put fake information into a computer, right?

4    "A   Yes.  We put fake bonds with a value on the computer.

5    "Q   And this wasn't just you are confronted and you coughed out

6    a lie, right; this is you set out to create a complete

7    fabrication, correct?

8    "A   Yes.

9    "Q   And you created phony accounts, right?

10   "A   Yes.

11   "Q   With phony values?

12   "A   Yes.

13   "Q   And that wasn't to help Refco hide a fraud; that was to

14   help BAWAG hide a fraud?

15   "A   Yes.

16   "Q   Mr. Maggio, when you commit perjury, do you start to sweat?

17   Is there any way someone can tell whether you're lying or not?

18   "A   I'm sorry.  Could you repeat that?

19   "Q   Sure.  When you commit perjury, when you lie to a jury, do

20   you start to sweat?  Do your eyebrows arch?  Is there anything

21   that gives away what you're doing?

22   "A   Sir, I'm not going to answer that.  I don't know.

23   "Q   Is there any objective way that a jury can tell when you're

24   lying as opposed to when you're telling the truth?

25   "A   I can tell you I'm telling the truth now.

Cafdcol3                          "Maggio – cross

1   "Q   Any objective way they can know that?

2   "A   I can tell you I'm telling the truth now.

3   "Q   We have your good word on that, sir?

4   "A   You have my good word on it.

5   "Q   Let's talk about the money that you made at Refco.  This is

6   the money you made by lying, right?

7   "A   Yes.

8   "Q   You started out your career at a number of different firms,

9   right?

10  "A   Yes.

11  "Q   But you never made the kind of money there that you made at

12  Refco, right?

13  "A   That's correct.

14  "Q   When you finished at Refco, you had invested in race

15  horses?

16  "A   Yes.

17  "Q   And fine wines?

18  "A   Yes.

19  "Q   And you had a number of homes?

20  "A   Yes.

21  "Q   And boats?

22  "A   Yes.

23  "Q   And at the end of the day you had to forfeit whatever you

24  had left, right?

25  "A   Yes.

Cafdcol3                    "Maggio – cross

1  "Q  And you forfeited cash and assets totaling $23 million, is

2  that correct?

3  "A  Yes.

4  "Q  Part of that 23 million was funded by the $7 million bonus

5  for just staying put that we've already discussed?

6  "A  Excuse me?

7  "Q  Part of the money you earned came from the $7 million

8  stay-put bonus that we've already discussed, right?

9  "A  Yes.

10  "Q  And there was a point while you were working at Refco where

11  you got an interest in the profits of the company, right?

12  "A  Yeah, the profits participation money.

13  "Q  And there came a point where Mr. Bennett agreed to buy that

14  interest out from you, right?

15  "A  I don't know if it was Refco Group, Limited or who bought

16  the interest -- it could have been Mr. Bennett, RGHI.

17  "Q  But you'd gotten money in exchange for giving up that

18  interest, right?

19  "A  Yes.  Yes, sir.

20  "Q  And you got $8.3 million, correct?

21  "A  I believe so.

22  "Q  But you wanted more?

23  "A  Yes.

24  "Q  And you went to Mr. Bennett in July 2005, correct?

25  "A  Yes.

Cafdcol3                          "Maggio – cross

1   "Q   And the IPO, the sale of the stock to the public, was just

2   around the corner, correct?

3   "A   Yes.

4   "Q   And you were in the midst of an SEC investigation

5   concerning Sedona, correct?

6   "A   Yes.

7   "Q   And Mr. Bennett wanted the SEC investigation resolved

8   before the IPO, right?

9   "A   Yes.

10  "Q   And it was in your hands whether to fight with the SEC or

11  to settle with them in resolving before the IPO, right?

12  "A   Yes.

13  "Q   You knew when you met with Mr. Bennett that Mr. Murphy had

14  gotten more money from him, right?

15  "A   Yes.

16  "Q   You knew that someone named Mr. Fetner had held him up

17  successfully for more money?

18  "A   Years earlier, yes.

19  "Q   And you knew that Mr. Bennett wanted that SEC case

20  resolved, right?

21  "A   Yes.

22  "Q   He agreed in that meeting to give you another $5.2 million,

23  right?

24  "A   Yes.

25  "Q   In other words, he'd already bought out your interest in

Cafdcol3                        "Maggio - cross

1  the profits of the company before --

2  "A   Yes.

3  "Q   At least one year before, right?

4  "A   Yes.   There were still payments that had to be made over --

5  it was an installment period, but yes.

6  "Q   Even though that deal was done in the course of this

7  meeting, you convinced him to give you another 5.2 million,

8  right?

9  "A   Yes.

10  "Q   Can we put Government Exhibit 2124 on the screen, please.

11         "You saw this on your direct examination, Mr. Maggio,

12  right?

13  "A   Yes.

14  "Q   This is the agreement where Mr. Bennett agreed to give you

15  another $5.2 million, right?

16  "A   Yes.

17  "Q   It's on his letterhead, his personal letterhead, Phil

18  Bennett?

19  "A   Yes.

20  "Q   It's to you.   And this agreement is one that you never

21  disclosed in any public filing connected to the IPO, correct?

22  "A   Yes.

23  "Q   It's dated July 25, 2005, right?

24  "A   Yes.

25  "Q   The IPO was on August 5, 2005, right?

1    "A   Yes.

2    "Q   And you Mr. Bennett kept this to yourself, right?

3    "A   I don't know.   I do not know who did -- if Mr. Bennett

4    disclosed it to anyone, but I did not.

5    "Q   You did not disclose it to anyone else, right?

6    "A   Yes.

7    "Q   Never told Mayer Brown about it, right?

8    "A   I don't recall telling them.

9    "Q   You have no recollection whatsoever of ever telling them,

10   right?

11   "A   No.

12   "Q   And after the IPO, we talked about an IPO that was on

13   August 5th, right?

14   "A   Yes.

15   "Q   And that's when all of Refco's stock is sold to the public,

16   right?

17   "A   No, just a portion.

18   "Q   A portion -- excuse me.   That's when a portion of Refco's

19   stock is sold to the public, right?

20   "A   Yes.

21   "Q   And the people who are interested in buying the stock can

22   read something called a prospectus, right?

23   "A   Yes.

24   "Q   Where they learn about the company and its officers and

25   decide whether it's a good investment, right?

Cafdcol3                    "Maggio – cross

1   "A   Yes.

2   "Q   And you did not disclose to them that you had gotten this

3   additional $5 million payment, correct?

4   "A   Yes.

5   "Q   In fact, there was an initial form filed –– public filing

6   in connection with the IPO called an S1 Form, correct?

7   "A   Yes.

8   "Q   And in that form you didn't even mention the first $8

9   million that you got, right?

10  "A   Yes.

11  "Q   You hid that back, you hid that and lied about your

12  compensation, correct?

13  "A   Yes.

14  "Q   And then you cut this private deal with Mr. Bennett in late

15  July, right?

16  "A   Yes.

17  "Q   Your IPO offered to the public on August 5th, right?

18  "A   Yes.

19  "Q   And then a few days later, on August 8th, there is an

20  amendment to the Form S1 that was filed in connection with the

21  IPO, correct?

22  "A   I believe so, yes.

23  "Q   And in that amendment you were asked to come clean and

24  disclose the amount of your financial interest in the profits

25  of Refco, correct?

```
 1    "A   Yes.

 2    "Q   And this is on August 8th, at least two weeks after you

 3    signed the letter on July 25th, right?

 4    "A   Yes.

 5    "Q   And in that amendment you didn't tell anyone about this

 6    additional $5 million, right?

 7    "A   No.

 8    "Q   You hid it?

 9    "A   Yes.

10    "Q   In fact, sir, you committed perjury at yet another

11    proceeding about this $5 million, right?

12    "A   I need to recall -- I need -- yes.

13    "Q   You were asked questions about it under oath and you lied,

14    right?

15    "A   Yes.

16    "Q   You lied without telling your lawyers, right?

17    "A   Yes.

18    "Q   You were asked how much money you made at Refco in

19    connection with selling a profit's interest.  You said 8

20    million, not $13 million, right?

21    "A   What proceeding was that, sir?

22    "Q   It's a proceeding in which you were represented by Mayer

23    Brown.

24    "A   What proceeding was that?  I'm missing something.

25    "Q   Let's go over it slow.  Do you remember claims being
```

Cafdcol3                          "Maggio – cross

1    brought by a gentleman named Mr. Macleric?

2    "A   Yes, CSFB.

3    "Q   He thought he should get some money in connection with the

4    Lee deal, right?

5    "A   Yes.

6    "Q   He thought he was entitled to a finder's fee for bringing

7    Lee and Refco together, right?

8    "A   Yes.

9    "Q   He commenced something called an arbitration against Refco,

10   correct?

11   "A   NASD arbitration.

12   "Q   Under the auspices of one of the major securities

13   regulators here in New York, right?

14   "A   Yes.

15   "Q   And you were a witness in that arbitration, right?

16   "A   Yes.

17   "Q   You testified under oath, right?

18   "A   Yes.

19   "Q   There was a court reporter, right?

20   "A   Yes.

21   "Q   And you were asked --

22   "A   Sir, could you just help my memory and tell me when that

23   arbitration was?  What date?

24   "Q   Well, the IPO was on August 5, right?

25   "A   Of 2005.

1   "Q   Does it refresh your recollection if I tell you that you

2   testified two days earlier, on August 3?

3   "A   Maybe.

4   "Q   And that would be about ten days after you got the

5   additional $5 million on July 25?

6   "A   Ten days?  Excuse me.

7   "Q   After you got Mr. Bennett to give you an additional $5

8   million, right?

9   "A   Mr. Bennett did not give me the –– Mr. Bennett did not give

10  me the five-million-two until such time as December 31, 2006.

11  "Q   But he agreed to give it to you, right?

12  "A   He certainly agreed, but the compensation was never

13  received.

14  "Q   So at this arbitration, sir, you were asked a number of

15  questions about the compensation that you were promised, right?

16  "A    Excuse me.  I don't have that here in front of me to

17  refresh my memory.

18  "Q   Well, isn't it a fact, sir, that at this proceeding you

19  referred a number of times to $8.4 million as the amount of

20  money that you got from the buyout of your profits interest?

21  "A   Sir, I don't have that in front of me, so you would have to

22  show me that.

23  "Q   Let me show it to you.

24  "A   Thank you.

25  "Q   I show you what's been marked 3501-78, pages 1778 through

Cafdcol3                          "Maggio - cross

1   20 --

2              "Mr. Maggio, can we pull up paragraph 2B of this

3   letter.  Let's first blow up Paragraph A.

4              "When this was just an $8 million buyout and not a $13

5   million buyout, you were supposed to get some installment

6   payments, right?

7   "A  Yes.

8   "Q  When you and Mr. Bennett signed this deal on July 25, it

9   was contemplated here in Paragraph A that the money would be

10  added to each of those installment payments for an

11  additional $5.2 million, right?

12  "A  Yes.

13  "Q  You were to get those on December 31, 2005, and

14  December 31, 2006, right?

15  "A  Yes.

16  "Q  Unless -- do you see the 'unless' at the end of A?

17  "A  Yes.

18  "Q  Unless prior to those dates Refco Group Ltd., LLC

19  successfully completes an initial public offering?

20  "A  Yes.

21  "Q  In which case those amounts will be payable upon the

22  closing of an IPO?

23  "A  Yes.

24  "Q  Now, Refco Group LLC did successfully complete an IPO,

25  right?

1    "A   Yes.  But I don't recall getting the payment, sir.

2    "Q   Before the dates --

3    "A   But I don't recall getting the payments.  I think they blew

4    up before the payments went out.

5    "Q   Well, you testified at this arbitration -- I will show this

6    to you to refresh your recollection.  Let me show this to you,

7    Mr. Maggio.

8              "Showing you 3501-78.  Look at these two.

9    "A   Is this in addition?

10   "Q   The same exhibit, some additional pages.

11   "A   OK.  Yes, sir.

12   "Q   You were asked about the amount of your profits interest,

13   right?

14   "A   They asked me what I was compensated.

15   "Q   And you told them $8.4 million, right?

16   "A   Yes, sir.

17   "Q   Not in excess of $13 million, right?

18   "A   That is correct.

19   "Q   At an arbitration there's someone called an arbitrator,

20   right?

21   "A   Yes.

22   "Q   Who's like a judge presiding over the proceeding, right?

23   "A   No, they are not a judge.  I don't know what an arbitrator

24   is legally.

25   "Q   You testified under oath at the arbitration that you felt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Cafdcol3                    "Maggio - cross

1    slighted that you were only getting $8.4 million and thought

2    you should be getting more, right?

3    "A   Yes.

4    "Q   You didn't let on to anyone that you had a private

5    arrangement with Mr. Bennett to get another $5 until, right?

6    "A   I would have to see that in the context of the thing.   That

7    is not in these documents you gave to me.

8    "Q   Joe Collins' law firm was representing you in this

9    arbitration, right?

10   "A   Yes.

11   "Q   You never told them about the $5.2 million?

12   "A   No, sir.

13   "Q   You hid it from them, right?

14   "A   I didn't hear the question.

15   "Q   You hid it from them, right?

16   "A   Did -- I hid the $5.2 million.

17   "Q   Yes.

18   "A   I did not reveal it to them.

19   "Q   Because if they had seen it, they would have known that you

20   had submitted false information in connection with a public

21   filing --

22   "A   I don't know that.

23   "Q   -- for the IPO?

24   "A   I don't know that, sir.  I don't know what they would have

25   done.

1   "Q  You made tens of millions of dollars at Refco, right?

2   "A  Yes.

3   "Q  And you still cheated on your taxes?

4   "A  Yes.

5   "Q  Mr. Maggio, you are here under an agreement with the

6   government, right?

7   "A  Yes.

8   "Q  A cooperation agreement, right?

9   "A  Yes.

10  "Q  You're facing a total of 65 years in prison, right?

11  "A  Yes.

12  "Q  And you are hoping to get probation, right?

13  "A  Yes.

14  "Q  Probation means no prison at all, right?

15  "A  Yes.

16  "Q  And you are hoping to get probation as a result of the

17  agreement that you entered into with the prosecutors?

18  "A  Yes.

19  "Q  Under the agreement it is your understanding that if you

20  provide substantial assistance to the government, they will

21  write a letter on your behalf to whichever judge sentences you,

22  right?

23  "A  My understanding is that if I cooperate with the U.S.

24  Attorney's Office, they will write what I believe is called a

25  5K letter.

Cafdcol3                    "Maggio - cross

1   "Q  I don't make that decision to write that letter, right?

2   "A  No, sir.

3   "Q  A judge doesn't make the decision to write that letter,

4   right?

5   "A  No, sir.

6   "Q  It is the government, the prosecutors, who make the

7   decision whether to write that letter on your behalf, right?

8   "A  That is correct.

9   "Q  They are the same ones who decide whether you have provided

10  substantial assistance, correct?

11  "A  I don't know.  My understanding is if I cooperate and they

12  deemed I cooperated and if I tell the truth, they will write a

13  5K letter.  That is my understanding about the cooperation

14  agreement.

15  "Q  Mr. Maggio, you want the judge who has final sentencing

16  authority over you to receive a letter from the government,

17  right?

18  "A  Yes.

19  "Q  And you believe that a letter like that may help lower your

20  sentence, right?

21  "A  Yes.

22  "Q  You want the strongest letter possible, right?

23  "A  Yes.

24  "Q  Let me put it this way, Mr. Maggio.  Would you lie if it

25  was in your own best interest?

1    "A   No, sir.  I've already cooperated with the U.S. Attorney's

2    Office.  I gave cooperation as it relates to three other people

3    who have now either pleaded guilty or are guilty.

4            "I have given a substantial amount of information as

5    relates to a fraud at BAWAG.  They've recovered hundreds of

6    millions of dollars.  I am not about to mess it up now at this

7    proceeding.

8    "Q   You started cooperating in October 2005, right?

9    "A   October 10.

10   "Q   That was shortly after the fraud had been discovered?

11   "A   That was the same holiday weekend it was discovered.

12   "Q   When you started cooperating, you went into the U.S.

13   Attorney's Office with the intention to tell all, to tell them

14   everything you know, right?

15   "A   Tell as much as I knew in that short period of time and

16   that day, yes.

17   "Q   You knew it was in your interest, sir, to give them as much

18   information as possible, right?

19   "A   As much as I could on that particular day.

20   "Q   You have met with this office on many different dates,

21   right?

22   "A   Yes.

23   "Q   Sometimes all day long, right?

24   "A   Yes.

25   "Q   And you know it is in your interest to identify as many

1    participants in the fraud as you can?

2    "A   Initially, it was explaining to them exactly what the fraud

3    was and the entire scope of the fraud.

4    "Q   Initially you explained to them the entire scope of the

5    fraud?

6    "A   Well, they didn't know anything about the business.  I had

7    to explain to them exactly what we did and the scope of the

8    fraud, so there was a learning curve.  There was a learning

9    curve.  So on the first day you don't go into everything or the

10   second day or the third day or even a fourth day, all right,

11   every little detail of every fraud.  You have to educate them

12   so that they know what the business is, and then you proceed

13   from there.

14   "Q   Right.  You didn't mention Joe Collins on the first day,

15   the second day, the third day, or the fourth day, right?

16   "A   I don't remember when the first time I mentioned

17   Mr. Collins.

18   "Q   You didn't mention Mr. Collins for the first year and a

19   half that you were cooperating with the government?

20   "A   Actually that is not true.

21   "Q   Not true?

22   "A   Not true.  I recall talking about the CFTC situation very

23   early on in my discussions with the U.S. Attorney's Office.

24   "Q   They took notes, right, when you met with them?

25   "A   Yes, they did.

Cafdcol3                    "Maggio - cross

1  "Q  When you told them things, they would write things down?

2  "A  Yes.

3  "Q  And do you remember, you started cooperating in October,

4  2005, right?

5  "A  October 10th.

6  "Q  Mr. Maggio, you testified, in response to some questions

7  that counsel asked you, that you met with Joe Collins back in

8  1993 when you were noticed to have your deposition taken in

9  connection with the CFTC proceeding, correct?

10  "A  Yes.

11  "Q  And what you told us was that you had a preparation session

12  with him prior to the deposition, right?

13  "A  Yes.

14  "Q  You felt you could trust him, right?

15  "A  Yes.

16  "Q  You said at the beginning words to the effect of, 'Joe, I'm

17  concerned that certain documents don't match up.' And he

18  proceeded in the course of the preparation to give you some

19  techniques on how to handle a deposition so that those facts

20  would be obscured, right?

21  "A  I believe what I said was, 'Joe, so you know, the

22  Manufacturers' statement does not match the statement we gave

23  to the FCM.'

24  "Q  Just you and Joe Collins were present, right?

25  "A  Yes, as far as I remember.

1   "Q   And that's because Mr. Bennett told you he was a lawyer you

2   could trust, right?

3   "A   Yes.

4   "Q   You said on direct this is like confession a sin, right?

5   "A   Yes.

6   "Q   And you wouldn't be comfortable saying these things in

7   front of any lawyer, right?

8   "A   I wasn't comfortable saying it, but Phil said I can trust

9   him.

10  "Q   You couldn't expect any lawyer to sit down with you and

11  tell you how to misdirect federal regulators, right?

12  "A   Could you repeat that?

13  "Q   I am asking you, you wanted the lawyer that Phil Bennett

14  recommended because you wanted to know how to deal with this

15  situation, right?

16  "A   Yes.

17  "Q   If this had been another lawyer that Mr. Bennett didn't

18  recommend, you never would have been so open, right?

19  "A   Yes.

20  "Q   And so you went in and you had this conversation with Joe

21  where you laid it all out, right?

22  "A   Yes.

23  "Q   By the way, you didn't tell him about the $25 million being

24  siphoned off, right?

25  "A   I believe he understood what I said.

1    "Q  You didn't tell him about it, sir, right?

2    "A  Sir, I disagree with you.  I believe he understood what I

3    was saying.

4    "Q  When you sat down with him face-to-face at that meeting,

5    you didn't mention the $25 million being siphoned off?

6    "A  Sir, he understood the transaction.

7    "Q  I'm not asking you your impression of what he understood.

8    I'm asking you what you said to him when you met with him.

9            "You never told him, sir, about $25 million being

10   siphoned off of customer funds, correct?

11   "A  I believe when I told him he understood what I meant.

12   "Q  What you told him about was documents, right, and not

13   about $25 million?

14   "A  Excuse me?

15   "Q  What you told him about was documents that didn't match,

16   but you didn't tell him about $25 million, right?

17   "A  I told him one statement didn't match the other statement.

18   "Q  You didn't say anything about $25 million being siphoned

19   off, right?

20   "A  I did not mention a number, but it was perfectly clear that

21   he understood what I was saying.

22   "Q  But you didn't tell him the real reason for the mismatch,

23   right, which was $25 million being siphoned off?

24   "A  Correct.

25   "Q  You and he proceeded to have open conversation in which you

1    confessed your sins and he told you how to deal with the

2    situation, right?

3    "A   Sir, I believe I was clear during direct and now that I

4    told him that the Manufacturers' statement did not match the

5    statement to the FCM.  That is my confession to him.

6    "Q   You don't have any notes or records of what you said to

7    Mr. Collins during that session, right?

8    "A   No.

9    "Q   We just have your recollection, right?

10   "A   Yes.

11   "Q   The deposition was in New York, right?

12   "A   I believe so.

13   "Q   Mr. Collins was at a Chicago law firm, the Schiff Hardin

14   law firm, at the time, right?

15   "A   Yes.

16   "Q   He flew in the day before to prepare you, right?

17   "A   I don't recall when the prep was.

18   "Q   Well, do you recall this, sir:  That a young lady named

19   Francine Tobin was there in the room the whole time, too?

20   "A   In the prep session?

21   "Q   Yes, sir.

22   "A   I don't recall.

23   "Q   That Mr. Bennett never told you that there was a Francine

24   Tobin who was no dummy, did he?

25   "A   No, he never said that.

Cafdcol3                    "Maggio - cross

1   "Q  Mr. Bennett never told you Francine Tobin was a lawyer you

2   could trust?

3   "A  No, he never said that.

4   "Q  She was there the whole time, wasn't she, sir?

5   "A  I don't know.  I just said I don't recall.

6   "Q  Well, let me see if I can refresh your recollection.

7           "I show you what's been be marked Defense Exhibit 748.

8   This is a copy of the transcript of your CFTC deposition,

9   right?

10  "A  Yes.

11  "Q  You testified yesterday that you were at the deposition

12  with Joe Collins, right?

13  "A  Could you repeat the question?

14  "Q  Yesterday you testified that you were at the deposition

15  with Joe Collins, right?

16  "A  Yes.

17  "Q  You didn't mention Ms. Tobin yesterday, right?

18  "A  I believe I did.

19  "Q  You did?

20  "A  He may have.

21  "Q  Can we have the transcript from yesterday?

22          "Weren't you asked these questions and did you give

23  these answers yesterday?  This is at page 2162, Mr. Maggio."

24          THE COURT:  For the reporter, could you just slow down

25  a little bit, please.

Cafdcol3                          "Maggio – cross

```
 1              MR. SCHWARTZ:  I apologize, your Honor.

 2              THE COURT:  Thank you.

 3              MR. SCHWARTZ:  (Reading)

 4              "This is at page 2162, Mr. Maggio.

 5   "'Q  During this deposition, was anybody present at the

 6   deposition with you?

 7   "'A   Yes.

 8   "'Q   Who was present?

 9   "'A   Joe Collins.'

10              "Do you recall being asked those questions and giving

11   those answers?

12   "A  I -- yes.

13   "Q  You didn't mention Ms. Tobin, did you?

14   "A  No, I did not mention Ms. Tobin.

15   "Q  OK.  The preparation session was the day before the

16   deposition, right?

17   "A  Yes.

18   "Q  Ms. Tobin and Mr. Collins worked in Chicago, right?

19   "A  I don't know where Ms. Tobin works.

20   "Q  She was one of Mr. Collins' -- Joe Collins' colleagues,

21   right?

22   "A  I don't know that.

23   "Q  She was at the preparation session the day before, correct?

24   "A  I do not recall that.

25   "Q  Now, you say that part of this preparation was to teach you
```

1    how to answer questions about these documents when they arose,

2    right?

3    "A  Yes.

4    "Q  The fact is, sir, you can't even remember going over any

5    documents with Joe Collins at the preparation session?

6    "A  No, I do not remember going over specific documents.

7    "Q  The $25 million that you didn't tell Mr. Collins about was

8    part of the hole, right?

9    "A  Was part of the hole?

10   "Q  Yes.

11   "A  First of all, I don't agree with you about telling him

12   about the $25 million.

13           "Second of all, the $25 million I guess was part of

14   the hole, the fact that the firm needed cash.

15   "Q  Referring to page 2158 of this transcript, do you recall

16   being asked these questions and giving these answers?

17   "'Q  You didn't mention the $25 million being siphoned off?

18   "'A  Right.

19   "'Q  In this preparation session, did you mention the fact

20   that $25 million was being siphoned off?

21   "'A  No.'

22           "Do you recall being asked those questions and giving

23   those answers?

24   "A  Yes.

25   "Q  That $25 million was the hole, part of the hole, right?

Cafdcol3                        "Maggio - cross

1    "A   I believe it was.

2    "Q   You didn't tell Mr. Collins about the hole, right?

3    "A   In 1993.

4    "Q   You didn't tell him about it in 1993, right?

5    "A   I didn't know there was a hole in 1993.

6    "Q   You didn't tell him about it in 1994, right?

7    "A   I didn't know there was a hole in 1994.

8    "Q   You didn't tell him about it in 1995, right?

9    "A   I didn't know there was a hole in '95.

10   "Q   You didn't tell him about it in 1996, right?

11   "A   No.

12   "Q   You didn't tell him about it in 1997?

13   "A   No.

14   "Q   You didn't tell him about it in 1998?

15   "A   No.

16   "Q   You didn't tell him about it in 1999?

17   "A   No.

18   "Q   You didn't tell him about it in 2000?

19   "A   I don't -- I think -- that's not true.

20   "Q   You never once told him that there was hidden intercompany

21   debt at Refco; isn't that a fact, sir?

22   "A   Sir, I don't really agree with you.  I believed that by

23   Mr. Collins drafting those documents it was --

24   "Q   I am asking you what you told him.  I am not asking you to

25   make arguments here.

Cafdcol3                        "Maggio – cross

1    "A  I'm not making an argument, sir.  You are asking me what I

2    believe.

3    "Q  I am asking you what you told him.

4    "A  What's the question?

5    "Q  Please just answer the question.

6    "A  Could you repeat the question, sir?

7    "Q  You never told him, meaning words coming out of your mouth,

8    about the hole in 2000, right?

9    "A  No.

10   "Q  You never told him about it in 2001, right?

11   "A  No.

12   "Q  2002?

13   "A  No.

14   "Q  2003?

15   "A  No.

16   "Q  2004?

17   "A  Disagree.  When you tell somebody that this place is a

18   piece of shit and it's a house of mirrors and I am going to

19   tell all to everyone, to me I'm telling him that there is a

20   hole here.

21   "Q  You are telling him a piece of shit and a house of mirrors,

22   and he heard that there was hidden intercompany debt between

23   RGHI and RGL?

24           "Is that your testimony?

25   "A  That's my testimony.

Cafdcol3                    "Maggio - cross

1   "Q  OK.  2005.  Did you tell him about the hole in 2005?

2   "A  No.

3   "Q  You testified yesterday that you had this great

4   relationship of trust with Mr. Collins starting back in 1993,

5   when you and he met alone to discuss the mismatch of the

6   documents, right?

7   "A  Yes.

8   "Q  You had this great relationship of trust, but when you

9   found out that there were losses in connection with Trader

10  Marine you never told him about it, right?

11  "A  No.

12  "Q  When Refco engaged in proprietary trading and lost millions

13  of dollars on Philip Morris stock, adding to the hole, you

14  never told Joe Collins about it, right?

15  "A  No.

16  "Q  You didn't tell Mr. Collins the steps you took in

17  connection with the Niederhoffer situation, correct?

18  "A  No.

19  "Q  You never told him that the Niederhoffer loss was being

20  moved from Refco Group Ltd. up to the parent, RGHI, right?

21  "A  No.

22  "Q  Sir, you never told him the purpose of round-trip loans,

23  correct?

24  "A  No.

25  "Q  In the years from 1993 to 2005, did you ever tell Joe

Cafdcol3                          "Maggio – cross

1   Collins about the loan?

2   "A   Sir, I think I agreed -- I think I answered that by saying

3   in 2004, what I told him was telling him that there was a major

4   hole and a problem.

5   "Q   I will rephrase the question.

6            "With the exception of saying this firm is a piece of

7   shit and a house of mirrors in 2004, did you ever tell

8   Mr. Collins about the hole?

9   "A   Specific?  Those questions?

10  "Q   1993 to 2005 in relation to the questions that I just asked

11  you.

12  "A   Did I ever tell him that there was a huge hole in the

13  company?  The answer is no.

14  "Q   Mr. Maggio, Mayer Brown began to prepare documents for the

15  back-to-back loans in 2000, correct?

16  "A   Yes.

17  "Q   You didn't tell Mr. Collins that Refco had been doing

18  year-end loan transactions in the preceding years, right?

19  "A   No.

20  "Q   And just to be clear, at the end of 1999 Refco had debt on

21  its books that it wanted to remove, right?

22            "A debt from RGHI.

23  "A   The question is, did Refco Group Holdings, Inc. have debt

24  on its books that it wanted to remove at year end?

25  "Q   Yes.

Cafdcol3                     "Maggio – cross

1   "A   Yes.

2   "Q   And you arranged at Mr. Bennett's instruction for a

3   transaction to take place that would move the RGHI debt off of

4   Refco's books, right?

5   "A   I arranged a transaction that would –– a short–term

6   transaction that would pay down a significant portion of the

7   receivable on the books of Refco Group, Limited from RGHI.

8   "Q   And you did that in 1999, 1998 and 1997, right?

9   "A   Yes.

10  "Q   You never told Joe Collins about that, right?

11  "A   Yes.

12  "Q   And no means you never actually had a conversation with him

13  where you told him about it, right?

14  "A   Correct.

15  "Q   And you never told Joe Collins that each year there were

16  year–end loans being done with BAWAG, right?

17  "A   Correct.

18  "Q   Meaning you never had a conversation with him where you

19  used words to tell him that, right?

20  "A   Correct.

21  "Q   And when it came time, when Refco decided to have Mayer

22  Brown document part of these loans in 2000, you yourself didn't

23  pick up the phone to call Joe Collins, right?

24  "A   Correct.

25  "Q   Instead, you had David Weaver do it, right?

Cafdcol3                          "Maggio - cross

1    "A   Yes.

2    "Q   David Weaver was someone who worked under you, right?

3    "A   Yes.

4    "Q   And David Weaver was someone who Joe Collins had been

5    working with on another transaction, right?

6    "A   What transaction was that?

7    "Q   It was a transaction involving Ingram Micro.

8    "A   Yes.

9    "Q   Ingram Micro was the parent company of CIM Ventures, right?

10   "A   Yes.

11   "Q   CIM, spelled C-I-M, right?

12   "A   Yes.

13   "Q   That was the first loan that Mayer Brown was asked to

14   document, was a loan involving CIM Ventures, right?

15   "A   There were a series of loans per that transaction.

16   "Q   And did -- Mr. Collins and your subordinate, David Weaver,

17   had been in the -- at the time were in the midst of a large

18   transaction with CIM's parent company, Ingram Micro, correct?

19   "A   Yes.

20   "Q   And there were lots of parties to that transaction?

21   "A   I don't remember the exact details.  I know that Refco was

22   part of the transaction, and I know Ingram was part of the

23   transaction.

24   "Q   And there were a lot of law firms working on different

25   pieces of this transaction, right?

1    "A   Yes.

2    "Q   A major accounting firm, Pricewaterhouse, came in and

3    helped structure that transaction, right?

4    "A   Yes.

5    "Q   And Dennis Klejna, who was at that time Refco's general

6    counsel, knew about and was involved in that transaction as

7    well?

8    "A   I don't recall that, sir.

9    "Q   Let me see if I can refresh your recollection.  Let me show

10   you what's marked Defendant's Exhibit 713.

11           "Do you recognize this document, Mr. Maggio?

12   "A   Yes."

13           Ms. O'Connor, can you put it on the screen, please.

14   And we're going to blow up Mr. Maggio's name on the first

15   column and the name right under it, the name under

16   "Mr. Maggio."

17           "Mr. Maggio, this was a cover e-mail enclosing a

18   larger document, right?  Withdrawn.

19           "The first page of this document is the circulation

20   list for who it's being faxed to, correct?

21   "A   Yes.

22   "Q   And you and Mr. Klejna are both getting faxes of this

23   document, right?

24   "A   It appears that way.

25   "Q   And can you see on the second column, do you see Ingram

Cafdcol3                        "Maggio – cross

1   Micro?

2   "A   Yes.

3   "Q   That was one of Refco's counterparties in this transaction,

4   correct?

5   "A   Yes.

6   "Q   And do you see the name Mr. Ricketts over in the first

7   column?

8   "A   Yes.

9   "Q   He was employed by you at –– he was employed at Micro,

10  right?

11  "A   Yes.

12  "Q   He was the one who Dennis Weaver was dealing with on the

13  Ingram Micro –– that Dennis Weaver was dealing with on the

14  Ingram Micro transactions?

15  "A   Yes.

16  "Q   And he was the person that interacted with Dennis Weaver on

17  the first CIM Ventures transaction?

18  "A   Yes.

19  "Q   And this is dated December 14, 1999, right?

20  "A   Yes.

21  "Q   Which is just a couple of months before February 2000, when

22  the CIM Ventures loan was documented by Mayer Brown, correct?

23  "A   I believe so, yes.

24  "Q   And could we turn to the next page?

25  "A   Sir, are you talking about the CIM Ventures loan with RGHI?

Cafdcol3                    "Maggio – cross

1    I apologize, but when you asked that question, were you

2    referring to the CIM Ventures loan with RGHI?

3    "Q  I'm talking about what you have called the round robin with

4    CIM Ventures in 2000.

5    "A  Yes.

6    "Q  Let's look at the next page.  This is a memorandum for the

7    working group, right?

8    "A  Yes.

9    "Q  And at the time you understood that to include the names on

10   the fax transmittal sheet that we just saw, right?

11   "A  Yes.

12   "Q  Including yourself and Mr. Klejna, right?

13   "A  Yes.

14   "Q  And the re line, subject line, is CIM Ventures, right?

15   "A  Yes.

16   "Q  And it says, Attached is a revised draft of the securities

17   purchase agreement, right?

18   "A  Yes.

19   "Q  And that was one piece of this large transaction that

20   Mr. Weaver and Mr. Collins had been working on, right?

21   "A  Yes.

22   "Q  In fact, this large transaction involved a sale of stock by

23   Ingram Micro and the transfer of the proceeds of that sale from

24   overseas back into the United States, right?

25   "A  I believe that's what it was for.  That's what happened.

Cafdcol3                          "Maggio - cross

1  "Q  And one -- part of this large transaction that Mr. Weaver,

2  Mr. Klejna and yourself were working on was tax-driven, right?

3  "A  It was clearly a tax shelter.

4  "Q  When you say 'tax shelter,' you're talking about they

5  wanted to take the proceeds of this stock sale and bring them

6  back into the United States in the most tax friendly way,

7  right?

8  "A  It was a tax shelter, yes.

9  "Q  And you believed that it made sense to have David Weaver

10  reach out to do the documents for one of these loans in 2000

11  because similar documents could be used, right?

12  "A  I believe that there was a template of a document that

13  could be used for these round robin loans, yes, but there was

14  no security purchase agreement or, you know, in that.

15  "Q  But there was a document that was part of this larger

16  transaction that you thought could be used as a template for

17  the loans that you were going to ask Mayer Brown to start

18  documenting in the year 2000, right?

19  "A  Yes.

20  "Q  And you asked Mr. Weaver, who had been working with

21  Mr. Collins on this larger transaction, to place the call about

22  the first CIM Ventures loan in 2000, right?

23  "A  You mean the first round robin in 2000?

24  "Q  Yes, what you call a round robin.

25  "A  It's the term I use, yes.

1  "Q  Now, when you told Mr. Weaver to call Mr. Collins, you

2  didn't say to Mr. Weaver, tell Joe we're trying to move RGHI

3  debt off our books and we need him to do some paperwork to help

4  us, right?

5  "A  No.

6  "Q  What you told Mr. Weaver was, tell Joe that Jim Ricketts,

7  of Ingram Micro, and I want to do some more business deals

8  together and we need help with some of the documents; isn't

9  that what you told Mr. Weaver to tell Mr. Collins?

10  "A  No.  I don't recall saying that to David Weaver.

11  "Q  Well, sir, you never told David Weaver the real purpose of

12  these loans, right?

13  "A  David Weaver knew the purpose of these loans.

14  "Q  Sir, let's talk about conversations.  The words never came

15  out of your mouth to Mr. Weaver telling him that the purpose,

16  the real purpose of these back-to-back loans, right?

17  "A  Not at that time.

18  "Q  Can we put Government Exhibit 2 on the screen.

19          "This transaction has three separate legs, right?

20  "A  Yes.

21  "Q  And this leg" --

22          THE COURT:  Mr. Schwartz, before you get going, when

23  you get to a convenient place, whether before or after you do

24  this, let me know.

25          MR. SCHWARTZ:  This would be a convenient place, your

Cafdcol3                          "Maggio – cross

1    Honor.

2              THE COURT:  All right.

3              Ladies and gentlemen, let's take the lunch break now.

4    I see the sun has gone in so let's see what happens next.  But

5    would you follow the same rules?  Leave your exhibits on your

6    chairs.  Leave your books in the jury room.

7              Please remember not to discuss the case among

8    yourselves or with anyone else or to do any research.

9              Would you return at ten after 2, and I'll be looking

10   for the weather report, particularly if it is going to rain.

11             Thank you.

12             THE CLERK:  All rise.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Cafdcol3                        "Maggio – cross

1          (Jury not present)

2          THE COURT:  Anything else on the record, counsel?

3          MR. CHERNOFF:  No, your Honor.

4          MR. SCHWARTZ:  Not from us, your Honor.

5          THE COURT:  Off the record.

6          (Discussion off the record)

7          (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAFPCOL4                    "Maggio" - cross

                   A F T E R N O O N   S E S S I O N

                              2:19 P.M.

1            THE COURT:  Thank you.  Won't you be seated.  We

2     continue with the cross-examination of Mr. Maggio.

3     Mr. Schwartz.

4            MR. SCHWARTZ:  Thank you, Judge.

5            Starting at Page 2511, Line 18.

6            Can you put up Exhibit 2 again on the screen, please.

7     CROSS-EXAMINATION (Resumed)

8     BY MR. SCHWARTZ:

9     "Q. Now, this transaction has three legs, right?

10    "A. Yes.

11    "Q. And this leg here, referring to the leg between RGHI and

12    Refco, this leg, that's the leg that removes the related-party

13    debt off the books, right?

14    "A. Yes.

15    "Q. That's the leg that allowed Refco to hide the intercompany

16    debt from its auditors, right?

17    "A. Yes.

18    "Q. Now, counsel introduced a pile of documents and asked you

19    questions about them during your direct examination, right?

20    "A. Yes.

21    "Q. There's not a single document in which Mayer Brown ever

22    documented that piece of the transaction, correct?

23    "A. The pay-down of the RGHI loan?

CAFPCOL4                    "Maggio" - cross

1                  A F T E R N O O N   S E S S I O N

2                             2:19 P.M.

3            THE COURT:  Thank you.  Won't you be seated.  We

4     continue with the cross-examination of Mr. Maggio.

5     Mr. Schwartz.

6            MR. SCHWARTZ:  Thank you, Judge.

7            Starting at Page 2511, Line 18.

8            Can you put up Exhibit 2 again on the screen, please.

9     CROSS-EXAMINATION (Resumed)

10    BY MR. SCHWARTZ:

11    "Q. Now, this transaction has three legs, right?

12    "A. Yes.

13    "Q. And this leg here, referring to the leg between RGHI and

14    Refco, this leg, that's the leg that removes the related-party

15    debt off the books, right?

16    "A. Yes.

17    "Q. That's the leg that allowed Refco to hide the intercompany

18    debt from its auditors, right?

19    "A. Yes.

20    "Q. Now, counsel introduced a pile of documents and asked you

21    questions about them during your direct examination, right?

22    "A. Yes.

23    "Q. There's not a single document in which Mayer Brown ever

24    documented that piece of the transaction, correct?

25    "A. The pay-down of the RGHI loan?

CAFPCOL4                         "Maggio" - cross

1    "Q. That third leg, sir.

2    "A. No.

3    "Q. Can we see defense Exhibit 2.

4           These are the legs that Mayer Brown was asked to

5    document, correct?

6    "A. Yes.

7    "Q. And you never told, meaning words coming out of your mouth

8    in a conversation, you never told Joe Collins about the

9    existence of the third leg?

10   "A. No.

11   "Q. 'No,' meaning you actually never told him, right?

12   "A. Yes, that's correct.

13   "Q. Can we put Government Exhibit 304 on the screen.  Blow it

14   up a little bit, please.

15          Now, counsel asked you questions about this document

16   on your direct examination, right?

17   "A. Yes.

18   "Q. It was stipulated that these are Joe Collins' notes, right?

19   "A. Yes.

20   "Q. And it appears to be the notes of a phone call between Joe

21   Collins and David Weaver, right?

22   "A. It appears to be notes of a conversation between David and

23   Mr. Collins, yes.

24   "Q. And counsel took you through every line of these notes,

25   right?

CAFPCOL4                    "Maggio" - cross

1   "A. Yes.

2   "Q. Does it appear that Joe Collins has been told that Refco

3   is -- I'm sorry.

4           Nowhere in here does it appear that Joe Collins has

5   been told that Refco is planning to hide intercompany debt from

6   its auditors, correct?

7   "A. Yes.

8   "Q. Let's change topics.  Counsel asked you questions about

9   conversations you had with Joe Collins about RCM and its status

10  as an offshore Bermuda corporation; do you remember that?

11  "A. Yes.

12  "Q. You said that from time to time you consulted Mr. Collins

13  about legal questions relating to how an offshore corporation

14  could do business in the United States and stay in conformity

15  with the law, right?

16  "A. Yes.

17  "Q. And in those conversations, you told us that you

18  communicated to Mr. Collins that you wanted to be able to have

19  access to the cash in the RCM customer accounts, right?

20  "A. Yes.

21  "Q. Now, those accounts are unregulated, right?

22  "A. Yes.

23  "Q. There's no seg requirement, right?

24  "A. Yes.

25  "Q. That means the customer money doesn't have to be segregated

1   and held for the customer's sole use, right?

2   "A. Yes.

3   "Q. That's why you have unregulated accounts, so you don't have

4   those burdens and requirements associated with them, right?

5   "A. In Refco's situation, they had those unregulated accounts

6   because they needed the cash.

7   "Q. Yes, but Refco had regulated accounts, right?

8   "A. Yes.

9   "Q. And it had unregulated accounts, right?

10  "A. Yes.

11  "Q. And where there's no regulation requiring segregation,

12  Refco was free to use those funds rather than segregate them,

13  right?

14  "A. Yes.

15  "Q. That wasn't some special secret that you could only tell a

16  trusted lawyer, right?

17  "A. That I wanted a company unregulated?

18  "Q. That you could use funds from unregulated accounts instead

19  of keeping them segregated for the customer?

20  "A. I would have had difficulty telling that to another

21  attorney.  If there was another attorney, I could never tell

22  them I need the cash.

23  "Q. Mr. Klejna was in the loop on these conversations, correct?

24  "A. Not really.  We tried to keep him out of the loop.

25  "Q. You tried to exclude him, right?

1    "A. Yes.

2    "Q. You wanted these conversations to be just between you and

3    Joe because this was -- this was sensitive stuff?

4    "A. We tried -- I tried to keep him out of the loop as best we

5    can.

6    "Q. By the way, and we're going to get to that.  Absolutely

7    nothing wrong with telling someone that you have a need for

8    cash, right?

9    "A. Is there any -- I don't really understand the question.

10   "Q. Well, let me put it this way, Mr. Maggio.  Refco went to

11   Chase Bank and said, we need $100 million in cash revolver,

12   right?

13   "A. Yes.

14   "Q. In fact, Refco went to Chase Bank and said we need $300

15   million in a cash revolver, right?

16   "A. Yes.

17   "Q. And Chase didn't say, oh, my God, because you need cash,

18   you're uncreditworthy and we can't give you this revolver,

19   right?

20   "A. Correct.

21   "Q. Refco had many short-term needs for cash, right?

22   "A. Yes.

23   "Q.  Refco cleared trillions of dollars a day in various

24   transactions and settlements?

25   "A. Billions of dollars.

CAFPCOL4                        "Maggio" - cross

1    "Q. Billions of dollars, right?

2    "A. Yes.

3    "Q. And sometimes, for instance, it needed Yen -- just to take

4    for an example -- it would need to have Yen on hand to sell to

5    people who wanted to buy Yen, right?

6    "A. No, that's a not the way it worked.

7    Q.  Sometimes it would need to be able to engage in one side of

8    a foreign currency transaction, right?

9    "A. No.  All the foreign currency transactions are done on a

10   back-to-back basis, and unless you're taking proprietary

11   positions, which sometimes Refco did, obviously, but the

12   situation is that, at the end of the day, your settlement

13   across the board everywhere should be even.  So using -- you

14   know, saying that I need the $7 out before Yen does not work in

15   this example.

16   "Q. I'll switch it then.

17   "A. Okay.

18   "Q. When Refco told Chase it needed hundreds of millions of

19   dollars in cash, Chase proceeded to lend it the money?

20   "A. But apples and oranges.  You're asking for a loan from

21   Chase as opposed to taking customers' funds.  It's not the

22   same.

23   "Q. But chase concluded it was a strong business, even though

24   it needed cash, right?

25   "A. Yes.

1   "Q. You never told Chase -- You were involved in presentations

2   to Chase for the revolver, right?

3   "A. Yes.

4   "Q. And you never told them the real reason you needed cash,

5   right?

6   "A. No.

7   "Q. And you never told Joe Collins the real reason you needed

8   cash, right?

9   "A. Right.

10  "Q. And I think you testified on direct that you went to Joe

11  Collins on two separate occasions to get legal advice about the

12  offshore status of RCM, correct?

13  "A. Yes.

14  "Q. First time he gave you a legal structure to handle the

15  situation, right?

16  "A. Yes.

17  "Q. He gave you legal advice, right?

18  "A. Yes.

19  "Q. And you ignored it?

20  "A. Most of it, yes.

21  "Q. The second time you said that Dennis Klejna had started to

22  raise concerns about the status of RCM, right?

23  "A. Yes.

24  "Q. That you told Mr. Klejna, this is none of your business,

25  and you told Mr. Bennett that this Dennis Klejna guy is butting

1   in where he doesn't belong, right?

2   "A. Yes.

3   "Q. And you went to Joe instead of Dennis to deal with the

4   situation; that was your testimony, right?

5   "A. Yes.

6   "Q. And you went to Joe, and you said to Mr. Collins, I'm

7   looking for a way to do things legally here, right?

8   "A. I didn't exactly say those words.

9   "Q. But you said you needed some legal advice on how to handle

10  this, right?

11  "A. I think I said that Dennis is butting in where he doesn't

12  belong.  I need to -- I need to make certain that RCM could

13  conduct business on shore.  I can't have capital issues, and I

14  need Dennis -- I need access to those customer funds.  That's

15  what I said, I think.

16  "Q. And Mr. Collins analyzed the situation and gave you advice,

17  right?

18  "A. He gave me a structure or gave me advice, told me he wasn't

19  comfortable with it, said, 'I wouldn't rely on it.'  And that's

20  what he did.

21  "Q. But let's look at what Mr. Collins told you.  I'll show you

22  what's been marked as Defense Exhibit 737.  Blow it up, please.

23          Mr. Maggio, this is a memo from you to Joe Collins, to

24  you -- strike that.

25          Mr. Maggio, this is a memo from Joe Collins to you and

CAFPCOL4                         "Maggio" - cross

1    Dennis Klejna and Mr. Keating, right?

2    "A. Yes.

3    "Q. Dated June 24, 2002, right?

4    "A. Yes.

5    "Q. As of June 24, 2002, the Sedona investigation had begun,

6    right?

7    "A. Yes.

8    "Q. You testified that the second time you met with Joe Collins

9    it was because Dennis Klejna had started to raise concerns in

10   connection with the Sedona investigation, right?

11   "A. Yes.

12   "Q. And in this memorandum, Joseph Collins is giving advice in

13   connection with the status of Refco Capital Markets, right?

14   "A. Yes.

15   "Q. It gives you his analysis and recommendations, correct?

16   "A. Yes.

17   "Q. It talks about equity trading, right?

18   "A. Yes.

19   "Q. Convertible trading?

20   "A. Yes.

21   "Q. Mr. Maggio, you were asked questions on direct examination

22   about conversations you had with Mr. Collins concerning

23   bringing offshore equities business on shore; is that correct?

24   "A. Yes.

25   "Q. And does this memorandum that's before you relate to the

1    advice that Mr. Collins gave you that you testified about on

2    direct examination?

3    "A. In part, yes.

4    "Q. Well, let's take a look at the top with all three names

5    there.  Is Mr. Klejna being asked to butt out here?

6    "A. No.

7    "Q. Is he being told to mind his own business?

8    "A. No.

9    "Q. Let's look at the next page.  Can we blow this up, please.

10            This is a memo from Joe Collins, right?  To the file,

11   right?

12   "A. Yes.

13   "Q. That was circulated under the page we just saw, right?

14   "A. Yes.

15   "Q. Now, let's take a look at the first paragraph.  It says,

16   'The following memorandum sets forth information regarding the

17   present activities of Refco Capital Markets, Limited, a Bermuda

18   corporation.  Most of the information was obtained during a

19   discussion on June 19th, 2002, with Sandy Maggio and Dennis

20   Klejna,' right?

21   "A. Yes.

22   "Q. Did you keep Mr. Klejna off that phone call?

23   "A. No, sir, but you're misunderstanding what I said.  What I

24   said was that Dennis was butting in.  He was still going to be

25   informed, but we did not want him to make the end -- the

CAFPCOL4                        "Maggio" - cross

1    decision about RCM and the way it conducts business.  You're

2    entirely misunderstanding what I said.

3    "Q. You didn't want him to be the decisionmaker?

4    "A. That's exactly right.

5    "Q. The business, Refco as a business, makes the decision after

6    lawyers give the advice, right?

7    "A. Sometimes that doesn't work that way.

8    "Q. But Joe Collins is not the decisionmaker for Refco, right?

9    "A. No.

10   "Q. Joe Collins just gives legal advice, right?

11   "A. Joe Collins was somebody I could talk to and could confide

12   in and tell him what my issues are.

13   "Q. And when he gives legal advice, you're free to ignore it at

14   your peril, right?

15   "A. Yes.

16   "Q. And sometimes you do ignore it, right?

17   "A. Yes.

18   "Q. That's your decision, sir, right?

19   "A. Yes.

20   "Q. He doesn't make that decision?

21   "A. No.

22   "Q. Dennis Klejna doesn't make the decision?

23   "A. No.

24   "Q. He's a lawyer, too, right?

25   "A. That's true.

1    "Q. Dennis Klejna was on this phone call, right?

2    "A. I didn't want Dennis to come up with the criteria and the

3    restrictions needed.  That's a big difference, sir.

4    "Q. Let's go to the last page.  Blow up, please, the final

5    paragraph from 'It may be prudent.'

6           This is Joe Collins' final advice in the memo, right?

7    "A. Yes.

8    "Q. And he's telling you it may be prudent to take certain

9    actions, right?

10   "A. Yes.

11   "Q. And you testified on direct that you had gone to Joe and

12   said we need to have access to these customer accounts for

13   cash, right?

14   "A. Yes.

15   "Q. And we need to give them unreg -- keep them unregulated so

16   we can have that access, right?

17   "A. Yes.

18   "Q. Let's look at what Joe Collins is recommending as being

19   prudent here.  First, he tells you to consider ceasing certain

20   activities, right?

21   "A. Yes.

22   "Q. Let's look at No. 2.  He tells you to consider the

23   transferring of existing options to Refco Securities, Limited,

24   right?

25   "A. Yes.

1    "Q. To transfer existing options to RCM, which is unregulated,

2    right, to Refco Securities, Limited, which is regulated, right?

3    "A. Yes.

4    "Q. If these things were transferred to a regulated entity, you

5    wouldn't have the same access to them as you would in an

6    unregulated entity?

7    "A. But they had no cash.  The issue was these -- these points

8    that are here are irrelevant to Refco for the cash.  This was

9    discussed prior to this memo coming out.  The real issue is in

10   the financing.  That was my big issue that was discussed with

11   Joe.  That's what we needed to have.  This is crap.  This meant

12   nothing to us.

13          There was no money involved.  There was no capital

14   involved.  This was discussed prior to the memo, and this is

15   what he gave us so we could keep the business offshore and

16   appease some of the real -- some of the issues and appease the

17   SEC.  That's why this memo came out.

18   "Q. He's not saying this here, sir, keep the business offshore.

19   He's saying consider moving it to Refco Securities?

20   "A. Oh, yes, he is.  You must see the rest of the memo.  Let's

21   take a look at it.  We have the financing.  We have foreign

22   exchange.  He's saying to keep it offshore.  That's what was

23   really meant for us.  That's where all the cash was.

24   "Q. Well, let's look at No. 3.  He's saying transfer any equity

25   trading client to Refco Securities, Limited, right?

CAFPCOL4                    "Maggio" - cross

1   "A. Yes.

2   "Q. That's to the regulated entity, right?

3   "A. Again, there was nothing involved in that.  There was no

4   money involved in that.  There was no customer assets involved

5   in that.

6   "Q. So you went to Joe to get advice, which was crap, about

7   something you had no money in?

8   "A. That's right.

9   "Q. That's why you go to a lawyer when you work for Refco?

10  "A. No.  I went to a lawyer to protect the issue that we had.

11  We did not want to lose the foreign exchange, the financing,

12  the emerging market debt.  That's where all our cash -- that's

13  where all the customer cash was tied up.  That's why I went to

14  Joe.

15          These five items were saying, you know what, Joe,

16  just, you know, move them over.  It doesn't matter to us.

17  There's no money in it.  There's no cash.  There's no capital

18  usage.  I'm sorry if I raised my voice, sir.

19  "Q. Mr. Maggio, there's absolutely nothing in this memo that is

20  hidden from Dennis Klejna, correct?

21  "A. Correct.

22  "Q. Dennis Klejna was the former general counsel of a major

23  United States regulator, right?

24  "A. He was --

25  "Q. Former general counsel of the CFTC?

1    "A. CFTC, I don't know what his position was.

2    "Q. You testified on direct that in 2003, the question arose as

3    to whether you should be represented by your separate lawyer in

4    the Sedona investigation, right?

5    "A. I don't know if the question was rose.  I was told I need

6    to catch up with counsel.

7    "Q. Wilmer Cutler had been representing Refco in the

8    investigation, right?

9    "A. Yes.

10   "Q. And the recommendation about whether you should proceed to

11   have the same firm, Wilmer Cutler, that was representing Refco

12   represent you as well, right?

13   "A. I'm sorry.  I apologize.  I didn't get that.

14   "Q. One of the issues that arose in 2003 was whether you had to

15   have your own lawyer in the Sedona investigation, right?

16   "A. Yes.

17   "Q. And in 2005, the same issue arose again, right?

18   "A. In what instance, sir?

19   "Q. In 2005, you learned that the SEC was considering charging

20   you for what it calls negligent supervision of some of Refco's

21   employees, right?

22   "A. Yeah.  I consider that all the same incident, the 2003 to

23   2005.

24   "Q. In 2003, what you knew was that your deposition was coming

25   up, right?

CAFPCOL4                    "Maggio" - cross

1   "A. Yes.

2   "Q. No one told you you were being charged in 2003, right?

3   "A. No.

4   "Q. 'No' meaning no one told you you were going to be charged

5   in 2003, right?

6   "A. Yes, that's correct.

7   "Q. In 2005, two years later, you were told that the SEC was

8   going to go ahead and charge you, right?

9   "A. Yes.

10  "Q. Refco was going to be charged as an entity as well, right?

11  "A. Yes.

12  "Q. And you knew from Mr. Bennett and others that Refco wanted

13  to settle this dispute with the SEC, right?

14  "A. Yes.

15  "Q. And you had the right, sir, even though Refco was settling,

16  to continue to fight the charges that the SEC planned to bring

17  against you, right?

18  "A. Yes.

19  "Q. And if you wanted to fight, you would have to get your own

20  lawyer, right?

21  "A. Yes.

22  "Q. And so in 2005, when you were told that you were being

23  charged, you were given the option again of getting your own

24  lawyer, correct?

25  "A. Sir, I do not think that's the way it happened.  To me,

nobody came up to me in 2005 and said, Sandy, you're going to

get charged.  You need to have your own option.  You need to

have your own attorney.

It was assumed, for me, that Mr. Collins was my

attorney from 2003 and that he was going to represent me all

the way to the end, even if it meant the end.

"Q. But you understand, sir, that if Joe was representing

Refco, which wants to settle, he can't represent you if you

choose to fight?  You understood that at the time, right?

"A. Sir, I didn't choose to fight because Joe was my counsel,

and he was representing myself and Refco.

"Q. Now, in 2005, you became aware that you were going to be

charged, Joe Collins and -- withdrawn.

In 2005, when you became aware that you were going to

be charged, Joe Collins and Lisa Dunsky of the Mayer Brown firm

had been representing you, right?

"A. Yes.

"Q. And they explained to you that, under the circumstances,

because your personal interests might be different from Refco

as an entity, that you should consider getting your own lawyer,

right?

"A. No, no.  Nobody from Mayer Brown told me, Sandy, you should

get your own lawyer.

"Q. Didn't they?

"A. Our biggest concern, actually, with Mayer Brown is what

1    sort of charges -- how could we keep it down, and what would my

2    position be after it's all said and done.

3            But nobody, sir, nobody from Mayer Brown came to me

4    and said, Mr. Maggio, you should get your own counsel.  There's

5    a -- you know, a -- I don't know, I guess a conflict.

6    "Q. Sir, once you decided to fight, you had conversations with

7    Mayer Brown about how to minimize your exposure to funds,

8    right?

9    "A. Yes.

10   "Q. But before that, Miss Dunsky and Mr. Collins told you that

11   because you had your own personal interests, you should

12   consider seriously the option of retaining your own lawyer,

13   didn't they?

14   "A. Sir, I do not recall that.

15   "Q. Didn't they tell you that Refco would pay for it, if you

16   wanted it?

17   "A. No.  That was Mr. Klejna telling me that with Wilmer

18   Cutler.  Wilmer Cutler said that I should get my own counsel,

19   and Mr. Klejna said Mr. -- he said, Sandy, Refco will pay for

20   it, but I don't recall a conversation from anyone from Mayer

21   Brown saying, Sandy, get your own lawyer.

22   "Q. Well, in 2005, when the SEC wanted to charge you, you

23   didn't feel that you'd done anything wrong, right?

24   "A. As it relates to the charges that they put forward?

25   Obviously, I did something wrong as it relates to --

CAFPCOL4                    "Maggio" - cross

1    "Q. As to the Sedona charges the SEC was pursuing.  When you

2    learned what they were going to charge you on, you felt that

3    those charges were unjustified, right?

4    "A. Yes.

5    "Q. And you, in words or conduct, made plain that you weren't

6    prepared just to fold, right?

7    "A. Yes.

8    "Q. And Mr. Collins and Miss Dunsky said to you, Sandy, the

9    company is going to fold.  If you want to fight, you have to

10   get your own lawyer, right?

11   "A. Sir, I don't recall.  I do not recall that.  There were --

12   to me, there was always the intention that Joe would be my

13   attorney from beginning to the end, and no one other than

14   Dennis in the beginning gave me another option.

15   "Q. I am not asking for your intention.  I'm asking you for --

16   wasn't it communicated to you that it made sense, given the

17   circumstances, that you consider retaining your own lawyer,

18   whether or not you ultimately decided to retain the lawyer?

19   "A. I do not recall anyone from Mayer Brown saying, Sandy, if

20   you intend to fight, get your own counsel.

21   "Q. But in 2005, you all agreed that you had a decision to make

22   about whether you wanted to fight these charges or not, right?

23   "A. Yes.

24   "Q. And the IPO was set to take place on August 5th, right?

25   "A. Yes.

1   "Q. And Mr. Bennett wanted to know whether you were going to

2   continue, whether you want to fight or fold, right?

3   "A. Yes.

4   "Q. And you approached him in late July to discuss the matter,

5   right?

6   "A. I approached him.  I don't remember if it was in late July.

7   "Q. But you had some leverage, right?

8   "A. Yes.

9   "Q. Because if you said you wanted to fight, that was going to

10  complicate the IPO, right?

11  "A. Yes.

12  "Q. And you saw this as an opportunity to get some more money,

13  right?

14  "A. Yes.

15  "Q. And you got more money, right?

16  "A. I was promised more money, yes.

17  "Q. That's the $5.2 million we were talking about earlier,

18  right?

19  "A. Yes.

20  "Q. And this is when you said to Mr. Bennett, let the chips

21  fall where they may.  If I have to get my own lawyer and fight

22  this, all hell is going to break loose, right?

23  "A. No, sir, that's not when I said that.  I believe what my

24  testimony is, and I've said it consistently, that in June of

25  2003 when I was told -- when I was told that I had to get my

CAFPCOL4                         "Maggio" - cross

1   own counsel, there's a time I walked into Phil's office after

2   my initial conversation with Mr. Collins that, all right, that

3   this is war.  All hell will break loose if I have to get my own

4   attorney.

5   "Q. Sir, in 2003, there was no reason for you to have to resort

6   to those tactics, right?

7   "A. Sir, if I had to get my own counsel in 2003, I would have

8   to tell them everything about what went on, and that was my

9   message to Mr. Bennett, and that's what I told Mr. Bennett.

10  "Q. Mayer Brown wasn't telling you you had to get your own

11  counsel in 2003, right?

12  "A. Mayer Brown wasn't our counsel in 2003.  It was Wilmer

13  Cutler who was the counsel in 2003 at that time.

14  "Q. But Mr. Klejna told you that he didn't see any need for you

15  to have separate counsel in 2003, and that he thought that

16  Wilmer Cutler's approach was a little bit overboard, right?

17  "A. I don't recall that conversation.  What I do recall is

18  Mr. Klejna coming to my office and telling me that Wilmer

19  Cutler is -- suggests that you get your own counsel, and then

20  me going ballistic.

21  "Q. Sir, you weren't told you were going to be charged in 2003,

22  right?  That didn't come up until 2005, right?

23  "A. That's correct.

24  "Q. Mr. Maggio, do you recall a meeting with the government on

25  May 30, 2007?

CAFPCOL4                        "Maggio" - cross

1    "A. No.

2    "Q. Let me show you what's been marked 3501-33.  Didn't you

3    tell the government, sir, when you met with them and discussed

4    this topic, that the conversation took place not in 2003, but

5    after Refco had concluded the LBO with Lee?

6    "A. Yes.  Initially I told the government that, and I was wrong

7    on my dates.

8    "Q. You were wrong on your dates?

9    "A. Yes, sir.

10   "Q. Initially, sir, didn't you tell the government that the

11   conversation occurred at the time that the SEC was holding up

12   the registration for the IPO --

13            THE COURT:  Mr. Schwartz.

14            MR. SCHWARTZ:  I'm sorry.

15   "Q. Initially, sir, didn't you tell the government that the

16   conversation occurred at a time when the SEC was holding up the

17   registration for the IPO because of your issue?

18   "A. The conversation was what, sir?

19   "Q. That the SEC was holding up the IPO because of your issue?

20   "A. Well, that's true.  The SEC was holding up the IPO because

21   of my issue.

22   "Q. That was in 2005, right?

23   "A. Yes.

24   "Q. That's not just a mistake about the date.  You're telling

25   the government the context, right?

1    "A. No, sir.  I don't understand it.  I do not understand it,

2    the line of questioning.  Could you --

3    "Q. I will break it down.

4    "A. Okay, please.

5    "Q. The IPO was on August 5, 2005, right?

6    "A. Yes.

7    "Q. Not 2003, right?

8    "A. Correct.

9    "Q. And you told the government about this conversation, you

10   said it occurred after the LBO, right?

11   "A. Which conversation?

12   "Q. The one that you claim you had with Joe about telling him

13   house of mirrors and the firm is shit?

14   "A. That Klejna had with Joe or me?

15   "Q. You.

16   "A. Okay.  So, I'm sorry.

17   "Q. When you initially described this, you put it in 2005, near

18   the IPO, right?

19   "A. Yes.  When I initially told it to the government, I told

20   them it was 2005, but in fact, it was in 2003.

21   "Q. What really happened, sir -- what really happened to you,

22   sir, was that you told Mr. Bennett, I will take the suspension.

23   I will eat the charges, and I want some money in return, right?

24   "A. In a nutshell, yes.

25   "Q. You said to him, 'If I have to get my own counsel and fight

CAFPCOL4                        "Maggio" - cross

1  this thing, let the chips fall where they may'?

2  "A. No.  What I actually said with Mr. Bennett was, 'We have

3  been through a lot together.  I will never do anything' -- and

4  I'm sorry, I'm quoting -- 'to fuck up the IPO, never.  However,

5  I think I should be compensated for taking this fall, and I

6  want to be Joe's equal.'

7  "Q. Mr. Bennett agreed to give you more than $5 million as a

8  result of this conversation, right?

9  "A. Yes, sir.

10  "Q. That wasn't out of the goodness of his heart?

11  "A. No.

12  "Q. It was because you pressured him, right?

13  "A. Yes.

14  "Q. And once he agreed to give you $5.2 million more, there was

15  no reason for you to call up Joe Collins and tell him what a

16  piece of shit firm this was, right?

17  "A. I didn't tell him that.  I told him that in 2003.

18  "Q. When you initially described this set of interactions to

19  the government, you put it in 2005, right?

20  "A. Understood.  I told you that I was wrong on the date that I

21  told them.  The conversation happened in 2003, after Wilmer

22  Cutler told me that I had to get my own counsel.

23  "Q. All we have, sir, is your word on that, right?

24  "A. About the timing about Wilmer Cutler?

25  "Q. Yes.

CAFPCOL4                        "Maggio" - cross

1   "A. No.  Wilmer Cutler, you can call somebody from Wilmer

2   Cutler.

3   "Q. When you spoke to Joe Collins in which you had told him

4   you -- withdrawn.

5         You had a conversation with Joe Collins in which you

6   told him that you had broken the law in connection with NCTI

7   stock, right?

8   "A. Yes.

9   "Q. And there's no record of that conversation, right?

10  "A. No record of that conversation?  Not that I'm aware of.

11  "Q. You didn't take any notes, right?

12  "A. No.  I would not take notes saying I committed a crime.

13  "Q. You're not aware of any e-mails memorializing it, right?

14  "A. No.

15  "Q. The only version we have of what you say occurred here is

16  from you, right?

17  "A. Yes.

18  "Q. And when you went to the SEC, you lied about NCTI stock,

19  right?

20  "A. Yes.

21  "Q. You didn't tell them that you had broken the law on NCTI

22  stock, right?

23  "A. No.

24  "Q. You went next to the United States Attorney's Office,

25  right, and you didn't tell them that you had broken the law in

CAFPCOL4                          "Maggio" - cross

 1   connection with the NCTI stock, right?

 2   "A. Tell who, sir?

 3   "Q. United States Attorney's Office in 2005, late 2004, early

 4   2005?

 5   "A. No, sir.

 6   "Q. Before you were cooperating, right?

 7   "A. Correct.

 8   "Q. In fact, you were lying and misleading the United States

 9   Attorney's Office?

10   "A. Yes, sir.

11   "Q. Nothing prevented you, sir, from lying about your role in

12   connection with the NCTI stock without having to tip off Joe

13   Collins?

14   "A. But I did tip him off.  I did tell him.

15   "Q. So you lied to the U.S. Attorney's Office about it, right?

16   "A. Yes.

17   "Q. You lied to the SEC about it, right?

18   "A. Yes.

19   "Q. You lied to Lisa Dunsky about it, right?

20   "A. I don't know.

21   "Q. But you say you picked up the phone, and with no witnesses

22   on the call, you happened to tell Joe Collins the truth?

23   "A. I told Joe Collins that I allowed Solomon Obtsfeld to short

24   the stock illegally without converting the stock.  That's what

25   I told him.

1    "Q. I think you still have 3501-33 in front of you.

2    "A. Excuse me?

3    "Q. May 30, 2007, you've been cooperating with the government

4    for about 18 months, right?

5    "A. Yes.

6    "Q. This is the first time you debriefed them about your

7    contacts with Mr. Collins?

8    "A. With who?

9    "Q. Mr. Collins.  The first time you told them about this

10   conduct with Mr. Collins, right?

11   "A. Sir, I don't recall when they started debriefing me.

12   "Q. You told them -- You had already covered a lot of topics

13   with the U.S. Attorney's Office over the past 18 months, right?

14   "A. We covered a significant amount of topics.  It was a

15   learning curve, and then after the learning curve, then they

16   just asked me questions and the shoe was on the other foot.

17   They started asking me, and I started answering as opposed to

18   me educating.

19   "Q. They set up a conference call with you on this date to find

20   out what you knew about Joe Collins, right?

21   "A. I assume so.  That's what the notes say.

22   "Q. Mr. Maggio, in this conversation, did you tell them -- you

23   talk about the Sedona investigation, correct?

24   "A. Yes.

25   "Q. This is when you placed the conversation in 2005, right,

1    the one I just showed you?

2    "A. Yes, sir.

3    "Q. You never told the government that you had told Joe Collins

4    in advance of giving sworn testimony that you had done

5    something illegal on NCTI stock?

6    "A. Sir, I told the government about NCTI.

7    "Q. You told them about it not in the very first meeting,

8    right?

9    "A. I don't know when, sir.

10   "Q. Your testimony, sir, is that it's something you added

11   later, right?

12   "A. Sir, I don't recall when I told the U.S. Attorney's Office

13   about the NCTI illegal shorting to Mr. Collins.

14   "Q. On May 30, 2007, they asked you to tell them what you knew

15   about Joe Collins, right?

16   "A. Yes.

17   "Q. You understood that it was part of the process of

18   cooperation to give them information they might be interested

19   in, right?

20   "A. It was part of my cooperation agreement that I cooperate

21   and answer the questions that they asked me.

22   "Q. And you understood they were investigating possible crimes,

23   right?

24   "A. Yes.

25   "Q. You never told them about any phone call when you met with

1   them on May 30, 2007, in which you tipped off Joe Collins to

2   the fact that you engaged in illegal trades in NCTI stock?

3   "A. Sir, I don't remember when I told them.  These are not my

4   notes.  I did not write them.

5   "Q. Let me show you, Mr. Maggio, what's been marked as defense

6   Exhibit 705.  I ask if you recognize this document?

7   "A. No, sir.

8   "Q. Are you familiar with Refco subsidiary known as Refco,

9   Inc.?

10  "A. Yes.

11  "Q. Have you ever seen this operations manual?

12  "A. Could you, sir -- I'm sorry.  I apologize.

13  "Q. Have you ever seen its operations manual?

14  "A. No.

15  "Q. When you joined Refco, there were three shareholders,

16  right?

17  "A. You're talking about Refco, Refco Group?

18  "Q. Yes.

19  "A. That is what I'm aware of, yes.

20  "Q. In other words, three people who shared the ownership of

21  Refco, right?

22  "A. Yes.

23  "Q. One was Mr. Bennett, right?

24  "A. Yes.

25  "Q. One was Mr. Grant, right?

1    "A. Yes.

2    "Q. And one was Mr. Dittmer, right?

3    "A. Yes.

4    "Q. At the time you joined, Mr. Dittmer held half of the

5    ownership interest?

6    "A. I believe it was a little bit more than half, yes.

7    "Q. He continued to hold a little bit more than half through

8    1999 when he left Refco, right?

9    "A. I'm not sure of the exact year that they transferred the

10   ownership.

11   "Q. Up until that transfer, he held about more than 50 percent

12   of the interest, right?

13   "A. I believe so, yes.

14   "Q. It was the CEO of Refco, right?

15   "A. Who, sir?  Mr. Dittmer?

16   "Q. Yes.

17   "A. He was the Chairman.

18   "Q. The Chairman?

19   "A. The Chairman.

20   "Q. He was the principal person in charge of Refco, right?

21   "A. He was the Chairman.  I don't know if he was involved in

22   the day-to-day operations.

23   "Q. And Mr. Dittmer was reputed to be a billionaire, right?

24   "A. No, sir.

25   "Q. You became aware, while you were at Refco, that he liked to

CAFPCOL4                       "Maggio" - cross

1   trade money, right?

2   "A. Yes.

3   "Q. And you learned in the course of your employment at Refco

4   that his trading resulted in significant losses for Refco?

5   "A. Yes.

6   "Q. You told us about losses in Phillip Morris stock.  Do you

7   remember that?

8   "A. Yes.

9   "Q. There were trading losses related to Mr. Dittmer -- Those

10  were trading losses related to Mr. Dittmer, right?

11  "A. Yes.

12  "Q. And those losses added to the hole at Refco, right?

13  "A. Yes.

14  "Q. And Mr. Dittmer had an associate named Mr. Cox, right?

15  "A. You have to define what you mean by an 'associate.'

16  "Q. Well, he had a business partner named Mr. Cox, right?

17  "A. I don't know the exact relationship, but he knew Mr. Cox,

18  yes.

19  "Q. Mr. Cox and Mr. Dittmer ran a hedge fund together that they

20  called MLC, right?

21  "A. I know Mr. Cox ran a hedge fund.  I don't know if Tom was

22  part of running that hedge fund.  I do know that they traded in

23  that hedge fund.

24  "Q. Mr. Maggio, you testified at a proceeding in this

25  courthouse in 2008, right?

CAFPCOL4                    "Maggio" – cross

1   "A. Yes.

2   "Q. You were asked the following questions and gave the

3   following answers, correct?

4            This is at Page 2060:

5            'Question:  And Mr. Cox was a business associate of

6   Mr. Dittmer, right?

7            'Answer:  Yes.

8            'Question:  And they together were involved in a hedge

9   fund called MLC?

10           'Answer:  Yes.'

11           Were you asked those questions and did you give those

12  answers?

13  "A. Yes.  I don't know exactly inside the hedge fund what the

14  structure was.  I know Mr. Cox ran the hedge fund, and he

15  helped raise the money.  I don't know what Tom's role was.

16  "Q. Mr. Maggio, I don't mean to be so subtle.  I think all I

17  asked you was whether you knew that they were business

18  associates and ran this hedge fund together?

19  "A. I know they were business associates.  Again, the running

20  of the hedge fund, I am not quite certain.

21  "Q. You know Mr. Dittmer was involved in one way or the other

22  with MLC, right?

23  "A. Yes.

24  "Q. MLC was one of the parties that was involved in the

25  year-end loans in 1999 and 1998, right?

1    "A. Yes.

2    "Q. Those were loans that were used to move the RGHI debt off

3    the books and hide it from Refco's auditors, right?

4    "A. Yes.

5    "Q. At the time that was happening, Mr. Dittmer was the

6    majority owner of Refco, right?

7    "A. I don't remember in 1999 when he left.  I think what

8    happened was that he transferred some of the shares to Ed Cox

9    and got an equity option of something of the sort in '98.

10   "Q. Would you agree, sir, that some of Mr. Dittmer's trading

11   activities led to an increase in the hole, right?

12   "A. Yes.

13   "Q. And you agree that his hedge fund was involved, in 1998 and

14   1999, in shifting that hole off the books of Refco, right?

15   "A. Yes.

16   "Q. I believe you called the hole the other day the essence of

17   the fraud at Refco?

18   "A. I don't recall those exact words, sir.

19   "Q. Mr. Maggio, you pleaded guilty in this case in December of

20   2007; is that correct?

21   "A. Yes.  I believe it was December 19 or December 22nd, 2007.

22   "Q. At about that time your wife bought back for you one of

23   your boats, right?

24   "A. Yes.

25   "Q. The Glacier Bay, right?

CAFPCOL4                        "Maggio" – cross

1    "A. Yes.

2    "Q. And your hope is to use the Glacier Bay as a business,

3    right?

4    "A. Yes.

5    "Q. You want to run fishing trips and pleasure trips for

6    customers, right?

7    "A. Yes.

8    "Q. You have opened a website in connection with the business,

9    right?

10   "A. Yes.

11   "Q. And the business goes under the name of Starting Over

12   Charters?

13   "A. Yes.

14   "Q. You are known on your website as 'Captain Sandy,' right?

15   "A. Yes.

16   "Q. And the pleasure expeditions you would run are on the

17   waters off the Florida coast, right?

18   "A. Yes, out of the Naples area.

19   "Q. Mr. Maggio, you committed crimes at Refco for over ten

20   years, right?

21   "A. Yes.

22   "Q. And investors lost billions of dollars, right?

23   "A. Yes.

24   "Q. You are hoping, sir, to walk out of here a free man and

25   start over and run that pleasure expedition company, correct?

CAFPCOL4                         "Maggio" - cross

1    "A. I was hoping to run it during this period and, yes, I'm

2    hoping to run it afterwards."

3              MR. SCHWARTZ:  No further questions.

4              THE COURT:  Thank you.  Redirect, counsel?

5    REDIRECT EXAMINATION

6    BY MR. IMPERATORE:

7    "Q. Mr. Maggio, prior to 1993, in the time that you gave that

8    deposition to the CFTC, you had lied in connection with your

9    work at various financial institutions or firms, correct?

10   "A. Yes.

11   "Q. You committed fraud, correct?

12   "A. Yes.

13   "Q. You had evaded taxes; is that right?

14   "A. Yes.

15   "Q. Was it wrong to do those things?

16   "A. Yes.

17   "Q. Did you need a lawyer to help you commit those crimes?

18   "A. No.

19   "Q. Now, from 2000 to 2005, did you commit any crimes in

20   connection with the amount of money that RGHI owed to Refco?

21   "A. Yes.

22   "Q. Specifically, what crime did you commit with regard to that

23   debt that was owed from RGHI to Refco?

24   "A. We moved the receivables off the books over fiscal year

25   ends and over quarter ends to hide the true debt from the

CAFPCOL4                          "Maggio" – redirect

1   auditors so we can give out false financials.

2   "Q. Did you have the help of a lawyer in connection with that

3   crime?

4   "A. Yes.

5   "Q. Who was it?

6   "A. Joe Collins.

7   "Q. How so?

8   "A. Joe drew up the documents.  He would be the only one I went

9   to.  He knew the structure of the documents, the documents

10  showed loans, indemnities and guarantees.  They went back and

11  forth, and there were three legs to that document.  Without any

12  one of those legs, that transaction, that fraud would not be

13  conducted.

14  "Q. Mr. Smith, could you please bring up Government Exhibit 2?

15  Thank you.

16          Do you remember, Mr. Maggio, that counsel asked you

17  some questions about this chart, right?

18  "A. Yes, sir.

19  "Q. He asked you whether or not Mr. Collins knew about the

20  amount of money that was being paid out from RGHI to Refco.  Do

21  you recall those questions?

22  "A. The amount?

23  "Q. Yes.

24  "A. Yes.

25  "Q. Do you remember that he asked you to take a look at a

CAFPCOL4                          "Maggio" - redirect

1    different chart and that different chart was Defense Exhibit 2,

2    right?

3    "A. Yes.

4    "Q. Mr. Smith, could you please bring up Defense Exhibit 2?

5    Thank you.

6              This is the chart that he showed you during the

7    cross-examination, right?

8    "A. Yes.

9    "Q. He asked you if this accurately represented the documents

10   in connection with the round-robins, as you called them, right?

11   "A. Yes.

12   "Q. Now, Mr. Maggio, does this document accurately represent

13   all of the features of the round-robins that we've been talking

14   about?

15   "A. No.

16   "Q. Mr. Smith, if you could bring up Government Exhibit 2B,

17   please, which Mr. Maggio was not shown.

18             Now, Mr. Maggio, how was this graph different from the

19   last one that we just saw?

20   "A. The graph is different than what I saw on the cross in that

21   Refco Group, Limited, the parent company, is giving to a

22   customer guarantees and indemnities to make sure that the

23   customer has no risk in this transaction whatsoever.

24   "Q. What was the significance of having no risk in this

25   transaction?

1    "A. The significance of having no risk in the transaction is

2    because the customer wanted to make money.  It was a fraud.

3    They wanted to make their 15 basis points; so there was no

4    financial gain, other than what the customer was going to

5    receive and no risk whatsoever.

6         And the fact that Refco Group is guaranteeing an

7    outside holding, a non-consolidating operating company, is the

8    one that's very significant.

9    "Q. By the way --

10   "A. Go ahead.

11   "Q. By the way, Mr. Maggio -- I'm sorry.  I cut you off, but

12   just a quick question.

13        Were you aware, in connection with the Lee

14   transaction, whether or not Lee or its representatives asked

15   for information about guarantees and indemnities?

16   "A. No.

17   "Q. Mr. Maggio, counsel asked you about Defendant's

18   Exhibit 713.

19        If we could just bring this up, please.

20        Do you remember he showed you this document?  It's a

21   fax from a woman named Alexandra Valdes-Faul, and it includes

22   you and Mr. Klejna and Mr. Weaver and Mr. Ricketts on this fax.

23   Do you recall that?

24   "A. Yes.

25   "Q. If you would turn to the next page of it.  It's a document

1    dated December 14th, 2009.  Do you see that?

2    "A. Yes.

3    "Q. And if we could just leave that up there.

4              Counsel asked you some questions about what type of

5    transactions this document related to.  Do you remember that?

6    "A. Yes.

7    "Q. What type of transaction did this document relate to?

8    "A. It related to a tax shelter.

9    "Q. Just generally, how did the tax shelter work?

10   "A. The tax shelter works where they were moving offshore money

11   onshore.

12   "Q. Whose offshore money onshore?

13   "A. CIM's offshore money onshore in this case.  I'm sorry.

14   Ingram Micro's money offshore, onshore.

15   "Q. Mr. Maggio, I think you testified on both direct and

16   cross-examination that you understood that when you were

17   thinking about doing the round-robin transactions, you were

18   aware that they had some documents relating to these tax

19   shelters that could be used in with the round-robins; is that

20   right?

21   "A. I think I said on the cross that there was a template of a

22   document that may be used, that could have been used.

23   "Q. All right.  Let's be clear about this, Mr. Maggio.  Were

24   the tax shelter transactions that Mr. Collins had worked on

25   with Mr. Weaver and others at Refco prior to 2000, anything

CAFPCOL4                      "Maggio" - redirect

1  like, in any way, the round-robin transactions that Mayer Brown

2  prepared and documented from 2000 through 2005?

3  "A. Absolutely not.

4  "Q. Please explain to us what some of the differences were?

5  "A. Number one, the difference with the round-robin transaction

6  is that Refco was a customer.  Refco was the one who was moving

7  the funds, not the customers.

8          Two, it involved stock purchase agreements.  There

9  were no stock purchase agreements in this transaction.

10         Three, there were tax shelters involved as opposed to

11  paying down loans and paying down receivables.

12         And Ingram Micro was also -- CIM was part of the

13  Ingram Micro family, as opposed to being an outside -- you

14  know, outside party.

15         So they're completely different.  One is completely,

16  completely different than the other one.

17  "Q. Let me ask you, Mr. Maggio, in connection with the tax

18  shelter transactions, was Refco Group Holdings, Inc. involved

19  in those transactions in any way, shape or form?

20  "A. No, sir.

21  "Q. Mr. Maggio, those tax shelter transactions, what was the

22  duration of those tax shelter transactions?

23  "A. It can last anywhere from a year to five years.

24  "Q. What was the duration of the transactions that Mr. Collins

25  documented for you in connection with the round-robins?

1   "A. From five days to 15 days.

2   "Q. Mr. Maggio, in connection with the tax shelters, were there

3   guarantees involved?

4   "A. I don't recall.  I don't think so.

5   "Q. Mr. --

6   "A. I don't think so.

7   "Q. Mr. Maggio, in connection with the tax shelters, did Refco

8   have any risk in those transactions?

9   "A. Yes, there was some risk, but it was minimal.

10  "Q. Why was it minimal, Mr. Maggio?

11  "A. It was minimal because there was paperwork, and there was

12  procedures in place to make certain that we would be able to,

13  you know, seize funds in case of any default by any party.

14  "Q. In fact, you participated in negotiating those tax shelter

15  transactions, correct?

16  "A. Yes.

17  "Q. Was it your concern to make sure that Refco had no risk in

18  those transactions?

19  "A. Yes.

20  "Q. Now, Mr. Maggio, in connection with the round-robin

21  transactions, did Refco have risk?

22  "A. No.  Actually, Refco was a beneficiary.  It had no risk

23  whatsoever.

24  "Q. Did the customer have any risk?

25  "A. Well, the customer had risk until such time that paperwork

CAFPCOL4                        "Maggio" - redirect

1    was put into place to make certain that they did not have any

2    risk.

3    "Q. All right.  Mr. Maggio, I'm sorry.  I might have confused

4    you.

5    "A. Okay.

6    "Q. In connection with the round-robins, Mr. Maggio, did the

7    customers have risk in connection with the round-robins from

8    2000 to 2005?

9    "A. No.

10   "Q. Why didn't they have any risk in those transactions from

11   2000 to 2005?

12   "A. Because Refco Group gave indemnifications and guarantees to

13   eliminate all risks for the customer.

14   "Q. Who was loaning the money in connection with the

15   round-robins?

16   "A. Refco Group is lending the money to the customer in the

17   round-robin, starting the round-robin.

18   "Q. As compared to the customer, who had risk in the

19   round-robins?

20   "A. Excuse me?

21   "Q. As compared with the customer, who bore the risk in the

22   round-robins?

23   "A. Refco.

24   "Q. In connection with the tax shelters, Mr. Maggio, who bore

25   the risk in the tax shelters?

1    "A. Ingram.

2    "Q. Not Refco, correct?

3    "A. Not Refco.

4    "Q. Mr. Maggio, were there any other ways in which the tax

5    shelters were different from the round-robin transactions?

6    "A. Well, there was no involvement of receivables being paid

7    down.  I believe CIM was part of the consolidating financials

8    of Ingram Micro, and CIM was the counterparty in this

9    transaction.  Those were what was different.

10   "Q. Mr. Maggio, counsel asked you during cross-examination

11   whether you lied to a gentleman named Rick Acasa.  Do you

12   recall that?

13   "A. Yes.

14   "Q. He asked you whether you lied to the NASD and the IRS.  Do

15   you remember that?

16   "A. Yes.

17   "Q. Counsel also asked you whether you lied to the United

18   States Attorney's Office.  Do you remember that?

19   "A. Yes.

20   "Q. I think as you indicated on direct examination, you had

21   lied to the U.S. Attorney's Office; is that right?

22   "A. In connection, prior to October 2005, yes.

23   "Q. Right.  So to be clear.  When was it that you lied to the

24   United States Attorney's Office?

25   "A. I lied to the U.S. Attorney's Office in the first meeting

CAFPCOL4                      "Maggio" - redirect

1    that we had regarding the investigation of Sedona, which I

2    believe was 2004.

3    "Q. Mr. Maggio, that session that you had with the U.S.

4    Attorney's Office, where you lied about Sedona, that was before

5    the blowup of Refco; is that correct?

6    "A. Yes.

7    "Q. You started meeting with the government on October 10, as

8    the company Refco was blowing up, right?

9    "A. Yes.

10   "Q. That was October 10th, 2005; is that right?

11   "A. Yes.

12   "Q. That was October 10th, 2005; is that right?

13   "A. Yes.

14   "Q. How many times have you met with the government since

15   October 10th, 2005?

16   "A. Several.  Many, many times.

17   "Q. And you lied once in those meetings with the U.S.

18   Attorney's Office -- I'm sorry.

19           And have you lied once in those meetings with the U.S.

20   Attorney's Office?

21   "A. No.

22   "Q. Mr. Maggio, in all of those meetings that you had with the

23   U.S. Attorney's Office after October 10th, 2005, did you ever

24   tell the U.S. Attorney's Office that Mr. Collins knew about

25   interest rate manipulation at Refco?

CAFPCOL4                        "Maggio" – redirect

1    "A. No.

2    "Q. Did you ever tell them that Mr. Collins knew about boxes?

3    "A. No.

4    "Q. Did you ever tell them –– tell the U.S. Attorney's Office

5    that Mr. Collins knew about the false pledging of assets?

6    "A. No.

7    "Q. Did you ever tell the government that Mr. Collins knew

8    anything about Refco Mortgage Securities, Inc.?

9    "A. No.

10   "Q. Did you ever tell the government that Mr. Collins knew

11   anything about Phillip Morris stock?

12   "A. No.

13   "Q. Did you ever tell them that Mr. Collins knew anything about

14   the PanAm stock?

15   "A. No.

16   "Q. Sham foreign exchange transactions?

17   "A. No.

18   "Q. Sham treasury actions?

19   "A. No.

20   "Q. Customer losses like Trader Marine and Niederhoffer?

21   "A. No.

22   "Q. Did you ever tell them that Mr. Collins knew about the

23   BAWAG round-robins?

24   "A. No.

25   "Q. Did you ever tell the U.S. Attorney's Office that you had a

1    conversation with Mr. Collins about the hole?

2    "A. No.

3    "Q. What were the only things that you told the U.S. Attorney's

4    Office about Mr. Collins that you knew about an involvement in

5    the fraud?

6    "A. One, that the CFTC -- I told him that the statement that I

7    gave, the Manufacturer's statement and the statement that the

8    FCM got were completely different.

9        I told him in 2004 that this company, that Refco was

10   basically a piece-of-shit firm and that it was a house of

11   mirrors, and that if I had to go to my own attorney, there

12   would be consequences.

13       The round-trip loans, I told him to -- well, I didn't

14   tell him personally, but I directed David Weaver to draft the

15   documents as related to the round-trip loans.

16   "Q. Mr. Maggio, regarding the --

17   "A.  Excuse me, sir.

18   "Q. Oh, sure.

19   "A. And Sedona, I told him allowed the client to sell stock

20   illegally.

21       (Continued on next page)

22

23

24

25

Cafdcol5                          "Maggio – redirect

1    "Q  Mr. Maggio, counsel asked some questions about the first

2    time that you spoke to the government about Mr. Collins.

3              "Do you recall those questions?

4    "A  Yes.

5    "Q  Mr. Maggio, do you recall the first time that you told the

6    United States Attorney's office about Mayer Brown's involvement

7    in the round robin transactions?

8    "A  No.

9    "Q  Mr. Maggio, I am now showing you what's been marked as

10   Government Exhibit 3501-9.

11             "If you could look at the flagged page, Mr. Maggio?

12   "A  Yes, sir.

13   "Q  Having looked at that document, Mr. Maggio, does that

14   refresh your recollection as to the date on which you first

15   mentioned to the government that Mayer Brown's firm's

16   involvement in the round-robin transactions?

17   "A  Yes.

18   "Q  What was the date on which you first told the government

19   about Mayer Brown's involvement in the round-robin

20   transactions?

21   "A  October 10, 2005.

22   "Q  On October 10, 2005, what was happening on that day?

23   "A  That was the first day I was there to cooperate with the

24   U.S. Attorney's Office.

25   "Q  Very first meeting, Mr. Maggio?

Cafdcol5                          "Maggio - redirect

1   "A  Yes, sir.

2   "Q  Now, Mr. Maggio, counsel asked you some questions about

3   Sedona towards the end of the cross-examination this afternoon.

4          "Do you remember those questions?

5   "A  Yes.

6   "Q  He asked you certain questions about conflicts of interest

7   and that kind of thing.

8          "Do you remember that?

9   "A  Yes.

10  "Q  Now, Mr. Maggio, you testified that in 2003 you spoke to

11  Mr. Collins and talked to him about the condition of Refco and

12  your interest in having him represent both you and the company.

13         "Do you recall that?

14  "A  Yes.

15  "Q  Now, Mr. Maggio, at the time that you met with Mr. Collins,

16  did you know Refco was engaged in a massive fraud?

17  "A  Yes.

18  "Q  Did you know about the income padding and the revenue

19  manipulation and the round-robin transactions?

20  "A  Yes.

21  "Q  You knew about an awful lot of wrong conduct at Refco,

22  right?

23  A.  Yes.

24  "Q  And at that time with that information you could have

25  pursued an interest different from the company's, right?

 1    "A   Yes.

 2    "Q   You could have ratted out Mr. Bennett, correct?

 3    "A   Yes.

 4    "Q   You could have ratted out Mr. Trosten, correct?

 5    "A   Yes.

 6    "Q   You could have ratted out the whole firm, right?

 7    "A   Yes.

 8    "Q   And at that time you were the subject of an investigation

 9    with the SEC, is that right?

10    "A   Yes.

11    "Q   And, Mr. Maggio, during that time did Mr. Collins ever tell

12    you or anyone with the Mayer Brown firm ever tell you that you

13    had an interest that was against the interests of Refco?

14    "A   No.

15    "Q   Did they ever tell you that you could be a witness against

16    Refco?

17    "A   No.

18    "Q   In fact, what was the conclusion that Wilmer Cutler

19    Pickering had about your status and your interests vis-a-vis

20    Refco?

21    "A   I was told that I needed to get my own counsel and that our

22    interests were now separating.

23    "Q   That was Wilmer Cutler's conclusion, right?

24    "A   That was Wilmer Cutler's conclusion, yes.

25    "Q   And, Mr. Maggio, you had different interests at the time

1    because you knew your firm was engaged in a fraud, correct?

2    "A   That's right.

3    Q.   And you could rat that firm out, correct?

4    "A   Yes.

5    "Q   And instead of having Wilmer Cutler represent you,

6    Mr. Maggio, you had Mr. Collins represent you, isn't that

7    right?

8    "A   Yes, sir.

9    "Q   And he never told you you had a separate interest, that you

10   could rat out the firm, isn't that right?

11   "A   That's correct.

12   "Q   And, Mr. Maggio, when you spoke to Mr. Collins, remind us,

13   what is it that you told him in that conversation in 2003?

14   "A   The first or second one, sir?

15   "Q   The one that has made the attorneys use bad words from time

16   to time.

17   "A   I guess I'm allowed to.  Basically I spoke to Joe and I

18   said, listen, Joe, I spoke to Phil and I'm asking you if only

19   here or -- to represent us because if I have to go to my

20   attorney, then all hell will break loose.  I'm going to tell

21   you all, everybody is going to know what kind of piece of shit

22   firm this is and this is nothing more than a house of mirrors

23   and that there will be consequences.  And he paused and he

24   says, I'll represent you.  We'll get through this.

25   "Q   And just to be absolutely clear, Mr. Maggio, you had this

Cafdcol5                        "Maggio - redirect

1    conversation before you were ever charged with anything by the

2    SEC, correct?

3    "A   In June of 2003.

4    "Q   And that was before you were charged with anything by the

5    SEC, is that correct?

6    "A   Yes.

7    "Q   And Mr. Collins never told you that you had an interest

8    separate from that of the company, is that right?

9    "A   Never.

10   "Q   Mr. Maggio, going back to your meetings with the U.S.

11   Attorney's Office, just to be clear, when you first met with

12   the government, I think you testified on cross-examination --

13   this is after the blowup -- that you tried to tell them, the

14   government, the entire scope of the fraud.  Do you remember

15   saying that?

16   "A   Well, I think I said there was first an educational

17   process, and then I tried to give them, you know, the scope of

18   the fraud without getting into a lot of the exact details of

19   how that took place.

20   "Q   So when you said the entire scope of the fraud, Mr. Maggio,

21   did you tell the government everything you knew about the fraud

22   in that first meeting?

23   "A   No.

24   "Q   Could you possibly have told them everything you knew about

25   the fraud in that first meeting?

Cafdcol5                    "Maggio - redirect

1   "A   No.

2   "Q   And you didn't get an opportunity to get down to the

3   details until later, is that right?

4   "A   That's correct.

5   "Q   But you did in that first meeting with the government

6   mention Mayer Brown's involvement in round robins, isn't that

7   right?

8   "A   Yes.

9   "Q   Mr. Maggio, going back to your 1993 deposition, prior to

10  your 1993 deposition, you committed various crimes in

11  connection with your financial services firms, right?

12  "A   Yes.

13  "Q   And then in 1993 you committed perjury, right?

14  "A   At the deposition, yes.

15  "Q   And I think you testified that you were uncomfortable going

16  into that deposition, is that right?

17  "A   Uncomfortable is an understatement.

18  "Q   How is it that a man who committed so many frauds in

19  connection with financial services firms historically could

20  feel uncomfortable in 1993 going into that deposition when

21  you'd lied in the past?

22  "A   Because this is the first time regulators are looking at

23  me.  This is the first time my career is on the line.  This is

24  the first time I may be caught for something.  So to me I was

25  petrified.

Cafdcol5                          "Maggio - redirect

1    "Q  And is that why you raised your concerns with Mr. Bennett?

2    "A  Yes.

3    "Q  Mr. Maggio, showing you what's been marked as Government

4    Exhibit 3501-54."

5           And if we could please pull that up.

6           "Mr. Maggio, what is 3501-54?

7    "A  It's -- it's an agreement with myself regarding the

8    forfeiture and regarding the cooperation.  I guess it's a

9    cooperation agreement, and also includes the forfeiture

10   agreement and what I agreed to plead to.

11   "Q  And, Mr. Maggio, if you could just turn to page 3 of the

12   document.

13   "A  Yes, sir.

14   "Q  And if you could just look at the middle paragraph.  What

15   does this paragraph set forth, Mr. Maggio?

16   "A  Sets up the parameters of the cooperation agreement.

17   "Q  And according to this agreement, Mr. Maggio, what does it

18   require you to do?  What's the first thing it requires you to

19   do in this letter A?

20   "A  'shall truthfully and completely disclose all information

21   with respect to the activities of himself and others concerning

22   all matters about which this office inquires of him, which

23   information can be used for any purpose.'

24   "Q  And, Mr. Maggio, looking at Subsection E, what else does

25   this require you to do, this cooperation agreement?

"A  'Shall truthfully testify before the grand jury and at any

trial and other court proceeding with respect to any matters

about which this office may request his testimony.'

"Q  Mr. Maggio, directing your attention to page 4 of the

document.  Look at the last paragraph on that page.

"A  Yes.

"Q  Please read the first sentence of that paragraph.

"A  'It is understood that should the defendant commit any

further crimes or should it be determined that he has given

false, incomplete or misleading testimony or information, or

should he otherwise violate any provision of this agreement,

the defendant shall thereafter be subject to prosecution for

any federal criminal violation of which this office has

knowledge, including perjury and obstruction of justice.'

"Q  And does that include your testimony in this proceeding,

Mr. Maggio?

"A  Yes, sir.

"Q  And if you could just turn quickly to page 5, Mr. Maggio.

The second paragraph reads:  'It is understood that in the

event it is determined that the defendant has committed any

further crimes, given false, incomplete or misleading testimony

or information or otherwise violated any provision of this

agreement (a) all statements by the defendant to this office or

other designated law enforcement agents and any testimony given

by the defendant before a grand jury or other tribunal, whether

Cafdcol5                         "Maggio - redirect

1    prior to or subsequent to the signing of this agreement, and

2    any leads will be admissible against defendant.'

3            "What is your understanding of what that means,

4    Mr. Maggio?

5    "A  It means if I -- I mean, if I mess up, that the government

6    doesn't have to live up to the agreement, to the cooperation

7    agreement.

8    "Q  And what happens to your cooperation agreement?

9    "A  Goes out the window.

10   "Q  And, Mr. Maggio, what does messing up mean?

11   "A  Excuse me?

12   "Q  What does messing up mean?

13   "A  Mess up means to me to lie by giving false information,

14   giving wrongful information, lying, perjury.

15   "Q  And, Mr. Maggio, is it your understanding that you need to

16   do anything in particular other than tell the truth during your

17   testimony at this proceeding?

18   "A  Yes, sir.

19   "Q  Is it your understanding you don't need to do anything else

20   but tell the truth during this proceeding?

21   "A  Sir, all I have to do is tell the truth.

22   "Q  Mr. Maggio, do you understand or do you believe that you

23   provided substantial assistance to the government so far?

24   "A  Yes, I did, sir.

25   "Q  Prior to your testimony what assistance have you provided?

Cafdcol5                          "Maggio - redirect

1    "A   I have given information and evidence that has led to the

2    conviction of three people -- the president, the CEO and the

3    CFO of Refco.  I have given information regarding the Austrian

4    bank BAWAG, which has -- which the trustee was able or the

5    government was able to get hundreds of millions of dollars back

6    for the settlement for the victims.  I have given information

7    about tax shelters that Refco -- Refco was involved in and the

8    people who were behind the tax shelters and the promoters and

9    even some of the -- some of the clients.  So I believe I've

10   given a lot of information and a lot of assistance so far.

     "Q   Now, Mr. Maggio, counsel ended his cross-examination by

11

12   asking you about your boat, is that right?

13   "A   Yes.

14   "Q   And what's the name of that boat?

15   "A   Starting Over.  It's the name that I used when I got

16   divorced in 1989 and I bought a new boat at the time -- excuse

17   me, 1982.  And the name of -- the boat's name was Starting

18   Over.  My wife bought a boat and my ex-wife bought a boat, and

19   she called it Free Again, so that's the name I used and that's

20   the name I kept on my subsequent boats over the years.  So I've

21   used that name as the name of the company.

22   "Q   And, Mr. Maggio, your intention with that boat with regard

23   to that boat is to actually work on a business?

24   "A   Yes, sir.

25   "Q   Nothing wrong with that, Mr. Maggio, right, sir?

1   "A  No, sir.

2   "Q  And, Mr. Maggio, let me ask you a question.  If you lie

3   here today, or if you've lied to the government and your

4   cooperation agreement gets ripped up, what's your understanding

5   about what's going to happen with that boat?

6   "A  It would -- it would be sold or sunk or something, but I

7   certainly wouldn't be using it.

8   "Q  No further questions."

9             THE COURT:  Recross, counsel.

10            MR. SCHWARTZ:  Very brief, your Honor.

11            THE COURT:  Promises, promises.

12            MR. SCHWARTZ:  (Reading)

13  "Q  Counsel just asked you some questions about your first

14  meeting with the U.S. Attorney's Office back in October 2005,

15  right?

16  "A  Yes.

17  "Q  And you told the government at that meeting that Mayer

18  Brown had prepared some of the documents for the loans, right?

19  "A  Yes.

20  "Q  Lots of people knew that Mayer Brown prepared those

21  documents, right?

22  "A  Lots of people knew that they prepared those documents?

23  "Q  Yes.

24  "A  No.  The customers did.

25  "Q  Every customer, right?

Cafdcol5                          "Maggio - recross

1   "A   Every -- the limited number of customers that did those

2   transactions did.

3   "Q   Those customers had attorneys, right?

4   "A   Yes.

5   "Q   Customers had accountants, right?

6   "A   Some of them, yes.

7   "Q   And those documents were given to those customers, right?

8   "A   Yes.

9   "Q   And the question at that first meeting with the U.S.

10  Attorney's Office was not who documented the loans but who knew

11  about the triangulation, right?

12  "A   No, sir.  I don't remember what the question was.

13  "Q   Well, let me show you -- do you still have 3501 --

14  "A   Yes, I do.

15  "Q   -- dash 9 in front of you?

16        I'd ask you to turn to page 4.  At that meeting, sir,

17  you were asked a number of questions about who knew about the

18  triangulation, right?

19  "A   I don't know if this was a -- I don't know exactly what the

20  question was.

21  "Q   Well, the word triangulation was used, right?

22  "A   Yes.

23  "Q   Triangle has three sides, right?

24  "A   Yes.

25  "Q   And what they wanted to know was who knew about the third

Cafdcol5                        "Maggio - recross

1    leg, who was covering up -- who knew that these loans were

2    being used to cover up Refco's hole, right?

3    "A  Yes, but I didn't give all the names.

4    "Q  That was the fraud they were asking about, right?

5    "A  Sir, there were other names that were given that knew of it

6    but I didn't give all the names.  David Weaver knew it.

7    Steve --

8    "Q  Sir, just answer my question.

9    "A  Yes, sir.

10   "Q  You told them Rob Trosten knew about it, right?

11   "A  Yes.

12   "Q  You told them Fred Mutterer knew about it, right?

13   "A  Yes.

14   "Q  You told them Phil knew about it, right?

15   "A  Yes.

16   "Q  And you told them separately in this meeting that Mayer

17   Brown had done the documents, right?

18   "A  Yes.

19   "Q  But you never told them that Joe Collins knew about the

20   triangulation?

21   "A  Sir, they didn't ask me.  I didn't tell them.  All I kept

22   on telling them was what I knew and gave bits and pieces and --

23   but there were other people who knew that I didn't tell them

24   either.

25   "Q  Thank you, Mr. Maggio."

Cafdcol5                    "Maggio - recross

1              MR. SCHWARTZ:  And thank you, Inspector Clark.

2              If I raised my voice, it was not at you.

3              THE COURT:  Redirect, counsel.

4              MR. IMPERATORE:  (Reading).

5     "Q  Mr. Maggio, you recall whether the specific question asked

6     of you was whether or not Lee specifically knew about the

7     triangulation as opposed to anybody else, do you recall?

8     "A  Yes.  Yes, because -- yes.  Yes.

9     "Q  And, Mr. Maggio, you mentioned that other people knew about

10    the existence of the hole that you didn't mention in this

11    proffer, is that correct?

12    "A  That's correct.

13    "Q  Did Tone Grant know about the hole?

14    "A  Yes."

15             MR. IMPERATORE:  No further questions.

16             THE COURT:  All right.  Ladies and gentlemen, we have

17    finished the testimony of Mr. Maggio.

18             I know.  I think it's time for a break.  And we will

19    do the usual five or ten minutes.

20             Would you follow the usual rules, please.  We'll see

21    you with a live witness shortly.  The same rules.  Don't

22    discuss the case or do any research.  I'll see you in a minute.

23             Thank you for your wonderful attention.

24             (Continued on next page)

25

Cafdcol5

1                  (Jury not present)

2                  THE COURT:  Anything else on the record, counsel?

3                  MR. IMPERATORE:  Not from the government, your Honor.

4                  MR. SCHWARTZ:  No, your Honor.

5                  THE COURT:  All right.  Off the record.

6                  (Discussion off the record)

7                  (Recess)

8                  (Jury not present)

9                  THE COURT:  May we bring the jurors in, friends?

10                 MR. CHERNOFF:  Yes, your Honor.

11                 Will we push all the way through to 5?

12                 THE COURT:  Yes, or to five of 5.  I have a call to

13        take.

14                 (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Cafdcol5

1            (Jury present)

2            THE COURT:  Welcome back, ladies and gentlemen.  I

3    hope you enjoyed your snacks.  This is not our normal practice

4    to do this in the middle of the day, but we thought it would

5    help you with the testimony that was being read.  And we

6    appreciate your wonderful attention.

7            A JUROR:  Thank you.

8            THE COURT:  And won't you be seated.

9            Mr. Chernoff.

10           MR. CHERNOFF:  Your Honor, the next witness is on the

11   stand, but before I call upon him, may the government offer two

12   fact stipulations between the parties?

13           THE COURT:  Yes, sir.

14           Ladies and gentlemen, you will recall that

15   stipulations are evidence for your consideration, and as to

16   these you must consider the facts that are set out in the

17   stipulations as true.

18           Sir.

19           MR. CHERNOFF:  Your Honor, the Government Exhibit

20   1701S is a stipulation between the parties.  It refers to a

21   number of exhibits which are documents.  I will not list those

22   at this time, although the parties will refer to them where

23   relevant during the balance of the trial.

24           It reads that these government exhibits, quote, are

25   true, accurate, and authentic copies of documents that were,

Cafdcol5

1     one, made at or near the time of occurrence of the matters set

2     forth by, or from information transmitted by, a person with

3     knowledge of those matters; two, kept in the course of

4     regularly conducted business activity; and, three, received

5     and/or made as part of the regular practice of that business

6     activity of one or more of the following companies:  Refco,

7     Inc; Refco Group Holdings, Inc. (RGHI); Bank Fur Arbeit Und

8     Wirtschaft Und Osterreichische Postparkasse –– and the last

9     word I can't say –– (BAWAG), Paris Bank and/or JPMorgan Chase &

10    Company.

11             Your Honor, the government offers 1701S.

12             THE COURT:  Received.

13             (Government's Exhibit 1701S received in evidence)

14             MR. CHERNOFF:  The next fact stipulation between the

15    parties, your Honor, Government Exhibit 300S, lists a number of

16    exhibits which I will not read out at this time.

17             It states that the parties have agreed that, quote,

18    The handwriting contained in the following exhibits belongs to

19    Joseph P. Collins, the defendant.

20             And the government offers 300S.

21             THE COURT:  Received.

22             (Government's Exhibit 300S received in evidence)

23             MR. CHERNOFF:  Your Honor, the government calls Robert

24    Trosten.

25             THE CLERK:  Sir, will you please stand and raise your

Cafdcol5

1    right hand.

2     ROBERT TROSTEN,

3          called as a witness by the government,

4          having been duly sworn, testified as follows:

5               THE CLERK:  Please be seated.

6               State your full name and spell your last name slowly

7    for the record.

8               THE WITNESS:  My name is Robert Trosten.  That's

9    T-r-o-s, as in Sam, t-e-n.

10              MR. CHERNOFF:  May I inquire, your Honor?

11   DIRECT EXAMINATION

12   BY MR. CHERNOFF:

13   Q.  Mr. Trosten, how old are you?

14   A.  I'm 43 years old.

15   Q.  One more time.

16   A.  I'm 43.

17   Q.  Where did you grow up, sir?

18   A.  I grew up on Long Island.

19   Q.  Did you go to high school out there?

20   A.  I did.  I went to high school in Plainview.

21   Q.  What high school did you attend?

22   A.  John F. Kennedy High School.

23   Q.  Did you go to college?

24   A.  I did.

25   Q.  Where did you attend college?

Cafdcol5                        Trosten – direct

1   A.  I attended college at the State University of New York at

2   Albany.

3   Q.  And what did you major in at SUNY Albany?

4   A.  I majored in accounting.

5   Q.  Where do you currently live?

6   A.  I live in Bradenton, Florida.

7   Q.  And are you working now?

8   A.  I am.

9   Q.  How do you work?

10  A.  I am a financial consultant for a vitamin supplement

11  company out on Long Island, and I am a partial owner in a

12  restaurant in Sarasota, Florida.

13  Q.  Mr. Trosten, are you a defendant in a criminal case here in

14  this courthouse?

15  A.  I am.

16  Q.  And have you pled guilty to several federal crimes?

17  A.  I have.

18  Q.  What were they?

19  A.  Conspiracy to commit securities fraud, securities fraud,

20  bank fraud, wire fraud, and money laundering.

21  Q.  Mr. Trosten, when did you commit those crimes that you've

22  pled guilty to?

23  A.  I committed those crimes during my tenure at Refco between

24  1997 and 2004.

25  Q.  Did you commit those crimes with other people?

Cafdcol5                          Trosten - direct

A.  I did.

Q.  When you pled guilty, did you enter into any kind of plea

agreement with the United States government?

A.  I did.

Q.  And is that a written agreement?

A.  Yes, it is.

Q.  Is it known as a cooperation agreement?

A.  Yes, it is.

Q.  What does the cooperation agreement, in short, require you

to do?

A.  It requires me to tell the truth, testify when called upon,

and commit no further crimes.

Q.  What benefit do you receive from upholding your end of the

cooperation agreement?

A.  If I uphold my end of the agreement, the government is

required to write a letter to my sentencing judge, which may be

her Honor, advising of what I have done since I've pled guilty

to those crimes, and her Honor may substantially deviate from

the sentence that I pled guilty to.

Q.  Are you testifying here today pursuant to that cooperation

agreement?

A.  Yes, I am.

Q.  Have you testified as a government witness in other

proceedings?

A.  Yes, I have.

Cafdcol5                          Trosten – direct

1   Q.  And can you be called as a witness in further proceedings

2   like this one in the future?

3   A.  Yes, I could.

4   Q.  Mr. Trosten, as a result of your guilty plea, did you

5   forfeit over $40 million in cash to the United States

6   government?

7   A.  Yes, I did.

8   Q.  As well as several homes and cars?

9   A.  I did.

10  Q.  And, Mr. Trosten, you have not yet been sentenced, correct?

11  A.  No, I have not.

12  Q.  And you are facing at the time of your sentence potential

13  time in prison, correct?

14  A.  Yes.

15  Q.  When you left Refco in 2004, what was your position with

16  the company?

17  A.  I was the Executive Vice President and Chief Financial

18  Officer.

19  Q.  What is a chief financial officer?

20  A.  The chief financial officer is the highest ranking official

21  at the company in charge of all the finance.

22  Q.  And as Chief Financial Officer, or CFO, who, Mr. Trosten,

23  who did you report to?

24  A.  I reported to the President and Chief Executive Officer,

25  Phillip Bennett.

1   Q.  And who was your predecessor as CFO of Refco?

2   A.  That was Phil Bennett as well.

3   Q.  Was he serving as both CFO and CEO at that time?

4   A.  Yes, he was.

5   Q.  Mr. Trosten, did you commit crimes with Phillip Bennett?

6   A.  Yes, I did.

7   Q.  And when you were working for Phil Bennett at Refco, did

8   you work with a particular lawyer?

9   A.  I did.

10  Q.  Who was that?

11  A.  I worked with Joe Collins.

12  Q.  How regularly did you interact with Joe Collins when you

13  worked at Refco?

14  A.  Anywhere from zero to several times a day.

15  Q.  And over how many years did you work with Joe Collins?

16  A.  I worked with Joe less frequently when I started with the

17  firm in '97 and more frequently as I became -- as my

18  responsibility increased to Chief Financial Officer.

19  Q.  Could you look around the courtroom and tell me if you see

20  Mr. Collins here?

21          MR. SCHWARTZ:  I concede the identification, your

22  Honor.

23          THE COURT:  Yes, sir.

24          MR. CHERNOFF:  Thank you, Mr. Schwartz.

25  BY MR. CHERNOFF:

1   Q.  What, generally speaking, was Joe Collins' role in the

2   legal affairs of Refco?

3   A.  He was our transactional lawyer, outside counsel.  He would

4   work on a variety of issues as requested by senior management.

5   Q.  Was Joe Collins a member of a law firm?

6   A.  Yes, he was.

7   Q.  Which law firm?

8   A.  At the time it was called Mayer, Brown & Platt.

9   Q.  Did that name change later on?

10  A.  I believe it did, yes.

11  Q.  Do you know why?

12  A.  It merged with another firm and it was called Mayer, Brown,

13  Rowe & Maw.

14  Q.  I'll just refer to the firm as Mayer Brown for the rest of

15  this examination.

16  A.  Thank you.

17  Q.  Did other lawyers at Mayer Brown assist Joe Collins in

18  representing Refco?

19  A.  Yes.

20  Q.  Can you estimate how many lawyers at Mayer Brown were

21  working on Refco matters during your tenure?

22  A.  Several, maybe a dozen or so.

23  Q.  And to your knowledge, over your time at Refco,

24  approximately how many different matters did Joe Collins work

25  on for Refco?

Cafdcol5                          Trosten - direct

1    A.  Dozens of matters.

2    Q.  Did you yourself assign legal work to Mr. Collins from time

3    to time?

4    A.  I did.

5    Q.  Why did you select Joe Collins as Refco's lawyer on those

6    matters?

7    A.  Because Refco utilized Joe Collins for most, if not all, of

8    those matters.

9    Q.  We're going to discuss some of those matters in detail

10   later in the examination.  But I want to go through some events

11   chronologically starting with how it was you came to work at

12   Refco.

13          You said you had an accounting degree?

14   A.  Yes.

15   Q.  And when did you finish college with that degree?

16   A.  1991.

17   Q.  What was your first job after graduating?

18   A.  I was an auditor.

19   Q.  Where did you work as an auditor?

20   A.  I worked for a firm called Arthur Andersen, which was for

21   me working out of New York City.

22   Q.  What is an auditor?

23   A.  An auditor is someone that goes into another firm and

24   reviews their what we call books and records or financial data

25   to determine whether or not it is accurate.

1   Q.   What were some of the companies that you, working for

2   Arthur Andersen, conducted audits at?

3   A.   I conducted audits at GTE, a company called TOTAL Oil, a

4   company called Turner Construction.

5   Q.   And how long did you work for Arthur Andersen?

6   A.   Two years.

7   Q.   Where did you leave Arthur Andersen to work?

8   A.   At a firm called Lehman Brothers.

9   Q.   Why did you leave for Lehman Brothers?

10  A.   I left because I was going to make more money.

11  Q.   What position were you given at Lehman Brothers?

12  A.   When I first got to Lehman Brothers, I was working in their

13  consolidation group.

14  Q.   What, in short, is a consolidation group?

15  A.   It's a group that takes financial information from several

16  different entities.  As Lehman Brothers was a global firm,

17  those entities would submit their data to New York.  We would

18  then review it, and we would do what we call consolidate the

19  information to the parent company.

20  Q.   How many years did you work in this consolidation group

21  with Lehman Brothers?

22  A.   Approximately four-and-a-half of my five years.

23  Q.   At some point your job changed?

24  A.   It did.

25  Q.   What were you doing then at Lehman?

1   A.  I was working in the regulatory department at Lehman

2   Brothers.

3   Q.  What does the regulatory department do?

4   A.  Lehman Brothers had an entity that was regulated by the

5   Securities and Exchange Commission and we had to file reports

6   on a monthly basis, and I was responsible for a piece of that

7   report.

8   Q.  And you said about six months into that you changed jobs

9   again?

10  A.  I did.

11  Q.  Where did you go to work at that point?

12  A.  I went to work for a firm called Refco Group Limited.

13  Q.  And remind us what year this was.

14  A.  This was in 1997.

15  Q.  How is it that you came to leave Lehman to join Refco in

16  1997?

17  A.  A manager that I worked with indirectly at Lehman

18  Brothers -- his name is Steven Rossi -- he left to go to Refco

19  in approximately January of 2007 -- I'm sorry, January of 1997.

20  He had asked me to come over shortly thereafter, and I went to

21  work for him.

22  Q.  And could you just spell Mr. Rossi's name for us?

23  A.  Last name, R-o-s-s-i.

24  Q.  So you said you left Lehman Brothers to follow Mr. Rossi to

25  Refco?

1    A.   That is correct.

2    Q.   Why did you decide to change jobs at that point?

3    A.   I thought I could learn a lot from Steven.  I never worked

4    directly for him in the past, and I was getting a significant

5    increase in salary.

6    Q.   What position were you offered at Refco?

7    A.   Vice president of Consolidation and Financial Reporting.

8    Q.   What was your starting salary?

9    A.   My base salary was $120,000, and I had a guaranteed minimum

10   bonus of 25,000.

11   Q.   And what were the positions you held at Refco ranging from

12   your starting position to when you left -- when you finished as

13   CFO?

14   A.   I started as vice president in charge of

15   consolidation/financial reporting.  I later became a senior

16   vice president in charge of financial reporting and ultimately

17   became Executive Vice President and Chief Financial Officer.

18   Q.   Were all these jobs in New York?

19   A.   Yes, they were.

20   Q.   Mr. Trosten, what was Refco?

21   A.   Refco is a -- was a financial services firm.

22   Q.   And what were its main sources of business?

23   A.   Refco would transact business for clients that it had,

24   whether it be in different financial products, futures, foreign

25   exchange, bonds, both U.S. and foreign, and other financial

Cafdcol5                          Trosten - direct

1    products.

2    Q.  Fair to say you conducted this business in markets around

3    the world?

4    A.  Yes.  We had a global base.

5    Q.  At its peak, how large was the company, Refco?

6    A.  At its peak, Refco, from the future side, was one of the

7    largest independent financial services firms in the world as it

8    related to clearing volume.

9    Q.  And roughly how many offices did it have around the world?

10   A.  Roughly 20-plus offices around the world.

11   Q.  Was New York the headquarters at the time you worked there?

12   A.  Yes, it was.

13   Q.  Where had the company -- where had Refco started out?

14   A.  Refco started out in Chicago.

15   Q.  And, by the way, where was Joe Collins himself based?

16   A.  He was based in Chicago.

17   Q.  And did you know him to live in and around Chicago?

18   A.  I did.

19   Q.  Let me turn to the time that you started at Refco.

20            Did you have an understanding of who actually owned

21   the company?

22   A.  Yes, I did.

23   Q.  And who did own Refco at the time that you started?

24   A.  Refco was owned by a company called Refco Group Holdings,

25   Inc.

Cafdcol5                          Trosten - direct

1   Q.  And who in turn owned Refco Group Holdings, Inc.?

2   A.  Refco Group Holdings, Inc. was owned by three people:

3   Thomas Dittmer owned 51 percent, Tone Grant owned 24.5 percent,

4   and Phillip Bennett owned 24.5 percent.

5   Q.  And could you tell us a little bit about, first of all, who

6   Mr. Dittmer was?

7   A.  Tom Dittmer was at some point the Chairman of the Board at

8   Refco.  He had a relationship with -- some family relationship

9   with the founder of Refco, Ray Friedman.  Tone Grant and Tom

10  was not particularly active at the company when I got there in

11  1997.  Tone Grant was the President and Chief Executive Officer

12  of the firm when I got there in 1997.  He was later phased out

13  of the business in approximately 1999/2000.

14         Phillip Bennett was the Chief Financial Officer when I

15  arrived with the firm and later moved up to President and Chief

16  Executive Officer and Chief Financial Officer and later gave

17  his position of chief financial officer to me.

18         MR. CHERNOFF:  Let me ask, Mr. Smith, if we could

19  bring up Government Exhibit 8.

20         Your Honor, I'm going to offer Government 855 without

21  objection.  So I will just ask that it be brought up now for

22  the witness.

23         THE COURT:  Yes.  Thank you.

24         Received, if it hasn't been.

25         (Government's Exhibit 855 received in evidence)

Cafdcol5                    Trosten - direct

1   BY MR. CHERNOFF:

2   Q.  So, Mr. Trosten, would you just take a look at the

3   ownership structure chart that's up there.

4           Does that accurately capture the testimony you just

5   gave about the ownership?

6   A.  At what point in 1999 does it refer?

7   Q.  Is there a difference, did it change in '99?

8   A.  I believe it did, yes.

9   Q.  So let's just take it at the beginning of '99.

10  A.  Yes, it is in the beginning of 1999.

11  Q.  OK.  And so we refer to Refco Group Holdings, Inc., and

12  that was known as RGHI within the company?

13  A.  Yes, it was.

14  Q.  All right.  Phillip Bennett, the CEO, what was his

15  background, in short, whatever details you know about it, when

16  you came to Refco and arrived as the CEO?

17  A.  Phillip Bennett worked at the time I believe it was Chase

18  Bank.  He was involved in their credit, working at the bank,

19  and later joined Refco to work on a company called Refco

20  Capital, one of its subsidiaries, and later, prior to my

21  arrival, was promoted to Chief Financial Officer.

22  Q.  And looking again at the ownership structure, RGHI, did

23  RGHI have any business operations of its own?

24  A.  No.

25  Q.  Did it have any employees?

1    A.  No.

2    Q.  And so its main purpose was to own Refco on behalf of its

3    owners?

4    A.  That is correct.

5    Q.  You testified moments ago that Mr. Collins was an outside

6    lawyer for Refco.  Did you ever work with any law firm or

7    lawyer who handled RGHI matters?

8    A.  I did.

9    Q.  Who was that, or who were they?

10   A.  There was Joe Collins at Mayer Brown, and his associates.

11   Q.  Sorry?

12   A.  And his associates.

13   Q.  Did you ever work with any other law firm for RGHI other

14   than Mayer Brown and Mr. Collins?

15   A.  No.

16           MR. CHERNOFF:  All right.  We can take that down,

17   Mr. Smith.  Thank you.

18   Q.  You said that the ownership structure changed in 1999?

19   A.  Yes, it did.

20   Q.  What was the change?

21   A.  An Austrian bank acquired 10 percent ownership interest in

22   Refco.

23   Q.  And was that the bank BAWAG that you heard me trying to

24   read the name of?

25   A.  Yes.

Cafdcol5                         Trosten - direct

1   Q.  OK.  We'll come back to that, but let me ask you a little

2   bit more at this time about your work at Refco.

3            You said you had a degree in accounting.  And are you

4   also a Certified Public Accountant?

5   A.  I am a Certified Public Accountant, not active.

6   Q.  How many years, roughly, have you worked in accounting

7   during your life?

8   A.  Well, accounting and finance, 15 years.

9   Q.  You said that when you first -- when you first started out

10  at Refco -- well, let me back up.

11           What were your primary responsibilities in the first

12  job you took at Refco?

13  A.  It was to aggregate or consolidate Refco's entities, which

14  were maybe 20-plus or so legal entities.  Their controllers

15  would report their financial information to me, and I would

16  then consolidate it and present it to my management.

17  Q.  OK.  When we use the term "Refco," I am going to ask that

18  it be used to refer to Refco Group Limited.  Is that how you

19  were using it?

20  A.  Yes.

21  Q.  Now, you said that Refco Group Limited had a number of

22  subsidiaries that reported up to it?

23  A.  Yes.

24  Q.  This term "consolidation" you referred to a couple of

25  times.  Can you explain to us in short how consolidation works,

1    what that accounting principle is?

2    A.   When you consolidate to the reporting entity -- in this

3    case that would be Refco -- the goal is to combine all of the

4    entities together and then perform what we call eliminations

5    for any transactions that occur between the parties inside of

6    the reporting entity, being Refco.

7    Q.   What do you mean when you say "eliminations"?

8    A.   You would eliminate any activity that occurred between --

9    between two different entities.  So if I was providing a

10   service for another legal entity and charged them $100, for

11   example, I would have $100 of revenue and the entity that I

12   provided the service to would have $100 of cost.  When we

13   consolidate, that entry would eliminate as if it never

14   happened; it would make it disappear.

15   Q.   Which is how it is supposed to work within a consolidated

16   group?

17   A.   Under generally accepted accounting principles, that's

18   correct.

19   Q.   OK.  Let me take that one more time.

20        You are talking about two subsidiaries in a

21   consolidated group having a transaction with each other?

22   A.   Yes, I am.

23   Q.   Could you give an example of any kind of a transaction

24   between two subsidiaries?

25   A.   Yes.  We had a -- we can have a subsidiary that lends money

1    to other operating subsidiaries.  To the extent that entity

2    number one lends $10 to entity number two, entity number one is

3    going to have $10 less cash and is going to have what we call

4    in accounting a receivable, monies that are owed to it.  Entity

5    number two that received the money is going to have cash in

6    their bank account and is going to have a payable for the money

7    that I just lent it.

8            When we consolidate, that receivable and payable get

9    eliminated in consolidation and the cash is still the cash,

10   because it is still the same $10 of cash in that example when

11   you consolidate.  So that the cash doesn't get eliminated; it

12   is still within the group.  But that receivable and payable

13   would get eliminated in consolidation.

14   Q.  OK.  You used an example involving debt.  Could you give us

15   another example that involves a simple kind of transaction like

16   a sale or a service?

17   A.  Sure.  Let's use the example of rent.  We have one legal

18   entity that would pay the rent on behalf of everyone else, and

19   it would charge them rent expense and allocate that rent

20   expense across all the entities that were utilizing the same

21   building.

22           So as the -- I've paid the rent.  So I have a

23   reduction of my cash and I have rent expense.  Now I'm going to

24   charge additional rent expense to every subsidiary and make

25   them owe me the money that I just paid for them.  In

1    elimination, I'm charging them rental income.  They're being

2    charged rent expense.  That income and expense would also be

3    eliminated in consolidation as well as any loans made to or

4    from to pay for that rent.

5    Q.   OK.  So the point of this elimination and consolidation is

6    to get a picture of how the whole consolidated group is doing?

7    A.   Yes, with third parties.

8    Q.   As opposed to having a set of books that just show

9    transactions within the consolidated group?

10   A.   That is correct.

11   Q.   OK.  Now, you said that Refco had a bunch of subsidiaries

12   that you consolidated, that you eliminated transactions and

13   together consolidated the picture?

14   A.   That's correct.

15   Q.   And you were talking a moment ago about RGHI, another

16   company.

17        Did RGHI and Refco consolidate in Refco's accounting

18   practices?

19   A.   Not for financial -- not for our financial reporting, no.

20   Q.   And why was that?

21   A.   RGHI was the holding company and Refco was the reporting

22   entity.

23   Q.   What do you mean by "reporting entity"?

24   A.   Refco would be the firm that got audited on an annual

25   basis.  It would be the firm that would borrow money from third

1    parties, and those financial statements would be distributed to

2    those third parties on an annual basis.

3    Q.  And, Mr. Trosten, I would ask you if you could slide the

4    mic a little bit to this side.  That way it will -- thank you.

5         OK.  So you said that Refco got audited on an annual

6    basis.  Do you mean audited by an auditing firm as opposed to

7    something like the IRS?

8    A.  Yes, a third-party auditor.

9    Q.  OK.  Those audits were required?

10   A.  They were required by the firms that lent Refco money as

11   part of their review of Refco's creditworthiness.  They

12   required an annual financial statement.

13   Q.  What is an annual financial statement?

14   A.  An annual financial statement is several different

15   financial reports, footnotes to those reports, and they're done

16   as of a 12-month period, whether that be calendar year-end from

17   January to December, or any other period of time covering 12

18   months, which would be considered a fiscal year-end.

19   Q.  So the financial statement is a statement that relates to

20   the end of the fiscal year?

21   A.  As it related with respect to our audits, that's correct.

22   Q.  And what was the fiscal year at Refco?

23   A.  The fiscal year began March 1st of a particular year and

24   ended February 28th or 29th of the following year.

25   Q.  Is there any reason why the fiscal year is different from a

1    calendar year?

2    A.   No.

3    Q.   In other words, the company could select its fiscal year

4    for purposes of preparing its reports?

5    A.   That is correct.

6    Q.   And in order to produce this financial statement, you had

7    to do this consolidation, correct?

8    A.   That is correct.

9    Q.   In these required audits, why did Refco use outside

10   accountants as opposed to accountants on its own payroll?

11   A.   It was required to have an independent audit report.

12   Q.   Independent in what sense?

13   A.   Refco would hire a group of accountants for them to come in

14   and independently look at our books and records to determine

15   whether or not they were accurate.

16   Q.   And where did these outside accountants, the auditors, get

17   the information that they are using to review the company to do

18   the audit?

19   A.   The auditors initially provide us with a list of reports

20   they would like us to provide to them.  We provide it to them.

21   We then have any followups that they may ask and compile a

22   report.

23   Q.   And after the audit is completed, what is it that the

24   auditors, the outside accountants, do in connection with the

25   company's financial statement?

1   A.  They prepare our financial statements in a booklet and they

2   issue an opinion as to those financial statements.

3   Q.  What do you mean by an opinion with respect to the

4   financial statements?

5   A.  Well, the job of the auditor is to go into a particular

6   company, in this case Refco; look at the financial data that we

7   had provided; where possible, independently verify balances; do

8   various testing on balances; and to the extent they are

9   comfortable that the books and records accurately reflect

10  Refco's financial position, they would issue what they call an

11  unqualified opinion.

12  Q.  An unqualified opinion?

13  A.  Yes, unqualified opinion.

14  Q.  Is there some other kind of opinion they might issue?

15  A.  Yes.  It's called a qualified opinion.

16  Q.  What are those and what's the difference?

17  A.  An unqualified opinion means there's no disclaimer within

18  your financial statements.  It will just say that your

19  financial statements in all, in every material respect,

20  accurately reflect the company's position as of a certain date.

21       A qualified opinion is as if to say an except-for

22  opinion.  So it would say your books and records accurately

23  reflect the financial condition of Refco except for as noted,

24  and it would just explain why the opinion was qualified.

25  Q.  And so, obviously, the goal here is to get the unqualified

Cafdcol5                          Trosten – direct

1    opinion?

2    A.   That is correct.

3    Q.   And when a company gets an unqualified opinion for its

4    financial statement, what does it do with that opinion?

5    A.   Well, it uses those financial statements and provides them

6    to banks, investors, rating agencies, potentially customers, if

7    requested.

8    Q.   And what do the banks and rating agencies, etc., do with

9    the financial statement and the unqualified opinion?

10   A.   They utilize Refco's financial statements and our

11   unqualified opinion in reviewing Refco whether to determine to

12   continue to extend it credit, to renew credit, or to get into

13   any other potential deals where Refco is looking to borrow

14   money.

15                 (Continued on next page)

16

17

18

19

20

21

22

23

24

25

CAFPCOL6                         Trosten - direct

1    BY MR. CHERNOFF:

2    Q.  Now, Mr. Trosten, when you worked at Refco, were the

3    financial records of the company audited annually?

4    A.  Yes, they were.

5    Q.  Who prepared the audits during your time there?

6    A.  Well, I, with my team, would aggregate the data, but in

7    terms of the physical book, it was Arthur Andersen from fiscal

8    year end.  But from my time in 1997 and, I believe in fiscal

9    year end 2003, we changed to Grant Thornton.

10   Q.  And why did you change at that time to Grant Thornton?

11   A.  Arthur Andersen had gone out of business.  The partner in

12   charge of the audit at Arthur Andersen left the firm and moved

13   to Grant Thornton, and the audit followed with him.

14   Q.  And so you, yourself, were involved in, and later in charge

15   of, preparing the books and records for the outside auditors to

16   review?

17   A.  That is correct.

18   Q.  And during the years we've been talking about, did Refco

19   get clean, unqualified opinions concerning its financials?

20   A.  Yes, we did.

21   Q.  We were talking a moment ago about consolidation, and I

22   asked you a few questions about RGHI.  Let me come back to

23   another accounting concept.  Are you familiar with the term

24   related party?

25   A.  Yes, I am.

1   Q.  What does that mean?

2   A.  A related party is an entity or a person, from an

3   accounting perspective, that doesn't consolidate with the

4   reporting group, in this case Refco, but does have a

5   relationship with Refco.

6   Q.  And what kind of relationship with Refco do you mean by

7   when you say related party has that kind of relationship?

8   A.  Well, if Phil Bennett had a transaction with Refco, Phil

9   Bennett would be considered a related party because his

10  personal activity wouldn't consolidate within Refco, but

11  there's still a transaction between Refco and Phil Bennett.

12          Refco Group Holdings would be considered a related

13  party, as well as any transactions with Tom Dittmer or Tone

14  Grant, for example.

15  Q.  You said before that Refco and RGHI did not consolidate?

16  A.  Not for financial reporting purposes, no, they do not.

17  Q.  So when you consolidated the books and records, did money

18  that RGHI might have owed Refco eliminate?

19  A.  No, it would not.

20  Q.  Because it was not part of the consolidated Refco Group?

21  A.  That is correct.

22  Q.  Okay.  So if RGHI owed Refco money, would that appear

23  someplace on Refco's audited financial statement?

24  A.  Yes, it would.

25  Q.  How and where would that appear?

1    A.  It would show up on the balance sheet as a receivable.

2    Whether it would show up saying receivable from related party

3    or just embedded in our receivables, it would show up on the

4    balance sheet as an asset under receivables.

5    Q.  What does the term "receivable" mean?

6    A.  A receivable is when there is monies that are owed to you

7    either through borrowings, through services rendered, or

8    through other matters that an entity or an individual owes you

9    money.

10   Q.  And so you said that a debt from RGHI to Refco would appear

11   in the financial statement in -- Does it also appear in the

12   footnotes, did you say?

13   A.  To the extent that it was not outwardly noted on the face

14   of the financial statement or on the balance sheet as a

15   separate line item, which Refco was not, it would show up on

16   what was called a footnote disclosure within the financial

17   statements.

18   Q.  That's what I wanted to ask.  First of all, what is a

19   footnote disclosure?

20   A.  Footnotes are required under generally accepted accounting

21   principles and generally accepted auditing standards.  They are

22   known to be an integral part of the financial statements, and

23   they provide more insight into the financial statements that

24   the reader will then utilize to then make business decisions.

25   Q.  And so how, if at all, does related-party debt appear in

1    the footnotes of a financial statement?

2    A.  It would appear, whether it be Item No. 1 or Item No. 10.

3    Somewhere within your footnote disclosures, you'd have a

4    related-party footnote, which would describe the balance

5    between Refco and any related parties.

6    Q.  Now, in your experience working on audits, are there

7    related-party transactions that are common?

8    A.  Yes.

9    Q.  Give some examples, please?

10   A.  The company could lend money to the owners and they don't

11   want to take it as a distribution; so they just take it as a

12   loan.

13           Conversely, the partners may deem it necessary to

14   contribute more money, but don't want to do it in the form of a

15   contribution of capital.  So they would lend money to the

16   entity with the expectation of getting paid back at a later

17   date.

18   Q.  And so it's fairly normal for related parties to borrow

19   from each other?

20   A.  Yes.

21   Q.  Now, does the size of a related-party debt matter to

22   auditors?

23   A.  It does.

24   Q.  Why?

25   A.  Because related-party debt gets more scrutiny from an

1    auditor than does third-party debt.

2    Q.  Why does it get more scrutiny?

3    A.  It gets more scrutiny because to the extent a third party

4    doesn't repay its obligation, you've got legal rights to sue

5    and to go after that third party.

6         With a related party, you still have the same rights

7    to go after and sue that related party, but you may be less

8    likely to do so.  So the auditors are more sensitive to

9    collectibility as it relates to a related party than they are

10   third party.

11   Q.  Now, when you were working at Refco, did Refco's financial

12   statements disclose some debt from RGHI to Refco in the

13   footnotes?

14   A.  Yes, it did.

15   Q.  Some of the debt?

16   A.  Some of it.

17   Q.  And in the time that you worked at Refco, did your outside

18   auditors, Arthur Andersen, express concern about the size of

19   the RGHI debt, even the size that was being reported?

20   A.  Yes, they did.

21   Q.  How was that concern conveyed to you?

22   A.  It was conveyed to me that Refco's related-party

23   receivable, which was reported in excess of $200 million, was

24   approximately the size of Refco's net worth, which is its

25   assets or monies owed to it, plus its liabilities or money that

CAFPCOL6                       Trosten - direct

1    would -- Refco would owe.  And to the extent that that

2    receivable was not collectible, Refco would have no net worth.

3    Q.  And so what was Arthur Andersen's reaction upon reviewing

4    the books and seeing the size of this RGHI debt that was the

5    same as the net worth of Refco?

6    A.  They had asked Phil Bennett as to how he planned to pay it

7    off and required that they pay it off -- that Refco pay it off

8    within a certain period of time.

9    Q.  And did Mr. Bennett say he had a plan to pay it off?

10   A.  The first time it came up, I don't recall what he had said.

11   The next year, it came up because the balance actually grew,

12   and the auditors wanted it paid down in, I believe it was,

13   approximately a three-year period of time.  And Phil had

14   offered more of a seven to eight-year period of time to repay

15   it through dividends or distributions.

16   Q.  And did you have an understanding as to what the auditors

17   could do if they weren't satisfied with Refco's paying down of

18   this debt from RGHI?

19   A.  They could have looked to determine whether Refco Group

20   Holdings, or RGHI, had the wherewithal and the ability to pay.

21   And to the extent it didn't, Refco would then have a receivable

22   on its books that would be deemed uncollectible, and the

23   auditors would write it off our books; so we'd reduce the

24   receivable and we'd reduce our net worth.

25   Q.  Mr. Trosten, did there come a time when you learned that,

1    in fact, RGHI owed Refco far more money than Refco was

2    reporting to its auditors?

3    A.   Yes, I did.

4    Q.   How did you first start to uncover that?

5    A.   It was approximately May or so of 1998, and I was asked by

6    my manager, Steve Rossi, to what we call roll forward or to

7    determine what the RGHI debt was to RGL as of May from

8    February, which was our fiscal year end.

9         And when I did that, I came up with a significantly

10   higher balance than what was reported.

11   Q.   So what did you do when you came up with that significantly

12   higher balance?

13   A.   I brought it to the attention of my manager, Steven Rossi,

14   and I explained to him that I'm having a difficult time

15   performing this task.  I'm coming up with a much higher number

16   than what is being reported in the financial statements.

17   Q.   So how did Mr. Rossi react?

18   A.   He said he would take a look at my analysis.

19   Q.   Did he tell you what he found in reviewing your analysis?

20   A.   He said he had the same -- He did, and he said he had the

21   same questions I had, and he was going to talk to Phil Bennett.

22   Q.   Did Mr. Rossi report back to you after he spoke to Phil

23   Bennett about this discrepancy?

24   A.   Yes.

25   Q.   And what did he say he had learned from Phil Bennett?

1    A.   Steve had told me that Phil Bennett advised him that at the

2    end of the -- toward the end of our fiscal year end, Phil

3    arranged for short-term pay-down of that debt that RGHI had

4    with Refco, and then that obligation would reverse back in

5    early March of 1998.

6    Q.   And so did you have an understanding at that point how this

7    short-term pay-down would effect Refco's financial statements?

8    A.   I did.

9    Q.   How would it affect them?

10   A.   It would move a portion, in this case, of the related-party

11   debt and make it appear like it was a third-party debt or

12   unrelated-party debt.

13   Q.   Now, we were talking just a moment ago about related-party

14   debts.  This money that RGHI owed Refco at that time was a

15   related-party debt?

16   A.   Yes, it was.

17   Q.   And, therefore, it should have been reported in the

18   footnotes for the financial statement that followed that,

19   closed that fiscal year?

20   A.   Yes.

21   Q.   Let me ask you.  Do you have a folder of exhibits before

22   you, Mr. Trosten?  And they should be roughly in the order I'm

23   going to be asking you about them.  Could you look at the first

24   one which has been marked for identification as Government

25   Exhibit 6001?

1    A.  I have it.

2    Q.  Do you recognize 6001?

3    A.  I do.

4    Q.  What do you recognize it to be?

5    A.  This is Refco's audited financial statement for the fiscal

6    year ended February 28th, 1998.

7            MR. CHERNOFF:  Your Honor, government offers 6001.

8            MR. SCHWARTZ:  No objection.

9            THE COURT:  Received.

10           (Government's Exhibit 6001 received in evidence)

11   Q.  And you also have it there on the screen in front of you,

12   Mr. Trosten.

13           First of all, what can you tell from the first page of

14   this document?

15   A.  Well, it's Refco's consolidated financial statements for

16   the period ended February 28, 1998.

17   Q.  And so that's what you would call the end of fiscal year

18   1998?

19   A.  That's correct.

20   Q.  Okay.  Please turn to Page 3.  And you have here a

21   statement from the independent accountants, Arthur Andersen?

22   A.  That is correct.

23   Q.  And that's dated May 15, 1998?

24   A.  That is correct.

25   Q.  And so was that the date of this financial statement being

CAFPCOL6                        Trosten - direct

1   issued?

2   A.   That is the date that they concluded their field work.  The

3   financial statements were likely issued shortly thereafter.

4   Q.   Let me ask you now to turn to Page 8 in this financial

5   statement, and I will read you Paragraph 7 and then ask you a

6   question.

7           It says, "Related Party Transactions.  During the year

8   ended February 28, 1998, the group loaned money to and borrowed

9   money from its stockholder, affiliated companies, and other

10  related parties."

11          Let me stop there.  Was RGHI within the group that is

12  described as stockholder, affiliated companies and other

13  related parties?

14  A.   Yes, it would be.

15  Q.   Continuing with the footnote 7, "At year end, these

16  balances included net loans receivable of approximately

17  $231 million due from non-consolidated affiliates."

18          And was RGHI an non-consolidated affiliate?

19  A.   Yes, it was.

20  Q.   The footnote continues, "Those transactions occurred in the

21  normal course of the group's business.  Interest was generally

22  charged at prevailing market rates."

23          Mr. Trosten, so it says here that there was

24  $230 million in receivables in debt from non-consolidated

25  affiliates.  Was that true?

CAFPCOL6                    Trosten - direct

1   A.   It's true that that's what was reported.

2   Q.   Was that the true amount of the amount of the money owed

3   from the non-consolidated affiliates?

4   A.   No, it was not.

5   Q.   And what number had you calculated was the related-party

6   debt that should have been reported here?

7   A.   Approximately 405 million.

8   Q.   Do you have an understanding as to why Arthur Andersen did

9   not object to or failed to qualify its opinion with respect to

10  the full reporting of the 400-plus million dollars in related

11  party debt to Refco by RGHI?

12  A.   Because Arthur Andersen was not aware that the true balance

13  was $405 million.

14  Q.   And did you come to participate in hiding those amounts

15  from Arthur Andersen?

16  A.   Yes, I did.

17  Q.   Before we leave this footnote, are there any other

18  statements here that you came to learn were false?

19  A.   For that year, I don't know if the transactions that

20  occurred were in the normal course of the group's business for

21  '98 and in 1998.  I do believe that interest was generally

22  charged at market rate.

23  Q.   And you later learned more about those statements in

24  subsequent fiscal years?

25  A.   I did.

1    Q.  Okay.  Before we talk about those, let me go back to your

2    manager, Mr. Rossi, who had brought your discovery to

3    Mr. Bennett's attention.  Did there come a time when Mr. Rossi

4    left Refco?

5    A.  Yes, he did.

6    Q.  Did you have discussions with him about his decision, in

7    the time that led up to his departure?

8    A.  Yes, I did.

9    Q.  And what brought about his decision?

10   A.  Steve was getting increasingly uncomfortable with the

11   reporting on the financial statements of the related-party

12   balance.  He was also getting uncomfortable with certain

13   shifting of expenses and other expense or revenue enhancements.

14          He attempted to change his position to get away from

15   the financial reporting, but the auditors continued to view him

16   in the same role that he had worked on in the past and decided

17   he was no longer going to participate in Refco's activities.

18   Q.  You said he tried to change his role to get away from the

19   financial activities?

20   A.  That is correct.

21   Q.  How did he try to change his role?

22   A.  He had a title change from controller to senior vice

23   president in charge of administration, I believe it was called.

24   And all non -- all financial-related activity was now going to

25   go through me, and I was going to report to Phil on those

1    activities, Mr. Bennett.

2    Q.  Did Mr. Rossi tell you why he was trying to change his

3    role?

4    A.  Yes, he did.

5    Q.  What did he say?

6    A.  He told me that he consulted with an attorney and that

7    initially he felt, through his discussions with counsel, that

8    he could stay on with Refco, provided he was not going to be

9    involved in day-to-day accounting activity at Refco.

10   Q.  Do you know whether he consulted further with a lawyer as

11   his time at Refco went on?

12   A.  I do.

13   Q.  What did he tell you about those conversations?

14   A.  He told me that because this wasn't working out as his

15   title would have indicated, he was still getting questions from

16   the auditors, he went back to an attorney -- presumably the

17   same attorney, I don't know -- and came back with that he

18   needed to leave the firm because he may be subject to civil or

19   possible criminal exposure.

20   Q.  And so he did leave?

21   A.  Yes, he did.

22   Q.  What did you expect would happen to you when your manager,

23   Mr. Rossi, left?

24   A.  I expected to be terminated upon Steve Rossi's departure.

25   Q.  Why?

1   A.  Because Steve was no longer going to participate in these

2   activities.  Steve had brought me over to work with Refco, and

3   I figured Phil would view me in the same light as Steve and

4   would start anew with an accounting group.

5   Q.  Is that what happened?

6   A.  No, it's not.

7   Q.  What happened instead?

8   A.  Within days of Steve's departure, I got a call into Phil

9   Bennett's office and was offered a promotion.

10  Q.  What promotion were you offered?

11  A.  I was offered a promotion to senior vice president in

12  charge of finance.

13  Q.  What did you expect Mr. Bennett would expect of you,

14  promoting you to senior vice president of finance?

15  A.  He was going to expect me to continue with the activities

16  that Steve Rossi was unwilling to do.

17  Q.  Did you make a decision that you were willing to do that?

18  A.  Yes, I did.

19  Q.  Why did you make that decision?

20  A.  I made that decision because I was going to be making a

21  significant -- significantly more amount of money than I was

22  making in the past, and I believed that Phil Bennett would

23  ultimately get the firm out of the position that it was in and

24  sell the company and repay its obligations.

25  Q.  You thought that Mr. Bennett would be able to sell the

CAFPCOL6                         Trosten - direct

1  company and repay the debt that RGHI owed Refco?

2  A.  Yes.

3  Q.  In other words, the debt -- RGHI was owned by Mr. Bennett?

4  A.  Yes.

5  Q.  So it was one step removed from the money that he owed

6  Refco?

7  A.  That's correct.

8  Q.  So why was it that you had such confidence that Mr. Bennett

9  would be able to sell it?

10  A.  In my dealings with Mr. Bennett up until that point, he

11  was, one, if not the most intelligent person I've ever met and

12  worked with.  He has a breadth of knowledge on multiple topics,

13  and I believed that I would learn a great deal from him, and I

14  was going to be working directly for him.

15  Q.  And you were also going to be making a lot more money, as

16  you said?

17  A.  Yes.

18  Q.  How much money did Mr. Bennett offer you to go along with

19  the things that Mr. Rossi wouldn't do?

20  A.  Ultimately, it was millions of dollars.

21  Q.  How much was it, at that time, if you recall, in

22  Mr. Bennett's office, and given this first promotion?

23  A.  $500,000 of base salary in advance on a bonus of

24  approximately $425,000.  I had also received an advance of

25  $625,000, which Phil forgave that debt and gave me money to pay

1    the taxes on that debt.  So for that year, I made over

2    $2 million.

3    Q.  And you said your compensation grew as your time at Refco

4    continued?

5    A.  That's correct.

6    Q.  In broad strokes, tell us how the compensation grew as you

7    advanced to the position of CFO?

8    A.  At some point during my career, my base salary went from

9    $500,000 to a million dollars.  The firm purchased a residence

10   for me.  I later paid that back with other monies that Refco

11   had given to me and, ultimately, in 2004, I received a payment

12   of $46 million when I left the firm.

13   Q.  And I gather what was left of that payment and your other

14   payments constituted the cash that you forfeited to the United

15   States?

16   A.  That is correct.

17   Q.  And the houses and cars that you forfeited were also bought

18   with those payments from Refco?

19   A.  That is correct.

20   Q.  So you said that Mr. Rossi left.  And what year was that?

21   A.  That was in 1999.

22   Q.  And how did your responsibilities actually change now that

23   you had this promotion?

24   A.  Now, I was fully responsible for running and administering

25   the audit.  I became more involved in raising debt for the

1    company and other related activities relating to Refco.

2    Q.  You said that Mr. Bennett had described a short-term

3    pay-down that was made at the end of each -- or made at the end

4    of a fiscal year to conceal RGHI debt?

5    A.  That's correct.

6    Q.  What, if any, responsibility did you now take for this

7    short-term pay-down at the end of the fiscal year?

8    A.  What I would do toward the end of each fiscal year, I would

9    prepare a schedule showing the true and accurate balance of

10   RGHI and affiliates and what the balance that they owed to

11   Refco.

12           I would provide that to Phil Bennett and Sandy Maggio,

13   and they would then go out and execute these short-term

14   pay-downs.  They would advise me when they were complete, and

15   then I would run the same set of schedules to determine that it

16   was done accurately.

17   Q.  And the reason that you did that, again?

18   A.  The reason why I did what?

19   Q.  The reason for these short-term pay-downs?

20   A.  It was to present Refco's financial statement in a better

21   position than it would otherwise have done.

22   Q.  By hiding the full amount of the related-party debt,

23   correct?

24   A.  That is correct.

25   Q.  Before we go into the details of this role you took on, how

1   many years did you, yourself, take part in hiding the full

2   amount of RGHI debt to Refco?

3   A.   I prepared the -- that schedule that I just referred to

4   from 19 -- fiscal year end 1999 through fiscal year end 2004,

5   and I also prepared it two other times, as well.

6   Q.   So for six fiscal years, correct, '99 to --

7   A.   Six years '99, 2000, one, two, three, four -- Yes.

8   Q.   And you said a couple other times as well?

9   A.   Yes, I did.

10  Q.   What were those other occasions?

11  A.   One was in December 2003, and one was in May of 2004.

12  Q.   So let's talk now about your role specifically in these

13  pay-down transactions.  Did you have a term that you used in

14  discussing these transactions with Mr. Bennett?

15  A.   We called them short-term financings.

16  Q.   Financings, short-term financings?

17  A.   Short-term financings.

18  Q.   What is it you specifically did to prepare the groundwork

19  for these short-term financings?

20  A.   What I would do is go through Refco's various entities'

21  financial reports, determine what the actual balance was with

22  RGHI and Refco, or any of its affiliates.

23        I'd aggregate that on a schedule, and I would submit

24  that schedule to Phil Bennett and Sandy Maggio, who would then

25  facilitate these short-term finances or short-term pay-downs.

1      And then I would prepare that schedule again to

2  determine what the now-reported balance would be and if that's

3  the schedule that I would give to the auditor.

4  Q.  You said that Maggio and Bennett would facilitate the

5  transactions?

6  A.  Yes.

7  Q.  How so?

8  A.  They would utilize third parties.

9  Q.  Who were these third parties?  What was your understanding

10  about them?

11  A.  They were hedge funds and they -- Refco, Phil and Sandy,

12  created a series of transactions that would make the

13  related-party receivable appear to be a third-party receivable.

14  Q.  And by the way, when you say "Sandy," that was the nickname

15  for Santo Maggio?

16  A.  Yes.

17  Q.  Let me ask Mr. Smith if we could bring up Government

18  Exhibit 2.

19      Mr. Trosten, I'm going to hand you a laser pointer to

20  give some assistance in your testimony.  It comes out of the

21  back end.

22      I'm going to ask you to take a look at Government

23  Exhibit 2.

24  A.  I have it.

25  Q.  Is this a reasonably accurate depiction of the short-term

CAFPCOL6                     Trosten - direct

1    pay-down transactions, the financings that we've been talking

2    about?

3    A.  Yes, it does.

4    Q.  Could you walk us through this chart and just explain in

5    brief how the transactions worked?

6    A.  Okay.  Toward the end of each fiscal year, Refco -- I don't

7    know if you guys can see it on the screen.  Refco would --

8    Q.  I think you might be pointing -- At this screen up here.

9    A.  Oh.  I'm not sure I can see it.

10   Q.  We can dispense with that.  You can just talk us through

11   it.

12   A.  I'm sorry.

13           THE COURT:  You're not the only one.

14   A.  Refco, which is on the bottom, which is the consolidated

15   entity, would lend money to the customer, which is the hedge

16   fund or funds that we had just mentioned.  So that would be the

17   red arrow going from the bottom toward the screen's right.

18           The customer would then lend the money that it

19   received from Refco, and lend it to Refco's parent company,

20   RGHI.  And that would have the effect of RGHI paying down its

21   related-party balance with Refco.

22   Q.  And so those three phases were carried out before the end

23   of fiscal year?

24   A.  That is correct.

25   Q.  What were some typical amounts that were used to make these

1    loans?

2    A.   They'd be several hundred millions of dollars.

3    Q.   How long would these loans be outstanding, typically,

4    generally speaking?

5    A.   Approximately a week.

6    Q.   And when in relation to the end of the fiscal year would

7    they be paid back?

8    A.   The transaction would unwind or be paid back at the

9    beginning of the following fiscal year or early March.

10   Q.   And explain to us, using the chart if you'd like, what do

11   you mean by unwind?  How did that work?

12   A.   Well, what would happen is RGH -- Refco would pay RGHI --

13   or RGHI would pay the customer.  The customer would then repay

14   Refco, and now the RGHI balance is back to what it was, say, in

15   the middle of February, then got paid down in late February and

16   was reinstated in early March.

17   Q.   So the money that Refco had loaned RGHI for the money that

18   RGHI owed would balloon back up?

19   A.   That is correct.

20   Q.   What was your understanding as to why customers engaged --

21   why were they willing to participate in these week-long

22   back-to-back loans?

23   A.   Because they were, in short, making a profit.

24   Q.   How were they making a profit?

25   A.   The interest rate that Refco was lending the money to the

1  customer was less than the amount of interest that the customer

2  was lending that money to RGHI.

3  Q.  And so, roughly, what amount of money was the customer

4  making for participating in a short-term loan like this, given

5  the amounts we're talking about?

6  A.  Thousands of dollars over the course of a week.

7  Q.  And so when these related party -- when these rounds -- I'm

8  sorry.

9        When the short-term pay-downs, as you were calling

10 them, were carried out right before the end of the fiscal year,

11 what percentage or what portion of RGHI's debt was reported to

12 the auditors?

13 A.  It was a fraction of what the true balance was.

14 Q.  In other words, the true balance, minus whatever had been

15 lent temporarily from this customer or customers?

16 A.  That's correct.

17        MR. CHERNOFF:  Thank you, Mr. Smith.

18 Q.  So based on your own involvement in this scheme, what was

19 Refco's purpose in hiding the amount that RGHI actually owed

20 it?

21 A.  The purpose was to continue to receive unqualified opinions

22 from the auditors, which would enable Refco to continue to

23 borrow funds, continue to report financial health to all third

24 parties.

25 Q.  Did you have a concern as to what would happen to Refco if

1    it's true debt from RGHI was accurately reported in its

2    financial statement?

3    A.  Yes.

4    Q.  What was your concern?

5    A.  My concern was that if the auditors found out that we were

6    utilizing these customers and others for short-term pay-downs,

7    they could do several things.

8           They could, one, make us disclose the true and

9    accurate balance, which would cause our banks to either not

10   lend to us or demand to have monies repaid to them.

11          Secondly, to the extent that they realized that we've

12   been doing this for several years by the time they found out

13   about it, they could, what they call, pull their opinion and

14   tell everyone involved with Refco's financial business that you

15   can no longer rely on their unqualified opinion because Refco

16   was committing fraud.

17   Q.  And what, in simple terms, would have happened to Refco in

18   that event?

19   A.  Refco would have to repay all of its debt, would be unable

20   to, and would likely go out of business.

21   Q.  Go to what?

22   A.  Go out of business.

23   Q.  Why was it better for Refco to show its auditors money owed

24   by a customer instead of money owed by RGHI?

25   A.  Because the auditor, when they see monies owed by a third

1  party, they can go and attempt to test that that money is

2  indeed collectible.  Well, when the transaction unwound in

3  early March and the auditors would come in in late March, and

4  they ask to see this third-party balance of, an example I used

5  before, several hundred millions of dollars, we would show the

6  auditor that customer's statement as of that day.  And it would

7  show that the money was repaid.  So, indeed, it was collectible

8  because it had been collected.

9  Q.  And so, Mr. Trosten, this concealment of the RGHI

10 receivable was being done to trick the auditors?

11 A.  That's correct.

12 Q.  And to trick your banks?

13 A.  Correct.

14 Q.  To trick your customers?

15 A.  Correct.

16 Q.  Mr. Trosten, you knew you were breaking the law when you

17 were doing this, correct?

18 A.  That's correct.

19       MR. CHERNOFF:  Your Honor, I'm about to move on to

20 another subject.

21       THE COURT:  This might be the right time.  Ladies and

22 gentlemen, we'll break for the day now.  Remember that we are

23 not sitting tomorrow.  Remember also that your attendance will

24 be reported, and you will be paid only for the days that you

25 sit.

1              Please follow the normal instructions.  Leave your

2        exhibits here.  Take your books with you.  Remember not to talk

3        about the case with anyone else, including your friends at

4        work.  Do not do any research on the case.  Your coffee will be

5        ready for you Wednesday morning at 9:30, extra tea bags, extra

6        hot water.

7              JUROR:  Thank you.

8              THE COURT:  Thank you very much for your attention

9        today and Friday, ladies and gentlemen.  We're through the hard

10       part.

11             (Jury exits)

12             THE COURT:  Let us know, Gilbert.

13             THE DEPUTY CLERK:  Yes.

14             THE COURT:  Thank you.  Anything else on the record,

15       counsel?

16             MR. CHERNOFF:  We do have a couple of short matters

17       related this witness' testimony, which we could take up on

18       Wednesday morning, in light of your Honor's other commitment.

19             THE COURT:  That would be helpful.  Please.  9:30?

20             MR. CHERNOFF:  Yes, your Honor.

21             THE COURT:  Thank you.  Good afternoon, friends.

22             MR. SCHWARTZ:  Good afternoon, your Honor.

23             MR. CHERNOFF:  We can even do 9:45, we think.

24             THE COURT:  You even think 9:45?  I don't know.

25       You're not so trustworthy on this.  All right.  I'll be ready

CAFPCOL6                        Trosten – direct

1     when you're ready.  Let me know.

2               MR. SCHWARTZ:  It's a very quick issue.

3               MR. CHERNOFF:  Thank you.

4               THE COURT:  Thank you.

5               (Adjourned to October 17, 2012, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    ROBERT CLARK
 4    Direct By Mr. Imperatore . . . . . . . . . . 915
 5    Cross By Mr. Schwartz  . . . . . . . . . . . 986
 6    Redirect By Mr. Imperatore . . . . . . . . .1073
 7    ROBERT TROSTEN
 8    Direct By Mr. Chernoff . . . . . . . . . . .1102
 9                        GOVERNMENT EXHIBITS
10    Exhibit No.                                Received
11     1701S   . . . . . . . . . . . . . . . . .1101
12     300S    . . . . . . . . . . . . . . . . .1101
13     855     . . . . . . . . . . . . . . . . .1113
14     6001    . . . . . . . . . . . . . . . . .1132
15                        DEFENDANT EXHIBITS
16    Exhibit No.                                Received
17     2, 713 and 737   . . . . . . . . . . . . . 986
18
19
20
21
22
23
24
25
```