CAHPCOL1                        Trial

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,                    New York, N.Y.

 4              v.                               07 Cr. 1170 (LAP)

 5  JOSEPH P. COLLINS,

 6                  Defendant.

 7  ------------------------------x
                                                 October 17, 2012
 8                                               9:48 a.m.
    Before:
 9
                        HON. LORETTA A. PRESKA,
10
                                                 District Judge
11
                            APPEARANCES
12
    PREET BHARARA
13       United States Attorney for the
         Southern District of New York
14  BY:  HARRY A. CHERNOFF
         MICHAEL A. LEVY
15       EDWARD A. IMPERATORE
             Assistant United States Attorneys
16
    COOLEY LLP
17       Attorneys for Defendant
    BY:  WILLIAM SCHWARTZ
18       JONATHAN BACH
         LAUREN GERBER LEE
19
             – also present –
20
    Kathryn Searles
21  Robert Clark,
         Postal Inspectors, U.S. Postal Inspection Service
22
    Gary Smith,
23       Paralegal, U.S. Attorney's Office

24

25

1        (Trial resumed; jury not present)

2        THE COURT:  Good morning, counsel.  Won't you be

3    seated.  What would you like to talk about, friends?

4        MR. SCHWARTZ:  Your Honor, we got recent 3500 material

5    of an interview with this witness that was conducted by the

6    government in the very recent weeks, and one of the things that

7    was noted in the interview was that after the collapse of

8    Refco, and I believe after Bennett's arrest, Mr. Trosten called

9    Mr. Collins to ask for a referral to a lawyer, and Mr. Collins

10   referred him to Bob Morvillo.

11       We asked the government whether they were intending to

12   bring that out.  The government has told us they are.  Frankly,

13   I do not see the relevance, whether or not they use

14   Mr. Morvillo's name.  They said they won't use his name.  I

15   don't see the relevance of a person who was a CFO of a company

16   calling a lawyer for the company and saying can you give me a

17   referral.

18       Frankly, your Honor, it's unfairly prejudicial.  The

19   jury will not understand that lawyers get calls like this all

20   of the time.  I would hate to think that someone calling me for

21   a referral in a criminal case could someday become evidence

22   against me in a criminal case.  There's no other evidence of

23   anything else in that conversation, as far as I know, other

24   than, I need a lawyer can, you tell me where to go, and getting

25   the name of a highly qualified lawyer to go to.

1           MR. CHERNOFF:  Your Honor, evidence that Mr. Schwartz

2     being asked for a referral is not exactly the same thing.  We

3     don't look at evidence in a vacuum.  This, combined with all

4     the other evidence that will show the relationship of trust

5     between the witness and the defendant, are relevant to showing

6     that they had that relationship.

7           So even after the witness had left the company, was no

8     longer the CFO, when he was in serious trouble, the person he

9     called, the only person he called was Joe Collins.  It's not --

10    It alone will not convict the defendant, but it's a relevant

11    piece of truth that shows the relationship between them.  I'm

12    not sure it means to say the jury won't understand that lawyers

13    get calls all the time.  I think that's pretty obvious that

14    lawyers get calls all the time, and I guess Mr. Schwartz can

15    ask that of some lawyers who will testify today -- or not

16    today, but later in the trial.

17          MR. SCHWARTZ:  The call from Robert, that has

18    relevance.  It has marginal relevance.  I'm moving the ball

19    forward.  Clearly it's a 403 issue.

20          THE COURT:  What's the prejudice?

21          MR. SCHWARTZ:  The prejudice is that juries don't

22    understand.  The jury is not going to understand that this is a

23    routine thing in life.

24          THE COURT:  But that's not an argument for prejudice.

25    What unfairly prejudicial inference are they going to draw?

1          MR. SCHWARTZ:  They are going to draw the inference

2     that he wants them to draw.  Simply because a lawyer gets

3     called, he's in on the fraud, and that's not a fair inference

4     to be drawn from this.  Maybe it's not relevant.  Maybe

5     actually it's not relevant.  Maybe I spoke too soon.

6          THE COURT:  I didn't understand that to be the

7     government's position.  Rather, that it could be seen to

8     illustrate the trust between the two individuals.

9          MR. SCHWARTZ:  But that trust would have existed as a

10    lawyer for the company anyway.  It wasn't -- Mr. Collins, we

11    contend, was a legitimate lawyer for this company, who did have

12    a relationship of trust with Mr. Trosten over a number of

13    legitimate deals.

14         THE COURT:  Okay.  Then what's the unfair prejudice to

15    demonstrating a relationship of trust between a lawyer and the

16    company officer?

17         MR. SCHWARTZ:  Your Honor, it is -- The assumption

18    they want them to take away is more than that it's a

19    relationship of trust, and the trust after the fraud has been

20    committed and after it has been exposed.  This is not a

21    building of relationship of trust, like they did with Maggio.

22    This is a routine thing in life.

23         THE COURT:  I don't under --

24         MR. SCHWARTZ:  Lawyers all the time -- Jonathan Bach

25    was on the phone with someone this morning in the car, who was

1    calling him from a company because a counsel had referred him.

2    This happens every single day in lawyers lives.  The jury can't

3    understand --

4              THE COURT:  I don't there's any --

5              MR. SCHWARTZ:  But it's not necessarily a relationship

6    of trust, your Honor.  It's, I need the name of a lawyer.  Who

7    knows name of lawyers?  Lawyers know names of lawyers.

8              THE COURT:  What's the unfair prejudice?

9              MR. SCHWARTZ:  It confuses a client relationship of

10   trust with a criminal relationship of trust.  That's the unfair

11   prejudice.  It's confusing to the jury.  It is of marginal

12   relevance, if it's of relevance at all.  And the jury is going

13   to be confused about this.

14             If you are -- If you have no idea that this takes

15   place daily in the world, and with lawyers who are not involved

16   in crimes, when a CFO of a company is charged, all of the

17   time -- or is under investigation, all of the time the general

18   counsel for that company will get a call from the CFO saying

19   recommend a lawyer to me.  That doesn't mean there's a criminal

20   relationship of trust, and what the jury can't understand is

21   that context.

22             THE COURT:  All right.  I'm sorry.  I didn't mean to

23   cut you off.  Was there something else you wanted to say?

24             MR. SCHWARTZ:  That's my argument.

25             THE COURT:  Anything else?

1          MR. CHERNOFF:  Your Honor, I don't think Mr. Schwartz

2     is right.  I think that, actually, if the witness thought that

3     Mr. Collins was going to be part of an effort to, as we say,

4     throw him under the bus or something like that, he wouldn't

5     have called Mr. Collins.

6          He called Mr. Collins, presumably, in his career he

7     encountered a bunch of lawyers, but the one person he called in

8     this crisis was Joe Collins.

9          MR. SCHWARTZ:  There have been so many matters that

10    have been referred to me by general counsels of companies of

11    people who turn out to be guilty.  To somehow say that's

12    evidence against the general counsel with a relationship of

13    trust, it's really an extraordinary thing to say.  And it's of

14    such marginal relevance.

15         And a jury who doesn't live in my world can't even

16    begin to understand this.  Bob Morvillo, in his career in his

17    life, received dozens of these calls from outside lawyers of

18    people who were, in fact, guilty, who called the outside lawyer

19    for the company and said send me a lawyer.  That's how Bob

20    Morvillo made a living.  That doesn't mean that those people

21    who sent him those clients were any -- in any way implicated in

22    the crimes.

23         THE COURT:  All right.  There certainly is relevance

24    to the conversation in that it showed the relationship of trust

25    between the defendant and this witness, and I think I heard you

1    right that the witness had left the company by that time?

2              MR. CHERNOFF:  Yes, your Honor.

3              THE COURT:  Okay.  So it does seem to me to be

4    relevant.  I still fail to see any unfair prejudice in the

5    conversation.  It does not seem to me to be such a stretch that

6    the jurors will not understand that lawyers get lots of these

7    calls.  They probably make the same calls themselves.

8              So I find that it is probative, but I do not find any

9    unfair prejudice to the conversation.

10             MR. SCHWARTZ:  Your Honor, we're also concerned about

11   confusion.  And we would ask the Court to -- if you're going to

12   allow this, we ask the Court to not allow this because the jury

13   will be confuse and draw inferences that shouldn't be drawn

14   from this.  But we ask you to instruct the jury that lawyers

15   representing companies get calls like this routinely from

16   officers and former officers.

17             THE COURT:  I don't see how I should instruct them on

18   that factual matter.

19             MR. SCHWARTZ:  Will we be able to call an expert to

20   that effect?

21             THE COURT:  What do you need an expert for?

22             MR. SCHWARTZ:  Because the jury isn't going to

23   understand that fact.

24             THE COURT:  I actually don't agree with you on that,

25   Mr. Schwartz.  The jurors themselves, undoubtedly, call lawyers

1    to ask for lawyers.  I don't think that is so unknown, and I

2    also don't find it to be confusing.  And I do not think I ought

3    to be instructing them on that fact, if you will.  Is there

4    anything else, gents?

5              MR. SCHWARTZ:  No, your Honor.

6              MR. CHERNOFF:  Your Honor, I'm sort of reluctant to

7    bring this up, but your Honor may recall from the last trial

8    there was a sidebar that occurred after this witness testified

9    because the defendant had something of an outburst directed

10   towards him in front of the jury.

11             Judge Sand cautioned the defendant that if he did that

12   again, he'd be held in contempt.  So I just wanted to remind

13   the defendant that displays of his own personal reaction to the

14   testimony should not be before the jury.

15             THE COURT:  I'm sure Mr. Collins has that well in

16   mind.

17             MR. CHERNOFF:  Your Honor, the only housekeeping

18   matter --

19             THE DEFENDANT:  Yes, your Honor.

20             MR. CHERNOFF:  -- is that the exhibit binders for this

21   witness are somewhat back breaking, and what we might want to

22   do is -- I think most of the exhibits are coming in by

23   stipulation.  To the extent there's a dispute, we could walk

24   those exhibits up, or we can, of course, provide your Honor the

25   binders.

CAHPCOL1                    Trial

1      THE COURT:  Is there a dispute as to exhibits?

2      MR. SCHWARTZ:  I don't think there is.  And, you know,

3  we can't follow -- There are lots of exhibits here.  We are

4  assuming that the government, in good faith, is going to stick

5  to its own stipulation, and as long as it's on the stipulated,

6  there's no problem.

7      MR. CHERNOFF:  I think they're either all stipulated

8  or there's no objection, the last time, and we provided a

9  list -- well, we've told the defense it's the same exhibits as

10  the last trial for this witness or fewer, actually.

11      The same issue concerns the 3500, which is these two

12  binders.  We won't need that on direct.  I guess we'll figure

13  out where to place those for your Honor.

14      THE COURT:  I can hardly wait.  Anything else on the

15  record?

16      MR. CHERNOFF:  No, your Honor.

17      MR. LEVY:  Your Honor, at some convenient time, there

18  are a couple of those prior testimony of Mr. Collins'

19  designations.  The government provided them to the defense, and

20  I think the defense would like to raise them at some point.

21  They're going to come in through Mr. Melamed, who we expect

22  will testify Friday.

23      THE COURT:  Okay.

24      MR. LEVY:  It would be nice if the defense would --

25      THE COURT:  Do you want to do a couple of them at

1    lunch?  Do we have time?  How long is it going to take?

2              MR. LEVY:  Actually, not very long.  The ones that are

3    coming in through Mr. Melamed, I think there are only two that

4    are in dispute and they're awfully short.

5              THE COURT:  Okay.  Do you want to do it as soon as we

6    send the jury to lunch?

7              MR. LEVY:  That's fine.

8              THE COURT:  Okay.  Anything else on the record?  Off

9    the record.

10             (Discussion held off the record.)

11             THE COURT:  I'm informed the jurors are here and

12   readying themselves.  So if you need to ready yourselves, let's

13   do it now.

14             (Pause)

15             (Jury enters)

16             THE COURT:  Won't you be seated, ladies and gentlemen.

17   We continue with the direct examination of Mr. Trosten.

18   Counsel?

19             MR. CHERNOFF:  Thank you, your Honor.

20    ROBERT TROSTEN,

21        called as a witness by the Government,

22        having been previously duly sworn, testified as follows:

23   DIRECT EXAMINATION (Resumed)

24   BY MR. CHERNOFF:

25   Q.  Mr. Trosten, when we broke off on Monday afternoon, we were

CAHPCOL1                      Trosten - direct

1   speaking about the year-end pay-down transactions; do you

2   remember that?

3   A.  I do.

4          MR. CHERNOFF:  And let me just ask, Mr. Smith, if we

5   could bring up Government Exhibit 2 again.

6   Q.  And those were the three-leg sort of round-trip

7   transactions, correct?

8   A.  Yes.  Mr. Chernoff, would you be kind enough -- it's kind

9   of hard to hear you.

10  Q.  Oh, yes.  Sorry.  Is that better?

11  A.  Yes.

12  Q.  Mr. Trosten, in your experience working on these

13  transactions, did they ever involve or require any

14  documentation?

15  A.  Yes, they did.

16  Q.  And when was documentation an issue with these loans; when

17  did that start?

18  A.  When you say "an issue," may I ask you to clarify?

19  Q.  Certainly.  When was documentation first created or

20  constructed for these loans transactions over the course of

21  your experience working on Refco?

22          MR. SCHWARTZ:  Objection to form.

23          MR. CHERNOFF:  Let me try this again, your Honor.

24          THE COURT:  All right.

25  Q.  When was the first time there was any documentation?

1   A.   That would be 2000, fiscal 2000.

2   Q.   And what kind of documentation do you have in mind?

3   A.   These were loan documents between Refco and the customer

4   and the customer with RGHI.

5   Q.   And do you have any understanding as to why Refco started

6   documenting the loans at that time?

7   A.   I believe it was asked for by the customer.

8   Q.   You said there was documentation of the legs between Refco

9   and the customer, customer and RGHI.  Why wasn't there any

10  documentation of the transactions between RGHI and Refco?

11  A.   Because when Refco lent the money to the customer and the

12  customer would then lend the money to RGHI, it would lend the

13  money to RGHI at a Refco bank account.  So they would not need

14  to be documentation for the RGHI funds flowing into Refco.  It

15  would just happen automatically as part of our systems.

16  Q.   Now, the documentation between Refco and the customer and

17  the customer and RGHI, did Refco use a law firm to prepare that

18  documentation?

19  A.   Yes.

20  Q.   And how do you know that?

21  A.   Because I was informed of that by Mr. Bennett, Mr. Maggio,

22  and one year I requested certain documents from that law firm.

23  Q.   What law firm was that?

24  A.   Mayer Brown.

25  Q.   And who in Mayer Brown was in charge of that work for

CAHPCOL1                    Trosten - direct

1   Refco?

2   A.   Joe Collins.

3   Q.   And, Mr. Trosten, let me ask you the same thing.  Just pull

4   closer to the microphone and tilt it up towards you so we can

5   hear you better.

6   A.   Okay.  Is that better?

7   Q.   Thank you.  Over the years that you were involved in the

8   round-trip loan transactions or the year-end pay-down

9   transactions, was there any law firm, other than Mayer Brown,

10  that was involved in documenting the loans, to your awareness?

11  A.   Not to my knowledge, no.

12  Q.   You said there was a point where you requested

13  documentation with respect to one of these year-end pay-down

14  transactions?

15  A.   Yes, I did.

16  Q.   And who did you request documentation from?

17  A.   From Joe Collins.

18  Q.   And you said that Mr. Bennett and Mr. Maggio told you that

19  Mr. Collins worked on other loan transactions over the years?

20  A.   That's correct.

21  Q.   Did Mr. Bennett ever caution you not to mention the true

22  purpose of these transactions in whatever discussions you might

23  have had with Mr. Collins?

24  A.   No, he did not.

25  Q.   Same question for Mr. Maggio.  Did Mr. Maggio ever caution

1   you not to mention the true purpose of these transactions in

2   whatever discussions you might have with Mr. Collins?

3   A.   No, he did not.

4   Q.   I've been using a couple of different terms, round-trip

5   loan transactions, year-end pay-down transactions.  In your

6   discussions with Mr. Bennett, did you have a shorthand term for

7   these kinds of loans?

8   A.   We called it short-term financing.

9   Q.   Okay.  We were just talking about the documentation that

10  was done for these loans.  What kind of documentation was it?

11  A.   They were loan documents.

12  Q.   What do you mean by "loan documents"?

13  A.   There was loan documents between Refco and the customer,

14  from the customer and RGHI, and then later there were other

15  documents that were prepared in conjunction with these

16  round-trip loan transactions.

17  Q.   What were those documents that were prepared later?

18  A.   They were guarantees and indemnities.

19  Q.   Who were the guarantees and indemnities from and to?

20  A.   The guarantee and indemnities were from Refco to the

21  customer.

22          MR. CHERNOFF:  Let me ask that we bring up Government

23  Exhibit 2A.

24  Q.   And, Mr. Trosten, does that diagram accurately reflect the

25  guarantees and indemnities and the role they played in the

1    transactions?

2    A.  Yes, it did.

3    Q.  Okay.  What is a guarantee?  How is a guarantee made in

4    this transaction?

5    A.  The guarantee, as it relates to this transaction, was that

6    to the extent that RGHI, which would be the middle blue arrow,

7    didn't payback the customer, Refco was guaranteeing that

8    payment or would make the payment on RGHI's behalf.

9    Q.  What about an indemnity, what is that?

10   A.  Indemnity is a little different.  Indemnity is, in this

11   instance, is where Refco is advising the customer that, to the

12   extent the customer has any issues, ever gets sued or other

13   related matters as it relates to this transaction, that Refco

14   would indemnify or repay the customer for any losses it may

15   incur.

16   Q.  And is there any expiration to that indemnity right that

17   the customer has?

18   A.  Not in the agreements, no.

19   Q.  You said that there was one occasion where you personally

20   requested documentation from Mr. Collins?

21   A.  Yes, I did.

22   Q.  Do you recall when that was?

23   A.  It was February of 2001.

24   Q.  And what caused your involvement directly in these

25   transactions?

1   A.  My manager, Phil Bennett, was out of town.  He reached out

2   to me and he told me that he forgot to execute certain

3   documents relating to one of these funds, and asked if I would

4   call Joe Collins to receive the documents and then execute them

5   on Refco's behalf.

6   Q.  And did Mr. Bennett place any limits on the discussion you

7   could have with Mr. Collins about the loans?

8   A.  No.

9   Q.  Let me ask you to look at Government Exhibit 2001.2(e).  Do

10  you recognize that?  That should be in the first Redwell.

11  A.  Sorry.  I have it.

12  Q.  Okay.  So do you recognize this two-page document?

13  A.  I do.

14  Q.  Did you sign it?

15  A.  Yes, I did.

16  Q.  What do you recognize this to be?

17  A.  This is the guarantee that Refco was providing to a fund

18  called Delta Flyer Fund, LLC.

19          MR. CHERNOFF:  Your Honor, the government offers

20  2001.2(e).

21          MR. SCHWARTZ:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 2001.2(e) received in evidence)

24          MR. CHERNOFF:  Can I have a moment, your Honor?  Thank

25  you, your Honor.

1    　　　　　If we could bring that up, Mr. Smith.

2    Q.  So, Mr. Trosten, this is the agreement you just began to

3    describe, the guarantee to fund the Delta Flyer fund?

4    A.  Yes, it is.

5    Q.  And that was a customer of Refco's?

6    A.  Yes.

7    Q.  Turning to the next page, is that your signature at the

8    bottom on behalf of Refco?

9    A.  Yes, it is.

10   Q.  And at that time, you were senior vice president?

11   A.  Yes, I was.

12   Q.  And so this is the document that guarantees that Refco will

13   pay the loan if RGHI does not?

14   A.  That is correct.

15   Q.  Let me ask you now to look at 2001.2(f)?

16   A.  I have it.

17   Q.  And do you recognize that?

18   A.  Yes, I recognize it.

19   Q.  What do you recognize it to be?

20   A.  This is the indemnification that Refco was providing to

21   Delta Flyer Fund, LLC.

22   　　　　　MR. CHERNOFF:  Your Honor, the government offers it.

23   　　　　　MR. SCHWARTZ:  We have no objection.

24   　　　　　THE COURT:  Received.

25   　　　　　(Government's Exhibit 2001.2(f) received in evidence)

CAHPCOL1                        Trosten – direct

1          MR. CHERNOFF:  If we could bring that up, Mr. Smith.

2     Thank you.

3     Q.  And so, Mr. Trosten, this is the indemnification agreement

4     that you signed for Refco?

5     A.  Yes, it is.

6     Q.  And it makes reference to a loan of $200,000 made by Refco

7     to Delta Flyer?

8     A.  Did you say 200,000, Mr. Chernoff?

9     Q.  Yes, the first paragraph.

10    A.  It's 200 million.  I'm sorry.

11    Q.  I'm sorry.  I'm probably going to do that a lot.  200

12    million?

13    A.  Yes.

14    Q.  And, again, this is the agreement that provides that Delta

15    Flyer Fund, if there's a claim against them in relation to

16    these loans, then Refco will stand in the Fund's shoes,

17    essentially?

18    A.  That is correct.

19    Q.  You said you obtained these documents before you signed

20    them for Mr. Collins?

21    A.  Yes.

22    Q.  When you spoke to the defendant about these documents, what

23    did you say and what did he say?

24    A.  I just called Joe.  I don't remember if he picked up on the

25    first try or called me back, but when we did communicate, I

CAHPCOL1                    Trosten - direct

1   just explained to him that Phil had asked me to give him a

2   call; that he was out of town and that Phil had not executed

3   the guarantee and indemnity agreements as it relates to Delta

4   Flyer and if he could please forward them to me for execution.

5   Q.  Did you understand in your conversation whether the

6   documents had already been prepared?

7   A.  Yes.

8   Q.  And so, presumably, Mr. Collins had spoken to someone else

9   in preparing them?

10          MR. SCHWARTZ:  Objection.  Objection to the question.

11          THE COURT:  Do you want to do that again?

12  Q.  When you spoke to Mr. Collins, the documents were already

13  prepared?  He didn't say he needed to prepare them?

14  A.  That is correct.

15  Q.  And when you spoke to Mr. Bennett, he had told you to call

16  Mr. Collins to get the documents?

17  A.  That is correct.

18  Q.  So did you understand from that, that the documents were

19  already prepared?

20  A.  Yes.

21  Q.  And that Mr. Collins had spoken with someone at Refco to

22  prepare them?

23          MR. SCHWARTZ:  Objection, leading.

24          THE COURT:  It certainly is leading, but I had thought

25  some of this was in an effort to move it along.  Go ahead,

CAHPCOL1                           Trosten - direct

1   Mr. Chernoff.

2           MR. CHERNOFF:  Thank you.

3   Q.  You spoke to Mr. Collins and the loan documents were

4   already prepared?

5   A.  Yes.

6   Q.  And the person at Refco who was in charge year to year of

7   getting these loans done, who was that?

8   A.  Sandy Maggio.

9   Q.  And who else did you speak with at Refco about these loans?

10  A.  Phil Bennett.

11  Q.  Now, when you spoke with Mr. Collins to get the documents,

12  did he ask you why these simultaneous, back-to-back loans were

13  being made?

14  A.  No.

15  Q.  Did you, yourself, ever have an occasion to discuss with

16  Mr. Collins the actual reason for these loans?

17  A.  No, I did not.

18  Q.  Had he wanted to discuss the purpose of these loans, would

19  you have had any hesitation of having those conversations?

20          MR. SCHWARTZ:  Objection, your Honor.  This is a

21  hypothetical.

22          THE COURT:  I'll permit it.  Do you have in mind the

23  question, sir, or do you need it asked again?

24  A.  If you could repeat the question, please.

25          MR. CHERNOFF:  May I, your Honor?

1    Q.  Had Mr. Collins wanted to have that discussion about the

2    purpose of these loans, did you have any hesitation in having

3    it with him?

4    A.  No.

5    Q.  Had Mr. Bennett told you to conceal from Mr. Collins the

6    purpose of these loans?

7    A.  No.

8    Q.  Other than the year 2001 that we've just been talking

9    about, were you ever personally involved in documenting or

10   signing documents relating to these short-term, year-end

11   pay-downs?

12   A.  No.

13   Q.  You mentioned that Santo Maggio had responsibility for

14   these loans, generally.  What was Santo Maggio's position at

15   Refco?

16   A.  Sandy -- if I may refer to him as "Sandy" -- he was the

17   president of a firm called Refco Capital Markets and was

18   president of another subsidiary called Refco Securities, LLC.

19   Q.  Mr. Trosten, are you familiar with a bank known as BAWAG?

20   A.  Yes.

21   Q.  And where is it based?

22   A.  It's based in Austria.

23   Q.  And is that an abbreviation for a longer name in German?

24   A.  Yes.

25   Q.  I'm just going to ask you to take a look at Exhibit 820.

CAHPCOL1                        Trosten - direct

1    A.  I have it.

2    Q.  Just so we have it in the record, does that look like the

3    full name of the bank, BAWAG?

4    A.  After it was combined with another bank.  I always knew it

5    as Bank Fur Arbeit Und Wirtschaft.

6         MR. CHERNOFF:  Okay.  Thank you, Mr. Smith.

7    Q.  We'll talk more about BAWAG later, but right now, I just

8    want to ask whether BAWAG was ever involved in these year-end

9    pay-down transactions that were being used to hide the RGHI

10   debt?

11   A.  Yes.

12   Q.  What role did BAWAG play?

13   A.  They played a similar role, whereas Refco would transfer

14   the debt that RGHI owed to Refco, and make it appear that that

15   money was owed by BAWAG to Refco.

16   Q.  And when BAWAG was doing these year-end transactions for

17   Refco, did BAWAG ever request any documentation of them?

18   A.  Not to my knowledge.

19   Q.  Now, we've been talking about these transactions and how

20   they were used to hide from the auditors the full amount of the

21   RGHI debt to Refco.  We talked a little bit about this on

22   Monday, but when was it that you first learned the actual, true

23   amount of that debt from RGHI to Refco?

24   A.  Approximately May of 1998.

25   Q.  And how much was it, approximately, then?

1   A.  A little over 400 million.

2   Q.  And looking ahead to June of 2004, what was the approximate

3   true amount of the debt from RGHI to Refco at that point in

4   time?

5   A.  1.1 billion.

6   Q.  We'll go through some transactions related to that debt in

7   detail, but generally speaking, how was it this amount that

8   RGHI owed Refco grew so much in that time period?

9   A.  Refco would transfer customer losses from its books to

10  RGHI.  Refco -- I shifted expenses from Refco to RGHI.  I

11  inflated interest income associated with this debt, which had

12  the effect of increasing the balance between RGHI and Refco.

13          There was trading losses that were proprietary trading

14  losses that were shifted up to RGHI from Refco, and there was

15  an arbitration award that was against Refco that was

16  transferred to RGHI.

17  Q.  And you, yourself, were involved in making those transfers,

18  correct?

19  A.  Many of them, yes.

20  Q.  How is it you were able to just transfer expenses or losses

21  that Refco incurred to RGHI's books?

22  A.  It's just a journal entry, a paper transaction.

23  Q.  And part of that is because RGHI was owned by Phil Bennett,

24  correct?

25  A.  RGHI was owned by -- depending on year it was, owned by

CAHPCOL1                     Trosten - direct

1   several members, including Phil Bennett, yes.

2   Q.  And in those years, Phil Bennett was the CEO of Refco,

3   right?

4   A.  From 1999 or so forward, yes.

5   Q.  You mentioned a few different categories of expenses that

6   were transferred.  Let me ask about the first one, customer

7   losses.  How did customer losses effect Refco?  How did they

8   come onto Refco's books?

9   A.  When a customer is trading with Refco and Refco is lending

10  the customer money to do that, to the extent the customer loses

11  money and they cannot afford to pay it back, Refco would incur

12  that loss and may or may not litigate the issue with the

13  customer.  But ultimately, if the customer can ill afford to

14  pay, then Refco would absorb that loss.

15  Q.  Were there any particular customer losses that had a

16  dramatic impact on Refco's books at the time you worked there?

17  A.  Yes.

18  Q.  Who do you have in mind, which customers?

19  A.  One was Victor Niederhoffer and another was a group of

20  Asian customers, the most notably was called Repco, R-e-p-c-o.

21  Not to be confused with Refco.

22  Q.  The first you mentioned was Victor Niederhoffer?

23  A.  Yes.

24  Q.  And who was Victor Niederhoffer?

25  A.  Victor Niederhoffer was a trader and he traded various

1   funds on behalf of himself and clients.

2   Q.   And there was a time that he suffered some kind of loss?

3   A.   That's correct.

4   Q.   How much was it?

5   A.   The loss was approximately 97 million.

6   Q.   And when was this?

7   A.   This was in 1997.

8   Q.   Was Mr. Niederhoffer's loss of $97 million a concern to

9   Refco?

10  A.   Yes.

11  Q.   Why?

12         MR. SCHWARTZ:  Your Honor, can we get a foundation for

13  his knowledge?  I don't believe he was there in 1997.

14         THE COURT:  Mr. Chernoff?

15  Q.   Mr. Trosten, when you were working at Refco, did you have

16  an opportunity to work on what I'll call the Niederhoffer

17  matter?

18  A.   I was familiar with the Niederhoffer matter during my

19  tenure at Refco.

20  Q.   How did you become familiar with it?

21  A.   I had spoken with Steve Rossi, who advised me that Refco

22  indeed suffered a significant loss relating to Victor

23  Niederhoffer.

24  Q.   And this was the time that you and Mr. Rossi were, among

25  other things, involved in hiding the true amount of the RGHI

CAHPCOL1                    Trosten - direct

1    debt on the audited financial statements?

2            MR. SCHWARTZ:  Objection.

3            THE COURT:  I'm sorry.  I just can't hear you,

4    Mr. Schwartz.

5            MR. SCHWARTZ:  Objection.  I don't know what "this was

6    the time" refers to, whether it refers to the Niederhoffer

7    losses or when he learned from Mr. Rossi about.

8    Q.  I'm referring to your discussions with Mr. Rossi.

9    A.  I don't recall whether it was -- it was certainly after the

10   time of the Niederhoffer loss and related documentation to it,

11   and prior to my May closing meeting with the auditor in '98.

12   Q.  And so did you, in your work at Refco, come to learn how it

13   was that Refco handled, dealt with the Niederhoffer loss?

14   A.  Yes.

15   Q.  How did you do that?

16   A.  I had spoken with Steve Rossi, who advised me that 26

17   million of the $97 million loss was going to remain on the

18   books of Refco as an expense or a loss, and the remainder was

19   going to be transferred to a related party.

20   Q.  And when you say that $71 million would be transferred to a

21   related party, was that an entity that consolidated with Refco,

22   to use the term we talked about on Monday, or did not

23   consolidate with Refco?

24   A.  It did not consolidate with Refco.

25   Q.  So that $71 million would vanish from Refco's books?

CAHPCOL1                           Trosten – direct

1   A.   The loss would vanish from Refco's books and would create

2   an additional debt for RGHI that's related with Refco.

3   Q.   From the related party?

4   A.   Correct.

5   Q.   Did Mr. Rossi tell you why these losses were going to be

6   substantially concealed on the books, this transfer that we

7   just talked about?

8   A.   He had told me that Refco went out with a statement that

9   Refco incurred no losses.  Victor Niederhoffer went out with a

10  statement that he incurred no losses, and Refco was going out

11  without financial statements that we were not prepared to

12  disclose the loss in our footnotes.

13  Q.   The third item you mentioned was financial statement.  You

14  said that Refco made a statement that there were no losses.

15  Niederhoffer made a statement there were no losses.  What kind

16  of statements were those?

17  A.   Those were public statements.

18  Q.   And were those public statements reported in the press?

19  Did you become aware of that?

20  A.   I did.

21  Q.   Were they?

22  A.   Were they?

23  Q.   Reported in the press?

24  A.   Yes.

25  Q.   You said that even though the statements to the press were

1    that there were no losses, Refco did reveal $26 million in

2    losses to its auditors?

3    A.  Yes, we did.

4    Q.  How do you know that?

5    A.  Because I worked on it.

6    Q.  Did you attend a meeting at the -- with the auditors

7    concerning those losses?

8    A.  I did.

9    Q.  And do you recall who else was there?

10   A.  Mr. Rossi was there, Phil Bennett, Mark Randler, the

11   partner at Arthur Andersen, and there may have been one or two

12   other members from Arthur Andersen.  I don't recall.

13   Q.  And during those meetings with the auditors, other than

14   concealing the additional $71 million in Niederhoffer losses,

15   were there any other misrepresentations made in the course of

16   those meetings?

17   A.  It was one closing meeting, but yes.

18   Q.  I'm sorry.  In that meeting, what other misrepresentations?

19   A.  We had discussed that the related-party receivable was 231

20   million as reported in our financial statements, when it was

21   significantly higher than that.

22   Q.  Let me ask you, Mr. Trosten, by the way, in your work with

23   Mr. Collins, did you come to become familiar with his

24   handwriting?

25   A.  Yes.

CAHPCOL1                          Trosten - direct

1   Q.  Will you be able to recognize it?

2   A.  Yes.

3   Q.  Let me ask you to take a look at Government Exhibit 300.

4           MR. CHERNOFF:  And, your Honor, we'll offer this

5   pursuant to the stipulation on authenticity and the stipulation

6   that this is Mr. Collins' handwriting.

7           THE COURT:  Received.

8           (Government's Exhibit 300 received in evidence)

9   Q.  And so, Mr. Trosten, you should have it on the screen in

10  front of you or in paper, just if you could read for me in the

11  upper right-hand corner what you see there in the right-hand

12  corner in Mr. Collins' handwriting?

13  A.  It says "Refco/Niederhoffer."

14  Q.  And do you see a date on the left-hand side of the top of

15  these notes?

16  A.  I do.  November 4, 1997.

17  Q.  And dropping down, do you see an entry for November 5th,

18  1997?

19  A.  I do.

20  Q.  It says TW Phil Bennett?

21  A.  Yes.

22  Q.  And then a bunch of numbers follow, some of them are

23  followed by M.  Did you have a practice -- or is there a

24  practice in business that informs you as to what M means in

25  this context?

1    A.  Are you saying M as in --

2               MR. SCHWARTZ:  Objection.

3               THE COURT:  I'm sorry?

4               MR. SCHWARTZ:  He's interpreting Mr. Collins' note.

5               THE COURT:  I'm sorry, sir.  I just -- I can't hear

6    you.

7               MR. SCHWARTZ:  Objection to his interpreting

8    Mr. Collins' initials in these notes, what Mr. Collins

9    abbreviates.

10              THE COURT:  I did not think that was the question.  I

11   think the question was is there a practice in business that

12   informs you as to what M means in this context.

13              MR. SCHWARTZ:  I withdraw the objection, your Honor.

14              THE COURT:  Do you have in mind the question, sir, or

15   do you need it again?

16              THE WITNESS:  I have it.  Thank you, your Honor.

17              THE COURT:  Go ahead.

18   A.  I do know what M as in Mary?

19   Q.  Yes.

20   A.  Means in general business practice.

21   Q.  And what does it stand for?

22   A.  Million.

23   Q.  And dropping down --

24              MR. CHERNOFF:  Mr. Smith, if we could highlight the

25   lower right-hand corner.

1   Q.  That either says, as I read it, 9.7 or 97M; do you see

2   that?

3   A.  I do.

4   Q.  And, again, what were the total losses that

5   Mr. Niederhoffer suffered?

6   A.  Approximately 97 million.

7   Q.  And if we --

8           MR. CHERNOFF:  Mr. Smith, if we could now highlight

9   just the next box on the left-hand side.

10  Q.  Do you see it says "26 Niederhoffer," Mr. Trosten?

11  A.  Yes, I do.

12  Q.  And that was the amount that you said Refco actually did

13  disclose to the auditors, correct?

14  A.  That is correct.

15          MR. CHERNOFF:  Thank you, Mr. Smith.  We can now bring

16  up Government Exhibit 303, which I'll offer pursuant to the

17  same stipulations concerning authenticity and handwriting.

18          THE COURT:  Received.

19          (Government's Exhibit 303 received in evidence)

20  Q.  Now, again, Mr. Trosten, do you see in the upper right-hand

21  corner what's written in Mr. Collins' handwriting there?

22  A.  Yes.

23  Q.  What do you see?

24  A.  "Refco/Niederhoffer."

25  Q.  And looking at the left-hand side, do you see a date, I

1   believe, of March 1st, 1999?

2   A.  That's correct.

3   Q.  And so that was sometime after the Niederhoffer incident?

4   A.  Yes, it was.

5   Q.  Do you see here it says "TF Steve Rossi and Phil

6   Silverman"?

7   A.  I do.

8   Q.  Who is Mr. Silverman?

9   A.  Phillip Silverman was the corporate secretary and was the

10  controller of the firm, the subsidiary, called Refco Capital

11  Corp.

12  Q.  And do you see right under that, then, Mr. Rossi is spoken

13  about?  Do you see under that the notation "71 million" again?

14  A.  I do.

15          MR. CHERNOFF:  Thank you.  We can take that down,

16  Mr. Smith.  Thank you.  Let me now bring up, I'll offer

17  pursuant to the business records stipulation, Government

18  Exhibit 1200A.

19          THE COURT:  Received.

20          (Government's Exhibit 1200A received in evidence)

21          MR. CHERNOFF:  And I'm sorry, your Honor.  I'm just

22  finding the documents.

23          (Continued on next page)

24

25

 1   Q.  Mr. Trosten, do you recognize what's before you, Government

 2   Exhibit 1200-A?

 3   A.  I do.

 4   Q.  What do you recognize this to be?

 5   A.  This is a legal bill sent by Mayer Brown to Refco.

 6   Q.  Let my ask -- and that is for the time period May of 1999?

 7   A.  Yes, it is.

 8           MR. CHERNOFF:  If we could flip ahead, Mr. Smith, to

 9   page 5.  And, actually, if we could blow up the last paragraph

10   on this page, "Niederhoffer Investments."

11   Q.  And, Mr. Trosten, do you see that section?  Could you just

12   read that to us, the bill from Niederhoffer investments?

13   A.  "Consultation regarding suit against CME; advice regarding

14   handling press reports" --

15   Q.  Sorry.  Let me stop you there.

16           What is the CME?

17   A.  The Chicago Mercantile Exchange.

18   Q.  OK.  "Advice regarding handling press reports," and could

19   you please read the rest of that?

20   A.  "Advice concerning assignment agreement and interviews;

21   review file for assignment and agreements; advice regarding

22   position in case and tasks; advice regarding confidentiality

23   provisions and possible need for CME request; advice concerning

24   private equity investment transfers; and review of complaint."

25   Q.  I think that that last part is on the top of the next page,

Cahdcol2                          Trosten – direct

1    page 6.

2    A.  I'm sorry.

3           MR. CHERNOFF:  Thank you, Mr. Smith.

4    Q.  Let me now ask you to flip back to Government Exhibit

5    1250-D.

6           MR. CHERNOFF:  Your Honor, we'll offer this pursuant

7    to the business records stipulation.

8           THE COURT:  Received.

9           (Government's Exhibit 1250D received in evidence)

10          MR. CHERNOFF:  And if we could -- yes, that's good.

11   Q.  Mr. Trosten, do you see it says, "Detail report by matter?"

12   A.  I do.

13   Q.  And then do you see down at the beginning of the items that

14   are listed in the column on the left, it says, "Niederhoffer

15   Investments, Niederhoffer Intermarket Fund?"

16   A.  I do.

17   Q.  And then you see several entries beginning with November 1,

18   1997.  Do you see where that column begins?

19   A.  Yes, I do.

20   Q.  And what is the name that appears under this?

21   A.  You mean in the third column?

22   Q.  In the next column.

23   A.  The name is -- the column is "Joseph P."

24   Q.  And then turning all the way to the far column on the

25   right, could you just read out the first entry there that

Cahdcol2                         Trosten - direct

1    relates to November 1, 1997.

2    A.   "Completed negotiations and drafting of Niederhoffer" what

3    appears to be an abbreviation for "agreements," "TCW, PPRB, ST

4    and TNG re same."

5    Q.   And "PRB," again, whose initials were those?

6    A.   Phillip Bennett.

7         MR. CHERNOFF:  Thank you, Mr. Smith.

8         Could we bring up Government Exhibit 3017, which I

9    will offer pursuant to the authenticity stipulation and the

10   handwriting stipulation.

11        THE COURT:  Received.

12        (Government's Exhibit 3017 received in evidence)

13   Q.   Mr. Trosten, do you see Government Exhibit 3017 is a

14   memorandum addressed to you, copying Joe Collins?

15   A.   Yes.

16   Q.   Do you remember who Ashish Prasad is?

17   A.   I do not.

18   Q.   And this memo says, "Enclosed please find the

19   Refco-Niederhoffer agreements, which I am sending to you at Joe

20   Collins' request.  Please contact me if I can be of further

21   assistance."

22        Correct?

23   A.   Yes.

24        MR. CHERNOFF:  And I will just ask Mr. Smith to bring

25   up page 2.

Cahdcol2                        Trosten – direct

1    Q.  And do you see here in Mr. Collins' handwriting it says

2    "file" with an arrow pointing to the subject line?

3    A.  Yes.

4           MR. CHERNOFF:  Thank you, Mr. Smith.

5    Q.  Why did you -- do you recall why you requested the

6    Niederhoffer agreements in the year 2001?

7    A.  I do.

8    Q.  Why was that?

9    A.  I was asked for these agreements by my tax advisors at

10   Ernst & Young.

11   Q.  And what were the Niederhoffer agreements, in short?

12   A.  The Niederhoffer agreements were the amounts of monies that

13   the Niederhoffer funds had lost and any collateral that they

14   may be able to pay back to recover some of that loss.

15   Q.  So this was a way of settling the dispute that Refco had

16   with Niederhoffer over these losses?

17   A.  That is correct.

18   Q.  Why did you ask Joe Collins apparently for these

19   agreements?

20          MR. SCHWARTZ:  Objection.

21          THE COURT:  Basis?

22          MR. SCHWARTZ:  "Apparently"?

23          MR. CHERNOFF:  Could we have Government Exhibit 3017

24   back up?

25   Q.  Mr. Trosten, do you see this says that Mr. Prasad is

1    sending you the Niederhoffer agreements, copying Joe Collins at

2    Mr. Collins' request?

3    A.   Yes.

4    Q.   Thank you.  So, again, sir, why did you ask Mr. Collins

5    apparently for the Niederhoffer agreements?

6    A.   I had asked for them because they were requested of me by

7    my tax advisors at Ernst & Young.

8    Q.   Why did you ask for them in connection with working with

9    your tax advisors?

10   A.   They had wanted to see the agreements.  I had expressed to

11   them that these were held in reasonable confidence within the

12   firm but I would see if I could obtain them.

13   Q.   Were why were they held within, as you say, reasonable

14   confidence within the firm?

15   A.   Because we went out with -- the firm went out with a

16   release that Refco did not lose any money from Victor

17   Niederhoffer.

18   Q.   And as you testified earlier, that release was false?

19   A.   That is correct.

20   Q.   Let me ask you to take a look at -- and, Mr. Smith, if we

21   could bring this up -- using the Bates numbers in the lower

22   right-hand corner, this would be 281.

23           Thank you, Mr. Smith.  If we could highlight the first

24   part?

25           So, Mr. Trosten, this appears to be an agreement from

Cahdcol2                         Trosten - direct

1   October of '97 between Niederhoffer Friends Partnership and

2   Refco?

3   A.  Or a subsidiary of Refco.

4   Q.  And am I correct that this was one of the Niederhoffer

5   funds involved in the $97 million of loss?

6   A.  Yes.

7   Q.  On paragraph 1, it says, The fund is obligated to Refco in

8   the amount of 32 million and change.

9          What did that amount represent?

10  A.  I believe it is 31 million and change, from what I can see

11  on my copy.

12         It represents the amount that the fund had lost

13  through its trading activity.

14  Q.  And what does paragraph 2 explain?

15  A.  It explains that the fund has approximately $6 million to

16  pay the obligation of 31 million and change.

17  Q.  So this single fund alone is agreeing that it owes Refco --

18  a Refco subsidiary over 31 million?

19  A.  Yes.

20  Q.  Turn to page 3, if you will.

21         And if we could bring up the top of that, Mr. Smith.

22         Thank you, Mr. Smith.

23         So you see there Mr. Collins' name and firm is given?

24  A.  Yes.

25  Q.  And Mr. Collins represents Refco in negotiating these

1    agreements with Niederhoffer?

2    A.  Yes.

3    Q.  Am I correct that there are several additional agreements

4    contained in this exhibit between other Niederhoffer funds and

5    Refco?

6    A.  Yes.

7            MR. CHERNOFF:  And if we could just page through a

8    couple of these, Mr. Smith, starting with Bates 288.

9    Q.  So, Mr. Trosten, do you have that page before you?

10   A.  Yes, I do.

11   Q.  And this is an agreement between Niederhoffer Intermarket

12   Fund and a Refco subsidiary concerning approximately $33

13   million in obligations?

14   A.  That is correct.

15   Q.  If we go flip ahead to Bates 295.

16           Mr. Trosten, this is an agreement between the

17   Niederhoffer Strategic Fund and Refco concerning an obligation

18   of about 1.5 million, correct?

19   A.  Correct.

20   Q.  And, again, how much, according to Refco's public

21   statements, had it lost to the Niederhoffer funds?

22   A.  Nothing.

23   Q.  And what was the amount that Refco told its auditor it had

24   lost in connection with the Niederhoffer funds?

25   A.  26 million.

Cahdcol2                       Trosten - direct

1   Q.  But these agreements we have looked at add up to far more

2   than that, correct?

3   A.  Yes, they do.

4   Q.  You said that the other source -- thank you, Mr. Smith.

5        You said the other source of major losses, customer

6   losses, arose from Repco, R-e-p-c-o, and other companies

7   trading in Asia?

8   A.  That's correct.

9   Q.  How did you learn about those losses?

10  A.  I had learned about it during the 1998 fiscal audit.  The

11  auditors were asking about specific customers, and I went to

12  Santo Maggio, Sandy, and Sandy provided me a schedule of these

13  customers.

14  Q.  So those losses occurred during 1997?

15  A.  To the best of my recollection.

16  Q.  Approximately how much are we talking about?

17  A.  $160 million.

18  Q.  And what was done to conceal the $160 million in losses

19  there?

20  A.  It ultimately got transferred to RGHI or an affiliate of

21  RGHI and a nonconsolidating entity.

22  Q.  The next category I think you mentioned or one of the

23  categories you mentioned with respect to the growth of the debt

24  from RGHI to Refco was expense shifting?

25  A.  Yes.

Cahdcol2                          Trosten - direct

1    Q.   What did you mean by expense shifting?

2    A.   Refco would systematically shift expenses which were for

3    services rendered for Refco and transfer them as services

4    rendered to RGHI, which had the effect of increasing the amount

5    that RGHI owed Refco.

6    Q.   Why was that done?

7    A.   It was done to increase the profitability of Refco so that

8    we can go out with our audited financial statements with a

9    higher income than we would otherwise have had.

10   Q.   What were some examples of expenses that were shifted off

11   of Refco's books onto RGHI's?

12   A.   Compensation expense, computer expenses, certain

13   tax-related expenses.

14   Q.   Did Refco have a profit participation plan?

15   A.   They did.

16   Q.   When, roughly, did that go into effect?

17   A.   January of 2002.

18   Q.   And what was this profit participation plan, what did it

19   do, in general terms?

20   A.   In general terms, it made certain members of senior

21   managements partners.  It enabled these partners to participate

22   as a partner if Refco were to be sold, and we would no longer

23   be receiving the standard W-2 paystub, if you will; instead, we

24   would be getting distributions as a partner.

25   Q.   And the expense associated with that plan, how was that

Cahdcol2                          Trosten - direct

1   handled?

2   A.   Because the plan was -- we now owned a piece of RGHI -- I'm

3   sorry, a piece of Refco, our draws would have the effect of

4   increasing the payable that -- our debt that RGHI had with

5   Refco.

6   Q.   Did you disclose the existence of this plan to Refco's

7   auditors?

8   A.   No, we did not.

9   Q.   How did you hide it?

10  A.   For one, we didn't provide it to them.  And later in one

11  audit they had asked as part of a payroll test to -- they do

12  what they call a predictive test at payroll.  So we would give

13  the auditor a set of documents from our payroll register, which

14  they could then look at and see that journal entry hitting our

15  books and records.

16          There was a concern that the members of senior

17  management would no longer be on that report.  So what we did

18  is we took that report and we took all the names off of the

19  report and we left it just with Social Security numbers so the

20  auditors couldn't realize, for example, that I was not on the

21  report and others were not on the report, to avoid the

22  detection of the profit participation plan.

23  Q.   Who were the members of management at Refco who were part

24  of this profit participation plan, by the way?

25  A.   Would you like me to list them all?

Cahdcol2                         Trosten - direct

1    Q.  Yes, please, to the extent you remember them.

2    A.  I believe there are eight.  There was Phil Bennett, Sandy

3    Maggio, myself, Joseph Murphy, Bill Sexton, Steve Grady, Dennis

4    Klejna, and Frank Mutterer.

5    Q.  Let me pause there for a moment.

6         You mentioned a Dennis Klejna.  Who was Dennis Klejna?

7    A.  He was in-house legal counsel, general counsel.

8    Q.  And do you recall when he was hired in that position?

9    A.  I do not.

10   Q.  What was Dennis Klejna's background before coming to Refco,

11   are you aware?

12   A.  I'm aware of some of it.

13   Q.  And what do you know about it?

14   A.  At one point in Dennis' career he was the head of

15   enforcement of the Commodities Futures Trading Commission,

16   otherwise known as the CFTC.

17   Q.  And the CFTC is a regulator of the commodities market?

18   A.  That is correct.

19   Q.  Did you also work with Mr. Klejna from time to time when

20   you were at Refco?

21   A.  I did.

22   Q.  How, if at all, did his role in the company's legal affairs

23   differ from Joe Collins' role?

24   A.  Dennis was hired firstly for public relations because Refco

25   was having issues.  So we brought in Dennis Klejna, former head

Cahdcol2                    Trosten - direct

```
 1   of enforcement of the CFTC, which looks very good on Refco's

 2   behalf.

 3   Q.  Let me stop you there.

 4   A.  Sure.

 5   Q.  You said Refco was having issues.  What kind of issues?

 6   A.  Historically Refco was receiving fines, violations, for

 7   various matters within commodities.

 8   Q.  And so you said for public relations' reasons Mr. Klejna

 9   was hired?

10   A.  One of them, yes.

11   Q.  What were the other reasons that you are aware of?

12   A.  Dennis is a very intelligent individual.  He handled

13   certain affairs, more finite affairs relating to the futures

14   division within Refco.

15   Q.  And so how did his role at the company differ from

16   Mr. Collins, if it did?

17   A.  Joe handled all of -- most if not all of Refco's

18   transactional business.  Acquisitions that we made, Dennis

19   would be -- have very limited interaction with those --

20   relative to Joe's interaction with those type of acquisitions,

21   for example.

22   Q.  Who did you yourself speak to more in your job?

23   A.  Joe Collins.

24   Q.  And when Joe Collins was handling legal matters for Refco,

25   did he in your experience report to Phillip Bennett or report
```

Cahdcol2                          Trosten - direct

1    to Dennis Klejna?

2    A.  Well, he didn't -- he didn't -- well, he wasn't an employee

3    of Refco so he didn't really report to anyone.

4    Q.  With respect to the work he was doing, though, what I meant

5    is who did he get the work from and who did he report to on the

6    results?

7    A.  Most of the time it was Phillip Bennett, and other senior

8    members of Refco might have given him work from time to time.

9    Q.  Are you aware of times where Mr. Collins was reporting to

10   Mr. Klejna on his work?

11   A.  No, I am not.

12   Q.  Now, when you called up Joe Collins in connection with

13   legal work, did you ever run that by Dennis Klejna before you

14   called Mr. Collins?

15   A.  No, I did not.

16   Q.  OK.  We were talking about different expenses that grew the

17   RGHI debt, and I think you mentioned interest rate adjustments

18   as one of them?

19   A.  Yes.

20   Q.  What does that mean?  How did you adjust interest rates,

21   and how did that help grow the debt?

22   A.  Refco was charging RGHI what was then the market rate as if

23   it was just another customer.  That rate at the time may have

24   been approximately 3, 4, 5 percent, I don't remember.  Refco,

25   myself and Phil, made a decision -- Phil Bennett -- made a

1    decision to increase that interest rate from the prevailing

2    market rate to a fixed rate at 10 percent.

3    Q.   What effect did that cause?

4    A.   That caused the debt between RGHI and RGL at Refco to grow

5    each year.

6    Q.   And how did that affect the apparent profitability of

7    Refco?

8    A.   It showed that Refco had significantly more profits.

9    Q.   And did you hide those interest rate adjustments from the

10   auditors?

11   A.   Yes, I did.

12   Q.   What about proprietary trading, what is that?

13   A.   Proprietary trading is when you are -- in this case Refco

14   was utilizing its own funds to trade for its own account.

15   Q.   And did Refco do that regularly?

16   A.   They did.

17   Q.   How, if at all, did this proprietary trading affect the

18   size of the RGHI debt?

19   A.   When Refco made money on the trading activity, they would

20   keep those profits, and at times when Refco had a small loss it

21   would keep those losses as well.  When Refco had significant

22   trading losses for its own account, we would transfer those

23   losses up to RGHI, thereby increasing debt that RGHI had to

24   Refco.

25   Q.   Now, these last set of categories we talked about,

1   proprietary trading, the expense shifting, the hiding of the

2   profit participation plan, you didn't ever have occasion to

3   discuss those matters personally with Joe Collins, did you?

4   A.  No, I did not.

5   Q.  Let's look now at the year-end audits that Refco went

6   through beginning with the year 2000.  I want to look at 2000

7   to 2004 in total.

8           In each of those years, did you and your colleagues at

9   Refco provide information to the auditors about the size of the

10  RGHI debt?

11  A.  We did.

12  Q.  And in each of those years were the auditors lied to by the

13  size of the RGHI debt?

14  A.  Mr. Chernoff, when we refer to RGHI, can I assume it RGHI

15  and its affiliates that it is not consolidating with Refco?

16  Q.  Sure.  Just tell us what you mean by that.

17  A.  RGHI was the owner of Refco and a related party.  There

18  were other legal entities that did not consolidate within Refco

19  that did have balances or debts that were owed to Refco.  One

20  example would be Wells Limited just as an example.  So there

21  were just other entities that had to be aggregated to get to

22  the footnote disclosure that we see in the financial

23  statements.

24  Q.  And these other nonconsolidating entities that were used,

25  who owned them?

Cahdcol2                        Trosten - direct

1   A.  They were owned by the same owners of RGHI, to the best of

2   my knowledge.

3   Q.  And so turning back to the financial audits.

4           And so, yes, we will use the term RGHI debt to refer

5   to -- I'll start using the term related-party debt to be more

6   precise to include those related entities.

7           But in any of those years, did Refco ever tell the

8   auditors the truth about the related-party debt?

9   A.  Not during my tenure, no.

10  Q.  Let me ask you to look at Government Exhibit 6003.

11  A.  I have it.

12  Q.  And do you recognize that document?

13  A.  I do.

14  Q.  What is it?

15  A.  It is Refco's audited financial statements for the fiscal

16  year ended February 29, 2000.

17          MR. CHERNOFF:  Your Honor, the government offers this

18  document.

19          MR. SCHWARTZ:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibit 6003 received in evidence)

22  BY MR. CHERNOFF:

23  Q.  So this was one of the years where the outside auditor was

24  Arthur Andersen, correct?

25  A.  Correct.

Cahdcol2                        Trosten - direct

1   Q.  Let me ask you to turn to page 8, paragraph 8 at the

2   bottom.

3   A.  I have it.

4   Q.  If we could just -- great.  Thank you, Mr. Smith.

5          OK.  And so this is the footnote that relates to

6   related-party transactions?

7   A.  It is.

8   Q.  I want you to just read the paragraph to me, and stop at

9   the points where the statements that are made there are false

10  and explain.

11  A.  "During the year ended February 29, 2000, the group loaned

12  money to and borrowed money from its members, affiliated

13  companies and other related parties.  As of February 29, 2000,

14  these balances included net loans receivable of

15  approximately $228 million due from these related parties which

16  are included in loans receivable on the accompanying

17  consolidated balance sheet."

18  Q.  Was that last sentence true?

19          (Pause)

20          The approximately 228 million?

21  A.  The balance is not true, no.

22  Q.  And what in truth approximately was the balance at this

23  point in time?

24  A.  Approximately 600 million or so.

25  Q.  The next sentence says, "These transactions occurred in the

Cahdcol2                           Trosten – direct

1   normal course of the group's business."

2            Was that true?

3   A.  No, it was not.

4   Q.  Why not?

5   A.  Because it's not normal for transferring other expenses,

6   changing interest income, etc.

7   Q.  And the last sentence says, "Interest was generally charged

8   at prevailing market rates."

9            Was that correct?

10  A.  That was incorrect.

11  Q.  How so?

12  A.  Because we changed the interest rates -- the prevailing

13  market rate to a fixed rate of 10 percent, which was greater

14  than the market rate at that time.

15  Q.  Let me ask you now to turn to Government Exhibit 6004.

16           Do you recognize that document, when you have it?

17  A.  I do.

18  Q.  What do you recognize it to be?

19  A.  It's Refco's audited financial statement for the fiscal

20  year ended February 28, 2001.

21           MR. CHERNOFF:  The government offers 6004, your Honor.

22           MR. SCHWARTZ:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 6004 received in evidence)

25  BY MR. CHERNOFF:

Cahdcol2                          Trosten - direct

1    Q.  So, Mr. Trosten, this financial statement for the fiscal

2    year ending February 2001 was also audited by Arthur Andersen,

3    correct?

4    A.  Correct.

5    Q.  Please flip to page 9, and we'll see footnote 8, which is

6    again a related-party transactions footnote.

7            The same language basically as the prior footnote?

8    A.  Yes.

9    Q.  The same false information about transactions occurring in

10   the normal course of the business and the interest being at

11   prevailing market rates?

12   A.  That is correct.

13   Q.  Here it says that the net loans receivable from related

14   parties was approximately $205 million.

15           Approximately how far off was it that year?

16   A.  Approximately 450 to $500 million.

17           MR. CHERNOFF:  Thank you, Mr. Smith.

18   Q.  I am going to come back to the years 2002, 2003 a little

19   later in the examination.

20           But just for now and those years, did the

21   related-party debt that was reported increase or decrease from

22   the 2001 audited financial statement?

23   A.  It increased.

24   Q.  And let me ask you now to look at Government Exhibit 6007.

25           Do you recognize that, when you have it?

1    A.  I do.

2    Q.  What is that?

3    A.  It is Refco's audited financial statements for the fiscal

4    year end February 29, 2004.

5           MR. CHERNOFF:  The government offers 6007, your Honor.

6           MR. SCHWARTZ:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 6007 received in evidence)

9           MR. CHERNOFF:  Thank you, Mr. Smith.

10   Q.  So this is the financial statement for fiscal year 2004,

11   and now the auditor is Grant Thornton?

12   A.  That is correct.

13   Q.  And I think you mentioned why it changed, but just remind

14   us why the auditor changed at this time.

15   A.  The auditor changed.  In our fiscal year end 2003 Arthur

16   Andersen went out of business.  The partner for the audit was

17   Mark Ramler -- R-a-m-l-e-r, I believe.  Mark Ramler went to

18   Grant Thornton, and Refco took the audit with Mark Ramler.

19   Q.  And what was your understanding of why Refco moved with

20   that audit partner from Arthur Andersen to Grant Thornton?

21   A.  Because Refco understood his audit style, I understood his

22   audit style.  I felt very comfortable that with Mark as the

23   partner we would be able to continue to falsify our financial

24   statements without discovery.

25   Q.  And in fact you were able to continue to falsify the

Cahdcol2                    Trosten – direct

1   financial statements without its discovery, correct?

2   A.  Until I left the firm, yes.

3   Q.  Let me ask you on this financial statement to flip to page

4   12.

5           We see here at the bottom of the page the note related

6   to related-party transactions.

7           Here it says, "The $105 million due from related

8   parties, including in loans receivable at February 28, 2003,

9   was received by February 29, 2004."

10           Was that true?

11   A.  That number is not true.

12   Q.  And what is not true about it?  What was the actual debt

13   owed at that time to related parties?

14   A.  At February 2004, the related-party debt was approximately

15   one billion dollars.

16   Q.  And this footnote is representing that it had been paid

17   down to zero?

18   A.  That is correct.

19   Q.  Why did you decide at that time to take the related-party

20   debt number all the way down to zero?

21   A.  Because at this point we were talking with potential buyers

22   regarding the sale of Refco, and one of those buyers had

23   requested that all related-party debt be repaid at the time of

24   closing.

25   Q.  Which buyer are you talking about?

Cahdcol2                        Trosten - direct

1   A.   Thomas H. Lee Partners.

2   Q.   We will talk more about Thomas H. Lee Partners at length

3   later on.  But let me ask you a couple of additional questions

4   about these false statements.

5         We have been talking about how these were lies given

6   to the auditors.  When you were at Refco, did you lie into any

7   other institutions about the financial health of Refco as

8   reflected in these footnotes, in these financial statements?

9   A.   Yes, I did.

10  Q.   And who were some of the institutions or parties that you

11  lied to?

12  A.   I lied to rating agencies.  I lied to banks, J.P. Morgan,

13  HSBC, to name a couple, Royal Bank of Scotland.  I lied to the

14  investment banks.  I lied to investors of our long-term debt,

15  firms like Prudential, Allstate, insurance companies of that

16  nature.

17  Q.   When you worked at Refco, did you ever lie to Joseph

18  Collins or any other lawyer at Mayer Brown about Refco's

19  financial health?

20  A.   Did I ever lie about?

21  Q.   About Refco's financial health about the size of the

22  related-party debt.

23  A.   No.

24  Q.   Let me ask you about another outside firm.

25        We have been talking about the outside accountants,

Cahdcol2                         Trosten - direct

1   Arthur Andersen and Grant Thornton, that were used for the

2   annual audits.  You mentioned you had tax advisors?

3   A.   Yes, we did.

4   Q.   Who were Refco's tax advisors?

5   A.   Ernst & Young.

6   Q.   What is the difference between the tax advisors and their

7   function at Refco and the auditors, if there is one?

8   A.   The tax advisors' responsibility is to aggregate and

9   prepare Refco's annual tax return, which is on a calendar-year

10  basis, and provide us with any tax advice as it relates to

11  acquisitions, restructurings, or anything that could have a tax

12  implication for the group.

13  Q.   And was there a partner at Ernst & Young who was the lead

14  accountant for the work for Refco they were doing?

15  A.   May I ask a timeframe?

16  Q.   Well, if it changed just give us the different partners who

17  were responsible there.

18  A.   Well, Kurt Neidhardt was always the most senior partner at

19  some point.  He stepped away from his more active role as lead

20  partner, and then Michael Meisler became the partner that

21  worked with me more day-to-day on the engagement.

22  Q.   Now, this related-party debt, which I'll also call the

23  hole, did Refco conceal the hole, the balance owed by the

24  related parties, from the tax preparers at Ernst & Young?

25  A.   No, we did not.

Cahdcol2                        Trosten - direct

1   Q.  Why not?

2   A.  Because, one, they didn't talk to our auditors; and, two,

3   when Refco at some point was to be sold there could be tax

4   benefits or implications as to how that sale would be treated,

5   and so we never felt the need to -- we never felt the need to

6   hide the balance from Ernst & Young.

7   Q.  Did there come a time when Ernst & Young asked you for

8   certain representations about the hole, about the related-party

9   debt?

10  A.  Yes, they did.

11  Q.  When, approximately, was that?

12  A.  It was in approximately mid-2002.

13  Q.  And when I say "representation," or when you say

14  representation, what do you mean?

15  A.  Representations are items that -- in this case the third

16  party, Ernst & Young, was looking for, management, or others to

17  make certain assertions about the companies, whether it be

18  specific items or how we were treating certain activities

19  within Refco.

20  Q.  So what did Ernst & Young want to know about the hole at

21  this time?

22  A.  I received a call from Kurt Neidhardt, and he advised me

23  that he was going to be sending me over a letter that he would

24  like Refco to make representations upon, and one of those items

25  that would be contained in the letter is whether the RGHI debt

Cahdcol2                      Trosten - direct

1   to RGL is enforceable, collectible, and the interest rate that

2   was being charged, 10 percent, is reasonable.

3   Q.  When you say "RGL," you mean Refco Group Limited?

4   A.  Yes.  Sorry.  Refco.

5   Q.  On behalf of the consolidated Refco entities?

6   A.  Yes.

7   Q.  You said he wanted to know what three things?

8   A.  Whether the balance was enforceable, collectible, and the

9   interest rate that was being charged at 10 percent was

10  reasonable.

11  Q.  What did you understand those three things to mean?

12  A.  Enforceable, whether Refco, if it needed to, can enforce

13  this receivable, to enforce RGHI to pay it; whether RGHI had

14  the ability to pay it, whether it was collectible; and whether

15  the interest rate that was being charged was reasonable, was

16  acceptable.

17  Q.  How big was the related-party debt at that point,

18  approximately?

19  A.  Approximately $700 million.

20  Q.  Did you yourself think that this $700 million was actually

21  collectible from the related parties?

22  A.  No.

23  Q.  What about whether it was enforceable?

24  A.  I thought it was enforceable.

25  Q.  How so?

Cahdcol2                        Trosten - direct

1    A.   Refco Group Limited could demand the monies from RGHI.

2    That doesn't mean that they will be able to collect it.

3    Q.   What about the interest rate, was that actually reasonable?

4    A.   It was not reasonable to prevailing market rates at that

5    time, no.

6    Q.   How did you set that interest rate?

7    A.   I had it fixed at 10 percent.

8    Q.   So after Ernst & Young asked for the representation on

9    these three topics, did you speak to anyone about the RGHI

10   debt?

11   A.   I did.

12   Q.   Who did you speak to first?

13   A.   I spoke to Phillip Bennett.

14   Q.   And where did you speak to him, do you remember?

15   A.   In his office.

16   Q.   What did you say to him and what did he say to you?

17   A.   I told him that I received a call from Kurt and he's asking

18   for a management representation regarding the 700 --

19   approximately $700 million balance that RGHI has with RGL.  I'm

20   going to ask you the three questions that he asked me even

21   though I know what you're going to tell me, but he's asked for

22   management representation so I'm going to you.

23   Q.   Mr. Trosten, if you could just slide the microphone that

24   way a little bit that way?

25   A.   OK.  Is that better?

1209

Cahdcol2                              Trosten - direct

1   Q.  Yes.  Thank you.

2           So you said you would tell him what the topics were.

3   And what did you tell him?

4   A.  I went through the questions with him.  I said, Kurt is

5   asking whether the balance is enforceable.  Phil advised me

6   that it was enforceable.  I had asked Phil if it was

7   collectible.  He advised that it was collectible.  And I asked

8   him if the interest rate that we're charging at 10 percent is

9   reasonable.  He said that the interest rate that we're charging

10  at 10 percent is reasonable because it is consistent with our

11  long-term debt rates that Refco was paying third parties to

12  borrow money.  At different points we were borrowing money in

13  excess of 10 percent, and so the interest rate is reasonable.

14  Q.  What did you say next?

15  A.  I then -- so he finished his statement.  After I asked him

16  the third question, I told him that they also looking for a

17  legal representation on the same three points and I'm going to

18  give Joe a call.

19  Q.  After you told Mr. Bennett that you were going to give Joe

20  Collins a call, did Mr. Bennett say anything further on the

21  action?

22  A.  No.

23  Q.  Did he ask you to withhold any information from Mr. Collins

24  on these subjects?

25  A.  No.

1210

1   Q.  So what did you do next?

2   A.  I don't recall if it was immediately thereafter, but

3   shortly thereafter I called Joe Collins.

4   Q.  And what did you say to him and what did he say to you?

5   A.  Well, I don't recall if he picked up or called me back, but

6   at some point shortly thereafter we spoke.  I had advised Joe

7   that I had received a call from Kurt looking for some tax

8   representations regarding the approximately $700 million

9   balance between RGHI and RGL.  They were asking three

10  questions.  I had already asked these three questions of Phil

11  and now I'm going to ask them of you.

12  Q.  When you said that they were asking for representations

13  about the $700 million, approximately, of related-party debt,

14  did Mr. Collins have any reaction to your description of the

15  size of that debt?

16  A.  No.

17  Q.  You said you then told Mr. Collins you were going to pose

18  to him the questions that RCM had posed to you?

19  A.  Yes, and that I had already spoken to Phil Bennett

20  regarding these questions as well.

21  Q.  So how did the conversation continue?

22  A.  I advised Joe that the first question was whether or not

23  the balance between RGHI and Refco was enforceable.  I advised

24  Joe that Phil said it is enforceable, that Joe advised that it

25  is enforceable.

Cahdcol2                       Trosten - direct

1              I then asked Joe if the balance between RGHI and Refco

2      is collectible.  He advised it is collectible.

3              I then asked him if the interest rate being charged at

4      10 percent is reasonable.  I advised Joe that Phil had told me

5      that the interest rate is reasonable, as was consistent with

6      what we pay on our long-term debt.  He advised that indeed it

7      is reasonable.

8      Q.   He advised being who?

9      A.   Joe Collins.

10     Q.   Did mr. Collins seem surprised you were asking him these

11     questions?

12     A.   No.

13     Q.   Did he ask you any questions about the related-party debt

14     on these subjects?

15     A.   No.

16     Q.   Did he say anything more at all on the subject that you

17     recall at that time?

18     A.   Not that I recall, no.

19     Q.   So after Joe Collins told you that the $700 million in

20     related-party debt was collectible, enforceable, carried a

21     reasonable interest rate, what did you do to respond to Ernst &

22     Young?

23     A.   I wrote them that representation letter that they asked me

24     to.

25     Q.   And you said that in your call with Ernst & Young they had

Cahdcol2                           Trosten - direct

1    said they were going to send you a written request as well?

2    A.  That is correct.

3    Q.  Let me ask you to look at Government Exhibit 3013.

4    A.  I have it.

5    Q.  And do you recognize that document, looking at the first

6    and second page.

7    A.  I do.

8    Q.  What is this?

9    A.  This is the letter that Kurt Neidhardt had sent to me

10   asking for the various representations by Refco.

11           MR. CHERNOFF:  Your Honor, the government offers 3013.

12           MR. SCHWARTZ:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibit 3013 received in evidence)

15   BY MR. CHERNOFF:

16   Q.  And so looking at the document that's before you on page 1,

17   we see that this is a July 17 letter, 2002, to yourself?

18   A.  That is correct.

19   Q.  And if we just flip to the second page, you see it's signed

20   by Kurt Neidhardt?

21   A.  Kurt Neidhardt.

22   Q.  It is copying Michael Meisler.  He was the other Ernst &

23   Young partner you mentioned?

24   A.  I believe he was a partner at that time.  He may have been

25   a senior manager, but at some point he became a partner, yes.

Cahdcol2                      Trosten - direct

1   Q.  So if we could flip back to the first page, is paragraph 1

2   where Ernst & Young asked you for the representations

3   concerning the related-party debt?

4   A.  That is correct.

5   Q.  I will just ask you to read out paragraph 1, which says

6   "Intercompany payable from RGHI to RGL."

7   A.  "Intercompany payable from RGHI to RGL.

8           "This has historically been treated as an

9   interest-bearing obligation for tax purposes.  Please provide a

10  representation as to whether this obligation is legally

11  enforceable and interest-bearing (interest rate, etc.) per your

12  legal counsel.  Also provide entries reflecting interest rate

13  for the 2001 year."

14  Q.  After this exchange, this series of exchanges in 2002, were

15  you ever asked by Ernst & Young for another such representation

16  on these three subjects concerning the hole?

17  A.  Yes, I was.

18  Q.  And when was that?

19  A.  It was in 2003.

20  Q.  How did you respond at that time?

21          I'm sorry.  Let me be more specific.

22          Were you asked for a representation that was per your

23  legal counsel is the language in Government Exhibit 3013?

24  A.  Yes, I was.

25  Q.  How did you respond to the request for representation in

Cahdcol2                          Trosten - direct

1    2003 for a representation on these subjects per your legal

2    counsel?

3    A.   I advised Ernst & Young that I had previously confirmed

4    that this is accurate per legal counsel and still remains true,

5    to the best of my knowledge.

6    Q.   Let me ask you to look at Government Exhibit 3014.

7         Do you recognize 3014?

8    A.   I do.

9    Q.   What do you recognize that to be?

10   A.   This is my response to Kurt's letter to me.

11   Q.   The letter we just looked at in Government Exhibit 3013?

12   A.   Yes.

13        MR. CHERNOFF:  And your Honor the government offers

14   Government Exhibit 3014?

15        MR. SCHWARTZ:  No objection.

16        THE COURT:  Received.

17        (Government's Exhibit 3014 received in evidence)

18   BY MR. CHERNOFF:

19   Q.   So this is your letter to Mr. Neidhardt dated November 7,

20   2002, correct?

21   A.   That is correct.

22   Q.   If you could just read the first paragraph after "Dear

23   Kurt" and then the paragraph that's numbered 1."

24   A.   "Dear Kurt:

25        "I have summarized below for your review my

1   understanding, based on discussions with management and legal

2   counsel, the issues you identified pursuant to your

3   July 17th letter.

4               "1.  The intercompany balance between RGHI and RGL is

5   a legal obligation and is enforceable.  Further, the interest

6   rate associated with this obligation to pay at relative

7   long-term rates is also reasonable.  This was further confirmed

8   with discussions with legal counsel."

9   Q.  By the way, was Joe Collins the only legal counsel you

10  consulted on this matter?

11  A.  Yes, he was.

12  Q.  Now, you said that for the reasons you described Refco was

13  truthful with Ernst & Young about the size of the related-party

14  debt, to start with?

15  A.  That is correct.

16  Q.  This letter that responds to several other issues in the

17  paragraphs that follow to Ernst & Young, does this letter

18  contain any other -- I'm sorry.  Does this letter that you sent

19  in November 2002 contain anything that was false?

20  A.  Yes.

21  Q.  What in this letter was false?

22  A.  Item 3 is false.

23  Q.  Let me stop you there.

24               How is item 3 false?

25  A.  It discusses global internet strategy and charges relating

1    to strategy.  RGHI did not have a global internet strategy.

2    Q.  Why were you and Refco lying to Ernst & Young about that?

3    A.  Because we had moved these expenses up to RGHI, and Ernst &

4    Young's concern about us moving expenses up to RGHI was that

5    BAWAG, now being a partner at this point, would not be able to

6    get the benefit of that expense.

7    Q.  Anything else in this letter that was false?

8    A.  Item 5 may or may not have been false.

9    Q.  How do you mean?

10   A.  I don't -- I don't remember whether for calendar 2001,

11   whether or not Refco had bad debt or credit losses in the

12   trading accounts of RGHI.

13            MR. CHERNOFF:  Now, if we could, Mr. Smith, if we

14   could flip back to paragraph 1.  Thank you.

15   Q.  Now, Mr. Trosten, when you said this was further confirmed

16   with discussions with legal counsel, obviously you could have

17   just written that without having confirmed it with legal

18   counsel; is that fair to say?

19   A.  Yes.

20   Q.  So why didn't you just lie to Ernst & Young about that

21   instead of bothering to call Joseph Collins to confirm this?

22   A.  Because I didn't see any issue with confirming it with Joe

23   Collins.

24   Q.  How do you mean?

25   A.  Joe Collins was documenting the round-trip loan

Cahdcol2                    Trosten - direct

1    transactions.  Joe was working at this point -- had completed a

2    transaction with a firm called DF Capital which documented the

3    intercompany debt to the -- a portion of the intercompany debt

4    of $350 million which was also in excess of our audited

5    financial statements, and I wasn't uncomfortable to discuss it

6    with him and Phil didn't tell me not to when I mentioned it to

7    him.

8    Q.  And after you gave the representations and sent this

9    letter, did you hear anything further from Ernst & Young that

10   year about this matter?

11   A.  Not that I recall, no.

12   Q.  And you said the next year Ernst & Young posed the same

13   question about the related-party debt, the same three

14   questions, right?

15   A.  That's correct.

16   Q.  Let me ask you to look at Government Exhibit 3013A.

17            Do you recognize that document?

18   A.  I do.  Although may I just back up for one moment?

19   Q.  Sure.

20   A.  On the phone call with Kurt Neidhardt he asked me about

21   enforceability, collectibility and the interest rate being

22   reasonable.  His letter to me did not make reference to

23   collectibility nor did I make reference to it.

24            This is another letter, Exhibit 3013A, which is a

25   letter I believe from Michael Meisler, and, again, it is not

1   making reference as to whether it is collect --

2   Q.  Let me stop you there.  Before you start, just let the

3   government offer Government Exhibit 3013A.

4           MR. SCHWARTZ:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 3013A received in evidence)

7   BY MR. CHERNOFF:

8   Q.  Please continue, Mr. Trosten.

9   A.  So it didn't ask to provide all three items; it asked for

10  two of the three.

11  Q.  Could you just direct us to where in this

12  September 9th letter from Ernst & Young to yourself it said

13  that?  Is that paragraph 1?

14  A.  Yes, it is.

15  Q.  OK.  Could you just read paragraph 1 to us?

16  A.  "Intercompany payable from RGHI to RGL.  This has

17  historically been treated as an interest-bearing obligation for

18  tax purposes.  Please provide a representation as to whether

19  this obligation is legally enforceable and interest-bearing

20  (interest rate, etc.) per your legal counsel.  Also provide

21  entries reflecting interest rate for the 2002 year."

22  Q.  And so when you got that request in 2003, did you have a

23  further discussion with Joe Collins about these subjects?

24  A.  No, I did not.

25  Q.  Why not?

Cahdcol2                         Trosten – direct

1    A.   I had a discussion with him before, and I was just going to

2    note it to Michael Meisler that I was actually out of town at

3    the time and that I've already discussed it and it remains true

4    to the best of my knowledge.

5    Q.   And you put that in a letter to Ernst & Young?

6    A.   I did put it in a letter to Ernst & Young.  I don't recall

7    if I had drafted it or they had drafted it because I was out of

8    town.

9    Q.   Let me ask you to look at Government Exhibit 3016.

10   A.   I have it.

11   Q.   And is this your letter of September 12, 2003 to Ernst &

12   Young on the subjects we have just been talking about?

13   A.   Yes.

14            MR. CHERNOFF:  The government offers 3016, your Honor.

15            MR. SCHWARTZ:  No objection.

16            THE COURT:  Received.

17            (Government's Exhibit 3016 received in evidence)

18            (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. CHERNOFF:

2    Q.  And if you could just read to us, Mr. Trosten, what you

3    wrote beginning "I have summarized," through paragraph one?

4    A.  "I have summarized below for your review, based on

5    discussions with management, the issues you identified pursuant

6    to your letter of September 8, 2003.

7              "1.  The intercompany balance between RGHI and RGL is

8    a legal obligation and is enforceable.  Further, the interest

9    rate associated with this obligation to pay at relative

10   long-term rates is also reasonable.  This was confirmed with

11   discussions with legal counsel previously and remains correct

12   to the best of my knowledge."

13   Q.  And, Mr. Trosten, what did you mean by "previously,"

14   confirmed with legal counsel previously?

15   A.  I had discussions with Joe Collins a year prior.

16   Q.  In 2002?

17   A.  Correct.

18   Q.  Now, other than --

19             MR. CHERNOFF:  May I have a moment, your Honor?

20             THE COURT:  Yes, sir.

21   Q.  Let me just make sure that I've understood correctly.  You

22   said Ernst & Young did not ask about collectibility in the

23   written letters?

24   A.  That is correct.

25   Q.  But they did ask about it by phone?

CAHPCOL3                    Trosten - direct

1    A.  That is correct.

2    Q.  And was collectibility one of the items that you posed to

3    Mr. Bennett and Mr. Collins?

4    A.  Yes, it is.

5    Q.  Other than the 2002 conversation that you had with

6    Mr. Collins, where you asked him about the collectibility,

7    enforceability and interest rate associated with the

8    $700 million in related-party debt, did you ever have any other

9    occasion or need to speak to Mr. Collins about the actual size

10   of the related-party debt?

11   A.  No, I did not.

12           MR. CHERNOFF:  Your Honor, would this be a good time

13   to take our morning break?

14           THE COURT:  I think so.  Ladies and gentlemen, are you

15   ready to take a break?  Please follow the normal instructions.

16   Leave your folders, take your books.  Please do not discuss the

17   case.  See you in a few minutes.  Thank you for your attention.

18           (Jury exits)

19           THE COURT:  Anything else on the record, counsel?

20           MR. CHERNOFF:  None from the government, your Honor.

21           THE COURT:  Thank you.  Off the record.

22           (Recess taken)

23           THE COURT:  Thank you, counsel.  Won't you be seated.

24           (Jury enters)

25           THE COURT:  Welcome back, ladies and gentlemen.  How's

1   the temperature in there for you today?  And won't you be

2   seated.  We continue with the direct examination of the

3   witness.  Mr. Chernoff?

4            MR. CHERNOFF:  Thank you, your Honor.

5   BY MR. CHERNOFF:

6   Q.  Mr. Trosten, if you could just pull your chair in so you're

7   right near the microphone.  I'll try to stay close to mine.

8            Before the break we were talking about a conversation

9   you had with Mr. Collins in mid-2002, about the size of the

10  related-party debt.

11  A.  That's correct.

12  Q.  I want to look now at the audited financial statements that

13  were released before and after that conversation.  Let me ask

14  you first, before that conversation with Joe Collins in

15  mid-2002, what was the last time that Refco had an annual

16  financial audit?

17  A.  February of 2002.

18  Q.  Please take a look at Government Exhibit 6005.

19  A.  I have it.

20  Q.  What -- Do you recognize that?

21  A.  I do.

22  Q.  What do you recognize it as?

23  A.  It's Refco's audited financial statements for the year

24  ended February 28, 2002.

25           MR. CHERNOFF:  Government offers 6005, your Honor.

1        MR. SCHWARTZ:  No objection.

2        THE COURT:  Received.

3        (Government's Exhibit 6005 received in evidence)

4        MR. CHERNOFF:  Thank you, Mr. Smith.

5   Q.  And so this was the year when Arthur Andersen, or I guess

6   now Andersen, was the auditor, correct?

7   A.  That's correct.

8   Q.  Could you flip to Page 9, Paragraph 9, related-party

9   transactions?  And so here we see that for fiscal year 2002,

10  Refco's reporting approximately 179 million in related-party

11  debt?

12  A.  I see that.

13  Q.  And was that figure accurate?

14  A.  No, it was not.

15  Q.  What approximately was the true amount at that time?

16  A.  Approximately 700 million.

17  Q.  Let me ask you now to look at Government Exhibit 3012.

18  A.  May I make another comment on these financials?

19  Q.  Yes.  Can we --

20  A.  Just briefly.  You said -- It's still Arthur Andersen.

21  They just changed their logo, but it's still Arthur Andersen in

22  2002.

23  Q.  Thank you.  Government Exhibit 3012.

24  A.  I have it.

25  Q.  Do you recognize that document?

1224

```
 1   A.  I do.

 2   Q.  And what do you recognize it to be?

 3   A.  It's a private placed memorandum, where we were utilizing

 4   JP Morgan as our agent to raise $100 million of senior debt.

 5            MR. CHERNOFF:  Government offers 3012, your Honor.

 6            MR. SCHWARTZ:  No objection.

 7            THE COURT:  Received.

 8            (Government's Exhibit 3012 received in evidence)

 9   Q.  And so when you say it was -- you say Refco was trying to

10   raise senior debt, what do you mean?

11   A.  Refco was out just trying to raise long-term debt from

12   investors, to borrow money from.

13   Q.  And did Refco have a lawyer in that transaction?

14   A.  It did.

15   Q.  Who was that?

16   A.  Joe Collins.

17   Q.  Let me ask you to look at the first page of this offering,

18   and it says private placement memorandum and there's a copy

19   number.  Do you know why there was a copy number there?  What

20   does that mean?

21   A.  All copies of private placement memorandum get identified

22   by the banker as to whom they're sent to.

23   Q.  And to the left, this one was apparently sent to Joseph

24   Collins?

25   A.  Apparently, correct.
```

1    Q.  Let me ask you to flip to or put up on the screen Bates

2    number ending 160.

3    A.  I have it.

4          MR. CHERNOFF:  If we could zoom back out, Mr. Smith.

5    Thank you.

6    Q.  This is the first page of the audited financial statement

7    that we just looked at for fiscal year 2002?

8    A.  That is correct.

9    Q.  The one in which the related-party debt was much lower than

10   700 million?

11   A.  That is correct.

12   Q.  Let me ask you to flip to Bates number 170, and Paragraph 9

13   is the same related-party footnote we just saw with the false

14   number on the related-party debt?

15   A.  Yes, it is.

16   Q.  Flipping back to the first page, if we may, do you see down

17   below, under the placement agent, it has a date of

18   September 2002?

19   A.  Yes.

20   Q.  So when was this offering memorandum sent to Joseph Collins

21   in relation to the conversation you had with him about the

22   related-party debt having reached $700 million?

23   A.  It was several months later.

24   Q.  Let me ask you now to look at Government Exhibit 6006.  Do

25   you recognize that?

CAHPCOL3                          Trosten - direct

1    A.  I do.

2    Q.  And what is it?

3    A.  It's Refco's audited financial statements for the year end

4    February 28, 2003.

5              MR. CHERNOFF:  Your Honor, the government offers 6006.

6              MR. SCHWARTZ:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 6006 received in evidence)

9    Q.  And so we see here on Page 3 -- Do you have that,

10   Mr. Trosten?

11   A.  Page 3?

12   Q.  Yes.

13   A.  I do.

14   Q.  This was issued or signed off on by Grant Thornton on or

15   about April 30, 2003?

16   A.  That's correct.

17   Q.  And let's look inside the audited financial statement on

18   Page 12.  This is the related-party transactions note?

19   A.  Yes, it is.

20   Q.  And what does it purport the related-party debt to be at

21   that time?

22   A.  Approximately 105 million.

23   Q.  Is that figure accurate?

24   A.  No, it was not.

25   Q.  And when was -- What approximately was it by then; do you

 1   remember?

 2   A.  It was approximately 900 million.

 3   Q.  And when was this financial statement issued around

 4   April 30, 2003, in relation to your conversations with

 5   Mr. Collins about the related-party debt of 2002?

 6   A.  Over a year.  Or about a year, I should say.

 7   Q.  You had the conversation with Mr. Collins in mid-2002?

 8   A.  Correct.

 9   Q.  And this was the first audited financial that was issued

10   after that conversation?

11   A.  That's correct.

12   Q.  Okay.  Could you look at Government Exhibit 1612?

13           MR. CHERNOFF:  And, your Honor, the government offers

14   1612 pursuant to our stipulation.

15           THE COURT:  Received.

16           (Government's Exhibit 1612 received in evidence)

17   Q.  Take a look at that, Mr. Trosten.  Do you see this is a

18   letter from Phillip Bennett to Joe Collins?

19   A.  I do.

20   Q.  Let me ask that we focus on paragraph one.  It says here,

21   "Refco Group Holdings is a non-operating holding company.  The

22   principal and overwhelming asset is its 90 percent ownership of

23   Refco Group, Limited, and subsidiaries."

24           And that was accurate, correct; it was a non-operating

25   company with no assets, other than the ownership of Refco

1    Group?

2    A.   It may have a small Taiwanese investment, but yes, its

3    overwhelming asset was Refco Group Holdings.

4    Q.   You said a small Taiwanese investment?

5    A.   It may have had a small investment -- Refco Group Holding

6    had owned a small investment Taiwanese company that was not

7    consolidated, that's correct.

8    Q.   Now, flipping to the attached financial statements, do you

9    see there -- This is Bates No. 17.  Do you see this is the

10   consolidated financials for fiscal year 1999?

11   A.   I do.

12   Q.   Flipping to the related-party transactions on Page 9, it's

13   Bates No. 26.  And do you see in footnote No. 7 it's reporting

14   that the related-party debt was 252 million?

15   A.   I do.

16   Q.   Was that number true or false?

17   A.   It was false.

18   Q.   Did you, in your work at Refco, ever work with a lawyer who

19   was representing RGHI?

20   A.   Yes.

21   Q.   And who was that?

22   A.   That was Joe Collins at Mayer Brown.

23            MR. CHERNOFF:  Your Honor, the government offers

24   Government Exhibit 1600 pursuant to our stipulation.

25            THE COURT:  Received.

 1          (Government's Exhibit 1600 received in evidence)

 2          MR. CHERNOFF:  And, your Honor, this is just an

 3     outside interests and transactions with the clients report

 4     signed by Joe Collins concerning RGHI.

 5     Q.  We've been talking about the 90 percent interest that RGHI

 6     had in Refco.  I want to turn back to 1999.  We looked on

 7     Monday at the ownership chart, and you said that there came a

 8     time in 1999 when the ownership of RGHI -- I'm sorry, the

 9     ownership of Refco was restructured.  What happened around that

10     time?

11     A.  Around that time, Refco or RGHI sold 10 percent of its

12     interest in Refco to the Austrian bank, BAWAG.

13     Q.  And approximately how much did BAWAG pay for that interest

14     at that time?

15     A.  They paid $95 million for the 10 percent interest.

16     Q.  You said that there had been an owner at some point named

17     Tom Dittmer.  What became of his interest in Refco?

18     A.  Tom Dittmer was bought out of his interest, and Tom was

19     left with what we call the carried interest in the company.

20     Q.  What was -- First of all, who bought him out?

21     A.  He was bought out by RGHI.

22     Q.  And what do you mean by he was left with a carried

23     interest?

24     A.  To the extent that Refco would later be sold to a

25     third-party buyer and there was monies remaining to be

1    distributed amongst the partners, that Tom Dittmer was to

2    receive a portion of those proceeds.

3    Q.   Now, other than this 10 percent equity investment that

4    BAWAG made, did BAWAG make any additional investments in Refco

5    around that time?

6    A.   They -- To Refco?

7    Q.   Yes.

8    A.   They --

9    Q.   Or to RGHI?

10   A.   They lent $85 million to RGHI.

11   Q.   And what did BAWAG get in return for this loan?

12   A.   Contained within the loan was the right to convert that

13   loan into another 10 percent equity interest in Refco.

14   Q.   And do you have an understanding as to why BAWAG bought

15   10 percent and then had a loan that could convert into another

16   10 percent instead of just buying 20 percent?

17   A.   I have an understanding of it, yes.

18   Q.   And what is that?

19   A.   My understanding is that BAWAG did not want to be subject

20   to what they call the Bank Holding Company Act and be subject

21   to further U.S. regulation.  In order to do that, they could

22   not own more than 4.9 percent voting interests in a U.S.

23   entity.  So the first 10 percent was 4.9 percent voting,

24   5.1 percent non-voting and this other 85 million was structured

25   as a loan convertible to equity.

1   Q.   And BAWAG could convert it to equity at its option?

2   A.   That's my recollection, yes.

3   Q.   This ownership of Refco was still through RGHI?

4   A.   May I ask you to repeat the question, please?

5   Q.   And so the ownership restructuring, the way it was

6   restructured with BAWAG's ownership, was still through RGHI?

7   A.   RGHI owned 80 percent of the business because of -- for

8   different reasons that are complex.  I'm not sure I can recall

9   them.  10 percent was owned by a company called RGHI, LLC,

10  which was then owned by RGHI.  So effectively, 90 percent was

11  owned by RGHI and 10 percent of Refco was owned by BAWAG.

12  Q.   And then there was the additional right to convert the loan

13  to another 10 percent?

14  A.   That is correct.

15  Q.   Now, who represented Refco in this transaction with BAWAG?

16  A.   That would be Joe Collins and Mayer Brown.

17  Q.   Do you know whether BAWAG knew about the hole when they

18  made this investment?

19  A.   When they made the investment, I do not know.

20  Q.   Did you come to learn that they had known about the hole,

21  is what I really meant to ask you?

22  A.   Yes.

23  Q.   How did you learn that?

24  A.   Phil Bennett advised me that they had discussions regarding

25  the true size of the RGHI balance.

1   Q.  And you said earlier in your testimony that BAWAG had been

2   doing these round-trip loans, these year-end pay-down

3   transactions for Refco as well?

4   A.  That is correct.

5   Q.  Now, after this 1999 investment or investments by BAWAG,

6   did there come a time when BAWAG made another significant

7   investment in Refco?

8   A.  They did.

9   Q.  When was that?

10  A.  That was in 2002.

11  Q.  And how do you know that?

12  A.  Because I participated and worked on the transaction.

13  Q.  What was Refco's financial condition, roughly speaking, in

14  2002?

15  A.  Refco was in need of cash.

16  Q.  And so what was Refco's plan, or what was its hope to

17  address the need for cash?

18  A.  Refco was looking either for a third-party buyer or any

19  buyer that would contribute cash into Refco.

20  Q.  How, generally, was this investment that BAWAG made

21  structured?

22  A.  It was structured through a -- an entity or a foundation

23  known as DF Capital and --

24  Q.  Let me stop you there.  A foundation, you said an entity

25  called DF Capital.  What was DF Capital?

1   A.   DF Capital was an entity that was created by BAWAG to

2   facilitate this additional purchase.

3   Q.   So it created and wholly owned by BAWAG?

4   A.   That's my understanding, yes.

5   Q.   Okay.  Please continue?

6   A.   It was structured in a way whereas BAWAG, through DF

7   Capital, would have what they called a proceeds participation

8   right, or the right to receive monies from a sale of Refco.

9   And they would increase their ownership percentage with this

10  participation right after each payment date, and there were

11  three payment dates that were structured in this document.

12  Q.   So as BAWAG paid more money, it would gain additional

13  rights to the proceeds of any sale of Refco?

14  A.   That is correct.

15  Q.   And so this concept of this, what was it called, this

16  agreement?

17  A.   It was called a Proceeds Participation Agreement.

18  Q.   And before that concept, the Proceeds Participation

19  Agreement arose, was it called something else in earlier drafts

20  or discussions?

21  A.   Yes, it was a purchase agreement.

22  Q.   This term, Proceeds Participation Agreement, had you ever

23  encountered a document, a contract like that in your work as a

24  CFO?

25  A.   No, I have not.

CAHPCOL3                          Trosten - direct

1    Q.  Let me ask you to look at Government Exhibit 1504.

2    A.  I have it.  I have it.

3    Q.  What do you recognize 1504 to be?

4    A.  It is a executed copy of the -- what we call the Proceeds

5    Participation Agreement between Refco and DF Capital, Inc.

6    Q.  And when you say executed, you mean signed by the relevant

7    parties?

8    A.  Yes, I do.

9              MR. CHERNOFF:  Your Honor, government offers 1504.

10             MR. SCHWARTZ:  No objection.

11             THE COURT:  Thank you.  Received.

12             (Government's Exhibit 1504 received in evidence)

13   Q.  Mr. Trosten, did Refco use an attorney in negotiating and

14   preparing the Proceeds Participation Agreement?

15   A.  Yes, it did.

16   Q.  Who was that?

17   A.  It was Joe Collins at Mayer Brown.

18   Q.  And I may refer to this as the PPA from time to time in our

19   discussion.  Did you speak with Joseph Collins about the PPA?

20   A.  Yes, I did.

21   Q.  Roughly how frequently or how often?

22   A.  It really would depend.  We had drafting sessions anywhere

23   from zero to several times a day.

24   Q.  Let me ask you to look at Government Exhibit 3018.  Do you

25   have that?

CAHPCOL3                        Trosten – direct

1   A.  I do.

2           MR. CHERNOFF:  Your Honor, we offer this pursuant to

3   our authenticity stipulation.

4           THE COURT:  Received.

5           (Government's Exhibit 3018 received in evidence)

6   Q.  And so if you would just take a look at the fax cover sheet

7   here.  This appears to be a fax from Joseph Collins to Phillip

8   Bennett on April 16th of 2002, correct?

9   A.  That is correct.

10  Q.  And --

11  A.  You said April 16th, correct?

12  Q.  I believe I did.  April 16th, 2002.

13  A.  Okay.

14  Q.  And so if you turn the page, you see there's a memorandum

15  from Joseph Collins to Phillip Bennett that was faxed?

16  A.  I see that.

17  Q.  And it states here in Paragraph 1 that this is a marked

18  copy.  What does "marked copy" mean?

19  A.  A marked copy of an agreement is where someone is making

20  changes or commenting, editing an agreement.

21  Q.  And it says it's a marked copy of a purchase agreement.  Is

22  that something that the PPA, the Proceeds Participation

23  Agreement, was initially called?

24  A.  Yes.

25  Q.  And to just take a look at the marked copy that follows

1    and --

2            MR. CHERNOFF:  Mr. Smith, if we could page through a

3    couple of pages of that.  Thank you.

4    Q.  Is this, in fact, a marked copy of an early draft of the

5    PPA?

6    A.  What became of the PPA, yes.

7    Q.  It also -- If we could just flip back -- Actually, we don't

8    need to flip back.

9            Is the memorandum you have -- You have the document in

10   front of you, right?

11   A.  I do.

12   Q.  Page 2 of the memorandum says it attaches a draft legal

13   opinion of Mayer Brown?

14   A.  Page 2?

15   Q.  The memorandum, which is Page 2 of this exhibit, but

16   it's --

17   A.  Yes.  Item 3?

18   Q.  Yes.

19   A.  Yes, sorry.

20   Q.  And if we could just now flip to Bates number 299.  And,

21   Mr. Trosten, do you have that?

22   A.  Yes, I do.

23   Q.  And this -- and the pages that follow appears to be a draft

24   of the Mayer Brown legal opinion that's called for?

25   A.  That is correct.

CAHPCOL3                    Trosten - direct

1   Q.  Let's now look at Government Exhibit 3019.

2           MR. CHERNOFF:  Your Honor, the government offers this

3   pursuant to our authenticity stipulation.

4           THE COURT:  Received.

5           (Government's Exhibit 3019 received in evidence)

6   Q.  Looking, if we can, at the first page of 3019.  Thank you.

7   And, Mr. Trosten, this is another fax from Joseph Collins to

8   Phillip Bennett, this one dated May 14, 2002?

9   A.  I have it, yes.

10  Q.  And is that what this fax -- Do you see that?

11  A.  I do.

12  Q.  Let's look at what was faxed.  If you turn to the next

13  page, there's a memorandum.  Now, this is from Joseph Collins;

14  do you see that?

15  A.  I do.

16  Q.  And then there's three names in the "To" section.  Do you

17  know who those people were?

18  A.  I do.

19  Q.  Tell us who they are?

20  A.  Thomas Hackl worked for BAWAG and later came to work for

21  Refco.  Mr. Sari worked for BAWAG and Dr. Neubauer is an

22  attorney.

23  Q.  And who did Dr. Neubauer represent in this transaction?

24  A.  BAWAG and DF Capital.

25  Q.  And so do you see where it says that Mr. Collins is

1    attaching a marked purchase agreement and a marked letter

2    agreement?

3    A.  I do.

4    Q.  Just take a look at what follows.  Do you see the first

5    document?  Is that, in fact, a marked draft of the purchase

6    agreement?

7    A.  Yes, it is.

8    Q.  And this is what would become the Proceeds Participation

9    Agreement?

10   A.  Yes, it is.

11   Q.  Look at Bates number 94, please.  Mr. Collins had said in

12   the memo agreement that he's sending a marked letter agreement.

13   Do you have that document before you?

14   A.  I do.

15   Q.  This appears to be a draft of what's titled a letter

16   agreement, correct?

17   A.  Yes.

18   Q.  And what, in general terms, was this letter agreement

19   that's now being sent to representatives of BAWAG?

20   A.  What do you mean, what is it?

21   Q.  What was the purpose there?  Why is there now a second

22   document that's being sent to BAWAG?

23   A.  It's an agreement that relates to the -- at the time, this

24   purchase agreement that talks about the sale of Refco,

25   discusses a minimum target price at Refco, and that there would

CAHPCOL3                    Trosten - direct

1    be certain restrictions as to consent of all parties relative

2    to the price of an ultimate sale of Refco.

3    Q.  I'm going to ask you more about the final letter agreement,

4    but the draft of this document, what was this document referred

5    to as in your discussion with BAWAG?

6    A.  Side letter agreement.

7    Q.  Let me ask you to flip back to Government Exhibit 1504, and

8    this is the executed final version of the Proceeds

9    Participation Agreement, or PPA, correct?

10   A.  Yes, it is.

11   Q.  Let me ask you to turn to, it's 263?

12   A.  I have it.

13            MR. CHERNOFF:  I'm sorry, maybe 253.  I just can't

14   make it out.  Sorry, Mr. Smith.  Is that it?  Perfect.  All

15   right.

16   Q.  According to this first paragraph of the PPA, who are the

17   parties to this agreement?

18   A.  Refco Group, Limited, LLC, that's what we've been referring

19   to as Refco, and DF Capital, Inc.

20   Q.  And you said before DF Capital, Inc. was the wholly owned

21   company, wholly owned by BAWAG, correct?

22   A.  Correct.

23   Q.  Now, is RGHI a party to this agreement?

24   A.  No, they are not.

25   Q.  When the PPA was first being discussed, who was going to

1    be -- based on your participation in the negotiations, who was

2    going to be the party selling this participation right to

3    BAWAG?

4    A.   It was going to be Refco Group Holdings or RGHI.

5    Q.   And why was RGHI originally going to be the party selling

6    this interest in Refco to BAWAG?

7    A.   They were going to be the party because RGHI would be the

8    entity, along with BAWAG for their 10 percent interest, if they

9    were to sell Refco to a third-party buyer, the monies that that

10   third-party buyer was going to provide would go to Refco Group

11   Holdings.

12           So Refco Group Holdings would then have those funds

13   and then would remit whatever funds it had to under what was

14   this purchase agreement.

15   Q.   And, at some point, the party agreement was changed from

16   RGHI to Refco?

17   A.   That's correct.

18   Q.   Did you speak with Mr. Collins about -- Did you have to --

19   Let me strike that.

20           Did you have a concern about the structure in which

21   RGHI was taken off this agreement?

22   A.   I did.

23   Q.   What was your concern?

24   A.   I didn't understand how RGHI couldn't be a party to this

25   agreement when any proceeds from a sale of Refco would go to

1   RGHI, and so I just didn't understand how this was going to

2   function because Refco wasn't going to receive proceeds on a

3   sale of itself.  So I didn't know how, as it was being

4   structured, DF Capital was going to receive its money.

5   Q.  Did you address that concern with Mr. Collins?

6   A.  I did.

7   Q.  What did you say to him and what did he say to you?

8   A.  I expressed to Joe my concern that I didn't understand why

9   RGHI wouldn't be a party to the agreement and asked if he would

10  go back to BAWAG and their representatives to try to get it

11  back.

12  Q.  Anything more come of that conversation?

13  A.  Yes.  We talked a different time and through the process

14  several times, but as it relates to this topic, Joe had told me

15  that there's a legal difference between an economic interest

16  and a equity interest.

17  Q.  And so based on this difference that he was explaining to

18  you, what was he going to do with respect to this agreement?

19  A.  He was going -- It was going to be left as a -- as a

20  Proceeds Participation Agreement between Refco and DF Capital,

21  Inc.

22  Q.  And so in the final agreements that we see on the screen

23  here before us, who is selling the participation right to

24  BAWAG?

25  A.  To BAWAG?

CAHPCOL3                    Trosten - direct

1    Q.   Yes.  To DF Capital on BAWAG's behalf.

2    A.   That would be Refco.

3    Q.   And is RGHI a party to this agreement?

4    A.   No.

5    Q.   Let's take a look at some of this agreement.  If we could

6    turn to the next page.  I'm sorry, it's going to be the bottom,

7    middle of the page we're on.

8           MR. CHERNOFF:  Sorry, Mr. Smith.

9    Q.   Okay.  So Article I of the agreement describes the

10   participation right, correct?

11   A.   That's correct.

12   Q.   And looking within paragraph (a), you said that BAWAG was

13   going to make payments in three stages?

14   A.   DF Capital would make payments.

15   Q.   DF Capital on behalf of BAWAG.  I'll use the term DF

16   Capital.  DF -- Let me step back.

17          The original concept was that BAWAG was going to make

18   periodic payments, correct?

19   A.   I don't recall if -- I believe DF Capital was or a new co

20   was going to be created.

21   Q.   And so DF Capital was created, a new co, a new company, for

22   the purposes of this deal?

23   A.   That's correct.

24   Q.   So DF Capital was going to make three separate payments?

25   A.   That is correct.

CAHPCOL3                          Trosten - direct

1    Q.  Paragraph (a) sets out the dates.  They're a year apart,

2    each payment date?

3    A.  Approximately.

4    Q.  Okay.  Thank you.  And approximately how much of an

5    interest in BAWAG's -- I'm sorry, strike that.

6            How much of an interest in the proceeds of the sale of

7    Refco was BAWAG acquiring with each of these three payments?

8    A.  For the purposes of this shell, I assume when you say

9    BAWAG --

10   Q.  I meant DF Capital, right.

11   A.  At each installment date, DF Capital is receiving

12   13.6 percent of the rights to participate in a sale of Refco.

13   Q.  And so after DF Capital, on behalf of BAWAG, makes all

14   three payments, what would be the total interest that DF

15   Capital has in the proceeds of sale of Refco?

16   A.  40.8 percent.

17   Q.  Now, if we could look at subparagraph (b).  I believe

18   subparagraph (b) captures the concept we talked about, where DF

19   Capital can exchange its interest into shares in Refco.

20   Describe how that worked?

21   A.  May I just read the paragraph?

22   Q.  Yes, please.

23   A.  May I ask you to repeat the question, please.

24   Q.  Yeah.  Well, just what is being accomplished here in

25   paragraph (b)?  What right does this give DF Capital?

1    A.  It gives DF Capital the right at each installment date to

2    receive the rights to 13.6 percent of a sale of the company and

3    that, at DF Capital's election, it can exchange that right into

4    actual membership shares or ownership interest.

5    Q.  And if DF Capital exchanges its right to the proceeds for

6    membership shares, membership shares being like equity stock in

7    the company?

8    A.  That's right.

9    Q.  Because it's private?

10   A.  Because it's a limited liability company.  It's just

11   different terms.

12   Q.  Let me start over.  If DF Capital exchanges its right of

13   proceeds for membership shares, what -- according to this

14   paragraph, how were those shares issued?

15   A.  They would be issued by Refco Group Holdings or the company

16   to DF Capital.

17   Q.  And what role, if any, does RGHI have in issuing these new

18   shares?

19   A.  I didn't hear the question.

20   Q.  What role, if any, does RGHI have in issuing these shares?

21   A.  RGHI either has to give, issue the -- deliver the shares to

22   DF Capital or instruct Refco to issue more shares of itself so

23   that it can be distributed to DF Capital.

24   Q.  Now, let's look at paragraph (c), which is on the next

25   page.  Paragraph (c) concerns the purchase price that DF

1    Capital has to pay for these rights, correct?

2    A.   That is correct.

3    Q.   And roughly speaking, how was the purchase price

4    calculated, according to this paragraph?

5    A.   It's calculated as a multiple of earnings for the year

6    ended February 28, 2003.  There is a component, which is a

7    non-discounted component, of $350 million, and then there are

8    additional discounts on what the remaining purchase price would

9    be for this right.

10   Q.   And so this formula would be applied each time DF Capital

11   owed a payment under the PPA?

12   A.   Not exactly.  The formula would be calculated based on the

13   earnings of fiscal 2003 and then be fixed.

14   Q.   Okay.  Let me now ask you to look down to subparagraph (e)

15   at the bottom of the page.

16   A.   I have it.

17   Q.   This says that, "The participation right shall be secured

18   pursuant to the terms of a security and pledge agreement from

19   RGHI, Refco Group Holdings, Inc., defined as 'Holdings' for

20   purposes of this agreement."

21         What is the purpose, as you understood it from

22   negotiating this deal, of the security and pledge agreement?

23   A.   The security and pledge agreement was going to enforce that

24   RGHI deliver to DF Capital each installment date the actual

25   membership interests that they would be receiving in the

1    event -- or proceeds in the event of a sale.  So they'd be

2    receiving a certificate of 136 shares of Refco to be delivered

3    by Refco Group Holdings or RGHI.

4    Q.  And so what was the effect of this security and pledge

5    agreement -- First of all, why was it included in the overall

6    agreement?

7    A.  It was included in the overall agreement because RGHI was

8    no longer a party to the agreement.

9    Q.  And if we look down at (e), it says "the obligations of the

10   company hereunder shall be guaranteed by Holdings, pursuant to

11   a guarantee in the form of" -- and then it gives a schedule

12   number, correct?

13   A.  That's correct.

14   Q.  And so what would that guarantee do?

15   A.  The guarantee said that to the extent the company or Refco

16   couldn't make the payment upon the ultimate sale of itself,

17   that Refco Group Holdings would guarantee that payment and make

18   the payment on Refco's behalf.

19   Q.  So what was the effect of the language that we see in

20   paragraph (e) on specific membership shares on its side?

21   A.  At each payment date, DF Capital had effectively a lien

22   through the security and pledge agreement once those membership

23   shares were delivered to DF Capital.

24   Q.  What do you mean by "a lien"?

25   A.  A lien, as if you have a mortgage on a home.  For example,

1   you borrow money to buy your house, the bank lends you the

2   money, and once you sell your house, you have to pay back the

3   bank before you receive any monies.

4           This is restricting Refco to -- it restricts Refco's

5   ability to sell -- to be sold without these shares being

6   delivered back to RGHI, and they'd be delivered back to RGHI

7   upon receipt of payment for their proceeds participation right.

8   Q.  For now, we can put aside the PPA.  I want to look at what

9   you referred to earlier as the side letter agreement to the

10  PPA, and that's Government Exhibit 1503.  If we could just have

11  a look at that?

12  A.  I have it.

13  Q.  And is this -- If you look at the last page, is this an

14  executed copy of the side letter agreement?

15  A.  Yes, it is.

16          MR. CHERNOFF:  The government offers 1503, your Honor.

17          MR. SCHWARTZ:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 1503 received in evidence)

20  Q.  So, Mr. Trosten, taking a look at this agreement, when was

21  it signed in relation to the signing, the execution of the PPA?

22  A.  It's dated the same day.

23  Q.  And if we could just blow up the first paragraph.

24          MR. CHERNOFF:  Thank you, Mr. Smith.

25  Q.  It's making reference to the Proceeds Participation

1    Agreement, correct?

2    A.  Yes, it is.

3    Q.  You said this was referred to as a side letter agreement.

4    Is that a relatively standard term in business, in contracts?

5    A.  Yes.

6    Q.  What is meant by a side letter agreement?

7    A.  It just -- It represents additional terms and conditions

8    that one or both parties preferred to not have in the original

9    form of the agreement, and so they create what they call a side

10   letter.

11   Q.  Okay.  I'll ask you more about that, but first, let me ask

12   you, are -- the parties that signed the side letter agreement

13   are the same parties that signed the PPA?

14   A.  No.  There are more parties to the side letter, but the

15   parties to the -- there are parties to the side letter that

16   signed the PPA.

17   Q.  And who are the additional parties on the side letter?

18   A.  Refco Group Holdings, LLC; Refco Group Holdings, Inc., and

19   BAWAG Overseas, Inc.

20   Q.  The other signers of the side letter agreement were the

21   people who signed the PPA?

22   A.  In terms of their entity.  I didn't look at the

23   signatories, but --

24   Q.  Okay.  So in other words, there are people who were signing

25   the side letter agreement that were not signing the PPA?

CAHPCOL3                        Trosten - direct

1  A.  That's correct.

2  Q.  Okay.  Did Refco, RGHI use a lawyer when preparing the side

3  letter agreement?

4  A.  Yes, it did.

5  Q.  And who was that lawyer?

6  A.  That lawyer was Joe Collins.

7  Q.  Did you, yourself, have any conversations with Joe Collins

8  about the side letter agreement?

9  A.  Yes.

10 Q.  What did you talk about in connection with the side letter

11 agreement?

12 A.  We just had drafting sessions regarding the agreement and

13 made some comments back and forth.

14 Q.  Let me ask you to flip to Government Exhibit 3020.

15 A.  This may take a moment.  I have it.

16 Q.  Okay.  Do you recognize Government Exhibit 3020?

17 A.  I recognize it.

18 Q.  What do you recognize it to be?

19 A.  It's via e-mail, a clean and marked version of the side

20 letter agreement sent from Joe Collins to Phil Bennett, and I'm

21 cc'd on it, carbon copied on it.

22         MR. CHERNOFF:  Your Honor, the government offers 3020,

23 your Honor.

24         MR. SCHWARTZ:  No objection.

25         THE COURT:  Received.

CAHPCOL3                         Trosten – direct

1              (Government's Exhibit 3020 received in evidence)

2      Q.  And so you said this is a marked version and a clean

3      version of the side letter agreement sent by Mr. Collins to

4      yourself and Mr. Bennett?

5      A.  Correct.

6      Q.  And then on Page 2, if you could turn the page, there's a

7      few side letter issues that are listed here?

8      A.  Correct.

9      Q.  And then if you just flip briefly through the document, do

10     you see that the document is marked up to some extent?

11     A.  I do.

12     Q.  And was this document sent to you around the time you were

13     participating in the drafting sessions with Mr. Collins on the

14     side letter agreement?

15     A.  Yes, it was.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

Cahdcol4a                         Trosten - direct

1  Q.  Let me ask you to turn back to the final side letter

2  agreement, Government Exhibit 1503.

3  A.  I have it.

4  Q.  Let's look at Section 11.1, which is on page 3 of the

5  document.

6       And I'll read it out.  It says:

7       "11.1.  The company agrees that $350 million of the

8  purchase price for the participation right shall be used or

9  caused to be used for the retirement of intercompany debt of

10  Refco Group Holdings, Inc."

11      what was the purpose of including this $350 million

12  figure and this language in the side letter agreement?

13  A.  Are you asking me why it's in the side letter agreement, or

14  just what it means?

15  Q.  No, I will ask you that later.  But what does this language

16  mean?  What does it do?

17  A.  It requires Refco -- that $350 million from the funds that

18  are being given by DF Capital to Refco be used to retire a

19  portion of the RGHI debt to Refco.

20      MR. SCHWARTZ:  Objection.  I move to strike.  That's

21  not what it says, your Honor.  It doesn't say anything about a

22  portion.

23      THE COURT:  Mr. Chernoff?

24      MR. CHERNOFF:  Let me try to lay a foundation for that

25  testimony.

Cahdcol4a                    Trosten – direct

1   BY MR. CHERNOFF:

2   Q.  This document, which refers to retiring $350 million of the

3   debt from RGHI to Refco -- correct?

4           MR. SCHWARTZ:  Objection.  It doesn't say "of the

5   debt."

6           (Counsel conferred)

7           MR. CHERNOFF:  I'll read it again.

8   Q.  "The company agrees that $350 million of the purchase price

9   for the participation right shall be used or caused to be used

10  for the retirement of intercompany debt of Refco Group

11  Holdings, Inc."

12          Mr. Trosten, what was the intercompany debt of Refco

13  Group Holdings, Inc.?

14  A.  The intercompany debt at Refco Group Holdings, Inc. at this

15  point approximately was $700 million.

16  Q.  That's what we have been calling the hole, the

17  related-party debt?

18  A.  That is correct.

19  Q.  OK.  So the parties to this side letter agreement knew that

20  RGHI owed Refco at least $350 million?

21          MR. SCHWARTZ:  Objection.

22          THE COURT:  Basis?

23          MR. SCHWARTZ:  That is not what it says.

24          THE COURT:  But I don't think that is the question.  I

25  don't believe the question is "Read this."

1          The question was asking the fact of how much it owed.

2          MR. SCHWARTZ:  Your Honor, if Mr. Chernoff wants to

3     ask him what conversations he had with people so we can hear

4     what the parties knew -- and I believe he actually had

5     conversations with people -- elicit those conversations.  But

6     generalizations about what the parties knew without a basis is

7     just speculation.

8          I think he had specific conversations.  Let him elicit

9     them.

10          MR. CHERNOFF:  All right.  I think the witness already

11     testified about those conversations, but I am happy to ask the

12     questions again.

13          THE COURT:  All right.  Go ahead, and I know you'll

14     try to make it go quickly.

15          MR. CHERNOFF:  I am trying, your Honor.

16     BY MR. CHERNOFF:

17     Q.  Mr. Trosten, you testified earlier that it was your

18     understanding that BAWAG knew about the size of the debt from

19     RGHI to Refco?

20     A.  Yes.

21     Q.  And you knew that based on all your discussions at Refco

22     with Phil Bennett and others who were working on the

23     transaction with BAWAG?

24     A.  I knew that through my discussions with Phil Bennett.

25     Q.  And at the time that this side letter agreement made

Cahdcol4a                       Trosten - direct

1   reference to $350 million of debt from RGHI, what,

2   approximately, was the debt of RGHI to Refco?

3   A.   $700 million.

4   Q.   And approximately how much had Refco reported on its most

5   recent audited financial statement to be the amount of the debt

6   owed by RGHI?

7   A.   Approximately 180 million.

8   Q.   So the parties to this agreement understood that RGHI --

9   RGHI's debt would be retired in the amount of $350 million?

10  A.   That's correct.

11  Q.   And that wouldn't be the whole debt than BAWAG knew about,

12  that would be some portion of it?

13  A.   That is correct.

14  Q.   Now, this $350 million figure, that was more than the

15  audited financial statement number but less than the true

16  number, was it always in this side letter during the drafting

17  sessions that you participated in?

18  A.   No, it was not.

19  Q.   Where was it originally?

20  A.   Originally it was in the main agreement, whether it be the

21  PPA or what was the purchase agreement before that.

22  Q.   And did you discuss with anyone at Refco the question of

23  whether this $350 million figure would be in the main

24  agreement, or somewhere else?

25  A.   Yes, I did.

1   Q.  Who did you discuss that with?

2   A.  Yes.  I saw in drafting sessions; there was a reference to

3   this $350 million of repayment of intercompany debt between

4   RGHI and Refco.  I went to Phil Bennett and expressed concern

5   that that language would be in the main agreement, because if

6   the auditors got word of this document they would see that the

7   balance of the related-party debt was at least $350 million and

8   that's not what we were reporting on the financial statements.

9   And I'd asked Phil if he can get it moved into the side letter.

10  And Phil said that he would talk to Joe.

11  Q.  And after Phil Bennett said he would talk to Joe Collins

12  about moving this number from the main agreement to the side

13  letter agreement, was it in fact moved?

14  A.  Yes.

15  Q.  Let's look at Government Exhibit 1517, please.

16  A.  I have it.

17  Q.  Do you recognize -- I'm sorry.  This is already in

18  evidence, I believe.

19        Government Exhibit 1517 is a memo from Joe Collins to

20  the three persons on the BAWAG side, the DF Capital side?

21  A.  That is correct.

22  Q.  And what is the date of this memorandum?

23  A.  June 3, 2002.

24        MR. CHERNOFF:  And just in case, your Honor, this

25  document is covered by our authenticity stipulation.  So I will

Cahdcol4a                          Trosten - direct

1    offer it again if I haven't already.

2              THE COURT:  Received again.

3              (Government's Exhibit 1517 received in evidence)

4              MR. CHERNOFF:  Thank you, your Honor.

5              MR. SCHWARTZ:  No objection.

6              THE COURT:  Again.  Good.

7              MR. CHERNOFF:  Let me ask if we could flip to Bates

8    No. 30, Mr. Smith.

9    Q.  And so based on the covering memo and what you see on the

10   document before you, Mr. Trosten, this is a marked copy of what

11   was called the Purchase Agreement and became the Proceeds

12   Participation Agreement, correct?

13   A.  That is correct.

14   Q.  From June 3rd of 2002.

15   A.  This draft is June 3rd of 2002, correct.

16   Q.  Turning to the next page, paragraph (c), and this refers to

17   how the purchase price will be determined, correct, the formula

18   you talked about before?

19   A.  That is correct.

20   Q.  And after subletter (c) there, do you see the number

21   $350,000 -- let me try to do that again -- $350,000,000?

22   A.  I do.

23   Q.  What is the language that is struck following $350,000,000?

24   A.  "Of the liabilities of holdings."

25   Q.  And "holdings" was defined in this agreement as RGHI,

Cahdcol4a                          Trosten – direct

1    correct?

2    A.  That is correct.

3    Q.  OK.  So in this draft that Mr. Collins circulated, the

4    reference to the $350,000,000, being of the liabilities of

5    holdings, was deleted, right?

6    A.  Correct.

7    Q.  Let's look at Government Exhibit 1518, please.

8    A.  I have it.

9            MR. CHERNOFF:  Your Honor, pursuant to our

10   stipulation, we offer 1518.

11           THE COURT:  It is received.

12           (Government's Exhibit 1518 received in evidence)

13   BY MR. CHERNOFF:

14   Q.  Mr. Trosten, do you see this is now a memo from Mr. Collins

15   to the same individuals representing BAWAG some days later,

16   June 11, 2002?

17   A.  Yes, it is.

18   Q.  And it says that Mr. Collins is again circulating some

19   clean and marked copies of the PPA and the revised side letter

20   agreement, correct?

21   A.  Yes.

22   Q.  Let's look at the next page of the document, Article 1,

23   1.01(c).

24           And little C has the figure $350,000,000, and you see

25   there that the language of "the liabilities of holdings" no

Cahdcol4a                      Trosten - direct

1   longer appears, correct?

2   A.  That is correct.

3   Q.  Let me now ask if we can flip ahead in this document to

4   what's Bates No. 963.

5           And, Mr. Trosten, do you see, this is the marked-up

6   version, or a version of the side letter agreement that's

7   attached to Mr. Collins' memo?

8   A.  I do.

9   Q.  Looking ahead in the document to Bates No. 965, do you see

10  the underlines?

11          What do the underlines indicate to you based on your

12  experience of working on this document?

13  A.  It means what was added to a document or on this particular

14  draft, or a particular draft.

15  Q.  So I'll just read out what's been added here on paragraph

16  10:  "The company agrees that $350 million of the purchase

17  price for the participation right shall be used or caused to be

18  used for the retirement of intercompany debt of Refco Group

19  Holdings, Inc."

20          And so the purpose of this language here -- strike

21  that.

22          This language having been moved to the side letter

23  agreement, did that satisfy the concern you expressed to

24  Mr. Bennett?

25  A.  Yes.

Cahdcol4a                    Trosten – direct

Q.  Let's go back to Government Exhibit 1503, the executed side

letter agreement.

A.  I have it.

Q.  Let's look at page 2, please, paragraph 5.1(a).

        This refers to a sale of the company.  What rights

does this give DF Capital in a sale of Refco?

A.  It gives DF Capital the right to consent or not consent to

a sale of the company.

Q.  And what about 5.1(b) what does that do for DF Capital?

A.  It targets a minimum price by which DF Capital can withhold

its consent for any reason.

Q.  OK.  So under this side letter agreement, because DF

Capital has an interest in the proceeds, it has to sign off on

a sale of Refco?

A.  That is correct.

Q.  And is there a restriction on their right to block a sale

of Refco here?

A.  Is there a restriction on their right?

Q.  Well, 5.1(a) says, "Such consent shall not be unreasonably

withheld by any party."

A.  That's correct.

Q.  That's referring to DF Capital's consent, it cannot

unreasonably be withheld, correct?

A.  That is for all parties of the letter agreement.

Q.  And then we turn to paragraph 11.1.

1          Here there is the reference that was moved from the

2     PPA to the 350 million of RGHI debt, correct?

3     A.  You said it was moved from the PPA to this letter, correct?

4          Yes.

5     Q.  And you said that that satisfied your concern.  What was

6     your concern about having it in the PPA, as opposed to having

7     it in the side letter?

8               MR. SCHWARTZ:  Objection.  Asked and answered.

9               THE COURT:  I think we probably have done this.

10              MR. CHERNOFF:  Thank you, your Honor.

11    Q.  Let me ask you to look at Government Exhibit 1504.

12          And this is the executed PPA, correct?

13    A.  Yes, it is.

14    Q.  On Bates No. 253, it sets out the installment payments, I

15    believe, that Refco -- that DF Capital is going to make to

16    Refco, correct?

17    A.  That is correct.

18    Q.  And the first installment that was scheduled for

19    February 2003, did that actually take place?

20    A.  Yes, it did.

21    Q.  And approximately how much did BAWAG pay at that time?

22    A.  Approximately $250 million.

23    Q.  Let me just ask you to flip now to 1752B.

24              MR. CHERNOFF:  And, your Honor, we offer this pursuant

25    our business records stipulation.

1           THE COURT:  Received.

2           (Government's Exhibit 1752B received in evidence)

3    BY MR. CHERNOFF:

4    Q.  Tell me when you have that, Mr. Trosten.

5    A.  I have it.

6    Q.  And what is that document?

7    A.  This is a wire transfer, or SWIFT, foreign transfer of

8    $254 million going from one bank account, a BAWAG bank account,

9    to a Refco Group Limited bank account at J.P. Morgan.

10   Q.  And around the time of this payment, were shares delivered

11   to DF Capital pursuant to the security agreement we had talk

12   about earlier?

13   A.  Yes, it was.

14   Q.  What form were those shares in?

15   A.  They were in certificate form, paper form.

16   Q.  And how, if at all, did that affect the ability to sell it

17   to a third party?

18   A.  They would be unable to sell them without getting them back

19   from DF Capital or creating a lien.

20   Q.  "They" being who?

21   A.  DF Capital now had a lien on Refco shares.

22   Q.  OK.  The second installment that's referenced in the PPA,

23   was that ever paid by BAWAG or by DF Capital?

24   A.  Yes, it was.

25   Q.  And that was originally scheduled for February 2004?

Cahdcol4a                    Trosten - direct

1   A.  Yes, it was.

2   Q.  Did it take place?

3   A.  It did.

4   Q.  At that time or some other time?

5   A.  At some other time.

6   Q.  And why was it paid at another time?

7   A.  It was paid at another time because during this period of

8   time between the first and second payment installment date,

9   Refco was looking for a third-party buyer, and we had an

10  understanding, through discussions with that third-party buyer,

11  that they were looking for a debt-free company.  Refco

12  looked --

13  Q.  Let me stop you there.

14          The third-party buyer being?

15  A.  Thomas H. Lee Partners.

16  Q.  So Thomas H. Lee Partners was looking for a debt-free

17  company.  Please continue.

18  A.  So recognizing that, we had asked BAWAG, DF Capital, or

19  BAWAG representatives, to make this payment earlier so that

20  Refco can use some of those proceeds to retire some long-term

21  debt that Refco had on its books which would have the effect of

22  increasing the purchase price that -- or the proceeds that

23  Refco would be receiving upon a sale of Refco Holdings.

24  Q.  Was BAWAG agreeable to doing that?

25  A.  Yes, they were.

Cahdcol4a                    Trosten - direct

1    Q.  How early was that payment made, roughly?

2    A.  It was made a few months earlier.

3    Q.  Let me ask you to look at Government Exhibit 1752A, which

4    we will offer pursuant to our business records at Refco

5    stipulation, your Honor.

6              THE COURT:  Received.

7              (Government's Exhibit 1752A received in evidence)

8    BY MR. CHERNOFF:

9    Q.  When you have it, tell me what you recognize 1752A to be.

10   A.  Again, it's a wire in the amount of it appears to be

11   $213,480,000 going from a BAWAG account to Harris Bank or into

12   a Refco account.

13   Q.  So were shares transferred as a result of that payment at

14   that time?

15   A.  Yes.

16   Q.  And, again, how were they transferred and what, if any,

17   restrictions were on them?

18   A.  They were transferring it in certificate or paper form, and

19   it created an additional lien on 136 shares.

20   Q.  Now, did the third payment, the third installment that was

21   going to be paid under the PPA, was that ever paid by DF

22   Capital?

23   A.  No, it was not.

24   Q.  And why wasn't that paid?

25   A.  Because in between the second installment that occurred in

Cahdcol4a                          Trosten - direct

1   November of '03 and their third installment date, which was

2   scheduled to be February of 2005, Refco sold the majority

3   interest -- Refco had sold the majority of its interest to a

4   company called Thomas H. Lee Partners.

5   Q.  And with respect to the prior two installments that were

6   actually paid, did Refco use any of those proceeds to actually

7   pay down the amount of RGHI debt?

8   A.  Yes.

9   Q.  Did that eliminate the debt that RGHI owed Refco?

10  A.  No.

11  Q.  Why not?

12  A.  Because Refco had approximately a billion dollars of debt,

13  and RGHI's debt exceeded the sum of these two payments.

14  Q.  So we talked about BAWAG's investments in 1999 and 2002.

15          Did there come a time when another investor, another

16  institution invested in Refco?

17  A.  Yes.

18  Q.  When was that?

19  A.  That transaction closed in 2004.

20  Q.  You are referring to the Thomas H. Lee transaction?

21  A.  Yes, I am.

22  Q.  What, in sum, did Thomas H. Lee buy in that transaction?

23  A.  They bought a majority share of Refco.

24  Q.  And do you remember the percentage that they bought?

25  A.  I do.

1   Q.  What was it?

2   A.  57 percent.

3   Q.  Were you involved in that transaction?

4   A.  I was.

5   Q.  What was your involvement?

6   A.  I was involved in, first, meeting with and hiring the

7   investment banker, along with Phil Bennett; working on the

8   investment banker fee arrangements; creating presentations;

9   offering circulars; information memorandums; drafting

10  documents, all the way through until ultimately the funding of

11  the transaction in August of 2004.

12  Q.  You said that TH Lee, Thomas H. Lee, bought 57 percent of

13  Refco.  From whom did it buy it?

14  A.  It bought it from Refco Group Holdings.

15  Q.  RGHI?

16  A.  Yes.

17  Q.  Who at that time owned RGHI?

18  A.  RGHI was owned equally by Phil Bennett and Tone Grant.

19  Q.  How much, approximately, did Thomas H. Lee pay to RGHI for

20  this 57 percentage interest in Refco?

21  A.  It was paying approximately $2 billion.

22  Q.  $2 billion?

23  A.  $2 billion.

24  Q.  OK.

25  A.  It was allowing Refco to take out of its business any what

1   we call additional working capital, and it allowed Refco owners

2   to continue to own its asset management business.

3   Q.   What do you mean by take out working capital?

4   A.   We had discussed with TH Lee that there was additional

5   working capital -- working capital is what you need to run your

6   business on a day-to-day basis.  We had advised TH Lee that we

7   had additional working capital, which was prior earnings

8   retained within the business that Refco did not need to run its

9   operations, and the owners of Refco would like to keep it.

10  Q.   And Thomas H. Lee agreed to that?

11  A.   They did.

12  Q.   Now, we'll talk about that more in detail later.

13          But let me ask you, the $2 billion that Thomas H. Lee

14  was paying, where did that money come from, in rough numbers?

15  A.   Approximately $600 million came from the TH Lee fund, and

16  $1.4 billion came in the form of debt.

17  Q.   And what kind of debt was that?

18  A.   This is debt, both bank debt and subordinated debt, or

19  bonds, that were issued, and the obligation to pay that back

20  was on Refco.

21  Q.   Does this kind of a sale where there was cash and private

22  debt have a name?

23  A.   Yes.

24  Q.   What's that called?

25  A.   A leveraged buyout, or LBO.

Cahdcol4a                    Trosten - direct

1   Q.  Did Refco have a law firm in connection with the sale to

2   Thomas H. Lee in this leveraged buyout?

3   A.  Yes.

4   Q.  Who was that?

5   A.  That was Mayer Brown.

6   Q.  Who at Mayer Brown was in charge of the LBO for Refco?

7   A.  Joe Collins.

8   Q.  Did Joe Collins represent anyone else in that transaction?

9   A.  Not to my knowledge.

10          MR. CHERNOFF:  Your Honor, I can keep going or should

11  we --

12          THE COURT:  This sounds like a good place to take the

13  lunch break, ladies and gentlemen.

14          Would you follow the normal rules?  Leave your

15  exhibits.  Take your books.

16          Please don't discuss the case among yourselves or with

17  anyone else.  Don't let anyone talk to you about the case, and

18  don't do any research about the case.

19          We'll see you at 2:10, please.  Enjoy the sun.

20          (Continued on next page)

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  Ladies and gentlemen, would you remain in

 3     the room until the jurors are down.

 4                You may step down, sir.

 5                THE WITNESS:  Thank you.

 6                THE COURT:  Counsel, would you like to do some of your

 7     deposition testimony now?

 8                MR. LEVY:  Happy to do it now, your Honor, and happy

 9     to do it when we come back from the break; either way.

10                THE COURT:  OK.  How about five of?

11                MR. LEVY:  Five of sounds good, your Honor.

12                At that point we will be able to hand it up.  They are

13     very small.

14                THE COURT:  Thank you.

15                (Luncheon recess)

16

17

18

19

20

21

22

23

24

25
```

Cahdcol4

1          **A F T E R N O O N   S E S S I O N**

2                          1:55 p.m.

3          (Jury not present)

4          THE COURT:  Good afternoon.  Counsel, won't you be

5   seated.

6          MR. SCHWARTZ:  May I proceed, your Honor?

7          THE COURT:  Of course.

8          MR. SCHWARTZ:  I think this is a fairly

9   straightforward issue, your Honor, and I have the transcript

10  that's at issue.  It is quite short.

11         THE COURT:  Thank you.

12         MR. SCHWARTZ:  And I'll give you the background.  I

13  don't know if you want it, your Honor, before you read it or

14  after you read it.  But the yellow is from the deposition of

15  Mr. Collins in a civil case.  The yellow is what the government

16  is offering in terms of Mr. Collins' note taking.  The green is

17  what we propose to complete it.

18         As background, your Honor, Mr. Melamed, as you may

19  have discerned from the opening statements, is going to testify

20  as to conversations with Mr. Collins.  In particular, there are

21  two conversations that he had with Mr. Collins in which

22  Mr. Collins took notes and Mr. Melamed did not.  Those two

23  conversations I believe the government is going to argue at the

24  end of the case are conversations that the jury should consider

25  towards guilt of Mr. Collins.

1          One of them took place on August 3rd; the other took

2     place on July 12.  The government is offering, we believe,

3     Mr. Collins' own deposition concerning his note taking

4     practices to explain his notes for both those conversations.

5          And all we are asking, your Honor, is that with

6     respect to the August 3rd conversation, he gave additional

7     testimony that simply says I followed my note taking practices

8     and wrote down everything that was significant.  And we think

9     it is necessary for completeness, and we would ask the Court to

10    read the transcript.

11          THE COURT:  OK.  Let me take a look.

12          (Pause)

13          And, Mr. Schwartz, is it your position that the green

14    material has to be read in order to make the yellow material

15    complete?  Is that your position?

16          MR. SCHWARTZ:  Yes, your Honor, and also to make it

17    complete and so that it is clear what Mr. Collins meant, what

18    his practice was with respect to these notes.

19          So the yellow is slightly ambiguous.  It says, "I

20    would just put down what was important, what I had to remember,

21    what I had to do."

22          Now, there are things, as your Honor might guess, that

23    are not in these notes, and it is things that Mr. Melamed

24    claims to have told Mr. Collins that are incriminating.  And so

25    we think that that would be misleading without having the

Cahdcol4

1    additional, "I wrote down August 3rd everything that was

2    significant."

3            (Pause)

4            THE COURT:  Mr. Levy.

5            MR. LEVY:  Your Honor, with all due respect to defense

6    counsel, this one is not even close.

7            The section that the government is putting in is page

8    805.  It deals generally with Mr. Collins' note taking.  In

9    fact, it is in reference -- at the deposition, not that it

10   particularly matters -- to some notes he took in the year 2000.

11           There is absolutely no reason why a couple of sections

12   about some specific notes from 2003 that Mr. Collins testified

13   about --

14           THE COURT:  2004.

15           MR. LEVY:  2004 that Mr. Collins testified about 150

16   pages later in his deposition as to some specific notes and

17   what he meant by them is necessary to correct some misleading

18   impression from his general explanation.

19           MR. SCHWARTZ:  Your Honor, they are not offering these

20   notes for a conversation that took place in 2000 or to explain

21   what he was testifying about when he gave the yellow version.

22   He was testifying about notes much earlier.

23           They are offering them about the same conversation he

24   testified about hundreds of pages later.  That's their choice.

25   They are entitled to do that.  Once they do that, we're

Cahdcol4

1    entitled to say there is an additional piece about that

2    conversation and his note taking practices that the jury should

3    hear.  If they are not going to -- they are not offering them

4    about anything except these two conversations.  So to say that

5    that he didn't testify -- that what they are offering wasn't

6    about this conversation makes no sense.

7            MR. LEVY:  Your Honor, that is a theory of relevance

8    that I understand, but we are not here on a relevance ruling,

9    we here on a rule of completeness ruling about whether or not

10   the defendant is allowed to put in his own hearsay statements

11   because the government is putting in his admission.

12           There is nothing about what they are offering that is

13   necessary to complete a section from 150 pages earlier in which

14   the defendant talks generally about his note taking practices.

15           MR. SCHWARTZ:  The number of pages is irrelevant.

16   They are offering this to explain the notes of specific

17   conversation.  Without the green part it's incomplete and we

18   believe misleading.

19           THE COURT:  All right.  The yellow part proffered by

20   the government talks about Mr. Collins' note taking practices.

21   The green part talks about -- establishes that Mr. Collins

22   followed his normal note taking practice, or it doesn't even

23   say that, but the critical question is:

24   "Q   Did you follow your normal practice of writing down

25   significant things said by Mr. Melamed during this call?

Cahdcol4

1      "A   Yes, I did."

2              I don't see that it completes or is necessary to make

3      clear the yellow portion proffered by the government, and,

4      therefore, I will not permit it under the rule of completeness.

5              Anything else before we start?

6              (Pause)

7              Off the record.

8              (Discussion off the record)

9              (Pause)

10             (Time noted at 2:14 p.m.)

11             THE COURT:  Off the record -- well, on the record, I

12     guess.

13             We're missing one juror.  That is what the problem is.

14             The juror is not on line, not that there is much of a

15     line.

16             (Pause)

17             (Time noted at 2:18 p.m.)

18             THE COURT:  OK.  We are ready, friends, as soon as it

19     takes the juror to get well settled.

20             (Continued on next page)

21

22

23

24

25

1           (Time noted at 2:20 p.m., jury present)

2           THE COURT:  And won't you be seated, ladies and

3    gentlemen.

4           We continue with the direct examination of the

5    witness.

6           Mr. Chernoff.

7           MR. CHERNOFF:  Thank you, your Honor.

8    ROBERT TROSTEN,

9        Resumed, and testified further as follows:

10

11   DIRECT EXAMINATION (Resumed)

12   BY MR. CHERNOFF:

13   Q.  So, Mr. Trosten, before the lunch break we started to talk

14   about this leveraged buyout in which Thomas H. Lee was going to

15   buy a majority interest in Refco.

16          Let me step back for a minute.  Before even the PPA

17   contract with BAWAG with DF Capital, was Refco looking for a

18   buyer?

19   A.  Yes.

20   Q.  When did Refco, to your recollection, first start looking

21   for a buyer?

22   A.  Do you mean after BAWAG's initial 10 percent interest?

23   Q.  Yes.

24   A.  2001.

25   Q.  And what kind of a deal, what kind of a buyer was Refco

Cahdcol4                          Trosten - direct

1    looking for at that time, if you know?

2    A.   They were looking for a buyer such as a bank that would

3    take 100 percent of the company.

4    Q.   Did Refco take steps to identify, to locate such a buyer?

5    A.   We did.

6    Q.   What did Refco do at that time?

7    A.   We hired an investment bank.

8    Q.   Which investment bank?

9    A.   Allen & Company.

10   Q.   And what generally did Allen & Company do to try to

11   identify a buyer for Refco?

12   A.   They met with executives, including myself, at Refco,

13   created a memorandum regarding Refco's business activities, and

14   went to prospective buyers to try to locate a level of interest

15   from a buyer.

16   Q.   And did anything come of the buyer that Allen & Company was

17   looking for for Refco at that time?

18   A.   No, it did not.

19   Q.   After that transaction failed to go anywhere, did Refco

20   find another source of cash in the PPA?

21   A.   Yes.

22   Q.   Did there come a time after the PPA that Refco started

23   looking again for a buyer?

24   A.   Yes.

25   Q.   And why, generally, was that?

Cahdcol4                        Trosten - direct

1    A.  Because the PPA and/or the side letter talked about how we

2    were going to work -- may I start over, please?

3    Q.  Go ahead.

4    A.  In Refco's discussions with BAWAG management, we discussed

5    that Refco was going to be looking for a third-party buyer at

6    some point during the DF Capital transaction.

7    Q.  And by "third-party buyer" you mean to buy the whole

8    company?

9    A.  That was Refco's intention.

10   Q.  And this time around did Refco retain an investment bank?

11   A.  Yes, we did.

12   Q.  Who did Refco hire at that time?

13   A.  Credit Suisse First Boston, or CSFB.

14   Q.  And did CSFB prepare documents in connection with looking

15   for a buyer?

16   A.  They did.

17   Q.  Let me ask you to look at Government Exhibit 1000.

18   A.  I have it.

19   Q.  Do you recognize 1000?

20   A.  I do.

21   Q.  And what is that?

22   A.  This is a confidential information memorandum that was

23   prepared by CSFB in conjunction with Refco management.

24            MR. CHERNOFF:  The government offers 1000.

25            MR. SCHWARTZ:  No objection.

1          THE COURT:  Received.

2          (Government's Exhibit 1000 received in evidence)

3   BY MR. CHERNOFF:

4   Q.  And what did CSFB do, in brief, with this confidential

5   information memorandum?

6   A.  Distributed it to potential acquirers of the business.

7   Q.  How many firms can you recall expressed preliminary

8   interest in exploring a buyout, a purchase of Refco?

9   A.  There was a handful, three or four, I believe, that gave

10  written indications, and there was one that gave an oral

11  indication.

12  Q.  And was one of those firms Thomas H. Lee?

13  A.  Yes.

14  Q.  When, approximately, did Refco and Thomas H. Lee first

15  begin talking about a possible sale?

16  A.  Approximately December of 2003.

17  Q.  And how long did it ultimately take for the Thomas H. Lee

18  deal to close?

19  A.  Approximately eight to nine months later.

20  Q.  Was Thomas H. Lee represented by lawyers in the

21  discussions, the negotiations around this buyout?

22  A.  Yes, they were.

23  Q.  What law firm represented Thomas H. Lee?

24  A.  Weil, Gotshal.

25  Q.  And was Refco represented in the same discussions?

1           MR. SCHWARTZ:  Time period, please, your Honor.

2           THE COURT:  I thought counsel's question went to the

3    discussions prior to the purchase.

4           MR. SCHWARTZ:  Correct.

5           THE COURT:  All right.

6           THE WITNESS:  May I --

7           THE COURT:  Do you need more than that?

8           MR. SCHWARTZ:  I will do it on cross.

9           THE COURT:  Do you have in mind the question, sir, or

10   would you like it asked again?

11          THE WITNESS:  If I could, your Honor?  Thank you.

12          THE COURT:  (Reading).

13   "Q   And was Refco represented in the same discussions?"

14          I can go back a couple of more.

15          THE WITNESS:  No.

16          THE COURT:  (Reading)

17   "Q   How long did it ultimately take for the Thomas H. Lee deal

18   to close?

19   "A   Approximately eight to nine months later.

20   "Q   Was Thomas H. Lee represented by lawyers in the

21   discussions, the negotiations around this buyout?

22   "A   Yes, they were.

23   "Q   What law firm represented Thomas H. Lee?

24   "A   Weil, Gotshal.

25   "Q   And was Refco represented in the same discussion?"

Cahdcol4                        Trosten - direct

1    A.  Yes.  Yes, we were.

2              MR. CHERNOFF:  Thank you, your Honor.

3    BY MR. CHERNOFF:

4    Q.  Mr. Trosten, who represented Refco in those transactions --

5    in those discussions?

6    A.  Mayer Brown.

7    Q.  And was RGHI represented in the deal with Thomas H. Lee?

8    A.  Yes, they were.

9    Q.  Who represented RGHI?

10   A.  Mayer Brown.

11   Q.  And who at Mayer Brown was in charge of the Refco

12   representation?

13   A.  Joe Collins.

14   Q.  And the RGHI representation?

15   A.  Joe Collins.

16   Q.  Did Refco have any other different law firm involved in

17   this deal with Thomas H. Lee that you are aware of?

18   A.  No.

19   Q.  Are you familiar with the term due diligence, Mr. Trosten?

20   A.  Yes, I am.

21   Q.  How do you know what that term means?

22   A.  Because I performed it approximately a dozen times during

23   my tenure at Refco.

24   Q.  And what is due diligence?

25   A.  Due diligence is when an acquirer is looking to buy a

1   business, you go and perform what they call due diligence, run

2   an analysis of that company utilizing both data that's provided

3   by that company, having management presentations, and any other

4   data that you may be able to identify, and then you ultimately

5   make a decision as to whether or not you would like to attempt

6   to proceed with the transaction.

7   Q.  Mr. Trosten, can I ask you to just pull that microphone a

8   little bit.

9   A.  I'm sorry.

10  Q.  Thank you.  You said that you had participated in due

11  diligence approximately a dozen times.  How so?

12  A.  Whilst at Refco we acquired many different businesses.

13  Q.  About a dozen times, is that your estimate?

14  A.  Yes.

15  Q.  OK.  So in this -- in this set of discussions leading up to

16  the Thomas H. Lee transaction, did there come a time when

17  Thomas H. Lee conducted due diligence on Refco?

18  A.  Yes, they did.

19  Q.  Were you involved in the process?

20  A.  I was.

21  Q.  How so?

22  A.  I was -- helped prepare what they call a data room, which

23  is the initial part of due diligence.  I was involved in

24  business presentations with TH Lee, and was involved in many of

25  the follow up questions that TH Lee had for Refco and its

Cahdcol4                          Trosten - direct

1    management.

2    Q.   Roughly speaking, can you estimate how long Thomas H. Lee

3    carried out due diligence on Refco before it agreed to buy the

4    company?

5    A.   Six to seven months.

6    Q.   And when did that due diligence occur in relation to the

7    sale?

8    A.   It occurred immediately prior to the sale.

9    Q.   Which was approximately when?

10   A.   The sale of the company was a few months after their due

11   diligence was complete.

12   Q.   So when was the sale on the calendar?

13   A.   August of 2004.

14   Q.   Now, compared to other due diligence processes that you had

15   been involved with personally, how extensive was the due

16   diligence that Thomas H. Lee conducted?

17   A.   It was the most extensive due diligence that I've ever been

18   a part of.

19   Q.   And in your role in the due diligence, did you participate

20   in discussions with representatives of Thomas H. Lee?

21   A.   Yes, I did.

22   Q.   Who was in charge of the matter at Thomas H. Lee?

23   A.   His name is Scott Schoen.

24   Q.   Let me ask you now to look at Government Exhibit 1003.

25   A.   I have it.

Cahdcol4                          Trosten - direct

1    Q.  Do you recognize Government Exhibit 1003?

2    A.  I do.

3    Q.  And what is 1003?

4    A.  It's an executed copy of a Letter of Intent between Thomas

5    H. Lee Partners and Refco.

6           MR. CHERNOFF:  And I believe this is in evidence.  We

7    should bring that up.

8    Q.  And so I think you said this is called what kind of a

9    letter?

10   A.  It is called a letter of intent.

11   Q.  And what is a letter of intent in these types of

12   transactions?

13   A.  A letter of intent goes into significant detail as to how

14   the transaction -- it describes the transaction, what needs to

15   occur to get to the next level, which is a definitive signed

16   agreement, and it makes the discussions with a potential buyer,

17   in this case Thomas H. Lee, much more serious.

18   Q.  And so what's the status -- how would you describe the

19   status of the deal with Thomas H. Lee once the Letter of Intent

20   is signed?

21   A.  Once the Letter of Intent is signed, there's some

22   additional due diligence but it's the intent of the parties to

23   execute a deal around the parameters described in the letter of

24   intent.

25   Q.  Did Refco take part in drafting this Letter of Intent?

1   A.  Yes.

2   Q.  And were you yourself involved?

3   A.  Yes, I was.

4   Q.  How so?

5   A.  I assisted in drafting sessions and providing comments.

6   Q.  And did Refco have a lawyer who represented it in drafting

7   this Letter of Intent?

8   A.  Yes.

9   Q.  Who was the lead lawyer?

10  A.  Joe Collins.

11  Q.  Did you discuss the Letter of Intent with Joe Collins?

12  A.  Yes.

13  Q.  And what was his role with regard to it?

14  A.  He assisted in drafting it from Refco's perspective.

15  Q.  Let me ask you to look at Government Exhibit 3010.

16  A.  I have it.

17          MR. CHERNOFF:  Your Honor, the government offers 3010

18  under our stipulation of authenticity.

19          THE COURT:  Received.

20          (Government's Exhibit 3010 received in evidence)

21  BY MR. CHERNOFF:

22  Q.  Mr. Trosten, this appears to be an e-mail sent on behalf of

23  Joseph Collins to Mr. Bennett and another, copying you, among

24  others?

25  A.  That is correct.

1  Q.  And it says, "Attached are clean and marked versions of the

2  LOI" --

3       Was that the Letter of Intent?

4  A.  Yes, it was.

5  Q.  -- "reflecting all comments received from Refco and CSFB.

6  The marked copy reflects all changes from the original LOI."

7       Let me ask you, at the time the Letter of Intent was

8  being drafted, had the Proceeds Participation Agreement, the

9  PPA, or the side letter, been revealed to Thomas H. Lee?

10 A.  Not to my knowledge.

11 Q.  Let's go back and look at the PPA, which is Government

12 Exhibit 1504, please.

13 A.  I have it.

14 Q.  If we could just look at the first page?

15      Dated July 12, 2002, correct?

16 A.  That's correct.

17 Q.  And let's look at quickly 1503, the side letter agreement.

18      And that has the same date on that agreement, correct?

19 A.  That is correct.

20 Q.  And so when Refco began negotiating a sale to Thomas H.

21 Lee, were those two agreements still in full force?

22 A.  Yes, they were.

23 Q.  Now, as these negotiations with Thomas H. Lee unfolded, did

24 you discuss your concerns about disclosing these agreements

25 with anyone at Refco?

Cahdcol4                         Trosten - direct

1    A.  I did.

2    Q.  Who did you discuss it with?

3    A.  I discussed it with Phil Bennett.

4    Q.  What did you say to him and what did he say back?

5    A.  I just felt that the PPA shouldn't be disclosed to Thomas

6    H. Lee Partners, or any other potential buyer, for that matter,

7    and he agreed.  And I said that I would speak to various people

8    that might make reference to it or provide it to Thomas H. Lee

9    and make sure that that didn't occur.

10   Q.  Why did you have concerns about the PPA being disclosed to

11   Thomas H. Lee?

12   A.  For one, it makes reference to the PPA and the side letter

13   in reference -- including the side letter.  The side letter

14   makes reference to the $350 million of debt between RGHI and

15   RGL which had not been identified.  We had not disclosed to

16   Thomas H. Lee prior to this that there was another investor

17   that contributed over $450 million of cash into the group.  And

18   it's something that a buyer might want to understand as to why

19   it wasn't disclosed to them in the past -- in the beginning of

20   due diligence.

21   Q.  When you say -- did I understand you correctly that your

22   concern was about disclosing not only the PPA but also the side

23   letter agreement?

24   A.  That is correct.

25   Q.  To play this out, if it were revealed to Thomas H. Lee the

Cahdcol4                         Trosten - direct

1   items that you just discussed, being the PPA and the side

2   letter, what were your concerns about what could happen to the

3   deal with them?

4   A.  My concern was that the deal might not occur.

5   Q.  Why not?

6   A.  For one, they would have identified that there's debt on

7   the books between RGHI and Refco in excess of what we had

8   reported on our financial statements.  There was a concern that

9   Thomas H. Lee or any buyer would wonder how this was not -- the

10  PPA was not disclosed in our audited financial statements, as

11  it was a significant event in Refco's history.

12  Q.  When you say they would wonder how it was not disclosed,

13  would they understand that the audited financial statements

14  were false?

15  A.  They would.

16  Q.  And how would that likely affect the deal with Thomas H.

17  Lee?

18  A.  They would likely pass on the deal, or not complete it.

19  Q.  Fair to say that the false audited financials made Refco

20  look like a more profitable company than it was?

21  A.  Yes.

22  Q.  You said that you spoke to Mr. Bennett and he agreed with

23  you; and then you said you talked to other Refco team members

24  who might in the course of the due diligence disclose these

25  agreements?

Cahdcol4                              Trosten - direct

1   A.   That's correct.

2   Q.   Who do you remember speaking to about that concern?

3   A.   Santo Maggio; my controller Frank Mutterer; possibly other

4   members of my accounting department, I don't recall; and Phil

5   Silverman, the corporate secretary.

6   Q.   Did you, yourself, talk to Joe Collins about concealing

7   these two agreements?

8   A.   No, I did not.

9   Q.   Why not?

10   A.   Because it wouldn't have been me that would have that

11   discussion.

12   Q.   Who in your view would have that discussion?

13   A.   Phil Bennett.

14   Q.   Let me ask you to look at Government Exhibit 319.

15   A.   I have it.

16          MR. CHERNOFF:   Your Honor, the government offers this

17   as notes of the defendant, Mr. Collins, pursuant to our

18   handwriting stipulation and our authenticity stipulation.

19          THE COURT:   Received.

20          (Government's Exhibit 319 received in evidence)

21   BY MR. CHERNOFF:

22   Q.   Mr. Trosten, take a look at these notes, which appear to

23   relate to a telephone conference with yourself on June 30,

24   2003, correct?

25   A.   That is correct.

1  Q.  Now, this is about a year before the Thomas H. Lee

2  transaction closed, right?

3  A.  It is a little bit before a year, that's right.

4  Q.  A little more than a year?

5  A.  A little more than a year.  I'm sorry.

6  Q.  And you see there is a reference here to CSFB; that was the

7  investment bank that was later retained?

8  A.  That is correct.

9  Q.  And there is a reference to the prep of the data room.

10       You mentioned that before.  Tell us in a little detail

11  what a data room is and what role it plays in this transaction,

12  this kind of transaction.

13  A.  Absolutely.  A data room is preliminary basic data that

14  goes into a designated location for many or several buyers or

15  however many potential buyers would be to come and take just a

16  preliminary look at basic Refco information.  So you have LLC

17  agreements.  You would have our long-term debt agreements.  You

18  might have lease agreements.  Any acquisition agreements that

19  we had.  Items such as that.

20  Q.  And that's something that people engaged in due diligence

21  sort of go in and out of, used to conduct due diligence?

22  A.  They set up an appointment to go into it, but yes.

23  Q.  OK.  So we can take that down.

24       I think you said that you became aware of the

25  discussions with Thomas H. Lee in about December of '03 or

1    January of '04?

2    A.  That's correct.

3    Q.  Let me ask you to look at Government Exhibit 1515.

4            MR. CHERNOFF:  And, your Honor, we offer this pursuant

5    to our stipulation.

6            THE COURT:  Received.

7            (Government's Exhibit 1515 received in evidence)

8    BY MR. CHERNOFF:

9    Q.  This seems to be an e-mail from Peter Schultz to Joseph

10   Collins.

11           Do you know who Peter Schultz was?

12   A.  I do.

13   Q.  Who was he?

14   A.  Peter Schultz was an attorney.

15   Q.  At Mayer Brown?

16   A.  At Mayer Brown, yes.

17   Q.  OK.  And so this is dated December 5, 2003.

18           And it says, from Mr. Schultz, With respect to the

19   proceeds participation agreement:  "Joe, please let me know if

20   you are looking for something different."

21           If you could just turn the page to what's attached to

22   this e-mail, and was this the executed -- well, it is not

23   executed, this is an e-mail attachment.  Is this the Proceeds

24   Participation Agreement that we were talking about?

25   A.  It appears to be.

1   Q.  And this was sent to Mr. Collins in about December of 2003.

2          That was long after the PPA had been executed,

3   correct?

4   A.  That's correct.

5   Q.  But around the time of the beginning of discussions with

6   Thomas H. Lee, correct?

7   A.  That is correct.

8   Q.  Let me ask you to look at Government Exhibit 353.

9          MR. CHERNOFF:  And, your Honor, we offer this pursuant

10  to our stipulation.

11         THE COURT:  Received.

12         (Government's Exhibit 353 received in evidence)

13         MR. CHERNOFF:  Both as to authenticity and as to

14  handwriting.

15         Thank you, Mr. Smith.  Could we just highlight the

16  upper right-hand corner.

17  Q.  You see Mr. Collins initials, and now we have jumped ahead

18  to April 12, 2004?

19  A.  Yes.

20  Q.  This document says, "Project Royce issues list."

21         Do you know what Project Royce was?

22  A.  Yes.

23  Q.  What is it?

24  A.  Project Royce was the code name that we used for the Refco

25  transaction.

1    Q.  This appears to be some kind of issues list, and you see

2    the handwriting of Mr. Collins toward the end?

3    A.  Yes, I do.

4    Q.  I want to focus in for a moment on number 5.  There are two

5    items there under "Debt Financing."

6              (a) was book runners.  What is a book runner?

7    A.  A book runner is junior to the lead investment bank, so

8    there are other investment banks that work with Refco in trying

9    to distribute or sell Refco debt or bonds.

10   Q.  And (b), it says, "PRB Financing."

11             PRB were Mr. Bennett's initials?

12   A.  That is correct.

13   Q.  And had you ever heard a reference to financing in your

14   discussions with Mr. Bennett?

15   A.  Yes.

16   Q.  How was that term used in those discussions?

17   A.  It was used to describe the short-term financings that

18   would occur at the end of each fiscal year end.

19   Q.  So when you had those discussions, you also heard the term

20   "short-term"?

21   A.  Yes.

22   Q.  So let me ask you now to look at -- sorry, just a moment,

23   your Honor.

24             Let me ask you to turn to Government Exhibit 1960.

25             MR. CHERNOFF:  Your Honor, we offer this pursuant to

1    our stipulation of authenticity.

2              THE COURT:  Received.

3              (Government's Exhibit 1960 received in evidence)

4              MR. CHERNOFF:  And if we could bring that up?

5    Q.  Do you see in the upper right-hand corner Mr. Collins'

6    handwriting that says, "Refco/Royce due diligence"?

7    A.  I do.

8    Q.  So this is a memorandum dated May 3, 2004, to Joe Collins

9    from Phil Bennett regarding Exhibit C.

10             Was there an Exhibit C to the Letter of Intent?

11   A.  Yes, there was.

12   Q.  What did it do?

13   A.  I would need to just take a quick look at it, but I believe

14   it was a checklist of open items.

15   Q.  Let's turn back to the Letter of Intent that's Government

16   Exhibit 1003.

17             Take a look at Exhibit C, which is Bates No. 300.

18   A.  I have it.  Thank you.

19   Q.  And so take a moment to look at that, and then please tell

20   me what Exhibit C is in the Letter of Intent.

21   A.  It's the remaining due diligence request, both legal,

22   financing and tax.

23   Q.  And these are due diligence requests being made by Thomas

24   H. Lee to Refco?

25   A.  Yes.

Cahdcol4                        Trosten - direct

1    Q.  Let's look down to item No. 6.  And that says:

2              "Indemnification arrangements.  Please provide any

3    agreements (or forms thereof, if a single form is widely used),

4    other than agreements otherwise supplied, that contain

5    significant indemnification obligations on the part of the

6    company."

7              Now, at the time this Letter of Intent was signed,

8    Mr. Trosten, were you aware of any indemnification arrangements

9    that Refco had?

10   A.  Yes.

11   Q.  What do you have in mind?

12   A.  As part of the short-term financings that occurred at the

13   end of each fiscal year end, Refco entered into an

14   indemnification agreement with these various customers.

15   Q.  And that was what we talked about this morning, the

16   indemnification agreement holds them harmless if there is some

17   kind of issue regarding these loans?

18   A.  That is correct.

19   Q.  Were those still in effect at the time the Letter of Intent

20   was signed?

21   A.  Yes.

22   Q.  And if you could flip back, we are going to come back to

23   Exhibit C, but take a quick look back at the Exhibit C

24   memorandum, which is Government Exhibit 1960.

25             Do you see in item 6, it says, "There are no

1    significant indemnification obligations that have not been

2    noted already."

3    A.  I do.

4    Q.  To your knowledge, had the indemnification obligations you

5    just described with the customers in the year-end paydown

6    transactions been disclosed?

7    A.  Not to my knowledge.

8    Q.  Let's go back for a moment to Exhibit C, Item No. 7.  It

9    says, "Shareholder Agreements."

10           Do you know of any shareholder agreements that existed

11   that you understood Thomas H. Lee to be seeking here?

12   A.  They wanted any related shareholder agreements between

13   Refco or Refco Group Holdings, as the owner of Refco, or any

14   other party.

15   Q.  And were there any of these kind of shareholder agreements

16   at the time of this exhibit being sent to Refco?

17   A.  Yes.

18   Q.  Such as?

19   A.  The PPA and side letter.

20   Q.  And let's flip back to the Exhibit C memorandum.

21           Here under Item 7, you see it says, "To be confirmed."

22   A.  I do.

23   Q.  And now the indemnification obligations that we just talked

24   about, those are the ones that Mr. Collins at Mayer Brown

25   drafted?

Cahdcol4                         Trosten - direct

1   A.   Yes.

2   Q.   And the PPA as well, correct?

3   A.   Yes.

4   Q.   Let's flip back to Exhibit C, please, the next page.

5        By the way, at No. 13, it says, "Please provide

6   information with respect to the SEC inquiry."

7        Do you know what the SEC inquiry was in this context?

8   A.   I don't remember.

9   Q.   Item 14 says:  "Material contracts.  Please confirm that

10  there are no other contracts considered material by management

11  that have not been supplied."

12       What did you understand yourself "material" to mean?

13  A.   Something that a potential investor would want to know

14  about.

15  Q.   Flipping back to Exhibit C.  Item 14 says, "I can confirm

16  there are no other material contracts to be disclosed."

17       And at the time that Mr. Bennett wrote that, were you

18  aware of whether there were contracts that you viewed as

19  material that had not been disclosed?

20  A.   To the best of my knowledge, there were contracts that were

21  not disclosed, yes.

22  Q.   And what do you have in mind?

23  A.   The PPA, the side letter, and the Profit Participation

24  Plan.

25  Q.   Now, it says here, "I will call you" -- I am still looking

1    at the memorandum, Exhibit C -- "I will call you to review each

2    of these responses and the timetable for outstanding issues."

3           And then it says, "Regards."

4           And then it looks like this may be the person who

5    prepared this memo or typed it.  Was there someone who worked

6    for Mr. Bennett with the initials KF?

7    A.  Yes.

8    Q.  Who was that?

9    A.  Karen Fleming.

10   Q.  And what was her role in the company?

11   A.  She was Phil Bennett's administrative assistant.

12   Q.  You mentioned that neither the PPA nor the side letter

13   agreement had been disclosed at the time of the Letter of

14   Intent.

15          At any point in the transaction, are you aware that

16   Refco ever told Thomas H. Lee about those two agreements?

17   A.  No, I'm not aware of that.

18   Q.  What about the existence of DF Capital?  To your awareness,

19   did anyone from Refco ever tell Thomas H. Lee about the

20   existence of DF Capital, the BAWAG-owned entity?

21   A.  No.

22   Q.  And, of course, Mr. Trosten, you went along with the

23   decisions not to disclose those documents to Thomas H. Lee,

24   correct?

25   A.  Yes, I did.

1  Q.  You had those discussions with Mr. Bennett about how that

2  would not be a good idea for Refco?

3  A.  Yes, I did.

4  Q.  What else did you do after you spoke to members of the

5  Refco team to make sure that Thomas H. Lee would not find out

6  about these agreements?

7  A.  I went into the data room with a colleague of mine at Refco

8  and looked for documents such as that and to remove it from the

9  data room if it was there.

10 Q.  How long did it take you to complete that project?

11 A.  Two days.

12 Q.  What other things were you looking for as you were going

13 through the data room?

14 A.  I was looking for the profit participation plan.  I was

15 looking for any document that would reference the true size of

16 the RGHI debt to RGL, whether that be short-term loan

17 transactions, any miscellaneous papers that would suggest that

18 the balance was indeed higher than what was reported in our

19 financial statements.

20 Q.  And did you do that search in the data room with anyone

21 else at Refco?

22 A.  Yes, I did.

23 Q.  Who?

24 A.  Frank Mutterer.

25 Q.  And so anything you found that referenced those items was

Cahdcol4                          Trosten - direct

1   removed?

2   A.  I do not recall if we found anything, but if there was

3   anything in there that referenced those items, I would have

4   removed them, yes.

5   Q.  Now, did there come a time as due diligence went along that

6   Refco and Thomas H. Lee signed a Purchase Agreement?

7   A.  Yes.

8   Q.  And did you have a role in drafting and negotiating that

9   Purchase Agreement?

10  A.  Yes, I did.

11  Q.  Again, did Refco have a law firm in negotiating and

12  drafting that agreement?

13  A.  Yes, they did.

14  Q.  Who was the law firm and who was the lead lawyer?

15  A.  That law firm was Mayer Brown, and Joe Collins was the lead

16  lawyer.

17  Q.  And did you yourself speak to Joe Collins about the drafts

18  of this agreement?

19  A.  Yes.

20  Q.  Let me ask you to turn to Government Exhibit 350.

21  A.  I have it.

22          MR. CHERNOFF:  And, your Honor, we offer this pursuant

23  to our authenticity stipulation and our handwriting of the

24  defendant stipulation.

25          THE COURT:  Received.

1        (Government's Exhibit 350 received in evidence)

2    BY MR. CHERNOFF:

3    Q.   Do you recognize this document, Mr. Trosten?

4    A.   I do.

5    Q.   What is Government's Exhibit 350?

6    A.   It is a draft of an equity Purchase Agreement from Refco's

7    perspective and BAWAG's prospective with a potential buyer.  It

8    is a draft of the Purchase Agreement.

9    Q.   Maybe just lift the microphone a little bit so your voice

10   doesn't drop.  Thank you, Mr. Trosten.

11        And so it seems from the handwriting that Mr. Collins

12   sent this to yourself as well as Mr. Bennett?

13   A.   That's correct.

14   Q.   Now, this draft of the Purchase Agreement, the buyer is not

15   even filled in, correct?

16   A.   That is correct.

17   Q.   And this is back on December 9th of 2003, this draft?

18   A.   Yes.

19   Q.   And just take a look at it and see if what's attached is an

20   early draft of the equity Purchase Agreement?

21   A.   Yes, it is.

22   Q.   And am I correct that ultimately the agreement with Thomas

23   H. Lee would be called the EPMA, the Equity Purchase and Merger

24   Agreement?

25   A.   That is correct.

Cahdcol4                         Trosten – direct

1   Q.  Let me ask you to look at Government's 1616.

2   A.  I have it.

3   Q.  And do you recognize the cover as an e-mail from

4   Mr. Collins to your e-mail address and Mr. Bennett's?

5   A.  Yes, it is.

6   Q.  Attaching the revised Purchase Agreement?

7   A.  Yes.

8           MR. CHERNOFF:  Your Honor, the government offers 1616.

9           MR. SCHWARTZ:  One moment, your Honor.

10          THE COURT:  Yes, sir.

11          (Pause)

12          MR. SCHWARTZ:  A brief voir dire, your Honor?

13          THE COURT:  Sir.

14  VOIR DIRE EXAMINATION

15  BY MR. SCHWARTZ:

16  Q.  Sir, you have no idea whatsoever of whether this formed the

17  basis of the Lee agreement, is that correct?

18  A.  With respect, I ask you what you mean by "form"?

19  Q.  Isn't it a fact that lead lawyers drafted the first draft

20  of the Lee agreement, not Mayer Brown?

21  A.  I believe that to be accurate.

22          MR. SCHWARTZ:  Objection.

23          THE COURT:  Mr. Chernoff.

24          MR. CHERNOFF:  Your Honor, I am offering this draft to

25  show that that the members of the conspiracy were working on

Cahdcol4                          Trosten – direct

1    this transaction at the time that this agreement went around in

2    March 2004, regardless of whether this was ultimately the

3    language.  I have no question whether this is actually about

4    the language.

5            MR. SCHWARTZ:  Your Honor, he has referred to this as

6    an early draft of the Lee deal.  We ask that those questions

7    and answers be stricken from the record.

8            THE COURT:  I think you can clear it up on cross if it

9    is not done on direct.

10           Received.

11           MR. CHERNOFF:  Thank you, your Honor.

12           (Government's Exhibit 1616 received in evidence)

13           THE COURT:  Yes, sir.

14   DIRECT EXAMINATION (Resumed)

15   BY MR. CHERNOFF:

16   Q.  So looking again at Government Exhibit 1616, if you turn to

17   the second page of what's attached to this e-mail, this is a

18   memorandum from Mr. Collins to Mr. Bennett and yourself, right,

19   Mr. Trosten?

20   A.  That is correct.

21   Q.  And this is dated March 4, 2004.

22           And Mr. Collins says that this is a revised draft of

23   the Purchase Agreement?

24   A.  That is correct.

25   Q.  Thank you.  We can take it down.

Cahdcol4                         Trosten - direct

1           Government Exhibit 1005.1, if I could ask you to take

2    a look at that.

3           Do you recognize 1005.1?

4    A.   I do.

5    Q.   What do you recognize it to be?

6    A.   It is the executed copy of the EPMA between Refco and TH

7    Lee.

8           MR. CHERNOFF:   And this is already in evidence, your

9    Honor.

10   Q.   The first page refers to the parties to the agreement and

11   there is something called the Refco Merger LLC.   What was that?

12   A.   That was going to be the entity that ultimately would take

13   part in this acquisition.   It was an unknown entity at the

14   moment.

15   Q.   But that entity would be owned by whom?

16   A.   That entity would be owned by Refco Group Holdings and TH

17   Lee Acquisition Partners.

18   Q.   And flipping to the back of the document, starting at Bates

19   No. 72, who signed this executed Equity Purchase and Merger

20   Agreement, first on behalf of Refco Group?

21   A.   That's Phillip Bennett.

22   Q.   And on behalf of RGHI?

23   A.   That's also Phillip Bennett.

24   Q.   And on behalf of Thomas H. Lee?

25   A.   Scott Schoen.

Cahdcol4                    Trosten - direct

Q.  On behalf of the Refco Merger LLC?

A.  Scott Schoen.

Q.  Then there are some more signatures.

        Alinea Holding, what was that?

A.  That was the entity that related to BAWAG.

Q.  With respect to BAWAG's 10 percent interest?

A.  Yes.

Q.  And then the last two signatures are Phillip Bennett and
Tone Grant?

A.  Yes.

Q.  OK.  Please turn to page 6 of the Equity Purchase and
Merger Agreement, and at the risk of using another acronym, I
am going to call this the EPMA.

        This was the document by which Thomas H. Lee bought
57 percent of Refco?

A.  That's correct.

Q.  Article 3, do you see that?  It says, Representations and
warranties of RGHI."

A.  Yes.

Q.  What are the purposes of representations and warranties in
a document like this?  What did you understand to be involved
in the negotiation of the document?

A.  Representations and warranties are what in this case RGHI
is advising the buyer as to various organizational or other
related matters with the company, and gives RGHI the

1    opportunity to make these representations and to make

2    exceptions to the representations where it is applicable.

3    Q.  And do representations and warranties like this typically

4    refer to schedules?

5    A.  Yes, they do.

6    Q.  What is a schedule in a document like this?

7    A.  A schedule in a document will either be an exception to, so

8    it will say except where as disclosed in schedule X, the

9    following is true and accurate, or it could just be a list of

10   schedules.  It just depends on what the representation that

11   they are making is.

12   Q.  And what, if any, rights did Thomas H. Lee have if any of

13   these representations were not true?

14   A.  If any of these representations were not true, then Thomas

15   H. Lee had the right to terminate the agreement.

16   Q.  Let me ask you to turn to page 30 of this document.

17           Article 6, "Conditions to Closing," you see Section

18   6.2, "Other conditions to the obligations of the buyer."

19   A.  Yes.

20   Q.  Could you read for us subparagraph (a), and then I will ask

21   you to tell us why, based on your understanding of the deal you

22   negotiated, this paragraph is in the document?

23   A.  Would you like me to read the whole paragraph?

24   Q.  Yes, please.

25   A.  "The representations and warranties of RGHI set forth in

1    Article 3 hereof that are not qualified by materiality or

2    'material adverse effect' shall be true and correct in all

3    material respects, and the representations and warranties of

4    RGHI set forth in Article 3 hereof that are qualified by

5    materiality or 'material adverse effect' shall be true and

6    correct in all respects, in each case as of the date hereof and

7    as of the closing date as though made on and as of the closing

8    date, except to the extent such representations and warranties

9    are made on and as of a specified date, in which case the same

10   shall continue on the closing date to be true and correct (in

11   all material respects or in all respects, as applicable) as of

12   the specified date, and the buyer shall have received a

13   certificate of RGHI to such effect."

14   Q.  Thank you, Mr. Trosten.

15          And what in plain English is this accomplishing in the

16   deal?

17          MR. SCHWARTZ:  Objection.

18          THE COURT:  Counsel.

19          MR. SCHWARTZ:  Is he talking about his own

20   understanding?  He is interpreting legal language, and I would

21   like it to be clear how he is doing that.

22          MR. CHERNOFF:  Your Honor, the witness is not a

23   lawyer.  I am not asking for a legal interpretation.

24          I am just asking why as a participant negotiating the

25   deal he understood generally that there was a paragraph like

Cahdcol4                         Trosten - direct

1    this.

2            MR. SCHWARTZ:  That wasn't the question.  That

3    question --

4            THE COURT:  Could you answer the question, sir, that

5    Mr. Chernoff just stated?  Do you need it read back?

6            THE WITNESS:  If you would be kind enough, please.

7    BY MR. CHERNOFF:

8    Q.  Mr. Trosten, based on your participation in the deal, what

9    did this paragraph do?  Why was it there?

10   A.  It was to obligate the buyer -- I'm sorry.  It obligates

11   RGHI that the reps and warranties that are stated in Article 3

12   are accurate in all material respects, and the buyer is to

13   receive a certificate from RGHI stating such at closing.

14   Q.  OK.  Let's look at Article 7, please, page 33.

15           And let me take a turn reading this section:

16           "7.1.  Termination.  This agreement may be terminated

17   and the transactions contemplated hereunder may be abandoned at

18   any time prior to the closing."

19           And then I'm going to skip ahead to D:  By the buyer

20   in the event of a breach by the company or RGHI of any

21   representation, warranty, covenant or other agreement contained

22   in this agreement which would, one, give rise to the failure of

23   a condition set forth in the section that I just read or 6.2(b)

24   hereof, and, two, cannot be or has not been cured within 20

25   business days after the giving of written notice thereof to

Cahdcol4                              Trosten - direct

1    RGHI by the buyer.

2                THE COURT:  Slowly.

3                MR. CHERNOFF:  Sorry, your Honor.

4    Q.  So, Mr. Trosten, this is the part of the agreement that you

5    understood to allow the buyer, Thomas H. Lee, to terminate the

6    deal if there was a breach of any of the reps and warranties,

7    the representations and warranties?

8    A.  That is correct.

9    Q.  Now, in February of 2004's audited financials, do you

10   recall what the reported amount was of the existing

11   related-party debt?

12   A.  For which year?

13   Q.  Fiscal year 2004.

14   A.  It was disclosed in our audited bank statements that all

15   the related-party debt has been retired or repaid.

16   Q.  That was not accurate, correct?

17   A.  No, it was not.

18   Q.  Remind us what the true size was approximately at that

19   time.

20   A.  In February it was approximately a billion dollars of '04.

21   Q.  So in 2004 did you have any discussions with anyone at

22   Refco about what Refco would tell Thomas H. Lee about the

23   amount of existing debt from RGHI?

24   A.  I don't remember if I had discussions or it was just

25   understood that we were going to tell Thomas H. Lee that there

Cahdcol4                           Trosten - direct

 1    were no shareholder loans at closing.

 2    Q.   Understood between you and whom?

 3    A.   Between me and Phil Bennett, anyone else that would be

 4    discussing this with TH Lee.

 5    Q.   Let me ask you to look at Government Exhibit 335.

 6              MR. CHERNOFF:  And, your Honor, the government offers

 7    this pursuant to the handwriting of the defendant stipulation.

 8              THE COURT:  Received.

 9              (Government's Exhibit 335 received in evidence)

10    BY MR. CHERNOFF:

11    Q.   Do you have that, Mr. Trosten?

12    A.   If you could just give me one minute, please?  I just need

13    one minute, please.

14    Q.   I think it is also on the screen, if you can see that.

15    A.   Oh, I see it.  Thank you.

16    Q.   So in the upper right-hand corner, this appears to be notes

17    of Mr. Collins concerning Refco/Royce.

18    A.   That is correct.

19    Q.   And it appears to be a note of a phone conversation -- or a

20    conversation with PRB.

21              That is Mr. Bennett?

22    A.   That is correct.

23    Q.   On April 12th of 2004, correct?

24    A.   Correct.

25    Q.   Do you see in the middle of the note, it says, "No

1   shareholder loans as of closing"?

2   A.  I do.

3   Q.  What did you understand, based on your work on the deal, to

4   be meant by "No shareholder loans as of closing"?

5             MR. SCHWARTZ:  Your Honor, is he testifying about his

6   understanding of this document or about something else?

7             THE COURT:  The question says:  Based on his work --

8   "Q   What did you understand, based on your work on the deal,

9   to be meant by 'No shareholder loans as of closing.'"

10            Are you able to answer that, sir?

11            THE WITNESS:  Yes, I am.

12            THE COURT:  Go ahead.

13  A.  TH Lee required as a condition of closing that there be no

14  more loans between RGHI and Refco.

15  Q.  In other words, that the related-party debt be zeroed out?

16  A.  Be zero.  Correct.

17  Q.  Now, did there come a time when you in the due diligence

18  spoke with representatives of Thomas H. Lee about this RGHI

19  debt to Refco?

20  A.  I did.

21  Q.  Do you recall any of the people at Thomas H. Lee you spoke

22  to?

23  A.  I do.

24  Q.  Who were they?

25  A.  I spoke to Scott Jaeckel.

Cahdcol4                          Trosten - direct

1   Q.  And what did you say to Scott Jaeckel about the RGHI debt,

2   and what did he say to you?

3   A.  We had discussed that there would be no shareholder loans

4   at closing.  I said, that is correct, that Refco did a

5   distribution or was planning a distribution of $120 million as

6   of our fiscal year end February 29, 2004.  Refco was going to

7   give 10 percent of that distribution to BAWAG as a 10-percent

8   owner, and the remainder, $108 million dollars, which would

9   constitute $105 million of the balance as reported as of

10  February 28, 2003, to retire that balance, and the remainder

11  being interest.

12  Q.  And when you had this conversation with Mr. Jaeckel of

13  Thomas H. Lee, was it true that the RGHI debt was only 105

14  million?

15  A.  No.

16  Q.  Was it true that it was -- that the RGHI debt was going to

17  be completely paid off with the closing of this transaction?

18  A.  No, it was not.

19  Q.  Let me ask you to go back to the Letter of Intent,

20  Government Exhibit 1003.

21  A.  I have it.

22  Q.  I will ask you to look at paragraph 3 on page 3, Roman

23  Numeral 4.

24          Paragraph 3 is the assumptions on the conduct of

25  business.  It begins:  "We have based or proposal on the

1    following assumptions and understanding," and (iv) says:  "Any

2    existing shareholder loans will be terminated prior to closing

3    and funded with cash otherwise payable to the sellers, and all

4    existing agreements, contracts or arrangements between the

5    company and the sellers or their affiliates will be terminated

6    (other than employment obligations," etc.

7             What did you understand, based on your work on the

8    deal, was Thomas H. Lee's purpose in requiring that to be true

9    of this transaction?

10   A.  Because Thomas H. Lee made it a requirement that RGHI had

11   no more shareholder debt as of the closing date.

12   Q.  Paragraph 3, (iii), reads as follows:  "Since February 29,

13   2004, the company has made no distributions to the sellers, and

14   prior to the closing it will make no such distributions" --

15   I'll skip over the parentheses -- "other than a cash

16   distribution of $500 million, the distribution of the asset

17   management business described above, and the distribution

18   described in the immediately following sentence."

19            Was that assumption set forth in paragraph (iii)

20   correct, with respect to the 500 million in cash distribution?

21   A.  It was not correct.

22   Q.  Why not?

23   A.  Because Refco didn't have $500 million of cash to

24   distribute.

25   Q.  And by the way, in your discussions with Thomas H. Lee in

1    which you said that the RGHI debt was only 105 million, why did

2    you pick that number?

3    A.   Because that was in our audited financial statements as of

4    fiscal year end 2003.

5    Q.   Let me direct you back to the EPMA, that Equity Purchase

6    and Merger Agreement, Government Exhibit 1005.1, and let's look

7    at page 23.

8            This is Article 5 covenants.  I am looking at Section

9    5.1, lower case C, Roman Numeral 3, and it says, "The company

10   may make distributions to RGHI of up to $120 million that was

11   accrued as of February 29, 2004 (provided that not more

12   than $12 million of such $120 million amount is distributed in

13   cash."

14           How did this section of the covenants compare to what

15   Thomas H. Lee had been told verbally?

16   A.   It's consistent.

17   Q.   Consistent with the false $108 million -- I'm sorry, was it

18   108 million or 105 million?

19   A.   It was 105 million and it -- 105 million.

20   Q.   And consistent with the false number of the RGHI debt in

21   what sense?

22   A.   It was consistent in that through my discussions with Scott

23   Jaeckel at TH Lee, we were going to have a $120 million

24   reduction in our equity.  108 million was going to be used to

25   retire the remaining 105 million that was disclosed in our

1    financial statements, plus we told them -- or at least I told

2    them it was $3 million of interest, with the remaining $12

3    million going to BAWAG as a 10 percent owner.

4    Q.  Let me now talk to you a little bit further about the $500

5    million distribution.

6         You used the term before "excess working capital."

7    How is it that excess working capital can accumulate?

8    A.  When a company is earning money and does not take out those

9    profits, those profits will sit in the company and will just

10   build upon itself.

11   Q.  And so in a deal like this, is it common that the seller

12   keeps the excess working capital?

13   A.  Yes, it is.

14   Q.  Did you discuss the excess working capital that Refco

15   already had with anyone at Thomas H. Lee in this deal?

16   A.  I did.

17   Q.  What did you say about the possibility of excess working

18   capital?

19   A.  TH Lee and I were trying to brainstorm or work together to

20   figure out how Refco can calculate how much excess working

21   capital, if any, there was to distribute.  TH Lee came up with

22   a schedule of how we could do it.  I had put the numbers in

23   as -- through the schedule they gave me, and I came up with

24   approximately $500 million of excess.

25   Q.  And at the time that you came up with this $500 million

Cahdcol4                          Trosten - direct

1    that you could claim as excess on the formula, again, how much

2    related-party debt was Refco owed by RGHI?

3    A.   Again, it was approximately a billion dollars.

4    Q.   Let's look at Government Exhibit 1003 again, the Letter of

5    Intent, page 1, paragraph 1(a).

6            This says, "Refco would distribute to the sellers $500

7    million."

8            What does that capture?

9    A.   That represents the excess working capital that we just

10   discussed.

11   Q.   And page 2, "Sources and uses of capital."  And, by the

12   way, let me back up and ask another question.  I'm sorry.

13           When it says "Refco would distribute to the sellers,"

14   this assumes that at this point Refco was owned by Thomas H.

15   Lee, I take it, when this 500 million is being distributed to

16   sellers?

17   A.   Would distribute at closing.

18   Q.   Right.

19   A.   Yes.

20   Q.   And so who at that time would the sellers be?

21   A.   The sellers would be RGHI.

22   Q.   OK.   Page 2, "Sources and uses."  This, again, sets forth

23   the first source is an excess cash in business number of 500

24   million?

25   A.   Yes.

1    Q.  Who was in charge, again, of this Letter of Intent document

2    for Thomas H. Lee -- I'm sorry, for Refco?

3    A.  In charge of -- from -- when you say "in charge of"?

4    Q.  In charge of the negotiation and drafting, the lawyer.

5    A.  The lawyer was Joe Collins from Mayer Brown.

6    Q.  All right.  Let me ask you to look at 1005.1, and, again,

7    this is the executed EPMA, correct?

8    A.  Yes, it is.

9    Q.  Please turn to page 19.  There is a Section 3.22 that

10   refers to the working capital.

11          And it says:  "After giving effect to the $500 million

12   cash distribution by the company to RGHI as provided in

13   Section" etc., "the company and the subsidiaries will have

14   sufficient working capital for the normal operation of the

15   company's or any subsidiary's business as currently conducted."

16          And so is this the section that establishes the

17   position you gave to Thomas H. Lee, that $500 million of the

18   cash distribution would be excess working capital?

19   A.  Yes.

20   Q.  And that the company would have sufficient working capital

21   without that 500 million?

22   A.  That's correct.

23   Q.  OK.  Let me ask you to look at Government Exhibit 356.

24          MR. CHERNOFF:  And, your Honor, we offer this pursuant

25   to the stipulation on the defendant's handwriting and the

Cahdcol4                          Trosten – direct

1    authenticity stipulation.

2              THE COURT:  Received.

3              (Government's Exhibit 356 received in evidence)

4    BY MR. CHERNOFF:

5    Q.  And, Mr. Trosten, do you have Government Exhibit 356?

6    A.  I'm looking at the screen.

7    Q.  OK.  This is a markup.  Do you see in the upper right-hand

8    corner Mr. Collins' initials dated June 2, 2004?

9    A.  That is correct.

10   Q.  And this is a markup of the EPMA that we've been talking

11   about?

12   A.  Yes, it is.

13             MR. CHERNOFF:  If we could just flip ahead, Mr. Smith,

14   to page 288 on the Bates numbers.

15   Q.  Do you see Section 3.22 that reflects an earlier draft of

16   this section on working capital?

17   A.  Yes.

18   Q.  And do you see Mr. Collins' handwriting changing the

19   language "its members" to "RGHI"?

20   A.  I do.

21   Q.  OK.  You can put that aside.

22             Did Thomas H. Lee ask for any proof, by the way, that

23   Refco actually could have this $500 million in excess working

24   capital?

25   A.  Yes.

Cahdcol4                    Trosten - direct

1   Q.  What did they propose to do to let you prove it?

2   A.  They asked us to segregate the $500 million.  And if we can

3   leave it in a segregated account between the agreement date for

4   the equity merger and purchase and the closing date, then we

5   obviously did not need it for working capital and we could keep

6   it.

7   Q.  So what did you do to try to prove that to Thomas H. Lee?

8   What did you do to segregate this $500 million in purportedly

9   excess working capital?

10  A.  Refco generated $110 million of cash and segregated it in

11  an account at BAWAG, and then BAWAG lent $390 million to make

12  up the difference.

13  Q.  Let's take another look at the Letter of Intent, which is

14  Government Exhibit 1003.  Page 3, paragraph 3, about a few

15  lines up from the bottom.

16      Is this the language -- I won't ask you to read it,

17  but is this language that sets forth this concept that you will

18  segregate the $500 million to prove that it is excess?

19  A.  Yes, it is.

20  Q.  And how was this segregating of the excess going to show

21  that Refco didn't -- that this was excess working capital, in

22  short?

23  A.  Because if Refco is able to segregate it out and not

24  utilize it during the period between the signing of the EPMA

25  and closing, then we would have convinced TH Lee that we didn't

Cahdcol4                    Trosten - direct

1   need this cash to run our business and that Refco could keep

2   it.

3   Q.  Let's look at the EPMA again, please, 1005.1, page 28, and

4   here we have Section 5.9, concerning the segregation of funds.

5           Let's skip reading the language, but I'll just ask

6   you, is this setting forth the arrangement you just described

7   where there would be a segregated account for the 500 million

8   in purportedly excess working capital?

9   A.  Yes, it is.

10  Q.  So this is what you told Thomas H. Lee you would do?

11  A.  That is correct.

12  Q.  Let's look at Government Exhibit 1805.

13          MR. CHERNOFF:  Your Honor, we offer this pursuant to

14  our authenticity stipulation.

15          THE COURT:  Received.

16          (Government's Exhibit 1805 received in evidence)

17          MR. CHERNOFF:  And if we could bring that up?

18  Q.  Mr. Trosten, this is an e-mail on May 30, 2004, from

19  Mr. Collins to Angela Lang.

20          Do you happen to know who she is?

21  A.  She was an attorney at Mayer Brown.

22  Q.  And it is copying Mr. Bennett, correct?

23  A.  That is correct.

24  Q.  And it relates to Section 5.9.

25          Is that the segregation of funds section that we just

Cahdcol4                    Trosten - direct

1    looked at?

2    A.  Yes, it is.

3    Q.  And it says:  "Here is an attempt at the wording for

4    Section 5.9 reflecting the thrust of the call this morning."

5           And then later on there is some language concerning

6    this segregation of accounts, correct?

7    A.  Yes.

8    Q.  So explain -- we had a little bit of testimony on this, but

9    explain how it was again that Refco was able to segregate

10   out $500 million if it didn't have that excess working capital.

11   A.  Refco asked for and received assistance from its minority

12   partner, BAWAG Bank.  BAWAG provided a loan to Refco with the

13   offsetting overdraft into an RGHI account at BAWAG.

14   Q.  And when you made this misrepresentation about the

15   existence of excess working capital with Thomas H. Lee, did you

16   believe you were defrauding them?

17   A.  Yes.

18   Q.  Did you and Mr. Collins ever have an opportunity to discuss

19   whether this excess working capital actually existed?

20   A.  No.

21   Q.  What was the advantage of claiming this $500 million excess

22   working capital if you were going to have to pay it back to

23   BAWAG anyway?

24   A.  Because what it enable Refco to do is to reduce its equity

25   base, which is your liability.  Your assets minus your

Cahdcol4                      Trosten - direct

 1   liabilities is your equity.  So it reduced our equity by $500

 2   million.  BAWAG ended up keeping $110 million that Refco came

 3   up with to segregate this account, and then Refco was able to

 4   write off or reduce the RGHI debt to RGL by $390 million.

 5                (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. CHERNOFF:

2   Q.  At the time -- By the time the deal with Thomas H. Lee

3   closed, to your knowledge, has anyone ever told BAWAG -- I'm

4   sorry, told THL that this segregated BAWAG account was funded

5   with borrowed money?

6   A.  Not to my knowledge, no.

7   Q.  And at any point before the deal closed, did anyone, to

8   your knowledge, tell Thomas H. Lee Partners that this excess

9   working capital, this $500 million, didn't actually exist?

10  A.  No.

11  Q.  Let me turn now again to the PPA and the right to convert

12  that it set forth.  You testified earlier that no one, to your

13  awareness, at Refco ever told Thomas H. Lee about the PPA or

14  the side letter agreement?

15  A.  That's correct.

16  Q.  Was there language in the EPMA that you negotiated with the

17  representatives of Refco that you believed required Refco to

18  tell Thomas H. Lee about the PPA and side letter?

19  A.  Yes.

20  Q.  What do you have in mind when you say that?

21  A.  There's language in the EPMA regarding liens on the

22  interest in RGL, there's disclosure requirements for material

23  contracts, there are others as well.

24  Q.  And so you believed you were violating the terms when you

25  participated in concealing the PPA and the side letter

1    agreement from Thomas H. Lee?

2    A.  Yes.

3    Q.  Let's look at the PPA, please, Government Exhibit 1504.

4    Page 1 of the text after the index.  Section 101.A we looked at

5    before.  This is the participation right that DF Capital for

6    BAWAG was purchasing in these three installments?

7    A.  Yes.

8    Q.  And Page 2, Section 101(b)(2) -- I'm sorry, just the second

9    paragraph of (b).  This describes when DFI can exchange its

10   loan into equity in the company, right?

11   A.  Its participation right into equity.

12   Q.  Yes.  Let's look at the EPMA, please, 1005.1, Page 7, and

13   Section 3.3 is entitled Capitalization of the company.  Without

14   reading the language, what did you understand, yourself, from

15   participating in this deal was required by this section to be

16   disclosed with respect to the PPA that we just looked at?

17   A.  That it needed to be disclosed.

18   Q.  How so?

19   A.  Because it talks about that there's no other agreements,

20   except as described in the schedule, written or oral, between

21   the company and any of its holders of rights, and that there

22   are no outstanding subscriptions, options, warrants or any

23   other agreements, obliging the company to issue equity

24   interests.

25   Q.  And I think you said if there are such agreements, they

1    have to be disclosed in a schedule.  Is that Schedule 3.3

2    that's referenced here?

3    A.  Yes, it is.

4    Q.  Let me ask you to look at Government Exhibit 1005.3.  Do

5    you recognize that document?

6    A.  I do.

7    Q.  What do you recognize it to be?

8    A.  I only have a few pages of the document, but it is the --

9    it's -- the first page says Disclosure Schedules.

10   Q.  Is that the first page of the disclosure schedules that

11   accompanied the EPMA?

12   A.  Yes.

13           MR. CHERNOFF:  Your Honor, the government offers

14   1005.3.

15           MR. SCHWARTZ:  No objection.

16           THE COURT:  Received.

17           (Government's Exhibit 1005.3 received in evidence)

18   A.  I found my copy, thank you.

19   Q.  Okay.  Great.

20           THE COURT:  It's amazing you're not buried.

21           THE WITNESS:  Thank you, your Honor.

22   Q.  Okay.

23           THE COURT:  Off the record.

24           (Discussion held off the record.)

25           MR. CHERNOFF:  Your Honor, I lost track of the time.

1   Should I go for a few more minutes to finish the subject?

2              THE COURT:  Do you want to take a break now?  How long

3   for the topic?

4              MR. CHERNOFF:  Three, four minutes.

5              THE COURT:  I think they want you to roll.

6              MR. CHERNOFF:  Okay.

7   Q.  So now that you have the schedules before you, there's a

8   reference to schedule 3.3, capitalization of the company, and

9   this, as I understood you to say, is where you believe section

10  3.3 of the EPMA would require that the PPA be disclosed?

11  A.  That is correct.

12  Q.  And looking at schedule 3.3, which is Page 3, obviously,

13  Mr. Trosten, it's not there?

14  A.  No, it is not.

15  Q.  Why was this section 3.3 concerning capitalization of the

16  company, why was this paragraph included in this contract?  Why

17  was it part of the deal?

18  A.  It's part of the deal because TH Lee wanted to know if

19  there were any other issues relating to Refco stock, and if so,

20  they'd have an opportunity to disclose it.  And then TH Lee

21  would be able to deal with it or not at that point, but it gave

22  us the opportunity to disclose it.

23  Q.  And did you understand, did you personally believe, that

24  the failure to disclose the PPA on the schedule 3.3 rendered

25  this representation in the EPMA false?

CAHPCOL5                    Trosten - direct

1   A.  Yes, it did.

2              MR. CHERNOFF:  Your Honor, I'm at the end of that

3   section.

4              THE COURT:  Why don't we take a break now, ladies and

5   gentlemen.  Would you follow the normal rules.  Take your

6   books, leave your exhibits, don't discuss the case.  We'll see

7   you in a couple of minutes.  Thank you for your attention.

8              (Jury exits)

9              THE COURT:  Anything else on the record, friends?

10             MR. CHERNOFF:  No, your Honor.

11             THE COURT:  All righty.  See you in a minute.  Thank

12  you.

13             (Recess taken)

14             THE COURT:  Thank you, counsel.  Won't you be seated.

15  Why don't we sit down.  I guess they're not quite ready yet.

16             (Pause) (Jury enters)

17             THE COURT:  Thank you, ladies and gentlemen.  Welcome

18  back.  Glad to see chivalry is not dead, Mr. Wiley.

19             JUROR:  No, it's not, your Honor.

20             THE COURT:  Thank you, sir.  And won't you be seated,

21  ladies and gentlemen.  We continue with the direct examination

22  of the witness.

23             MR. CHERNOFF:  Thank you, your Honor.

24  BY MR. CHERNOFF:

25  Q.  Okay.  Mr. Trosten, let's look at the EPMA again.  This is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Government Exhibit 1005.1, and I'll ask that we take a look at

2    section 3.15, which is on Page 12.

3    A.   I have it.

4    Q.   Section 3.15 begins, "Material contracts except as set

5    forth in schedule 3.15, collectively the material contracts,

6    and except for this agreement and except for any material lease

7    and except for customer financing indebtedness, neither the

8    company nor any subsidiary is a party to, or bound by any" --

9    and I'm going to skip ahead to section -- subsection Roman

10   numeral (vi) -- "agreement which contains restrictions with

11   respect to payment of any distribution in respect of any

12   membership interests."

13            When you were negotiating the EPMA, did you understand

14   the PPA to be such an agreement?

15   A.   I did.

16   Q.   Why?

17   A.   Because it did contain restrictions with respect to

18   payments for distributions of membership interests.

19   Q.   Membership interests being what?

20   A.   Membership interests being membership have that DF Capital

21   had the right to exercise and own.

22   Q.   Let me ask you to look down at ix, Roman numeral ix.  "Any

23   contract, arrangement or understanding that relates to the

24   future disposition or acquisition of material assets or

25   properties or any merger or business combination."

1     When you were negotiating the EPMA, did you understand

2     the PPA to be such an agreement?

3     A.   That and the side letter, yes.

4     Q.   Why?

5     A.   Because it did make discussion to the future disposition of

6     Refco.

7     Q.   How so?

8     A.   They talked about minimum purchase price, and when DF

9     Capital may or may not be able to restrict the deal from going

10    through.

11    Q.   Let's look at the schedule 3.15 that lists the material

12    contracts that Refco disclosed in the EPMA.  Do you see how

13    this schedule 3.15 is broken down with reference to each of the

14    subsections, of section 3.15 of the EPMA?

15    A.   I do.

16    Q.   Let's look at the disclosures under (vi), one of the two we

17    just looked at.  And is the EPMA -- Well, instead of scrolling

18    through it, have you had a chance to read this whole schedule

19    before?

20    A.   Yes, I have.

21    Q.   And is the EPMA disclosed?

22    A.   No, it is not.  Is the EPMA disclosed, did you say?

23    Q.   Sorry, your Honor.  We'll just bring it up.

24    A.   Mr. Chernoff?

25    Q.   Yes, sir?

CAHPCOL5                         Trosten - direct

1   A.  Did you say the EPMA disclosed or the PPA?

2   Q.  I'm not sure what I said at this point, but let me repeat

3   the question.

4   A.  Thank you.

5   Q.  Is there a disclosure for section 3.5 (vi) at all in

6   section 3.15?

7   A.  No, there's not.

8   Q.  And let's look at (ix), schedule 3.15, (ix), which is on

9   Page 28.  The PPA is not disclosed there either, is it?

10  A.  No, it is not.

11  Q.  Or the side letter agreement?

12  A.  No, it is not.

13  Q.  And so does Refco's failure to disclose the PPA and the

14  side letter agreement render this representation false?

15  A.  Yes.

16  Q.  Did you think you were defrauding Thomas H. Lee when you

17  concealed those agreements under the EPMA?

18  A.  Yes.

19  Q.  Let's go back to -- No, I'm sorry.

20          MR. CHERNOFF:  This is a new exhibit, Government

21  Exhibit 356, and we have a handwriting stipulation on this.  So

22  we offer it pursuant to that, your Honor.

23          THE COURT:  Received.

24          (Government's Exhibit 356 received in evidence)

25  Q.  And if you look at the first page, Mr. Trosten, you see

1   this is a markup of the EPMA?

2   A.  Yes.

3   Q.  And do you see it's dated June 1st, 2004?

4   A.  I believe it's June 2nd --

5   Q.  I'm sorry, I'm looking at the Weil Gotshal draft under

6   that, June 2000 --

7   A.  Yes, underneath is the Weil Gotshal draft, June 1st, 2004.

8   Q.  And in Mr. Collins' handwriting it says June 2nd, 2004?

9   A.  Yes.

10      MR. CHERNOFF:  And let me ask that you turn to Bates

11  number 281, Mr. Smith.

12  Q.  And, Mr. Trosten, do you have that?

13  A.  I'm looking at it.

14  Q.  Do you see (v), (vi) -- (vi) and (ix), those are the two

15  sections we just looked at of 3.15?

16  A.  I see (vi) on the screen.

17      MR. CHERNOFF:  And if you could just bring up (ix) on

18  the next page.  Before we do that, sorry.  That's okay.  We can

19  come back.

20  Q.  Okay.  Next to (vi) do you see just some -- a little bit of

21  handwriting of Mr. Collins' there?

22  A.  I do.

23  Q.  And let's look quickly at section (ix) on the next page.

24  This is language on these two sections in this earlier markup,

25  correct?

1    A.  Yes.

2    Q.  Let's go to Government Exhibit 1503, the side letter.  And

3    if we could look at Page 2, section 5.1A, and just remind us,

4    Mr. Trosten, what right this gives DF Capital?

5    A.  It gives them the right to not consent to a sale of the

6    company but that consent shall not be unreasonably withheld by

7    any party.

8    Q.  And so based on your involvement in negotiating the EPMA,

9    was there something in the contract that required Refco to tell

10   Thomas H. Lee about these consent provisions with DF Capital?

11   A.  Yes.

12   Q.  Let's look back at the EPMA, please, 1005.1, and Page 8.

13   And I'm looking in section 3.5.

14   A.  I see it.

15   Q.  Is there language here that reflects your view that the

16   consent provisions giving DF Capital, the right to block a deal

17   concerning Refco, had to be disclosed to Thomas H. Lee?

18   A.  Yes.

19   Q.  What's that language?

20   A.  It's about halfway down, the paragraph where it talks about

21   giving notice or governmental authority, and self-regulatory

22   organization or any other person, except --

23            THE COURT:  Slow down.

24   A.  It says, "schedule 3.5 sets forth each of the approvals or

25   consents of any self-regulatory organization of which a

1  subsidiary is a member, or to the knowledge of the company is

2  required" --

3            THE COURT:  Slowly.

4  A.  Sorry.  "Is required to be obtained by the company or any

5  subsidiary as a result of the execution and delivery of this

6  agreement by the company or RGHI or the consummation of the

7  company -- by the company and RGHI of the transactions

8  contemplated hereby."

9            MR. CHERNOFF:  May I have a moment?

10           THE COURT:  Yes, sir.

11  Q.  And, Mr. Trosten, I want to direct you to the language that

12  says "except" -- I'm just looking, pulling back on this section

13  3.5.  It says, "Except for," and there's several conditions

14  there.  And then it says, "the transactions" -- I'm picking up

15  at the transactions on Line 5 -- "contemplated hereby do not

16  and will not, to the knowledge of the company, require RGHI,

17  the company require RGHI, the company or any subsidiary to

18  obtain the approval, consent or authorization of, to make any

19  declaration, filing or registration with, or to give notice to

20  any governmental authority, any self-regulatory" --

21           THE COURT:  You've got to do it again.  Remember --

22           MR. CHERNOFF:  Sorry, your Honor.

23           THE COURT:  -- you're reading it, the court reporter

24  is taking it down.

25           MR. CHERNOFF:  You're absolutely right.

1    BY MR. CHERNOFF:

2    Q.  "Any governmental authority, any self-regulatory

3    organization, or any other person, except to the extent the

4    failure to obtain, make or give any of the foregoing would not

5    reasonably be expected to have a material adverse effect."

6    A.  Yes.

7    Q.  Mr. Trosten, how did this language relate to the consent

8    rights in the PPA?

9    A.  DF Capital had to consent to a sale of Refco to a third

10   party and this language says that it must give notice to a

11   governmental authority, any self-regulatory organization or any

12   other person, and it's the "or any other person" that would

13   give rights to -- that DF Capital's interest should have been

14   disclosed.

15   Q.  And I misspoke.  I said the consent provisions in the PPA,

16   but I meant the side letter agreement.  That's where they were,

17   correct?

18   A.  That is correct.

19   Q.  Now, let's look at the schedule.  This refers to schedule

20   3.5.  I'll ask you to turn to Government Exhibit 1005.3, page 5

21   and, Mr. Trosten, this is the schedule of consents that Refco

22   might have to obtain in various situations?

23   A.  That's correct.

24   Q.  Fair to say, let me just scroll through them, there's about

25   eight pages of consents?

1   A.  Seven or eight.

2   Q.  And is the consent provision in the side letter agreement

3   disclosed anywhere on this seven or eight-page schedule?

4   A.  No, it is not.

5   Q.  Did the failure to disclose the consent provisions in the

6   side letter agreement, in your opinion, make the

7   representations in connection 3.5 of the EPMA false?

8   A.  Yes, it did.

9   Q.  And were you defrauding Thomas H. Lee by concealing them?

10  A.  Yes.

11  Q.  Let's look at Government Exhibit 356.  This is the June 2

12  markup -- June 2, 2004, markup by Mr. Collins; do you see that?

13  A.  I do.

14  Q.  And if we could look at Bates number 276.  Do you see there

15  Mr. Collins' handwriting making certain corrections to the

16  section of the EPMA that we just looked at?

17  A.  I see his notes to the right, that's correct.

18          MR. CHERNOFF:  Okay.  Take that down.

19  Q.  I want to talk for a moment now about the year-end pay-down

20  transactions.  Did those continue post-April 2003?

21  A.  Post-April 2003?

22  Q.  Yes.

23  A.  Yes.

24  Q.  In connection with these pay-down transactions, you

25  testified before that Refco had taken on indemnities and

1   guarantees concerning them, right?

2   A.  Yes.

3   Q.  And those were the in -- these guarantees drafted by the

4   defendant, Mr. Collins?

5          MR. SCHWARTZ:  Objection.

6          THE COURT:  Basis?

7          MR. SCHWARTZ:  Mayer Brown, once they've taken place

8   now, there's no evidence that Mr. Collins drafted them.

9          THE COURT:  Mr. Chernoff?

10  Q.  Mr. Trosten, were you aware that Mr. Collins worked on some

11  of the indemnities and guarantees concerning the short-term

12  pay-down transactions?

13  A.  Yes.

14  Q.  And did others at his law firm, working for him, also work

15  on them?

16  A.  Yes.

17  Q.  Now, to your knowledge, did anyone from the Refco side of

18  the transaction with Thomas H. Lee ever tell Thomas H. Lee

19  about these indemnities and guarantees regarding the short-term

20  loans?

21  A.  Not to my knowledge.

22  Q.  Why didn't you reveal that to them?

23  A.  Because in revealing it, it would have uncovered the fact

24  that Refco -- RGHI had significantly more debt than what was

25  being disclosed on its financial statements.

1    Q.  And based on your involvement in the negotiation and

2    drafting of the EPMA, was there anything in the contract that

3    required Refco to tell Thomas H. Lee about these indemnities

4    and guarantees?

5    A.  Don't recall about the guarantee, but about the indemnity,

6    yes.

7    Q.  What do you have in mind?

8    A.  I'd have to go through the specific language, but there is

9    an item in the EPMA that discusses if Refco has entered into

10   any obligations on behalf of its parent.

11   Q.  Let me ask you to take out the EPMA, Government

12   Exhibit 1005.1, and let's look at Page 10.  At the bottom of

13   the page, it says, "Section 3.12.  Interests of Officers and

14   Directors.  Except as set forth on schedule 3.12, since

15   March 1, 2003, no officer, manager, director or member of the

16   company or any subsidiary or any affiliate of any such officer,

17   director, member or other equity holder, has had, either

18   directly or indirectly, a material interest in any contract or

19   agreement to which the company or any subsidiary is a party or

20   by which any of their properties or assets may be bound or

21   affected, except for employment contracts entered into on an

22   arm's-length basis."

23        What, based on your understanding of the deal you

24   negotiated and the contract you drafted, did this language

25   require?

CAHPCOL5                         Trosten - direct

1  A.  It required exposure of the indemnity agreements with these

2  customers involved in the short-term financing transactions.

3  Q.  And to your knowledge, how many times did Refco engage in

4  short-term loan transactions, even after March 1st, 2003, the

5  date in this agreement?

6  A.  Well, on March 1st, 2003, we were in the middle of one; so

7  I count that one.  There were four.

8  Q.  And in each of those four short-term pay-down transactions

9  in those back-to-back loans, did Refco issue indemnities and

10  guarantees to the customer for RGHI's obligation?

11  A.  Yes.

12  Q.  So did RGHI have a material interest, in your view, in

13  these indemnities and guarantees?

14  A.  Yes.

15  Q.  Why?

16  A.  Because Refco was guaranteeing the performance of RGHI to

17  the extent RGHI did not pay the customer, and Refco was

18  indemnifying the customer in the event that there were any

19  issues or lawsuits or claims relating to the transactions that

20  the customer was engaging in.

21  Q.  Now, the section we're looking at says "except as set forth

22  on schedule 3.12."  Let's look at that Government

23  Exhibit 1005.3, schedule 3.12, which is on Page 16.  Schedule

24  3.12, Interests of Officers and Directors.  We need to move to

25  the left a little bit.  Thank you, Mr. Smith.

1    It says "none," correct?

2    A.   That is correct.

3    Q.   Based on your participation in the deal and your drafting,

4    the negotiation of this contract, did you believe that the

5    failure to disclose these indemnifications, rendered section

6    3.12 of the EPMA false?

7    A.   Yes, it did.

8    Q.   Did you believe you were defrauding Thomas H. Lee by

9    failing to disclose those indemnifications?

10   A.   Yes.

11   Q.   Please turn back to the EPMA, 1005.1, Page 9.  And Page 9

12   at section 3.9, there in the middle.  Thank you, Mr. Smith.

13        This concerns financial statements.  What does it

14   require of Refco?

15   A.   It requires Refco to provide complete and accurate copies

16   of its audited financial statements for the fiscal year ends

17   2002, 2003 and 2004 and that those financial statements are in

18   conformity with generally accepted accounting principles in the

19   United States.

20        MR. CHERNOFF:  And just if we could pull down and blow

21   up a little bit, Mr. Smith, and get all of (a) there.

22   Q.   This says that "The financial statements have been prepared

23   from the books and records of the company and its subsidiaries

24   on a consolidated basis, present fairly in all material

25   respects the consolidated financial position, results of

1    operations and cash flow of the company and its subsidiaries on

2    a consolidated basis," et cetera.

3         Obviously, the financial statements were false,

4    correct, Mr. Trosten?

5    A.  That is correct.

6    Q.  And did you understand that providing Thomas H. Lee with

7    false financial statements was a violation of this section of

8    the EPMA?

9    A.  Yes, it was.

10   Q.  Did you believe you were defrauding Thomas H. Lee when you

11   were providing them with false financials?

12   A.  Yes, I did.

13   Q.  You testified earlier about a profits participation plan?

14   A.  Yes.

15   Q.  And what was that exactly?  How is that different from,

16   say, the PPA?

17   A.  Profits participation plan was a plan for senior members of

18   management.  There were eight members in the plan, and we were

19   able to participate in a potential sale of Refco.

20   Q.  I think you mentioned before who the participants in the

21   profits participation plan were.  Was this plan disclosed to

22   Thomas H. Lee?

23   A.  No, it was not.

24   Q.  Did Thomas H. Lee ask for information on this type of a

25   plan?

CAHPCOL5                         Trosten - direct

1   A.  Yes, they did.

2   Q.  How did they ask you for that?

3   A.  They asked for a questionnaire that members of senior

4   management needed to complete.

5   Q.  And did you complete the questionnaire?

6   A.  I did.

7   Q.  Did you lie about the profits participation plan?

8   A.  Yes, I did.

9   Q.  Did you instruct anyone else at Refco to lie, or did you

10  reach an agreement with anyone else to lie?

11  A.  I did.

12  Q.  Who?

13  A.  I spoke with Phil Bennett, and we agreed that we would talk

14  to members of the management team regarding not disclosing the

15  profits participation plan on our questionnaires.

16  Q.  We've been talking about at some length, of course, of

17  Thomas H. Lee's purchase of the 57 percent interest in Refco.

18  While Thomas H. Lee was in the process of buying Refco, was

19  Refco also involved in other purchase and sale transactions?

20  A.  Yes.

21  Q.  Was RGHI involved in some of these transactions?

22  A.  Yes.

23  Q.  How did these transactions, if they did, relate to the

24  Thomas H. Lee leveraged buyout?

25  A.  As part of the Thomas H. Lee deal, they required that at

1    closing or simultaneous to closing or a condition of closing,

2    that RGHI have only one member, being Phil Bennett, and all

3    other members of -- all other owners of Refco be bought out.

4    Q.  Who were the other owners that you're speaking of?

5    A.  BAWAG, Tone Grant, and we were working on the DF Capital

6    repurchase as well.

7    Q.  And did RGHI have a lawyer in connection with these

8    transactions?

9    A.  Yes.

10   Q.  Who was the lawyer?

11   A.  Joe Collins.

12   Q.  Now, you mentioned the buyback, I think, of 10 percent, the

13   BAWAG 10 percent interest in Refco being bought back?

14   A.  Yes.

15   Q.  And did Thomas H. Lee know about that 10 percent?

16   A.  Yes.

17   Q.  What about RGHI buying back the PPA interest from DF

18   Capital?

19   A.  TH Lee did not know that.

20   Q.  Did RGHI have a law firm in that transaction?

21   A.  Yes.

22   Q.  Who was that?

23   A.  Mayer Brown.

24   Q.  And who in particular?

25   A.  Joe Collins.

1   Q.  And in that deal, did BAWAG have a law firm on behalf of

2   its entity DF Capital?

3   A.  Yes, it did.

4   Q.  Do you know who they used?

5   A.  I do not.

6   Q.  When did this buyback of the PPA interest, when was it

7   supposed to close in relation to the Thomas H. Lee purchase?

8   A.  It was contingent upon the Thomas H. Lee deal closing.

9   Q.  What do you mean "contingent" upon it?

10  A.  Well, the DF Capital transaction was still in full force

11  and effect, and had its third payment to be made February of

12  2005.  And if the TH Lee deal was not to be completed, then

13  RGHI was not buying back the rights that DF Capital had under

14  its agreement.

15  Q.  And what about BAWAG's ten percent interest that Thomas H.

16  Lee knew about, was that buyback contingent on the leveraged

17  buyout?

18  A.  That is correct.

19  Q.  You mentioned, I think, Tone Grant?

20  A.  Yes.

21  Q.  His interest.  Did Phillip Bennett use a lawyer in buying

22  out Tone Grant?

23  A.  Yes.

24  Q.  Who was that lawyer?

25  A.  Joe Collins.

1   Q.   Did Mr. Bennett ever advise you as to how the negotiations

2   were going with Tone Grant in connection with buying him out?

3   A.   Yes.

4   Q.   What did he say about those negotiations?

5   A.   He said that those -- that Tone's on board, and he was

6   going to have a carried interest in the future success of

7   Refco.

8   Q.   Do you have some understanding, from your conversation with

9   Mr. Bennett, about how much Tone Grant was getting in this

10  buyout?

11  A.   I do.

12  Q.   About how much was he getting?

13  A.   Five, ten million, approximately.

14  Q.   Did anyone from the Refco side, Phillip Bennett, yourself

15  or anyone else that you know of, tell Thomas H. Lee the truth

16  about how much Tone Grant was getting from this buyout?

17  A.   No.   To my knowledge, no one told TH Lee what Tony was

18  getting from the buyout, the actual amount.

19  Q.   And why did you conceal the amount that Tone Grant was

20  getting for the buyout from Thomas H. Lee?

21  A.   Because Thomas H. Lee presumed, did the math, that Tone

22  Grant would be receiving approximately half a billion dollars

23  upon the sale, based on the purchase price that TH Lee was

24  using to acquire Refco.

25  Q.   And so you understood Thomas H. Lee to believe that Tone

CAHPCOL5                          Trosten - direct

1    Grant was getting half a billion?

2    A.   Yes.

3    Q.   But he was only getting five to ten million?

4    A.   Approximately, yes.

5    Q.   Why didn't you want Thomas H. Lee to know that?

6    A.   Because if Thomas H. Lee became aware that Tone Grant

7    wasn't receiving what they expected him to receive, they would

8    ask, well, where's that additional money going?  And it would

9    have disclosed either or both the existence of this PPA

10   agreement with DF Capital, and also would have disclosed,

11   pursuant to further diligence by TH Lee, that RGHI had -- still

12   had debt on the books with RGL.

13   Q.   And by debt on the books, that's what we've been calling

14   the hole?

15   A.   The hole, the related-party debt.

16   Q.   So fair to say you were concerned that if Thomas H. Lee

17   learned about Tone Grant's actual payment in this buyout, they

18   might find out about the hole?

19   A.   Yes.

20   Q.   And then I think you said Mr. Dittmer had to be bought out

21   as well.  What was the deal that had to be done with

22   Mr. Dittmer?

23   A.   Tom had a carried interest with -- on the ultimate sale of

24   Refco, and Tom was expecting a payment as it related to the

25   Thomas H. Lee deal.

1    Q.  And did Mr. Bennett advise you as to how his discussions

2    with Mr. Dittmer or his representatives were going?

3    A.  Yes.

4    Q.  What did he say to you?

5    A.  He expressed to me that, you know, Tone's agreement was

6    going fine, and that he was stressing about Tom's agreement.

7    Q.  Did he give you any other details?

8    A.  Not that I remember.

9    Q.  And was Mr. Bennett using a lawyer in connection with his

10   dealings with Mr. Dittmer?

11   A.  To the best of my understanding.

12   Q.  Who did you understand him to be represented by there?

13   A.  Mayer Brown, Joe Collins.

14   Q.  The profits participation plan, did that have to be bought

15   out also?

16   A.  Yes.

17   Q.  Why?

18   A.  Because Thomas H. Lee required that there be no other

19   owners of Refco aside from Phil Bennett as a member of RGHI at

20   the time of the closing, and TH Lee was going to institute

21   their own management plan.

22   Q.  Although TH Lee didn't actually know there was a profits

23   participation plan, correct?

24   A.  To the best of my knowledge, they did not.

25   Q.  But it was bought back -- bought out?

CAHPCOL5                         Trosten - direct

1   A.  It was.

2   Q.  And you, yourself, received a buyout in that deal, correct?

3   A.  I did.

4   Q.  And when was that deal -- When did that deal close in

5   relation to the Thomas H. Lee deal?

6   A.  It was contingent upon it.

7   Q.  We discussed earlier about how the Thomas H. Lee purchase

8   was going to be financed, was going to be leveraged with bonds

9   and bank debt.

10        At the time that the EPMA that we've been looking at

11  had been signed, had that financing yet been obtained?

12  A.  No.

13  Q.  When was it obtained?  How was it obtained, if it was?

14  A.  It was obtained in August of 2004.  We, Refco, and

15  investment banks went out to raise the appropriate level of

16  bank debt and bonds debt.

17  Q.  Did you have a role in those series of transactions?

18  A.  I did.

19  Q.  What was it?

20  A.  I assisted in preparing an offering circular.  I helped

21  present -- prepare and present lender presentations and

22  ultimately the transaction closed.

23  Q.  Did Joe Collins have a role in preparing documents for this

24  financing?

25  A.  Yes.

1   Q.  What was his role, generally?

2   A.  He gave comments as to the offering circular.  I don't

3   believe he had any feedback regarding the lender presentations.

4   Q.  Let's look at Government Exhibit 1008.  Do you recognize

5   that?

6   A.  I do.

7   Q.  What is 1008?

8   A.  It's the lender presentation that Refco and its executives,

9   in conjunction with Thomas H. Lee, gave to a consortium of

10  banks in July of 2004.

11  Q.  And look at Page 3 of this document.  Does that set forth

12  the presentation team as it's described here?

13  A.  Yes.

14  Q.  Now, how much debt, in truth, did RGHI have to Refco

15  approximately at this time?

16  A.  Approximately 1.1 billion.

17  Q.  Obviously, your understanding was that Mr. Schoen of Thomas

18  H. Lee Partners didn't know that?

19  A.  That is correct.

20  Q.  Now, did Refco disclose to any potential lenders that there

21  was any remaining debt from RGHI in the course of these

22  presentations?

23  A.  No.

24  Q.  Why not?

25  A.  Because we have our financial statement that says we're

1    fully paid off.  We've represented to Thomas H. Lee that the

2    shareholder loans have been paid, and we were going to raise

3    the financing under the impression that there was no

4    shareholder loans remaining.

5    Q.  And so did you believe you were defrauding the lenders when

6    this presentation was made with the false financials?

7    A.  Yes.

8    Q.  What about the notes, the bonds that were prepared, was

9    there any documentation prepared in connection with those?

10   A.  Yes.

11   Q.  Was that a bond prospectus?

12   A.  Or offering circular, yes.

13   Q.  Let me ask you to look at Government Exhibit 3011.  And do

14   you recognize Government Exhibit 3011?

15   A.  I do.

16   Q.  What is it?

17   A.  It's a draft of the bond offering that we had just spoke

18   about.

19            MR. CHERNOFF:  Your Honor, we offer this and also

20   pursuant to the handwriting stipulation of the defendant.

21            MR. SCHWARTZ:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibit 3011 received in evidence)

24   Q.  And so this is the offering circular that was given to

25   parties interested in the bonds at Refco that's attached?

1   A.  A draft.

2   Q.  A draft of it?

3   A.  Yes.

4   Q.  Could we look --

5            MR. CHERNOFF:  Thank you, Mr. Smith.

6   Q.  If you look at Page 1, do you see Mr. Collins' initials and

7   dating of the document, and then a few markings as the page

8   continues?

9   A.  Yes.

10  Q.  And if we can just, I think, scroll through this document

11  on the screen.  I'll ask you to flip through it and just tell

12  me whether you see Mr. Collins' markup by hand on numerous

13  pages in this lengthy document?

14  A.  I do.

15           MR. CHERNOFF:  And I think we can go back to the first

16  page.  Thank you, Mr. Smith.

17  Q.  This was sent to you, Mr. Trosten, as well as Mr. Bennett

18  and others by Mr. Collins?

19  A.  Yes.

20  Q.  Let me ask that we turn to Government Exhibit 357.

21           MR. CHERNOFF:  Your Honor, we offer this pursuant to

22  our stipulation on authenticity, as well as the handwriting of

23  the defendant.

24           THE COURT:  Received.

25           (Government's Exhibit 357 received in evidence)

1   Q.  And, Mr. Trosten, do you see Mr. Collins' initials and

2   date, with another markup of the offering circular, in

3   connection with the notes, bonds?

4   A.  I do.

5   Q.  And this is on July 7th, of course, 2004?

6   A.  According to the handwriting, yes.

7   Q.  And you see some handwriting marks of his on that page?

8   A.  I do.

9   Q.  And I'll just ask you to flip through the marked-up copy

10  that follows the clean copy later in the document.  And do you

11  see a bunch of additional handwritten markups on this document

12  throughout?

13  A.  In my draft, the handwritten notes markup is first, but

14  yes, there are handwritten notes in this document.

15          MR. CHERNOFF:  And, Mr. Smith, we can bring up maybe

16  Bates number 883 and scroll up from there.  Okay.  You can take

17  that down.  Thank you, Mr. Smith.

18  Q.  So let me ask you now to turn to Government Exhibit 5008.

19  Do you have that document in front of you?

20  A.  I do.

21  Q.  What is that?

22  A.  This is the offering circular final for Refco, dated

23  July 22nd, 2004.

24  Q.  And is this the final circular that was distributed?

25  A.  It's one of them, yes.

1    Q.  Could you just hold it up?  I think you have the original

2    there.  Thank you.

3            How much debt was raised through this offering?

4    A.  $600 million.

5    Q.  And who was the material in this offering circular given to

6    in connection with that $600 million?

7    A.  Various sophisticated investors, funds and the like.

8    Q.  Please turn to Page F1 of this document and that's Bates

9    813.  Okay.  Thanks.

10           This is the index to consolidated financial statements

11   that's part of the circular, correct?

12   A.  That is correct.

13   Q.  And just flipping within this section to F22, this is --

14   A.  I have it.

15   Q.  Do you see here the footnote from the Refco financial

16   statements concerning related-party transactions?

17   A.  I do.

18   Q.  And this is the one we saw earlier that represented that

19   the amounts had been zeroed out, correct?

20   A.  With respect to RGHI?

21   Q.  Right.

22   A.  Yes.

23   Q.  And how much debt, in truth, roughly, did RGHI owe at the

24   time this circular went out?

25   A.  Approximately 1.1 billion.

1    Q.  So when did the leveraged buyout with Thomas H. Lee

2    ultimately close?

3    A.  August 5th of 2004.

4    Q.  And what happens at a closing?

5    A.  At a closing, documents get signed and monies get funded.

6    Q.  Do you recall where the closing was?

7    A.  The closing was in New York.

8    Q.  Did you attend it?

9    A.  I did.

10   Q.  Did Joe Collins attend it?

11   A.  Yes, he did.

12   Q.  And what was Mr. Collins' role in attending the closing?

13   A.  He was organizing the various documents for us to sign.

14   "Us" being Refco.

15   Q.  What is a flow of funds document in this kind of

16   transaction?

17   A.  Flow of funds document is meant to show where funds are

18   coming from and where they are going to.

19   Q.  And how is it used at a closing of a transaction like the

20   one we were talking about?

21   A.  It's meant to describe how TH Lee is funding the

22   transaction and then how those funds, once it is received by

23   the sellers, are being distributed –– I'm sorry, received.

24   Yes, received by the seller.

25   Q.  Was there a flow of funds document or memo in connection of

1    the closing of the deal with Thomas H. Lee?

2    A.  Yes.

3    Q.  Was there more than one flow of funds memo or just one?

4    A.  There was more than one.

5    Q.  What do you mean by that?

6    A.  There was the flow of funds memo that TH Lee was familiar

7    with regarding the funds that it was submitting to the owners

8    of Refco and what Refco was doing with it.

9         And then there was the flow of funds memo that

10   described monies, once it was at RGHI, how BAWAG and DF Capital

11   were being funded for their ownership interest or participation

12   rights in Refco.

13   Q.  Okay.  The first flow of funds memo you said was the one

14   that Thomas H. Lee was familiar with?

15   A.  Yes.

16   Q.  So they had that one?

17   A.  Yes.

18   Q.  And the Refco side had that one, too?

19   A.  Yes.

20   Q.  Okay.  The second flow of funds memo, what was that?

21   A.  That was a flow of funds memo that was describing the

22   various payments that were going to BAWAG and DF Capital.

23   Q.  And the Refco side had that one, too?

24   A.  Yes.

25   Q.  Did the Thomas H. Lee side have that one?

1   A.   Not to my knowledge, no.

2   Q.   Why didn't you give the Refco flow of funds memo to the

3   Thomas H. Lee side of the table?

4   A.   Because the -- that flow of funds memo described payments

5   going to DF Capital, described the payment going to BAWAG,

6   which TH Lee was familiar with.  Also represented this

7   $390 million overdraft that we talked about, the repayment of

8   the $85 million loan, just items that TH Lee was not familiar

9   with, and as well as an item that they were.

10  Q.   When you say not familiar with, you mean items you were

11  hiding from them?

12  A.   That is correct.

13  Q.   Let's look at Government Exhibit 1005.88.  Do you recognize

14  that document, sir?

15  A.   I do.

16  Q.   What is it?

17  A.   This is the funds flow document between TH Lee and Refco.

18  Q.   And is this the one that TH Lee had?

19  A.   Yes.

20            MR. CHERNOFF:  The government offers 1005.88.

21            MR. SCHWARTZ:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibit 1005.88 received in evidence)

24            MR. CHERNOFF:  Bring it up, Mr. Smith.  Thank you.

25  Q.   We see here it's titled Refco Transaction Flow of Funds

1    Memo.  It's from Weil Gotshal and Manges, LLP.  Remind us who

2    that was?

3    A.  Weil Gotshal was the attorneys for TH Lee.

4    Q.  And it's dated August 5th, which the rest of the memo

5    states is the date of the closing at the Weil Gotshal offices,

6    correct?

7    A.  That is correct.

8    Q.  Let's look at Page 5 of this document.  Do you see in the

9    second half of the page it says that Refco Group, Limited,

10   transfers $500 million to Refco Group Holdings as a

11   distribution.  Do you see that?

12   A.  I do.

13   Q.  Is that 500 million the purported excess working capital?

14   A.  Yes, it is.

15   Q.  Was this really happening, what's described here as this

16   wire transfer through JP Morgan in the amount of $500 million?

17   A.  No, it was not.

18   Q.  What actually did happen with the money that RGHI got from

19   the deal?

20   A.  With respect to?

21   Q.  This 500 million.

22   A.  BAWAG -- Well, Refco took the $390 million that was sitting

23   in its BAWAG-created account to repay its RGHI account, and

24   BAWAG kept the additional $110 million in the BAWAG's account

25   or in Refco's account at BAWAG.

1   Q.  Let's look at Government Exhibit 1821, please.  Do you

2   recognize 1821?

3   A.  I do.

4   Q.  What is it?

5   A.  This is the flow of funds memo between Refco and BAWAG and

6   its affiliates.

7   Q.  And this is the one that Refco had that Thomas H. Lee

8   didn't?

9   A.  To the best of my knowledge, Thomas H. Lee did not have

10  this and Refco did.

11  Q.  On Page 1 of the Refco flow of funds memo -- oh, I'm sorry.

12  I forgot to offer this.

13          MR. CHERNOFF:  1821, your Honor, the government

14  offers.

15          MR. SCHWARTZ:  No objection.

16          THE COURT:  Thank you.  Received.

17          (Government's Exhibit 1821 received in evidence)

18          MR. CHERNOFF:  Will you bring up Page 1.

19  Q.  What is the transaction that is described here in the first

20  set of boxes on the Refco flow of funds document?

21  A.  It's describing that Refco, who has set up with the

22  assistance of BAWAG, that 500 million in the account ending in

23  955, be transferred to the Refco Group Holdings account at

24  BAWAG ending 631.

25  Q.  And why was the $500 million being transferred to the

CAHPCOL5                    Trosten - direct

1   Refco -- I'm sorry, the RGHI account at BAWAG?

2   A.  That's because RGHI had an overdraft of $390 million; so

3   this was repaying that, plus an additional 110 million.

4   Q.  Let's look, if you will, at Page 4 of this document.  Here

5   we see, Mr. Trosten, $110 million being paid from RGHI to the

6   Desana Foundation.

7           First of all, in your work in this transaction, did

8   you come to learn what the Desana Foundation was?

9   A.  Yes.

10  Q.  What is it?

11  A.  It's DF Capital.

12  Q.  And what is taking place in the transaction on this part of

13  the flow of funds memo?

14  A.  This is the part where Refco Group Holdings, after

15  receiving that $500 million into its current -- into its

16  overdrawn account, had $110 million left in it.  And the

17  agreement that RGHI had with BAWAG/DF Capital was that BAWAG

18  was going to keep that $110 million.  So this is effecting that

19  $110 million payment from RGHI to DF Capital.

20  Q.  Now, at this point, had anyone at the Thomas H. Lee ever

21  heard of the Desana Foundation or DF Capital?

22  A.  No.

23  Q.  And you concealed those entities from them, to the best of

24  your knowledge, correct?

25  A.  Yes.

1   Q.  And the next entry -- and so without flipping back to the

2   Weil Gotshal flow of funds memo, am I correct that this

3   transaction, this wire transfer, does not appear on that flow

4   of funds memo?

5   A.  No, it does not.

6   Q.  Let's look at the second row of boxes, please, on Page 4 of

7   the Refco flow of funds memo document we're looking at.

8           What's happening in this transaction where there's a

9   wire transfer of $566 million?

10  A.  This is RGHI paying DF Capital for its 22 -- 27.2 percent

11  participation right that it had outstanding as of the closing

12  date.

13  Q.  When you say 27.2 participation right --

14  A.  Yes.

15  Q.  -- you're referring to the rights that DF Capital or BAWAG

16  had acquired by making the first two installment payments under

17  the PPA?

18  A.  That is correct.

19  Q.  Fair to say that since you had concealed the PPA from

20  Thomas H. Lee, this wire transfer was also concealed in the

21  transaction?

22  A.  That is correct.

23  Q.  And so this transfer to the Desana Foundation does not

24  appear on the Weil Gotshal -- on the Thomas H. Lee flow of

25  funds document, does it?

1    A.  No, it does not.

2    Q.  Let's just flip back now to Page 2.  Page 2, there's -- at

3    the top, there's a set of boxes that have a wire transfer to

4    Alinea Holding.  What was Alinea Holding, again?

5    A.  That was BAWAG.

6    Q.  And this is a transfer from RGHI for 191 million, correct?

7    A.  That is correct.

8    Q.  What was that transfer for?

9    A.  That was for the 10 percent known interest that BAWAG owned

10   in Refco.

11   Q.  And that was the ten percent that BAWAG knew about?

12   A.  Well, BAWAG owned it.

13   Q.  I'm sorry.  That Thomas H. Lee knew about it?

14   A.  Yes.

15   Q.  Thank you.  And so if we flip back to the Thomas H. Lee

16   flow of funds memo, Government Exhibit 1005.88, is that wire

17   transfer listed correctly on Page 5?

18   A.  It does represent the $191 million.  I don't know if the

19   wiring instructions are the same, but the dollar amount is.

20   Q.  Thank you.  Let's go back to the Refco flow of funds memo,

21   the last page, please.  Here we see a wire in the amount of 390

22   million from RGHI -- RGHI account at BAWAG to an RGHI account

23   at BAWAG?

24   A.  Yes.

25   Q.  This was the overdraft that was used to create the excess

1   working capital amount?

2   A.   It's another layer of that, yes.

3   Q.   And was this wire transfer on the Thomas H. Lee flow of

4   funds memo?

5   A.   No, it was not.

6   Q.   So other than the $191 million to buy out the ten percent

7   interest that Thomas H. Lee knew about for BAWAG, did the flow

8   of funds memo that Thomas H. Lee had, describe any other

9   proceeds that were going from Thomas H. Lee's purchase to BAWAG

10   or any BAWAG entity at all?

11   A.   No, it does not.

12          MR. CHERNOFF:   Your Honor, I know we're coming close

13   to the time, and I'm about to go to another --

14          THE COURT:   Another?

15          MR. CHERNOFF:   Another subject.

16          THE COURT:   Okay.  I can give you ten minutes, if you

17   have a ten-minute subject, or whatever the jurors want.

18          JUROR:   Keep going.

19          THE COURT:   Go.

20          MR. CHERNOFF:   Thank you, your Honor.

21          THE COURT:   Everybody else, all right?  Thank you,

22   ladies and gentlemen.

23          You should be delighted, Mr. Chernoff.

24          MR. CHERNOFF:   I am, your Honor.

25          THE COURT:   I knew it.

1  Q.  Mr. Trosten, do you know what is meant by an LLC agreement?

2  A.  Yes.

3  Q.  What is an LLC agreement?

4  A.  It's a limited liability company agreement.

5  Q.  And what does a limited liability company agreement do in a

6  limited liability company?

7  A.  It sets forth the general parameters of the company, nature

8  of the business, its principal location of business, officers

9  of the company, just general parameters of the company.

10  Q.  Was there an LLC agreement for the Refco Group?

11  A.  Yes.

12  Q.  And have you seen various LLC agreements and amendments for

13  Refco?

14  A.  Yes.

15  Q.  In what context?

16  A.  I saw them as it related to the DF Capital transaction.

17  Q.  Let's look back, please, at Government Exhibit 1503, the

18  side letter agreement.  And this is the side letter agreement

19  to the PPA, correct?

20  A.  Correct.

21  Q.  If we could advance to Page 3, section 14.1.  Is there

22  language here that relates to Refco's LLC agreement?

23  A.  Yes.

24  Q.  Please read what you have in mind?

25  A.  It says, "The members of Refco Group, Limited, LLC, agree

1    that the existing limited liability company agreement of the

2    company, (a) shall be amended pursuant to 12.01 of the

3    agreement immediately following the signing of this letter

4    agreement."

5    Q.  Mr. Trosten, slow down, please.  "Immediately following"?

6    A.  "Immediately following the signing of this letter

7    agreement; (b) immediately following the first payment date

8    will be amended in the form attached as schedule 5.04 to the

9    agreement; and (c) shall otherwise be further amended only by

10   unanimous decision of all members of the company."

11   Q.  And so what was your understanding as to why the side

12   letter agreement was calling for this amendment to the LLC

13   agreement?

14   A.  Because BAWAG wanted DF Capital and the PPA to be

15   documented within the limited liability company of Refco.

16   Q.  What do you mean "documented"?

17   A.  To be put into the LLC agreement as if DF Capital was a

18   member.

19   Q.  When you say "as if DF Capital was a member," was DF

20   Capital becoming a member?

21   A.  Well, they had a participation right, which they could

22   exercise; so they wanted to make sure that the PPA was

23   disclosed in the LLC agreement and allowing DF Capital to have

24   certain rights under that agreement.

25   Q.  Now, let's look again at the PPA, which is Government

1    Exhibit 1504.

2    A.  I have it.

3          MR. CHERNOFF:  And, Mr. Smith, if we could advance to

4    Bates No. 9300.

5    Q.  This is schedule 5.04 of the PPA, correct?

6    A.  That is correct.

7    Q.  And do you know what's attached here as schedule 5.04?

8    A.  It's what the -- it's the fourth amended -- it's what the

9    fourth amended and restated limited liability company agreement

10   of Refco Group, Limited, LLC, is to be executed or look like at

11   the time of the first payment.

12   Q.  So at the time of the PPA, the parties to it are agreeing

13   that this is what the amended LLC agreement for Refco will look

14   like?

15   A.  As of the first payment date.

16   Q.  Right.  Now, when did the first payment date come on the

17   PPA?

18   A.  February of 2003.

19   Q.  And so under section 14.1 of the side letter agreement that

20   we just looked at, is that when Refco was required to amend the

21   LLC agreement in the form we're looking at on the screen here?

22   A.  Yes.

23   Q.  Let me ask you to take a look at Government Exhibit 1514.

24   A.  I have it.

25          MR. CHERNOFF:  Your Honor, we offer this pursuant to

1    the authenticity stipulation.

2                 THE COURT:  Received.

3                 (Government's Exhibit 1514 received in evidence)

4    Q.  And, Mr. Trosten, Government Exhibit 1514 is a memo dated

5    January 10th, 2003, from Mr. Collins and it's copied to

6    Mr. Schultz from Mr. Bennett?

7    A.  Yes.

8    Q.  It says, "Regarding the Proceeds Participation Agreement,"

9    in the first paragraph, "This memorandum will describe what

10   needs to occur on the first payment date, as that term is

11   defined in the Proceeds Participation Agreement dated as of

12   July 12th, 2002 (the agreement) between Refco Group, Limited,

13   (the company) and DF Capital, Inc. (DFI), section references

14   are to the relevant sections in this agreement."

15               It then says the first payment date is February 28th,

16   2003, and that was set forth in the PPA, correct?

17   A.  Correct.

18   Q.  Let's flip to the third page.  At the end you see it says,

19   "Immediately following the first payment date, the limited

20   liability company agreement of the company is to be amended as

21   contemplated in schedule 5.04."  That's the schedule we just

22   looked at with the form of the amended LLC agreement, correct?

23   A.  Correct.

24   Q.  All right.  Can we look at Government Exhibit 316.

25               MR. CHERNOFF:  And, your Honor, we offer this pursuant

CAHPCOL5                           Trosten - direct

1    to the stipulation concerning the defendant's handwriting.

2              THE COURT:  Received.

3              (Government's Exhibit 316 received in evidence)

4    Q.  In the upper right-hand corner, Mr. Trosten, do you see it

5    says "Refco/BAWAG, DF Capital"?

6    A.  I do.

7    Q.  And this, apparently, refers to a February 26th, 2003,

8    conference with Mr. Bennett, correct?

9    A.  Correct.

10   Q.  And that is a little bit before the February 28 date on

11   which the LLC agreement is to be amended, correct?

12   A.  That's correct.

13   Q.  And here we see it says, I guess, three execution of fourth

14   amendment?

15   A.  That's correct.

16   Q.  Let's look at Government Exhibit 500, please?

17             THE COURT:  At your convenience, Mr. Chernoff.

18             MR. CHERNOFF:  I'll stop here, your Honor.  Thank you.

19             THE COURT:  Ladies and gentlemen, we'll stop for the

20   day now.  Would you follow the normal instructions.  Would you

21   leave your exhibits, take your books, don't discuss the case,

22   and I have one more thing to tell you to help you plan for

23   tomorrow.

24             We're going to get out a little bit early tomorrow.

25   We'll probably get out at or about 3:00.  What we're going to

CAHPCOL5                          Trosten – direct

1    do, so we don't waste your time, is we'll get you a selection

2    of sandwiches, and we'll just take a half an hour for lunch,

3    but that will mean that you'll be out early.  So thank you for

4    your working along with us.

5              JUROR:  Thank you.

6              THE COURT:  Your coffee will be ready at 9:30.  See

7    you for 10:00.

8              (Jury exits)

9              THE COURT:  Is there anything else on the record,

10   counsel?

11             MR. CHERNOFF:  No, your Honor, thank you.

12             MR. SCHWARTZ:  No, your Honor.

13             THE COURT:  Thank you.  If you just stay here until

14   Gilbert gives us the all clear.  You may step down, sir, but

15   stay in the room until they leave.

16             THE WITNESS:  Thank you, your Honor.

17             THE COURT:  Thank you.

18             (Adjourned to October 18, 2012, at 10:00 a.m.)

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3    ROBERT TROSTEN

4    Direct By Mr. Chernoff . . . . . . . . . . .1160

5                     GOVERNMENT EXHIBITS

6    Exhibit No.                              Received

7     2001.2(e)  . . . . . . . . . . . . . . . .1166

8     2001.2(f)  . . . . . . . . . . . . . . . .1167

9     300  . . . . . . . . . . . . . . . . . . .1179

10    303  . . . . . . . . . . . . . . . . . . .1181

11    1200A  . . . . . . . . . . . . . . . . . .1182

12    1250D  . . . . . . . . . . . . . . . . . .1184

13    3017  . . . . . . . . . . . . . . . . . . .1185

14    6003  . . . . . . . . . . . . . . . . . . .1198

15    6004  . . . . . . . . . . . . . . . . . . .1200

16    6007  . . . . . . . . . . . . . . . . . . .1202

17    3013  . . . . . . . . . . . . . . . . . . .1212

18    3014  . . . . . . . . . . . . . . . . . . .1214

19    3013A  . . . . . . . . . . . . . . . . . .1218

20    3016  . . . . . . . . . . . . . . . . . . .1219

21    6005  . . . . . . . . . . . . . . . . . . .1223

22    3012  . . . . . . . . . . . . . . . . . . .1224

23    6006  . . . . . . . . . . . . . . . . . . .1226

24    1612  . . . . . . . . . . . . . . . . . . .1227

25    1600  . . . . . . . . . . . . . . . . . . .1229

 1   1504  . . . . . . . . . . . . . . . . .1234

 2   3018  . . . . . . . . . . . . . . . . .1235

 3   3019  . . . . . . . . . . . . . . . . .1237

 4   1503  . . . . . . . . . . . . . . . . .1247

 5   3020  . . . . . . . . . . . . . . . . .1250

 6   1517  . . . . . . . . . . . . . . . . .1256

 7   1518  . . . . . . . . . . . . . . . . .1257

 8   1752B . . . . . . . . . . . . . . . . .1261

 9   1752A . . . . . . . . . . . . . . . . .1263

10   1000  . . . . . . . . . . . . . . . . .1277

11   3010  . . . . . . . . . . . . . . . . .1283

12   319 . . . . . . . . . . . . . . . . . .1287

13   1515  . . . . . . . . . . . . . . . . .1289

14   353 . . . . . . . . . . . . . . . . . .1290

15   1960  . . . . . . . . . . . . . . . . .1292

16   350 . . . . . . . . . . . . . . . . . .1299

17   1616  . . . . . . . . . . . . . . . . .1301

18   335 . . . . . . . . . . . . . . . . . .1308

19   356 . . . . . . . . . . . . . . . . . .1316

20   1805  . . . . . . . . . . . . . . . . .1318

21   1005.3  . . . . . . . . . . . . . . . .1323

22   356 . . . . . . . . . . . . . . . . . .1328

23   3011  . . . . . . . . . . . . . . . . .1347

24   357 . . . . . . . . . . . . . . . . . .1348

25   1005.88 . . . . . . . . . . . . . . . .1353

1368

1821 . . . . . . . . . . . . . . . . .1355

1514 . . . . . . . . . . . . . . . . .1363

316 . . . . . . . . . . . . . . . . .1364