Caidcol1
                              Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           07 Cr. 1170 (LAP)

5    JOSEPH P. COLLINS,

6              Defendant.

7    ------------------------------x
                                           October 18, 2012
8                                          10:02 a.m.
     Before:
9
                      HON. LORETTA A. PRESKA,
10
                                           District Judge
11
                            APPEARANCES
12
     PREET BHARARA
13        United States Attorney for the
          Southern District of New York
14   BY:  HARRY A. CHERNOFF
          MICHAEL A. LEVY
15        EDWARD A. IMPERATORE
             Assistant United States Attorneys
16
     COOLEY LLP
17        Attorneys for Defendant
     BY:  WILLIAM SCHWARTZ
18        JONATHAN BACH
          LAUREN GERBER LEE
19
                 – also present –
20
     Kathryn Searles
21   Robert Clark,
          Postal Inspectors, U.S. Postal Inspection Service
22
     Gary Smith,
23        Paralegal, U.S. Attorney's Office

24

25

Caidcol1                              Trosten - direct

1                   (Trial resumed; jury not present)

2                   THE COURT:  Good morning, ladies and gentlemen.

3                   May we bring the jurors in, please?

4                   MR. CHERNOFF:  Yes, your Honor.

5                   (Time noted at 10:05 a.m.)

6                   THE CLERK:  Jury entering.

7                   (Jury present)

8                   THE COURT:  We continue with the direct examination of

9        this witness.

10                   Mr. Chernoff.

11                   MR. CHERNOFF:  Thank you, your Honor.

12        ROBERT TROSTEN,

13              Resumed, and testified further as follows:

14        DIRECT EXAMINATION (Resumed)

15        BY MR. CHERNOFF:

16        Q.  Mr. Trosten, when we broke yesterday, we had been talking

17        about some of the agreements and payments that were made at the

18        time of the closing of the Thomas H. Lee deal.

19                   Right before that deal closed, what, approximately,

20        was the RGHI debt to Refco?

21        A.  Approximately 1.1 billion.

22        Q.  Did Refco use any of the proceeds from the sale of Thomas

23        H. Lee to pay down some of that debt?

24        A.  Yes, it did.

25        Q.  How much?

Caidcol1                    Trosten - direct

1   A.   Approximately $700 million through the proceeds and the

2   writeoff of the receivable.

3   Q.   And so how much debt was left from RGHI after the

4   closing -- how much debt to Refco?

5   A.   Approximately 4 to 500 million.

6   Q.   When did you leave Refco?

7   A.   Immediately thereafter the closing in August of '04.

8   Q.   Why did you leave Refco at that time?

9   A.   I left for two reasons.  I was having marital issues at

10  that time, for one; and, two, I was not prepared to sign a

11  public registration statement as it related to the bonds that

12  were done in conjunction with the TH Lee sale.

13  Q.   Why did you not want to sign a public registration

14  statement?

15  A.   I believe there was a greater level of criminal exposure if

16  the Refco fraud was uncovered in a public forum.

17  Q.   And so you didn't want your name on something like that?

18  A.   No, I did not.

19  Q.   What did you get -- what were you paid at the time that you

20  separated from Refco?

21  A.   I received a payment of $46 million.

22  Q.   And how was that broken down?

23  A.   When you say "broken down"?

24  Q.   Did it have components that went into that amount?

25  A.   Yes.  A component was for the redemption of my payment from

Caidcol1                    Trosten - direct

1   my profit participation plan and the rest was a severance.

2   Q.  Mr. Trosten, did there come a time after you left Refco

3   that the fraud at Refco was exposed to the public?

4   A.  Yes, it was.

5   Q.  When was that?

6   A.  October of 2005.

7   Q.  And how did you learn about those events?

8   A.  I received a call from a friend of mine while fishing, and

9   he advised me that Refco is down 10 points in the public

10  market, stock market.

11  Q.  And what happened to Refco in the days that followed that

12  call from your friend?

13  A.  In the days that followed Phil Bennett got indicted and the

14  firm later went bankrupt, or filed for bankruptcy.

15  Q.  Did you hire a lawyer?

16  A.  Yes, I did.

17  Q.  And did you decide to meet with the U.S. Attorney's Office?

18  A.  Yes, I did.

19  Q.  What was your purpose in meeting with the U.S. Attorney's

20  Office?

21  A.  I wanted to meet with the U.S. Attorney's Office to provide

22  them with information in the hopes that I would be looked at

23  more as a witness than as a potential target of the U.S.

24  government.

25  Q.  And did you soon come to realize that you were in fact a

Caidcol1                          Trosten - direct

1    target?

2    A.  Yes, I did.

3    Q.  Did you have a lawyer present for those meetings with the

4    U.S. Attorney's Office?

5    A.  I did.

6    Q.  And did you take part in what we call proffer sessions?

7    A.  Yes, I did.

8    Q.  What is that term?  What is a proffer?

9    A.  A proffer is a meeting that in this case myself had with

10   the U.S. government where I have a question-and-answer session

11   and describe my conduct and the conduct of others at Refco as

12   questioned.

13   Q.  Is that generally what you did discuss at this proffer

14   session?

15   A.  Which proffer session?

16   Q.  Well, when was the first one?

17   A.  October of 2005.

18   Q.  And did you have several over the next months?

19   A.  Yes.

20   Q.  And on average how long were these meetings?

21   A.  Approximately four hours.

22   Q.  During these set of sessions, did you have discussions

23   about the crimes you had committed?

24   A.  Yes.

25   Q.  And did you talk about the crimes that others had committed

Caidcol1                          Trosten - direct

1  with you?

2  A.  Yes.

3  Q.  Were you eventually offered a cooperation agreement by the

4  government?

5  A.  Yes.

6  Q.  Approximately how many proffer sessions had you had before

7  that agreement was offered?

8  A.  Six or seven.

9  Q.  And you said that in the meetings leading up to the

10 offering of that agreement, you discussed with the government

11 not only your own crimes but the crimes of others that had been

12 committed with you at Refco?

13 A.  Yes.

14 Q.  Did you have discussions with the government about who knew

15 about the Refco hole, the RGHI debt to Refco?

16 A.  Yes.

17 Q.  Do you recall whose names you mentioned in those proffer

18 sessions?

19 A.  I recall some of them, yes.

20 Q.  Who were they?

21 A.  Myself, Phil Bennett, Sandy Maggio, Dave Weaver.

22 Q.  I'm going to interrupt you.

23      Who is Dave Weaver?  Just tell us.  Some of these are

24 names we haven't heard yet.

25 A.  Dave Weaver reported to Sandy Maggio.

Caidcol1                    Trosten – direct

1   Q.  OK.  Who else?

2   A.  Stephen Dispenza.

3   Q.  Who was he?

4   A.  He reported to Sandy Maggio.

5           Frank Mutterer, who was my controller; Victor Zarate,

6   who was my assistant controller, and there may have been others

7   at Refco.

8   Q.  Did you mention the tax partners at Ernst & Young who knew

9   about the hole during these meetings with the government?

10  A.  No, I did not.

11  Q.  And did you mention Joe Collins in particular the

12  conversation you had had in 2002 about the hole?

13  A.  No.

14  Q.  Why didn't you mention those three -- roughly three

15  partners at Ernst & Young and Joe Collins in those proffer

16  sessions?

17  A.  Because the question was posed to me, or I interpreted it

18  to mean who at Refco knew about the hole and that's how I

19  answered it.

20  Q.  So in answering that question, did you give the government

21  at that point anyone's name who was not an owner or employee of

22  Refco?

23  A.  No, I did not.

24  Q.  During these proffer sessions, did you discuss an

25  arbitration where you had testified?

Caidcol1                          Trosten – direct

1    A.   Yes.

2    Q.   When was that?

3    A.   When was what, Mr. Chernoff?

4    Q.   The arbitration.

5    A.   It was sometime after I left Refco in 2004.

6    Q.   And what did the arbitration relate to?

7    A.   It related to someone that was working at Refco that wanted

8    to receive a finder's fee or money from Refco because he

9    believed that he introduced Credit Suisse First Boston to Refco

10   which ultimately led to the sale of Refco to Thomas H. Lee.

11   Q.   Did you state in your proffer that you had testified

12   truthfully at that arbitration?

13   A.   Yes, I did.

14   Q.   And after leaving that meeting with the government, did you

15   do anything to check what you had said?

16   A.   Yes, I did.

17   Q.   What did you do?

18   A.   I had asked for and received the transcript and reread my

19   testimony.

20   Q.   Did you realize that your testimony had not in fact been

21   entirely truthful?

22   A.   Yes.

23   Q.   How had it been false?

24   A.   I had made reference to the working capital distribution as

25   cash, cash, the 500 million, when indeed it was not

Caidcol1                    Trosten - direct

1   $500 million of cash.  It was significantly less than that.

2   Q.  And so did you bring that false testimony to the

3   government's attention?

4   A.  I did.

5   Q.  Now, you said that there came a time when you were offered

6   a cooperation agreement after these proffer sessions?

7   A.  Yes.

8   Q.  And did you accept the proffer agreement -- I'm sorry, the

9   cooperation agreement?

10  A.  No, I did not.

11  Q.  Why not?

12  A.  Because I felt the terms of the agreement as it related to

13  the monies that I was being asked to forfeit was unfair.  I

14  felt like I had done legitimate work at Refco.  I also did much

15  work that was fraudulent, but I felt like I did do some

16  significant true, real work and wanted to keep some of those

17  funds.

18  Q.  And the government obviously did not see it your way?

19  A.  That is correct.

20  Q.  The cooperation agreement would have required you to plead

21  guilty as well as forfeit money, correct?

22  A.  That is correct.

23  Q.  And after you turned down that cooperation agreement, what

24  happened in your case?

25  A.  I was indicted.

1378

Caidcol1                    Trosten - direct

1   Q.   When was that?

2   A.   Approximately November of 2006.

3   Q.   And so from that point you began to prepare for trial?

4   A.   That is correct.

5   Q.   Now, at that point in time had Phil Bennett already been

6   indicted?

7   A.   Yes.

8   Q.   And Tone Grant?

9   A.   Yes.

10  Q.   Did there come a time in your case when you asked to meet

11  with the government again?

12  A.   Yes.

13  Q.   When was that?

14  A.   In February of 2008.

15  Q.   And how did that come about that you made that request?

16  A.   I had asked for the request.  I had gone through my rights

17  to review the discovery that the government has received.  I

18  realized that I'm very likely going to be found guilty and I'm

19  going to be spending a significant period of time in jail.

20  Q.   Now, at the point that you asked for that additional

21  meeting with the government, had Phil Bennett by then pled

22  guilty?

23  A.   Yes.

24  Q.   And was Tone Grant heading to trial?

25  A.   Yes.

Caidcol1                          Trosten - direct

1  Q.  And by that point had Joe Collins already been indicted?

2  A.  Yes.

3  Q.  After you met with the government again, were you offered a

4  cooperation agreement?

5  A.  Yes.

6  Q.  And was that a written agreement?

7  A.  Yes.

8  Q.  The same requirement that you plead guilty?

9  A.  Yes.

10 Q.  And the same forfeiture requirements as before?

11 A.  Yes.

12 Q.  Was that cooperation agreement written?

13 A.  Yes.

14 Q.  Let me show you what's been marked 3502, for

15 identification.

16         Do you recognize that document?

17 A.  I do.

18 Q.  What do you recognize it to be?

19 A.  This is my cooperation agreement, dated February 20, 2008.

20         MR. CHERNOFF:  Your Honor, the government offers

21 3502-2.

22         MR. SCHWARTZ:  No objection.

23         THE COURT:  Received.

24         (Government's Exhibit 3502-2 received in evidence)

25 BY MR. SCHWARTZ:

Caidcol1                    Trosten - direct

1    Q.   And in this cooperation agreement you agreed to plead

2    guilty to the crimes you've told us about?

3    A.   Yes.

4    Q.   And there is also a schedule at the back of it that sets

5    forth the bank accounts, real property and cars you agreed to

6    forfeit, correct?

7    A.   Yes.

8    Q.   I want to talk with you a little bit now about some of

9    those assets, and first ask you about your compensation.

10            How did your compensation increase, generally

11   speaking, from the time you joined Refco to the time you left;

12   what were the imagine components?

13   A.   The major components was cash.  There was a home that I

14   acquired.  I got a portion of some stock.  I had joint interest

15   in an aircraft with Phil Bennett.  And I received, again,

16   significant monies throughout my career culminating in the $46

17   million payment when I left the firm.

18   Q.   You said that you had started out in the low six figures.

19   What was your base salary and bonus at the time that you were

20   CFO in the last year you were CFO, for instance?

21   A.   My base salary was a million dollars.  I was receiving

22   payments off of the proceeds participation plan.  As DF Capital

23   was acquiring its participation right, I was receiving payments

24   from that, which amounted to millions of dollars.

25   Q.   And these sums that you were paid were all agreed to by

Caidcol1                    Trosten - direct

1   Phil Bennett?

2   A.  That is correct.

3   Q.  How did you get him to agree to pay you such extraordinary

4   sums?

5   A.  Because I was preparing to do, and did, what my predecessor

6   Steve Rossi would not.

7   Q.  Meaning prepare fraudulent financial reports to the

8   auditors?

9   A.  Prepare fraudulent reports to the auditors and give

10  presentations and lie to banks, investors, rating agencies,

11  etc.

12  Q.  And so it's fair to say you had some leverage over

13  Mr. Bennett because you were doing this for him?

14  A.  Yes.

15  Q.  You said that the company acquired a house for you?

16  A.  Yes.

17  Q.  Where was that house, and what did it cost?

18  A.  It's in Franklin Lakes, New Jersey, and it cost $2.8

19  million at the time.

20  Q.  And you were given some stock as well?

21  A.  I was.

22  Q.  What stock were you given?

23  A.  It was stock in a private company called Navtec.

24  N-a-v-t-e-c, I believe; it could be t-e-k.  I'm not sure.

25  Q.  And what about options?  Did you also get options while you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Caidcol1                    Trosten - direct

1   were at Refco?

2   A.  I did.

3   Q.  What is an option?  What does that give you the option to

4   do?

5   A.  In this case it gave me the option to acquire a piece of

6   Refco.

7   Q.  How do you acquire a piece of Refco with options?

8   A.  We documented an agreement that said at a certain price I

9   would be able to acquire 2 percent interest in the business.

10  Q.  When you received those options, did you backdate them?

11  A.  Yes.

12  Q.  What does that mean?

13  A.  It means that we had the discussions in a particular year

14  but when we did the documentation we documented it as if it

15  happened two years prior.

16  Q.  And what did that enable you to do?

17  A.  It enabled me to take a -- to reduce the tax liability as

18  it related to this compensation.

19  Q.  And so you also committed tax fraud in connection with

20  those options?

21  A.  I did.

22  Q.  What year was that?

23  A.  The option was payable in two years.  So it was in 2000 and

24  2001.

25  Q.  You said a moment ago that "we" did this.  You and who did

Caidcol1                         Trosten - direct

1    this?

2    A.   Phil Bennett.

3    Q.   When you left Refco you said you received a severance

4    payment and a profits participation plan cash out.

5         You didn't report that money properly on your tax

6    returns for that year either, did you?

7    A.   I did not.

8    Q.   What did you do on your 2004 tax return that was

9    fraudulent?

10   A.   I reported all $46 million as the sale of my profits

11   participation plan and able to reduce my tax liability.

12   Q.   Now, did there come a time in the following year that you

13   actually amended that return?

14   A.   I did.

15   Q.   What led you to amend the return -- what did you do in the

16   amended return, I should ask first?

17   A.   In the amended return I had updated it for a K-1

18   partnership return, but most importantly, I amended the return

19   to break out the components of what was from the profits

20   participation plan and was additional compensation, thereby

21   increasing my tax liability with penalties and interest of

22   approximately $12 million.

23   Q.   And so what led you to amend your return and pay that $12

24   million in additional taxes?

25   A.   Word of Refco had come out about the debt between RGHI and

Caidcol1                      Trosten - direct

1  Refco.  I was concerned about my tax return and how I accounted

2  for it and decided to amend it, and then I did so and made the

3  additional payment.

4  Q.  Now, in your meetings with the government on this case, did

5  you at some point bring your amended tax return issue to the

6  attention of the prosecutors in this district?

7  A.  At some point, yes.

8  Q.  And was that only after lawyers for Mr. Collins had

9  subpoenaed you for your tax returns?

10  A.  Yes.

11  Q.  By 2005 had you paid all the taxes you owed for that income

12  for the severance payment?

13  A.  Yes.

14  Q.  You mentioned earlier in your testimony that a forfeiture

15  order was put against you at the time you pled guilty?

16  A.  Yes.

17  Q.  What is a forfeiture order?

18  A.  A forfeiture order is meant to represent the amount of loss

19  that was incurred by the victims of the crimes to which I've

20  committed and others.

21  Q.  And so that's money you have to pay to the United States?

22  A.  Yes.

23  Q.  For what purpose?

24  A.  My understanding is the government then puts it into a fund

25  so that the victims can receive some of the monies, if not all

Caidcol1                    Trosten - direct

1   of the monies, that are being forfeited by myself and others.

2   Q.  And what was the total amount of the forfeiture order

3   entered against you?

4   A.  $2.4 billion.

5   Q.  And that amount was calculated how?

6   A.  It was calculated as the amount of loss that was suffered

7   by the victims, both individuals and institutions, of this

8   crime.

9   Q.  When you signed the cooperation agreement and pled guilty,

10  approximately how much cash from your earnings at Refco and

11  elsewhere did you still have left?

12  A.  Approximately $35 to 40 million.

13  Q.  And did you agree to forfeit that cash?

14  A.  I did.

15  Q.  Who did you forfeit it to?

16  A.  The United States government.

17  Q.  And specifically what arm of the United States government

18  handles forfeiture?

19  A.  I don't know if you mean the U.S. Marshals, but I'm not

20  really sure.

21  Q.  We'll get to your houses in a moment, but when your houses

22  were seized, that was by the U.S. Marshals?

23  A.  Yes.

24  Q.  Had you bought several cars with proceeds from Refco?

25  A.  Yes.

Caidcol1                          Trosten - direct

1    Q.   How many?

2    A.   For myself I believe it was five, and there were others for

3    other people.

4    Q.   And did you still own any of those cars at the time that

5    you pled guilty?

6    A.   May I backtrack for a moment?

7    Q.   Go ahead.

8    A.   I had bought many cars in my career at Refco, but at the

9    time that this was occurring I had five for myself and then I

10   had others as well.

11   Q.   What do you mean you had others as well?

12   A.   There were one that I had given to my parents.  My fiancée

13   or wife at the time had one.  My ex-wife had a car as well.

14   Q.   And so did you agree to forfeit any interest you had in

15   those vehicles, too?

16   A.   I did.

17   Q.   And what about the proceeds from a car you had sold, did

18   you give that to the forfeiture -- did you pay that to the

19   forfeiture order as well?

20   A.   I did.

21   Q.   What car was that?

22   A.   It was an Enzo Ferrari.

23   Q.   And what were the proceeds from the sale you had made of

24   the Enzo Ferrari?

25   A.   $870,000.

Caidcol1                        Trosten - direct

1   Q.  How many homes did you have an interest in at the time that

2   you pled guilty?

3   A.  Four.

4   Q.  Where were they and who was using them?

5   A.  There were two in Franklin Lakes.  I was using one; my

6   ex-wife lives in the other one.  My parents were living in a

7   condo in Florida, and I had a residence in Florida.

8   Q.  And did your ex-wife dispute the forfeiture of that house?

9   A.  Yes.

10  Q.  Do you have any interest in the house at this time?

11  A.  I do not.

12  Q.  And who lives there with your ex-wife, if anyone?

13  A.  My son.

14  Q.  What about the home that your parents lived in, do you have

15  any interest in that?

16  A.  I do not.

17  Q.  Did they initially dispute the forfeiture of that house?

18  A.  Yes.

19  Q.  And you paid for an attorney to help them explore their

20  rights to keep the house?

21  A.  That is correct.

22  Q.  But what ultimately happened to that house, or that condo?

23  A.  My parents agreed to forfeit it to the U.S. government.

24  Q.  Now, did there come a time in your case, in your meetings

25  with the government, that you forfeited some additional

Caidcol1                    Trosten - direct

1    property?

2    A.   Yes.

3    Q.   Was that around the time your home in Florida was

4    burglarized?

5    A.   Yes.

6    Q.   What happened around that time?

7    A.   My house was burglarized.  They had stolen some cash, some

8    jewelry, some cufflinks.  I advised the government.  The

9    government asked me some more questions about assets that I

10   had.  I identified some wine.  I identified rights that I had

11   to a luxury box at Madison Square Garden.  I identified a

12   deposit at a social club, and forfeited those as well.

13   Q.   And after you had that discussion with the government about

14   the jewelry and these interests in the box and the club and so

15   forth, did you amend this Schedule A that reflects the assets

16   you were forfeiting pursuant to your guilty plea?

17   A.   I did.

18   Q.   Let me show you what's been marked 3502-2A.

19            And I'll ask you if you recognize this document?

20   A.   Thank you.

21            I do.

22   Q.   What is 3502-2A?

23   A.   This is the revised Schedule A of my forfeiture of what I'm

24   forfeiting to the government.

25            MR. CHERNOFF:  The government offers it, your Honor.

Caidcol1                          Trosten - direct

1              MR. SCHWARTZ:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibit 3502-2A received in evidence)

4    BY MR. CHERNOFF:

5    Q.  And after you pled guilty, Mr. Trosten, were you receiving

6    payments in connection with a loan you had made?

7    A.  Yes.

8    Q.  What was that loan?

9    A.  I had made a loan to a synagogue in New Jersey.

10   Q.  Why did you make the loan to the synagogue in New Jersey?

11   A.  They were expanding and needed some financial support.

12   Q.  How much did you loan them?

13   A.  $750,000.

14   Q.  And did you ultimately agree to forfeit your right to

15   receive payments from that synagogue as well?

16   A.  Yes, I did.

17   Q.  Under your cooperation agreement, you pled guilty to

18   several of the counts charged against you in the Indictment

19   which you have described, correct?

20   A.  Correct.

21   Q.  What's the total maximum possible prison sentence that you

22   would face under all the offenses that you've pled guilty to?

23   A.  85 years.

24   Q.  And do you face other potential penalties in addition to

25   forfeiture?

Caidcol1                          Trosten - direct

1   A.  I do.

2   Q.  What are those?

3   A.  Restitution and fines.

4   Q.  What is restitution?

5   A.  Restitution is additional monies that I would be having to

6   remit to give back to the victims of the crime.

7   Q.  What is your understanding of what the cooperation

8   agreement that is Exhibit 3502-2 requires you to do?

9   A.  It requires me to tell the truth, testify when called upon,

10  and commit no further crimes.

11  Q.  And you're testifying here pursuant to that agreement?

12  A.  Yes, I am.

13  Q.  And have you previously testified as a government witness

14  in a criminal trial of Tone Grant?

15  A.  I have.

16  Q.  And, by the way, let me show you what's been marked as

17  Government Exhibit 751.

18          Is that a photo of Tone Grant?

19  A.  Yes, it is.

20          MR. CHERNOFF:  Your Honor, the government offers 751.

21          MR. SCHWARTZ:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 751 received in evidence)

24  BY MR. CHERNOFF:

25  Q.  Now, Mr. Trosten, if you abide by the terms of your

1  cooperation agreement, what it requires of you, what is your

2  understanding of what the government is obligated to do under

3  this written agreement?

4  A.  They are required to write a letter detailing my

5  cooperation with the U.S. government and submit it to my

6  sentencing judge.

7  Q.  And if the government writes this letter detailing the ways

8  in which you have cooperated, what is your understanding of

9  what the judge would likely do with respect to your sentence at

10 the end of your case?

11 A.  Reduce my sentence.

12 Q.  Now, under this agreement is the government going to

13 recommend to your sentencing judge a particular sentence?

14 A.  No, they are not.

15 Q.  And is that stated in your written agreement?

16 A.  Yes, it is.

17 Q.  Has anyone promised you any particular sentence in your

18 case?

19 A.  No.

20 Q.  Who will determine your sentence?

21 A.  My sentencing judge.

22 Q.  And what will the judge who sentences you consider in

23 sentencing you?

24 A.  He or she will consider the crimes that I've committed, the

25 amount of loss that was undertaken by the victims of the crimes

Caidcol1                           Trosten - direct

1   that I've committed, a report that will be submitted to my

2   sentencing judge by the Probation Department going through, you

3   know, my life history.  They will take into account the letter

4   that the government will be writing pursuant to my cooperation

5   agreement, and take into account where I am in my life today

6   and will take into account any letters that may be written both

7   for or against me at the time of sentencing.

8           MR. CHERNOFF:  May I have one moment, your Honor?

9           THE COURT:  Yes, sir.

10          (Pause)

11          THE COURT:  I think everybody in America has a cold.

12   BY MR. CHERNOFF:

13   Q.  Mr. Trosten, one final subject.

14          When was the last time you spoke with Joseph Collins,

15   do you recall it?

16   A.  I do.

17   Q.  When, approximately, was that?

18   A.  October of 2005.

19   Q.  And how do you remember that?

20   A.  Because Refco had just begun having these disclosures come

21   out, and I called Joe to look for a referral for a lawyer.

22   Q.  You said you called him to ask for a referral for a lawyer?

23   A.  Yes.

24   Q.  Did you tell him what kind of a lawyer you wanted to hire?

25   A.  I did.

1    Q.  And?

2    A.  I asked for a criminal attorney.

3    Q.  And what did Mr. Collins say in response?

4    A.  He said that he'd ask around and get back to me.

5    Q.  Did he get back to you?

6    A.  Yes.

7    Q.  And did he give you a referral for an attorney?

8    A.  Yes.

9    Q.  Did you take his advice and hire an attorney he

10   recommended?

11   A.  Yes.

12           MR. CHERNOFF:  No further questions, your Honor.

13           THE COURT:  Thank you.

14           Cross-examination, counsel.

15   CROSS-EXAMINATION

16   BY MR. SCHWARTZ:

17   Q.  Good morning, Mr. Trosten.

18   A.  Good morning.

19   Q.  Now, when you called Mr. Collins for a recommendation for

20   an attorney, there was no secret that there was a criminal

21   investigation of Refco going on, correct?

22   A.  That is correct.

23   Q.  Phillip Bennett had already been arrested, correct?

24   A.  That is correct.

25   Q.  And that had been all over the papers, correct?

Caidcol1                          Trosten - cross

1  A.  May I ask you to speak up?  I'm having a hard time hearing

2  you.

3  Q.  That had been in the newspapers, correct?

4  A.  That is correct.

5  Q.  And you called Mr. Collins; and he was a lawyer you knew,

6  correct?

7  A.  That is correct.

8  Q.  You didn't know where to find a criminal attorney, correct?

9  A.  That is correct.

10  Q.  And you thought that he might be able to recommend one to

11  you, correct?

12  A.  That is correct.

13  Q.  So you called him and asked him for that, correct?

14  A.  That is correct.

15  Q.  And you discussed the fraud with him on that phone call,

16  correct?

17  A.  I did not.

18  Q.  And he got back to you, correct?

19  A.  That is correct.

20  Q.  And he recommended you to a criminal attorney, correct?

21  A.  That is correct.

22  Q.  And then you researched the attorney after he made the

23  recommendation?

24  A.  I made the phone call shortly thereafter.

25  Q.  Did you look into the attorney's reputation?

Caidcol1                          Trosten - cross

1    A.  Yes.

2    Q.  And you learned that he was one of the most highly

3    reputable criminal attorneys in New York, is that correct?

4    A.  That is correct.

5    Q.  A man of great honesty, correct?

6    A.  Yes.

7    Q.  And enormous integrity, correct?

8    A.  That is correct.

9    Q.  And in your experience with him, he was a man of honesty

10   and integrity, correct?

11   A.  That is correct.

12   Q.  How long after you hired him were you in the United States

13   Attorney's office confessing your crimes?

14   A.  May I ask you to repeat the question, please?

15   Q.  How long after you hired him were you in the U.S.

16   Attorney's Office confessing your crimes?

17   A.  Within weeks, if not days.

18   Q.  Within weeks, if not days, the attorney that Joseph Collins

19   recommended to you took you to the United States Attorney's

20   office to tell them everything you knew about the fraud,

21   correct?

22   A.  Correct.

23   Q.  Now, sir, you worked with Mr. Collins for a long period of

24   time, is that correct?

25   A.  That is correct.

Caidcoll                    Trosten - cross

1   Q.  And I believe you testified on direct that there were days

2   when you had numerous conversations with him?

3   A.  That is correct.

4   Q.  And over the period that you worked with him, is it fair to

5   say you had at least hundreds of conversations with him?

6   A.  That is correct.

7   Q.  And possibly thousands?

8   A.  Possibly.

9   Q.  And you met with him often, correct?

10  A.  Not in person.

11  Q.  So the conversations were mostly on the phone?

12  A.  Yes.

13  Q.  And out of the hundreds and possibly thousands of

14  conversations with him, you had related just a few here today

15  in the last few days, correct?

16  A.  That is correct.

17  Q.  You related a single conversation where you called him and

18  asked him to send you documents on the back-to-back loans in

19  2001, correct?

20  A.  That is correct.

21  Q.  You related a conversation -- it may have been one or

22  two -- where you expressed to him concerns about the structure

23  of the Proceeds Participation Agreement, correct?

24  A.  That is correct.

25  Q.  And you testified about a conversation in which you claim

Caidcol1                          Trosten - cross

1   you told him there were $700 million in intercompany debt at

2   Refco, correct?

3   A.  Correct.

4   Q.  Of possibly thousands of conversations, you related to the

5   jury just three over these two days, correct?

6   A.  Correct.  There may have been one more but ...

7   Q.  You never had a conversation with Mr. Collins where you

8   told him there was $1.1 billion of intercompany debt at the

9   time you made the deal, correct?

10  A.  That is correct.

11          THE COURT:  Mr. Schwartz, would you keep your voice

12  up?

13          MR. SCHWARTZ:  I apologize.

14          THE COURT:  The problem is both of you are too tall

15  for the microphone, but keep your voice up, please.

16          MR. SCHWARTZ:  You have to order a tall microphone.

17          THE COURT:  I know.

18          MR. SCHWARTZ:  I don't want to increase the deficit,

19  your Honor.

20          THE COURT:  Thank you.  We appreciate that.

21  BY MR. SCHWARTZ:

22  Q.  You never had a conversation where you told him that the

23  $500 million in excess cash was really not excess cash

24  belonging to the company, correct?

25  A.  That is correct.

Caidcol1                    Trosten - cross

1   Q.  And you never had a conversation with him where you told

2   him the opinions you testified to here about the meaning of

3   representations and warranties in the EPMA, correct?

4   A.  That is correct.

5   Q.  And you never had a conversation with him in which you told

6   him there's a hole at Refco and here is how it has been

7   created, correct?

8   A.  That is correct.

9   Q.  Now, let's discuss the creation of the hole for a moment.

10          You testified there were several ingredients that went

11  into that, correct?

12  A.  Correct.

13  Q.  The first was customer losses?

14  A.  That is correct.

15  Q.  And those were losses that would be moved up to RGHI,

16  correct?

17  A.  Correct.

18  Q.  And RGHI -- it would look on Refco's books as if RGHI had

19  borrowed money from it, correct?

20  A.  That is correct.

21  Q.  So the losses would go up to RGHI, and in exchange there

22  would be an IOU recorded on the books of Refco, correct?

23  A.  That is correct.

24  Q.  And these came about because customers had something called

25  margin, is that right?

Caidcol1                        Trosten - cross

 1    A.   That is right.

 2    Q.   Margin is where you buy a stock or a commodity, the

 3    customer, in part, borrows the money from the broker, correct?

 4    A.   That is correct.

 5    Q.   So customers would borrow money from Refco to enable them

 6    to buy commodities in their accounts, correct?

 7    A.   That is correct.

 8    Q.   And then the price of what they owned would drop on the

 9    market, correct?

10    A.   That is correct.

11    Q.   And somebody was required to pay for the loss that they had

12    incurred, correct?

13    A.   That is correct.

14    Q.   So Refco would call the margin; they would say to the

15    customer send the money over, correct?

16    A.   That is correct.

17    Q.   The money you had borrowed?

18    A.   Correct.

19    Q.   And sometimes they wouldn't have it, correct?

20    A.   That is correct.

21    Q.   So Refco would have to dig into its own pocket, correct?

22    A.   Correct.

23    Q.   And it would have to pay for the losses, correct?

24    A.   Correct.

25    Q.   And then those losses were now loanable to Refco, correct?

1   A.  At that moment, correct.

2   Q.  And so what Refco would do was move them upstairs, sell

3   them, essentially, to the parent, correct?

4   A.  That is correct.

5   Q.  And get -- and give the parent a loan, in which it would

6   use to buy them, correct?

7   A.  Correct.

8   Q.  And the parent would give the IOU, correct?

9   A.  Correct.

10  Q.  And that IOU would be on the books of Refco as an asset of

11  Refco, correct?

12  A.  That is correct.

13  Q.  And it would make Refco look richer than in fact it was,

14  correct?

15  A.  That is correct.

16  Q.  And the hole kept getting deeper as customers lost money,

17  correct?

18  A.  That is correct.

19  Q.  And you never had a single conversation with my client in

20  which you told him that you were transferring these obligations

21  to the parent, RGHI, in exchange for an IOU, correct?

22  A.  That is correct.

23  Q.  Now, another thing you did that deepened the hole was you

24  would shift expenses, correct?

25  A.  That is correct.

Caidcol1                    Trosten - cross

1   Q.  So Refco would have to spend the money, correct?

2   A.  That is correct.

3   Q.  To buy something for the office, for example?

4   A.  Correct.

5   Q.  And that would normally show on the books as money that

6   came out of Refco's pocket, right?

7   A.  Correct.

8   Q.  And it would reduce the net worth of Refco, correct?

9   A.  Correct.

10  Q.  Because an expense brings down the value of the company,

11  correct?

12  A.  That is correct.

13  Q.  And so those expenses would be sold upstairs to the parent

14  as well, correct?

15  A.  That is correct.

16  Q.  And the parent would give the same kind of IOU, correct?

17  A.  Correct.

18  Q.  And it would be recorded -- the expenses would now not look

19  like expenses on Refco's books but they would be an asset,

20  correct?

21  A.  That is correct.

22  Q.  And you didn't have a single conversation with Joseph

23  Collins regarding the transferring of expenses to RGHI or any

24  of the other parents -- or any of the affiliates in exchange

25  for that IOU, correct?

Caidcol1                        Trosten – cross

1   A.  That is correct.

2   Q.  So now you had a hole, right?  And the hole was a debt that

3   was owed by RGHI to Refco, correct?

4   A.  That is correct.

5   Q.  And like any other debt, interest was accruing on it,

6   correct?

7   A.  Correct.

8   Q.  So on the books of Refco, RGHI not only owed for the

9   principal of the loans that had been made to it, it owed

10  interest, right?

11  A.  Correct.

12  Q.  And to make Refco look even better than it looked, you

13  raised the interest rate, right?

14  A.  Correct.

15  Q.  And that interest as it accrued you were allowed to take as

16  income of Refco, correct?

17  A.  That is correct.

18  Q.  Even though you believed there was no realistic chance of

19  collecting it from RGHI, correct?

20  A.  Correct.

21  Q.  And at one point you increased the interest rate, right?

22  A.  That is correct.

23  Q.  To make it look even better?

24  A.  That is correct.

25  Q.  And you never had a conversation with Joseph Collins about

1    any of that, correct?

2    A.   When you say "any of that"?

3    Q.   You never had a conversation in which you told him that we

4    are manipulating the net worth of Refco by increasing the

5    interest rate.

6    A.   That is correct.

7    Q.   Now, you testified for over two -- for almost two days on

8    direct examination, and you went through documents.  You were

9    shown a lot of documents, right?

10   A.   Correct.

11   Q.   You were shown a lot of notes, correct?

12   A.   Yes.

13   Q.   And there was only one conversation at all that you claim

14   you ever had with Mr. Collins about the hole, correct?

15   A.   That is correct.

16   Q.   And that was the ENY letter?

17   A.   It related to the ENY call and letter, yes.

18   Q.   We'll get back to that.

19        Mr. Trosten, do you consider yourself an accomplished

20   liar?

21   A.   How would you define "accomplished liar"?

22   Q.   Someone who was successful for many years telling thousands

23   of lies.

24   A.   Yes.

25   Q.   You lied to many people over many occasions?

Caidcoll                    Trosten – cross

1    A.  That is correct.

2    Q.  In fact, you were a professional liar, correct?

3    A.  How would you define "professional liar"?

4    Q.  Someone who gets paid in part to tell lies.

5    A.  That is correct.

6    Q.  You were responsible for the financial statements at Refco,

7    correct?

8    A.  That is correct.

9    Q.  And every year that you were responsible for the financial

10   statements of Refco, they were false, correct?

11   A.  That is correct.

12   Q.  You knew they were false, correct?

13   A.  That is correct.

14   Q.  And you knew that banks were relying on them, correct?

15   A.  Correct.

16   Q.  You knew that the regulators had them, correct?

17   A.  Correct.

18   Q.  You knew that potential buyers were looking at them,

19   correct?

20   A.  Correct.

21   Q.  And investment bankers, correct?

22   A.  That is correct.

23   Q.  And you lied to the accountants who audited the financial

24   statements, correct?

25   A.  That is correct.

Caidcol1                    Trosten – cross

1   Q.  First it was Arthur Andersen and then it was Grant

2   Thornton, right?

3   A.  That is correct.

4   Q.  And they would spend weeks at Refco every year trying to

5   make sure that the financial statements were accurate, correct?

6   A.  That is correct.

7   Q.  And anytime they asked you a question that came close to

8   the hole, you lied to them, correct?

9   A.  That is correct.

10  Q.  And you did that regularly?

11  A.  When you say "regularly," every time it was asked of me,

12  that is correct.

13  Q.  And it was critical to the fraud that you lie to them

14  successfully?

15  A.  That is correct.

16  Q.  And you gave them false schedules to back up the numbers

17  that you had put in the financial statements, right?

18  A.  That is correct.

19  Q.  And you lied to them in the annual meeting that they would

20  have with you to go over the audit, right?

21  A.  That is correct.

22  Q.  Now, the chief auditor to whom you lied was a man named

23  Mark Ramler, correct?

24  A.  That is correct.

25  Q.  And you actually considered him a friend, correct?

Caidcol1                          Trosten - cross

1   A.  Yes.

2   Q.  And you lied to him year after year about things that were

3   central to the work your friend was doing, correct?

4   A.  That is correct.

5   Q.  In fact, by lying to him you knew you were putting him in

6   harm's way, correct?

7   A.  That is correct.

8   Q.  Because as a result of your lies he was giving a positive

9   opinion on your financial statements, correct?

10  A.  That is correct.

11  Q.  And he was a man of significant reputation, correct?

12  A.  That is correct.

13  Q.  And he was a sophisticated professional, correct?

14  A.  In my opinion.

15  Q.  And in your opinion he was a very good accountant, correct?

16  A.  Correct.

17  Q.  And as a result of your lies he was unable to uncover the

18  fraud, correct?

19  A.  That is correct.

20  Q.  And he would also have meetings with Mr. Bennett?

21  A.  He would.

22  Q.  And Mr. Bennett would lie to him anytime he got close to

23  the hole, correct?

24  A.  That is correct.

25  Q.  And you came to understand exactly how you could

Caidcol1                         Trosten - cross

1    successfully lie to him, right?

2    A.  I did.

3    Q.  You came to understand how he did his work and what kinds

4    of lies would actually work with him, right?

5    A.  That is correct.

6    Q.  And you began to feel more and more confident, because you

7    knew how he worked, that the way you told him lies would be

8    successful, correct?

9    A.  That is correct.

10   Q.  And then there came a time where he switched accounting

11   firms, right?

12   A.  Yes.

13   Q.  Arthur Andersen collapsed, right?

14   A.  Correct.

15   Q.  And he went to Grant Thornton?

16   A.  Yes, he did.

17   Q.  And you had to consider whether to bring the Refco work to

18   Grant Thornton, right?

19   A.  That is correct.

20   Q.  And because you knew the way he worked and the way you

21   could successfully lie to him, you moved the work over to Grant

22   Thornton, right?

23   A.  That is correct.

24   Q.  Because whatever you were doing in the past had worked and

25   you felt it would continue in the future?

Caidcol1                    Trosten – cross

1   A.  Correct.

2   Q.  And so now you put his new firm in harm's way as well?

3   A.  Yes.

4   Q.  And when you were considering whether to hire a new

5   accountant when you went to Grant Thornton, you didn't want to

6   take the risk that somebody with different ways of practicing

7   might actually uncover the fraud, right?

8   A.  That's correct.

9   Q.  Because you knew that he -- you could fool him, right?

10  A.  Correct.

11  Q.  And he never found out about the fraud until after the

12  collapse of Refco, is that right?

13  A.  That's my understanding.

14  Q.  For a long time you lied to Ernst & Young, correct?

15  A.  Regarding?

16  Q.  Ernst & Young were your tax accountants?

17  A.  That's correct.

18  Q.  Did you lie to them?

19  A.  Yes.

20  Q.  They also had a fine reputation, correct?

21  A.  Yes.

22  Q.  And, by the way, the fact that these accountants had good

23  reputations was very important to Refco, right?

24  A.  Yes.

25  Q.  Because it made Refco look better in the eyes of the rest

Caidcol1                          Trosten – cross

1   of the world, correct?

2   A.  That's my opinion, yes.

3   Q.  They prepared your taxes, Ernst & Young, right, the firm's?

4   A.  Yes.

5   Q.  And they relied on you to tell them the truth, correct?

6   A.  Correct.

7   Q.  And you lied?

8   A.  Correct.

9   Q.  You lied to investment bankers, correct?

10  A.  Yes.

11  Q.  You testified about Allen & Company.  That is the firm you

12  retained in 2001.  Did you lie to them?

13  A.  Yes, I did.

14  Q.  They were a highly reputable investment banker, correct?

15  A.  Yes.

16  Q.  And then you -- in 2003, you went a couple of steps better

17  and you hired Credit Suisse First Boston, correct?

18  A.  That is correct.

19  Q.  They were one of the premier investment banks in the world,

20  correct?

21  A.  That is my understanding, correct.

22  Q.  And you knew that by Refco hiring them to sell the company,

23  it gave instant credibility to Refco in the marketplace,

24  correct?

25  A.  That was my belief and understanding, correct.

Caidcol1                        Trosten - cross

1    Q.  Because of their incredible reputation, correct?

2    A.  Correct.

3    Q.  And the firms that came to look at Refco at that time were

4    actually major firms, correct?

5    A.  That is correct.

6    Q.  You told us about Thomas H. Lee, right?

7    A.  Yes.

8    Q.  Bain Capital was another?

9    A.  Yes.

10   Q.  And they came, you thought in part, because of the name

11   Credit Suisse First Boston, isn't that right?

12   A.  It is.

13   Q.  You lied to them, correct?

14   A.  I did.

15   Q.  We saw documents, and we looked at them again yesterday,

16   where their name is on the front page, right?

17   A.  Yes.

18   Q.  And those documents were riddled with lies that you had

19   told them, correct?

20   A.  Myself and others, correct.

21   Q.  Refco had a revolving line of credit with J.P. Morgan,

22   right?

23   A.  Correct.

24   Q.  That means that if Refco needed money on a short-term

25   basis, J.P. Morgan would make it available to them, correct?

Caidcol1                        Trosten - cross

```
1    A.  That is correct.

2    Q.  And that is also a bank of premier international

3    reputation, correct?

4    A.  Correct.

5    Q.  And the fact that they were lenders to Refco made Refco

6    look good, correct?

7    A.  Correct.

8    Q.  And you lied to them?

9    A.  Yes.

10   Q.  And you lied to all the bidders who came to look at Refco?

11   A.  Yes.

12   Q.  You lied to the rating agencies that rated Refco, correct?

13   A.  Correct.

14   Q.  Who were they, by the way?

15   A.  Fitch.  I believe, Moody's.  I don't recall if S & P looked

16   at it, I don't remember.

17   Q.  Well, Fitch and Moody's are two of the three major credit

18   rating agencies in the world, correct?

19   A.  Correct.

20   Q.  And they gave Refco good ratings, correct?

21   A.  Correct.

22   Q.  And because the name Fitch and Moody's were on those

23   ratings, Refco looked good, correct?

24   A.  Correct.

25   Q.  And you lied to them?
```

Caidcol1                         Trosten - cross

```
1   A.  Correct.

2   Q.  And you were paid to lie?

3   A.  Correct.

4   Q.  In fact, you were made CFO in order to lie, correct?

5   A.  I don't know if I was made CFO in order to lie.

6   Q.  Well, let's discuss that.

7            Your predecessor was Steve Rossi, right?

8   A.  Not as CFO.

9   Q.  What was his job?

10  A.  He was the controller.  Phil Bennett was the CFO and CEO.

11  Q.  You were made controller in order to lie, correct?

12  A.  Correct.

13  Q.  And then you were made CFO later on because you were a good

14  liar, right?

15  A.  Correct.

16  Q.  So Mr. Rossi, your predecessor as controller, you testified

17  on direct he was becoming increasingly uncomfortable, right?

18  A.  Correct.

19  Q.  Isn't the fact that what he told you is I don't want to lie

20  anymore?

21  A.  That's not what he told me.

22  Q.  That's what you understood him to be saying?

23  A.  Correct.

24  Q.  Because he had been lying to cover up the hole?

25  A.  Correct.
```

Caidcol1                          Trosten - cross

1   Q.  And rather than continue to lie, he left the company?

2   A.  That is correct.

3   Q.  And you found an opening for yourself, is that right?

4   A.  That is right.

5   Q.  And you knew that you had enormous financial leverage,

6   correct?

7   A.  Correct.

8   Q.  That's because Phil Bennett needed a liar, right?

9   A.  Correct.

10  Q.  And, by the way, at this time before 1999 -- what year did

11  you become controller?

12  A.  I became Senior Vice President of Finance in 1999.

13  Q.  At the time Rossi was doing his lying, Tom Dittmer was the

14  principal of the company, right, as a shareholder?

15  A.  For part or most of his tenure, yes.

16  Q.  And some of the hole had been created by his trading,

17  right?

18  A.  Yes.

19  Q.  He did what you call proprietary trading, right?

20  A.  Yes.

21  Q.  And he had losses, right?

22  A.  Correct.

23  Q.  And the losses that he had went right into the hole, right?

24  A.  I can't speak for all of them but I do know of some, yes.

25  Q.  He was one of the creators of the hole, right?

Caidcol1                        Trosten – cross

1    A.  Correct.

2    Q.  Phil Bennett was another creator of the hole, right?

3              (Pause)

4              Phil Bennett was another one of the creators of the

5    hole?

6    A.  Yes.

7    Q.  So Rossi leaves and you have a conversation with Bennett

8    about a new job, right?

9    A.  Correct.

10   Q.  And you entered into an agreement with Mr. Bennett, right?

11   A.  I did.

12   Q.  And you put that agreement in writing, correct?

13   A.  Yes.

14   Q.  Let me show you what's been marked as Defendant's Exhibit

15   115, for identification.

16             That's the agreement that you had with Mr. Bennett,

17   right?

18   A.  I just need a half a moment.

19             (Pause)

20             Yes, it is.

21             MR. SCHWARTZ:  We offer it.

22             MR. CHERNOFF:  No objection.

23             THE COURT:  Received.

24             (Defendant's Exhibit 115 received in evidence)

25             MR. SCHWARTZ:  Can we put 115 on the screen, please?

1   Q.  So this is in the form of a letter to you from Phil

2   Bennett, right?

3   A.  That is correct.

4   Q.  And Mr. Bennett signed the letter, correct?  If you go to

5   the next page.

6   A.  That is correct.

7   Q.  And there are some cc's.

8           One is Tone Grant, correct?

9   A.  Correct.

10  Q.  Who is Edwin Cox?

11  A.  Ed Cox at one point was the Chairman of Refco.

12  Q.  He was put there by Mr. Dittmer, right?

13  A.  That's my understanding, yes.

14  Q.  And who is William Graham?

15  A.  Bill Graham worked with Ed Cox.

16  Q.  And he was put there by Mr. Dittmer, correct?

17  A.  That's my understanding.

18  Q.  They were Mr. Dittmer's eyes and ears of the company,

19  correct?

20  A.  That is also my understanding.

21  Q.  So they knew about this agreement that you had with

22  Bennett, right?

23  A.  I don't know if they received this or not.

24  Q.  So let's go to the first paragraph, please.

25          It says, "I am taking the opportunity to confirm our

Caidcol1                    Trosten - cross

1    recent discussions now that we have formalized your promotion

2    to Senior Vice President - Finance and Administration."

3            Those discussions were discussions in which and

4    Bennett sat down and you agreed to do whatever you had to do to

5    continue the fraud, right?

6    A.  That is correct.

7    Q.  How old were you?

8    A.  At this time 29/30.

9    Q.  How old were you when you came to the company?

10   A.  27.

11   Q.  How much were you making up until the time that Mr. Rossi

12   left?

13   A.  When Steve left, I had a base salary I believe of $250,000,

14   and my bonuses I don't recall.

15   Q.  So paragraph 1, your base salary is immediately increased

16   to a half a million dollars, correct?

17   A.  Correct.

18   Q.  And paragraph 2, you're getting a $475,000 -- you're

19   getting $475,000 for the previous six months, right?

20   A.  That is correct.

21   Q.  In paragraph 3, you're being promised a further bonus

22   payment of a minimum of $250,000, payable on the following

23   June 30, correct?

24   A.  That is correct.

25   Q.  And then in paragraph 4, it says, "You will receive such

Caidcol1                    Trosten - cross

1    additional compensation, which net of the effective rate of the

2    taxpayer will retire any advances made previously to you."

3              Let's dissect that.

4              Prior to this you had borrowed $625,000 from the

5    company, right?

6    A.  That is correct.

7    Q.  And what Mr. Bennett is telling you is forget the loan,

8    we're going to write it off, right?

9    A.  Yes.

10   Q.  And we're going to give you enough money so that you can

11   pay taxes on the income because of the writeoff, right?

12   A.  That is correct.

13   Q.  Paragraph 4 was worth a million bucks to you, right?

14   A.  Approximately.

15   Q.  So you went from $250,000 prior to July 1999 to this deal

16   on July 16, 1999, correct?

17   A.  That's correct.

18   Q.  That was a pretty good deal, right?

19   A.  Yes.

20   Q.  Not good enough, correct?

21   A.  No.

22   Q.  Because you went back to Mr. Bennett just a few months

23   later and you said, Phil, I need more; correct?

24   A.  No, I did not say that to Phil.

25   Q.  In substance you didn't say that to Phil?

Caidcol1                      Trosten - cross

1   A.  In substance I did go back and ask for more money, yes.

2   Q.  You just didn't use the words that I said, correct?

3   A.  Correct.

4   Q.  But there was no question in your mind that you were

5   entitled to more money, correct?

6   A.  I don't know if I would say entitled but that I would

7   receive it.

8   Q.  Well, there was no question in your mind that even though

9   you had just gotten a sweet deal in Defendant's Exhibit 115,

10  you still had leverage with Mr. Bennett, right?

11  A.  Correct.

12  Q.  Because he needed a liar in your job?

13  A.  That is correct.

14  Q.  And so you went back to him and in fact you exercised your

15  leverage, correct?

16  A.  Yes, I did.

17  Q.  And he gave you even a sweeter deal, is that right?

18  A.  That is correct.

19  Q.  I show you what's been marked as Defendant's Exhibit 116,

20  for identification.

21          That's the new deal, right?

22  A.  That is correct.

23          MR. SCHWARTZ:  We offer it.

24          MR. CHERNOFF:  No objection.

25          THE COURT:  Received.

Caidcol1                     Trosten - cross

1            (Defendant's Exhibit 116 received in evidence)

2            MR. SCHWARTZ:  Could we put it up, please.

3   Q.  This was only four months after the sweet deal we just saw,

4   right?

5   A.  Correct.

6   Q.  So let's look at what is said here.

7            "I was quite pleased" -- this is from you this time to

8   Mr. Bennett, right?

9   A.  Correct.

10  Q.  By e-mail?

11  A.  I don't recall.

12  Q.  It appears to be the format of an e-mail, is that correct,

13  or a memo?

14  A.  A memo, yes.

15  Q.  You have no doubt that you sent it to him, right?

16  A.  No, I do not.

17  Q.  "I was quite pleased with, what I felt, was an open and

18  fair discussion regarding our collective commitment to the

19  ongoing success of Refco and our collective roles in ensuring

20  that success."

21           Now, what you meant by that was we had sat for a

22  conversation and I'm ready to keep lying for you, right?

23  A.  That is correct.

24           (Continued on next page)

25

 1   BY MR. SCHWARTZ:

 2   Q.   And then there are terms of the new agreement, right?

 3   A.   Correct.

 4   Q.   Paragraph 1, it's going to be a three-year agreement,

 5   correct?  Can we highlight?

 6   A.   Yes.

 7   Q.   Paragraph 2, you're going to keep getting the $500,000 a

 8   year, right?

 9   A.   Correct.

10   Q.   Paragraph 3 are guaranteed bonuses, right?

11   A.   Correct.

12   Q.   You're going to get 250,000 guaranteed in each of the

13   following three Aprils?

14   A.   That is correct.

15   Q.   Paragraph 4 is they're going to give you a house, right?

16   A.   They were going to acquire a house, correct.

17   Q.   They're going to acquire a house.  You later got that

18   house, right?

19   A.   That is correct.

20   Q.   We'll come back to that.  "A corporate residence will be

21   acquired by Refco to be utilized by my wife and I.  Refco will

22   be responsible for the taxes and furnishing the home as deemed

23   appropriate for a residence of this stature."

24          Would you tell us, please, what that means, "deemed

25   appropriate for a residence of this stature"?

1    A.  It was meant to say that there was going to be high-end

2    furniture for our home, which is a high-end home.

3    Q.  In fact, further down in the paragraph, we see that you're

4    looking for a house between 2.1 and $3.2 million, correct?

5    A.  Correct.

6    Q.  And this is in 1999, not in 2012, right?

7    A.  That is correct.

8    Q.  And then, paragraph 5, you were getting another bonus,

9    right?

10   A.  Correct.

11   Q.  A million dollars, correct?

12   A.  That is correct.

13   Q.  That's in addition to all the quarter-million-dollar

14   bonuses, right?

15   A.  It is in 2002.

16   Q.  Paragraph 6 said -- The company was going to acquire the

17   house for you.  Paragraph 6 gave you an option to buy the house

18   from the company for $500,000, right?

19   A.  Correct.

20   Q.  So the way it was contemplated is the company would spend

21   2.1 to $3.2 million on a house, right?

22   A.  Right.

23   Q.  Furnish it as appropriate for a house of that stature,

24   correct?

25   A.  Correct.

CAIPCOL2                      Trosten - cross

1   Q.  You could give them a half million dollars and get the

2   whole lot, right, the house and the furniture?

3   A.  That is correct.

4   Q.  But, in fact, that's not what happened, right?

5   A.  No, it is not.

6   Q.  You didn't have to pay $500,000 ultimately to get the

7   house, right?

8   A.  No, I did not.

9   Q.  We'll come back to that.  How much did they pay for the

10  house, by the way, Refco?

11  A.  2.8 million.

12  Q.  Turn to Paragraph 9.  Now, in addition to the vacation you

13  were entitled to, Mr. Bennett now agreed to give you a month of

14  mental leave each year from the company, correct?

15  A.  Correct.

16  Q.  What is mental leave?

17  A.  Just taking a leave of absence away from the company.

18  Q.  Did you find lying to be stressful?

19  A.  Yes.

20  Q.  So you thought, at this point, you might need a month every

21  year to kind of regroup before coming back to lie again, right?

22  A.  That is right.

23  Q.  Now, let's talk about how you ended up buying the house.

24  Is it fair to say that you and Mr. Bennett created a deal that,

25  in one fell swoop, gave you millions of dollars of money, a

CAIPCOL2                         Trosten - cross

1    house and committed a tax fraud?

2    A.  Yes.

3    Q.  Let me show you Defense Exhibits 118 and 119 for

4    identification.  These are the documents that constituted that

5    new deal, right?

6    A.  Yes.

7              MR. SCHWARTZ:  We offer them.

8              MR. CHERNOFF:  No objection.

9              THE COURT:  Received.

10             (Defendant's Exhibits 118 and 119 received in

11   evidence)

12   Q.  You had an idea about how you might be able to get this

13   house, right?

14   A.  Yes.

15   Q.  And you sat down with Phil Bennett and you said to him,

16   Here's my idea, Phil; what do you think?  Correct?

17   A.  Correct.

18   Q.  And what resulted were these documents, right?

19   A.  That is correct.

20   Q.  Let's take a look at them.  The first one is called Option

21   Agreement.  Can you tell us, sir, what an option is?

22   A.  An option is the right to purchase something in the future

23   at a fixed price.

24   Q.  So it means if I pay you a certain amount of money today,

25   what's that called?  That's the purchase price?

CAIPCOL2                          Trosten - cross

1    A.  That's the purchase price.

2    Q.  Purchase price for the option?

3    A.  Correct.

4    Q.  I can buy some asset you have at a later date for a price

5    we decide today, correct?

6    A.  That's correct.

7    Q.  And that's called the strike price, right?

8    A.  Yes.

9    Q.  So if I want to purchase the binder that's sitting in front

10   of you tomorrow for $5, I can -- you and I can make a deal

11   where I pay you 50 cents a day for that right, correct?

12   A.  Correct.

13   Q.  And then tomorrow I'll be able, if I want to, to purchase

14   the binder for $5, correct?

15   A.  That is correct.

16   Q.  And if the binder has increased in value overnight, I can

17   make some money, correct?

18   A.  That is correct.

19   Q.  So you entered an option agreement with Mr. Bennett to buy

20   stock of Refco, correct?

21   A.  Correct.

22   Q.  That's Exhibit 118?

23   A.  Yes.

24   Q.  Except you didn't enter it at the time, right?  It wasn't

25   today, it wasn't when you were discussing it with Mr. Bennett,

CAIPCOL2                    Trosten – cross

1    right?

2    A.   This option agreement was about the time that we were

3    talking about it with Mr. Bennett.

4    Q.   You were talking about it with Mr. Bennett in October 2000,

5    correct?

6    A.   Correct.

7    Q.   What's the date of the option agreement?

8    A.   July of '98.

9    Q.   It was back-dated, right?

10   A.   Correct.

11   Q.   It's a fraud, right?

12   A.   Correct.

13   Q.   But you wanted it in the files of Refco so you could

14   justify getting the house, right?

15   A.   Yes.

16   Q.   And so that you could justify the tax fraud you were about

17   to commit?

18   A.   That's correct.

19   Q.   So you went -- You went to the -- You decided to draw up

20   legal documents on your own in order to create this fraud,

21   right?

22   A.   That is correct.

23   Q.   Let's see what the terms are.  Right at the top it says

24   Refco confirms that it's granting you an option to purchase

25   2 percent of the company, right?

1   A.   That's correct.

2   Q.   That means that you're going to pay them something today

3   for a right to buy 2 percent at sometime in the future for a

4   fixed price?

5   A.   Correct.

6   Q.   And the "today" here is July 1998?

7   A.   On the agreement, that's right.

8   Q.   On the agreement, correct?

9   A.   Correct.

10   Q.   Anybody seeing it would think this option had been granted

11   in July 1998, unless you told them the truth?

12   A.   That's correct.

13   Q.   And the option in paragraph A says that you will be able to

14   pay $8,450,400 in order to buy that stock, correct?

15   A.   Did you say 8,450,000 --

16   Q.   Yes.

17   A.   -- $400?  Yes, that's correct.

18   Q.   And Paragraph 2 says that if you pay that money anytime

19   before July 21, 2002, that's good enough; that's the strike

20   price, right?

21   A.   Correct.

22   Q.   And you have until July 2002 to make the payment and get

23   2 percent of the option, right?

24   A.   Correct.

25   Q.   And then it says in Paragraph C -- I'm sorry.  When I said

CAIPCOL2                         Trosten - cross

1    paragraph 2, I meant paragraph B.

2              In Paragraph C it says that the option payment is

3    $300,000, correct?

4    A.  Correct.

5    Q.  That means you were supposed to pay $300,000 for this

6    right, correct?

7    A.  That's correct.

8    Q.  You never did that, right?

9    A.  I did do that.

10   Q.  You did do that.  You paid that in 2000 for the right that

11   it looked like you acquired in 1998?

12   A.  That's correct.

13   Q.  It all got washed out at the end, right?  We'll come back.

14   And then paragraph E says that the company has the unilateral

15   right to repurchase the option at any time prior to its

16   expiration for a mutually agreed consideration to be

17   negotiated, correct?

18   A.  Correct.

19   Q.  That meant that somebody looking at this agreement sees the

20   company can buy you out of your right, correct?

21   A.  Correct.

22   Q.  But a critical piece of the deal was that you and

23   Mr. Bennett had already decided how much the company was going

24   to pay you to buy you out of that right, correct?

25   A.  That is correct.

CAIPCOL2                    Trosten - cross

1    Q.  That's Exhibit 119, right?

2    A.  That is correct.

3    Q.  If we can put it up.

4           This is a letter from you -- from Mr. Bennett to you,

5    correct?

6    A.  Correct.

7    Q.  With "agreed Robert Trosten" at the bottom, right?

8    A.  Yes.

9    Q.  And this letter is dated October 25, 2000, correct?

10   A.  Correct.

11   Q.  But it was all part of the same discussion with Mr. Bennett

12   in that month of October, correct?

13   A.  That is correct.

14   Q.  He's essentially -- Virtually at the same time you're

15   signing the option agreement dated October 28th -- I'm sorry,

16   dated July 28, 1998, to buy stock in the company in the future,

17   he's agreeing already to buy you out, correct?

18   A.  That is correct.

19   Q.  And he's agreeing in the second paragraph to pay you

20   $8,422,200; so that you will never exercise your phony option,

21   correct?

22   A.  Correct.

23   Q.  And that was done over two years, correct?

24   A.  What was done?

25   Q.  The payment was made over two years, correct?

CAIPCOL2                        Trosten - cross

1   A.  Yes.

2   Q.  And because you back-dated Exhibit 118 to July 1998, you

3   were able to get a payment over two years of $8,422,200 at a

4   capital gains rate and not at a rate for ordinary income,

5   correct?

6   A.  That is correct.

7   Q.  You thought this one up all by yourself, right?

8   A.  I don't understand the question, I'm sorry.

9   Q.  This was your idea?

10  A.  Yes.

11  Q.  And that capital gains rate saved you taxes of about

12  20 percent on the $8,422,000, correct?

13  A.  That is correct.

14  Q.  So you submitted a tax fraud against the United States for

15  $1.6 million, correct?

16  A.  Approximately, that's correct.

17  Q.  You entered an agreement with the United States of America

18  that you testified about on direct?

19  A.  Yes.

20  Q.  Have you had to pay those taxes?

21  A.  No, I have not.

22  Q.  Have you had to pay penalties on those taxes?

23  A.  No, I have not.

24  Q.  Have you had to pay interest on those taxes?

25  A.  No.

1   Q.  Now, the first year your payment on this phony option was

2   $4.2 million, correct?

3   A.  Approximately, correct.

4   Q.  And then you gave the company $2.8 million for the house,

5   right?

6   A.  Correct.

7   Q.  And you put a million and four in your own pocket?

8   A.  Correct.

9   Q.  In addition to all the money we've already been talking

10  about?

11  A.  Well, some of those agreements ended up changing over time,

12  but in addition to the cash that I received, that's correct.

13  Q.  And the next year you got $4.2 million, correct?

14  A.  Approximately.

15  Q.  The company ended up first buying the house, then giving

16  you money to buy it back from them, and helping you commit a

17  tax fraud in the same instance, right?

18  A.  Yes.

19  Q.  Now, you own the house free and clear, right?

20  A.  Yes.

21  Q.  And that's the house your ex-wife lives in today, correct?

22  A.  That is incorrect.

23  Q.  You left the company in 2004; is that right?

24  A.  Yes.

25  Q.  And you testified under direct examination that you left

CAIPCOL2                         Trosten – cross

1    because you didn't want to sign a document that would be filed

2    with the SEC, correct?

3    A.  Correct.

4    Q.  After all these years of signing false financial

5    statements, right?

6    A.  Correct.

7    Q.  Which were, by the way, filed with the SEC in the bond

8    offering in 2004, correct?

9    A.  They were when those bonds became public bonds.  They were

10   private bonds initially.

11   Q.  But those are documents that you had created, the false

12   financial statements?

13   A.  Correct.

14   Q.  Isn't it a fact, sir, that you left the company because

15   Mr. Schoen of TH Lee told Phil Bennett he didn't think you were

16   up to the job?

17   A.  I had no knowledge of that.

18   Q.  But the conversation that you had about leaving the company

19   was with Mr. Bennett, right?

20   A.  Correct.

21   Q.  And by that time, you were CFO, correct?

22   A.  Correct.

23   Q.  You became CFO in what year?

24   A.  Approximately 2001.

25   Q.  And as you left in 2004, as you testified this morning, you

CAIPCOL2                         Trosten - cross

1    got an additional $46 million from the company, right?

2    A.   That is correct.

3    Q.   That was money that was made to look as if you had gotten

4    it for successfully completing the Lee transaction, correct?

5    A.   That is correct.

6    Q.   And what that meant was that you had succeeded in lying to

7    Lee, correct?

8    A.   Correct.

9    Q.   This was another payday for the fraud, correct?

10   A.   Correct.

11   Q.   And it was divided into two pieces, correct?

12   A.   Correct.

13   Q.   One was $20 million of severance, correct?

14   A.   Approximately, correct.

15   Q.   And the other was $26 million for what you call your

16   profits participation, correct?

17   A.   Approximately, that's correct.

18   Q.   And you committed tax fraud on the payout, correct?

19   A.   Correct.

20   Q.   You filed a phony tax return, correct?

21   A.   Correct.

22   Q.   And when you first met with the government, after you began

23   to cooperate and sign the cooperation agreement, you told them

24   you had only committed tax fraud once in your life, correct?

25   A.   Once as it relates to the options.  It was in two different

CAIPCOL2                    Trosten - cross

1    years.

2    Q.  But you didn't tell them about this tax fraud, correct?

3    A.  Correct.

4    Q.  You didn't tell them about this tax fraud until we

5    subpoenaed you for those tax returns, correct?

6    A.  That is correct.

7    Q.  And then you went in to the government and you told them

8    you committed a tax fraud, correct?

9    A.  Correct.

10   Q.  And tax fraud is a crime, correct?

11   A.  Yes.

12   Q.  And do you remember on direct examination you testified

13   that if you lied to the government, they could rip up your

14   agreement, correct?

15   A.  Correct.

16   Q.  Did they rip up your agreement, sir?

17   A.  No, they have not.

18   Q.  You lied to them, correct?

19   A.  Correct.

20   Q.  And we caught you in the lie, correct?

21   A.  Yes.

22   Q.  And they didn't rip up your agreement, right?

23   A.  No.

24           MR. SCHWARTZ:  Your Honor, this would be a good time

25   for a break.

CAIPCOL2                          Trosten - cross

1            THE COURT:  Shall we take a break, ladies and

2     gentlemen?  Would you follow your normal instructions.  Leave

3     your exhibits here, take the pads with you, and please remember

4     not to discuss the case amongst yourselves.  See you shortly.

5            (Jury exits)

6            THE COURT:  Anything's else op the record, counsel?

7            MR. SCHWARTZ:  Is your Honor planning to break at

8     normal time today for lunch, even though it's a half an hour?

9            THE COURT:  I don't know.  We'll see.  Don't know the

10    answer to that.  How are we doing -- Anything else on the

11    record?

12           MR. LEVY:  Yes, your Honor.  I think the government

13    does need to make a record on something.

14           THE COURT:  Okay.  Won't you be seated, counsel,

15    ladies and gentlemen.

16           MR. LEVY:  I don't think it matters for the witness at

17    all.

18           THE COURT:  Sir, you may step down.

19           (Witness temporarily excused)

20           MR. LEVY:  It has to do with a juror.  Your Honor,

21    this morning juror No. 5 was exhibiting some unusual behavior

22    that I wanted to make a record on, and we think maybe an

23    inquiry is required.

24           First, she came out and she assembled in front of her

25    on the bar from the jury box five brightly colored jeweled

1    rings in a sort of semi-circle facing out.  At some point later

2    in the examination, I didn't catch when, she turned each of the

3    five in a semi-circle facing her.  That, in and of itself, the

4    courtroom's drab, and if she's trying to color it up, that's

5    fine.

6              THE COURT:  I resent that.

7              MR. LEVY:  At some point during the examination of

8    Mr. Trosten, she turned around, faced the jurors behind her and

9    held up what appeared to be a Lucite encased silver bill of

10   some sort during direct examination and sort of, like a signal,

11   turned around and sort of showed it to all them, and then

12   placed it back in her lap.

13             I don't know what the signal was meant to be.  For all

14   I know, somebody had tapped her shoulder and said, "What's

15   that?"  Although, it's an odd thing for her to have brought in,

16   but it looked more like a signal.

17             She has another trinket of some sort that's -- it

18   seems to be some sort of large coin, again, in some sort of

19   Lucite case of some sort.  I don't know what she's doing.  The

20   rings alone were odd.  The fact that they moved part way

21   through is odd.

22             And so she's also, I think, muttering a certain amount

23   during the testimony.  You will recall she gave some unusual

24   answers during jury selection.  I think our recommendation

25   would be -- if it were just the rings, maybe we'd watch a

1    little further.  If she's actually turning around and

2    potentially sending signals during the deliberation -- I'll

3    note, by the way, this is not lost on the other jurors.  I made

4    eye contact, in looking over, with juror No. 6, who sort of

5    rolled her eyes at me.

6          So I think maybe it warrants an in camera examination

7    of this juror about what exactly she's doing.  If it's

8    harmless, then it's harmless.  I'd also ask that your Honor

9    make it appear as though your Honor noticed it and not

10   something that we noticed.

11         THE COURT:  Also on the muttering point, she certainly

12   seemed to be talking to herself yesterday during the testimony

13   and, apparently, one or more of the jurors has said to the

14   courtroom deputy that she seems to be talking to herself.  So I

15   will be guided by your views as to how we should proceed here.

16         MR. LEVY:  I think our view is that your Honor should

17   call her into chambers with all the parties present and just

18   ask her sort of what some of the things she's clearly

19   deliberately doing today are intended to mean.

20         MR. SCHWARTZ:  Your Honor, on all things concerning

21   jewelry, I trust the Court, and if you may --

22         THE COURT:  But not plastic jewelry, Mr. Schwartz.

23         MR. SCHWARTZ:  But we have no objection to your Honor

24   making inquiry.

25         THE COURT:  When do you want me to do that, friends?

CAIPCOL2                        Trosten – cross

1            MR. SCHWARTZ:  Maybe you should do it now.

2            MR. LEVY:  I think maybe that makes sense now.  I

3    would ask -- I was nervous in bringing this up, that it would

4    cut into the bathroom break that I kind of need, but other than

5    that --

6            THE COURT:  I promise you, you'll get a bathroom

7    break.

8            Miss Reporter, would you be kind enough to come into

9    the robing room with counsel, and as soon as we're all there

10   and situated, I'll ask Gilbert if he would get juror No. 5,

11   Miss Virgo, and ask her if she might come in.  And if you want,

12   you can say to her, you may bring your bag with you so that she

13   has the stuff.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

CAIPCOL2                       Trosten - cross

1              (In robing room)

2              (Juror not present)

3          MR. SCHWARTZ:  Defendants waive his presence at this

4     proceeding.

5          THE COURT:  Thank you.  I propose to say to her that I

6     note that she had some colored objects on the sidebar.  I

7     wondered what they were, and she seemed to change the position

8     and that she exhibited something to the other jurors, I wonder

9     what that was.  Any objection?

10         MR. CHERNOFF:  No, your Honor.

11         MR. LEVY:  And I think sort of why?

12         MR. SCHWARTZ:  Your Honor, will you explain to her the

13    reason that the lawyers are here is that what the rules

14    require?

15         THE COURT:  Yes.

16         THE COURT:  Off the record.

17         (Discussion held off the record)

18         (Juror enters)

19         THE COURT:  Good morning, Miss Virgo.  Won't you have

20    a seat, ma'am.

21         JUROR:  Yes.

22         THE COURT:  Hi.  We're all in here, this is the robing

23    room.  This is where I put my robe on, and the lawyers are

24    present because the rules require that.  That's how we keep

25    things fair and even here.

1          I noticed this morning that you had some nicely

2     colored objects.  I'm not sure if they were rings or what --

3          JUROR:  Mmm, hmm.

4          THE COURT:  -- that you put up on the sidebar, and

5     then, at some point, you changed their positions.

6          JUROR:  Mmm, hmm.

7          THE COURT:  Would you mind telling me what they are

8     and what you were doing with them, please?

9          JUROR:  May I ask what this inquiry is for, first,

10    please?

11         THE COURT:  It's my inquiry because I notice that you

12    had done a couple of things that perhaps other jurors hadn't

13    done, and I just wanted to find out what the reason was.

14         JUROR:  We were discussing property yesterday, and

15    they asked me to bring something an equivalent of.

16         THE COURT:  And with whom were you discussing the

17    property, ma'am?

18         JUROR:  The other jurors, and I was hearing stuff from

19    one of the prosecutors, I think.

20         THE COURT:  I'm sorry, ma'am.  Say it again?

21         JUROR:  Prosecutors or something like that.

22         THE COURT:  You had a conversation with a --

23         JUROR:  No, I thought I heard him say something about

24    some sort of property.

25         THE COURT:  Oh, I see.  During the course of the

CAIPCOL2                    Trosten - cross

1  trial?

2          JUROR:  Mmm, hmm.

3          THE COURT:  And what were the other jurors asking you

4  about property, ma'am?

5          JUROR:  They were talking about gold and silver coins

6  and that sort of thing.

7          THE COURT:  I see.  And what did you bring in this

8  morning, ma'am?

9          JUROR:  Not gold.  A silver coin.  I'm not trying to

10  sell any of them.  They wanted to see them.

11          THE COURT:  I see.

12          JUROR:  And --

13          THE COURT:  And I thought I saw a couple of

14  different-colored objects.  Maybe they were rings or something?

15          JUROR:  They're all innocuous.  Do you want to see

16  them?

17          THE COURT:  Oh, you have them.

18          THE DEPUTY CLERK:  Do you want to see them, Judge?

19          THE COURT:  Oh, they are rings.

20          JUROR:  Yes.

21          THE COURT:  What kind of rings are they, ma'am?

22          JUROR:  I really don't know.  It was --

23          THE COURT:  Oh, they're beautiful, and I guess let the

24  record reflect that Ms. Virgo has rings of different colors,

25  blue, black, green.  What do you think, light blue on this one?

CAIPCOL2                        Trosten – cross

1          JUROR:  I don't know.

2          THE COURT:  I think they're plastic.  They're quite

3     beautiful, and I noticed, ma'am, that you put them down on the

4     bar.

5          JUROR:  Mmm, hmm.

6          THE COURT:  The jury rail, and then at some point, you

7     moved them to a different position.

8          JUROR:  I thought I heard them whisper to change the

9     position.  I thought it was from the prosecutor because the

10    first one from the witness I thought I heard, and then from the

11    other one.  I'm a known holder.

12         THE COURT:  Say again, ma'am?

13         JUROR:  I'm a known holder of this sort of stuff; so

14    everyone knows in town.  So I get this all the time.

15         THE COURT:  I see.  And are you saying that the

16    witness whispered to you about the stuff?

17         JUROR:  I sort of thought I heard something like that

18    in between that.  So I'm a known holder; so....

19         THE COURT:  And known just generally in town, ma'am,

20    or how are you known to hold this type of material?

21         JUROR:  In New York.  I would say in New York City.

22         THE COURT:  I see.  Yes, ma'am.  And I think I heard

23    you say that you thought the prosecutor whispered to you to

24    change the position as well?

25         JUROR:  He wanted to see.

1          THE COURT:  I'm sorry?

2          JUROR:  He just wanted to see it, I thought.

3          THE COURT:  Okay.  Am I correct that you showed

4     something else, which was not one of the beautiful rings but

5     something else, to the other jurors?  Now, what was that,

6     ma'am?

7          JUROR:  It was just these.  Shall I slide it down?

8          THE COURT:  Mr. Cordona will help us.  Oh.  And are

9     those the silver coins, ma'am?

10         JUROR:  Yes.

11         THE COURT:  I see.

12         JUROR:  We're not reading anything.  We're told not to

13    bring any reading material.

14         THE COURT:  Yes, ma'am.

15         JUROR:  Technically, I think I'm okay, but you can

16    throw me out, if you like.

17         THE COURT:  So these are silver American Eagle 2005

18    coins.  They're just beautiful, ma'am.

19         JUROR:  Thank you.

20         THE COURT:  They say:  One ounce fine silver, one

21    dollar, and they're in the packages that you received them in,

22    yes, ma'am?

23         JUROR:  Mmm, hmm.

24         THE COURT:  And why did you show those to the other

25    jurors, ma'am?

1            JUROR:  I think we had a discussion, actually, with

2     the lady next to me, about the gold and the silver yesterday.

3     She didn't even remember it too much herself, and that was why.

4            THE COURT:  And did she ask you during the trial to

5     show it to her, or did you just happen to do it at that moment?

6            JUROR:  I think she asked me yesterday to bring the

7     stuff in.

8            THE COURT:  I see.  And so you showed it to her during

9     the testimony?

10           JUROR:  Yeah, because I didn't want to have to show it

11    to them all, but --

12           THE COURT:  Yes, ma'am.  Anything else you want to

13    tell me about these lovely things that you brought in?

14           JUROR:  I can't think of anything else, other than

15    they asked me to do that.  I should have, I suppose, done it in

16    the break room, but....

17           THE COURT:  But here we are, right?

18           JUROR:  Yeah, sorry.  I apologize.

19           THE COURT:  All right, ma'am.  I think we can excuse

20    Miss Virgo; is that right, counsel?

21           MR. SCHWARTZ:  Yes, your Honor.

22           MR. CHERNOFF:  Yes, your Honor.

23           THE COURT:  Yes, ma'am.  Thank you so much.  Thank

24    you, Gilbert.

25                (Juror exits robing room)

CAIPCOL2                        Trosten - cross

1          MR. LEVY:  Should we ask Gilbert not to let her go

2     back in the jury room?

3          THE COURT:  Yes.  Any proposals?

4          MR. LEVY:  I think we have to excuse her, your Honor.

5     She's hearing voices.

6          THE COURT:  Any objection, gentlemen?

7          MR. SCHWARTZ:  May we confer?  Is that -- Can we talk

8     to our client?  That's something --

9          THE COURT:  Yes, of course.  The sooner the better.

10         MR. SCHWARTZ:  I knew you'd be good with the jury.

11         THE COURT:  You say that to all the girls.  Off the

12    record.

13         (Discussion held off the record)

14         MR. SCHWARTZ:  Your Honor, we've conferred with our

15    client and we have no objection.

16         THE COURT:  All right.  I propose to ask the deputy to

17    bring her back in, and I will tell her that she is excused from

18    this jury with the thanks of the Court.  Is there any objection

19    or suggestion on that one?

20         MR. CHERNOFF:  No, your Honor.

21         MR. BACH:  I would also instruct her not to have any

22    contact with these jurors.

23         THE COURT:  Good.  Okay.  I'm going to ask Gilbert to

24    take her back down to the jury assembly room and actually help

25    her clear the building, just so we know she's out.

CAIPCOL2                              Trosten – cross

1          LAW CLERK:  Does she take her notes with her?

2          THE COURT:  She can take her notes with her.

3          MR. LEVY:  No, are they leaving her notes in their

4     chairs?  She won't be required to go back in with the jurors to

5     get her notes?

6          LAW CLERK:  Yes.

7          THE COURT:  Tell Gilbert don't let her go back in the

8     jury room.

9          MR. SCHWARTZ:  I wonder if she has notes of what she

10    heard Harry say to her.

11         THE COURT:  And then I'll ask Gilbert to inform

12    alternate No. 1 that she should come out in juror No. 5's

13    place; so that she knows that she's going to move up in the

14    lineup.  Actually, I'll have Martha do it.

15         MR. LEVY:  Minor point.  And does she become juror

16    No. 5, or does everybody shift up?

17         THE COURT:  No, she's going to become juror No. 5.

18         MR. SCHWARTZ:  What difference does it make?

19         THE COURT:  Off the record.

20         (Discussion held off the record)

21         (Juror reenters)

22         THE COURT:  Thank you for coming back in, Miss Virgo.

23    Ma'am, we're going to excuse you from the case.

24         JUROR:  Thank you.

25         THE COURT:  And I'm going to ask Gilbert to take you

1    down to the jury assembly room so that they know that you are

2    departing the case, and just help you get out through the

3    guards and whatever you have to do.  Thank you for coming in,

4    ma'am.  It was nice to see you.

5            JUROR:  Thank you.  And I'm not under charges or

6    anything, am I?

7            THE COURT:  Oh, no, of course.  Thank you, ma'am.  Oh,

8    Miss Virgo, I'm sorry, ma'am, I forgot.  Would you be sure not

9    to make any contact with any of the other jurors?  Because, you

10   know, we don't want them violating the normal rules, right?

11           So they can't have any contact with you, and you can't

12   have any contact with them.  After the case is over, I think we

13   probably have about six weeks left, you're free to call

14   chambers and we'll let you know what happened, if you want.

15           JUROR:  I don't really care.

16           THE COURT:  All right.  Better even.  But just be sure

17   you don't contact the other jurors, ma'am.  Off the record.

18           (Juror exits)

19           (Discussion held off the record)

20           THE COURT:  Was there something else on the record?

21           MR. LEVY:  No, that was the point.

22           THE COURT:  Anything else?

23           MR. SCHWARTZ:  No.

24           (Discussion held off the record)

25           THE COURT:  On the record.  Counsel just asked if

CAIPCOL2                    Trosten – cross

1    there's anything to be said to jurors about what just happened,

2    and I think there was unanimous agreement that they will get it

3    and nothing else needs to be said.  Is there any objection to

4    that?

5              MR. LEVY:  No, your Honor.

6              MR. CHERNOFF:  Should we just say that Ms. Virgo has

7    been excused and won't be coming back?

8              THE COURT:  Yes, just Miss Virgo is excused.  She's

9    been told not to contact you.  You shouldn't contact her.

10   Miss Whitehurst is now juror No. 5.  Okay?

11             MR. SCHWARTZ:  Thank you, your Honor.

12             MR. LEVY:  Thank you.

13             THE COURT:  Let's go, kids.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

CAIPCOL2                    Trosten - cross

1              (In open court) (Jury enters)

2              THE COURT:  Welcome back, ladies and gentlemen.  And

3      won't you be seated, ladies and gentlemen.  Ladies and

4      gentlemen, I have excused Miss Virgo from the case, and as you

5      see, Miss Whitehurst has now become juror No. 5.  From my

6      vantage point, it's obvious for the reason for this, is the

7      beautiful shawls in the front row of the jury.  We continue now

8      with the cross-examination of the witness.

9              Mr. Schwartz?

10     BY MR. SCHWARTZ:

11     Q.  You testified yesterday about the Niederhoffer losses; is

12     that correct?

13     A.  That is correct.

14     Q.  And I'll come back to that in more detail, but I have just

15     a few questions now.  Niederhoffer was one of these people who

16     lost money because he couldn't make -- Strike that.

17             Niederhoffer, Victor Niederhoffer was one of these

18     people with accounts at Refco that had borrowed on margin,

19     correct?

20     A.  Yes.

21     Q.  And he couldn't make the margin call, correct?

22     A.  Yes.

23     Q.  And Refco had to cover his losses, right?

24     A.  Right.

25     Q.  And the government showed you some agreements yesterday,

1    correct?

2    A.   Yes.

3    Q.   And Mr. Niederhoffer agreed to turn over different assets

4    to Refco that were not liquid in order to help pay for the

5    losses that Refco had to cover, correct?

6    A.   That is correct.

7    Q.   And by not liquid, I mean assets that Refco couldn't

8    immediately turn into money, correct?

9    A.   Yes.

10   Q.   Among the things that he gave Refco was stock in a company

11   called Navtech; is that correct?

12   A.   Yes.

13   Q.   And Navtech was restricted stock, right?

14   A.   I believe that to be true.

15   Q.   That means it couldn't be sold for a while, right?

16   A.   Yes.

17   Q.   But it now belonged to Refco because Mr. Niederhoffer

18   couldn't pay them, right?

19   A.   Correct.

20   Q.   And there came a time, at about the time of the Lee deal,

21   when Navtech had an initial public offering and it became a

22   public company, correct?

23   A.   I believe it was after the Lee deal, but --

24   Q.   After the Lee deal?

25   A.   I believe so.

1   Q.  After you left?

2   A.  That's my recollection.

3   Q.  And the stock price soared of Navtech, correct?

4   A.  When you say soared --

5   Q.  All of a sudden, it was worth a lot of money?

6   A.  The stock price went up, that's correct.

7   Q.  How much did the stock of Navtech was it worth after the

8   public offering that the company had?

9   A.  At some point, it was in excess of $50 a share.  I don't

10  recall that much of that.

11  Q.  And that was an asset of Refco, right?  Because

12  Niederhoffer turned it over to Refco?

13  A.  Yes.

14  Q.  And what happened was the managers of Refco took the stock

15  and sold it for themselves?

16  A.  That is correct.

17  Q.  They didn't leave it for Lee when he took over the company,

18  correct?

19  A.  Yes.

20  Q.  Yes, that's correct?

21  A.  Yes, that is correct.

22  Q.  And you got a cut of that pie, right?

23  A.  I did.

24  Q.  How much?

25  A.  After the reverse split, I think it was about, maybe 50,000

CAIPCOL2                          Trosten - cross

1   shares.  I just don't remember.

2   Q.  And how much were they worth?

3   A.  A couple million dollars.

4   Q.  So after Refco was sold to Lee, Bennett took the stock out

5   of the drawer, sold it and gave you a couple million dollars,

6   correct?

7   A.  No.

8   Q.  The stock was sold?

9   A.  The stock was distributed to several of the managers.

10  Q.  Bennett took the stock out of the drawer and gave you

11  shares, correct?

12  A.  Correct.

13  Q.  That belonged to Refco, correct?

14  A.  Correct.

15  Q.  And Lee owned 57 percent of Refco at that time, correct?

16  A.  Not at that time, no.

17  Q.  It was after --

18  A.  The stock was transferred prior to Lee closing on the deal.

19  Q.  So as you're waiting for Lee to close on the deal, correct?

20  A.  Yes.

21  Q.  Lee is expecting to buy the company with all of its assets,

22  right?

23  A.  Yes.

24  Q.  Mr. Bennett goes in the drawer, or did you go to the

25  drawer?  Who went into the drawer to find the stock?

1   A.  It didn't actually happen that way, but Mr. Bennett decided

2   on the allocation of the stock, if that's what you're asking.

3   Q.  And you got some, correct?

4   A.  Yes, I did.

5   Q.  And you knew that was a fraud, correct?

6   A.  No.

7   Q.  Oh, you didn't think taking the stock out of the drawer and

8   putting it in your pocket was a fraud; is that your testimony

9   in this court?

10  A.  Yes.

11  Q.  And then it went public?

12  A.  Correct.

13  Q.  And you sold yours for two-and-a-half million dollars,

14  correct?

15  A.  Approximately.

16  Q.  So you were hired at the company at the age of 28, correct?

17  A.  27, 28.

18  Q.  And you were -- In 1997?

19  A.  Yes.

20  Q.  And you were making approximately $120,000 a year when you

21  were hired?

22  A.  Base salary, correct.

23  Q.  That's not a bad base salary for somebody who was 27, 28

24  years old, correct?

25  A.  I thought it was a good salary, yes.

1    Q.  But by the time you left at 35, in 2004, you'd had over 70

2    million, plus or minus, correct?

3    A.  That is correct.

4    Q.  And then it all came tumbling down, right?

5    A.  Yes.

6    Q.  The company went under in October of 2005?

7    A.  Yes.

8    Q.  And you understood that you were in serious trouble?

9    A.  At some point, that's correct.

10   Q.  Right after the company went down?

11   A.  Hard to say what I was thinking at that exact same time,

12   but clearly within weeks I was very, very concerned.

13   Q.  You got a phone call from Santo Maggio, didn't you?

14   A.  I did.

15   Q.  And you thought he was taping you, correct?

16   A.  Correct.

17   Q.  And it turns out he was taping you, correct?

18   A.  Yes.

19   Q.  By the way, when you called Joe Collins for a lawyer, you

20   didn't tell him that, did you?

21   A.  No.

22   Q.  And you knew then that you were in trouble, right?

23   A.  I still didn't know, but I was concerned that he was taping

24   me, that's correct.

25   Q.  When you pleaded guilty -- This was in 2005, correct, that

1  Maggio called you?

2  A.  Yes.

3  Q.  And you ultimately pleaded guilty in 2008?

4  A.  Yes.

5  Q.  And you were facing 85 years in jail, correct?

6  A.  That is correct.

7  Q.  Now, it's a fact, isn't it, that you have been scheduled

8  for sentencing in this courthouse more than once, correct?

9  A.  Yes.

10 Q.  You have, in fact -- And by the way, the judge who you

11 think is going to sentence you is not her Honor but Judge

12 Buchwald, right?

13 A.  It will be one or the other or as the determined by the

14 court.

15 Q.  The sentencings that have been scheduled have been

16 scheduled in front of Judge Buchwald, right?

17 A.  That's my understanding, yes.

18 Q.  And they keep getting adjourned so that you can finish your

19 testimony in this case; isn't that right?

20 A.  It keeps getting adjourned until the government's decided

21 that I'm done cooperating.

22 Q.  The government told you you will not be sentenced until

23 this case is over and you have finished testifying; is that

24 correct?

25 A.  That is correct.

CAIPCOL2                        Trosten – cross

1   Q.   And they have adjourned the sentencing seven times; is that

2   correct?

3   A.   I don't know.

4   Q.   Does it sound in the neighborhood?

5   A.   I actually don't know.

6   Q.   More than once, right?

7   A.   Yes.

8   Q.   And, sir, you're hoping that after you finish testifying

9   here and your sentence is no longer adjourned and you appear

10  before the sentencing judge, that you will walk out of this

11  courtroom on probation, out of this courthouse on probation; is

12  that correct?

13  A.   Absolutely.

14  Q.   And in the time since 2005, when Refco has collapsed, you

15  have not spent a single day in jail on this case; is that

16  correct?

17  A.   That is correct.

18  Q.   And you are hoping that you will never go to jail on this

19  case, correct?

20  A.   Yes.

21  Q.   And one of the things you are hoping that will contribute

22  to that is that you will get a letter from the government to

23  the sentencing judge, correct?

24  A.   That is correct.

25  Q.   And it is a fact that you believe the strength of the

CAIPCOL2                    Trosten - cross

1    government's sentencing letter may have an impact on the

2    sentencing judge, correct?

3    A.   Yes.

4    Q.   And you are hoping that the government will refer to your

5    testimony in this case in that letter; is that correct?

6    A.   Yes.

7    Q.   So it's your hope that, despite having lied for $70 million

8    and participated in the fraud of a couple of billion dollars,

9    you will never go to jail?

10   A.   I need you to repeat the question, please.  You said

11   something about $70 million?

12   Q.   You made $70 million, right?

13   A.   Yes.

14   Q.   You participated in a fraud that was a couple of billion

15   dollars, correct?

16   A.   Correct.

17   Q.   That's how much money people lost?

18   A.   Yes.

19   Q.   And you're hoping after you finish testifying in this case,

20   you'll never go to jail, correct?

21   A.   Yes.

22   Q.   Now, this business of cooperation is a process; am I

23   correct?

24   A.   You are correct.

25   Q.   It doesn't -- You don't come to the government and say, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  want to make a deal; they say great we're glad you're here,

2  right?

3  A.  That didn't happen with me, no.

4  Q.  You have to go to the government and sit down with them and

5  tell them everything that took place; is that right?

6  A.  Yes.

7  Q.  And that's what the lawyer, who Mr. Collins recommended to

8  you, did.  He took you into the government so you could tell

9  them what took place, right?

10  A.  Yes.

11  Q.  By the way, he never told you to lie, did he?

12  A.  Counsel?

13  Q.  Yes.

14  A.  No.

15  Q.  You know him pretty well, correct?

16  A.  My legal counsel?

17  Q.  Your legal counsel.

18  A.  I wouldn't say I knew him well, no.

19  Q.  But you had great faith in his integrity?

20  A.  Yes.

21  Q.  And you met with the government starting in what month

22  after the collapse of Refco?

23  A.  In the same month, October of '05.

24  Q.  And you met with them into July of 2006, at least six

25  times, right?

CAIPCOL2                    Trosten – cross

1    A.  Approximately.

2    Q.  And each meeting with the government was approximately four

3    hours; is that correct?

4    A.  On average, correct.

5    Q.  Some of them lasted a whole day, right?

6    A.  They may have.  I don't remember.

7    Q.  But it's fair to say you spent, on average, at least 24 --

8    a total of at least 24 hours with the government?

9    A.  Approximately, yes.

10   Q.  And each time you go in, you'd sign a document, correct?

11   A.  That is correct.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Caidcol3                         Trosten – cross

1    Q.  And you would give –– you would answer their questions,

2    right?

3    A.  Yes, I would answer their questions.

4    Q.  And after these approximately 24 hours in July, they

5    finally offered you a deal, is that correct?

6    A.  Yes.

7    Q.  And you turned it down, right?

8    A.  I did.

9    Q.  Because you did not want to give up your assets, correct?

10   A.  Yes.

11   Q.  You liked the way you lived?

12   A.  Yes.

13   Q.  And what the government did after you turned down the deal

14   is they went to the Grand Jury and asked the Grand Jury to

15   indict you, correct?

16   A.  Right.  That is correct.

17   Q.  And you were in fact indicted?

18   A.  Yes.

19   Q.  And your trial was scheduled for the spring of 2008, is

20   that correct?

21   A.  Yes.

22   Q.  And you spent a lot of time with counsel preparing to go to

23   trial, correct?

24   A.  Yes.

25   Q.  And you spent a lot of time thinking about whether you

Caidcol3                    Trosten - cross

1  could succeed at trial, correct?

2  A.  Yes.

3  Q.  And you learned that because of the six times you had gone

4  into the government and signed that agreement before

5  discussing -- before answering their questions, that they were

6  going to be able to try you by putting on your confession,

7  correct?

8  A.  Under certain circumstances, that's correct.

9  Q.  If your lawyer stood up in front of the jury and said my

10 client didn't commit these crimes, they were going to be able

11 to call an agent who sat in those meetings to say you had

12 confessed, correct?

13 A.  Yes.

14 Q.  You had no way you could win at a trial, right?

15 A.  I didn't believe so, no.

16 Q.  And you made a deal?

17 A.  Yes.

18 Q.  That took place in February of 2008, correct?

19 A.  Correct.

20 Q.  Can we take the period from October 2005 to July 2006, when

21 you had the first six meetings with the government before you

22 turned them down, and can we call them round one, please, sir?

23 A.  OK.

24 Q.  And we'll take the period after you made your deal and we

25 will call it round two, correct?  All right?

Caidcol3                    Trosten - cross

1    A.  OK.

2    Q.  And I will refer to round one and round two throughout your

3    testimony and you will know what I mean, is that right?

4    A.  OK.

5    Q.  Round one is the period where you are talking to them but

6    you turned down the deal, and round two is the period after you

7    get the deal, OK?

8    A.  OK.

9    Q.  Now, this morning when the government asked you questions

10   about who you had implicated in the fraud, that was all round

11   one, right?

12   A.  Yes.

13   Q.  And you didn't tell them that you had had conversations

14   with Joseph Collins about the hole in round one, correct?

15   A.  That is correct.

16   Q.  So let's just understand, sir, you knew what they were

17   looking for was everything you knew about this fraud, correct?

18   A.  Yes.

19   Q.  And you didn't tell them about the conversations you told

20   us about today or yesterday, is that correct?

21   A.  I was instructed to answer the questions as asked.

22   Q.  They asked you about Joseph Collins, isn't that a fact?

23   A.  I don't remember.

24   Q.  You told them that Joseph Collins had documented the

25   round-trip loans; do you remember that?

Caidcol3                    Trosten - cross

1   A.  I don't remember whether it would be in round one or round

2   two.

3   Q.  Do you recall testifying in another proceeding under oath?

4   A.  Yes.

5   Q.  You took the oath and you swore to tell the truth, correct?

6   A.  Correct.

7   Q.  And that was in 2009; do you remember that?

8   A.  I do.

9   Q.  That was a lot closer to the time, correct?

10  A.  To what time?

11  Q.  The time when you were working at Refco -- I'm sorry, a lot

12  closer to round one.

13  A.  Than today?

14  Q.  Yes.

15  A.  Yes.

16  Q.  And your testimony today is you don't -- you don't remember

17  ever being asked about Joseph Collins in round one, correct?

18  A.  I remember a discussion about the round-trip loans in round

19  one, and I believe I was shown a document.

20  Q.  Do you remember being asked, under oath, this question and

21  giving this answer, or these questions and giving these

22  answers, at page 726?

23  "Q  You understood, sir, that one of the things the government

24  wanted to know was who had participated in the fraud, right?"

25          You answered, "Yes."

Caidcol3                    Trosten - cross

1          "And then they asked you about Joe Collins, and you

2     gave them answers, right?

3     "A   That is correct."

4          Do you remember giving that testimony?

5     A.   I do not remember giving that testimony.  I don't dispute

6     it.

7     Q.   Would it refresh your recollection if I show it to you?

8     A.   No.

9     Q.   You didn't tell them in round one about Joe Collins what

10    you told this jury, correct?

11    A.   I don't remember.

12    Q.   Did you tell them about the conversation where you told

13    them $700 million -- that Joe, the ENY is calling, they want to

14    know about the $700 million in intercompany debt; you didn't

15    tell them that in round one?

16    A.   I did not.

17    Q.   You didn't tell them that you called up Joe Collins and had

18    a conversation with him about the intercompany -- backdating

19    documents for the round-trip loans in round one, correct?

20    A.   I don't remember.

21    Q.   You didn't tell them about your conversation with Joe

22    Collins on the PPA in round one, is that correct?

23    A.   I recall a discussion regarding the PPA in round one.

24    Q.   You told them Joe Collins worked on the PPA, correct?

25    A.   Yes.

Caidcol3                    Trosten - cross

1   Q.  But you didn't tell them what your conversations were with

2   him, is that right?

3   A.  I don't remember.

4   Q.  The government asked you on round one who you had had

5   conversations with about the hole, didn't they?

6   A.  Not in that exact form, no.

7   Q.  But you understood that's what they wanted to know, isn't

8   that right?

9   A.  I understood it to mean at Refco.

10  Q.  So if you had conversations about the whole thing with

11  anyone else, you didn't tell them, right?

12          If you had conversations with anyone else at Refco,

13  you didn't think they wanted to know -- anyone else not at

14  Refco, you didn't think they wanted to know that, right?

15          THE COURT:  Give me a second.

16  A.  I just answered the questions as it was asked of me.

17          (Record read)

18          MR. SCHWARTZ:  I will withdraw the question.

19          THE COURT:  Let's do it again.  Thank you.

20  Q.  You knew they were investigating Refco, correct?

21  A.  Yes.

22  Q.  And you knew they were looking to bring criminal charges

23  against people who were involved in the fraud, correct?

24  A.  I believed that to be at Refco, but correct.

25  Q.  So that if somebody helped them with the fraud outside of

Caidcol3                    Trosten - cross

1   Refco, that didn't care; is that what you believed?

2   A.  I believe they wanted to know who at Refco knew about the

3   hole, and that's what I answered.

4   Q.  This morning you testified -- you testified yesterday that

5   there came a point where ENY learned about the hole, correct?

6   A.  They had always known about the size of the balance.

7   Q.  You testified this morning that in round one you didn't

8   tell the government about Ernst & Young, correct?

9   A.  I don't think we called it in round one.  We were talking

10  about an initial question that was asked in one of the early

11  meetings in round one that I did not reference Ernst & Young.

12  Q.  Isn't it a fact, sir, that in the very first meeting you

13  ever had with the government you told them about Ernst & Young?

14  A.  I may have, just not in that question, the question that

15  you are referring to.

16  Q.  You told them that Ernst & Young was unhappy when they

17  learned about the audited financial statements, correct?

18  A.  I don't recall when I did that, but I do recall having that

19  discussion, yes.

20  Q.  In round one?

21  A.  Yes.

22  Q.  And you told them that there were conversations about

23  whether Ernst & Young could continue as Refco's tax advisors,

24  correct?

25  A.  Correct.

Caidcol3                    Trosten - cross

1   Q.  And you told them that you discussed how to keep them on,

2   correct?

3   A.  How to keep who on?

4   Q.  Ernst & Young.

5   A.  That we were going to try to keep them on, yes.

6   Q.  And you told them that Ernst & Young wanted to tell the

7   successor tax counsel what it knew, and you told them they

8   couldn't, correct?

9   A.  That's incorrect.

10  Q.  Ernst & Young wanted to tell the auditors --

11  A.  That's correct.

12  Q.  -- what was going on?

13          And you told them they couldn't, correct?

14  A.  That is correct.

15  Q.  So you did tell the government in round one about your

16  conversations with Ernst & Young about the hole, correct?

17  A.  I did.

18  Q.  But you didn't tell them about any conversations with

19  Joseph Collins about the hole in round one, correct?

20  A.  That is correct.

21  Q.  And Ernst & Young was not inside Refco?

22  A.  No.

23  Q.  So when you testified just before that they were only

24  interested in who knew inside Refco, that wasn't true; that

25  they only cared about who was inside Refco, that wasn't true,

1    correct?

2    A.  It was referring to a specific question, and I answered it

3    as it related to who inside of Refco knew about the hole.

4    Q.  In six meetings with the government in round one you never

5    told them about a conversation with Joseph Collins about the

6    hole, correct or not correct?

7    A.  That is correct.

8    Q.  And you did tell them about conversations with Ernst &

9    Young, correct or not correct?

10   A.  That is true.

11   Q.  Then you walked away to save your assets, correct?

12   A.  Yes.

13            MR. SCHWARTZ:  Can we have, what is the government

14   exhibit with -- if I may, your Honor, ask the prosecutors, what

15   is the government exhibit?

16            THE COURT:  Use your off-the-record voice.

17            MR. SCHWARTZ:  Off the record.

18            (Counsel conferred)

19            MR. SCHWARTZ:  Let's make this easier.

20   Q.  Can I show you what has been marked as Defendant's Exhibit

21   127, for identification.

22            This is the schedule of assets that was originally

23   attached -- that is attached to the cooperation agreement that

24   you saw this morning, correct?

25   A.  Yes.

Caidcol3                      Trosten – cross

1            MR. SCHWARTZ:  Can we put it up, please?

2            Can we offer it.  We offer it, your Honor.

3            MR. CHERNOFF:  It is already in evidence, your Honor.

4            MR. SCHWARTZ:  It is in evidence as a different

5    document.  I separated it.

6            THE COURT:  I'm sorry.  It is a different document, or

7    what?

8            MR. SCHWARTZ:  It is attached to a longer document.  I

9    have separated it out.

10           THE COURT:  It is already in?

11           MR. SCHWARTZ:  Yes.

12           THE COURT:  OK.  Good.  Thank you.

13   BY MR. SCHWARTZ:

14   Q.  So let's take a look and just discuss what it is that you

15   didn't want to forfeit.

16           The first thing is No. 1, you had a certificate of

17   deposit of $30 million, correct?

18   A.  Yes.

19   Q.  That was in your wife's name, correct?

20   A.  At that time, yes.

21   Q.  The money you got from the fraud, right?

22   A.  Yes.

23   Q.  And then you had another certificate of deposit, number

24   two, for $4 million, right?

25   A.  Correct.

Caidcol3                    Trosten - cross

1   Q.  And a bank account for $2 million or more, correct?

2   A.  Yes.

3   Q.  I'll come back to the houses in a minute.

4        You had a Mercedes-Benz, No. 8, is that right?

5   A.  Yes.

6   Q.  How much did you pay for that car, sir?

7   A.  In excess of $500,000.

8   Q.  In excess of a half a million dollars for an automobile,

9   correct?

10  A.  Yes.

11  Q.  And then you had a Mercedes-Benz, No. 9, Item 9.  How much

12  did you pay for that one?

13  A.  Approximately 200,000.

14  Q.  How about the Mercedes that's 10?

15  A.  Somewhere between 100 and 200,000.

16  Q.  And then No. 11, "Approximately $870,000 plus interest

17  accrued on said funds while in the account holder's possession,

18  being held in an escrow account for Robert Trosten at J.P.

19  Morgan, representing the proceeds from the sale of a Ferrari

20  Enzo formerly owned by Robert Trosten."

21       How much did you say that you paid for that Ferrari?

22  A.  Between 1.2 and 1.3 million.

23  Q.  And you sold it for $800,000, correct?

24  A.  No.

25  Q.  $870,000?

Caidcol3                    Trosten - cross

1    A.   Yes.

2    Q.   No. 12 was $245,000, representing the proceeds from the

3    sale of a 2003 Ferrari, correct?

4    A.   Correct.

5    Q.   How much did you pay for that Ferrari?

6    A.   I don't remember.  Several hundred thousand dollars.

7    Q.   You bought that one after you bought the first one, the one

8    in Item 11?

9    A.   I don't believe so.

10   Q.   No. 13 is a car -- another car -- another Mercedes.  How

11   much did you pay for that?

12   A.   Approximately $100,000.

13   Q.   Then we have a series of bank accounts, right?

14   A.   There are a series of bank accounts on the schedule, yes.

15   Q.   And then another Mercedes is the last item, correct?

16   A.   Yes.

17   Q.   Now, tell us, sir, how many houses did you own?

18   A.   When you say "did I own"?

19   Q.   Is there something that you don't understand about that

20   question?

21   A.   I owned three homes.

22   Q.   In addition to what you bought for your parents, right?

23   A.   I was including that because I owned that.

24   Q.   So you owned -- where were the homes that you owned?

25   A.   The homes that I owned, one was in Franklin Lakes, one was

1    in Sarasota, Florida, and one was in Longboat Key, Florida.

2    Q.  The one in Franklin Lakes is the one that we talked about

3    this morning, you and I, that you paid for with the phony

4    option, right?

5    A.  That is correct.

6    Q.  And the one in Sarasota, Florida was on the water, correct?

7    A.  Yes.

8    Q.  Let me show you Defense Exhibit 120, for identification.

9         That is the Sarasota house?

10   A.  It is.

11        MR. SCHWARTZ:  We offer it, your Honor.

12        MR. CHERNOFF:  No objection.

13        THE COURT:  Received.

14        (Defendant's Exhibit 120 received in evidence)

15        MR. SCHWARTZ:  Can we put it on the screen, please?

16   Q.  And that house is one of the things you felt it was unfair

17   for the government to ask you to forfeit, is that correct?

18   A.  Yes.

19   Q.  And, by the way, the first time that you signed -- you

20   turned over to the government -- you were supposed to come in

21   and tell the government all the assets that you have, right?

22   A.  They had asked me for my significant assets, and I provided

23   it, yes.

24   Q.  Because they wanted to attach a list of assets to the

25   cooperation agreement, correct?

Caidcol3                    Trosten - cross

1  A.  Yes.

2  Q.  And you signed the cooperation agreement, and then this

3  list of assets was listed, correct?

4  A.  Yes.

5  Q.  And it wasn't complete?

6  A.  No.

7  Q.  You hadn't told them all of your assets, correct?

8  A.  That is correct.

9  Q.  So you had come into the government to sign a cooperation

10 agreement and you lied to them about your assets?

11 A.  Not intentionally, no.

12 Q.  We have your word on that, correct?

13 A.  Yes.

14 Q.  And then what happened is your house in Sarasota was

15 robbed?

16 A.  That is correct.

17 Q.  And then you told the government, after the house was

18 robbed, I forgot about the cash that I kept in the house,

19 correct?

20 A.  Yes.

21 Q.  I forgot about the jewelry that I kept in the house,

22 correct?

23 A.  I didn't own the jewelry, it was my wife's.

24 Q.  I forgot about my wife's jewelry that I bought with the

25 fraudulent proceeds of this crime that was kept in the house,

Caidcol3                           Trosten – cross

1   correct?

2   A.  Yes.

3   Q.  But now it was gone, right?

4   A.  It was gone.

5   Q.  Because it had been stolen, correct?

6   A.  Yes.

7   Q.  They never caught the thief, correct?

8   A.  That's my understanding.

9   Q.  And so the only way we know what was stolen and how much it

10  was worth is your good word, correct?

11  A.  Yes.

12  Q.  And what you told the government was that you had $15,000

13  in U.S. currency that had been stolen, correct?

14  A.  That is correct.

15  Q.  Pocket change for you, correct, sir?

16  A.  No.

17  Q.  And the only person who can tell us how much was stolen is

18  you, right?

19  A.  Correct.

20  Q.  And you told the government that there was a diamond

21  pendant, a diamond necklace and a set of tuxedo studs and

22  cufflinks that were stolen, correct?

23  A.  Yes.

24  Q.  Is that all the jewelry that you had bought with the

25  $70 million?

Caidcol3                    Trosten - cross

1   A.  I don't wear any jewelry.  I had a receipt for the pendant.

2   I don't -- I don't buy much jewelry.

3   Q.  Did your wife buy jewelry?

4   A.  No.

5   Q.  No.  Did anybody -- did you give jewelry to anybody else?

6   A.  Over the course of my tenure at Refco I'm sure I have.

7   Q.  Did you tell the government that?

8   A.  No.

9   Q.  Have you ever told the government that?

10  A.  No.

11  Q.  Who else did you give jewelry to?

12  A.  I imagine my ex-wife, possibly my mother.

13  Q.  All bought with the proceeds of the fraud, correct?

14  A.  Not necessarily, no.  I had worked at other places before

15  that.

16  Q.  Some of it bought with the proceeds of the fraud, correct?

17  A.  Likely.  I don't know that I can differentiate it.

18  Q.  And you've never told the government -- the only jewelry

19  you've ever told the government about is the jewelry that was

20  stolen, correct?

21  A.  Correct.

22          (Pause)

23          Actually, if I may, that is actually not true.  I'm

24  sorry.  I also discussed with them the engagement ring that

25  Theresa Dunn had, and that was not stolen.

Caidcol3                        Trosten - cross

1   Q.  She was your fiancée?

2   A.  At the time, or my wife, I just don't remember the timing.

3   Q.  So you came back and you told the government after the

4   theft about these additional assets, right?

5   A.  I did.

6   Q.  And then you also told them that, by the way, I have a box

7   at Madison Square Garden?

8   A.  I did.

9   Q.  Had that slipped your mind the first time?

10  A.  Yes.

11  Q.  Isn't it a fact that when you told the government about

12  these additional assets, they said now you've got to tell us

13  all, we're not accepting any more lies; isn't that a fact?

14  A.  No.  I don't think it was presented that way.

15  Q.  You told them about your wine collection, correct?

16  A.  I did advise them I had wine, yes.

17  Q.  You used to refer to it as a wine collection, isn't that

18  correct?

19  A.  In years past I had, yes.

20  Q.  So when you say I told them about my wine, that's what you

21  call your wine collection; you were a collector of wine, isn't

22  that correct?

23  A.  Not at that time when they took it, no.

24  Q.  Then you forfeited your houses, correct?

25  A.  Yes.

Caidcol3                          Trosten - cross

1   Q.  Let me show you Defense Exhibit 122, for identification.

2           THE COURT:  When you get to a convenient time, let me

3   know.

4           MR. SCHWARTZ:  Almost there.

5   Q.  That's what your house looked like, the house we just saw,

6   that's what it looked like after you gave it to the government,

7   correct?

8   A.  I know the U.S. marshals took it.  I don't know that I have

9   seen this photo.

10  Q.  Does that look like your house?

11  A.  Yes.

12          MR. SCHWARTZ:  We offer it.

13          MR. CHERNOFF:  No objection.

14          THE COURT:  Received.

15          (Defendant's Exhibit 122 received in evidence)

16  BY MR. SCHWARTZ:

17  Q.  And that red, white and blue sign is a sign of the U.S.

18  marshals, right?

19  A.  I believe so, yes.

20          MR. SCHWARTZ:  This would be a convenient time, your

21  Honor.

22          THE COURT:  All right.  Ladies and gentlemen, I

23  believe your lunches are in the jury room.  As I said, we would

24  like to try to keep it to a half an hour so that we get as much

25  work done today as we can.

Caidcol3                         Trosten - cross

1              Would you follow the normal rules?  Leave your

2      exhibits here.  Take your notepads with you.  And please

3      remember not to discuss the case among yourselves.

4              Have a pleasant lunch.  Just let us know when you're

5      finished.

6              Thank you, ladies and gentlemen.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Caidcol3                          Trosten - cross

1          (Jury not present)

2          THE COURT:  Is there anything else on the record?

3          MR. CHERNOFF:  There is, your Honor.

4          THE COURT:  Sir.

5          MR. CHERNOFF:  I'm just going to refer to the Rules of

6   Evidence.

7          I think it is OK if the witness is here unless

8   Mr. Schwartz objects.  Mr. Schwartz can either refresh

9   recollection or he can offer prior testimony that is

10  inconsistent, but he knows he can't just read testimony into

11  the record from the podium that I don't have even a reference

12  to where it is coming from and a page number.  He did give me a

13  page number but I didn't know which document it was.

14         Anyway, the witness can either be -- he can try to

15  refresh it or he can show us how it is inconsistent and then

16  offer it.  He can't just read it from the podium and then ask

17  the witness if he remembers giving the testimony.

18         MR. SCHWARTZ:  Your Honor, what I did in the first

19  instance was cited the page of the transcript and the date of

20  the transcript, and then I read the witness the question and

21  answer.  He said, I don't remember saying that.  And I asked

22  him would it refresh his recollection, which I am now entitled

23  to do, if he saw it.  He said no, and then I moved on.

24         It is a perfectly appropriate cross-examination for

25  impeachment.

 1          THE COURT:  OK.  You can take the cross-examination

 2     tone out, now that we are all among ourselves.

 3          MR. SCHWARTZ:  Sorry.

 4          Your Honor, it was an inconsistent statement, and I

 5     was entitled to confront him with it, which I did.

 6          THE COURT:  All right.  But you know how to do it.

 7          MR. SCHWARTZ:  I do.

 8          THE COURT:  And I know how hard it is to pull up these

 9     transcripts.  So if you can do the page cite early in the

10     question, it will let people get to the transcript.

11          MR. SCHWARTZ:  And I will wait until the government

12     has gotten it.

13          THE COURT:  OK.  Cool.

14          Anything else on the record, friends?

15          MR. CHERNOFF:  Your Honor, I thought I actually did a

16     very light treatment of the -- is the witness still here?

17          MR. SCHWARTZ:  No.

18          MR. CHERNOFF:  Of the Giglio this morning in an effort

19     to get the witness to Mr. Schwartz as early as possible.  But

20     what we had this morning was all the Giglio the witness just

21     testified to with the documents that memorialized the

22     agreements he just testified to, and I think Mr. Schwartz said

23     at least five times that we're going to come back to that.  So

24     at some point this is going to get just way too repetitive.  I

25     mean, offering pictures of the padlocked house, I just don't

Caidcol3                      Trosten - cross

1   know where a lot of this is going.

2          THE COURT:  Let me ask for the relevance of the

3   padlocked house?

4          MR. SCHWARTZ:  I will give you the relevance, and I

5   will tell you why I did it, for the same reason that he asked

6   the witness this morning about things he knew I was going to

7   cross him on.  This was their redirect in the last case.  They

8   showed him the padlocked house.  So I just did it.  I'm done

9   with that.

10          MR. CHERNOFF:  It is not something I did.

11          THE COURT:  It is not the sauce for the goose theory.

12          MR. SCHWARTZ:  No, but, your Honor --

13          MR. CHERNOFF:  All I am asking is that Mr. Schwartz,

14   rather than return to all of these subjects, the backdated

15   options, the tax returns, each raise that he got, the jury has

16   heard this so many times.  I am not going to keep jumping up

17   and objecting in the middle of Mr. Schwartz's cross, but I just

18   hope at some point if he doesn't move along, that your Honor

19   will ask Mr. Schwartz to do that.

20          THE COURT:  I know.  But Mr. Schwartz is doing it at

21   his peril, and if either the jury gets tired of hearing it

22   again or you then get up and I say move along, it is his peril.

23   But I'm sure he is going to move along.

24          MR. SCHWARTZ:  Your Honor asked me for a good place to

25   break.  It was at the end of that cross.

Caidcol3                          Trosten – cross

1           THE COURT:  All right.  But I know you are going to

2      move along.

3           MR. SCHWARTZ:  You've got that right.

4           THE COURT:  OK.  Hurry up and have your lunches,

5      friends.

6           MR. CHERNOFF:  Thank you, your Honor.

7           MR. BACH:  What time back?

8           THE COURT:  Five after.

9           (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **A F T E R N O O N   S E S S I O N**

2                              1:15 p.m.

3    ROBERT TROSTEN,

4         Resumed, and testified further as follows:

5              (Jury not present)

6              THE COURT:  May we bring the jurors in, ladies and

7    gentlemen?

8              THE CLERK:  Jury entering.

9              (Jury present)

10             THE COURT:  Thank you, all.

11             Won't you be seated.

12             We continue with the cross-examination of the witness.

13             Mr. Schwartz.

14             MR. SCHWARTZ:  Thank you, your Honor.

15             THE COURT:  Yes, sir.

16   CROSS-EXAMINATION (Resumed)

17   BY MR. SCHWARTZ:

18   Q.  Mr. Trosten, you testified a number of times with respect

19   to Refco, correct?

20   A.  Correct.

21   Q.  Each time you testified in this courthouse you sat with the

22   government before you testified, corrects?

23   A.  That is correct.

24   Q.  And they prepared you to testify, correct?

25   A.  Yes.

Caidcol3b                    Trosten - cross

1   Q.  They walked you through the questions they were going to

2   ask you, right?

3   A.  We did do questions and answers, yes.

4   Q.  And you've also testified at civil depositions, is that

5   correct?

6   A.  Yes, it is.

7   Q.  Had you sat down with the government before you would

8   testify at those civil depositions?

9   A.  I don't remember.

10  Q.  Do you remember that when you testified at civil

11  deposition, a federal agent accompanied you to the deposition?

12  A.  I don't remember that.

13  Q.  You testified at a deposition taken by the Austrian

14  government, correct?

15  A.  I did.

16  Q.  And that was held in the United States Attorney's office,

17  correct?

18  A.  That is correct.

19  Q.  And representatives from the United States Attorney's

20  office were present at that time, correct?

21  A.  To the best of my recollection, yes.

22  Q.  Let's discuss the conversation in which you claim you told

23  Mr. Collins that there was a $700 million intercompany debt.

24  A.  OK.

25  Q.  Ernst & Young was preparing your tax returns, right?

1   A.  That is correct.

2   Q.  And you received a letter from a partner at Ernst & Young

3   about information that he needed to prepare Refco's 2001 tax

4   return, correct?

5   A.  I did.

6   Q.  That was Kurt Neidhardt, correct?

7   A.  Neidhardt.

8   Q.  Neidhardt.

9           And the fact is that at this point you had already

10  lied to Ernst & Young, correct?

11  A.  Regarding?

12  Q.  Whenever you had to lie, you lied to them, correct?

13  A.  That is correct.

14  Q.  And by this time you already had to have told them lies,

15  right?

16  A.  Yes.

17  Q.  And you were prepared to tell Ernst & Young whatever you

18  needed to tell them to get the tax returns done, correct?

19  A.  Yes.

20  Q.  It didn't matter to you whether what you told Ernst & Young

21  in response to their questions was true or it was false,

22  correct?

23  A.  No.  That's not correct.

24  Q.  You cared about telling them the truth?

25  A.  Well, yes, because it had an impact on a potential sale and

1   how it was going to occur within Refco.

2   Q.  For the purpose of this return, 2001, that they were

3   preparing, you were prepared to tell them whatever you needed

4   to tell them to get the return done, correct?

5   A.  Yes.

6   Q.  Whether it was true or whether it was false?

7   A.  That is correct.

8   Q.  So if you had to lie, you would?

9   A.  Yes.

10  Q.  Let me call up on the screen what is in evidence as

11  Government Exhibit 3016 -- I'm sorry, 3014.

12       This is the letter you wrote to Mr. Neidhardt about

13  which you claim to have had the conversation with Mr. Collins,

14  correct?

15  A.  Yes.

16  Q.  Paragraph 2 refers to representations that have been

17  previously made in the certificate to Ernst & Young, correct,

18  that they asked you further questions about?

19  A.  Yes.

20  Q.  And you knew that that certificate was false, correct?

21  A.  Not all of it.

22  Q.  You knew some of it was false, correct?

23  A.  Yes, but not as it relates to point 2.

24  Q.  But you didn't tell them the certificate you are relying on

25  and you are asking me information about has false information,

Caidcol3b                         Trosten - cross

1   correct?

2   A.   Yes.

3   Q.   Yes, I'm correct?

4   A.   Yes, you are correct.

5   Q.   Paragraph 3 is a lie, correct?

6   A.   Yes, it is.

7   Q.   And the reason it is a lie is, as you testified on direct,

8   Refco had no global Internet strategy, correct?

9   A.   Refco nor RGHI, that's correct.

10  Q.   And in fact what you were telling them here in paragraph

11  3 -- could we highlight paragraph 3, please, just bring it up?

12          What you were telling them here about global Internet

13  strategy charges being roughly $7.5 million, that $7.5 million

14  referred to something completely different, correct?

15  A.   It did.

16  Q.   Refco had purchased computer equipment for $7.5 million,

17  correct?

18  A.   I don't recall.

19  Q.   And had moved the receivable -- moved the expense for the

20  computer equipment up to RGHI, correct?

21  A.   I do not recall if it was computer equipment, but this is

22  the shifting of expense, yes.

23  Q.   So you had shifted some expenses that Refco had up toward

24  RGHI, correct?

25  A.   Yes.

Caidcol3b                    Trosten - cross

1    Q.  And you called that a global Internet strategy, correct?

2    A.  That is correct.

3    Q.  You couldn't tell them the truth, correct?

4    A.  We could have told them the truth.

5    Q.  But you didn't?

6    A.  We did not.

7    Q.  Paragraph 5:  "I am not aware of any bad debt or credit

8    losses included in the trading income or loss accounts of RGHI

9    consolidated."

10           You don't know today whether that is true or false;

11   you don't remember anymore, correct?

12   A.  That is correct.

13   Q.  But it didn't matter at the time, correct.

14   A.  That is correct.

15   Q.  And you claim, with respect to paragraph 1, where it says

16   "This was further confirmed with discussions with legal

17   counsel," that you called up Joe Collins, right?

18   A.  Yes.

19   Q.  And you said to him, Joe, we've got $700 million in

20   intercompany debt; that's your claim, correct?

21   A.  Yes.

22   Q.  And you claim that he said, it's enforceable, Rob, correct?

23   A.  Yes.

24   Q.  And he didn't ask any questions?

25   A.  No.

Caidcol3b                    Trosten - cross

1  Q.  You didn't have to tell the truth in this paragraph,

2  correct?

3  A.  No, I didn't have to.

4  Q.  Anybody else on the phone call?

5  A.  Not to my knowledge.

6  Q.  Did you take any notes of the phone call?

7  A.  I don't remember.

8  Q.  You haven't seen them since Refco collapsed?

9  A.  No.

10  Q.  The government hasn't shown you your notes of the phone

11  call?

12  A.  No.

13  Q.  The only thing we have --

14        MR. CHERNOFF:  Your Honor, I'm sorry.  I just have to

15  object to the form of the last question.  It should be the

16  government hasn't shown you any note, as opposed to your notes.

17        Correct?

18        THE COURT:  I think the question actually was the

19  government hasn't shown you your notes of the phone call.

20        MR. CHERNOFF:  That assumes a fact not in evidence

21  because there aren't any notes.

22        THE COURT:  Mr. Schwartz.

23  BY MR. SCHWARTZ:

24  Q.  There are no notes of the phone call, to your knowledge,

25  correct?

1   A.  Correct.

2   Q.  All this jury has for whether this is a true paragraph or a

3   false paragraph is the good word of Robert Trosten?

4   A.  That is correct.

5   Q.  You sent the letter quoting your lawyer to Ernst & Young,

6   correct?

7   A.  Not a quote.

8   Q.  Saying that you had confirmed something with him, you sent

9   that to Ernst & Young, correct?

10  A.  Yes, I did.

11  Q.  Did you give Mr. Collins the courtesy of putting a cc on

12  the letter so he could see that you were telling Ernst & Young

13  about a conversation you claim to have had with him?

14  A.  No.

15  Q.  So Mr. Collins didn't receive this, correct?

16  A.  To the best of my knowledge, no.

17  Q.  And this is the only time you claim to have had a

18  conversation with Joe Collins about the size of the hole,

19  correct?

20  A.  Yes.

21  Q.  So all we have is this letter and your testimony for that?

22  A.  As far as I'm aware.

23  Q.  Then the next year you sent a second letter, correct?

24  A.  Yes.

25  Q.  And that's Government Exhibit 3017 -- 3016.

1           Can we bring that up?

2           And this is a similar letter, correct?

3    A.   Correct.

4    Q.   Answering questions that they had the next year, correct?

5    A.   Yes.

6    Q.   And your testimony is this time you didn't bother to call

7    Joe, right?

8    A.   That is correct.

9    Q.   Let's talk about the history of this conversation.

10          In round one you never told the government about this

11   conversation, correct?

12   A.   That is correct.

13   Q.   In round one the government showed you Government Exhibit

14   3016 and asked you questions about it, correct?

15   A.   To the best of my recollection, that is correct.

16   Q.   That's the document that refers to discussions with legal

17   counsel previously, correct?

18   A.   Yes.

19   Q.   And when you saw that language sitting in the office of the

20   prosecutor, you didn't say now I remember a call I had the

21   previous year with Joe Collins that that's referring to, did

22   you?

23   A.   I wasn't asked and didn't answer.

24          (Continued on next page)

25

CAIPCOL4                         Trosten - cross

1    BY MR. SCHWARTZ:

2    Q.  You didn't tell them about that call when you were shown

3    this document and they asked you questions about it, correct?

4    A.  Yes.

5    Q.  And they were trying to find out who knew about the fraud?

6    A.  Yes.

7    Q.  And then you got indicted after turning away the deal,

8    right?

9    A.  Yes.

10   Q.  And Mr. Bennett pleaded guilty in February of 2008,

11   correct?

12   A.  At or around.

13   Q.  And you had made up your mind that you were never going to

14   go back to the government and cooperate if it involved

15   cooperating against Phil Bennett, correct?

16   A.  Yes, that was in my mind, yes.

17   Q.  And that's because Phil Bennett was like a father figure to

18   you, correct?

19   A.  That is correct.

20   Q.  And now, Phil Bennett was not a problem anymore because he

21   had pleaded guilty, right?

22   A.  Yes.

23   Q.  But you had also learned that two months before Phil

24   Bennett pleaded guilty, Joe Collins had been charged in this

25   case, correct?

1   A.   At or around, yes.

2   Q.   And so your first meeting in round two, Mr. Trosten, the

3   first meeting, you went in and told them about this

4   conversation you claim to have taken place with Joe Collins; is

5   that correct?

6   A.   Yes.

7   Q.   You'd just forgotten about it in round one, right?

8   A.   Wasn't asked and didn't discuss it.

9   Q.   And you told them about it on one day and you signed a

10  cooperation agreement the next?

11  A.   At or around, that's correct.

12  Q.   And that's the only conversation you claim to have ever had

13  with Mr. Collins about the hole?

14  A.   Yes.

15  Q.   How big was the hole in 1999?

16  A.   1999, initially when we uncovered it, it was about 405

17  million so it would have been in excess of that.

18  Q.   In excess of 400 to $500 million?

19  A.   Yes.

20  Q.   And it's fair to say that the because of the hole -- Did

21  you say 405 or 4 to 500 --

22  A.   I said it was 405 million when we initially uncovered it;

23  so it would have been at or around that number.

24  Q.   I misheard you.  I apologize.  So it was more than

25  $400 million?

CAIPCOL4                     Trosten - cross

1   A.  Yes.

2   Q.  And because of the hole, Refco was in financial difficulty,

3   correct?

4   A.  Yes.

5   Q.  Refco was broke, correct?

6   A.  I don't know that they were broke.

7   Q.  They had a negative net worth, if you took away the hole,

8   correct?

9   A.  That is correct.

10  Q.  If you had done honest accounting, it would have shown that

11  Refco was broke, correct?

12  A.  If you're defining "broke" as negative net worth, that's

13  correct.

14  Q.  It would have shown they were in financial difficulty,

15  correct?

16  A.  Yes.

17  Q.  Now, the government showed you Government Exhibit 612, and

18  put it up on the screen.  I mean 1612.  And do you remember

19  they asked you questions about RGHI being a non-operating

20  company, correct?

21  A.  Yes.

22  Q.  And now I'm going to show you a paragraph the government

23  didn't show you, paragraph 3.  This is the letter --

24          MR. CHERNOFF:  I object to Mr. Schwartz's statement.

25  The whole document is in evidence.

CAIPCOL4                          Trosten – cross

1   Q.  Did the government ask you --

2                THE COURT:  Stop, stop.  One at a time.

3                MR. SCHWARTZ:  I'll withdraw the question.

4                THE COURT:  All right.

5   Q.  Did the government ask you any questions, when you

6   testified here yesterday, about paragraph 3?

7   A.  Not that I remember, no.

8   Q.  Now, can we just see who this letter is from, up at the

9   top?  I'm sorry, who it's to.  It's to Joseph P. Collins at

10  Mayer Brown, right?

11  A.  Yes.

12  Q.  And if we turn to Page -- the next page and see who it's

13  from, it's from Phillip Bennett, correct?

14  A.  Yes.

15  Q.  And there are nobody cc'd on this letter, correct?

16  A.  There is not.

17  Q.  This is Phillip Bennett talking to Joe Collins,

18  person-to-person, with no one else, correct?

19  A.  Yes.

20  Q.  Let's see what Phil Bennett says to Joe Collins.

21               MR. SCHWARTZ:  Can we blow up paragraph 3?

22  Q.  Given the fact that it is a non-operating company, Refco

23  Group Holdings Capital is represented by the value of its

24  investment in Refco Group --

25               THE COURT:  Slowly.

1    Q.  "Given the fact that," that's what they showed you

2    yesterday, right?  Given the fact that it is -- I'm sorry.

3    They didn't show you this.  They showed you another paragraph.

4           Let's read it slowly.  "Given the fact that it is a

5    non-operating company, Refco Group Capital, i.e. Refco Group

6    Holdings Capital, i.e. net worth, is represented by the value

7    of its investment in Refco Group, Limited."

8           Please highlight the next sentence.

9           "At May 31, 1999, the net worth of Refco Group,

10   Limited totaled $446 million."  That is a lie, correct?

11   A.  That's correct.

12   Q.  That is Phillip Bennett lying to his lawyer about the net

13   worth of Refco, correct?

14   A.  Yes.

15   Q.  Because if you know about the hole, there's a negative net

16   worth, correct?

17   A.  If you write off the hole, there is a negative net worth,

18   correct.

19   Q.  He's telling him this is a valuable company, correct?

20   A.  He's telling him that Refco's net worth was 446 million.

21   Q.  You were pretty proud to be working for a company with a

22   half a billion dollars' net worth, at least what the world

23   thought was a half a billion dollars' net worth, right?

24   A.  No, I didn't look at it like that.

25   Q.  Let's take a look at the sentence that begins -- let's

CAIPCOL4                         Trosten – cross

1    highlight the sentence that begins, "The combined value" and

2    goes on to the next page.

3              "The combined value of Refco Group Holdings,

4    90 percent interest in the equity of Refco Group, Limited, plus

5    the principal of the subordinated note is, therefore,

6    approximately $418 million."  A lie, correct?

7    A.  That is correct.

8    Q.  Now, I want to take a look at paragraph 5.  BAWAG had

9    loaned money to RGHI, correct?

10   A.  Yes.

11   Q.  That's what paragraph 5 is about, correct?

12   A.  It's not highlighted for me.

13   Q.  I'm sorry, sir?

14   A.  I don't see it highlighted.  I'm just reading the note.

15   Q.  The jury has it.  You don't have it in front of you?

16   A.  I'm just looking at it for one moment.  I see it.

17   Q.  And that's about the BAWAG loan, isn't it?

18   A.  I don't know.

19   Q.  Take a look at paragraph 4 and then read paragraph 5, and

20   see if that helps you.

21   A.  Thank you.  It does, thank you.

22   Q.  So paragraph 5, let's go back to paragraph 5, is about the

23   loan that BAWAG had made to RGHI, correct?

24   A.  Yes.

25   Q.  And what Mr. Bennett is saying to his lawyer in this

1    private communication is that, "In terms of the commercial

2    viability of the loan, interest and principal can readily be

3    covered by remittance payments -- of dividend payments or

4    distributions from Refco Group, Limited, and its subsidiaries

5    to Refco Group Holdings, its parent company."

6         Did I read that correctly?

7    A.  "Its parent entity."

8    Q.  "Its parent entity."  Thank you.

9         He's telling him here, don't worry about the loan.

10   We're getting distributions from Refco Group, up to RGHI that

11   will cover the loan, right?

12   A.  He is saying that he'll make payments via distributions,

13   that's correct.

14   Q.  The money is going the wrong way, right?  There were no

15   distributions to RGHI?

16   A.  There were distributions to RGHI.

17   Q.  RGHI was borrowing from Refco, correct?  That's where the

18   hole was?

19   A.  That's correct.

20   Q.  And would the distributions to RGHI cover the BAWAG loan?

21   A.  No.

22   Q.  It's a lie, correct?

23   A.  Yes.

24   Q.  He's lying to his lawyer in writing with no one else on the

25   document, correct?

1   A.  Yes.

2   Q.  Let's call up Government Exhibit -- By the way, did Phil

3   Bennett ever say to you, "Joe Collins is no dummy"?

4   A.  Not that I remember.

5   Q.  From evidence in this letter, it wouldn't have appeared

6   that he believed that, correct?

7           MR. CHERNOFF:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q.  Government showed you Government Exhibit 335 yesterday.

10          MR. SCHWARTZ:  Can we call that up, please.

11  Q.  These are notes of Joe Collins of a phone call with Phillip

12  Bennett on April 12, '04, right?

13  A.  Yes.

14  Q.  You weren't on that call?

15  A.  Not that I remember, no.

16          MR. SCHWARTZ:  Can we just highlight where it says "no

17  shareholder loans as of closing"?

18  Q.  You have no idea what Phil Bennett told Joe Collins in that

19  phone call about that, correct?

20  A.  I do not.

21  Q.  But the words are, no shareholder loans at the closing,

22  correct?

23  A.  Correct.

24  Q.  Now, between 2000 and 2004, Refco went on an acquisition

25  spree, correct?

1   A.  That is correct.

2   Q.  It went out and bought a lot of different businesses,

3   correct?

4   A.  Yes.

5   Q.  And you would agree that when a company does that in a

6   short period of time, to the outside world, that's a sign of

7   financial health, correct?

8   A.  In my opinion, yes.

9   Q.  And when you sell a company -- when you went to sell the

10  company, one of the things you told prospective buyers, to

11  demonstrate how healthy Refco was, is look at all the companies

12  we've recently purchased, correct?

13  A.  Yes.

14  Q.  So in 2000, you bought a broker called Lind-Waldock, right?

15  A.  That is correct.

16  Q.  And Refco was represented by Joe Collins, right?

17  A.  Yes.

18  Q.  And in the same year you bought another broker called LFG,

19  correct?

20  A.  That is correct.

21  Q.  And Refco was represented by Joe Collins, correct?

22  A.  Yes.

23  Q.  In 2001, you bought a company called Main Street Trading,

24  correct?

25  A.  I don't recall the year, but we did acquire Main Street

CAIPCOL4                    Trosten – cross

1    Trading.

2    Q.  And Refco was represented by Joe Collins, correct?

3    A.  Yes.

4    Q.  In 2011, you bought a company called First Options,

5    correct?

6    A.  Did you say 2011?

7    Q.  I'm sorry, 2001.

8    A.  Again, I don't recall the years, but yes, we did acquire

9    the company.

10   Q.  And Joe Collins was your lawyer again?

11   A.  Yes.

12   Q.  He and his team at Mayer Brown, right?

13   A.  Yes.

14   Q.  And in about 2002, you bought a company called SLK or a

15   division of it, correct?

16   A.  A division of it is correct.

17   Q.  And Joe Collins was your lawyer?

18   A.  Yes.

19   Q.  In 2003, you bought a company called Mac Futures, an

20   English company, correct?

21   A.  Yes.

22   Q.  They were about to expand in Europe, right?  You were

23   expanding to Europe?  I'm sorry.

24   A.  We were already in Europe.  We were expanding there, yes.

25   Q.  And Joe Collins was your lawyer?

CAIPCOL4                          Trosten - cross

1   A.  That is correct.

2   Q.  In 2003, you bought a company called Carlton Brokerage in

3   England; is that correct?

4   A.  Yes.

5   Q.  And Joe Collins was your lawyer?

6   A.  Yes.

7   Q.  And then in the same year you bought a company called

8   Friedberg Mercantile Group, a Canadian company, correct?

9   A.  Or a portion of it, yes.

10  Q.  You bought a portion of it, correct?

11  A.  Yes.

12  Q.  And Joe Collins was your lawyer?

13  A.  Yes.

14  Q.  And then you bought an English brokerage called Trafalgar

15  Commodities in 2003, correct?

16  A.  Again, I don't recall the year, but we did.

17  Q.  And Joe Collins was, again, your lawyer?

18  A.  Yes.

19  Q.  And then you asked Credit Suisse to put all these

20  transactions into promotional materials, correct?

21  A.  Yes.

22  Q.  So that the prospective buyers could see how healthy you

23  have been from all the acquisitions you had made, yes?

24  A.  When you use the term promotional materials, are you

25  referring to the notes about acquisitions or are you referring

CAIPCOL4                    Trosten – cross

1   to the actual documents themselves?

2   Q.   The documents that Credit Suisse –– What Credit Suisse was

3   sending to prospective buyers.

4   A.   Well, they were not sending the entire agreements, those

5   were going into a data room for the prospective buyers to look

6   at.

7   Q.   But the names of the acquisitions were in the promotional

8   materials?

9   A.   Yes.

10  Q.   Because you wanted the prospective buyers to look at, see

11  this buying binge we've been on and how healthy we are,

12  correct?

13  A.   Yes.

14  Q.   And by the way, there's a lot of legal work that went into

15  those acquisitions; is that correct?

16  A.   When you say "legal work" ––

17  Q.   When you made the acquisitions.

18  A.   Do you mean legal due diligence or legal work in drafting?

19  Q.   Mayer Brown did a lot of work in connection with those?

20  A.   They did.

21  Q.   And they billed by the hour, correct?

22  A.   Yes.

23  Q.   In fact, they billed by the hour and gave Refco a discount,

24  correct?

25  A.   Yes.

1    Q.  And during the same period of time, there were litigations,

2    correct?

3    A.  Yes.

4    Q.  And Mayer Brown represented you in some of those, correct?

5    A.  That is correct.

6    Q.  Not in all of them, correct?

7    A.  Yes, that is correct.

8    Q.  They weren't your only lawyer?

9    A.  No, they were not.  Mr. Schwartz, may I just ask a

10   question?  When you said that they weren't our only lawyer,

11   were you referring to Refco?

12   Q.  Yes.

13   A.  Yes.  Thank you.

14   Q.  Yesterday you talked to us about Victor Niederhoffer,

15   right?

16   A.  Correct.

17   Q.  And other than requesting documents -- and the Victor

18   Niederhoffer, the incident that caused Refco to lose money took

19   place in 1997, correct?

20   A.  That is correct.

21   Q.  And you had no conversations at all with Mr. Collins at

22   that time, correct?

23   A.  Yes, that is correct.

24   Q.  And, in fact, other than requesting documents from him in

25   2001 that had been drafted years earlier, you never talked to

CAIPCOL4                      Trosten - cross

1    Joe Collins about Niederhoffer, correct?

2    A.  I don't recall any other conversations, no.

3    Q.  And you have claimed to this jury that $21 million in

4    losses were kept on the books at Refco at the time, correct?

5    A.  That is incorrect.

6    Q.  What's the $26 million?

7    A.  Pardon me?

8    Q.  Well, 71 was moved off the books.

9    A.  I thought you had said 21 million.

10   Q.  26, I'm sorry.

11   A.  That's correct.

12   Q.  And you know that because somebody told you?

13   A.  I know what?

14   Q.  That it was $26 million that was kept on the books?

15   A.  I know it because I saw it.

16   Q.  And the government -- and that $71 million was moved

17   upstairs to RGHI to help create the hole, right?

18   A.  Or an affiliate of RGHI but, yes, increasing the hole.

19   Q.  So let's take them in two parts.  Let's first discuss the

20   26 million that stays at Refco, and then let's discuss the 71

21   million that moves to RGHI.  Now, the government showed you a

22   document yesterday containing Joe Collins' handwriting,

23   Government Exhibit 300.

24            Can we call that up, please?

25            And it appears at the top to be a conversation

1    starting on 11-5-97, TW Phil Bennett, right?

2    A.  On November 5th, '97.

3    Q.  That's what it says.  You don't know whether it's a

4    conversation with Bennett or not.  You know that's just what it

5    says, right?

6    A.  That is right.

7    Q.  You don't know anything about if this was a conversation,

8    you don't even know if it was a conversation, right?

9    A.  I do not.

10   Q.  And you don't know why these numbers were put here or who

11   said what to cause them to be put there, correct?

12           MR. CHERNOFF:  Your Honor, I just ask Mr. Schwartz,

13   this is not the witness' notes.  I don't know why he's yelling

14   at the witness about it.

15           MR. SCHWARTZ:  I didn't mean to yell.  Could I have

16   the question read back in a more polite voice, please.

17           THE COURT:  Question:  And you don't know why these

18   numbers were put here or who said what to cause them to be put

19   there, correct?

20   A.  That is correct.

21   Q.  And the government pointed out two numbers to you on this

22   sheet.

23           Can we move down a little bit?

24           The first is where it says -- first, is the 9.7,

25   correct?

1   A.  Yeah, I can't tell if it's 9.7 or 97, but yes.

2   Q.  Let's blow it up.  Does it look like 9.7 now, sir?

3   A.  It does.

4   Q.  So they asked you about -- they showed you the 9.7.  It's

5   not 97, right?

6   A.  It appears that way.

7   Q.  And they asked you about -- they showed you the 26, right?

8   A.  Yes.

9   Q.  And you don't know what, if anything, was said about that

10  26, correct?

11  A.  I do not.

12  Q.  All you know is that has the name Niederhoffer next to it,

13  right?

14  A.  Yes.

15  Q.  And then --

16          MR. CHERNOFF:  Your Honor, we'll stipulate that the

17  witness doesn't know more than what he's shown.

18          THE COURT:  Yeah, we probably don't have to keep

19  asking him if he heard any of this because he said he didn't.

20  Q.  The next line says "4.5 million in restricted stock,"

21  correct?

22  A.  Yes.

23  Q.  Victor Niederhoffer was going to give assets to Refco to

24  help cover the loss, right?

25  A.  Yes.

CAIPCOL4                    Trosten - cross

1   Q.  And $4.5 million of restricted stock refers to the Navtech

2   stock we talked about before, correct?

3   A.  And possibly others.  I don't know.

4   Q.  But that -- Can we go down to the next one?  And then it

5   says "27.8 million total possible recovery," correct?

6   A.  Yes.

7   Q.  If you subtract 27 -- 26 from 27.8 million, you get a

8   positive number, not a negative number; is that correct?

9   A.  If you subtract 26 from 27.8?

10  Q.  Yes.

11  A.  Yes, you'd have a positive number.

12  Q.  Take it down.

13  A.  Can I have a quick break when we can?  Whenever?

14          THE COURT:  Is this a convenient time to have a

15  five-minute break, Mr. Schwartz?

16          MR. SCHWARTZ:  Absolutely.

17          THE COURT:  All right.  Five minutes, ladies and

18  gentlemen.  You know what the rules are.  Thank you.

19          (Jury exits)

20          THE COURT:  Anything else on the record, counsel?

21          MR. SCHWARTZ:  No, your Honor.

22          MR. CHERNOFF:  No, your Honor.

23          MR. LEVY:  No, your Honor.

24          (Recess taken)

25          THE COURT:  Thank you, counsel.  May we bring the

1    jurors in.

2                (Jury enters)

3                THE COURT:  Welcome back, ladies and gentlemen.  Thank

4    you.  Won't you be seated.  We'll continue with the

5    cross-examination of the witness.  Mr. Schwartz?

6                MR. SCHWARTZ:  Thank you, your Honor.

7    BY MR. SCHWARTZ:

8    Q.  Mr. Trosten, before we left, we were going to begin to

9    discuss the $71 million that was -- became part of the hole

10   from the Niederhoffer transaction.  The way that became part of

11   the hole is an assignment was paid, correct?

12   A.  Yes.

13   Q.  The loss was assigned from Refco to RGHI, correct?

14   A.  I thought it was Wells, who was an affiliate of RGHI,

15   right.

16   Q.  Either RGHI or Wells, correct?

17   A.  Yes.

18   Q.  And they were a parent of them, correct?

19   A.  That is correct.

20   Q.  And I believe you were testifying yesterday, and just

21   reviewing it briefly, Refco was at consolidating group level,

22   correct?

23   A.  When you say Refco was at the consolidated level?

24   Q.  Refco Group, Limited, had a number of different affiliates,

25   correct?

CAIPCOL4                    Trosten – cross

 1   A.  Yes.

 2   Q.  Below the parents, correct?

 3   A.  Below Refco and below RGHI, yes.

 4   Q.  Maybe I can make this a little clearer.

 5   A.  Please.

 6           MR. SCHWARTZ:  Your Honor, is there a good place to

 7   put this?

 8           THE COURT:  I suppose right here, as long as the

 9   jurors can see it.

10           MR. SCHWARTZ:  Okay.  I'm also worried that the

11   witness can see it.

12   Q.  Are you able to see this, Mr. Trosten?

13   A.  Yes, I am.  Thank you.

14   Q.  Down here is Refco.  The parent is RGHI –– one of the

15   parents is RGHI, correct?

16   A.  Yes.

17   Q.  And Wells is an affiliate of RGHI?

18   A.  Yes.

19   Q.  And then there was something that you called –– Explain to

20   us again what consolidation meanings?

21   A.  The consolidation of Refco is consolidating its

22   subsidiaries.

23   Q.  So down here, there are subs?

24   A.  That is correct.

25   Q.  And there were a number of them, right?

1   A.  Yes.

2   Q.  And you explained yesterday that the parent was outside of

3   the consolidated group, correct?

4   A.  That is correct.

5   Q.  So if I can draw a line here.  And would it be fair to say

6   that below the line is the consolidated group and above the

7   line is the parent?

8   A.  Okay.

9   Q.  Is that fair?  I don't want to do this if it doesn't

10  reflect accurately --

11          MR. CHERNOFF:  Objection to the form, "fair."  That's

12  what Mr. Schwartz has drawn.

13  Q.  You understand what I've just drawn, right?

14  A.  I did.

15  Q.  And it doesn't seem inaccurate as I've just explained it to

16  you, correct; the way we've just explained it?

17  A.  I understand it.

18  Q.  Okay.  And the financials of all these companies below the

19  line are consolidated, correct?

20  A.  Yes.

21  Q.  And what that means that if one company has a loss and it

22  assigns it to another company below the line, the financial

23  statements don't change, right?

24  A.  That is correct.

25  Q.  Because they're the financial statements of Refco?

CAIPCOL4                         Trosten – cross

1  A.  And because that would eliminate the consolidation.

2  Q.  That's the idea of consolidation, right?

3  A.  Yes.

4  Q.  But if something is moved up above the line, it comes off

5  the books of Refco, right?

6  A.  It would still be on the books of Refco as an asset, just

7  from a different entity.

8  Q.  You have a loss, and if you move it up to Refco and get a

9  loan in return, you've turned the loss into an asset, correct?

10  A.  If you move it up to RGHI, that is correct.

11  Q.  So if you move it here, it stays as a loss, correct?

12  A.  Yes.

13  Q.  If you move it up here, it becomes an asset and the company

14  looks better, correct?

15  A.  That is correct.

16  Q.  And what you understood happened here is Niederhoffer,

17  there was $71 million in Niederhoffer, and that moved upstairs,

18  correct?

19  A.  That was my understanding, yes.

20  Q.  Through an assignment, correct?

21  A.  An assignment, yes.

22  Q.  And I'm writing the word "assignment."

23        MR. SCHWARTZ:  Can I put a sticker on this, please?

24  Do we have a sticker?  Just so we can identify it for the

25  record, your Honor.

CAIPCOL4                          Trosten - cross

1          THE COURT:  All right.  You can put it on later.  Go

2     ahead.

3     Q.  And the assignment is a legal document, right?

4     A.  Yes.  In my opinion.

5     Q.  Let me show you what we've marked as Defense Exhibits 134

6     and 135.

7          MR. SCHWARTZ:  And I believe -- Your Honor, I believe

8     the government is prepared to stipulate that these are from the

9     files of Refco.

10         MR. CHERNOFF:  Yes, your Honor.

11         MR. SCHWARTZ:  And that where it says "Government

12    confidential treatment requested by Refco," that was put on in

13    connection with the production in this case.

14         THE COURT:  Yes.

15    Q.  Now, 134 purports to be an assignment of the Niederhoffer

16    loss to Refco, Inc., correct?

17    A.  Assignment of the loss from Refco, Inc., did you say?

18    Q.  I'm sorry.  Assignment of the loss to Refco Group Holdings?

19    A.  Yes.

20         THE COURT:  This one says 135 on it, Mr. Schwartz.

21         MR. SCHWARTZ:  There's a 134 and a 135.  I should have

22    given you two, your Honor.  I apologize.

23         THE COURT:  Thank you.

24         MR. SCHWARTZ:  You're welcome.

25    A.  Mr. Schwartz?

1    Q.  Yes, sir.

2    A.  I don't have 135.

3    Q.  I got very confused walking back and forth.  You may have

4    the judge's.

5    A.  I have 134 only.

6    Q.  I think I only brought up one.  I gave you one and I gave

7    the Judge one.  I apologize.

8    A.  Thank you.

9    Q.  You're welcome.  Let's start again.

10           134 is an assignment agreement that's signed by Phil

11   Bennett, correct?

12   A.  That is correct.

13   Q.  And 134 is another assignment group, correct, also signed

14   by Phil Bennett?

15   A.  That is correct.

16           MR. SCHWARTZ:  We offer it.

17           MR. CHERNOFF:  No objection.

18           THE COURT:  Received.

19           (Defendant's Exhibits 134 and 135 received in

20   evidence)

21   Q.  So let's take a look first at 134, first paragraph.

22           THE COURT:  Mr. Schwartz, you talk.  They can move.

23   Q.  Okay.  134 is an assignment from Refco, Inc. to Refco Group

24   Holdings, Inc., correct?

25   A.  Yes.

CAIPCOL4                    Trosten - cross

1   Q.  And Refco Group Holdings, Inc. is the company that later

2   became Refco Group, Limited, right?

3   A.  No.

4            MR. SCHWARTZ:  May I have a second, your Honor?

5            THE COURT:  Yes, sir.

6   Q.  Sir, this is Refco, Inc. assigning to RGHI, correct?

7   A.  Yes.

8   Q.  And Refco, Inc., it's below this line, correct?

9   A.  Yes.

10  Q.  So this is the -- this concerns the Niederhoffer loss.  You

11  can see that in the first paragraph, correct?

12  A.  Yes.

13  Q.  And it's being assigned, as you said yesterday and today,

14  outside the groups so the loss is taken off the books, right?

15  A.  That's what this agreement would do, yes.

16  Q.  And it's signed by Phil Bennett, correct?

17  A.  Yes.

18  Q.  Take a look at 135.  135 is an assignment from Refco Group,

19  Inc. to Wells, limited, correct?

20  A.  I believe it says Refco, Inc. to Wells, Limited.

21  Q.  I'm sorry.  Refco, Inc. to Wells, Limited.  So again,

22  that's another assignment, another document showing the

23  assignment from below the line, above the line, correct?

24  A.  That is correct.

25  Q.  And the loss is being removed from the books below the

CAIPCOL4                        Trosten - cross

1    line, correct?

2    A.  Yes.

3    Q.  And both of these documents show that the amount that is

4    being assigned is $71 million, correct?

5    A.  Yes.

6    Q.  Is it fair to say that you don't know which of these

7    documents is the actual assignment, correct?

8    A.  I just know what I was told.

9    Q.  You were told that $71 million had been assigned from below

10   the line to above the line, correct?

11   A.  I was told by my manager at the time, Steve Rossi, that it

12   was assigned to Wells, Limited.

13   Q.  To Wells, Limited.  So let's just take a look at that one.

14   This document would do exactly what Mr. Rossi told you had been

15   done, correct?

16   A.  Yes.

17   Q.  And it is signed -- it is dated October 28, 1997, on the

18   front?

19   A.  That is correct.

20   Q.  And that's about the time of the Niederhoffer loss, right?

21   A.  Yes.

22   Q.  So if what Mr. Rossi told you was true, it appears that

23   this document is the document that made the assignment,

24   correct?

25   A.  Based on my discussion with Mr. Rossi, yes.

 1   Q.  By the way, is Niederhoffer spelled correctly here?

 2   A.  Niederhoffer is spelled several times.  I don't know.

 3   Q.  Well, the first time it's spelled i-e?

 4   A.  I don't know.

 5   Q.  Now, I'm going to show you what has been marked as defense

 6   Exhibit 136 for identification.

 7            MR. SCHWARTZ:  And the government has stipulated, your

 8   Honor, that this is a fax from Mayer Brown to Refco and we

 9   offer it.

10            MR. CHERNOFF:  No objection.

11            THE COURT:  Received.

12            (Defendant's Exhibit 136 received in evidence)

13   Q.  Okay.  Have patience with me, sir, please.

14            You can see that this fax has JP Collins on it,

15   correct?

16   A.  I do.

17   Q.  And you actually recognize Joe's handwriting on it,

18   correct?

19   A.  Not what you highlighted, but I do recognize the

20   handwriting.

21   Q.  Where it says "Refco/Niederhoffer" that's Joe's

22   handwriting?

23   A.  Yes.

24   Q.  And you see that it is faxed on October 28th, correct?

25   A.  I do.

CAIPCOL4                        Trosten - cross

1  Q.  That's the same date as the assignment to Wells that we

2  just saw, correct?

3  A.  Yes.

4  Q.  And do you see, as well, that it is faxed to a number that

5  I take it, sir, you recognize as Refco's fax number?

6  A.  I believe that's correct.

7  Q.  Now, if you turn the page, you will see that Mr. Collins is

8  sending this fax to Mr. Bennett; is that correct?

9  A.  That's what it suggests, yes.

10 Q.  And if you turn the page again, you see that it is also an

11 assignment agreement, correct?

12 A.  I see it, yes.

13 Q.  It's a form of assignment agreement, is that what it

14 appears to be?

15 A.  Yes.

16 Q.  And the numbers are left out where, in the one we just saw,

17 it said $71 million; in this one, there's a blank, correct?

18 A.  That is correct.

19 Q.  And here, the assignment is being made between Refco, Inc.

20 and Refco Capital Corporation; do you see that?

21 A.  Well, it's not an executed agreement, but I see that that's

22 what the assignment would do, yes.

23 Q.  That's what the form says?

24 A.  Yes, thank you.

25 Q.  So the form then -- and that is all below the line,

1    correct?

2    A.   That is correct.

3    Q.   So if this form were to become an assignment, actually be

4    filled out, the loss would not be moved off the books of Refco,

5    correct?

6    A.   Refco consolidated, that's correct.

7    Q.   And the hole wouldn't have been deeper, correct?

8    A.   Yes, that is correct.

9    Q.   So now, can we -- And by the way, now can we compare --

10   Well, before we compare, do you see at the bottom of this page,

11   in the lower left-hand, right under the text, there is what is

12   called a footer; is that correct?

13   A.   Yes.  Based on my knowledge, that's a footer.

14   Q.   And a footer, based on your knowledge, is a notation that

15   is made by a word processing system to keep track of the

16   document, correct?

17   A.   That is correct.

18   Q.   And in your experience dealing with Joe Collins, am I

19   correct that when he sent legal documents to Refco, they

20   typically had footers, correct?

21   A.   I would say they typically did.  Not necessarily always,

22   but typically they did, yes.

23            MR. SCHWARTZ:  Can we compare -- Can we put up two

24   documents at the same time, please?  I would like to put up 135

25   and 136 next to each other.  Can we turn two pages into 136?

CAIPCOL4                    Trosten - cross

1   Q.  Now, sir, the one on the left is the one that is actually

2   signed, No. 135, by Phil Bennett that moved the loss out of the

3   hole, correct -- moved the loss into the hole?

4   A.  That is correct.

5   Q.  The one on the right is the form sent by Mr. Collins that,

6   if executed, would not have moved the loss into the hole,

7   correct?

8   A.  That is correct.

9            MR. SCHWARTZ:  Can we blow up the first paragraph of

10  each, starting with -- right above that, starting with

11  "Assignment," the date and "The Witnesseth," the first

12  paragraph.

13  Q.  Now, 135, the one that moved it into the hole is on the

14  bottom and 136 is on the top.  Do you recognize, sir, that

15  those two documents have different fonts?

16  A.  I do.

17  Q.  And 136 -- or 135, the document that moved it into the hole

18  does not have a footer, correct?

19  A.  No, it does not.

20  Q.  In addition, there appears to be a typo in 135, in the

21  second line; is that correct?  Do you see the word "the" is

22  capitalized?

23  A.  Sorry, I didn't look at it.

24  Q.  Well, forget whether it's a typo.  On the top document,

25  "the" is in lower case, in one font, right?

1   A.  I'm just asking where you're looking.  I'm sorry.

2   Q.  I'm sorry, you're not seeing top and bottom, 136?

3   A.  Oh, I see it now.  Thank you.

4   Q.  In 136 "the" is in lower case in one font, right?

5   A.  That is correct.

6   Q.  And in 135 "the" is in upper case in another font, correct?

7   A.  That is correct.

8   Q.  In 136, the document sent by Mr. Collins, Niederhoffer is

9   spelled e-i; do you see that?

10  A.  I do.

11  Q.  In 135, the document that moved the loss into the hole,

12  Niederhoffer is spelled i-e, correct?

13  A.  That is correct.

14  Q.  And in the top document, which is the one Mr. Collins sent,

15  the form that would not have moved it into the hole, which is

16  136, "witnesseth" has underlining under each letter, and in

17  135, the actual assignment that moved it into the hole, is

18  fully underlined, correct?

19  A.  Yes.

20  Q.  And the word "witnesseth," like the rest of the document,

21  is in a different font, correct?

22  A.  Between the two documents?

23  Q.  Yes.

24  A.  Yes, that's correct.

25  Q.  And is it a fact, sir, that other than the changes that

CAIPCOL4                        Trosten - cross

1    I've just shown and the $71 million, the two documents are

2    identical?

3              MR. CHERNOFF:  Objection, foundation.

4    Q.  Would you compare them?

5    A.  I'm sorry?

6    Q.  Would you compare the two documents and tell me if they are

7    the same?

8              THE COURT:  Do you really want the witness to sit here

9    and do this?

10             MR. SCHWARTZ:  That's fine.

11   Q.  Isn't it a fact, sir, that what happened with Niederhoffer

12   is Joseph Collins sent Phil Bennett --

13             MR. CHERNOFF:  Foundation, objection.  He's asking the

14   witness what Joe Collins sent.

15             THE COURT:  I know.  The foundation, do we have any

16   reason to think this witness knows?

17             MR. SCHWARTZ:  This witness was in many conversations

18   about Mr. Collins.

19             THE COURT:  I'm not sure you can ask the question

20   unless you know the answer on this one.

21             MR. SCHWARTZ:  Your Honor, why is a good faith basis

22   not sufficient?

23             THE COURT:  Well, if the good faith basis is that this

24   witness was in a lot of conversations, I'm not sure --

25             MR. SCHWARTZ:  About this subject matter and about the

CAIPCOL4                          Trosten - cross

1    assignment.  I accept the Court's ruling, of course.

2              THE COURT:  I think you could probably do it a

3    different way.  Do you know such and such and such; do you know

4    how that happened?  I know that's not classic cross, but --

5              MR. SCHWARTZ:  Let me just see your Honor's verbiage.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Caidcol5                       Trosten - cross

1    BY MR. SCHWARTZ:

2    Q.  Do you know if what happened here --

3           THE COURT:  That's the same question, Mr. Schwartz.

4    Come on.  That was good, though, I'll give you that.

5           MR. SCHWARTZ:  Thank you, your Honor.

6           THE COURT:  However --

7           MR. SCHWARTZ:  I wasn't sure, then, what your Honor

8    was suggesting exactly.

9           THE COURT:  I don't think we have a foundation for

10   knowing that this witness knows anything about it.  And I don't

11   believe the fact that he engaged in lots of conversations is a

12   sufficient basis.

13          MR. SCHWARTZ:  OK, your Honor.  Then I won't go any

14   further.

15          THE COURT:  Yes, sir.

16   BY MR. SCHWARTZ:

17   Q.  But to just sum up one time, sir:  The top document that

18   Collins sent keeps the loss at Refco, correct?

19   A.  The form document?

20   Q.  Yes.

21   A.  That was filled in?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And the 175, which is signed by Phil Bennett and from

25   Refco's files and is in a different font, moves the loss to

Caidcol5                    Trosten – cross

 1   RGHI, correct?

 2   A.  Did you say 135 or 175?

 3   Q.  I mean 135 moves it to Wells?

 4   A.  Yes, that's correct.

 5   Q.  Out of the consolidated group and into the hole?

 6   A.  Correct.

 7           MR. SCHWARTZ:  Would you take it down, please.

 8           (Pause)

 9   Q.  Yesterday do you recall being asked questions by the

10   prosecutor concerning what you had termed the short-term

11   finances?

12   A.  Financing.

13   Q.  Financing, I'm sorry.

14   A.  Yes.

15   Q.  And is it fair to say, sir, that you also heard them

16   referred to as round-trip loans?

17   A.  I have.

18   Q.  And as round robins?

19   A.  Didn't really hear that term.

20   Q.  And these started as undocumented loans, correct?

21   A.  To the best of my knowledge.

22   Q.  They started with BAWAG.  BAWAG was the counterparty on

23   these transactions in the late '90s, correct?

24   A.  BAWAG was a counterparty in the late '90s.  I believe the

25   first loan transaction was not with BAWAG.

Caidcol5                    Trosten - cross

1    Q.  But BAWAG -- then the first loan transaction of this nature

2    took place while Tom Dittmer was the principal shareholder of

3    the company, correct?

4    A.  That is correct.

5    Q.  And after he had started, through his proprietary trading,

6    digging a bit in a hole, right?

7    A.  I don't know when Tom was proprietary trading.

8    Q.  And then there came a time when one of the counterparties

9    said it wanted the documents -- it wanted documents, right?

10   A.  Based on my understanding.

11   Q.  Was the first round trip loan done with a company called

12   MLC?

13   A.  That is my understanding.  I don't know if anything

14   happened prior to me coming to the firm.

15   Q.  And do you know, sir, that MLC is a company that was

16   related to Cox and Dittmer?

17   A.  I believe that is correct.

18   Q.  There came a time where some of these loans were

19   documented, right?

20   A.  Yes.

21   Q.  And Mayer Brown documented them, correct?

22   A.  Yes.

23        MR. SCHWARTZ:  Can we see Government's Exhibit 2?

24   Q.  Yesterday you walked us through this very chart, is that

25   right?

Caidcol5                    Trosten - cross

1   A.  Yes.

2   Q.  And the leg -- there's three legs, right?

3   A.  Yes.

4   Q.  It goes -- the red is the first transaction and it goes

5   around to Refco and then comes back in the blue, correct?

6   A.  Yes.

7   Q.  And it is this third leg where it is taken off the books of

8   Refco for the short-term, correct?

9   A.  The red?

10  Q.  The red.

11  A.  Yes.

12  Q.  And you said yesterday that you didn't need to document the

13  third leg because RGHI had an account at Refco and it just was

14  kind of automatic, right?

15  A.  That is correct.

16  Q.  Am I correct, sir, that in the documents prepared by Mayer

17  Brown you have never seen anything that would have let them

18  know from the documents that RGHI had an account at Refco where

19  this was going, is that correct?

20  A.  I have never seen that, that's correct.

21  Q.  So Mayer Brown just from the documents -- anybody who saw

22  the documents -- would not know about the third leg, correct?

23  A.  People at Refco would know because we know how our systems

24  work.

25  Q.  People that didn't know how the Refco systems work -- in

Caidcol5                         Trosten – cross

1    other words, somebody at Refco would know it's got to be,

2    right?

3    A.  That's right.

4    Q.  Because the computer system is going to make this happen?

5    A.  It happens automatically, that's correct.

6    Q.  If you are not at Refco you don't know that, correct, from

7    the document?

8    A.  If you are not familiar with our systems, that's right.

9    Q.  Can we put up Defense Exhibit 2?

10        This is what somebody who just has the documents would

11   see, correct?

12   A.  Yes.

13   Q.  And the leg that's missing is the leg that takes it off the

14   books of Refco, correct?

15   A.  Takes what off the books?

16   Q.  Takes the RGHI asset, the loan from RGHI, off the books for

17   the period of the loan, is that correct?

18   A.  Yes.

19   Q.  Now, all the customers saw were the documents, right?

20   A.  I don't know what the customers saw.

21   Q.  You do know that you never had a conversation with Joe

22   Collins about the third leg?

23   A.  That is correct.

24   Q.  And you did have conversations with Santo Maggio about the

25   third leg, correct?

Caidcol5                    Trosten - cross

1    A.  About how the process worked.  We didn't call it a third

2    leg.

3    Q.  You and Maggio and Bennett each time one of these was going

4    to happen would sit in a room and discuss it, correct?

5    A.  One or both, that is correct.

6    Q.  And you would discuss how much was going to get put into

7    the transaction and moved and how much -- and how much of the

8    hole was going to be moved around, correct?

9    A.  Don't know that I partook in many of those conversations.

10   I would hand off the schedule and they would have their

11   discussions.

12   Q.  But you did discuss this with Maggio, correct?

13   A.  Yes.

14   Q.  And discuss the third leg, meaning that's going to come

15   back to Refco with Bennett, correct?

16   A.  Didn't discuss it in the context to which you refer.  We

17   never talked about a third leg.  We understood that this

18   transaction would have the effect of taking the RGHI debt off

19   of Refco's books and replace it with the customer.

20   Q.  Because that's exactly what Bennett and Maggio had designed

21   it to do, correct?

22   A.  To the best of my knowledge, yes.

23   Q.  They were the creators of this, right?

24   A.  To the best of my knowledge, yes.

25   Q.  Now, you were also aware that Joe Collins gave this work to

Caidcol5                    Trosten - cross

1   associates to work on, correct?

2   A.  At some point in my career I was aware that others worked

3   on this, yes.

4   Q.  And by "associates" I mean younger lawyers at the firm who

5   were not partners, correct?

6   A.  I don't know their age but they weren't partners, yes.

7   Q.  In your experience with Mayer Brown, the associates were

8   pretty good, right?

9   A.  Yes.

10  Q.  And one of them was an associate named Robert Monk,

11  correct?

12  A.  I don't know the name.

13  Q.  You do know the name Paul Koury, correct?

14  A.  I do.

15  Q.  And Paul was somebody who you had worked with on more than

16  one transaction?

17  A.  Yes.

18  Q.  And Paul was an associate of Joe's and worked on these loan

19  documents, right?

20  A.  I just don't know.

21  Q.  Now, yesterday you testified that no law firm apart from

22  Mayer Brown worked on these, correct?

23  A.  That is correct.

24  Q.  But the customers did get them, correct?

25  A.  I'm sorry?

Caidcol5                    Trosten - cross

1    Q.  But the customers, the counterparties, did receive the

2    documents, correct?

3    A.  I do not know.

4    Q.  They had to sign them, didn't they?

5    A.  The customer had to sign the loan agreements?

6    Q.  Yes.

7    A.  Yes.

8    Q.  So they had to get the documents?

9    A.  I'm assuming that they did.  I didn't deal with the

10   customer except for that one year when I executed documents

11   when Phil left town.

12   Q.  You are not only assuming now that the customers got them,

13   you assumed back then the customers got them, right?

14   A.  Yes.

15   Q.  And the customers had lawyers, right?

16   A.  Again, I don't know.

17   Q.  So when you testified yesterday that no other law firm

18   worked on this, you meant no other law firm representing Refco,

19   correct?

20   A.  Correct.

21   Q.  You don't know whether there were law firms representing

22   the customer who saw the same documents that were seen by the

23   lawyers at Mayer Brown, correct?

24   A.  I do not know that, that's correct.

25   Q.  Thank you.

Caidcol5                          Trosten – cross

1           Yesterday you testified to a conversation that you had

2     with Joe Collins in which you called him and said send me the

3     documents to sign, correct?

4     A.  Yes.

5     Q.  Because Bennett had asked you to sign them on his behalf,

6     correct?

7     A.  That is correct.

8     Q.  That's the whole conversation that you remember, correct?

9     A.  With whom?

10    Q.  Joe.

11    A.  Yes.

12    Q.  Do you recall in round one that the government showed you

13    the loan document that you signed and asked you about it?

14    A.  I recall they did show it to me.  I don't recall what they

15    asked.

16    Q.  Do you recall telling them you didn't remember signing it?

17    A.  I do remember that.

18    Q.  And you didn't remember the whole thing, correct?

19    A.  I don't recall if I said I don't remember the whole thing.

20    Q.  But you didn't remember the document, correct?

21    A.  At the time that I saw it I didn't remember it.

22    Q.  Then you came back in round two, correct, and you

23    remembered it in the very first meeting that you had with the

24    government, is that correct?

25    A.  I don't know if I remembered it in round one later in those

Caidcol5                        Trosten - cross

1   discussions or not.

2            MR. SCHWARTZ:  Your Honor, this would be a good time

3   to break if it is convenient.

4            THE COURT:  All right.  Ladies and gentlemen, we will

5   break for the day now.  I hope you will enjoy your early exit.

6            Would you follow the normal instructions?  Leave your

7   exhibits here.  Take your books into the jury room.  Please

8   remember not to discuss the case among yourselves or with

9   anyone else.  Do not do any research on the case.

10           We'll see you in the morning at 9:30 for your coffee,

11   to begin at 10.

12           Have a pleasant evening.  And thank you for working

13   along with us today, ladies and gentlemen.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Caidcol5

1              (Jury not present)

2              THE COURT:  Anything else on the record, counsel?

3              MR. CHERNOFF:  Not from the government, your Honor.

4              MR. SCHWARTZ:  Your Honor, I am going to mark the

5    chart as Defense Exhibit 5.

6              THE COURT:  Yes.  Thank you.

7              MR. SCHWARTZ:  And I will offer it when the jury is

8    back.

9              THE COURT:  OK.  Thank you.

10             MR. SCHWARTZ:  I will just mark it.

11             THE COURT:  Off the record.

12             (Discussion off the record)

13             MR. SCHWARTZ:  Yes, your Honor.  I do have one issue.

14             THE COURT:  What is your issue?

15             Won't you be seated.  You can step down, sir.  Just

16   stay inside until the jurors are downstairs.

17             THE WITNESS:  Thank you, your Honor.

18             (Witness excused)

19             THE COURT:  Yes, sir.

20             MR. SCHWARTZ:  We understand that the government is

21   going to be calling on Monday in this order -- I don't know if

22   there will be other witnesses before then -- Mr. Sullivan and

23   Mr. Berger.  And I think we understand the Court's ruling, but

24   there is one issue that I think we have not fully vetted with

25   the Court, which is whether Mr. Sullivan will be permitted to

Caidcol5

1   testify that at the time of closing he did not -- because of

2   the legal steps that he had taken with Mayer Brown did not view

3   the PPA to be material, and that's an issue that we had not yet

4   fully argued, I think.  If your Honor feels it is fully argued,

5   then we have, but I don't think we have.

6           THE COURT:  Yes.

7           MR. LEVY:  Your Honor, we are opposed to that.

8           THE COURT:  I knew that.

9           MR. LEVY:  Mr. Sullivan is going to be testifying I

10  think actually much more narrowly than he did the last time.

11  He is effectively going to testify about one early meeting that

12  he had with Mr. Bennett and Mr. Collins in which he himself

13  asked why isn't the PPA being disclosed.  And that's awfully

14  close to it.  I mean, he will be on and off the stand in five

15  minutes.

16          Why he would be allowed to opine that in his view the

17  PPA wasn't material is beyond me, particularly in light of the

18  Court's rulings with respect to every other witness in this

19  case.

20          MR. SCHWARTZ:  Well, the government would like the

21  jury to believe that Mr. Sullivan attended one or two meetings,

22  had conversations in which he was told the PPA would not be

23  produced to the other side, and then nothing else happened.

24  And the fact is steps immediately began with Mr. Sullivan and

25  Mr. Collins to deal with the fact that Mr. Collins' client had

Caidcol5

1   said he didn't want to disclose it.  And they took a number of

2   legal steps that in the end of the day Mr. Sullivan has told

3   the government he believes that at the time of the closing this

4   was not a material document.

5              THE COURT:  I assume you're getting in the legal steps

6   other than through Mr. Sullivan?

7              MR. SCHWARTZ:  I am going to --

8              THE COURT:  Some of it is coming in and I assume you

9   will get more in --

10              MR. SCHWARTZ:  We are going to get the documents that

11   were entered into through Mr. Sullivan.  They are going to come

12   into evidence.

13              MR. LEVY:  To the extent he is going to ask

14   Mr. Sullivan did you do X, did you do Y, I don't have any

15   problem with that.

16              I think if he starts to ask him why or what he thought

17   the net result was, I think that is problematic.  We haven't

18   talked about this a lot since we argued this before.  It is

19   particularly problematic in this case because of the privilege.

20   I can't turn around and ask -- first of all, it is irrelevant.

21   But even if it were relevant, I can't turn around and ask

22   Mr. Sullivan what he knew, what he didn't know in forming the

23   judgment of whether it was or wasn't material.  I think your

24   Honor may have gotten a letter today or yesterday from --

25              THE COURT:  Yes.  I have a BAWAG letter.

Caidcol5

1          MR. LEVY:  They are going to pop up and say whatever

2     opinions he formed on that were formed in discussions with

3     counsel and in discussions with the client and they can't get

4     into it.  I'm not sure that the defense would like the answer,

5     I don't know, if we were to ask him based on everything that he

6     knows now how he feels about the materiality.  It is just

7     irrelevant, in our view.

8          MR. SCHWARTZ:  Your Honor, Mr. Sullivan -- and I say

9     this in good faith -- based solely on the documents will be

10     prepared to testify that as a result of the legal steps that he

11     took with Mr. Collins, he did not believe the PPA would have

12     any impact on Refco.  There is nothing privileged about that.

13          You know, this is a red herring with privilege in this

14     case.  Mr. Sullivan has come in.  He has been interviewed.  He

15     has not asserted privilege when he told the government --

16          THE COURT:  I don't care about privilege.  What I care

17     about is opinions.

18          MR. SCHWARTZ:  May I?

19          The government brought out, and is going to bring out

20     from Mr. Tabor and Mr. Westra, as well as from Mr. Schoen,

21     their opinion that certain things were important.  That goes to

22     materiality.  And that opinion we haven't objected to, and that

23     opinion is relevant --

24          THE COURT:  When you say "certain things were

25     important."

Caidcol5

          MR. SCHWARTZ:  The PPA would have been important to

them.

          THE COURT:  Right, or something like that; the fact of

related-party debt would have been important.

          MR. SCHWARTZ:  If I had known this, it would have been

important to me; Mr. Schoen testified to that.  Mr. Schoen

testified to that.

          That is subjective evidence, which is admissible on

the issue of materiality, which is an objective standard.  The

jury is entitled to know that another witness in this case,

with an information set different from the information set of

the other government witnesses, and which we contend, and will

argue, is more complete than the information set that they had,

drew a different inference, that it was not important.  That is

something that we are entitled to bring out, because they have

to make an objective determination.  We will argue about who is

right and who is wrong, but that should be the jury's issue.  I

don't get into the law.

          THE COURT:  All right.  I will hear you more on this

tomorrow.  But there is a difference between his saying I don't

think it was material and otherwise opining and his explaining

what in his view the various documents do.

          MR. SCHWARTZ:  But at the end of the day he should be

allowed to say that as a result of these documents and these

legal steps, in my view there was going to be no impact -- that

Caidcol5

1    goes to materiality, probative of materiality -- no impact on

2    Refco.

3              THE COURT:  It is the "in my view" stuff.  We have

4    been very careful not to get lawyers expressing their opinions.

5              MR. SCHWARTZ:  We have Mr. Schoen expressing an

6    opinion on that this would have been important to know.

7              THE COURT:  Well, first of all, he is not speaking as

8    a lawyer; he is he speaking as a participant with respect to

9    the facts.

10             MR. SCHWARTZ:  So is this witness.  He is or happens

11   to be a lawyer.  But he is not offering a legal opinion, your

12   Honor; he is not saying I didn't think it has to be disclosed

13   or not disclosed.

14             THE COURT:  Right.

15             Off the record.

16             (Discussion off the record)

17             THE COURT:  I'll listen to you some more on this

18   tomorrow.

19             To be continued tomorrow, Mr. Reporter.

20             MR. CHERNOFF:  And whenever it is convenient, your

21   Honor, we will update the Court about what we believe is the

22   schedule going forward.

23             THE COURT:  Thank you.

24             (Adjourned to 10 a.m., Friday, October 19, 2012)

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    ROBERT TROSTEN

4    Direct By Mr. Chernoff . . . . . . . . . . .1370

5    Cross By Mr. Schwartz  . . . . . . . . . . .1393

6                       GOVERNMENT EXHIBITS

7    Exhibit No.                              Received

8     3502-2   . . . . . . . . . . . . . . . . .1379

9     3502-2A  . . . . . . . . . . . . . . . . .1389

10    751 . . . . . . . . . . . . . . . . . . .1390

11                       DEFENDANT EXHIBITS

12   Exhibit No.                              Received

13    115  . . . . . . . . . . . . . . . . . . .1414

14    116  . . . . . . . . . . . . . . . . . . .1419

15    118 and 119  . . . . . . . . . . . . . . .1423

16    120  . . . . . . . . . . . . . . . . . . .1471

17    122  . . . . . . . . . . . . . . . . . . .1476

18    134 and 135  . . . . . . . . . . . . . . .1513

19    136  . . . . . . . . . . . . . . . . . . .1516
```

20

21

22

23

24

25