CAJPCOL1                        Trial

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                           07 Cr. 1170 (LAP)

5  JOSEPH P. COLLINS,

6               Defendant.

7  ------------------------------x
                                            October 19, 2012
8                                           10:12 a.m.
   Before:
9
                    HON. LORETTA A. PRESKA,
10
                                            District Judge
11
                          APPEARANCES
12
   PREET BHARARA
13      United States Attorney for the
        Southern District of New York
14  BY:  HARRY A. CHERNOFF
         MICHAEL A. LEVY
15       EDWARD A. IMPERATORE
            Assistant United States Attorneys
16
   COOLEY LLP
17      Attorneys for Defendant
   BY:  WILLIAM SCHWARTZ
18       JONATHAN BACH
         LAUREN GERBER LEE
19
             – also present –
20
   Kathryn Searles
21  Robert Clark,
        Postal Inspectors, U.S. Postal Inspection Service
22
   Gary Smith,
23      Paralegal, U.S. Attorney's Office

24  Stephanie O'Connor, Consultant with defense

25

CAJPCOL1                      Trial

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, counsel.  Won't you be

3    seated.  Counsel, we're still waiting for one juror, but I had

4    a jury issue I wanted to bring to your attention.  There's a

5    note here from Mr. Farooq, who essentially says that he

6    requests to be excused from the case because it's causing him

7    to be the prime guy to lose his job.  We'll mark it as Court

8    Exhibit 1.  If you want to take a look.

9           All the jurors are here, counsel.  Counsel, I actually

10   think we don't have any alternative but to let the juror go.

11   Is there objection to that?

12          MR. CHERNOFF:  We were only going to propose that the

13   juror be voir dired at the end of the day, since he's here

14   anyway, but we'll defer to your Honor's judgment.

15          THE COURT:  I guess I don't see any reason to make him

16   sit here all day if we're going to let him go anyway.  And in

17   light of the tone of the letter, much as it pains me to lose

18   another alternate, I don't think it's fair for us to keep him.

19   Not that he couldn't have told us this during voir dire, but

20   here we all are.

21          MR. CHERNOFF:  The only thing I'm wondering, your

22   Honor, is we haven't yet had the chance to let the jury know

23   that we think the trial is going to come in significantly under

24   six weeks.  I don't know if that's --

25          THE COURT:  How significantly?

CAJPCOL1                    Trial

1         MR. CHERNOFF:  That's what we wanted to talk about.

2    We're thinking four or five weeks.  It depends on if the

3    defendant testifies.  Closer to four even if the defendant

4    testifies.  We think we may be in a position to rest a week

5    from today.

6         MR. LEVY:  Maybe Monday.

7         MR. CHERNOFF:  If we move along, but we're planning

8    for that.

9         THE COURT:  All right.  I'll defer this then until

10   later in the day.  You people can think about it.  May we bring

11   the jurors in.

12        MR. LEVY:  Your Honor, is it worth letting him know

13   that you received it, or somehow communicating to him that

14   we're going to take it up at the end of the day?

15        THE COURT:  Gilbert, will you let Mr. Farooq know that

16   I received the letter, and we'll be discussing it later on?

17        THE DEPUTY CLERK:  Yes, your Honor.

18        THE COURT:  Thank you.

19        (Jury enters)

20        THE COURT:  Good morning.  How are you?

21        JUROR:  Good morning.

22        THE COURT:  Won't you be seated.  We continue with the

23   cross-examination of the witness.  Mr. Schwartz.

24        MR. SCHWARTZ:  Thank you, your Honor.

25    ROBERT TROSTEN,

CAJPCOL1                    Trial

1     called as a witness by the Government,

2      having been previously duly sworn, testified as follows:

3   CROSS-EXAMINATION (Resumed)

4   BY MR. SCHWARTZ:

5   Q.  Good morning, Mr. Trosten.

6   A.  Good morning.

7   Q.  And remember yesterday we briefly discussed Paul Koury?

8   A.  Yes, Paul Koury.

9   Q.  He was an associate at Mayer Brown, right?

10  A.  Yes.

11  Q.  And on the Lee deal there were a number of lawyers from

12  Mayer Brown who were working on that matter, right?

13  A.  That is correct.

14  Q.  And as far as you could tell, they had different

15  assignments that they were responsible for?

16  A.  In part and parcel, that's correct.

17  Q.  And Mr. Koury was one of the people you worked with on that

18  transaction, correct?

19  A.  Yes.

20  Q.  And you testified, I think yesterday or the day before,

21  about preparing schedules that were ultimately attached or

22  called for -- attached for and called for by the EPMA; do you

23  recall that?

24  A.  I do.

25  Q.  Mr. Koury was the lawyer you worked with at Mayer Brown in

CAJPCOL1                          Trosten - cross

1    preparing those schedules, correct?

2    A.  He was my main point of contact, that's correct.

3    Q.  Now, I'd like to discuss the negotiation of the Proceeds

4    Participation Agreement with you, sir.

5    A.  Okay.

6            THE COURT:  Mr. Schwartz, keep your voice up as you

7    approach the end of the sentence.  It tends to trail.

8            MR. SCHWARTZ:  I was trying to lean into the

9    microphone, but apparently, I'm failing.

10   Q.  The actual price negotiation was done by Mr. Bennett,

11   right?

12   A.  Yes, from Refco's perspective.

13   Q.  And Mr. Bennett told you that BAWAG knew about the

14   receivable, correct?

15   A.  That is correct.

16   Q.  And as far as you know, Mr. Collins wasn't present when

17   Mr. Bennett negotiated the price with BAWAG, correct?

18   A.  As far as I'm aware, I do not know.

19   Q.  And it's -- and Mr. Bennett never told you that he told

20   Mr. Collins that BAWAG was aware of the size of the receivable,

21   correct?

22   A.  That is true.

23   Q.  And you didn't tell that to Mr. Collins, correct?

24   A.  Didn't tell what to Mr. Collins?

25   Q.  That BAWAG was aware of the size of the receivable?

CAJPCOL1                        Trosten - cross

1  A.  I did not say that to Joe, no.

2  Q.  Now, as ultimately drafted -- One of the parties to the

3  Proceeds Participation Agreement was a company called DF

4  Capital, correct?

5  A.  Correct.

6  Q.  And you understood -- and that was also called DFC from

7  time to time?

8  A.  Correct.

9  Q.  And you understood that DF Capital was an affiliate of

10  BAWAG, correct?

11  A.  Affiliate, related in some way, yes.

12  Q.  In fact, on the Refco side, people saw DF Capital as being

13  BAWAG essentially, correct?

14  A.  At senior management, that's correct.

15  Q.  And DF Capital was the vehicle that BAWAG was using to

16  invest additional monies into Refco, correct?

17  A.  That is true.

18  Q.  And in exchange for making that investment, what DF Capital

19  was going to get was not an ownership interest in the company,

20  correct?

21  A.  Not initially, no.

22  Q.  What they were going to get, instead, was the right to have

23  RGHI pay it some of the proceeds upon the sale of the company,

24  correct?

25  A.  To the extent that RGHI was unable to pay, that's correct.

CAJPCOL1                    Trosten - cross

1    Q.  They were investing money, and they were getting a right to

2    get some of the proceeds after the sale, correct?

3    A.  Yes.

4    Q.  But they were not getting a straight-out ownership interest

5    in the company, correct?

6    A.  That is correct.

7    Q.  And originally, what was being negotiated at the beginning

8    was they were going to buy the ownership interest in the

9    company, correct?

10   A.  Yes.

11   Q.  And you understood that BAWAG had asked to change the

12   structure of the deal, right?

13   A.  Yes.

14   Q.  Because BAWAG was concerned, had legal concerns about

15   regulatory issues in the United States in bank ownership of

16   Refco, correct?

17   A.  That was my understanding, yes.

18   Q.  So the party -- And you didn't understand there was

19   anything wrong with that, that was just a concern they had,

20   correct?

21   A.  That's correct.

22   Q.  And so BAWAG asked that the deal be changed from one in

23   which its affiliate was going to purchase equity in the company

24   to one in which its affiliate would receive a proceeds right,

25   correct?

1   A.  That is correct.

2   Q.  And the way the document had originally been drafted, I

3   think you discussed on -- withdrawn.

4           The way the document -- The way the document

5   originally was drafted, it was Refco that was going to be

6   paying the proceeds to DF Capital, correct?

7   A.  When you say originally, which draft?

8   Q.  When it first changed to a proceeds agreement?

9   A.  That's correct.

10  Q.  And that was inserted by BAWAG, right?

11  A.  I don't know.

12  Q.  But it didn't make any sense to you, correct?

13  A.  That's correct.

14  Q.  And the reason it didn't make any sense to you was that

15  Refco was the company that was being sold, correct?

16  A.  In the event of, yes.

17  Q.  In the event of a sale, correct?

18  A.  Yes.

19  Q.  And the proceeds from a sale would not be paid to the

20  entity being sold, they would be paid to the owner, correct?

21  A.  Yes.

22  Q.  So it wasn't Refco that was going to get the money from the

23  proceeds, it was going to be RGHI and BAWAG, correct?

24  A.  Yes.

25  Q.  So it made no sense to you that under the agreement, Refco

CAJPCOL1                    Trosten - cross

1   was the one that had to pay a piece of the proceeds to DF

2   Capital, correct?

3   A.   That is correct.

4   Q.   And that confused you, correct?

5   A.   Yes.

6   Q.   In fact, it perplexed you, right?

7   A.   Yes.

8   Q.   And you called Mr. Collins about that, correct?

9   A.   I did.

10  Q.   And you and he discussed that issue, correct?

11  A.   Yes.

12  Q.   And then you learned that an additional document was

13  inserted in the deal to deal with that problem, correct?

14  A.   One, if not more than one.

15  Q.   But there was something called a guarantee, correct?

16  A.   Yes.

17  Q.   And what the guarantee did, as you understood it, was RGHI

18  guaranteed all the obligations of Refco under the deal,

19  correct?

20  A.   It guaranteed all the obligations of Refco, that's correct.

21  Q.   So when the company -- If the company were sold as a whole,

22  since Refco wasn't getting the proceeds, it could not make the

23  payment.  Under the guarantee, RGHI would be required to make

24  the payment, correct?

25  A.   Yes, if RGL could not make the payment then RGHI would

1   enter into a guarantee to make the payment.

2   Q.  And RGL wouldn't be able to make the payment because it

3   wasn't getting paid for selling itself, correct?  It was RGHI

4   getting paid?

5   A.  That's correct.

6   Q.  And as far as you were concerned, that solved the problem,

7   right?

8   A.  I still felt that -- I didn't understand why it needed to

9   go to RGL directly, but yes, it was a workaround of the issue

10  that I addressed with Joe.

11  Q.  Well, did you know, sir, that BAWAG insisted on structuring

12  it this way?

13  A.  That was my understanding.

14  Q.  So that guarantee -- so they insisted on having Refco as

15  the principal and then the guarantee was needed to solve the

16  problem that you raised?

17  A.  I was aware that BAWAG wanted Refco as the party and the

18  guarantee.  I don't know how it came up in the discussions, but

19  it was from my conversation with Joe or through BAWAG's

20  discussions.

21  Q.  Did you understand that was Mr. Collins that proposed the

22  guarantee?

23  A.  I don't know who proposed it.

24          MR. SCHWARTZ:  Can we pull up Government Exhibit 1504,

25  which is the Proceeds Participation Agreement, and can we turn,

1550

CAJPCOL1                    Trosten – cross

1   please, to Page PMB029389.

2   Q.  Do you recognize that, Mr. Trosten, am I correct, as the

3   guarantee?

4   A.  Yes.  I assume it's executed, yes.

5   Q.  This is part of the Proceeds Participation Agreement that's

6   in evidence.

7   A.  Thank you.

8   Q.  Are you able to see it on the screen?

9   A.  I can see it on my screen.

10  Q.  So let me just read this, a little bit of this, and ask you

11  some questions.  It begins -- it's in the form of a letter from

12  Refco Group Holdings, Inc. to DF Capital; is that correct?

13  A.  That is correct.

14  Q.  And it's dated July 12, 2002, which is the same day as the

15  Proceeds Participation Agreement; is that correct?

16  A.  Yes, it is.

17  Q.  So it says, "For value received, Refco Group Holdings,

18  Inc., a Delaware corporation, the guarantor, hereby

19  unconditionally and absolutely guarantees to DF Capital, a

20  Delaware corporation, DFI, the prompt and complete payment and

21  performance when due, whether by acceleration or otherwise, of

22  all obligations and liabilities (the obligations) of Refco

23  Group, LTD, LLC (the company) arising under that certain

24  Proceeds Participation Agreement between the company and DFI

25  dated July 12th, 2002, the agreement."

CAJPCOL1                    Trosten - cross

1          That's the part of the guarantee that you understood

2     that if the company were sold, would cause Refco Group Holdings

3     to have to pay the proceeds to DF Capital, correct?

4     A.   Yes.

5     Q.   This is -- Now, Refco was the parent, right?

6     A.   That's incorrect.

7     Q.   Refco was a parent -- I'm sorry.  You are correct.  RGHI

8     was a parent of Refco, correct?

9     A.   Correct.

10    Q.   So this is like, let's take a child leases an apartment and

11    the parent guarantees it, knowing the child is not going to be

12    able to pay, correct?  Do you understand the hypothetical?

13    A.   I understand it.

14    Q.   The parent understands that by signing that guarantee, he

15    or she is going to end up paying the rent, right?

16    A.   They may if the child cannot pay it, that's right.

17    Q.   And if they know that the child has no money, then they

18    know that they're going to be paying the rent, right?

19    A.   That they'll be ultimately responsible for it as well,

20    that's correct.

21    Q.   So let me --

22              MR. SCHWARTZ:  By the way, we offer Defendant's

23    Exhibit 5, which is the chart we drew yesterday.

24              MR. CHERNOFF:  No objection.

25              THE COURT:  Received.

CAJPCOL1                        Trosten - cross

1          (Defendant's Exhibit 5 received in evidence)

2          MR. SCHWARTZ:  And I'm going to, with the Court's

3     permission, move the easel again.

4          THE COURT:  Yes, sir.

5          MR. SCHWARTZ:  I'm not exactly sure where we put this

6     yesterday.  We can turn off the light.

7     Q.  Mr. Trosten, you're able to see this?

8     A.  I am.

9          MR. SCHWARTZ:  Your Honor, may I inquire of the jury,

10    if they can see this.

11         THE COURT:  Ladies and gentlemen, anyone who is

12    unable -- Mr. Wiley, can you see this, or does it need to be

13    moved around a little?

14         JUROR:  I can see it pretty well.  Thank you, your

15    Honor.

16         THE COURT:  Okay, Mr. Schwartz.

17    Q.  Let's see if we can make this visual.  If you'll bear with

18    me, Mr. Trosten.  I'm going to put at the bottom the company

19    that under the Proceeds Participation Agreement might be sold.

20    That's Refco, and I'm going to put that in blue.

21         And it has two parents, who I'll put above it, RGHI

22    and BAWAG.  And since BAWAG has an affiliate, DF Capital, I'm

23    going to put a slash and then just put DFC.  And to show the

24    ownership, I'm going to draw a line between RGHI and Refco and

25    a line between BAWAG and Refco.  And RGHI was a 90 percent

CAJPCOL1                          Trosten - cross

1   holder; is that correct?

2   A.   That's correct.

3   Q.   So let me put 90 percent next to the line, and next to the

4   line for BAWAG, I'm going to put 10 percent; is that accurate?

5   A.   Yes.

6   Q.   And this is similar -- this reflects the ownership interest

7   of Refco, of Refco Group at the time of the Proceeds

8   Participation Agreement, correct?

9   A.   Assuming -- Well, immediately prior to the Proceeds

10  Participation Agreement, it was just BAWAG and RGHI, yes.

11  Q.   And as soon as the Proceeds Participation Agreement was

12  signed, there's a company called DFC that gets involved,

13  correct?

14  A.   Yes.

15  Q.   Now, the Proceeds Participation Agreement contemplated a

16  buyer and the buyer is going to pay money; so I'm going to put

17  the buyer in green.

18  A.   Okay.

19  Q.   And it contemplated, sir, am I correct, in the scenario

20  we're talking about, that the buyer would buy 100 percent of

21  Refco from RGHI and BAWAG?

22  A.   That was the intention.

23  Q.   So I'm going to put a blue line, but I'm going to --

24  between the buyer and Refco, and put a hundred percent on top

25  of it.  And the reason I've made it dashes is to distinguish it

CAJPCOL1                         Trosten – cross

 1    from RGHI and BAWAG who are the sellers.

 2    A.  I understand.

 3    Q.  So does this fairly represent how the ownership was going

 4    to change in the event of a sale of Refco?

 5    A.  Assuming the hundred percent sale of Refco.

 6    Q.  Now, the problem that you had when BAWAG asked that the

 7    deal be restructured was this buyer was not going to be paying

 8    money to Refco, but was instead going to be paying money up

 9    here to the owners, correct?

10    A.  Yes.

11    Q.  And since he wasn't going to be paying money to Refco, or

12    she or it wasn't going to be paying money to Refco, Refco would

13    not have the money out of which to pay the proceeds that were

14    owed to DF Capital, correct?

15    A.  That is correct.

16    Q.  So let me just show how the money was going to flow.  A

17    buyer would be making a payment to RGHI, correct?

18    A.  Correct.

19    Q.  And presumably that would be 90 percent?

20    A.  Correct.

21    Q.  The buyer would also be making a payment to BAWAG, correct?

22    A.  That's correct.

23    Q.  And that would be 10 percent?

24    A.  Correct.

25    Q.  So you called Mr. Collins and said you were confused by

CAJPCOL1                        Trosten - cross

1    this, right?

2    A.  Yes.

3    Q.  And then you learned that there was going to be a

4    guarantee, correct?

5    A.  Yes.

6    Q.  And I'm going to draw the guarantee in red down from RGHI

7    to Refco.  I'll put a "G" next to it, and that guaranteed the

8    obligation, correct?

9    A.  Correct.

10   Q.  And as a result of that guarantee, what you understood

11   would happen upon the sale of RGHI -- I mean, the sale of

12   Refco, is that RGHI would make a proceeds payment to BAWAG/DF

13   Capital, correct?

14   A.  Under the guarantee.

15   Q.  I'm going to label that proceeds in red because it's under

16   the guarantee.  And that is what solved the problem, correct?

17   A.  It solved my problem.

18   Q.  And you understood, did you not, that the ultimate payment

19   of the proceeds from RGHI to BAWAG was taking place at the

20   ownership level, right?

21   A.  Correct.

22   Q.  And was there, therefore, what can be termed an upstream

23   transaction?  Is that correct?

24   A.  I don't know if that would be termed an upstream

25   transaction, but it would be a transaction -- the payment would

CAJPCOL1                         Trosten – cross

1    be amongst the owners.

2    Q.  And that's a transaction that you understood was upstream,

3    correct?

4              MR. CHERNOFF:  Asked and answered.

5              THE COURT:  Sustained.

6    Q.  Do you recall giving testimony in another trial, another

7    proceeding under oath in the spring of 2009?

8    A.  Yes.

9              MR. CHERNOFF:  Your Honor, we had a discussion about

10   Mr. Schwartz following the rules.

11             THE COURT:  Okay.

12             MR. SCHWARTZ:  I'm about to get there, your Honor, and

13   I'm going to refer to Page 814, Line 10.

14             MR. CHERNOFF:  Mr. Schwartz can either offer a

15   statement or he can refresh the witness, but right now he's

16   just reading.

17             THE COURT:  I think he's getting ready to do Q, A, Q,

18   A.

19             MR. SCHWARTZ:  That is correct, your Honor.

20   Q.  Do you recall being asked --

21             MR. SCHWARTZ:  Tell me when you have it.

22             MR. CHERNOFF:  Thank you.

23   Q.  Do you recall being asked the following question and

24   giving -- questions and giving the following answers:

25   "Q.  That's an upstream obligation, correct?

CAJPCOL1                          Trosten - cross

1    "A.  It's a direct obligation between RGHI and --

2    "Q.  As between RGHI and Refco, correct?  It's correct?

3    "A.  Correct.

4            So that's upstream?

5    "Q.  So that's upstream?

6    "A.  Yes."

7            Do you recall being asked those questions and giving

8    those answers?

9            MR. CHERNOFF:  Your Honor, we stipulate that's the

10   testimony that was given.

11           MR. SCHWARTZ:  I'm sorry, I didn't hear Mr. Chernoff,

12   your Honor.

13           MR. CHERNOFF:  We stipulate that testimony was given.

14   I don't know if the witness can possible answer whether he

15   remembers.

16           THE COURT:  Okay.  But that's the question.  Are you

17   able to answer that question, sir?

18   A.  I don't remember.

19           MR. SCHWARTZ:  Your Honor, I'm going to put an exhibit

20   sticker on this chart.  It's now Defendant's Exhibit 6, and I'm

21   going to offer it into evidence.

22           MR. CHERNOFF:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit 6 received in evidence)

25           MR. SCHWARTZ:  And with the Court's permission, I'll

1   move it away.

2   Q.  Now, under the Proceeds Participation Agreement,

3   Mr. Trosten, BAWAG was scheduled by the terms of that agreement

4   to inject capital into Refco three times, correct?

5   A.  It injected cash.

6   Q.  Inject cash into Refco three times, correct?

7   A.  Correct.

8   Q.  And you -- And it actually did so twice before the Lee

9   deal, correct?

10  A.  That is correct.

11  Q.  And it didn't do it the third time because the company was

12  sold in the interim, correct?

13  A.  Yes.

14  Q.  And you, as CFO, were responsible for recording that cash

15  that BAWAG was injecting into the books of Refco, correct?

16  A.  Yes.

17  Q.  And is it fair to say that you booked it in a misleading

18  way?

19  A.  That is fair to say.

20  Q.  You booked it in a way that the cash injection could not be

21  traced to either -- could not be traced to BAWAG or DF Capital,

22  correct?

23  A.  I did.

24  Q.  So that if the auditors saw it, they would not know that

25  the money had come from BAWAG or DF Capital, correct?

CAJPCOL1                    Trosten - cross

1   A.  That is correct.

2   Q.  You hid it from them, correct?

3   A.  I did.

4   Q.  And you didn't tell Joe Collins you were doing that,

5   correct?

6   A.  I did not directly tell Joe Collins that, no.

7   Q.  You didn't tell Joe Collins that, correct?

8   A.  No.

9   Q.  Now, you testified about a side letter, correct?

10  A.  I did.

11  Q.  And there was a provision in the side letter that the first

12  $350 million that was to be injected into the company by BAWAG

13  would be used to retire intercompany debt, correct?

14  A.  I do not believe the side letter references it as the first

15  300 million.

16  Q.  The side letter says, and I think you're correct, sir, is

17  that the company agrees that $350 million of the purchase

18  price, the participation right shall be used to cause to be

19  used for the retirement of intercompany debt; is that correct?

20  A.  That's correct.

21  Q.  And you said you had a conversation with Phil Bennett about

22  that; is that right?

23  A.  Relating to the $350 million of intercompany debt pay-down?

24  Yes.

25  Q.  You said that it was your idea that that be put in a side

CAJPCOL1                      Trosten - cross

1    letter, correct?

2    A.  That is correct.

3    Q.  By the way, there's nothing unusual in legal transactions

4    about side letters, right?

5    A.  That's correct.

6    Q.  And you testified that Bennett told you he would talk to

7    Joe about whether -- about putting that into the side letter,

8    correct?

9    A.  That is correct.

10   Q.  And you have no idea, as you sit here today, what Phil

11   Bennett said to Joe Collins about that; is that correct?

12   A.  Yes.

13   Q.  Yes, you don't have an idea?

14   A.  I do not know what Phil said to Joe.

15   Q.  You understand that sometimes we have a problem with yeses

16   and noes, the way I ask the question?

17   A.  Understood.

18   Q.  And you said, I think on direct examination, that the

19   reason you wanted to put the $350 million into a side letter is

20   so that the auditors would not be able to find it if they got

21   hold of the Proceeds Participation Agreement, correct?

22   A.  Correct.

23   Q.  But the fact of the matter, sir, is the auditors never got

24   hold of the Proceeds Participation Agreement, correct?

25   A.  That is correct.

1    Q.  That's because right from the beginning, you hid that from

2    them also, correct?

3    A.  That is correct.

4    Q.  So you essentially had the Proceeds Participation Agreement

5    in one locked drawer and the side letter in another, correct?

6    A.  That's incorrect.

7    Q.  You had them where they wouldn't be found, correct?

8    A.  There were several copies of them in the office, but I

9    wasn't about to give it to the auditors, no.

10   Q.  So you made -- So you made sure they didn't get the

11   Proceeds Participation Agreement and you made sure they didn't

12   get the side letter, correct?

13   A.  To the best of my ability, yes.

14   Q.  And, in fact, when you had this conversation you say you

15   had with Mr. Bennett, telling him we need to put the

16   $350 million reference in the side letter so the auditors don't

17   see it, even at that moment, you never had any intention of

18   letting the auditors see the Proceeds Participation Agreement

19   itself, correct?

20   A.  Correct.

21   Q.  And you had no conversations with Joe Collins about those

22   facts, correct?

23   A.  That is correct.

24   Q.  By the way, you were shown financial statements yesterday;

25   do you recall that?

CAJPCOL1                      Trosten - cross

1   A.  Yesterday or the day before.

2   Q.  And financial statements include something called a balance

3   sheet, correct?

4   A.  That is correct.

5   Q.  And a balance sheet is the part of the financial statements

6   that shows at the moment the year closes, what the liabilities

7   are of the company and what the assets are of the company,

8   correct?

9   A.  Correct.

10  Q.  So it shows what the company has and what it owes, correct?

11  A.  Correct.

12  Q.  And that's a snapshot at one moment of time, correct?

13  A.  That is correct.

14  Q.  And the numbers on that balance sheet for the 364 days

15  between snapshots, or 365 days between snapshots, change,

16  correct?

17  A.  They do.

18  Q.  Some numbers go up during that period, some numbers go

19  down, correct?

20  A.  Yes.

21  Q.  And that changes from year to year, correct?

22  A.  Correct.

23  Q.  So the financial statements that a company might put out at

24  a snapshot in time on February 28 do not necessarily say what

25  is happening in the company the following July, correct?

CAJPCOL1                    Trosten - cross

1   A.   That is correct.

2   Q.   Now, as we just discussed, as the Proceeds Participation

3   Agreement contemplated, DF Capital was going to be making three

4   separate payments, correct?

5   A.   Correct.

6   Q.   And each time they made a payment, you referred to it

7   internally as a tranche, correct?

8   A.   Yes, we did.

9   Q.   So there were going to be three tranches, right?

10  A.   Yes.

11  Q.   And they made payment under the first tranche in February

12  of 2003; is that correct?

13  A.   Yes, that's correct.

14  Q.   And do you remember how much the company would receive at

15  that time?

16  A.   $254 million.

17  Q.   And isn't it a fact, sir, that some of that money went

18  right to your pocket?

19  A.   Yes.

20  Q.   Didn't go down -- What went into your pocket didn't go to

21  paying down intercompany debt, correct?

22  A.   Correct.

23  Q.   And some of that money went right to Phil Bennett's pocket,

24  right?

25  A.   That is correct.

CAJPCOL1                          Trosten – cross

1    Q.  Didn't go to paying down intercompany debt, what went into

2    Phil Bennett's pocket, correct?

3    A.  Correct.

4    Q.  And what went into your pocket was millions of dollars,

5    right?

6    A.  Yes.

7    Q.  And what went into Phil Bennett's pocket was even more

8    millions of dollars, correct?

9    A.  Correct.

10   Q.  You didn't tell the lawyer who had negotiated the Proceeds

11   Participation Agreement for Refco, Joe Collins, about that; is

12   that correct?

13   A.  I don't recall having a conversation with Joe about that.

14   Q.  And you don't recall because you didn't, right?

15   A.  I just don't recall it.

16   Q.  And you structured that under the profits participation

17   plan, correct?

18   A.  Yes.

19   Q.  But you hid from the auditors that that payment that was

20   supposedly made under the profits participation plan was coming

21   pursuant to the Proceeds Participation Agreement from DF

22   Capital, correct?

23   A.  That is correct.

24   Q.  And you didn't tell Joe Collins about that?

25   A.  About what?

1    Q.  That you hid that from the auditors?

2    A.  No, I did not tell Joe that.

3    Q.  Now, the second tranche was scheduled to be paid in

4    February of 2004, correct?

5    A.  Correct.

6    Q.  Anyone looking at the Proceeds Participation Agreement

7    would see that, correct?

8    A.  Correct.

9    Q.  The company was getting ready to try to find a buyer,

10   right, in 2003?

11   A.  That is correct.

12   Q.  And you and Mr. Bennett had a conversation in which you

13   discussed we need to show some cash in the company to look

14   better for a buyer, correct?

15   A.  Amongst other things in that conversation, yes.

16   Q.  You wanted to show a buyer that the company was liquid,

17   correct?

18   A.  We wanted to show that the company had the ability to pay

19   down its long-term debt with its cash, if that's what you mean

20   by "liquid."

21   Q.  That it had enough cash to pay its obligations?

22   A.  Yes.

23   Q.  It didn't, correct?

24   A.  Not to prepay it, no.

25   Q.  So you wanted to show a prospective buyer that you had --

CAJPCOL1                        Trosten - cross

```
 1   that you were more healthy than you actually were, correct?
 2   A.  That is correct.
 3   Q.  And you told BAWAG that we need more cash, right?
 4   A.  Yes.
 5   Q.  And, in fact, you wrote a letter to them to that effect,
 6   correct?
 7   A.  I do not recall that.
 8   Q.  I'm showing you what's been marked as Defense Exhibit 157
 9   for identification.  That is a letter from you to Mr. Selkuk
10   Sari at BAWAG, correct?
11   A.  It's unsigned by me.
12   Q.  You, in fact, sent it, didn't you?
13   A.  I do not recall that, no.
14   Q.  It contains the arguments you made to BAWAG about getting
15   more cash, correct?
16           MR. CHERNOFF:  Objection, your Honor.
17           THE COURT:  Are you able to answer that question, sir,
18   as it's phrased?
19           THE WITNESS:  About what it says in the letter?
20           THE COURT:  The letter that -- the question counsel
21   raised was:  Question.  It contains the arguments you made to
22   BAWAG about getting more cash, correct?  And I'm asking you,
23   are you able to answer that question as it's phrased?
24   Q.  And I'll refer you, sir, specifically to the second-to-last
25   paragraph.
```

CAJPCOL1                          Trosten - cross

1        MR. CHERNOFF:  Your Honor, Mr. Schwartz hasn't offered

2   the exhibit, and I'm not sure he has a foundation for it.

3        MR. SCHWARTZ:  I'm trying to create one, your Honor.

4        THE COURT:  Let's hear what he says.

5   A.  I would say no.

6   Q.  Who talked with BAWAG about getting more cash?

7   A.  I believe that would be Phil.

8   Q.  And BAWAG agreed to an early payment under the Proceeds

9   Participation Agreement, correct?

10  A.  When you say BAWAG, Mr. Schwartz, are you using

11  interchangeably DF Capital and BAWAG?

12  Q.  That's a fair question, sir.  DF Capital agreed to an early

13  payment under the agreement, correct?

14  A.  Correct.

15  Q.  And you understood that BAWAG caused DF Capital to make

16  that agreement, correct?

17  A.  To make the agreement or the payment?

18  Q.  To agree to pay early?

19  A.  That's correct.

20  Q.  Because DF Capital was an alterego of BAWAG, correct?

21  A.  We viewed them as one in the same, yes.

22  Q.  And that early payment was made pursuant to an amendment of

23  the Proceeds Participation Agreement, correct?

24  A.  Correct.

25  Q.  There was actually a legal document that was created for

CAJPCOL1                    Trosten – cross

1  that to happen, correct?

2  A.  Yes.

3  Q.  And you didn't call upon Joe Collins to participate in the

4  drafting of an amendment to the Proceeds Participation

5  Agreement, correct?

6  A.  I did not, no.

7  Q.  Even though he had been the lawyer who had represented you

8  in the original Proceeds Participation Agreement, correct?

9  A.  That is correct.

10 Q.  In fact, BAWAG was represented in the negotiation of this

11 amendment by the same lawyer who had negotiated the original

12 Proceeds Participation Agreement, correct?

13 A.  Yes, that is correct.

14 Q.  That was Dr. Neubauer, correct?

15 A.  Correct.

16 Q.  And Refco was represented in the negotiation of this

17 amendment by you, correct?

18 A.  By Phil and I.

19 Q.  By Phil and you, correct?

20 A.  Correct.

21 Q.  Let me show you what's been marked as defense Exhibit 103

22 for identification.

23 A.  Thank you.

24 Q.  That is a letter from Dr. Neubauer to you in the course of

25 the negotiation, correct?

CAJPCOL1                          Trosten - cross

1    A.  That is correct.

2             MR. SCHWARTZ:  We offer it.

3             MR. CHERNOFF:  No objection, your Honor.

4             THE COURT:  Received.

5             (Defendant's Exhibit 103 received in evidence)

6    Q.  And you see on the top in the "to" and "from" that is in

7    German -- I think that's German.  It's not in English.

8    A.  It's not in English.

9    Q.  But that's "to" and "from," correct?

10   A.  I don't know.

11   Q.  But the letter is, in fact, to you, correct?

12   A.  Yes.

13   Q.  And it is, in fact, from Neubauer and Springer lawyers,

14   correct?

15   A.  The letter I'm looking at, it says it's from Mr. Sari in

16   terms of the language in the letter.

17   Q.  Well, under the -- right under where it says your name at

18   the top, it says "Neubauer and Springer."  It appears to have

19   been e-mailed from there, correct?

20   A.  Correct.

21   Q.  Mr. Sari -- Would you tell the jury please who Mr. Sari

22   was?

23   A.  Mr. Sari was an employee at BAWAG.

24   Q.  And you see at the bottom of the letter there appears to

25   be -- going all the way down, please, there appears to be an

1   attachment that's being forwarded, correct?

2   A.  That's correct.

3   Q.  And that attachment appears to come from Neubauer and

4   Springer and being sent to their client, Mr. Sari, correct?

5   A.  That's what it appears, yes.

6   Q.  And he then forwarded it to you, correct?

7   A.  That's what it appears, yes.

8   Q.  Now, let's look at the text.  Mr. Bennett's role, by the

9   way, was to make the agreement and it was your role to document

10  it, right?

11  A.  Phil and I had joint -- I would send it to him.  We would

12  look at it together.

13  Q.  It says: "Dear Rob, Enclosed you will find the last version

14  of the amendment of the Proceeds Participation Agreement

15  provided by Mr. Neubauer -- or Neubauer today, and we kindly

16  request you to inform us whether you would agree with this

17  version so that we can proceed with the process and the

18  amendment could be signed ASAP in order that DFI can make the

19  second payment as agreed last week with Mr. Bennett on 14th,

20  November, 2003."  DFI is also DF Capital, correct?

21  A.  Yes, it is.

22  Q.  "In this connection, I would kindly ask you that any

23  purchase agreement draft has been prepared by Refco so that you

24  could make it available for us.  If not, I would kindly request

25  you to make it available for us as soon as it is prepared."

1           And you see that attached to this letter is a legal

2    document that was being sent for your review that was a draft

3    of an amendment to the Proceeds Participation Agreement,

4    correct?

5    A.  That's correct.

6    Q.  You didn't send this over to Joe Collins and say, can we

7    have some comments on this, right, Joe?

8    A.  Right?

9    Q.  I'll repeat the question, sir.  You didn't send this over

10   to Joe Collins and say, here's a legal document; we'd like some

11   comments, correct?

12   A.  That's correct.

13   Q.  You never told Joe Collins we need to get money in quicker

14   to make the company look better, correct?

15   A.  That wasn't the main purpose of why we were bringing in the

16   money, but I did not speak to Joe about the second tranche.

17   Q.  You never told Joe Collins we need to bring money in early

18   to make the company look healthier, correct?

19   A.  I never said that to Joe, no.

20   Q.  Now, I want to show you what has been marked as Defense

21   Exhibit 102 for identification.  This is the final agreement;

22   is that correct?

23   A.  That is correct.

24           MR. SCHWARTZ:  We offer it.

25           MR. CHERNOFF:  No objection.

1       THE COURT:  Received.

2           (Defendant's Exhibit 102 received in evidence)

3       MR. SCHWARTZ:  Can we put it up?

4   Q.  So this is an agreement called amendment to the Proceeds

5   Participation Agreement of July 12, 2002; is that right?

6   A.  That is correct.

7   Q.  And then there are approximately three pages of legal text

8   that follow, correct?

9   A.  Approximately.

10  Q.  And at the bottom, Refco has signed it by Phil Bennett,

11  Refco Group, LTD?

12  A.  I see that, yes.

13  Q.  And DF Capital has signed it, correct?

14  A.  Thank you, yes.

15  Q.  That's Mr. Sari's signature?

16  A.  I do not know.

17  Q.  But you now felt that you had a legally binding amendment

18  that you had negotiated without your lawyer to the Proceeds

19  Participation Agreement, correct?

20  A.  Both Phil and I negotiated it, but correct.

21  Q.  And then the early payment --

22      MR. SCHWARTZ:  Can you take it down, please.  Thank

23  you, Miss O'Connor.

24  Q.  Then the early payment came in pursuant to this amendment,

25  right?

CAJPCOL1                    Trosten – cross

1    A.  Right.

2    Q.  And you did not tell Joe Collins you just received an early

3    payment, right?

4    A.  Right.

5    Q.  And you put it on the books so that the auditors couldn't

6    find out where it came from, correct?

7    A.  That is correct.

8    Q.  No one looking just at the original Proceeds Participation

9    Agreement before it was amended could know from that document

10   that you were going to accelerate payment to make the company

11   look healthier, correct?

12   A.  Correct.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Off the record.

2    (Discussion off the record)

3    Q.  So, you testified earlier that in connection with the

4    potential sale of the company, you hired Credit Suisse First

5    Boston.  Right?

6    A.  Right.

7    Q.  And they started to bring in prospective buyers for the

8    company, for the company to evaluate and for the buyers to

9    evaluate the company.  Correct?

10   A.  "The company" being Refco?

11   Q.  Yes.

12   A.  Yes.

13   Q.  And one of the things you prepared to show to prospective

14   buyers was something called a regulatory capital overview.

15   Correct?

16   A.  Correct.

17   Q.  I believe this is in evidence as government's-- no.  Oh,

18   Defense Exhibit 164.

19   A.  May I have a copy?

20   Q.  Oh, I apologize.

21        MR. SCHWARTZ:  Would the Court like a copy as well?

22        THE COURT:  I think I'll be able to read off the

23   screen.  Go ahead.

24   Q.  So you recognize this.  Right, sir?

25   A.  Thank you.

1575

CAJBCOL2                         Trosten - cross

1   Q.  That is what you understood to be Refco's regulatory

2   capital overview prepared by-- well, that was presented to

3   prospective buyers by Credit Suisse.  Correct?

4   A.  I think it was presented to one buyer.

5   Q.  And would that one buyer be Thomas H. Lee?

6   A.  Yes.

7   Q.  And Credit Suisse's name is right there in big capital

8   letters on the first page.  Correct?

9   A.  Correct.

10  Q.  And you gave Credit Suisse the information to put into this

11  document that is in their name.  Correct?

12  A.  That is correct.

13  Q.  And is it fair to say that the document that they created

14  and presented to T.H. Lee is as a result of the fact that you

15  gave them the information riddled with lies?

16  A.  There certainly are lies in this document, yes.

17  Q.  Lots of lies.

18  A.  I'd have to rereview the document.

19  Q.  Why don't you take a look at it.

20  A.  Many of the items in the appendix are false statements, and

21  his statement regarding free cash available for distribution is

22  false.

23  Q.  Let's turn now to page 3.

24          By the way, you never gave the proceeds participation

25  agreement to Credit Suisse.  Correct?

1  A.  Correct.

2  Q.  And you never gave this document to Joe Collins.  Correct?

3  A.  That is correct.

4  Q.  As far as you know, the only people in the world who had

5  both of them were the owners of Refco.  Correct?

6  A.  That is correct.

7  Q.  On page 3, it says "Refco's annual distributions"-- it's

8  the second paragraph, "have, in most years, been used to retire

9  loans to shareholders made in prior years."  A lie.  Correct?

10  A.  Its distributions were used to retire a portion of loans.

11  That part is true.

12  Q.  What part is false?

13  A.  None of that statement is false.  It's just that it didn't

14  retire up all of our shareholder loans.

15  Q.  How about the next statement:  "As of fiscal year 2000,

16  shareholder loans totaled $228 million; as of year end 2004,

17  the balance will be zero inclusive of ordinary course operating

18  distribution"?

19  A.  That's a false statement.

20  Q.  How about the next one:  "Free cash flow during this period

21  totaled approximately $500 million as evidenced by the analysis

22  in Appendix 3"?

23  A.  That is false.

24  Q.  Let's turn to Appendix 3.  Tell us what's false on this

25  page, sir.

CAJBCOL2                     Trosten - cross

1   A.   Earned net income is false.  That's when it was actually

2   reported in our financial statements.

3   Q.   The first line.  Correct?

4   A.   Correct.  The depreciation and amortization I believe is

5   true.  I'd have to go back and look.  Capital expenditures also

6   may be true.

7   Q.   May be true, but not necessarily?

8   A.   I just don't remember.

9   Q.   Didn't matter at the time.  Right?  You were going to give

10  them what you needed.

11  A.   No.  This particular line, I think I got it from our books

12  and records and reported it.  Actual shareholder distributions,

13  those are false.  Shareholder cash repayment is false.  The

14  BAWAG distribution is true.  And then it continues to get to a

15  total of $498 million, and that number is clearly false.

16  Q.   Go down.  In other words, there's no free cash flow of $498

17  million correct?

18  A.   That's correct.

19  Q.   That's the $500 million in so-called excess cash that was a

20  lie on the previous page?

21  A.   That is correct.

22  Q.   The next section of the report, please.

23  A.   Shareholder beginning balance, it's false.  Shareholder

24  portion of dividend, that is true.  Shareholder cash repayment

25  I believe is false.  Shareholder distributions, true.  And the

CAJBCOL2                         Trosten - cross

 1   interest number is false.

 2              MR. SCHWARTZ:  Take it down, please.

 3   Q.  Lee first expressed an interest in buying Refco in the fall

 4   of 2003.  Correct?

 5   A.  Fall/winter.

 6   Q.  So fall/winter 2003/2004, they start to show some interest.

 7   Right?

 8   A.  Correct.

 9   Q.  And they start to do what's called due diligence.  Correct?

10   A.  Correct.

11   Q.  And you, at the beginning, were one of the people in charge

12   of providing the due diligence.  Correct?

13   A.  That is correct.

14   Q.  And Mayer Brown had very little to do with this transaction

15   until the letter of intent was signed in April.  Is that

16   correct?

17   A.  That is correct.

18   Q.  And after the letter of intent was signed, Mayer Brown

19   began to be involved in due diligence.  Correct?

20   A.  Correct.

21   Q.  Before that, you were running that show.  Correct?

22   A.  Refco was running the show.

23   Q.  Let's speak for a few minutes about the $500 million in

24   excess cash that you told Lee you had.  Okay?

25   A.  Okay.

CAJBCOL2                        Trosten - cross

1    Q.  They had to come up with it.  Correct?  They had to find

2    some cash to show.

3    A.  Correct.

4    Q.  Because they wanted to see cash actually sitting in a bank

5    account.  Correct?

6    A.  Correct.

7    Q.  You had told them, when they first started looking, We're

8    doing so well we've got a half a billion bucks extra that's

9    sitting in the company.  Right?

10   A.  As of March of '04.

11   Q.  And they said, Put it in an account and show it to us.

12   Right?

13   A.  Right.

14   Q.  So you had to scrounge for it.  Is that correct?

15   A.  I wasn't involved in how much cash Refco actually

16   contributed to the five hundred million.

17   Q.  Well, you were aware, sir, that some of it came right out

18   of customer accounts.  Correct?

19   A.  I do not know where it came from.

20   Q.  At the time you believed that that was happening.  Correct?

21   A.  I thought it was certainly possible that it came from Refco

22   Capital Markets.

23   Q.  Which was Mr. Santo Maggio.  Correct?

24   A.  That is correct.

25   Q.  So it was certainly possible that Santo Maggio was sticking

CAJBCOL2                    Trosten - cross

1    his hand into customer accounts and pulling out the cash so you

2    could show excess cash to Lee.  Correct?

3    A.  It's possible, but I don't know.

4    Q.  And you considered at the time it was possible.  Correct?

5    A.  I don't remember what I thought at the time.

6    Q.  And I think you testified on direct that to come up with

7    some of the cash, you negotiated a loan with BAWAG.  Correct?

8    A.  I did not.

9    Q.  Refco did.

10   A.  Correct.

11   Q.  And do you remember how much that was?

12   A.  I do.

13   Q.  How much?

14   A.  $390 million.

15   Q.  And there were legal documents associated with that

16   transaction.  Correct?

17   A.  Correct.

18   Q.  There was a loan agreement.  Correct?

19   A.  That is correct.

20   Q.  And you didn't pick up the phone and call Refco's trusted

21   lawyer, Joe Collins, and say, We need you to document a loan

22   transaction with BAWAG.  Correct?

23   A.  I don't know how involved I was with that loan transaction.

24   Q.  You were the point man at Refco on that loan transaction.

25   Correct?

CAJBCOL2                    Trosten - cross

1   A.  I don't remember that.

2   Q.  Let me show you what's been marked as Defense Exhibit 104

3   for identification.

4   A.  Thank you.

5   Q.  This is a letter from Mr. Sari at BAWAG to you with a cc to

6   Mr. Bennett enclosing loan documentation.  Correct?

7   A.  Correct.

8           MR. SCHWARTZ:  We offer.

9           MR. CHERNOFF:  Voir dire, your Honor.

10          THE COURT:  Sir.

11  VOIR DIRE EXAMINATION

12  BY MR. CHERNOFF:

13  Q.  Mr. Trosten, does this document say, in the first sentence,

14  "Enclosed you will find documentation of RGHI loans on

15  September 30, 2004, as agreed with Mr. Bennett"?  ^^

16  A.  Yes, it does.

17          MR. CHERNOFF:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 104 received)

20          MR. SCHWARTZ:  Can we put it on the screen?

21  Q.  The prosecutor read that correctly.  Right?

22  A.  Yes.

23  Q.  And attached is the documentation.  Correct?

24  A.  Correct.

25  Q.  You didn't send this over to Joe Collins and say, Take a

CAJBCOL2                        Trosten - cross

1    look at it, did you?

2    A.  No.

3    Q.  Let me show you what's Defense Exhibit 105 for

4    identification.  This is the loan agreement that's executed.

5    Correct?

6    A.  It appears to be.  I don't know that I've seen it whilst

7    working at Refco.

8    Q.  Does it have Phillip Bennett's signature on it?

9    A.  Yes.

10           MR. SCHWARTZ:  We offer.

11           MR. CHERNOFF:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 105 received)

14           THE COURT:  Did you want your break now, Mr. Schwartz?

15           MR. SCHWARTZ:  I would, your Honor.  Thank you.

16           THE COURT:  I knew it.

17           Counsel, ladies and gentlemen, we follow the normal

18    instructions:  Leave your exhibits, take your pads, and please

19    remember not to discuss the case among yourselves.

20           (Jury excused)

21           THE COURT:  Anything else on the record, Counsel?

22           MR. CHERNOFF:  No, your Honor.

23           MR. SCHWARTZ:  No.

24           THE COURT:  See you in a couple of minutes.

25           (Recess)

1      THE COURT:  Thank you, ladies and gentlemen.  May we

2  bring the jurors in, please.

3      MR. CHERNOFF:  Yes, your Honor.

4      THE COURT:  Thank you.

5      (Jury present)

6      THE COURT:  Welcome back, ladies and gentlemen.  Won't

7  you be seated.

8      We'll continue the cross-examination of the witness.

9      Mr. Schwartz.

10      MR. SCHWARTZ:  Thank you, your Honor.

11  BY MR. SCHWARTZ:

12  Q.  So we were talking, you'll recall, about $500 million of

13  so-called excess cash before we left.  Do you recall that?

14  A.  I do.

15  Q.  You put together the 380 on the loan with another 120 of

16  cash that you're not sure where it came from, but it may have

17  come from RCM.  Correct?

18  A.  I believe you have your numbers wrong.

19  Q.  I'm sorry, sir.  Please correct me.

20  A.  I believe it was 110 million from Refco or a Refco

21  subsidiary and 390 million was the BAWAG loan.

22  Q.  I'm sorry.  And the 110 is the money that may or may not

23  come out of customer accounts at Santo Maggio?

24  A.  Yeah.  I don't know.

25  Q.  And your created sham transactions on the books to cover up

1   where the money was coming from.  Correct?

2   A.  That is correct.

3   Q.  The books of Refco hid what you were doing.  Right?

4   A.  Correct.

5   Q.  And when you recorded the $390 million that you borrowed

6   from BAWAG on the books, you did not record that as a loan from

7   BAWAG.  Correct?

8   A.  That is correct.

9   Q.  And you didn't tell that to Joe Collins.  Correct?

10  A.  That is correct.

11  Q.  And you knew what you were doing was fraudulent.

12  A.  That is correct.

13  Q.  And then you put it all together in a single account so it

14  looked like five hundred million.  Right?

15  A.  I didn't, but it did occur as one account, yes.

16  Q.  And you gave a bank statement to Credit Suisse First Boston

17  so they could show it to Lee.  Correct?

18  A.  As a bank document.

19  Q.  So that Lee could look at a document and say they said

20  there was five hundred in excess cash, here it is in the bank?

21  A.  Correct.

22  Q.  And you gave the same document to Mayer Brown.  Correct?

23  A.  Correct.

24  Q.  And you never told them how it was all disguised on the

25  books?

CAJBCOL2                         Trosten - cross

1    A.  I did not, no.

2    Q.  Now, the government showed you on direct examination

3    Exhibit 353, which I would ask Ms. ^O'Connor to call up now.

4    Remember the discussion about this document?

5    A.  I do.

6    Q.  This was the "Issues" list.  And you noted before the

7    initials "JPC 4/12/04" in the upper right-hand corner.

8    Correct?

9    A.  That is correct.

10   Q.  And the government asked you to read the items under 5,

11   which were Book Runners and PRB Financing.  Correct?

12   A.  Correct.

13   Q.  And then the government asked you on direct examination,

14   while this was on the screen, what you and Mr. Bennett called

15   the round-trip loans.  Correct?  What name you gave to them.

16   A.  Correct.

17   Q.  And you answered you gave them the name "short-term

18   financing."  Correct?

19   A.  Correct.

20   Q.  Am I correct, sir, that never did you and Mr. Bennett refer

21   to them as PRB Financing?

22   A.  That is correct.

23   Q.  PRB is Phillip R. Bennett.  Correct?

24   A.  Presumably.

25   Q.  And he wasn't financing the round-trip loans.  Correct?

CAJBCOL2                       Trosten - cross

1   A.  That is correct.

2   Q.  There was financing, however, in connection with the Lee

3   deal.  Correct?

4   A.  Correct.

5   Q.  The Lee deal was being financed by several different-- in

6   several different manners.  Correct?

7   A.  Correct.

8   Q.  One way the Lee deal was being financed was Thomas H. Lee

9   was putting in cash.  Correct?

10  A.  Yes, that's correct.

11  Q.  And another way the Lee deal was being financed was a bond

12  offering so investors could invest through bonds in the

13  company.  Correct?

14  A.  Correct.

15  Q.  And a third way the Lee deal was being financed was Phillip

16  Bennett was taking the equity from the old Refco that he had

17  and rolling over some of it into the new Refco.  Correct?

18  A.  I don't know if that's how you call it being financed, but,

19  yes, he was rolling over his equity into the new Refco.

20  Q.  And that, the amount that-- the value of his new equity

21  depended on the amount of debt that was financed in the bond

22  offering.  Correct?

23  A.  That is correct.

24  Q.  I'm going to show you exhibit-- Government Exhibit 1003,

25  which is the letter of intent.  And I ask you to turn, sir-- or

1    I ask Ms. O'Connor--

2              MR. SCHWARTZ:  Could we have a copy for Mr. Trosten?

3    Q.  Do you have it in front of you?

4    A.  I do.

5    Q.  I ask you to turn to page 2.  You see at the bottom of page

6    2, there's something called "Sources" and "Uses." correct?

7    A.  I do.

8    Q.  That's the sources of the funds that are going to come into

9    the deal and the uses of the funds.  Correct?

10   A.  Correct.

11   Q.  Let's just focus on sources.  The first source is 500

12   million in excess cash.  That's the sham transaction we just

13   talked about.  Right?

14   A.  That is correct.

15   Q.  The second source is senior and subordinated debt.  That's

16   a billion 250 and that's the bond transaction we just talked

17   about.  Correct?

18   A.  It's part of the bond transaction.  There's also senior

19   debt bank transaction, as well.

20   Q.  That's third-party senior--

21   A.  Yes, it's third-party debt.

22   Q.  Then there's THL equity.  That's what he is going to

23   invest, Thomas H. Lee, or they are going to invest.  Correct?

24   A.  Correct.

25   Q.  And they are going to put in cash of $627 million.

1   Correct?

2   A.   That's contemplated here.  Correct.

3   Q.   And one of the sources of the funds contemplated here is

4   Mr. Bennett's rolled-over equity of $472 million.  Correct?

5   A.   That is correct.

6   Q.   And the reason it's a source of funds is that's 472 that

7   he's not taking out, but he's putting back into the company.

8   Right?

9   A.   He's leaving it, his interest in the company.

10          MR. SCHWARTZ:  I'm going to take this down, please.

11   Q.   And when Joe Collins had the words "PRB Financing" typed,

12   you don't know what he meant.  Correct?

13   A.   I do not.

14   Q.   Now, on direct examination, the government also showed you

15   a couple of flow of funds memos.  Do you remember that?

16   A.   I do.

17   Q.   So let's just back up, sir, if you will, and let's discuss

18   what a flow of funds memo is.

19          Whenever you do a transaction, there's a closing.

20   Correct?

21   A.   Correct.

22   Q.   And typically, or at least in this closing, money exchanged

23   hands.  Correct?

24   A.   That is correct.

25   Q.   And there are memos prepared to show how the flow of funds

CAJBCOL2                              Trosten - cross

1    went.  Correct?

2    A.  In this transaction, that's correct.

3    Q.  And in this transaction, there were two such flow of funds

4    memos:  One was the flow of funds memo showing how the money

5    that was being invested into the merger and acquisition by Lee

6    and the debt-- people with the debt was going to be used.

7    Correct?

8    A.  That is correct.

9    Q.  And there was a second flow of funds memo that was going to

10   show how the money upstream between RGHI and people it had to

11   pay was going to flow.  Correct?

12   A.  As well as internal transactions within BAWAG.

13   Q.  As well as internal transactions within BAWAG.

14          And as far as you know, sir, the Lee people never

15   asked you to see that second flow of funds memo.  Correct?

16   A.  They did not ask me that, no.

17   Q.  And you participated-- and the first flow of funds memo,

18   the one for the Lee transaction, that was created at Weil

19   Gotshal, which were Thomas H. Lee's lawyers.  Correct?

20   A.  That is correct.

21   Q.  And they called you and they asked you for information

22   about the flow of funds that would have been in your hands so

23   they could put it into the memo.  Correct?

24   A.  I don't remember.

25   Q.  Well, either you or somebody told them that the $500

CAJBCOL2                    Trosten – cross

1   million was going to be sent to a bank account in New York.

2   Correct?

3   A.  That is correct.

4   Q.  And if it wasn't you, it was somebody working for you.

5   Correct?

6   A.  Or Phil Bennett.

7   Q.  Or Phil Bennett.  And you knew that was false information.

8   A.  Correct.

9   Q.  Now, the government showed you the final flow of funds

10  memo.  Do you remember that?

11  A.  The T.H. Lee?

12  Q.  Yes.

13  A.  Yes, they did.

14  Q.  And that's Exhibit 1005.88.

15          MR. SCHWARTZ:  Can we call it up?

16  Q.  And it refers to something called the working group.

17  Correct?

18  A.  Correct.

19  Q.  The government didn't show you on direct examination, did

20  they, the document that shows where this was actually

21  distributed?  Correct?

22  A.  No, they did not.

23  Q.  Well, I will.  Let's take a look at Defense Exhibit 183 for

24  identification.

25          Do you recognize that as an e-mail distributing the

CAJBCOL2                          Trosten - cross

1   final flow of funds memo on the day before the closing?

2   A.  Yes.

3               MR. SCHWARTZ:  I offer.

4               MR. CHERNOFF:  No objection.

5               THE COURT:  Received.

6               (Defendant's Exhibit 183 received)

7   Q.  Let's first start with the second page.  This is exactly

8   the memo that we just had up from the government exhibits.

9   Right?

10  A.  That page, yes.

11  Q.  And everything that comes behind it is the flow of funds

12  memo that was attached to the government exhibit.  Right?

13  A.  Yes.

14  Q.  Now let's look at the first page.  This is the e-mail

15  through which Weil Gotshal actually distributed the document.

16  Correct?

17  A.  Yes.

18  Q.  And let's look at who it was distributed to.

19              MR. SCHWARTZ:  Can we blow-up the "to"?

20  Q.  It was distributed to some lawyers, correct, at Cravath?

21  A.  Correct.

22  Q.  It was distributed to CSFB?

23  A.  Yes.

24  Q.  Do you understand DPW to be Davis Polk, another law firm?

25  A.  I don't remember.

CAJBCOL2                         Trosten - cross

1   Q.  You don't see it--

2   A.  I see it.  I just don't remember that that's what it means.

3   Q.  You don't see next to the "to" any reference to any of

4   Refco's lawyers at Mayer Brown?

5   A.  I do not.

6   Q.  Now let's go to the cc's.  It's distributed to various

7   people at Thomas H. Lee.  Correct?

8   A.  Correct.

9   Q.  It is distributed to you.  Correct?

10  A.  Correct.

11  Q.  And it is distributed to various lawyers at Weil Gotshal.

12  Correct?

13  A.  Correct.

14  Q.  It was not cc'd to Joe Collins.  Correct?

15  A.  Correct.

16  Q.  Nor to any of his partners or associates.  Correct?

17  A.  It does not appear so.

18              (Continued on next page)

19

20

21

22

23

24

25

BY MR. SCHWARTZ:

Q.  And one of the reasons you received it was you wanted to
make sure that the money that was being paid to Refco was going
to go to the right place, correct?

A.  I don't remember why I had been on the distribution list,
but I clearly looked through it and confirmed it with Phil.

Q.  But you were the CFO, correct?

A.  Yes.

Q.  And a lot of money is going to be wired that you're
concerned gets to the right place, correct?

A.  Correct.

Q.  So when you looked at it, this was your job, to make sure
that the money went to the right place, correct?

A.  Both Phil and myself.

Q.  Not Mayer Brown's job?

A.  No.

Q.  Do you recall testifying on direct about a data room?

A.  Yes.

Q.  Let's just quickly review that.  The data room was a room
that was set up early in due diligence so that Thomas H. Lee or
any other bidder could come in and look at significant
documents of Refco, correct?

A.  Correct.

Q.  And you were the person in charge of setting up the data
room, correct?

1   A.  From Refco's perspective, correct.

2   Q.  And you also called other people or contacted other people

3   who might have Refco documents and ask them to send them over

4   so you could put them in the data room, correct?

5   A.  That is correct.

6   Q.  And this is back in the early winter of 2004, late fall of

7   2003, right?

8   A.  Approximately, correct.

9   Q.  And one of the things they were interested in seeing in the

10  data room, you believe, were various legal documents related to

11  the company and its subsidiaries and affiliates, correct?

12  A.  Correct.

13  Q.  And some of these were kept at Mayer Brown, correct?

14  A.  Correct.

15  Q.  So you contacted Mr. Collins and said, can you ship over a

16  whole bunch of documents to me, right?

17  A.  That is correct.

18  Q.  Let me show you what we have marked for identification as

19  Defense Exhibit 106.  That is a transmittal letter from Joe

20  Collins to you of various legal documents that you had

21  requested, correct?

22  A.  Correct.

23  Q.  In order to be put into the data room, correct?

24  A.  Correct.

25          MR. SCHWARTZ:  We offer it.

CAJPCOL3                     Trosten – cross

 1            MR. CHERNOFF:  No objection.

 2            THE COURT:  Received.

 3            (Defendant's Exhibit 106 received in evidence)

 4            MR. SCHWARTZ:  Can we put that up on the board?  Thank

 5   you.

 6   Q.  And we see it's dated January 14, 2004?

 7   A.  Yes.

 8   Q.  And it refers to "project Royce; company records," correct?

 9   A.  Correct.

10   Q.  You weren't asking Mr. Collins to do any legal work here;

11   you were just asking him to send over some documents, right?

12   A.  That is correct.

13   Q.  And as far as you know, this is what he contributed to due

14   diligence prior to April of 2004, correct?

15            MR. CHERNOFF:  Objection, foundation.

16   Q.  You were in charge of due diligence?

17   A.  I was in charge of the data room and coordinating due

18   diligence and doing presentations with others.

19   Q.  So as far as you know, this is what Joe Collins contributed

20   to the due diligence prior to April?

21   A.  As far as I know.

22   Q.  And do you see it is re: Project Royce; that was the code

23   name, correct?

24   A.  That's correct.

25   Q.  Can you enlighten us on why the word "Royce" was chosen?

1   A.  I cannot.

2   Q.  Who chose it?

3   A.  I don't remember.

4   Q.  And you see the first item -- Well, first Joe says, "Rob,

5   enclosed are 'company records' packages for the following

6   affiliates," and then the first one is Refco Group, LTD, LLC,

7   correct?

8   A.  Correct.

9   Q.  And did you understand, sir, that included, in company

10  records packages, would be LLC agreements?

11  A.  I would think so.  I just don't remember.

12  Q.  Well, take a look now at the third page.  Do you see the

13  sentence there under 24, item 24 says, "Please note that there

14  are no attached schedules -- no membership schedules attached

15  to the Refco Group or Refco Securities, LLC, agreements,"

16  correct?

17  A.  Correct.

18  Q.  So this would indicate to you, am I correct, that

19  Mr. Collins was providing you with Refco -- a Refco Group or

20  more than one Refco Group LLC agreement, correct?

21  A.  That's what it implies, yes.

22  Q.  Now, at this time, as far as you understood, there had been

23  several different versions of the Refco, LLC, agreement,

24  correct?

25  A.  When you say versions, I'm sorry.

CAJPCOL3                     Trosten - cross

1    Q.  Amendments?

2    A.  Yes.

3    Q.  And there had been four amendments, correct?

4    A.  Time frame?

5    Q.  As far as you knew, prior to January 14, 2004?

6    A.  Yes.

7    Q.  And is it a fact, sir, that you did not keep an executed

8    copy of a fourth amended LLC agreement at Refco?

9    A.  I don't remember.

10   Q.  That was one that referred to the Proceeds Participation

11   Agreement, correct?

12   A.  Correct.

13   Q.  And it referred to DF Capital, correct?

14   A.  Correct.

15   Q.  I'm going to show you what's Defense Exhibit 1098 for

16   identification.

17            MR. SCHWARTZ:  And your Honor my colleague has asked

18   me to warn you about the staples.  I also warn Mr. Trosten.

19            THE COURT:  Thank you.

20            MR. SCHWARTZ:  And I assume the government heard the

21   warning.

22            THE COURT:  They're lethal.

23   Q.  This is an unexecuted copy of the fourth amended LLC

24   agreement; is that correct, that you knew to be in effect in

25   January of 2004?

CAJPCOL3                     Trosten - cross

1    A.  May I just have a minute?

2    Q.  Absolutely.

3              MR. CHERNOFF:  Your Honor, this document, I think,

4    does exist with Bates numbers somewhere, but that's not the one

5    that Mr. Schwartz has provided anyone.  So I don't know how the

6    witness can be asked to read 30 to 40 pages of single-spaced

7    print at this time.

8              MR. SCHWARTZ:  Your Honor, I'm going to ask him about

9    a few provisions that I don't think anybody has dispute about,

10   and we will double-check to make sure it is precisely the one

11   that the government thinks it is, but I apologize.

12             THE COURT:  All right.  Well, we'll see if the witness

13   can answer.  Go ahead.

14   Q.  Does it appear to be an unexecuted copy?

15   A.  It may be.

16             MR. SCHWARTZ:  Well, you know what, is the executed

17   copy in evidence?  Your Honor, we'll try to find the one the

18   government is referring to.

19             THE COURT:  Yes, sir.

20             MR. SCHWARTZ:  I apologize to you and the jury and to

21   you, Mr. Trosten.

22   Q.  Let's move on, Mr. Trosten.  This will be a little too

23   complicated.  I think I can make it simpler.

24   A.  Okay.

25   Q.  There's no question that someone reading what you

1  understood at the time to be the fourth amended LLC agreement,

2  would have seen that there was a Proceeds Participation

3  Agreement?

4  A.  Yes.  That's correct.

5  Q.  Okay.

6  A.  Sorry.

7  Q.  That's okay.  It's a common problem with a leading

8  question.

9           And there's no question, sir, that somebody would have

10  seen a reference to DF Capital, correct?

11  A.  Correct.  If they read it.

12  Q.  Isn't it a fact, sir, that what Joseph Collins sent, one of

13  the documents he sent with respect, together with Defendant's

14  Exhibit 106, the cover memo we just looked at, was an

15  unexecuted version of the fourth amended LLC agreement?

16           MR. CHERNOFF:  Your Honor, objection to the form.

17           THE COURT:  Shall we try it again?

18           MR. SCHWARTZ:  Will you put back 106 on the screen.

19  Q.  Mr. Collins sent a number of documents together with this

20  e-mail, correct, this memo?

21  A.  To the best of my recollection.

22  Q.  And isn't it a fact that one of those documents was an

23  unexecuted version of the fourth amended LLC agreement?

24  A.  I don't remember.

25  Q.  Isn't it a fact, you didn't put an unexecuted version of

1   the LLC agreement into the data room, correct?

2   A.  I don't remember.

3   Q.  You didn't want DF Capital to be disclosed, correct?

4   A.  That is correct.

5   Q.  And isn't it a fact that the Lee lawyers learned of an

6   unexecuted copy of the fourth amended LLC agreement and asked

7   you for the signed original?

8   A.  Perhaps you can refresh my recollection.

9   Q.  I'm going to show you what is Defense Exhibit 107 for

10  identification.

11          THE COURT:  Thank you.

12  Q.  And I ask you if that is an e-mail to you -- to Phil

13  Bennett from you on March 2, 2004?

14  A.  Yes.

15          MR. SCHWARTZ:  We offer it.

16          MR. CHERNOFF:  No objection, your Honor.

17          THE COURT:  Received.

18          (Defendant's Exhibit 107 received in evidence)

19          MR. SCHWARTZ:  Can we put it up on the screen, please.

20  Q.  You are forwarding an e-mail to Mr. Bennett that you had

21  received from Credit Suisse, correct?

22  A.  That is correct.

23  Q.  And that e-mail says "Rob, TH Lee's counsel, Weil Gotshal,

24  had some follow-up with respect to their review of the data

25  room materials.  I attach below."  Do you see that?

CAJPCOL3                    Trosten - cross

1    A.  I do.

2    Q.  And then there's an e-mail below that that was sent to CSFB

3    that's being forwarded to you from Daniel Gewirtz at Weil

4    Gotshal, correct?

5    A.  That is correct.

6    Q.  Daniel Gewirtz was one of the lawyers at Weil Gotshal that

7    you understood was in charge of their due diligence efforts in

8    the data room, correct?

9    A.  I don't remember.

10   Q.  Can you see now paragraph 4 under that e-mail.  One of the

11   items --

12          MR. SCHWARTZ:  Thank you, Miss O'Connor.

13   Q.  One of the items that they are requesting, owners of Refco

14   Group, Limited, LLC.  "We saw an unexecuted copy of the parent

15   company LLC agreement and noted that the signatory members to

16   the LLC agreement were two corporations and an LLC, Refco Group

17   Holdings, Inc." -- it goes over to the next page -- "Refco

18   Group Holdings, LLC, and BAWAG Overseas, Inc.  We would like to

19   see the corporate documentation for such entities, as well as

20   view any arrangements among the members, such as shareholders

21   agreements or other contractual arrangements.  We would also

22   like to see the executed parent company LLC agreement and a

23   capitalization chart."

24          Now, when you saw that, sir, you understood that the

25   fourth amended LLC agreement had somehow ended up in the data

CAJPCOL3                          Trosten - cross

```
 1   room?
 2            MR. CHERNOFF:  Objection, mischaracterizes the
 3   document.
 4   Q.  Did you understand that --
 5            THE COURT:  I'm sorry.  Excuse me.  I'm sorry,
 6   Mr. Chernoff.  I don't think counsel was characterizing the
 7   document.  I think he's asking the witness that when he saw
 8   this inquiry, did he realize such and such.
 9            MR. CHERNOFF:  There was a use of the term fourth
10   amendment that's quite --
11            THE COURT:  I see.
12            MR. SCHWARTZ:  I'm not characterizing the document at
13   all.
14            MR. CHERNOFF:  I'll withdraw the objection.
15   Q.  You understood from this paragraph that the unexecuted
16   version of the fourth amended LLC agreement had somehow ended
17   up in the data room, correct?
18   A.  That is incorrect.
19   Q.  You testified on direct that, at some point in time, you
20   decided that you had to go into the data room with a member of
21   your team and clean it out of all documents that might refer to
22   DF Capital or the Proceeds Participation Agreement, correct?
23   A.  That is correct.
24   Q.  And isn't it a fact, sir, that this was one of the things
25   that made you realize you had to do that?
```

1   A.  I don't understand the question.

2   Q.  Isn't it a fact, sir, that when you got this e-mail, you

3   were concerned?

4   A.  Concerned about what?

5   Q.  That there might be an unexecuted copy of the fourth

6   amended LLC agreement in the data room?

7   A.  I was not.

8   Q.  And isn't it a fact, sir, that after you went on your

9   private mission to the data room, Joseph Collins asked you if

10  you could provide him with an executed version of the fourth

11  amended LLC agreement?

12  A.  I don't remember.

13  Q.  And isn't it a fact, sir, you told him it was not signed

14  and does not exist?

15  A.  I also do not remember that.

16  Q.  And it was very important to you that none of the financial

17  records inside Refco revealed the existence of DF Capital,

18  correct?

19  A.  Correct.

20  Q.  That was an important part of the conspiracy, correct?

21  A.  Correct.

22  Q.  Because when Lee took over the company, Lee would have

23  access to the financial records of the company, correct?

24  A.  If they wanted to, correct.

25  Q.  And one of the things the company does, in addition to

CAJPCOL3                          Trosten - cross

1    maintaining the books and records, is it maintains the

2    documents that support those books and records, correct?

3    A.  Correct.

4    Q.  So that if you pay an invoice, you maintain the invoice so

5    it can be reviewed by the auditors, correct?

6    A.  You should.  That's correct.

7    Q.  And it was very important to you, sir, that nobody

8    mistakenly sent in an invoice that might refer to DF Capital,

9    correct?

10   A.  An invoice?

11   Q.  Anything, put anything in the financial records that might

12   refer to DF Capital?

13   A.  Correct.

14   Q.  Because that was essential to the success of the

15   conspiracy?

16   A.  Correct.

17   Q.  Let's take a look at Defendant's Exhibit 161 for

18   identification.  That is an invoice from Mayer Brown dated

19   May 4, 2004; is that correct?

20   A.  It appears to be, correct.

21            MR. SCHWARTZ:  We offer it.

22            MR. CHERNOFF:  No objection.

23            THE COURT:  Received.

24            (Defendant's Exhibit 161 received in evidence)

25   Q.  This looks like the kind of invoice you typically received

CAJPCOL3                    Trosten - cross

1    from Mayer Brown, correct?

2    A.  Assuming they -- I don't -- I don't remember.  This isn't

3    like the one that I saw back from 1999.

4    Q.  Well, do you see attached to it there is a remittance

5    statement?

6    A.  I do.

7    Q.  And do you see on the front -- You have no doubt you

8    received this; is that correct?

9    A.  I don't remember if I had or had not.

10   Q.  Do you see that it is an invoice for project Royce,

11   correct?

12   A.  Correct.

13   Q.  That is the Lee deal, correct?

14   A.  That is correct.

15   Q.  And you paid Mayer Brown invoices for the Lee deal,

16   correct?

17   A.  I approved them for payment.

18   Q.  And then they were put into the files and saved, correct?

19   A.  Once I approved them, I would assume they were saved, but I

20   don't know.

21   Q.  And since you assume they were saved, they would have been

22   available to Thomas H. Lee when he took over the company,

23   correct?

24   A.  If this was sitting in someone's office and they went in

25   and looked for it, potentially, yes.

CAJPCOL3                          Trosten - cross

1   Q.  Well --

2   A.  I don't know.

3   Q.  Let's take a look at what Mr. Collins is billing for.  Do

4   you see in the middle of the description, "Preparation for and

5   conference regarding DFC, BAWAG investments, and issues related

6   to the proposed transactions"; do you see that?

7   A.  Yes, I do.

8   Q.  That's a clear reference to DF Capital, correct?

9   A.  Yes.

10  Q.  Then do you see it says "Preparation of DF Capital

11  agreement"?  That's a clear reference to DF Capital; is that

12  correct?

13  A.  Yes.

14  Q.  And this invoice was sent by Joe Collins to you, correct?

15  A.  I don't recall it.

16  Q.  Now, on direct examination, you testified that you believed

17  it was essential to the conspiracy that the Tone Grant

18  agreement not be produced to Thomas H. Lee or its lawyers,

19  correct?

20  A.  I never saw the Tone Grant agreement during my -- while I

21  was at Refco.

22  Q.  Let me change the question.  You testified that you thought

23  it was critical to the conspiracy that TH Lee not find out how

24  much Tone Grant was being paid?

25  A.  That's correct.

1  Q.  Because if TH Lee found out how much Tone Grant was being

2  paid, the entire conspiracy might come crumbling down, correct?

3  A.  That is correct.

4  Q.  Were you aware, sir, that Joe Collins' firm provided the TH

5  Lee agreement to Weil, Gotshal and Manges at the closing?

6  A.  Which deal?

7  Q.  I withdraw that.  That they provided the Tone Grant

8  agreement to Weil, Gotshal and Manges at the closing?

9  A.  I'm not aware of that.

10  Q.  Are you aware, sir, that it found its way into a closing

11  binder prepared by Weil Gotshal and Manges?

12  A.  I don't remember.

13  Q.  Did you get a copy of the closing binder?

14  A.  I left immediately after the transaction closed.

15  Q.  And did Phil Bennett ever send you the binder?

16  A.  I don't recall ever having a binder, a closing binder.

17  Q.  Did you ever see a binder?

18  A.  Not while I was working at Refco.

19  Q.  After you were working at Refco?

20  A.  Are you asking me if I ever saw a binder from the time I

21  left the company until today?

22  Q.  Yes.

23  A.  I don't remember.

24  Q.  And let's just -- let me ask you this.  When the company

25  does a large transaction like the TH Lee transaction, there are

CAJPCOL3                    Trosten - cross

1    many, many documents, correct?

2    A.  Correct.

3    Q.  And there's a thing called a closing checklist, correct?

4    A.  I don't know if they use the term of that but --

5    Q.  There's a list that shows what needs to be at closing,

6    correct?

7    A.  Correct.

8    Q.  So that the lawyers and the parties who are attending the

9    closing can go down the list and make sure it's all there,

10   correct?

11   A.  For transactions such as this size, yes.

12   Q.  And then after the closing, all the documents involved are

13   put into a binder so that people can have a record of what took

14   place, correct?

15   A.  In most transactions that I've been involved in, yes.  We

16   call them "bibles."

17   Q.  You call them bibles?

18   A.  Yes, you receive the bible.

19   Q.  And the word bible is used because this is all the

20   documents holy to the deal, right?

21   A.  No, I don't know why it was ever called that, but that's

22   just what we received.

23   Q.  And as you sit here today, it's your testimony you have no

24   recollection of ever having seen the TH Lee, Refco bible?

25   A.  It is -- Yes.

CAJPCOL3                        Trosten - cross

1    Q.  Let me just show you a document and ask you if it refreshes

2    your recollection.

3    A.  Okay.

4    Q.  I'm going to show you what has been marked as Defense

5    Exhibit 1010 for identification, and ask you, sir, does that

6    refresh your recollection that you may have seen or that you

7    did see the bible?

8    A.  No, because I left the firm almost literally the next day

9    and came back just to tell Phil I wasn't coming back.

10   Q.  Okay.  Now, you remember on direct examination you were

11   asked a series of questions about representations and the

12   warranties that appear in the EPMA, the equity purchase and

13   merger agreement, with Thomas H. Lee?

14   A.  I remember, yes.

15   Q.  And do you remember, sir, that you gave your opinion with

16   respect to several of them, that the failure to provide a

17   Proceeds Participation Agreement, in your view, violated those

18   representations and warrantees, correct?

19   A.  Some of them, correct.

20   Q.  And it is a fact, sir, that you never discussed with Joseph

21   Collins that you held this opinion, correct?

22   A.  That is correct.

23   Q.  And you felt that some of those provisions had been

24   violated because the PPA gave certain rights to DF Capital,

25   correct?

CAJPCOL3                    Trosten – cross

```
 1    A.  Correct.
 2    Q.  DF Capital had received, in 2002 in the Proceeds
 3    Participation Agreement, a right to convert its purchase -- its
 4    proceeds participation to equity, correct?
 5    A.  Correct.
 6    Q.  And it had received a lien on the stock of the company?
 7    A.  "The company" being?  Refco?
 8    Q.  Refco.
 9    A.  That's correct.
10    Q.  And it provided that they had to consent to any deal going
11    forward, correct?
12    A.  DF Capital did, yes.
13    Q.  In other words, DF Capital had the power to hold up the
14    deal if it didn't approve it, correct?
15    A.  Correct.
16    Q.  And you understood that DF Capital and BAWAG were
17    essentially one in the same?
18    A.  Yes.
19    Q.  They had the same lawyers?
20    A.  Yes.
21    Q.  The same principals?
22    A.  I don't know what the principals were of the entity DF
23    Capital.
24    Q.  But you understood that was controlled by BAWAG?
25    A.  Yes.
```

1    Q.  And that it was BAWAG who would decide whether to hold up

2    the deal by asserting these rights, correct?

3    A.  That was my understanding, yes.

4    Q.  And it is a fact that you never, for one instant, believed

5    that BAWAG was going to hold up this deal, correct?

6    A.  I did not believe that they would hold up the deal, no.

7    Q.  You never believed they were going to come and say, now we

8    want to get equity for our proceeds right, correct?

9    A.  Point in time?

10   Q.  When you started talking to Lee.

11   A.  Correct.

12   Q.  And you never believed they were going to say, you can't

13   sell this stock to Lee; we've got a lien on it?  They were

14   never going to do that, correct?

15   A.  I didn't believe that they would, that's my opinion.

16   Q.  And not only were they not going to withhold consent, they

17   gave their consent to do this deal, correct?

18   A.  I don't know what you mean by they gave their consent.

19   Q.  They signed the deal?

20   A.  Which deal?

21   Q.  All the deals.

22   A.  DF Capital did not sign the TH Lee deal.

23   Q.  BAWAG did?

24   A.  BAWAG waived its interest.

25   Q.  And BAWAG was DF Capital?

1   A.  Not as it related to the TH Lee deal.

2   Q.  But as it related to these rights, it was BAWAG that was

3   going to decide whether to exercise them, right?

4   A.  Correct.

5   Q.  There was no way that DF Capital was going to come into a

6   deal where BAWAG was getting paid hundreds of millions of

7   dollars and say, stop the presses, we don't want this deal to

8   go forward, correct?

9   A.  Depending on the price, that would be correct.

10  Q.  Depending on the price that you had?

11  A.  On the price that we had, I did not believe that DF Capital

12  would exercise that right.

13  Q.  They were hungry for this deal, correct?

14  A.  I wouldn't use the term "hungry."

15  Q.  Excited for it?

16  A.  I believe they were.

17  Q.  And you know that through your own conversations with the

18  BAWAG people, right?

19  A.  Yes.

20  Q.  "Let's get this closed" was their attitude, correct?

21  A.  I don't remember if that was their attitude.

22  Q.  But "we're very happy to do this," that was their attitude?

23  A.  Yes, "we're working together to get this done," that's

24  correct.

25  Q.  So it's fair to say that their right to convert their

CAJPCOL3                    Trosten - cross

1   agreement to equity, their liens and their right to have a

2   consent, had absolutely no impact on this deal going forward,

3   correct?

4            MR. CHERNOFF:  Objection to the form.

5            THE COURT:  Sustained.

6   Q.  It is fair to say, as you understood, they weren't going to

7   convert the stock to equity -- I mean, their proceeds

8   participation into equity, correct?

9   A.  Correct.

10  Q.  They weren't going to exercise their liens, correct?

11  A.  Correct.

12  Q.  And they weren't going to withhold their consent, as you

13  understood?

14           MR. CHERNOFF:  It's all been asked and answered.

15  Could Mr. Schwartz move on to another point.

16           THE COURT:  We probably have done this, haven't we?

17  Probably ask --

18  Q.  So you understood -- It was your understanding that those

19  rights would have no impact on this deal going forward,

20  correct?

21  A.  Correct.

22  Q.  Now, you testified earlier on cross-examination that you

23  thought of Phil Bennett as a father figure, correct?

24  A.  Yes.

25  Q.  Let me show you what's been marked as Defense Exhibit 111

1   for identification.

2   A.   Thank you.

3   Q.   That is the letter you sent to Phil Bennett on New Year's

4   Eve 2002; is that correct?

5   A.   I sent it out around New Year's Eve.   Yes, I remember it.

6   Q.   It was New Year's greetings, correct?

7   A.   Correct.

8            MR. SCHWARTZ:   We offer it.

9            MR. CHERNOFF:   No objection.

10           THE COURT:   Received.

11           (Defendant's Exhibit 111 received in evidence)

12           MR. SCHWARTZ:   May we put it up on the screen.

13   Q.   Now, December 31, 2002, that's the point where the hole is

14   still getting bigger, right?

15   A.   Yes.

16   Q.   The fraud has now become a huge fraud, correct?

17   A.   It was still a fraud throughout my tenure at Refco.   You

18   say huge.

19   Q.   The hole was becoming huge?

20   A.   Yes.

21   Q.   Or excuse me, huger?

22   A.   Yes.

23   Q.   Let's take a look at what you say to Mr. Bennett.   In fact,

24   2002 was right before you decide to go try and sell the

25   company, right?

CAJPCOL3                     Trosten - cross

1    A.  Within a year.

2    Q.  So "Dear Phil:  Several years ago, with the viability of

3    Refco hanging in the balance, one man came to the forefront to

4    lead.  A leader with the focus and drive not yet seen by this

5    institution.  A difference maker.

6            "It is time for a new generation to cope with new

7    problems and new opportunities for there is a new world to be

8    won.  President Kennedy said these words during an independence

9    day speech in 1960."

10           You didn't mean to compare Phil Bennett to President

11   Kennedy, did you?

12   A.  Not in the absolute term, no.

13   Q.  But you wanted him to be flattered by that?

14   A.  Yes.

15   Q.  He was conducting an enormous fraud with your assistance,

16   correct?

17   A.  Yes.

18   Q.  And you're praising him on his leadership of that fraud; is

19   that correct?

20   A.  I'm praising him on his leadership.

21   Q.  I'm going back to reading.  "You have put together a group

22   of leaders who, under your direction, have taken Refco to new

23   heights and prosperity."  That's just a lie, correct?

24   A.  In terms of its income, it is a false statement, that's

25   correct.

1    Q.  The word "prosperity" with the phrase "new heights" is an

2    out and out lie, correct?

3    A.  Yes.

4    Q.  And you knew that Phil Bennett knew that, correct?

5    A.  Yes.

6    Q.  But you wanted to flatter him, so you said it anyway,

7    right?

8    A.  Yes.

9    Q.  "The year ended 2002 has come with some remarkable

10   achievements.  On February 11th, the first wave of personnel

11   moved back into our downtown office, after five months after

12   the tragic events of September 2001.  Later that year, as we

13   were finalizing our third consecutive year" --

14           THE COURT:  Slowly.

15           MR. SCHWARTZ:  I apologize.  I apologize principally

16   to the reporter, but also to the Court.

17   Q.  "Later that year, as we were finalizing our third

18   consecutive year of record earnings under your direction, you

19   were meeting with our Austrian partner and they, at the 11th

20   hour, tried to renegotiate the multiple."

21           These are the secret negotiations that Bennett had

22   with BAWAG on the Proceeds Participation Agreement that Joe

23   Collins did not attend, correct?

24   A.  Joe did not attend these, no.

25   Q.  "You held firm and the deal was closed this past summer.

1   Further, we had a record level of revolver participation, and

2   the largest private placement ever issued by Refco."

3           Now, both the revolver participation, which is a loan,

4   correct?

5   A.  Yes.

6   Q.  And the private placement, which is private placement of

7   debt, also a loan, correct?

8   A.  Correct.

9   Q.  Were secured by fraud, correct?

10  A.  Correct.

11  Q.  "Although we would both like to see, and will see, stronger

12  performance in our operating subsidiaries, this year we will

13  set a record in core performance, as evidenced by the projected

14  fiscal 2003 earnings exceeding $140 million."

15          That 140 doesn't take account of the deepening hole,

16  correct?

17  A.  It does take into account the deepening hole.  We referred

18  to the interest income increasing the hole.

19  Q.  If the hole -- there were no hole, you wouldn't be talking

20  about $140 million of earnings, correct?

21  A.  That is correct.

22  Q.  So you have 140 million because you and Bennett have

23  committed a huge fraud?

24  A.  Correct.

25  Q.  Next page.  "That being said, we have not taken comfort or

1  slowed down efforts to improve operations as a result of this

2  strong performance.  We will lead a joint effort of

3  rationalizing operations, restructuring p/l deals, reviewing

4  acquisition targets, rebuilding our foreign exchange business,

5  re-inventing our asset management platform, maximizing returns

6  from customer group balances, repricing local business,

7  et cetera.

8          "For all that we have done to date, so much more can

9  be accomplished, and there is no better man to lead Refco in

10  these endeavors than you.  Vince Lombardi once said 'The

11  quality of a person's life is in direct proportion to their

12  commitment to excellence, regardless of their chosen field of

13  endeavor.'"

14          Do you believe that to be true with respect to

15  yourself, sir?

16  A.  Yes.

17  Q.  And it is also true with respect to Phillip B. Bennett,

18  correct?

19  A.  I'm sorry, who?

20  Q.  Phillip Bennett.

21  A.  Yes.

22  Q.  But not in the way you intended him to read this, correct?

23  A.  Correct.

24  Q.  "It is that commitment to excellence which you possess that

25  I hope to instill in my son or daughter.  For it will make he

CAJPCOL3                    Trosten - cross

 1   or she a great leader and, more importantly, a great person."

 2          You're telling Phil Bennett you want your kids to grow

 3   up to be like him, correct?

 4   A.  Yes.

 5   Q.  "With that, I wish you, Valerie and the kids a very happy

 6   and prosperous new year and look forward to our continued

 7   success as we advance our partnership to new levels in 2003."

 8          And as you sat there writing this letter, you knew the

 9   hole would get bigger in 2003, correct?

10   A.  Barring something extremely unusual, yes, I believed that.

11   Q.  Let me back up a second, sir.  I think I found a document

12   the government was referring to before.

13          MR. SCHWARTZ:  We offer Defendant's Exhibit 7 for

14   identification as a copy of the fourth amended -- unexecuted

15   fourth amended LLC agreement from the files of Mayer Brown.

16   We're offering it.

17          MR. CHERNOFF:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 7 received in evidence)

20   Q.  Now, sir, you can put that down.  You testified on direct

21   examination that Phillip Bennett never told you not to tell Joe

22   Collins about the fraud; is that correct?

23   A.  I'm sorry.  May I ask you to repeat the question, please?

24   Q.  You may.  You testified on direct examination that Phillip

25   Bennett never told you not to tell Joe Collins about the fraud,

CAJPCOL3                    Trosten - cross

1    correct?

2    A.  That's correct.

3    Q.  It is also a fact that Phillip Bennett never told you not

4    to tell Dennis Klejna about the fraud, correct?

5    A.  That is correct.

6    Q.  It's also true that Phillip Bennett never told you not to

7    tell Thomas H. Lee about the fraud, correct?

8    A.  That is correct.

9    Q.  It is also true that Phillip Bennett never told you not to

10   tell CSFB about the fraud; is that correct?

11   A.  Yes.

12   Q.  It is also true that Phillip Bennett never told you not to

13   tell your friend, the auditor, Mark Rambler about the fraud; is

14   that correct?

15   A.  Yes, that is correct.

16   Q.  You understood implicitly that you could not tell people

17   about the fraud who were not involved in the fraud; isn't that

18   correct?

19   A.  At Refco, yes.

20   Q.  And within Refco, at Refco, you and Phillip Bennett had

21   open conversations about the fraud behind closed doors,

22   correct?

23   A.  Yes.

24   Q.  And sometimes Santo Maggio was in those open conversations

25   behind closed doors, correct?

CAJPCOL3                     Trosten – cross

1   A.  Yes.

2   Q.  And Joe Collins was never invited into those meetings

3   behind closed doors; is that correct?

4   A.  Yes.

5           MR. SCHWARTZ:  No further questions.

6           THE COURT:  Thank you.  Do you want to do a little

7   bit, or do you want to break now for lunch?

8           MR. CHERNOFF:  We do need to pull some exhibits

9   together.

10          THE COURT:  Ladies and gentlemen, we'll take the lunch

11  break now.  I probably have to send you out into the rain, I'm

12  afraid.  Would you follow the normal rules.  Leave your

13  exhibits, take your pads with you, please.  Remember not to

14  discuss the case amongst yourselves or with anyone else or to

15  do any research on the case.  We'll see you at 2:00 ladies and

16  gentlemen.  Please stay dry.

17          (Jury exits)

18          THE COURT:  Anything else on the record, counsel?

19          MR. CHERNOFF:  No, your Honor.  Thank you.

20          MR. SCHWARTZ:  No, your Honor.

21          THE COURT:  Thanks.  Off the record.

22          (Whereupon a luncheon recess was taken.)

23          (Continued on next page)

24

25

Cajbcol4                          Trosten – cross

1                     A F T E R N O O N   S E S S I O N

2                                2:35 P.M.

3               (In open court; jury not present)

4               THE COURT:  Good afternoon, friends.  May we bring the

5      jurors in.

6               MR. CHERNOFF:  Yes, your Honor.

7               (Jury present)

8               THE COURT:  Thank you, ladies and gentlemen.  Won't

9      you be seated.  We'll move to the redirect examination of the

10     witness.

11              Mr. Chernoff.

12              MR. CHERNOFF:  Thank you, your Honor.

13              Put up Government Exhibit 1612, please.

14     REDIRECT EXAMINATION

15     BY MR. CHERNOFF:

16     Q.  Mr. Trosten, this is the letter from Phillip Bennett to

17     Joseph Collins in October of 1999.  You remember Mr. Schwartz

18     asked you some questions about this letter on

19     cross-examination?

20     A.  I do.

21     Q.  And the nature of those questions concerned several false

22     statements that Mr. Bennett made in this letter to Mr. Collins.

23     Correct?

24     A.  Correct.

25     Q.  Now, did you have any involvement in preparing this letter?

1   A.  No.

2   Q.  Did you receive a copy of it at the time?

3   A.  No.

4   Q.  Do you have any idea why Mr. Bennett put false information

5   in this letter to Mr. Collins?

6   A.  No.

7   Q.  And take a look at the kind of information that's in there.

8           MR. CHERNOFF:  If we could just advance up, Mr. Smith,

9   just a little bit, so Mr. Trosten can view the screen.  And we

10  can go to the next page, please.  Thank you.

11  Q.  Now, is this the kind of information that you, in your

12  dealings with Mr. Collins, might have just picked up the phone

13  and told him?

14  A.  Yes.

15  Q.  And do you have any idea why Mr. Bennett wrote this out in

16  this letter instead of himself just calling Mr. Collins?

17  A.  I do not.

18  Q.  Do you have any idea whether Mr. Collins asked Mr. Bennett

19  to send him a letter like this?

20          MR. SCHWARTZ:  Objection, your Honor.  Good faith

21  basis.

22          THE COURT:  Mr. Chernoff?

23          MR. CHERNOFF:  I think the answer is --

24          MR. SCHWARTZ:  The answer's going to be no and what

25  he's doing is asking questions to get no answers, Judge.

1        MR. CHERNOFF:  I didn't know that was an objection

2   based on what I heard on cross, but I'll withdraw the question.

3        THE COURT:  All right, kids.

4        MR. CHERNOFF:  Thank you, your Honor.

5   Q.  Did Joe Collins ever ask you to send him documents?

6   A.  Did Joe ever ask me to send him documents?

7   Q.  Yes.

8   A.  Not that I remember.

9   Q.  Let me ask you to now take a look at Government Exhibit

10  136.  I'm sorry, I meant Defendant's Exhibit 136.

11       Mr. Trosten, take a look at that letter.  You remember

12  this is that letter that Mr. Schwartz was asking you about with

13  respect to the Niederhoffer transaction?

14  A.  Yes.

15  Q.  And if you flip to the third page of this exhibit, this is

16  the assignment agreement that would have kept the amounts in

17  question within the consolidated group?

18  A.  That's correct.

19  Q.  And flipping ahead-- I'm sorry, back one page, this is the

20  one that Mr. Collins faxed to Mr. Bennett.  Correct?

21  A.  Correct.

22  Q.  And when Mr. Collins sent over a document like this, did

23  you have any way of knowing whether he also had an associate or

24  another junior lawyer working with him to draft it?

25  A.  He typically would have others working with him, but I

1    wouldn't know if this was drafted by him or someone else.

2    Q.  Now, take a look at Government Exhibit 135.  You'll

3    remember Mr. Schwartz's chart, Exhibit 5, Defense Exhibit 5,

4    this is the one that assigned the amount in question outside of

5    the consolidated group.  Right?

6    A.  Correct.

7             MR. CHERNOFF:  Defense Exhibit 135.

8    Q.  And you were asked a bunch of questions by Mr. Schwartz to

9    compare the two letters with respect to the capitalization, the

10   underlining of "witnesseth" questions of that nature.

11            Do you remember those?

12   A.  I do.

13   Q.  And I think you were asked about the spelling of

14   Niederhoffer in these exhibits.  Correct?

15   A.  I was.

16   Q.  Take another look, please, at Government Exhibit 136.  I'm

17   sorry, I keep saying that.  Defense Exhibit 136.

18            And you see in the draft that Mr. Collins initially

19   faxed over it spells Niederhoffer N-e-i-d-e-r, et cetera?

20            MR. SCHWARTZ:  Objection, your Honor.

21   A.  In this draft it says N-e-i-d-e-r-h-o-f-f-e-r.

22   Q.  And now if you could flip to the cover page, Defense

23   Exhibit 136, do you see Mr. Collins' handwriting there?

24   A.  I do.

25   Q.  And how does he spell Niederhoffer?

Cajbcol4                    Trosten - redirect

1   A.  N-i-e-d-e-r-h-o-f-f-e-r.

2   Q.  And do you happen to know if that's the correct way to

3   spell it, by the way?

4   A.  I do not.

5   Q.  Okay.  So Mr. Collins in his own handwriting is spelling it

6   N-e-i.  Let's take a look back at Defense Exhibit 135?

7   A.  Did you say N-e-i or N-i-e?

8   Q.  I meant to say N-i-e.  Thank you, Mr. Trosten.

9           And on Defense Exhibit 135, here Niederhoffer is

10  spelled N-i-e-d, et cetera?

11  A.  Yes.

12  Q.  The same way Mr. Collins spells it in his own handwriting?

13  A.  Yes.

14          MR. CHERNOFF:  We can take those down.

15          Could we bring up Government Exhibit 1504?

16  Q.  And this is the proceeds participation agreement, you'll

17  recall, Mr. Trosten?

18  A.  I do.

19          MR. CHERNOFF:  Mr. Smith, if we could advance to the

20  bottom of page 3, Article II, "Company Sale."

21  Q.  Mr. Trosten, do you remember on cross-examination

22  Mr. Schwartz was asking you about the question you had raised

23  about how this was being drafted, being that if all of Refco

24  was sold, the entire ownership was sold, it would be sold by

25  RGHI?

Cajbcol4                          Trosten - redirect

1    A.   That's correct.

2    Q.   Okay.   Take a look now at Article III, which concerns the

3    company sale, and I'll read a bit of it and then have a

4    question.

5         "Company sale.   The parties hereto agree and

6    acknowledge that it is their understanding that the company's

7    board of managers shall endeavor to sell the membership shares

8    of the company or its assets (the 'Company sale'), including

9    without limitation by means of any of the following actions:

10        "A, the sale of the ownership of the company, or the

11   sale of all shares of all holding companies of the company."

12        Mr. Trosten, that's the transaction that's described

13   on Mr. Schwartz's chart where the whole company's membership

14   shares are sold?

15   A.   That is correct.

16   Q.   Now let's look at B:   "The sale of all or substantially all

17   of the assets of the company including without limitation by

18   means of any of the following actions."   And then you see

19   there's three possible actions by which the assets of the

20   company would be sold.

21   A.   Yes.

22   Q.   Now, if Refco is selling off its assets or substantially

23   all of the assets, where would the buyer be paying the money

24   for that purchase?

25   A.   If the company was selling or divesting of its assets, then

Cajbcol4                         Trosten - redirect

1    Refco would be receiving the monies from that sale.

2    Q.  Let me show you what's been marked Government Exhibit 6 for

3    identification.  And when you take into account the possibility

4    provided in the PPA of Refco selling off its assets or

5    substantially all of its assets, does Government Exhibit 6

6    reflect the flow of funds in that case?

7    A.  In the case of the assets?

8    Q.  Yes.

9    A.  Yes.

10             MR. CHERNOFF:  Your Honor, government offers

11   Government Exhibit 6 which is an amended version of the defense

12   exhibit on display here.

13             MR. SCHWARTZ:  Which one was -- voir dire.

14   VOIR DIRE EXAMINATION

15   Q.  Does this represent what was going to happen in the Lee

16   deal?

17   A.  No.

18             MR. SCHWARTZ:  Objection.

19             THE COURT:  Mr. Chernoff.

20             MR. CHERNOFF:  Your Honor, I'm asking about what the

21   PPA does.  The PPA was written well before the Lee deal, so I

22   don't know what the relevance is of the voir dire or the

23   objection.

24             THE COURT:  Mr. Schwartz?

25             MR. SCHWARTZ:  It has no relevance to the case, your

Cajbcol4                        Trosten - redirect

1   Honor.  This kind of sale was not done, it wasn't contemplated,

2   it wasn't discussed.  It was in the PPA, but that's not what

3   the company did or tried to do.  It's just irrelevant.

4              THE COURT:  Overruled.  I'll receive it.

5              MR. CHERNOFF:  Thank you, your Honor.

6              (Government's Exhibit 6 received)

7              MR. CHERNOFF:  And could we bring that up?

8   Q.  And so you see where Mr. Schwartz had written "buyer" with

9   an arrow going to RGHI?

10  A.  I do.

11  Q.  And that's what would happen, those two arrows to RGHI and

12  BAWAG, in the event of the entire company being sold?

13  A.  Correct.

14  Q.  But on the lower left hand, if the buyer was buying some or

15  substantially all or all of Refco's assets, the money would be

16  paid to the buyer.  Correct?

17  A.  That is correct.

18             MR. CHERNOFF:  Thank you.  You can take that down.

19             May I have one moment, your Honor?

20             THE COURT:  Yes.

21             MR. CHERNOFF:  I'm sorry, please put that back up,

22  Mr. Smith.

23             Your Honor, with the help of Livenote, my trial

24  partner, Mr. Levy, said I misspoke.

25  Q.  The money was going from the buyer to Refco, not the money

1  going to the buyer, of course.

2  A.  Yeah, the money is going from the buyer to Refco.

3  Q.  Okay.  And then there's an arrow on the right-hand side

4  that shows 27 percent from Refco going to DFC.  What does

5  represent?

6  A.  DF Capital.

7  Q.  And why is there a 27 percent arrow?  What would that

8  reflect in this transaction if a buyer were buying the assets

9  of Refco?

10  A.  After DF Capital made its second installment, it had the

11  right to receive 27.2 percent in the event of a sale or the

12  sale of the assets of Refco.

13  Q.  So in the sale of assets, the money goes from the buyer to

14  Refco, and then some money goes from Refco to BAWAG or DF

15  Capital?

16  A.  To DF Capital, correct.

17  Q.  Thank you.

18          I'm going to show you what's been marked for

19  identification as Government Exhibit 710.

20  A.  Thank you.

21  Q.  And you see Government Exhibit 710 is a memorandum from

22  Mr. Collins to Jay Tabor?

23  A.  Yes.

24  Q.  And Jay Tabor was a lawyer at Weil Gotshal representing

25  Thomas H. Lee in the transaction that we've been talking about

Cajbcol4                    Trosten - redirect

1    in this trial.  Correct?

2    A.   Correct.

3            MR. CHERNOFF:  Your Honor, the government offers 710.

4            MR. SCHWARTZ:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 710 received.)

7    Q.   Now, Mr. Schwartz asked you several questions earlier on

8    cross about consents that were provided for in the PPA.

9    A.   Yes.

10   Q.   And you see that this time, if you just refer to the first

11   page, paragraphs 2, 3 and 4.  Do you see those?

12   A.   I do.

13   Q.   Do those reflect consents that Mr. Collins was sending to

14   Mr. Tabor in order for this deal to take place?

15   A.   Yes.

16   Q.   So it's fair to say that regardless of how likely or

17   unlikely the consents were to be given, they had to be gotten

18   and given to Thomas H. Lee?

19   A.   Yes.

20           MR. CHERNOFF:  One moment, your Honor.

21   Q.   Let me just ask you to briefly describe each of these

22   consents as you understood them.  The first one says "Concepts

23   of the members of Refco Group approving the transfer of

24   membership shares owned by RGHI."

25   A.   It just means that RGL is consenting to transfer the shares

1    that were owned by Refco Group Holdings.

2    Q.  And what about the next one, unanimous consent of managers

3    of Refco Group?

4    A.  "Unanimous consent of the managers of Refco Group, Limited

5    proven the transfer of the membership shares owned by Refco

6    Group Holdings, LLC and its withdrawal," that's a consent that

7    was needed relating to Refco Group Holdings, LLC'S 10 percent

8    interest that RGHI owned.

9    Q.  And the fourth one, what kind of consent was that?

10   A.  Consent of the members of Refco Group Holdings, Inc.

11   authorizing the transfer to-- I'm sorry, I'll repeat it.  It's

12   consent from the members of Refco Group Holdings, LLC

13   authorizing the transfer to Refco Group Holdings, Inc.

14   Q.  Thank you, Mr. Trosten.  You can put that aside.

15       Mr. Schwartz asked you, as well, about payments that

16   you received under the profits participation plan when BAWAG

17   made its first payment under the PPA?

18   A.  BAWAG to DF Capital.

19   Q.  Right, BAWAG to DF Capital paid under the first

20   installment, and then you received a share of the profits from

21   that.

22   A.  Yes.

23   Q.  And Mr. Bennett received a share of the profits from that,

24   as well, as a partial owner of --

25       MR. SCHWARTZ:  Objection to the use of the term

Cajbcol4                    Trosten – redirect

1    "profits."

2              MR. CHERNOFF:  What term would you like me to use?

3    I'll use it.  Let me rephrase.

4              MR. SCHWARTZ:  There were no profits.

5              MR. CHERNOFF:  Let me rephrase.

6    Q.  The payments, the money that was being paid under the PPA

7    by DF Capital, you received some of it through the profit

8    participation plan?

9    A.  I did receive some of the proceeds, yes.

10   Q.  And you knew that Mr. Bennett was receiving some -- in

11   fact, a much larger percentage of that money.  Correct?

12   A.  He did receive a larger payment than I did, yes.

13   Q.  And he received that payment because he was a partial

14   owner, a substantial owner, of Refco, of RGHI?

15   A.  Because he was an owner of RGHI and he was also part of our

16   profit participation plan.

17   Q.  And Mr. Schwartz asked on cross-examination whether you

18   told Mr. Collins that you were getting money from this payment

19   by DF Capital.

20              Do you remember that?

21   A.  Yes.

22   Q.  Any doubt in your mind whether Mr. Collins knew that Phil

23   Bennett was an owner of Refco?

24   A.  There was no doubt in my mind that Joe knew that Phil was

25   an owner.

Cajbcol4                    Trosten – redirect

1   Q.  And Mr. Collins drafted the PPA on Refco's behalf.

2   Correct?

3   A.  Correct.

4   Q.  Now, the flow of funds memos that we saw towards the end of

5   the cross-examination.  You were shown Defense Exhibit 183.

6          MR. CHERNOFF:  Could we bring that up?

7   Q.  And this is the flow of funds memo that the Thomas H. Lee

8   people had in which the PPA payments-- by that I mean payments

9   to DF Capital-- weren't on it.  Right?

10  A.  That is correct.

11  Q.  And that's because you were hiding the PPA and payments to

12  DF Capital from Thomas H. Lee?

13  A.  Yes.

14  Q.  Now, Mr. Schwartz asked you whether this flow of funds

15  memo, according to this e-mail, had been sent to Mr. Collins.

16  Correct?

17  A.  Yes.

18  Q.  Any doubt in your mind as to whether Mr. Collins disclosed

19  the PPA or the side letter agreement or the existence of DF

20  Capital to Thomas H. Lee?

21  A.  No, he did not.

22  Q.  So you didn't need a flow of funds memo to know that the

23  PPA was not being turned over?

24  A.  That's correct.

25  Q.  And, in fact, the Refco side had its own flow of funds memo

Cajbcol4                    Trosten - redirect

1    that showed the payments to DF Capital?

2    A.   Yes.

3    Q.   And that's the one we looked at in your direct examination?

4    A.   Yes.

5              Mr. Chernoff, may I just correct an answer that I gave

6    earlier?

7    Q.   Absolutely.

8    A.   You had asked me if Joe ever asked me to send him

9    documents.  And he may have, but for the most part it was the

10   other way around.  I'd ask him to send me drafts of documents,

11   but there may have been times where I sent him stuff.  You

12   asked me about that earlier.

13   Q.   Understood.

14             MR. CHERNOFF:  Could we see Defense Exhibit 2,

15   please?

16   Q.   Now, as you discussed on cross-examination, this is the

17   portion, or as I think it was called the two legs, of the

18   round-trip loans, the year-end paydown transactions, that were

19   documented by Mr. Collins.

20   A.   Yes.

21   Q.   And what's missing here is the journal entry that would be

22   performed internally at Refco to make the funds flow from RGHI

23   to Refco and back?

24   A.   Yes.

25             MR. SCHWARTZ:  Your Honor, I would just interpose a

Cajbcol4                        Trosten - redirect

1  leading objection for future questions.

2          THE COURT:  There is that.

3          MR. CHERNOFF:  Yes, your Honor.

4  Q.  Defense Exhibit 2, do those arrows reflect the

5  documentation in the indemnities and guaranties in the instance

6  of the year down paydown-- year-end paydown that you executed?

7  A.  It does not reference the indemnities and guaranties, no.

8  Q.  But the arrow--

9          MR. CHERNOFF:  Maybe we'll just bring up Government

10 Exhibit 2A.

11 Q.  That red dotted line references the guaranties and

12 indemnities.  Correct?

13 A.  That's correct.

14 Q.  Those are the parties that are participating in that?

15 A.  Yes.

16 Q.  Okay.

17         MR. CHERNOFF:  Could we go back to Defense Exhibit 2?

18 Q.  And, so, looking just at these two legs of the transaction,

19 in the short-term year-end paydowns that you participated in,

20 Refco lent money to the customer?

21 A.  Yes.

22 Q.  And then the customer lent money to RGHI?

23 A.  Correct.

24 Q.  Same amounts being lent to the customer as being lent to

25 RGHI?

Cajbcol4                        Trosten - redirect

1          MR. SCHWARTZ:  Objection, your Honor; leading.

2          MR. CHERNOFF:  I'm just trying to move along, your

3    Honor, but I can do it the slow way.

4          THE COURT:  Are you able to answer that question, sir?

5          THE WITNESS:  Yes.

6          THE COURT:  And the answer is?

7          THE WITNESS:  Yes, it is.

8          MR. CHERNOFF:  Thank you, Judge.

9    Q.  Now, what was your understanding of why the customer agreed

10   to participate in these two legs that we see up on Defense

11   Exhibit 2?

12   A.  Because the customer was going to make a profit.

13   Q.  How so?

14         MR. SCHWARTZ:  Objection; beyond the scope.  He

15   brought this out on direct examination.

16         THE COURT:  Right.

17         MR. SCHWARTZ:  And this is beyond the scope of cross.

18         THE COURT:  Beyond the scope.

19         MR. CHERNOFF:  I'm asking about a defense exhibit so I

20   thought it came out on cross.

21         THE COURT:  The question is really as to this

22   particular question.  Is there more that follows it that

23   relates to the defense exhibit?

24         MR. CHERNOFF:  Let me withdraw the question.  I'll ask

25   a penultimate question.

Cajbcol4                    Trosten - redirect

1   Q.  Which is that, in this transaction, is the effect that

2   Refco is lending money to RGHI via this customer?

3            MR. SCHWARTZ:  Objection; leading.

4            THE COURT:  Sustained.

5   Q.  Mr. Trosten, please describe for us in your own words what

6   is unfolding in these transactions as we see them in Defense

7   Exhibit 2.

8   A.  The debt or portion-- assume there were amounts to this.

9   That amount of debt that RGHI had owed to Refco would be

10  transferred to make it appear like it was owed by a customer.

11  Q.  And what are the actual transactions that are taking place

12  to accomplish that?

13  A.  Refco was loaning money to a customer at an interest rate.

14  The customer was loaning money to RGHI at a slightly higher

15  interest rate.  And that had the effect of taking the debt that

16  RGHI had with Refco and transferring it as if it was from a

17  customer.

18  Q.  And was RGHI receiving the same amount that Refco was

19  loaning to the customer?

20  A.  Yes.

21  Q.  In other words, if the customer weren't-- withdrawn.

22            The customer, you said, was earning a percentage based

23  on the difference in interest rates?

24  A.  Yes.

25  Q.  Other than that, is anything happening here except Refco

Cajbcol4                        Trosten – redirect

1    loaning money to RGHI?

2              MR. SCHWARTZ:  Objection; leading.

3              MR. CHERNOFF:  I'll rephrase.

4              THE COURT:  Go ahead.

5    Q.   What's the final outcome of the two red arrows that we see

6    here?

7    A.   That Refco is effectively loaning the money to RGHI through

8    the customer.

9    Q.   And the customer is making money on the deal.  Correct?

10             MR. SCHWARTZ:  Objection; leading.

11             THE COURT:  I think it's already been established

12   that --

13             MR. CHERNOFF:  Thank you, your Honor.

14             THE COURT:  Go ahead.

15   Q.   Mr. Trosten, in your experience as a CFO dealing with

16   corporate finance, is there any valid business purpose to that

17   kind of a transaction?

18             MR. SCHWARTZ:  Objection.

19             THE COURT:  I'll permit that.

20             MR. SCHWARTZ:  Can we have a sidebar, your Honor?

21             THE COURT:  Say it, sir.

22             MR. SCHWARTZ:  Sidebar.

23             THE COURT:  Of course.  Miss Reporter.

24             (At the sidebar)

25             (Continued on next page)

Cajbcol4                        Trosten - redirect

1              (At the sidebar)

2              MR. SCHWARTZ:  Your Honor, they are essentially trying

3      to substitute his opinion about whether this is legitimate just

4      on the documents for Joseph Collins.  It has no relevance to

5      Joseph Collins' state of mind whatsoever which is the issue in

6      this case.  His opinion about this is irrelevant.  There were

7      lawyers working over the case.  Davis Polk had these documents.

8      This is truly unfair.  This is his opinion and it may be

9      relevant to describe legal documents that Joseph Collins did,

10     what he thought they meant.

11             But to describe that, there's no legitimate purpose to

12     this.  That's just way beyond what he's capable of doing.  He's

13     not an expert on this.  And his experience, as you well know,

14     as a CFO doing corporate transactions is not exactly a great

15     experience from which to draw.  It is entirely an unfair

16     question with an unfair inference attached to it.

17             MR. CHERNOFF:  Your Honor, this is a member of the

18     conspiracy talking about his perception of the transactions

19     that he took place in.

20             THE COURT:  Took part in.  Took part in.

21             MR. CHERNOFF:  Pardon?

22             THE COURT:  Took part in.

23             MR. CHERNOFF:  Took part in.  Sorry.

24             Whatever Mr. Schwartz may think about Mr. Trosten's

25     accounting expertise, I think he's shown that he certainly

Cajbcol4                          Trosten - redirect

knows the material.  I think the point is not that difficult a

one to grasp.  He's certainly qualified to say that this

transaction was not for a valid purpose.  He was doing these

transactions.  He's an essential part of the conspiracy.

Mr. Schwartz just said he was --

          THE COURT:  Please, the reporter can't hear

Mr. Chernoff if you're so close to her.  If you want to talk,

you guys switch places.

          MR. CHERNOFF:  So Mr. Schwartz just said they're going

to prove that Davis Polk had these documents, and we can take

up whether that's a valid piece of evidence.  But what they're

trying to show, I guess, is that someone who just looked at

these loan transactions alone would have know idea that this

was for some improper purpose.

          And they're entitled to cross Mr. Trosten, recross

him, on what other purpose there might have been, if they think

there is one, because that's the argument they're making to the

jury.  Mr. Collins I think has said he thought there may be

some kind of a tax shelter.  If they can substantiate that

through this witness, they're entitled to try to do that, but

Mr. Trosten is totally capable of rendering testimony about

this as a member of the conspiracy who understood how the

transactions worked.

          MR. SCHWARTZ:  Your Honor, it is-- he's rendering an

opinion without the experience to understand what other kinds

Cajbcol4                    Trosten - redirect

1    of transactions might be done this way.  That he sees no other

2    purpose in this is not relevant to whether Mr. Collins could

3    have seen some other purpose.  It's simply not relevant to that

4    and he shouldn't be allowed to testify to that.

5         THE COURT:  It seems to me it's different-- the thing

6    that makes this different is that he was a member of the

7    conspiracy.  He was the guy who knew about these transactions.

8    I don't see why, as part of the conspiracy, he can't say there

9    was no legitimate basis for this.

10        MR. SCHWARTZ:  No, he can say that the documents were

11   used in the conspiracy and he can describe how they were used

12   in the conspiracy.  But what he can't do is render what is

13   essentially a legal opinion that there is no legitimate purpose

14   for this kind of transaction, for this kind of documentation.

15   That is well beyond what he is capable of talking about.

16        THE COURT:  I'm not so sure it's a legal opinion.  If

17   there's a tax shelter benefit or something that is beyond his

18   ken, have at it.  But I think as a member of the conspiracy,

19   who has told us that these transactions were an essential part

20   of the conspiracy, that he is, indeed, capable and it is

21   probative for him to say I know of no legitimate basis for such

22   transactions.

23        MR. BACH:  Judge, he was being asked to give an

24   opinion about how these documents would look to anyone, whether

25   they were inside the conspiracy or outside the conspiracy.

1           THE COURT:  The question is, in his experience as a

2     CFO, is there any valid basis?  Which is, I think, a different

3     question from what you've supposed.

4           MR. BACH:  But he's not asking him based on your role

5     in the conspiracy.  He's asking him based on your role as a

6     CFO.  And we could have every witness in this case who has

7     business experience chime in with an opinion.  And some of

8     these are sophisticated lawyers who, you know, could come in

9     with opinions about whether they've seen transactions like this

10    or not and we can get into another morass of opinion evidence

11    here with lawyers testifying about the meaning of legal

12    documents and what they mean to them.

13          And the Court has been very good --

14          THE COURT:  It's not this question.

15          MR. BACH:  This question doesn't ask him about his

16    knowledge as a conspirator.  This says in your experience as a

17    CFO.  So it's asking him objectively.

18          THE COURT:  Okay.

19          MR. CHERNOFF:  And, your Honor, that's the experience

20    he brings to the conspiracy.  So he's explaining why, as a CFO,

21    as a head of the conspiracy, he's hiding these documents.  He's

22    hiding the indemnities and guaranties from anyone who might

23    figure out just by looking at them without looking at the

24    journal entry that this is an illegitimate transaction and it's

25    meant to move money off the books.

1        MR. SCHWARTZ:  He's hiding them.  Joseph Collins

2    wasn't hiding this.  They haven't proven that Joseph Collins is

3    hiding.  I --

4        THE COURT:  What's that got to do with anything?

5        MR. SCHWARTZ:  I don't understand what this has to do

6    with Joseph Collins' state of mind.  The testimony is

7    essentially what he's about to say, because you can't look at

8    this without knowing it's a fraud.  That is putting his head

9    into Joseph Collins's head.  It is not probative of Joseph

10   Collins's head.

11       THE COURT:  But I don't think that's what it's being

12   offered for.  He's not saying this is Collins' knowledge.

13       MR. BACH:  He's saying any CFO.

14       MR. SCHWARTZ:  Would you instruct the jury that they

15   cannot take from his testimony that Joseph Collins believed

16   this?

17       THE COURT:  Come on, stop.

18       MR. SCHWARTZ:  But you said that's not what he's

19   offering it for.  Of course that's what he's offering it.

20       THE COURT:  I hear what you're saying.  What else?

21       MR. CHERNOFF:  That's all, your Honor.

22       THE COURT:  What is the difference between as the CFO

23   and as a conspirator?

24       MR. CHERNOFF:  Your Honor, if the Court is asking

25   whether I should withdraw the portion that says as a CFO, but

1    to me they can argue that he had special expertise.  The

2    defense will argue, as they're entitled to, that this would

3    represent specific expertise.  He understood the whole deal,

4    the journal entries, taking the debt off the books.  He saw all

5    these things that, based on his factual knowledge and

6    expertise, Joe Collins couldn't have seen.  But this is offered

7    for the fact that this witness understood that even on the

8    transactions documentation, this had to be hidden in his

9    opinion as a member of the conspiracy and that's why the

10   conspiracy took steps to do that.

11            MR. SCHWARTZ:  Your Honor, if he's going to be allowed

12   to ask the question, we have no problem with him asking the

13   question as a member of a CFO-- as a CFO.  If your Honor is

14   going to permit it, go ahead and ask it.  We've made our

15   argument.

16            MR. CHERNOFF:  Okay.

17            THE COURT:  Well, this was a nice respite for you to

18   come over here.

19            Thank you, Ms. Reporter.

20            MR. CHERNOFF:  Your Honor, may I ask the question be

21   read back?

22            MR. SCHWARTZ:  Your Honor is going to rule as

23   appropriate.  I can anticipate the ruling.

24            THE COURT:  Yes.  Yes.

25            MR. BACH:  We preserve our objection.

1        MR. SCHWARTZ:  I didn't mean to take the Court's

2    prerogative away from it.

3        THE COURT:  Are you going to rephrase the question or

4    do you want me to read it?

5        MR. CHERNOFF:  Could your Honor read it back?

6        THE COURT:  "QUESTION:  Mr. Trosten, in your

7    experience as a CFO dealing with corporate finance, is there

8    any valid business purpose to that kind of a transaction?"

9    A.  No.

10   Q.  And that was with reference to Defense Exhibit 2, which we

11   don't have up but we'll display it for you.  Correct,

12   Mr. Trosten?

13   A.  That is correct.

14   Q.  Thank you, Mr. Trosten.

15        Mr. Trosten, you remember some questions on

16   cross-examination that Mr. Schwartz posed to you about your

17   failure to pay proper taxes.  Correct?

18   A.  Yes.

19   Q.  And those were the same subjects you testified about on

20   direct examination.  Correct?

21   A.  Yes.

22   Q.  You told the government in one of your early proffers that

23   the tax fraud you had engaged in in the past concerned these

24   backdated options that you talked about?

25   A.  Yes.

Cajbcol4                        Trosten - redirect

1  Q.  And as you testified on your direct examination and on

2  cross, you didn't mention to the prosecutors that you had also

3  filed a return for 2004 in which you wrongly treated some of

4  your salary as capital gains?

5  A.  That is correct.

6  Q.  It was a lot of money.

7  A.  Yes.

8  Q.  And in 2005, before you were ever charged criminally here,

9  did you file an amended return?

10  A.  I did.

11  Q.  What did you do in that amended return?  Did you pay the

12  full tax?

13  A.  I reallocated some of that income properly as compensation

14  and paid taxes, interest and penalties.

15  Q.  And how much did you pay at that time?

16  A.  In excess of $12 million.

17  Q.  And you filed that return with the Internal Revenue

18  Service?

19  A.  Yes, I did.

20  Q.  Were you audited after that by IRS?

21  A.  I was.

22  Q.  How long did they audit you after you filed your amended

23  return?

24  A.  Several months.

25  Q.  And what was the result of the audit?

Cajbcol4                    Trosten - redirect

1  A.  It came back with no changes.

2  Q.  In 2005, you then started talking to the prosecutors about

3  your crimes at Refco?

4  A.  Yes.

5  Q.  And you did not in those proffer sessions initially mention

6  the capital gains tax issue.  Correct?

7            MR. SCHWARTZ:  Objection; leading.

8            THE COURT:  I kind of think this is to expedite

9  matters, isn't it?

10            MR. CHERNOFF:  Yes, your Honor.

11            THE COURT:  Go ahead, sir.

12  A.  Which capital gains are you referring to?

13  Q.  The issue on the amended return, you didn't mention that to

14  prosecutors when you first started meeting with them?

15  A.  No, I did not.

16  Q.  At that point you had resolved it with the IRS or was it

17  still open?

18  A.  The issue-- I don't remember whether the issue was open or

19  whether it was resolved.  Actually, I do.  The matter was open.

20  Q.  How was it open at that point?

21  A.  I had filed an amended return.  And at that point I don't

22  recall if the return had begun to be audited.

23  Q.  Roughly, do you recall when you made the tax payment of

24  penalty and interest?

25  A.  It was in October of '05.

Cajbcol4                    Trosten - redirect

1  Q.  And, Mr. Trosten, do you understand that your failure to

2  mention that amended return in your first meetings with the

3  government could be considered by a judge in deciding what your

4  sentence will be in this case?

5  A.  Yes.

6  Q.  Mr. Schwartz asked you several times whether you hope to

7  get a sentence of probation when your sentencing takes place.

8  A.  Yes.

9  Q.  Is it fair to say that that is your hope?

10  A.  Yes.

11  Q.  No time in your life have you thought maybe I'd like to go

12  to prison for some time?

13  A.  No.

14  Q.  No one has promised you a sentence of probation.  Correct?

15  A.  That's correct.

16  Q.  You fully understand you may be sentenced to a term of

17  years in prison?

18  A.  I do understand that.

19  Q.  And who is that up to?

20  A.  My sentencing judge.

21  Q.  You were asked about adjournments in your sentencing.  Who

22  requested those adjournments in your sentencing?

23  A.  The government.

24  Q.  And what was the purpose, as you understand it, in having

25  the sentence adjourned?

Cajbcol4                    Trosten - redirect

1    A.  It was adjourned because the government was still

2    investigating and I had not finished with my cooperation.

3    Q.  And were those adjournments approved by a judge?

4    A.  Yes.

5    Q.  I think you testified that Judge Buchwald approved of those

6    adjournments?

7    A.  She did approve those adjournments.

8    Q.  And what relation does Judge Buchwald have to your case?

9    Have you testified before her?

10   A.  Yes, I have.

11   Q.  And was that in a criminal trial of Tone Grant?

12   A.  Yes.

13   Q.  Do you have an understanding that any of the judges who

14   heard you testify can ultimately sentence you according to this

15   Court's policy?

16   A.  I do.

17   Q.  And that the transcript of all of your testimony, direct

18   and cross-examination, will be available to the sentencing

19   judge?

20   A.  Yes.

21   Q.  You've already testified against Mr. Grant.  Correct?

22   A.  I have, yes.

23   Q.  And do you consider that having provided substantial

24   assistance to date to the government?

25   A.  Yes.

1   Q.  What could you do now that would forfeit your cooperation

2   agreement with the government?

3   A.  I can not testify truthfully and I can commit further

4   crimes.

5   Q.  In other words, if you commit further crimes, you'd lose

6   the agreement?

7   A.  That's correct.

8   Q.  And if it's determined that you have not testified

9   truthfully, or that you committed further crimes and you lose

10  your cooperation agreement, can you take back your guilty

11  plea?

12  A.  No, I cannot.

13  Q.  And if you lose your cooperation agreement, can the judge

14  sentence you without regard to any of the cooperation you've

15  given over the years?

16  A.  Yes.

17  Q.  What is your understanding of the factors that the

18  sentencing judge will consider in sentencing you?

19  A.  The severity of the crimes that I've committed, that I've

20  pled guilty to; the crimes such as tax fraud that I've not pled

21  guilty to; a report that we filed by probation; the

22  government's 5K1 letter describing my cooperation; letters that

23  may come forth on my behalf, as well as letters from others,

24  victims, et cetera, that would not be on my behalf.

25  Q.  And, by the way, based on your written cooperation

Cajbcol4                    Trosten - redirect

1  agreement that's in evidence, what is your understanding as to

2  whether the verdict of this jury, or any jury you've testified

3  before or do testify before, can be considered in fashioning

4  your own sentence?

5  A.  My agreement makes no reference to the guilt or innocence

6  of anyone as it relates to a sentencing judge factoring it into

7  my sentence.

8          MR. CHERNOFF:  I have no further questions, your

9  Honor.  Thank you.

10         THE COURT:  Thank you.

11         MR. SCHWARTZ:  I do have recross with the Court's

12 permission.

13         THE COURT:  Yes, sir.

14         MR. SCHWARTZ:  May I have Government Exhibit 6 up on

15 the screen?

16 RECROSS EXAMINATION

17 BY MR. SCHWARTZ:

18 Q.  Mr. Trosten, you see on the screen is the government's new

19 drafting of Defense Exhibit 6 and my chart, which is also in

20 front of you.  Correct?

21 A.  Yes, it is.

22 Q.  Now, when the proceeds participation agreement was being

23 negotiated in 2002, and you were confused and perplexed about

24 how Refco would be able to pay proceeds if it weren't going to

25 get them in a sale, were you talking about the scenario in

Cajbcol4                          Trosten - recross

1   Defense Exhibit 6 or the scenario in Government Exhibit 6?

2   A.  I was talking about the scenario in Defense Exhibit 6.

3   Q.  And that is the scenario that you called my client about.

    Correct?

5   A.  That is correct.

6   Q.  And that is the scenario that the guaranty resolved for

7   you.  Is that correct?

8   A.  Yes.

9   Q.  Not that one that's on the screen.  Correct?

10  A.  That is correct.

11  Q.  And when you started talking about selling the company to

12  Lee, you weren't talking about a sale of assets, which is

13  what's reflected on the screen.  Correct?

14  A.  That is correct.

15  Q.  You were talking about the scenario that is addressed in

16  Defense Exhibit 6 that's on the board.  Correct?

17  A.  That is correct.

18  Q.  And Lee bought the company, not its assets.  Correct?

19  A.  It merged into-- but, yes, correct.  It's more reflective

20  of --

21  Q.  -- Defense Exhibit 6?

22  A.  That's how the transaction was effectuated, yes.

23  Q.  The company never wanted to do Government Exhibit 6.

24  Correct?

25  A.  It was not contemplated in the Lee deal, no.

Cajbcol4                    Trosten - recross

1   Q.  And when you started looking for buyers, it wasn't

2   contemplated.  Correct?

3   A.  That is correct.

4   Q.  And when you talked to Joe Collins about the confusion and

5   perplexity that you had over what had changed in the PPA, it

6   wasn't contemplated.  Correct?

7   A.  That is correct.

8   Q.  What was contemplated was the resolution that came about by

9   making this-- by the guaranty making this an upstream

10  transaction in Defense Exhibit 6.  Correct?

11  A.  Yes.

12          MR. SCHWARTZ:  Can you take it down, please?

13  Q.  Now, the government showed you Government Exhibit 710.

14          MR. SCHWARTZ:  Can we have that put up on the board?

15  Q.  And they asked you about consents.  Correct?

16  A.  Yes.

17  Q.  The consents that are in Government Exhibit 710 are not

18  consents to the Lee deal.  Correct?

19  A.  They relate to the Lee deal.

20  Q.  But they were not consents approving the Lee deal.

21  Correct?

22          MR. CHERNOFF:  Objection; asked and answered,

23  argumentative.

24          MR. SCHWARTZ:  It was not answered.

25  Q.  They are not consents to the Lee deal.  Correct?

Cajbcol4                    Trosten - recross

1          THE COURT:  I think that's the exact question that was

2     asked.

3     Q.  They are not consents to the sale of the company.  Correct?

4     A.  That is correct.

5     Q.  They are consents to change the ownership of RGHI.

6     Correct?  To change-- excuse me.  To change the ownership of

7     Refco before the Lee deal.  Correct?

8     A.  Correct.

9     Q.  They have nothing to do with consenting about whether Refco

10    could be sold to Lee.  Correct?

11    A.  Correct.

12    Q.  Do you remember the date the Lee deal was signed?  Was the

13    Lee deal signed on June 8, 2004?

14    A.  Yes.

15    Q.  And did BAWAG put its signature on that page, on the page

16    of the Lee deal, on June 8, 2004?

17    A.  Yes.

18    Q.  And you understood that to be BAWAG's consent to the Lee

19    deal.  Correct?

20    A.  Yes.

21          MR. SCHWARTZ:  Could we bring up Defense Exhibit 2?

22    Q.  The government asked you whether, in your experience as a

23    CFO dealing with corporate finance, there was any legitimate

24    reason to do this transaction.  Do you recall that?

25    A.  I do.

1   Q.  Sir, the only experience that you ever had as a CFO was the

2   CFO of a company riddled in fraud.  Correct?

3   A.  Yes.

4   Q.  You have never been the CFO of a company that isn't

5   committing a fraud.  Correct?

6   A.  That is correct.

7   Q.  So you would have no idea whatsoever how a CFO of another

8   company not committing a fraud might view this.  Correct?

9   A.  That's not correct.

10  Q.  Sir, the customer has received the documents.  Correct?

11  A.  Yes.

12  Q.  They had accountants.  Correct?

13  A.  I don't know.

14  Q.  Nobody from Refco called them up and said, Don't give these

15  documents to your accountants as far as you know.  Correct?

16  A.  As far as I know.

17  Q.  They had lawyers.  Correct?

18  A.  I do not know.

19  Q.  No one called them up and said, Don't give these documents

20  to lawyers.  Correct?

21  A.  To the best of my knowledge.

22  Q.  And you never told Joe Collins, Don't send this to any of

23  the customers' lawyers.  Correct?

24  A.  I did not, no.

25  Q.  Now, this was a year-end transaction.  Correct?

1   A.  Yes.

2   Q.  Something that might be called a structured transaction?

3   A.  I don't know that I'd call it a structured transaction.

4   Q.  When companies do tax transactions, they often do them

5   around year end.  Is that correct?

6   A.  Yes.

7   Q.  And were you aware that Refco had used a similar structure

8   in a transaction involving CIM--

9   A.  No.

10  Q.  -- that involved taxes?

11  A.  No.  I don't recall that.

12  Q.  Were you aware that Refco had used a similar structure in a

13  company involving Ingram Micro involving taxes?

14  A.  The name sounds familiar, but I do not recall the

15  structure.

16  Q.  You weren't involved in it.  Correct?

17  A.  I don't remember it.

18              (Continued on next page)

19

20

21

22

23

24

25

BY MR. SCHWARTZ:

Q.  You can take that down.

        Now, the government asked you some questions about
having not disclosed the tax fraud that you committed on your
2004 return, correct?

A.  Yes.

Q.  When you file -- And they asked you questions about a trial
you testified in in front of Judge Buchwald, correct?

A.  Yes.

Q.  And at that trial, you were asked how many times you had
committed tax fraud, correct?

A.  I don't remember.

Q.  While we're looking for that, you knew you'd committed tax
fraud when you filed your 2004 tax returns, correct?

A.  Initially.

Q.  And when you refiled the amended return in 2005, it wasn't
because you said, I feel bad about committing the tax fraud,
right?

A.  That is correct.

Q.  It was because Refco had collapsed, correct?

A.  Yes.

Q.  And you were afraid the U.S. government might start asking
questions of you in looking at your tax return, correct?

A.  No, I wouldn't say it was because I thought they were going
to look at my tax returns.  I thought they may be looking at

1   me, and I just wanted to clean up that return.

2   Q.  And when you went to meet with the government in round one

3   and later in round two, they asked you whether you had ever

4   committed tax fraud, correct?

5   A.  I had told them that I had committed tax fraud.

6   Q.  Once, correct?

7   A.  Point -- frame of reference, timing?

8   Q.  In the period before Joseph Collins' lawyers subpoenaed

9   your tax returns, how many times -- what did you tell the

10  government about the number of times you had committed tax

11  fraud?

12  A.  I told them I committed tax fraud related to the back-dated

13  options that occurred in two years, 2000, 2001.  One time, but

14  two periods.

15  Q.  And you didn't tell them about the 2004 tax fraud until

16  your tax returns were subpoenaed, correct?

17  A.  Yes.

18  Q.  And then when Joseph Collins' lawyers subpoenaed your tax

19  returns, that's when you volunteered the second tax fraud,

20  correct?

21          MR. CHERNOFF:  Asked and answered.

22          THE COURT:  I think we did this.

23  Q.  And it wasn't these prosecutors, it was a different set of

24  prosecutors; is that right?

25  A.  Yes.

CAJPCOL5                    Trosten - recross

1    Q.  And nobody tore up your agreement for having misled the

2    government, correct?

3    A.  No.

4    Q.  Although you understood they have the power, if they want,

5    to tear up your agreement, correct?

6    A.  Yes.

7             MR. SCHWARTZ:  Your Honor, we're still looking for

8    that transcript.

9             THE COURT:  Yes, sir.

10            MR. SCHWARTZ:  I apologize.

11            THE COURT:  Is there anything else we can do in the

12   interim?

13            MR. SCHWARTZ:  I'm finished, your Honor.  It's just

14   this.  Your Honor, I don't think I'm going to find it in time,

15   but I don't want to take up the Court's time.  I think the

16   question is kind of what I intended.  No further questions.

17            THE COURT:  Thank you.  Redirect?

18            MR. CHERNOFF:  Nothing, your Honor.

19            THE COURT:  Thank you, Mr. Trosten.  You may step

20   down.

21            How are you doing, ladies and gentlemen.  Everybody

22   all right?  I'm thinking we'll go until 4:00, a little after

23   4:00.  Are you all right?

24            MR. SCHWARTZ:  Your Honor, may I have a moment just to

25   step outside?

CAJPCOL5                        Trosten - recross

 1          THE COURT:  All right.  Five-minute break.  Please

 2   follow the normal rules, ladies and gentlemen.

 3          MR. SCHWARTZ:  I apologize, your Honor.

 4          (Jury exits)

 5          (Recess taken)

 6          (Jury enters)

 7          THE COURT:  And won't you be seated, and the

 8   government calls?

 9          MR. LEVY:  Your Honor, the government calls Earl

10   Melamed.

11          THE COURT:  Thank you.

12    EARL MELAMED,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. LEVY:

17   Q.  Good afternoon, Mr. Melamed.

18   A.  Good afternoon.

19   Q.  Could you please pull the microphone a little bit closer to

20   you.  In the center, it might be a little better.  Thank you.

21          Where do you work, Mr. Melamed?

22   A.  I work at the law firm Neal, Gerber & Eisenberg.

23   Q.  What do you do at Neal, Gerber & Eisenberg?

24   A.  I'm a partner practicing in the corporate and transactions

25   area.

1   Q.  In what city is your law firm located?

2   A.  Chicago.

3   Q.  And do you live and work in the Chicago area?

4   A.  Yes.

5   Q.  All right.  I'm going to apologize to you in advance that I

6   think your testimony is probably going to roll over to Monday.

7   So sorry we're going to have to bring you out here twice.

8           THE COURT:  It's my fault, sir.  I'm going to let the

9   jury go a little around 4:00.

10  Q.  What kind of work do you do at your firm?

11  A.  I do corporate and transactions work.

12  Q.  How long have you been with Neal, Gerber & Eisenberg?

13  A.  Thirty years.

14  Q.  Drawing your attention to the summer of 2004, were you

15  working at the firm then?

16  A.  Yes.

17  Q.  At that time, did you represent somebody named Thomas

18  Dittmer?

19  A.  Yes.

20  Q.  Was there a time when Thomas Dittmer was associated with

21  the company Refco?

22  A.  Yes.

23  Q.  Can you describe what Thomas Dittmer's association was with

24  the company Refco in 1999?

25  A.  In 1999, Mr. Dittmer owned 51 percent of the stock of Refco

1    Group Holdings, and during 1999, he sold that stock and no

2    longer owned any from that point forward.

3    Q.  Do you know anything about Mr. Dittmer's historical

4    relationship with Refco?

5    A.  I do not.

6    Q.  Okay.  Now, you said in 1999 Mr. Dittmer sold his 51

7    percent ownership?

8    A.  Yes.

9    Q.  Did you have any involvement in that sale?  Did you

10   represent Mr. Dittmer in connection with that sale in 1999?

11   A.  No, I did not.

12   Q.  Based on your subsequent work for Mr. Dittmer, are you

13   familiar with the terms of that sale, when Mr. Dittmer sold his

14   51 percent interest in 1999?

15   A.  Yes.

16   Q.  Back in 1999, was there a holding company that owned Refco?

17   A.  Yes.

18   Q.  And in 1999, before selling his interest, did Mr. Dittmer

19   own 51 percent of Refco or 51 percent of that holding company?

20   A.  51 percent of the holding company.

21   Q.  What was the name of the holding company?

22   A.  Refco Group Holdings, Inc.

23   Q.  Is it all right if we call that RGHI today?

24   A.  Sure.

25   Q.  Who owned the rest of RGHI, if Mr. Dittmer owned

1  51 percent?

2  A.   Phil Bennett.

3  Q.   And who else?  Was there anybody else?

4  A.   Tone Grant.

5  Q.   Do you know how much they owned of the other 49 percent?

6  A.   I believe it was equally.

7  Q.   So 50/50 for each of them of the minority share, the

8  49 percent share?

9  A.   Correct.

10  Q.   You've seen a chart that summarizes the ownership of Refco

11  back before Mr. Dittmer sold his interest?

12  A.   Yes.

13          MR. LEVY:   I think Government Exhibit 855 is already

14  in evidence.  So can we put Government Exhibit 855 on the

15  screen.

16  Q.   Does that chart reflect what you were just talking about,

17  51 percent of RGHI for Mr. Dittmer, 24.5 percent for

18  Mr. Bennett and 24.5 percent for Tone Grant?

19  A.   Yes.

20  Q.   And that's of RGHI, and RGHI owned 100 percent of Refco at

21  that time?

22  A.   Correct.

23  Q.   Who did Mr. Dittmer sell his interest in RGHI to?

24  A.   He sold it back to the company itself.  It was a redemption

25  transaction; so RGHI itself purchased Mr. Dittmer's 51 percent

CAJPCOL5                     Melamed - direct

1   ownership interest.

2   Q.  What was the -- That's the structure of the transaction

3   you're talking about --

4   A.  Yes.

5   Q.  -- is that right?  What was the net effect of what happened

6   in that transaction?  Who was relinquishing ownership and who

7   was acquiring ownership?

8   A.  Well, Mr. Dittmer was relinquishing his entire ownership at

9   that point and, in effect, Phil Bennett and Tone Grant were

10  acquiring his interest.

11          MR. LEVY:  We can take that down.

12  Q.  Have you seen the contract pursuant to which Mr. Dittmer

13  relinquished his 51 percent ownership of RGHI?

14  A.  Yes.

15  Q.  Do you have in front of you -- I think there's a stack of

16  documents in front of you.  Is the one on top Government --

17  what's been marked for identification as Government

18  Exhibit 900?

19  A.  Yes.

20  Q.  Is that the contract through which Mr. Dittmer sold his

21  interest?

22  A.  Yes.

23          MR. LEVY:  Your Honor, the government offers

24  Government Exhibit 900.

25          MR. SCHWARTZ:  The defense has no objection.

CAJPCOL5                    Melamed - direct

1              THE COURT:  Received.

2              (Government's Exhibit 900 received in evidence)

3    Q.  Let's look at the first page, and specifically the first

4    paragraph.  Looking at that first paragraph, the date on the

5    contract was August 24th, 1999; is that right?

6    A.  Correct.

7    Q.  And it says Redemption Agreement.  You said that was the

8    technical way in which this transaction was done; is that

9    right?

10   A.  That's correct.

11   Q.  And is this the agreement through which Mr. Dittmer sold

12   his 51 percent ownership in RGHI?

13   A.  Yes.

14   Q.  Let's turn to Page 3 of this contract, if you will, and can

15   we bring up the top, down through what is (iv).

16              Does this lay out these four subparagraphs what it was

17   that Mr. Dittmer was getting for selling out in 1999?

18   A.  Yes.

19   Q.  Looking at the first item on there, was Mr. Dittmer going

20   to get some cash in exchange for selling his interest?

21   A.  Yes.  He was receiving $5,001,000 in cash.

22   Q.  Look at the second item.  What was Mr. Dittmer going to get

23   there?

24   A.  He was going to receive a million dollar payment on his

25   65th birthday.

CAJPCOL5                          Melamed - direct

1   Q.   Looking at the third item, it has something called the

2   Appreciation Component, and "Appreciation" and "Component" are

3   both capitalized; do you see that?

4   A.   Yes.

5   Q.   Is that term, Appreciation Component, defined somewhere

6   else in the agreement?

7   A.   Yes, it is.

8   Q.   If you could turn back to Page 2, and is that up at the

9   top, the paragraph that defines that term Appreciation

10  Component?

11  A.   Yes.

12  Q.   And that's one additional thing that Mr. Dittmer was going

13  to get from this transaction; is that right?

14  A.   That's correct.

15  Q.   Now, I'm just going to read this.  It says, "Appreciation

16  Component means an amount of cash equal to 25 percent of the

17  aggregate proceeds received by any equity holder of Refco, LLC;

18  Refco, Inc. or any successor thereto as a result of or arising

19  from any transfer involving an entity within Refco."  And then

20  it continues.

21           Can you tell us in laymen's terms what did you

22  understand this appreciation component to give?

23           MR. SCHWARTZ:  Objection.

24           THE COURT:  I'm not so sure that's afoul of our rule

25  in this case.  Anything else on this?

1          MR. SCHWARTZ:  We would respectfully disagree, but of

2     course, we'll follow your Honor's instruction.

3          THE COURT:  Anything to add?

4          MR. LEVY:  No, I agree with what your Honor just said.

5          THE COURT:  I knew it.  Do you have in mind the

6     question, sir, or do you need it again?

7          THE WITNESS:  No, I understand the question.

8          THE COURT:  Go ahead.

9     A.  What this means is that if the business of Refco or the

10    ownership of Refco was sold in the future, Mr. Dittmer would be

11    entitled to, as additional purchase price, 25 percent of the

12    net proceeds of that sale.

13    Q.  And just to clarify a little bit, in 2004 you were called

14    upon to figure out what that was, right?

15    A.  Yes.

16    Q.  So this is your understanding of what this provision did,

17    as you went forward in 2004 and tried to figure out what

18    Mr. Dittmer was entitled to, right?

19    A.  Yes, just reading the definition.

20    Q.  Let's turn back to Page 3, and it looks like at the fourth

21    point, this is the last thing in this list that Mr. Dittmer was

22    going to get for selling his interest in RGHI; is that right?

23    A.  Yes.

24    Q.  And it says, "The other consideration set forth on Schedule

25    A."  What did that cover?  If you could flip to Schedule A, I

1   don't know that we necessarily need to put it up there.

2   Generally what was that schedule?

3   A.  He was entitled to some housing allowance payments for an

4   office.  He was entitled to, I believe, some insurance, ongoing

5   insurance payments, things of that nature.

6   Q.  Have you seen an exhibit prepared by the government that

7   summarizes these items, what it was that Mr. Dittmer was

8   receiving in 1999?

9   A.  Yes.

10  Q.  Do you have in front of you what's been marked for

11  identification as Government Exhibit 860?

12  A.  Yes.

13  Q.  And is that the exhibit that summarizes what Mr. Dittmer

14  received in that transaction?

15  A.  Yes.

16          MR. LEVY:  Your Honor, the government offers

17  Government Exhibit 860.

18          THE COURT:  860, Mr. Schwartz?

19          MR. SCHWARTZ:  I'm looking at it, Judge.

20          THE COURT:  I'm sorry.

21          MR. SCHWARTZ:  The question could be more artfully

22  put, but we have no objection to this.

23          THE COURT:  Received.

24          (Government's Exhibit 860 received in evidence)

25          MR. LEVY:  I won't be offended.  And, your Honor,

CAJPCOL5                    Melamed - direct

1    would you mind if my colleague, Mr. Chernoff, passed out copies

2    of Government Exhibit 860 to the jury?

3              THE COURT:  Sure.  Go ahead.

4              MR. LEVY:  I'll be happy to question while he's doing

5    that.

6    Q.  Mr. Melamed, let's move forward now to 2004.  In 2004, did

7    you learn that there was a planned transaction involving Refco?

8    A.  Yes.

9    Q.  What did you learn in 2004?

10   A.  I became aware that there was a contemplated or possible

11   transaction pursuant to which Thomas Lee or one of his funds

12   was going to be acquiring an interest in Refco.

13   Q.  Did that fact, the fact that Thomas H. Lee Partners was

14   going to be acquiring an interest in Refco, have any

15   significance for Mr. Dittmer?

16   A.  It did.  Yes.

17   Q.  What was the significance?

18   A.  Well, it could very well trigger that appreciation

19   component under the 1999 sales agreement; so that if, in fact,

20   Refco was being sold, in whole or in part, Mr. Dittmer, under

21   that earlier agreement, would be entitled to 25 percent of the

22   net proceeds of that sale.

23   Q.  Now, prior to learning about its possible sale of Refco to

24   Thomas H. Lee Partners, did you have any involvement in Refco

25   or the 1999 transaction we were just looking at?

1    A.  No.

2    Q.  Had you ever worked for Mr. Dittmer as a client before?

3    A.  No, I don't believe so.

4    Q.  So this was your first involvement with Mr. Dittmer when

5    you found out that he might be entitled to this 25 percent?

6    A.  Yes.

7    Q.  Did you speak to anyone upon finding out about this

8    possible Thomas H. Lee Partners transaction to try to find out

9    more about it?

10   A.  Yes.

11   Q.  Who did you speak to?

12   A.  I called Joseph Collins.

13   Q.  Who did Joseph Collins represent, as far as you knew at

14   that time?

15   A.  He was Refco's counsel.

16   Q.  Do you know where he worked?

17   A.  The law firm of Mayer Brown, I think, Platt, at the time.

18   Q.  How did you know to call Joseph Collins when you wanted to

19   find out more about the Thomas H. Lee Partners?  Where did you

20   get his name from?

21   A.  I received a copy of a draft agreement that he had

22   circulated right at that time; so it was clear that he was

23   representing Refco in the transaction.

24   Q.  Had you ever dealt with Mr. Collins before on any other

25   matter, any other time?

CAJPCOL5                    Melamed - direct

1   A.  No.

2   Q.  Or do you know if you'd ever spoken to him before at all?

3   A.  No.

4   Q.  Do you recall the date of your conversation with

5   Mr. Collins?

6   A.  I believe it was on May 28th, 2004.

7   Q.  Did anyone else participate in that call, or was it just

8   you and Mr. Collins?

9   A.  It was just me and Mr. Collins.

10  Q.  What was the purpose of your call to Mr. Collins on

11  May 28th, 2004?

12  A.  It was so that we could obtain additional information

13  background about what this potential transaction was and,

14  really, what it would mean to our client, Mr. Dittmer, in terms

15  of his ability to participate in those sales proceeds.

16  Q.  What do you recall Mr. Collins telling you during that

17  telephone conversation -- Let me back up for one second.

18          This is the first conversation you ever had with

19  Mr. Collins, as far as you're aware?

20  A.  Yes.

21  Q.  What did Mr. Collins tell you in that first conversation?

22  A.  He provided some background information to me.  I think he

23  told me that Refco Group Holdings, Inc., at that point, was

24  owned 50 percent by Phil Bennett, 50 percent by Tone Grant.

25          He also mentioned that Refco, the operating company,

1    was owned by Refco Group Holdings, Inc. and by another entity,

2    a BAWAG entity he mentioned.

3    Q.  Did he tell you what BAWAG was?

4    A.  He did not tell me what it was.  He mentioned that they

5    owned an interest and one of their affiliated entities, DF

6    Capital, owned an interest.

7    Q.  Did he tell you the percentage of ownership as between RGHI

8    and BAWAG, how much each owned of Refco?

9    A.  Yes.  He said that RGHI had a 90 percent voting interest

10   and BAWAG had a 10 percent voting interest, but the economics

11   of the ownership were RGHI-owned 52 percent and BAWAG owned

12   48 percent.

13   Q.  Did he explain what he meant by that, how the economics

14   were different somehow from the ownership?

15   A.  He didn't, no.

16   Q.  Did he explain whether it was BAWAG itself that held all of

17   this 48 percent interest or whether there were any other

18   BAWAG-related entities?

19   A.  Yeah, I think he mentioned that DF Capital, a BAWAG

20   affiliate of some kind, owned I think a substantial portion of

21   that economic interest.

22   Q.  What, if anything, did he tell you about the proposed

23   transaction that Thomas H. Lee Partners was contemplating?

24   A.  He said that the Thomas Lee fund was going to acquire a

25   57 percent interest in the Refco operating company, and that

1    RGHI then would own, in effect, 43 percent.

2    Q.  Did he say anything about how this deal was going to be

3    financed, what the numbers were going to look like?

4    A.  He did.  He said that there was going to be, I think,

5    $1,250,000,000 debt that Thomas Lee was going to raise and that

6    the closing of the deal was contingent on him raising those

7    funds.

8    Q.  Did he mention anything about the other owners of RGHI or

9    prior owners of RGHI and what their role could be in this

10   transaction?

11   A.  He did.  He said that, as a condition of Thomas Lee doing

12   the deal, that neither Tone Grant nor our client, Thomas

13   Dittmer, could have any continuing or ongoing ownership or

14   other interest.

15   Q.  Did the fact that -- Let me back up.

16        Are you saying that he told you Mr. Dittmer had to be

17   bought out, essentially?

18   A.  Yes.

19   Q.  Did the fact that Mr. Bennett had to buy out Mr. Dittmer

20   and had to buy out Mr. Grant give Mr. Dittmer any leverage in

21   this transaction, as far as you were concerned?

22        MR. SCHWARTZ:  Objection, leading.

23        THE COURT:  I don't think it's so much, so

24   controversial.  You may answer, sir.

25   A.  Yes.  The fact that, as a condition to Thomas Lee doing the

CAJPCOL5                    Melamed - direct

```
1    deal, that Mr. Dittmer had to be bought out, and having now
2    understood this, Mr. Dittmer did have some leverage because he
3    would -- you know, would -- in effect, could cause the deal to
4    not happen unless he was satisfied with the payment he was
5    receiving.
6              MR. LEVY:  Your Honor, at this point, the government
7    offers prior testimony of Mr. Collins, Government Exhibit 2200
8    we offer.
9              MR. SCHWARTZ:  No objection.
10             THE COURT:  Go ahead, sir.
11             (Government's Exhibit 2200 received in evidence)
12             MR. LEVY:  I'd like to put this up on the screen, and
13   I will read it to the jury.  This is the testimony of
14   Mr. Collins at a prior proceeding:
15   "Q.  Let me ask you, was there a covenant or a representation
16   put in an agreement with Lee to the effect that Mr. Bennett
17   would be the sole owner at the holdings level at the time of
18   the closing with Lee?
19   "A.  Yes, there was.  There was a covenant.  I think it was
20   Section 10.10 in what was called the security holder's
21   agreement.
22   "Q.  Mr. Collins, was signing this covenant a significant
23   undertaking by Mr. Bennett?
24   "A.  It was an extremely significant undertaking for a couple
25   of reasons.  It is a personal covenant.  There's no corporation
```

1    that could be used to block liability.

2    "Q.  Meaning Mr. Bennett was personally on the line if he

3    didn't live up to this?

4    "A.  He was personally on the line.

5              "He also didn't have any cap on his liability.  If he

6    breached this obligation and Lee didn't waive it, he would be

7    responsible for potentially hundreds of millions of dollars in

8    damages.

9              "And possibly most importantly, this is a covenant

10   that can't be cured.  At the closing, he had to be the sole

11   owner of Refco Group Holdings.  That put him in a rather

12   precarious position vis-a-vis the former owners he had to buy

13   out.  They knew they had to be bought out, and they had

14   tremendous leverage over him as a result of that."

15   Q.  Mr. Melamed, after this initial conversation with

16   Mr. Collins, did you send Mr. Collins a letter?

17   A.  Yes.

18   Q.  Why?

19   A.  We wanted to obtain additional information.  Obviously, the

20   call with Mr. Collins was just very general, some background

21   information.  But in order for us, on behalf of our client, to

22   assess really what the economics would be or what he would be

23   entitled to, we thought we needed additional information.

24   Q.  Mr. Melamed, do you have in front of you what's been marked

25   for identification as Government Exhibit 903?

CAJPCOL5                    Melamed - direct

1   A.  Yes.

2   Q.  Is this a letter that you sent to -- I'm sorry, that your

3   firm sent to Joseph Collins on June 1st, 2004?

4   A.  Yes.

5           MR. LEVY:  Your Honor, the government offers

6   Government Exhibit 903.

7           MR. SCHWARTZ:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 903 received in evidence)

10  Q.  And, actually, if we scroll down to the bottom, this

11  actually is from you; is that right?

12  A.  Yes, it is.

13  Q.  Is there another lawyer at your firm who was working with

14  you on these matters?

15  A.  Yes.

16  Q.  Who is that?

17  A.  Marshall Eisenberg.

18  Q.  And in some instances, did he sign the letters?

19  A.  Yes.

20  Q.  This particular one came from you, though, right?

21  A.  Correct.

22  Q.  Let's go back up to the top.  This is the letter from you

23  to Joseph Collins; is that right?

24  A.  Yes.

25  Q.  And it says, "Regarding Thomas Dittmer, Refco Holdings,

1    Inc.," that's the subject line, right?

2    A.  Yes.

3    Q.  Then it says, "Dear Joe, We have received your draft

4    agreement dated May 27th, 2004, between Refco Holdings Inc. and

5    Thomas H. Dittmer, relating to obligations under the redemption

6    agreement dated August 24, 1999, to which Refco and Tom are

7    parties."

8           Let me stop for a second.  That correspondence, is

9    that something that you referred to earlier in your testimony?

10   A.  Yes.

11   Q.  What was that, what's this letter of May 27th that you had

12   received from Mr. Collins?

13   A.  Mr. Collins had circulated on May 27th a draft agreement

14   that would have purchased Mr. Dittmer's ongoing Appreciation

15   Component right; that would have basically bought him out of

16   that ongoing right, and pay him for it.

17   Q.  And I think you said that's the document that you received

18   that alerted you to the fact that Mr. Collins existed and that

19   he was the lawyer for Refco?

20   A.  Correct.

21   Q.  Let's drop down to the third paragraph.  It says,

22   "Accordingly, we request that you provide us with as much

23   information about the proposed transactions at the earliest

24   possible time, including, for example, a copy of the equity

25   purchase and merger agreement referenced in your proposed

CAJPCOL5                          Melamed - direct

1    agreement.  Plus any other relevant documents.  We look forward

2    to receiving the requested documents and information as soon as

3    possible."

4            Did you, in fact, receive a copy of the Thomas H. Lee

5    Partners equity purchase and merger agreement in response to

6    this request from Mr. Collins?

7    A.  Yes, I did.

8    Q.  Do you have in front of you what's been marked for

9    identification as Government Exhibit 936?

10   A.  Yes.

11           MR. SCHWARTZ:  No objection, your Honor.

12           THE COURT:  Received.

13           (Government's Exhibit 936 received in evidence)

14           MR. LEVY:  Thank you.

15   Q.  Let's look at the cover memorandum.  This is to Marshall

16   Eisenberg, and I think you discussed about he was a lawyer

17   working with you?

18   A.  Yes.

19   Q.  That's the name of your firm, Neal, Gerber & Eisenberg,

20   right below that?

21   A.  Correct.

22   Q.  Now, on the right it says, Mayer, Brown, Rowe and Maw.

23   That's the letterhead that this memorandum was sent on.  That's

24   where it's coming from, right?

25   A.  Yes.

CAJPCOL5                        Melamed - direct

1    Q.  It's from an individual named Paul Koury.  Do you know who

2    Paul Koury is?

3    A.  I don't.

4    Q.  And it says, "Regarding equity purchase and merger

5    agreement."  Below that it says, "At Phil Bennett's request,

6    attached please find the latest version of the equity purchase

7    and merger agreement."  And it copies Phillip R. Bennett and

8    Joseph P. Collins; is that right?

9    A.  Yes.

10   Q.  Can we look at the next page of this exhibit, and can we

11   expand the body of this.

12          This is the document that you were sent attached to

13   that memo?

14   A.  Yes.

15   Q.  And this is a draft of the equity purchase and merger

16   agreement?

17   A.  Correct.

18   Q.  Did you review this draft of the equity purchase and merger

19   agreement?

20   A.  Yes, in part.

21   Q.  What were you looking for when you went through this EPMA?

22   A.  We were -- I was looking to really try to determine what

23   the economics of the Thomas Lee investment were, what the value

24   of the Refco operating company was, if we could determine that,

25   how much cash was being paid.  Really, how much money was being

1    paid so we could do a calculation of what Mr. Dittmer would be

2    entitled to for his Appreciation Component.

3    Q.   Could you flip to what is not the second page of the

4    exhibit, but Page 2 of the EPMA.

5            And if we could bring up the first half of that

6    paragraph.  That's good.

7            Was there a number in this particular paragraph that

8    caught your eye at the time?

9    A.   Yes, the number $2,250,000,000.

10   Q.   Why was that number of significance to you?

11   A.   Well, that was the starting place for the valuation of

12   Refco.  There were some deductions and offsets which weren't

13   really -- they were described but not quantified, but at least

14   the starting place seemed to be in the neighborhood of

15   $2,250,000,000.

16   Q.   When you say it's a deduction, that sentence that includes

17   the numbers says "Aggregate consideration amount means

18   $2,250,000,000, minus the sum of," and then continues through a

19   number of different things; is that right?

20   A.   Correct.

21   Q.   So were you aware that there were going to be deductions

22   from this $2.25 billion number?

23   A.   Yes.

24   Q.   Did you know what those deductions were within --

25   Withdrawn.

1    Did you know the specific amounts of those various

2   deductions?

3   A.   No.

4   Q.   Could you please turn to Page 23 of this agreement, and can

5   we bring up subparagraph (c).  Is there a number in this

6   paragraph that caught your eye when you were reviewing it?

7   A.   Yes, $500 million.

8   Q.   What did you understand about the $500 million, based on

9   reading this document?

10  A.   That as part of the Thomas Lee acquisition, Refco would be

11  able to distribute $500 million to -- in effect, to Phil

12  Bennett prior to the acquisition.

13  Q.   Did you interpret that $500 million to be in addition to

14  the $2.25 billion that we were looking at a moment ago?

15  A.   Yes.

16  Q.   So adding those together, $2.75 billion; is that right?

17  A.   Correct.

18  Q.   Did you also notice anything in this agreement about asset

19  management companies?

20  A.   Yes.

21  Q.   What did you notice in the agreement about asset management

22  companies?

23  A.   That the asset management companies were also not going to

24  be acquired, in effect, by Thomas Lee, and so those entities

25  also could be distributed out to RGHI, to Phil Bennett's

1    entity, prior to the Thomas Lee closing on his purchase.

2    Q.  Let's back up a second just to discuss.  You say the asset

3    management company.  What asset management company are you

4    talking about?  What relationship did they have to Refco or

5    this deal?

6    A.  The asset management companies were assets that were owned

7    by Refco, and so those assets were going to be transferred to

8    RGHI prior to the Thomas Lee closing.

9    Q.  Did you have an opinion as to whether or not Mr. Dittmer

10   was going to be entitled to 25 percent of these asset

11   management companies, whatever their value was, when they were

12   distributed to RGHI?

13   A.  Yes, he would.  He would be entitled to all of the assets

14   that were either payable to or distributed to Phil Bennett or

15   his entity.

16   Q.  To 25 percent?

17   A.  25 percent; mmm, hmm.

18   Q.  Did you know anything about the value of these asset

19   management companies, or just that whatever it was, it was

20   going to be 25 percent?

21   A.  Yeah.  No, at this point, I did not know any of the values.

22   Q.  So after reviewing the EPMA, what were the three components

23   that you thought Mr. -- that you thought Mr. Dittmer might be

24   entitled to 25 percent of?

25   A.  Well, it was the value of the business, of the

1    2,250,000,000, whatever that net amount ended up being after

2    deductions, the 500 million of cash that was going to be

3    distributed, and then the asset management entities that were

4    also going to be distributed.

5    Q.  And I think you've just said minus whatever the deductions

6    were?

7    A.  Correct.

8    Q.  With RGHI, with these numbers that we've been talking

9    about, 2.75 billion, minus deductions, the value of these asset

10   management companies, whatever that was, did you have any

11   ballpark sense, after reviewing this document, of what kind of

12   amount Mr. Dittmer might get for his 25 percent?

13   A.  Well, based on these numbers, it appeared that it would be

14   in the hundreds of millions of dollars.

15   Q.  Did you subsequently have a conversation with Phillip

16   Bennett on June 9th, 2004?

17   A.  Yes.

18   Q.  Who else was on that call?

19   A.  It was me, Phil Bennett and Marshall Eisenberg of my

20   office.

21   Q.  Mr. Collins was not on that call; is that right?

22   A.  That's correct.

23   Q.  Did Mr. Bennett convey an offer to your client,

24   Mr. Dittmer, on that call?

25   A.  He did.

CAJPCOL5                    Melamed – direct

1   Q.  What was the offer?

2   A.  He said that he was willing to pay Mr. Dittmer $50 million

3   in cash, as well as an additional $25 million deferred at a

4   later date.

5   Q.  How did that number or that offer, 50 million upfront, 25

6   million at a later date, sound to you, in light of what you had

7   seen in the EPMA?

8   A.  Well, compared to the numbers that we saw in the earlier

9   document, the offer seemed extremely low.

10  Q.  Did Mr. Bennett give you any explanation at that time for

11  why Mr. Dittmer would possibly want to accept $50 million now,

12  $25 million later, given that Mr. Dittmer, in your estimate,

13  was entitled to hundreds of millions of dollars?

14  A.  No, he really didn't go into that in any detail.

15  Q.  Did you subsequently send a letter to Mr. Bennett seeking

16  more information?

17  A.  Yes.

18  Q.  Do you have in front of you what's been marked for

19  identification as Government Exhibit 905?

20  A.  Yes.

21  Q.  And is this a letter from Marshall Eisenberg of your firm

22  to Phillip Bennett?

23  A.  Yes.

24          MR. SCHWARTZ:  No objection.

25          THE COURT:  Received.

1    (Government's Exhibit 905 received in evidence)

2    MR. LEVY:  He keeps stealing my thunder.

3  Q.  This is on the letterhead of your law firm; is that right?

4  A.  Yes.

5  Q.  And if we just scroll down to the signature block a little

6  bit, that says "Marshall Eisenberg"; is that right?

7  A.  Yes.

8  Q.  Did you ever draft letters to go out over Mr. Eisenberg's

9  name?

10  A.  On occasion, yes.

11  Q.  Do you have any recollection of whether he drafted this

12  letter or you drafted this letter?

13  A.  I did.

14  Q.  You did?

15  A.  Mmm, hmm, for his signature.

16  Q.  It's dated June 16th, 2004.  It's to Refco Group Holdings,

17  Inc., which we've been calling RGHI; is that right?

18  A.  Yes.

19  Q.  Attention Phillip Bennett regarding Thomas Dittmer.  "Dear

20  Phil," and then if we just drop down to the third paragraph.

21  "As you would expect, it is difficult for Tom" -- let me pause

22  there.  Who's Tom?

23  A.  That's our client, Tom Dittmer.

24  Q.  "It is difficult for Tom to evaluate the proposals without

25  a comprehensive understanding of all aspects of the Thomas Lee

1    transactions.  Accordingly, it would be extremely helpful if

2    you could provide a detailed computation of the Appreciation

3    Component that would be owed to Tom under the redemption

4    agreement with respect to the Thomas Lee transfers, including

5    the methodology for such computation and your assessment as to

6    the timing of when proceeds would be received."

7            Did you receive a written response from Mr. Bennett,

8    providing a computation like the one that you had asked for in

9    this letter?

10   A.  No, we did not.

11   Q.  How did Mr. Bennett first provide you with the computation

12   you'd asked for?

13   A.  He did it on a phone call.

14   Q.  After that phone call, did Mr. Bennett subsequently provide

15   you with a computation during an in-person meeting?

16   A.  Not in writing.

17   Q.  I'm sorry.  Did he subsequently provide you orally with a

18   computation face to face, in a meeting?

19   A.  Yes.

20   Q.  Where did that meeting take place?

21   A.  That was at our law offices in Chicago.

22   Q.  Who was present at your law offices in Chicago when

23   Mr. Bennett made this presentation?

24   A.  It was Phil Bennett, me, Marshall Eisenberg and Steven

25   Spector.

1    Q.  Who's Steven Spector?

2    A.  He's Mr. Dittmer's accountant.

3    Q.  And Mr. Collins was not present; is that right?

4    A.  That's correct.

5    Q.  Did you take notes during that meeting?

6    A.  Yes.

7    Q.  Do you have in front of you, I'm not sure if you do or not,

8    what's been marked for identification as Government

9    Exhibit 940.  If not, I can hand you a copy.

10   A.  Yes.  No, I have it.

11   Q.  Just take a second and look through those.  Are those your

12   notes from that meeting?

13   A.  Yes.

14   Q.  How many pages of notes did you take about what Mr. Bennett

15   told you that day?

16   A.  Seven pages.

17   Q.  How detailed are your notes?

18   A.  Fairly detailed.

19   Q.  Okay.  Could you put those to the side.  If you need to

20   refresh your recollection at any point, let me know and you can

21   take those out.

22         What was the date of your meeting with Mr. Bennett in

23   your office?

24   A.  It was on June 25th, 2004.

25   Q.  And during that meeting, did Mr. Bennett walk through the

1    computation that you had asked him for in that letter?

2    A.  Yes.

3    Q.  In providing you with this computation, did you sense that

4    Mr. Bennett had a particular point, a particular theme that he

5    was trying to drive home during this meeting?

6    A.  Yes, he was trying to convince us, as Mr. Dittmer's

7    counsel, that the offer he had made was fair and that

8    Mr. Dittmer really wouldn't be entitled to any more or

9    shouldn't be entitled to any more than what he had offered.

10   Q.  Did Mr. Dittmer discuss with you during that meeting the

11   components of what RGHI expected to receive from the Thomas H.

12   Lee Partners' transaction?

13   A.  Mr. Bennett?

14   Q.  I'm sorry, Mr. Bennett.

15   A.  He did, yes.

16   Q.  And did Mr. Bennett discuss with you the various expenses

17   that were going to have to come out of those proceeds before

18   arriving at the number that Mr. Dittmer might share in?

19   A.  Yes, he did.

20   Q.  And did you record what Mr. Bennett told you in those notes

21   that you have in front of you as Government Exhibit 940?

22   A.  Yes.

23   Q.  Have you seen a chart that summarizes what Mr. Bennett told

24   you that day at the meeting about the proceeds that RGHI would

25   receive on the one hand, and the expenses that would have to

1    come out, on the other?

2    A.  Yes.

3    Q.  Do you have in front of you what's been marked for

4    identification as Government Exhibit 865?

5    A.  Yes.

6    Q.  Is this the chart that summarizes what it was you were told

7    that day by Mr. Bennett?

8    A.  Yes, it is.

9    Q.  And have you gone over it for accuracy?

10   A.  Yes.

11          MR. LEVY:  Your Honor, the government offers

12   Government Exhibit 865.

13          MR. SCHWARTZ:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 865 received in evidence)

16          MR. LEVY:  Your Honor, could Mr. Chernoff distribute

17   copies of this to the jury, please?

18          THE COURT:  Yes.

19   Q.  All right.  Mr. Melamed, let's first go through the

20   proceeds that Mr. Bennett told you about at this meeting.  Did

21   Mr. Bennett tell you that there was going to be cash from

22   Thomas H. Lee Partners' own pocket that RGHI was going to

23   receive in the sale?

24   A.  Yes, he did.

25   Q.  How much cash did Mr. Bennett tell you RGHI was going to be

1    getting from Thomas H. Lee Partners?

2    A.  $570 million.

3    Q.  And is that reflected in the first line of this chart below

4    "Proceeds from Transactions"?

5    A.  Yes.

6    Q.  Did Mr. Bennett tell you whether the cash proceeds that

7    RGHI was going to receive in this transaction also include

8    money that was going to be borrowed from lenders?

9    A.  Yes, he did.

10   Q.  How much money did Mr. Bennett tell you was going to be

11   borrowed from lenders that RGHI would receive in addition to

12   the money you just mentioned that was coming from Thomas H. Lee

13   Partners?

14   A.  $1,250,000,000.

15   Q.  And is that listed on the second line, where it says "1.25

16   billion cash from lenders"?

17   A.  Yes.

18   Q.  Did Mr. Bennett tell you that associated with this

19   transaction there was going to be any distribution of excess

20   cash?

21   A.  Yes.

22   Q.  How much excess cash did Mr. Bennett tell you was going to

23   be distributed to RGHI in this transaction?

24   A.  $500 million.

25   Q.  And is that what's listed on the third line, 500 million

1    excess cash payments?

2    A.  Yes.

3    Q.  Did Mr. Bennett say whether RGHI was going to get to keep

4    any ownership interest in Refco at the end of this transaction?

5    A.  Yes.

6    Q.  What percentage of Refco did Mr. Bennett tell you RGHI was

7    going to keep?

8    A.  That they would keep a 43 percent interest and the Thomas

9    Lee fund would have a 57 percent interest.

10   Q.  If Thomas H. Lee was paying 570 million for a 57 percent

11   interest, did you have an understanding of what 43 percent

12   would be worth, what RGHI's retained share would be worth?

13   A.  Yes, $430 million.

14   Q.  And is that what's listed on the fourth line where it says,

15   "430 million, Bennett's 43 percent equity in Refco"?

16   A.  Yes.

17   Q.  Did Mr. Bennett tell you anything about asset management

18   companies during this meeting that were owned by Refco at that

19   time?

20   A.  Yes.

21   Q.  What did he tell you?

22   A.  He said that the net value of the asset management

23   companies was $25 million.

24   Q.  What did he say, if anything, about how the net value was

25   $25 million?  What does that mean?

1  A.  He said that the asset management entities had a value of

2  $290 million, but had 265 million of debt associated with those

3  assets for a net positive value of $25 million.

4  Q.  And is that what's listed on the fifth and final line of

5  the proceeds from the transaction, where it says "25 million

6  value of asset management businesses"?

7  A.  Yes.

8  Q.  Have you added up these five components of the proceeds

9  that RGHI was going to receive to get a total gross amount that

10 RGHI was going to receive in value from Thomas H. Lee Partners?

11 A.  Yes.

12 Q.  What number is that?

13 A.  The $2,775,000,000.

14 Q.  And is that reflected in the total under the proceeds from

15 transaction, where it says "equals 2.775 billion total gross

16 proceeds"?

17 A.  Correct.

18 Q.  Now, did Mr. Bennett discuss with you what expenses would

19 need to be deducted from that amount?

20 A.  Yes, he did.

21 Q.  And would need to be deducted from that amount before

22 Mr. Dittmer could share in the final number; is that right?

23 A.  That's right.

24 Q.  Did Mr. Bennett mention that any money would be going to

25 BAWAG?

1    A.  Yes.

2    Q.  How much?

3    A.  He said that $952 million would be paid to BAWAG, who was

4    going to be bought out as part of the transaction.

5    Q.  And is that reflected on the first line under the

6    sub-heading Expenses, where it says "minus 952 million, BAWAG's

7    share"?

8    A.  Yes.

9    Q.  Did Mr. Bennett mention that any money would be going to

10   repay bank loans?

11   A.  Yes.

12   Q.  Did he mention any other money that would be going to the

13   banks, apart from the debt that was owed to the banks?

14   A.  Yes.  He said that they would repay the bank debt, but also

15   had to pay some prepayment penalties because they were, in

16   effect, paying down the debt before it was due and would be

17   charged, in effect, a fee for doing so.

18   Q.  Did he give you a total number that was going to have to be

19   paid to the banks as part of the payment of the payoff of the

20   loans and these prepayment penalties?

21   A.  Yes.

22   Q.  What was that number?

23   A.  $425 million.

24   Q.  And is that reflected on the next line of expenses where it

25   says "minus 425 million, repay bank loans and fees"?

1  A.  Yes.

2  Q.  Finally, did Mr. Bennett mention any other smaller expenses

3  that RGHI would need to pay?

4  A.  Yes.

5  Q.  What types of smaller expenses did he mention?

6  A.  There was an escrow account that had to be set up, I think,

7  for $38 million to pay out certain individuals that were

8  entitled to payments on a change of control.  He also said that

9  management -- certain of their management personnel were

10  entitled to payouts as well.

11  Q.  And did he -- Did you total up the amount of these various

12  other smaller payments that Mr. Bennett said would have to be

13  deducted?

14  A.  Yes.

15  Q.  And what was the total of those sort of miscellaneous

16  items?

17  A.  $123 million.

18  Q.  And is that reflected on the chart where it says "minus

19  $123 million, other assorted payments"?

20  A.  Yes.

21  Q.  Now, let's stop here for a moment.  If those were the only

22  deductions from the proceeds that Mr. Bennett told you about,

23  have you calculated what the proceeds to RGHI, the net proceeds

24  to RGHI would have been, the number that your client would have

25  been entitled to share in?

1    A.   Yes.

2    Q.   What is that number?

3    A.   $1.275 million.

4    Q.   And is that reflected on this chart, where it says "equals

5    $1.275 billion remaining proceeds to RGHI"?

6    A.   Correct.

7    Q.   So that's the number -- If those were all the expenses that

8    were coming out, that's the number your client would have been

9    entitled to 25 percent of?

10   A.   Correct.

11   Q.   And have you calculated what your client's, Mr. Dittmer's

12   25 percent would have been worth if those were the only

13   expenses that were coming out of the overall proceeds?

14   A.   Yes, $219 million.

15   Q.   And that's reflected in green just below expenses?

16   A.   Correct.

17   Q.   Now, were the expenses that we've covered so far the only

18   expenses that Mr. Bennett told you about in that meeting that

19   day?

20   A.   No.

21   Q.   What else did he mention?

22   A.   He mentioned that there was intercompany debt owed by RGHI

23   to the Refco operating company of $1.1 billion.

24   Q.   Did Mr. Bennett explain to you where that $1.1 billion in

25   intercompany debt had come from?

1   A.   Yes.

2   Q.   What did he say?

3   A.   He said that the 1.1 billion originated from losses that

4   were incurred at the operating company.

5   Q.   And how did that translate into $1.1 billion in

6   intercompany debt, if Mr. Bennett told you?

7   A.   He didn't identify how that debt was assumed by RGHI.  He

8   didn't go through how the debt, in effect, moved from the

9   operating company to the holding company.

10  Q.   Did anyone in your meeting on your side, on the Dittmer

11  side of that meeting, ask Mr. Bennett whether Thomas H. Lee

12  Partners knew about this $1.1 billion intercompany debt?

13  A.   Yes.

14  Q.   Do you remember who asked?

15  A.   Yes.  Marshall Eisenberg asked Phil Bennett that question.

16  Q.   What did Mr. Bennett say?

17  A.   He said that Thomas Lee was unaware of the intercompany

18  debt.

19  Q.   Did Mr. Bennett say whether or not any of this $1.1 billion

20  in intercompany debt was going to be remaining, whether any

21  portion of it was going to be left even after the Thomas H. Lee

22  Partners acquisition closed?

23  A.   Yes.

24  Q.   What did he say?

25  A.   I believe he said that $278 million of intercompany debt

1    would be left.

2    Q.  Even after the transaction?

3    A.  Yes.

4    Q.  Now, have you calculated what RGHI's total proceeds would

5    be if you subtract this additional $1.1 billion in intercompany

6    debt that Mr. Bennett told you about that day?

7    A.  Yes, that would be $175 million.

8    Q.  And --

9           THE COURT:  Did you mean to ask Mr. Dittmer's

10   proceeds?

11          MR. LEVY:  I'm sorry, if I could look at the question?

12          THE COURT:  The question was:  "Question.  Have you

13   calculated what RGHI's total proceeds would be if you subtract

14   this additional $1.1 billion in intercompany debt that

15   Mr. Bennett told you about that day?"

16          MR. LEVY:  I think I did ask it correctly.  I think

17   your Honor's anticipating my next question.

18          THE COURT:  So sorry.

19   Q.  Let me back up so that it's clear.  On this chart, where it

20   says "intercompany debt," as a heading, "minus 1.1 billion

21   intercompany debt owed to Refco," the number below that, is

22   that the $175 million that would be remaining as proceeds to

23   RGHI?

24   A.  Correct.

25   Q.  And then below that, have you calculated what Mr. Dittmer's

1    25 percent share would be if those were the proceeds -- if you

2    deduct out the 1.1 billion as well?

3    A.  Yes.

4    Q.  And --

5    A.  $44 million.

6    Q.  Now, looking at all of this information that Mr. Bennett

7    provided to you on that day, was there any number that was of

8    particular interest or concern to you?

9    A.  Yes.

10   Q.  Which one?

11   A.  The $1.1 billion intercompany debt.

12   Q.  Why was that number the one that was of particular interest

13   or concern to you, out of all the numbers that Mr. Bennett went

14   through?

15   A.  Well, that number didn't appear anywhere.  We had never

16   heard of that, never seen it, and, obviously, it would reduce

17   substantially what Mr. Dittmer would be entitled to receive.

18   Q.  Did you see yourself as having any ability to verify

19   whether that number was true or not?

20   A.  No.

21   Q.  Why not?

22   A.  There really wasn't time.  The transaction was moving

23   extremely quickly.  Mr. Bennett had told Mr. Dittmer, in

24   effect, through us, that unless he was out of the deal, the

25   Thomas Lee deal wouldn't close, and that it needed to move and

CAJPCOL5                         Melamed - direct

1    was moving very, very quickly.

2            So we did not think we would have the time or ability

3    to do detailed due diligence to try to get to the bottom of

4    those numbers.

5    Q.  Let's focus on the ability aspect as opposed to the time.

6    If you wanted to verify the bank loans that were being paid

7    off, the $425 million, was it your understanding that you would

8    have had the ability to do that?

9    A.  Yes.

10   Q.  Why?

11   A.  Well, we could have both seen bank documents, loan

12   documents.  We could have contacted the bank to find out what

13   the amount of the debt was.  So there would have been ways to

14   try to track that down.

15           On the intercompany debt, it would not have been

16   possible to do those things.

17   Q.  Why not?

18   A.  Well, as far as we knew, there were no documentation for

19   the intercompany debt.  Mr. Bennett didn't say there was any

20   documentation at all.  He didn't show any documentation to

21   Mr. Dittmer or to us, and there was only his word for it.

22   There was no one else to contact but him.

23   Q.  Now, after Mr. Bennett left, did you know whether

24   Mr. Bennett had been telling you the truth about this

25   $1.1 billion in intercompany debt?

CAJPCOL5                         Melamed – direct

1          MR. SCHWARTZ:  Objection.

2          THE COURT:  Basis?

3          MR. SCHWARTZ:  Objection.

4          THE COURT:  Basis?

5          MR. SCHWARTZ:  State of mind.

6          THE COURT:  Is it the relevance of this witness' state

7   of mind?

8          MR. LEVY:  I can argue it here, your Honor.  I can

9   also come up to the sidebar and explain.  It's going to be

10  perfectly obvious.

11         MR. SCHWARTZ:  I'll withdraw the objection.

12         THE COURT:  Do you have in mind the question, or do

13  you need it asked again?

14  A.  I think if you could ask it again.

15  Q.  After Mr. Bennett left, did you have any sense or any

16  opinion about whether or not Mr. Bennett had been telling you

17  the truth?

18  A.  Yes.

19  Q.  What was your opinion at that time?

20  A.  We thought he was lying to us.

21  Q.  About what?

22  A.  About the 1.1 billion of intercompany debt.

23  Q.  What motive would he have had, as you understood it, at the

24  time, in forming that opinion as to -- for lying to you and

25  making up $1.1 billion in intercompany debt?

CAJPCOL5                    Melamed - direct

1  A.  Because he was using that intercompany debt to justify a

2  much lower payment to Mr. Dittmer than otherwise would be the

3  case.

4  Q.  Did you know whether Mr. Bennett was lying to you, or

5  telling you the truth, when he claimed that the Thomas H. Lee

6  Partners wasn't aware of the $1.1 billion --

7  A.  No.

8  Q.  -- in intercompany debt?

9  A.  No.  We thought he was lying, but we didn't know.

10  Q.  You thought he was lying to whom?

11  A.  To us.

12  Q.  Why?  What was your -- Why did you suspect that Mr. Bennett

13  was lying to you about the fact that this debt was being hidden

14  from Thomas H. Lee Partners?

15  A.  Well, Thomas Lee Partners is a sophisticated hedge fund

16  that also employs very sophisticated counsel.  We thought there

17  would be no chance that, through the due diligence they would

18  do, that he would somehow be able to hide something like that.

19  It just didn't make any sense to us, and we didn't really

20  believe it.

21  Q.  So you thought Mr. Bennett was lying to you?

22  A.  Yes.  We didn't think there was an intercompany debt.

23  Q.  Did you believe, at that time, that it was feasible to try

24  to figure out whether Mr. Bennett was lying to you and making

25  up this $1.1 billion in intercompany debt?

1    A.  No.  We didn't think there was the time or, really, the

2    ability within that time period to really get to the bottom of

3    all of the numbers he had been kind of throwing out at us.

4    Q.  How did you view Mr. Dittmer's options at that point, after

5    Mr. Bennett had made this presentation to you, portions of

6    which you didn't believe?

7    A.  Well, I think we had several options.  One was we could

8    tell Mr. Bennett that we wanted to do due diligence of the

9    deal, try to look at the numbers, look at the backup to the

10   numbers, try to verify the numbers.  But as I mentioned, we

11   realized that there just wasn't enough time, and a lot of that

12   information would come from Mr. Bennett anyway.  So we didn't

13   really believe we would really get to the bottom of it anytime

14   soon.  So that didn't seem like a really viable option for our

15   client.

16           The other option was to not do the deal, to tell

17   Mr. Bennett that we didn't believe some of these numbers and,

18   therefore, we're not going to cash out Mr. Dittmer's remaining

19   interest.  But we did believe, and were told by both

20   Mr. Bennett and Mr. Collins, that if Mr. Dittmer didn't

21   relinquish his interest, that the Thomas Lee deal would not go

22   forward.

23           So the third option, which was the option that

24   Mr. Dittmer really followed, was to take the numbers that Phil

25   Bennett had provided.  It was, in effect, a $75 million offer,

1    and he didn't want to turn that down out of hand.  So it was to

2    take -- to accept, in effect, that number, but then try to

3    protect our client in the event those numbers turned out to be

4    wrong.

5    Q.  And when you say accept the offer or accept something like

6    the $75 million offer -- Let me back up for one second.

7              $75 million was something that was of interest to your

8    client?  He wanted to receive that?

9    A.  Yes.  It was of interest to him.

10   Q.  I think you just said it's not a number that he's going to

11   dismiss out of hand?

12   A.  Correct.

13   Q.  So in this third option, you said your client ultimately

14   decided to follow, accept the offer but protect yourself.  How,

15   what was the protecting yourself?

16   A.  Well, we were going to require that Mr. Bennett make a

17   representation warranty that the numbers that were provided in

18   all of the information that he had provided in these meetings,

19   including the intercompany debt and all of the other numbers,

20   were true, and he was going to stand behind those numbers.

21             And if those numbers turned out not to be true, then

22   he would be responsible or liable to basically pay additional

23   amounts that each would be owing or would have been owing.

24   Q.  When you say he would be liable, what would you do?

25   A.  Sue him for the balance if the numbers had turned out to be

understated or were wrong, and by virtue of that, Mr. Dittmer

had accepted less money than he really was entitled to, then by

virtue of him breaching that representation, Mr. Dittmer would

have been able to sue him for the balance at a later time.

Q.   So the option that Mr. Dittmer chose was option three and

get a representation and warranty?

A.   Well, to take the $75 million, or that ballpark, and then

to have the option to sue, should it turn out that the numbers

should have been higher.

          MR. LEVY:  Your Honor, may I have one moment?

          THE COURT:  Yes, sir.

Q.   Mr. Melamed, just for clarification, we've been talking

about this $75 million number.  That's not on the chart in

front of us?

A.   That's correct.

Q.   Where does that $75 million number come from?  I think you

testified about it.

A.   That was the offer that Mr. Bennett had made to

Mr. Dittmer, the $50 million in cash, plus 25 million at a

later date.  So it was that ballpark that he had offered,

Mr. Bennett had offered to Mr. Dittmer that we didn't want to

pass up too quickly.

Q.   And these numbers on Government Exhibit 865 were

Mr. Bennett's justification for why your client should take

that 75 million?

CAJPCOL5                        Melamed - direct

1    A.  Correct.

2              MR. LEVY:  Your Honor, I think this would be an

3    appropriate time to break for the weekend.

4              THE COURT:  All right.  Ladies and gentlemen, we'll

5    take a break now for the weekend.  Would you remember your

6    rules.  Please leave your exhibits, put your books in the jury

7    room.  Please remember not to discuss the case or do any

8    research on the case.  Your coffee will be ready at 9:30 on

9    Monday for 10:00 to start.

10             Mr. Farooq, may I ask you to stay for a moment, sir.

11   Thank you.  Ladies and gentlemen, have a nice weekend and stay

12   dry on your way home.  Thank you for your attention.

13             (Jury exits)

14             THE COURT:  You may step down.  Would you stay in the

15   courtroom until we get word that the jurors have gone down.

16             THE WITNESS:  Sure.

17             THE COURT:  Thanks.  Actually, maybe could somebody

18   take the witness into the witness room, please; so he's

19   comfortable?  Thank you.

20             (Witness temporarily excused)

21             THE COURT:  Mr. Farooq, why don't you come up in the

22   front row so you're nice and close.  Come right on over here,

23   sir.  Counsel, did you wish me to use the four to five number?

24   Won't you be seated, counsel?

25             MR. SCHWARTZ:  May we come to sidebar, your Honor?

CAJPCOL5                          Melamed - direct

1              THE COURT:  Sure.  Off the record, right?  Is that
2     okay?
3              MR. SCHWARTZ:  Yes.
4              THE COURT:  Gents.
5              (At the side bar; off the record)
6              (In open court)
7              THE COURT:  Mr. Farooq, I have your letter.  Thank you
8     for sending it.  Counsel have authorized me to say that we
9     expect the jury will receive the case for its consideration in
10    three weeks, which is, of course, a little better than we had
11    anticipated in the past.  Does that change your view, sir, as
12    to your request to be excused?
13             JUROR:  Can I share one confidential information with
14    you only?
15             THE COURT:  Yes, sir.
16             JUROR:  And if you think it's okay, then you can share
17    with the other people.
18             THE COURT:  Okay.  Miss Reporter, can you come over?
19             JUROR:  What is the basis of this request.
20             THE COURT:  Yes?
21             MR. LEVY:  Your Honor, for reasons that I'm sure
22    you'll be sensitive to, could the defendant just agree to this
23    procedure of your Honor speaking to the counsel.
24             MR. SCHWARTZ:  I'm sorry, I didn't understand.
25             THE COURT:  Mr. Farooq wants to give me additional

CAJPCOL5                         Melamed – direct

1   background on the basis of the request, and I think that he

2   said that it would be okay if I share it with the other people.

3            JUROR:  Yes, it will be okay.

4            THE COURT:  Okay.  Do you want to just do it in open

5   court now?

6            MR. SCHWARTZ:  No, your Honor, your Honor, if

7   Mr. Farooq is more comfortable --

8            JUROR:  Just, if you guys -- This is public.  Day

9   before yesterday we have a day off.  I reported back to

10  Boehringer Ingelheim, which I joined a month before.

11           MR. SCHWARTZ:  May I step up, your Honor?

12           THE COURT:  Yes, of course.

13           MR. SCHWARTZ:  Sorry, Mr. Farooq.

14           JUROR:  My supervisor shared a news that we were -- we

15  had a fine from U.S. for $100 million, and due to this reason

16  we will not receive any more yearly raise or bonuses or it

17  might be late.

18           I was working for Pfizer for 24 years, and after this,

19  I got laid off because they are moving the business.  This is

20  the normal case.  After a long struggle, I found a job at

21  Boehringer Ingelheim, and this is the second month.  After one

22  month training, I received the first project for the HIV

23  vaccine.  And with present situation, I have a lot of pressure

24  because they moved my project to someone else, and I will be

25  the prime candidate to kick.  So this is my problem.

CAJPCOL5                        Melamed – direct

1    Otherwise, I really -- this is a life learning, even for me.

2              THE COURT:  Yes, sir.

3              JUROR:  And I have a great respect for you, especially

4    for you.

5              THE COURT:  Thank you, sir.  So my only question to

6    you is whether the adjusted time schedule has any effect on

7    your desire to be excused, or do you say, yes, please excuse

8    me, Judge?

9              JUROR:  Please excuse me, Judge, if you can.

10             THE COURT:  You are excused, sir.  Thank you for your

11   service.

12             JUROR:  I do appreciate it very much, and my family is

13   very thankful also.

14             THE COURT:  Yes, sir.  I'm going to ask Gilbert to

15   just be sure the other jurors have collected their things and

16   left, and then he'll help you into the jury room.

17             JUROR:  Thank you very much.

18             THE COURT:  Thank you, sir.

19             JUROR:  Thank you, sir.

20             THE COURT:  Thank you, counsel, for your assistance.

21             MR. SCHWARTZ:  Your Honor, just give him

22   the instruction.

23             THE COURT:  Oh, would you be kind enough, Mr. Farooq,

24   to remember the rules.

25             JUROR:  Yes, I will.

1           THE COURT:  And don't talk with any of the other

2     jurors.

3           JUROR:  Yes.

4           THE COURT:  Don't let them talk to you.  Once the case

5     is over, you're welcome to call and ask what happened.  And you

6     have Miss Phillips' telephone number.  Thank you.

7           JUROR:  Thank you very, very much.

8           THE COURT:  Yes, sir.  And, counsel, thank you for

9     your consideration.

10          JUROR:  Thank you, sir.

11          (Juror exits)

12          THE COURT:  Thank you, counsel.  Won't you be seated,

13    and just for the record, we have Mr. Farooq's note, which I did

14    actually show to counsel at the sidebar and counsel reviewed

15    before.  It's marked Court Exhibit 1, and just for the record,

16    at sidebar, counsel and I discussed the questions to be asked

17    of Mr. Farooq.  Is that right, gentlemen?

18          MR. CHERNOFF:  Yes.

19          MR. SCHWARTZ:  Absolutely, your Honor.

20          THE COURT:  Thank you.  Okay, folks.  Mr. Sullivan.

21          MR. SCHWARTZ:  Your Honor, would the Court mind if

22    Mr. Collins departs?

23          THE COURT:  Of course not, so long as the jurors are

24    down.  Would you just -- We'll double-check, sir, to be sure

25    they're down.  We don't want to torture you more than anybody

CAJPCOL5                          Melamed – direct

1    else.  Yes, sir?

2              MR. SCHWARTZ:  May I be heard?

3              THE COURT:  Yes, sir.

4              MR. SCHWARTZ:  Your Honor, the government has already

5    elicited testimony from two witnesses concerning their opinions

6    as to whether the nondisclosure would have mattered to Lee in

7    doing the deal.  Mr. Schoen testified for a number of reasons

8    that it might have mattered, and I think Mr. Trosten, as well,

9    gave his opinion on the materiality of the nondisclosure PPA.

10   Materiality is not a subjective standard.  The fact that the

11   victim thinks it would have mattered to him is not sufficient

12   for the jury to decide that, indeed, it is material.

13             Mr. Sullivan was a lawyer who was familiar with all

14   aspects of the Proceeds Participation Agreement.  He was there

15   at its founding, so to speak, one of the lawyers who reviewed

16   it on behalf of BAWAG, both it and the side letter, in 2002.

17   In 2004, the government is going to elicit he attended a

18   meeting with Mr. Collins present, where Mr. Bennett made

19   explicit his desire -- not his desire.  He said he was not

20   going to disclose the Proceeds Participation Agreement in the

21   course of the transaction that was about to take place.

22             The government is not going to inquire into his

23   concerns.  The last time, at the last trial, just as

24   background, he wrote a memo to the file saying this -- and I

25   understand the government is not going to elicit this -- that

CAJPCOL5                          Melamed - direct

1    he had legal and -- this raised legal and business issues

2    and --

3                THE COURT:  This is Mr. Sullivan to the file?

4                MR. SCHWARTZ:  Yes.  On cross-examination, we

5    cross-examined him about how his legal business issues had been

6    resolved without -- through a series of legal transactions that

7    were undertaken with Joe Collins and Mayer Brown towards the

8    end.  We received the night before the examination of

9    Mr. Sullivan, from the government, 3500 material in which --

10   Brady material, in which Mr. Sullivan had informed the

11   government that, as a result, I believe, of these transactions,

12   he did not believe that the PPA was material.

13               We were not allowed to elicit that in front of Judge

14   Sand.  We believe that that is testimony that, if it is based

15   on his legal transactions with Mr. Collins and his

16   understanding of the legal situation of the PPA, and the

17   government here has an admission, they've admitted in their own

18   brief to your Honor on the subject, that before the closing,

19   all the rights and obligations under the PPA had been

20   extinguished, and Mr. Sullivan's testimony is about materiality

21   as of the closing.

22               We believe we should be able to elicit that, and that

23   both sides should be able to argue to the jury that there's

24   evidence that is either material or not material.  Your Honor

25   is going to charge the jury on what materiality is, and the

1    jury should be able to consider it.  This is two different

2    opinions of people that were involved in the transaction, and

3    at least from our perspective -- and the government takes issue

4    with this, but I'm not quite sure I understand the factual

5    basis -- Mr. Sullivan knew all the things about the Proceeds

6    Participation Agreement that Mr. Collins knew.

7            And so one of the things he knew, he knew that the

8    Proceeds Participation Agreement required just $350 million to

9    pay down intercompany debt.  He knew that it had all of these

10   blocking rights in it.  He knew all of these things.  He was

11   completely familiar with it, and he knew things that the Lee

12   people did not know.

13           So, for example, Mr. Schoen talked about how it

14   wouldn't matter to him to know that there were blocking rights.

15   Well, he knew the blocking rights were going to be

16   extinguished, and that BAWAG controlled the entity, and that

17   BAWAG had consented to the deal; so that these were not matters

18   that would have an impact.

19           I believe he would also say that he believed that

20   there would be no impact on Refco by the nondisclosure of the

21   PPA, which is also relevant to the issue of materiality.  I,

22   frankly, don't understand why the government should be

23   permitted to elicit the opinion, and I believe they're going to

24   do this with Mr. Tabor, the lawyer for Weil Gotshal, and I

25   believe as well with Mr. Westra, another lawyer for Weil

CAJPCOL5                        Melamed - direct

1    Gotshal, that this would have mattered to them and would be

2    something that -- and Mr. Stephanakis, the lawyer for the

3    bondholders, that these are things that would have mattered to

4    them and they wanted to know.

5         And why we can't elicit from a government witness that

6    at least, in his view, this was not material or had no impact

7    on the company going forward.

8         THE COURT:  All right.  Would you remind me what pages

9    this was discussed at in the prior transcript so I can go look

10   it up?  You can give it to me before we go home or e-mail it to

11   me.

12        MR. SCHWARTZ:  I think the problem with the prior

13   transcript is going to be this, your Honor; that like this

14   case, like this time, the issue came up before trial, kind of

15   wandered through trial, came up again during trial and then

16   comes up with a fairly short exchange, I believe, with Judge

17   Sand before the witness testified, in which he ruled that he

18   wasn't going to permit it.

19        THE COURT:  All right.  I assume somebody is going to

20   tell me the basis of the holding, for the ruling.

21        MR. SCHWARTZ:  I don't think I ever understood it,

22   your Honor.

23        THE COURT:  That's different question, Mr. Schwartz.

24        MR. LEVY:  Your Honor, if I might.  I think the ruling

25   from the last trial also might not be all that enlightening.

CAJPCOL5                          Melamed - direct

1    The last trial was very different in terms of --

2                 THE COURT:  The opinion testimony.

3                 MR. LEVY:  -- people giving their opinion.  Everybody

4    was offering their opinion on everything in the first trial,

5    and this is a different trial.  And we've been going forward on

6    the understanding that it's going to be a different trial.

7                 Mr. Sullivan, his testimony is going to be very

8    different from what it was last time.  From our questioning,

9    he's not going to offer his opinion on anything on direct,

10   which is not how it came in the last time.  Doors were opened

11   through a whole number of witnesses that haven't been opened

12   here.  We've been working very hard to keep everybody's opinion

13   out of this.

14                Mr. Sullivan is almost the worst possible witness to

15   be allowed to offer his opinion on materiality.  He wasn't a

16   part of the transaction between the buyer and the seller.  He's

17   off for a third party.  He knew some of the facts, but we can't

18   ask him which ones because his lawyers will jump up and down on

19   privilege grounds if he tried to.

20                On Scott Schoen, if they wanted to ask him on, let's

21   say, the blocking rights, the consent about materiality, they

22   could have gone into that on cross.  Mr. Schoen, why did you

23   believe that that would matter?  Let me pose the following 15

24   hypotheticals where it wouldn't matter.  You're making it up,

25   Mr. Schoen.

1          I can't do that with Mr. Sullivan because his lawyers

2     in the back will say he can't talk about his conversations with

3     other lawyers.  He can't talk about what he learned from his

4     clients.  When I say, Mr. Sullivan, based on what you know now,

5     would have considered it to be material?  I'm not sure he will

6     answer that question, and I can't ask him the question what he

7     knows now that he didn't know then because his lawyers will

8     jump up and down and say, privilege; he's getting it from his

9     clients.  I'm sorry, he's getting it from BAWAG.  He's BAWAG's

10    lawyer.  BAWAG's lawyers will jump up and down say I can't ask

11    him these questions.

12         He is, in effect, being offered as an expert that the

13    government can't cross-examine.

14         MR. SCHWARTZ:  Your Honor, the question I posed to him

15    last time, I think I posed it a couple of different ways, and

16    we'll get to your Honor.  Based on the transactions -- on the

17    transaction with Mr. Collins, the single transaction we just

18    discussed, did you have an opinion as to the materiality of the

19    PPA at the time of the closing, or did you have an opinion as

20    to its impact.  That's one.

21         THE COURT:  I'm surely not letting that in because

22    nobody the opining on that.

23         MR. SCHWARTZ:  That was the way --

24         THE COURT:  Yeah, I remember, everybody did that

25    throughout.

CAJPCOL5                        Melamed - direct

1              MR. SCHWARTZ:  My point is different.  My point is
2      that --
3              THE COURT:  You can't talk over me.
4              MR. SCHWARTZ:  That, I actually know.
5              THE COURT:  Oh, thank God there's something.
6              Everybody opined on everything in the last trial; so
7      we all agree we're not doing that.
8              MR. SCHWARTZ:  We agree, but my point is different,
9      not that I would ask the question in the same way, but that the
10     question and the answer was not based on privileged
11     information.  It was based on his dealings with Mr. Collins and
12     his understanding of the nature of the transactions that were
13     taking place.
14             May I finish, please?
15             MR. LEVY:  Sure.
16             MR. SCHWARTZ:  Secondly, I don't believe at that time
17     that we had posed the issue to Judge Sand as starkly as we have
18     now posed it to your Honor, which is that there is a defense in
19     this case on the element of materiality.  The case -- The last
20     time was positioned more with respect to Mr. Collins' state of
21     mind, not materiality.  But we are actually going to argue to
22     the jury, particularly if we can get this evidence in, that the
23     PPA -- they did find that the PPA was not material.
24             THE COURT:  And it's based on these other documents?
25             MR. SCHWARTZ:  Yes.

1           THE COURT:  May I ask this?  I think when you started,

2    Mr. Schwartz, you said that Mr. Sullivan knew everything there

3    was to know about the PPA.  I guess the more important question

4    is does he know everything there is to know about the deal?

5           MR. SCHWARTZ:  Yes.

6           THE COURT:  And the reason I ask that is what might be

7    material to his client, something his client would care about,

8    might or might not be the same as what the buyer would care

9    about.

10          MR. SCHWARTZ:  I understand that.

11          THE COURT:  And that's why I thought Mr. Schoen was

12   different.  He was also not a lawyer.  He was the business guy

13   on the deal.

14          MR. SCHWARTZ:  Your Honor, I think the answer to the

15   question is yes.  BAWAG was a party to the transaction, to the

16   Lee transaction itself.  They had all the drafts of the deal.

17   They were exchanged back and forth.  There was going to be

18   evidence, I believe, from Mr. Berger that the government is

19   going to elicit about the representations going back and forth

20   between the two law firms.  They were -- they were completely

21   familiar with the transaction.

22          They were getting most of the money out of the

23   transaction.  That's why they were so familiar with it.  They

24   signed the deal, and Mr. Sullivan was familiar with the

25   documents to the deal, and they made a very conscious decision

CAJPCOL5                          Melamed - direct

1   about how they were going to negotiate these various

2   transactions moving forward, in order to deal with the PPA.

3   They knew this was an issue, and Mr. Bennett raised it.

4          Mr. Sullivan, that's what his memo says, understood it

5   to be an issue that raised legal problems that he had to deal

6   with, and he dealt with Mr. Collins.  And they made those

7   problems, at least in his mind, not in the government's,

8   disappear and that's -- it's sort of the essence of what went

9   on here.  And it's -- the only opinion we're going to ask him

10  is that one.  He raised concerns.

11         THE COURT:  The opinion of what?  How are you going to

12  ask it this time?

13         MR. SCHWARTZ:  If the Court would permit me, I would

14  ask the materiality question.  If the court would not permit

15  that, I would ask that, at the time of closing, if he

16  understood, it's his view based on these transactions, that the

17  PPA would not have an impact on Refco, the nondisclosure.

18         THE COURT:  Okay.

19         MR. LEVY:  Two things, your Honor.  First of all, who

20  is Mr. Sullivan to say whether or not it would have had an

21  impact on Refco?  He's BAWAG's lawyer, not negotiating directly

22  with Thomas H. Lee.  But perhaps more importantly, what's the

23  obvious follow-up question?  Mr. Sullivan, how did you arrive

24  at that conclusion?  How did you arrive at that?  Tell me what

25  your thought process was.

CAJPCOL5                        Melamed - direct

1          I can't ask him that because BAWAG's lawyers will jump

2     up and down and say he can't answer that.  For all we know, and

3     I suspect, they were very long, thought-out conversations back

4     at McDermott, Will & Emery and with the client about whether or

5     not they could go forward with this transaction.  It may have

6     been an awfully close call.  We have no way of knowing.  That's

7     exactly what you would cross-examine, let's say, an expert on

8     that, which is all this is, expert testimony from somebody who

9     supposedly saw all the documents.  I can't --

10          THE COURT:  Let me ask you this question.  And I do

11     agree that Mr. Schwartz's formulation is a little opiniony and

12     conclusory and difficult to cross.

13          MR. SCHWARTZ:  If it's based --

14          THE COURT:  But you say, Mr. Schwartz, that

15     Mr. Sullivan realized there was a problem or somebody realized

16     there was a problem with the PPA.

17          MR. SCHWARTZ:  What he said in the memo was it raises

18     business and legal concerns.  And what he then undertook to do

19     was resolve -- The business concern was a simple one.  The

20     business concern was that if -- What the two sides decided to

21     do, your Honor, was rather than allow the participation right

22     to be paid, was to structure the deal slightly differently, in

23     which -- so that RGHI would purchase DF Capital from BAWAG

24     prior to the closing.  And the reason for that was to deal with

25     the business issue.

1              THE COURT:  What's he going to say the business issue

2       was?

3              MR. SCHWARTZ:  The business issue was, if we don't get

4       our participation right until after the closing, and we have

5       agreed to give everything up under the PPA, how do we know

6       we're going to get paid?

7              So what they tried to do -- what they did do, was they

8       structured the deal so that they would give it all up before

9       the closing and instituted a document called a reversion rights

10      agreement, which if the Lee deal collapsed or didn't get -- or

11      they weren't paid, would allow the transaction to be unwound,

12      and the participation would have been reinstated, the PPA.  And

13      that dealt with the business issue.

14             THE COURT:  Okay.  And what are the legal issues?

15             MR. SCHWARTZ:  I think he wasn't as clear about the

16      legal issue, but I think --

17             THE COURT:  What did he say?

18             MR. SCHWARTZ:  I don't think he's ever really

19      identified what the legal issues were.  I have to go back and

20      look, your Honor.  As I stand here, I don't recall.  But what

21      we did was we took him through each of the agreements and asked

22      him what they had accomplished.  And at the end, he said -- he

23      did say that they had resolved his business and legal issues,

24      and that he was prepared to go to the closing and allow his

25      client to close the deal.

1        And if you recall, Judge Patterson -- I believe Judge

2   Sand volunteered that he give it and that Judge Patterson gave

3   it was a charge to the jury about a lawyer's ethical obligation

4   not to allow a client to receive the proceeds of the fraud.

5        We'll deal with that issue later with this Court to

6   charge that, but that was to deal with that issue.

7        THE COURT:  Gilbert -- Excuse me.  Off the record.

8        (Discussion held off the record)

9        THE COURT:  Excuse me.  We're back on the record.  You

10  were talking about the charge, and you said we'll deal with

11  that issue next.

12       MR. SCHWARTZ:  I assume the Court doesn't want to deal

13  with that now, but the privilege issue, I think, is a red

14  herring because we're going to limit our cross-examination to

15  these documents.  And the fact of the matter is, we have -- we

16  do have a right to present a defense.  The government is

17  calling the witness --

18       THE COURT:  Please, Mr. Schwartz, it's Friday

19  afternoon.

20       MR. SCHWARTZ:  But the government --

21       THE COURT:  I know that.

22       MR. SCHWARTZ:  But the government is calling this

23  witness in order to leave certain things on the table.  They're

24  going to leave on the table that Bennett said to Sullivan --

25       THE COURT:  I know.  I know.  It has to be disclosed,

CAJPCOL5                    Melamed - direct

1    I know.

2              MR. SCHWARTZ:  No, we're not going to disclose it

3    because it's going to complicate the transaction, that's what

4    he said, and we don't dispute that that's what he said.  But we

5    have to be able to bring out that the lawyer who heard that,

6    moves forward with the deal, after dealing with Bennett's

7    lawyer, we contend, in a good faith way to deal with the issues

8    that are raised by Bennett's decision.

9              MR. LEVY:  Your Honor, that's exactly what they want

10   to do, but it's just wrong.  I mean, what we're bringing

11   Mr. Sullivan for is to say, I was at a meeting where Phil

12   Bennett said this is not going to be disclosed because it will

13   complicate the transaction.

14             And from that very limited thing, they would like to

15   now prop Mr. Sullivan up there as a proxy for Mr. Collins and

16   show that Mr. Sullivan went through this whole transaction.

17   Mr. Sullivan hasn't been charged, or at least by implication,

18   Mr. Sullivan didn't think there was a fraud.

19             THE COURT:  Let me ask you this.  What if Mr. Schwartz

20   called Sullivan on his case for the proposition that

21   Mr. Collins and Mr. Sullivan did these documents, these

22   agreements, and it met the concerns that Mr. Sullivan

23   articulated?

24             I mean that's essentially what he's doing.  I

25   understand it's beyond the scope and all that other stuff.

1     What if he did that?

2                 MR. LEVY:  It's not a scope problem with the

3     government.  If that were proper, we could do that on our case.

4     It's not proper because the only purpose of it is to show that

5     Mr. Sullivan thought this all was okay.

6                 There are a couple of problems with that.  One, it's

7     irrelevant.  Who cares if Mr. Sullivan thought it was all okay

8     or not?  The jury is going to have to decide if this was all

9     okay.  And, two -- and incidentally, on our case, we're never

10    going to say anything to suggest that Mr. Sullivan thought it

11    wasn't okay.  He asked a question in Mr. Collins' presence and

12    he got an answer, and that's as much as we're going to put in

13    on that subject.

14                But No. 2, even if it was somehow relevant that this

15    other person out there is vouching for Mr. Collins, that he

16    didn't commit a crime, I don't understand why Mr. Sullivan

17    would be the one to do it because we can't cross-examine him on

18    that, on how he got there.

19                THE COURT:  The part I don't understand there is why

20    Sullivan can't say, having heard that answer, we've put

21    together a bunch of document, here's what they did.

22                MR. LEVY:  Oh, that's fine.  I mean, if he wants to

23    say -- I think if he gets into a particularly complex

24    contractual analysis, that might be harder, but if they want to

25    say, after that, did you execute a reversion rights agreement,

1    I'm going to show you this paragraph, can you read this

2    paragraph for me?

3           THE COURT:  And what did it do?  It said, if the deal

4    doesn't get done, you would go back to square one?

5           MR. LEVY:  I will say that there's one paragraph that

6    I think they're going to want to ask about that we would object

7    to.  There's a "whereas" clause that says, "Whereas, it is the

8    intent"--

9           THE COURT:  And then they got the instruction on that,

10   right?

11          MR. LEVY:  So what they would want to ask, I suspect,

12   is:  Mr. Sullivan, did you view this whereas clause as

13   essentially extinguishing the PPA, making clear that the PPA

14   was now a dead letter.

15          MR. SCHWARTZ:  I'm not --

16          THE COURT:  He's not going to ask that.

17          MR. LEVY:  If all he wants to do is put the reversion

18   rights agreement in front of him and say, did you guys execute

19   this?  Can you read this?  What was the, sort of general

20   effect?

21          MR. SCHWARTZ:  I'm not going to ask him his opinion on

22   the "whereas" clause.  I might read it.  I'm not going to ask

23   his opinion on it.

24          THE COURT:  But if you read it, then we have to have

25   the instruction on it.

CAJPCOL5                       Melamed - direct

1           MR. SCHWARTZ:  What's the instruction?  There's a

2      "whereas" clause that says --

3           THE COURT:  It's not an operative part of the

4      contract.

5           MR. SCHWARTZ:  But, your Honor, that's not --

6           THE COURT:  Look, I know there was an instruction

7      given on it last time.

8           MR. SCHWARTZ:  It was given during Mr. Collins'

9      testimony because Mr. Collins testified that he thought it was

10     an operative that had a legal consequence.  I am not going to

11     argue that it has a legal consequence.  It states the intention

12     of the parties.  That's what it does, and I don't think there

13     was an instruction, actually.

14          MR. BACH:  The government requested instruction and

15     the judge declined to give it.

16          MR. SCHWARTZ:  And secondly, your Honor --

17          THE COURT:  I'm sure you're more accurate than I.

18          MR. SCHWARTZ:  Than I.

19          THE COURT:  I haven't committed it all to memory.

20          MR. BACH:  There's just so many details.

21          MR. SCHWARTZ:  And we should be able to say, without

22     taking -- the same way he's just said, done with the

23     depreciation component, this is what the purpose of this was.

24     You know, not taking the jury through all the fine language,

25     but if we have to do that, we'll do that.  This is not a

1    witness that's going to be on the stand a long time.

2              THE COURT:  This is to Mr. Levy now.  I don't

3    understand why they can't say, Here's these documents.  What

4    did they do?

5              MR. LEVY:  Oh, yes.

6              THE COURT:  Just like you did with these people.

7              MR. LEVY:  I have no problem with that.  That one

8    "whereas" clause, what it did --

9              THE COURT:  All right.  We're going to argue about

10   that later, but it seems to me that the guy ought to be able to

11   be asked what the documents did.

12             MR. LEVY:  Absolutely.

13             THE COURT:  I don't think he gets to opine that it

14   mooted the PPA or it made the PPA not material, or any of those

15   more conclusory matters.  I mean, truthfully, and maybe you can

16   give me the couple of documents you want to do, but it did not

17   seem to me that they were of such complexity that the jury

18   wouldn't be able to understand what the witness is saying.

19             MR. LEVY:  That's fine, your Honor.  We've never

20   objected to their being able to go through the reversion rights

21   agreement.  It's the, okay, now having done this reversion

22   rights agreement, Mr. Sullivan, you now felt comfortable that

23   no fraud was being perpetrated, or that the PPA didn't need to

24   be disclosed.

25             THE COURT:  No, I don't see that we go that far.

1           MR. LEVY:  Clearly, they have a right to bring in the

2      fact that there was a reversion rights agreement.

3           THE COURT:  But I think they can do it through this

4      guy because he was the guy who was working on it, right?

5           MR. LEVY:  Sure, absolutely.

6           THE COURT:  Does that solve the problem?

7           MR. SCHWARTZ:  We don't think so, your Honor.  We

8      think -- I'm not withdrawing our position here.  I believe that

9      we are entitled in the case, where materiality is an offense,

10     to bring out an opinion contrary to the victim.  That is based

11     on the fact of the lay opinion.  That is based on the facts and

12     circumstances as he saw them at the time as opposed to the

13     victim, who --

14          THE COURT:  Look, I'm happy to consider what other

15     questions you want to ask him after you go through, what does

16     this document do.  But I don't think we ought to be opining on

17     materiality, and whatever the last question was you just told

18     me seemed to go too far, but I'm happy to consider some more.

19     But I don't want to get into a war of experts opining on

20     materiality.

21          MR. SCHWARTZ:  I hear, your Honor.  I respectfully

22     disagree, but, obviously, I'm in the position I'm in.

23          THE COURT:  Okay.  If there are other questions you

24     want to tack on, let me know.

25          MR. SCHWARTZ:  We will consider that, your Honor.

CAJPCOL5                        Melamed – direct

1          THE COURT:  Okay.

2          MR. SCHWARTZ:  And be prepared on Monday at an

3    appropriate time to raise the issue with the Court.

4          THE COURT:  Cool.  Anything else?

5          MR. SCHWARTZ:  I think Mr. Bach is suggesting it might

6    be hard to do that before hearing the direct, but --

7          THE COURT:  Well, let's do it when we can.  Do we need

8    anything else on the record, friends?

9          MR. CHERNOFF:  No, your Honor.  Thank you.

10          THE COURT:  Okay.  Off the record.

11          (Discussion held off the record)

12          THE COURT:  Anything else, friends?

13          MR. LEVY:  No.  Thank you, your Honor.  Have a good

14    weekend.

15          MR. SCHWARTZ:  Thank you, your Honor.

16          THE COURT:  You too.

17          (Adjourned to October 22, 2012, at 10:00 a.m.)

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                         Page

3   ROBERT TROSTEN

4   Cross By Mr. Schwartz . . . . . . . . . . .1543

5   Recross By Mr. Schwartz . . . . . . . . . .1652

6   EARL MELAMED

7   Direct By Mr. Levy . . . . . . . . . . . . .1661

8                    GOVERNMENT EXHIBITS

9   Exhibit No.                         Received

10  6   . . . . . . . . . . . . . . . . . . .1629

11  710   . . . . . . . . . . . . . . . . . . .1631

12  900   . . . . . . . . . . . . . . . . . . .1666

13  860   . . . . . . . . . . . . . . . . . . .1669

14  2200   . . . . . . . . . . . . . . . . . . .1675

15  903   . . . . . . . . . . . . . . . . . . .1677

16  936   . . . . . . . . . . . . . . . . . . .1679

17  905   . . . . . . . . . . . . . . . . . . .1686

18  865   . . . . . . . . . . . . . . . . . . .1690

19                    DEFENDANT EXHIBITS

20  Exhibit No.                         Received

21  5   . . . . . . . . . . . . . . . . . . .1552

22  6   . . . . . . . . . . . . . . . . . . .1557

23  103   . . . . . . . . . . . . . . . . . . .1569

24  102   . . . . . . . . . . . . . . . . . . .1572

25  104   . . . . . . . . . . . . . . . . . . .1581
```

105 . . . . . . . . . . . . . . . . . . .1582

183 . . . . . . . . . . . . . . . . . . .1591

106 . . . . . . . . . . . . . . . . . . .1595

107 . . . . . . . . . . . . . . . . . . .1600

161 . . . . . . . . . . . . . . . . . . .1604

111 . . . . . . . . . . . . . . . . . . .1614

7 . . . . . . . . . . . . . . . . . . .1619