Capdcol1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                             07 Cr. 1170 (LAP)

5    JOSEPH P. COLLINS,

6              Defendant.

7    ------------------------------x
                                             October 25, 2012
8                                            10:06 a.m.

9    Before:

10                  HON. LORETTA A. PRESKA,

11                                           District Judge

12                        APPEARANCES

13   PREET BHARARA
          United States Attorney for the
14        Southern District of New York
     BY:  HARRY A. CHERNOFF
15        MICHAEL A. LEVY
          EDWARD A. IMPERATORE
16            Assistant United States Attorneys

17   COOLEY LLP
          Attorneys for Defendant
18   BY:  WILLIAM SCHWARTZ
          JONATHAN BACH
19        LAUREN GERBER LEE

20        – also present –

21

22   Gary Smith, Paralegal, U.S. Attorney's Office
     Stephanie O'Connor, Consultant with defense

23

24

25

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  I hear you have something you want to talk
 3    about.
 4              MR. BACH:  There is an issue, Judge, that we want to
 5    raise.  I've given the government the option of raising it
 6    either now or after Mr. Westra's direct testimony.  It is an
 7    issue that potentially could come up on the cross of
 8    Mr. Westra.  It is up to the government, but I don't want to
 9    speak for them.
10              MR. CHERNOFF:  Judge, we will proceed at the Court's
11    pleasure, that Mr. Westra's direct is not going to be more than
12    30 minutes so we might as well do it now.
13              THE COURT:  OK.  What is up?
14              MR. BACH:  The government has indicated that it wants
15    to call a witness from the Wilmer Cutler law firm to testify
16    about conversations with Dennis Klejna.  Those conversations
17    are on the subject matter of the Sedona investigation.  That's
18    the investigation in which Mr. Maggio was a witness who
19    claims --
20              THE COURT:  This is the, "They're going to throw me
21    under the bus"?
22              MR. BACH:  That's right.  So they don't want to
23    have -- and I don't -- they've shown us some 3500 material and
24    we've been discussing it, but essentially they want to
25    establish, as I understand it, two things.  Number one, that in
```

Capdcol1                    Trial

1    2003, Wilmer Cutler advised Refco that it would represent the

2    company but wanted to have individuals retain separate counsel.

3    We have no quarrel with that.  We don't think that is in

4    dispute in this case.  We think there is already not only

5    Mr. Maggio's testimony on that issue but there is documentary

6    evidence, including Joe Collins' time records, to show that

7    those are the dates on which those types of conversations

8    occurred on that very subject matter.

9         The government seems with this witness to want to go

10   beyond that and elicit Wilmer Cutler's expert opinion that the

11   individuals had to have separate counsel, and implying, or at

12   least creating the situation in which the jury could infer that

13   the way Mayer Brown did it, by ignoring a potential conflict of

14   interest, was improper.

15        And we think, number one, these conversations with

16   Mr. Klejna, which were not with Mr. Maggio or Mr. Collins, are

17   pure hearsay.  We think, number two, that they are irrelevant.

18   They are after the fact.  They occur after there have already

19   been discussions with Mr. Maggio about the issue of separate

20   counsel.  They occur after Refco gets back to Dennis Klejna and

21   says we don't want to proceed with separate counsel for the

22   individuals.  And this appears to be a phone call in which

23   Mr. Klejna asks Wilmer Cutler if they will stay on as secondary

24   counsel after Mayer Brown comes in to take the lead role.  And

25   Wilmer says, you know, we're just not comfortable doing that,

Capdcol1                    Trial

1    we don't want to be secondary counsel, and we don't like the

2    idea of representing individuals when we're also representing a

3    company and have to do what's in the company's best interest.

4         We think those conversations are beyond anything of

5    relevance to this case.  They are hearsay.  They don't involve

6    communications directly with Collins, directly with Maggio.

7    They are on a collateral issue in this case.  And they go into

8    the territory of state of mind, lawyer expert opinion testimony

9    that we've all made efforts here to minimize and avoid, and

10   they raise 403.

11        THE COURT:  OK.

12        MR. CHERNOFF:  Your Honor, first of all, this issue

13   has nothing to do with Mr. Westra, and I don't know why we are

14   taking it up now.  The defense cannot cross-examine Mr. Westra

15   on what hearsay information he may have heard about the Sedona

16   matter in doing the legal due diligence on this deal.  That

17   being said, I am going to try to be brief because I think we

18   can take this up further later.

19        The Wilmer Cutler firm withdrew from the case because

20   it would not represent both the company and the individuals.

21   That was Mr. Maggio's testimony.  It was offered for the

22   purpose of showing that when Joe Collins knew that another law

23   firm withdrew from the representation in the Sedona matter, he

24   said to Mr. Maggio:  We'll get through this together.  I'll

25   represent both you and the company, assuming that Mr. Bennett

Capdcol1                    Trial

1    wants me to.  And that's what Mr. Bennett wanted.

2         We are not offering expert opinion as to why Wilmer

3    made that decision, and we could even have an instruction that

4    one law firm's decision -- well, we could try to fashion an

5    instruction that addresses some of the defense's concern.  But

6    the reality is that Mr. Maggio's credibility was attacked

7    severely.  On this very point, I remember Mr. Schwartz reading

8    Mr. Bach's cross and saying, And on this we only have your good

9    word, sir.  And, as your Honor I think will recall, Mr. Maggio

10   said, no, I recall someone from Wilmer Cutler.  Which is what

11   we propose to do.

12        THE COURT:  Can I just interrupt you for one minute?

13        Did you just tell me you have 30 more minutes with

14   Mr. Westra, about?

15        MR. CHERNOFF:  Yes, your Honor.

16        THE COURT:  How much cross for Mr. Westra?

17        MR. BACH:  About 45 minutes.

18        THE COURT:  I'm only trying to figure out if we should

19   be talking about this now on jury time or whether we can defer

20   it.

21        MR. BACH:  Well, it is going to come up in the cross

22   of Mr. Westra.  So if you want to -- if the Court wants to

23   discuss it after the direct, that is fine with us.

24        THE COURT:  Fine.  Well, there is no point in taking

25   another break.

Capdcol1                    Trial

1              I'm sorry.  Go ahead.

2              MR. CHERNOFF:  Again, we have no idea how Mr. Westra

3    could be cross-examined on why Wilmer Cutler withdrew from the

4    representation of Mr. Maggio.

5              But in any case, we have offered, because we are

6    certainly interested in resting, getting the case in, we've

7    offered a stipulation to minimize whatever confusion Mr. Bach

8    thinks would result from lengthy testimony from a Wilmer Cutler

9    lawyer, but the reality is that it was not the case that Wilmer

10   said, hey, let's all get some other lawyers to help out and

11   we'll all go forward on the same team.  Wilmer said to

12   Mr. Maggio you've got to get your own lawyer.  They said that

13   through Mr. Klejna, and Mr. Maggio had the reaction that was

14   the subject of his testimony.

15             MR. BACH:  Judge, a couple of points.

16             We are happy with a stipulation.  I proposed a

17   stipulation that says Wilmer advised that it would represent

18   the company and have separate counsel retained to represent the

19   individuals.  The government says -- let me finish,

20   Mr. Chernoff -- that that simple statement of fact is not

21   enough, because it wants to prove up a point that goes beyond

22   that.  It wants to bring into evidence the opinion of Wilmer

23   Cutler that that's the way it had to be and that there was a

24   genuine conflict of interest here that could not be addressed

25   any other way.  And that's an opinion.  It is in the area of

Capdcol1                    Trial

1   experts, conflicts of interest law --

2           THE COURT:  All right.  I heard that already.

3           MR. BACH:  And, Judge, the Second Circuit has said --

4   and this is in the Kaizer case that was recently argued -- this

5   is with respect to advice that an in-house general counsel --

6   the statement that in-house general counsel made that was

7   considered hearsay, the Second Circuit overturned in Kaizer in

8   this situation, where it said that the mere identification of a

9   relevant nonhearsay use of the evidence is insufficient to

10  justify its admission if the jury is likely to consider the

11  statement for the truth of what was stated with significant

12  result in prejudice.

13          This is the same situation.  It is going to be an

14  in-house conversation with an in-house general counsel.  It is

15  hearsay.

16          Whatever Wilmer said to Mr. Klejna, if it was not --

17  you know, if Mr. Klejna, it would be one thing if he were to

18  testify about what he said to Mr. Maggio or what was

19  communicated to Mr. Collins, but instead they are proposing to

20  have Wilmer --

21          THE COURT:  Got it.  How is it come in?  What is the

22  hearsay exception?  Wilmer is going to say -- or Wilmer is

23  going to say we said -- we, Wilmer, said --

24          MR. BACH:  That Klejna --

25          MR. CHERNOFF:  That they told Mr. Klejna that they

Capdcol1                    Trial

1    would not represent the company and the individuals.

2              THE COURT:  So that is not hearsay, right, Mr. Bach?

3              MR. BACH:  Yes, it is, Judge.

4              THE COURT:  I, Wilmer, told Klejna.

5              MR. BACH:  It's Wilmer's out of court statement to

6    Mr. Klejna.

7              THE COURT:  No.  It is the speaker's statement.

8              MR. CHERNOFF:  It is not offered for the truth of

9    what -- there is no truth in that statement.  It is saying this

10   is what we're going to do.  This is what we are doing.  And

11   that is in fact what they did do, and it was communicated to

12   Mr. Maggio.

13             MR. BACH:  First of all, Judge, a speaker can't offer

14   the speaker's own statement.

15             But, secondly, Ms. Avakian, as I understand, a former

16   partner of Wilmer, is going to testify to things that other

17   partners at her law firm said.  She was not the speaker at the

18   time.  She is going to be testifying to what Bill McLucas said

19   or Andrew Kaizer said, and she is going to be relating

20   conversations, the statements made by other speakers to Dennis

21   Klejna, and there is no connection -- there is no proof that

22   Klejna related any of this to either Mr. Collins or to

23   Mr. Maggio.

24             Now, as the Court knows, when there is a retention of

25   a new law firm, it is a delicate situation for the general

1   counsel.  And you say some things to the departing law firm and

2   you say some different things to the incoming law firm, and you

3   try to make everyone happy and suggest that there is no rifts

4   or issues and that there are good reasons that everyone is

5   right.

6           THE COURT:  Mr. Bach, let's move this along.  You

7   people call me at 10 o'clock and you say there is a problem.  I

8   don't understand why you have to wait until we are on jury time

9   for these things.

10          MR. BACH:  I apologize, Judge.  We have --

11          THE COURT:  I don't care.

12          MR. BACH:  We have been raising this issue with the

13  government --

14          THE COURT:  Come on.  Let's go.  Next.

15          Mr. Chernoff, Mr. Bach says that it is not the speaker

16  who is going to testify.

17          MR. CHERNOFF:  Your Honor, there were three partners

18  of the firm on the phone with Mr. Klejna.  I can't imagine

19  Mr. Bach is proposing that we should call all three to say what

20  each one of them said in the course of this conversation.  They

21  were all present for the conversation.  The Wilmer firm

22  presented a unified front in telling Mr. Klejna this is what's

23  happening.  We are not getting into the nitty-gritty of who

24  said what in the course of that conversation.  I'm sure no one

25  remembers the exact details.

1          We produced to the defense the 3500 that reflects

2     everything that was said.  Ms. Avakian was the primary note

3     taker of the conversations and is the most competent to talk

4     about these things, especially to the extent that anyone's

5     recollection would fail.  And, again, we've offered a

6     stipulation as to what the Wilmer firm would have said, but

7     Mr. Bach, as he just read to the Court, is proposing one that

8     suggests that the Wilmer firm was going to retain lawyers for

9     Mr. Maggio and some other individual, and that, of course, is

10    not permitted.

11         MR. BACH:  They advised that the individuals retain

12    separate counsel.  That is what happened here.

13         Ms. Avakian is a very, very good note taker and she

14    identified each speaker who speaks on the call and she is not

15    the speaker --

16         THE COURT:  Do I have those notes?

17         MR. BACH:  I will hand them right up.

18         And "ADK" is Andrew Kaiser.

19         Judge, you will see that these notes occur after the

20    fact, after the communication has been made with Mr. Maggio,

21    after the decision has been made by Refco to have Mayer Brown

22    come on board.  These are conversations about whether Wilmer

23    will stay on even after those decisions --

24         THE COURT:  But that's what the government wants to

25    put in.  What do you care?

1           MR. BACH:  Because those don't relate to Wilmer saying

2      to Mr. Maggio, in the first instance, you need separate

3      counsel.  This is --

4           THE COURT:  What is it that the government is seeking

5      to elicit from this conversation?

6           MR. CHERNOFF:  Again, not a hearsay statement, not

7      offered for the truth.  We are seeking to elicit that Wilmer

8      told the Refco company, through its general counsel, that the

9      Wilmer firm would not represent both the company and the two

10     individuals who were the subjects or targets of the Sedona

11     investigation.

12          We are offering that solely to corroborate that

13     Mr. Klejna then related that to Mr. Maggio, who had the

14     reactions that were set forth in his testimony, and discussing

15     that with Mr. Bennett and then ultimately coming to

16     Mr. Collins.  It is offered for the purpose of showing not that

17     Mr. Collins committed a crime but that Mr. Collins was aware

18     from Mr. Maggio -- and this is already in the record -- that

19     Mr. Maggio told Mr. Collins, hey, Wilmer won't represent us

20     both, and, as he said, Joe said we'll get through this

21     together.

22          MR. BACH:  It is the "would," Judge, that we object

23     to.  They want to bring in that Wilmer is saying we would not

24     do that.

25          THE COURT:  Why can't -- I know that that's what you

1    don't want.  The question is what is your principal reason for

2    objecting?

3              MR. SCHWARTZ:  Your Honor, they didn't say it to

4    Mr. Collins.  They didn't -- they are not going to say they

5    said it to Mr. Maggio.  He assumes -- the assumption here is

6    that it is communicated to Mr. Collins; that was Mr. Chernoff's

7    assumption.  It is hearsay.  They are offering it for the

8    truth, that they wouldn't.

9              The fact that it is said to Klejna has no relevance

10   here -- none.  And it's highly prejudicial, given the fact that

11   Mayer Brown represented them, and it is very confusing because

12   different lawyers can disagree about --

13             THE COURT:  I thought the probative value was in

14   corroborating what Maggio said later on.

15             MR. SCHWARTZ:  But Maggio -- but this conversation

16   takes place after Maggio has been told this and it doesn't take

17   place with Joe Collins.

18             THE COURT:  But it still corroborates what he's

19   saying.

20             MR. SCHWARTZ:  No, it doesn't.  What he says is they

21   are going to throw me under the bus.  That is a lot different.

22   They are not saying he said it.  Wilmer isn't saying Maggio is

23   guilty, he's got to get his own lawyer.  What Wilmer is saying

24   here is very confusing to the jury, and would be very confusing

25   to the jury, is that there are firms that will not represent

Capdcol1                      Trial

1    both companies and individuals and there are firms that will.

2    Without -- until they find that there is a conflict, and that's

3    just way beyond the scope of what this trial is about.

4            MR. BACH:   In terms of what it corroborates, there is

5    no dispute that this decision was made in 2003, that Mayer

6    Brown came in in 2003, that there were discussions about how

7    Mr. Maggio needed individual counsel, there is no dispute about

8    that.  The only dispute is whether in that context Mr. Maggio

9    said to Mr. Collins this is a house of mirrors and I'm going to

10   let it all out.

11           The background facts are not in dispute.  And, in

12   fact, there is already corroborating evidence in the record,

13   documents, that in 2003 all of this happened.  So this would

14   be -- if that's what the government wanted this for, it would

15   be surplusage on an undisputed point.

16           What goes beyond that here, the only new fact they are

17   seeking to introduce, is that Wilmer was of the view that this

18   had to be done.  And we will stipulate that it was in 2003 --

19           THE COURT:  I know.

20           MR. BACH:  -- that Maggio was advised and that

21   corroborates it.

22           THE COURT:  Where are the note of whatever it is the

23   government wants to elicit, please?

24           MR. CHERNOFF:  I'm sorry, your Honor.

25           (Pause)

Capdcol1                    Trial

1          Your Honor, the notes are from a couple different

2     lawyers, and as Mr. Bach points out, these notes relate to a

3     follow-up conversation with Mr. Klejna.  These are the notes

4     that the Wilmer firm has.  I don't think they are notes on the

5     first call -- presumably, there were a number of calls about

6     this, but the first call where the advice is given to

7     Mr. Klejna are not in these notes.  I think these notes

8     reflect, as I understand it, what Mr. Klejna learned, what

9     Mr. Klejna discussed when he called back to try to talk Wilmer

10    into doing this.

11          THE COURT:  I see.  Forgive me for being slow on this,

12    Mr. Chernoff, the probative value is?

13          MR. CHERNOFF:  The probative value is just that

14    Mr. Maggio was told he'd have to get his own lawyer, not that

15    Wilmer said maybe you should or maybe we'll help you.  He was

16    told you have to get your own lawyer.  As he perceived it, he

17    was being cut loose.

18          The defense attacked Mr. Maggio's credibility on that

19    and many other issues, and we are just corroborating that

20    Wilmer did tell the firm -- did tell Refco that they would not

21    do the representation under those circumstances.

22          Now, I told the defense we'll take a stipulation that

23    says they could not or they would not.  It seems like they

24    would prefer "would not," and that is fine with us.  We are not

25    asking for Wilmer's expert opinions to be adopted.  But the

1    fact is that Mr. Collins knew, because Mr. Maggio told him,

2    that Wilmer would not represent both he -- both him and the

3    company.  And that is what we are trying to corroborate, that

4    Mr. Maggio was truthful when he testified that way, and

5    Mr. Collins' state of mind when he said we'll get through this

6    together was that he knew that another law firm, which I assume

7    is unknown to the jury, their expertise, their

8    professionalism -- none of that we have asked for in the

9    stipulation -- another law firm said we're not going to do it

10   this way.

11           MR. SCHWARTZ:  The fact is it doesn't prove that

12   that's what Wilmer told Maggio; it proves that's what Wilmer

13   told Klejna.

14           MR. CHERNOFF:  That is just the weight of the

15   evidence.  That is really a silly argument at this point.

16           MR. SCHWARTZ:  Mr. Chernoff, let me finish.

17           We don't dispute that Mr. Maggio believes he was told

18   that he had to get new counsel.

19           THE COURT:  What's wrong with the "would not"

20   stipulation?

21           MR. SCHWARTZ:  It implies -- it implies that there is

22   an ethical problem.  That is problem.

23           THE COURT:  "Could not."

24           MR. SCHWARTZ:  Also "could not" implies that it is

25   unethical.

Capdcol1                    Trial

1           THE COURT:  Right.  But that's why I asked you about

2      "would not."  You just said -- Mr. Bach just said -- I'm sorry

3      for interrupting you, but some law firms will represent --

4           MR. SCHWARTZ:  You are certainly entitled.

5           THE COURT:  -- companies and individuals and some

6      won't.  This is a would not.  What's wrong with would not?

7      It's just what Mr. Bach said.

8           MR. BACH:  Because I don't -- would not implies that

9      they are taking a stand, that it's a matter of principle,

10     and --

11          THE COURT:  Well, it's just what you said.

12          MR. SCHWARTZ:  No, but they --

13          THE COURT:  Some law firms will and some law firms

14     won't.  This is a won't.

15          MR. SCHWARTZ:  But the jury doesn't know that, your

16     Honor.  And would not implies -- and this is Wilmer's position,

17     but it doesn't -- it reflects on Mayer Brown in a way that

18     Mayer Brown is prepared to do something that this other firm

19     finds a little sketchy.  That's what is implied here.  And

20     that's an unfair inference to be drawn from this testimony.

21          If what they want is us to stipulate that Maggio was

22     told he had to get separate counsel by Wilmer -- are we

23     prepared to stipulate to that?

24          MR. BACH:  I --

25          MR. SCHWARTZ:  They are not going to say that.  How

Capdcol1                    Trial

 1    can we stipulate to that?  They are not even going to say that.

 2                MR. BACH:  Their own witness is not going to say that.

 3    They don't know what Maggio was told.  They could have called

 4    Mr. Klejna and ask Mr. Klejna what did you tell Mr. Maggio

 5    based on your conversations at Wilmer Cutler.

 6                MR. SCHWARTZ:  That is how you corroborate it.

 7                MR. BACH:  They couldn't object, and that would be

 8    direct corroboration.

 9                This is hearsay.  I won't bore the Court because I've

10    already said that.  But if the Court were to instruct the jury

11    that law firms handle this different ways; there are some law

12    firms that only represent the entities and that's their modus

13    operandi, and we can put all of this in context for the jury,

14    either through an instruction or through an expert, and explain

15    how different law firms handle that, because we can't do that.

16    For them to -- if this is an issue that kind of hangs --

17                THE COURT:  Yes, but does it really matter why.  Their

18    point, the only relevant point, is that the Wilmer Cutler firm

19    declined to do this, right?  That's the only point.

20                MR. BACH:  Judge --

21                THE COURT:  They refused.

22                MR. BACH:  But I don't think -- I don't think the

23    conversations reach that kind of point until much later in the

24    game.  I think what happened is -- and, you know, I work in

25    this area.  You know, people, lawyers, they said this is how we

1    would approach this case.  We are not going to represent

2    individuals --

3            THE COURT:  The company and the individuals; that's

4    what I said five minutes ago.

5            MR. BACH:  There is no -- by the way, there is no

6    suggestion that there is any particular conduct by Maggio that

7    merits this approach.  It is simply this is how Wilmer wants to

8    approach this situation.

9            And it might be that, you know, and that's -- and so

10   there is conversation about this is how we plan to do it, and

11   that is communicated --

12           THE COURT:  I think that is not strong enough,

13   Mr. Bach, from what I understand of the facts here.  It is not

14   this is how we plan, this is how we're going to do it, because

15   we're not going to do it the other way.

16           MR. CHERNOFF:  And, your Honor, Mr. Bach now seems to

17   want to have a minitrial on this where we call Mr. Klejna, we

18   call everyone that was involved.  But I assure Mr. Bach that if

19   the Wilmer firm were called, they would testify they would not

20   say that there was no conduct that they learned of that

21   affected their decision.  We all know that the way they made

22   that decision was to interview Mr. Maggio and then made a

23   determination based on what his interests were vis-a-vis the

24   primary client, the company.

25           MR. SCHWARTZ:  We're not saying we're asking for a

Capdcol1                     Trial

 1    minitrial.  There is a competent witness out there that can

 2    give them the corroboration they want and they can call him.

 3             MR. CHERNOFF:  Mr. Schwartz is saying that he thinks

 4    Mr. Klejna would be a better witness than Ms. Avakian.  It is

 5    my decision to call Ms. Avakian.  Whether Mr. Klejna would be a

 6    better witness or not, we think that Ms. Avakian is certainly

 7    competent and sufficient to demonstrate that the information

 8    that was communicated to Mr. Klejna in light of Mr. Maggio's

 9    testimony made its way to Mr. Maggio.

10             MR. SCHWARTZ:  There are only two witnesses who are

11    competent to testify about what Mr. Klejna told Mr. Maggio.

12    One of them is no longer with us; one of them is.  They are

13    calling a third witness.

14             THE COURT:  The question is why can't they?  Then they

15    have to argue to the jury that what this lawyer says was told

16    to Klejna is in fact what Klejna told Maggio.  That's their

17    problem.

18             MR. SCHWARTZ:  What this lawyer said to Klejna after

19    Maggio was told this doesn't prove that Maggio was told this.

20    It's not we're going to tell Klejna this and then he is going

21    to tell Maggio.  It's Maggio has been told this and now we're

22    telling Klejna this.  It doesn't connect.

23             THE COURT:  What about that?

24             MR. CHERNOFF:  Your Honor, Mr. Schwartz again is just

25    talking about the 3500 now, which does relate to a subsequent

 1    conversation.  That doesn't mean -- as we all understand,

 2    before that conversation took place, before those notes were

 3    written, Mr. Klejna was told that Wilmer would not do this

 4    representation.

 5            THE COURT:  Prior to the Klejna/Maggio conversation?

 6            MR. CHERNOFF:  Yes.  And so the fact that there are

 7    not notes of that at this time --

 8            THE COURT:  All right.  I got that part.  Tell me one

 9    more time why is this not hearsay?

10            MR. CHERNOFF:  It's not offered for the truth of

11    anything.  It is just offered as Wilmer is telling Refco we're

12    not going to do this.  This is how -- this is what we're doing.

13    This is the act that we are talking.

14            We're not asking for any details of the conversation

15    about what was said or why it was said.  We're just saying -- I

16    mean, I think it couldn't be more straightforward.  Refco,

17    Wilmer is not going to represent the company in this way.

18    There can be no question that that was actually what they were

19    saying.  There is no cross-examination as to whether that was

20    true, whether they really were going to represent the company

21    and Mr. Maggio.  So I just don't know how the hearsay objection

22    can be made.

23            MR. SCHWARTZ:  The fact that something may be true

24    doesn't mean that you can put in a statement for that truth.

25    That doesn't get over the hearsay rule.  The fact that it

1    really is true is not an exception to the hearsay rule.

2             MR. CHERNOFF:  Your Honor, again, it was said as a

3    directive.  It wasn't said as material that is subject to

4    cross-examination as to whether it was true.  It was said that

5    this is what the Wilmer firm is doing.

6             THE COURT:  All right.  I will permit it.  I see the

7    probative value of it in corroborating Maggio.  I do not see

8    the unfair prejudice in that, as Mr. Bach has told us, there is

9    already evidence of this in the record both from the Maggio

10   testimony and the documentary evidence that Mr. Bach referred

11   to.

12            Now, do we have any issues about the cross-examination

13   of Mr. Westra in light of this?

14            MR. SCHWARTZ:  Your Honor, before we --

15            THE COURT:  Did I understand that --

16            MR. SCHWARTZ:  Before you move on to Mr. Westra, we

17   would request from the Court an instruction that the evidence

18   is not being offered for the truth of the matter asserted and

19   that the jury should not speculate on the reasons that those

20   things were said.

21            THE COURT:  Any objection to that?

22            MR. CHERNOFF:  Well, I think the first part is kind of

23   a legalism that the jury will have no idea what it means.

24            THE COURT:  We tell them that all the time.

25            MR. CHERNOFF:  I understand.  I just feel like in this

Capdcol1                     Trial

1    case where the statement is clearly not being offered for the

2    truth, well --

3            THE COURT:  Is there any reason not to say it is not

4    being offered for the truth, only for the fact that the

5    statement was made?

6            MR. CHERNOFF:  That's fine, your Honor.

7            THE COURT:  All right.

8            MR. SCHWARTZ:  And that the jury not speculate as to

9    why Wilmer made the statement.

10           THE COURT:  I'm not sure we need that.  I mean, they

11   shouldn't be speculating about anything, for that matter.

12           What about Westra?

13           MR. BACH:  Can we talk in camera?

14           THE COURT:  What?

15           MR. BACH:  It has to do with my cross-examination.  I

16   would rather not disclose it in advance to the government.

17           THE COURT:  It's now 10:32, but OK.  I don't

18   understand why this is done on jury time.

19           MR. CHERNOFF:  Your Honor, could we do this after the

20   direct, because --

21           THE COURT:  Sure.  Let's do it after the direct.

22           MR. CHERNOFF:  OK.

23           (Continued on next page)

24

25

Capdcol1                           Trial

1              (Jury present)

2              THE COURT:  Welcome back.  I hope you had a nice day

3     yesterday.

4              Won't you be seated.

5              MR. CHERNOFF:  Your Honor, the government recalls

6     James Westra.

7              THE COURT:  Good morning.  Thank you.

8              I remind you, you are still under oath.

9              THE WITNESS:  Thank you.

10     JAMES WESTRA,

11              Resumed, and testified further as follows:

12              THE COURT:  We continue with the direct examination of

13     Mr. Westra.

14              MR. CHERNOFF:  Thank you, your Honor.

15              THE COURT:  Mr. Chernoff.

16     DIRECT EXAMINATION (Resumed)

17     BY MR. CHERNOFF:

18     Q.  Mr. Westra, when we broke at the end of the day Tuesday, we

19     were looking at sections of the Equity Purchase and Merger

20     Agreement, Government Exhibit 1005.1, and I think there is

21     still a stack of documents before you.  Can you find that one,

22     that 1005.1?

23     A.  I have it.  Thank you.

24     Q.  OK.  And let's pick up, if we may, with page 7.  You'll see

25     Section 3.3, "Capitalization of the Company."

1   A.  Yes.  I have it.

2   Q.  And, Mr. Westra, is the language here in this section that

3   your client Thomas H. Lee wanted in this agreement, the EPMA?

4   A.  Yes.

5   Q.  What did they want to accomplish by asking for this

6   language?

7   A.  They wanted to know --

8           MR. BACH:  Objection.

9           THE COURT:  Mr. Chernoff.

10          MR. CHERNOFF:  I thought this was the same series of

11  objections we had the last time.  I am asking for the witness

12  to explain why he, representing this client, sought the

13  language in the document he negotiated.

14          THE COURT:  Overruled.

15          You may answer, sir.  Do you need the question again?

16          THE WITNESS:  No, your Honor, I don't.

17  A.  Our client wanted this language because they wanted to know

18  how many shares were outstanding or in this case membership

19  interests in the company and who owned them.

20  Q.  And why was that important to you and your client in

21  negotiating this agreement, this contract?

22  A.  It was important because we wanted to make certain that the

23  company was owned by those whom we had been told it was owned

24  by, and, also, we wanted to make certain that the purchase

25  price was paid to the right people, and we wanted to know that

1  others did not have an interest in the company.

2  Q.  And I see, looking in the middle of this Section 3.3, there

3  is some language that says there are no outstanding

4  subscriptions, options, warrants, calls, commitments or any

5  other agreements of any character obligating the company or any

6  subsidiary to issue any equity interests at any time or under

7  any circumstance, including conversion of debt into equity and

8  including any rights to receive securities in any public

9  offering by the company or its successors, except as disclosed

10  in Schedule 3.3.

11          And why was Thomas H. Lee interested in particular

12  about options, to pick some of the words that are in this

13  section, options that would give another party the right to

14  obtain equity interests at any time under any circumstance?

15          MR. BACH:  The same objection.

16          THE COURT:  The same ruling.

17          You may answer, sir.

18  A.  The Lee company was interested in knowing that because

19  again they wanted to know who owned the company and they wanted

20  to make certain that they were dealing with the people who had

21  the ownership interest in the company and that no other people

22  had the right to acquire interest in the future.

23  Q.  Mr. Westra, let me ask you to turn ahead in the EPMA to

24  page 12, where you will find Section 3.15, "Material

25  Contracts."

1   A.  Yes, I have it.

2   Q.  Is this language that your client Thomas H. Lee sought to

3   be included in this EPMA contract?

4   A.  Yes.

5   Q.  And we see here that "Material Contracts" says except as

6   set forth in a related schedule, "Neither the company nor any

7   subsidiary is a party to not bound by any," and there is a few

8   subparagraphs there.

9           I will ask you to flip the page, to subparagraph Roman

10  Numeral 6.  It says, "Agreement which contains restrictions

11  with respect to payment of any distribution in respect of the

12  membership interests."

13          Let me stop you there and ask why you sought that

14  language for Thomas H. Lee?

15  A.  We sought that --

16          MR. BACH:  Objection.

17          THE COURT:  The same answer.

18          You may answer, sir.

19  A.  We sought that because, again, we wanted to make certain

20  that we were dealing with the people that owned the entity and

21  that the purchase price was being paid to the people who in

22  fact were the owners of company.

23  Q.  Dropping down the page a little bit to Roman Numeral 9, it

24  says, "Any contract, arrangement or understanding that relates

25  to the future disposition or acquisition of material assets or

1   properties, or any merger or business combination."

2              And, again, why did you seek that language on behalf

3   of your client Thomas H. Lee?

4              MR. BACH:  I object.

5              THE COURT:  The same answer.  Overruled.

6              You may answer.

7   A.  We looked for that language because in determining if we

8   wanted to acquire the company, we wanted to make certain that

9   if there was any other contract with a third party which gave

10  them any restrictions, consent rights over that acquisition,

11  that we were aware of that.

12  Q.  And this section, 3.5, provides for schedules for such

13  contracts to be disclosed on?

14  A.  Yes, it does.

15  Q.  On that schedule or at any time, was an interest by a

16  company called DF Capital disclosed?

17  A.  No.

18  Q.  Let me ask you now to turn to page 10 of this document.

19  Section 3.12.

20  A.  I have it.

21  Q.  And it says:  "Interests of Officers and Directors.  Except

22  as Set Forth on Schedule 3.12, since March 1, 2003, no officer,

23  manager, director, or member of the company or any subsidiary,

24  or any affiliate of any such officer, director, member or other

25  equity holder, has had, either directly or indirectly, a

1    material interest in any contract or agreement to which the

2    company or any subsidiary is a party or by which any of their

3    properties or assets may be bound or affected, except for

4    employment contracts entered into on an arm's-length basis."

5           Mr. Westra, the same question.  Is this language that

6    you sought on behalf of your client Thomas H. Lee?

7    A.  Yes.

8    Q.  Why was that important to Thomas H. Lee?

9           MR. BACH:  The same objection.

10          THE COURT:  The same answer.

11          Overruled.

12   A.  This goes back to the discussion we had in my testimony two

13   days ago in which you asked about related-party transactions,

14   and as I testified in response to that question, it's important

15   for the buyer to know if there are --

16          MR. BACH:  Objection.

17          THE COURT:  Are you talking about in this case, sir?

18          THE WITNESS:  Yes, your Honor.  I am.

19          THE COURT:  Go ahead.

20   A.  It was important for the buyer in this case to know if

21   there were any contracts with officers, directors,

22   shareholders, because if there were, we needed to determine

23   what those contracts were, whether they had any effect on the

24   financial condition or operations of the company, and whether

25   we wish those to continue after closing.

Capdcol1                    Westra - direct

1   Q.  And when it says "the company" here, that's Refco, the

2   Refco Group, correct?

3   A.  That is correct.

4   Q.  Were the officers of the company considered -- of Refco

5   considered related parties with respect to the company?

6   A.  Yes.

7   Q.  And what about RGHI, the holding company that owned Refco,

8   was that viewed as a related party?

9   A.  It was -- we had understood it was a 90 percent

10  stockholder, so, yes, it would have been.

11  Q.  And before Refco collapsed, were you ever made aware that

12  the company, Refco, had the practice of indemnifying,

13  recovering any losses of third parties resulting from loans

14  that the third parties had made to RGHI?

15  A.  No.

16  Q.  Were any such indemnifications disclosed on Schedule 3.12

17  that relates to the section we just looked at?

18  A.  No.

19          MR. CHERNOFF:  Mr. Smith, if we could bring up the

20  first page, Government Exhibit 1504, which is in evidence.

21  Q.  Mr. Westra, the document that is up on the screen is the

22  "Acquisition of Rights to Participate in Proceeds of Sale

23  Between Refco Group Limited, LLC and DF Capital Inc.," which

24  I'll sometimes refer to as the Proceeds Participation

25  Agreement.

1          Have you seen this before, sir?

2   A.   Yes.

3   Q.   When was the first time you saw this document?

4   A.   I don't recall the exact date, but it was following the

5   collapse of Refco in connection with some of the inquiries or

6   depositions that occurred thereafter.

7   Q.   And was -- prior to the collapse of Refco or at any time,

8   actually, did Mr. Collins ever disclose this document to you?

9   A.   No.

10  Q.   Before Refco's collapse, had you ever heard of a company

11  called DF Capital?

12  A.   No.

13  Q.   Before Refco's collapse, did you know that any kind of

14  BAWAG-controlled entity had a right to share in the proceeds of

15  the sale of Refco?

16  A.   Well, I knew that BAWAG was a 10 percent shareholder and

17  that it had a right to participate with respect to that

18  10 percent, but I did not know that any other entity associated

19  with BAWAG had a right to participate, no.

20  Q.   And without getting into the details of the document, does

21  this Proceeds Participation Agreement concern such additional

22  rights by a BAWAG-controlled entity?

23  A.   Yes.

24  Q.   When you learned that there was an agreement that Refco had

25  with a BAWAG entity, DF Capital, called either the acquisition

Capdcol1                        Westra - direct

1     of rights to participate in the proceeds of sale -- well, let

2     me withdraw that.

3              When you -- this is a document you saw in connection

4     with interaction with the bankruptcy, is that not correct?

5     A.  Yes.

6     Q.  Have you also heard it called Proceeds Participation

7     Agreement?

8     A.  Yes.

9     Q.  That term, Proceeds Participation Agreement, does it have

10    any kind of particular meaning in contracts or the business

11    world?  Does it tell you what that agreement is?

12    A.  The name is descriptive.  Other than that, no.  It's not

13    something which I have typically seen in contracts.

14    Q.  Do you recall ever having an agreement, working on an

15    agreement that was called a proceeds participation agreement?

16             MR. BACH:  Objection.

17             THE COURT:  Basis, please?  It is a do you recall

18    working on.

19             MR. BACH:  It goes to his general experience outside

20    this case.

21             THE COURT:  I thought it was with respect to this case

22    because counsel named the Proceeds Participation Agreement.

23             MR. BACH:  No objection then.

24             MR. CHERNOFF:  Your Honor, I am asking for the

25    witness' state of mind when he learned there was something

1    called a proceeds participation agreement.

2              THE COURT:  In this case?

3              MR. CHERNOFF:  Yes.

4              THE COURT:  In this case, Mr. Bach.

5              MR. CHERNOFF:  And so I am just asking whether he ever

6    heard that term before or worked on such an agreement before.

7              MR. BACH:  In any other matters.

8              THE COURT:  That is not -- the question reads:

9    "Q  Do you recall ever having an agreement, working on an

10   agreement that was called a proceeds participation agreement?"

11             Mr. Chernoff says he's asking the question with

12   respect to this matter.

13             MR. CHERNOFF:  Although, your Honor, I would also like

14   to next ask with respect to any matter, just to get the

15   witness' state of mind with reference to that term.

16             THE COURT:  Let's answer this question.

17             Sir, are you able to answer the question with respect

18   to this matter?  That is, do you recall working on an agreement

19   that was called a Proceeds Participation Agreement?

20             THE WITNESS:  With respect to this transaction?

21             THE COURT:  Yes, sir.

22             THE WITNESS:  No, we did not.

23             MR. CHERNOFF:  Your Honor, if I may ask the next

24   question?

25   BY MR. CHERNOFF:

Capdcol1                        Westra – direct

1    Q.  Had you ever worked on something call a proceeds

2    participation agreement in other transactions?

3              MR. BACH:  Objection.

4              THE COURT:  The basis of the objection is?

5              MR. BACH:  Relevance.

6              THE COURT:  Mr. Chernoff.

7              MR. CHERNOFF:  Maybe we should go to the sidebar, your

8    Honor.  I'm sorry.  I don't want to --

9              THE COURT:  Mr. Reporter, if you would.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (At the sidebar)

 2              MR. CHERNOFF:  Your Honor, I believe the witness will

 3     answer that he had never worked on something called a proceeds

 4     participation agreement.  There has already been

 5     cross-examination in this case that the document which we will

 6     be offing next, which is a February draft by an associate

 7     working in the data room, made reference to a copy of a

 8     Proceeds Participation Agreement.  The defense will try to

 9     assert, as they did with Mr. Schoen, I believe, and maybe other

10     witnesses, that this witness actually knew about the Proceeds

11     Participation Agreement and considered it a, quote, minor point

12     to keep track of.  I think that might have even been the

13     defense opening statement.

14              So my question is simply to establish a basis that

15     even if the witness had seen this agreement, this term meant

16     nothing to him.  It did not disclose in and of itself that this

17     was a material contract.

18              MR. BACH:  Is the witness going to say that he saw

19     this document and the reference?

20              MR. CHERNOFF:  No.

21              MR. BACH:  Then how is this relevant?

22              MR. CHERNOFF:  Because you are going to try to suggest

23     that he is not testifying truthfully and he did see the

24     document because Weil had an interest in and, as you're going

25     to assert on cross-examination, and in the next witness, that

Capdcol1                         Westra - direct

1    Weil had an interest in fudging what happened here because of

2    their concerns about liability for themselves and their client.

3              MR. SCHWARTZ:  I don't see how the fact that that he

4    has never worked on a proceeds participation agreement goes to

5    the weight of them deciding that they don't want to ask for it.

6    The fact that he has never personally worked on a proceeds

7    participation agreement?

8              THE COURT:  OK.  I'll permit it not to open the

9    floodgates to what are we doing in all sorts of transactions in

10   general but because of the particular question here about minor

11   things to keep track of.

12             MR. CHERNOFF:  Thank you, your Honor.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. CHERNOFF:  Thank you, your Honor.

3         May I have the question read back?

4              THE COURT:  Yes, sir.  If you will wait for the court

5    reporter.

6              (Pause)

7              THE COURT:  (Reading).

8    "Q  Had you ever worked" -- and this is after you answered,

9    sir, with respect to this matter:

10   "Q  Had you ever worked on something called a proceeds

11   participation agreement in other transactions?"

12             THE WITNESS:  May I answer it?

13             THE COURT:  Yes, sir.

14   A.  To my recollection, no, I have not.

15   BY MR. CHERNOFF:

16   Q.  And so upon first hearing that there was something called a

17   proceeds participation agreement, did that term mean anything

18   to you just based on the term itself?

19   A.  I could only surmise from the title of the agreement that

20   it related to some sharing of proceeds.

21   Q.  Now, you testified yesterday that the due diligence that

22   Weil, Gotshal performed began sometime prior to the signing of

23   the Letter of Intent in mid-April?

24   A.  Yes.

25   Q.  When, approximately, do you recall Weil, Gotshal first

Capdcol1                        Westra - direct

1   beginning its efforts to conduct due diligence?

2   A.  I don't recall the exact date but I believe it was January

3   or February of 2004.

4   Q.  And how did things get started with respect to Weil's role

5   in due diligence at that time?

6   A.  We received a call from our client Thomas H. Lee Company

7   informing us that they were interested in making this

8   acquisition.  They asked us to begin our due diligence effort.

9           We did so by coordinating with the company, with

10  counsel for the company, and with the investment bankers who

11  were running that process to request a variety of documents

12  from them that we could review as part of our diligence.

13  Q.  And I think you said there was a data room established?

14  A.  I don't recall saying that, but I believe there was by the

15  investment banker, yes.

16  Q.  I'm sorry.  It seems like a long time since Tuesday.

17          Let me ask you what a data room is?

18  A.  A data room is a room that is assembled by the company and

19  its advisors.  Sometimes it is a physical data room where

20  documents are actually there in hard copy.  More often it is an

21  electronic data room.  And relevant documents pertaining to the

22  company which is going to be acquired are put or loaded into

23  that data room so that a buyer can have ready access to them to

24  review them as part of the diligence effort.

25  Q.  Mr. Westra, in the Refco deal, do you recall whether there

Capdcol1                     Westra - direct

1  was actually a physical data room established somewhere?

2  A.  I don't recall if it was physical or online, I can't

3  recall.

4  Q.  And was that something that the investment banker CSFB set

5  up?

6  A.  The investment banker, working with the company, did so.

7  Yes.

8  Q.  And did you, as the leader of the Weil, Gotshal team on

9  this deal, assign associate lawyers to begin to go through the

10 contents of the data room?

11 A.  I don't remember whether I did so or whether my partner Jay

12 Tabor, working on the transaction did, so I don't recall; but

13 collectively we did so, yes.

14 Q.  Did you yourself, by the way, go into any data room or go

15 into an electronic data room?

16 A.  Not that I recall.

17 Q.  Let me ask you to turn to what I think is up there as

18 Government Exhibit 179.  Do you have that document?

19 A.  Yes, I do.

20 Q.  And, sir, do you recognize this from the footer and the

21 notes -- the note in the upper right-hand corner as a document

22 prepared by Weil, Gotshal?

23 A.  It appears to be, yes.

24 Q.  Does it bear a Bates number in the lower right-hand corner

25 indicating it was produced from Weil, Gotshal's files?

1    A.  Yes.

2              MR. CHERNOFF:  Your Honor, the government offers 179.

3              MR. BACH:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 179 received in evidence)

6    BY MR. CHERNOFF:

7    Q.  So, first, Mr. Westra, let me just ask you to look down at

8    the bottom of the document.  There is a sort of tiny footer

9    there.

10             Does that give you any indication as to which lawyer

11   at Weil, Gotshal prepared or had ownership of this document?

12   A.  There is the name Gewirtz, G-e-w-i-r-t-z, on the bottom,

13   and I presume that that was one of the associates who was

14   involved in the diligence effort.

15   Q.  And was there in fact an Adam Gewirtz involved in the deal

16   at some time?

17   A.  Yes.

18   Q.  And let me ask you to look up at the upper right-hand

19   corner.  You see there it says "WGM."  Is that the initials for

20   the full name of the firm, Weil, Gotshal & Manges?

21   A.  Yes.

22   Q.  You see a date of February 20, 2004.  That, as you

23   testified, was sometime during the due diligence that Weil,

24   Gotshal was performing?

25   A.  As I testified earlier, I believe that diligence commenced

2269

Capdcol1                          Westra – direct

1    in January or February, that's correct.

2    Q.  And so this document is called "Project Royce Open

3    Diligence Issues."

4              Do you remember what Project Royce was, sir?

5    A.  Yes.  That was the Refco transaction.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. CHERNOFF:

2   Q.  And we see in Roman Numeral I additional diligence items

3   needed?

4   A.  Yes.

5   Q.  As we're looking through this document, Mr. Westra, did you

6   ever receive a copy of this, to your knowledge?

7   A.  I don't recall.

8   Q.  Let me ask you to look at Page 2, and we see it continues

9   with a number of items that are apparently open issues.  I'll

10  ask Mr. Smith if we could focus on paragraph 12 at the bottom?

11  A.  Yes, I see it.

12  Q.  And this is titled minor points to keep track of.  12(e)

13  says, "Copy of Proceeds Participation Agreement between Refco

14  Group, Limited, LLC, and DF Capital, Inc."

15          Mr. Westra, do you remember Mr. Gewirtz or anybody

16  bringing the fact that there was some kind of a Proceeds

17  Participation Agreement to your attention?

18  A.  No.

19  Q.  Do you remember anyone telling you that it was a minor

20  point?

21  A.  No.

22          MR. CHERNOFF:  You can take that down.  Thank you,

23  Mr. Smith.

24  Q.  Mr. Westra, if I could ask you again to look at the EPMA,

25  that's Government Exhibit 1005.1?

CAPPCOL2                    Westra - direct

 1   A.  Yes, I have it.

 2   Q.  And please flip to Page 8, section 3.5.

 3   A.  Yes, I have it.

 4   Q.  Okay.  So this section in the middle of the page concerns

 5   governmental and third-party consents.  I won't read the whole

 6   paragraph, but you're familiar with it, Mr. Westra?

 7   A.  Yes, I am.

 8   Q.  Was this language that you sought on behalf of your client,

 9   Thomas H. Lee?

10   A.  Yes.

11   Q.  And why did you seek this language; why was it important?

12   A.  It's important because --

13            MR. BACH:  Objection.  Sorry it's late, but objection.

14            THE COURT:  Go ahead, sir.

15   A.  It was important because we wanted to know what consents,

16   approvals of governmental entities or third parties were

17   required to complete the transaction because we needed to

18   understand what obstacles to completion existed, and we also

19   wanted to understand if there were any parties, other than the

20   government, who had any right to consent to this transaction.

21   Q.  There's something towards the bottom of this paragraph that

22   says -- I'll jump in the middle -- "to the extent the failure

23   to obtain, make or give any of the foregoing," which I believe

24   refers to the consents, "would not reasonably be expected to

25   have a material adverse effect."

1              Mr. Westra, did you agree to that material adverse

2     effect exception, as I'll call it?

3     A.   Yes.

4     Q.   And why did you agree to that?

5     A.   We agreed to it because we understood that there might be

6     minor third-party consents such as consent for a minor lease,

7     or something of that nature, which was not important enough to

8     warrant not proceeding with the transaction.

9     Q.   I'm sorry, I couldn't hear.  You gave an example of a

10    minor --

11    A.   Yes.  For example, if there were a lease for a relatively

12    unimportant leased facility for the company, and that lease had

13    a provision that said that the consent of the landlord is

14    required in order to sell the company, that would not have been

15    sufficiently important for the transaction not to go forward or

16    for it to be disclosed.

17             So that was the purpose of that material adverse

18    effect exception, to except those immaterial contracts.

19    Q.   Could we now bring up Government Exhibit 1503 which is in

20    evidence?

21    A.   Yes, I have it.

22    Q.   And, Mr. Westra, this is a letter agreement that, as you

23    see in the first paragraph, makes reference to the Proceeds

24    Participation Agreement that we've been talking about, and I'm

25    going to refer to this, if I may, as the side-letter agreement.

1          First of all, Mr. Westra, was this side-letter

2    agreement ever disclosed to you by Mr. Collins in the course --

3    A.  No.  I'm sorry.  No.

4    Q.  And do you recall when the first time you saw the

5    side-letter agreement was?

6    A.  It was in connection with the document which you referred

7    to before as the participation agreement, which was following

8    the collapse of Refco.

9    Q.  Let me ask that we turn to Page 2, and this is section 5.1.

10   A.  Yes, I have it.

11   Q.  Okay.  5.1(a) says, "A sale of the company including the

12   sale of all or substantially all of its outstanding membership

13   shares shall be undertaken only with the consent of all the

14   parties to this letter agreement; such consent shall not be

15   unreasonably withheld by any party."

16          Mr. Westra, before Refco collapsed, had you been told

17   by Mr. Collins or anyone that a third-party or parties had to

18   consent to the sale of Refco?

19   A.  No.

20   Q.  Let's look at 5.1 (b).  This says that DFI, which I believe

21   is defined somewhere as DF Capital, Inc., and DFI, after the

22   February 28th, 2005, Refco Group Holdings, Inc. -- I'm not sure

23   of those, but anyway, there it is -- "is entitled to withhold

24   its consent, regardless of other reasons, if the purchase price

25   for the sale of the company, including a sale of all or

CAPPCOL2                    Westra – direct

1    substantially all of its outstanding membership shares is less

2    than $1,650,000,000" and the language continues.

3             Mr. Westra, before Refco's collapse, were you ever

4    told by Mr. Collins or anyone that a third party had the power

5    to block the sale of Refco if the purchase price was below a

6    certain amount?

7    A.  No.

8    Q.  In fact, the purchase price here was above that; is that

9    correct?

10   A.  The purchase price of the actual transaction?

11   Q.  Yes.

12   A.  Yes, it was.

13   Q.  Let me now ask you --

14            MR. CHERNOFF:  Actually, your Honor, at this time, I'd

15   like to offer a stipulation between the parties.

16            THE COURT:  Yes, sir.  Is it fact?

17            MR. CHERNOFF:  It's a testimonial stipulation

18   concerning the Government Exhibit 501-O.

19            THE COURT:  Ladies and gentlemen, same rules.  This is

20   evidence for your consideration.  You must consider that the

21   testimony recited in the stipulation would be given if the

22   witness was called.  The weight to be given to that testimony

23   is, as always, up to you people.

24            MR. CHERNOFF:  Sorry, your Honor.  Your Honor,

25   Government Exhibit 501-S, as a stipulation between the parties,

CAPPCOL2                    Westra - direct

1      states that Government Exhibit 1 -- "Government Exhibit 501-O

2      is a true, accurate and authentic copy of an agreement entitled

3      Fourth Amended and Restated Limited Liability Agreement of

4      Refco Group, Limited, LLC, dated February 27th, 2003.

5              "2.  If called as a witness, Holger, H-o-l-g-e-r

6      Steinborn, S-t-e-i-n-b-o-r-n, who lives in Vienna, Austria,

7      would testify as follows:  Steinborn works for BAWAG" -- the

8      full name of the bank is given in the stipulation -- "at its

9      main office in Vienna, Austria;

10             "Government Exhibit 501-O was signed by Phillip

11     Bennett on behalf of Refco Group Holdings, Inc., BAWAG

12     Overseas, Inc. and Refco Group Holdings, LLC, and by Selcuk

13     Sari on behalf of BAWAG Overseas, Inc.

14             "(c)  Steinborn received Government Exhibit 501-O from

15     his supervisor at BAWAG in Vienna, Austria;

16             "(d)  Steinborn has no special knowledge of when

17     Government Exhibit 501-O was signed.

18             "Further, the parties stipulate that this stipulation

19     and the Exhibit 501-O can be offered into evidence."  And I do

20     so at this time, your Honor.

21             THE COURT:  Received.

22             (Government's Exhibit 501-O received in evidence)

23     BY MR. CHERNOFF:

24     Q.  Mr. Westra, what is an LLC agreement?

25     A.  An LLC agreement is short for limited liability company

CAPPCOL2                         Westra - direct

```
 1   agreement.  That is the document which governs the affairs of a
 2   limited liability company.
 3   Q.  I'm going to ask you to look at what's just been admitted
 4   into evidence as Government Exhibit 501-O.
 5   A.  I have it, yes.  Thank you.
 6   Q.  And do you see, as you flip through it, towards the last
 7   page, this is an executed copy of what's titled Fourth Amended
 8   and Restated Limited Liability Company Agreement of Refco
 9   Group, Limited?
10   A.  Yes.
11   Q.  In the course of due diligence, were LLC agreements
12   something that Weil Gotshal wanted to receive on behalf of its
13   client?
14   A.  Yes.
15   Q.  Why?
16   A.  As I testified a moment ago, it is the document that
17   governs the affairs of the limited liability company; so it was
18   a critical document as part of our diligence.
19   Q.  And, sir, this executed copy of the Fourth Amended and
20   Restated Limited Liability Agreement, 501-O, were you ever
21   given or shown this document during the due diligence?
22   A.  No.
23   Q.  Mr. Westra, when do you recall the closing in this
24   transaction with Refco taking place?
25   A.  In August of 2004.
```

1   Q.   And where was the closing at?

2   A.   At the offices of Weil, Gotshal & Manges in New York City.

3   Q.   Was there a closing binder prepared at that time?

4   A.   Not at that time.  There was a closing binder prepared

5   after the closing.

6   Q.   And what is a closing binder?

7   A.   A closing binder is a bound volume of the documents that

8   are placed on the closing table at the closing.

9   Q.   Did you, yourself, sir, ever go through the closing binder?

10  A.   No.  Not to my recollection, no.

11  Q.   Mr. Westra, did you invest any of your own money with

12  Thomas H. Lee in the purchase of Refco?

13  A.   Yes.

14  Q.   How much did you invest?

15  A.   I invested $20,000.

16  Q.   And how did you do that?

17  A.   Wrote them a check.  I had been invited by them to invest

18  that amount in each investment that they did, which I did.

19  Q.   In each investment they did, you mean Thomas H. Lee?

20  A.   Correct.

21  Q.   And so had you invested amounts of $20,000 in prior deals

22  you had worked on for them?

23  A.   Yes.

24  Q.   How much did you lose, by the way, in that investment?

25  A.   My recollection is about $5,000.

CAPPCOL2                        Westra - direct

1   Q.  Let me ask you, shifting gears for a moment, about the

2   other partial owner of RGHI, Tone Grant.  Based on your

3   understanding of the transaction you worked on, Mr. Westra, how

4   much, roughly, did Tone Grant stand to earn in this deal for

5   his partial ownership of Refco through RGHI?

6   A.  We were told that Mr. Grant was a 50 percent holder of

7   RGHI.  RGHI, in turn, we were told, owned 90 percent of Refco

8   Group and, therefore, Mr. Grant would have received a

9   proportionate amount of the proceeds, which would have been

10  hundreds of millions of dollars.

11  Q.  And when you say you were told that Mr. Grant stood to

12  receive hundreds of millions of dollars, who did you have those

13  conversations with?

14  A.  I had conversations with -- at the company and with the

15  Mayer Brown attorneys as to the amount of stock that was owned

16  by Mr. Grant.  I don't recall any specific conversations about

17  the amount of dollars that would be received other than a

18  request at one time made by Mr. Collins asking if Mr. Grant

19  could reinvest a portion of his proceeds into the deal going

20  forward.

21  Q.  Mr. Collins asked that Mr. Grant could reinvest going

22  forward?

23  A.  Mr. Collins related Mr. Grant had requested the right to do

24  so, yes.

25  Q.  Did he place any numbers or rough estimates as to what kind

CAPPCOL2                    Westra - direct

1    of investment Mr. Grant wanted to make?

2    A.  I don't recall the amount.

3    Q.  What was Thomas H. Lee's reaction to Mr. Collins'

4    requesting that Mr. Grant be permitted to invest going forward

5    in Refco?

6    A.  The Thomas H. Lee Company declined that offer.  As I've

7    testified earlier, part of the thesis for the Lee company's

8    investment was that they were investing in a new Refco, and

9    that the prior equity investors, other than Mr. Bennett and

10   BAWAG, were going to be cashed out as part of this transaction.

11   Q.  And by the way, when you were told that Mr. Grant was going

12   to earn hundreds of millions of dollars in this transaction,

13   did that make sense to you, based on your understanding of the

14   deal?

15   A.  Yes.

16   Q.  How come?

17   A.  Because as I've just testified, we understood he owned

18   50 percent of RGHI, which owned 90 percent of Refco, and the

19   terms of the transaction provided for significant payments to

20   the shareholders, including the $500 million of excess cash,

21   which we discussed earlier, some stock of certain companies

22   they owned, and then $1.7 billion of cash, less certain

23   indebtedness.

24   Q.  Let me ask you now to look at Government Exhibit 1005.28.

25        MR. CHERNOFF:  I think this is already in evidence

1   pursuant to our stipulation, but just to be safe, I offer it,

2   your Honor.

3            THE COURT:  Yes, sir, received.

4            (Government's Exhibit 1005.28 received in evidence)

5   A.  I'm sorry, this is 1005.28?

6   Q.  Yes, sir.

7   A.  Yes, I have it.

8   Q.  Okay.  And so you'll see, Mr. Westra, that this is called a

9   stock purchase agreement.  It's between Mr. Bennett and

10  Mr. Grant, correct?

11  A.  Yes.

12  Q.  And I'll ask you to just, as we scroll down through the

13  document, it says among the "whereas" clauses, "the buyer,"

14  that's Mr. Bennett, "wishes to purchase the shares from the

15  seller and the seller desires to sell the buyer all of the

16  shares."

17           And so this was the deal, as you understood it,

18  Mr. Bennett was going to buy out Mr. Grant, correct?

19  A.  When you say we understood it, we didn't --

20  Q.  I'm sorry.  I'm not asking about this agreement.  You

21  understood that Mr. Grant's interests would be bought out?

22  A.  Not by -- Yes, we understood that Mr. Grant's interest

23  would be extinguished as part of the transaction, that's

24  correct.

25  Q.  And that's how he received these hundreds of millions of

1    dollars?

2    A.   Correct.

3    Q.   Okay.  And if we could flip to Page 2 of this, sir?

4    A.   Yes.

5    Q.   There's a definition here you see cash amount?

6    A.   Yes, I see it.

7    Q.   And it's defined as $4 million plus the estimated tax

8    amount?

9    A.   That's correct.

10   Q.   Is this stock purchase agreement a document that you were

11   provided in the course of your due diligence?

12   A.   No.

13   Q.   Do you remember when you first saw this?

14   A.   I first saw this following the collapse of Refco.

15   Q.   Did you ever learn, by the way, that this document had

16   somehow been included in the closing binder?

17          MR. BACH:  Objection to "somehow."

18          MR. CHERNOFF:  I'll rephrase.

19          THE COURT:  Thank you.

20   Q.   Did you ever learn that this document had been included in

21   the closing binder that was prepared after the transaction?

22   A.   Yes.

23   Q.   How did you learn that?

24   A.   I learned that sometime after the collapse of Refco.

25   Q.   Did anyone ever bring this document to your attention

CAPPCOL2                        Westra – direct

1   before that?

2   A.  No.

3   Q.  And what was your reaction upon learning that Mr. Grant was

4   only receiving $4 million, plus the estimated tax amount, for

5   selling his interest in Refco to Mr. Bennett?

6            MR. BACH:  Objection.

7            THE COURT:  Basis?

8            MR. BACH:  Relevance.

9            THE COURT:  I'm sorry?

10           MR. BACH:  Relevance.

11           MR. CHERNOFF:  Let me be more focused, your Honor, so

12   we can move this along.

13           THE COURT:  All right.

14   Q.  Did this $4 million payment that Mr. Grant received comport

15   with what you had been told by Refco in the course of the due

16   diligence?

17   A.  No.

18   Q.  Let me ask you about another topic, Mr. Westra.  What is a

19   flow of funds memo?

20   A.  A flow of funds memo is a memo that is prepared in

21   connection with a transaction.  It shows how the proceeds of

22   the transaction are to be paid out to the various parties in

23   connection with the transaction.  Those parties being the

24   sellers, as well as other parties such as banks, whose debt is

25   being repaid, and advisers, whose fees are being paid.

CAPPCOL2                       Westra - direct

1   Q.  Did you see a flow of funds memo in connection with the

2   Refco deal?

3   A.  Yes.

4   Q.  And where was that prepared, do you know?

5   A.  I'm sorry, where was it prepared?

6   Q.  Do you know who prepared it or worked on it?

7   A.  It was prepared in the first instance by Weil Gotshal, and

8   then it was shared with Mayer Brown as counsel for the sellers

9   to receive any input modifications, changes which they deemed

10  appropriate.

11  Q.  Let me ask you to look at Government Exhibit 1005.88.

12  A.  Yes, I have it.

13  Q.  Is this the flow of funds memo that, as you said, was

14  initially prepared by Weil Gotshal?

15  A.  Yes.

16  Q.  And did you, yourself, personally review the flow of funds

17  memo around the time of the closing?

18  A.  Yes.

19  Q.  What was your purpose in doing so?

20  A.  I wanted to make certain that the appropriate amounts were

21  paid to the appropriate parties.

22  Q.  And did you determine that, to the best of your

23  understanding, the appropriate amounts were being paid to the

24  parties?

25  A.  Yes.

1   Q.  Did you sign off on the final version of the flow of funds

2   memo?

3   A.  If you're asking if I had a physical signature, I don't

4   know that, but I did approve it, yes.

5   Q.  You did approve it.  And why was it up to you or left to

6   you to approve the final version?

7   A.  Because as the --

8          MR. BACH:  Objection.

9          THE COURT:  Overruled.  You may answer, sir.

10  A.  As the partner who ultimately had responsibility for this

11  transaction, it was my responsibility to make certain that the

12  appropriate amounts were, in fact, being paid to the

13  appropriate parties.

14  Q.  Now, did you and Mr. Collins, in connection with the

15  information in the flow of funds memo or otherwise, have a

16  discussion as to how much of the proceeds from this transaction

17  would go to BAWAG, the Austrian bank?

18  A.  I don't recall any specific conversations, no.

19  Q.  What was your understanding of what BAWAG would receive

20  from the funds that would, so to speak, flow from this

21  transaction?

22  A.  They would receive, with respect to their equity interests,

23  10 percent of the equity proceeds.

24  Q.  Let me ask you to look at Page 5 of the flow of funds memo.

25  A.  Yes, I have it.

CAPPCOL2                          Westra - direct

1   Q.  We see there at the top, this refers to a wire transfer in

2   the amount of $191 million.  Is that flow of funds entry here,

3   the 191 million payment, consistent with what you understood

4   BAWAG would get for its 10 percent interest in Refco?

5   A.  Yes.

6   Q.  Before this deal closed or at any time before Refco's

7   collapse, were you ever made aware that BAWAG or a

8   BAWAG-controlled entity would actually be getting hundreds of

9   millions of dollars in addition from the closing of the Thomas

10  H. Lee transaction?

11  A.  No.

12  Q.  Let me ask you to look at Government Exhibit 1821.

13  A.  Yes, I have it.

14  Q.  Sir, as you look through this document, does this also look

15  like a flow of funds memo for a deal?

16  A.  Yes.

17  Q.  Is this a flow of funds memo that you received in

18  connection with the closing of the Refco deal?

19  A.  No.

20  Q.  Let me ask you to look at Page 4, and you'll see there --

21  Tell me when you have it, sir.

22  A.  These pages don't appear to be numbered.  It's just the

23  fourth page in?

24  Q.  Sir, if you want to look at the screen, I believe Mr. Smith

25  has highlighted the portion on Page 4 I'll ask you about.

CAPPCOL2                          Westra - direct

1    A.  Yes, I have it.

2    Q.  We see here two different disbursements to the Desana

3    Foundation in the amounts of 110 million and 566 million?

4    A.  Yes.

5    Q.  Did you ever know about those disbursements from the Refco

6    deal proceeds?

7    A.  No.

8            MR. CHERNOFF:  Let me ask you if we could bring up

9    Page 6.

10   Q.  And, Mr. Westra, here there is a $390 million payment; do

11   you see that there?

12   A.  Yes, I do.

13   Q.  Going from one RGHI account to another?

14   A.  Yes.

15   Q.  Did you ever learn anything in connection with the closing

16   about a $390 million overdraft that RGHI would be repaying?

17   A.  Are you asking me if I learned it at the time of the

18   closing?

19   Q.  Yes, sir.

20   A.  No.

21   Q.  When did you first see this flow of funds memo that we've

22   just been looking at, the second one?

23   A.  It was sometime after the collapse of Refco.

24   Q.  And how did the information in this flow of funds memo

25   compare to your understanding of how the funds were supposed to

1   flow after the closing?

2   A.  It is quite inconsistent with the flow of funds memorandum

3   which we discussed earlier, which had been prepared in

4   connection with the transaction.

5           MR. CHERNOFF:  Thank you, Mr. Smith.

6   Q.  Mr. Westra, after the closing was completed, was additional

7   work done with Weil Gotshal's participation to obtain financing

8   for the leveraged buyout?

9   A.  After the acquisition was completed?

10  Q.  Yes.

11  A.  It was --

12  Q.  Or around the time of the acquisition?

13  A.  There was financing that was done concurrent with the

14  acquisition, yes.

15  Q.  And were you involved in that legal work?

16  A.  I was to some extent.  There were other partners at Weil

17  who had primarily responsibility for the financing, but I was

18  involved to some extent, yes.

19  Q.  And what financing in particular were you referring to?

20  A.  There were both senior financing and bonds that were

21  issued, proceeds that were used together with the Lee company

22  equity to fund the purchase price.

23  Q.  Was Mr. Collins involved in that legal work as well?

24  A.  Yes.

25  Q.  Did there come a time when Refco shares were sold to the

CAPPCOL2                         Westra - direct

1   public in an initial public offering?

2   A.  Yes.

3   Q.  Was the Weil firm involved in legal work around that

4   transaction?

5   A.  Yes.

6   Q.  Were you, yourself, involved in that?

7   A.  I was.  Again, there were other partners who had primary

8   responsibility for that transaction, but I was also involved.

9   Q.  And what about Mr. Collins and Mayer Brown, were they

10  involved?

11  A.  They were co-counsel on the offering and Mr. Collins was

12  involved as well.

13  Q.  We were talking about the collapse of Refco, and by that, I

14  mean to speak of the bankruptcy filing in October of 2005.  At

15  that time, Mr. Westra, what had been your understanding of the

16  amount of related-party debt that was still owed by RGHI to

17  Refco?

18  A.  It was my understanding that that was extinguished at the

19  time of the August 2004 closing and that no incremental debt

20  had subsequently been put in place.

21  Q.  And in October of 2005, did you learn that, in fact, RGHI

22  still owed Refco a substantial amount of money?

23  A.  Yes.

24  Q.  What was your reaction upon learning that?

25  A.  I was shocked and very concerned.

CAPPCOL2                          Westra – direct

1   Q.  And what, as a lawyer of Thomas H. Lee, did you do at that

2   point?

3   A.  I advised the Lee company that they should immediately

4   reach out to Mr. Bennett to understand the facts, and that they

5   should convene an immediate board meeting at which this topic

6   would be discussed.

7   Q.  Did that happen?

8   A.  Both happened.  They called Mr. Bennett, who was, my

9   recollection, was in Tokyo at the time.  He was instructed to

10  fly back immediately, and a board meeting was convened very

11  promptly thereafter.

12  Q.  And what were the -- What was the focus of this board

13  meeting?  Why was it convened?

14  A.  The board meeting was called to, first of all, determine

15  the facts, whether, in fact, this loan was outstanding and, if

16  so, to determine what the board's responsibility was to make

17  public disclosure of that, since it had not theretofore been

18  disclosed.

19  Q.  And what sort of the legal concerns were at issue with

20  respect to making a public disclosure like the one you were

21  considering?

22  A.  Under the securities laws, a public company has to make

23  prompt disclosure of any material fact which may influence the

24  trading price of its shares so that the investing public has

25  all material information at its disposal in deciding whether to

1    buy or sell those shares.

2    Q.  And so after these board meetings, did Refco make such a

3    disclosure?

4    A.  Yes.

5    Q.  After you learned about the continuing existence of

6    related-party debt from RGHI to Refco, did you, Mr. Westra,

7    have a conversation with Mr. Collins?

8    A.  Yes.

9    Q.  Was that before or after the public disclosure of the

10   receivable had been made?

11   A.  Before.

12   Q.  Where did that conversation take place?

13   A.  It was a telephone conversation that occurred during the

14   board meeting.  This board meeting went on for several days,

15   though.  I'm not sure of the exact date, but it was either at a

16   break of the meeting, or I stepped out.  I don't recall which.

17   Q.  Roughly, how long was your phone call with Mr. Collins at

18   that time?

19   A.  It was only several minutes long.

20   Q.  What did you say, and what did he say?

21   A.  I indicated that we had a very significant issue; that we

22   were determining what disclosure had to be made; that we were

23   fairly certain that we had an issue as to which disclosure was

24   required, and we would be working on understanding the facts

25   and determining what to disclose and when to disclose it.

1        His response was that we needed to be very careful in

2   the disclosure that was made because it could have severe

3   consequences to the company.

4   Q.  And when Mr. Collins said that the disclosure could have

5   severe consequences for the company, did he express any

6   surprise or shock that there was an unpaid receivable from RGHI

7   to Refco?

8              MR. BACH:  Object.

9              THE COURT:  I'll permit it.  You may answer, sir.

10  A.  I don't recall any such conversation, no.

11  Q.  And after your client did make that disclosure, fair to say

12  that there was, of course, the severe consequence for the

13  company?

14  A.  Yes, the company failed and ultimately filed bankruptcy.

15  Q.  After the company failed and filed for bankruptcy, was your

16  client, Thomas H. Lee, sued?

17  A.  Yes.

18  Q.  In general terms, who were the plaintiffs; who was suing

19  them?

20  A.  I don't recall all the specifics, but certainly there was a

21  suit by the bankruptcy trustee, who was administering the

22  affairs of the Refco bankrupt estate.

23  Q.  Was Weil, your law firm, sued?

24  A.  No.

25  Q.  Did Weil make a payment to Thomas H. Lee in connection with

1    Thomas H. Lee's ultimate settlement of the lawsuits against it?

2    A.  Yes.

3    Q.  And at the time that Weil decided to contribute to that

4    payment, were you a member of the management committee?

5    A.  Yes.  At Weil Gotshal, yes.

6    Q.  And why did the Weil Gotshal firm decide to make the

7    payment to Thomas H. Lee's settlement?

8    A.  They were a very important client for the firm.  We have --

9    They paid a lot of fees to us, Refco and many other

10   transactions.  This was a very delicate time for the Lee

11   company, and we felt that, in support of what had been a

12   longstanding relationship and one which we expected to continue

13   in the future, we would contribute to that settlement.

14   Q.  How much did the Weil firm contribute?

15   A.  I don't recall the amount.

16   Q.  Since the collapse of Refco, has the Weil firm entered into

17   any other settlements?

18   A.  There was a settlement with the bankruptcy trustee, yes.

19   Q.  And were you involved in the decision to enter into that

20   agreement?

21   A.  As a member of the management committee at Weil Gotshal,

22   yes.

23          MR. CHERNOFF:  May I have one moment, your Honor?

24          THE COURT:  Yes, sir.

25   Q.  Did the Weil firm, in connection with that settlement,

1    agree or stipulate that it had done anything wrong or that it

2    had a liability?

3    A.   It expressly stated that it did not have liability and did

4    not acknowledge any error.

5    Q.   And so why did Weil Gotshal settle that particular suit?

6    A.   Because we had engaged outside counsel to look at the

7    facts.   They felt that we had not erred or had any liability.

8            MR. BACH:  Objection, hearsay.

9            THE COURT:  Mr. Chernoff?

10   Q.   Mr. Westra, I'll just ask you, without reference to outside

11   counsel, why it was, from your vantage point on the management

12   committee, that Weil decided to settle that suit?

13   A.   We decided to settle the suit because of the realization

14   that there was always uncertainty in any potential litigation.

15   It was going to be very costly to pursue it, both in terms of

16   expense, as well as devotion of manpower.   We had significant

17   insurance coverage to cover much of the settlement and,

18   therefore, as a business matter, decided to settle and not have

19   the claim paid.

20           MR. BACH:  Objection.  We move to strike the answer

21   immediately preceding this.

22           MR. CHERNOFF:  On consent, your Honor.

23           THE COURT:  Ladies and gentlemen, the answer relating

24   to whatever outside counsel said or felt is stricken.  It will

25   play no part in your deliberations.

1   Q.  And finally, Mr. Westra, I'm aware you no longer work at

2   Weil, but are you aware of any outstanding litigation against

3   Weil Gotshal related to the matters we've been talking about?

4   A.  No.

5           MR. CHERNOFF:  I have no further questions.

6           Thank you, Mr. Westra.

7           THE WITNESS:  You're welcome.

8           THE COURT:  Thank you.  Do you want to break now,

9   ladies and gentlemen?  Yes.  I see the nodding of heads.  Would

10  you follow the normal rules during your break.  Please, take

11  your pads, leave your folders, and don't discuss the case.  See

12  you in a couple of minutes, friends.

13          (Jury exits)

14          THE COURT:  Sir, you may step down.

15          (Witness temporarily excused)

16          THE COURT:  Won't you be seated, counsel.

17          MR. SCHWARTZ:  Your Honor, we have just one issue.  If

18  Mr. Westra could step outside, please.

19          THE COURT:  I think he's on his way out.

20          MR. SCHWARTZ:  Excellent.

21          THE COURT:  Mr. Westra, we're going to excuse you from

22  the room for a few minutes, if you don't mind.  Thank you, sir.

23          MR. SCHWARTZ:  I would like to return to an objection

24  that we made that your Honor overruled, just very briefly.

25  Mr. Westra was asked a series of questions about the existence

of two flow of funds memos, one of which he saw and one of
which he didn't see.

It is the contention of the government in the case
that Mr. Collins must have seen both of them and, therefore,
would have known that they were inconsistent.  That was clearly
what they were trying to establish with him, and I think what
they're going to argue to the jury, and that's what they argued
to the jury the last time.

There is not a scintilla of evidence in this case,
that I am aware of, that Mr. Collins actually saw the flow of
funds memo to the Lee deal.  And you may recall, your Honor,
that there was an e-mail that I showed Mr. Trosten for which
the final draft was circulated, and Mr. Collins was not on it.

What they -- The questions about the existence of two
memos, we have no problem with.  The question that we have the
problem with is the following:  "And why was it left up to
you" --

THE COURT:  Excuse me.  Are you able to tell me what
line it's at?

MR. SCHWARTZ:  I certainly am, your Honor.  On
LiveNote, it's Page 56, Line 8.

THE COURT:  Thank you.  Let me just get to it.  Yes,
sir, go ahead.

MR. SCHWARTZ:  Mr. Westra, was asked whether he
approved it, and we don't object to that.  We object to the

 1    next question:  "Why," which is irrelevant, "was it up to you

 2    or left to you to approve the final version?"

 3              Objection overruled.

 4              Answer, "As the partner who ultimately had

 5    responsibility for this transaction, it was my responsibility

 6    to make certain that the appropriate amounts were, in fact,

 7    being paid to the appropriate parties."

 8              That "why" is irrelevant to any issue in this case,

 9    except that Mr. Collins was the partner in charge on the Mayer

10    Brown side, and the jury may be asked to infer or may infer

11    from that answer that he, too, would have had to review that

12    flow of funds memo.

13              It's the government's burden of proof to show that he

14    saw it.  They're not going to meet that burden of proof in this

15    case, and they certainly can't do it by inference that since he

16    approved it as the partner in charge, Mr. Collins, as partner

17    in charge, would have seen it.  There is no other reason in the

18    world to ask this witness why he did that action, none that's

19    relevant to this case.  We ask that it be stricken.

20              THE COURT:  Off the record.

21              (Discussion held off the record)

22              THE COURT:  Anyway.  Go ahead, Mr. Chernoff.

23              MR. CHERNOFF:  Your Honor, it's a small point for the

24    defense to ask for it to be stricken, but it is clearly

25    relevant.  Mr. Westra explained what he did with the flow of

CAPPCOL2                     Westra - direct

 1  funds memo, and what he did as the senior partner on the deal.

 2          Now, there were other partners on the deal from the

 3  Mayer Brown firm and, apparently, the defense has excellent

 4  evidence that Mr. Collins did not receive the flow of funds

 5  memo because they're going to show this e-mail that he wasn't

 6  on.

 7          On the other hand, they can also cross-examine

 8  Mr. Westra that he had no idea whether this was something that

 9  Mr. Collins did.  He didn't discuss it with him, which I think

10  was elicited, and I think that they will be able to make all

11  the arguments they can that the better evidence is that

12  Mr. Collins never saw this.

13          But, you know, it is a significant deal document, and

14  so it's not surprising that Mr. Westra looked at it.  And

15  certainly, we'd be making the argument that Mr. Collins did,

16  regardless of how Mr. Westra testified, but the defense is

17  entitled to put in its proof to the contrary.

18          MR. SCHWARTZ:  We proffered expert testimony on this

19  very issue, which your Honor has yet to rule on, which is that

20  the expert will testify that in transactions like this that

21  senior partners on transactions often do not review flow of

22  funds memos.  The only thing in the record right now is that

23  Mr. Westra, which was the senior partner, and therefore, I'm

24  entitled to -- I did this.  It's not probative of what

25  Mr. Collins' practice was.  That's the issue in the case.

CAPPCOL2                        Westra - direct

```
 1            THE COURT:  I don't think it's -- The question is, is
 2   it being offered as probative of Mr. Collins' practice?  It
 3   can't be, right?
 4            MR. CHERNOFF:  Your Honor, I guess what I'll say is,
 5   despite my strong views on what I just articulated, the last
 6   thing we want to do is even begin to open the door to the
 7   expert testimony that would consume, we don't know how long in
 8   this trial.  And so we will consent to that being stricken.
 9   Although, I don't think any instruction should be given beyond
10   the normal one your Honor would give.
11            THE COURT:  Well, the real question is how to strike
12   it without emphasizing it.
13            MR. SCHWARTZ:  I would -- your Honor, I would think
14   the way to strike it is the Court merely to say that Mr. Westra
15   was asked why he viewed a flow of funds memo.  I have stricken
16   the question, and I have stricken the answer, and you may not
17   consider the answer to the extent you remember it, in your
18   deliberations.  We'd ask that you not actually repeat the
19   answer.
20            THE COURT:  Any objection?
21            MR. CHERNOFF:  No, your Honor.
22            THE COURT:  Thank you.
23            MR. CHERNOFF:  And we will not make any argument that
24   Mr. Westra was an expert on this matter.
25            MR. SCHWARTZ:  Well, now you won't.
```

1          THE COURT:  All right.  Anything else, friends?

2          MR. BACH:  Yes, Judge.  I raised before an issue of

3     cross-examination relating to Mr. Westra.  I would like to

4     inquire of Mr. Westra what he was told by the legal team at

5     Wilmer Cutler about the reasons for the transition from Wilmer

6     Cutler to Mayer Brown.

7          The government has made clear to the Court that that's

8     an issue that it's going to explore later on in its case, and

9     if Wilmer lawyers spoke to Dennis Klejna about it and that's

10    relevant, I think it's relevant to hear what they said to

11    Mr. Westra on the same topic.

12         MR. CHERNOFF:  Your Honor, what I guess Mr. Bach wants

13    to offer is this witness' due diligence over a year later with

14    respect to hearsay statements by Wilmer as to what happened in

15    this transaction, being offered for the truth.  That is clearly

16    hearsay.

17         We are not getting into, pursuant to the discussion we

18    had this morning, why it was that Wilmer withdrew.  So for

19    Mr. Bach to try to get that from this witness, even if there

20    were a hearsay exception, it would be irrelevant and

21    inappropriate.

22         I should also point out that I think Mr. Bach would

23    open this door where we have to explore the fact that there was

24    no actual waiver of attorney-client privilege, I believe, given

25    in connection with the legal due diligence.  And so we would

1    have to get into why it was that Wilmer said what they said, in

2    the light of the fact that there was no such waiver.

3           We'd have to get into the depth of the due diligence

4    that was done, and so now Mr. Bach tries to, I guess, impeach

5    Mr. Maggio with the Wilmer witness with the hearsay that

6    Mr. Westra may or may not have available.

7           THE COURT:  Why is it not yet another level of

8    hearsay, if this witness is going to repeat what he heard from

9    somebody else?

10          MR. BACH:  Well, it's the same thing as what the

11   government wants to offer, Judge, and it's -- They are having

12   hearsay statements, Wilmer Cutler to Dennis Klejna.  We're

13   asking to introduce hearsay statements from Wilmer Cutler to

14   Mr. Westra.  If this is going to be -- We can impeach hearsay

15   with hearsay.  If they're going to bring in hearsay, we're

16   entitled to impeach it with hearsay.

17          MR. CHERNOFF:  I believe that what your Honor ruled is

18   what we will be eliciting is not hearsay.  It is offered for

19   the fact that Wilmer advised someone that this is what they

20   will do.  Mr. Bach wants to elicit why Wilmer did, including

21   reasons that if he examined the Wilmer witnesses, which is why

22   we have hearsay rules, he would learn that there were things

23   that they knew and were aware of about the transaction, about

24   the investigation, about Mr. Maggio that they did not share

25   with the legal due diligence team because there was no waiver

1    of attorney-client privilege.

2            And, in fact, Mr. Levy reminds me, we already agreed

3    on the instruction it wasn't being offered for the truth; so I

4    don't know how Mr. Bach can refer to our proffer as hearsay.

5            THE COURT:  But, Mr. Bach, you would be eliciting this

6    for the truth of the Wilmer statements, no?

7            MR. BACH:  No, what I would be --

8            THE COURT:  What do you expect this witness to say?

9            MR. BACH:  I expect him to say that he had a

10   conversation with Bill McLucas of the Wilmer Cutler firm.

11   Mr. McLucas being in charge of that firm's work in connection

12   with Sedona matter, that he inquired and was allowed to inquire

13   about the reasons for the transition from Wilmer Cutler to

14   Mayer Brown, and that Mr. McLucas told him that there was

15   absolutely nothing improper about it and that there were

16   strategic differences about how to approach the situation.

17           THE COURT:  But that's the truth you want to argue,

18   right?

19           MR. BACH:  Well, what I want to show is that these are

20   statements that are made to lawyers involved during the course

21   of the conspiracy and that are communicated to Mr. Collins and

22   they ultimate form his state of mind.

23           THE COURT:  I don't get that.  What do you mean these

24   are statements during the course of the conspiracy?  You're

25   saying Wilmer is in on the conspiracy?

1            MR. BACH:  No, no.  That's not what I'm saying.  I'm

2     saying --

3            MR. CHERNOFF:  The statements were made a year later,

4     your Honor.  It had nothing to do with what Mr. Collins did

5     with respect to Mr. Maggio at the time.

6            THE COURT:  I don't think the cross-examination is

7     appropriate because you are offering it for the truth, and

8     that's before you get to the year later stuff.

9            MR. BACH:  Judge, then I accept -- respectfully

10    disagree, but accept the Court's ruling.  But we renew our

11    objection on that ground to what the government intends to do

12    with it.

13           THE COURT:  What about the apparent agreement that

14    it's not being offered for the truth?

15           MR. BACH:  We dispute that.  We think it's being

16    offered for no other purpose but the truth.

17           MR. SCHWARTZ:  Your Honor ruled and we asked for a

18    limiting charge, but we don't agree that it necessarily cures

19    what the underlying defect was.  That's all.

20           THE COURT:  All right.  I adhere to the prior ruling

21    and will give the limiting charge that it's not being offered

22    for the truth, but for the fact that the statement was made.

23    Be sure that I do it at the time.  Let's run out for five

24    minutes quickly, please.

25           MR. SCHWARTZ:  Thank you, Judge.

1          MR. CHERNOFF:  Your Honor, with respect to Mr. Bach,

2    said he had 40 minutes of cross.  Even if that's increased, I

3    wonder if we can try to push through because Mr. Westra, we

4    arranged his schedule several times just to be with us, and he

5    has to get back to Boston.

6          THE COURT:  Let's go fast.  Off the record.

7          (Recess taken)

8          (Jury enters)

9          THE COURT:  Welcome back.  Thank you for being so

10   prompt.  Thank you, friends.  Won't you be seated.

11         We move on now to the cross-examination of Mr. Westra.

12         Mr. Bach?

13         MR. BACH:  Thank you, Judge.

14   CROSS-EXAMINATION

15   BY MR. BACH:

16   Q.  Good morning, Mr. Westra.

17   A.  Good morning.

18   Q.  Mr. Westra, you were testifying about a telephone

19   conversation that you had with Joseph Collins after news had

20   come out in October 2005 that there were problems at Refco,

21   correct?

22   A.  Correct.

23   Q.  And in the course of that brief conversation, as you

24   described it, Mr. Collins suggested to you that the matter of

25   disclosures being handled in a careful manner, correct?

CAPPCOL2                          Westra - cross

1   A.  Correct.

2   Q.  And you agree with him, sir, that matters of disclosure

3   have to be handled carefully, correct?

4   A.  Yes.

5   Q.  Nothing unusual about wanting to be careful about matters

6   of disclosure, correct?

7   A.  That's correct.

8   Q.  You also described for the jury the data room that had been

9   set up by Credit Suisse First Boston to make materials

10  available for people who wanted to learn about the company; do

11  you remember that?

12  A.  I do.

13  Q.  And attorneys from your firm went through that data room

14  and looked at the materials?

15  A.  That's correct.

16  Q.  And you were kept informed of their efforts, correct?

17  A.  In a general sense, yes.

18  Q.  And Mr. Tabor was working with you, and he had more

19  supervisory responsibility for that piece of the work, correct?

20  A.  For the diligence, are you asking?

21  Q.  For the diligence and the work in the data room.

22  A.  Yes.

23  Q.  But you knew, even though Mr. Tabor was in charge, you knew

24  that colleagues of yours were going through the material in the

25  data room and making lists of items that they found there,

CAPPCOL2                          Westra - cross

1    correct?

2    A.   They were certainly going through there and making notes on

3    what they had found or what they needed to pursue.

4    Q.   And you knew that they were making lists of things that

5    they would want you or Mr. Tabor to see, correct?

6    A.   Well, again, they were making a report on what they had

7    found, and they would want us to review those reports, yes.

8    Q.   And that's because someone, either yourself or primarily

9    Mr. Tabor, would have to go through the lists of items they

10   found and make decisions about whether there were things that

11   needed to be reported to TH Lee or things that needed to be

12   examined further, correct?

13   A.   Well, I think you're not quite accurate in the way you're

14   describing the process.  As I've tried to explain, it's not a

15   case where my associate would be making lists of things they

16   found.  It would be that they would be reporting on what they

17   found, and they would often be making lists of things that they

18   were told about which needed to be pursued.

19   Q.   Wouldn't they make lists of things that you or Mr. Tabor

20   needed to see?

21   A.   I'm sorry, the question again, please?

22   Q.   They would make lists of things that they -- that you or

23   Mr. Tabor needed to see in order to fulfill your roles in

24   connection with the --

25   A.   They certainly made lists of open diligence items which

1    needed to be pursued as part of our overall diligence efforts,

2    yes.

3    Q.  And Dan Gewirtz was one of the associates on your team who

4    was involved in that process, correct?

5    A.  Correct.

6            MR. BACH:  Could we put up on the board Defense

7    Exhibit 179.  Take that down.  Can the government help us put

8    up on the board the GX179?  Do you have GX179?  And can we blow

9    that up?

10   Q.  The government showed you this list while they were asking

11   you questions, right?

12   A.  Yes.

13   Q.  And there's no doubt in your mind that this is a list

14   prepared by people at Weil Gotshal who were working as part of

15   your team, correct?

16   A.  That's correct.

17   Q.  In fact, you showed us a footer that had the name of Dan

18   Gewirtz, sort of last name, in it, right?

19   A.  That's correct.

20   Q.  And you were aware at this time that Mr. Gewirtz was

21   actually preparing this list so that he could show it to you or

22   Mr. Tabor?

23   A.  As I testified earlier, I don't recall seeing this list; so

24   I really can't answer that question.

25   Q.  Okay.  One moment.  Let me show you what's been marked for

 1   identification as Defendant's Exhibit 400.

 2          Mr. Westra, I'm handing you what's been marked for

 3   identification as Defendant's Exhibit 400, and I'm going to ask

 4   you, sir, if those are a copy of notes, your personal notes, in

 5   connection with work you did on this transaction?

 6   A.  They are notes that I did make in connection with this

 7   transaction, yes.

 8          MR. BACH:  We offer them.

 9          MR. CHERNOFF:  Sorry, your Honor.  Just one moment.

10   Can I just ask Mr. Bach a question?

11          THE COURT:  Yes.

12          MR. CHERNOFF:  No objection.

13          MR. BACH:  On consent with the government, we're just

14   going to offer Page 23502.

15          THE COURT:  Received.

16          (Defendant's Exhibit 400, Page 23502 received in

17   evidence)

18          MR. BACH:  Can we put this up on the screen and blow

19   it up.

20   Q.  And do you see at the top, Mr. Westra, it says the date,

21   February 19th, 2004?

22   A.  Yes.

23   Q.  And that's the day before the typed list we just saw of

24   the -- someone on your team made?

25   A.  That's correct.

CAPPCOL2                         Westra - cross

1   Q.  And do you see at the top it says, "Dan Gewirtz"?

2   A.  I do.

3   Q.  And then a couple of lines down, it says "Dan;" do you see

4   that?

5   A.  I do.

6   Q.  And then Item 2, can you read your notes for the jury?

7   A.  It says, "He is doing list of things we need to see."

8           MR. BACH:  You can take that down.  If we could bring

9   back up the Government's Exhibit.  Go to Page 2, item 12.

10  Q.  Again, this is prepared the day after those notes, correct?

11  A.  That's the date stated, yes.

12  Q.  And item 12 lists minor points to keep track of, correct?

13  A.  Correct.

14  Q.  And it refers to the Proceeds Participation Agreement and

15  DF Capital Inc., correct?

16  A.  Yes.

17          MR. BACH:  We can take that down.

18  Q.  You also testified about some meetings that you

19  participated in in April 2004 in connection with preparing a

20  document known as the letter of intent, correct?

21  A.  That's correct.

22  Q.  And in anticipation of those meetings, you and your law

23  firm prepared a draft letter of intent to be discussed,

24  correct?

25  A.  That's correct.

1    Q.  And in advance of those meetings, you sent that draft over

2    to Mr. Collins and Mr. Bennett so that they'd have it when they

3    met with you, correct?

4    A.  Yes.

5    Q.  By the way, Mr. Westra, you have no specific recollection

6    of ever meeting with Mr. Collins before those meetings in

7    April, correct?

8    A.  No recollection, no.

9    Q.  And you don't have any record in the time records that you

10   keep as an attorney of ever doing any legal work with him

11   before April, correct?

12   A.  I wouldn't know without looking at all the time records.

13   Q.  Let me show you.

14            MR. BACH:  I'm trying to push forward.

15            THE COURT:  You're not going to make the witness look

16   through all of his time records, are you?

17            MR. BACH:  Will the government stipulate that there's

18   no time record in March or February naming Mr. Collins?

19            MR. CHERNOFF:  I thought the question was ever doing

20   any legal work prior to April, and now Mr. Bach's asking about

21   March and April?

22            MR. BACH:  If the government will stipulate.

23            THE COURT:  To what?

24            MR. BACH:  That he has no time record mentioning Joe

25   Collins before April of 2004, we can move on.

CAPPCOL2                          Westra - cross

1              MR. CHERNOFF:  Your Honor, I'll take Mr. Bach's word

2      for it, and if that's not correct, we'll adjust it.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  MR. BACH:  The same with this one.

 2                  MR. CHERNOFF:  I'm sorry if I wasn't clear, your

 3      Honor.  I am stipulating to what Mr. Bach has proffered pending

 4      my review of the documents, which I am sure will bear out what

 5      Mr. Bach has proffered.

 6                  THE COURT:  All right.  Let's go.

 7      BY MR. BACH:

 8      Q.  And nowhere in your notes is there any mention of

 9      Mr. Collins before April, correct?

10      A.  Again, I can't respond without looking at my records.

11                  (Pause)

12                  THE COURT:  Now what?  Let's go.

13                  MR. CHERNOFF:  Your Honor, maybe we can just stipulate

14      to that as well on the same issue.

15                  MR. BACH:  If he has the notes in front him, I don't

16      want to make him go through it --

17                  THE COURT:  Good, but we should have done this before.

18      This is not a secret question.  All right?

19                  MR. BACH:  OK.

20                  THE COURT:  All right.

21      BY MR. BACH:

22      Q.  Now, before you met Mr. Collins in April, you had prepared

23      this draft Letter of Intent?  That's what we were talking about

24      before.

25                  Let me show you what's been marked for identification

1   as Defense Exhibit 224.

2           Mr. Westra, is this a document that you caused to be

3   sent to Joe Collins on or about April 9, 2004?

4   A.  Yes.

5           MR. BACH:  We offer it.

6           MR. CHERNOFF:  No objection, your Honor.

7           THE COURT:  Received.

8           (Defendant's Exhibit 224 received in evidence)

9           MR. BACH:  And if we can put Defendant's Exhibit 224

10  up on the board?

11  Q.  It is dated April 9, 2004, correct?

12  A.  That's correct.

13  Q.  And you sent this in anticipation of a meeting with

14  Mr. Collins, correct?

15  A.  Yes.

16  Q.  And if we look at -- go to Bates page 6074.

17  A.  Yes, I have it.

18  Q.  And blow up 1(a).

19          That is a reference to $500 million that Refco would

20  distribute, correct?

21  A.  Correct.

22  Q.  And that's something that you had discussed with Refco's

23  management and Credit Suisse First Boston before you ever met

24  Mr. Collins, correct?

25  A.  I don't know the sequencing.

Capdcol3                    Westra - cross

1    Q.  But you do know that you have no recollection of meeting

2    Mr. Collins before these meetings in April?

3    A.  What I testified before was that I only recalled meeting

4    Mr. Collins at the meeting in which we describe this.  I know

5    we had telephone calls before that.  I don't recall when or how

6    many.

7    Q.  Do you have any specific recollection of any telephone

8    calls or meetings with Mr. Collins before April?

9    A.  If you're asking me as to specific dates, no.

10   Q.  As to a specific conversation.

11   A.  I recall having conversations about the transaction more

12   generally, yes.

13   Q.  Could you relate the details of any one to us today?

14   A.  It was eight years ago.  I don't recall.

15   Q.  At these meetings in April, you don't recall Mr. Collins

16   making any specific representations about the $500 million,

17   correct?

18   A.  As I testified earlier, I recall Mr. Bennett making that

19   representation in Mr. Collins' presence.  I testified I did not

20   recall Mr. Collins making a representation.

21   Q.  You also recall Mr. Bennett made representations in

22   Mr. Collins' presence about how shareholder loans would be

23   zeroed out at the closing, correct?

24   A.  Correct.

25   Q.  Now, you represented TH Lee in this transaction, and the

1    person who you principally interacted with was a man named

2    Scott Schoen, correct?

3    A.  You asked me the person at the Thomas H. Lee Company?

4    Q.  Yes.

5    A.  Yes.

6    Q.  Throughout the work you did on this transaction you would

7    consult with Mr. Schoen on a regular basis, correct?

8    A.  That's correct.

9    Q.  So that you could keep him up to date on things that you

10   learned and that he could keep you up to date on things that he

11   learned?

12   A.  To the extent that we both deemed appropriate, yes.

13   Q.  Did Mr. Schoen ever tell you that he had a conversation

14   with Phil Bennett to get a Reader's Digest version or a general

15   businessman's understanding of where some of the proceeds of

16   the Lee transaction would go?

17   A.  I don't recall that, no.

18   Q.  Did Mr. Schoen ever tell you that Phil Bennett told him, in

19   such a conversation, that Tom Dittmer would be getting 75 to

20   $100 million?

21   A.  Not that I recall.

22   Q.  You testified, in response to some of Mr. Chernoff's

23   questions, that your expectation was that BAWAG was getting

24   10 percent of the proceeds, or approximately $191 million,

25   correct?

Capdcol3                    Westra - cross

1  A.  I testified that I understood that he would be getting

2  10 percent of the equity proceeds, yes.

3  Q.  And you also testified that you did not know that BAWAG

4  would be getting any hundreds of millions of dollars beyond

5  that, correct?

6  A.  Not exactly proceeds, no.

7  Q.  Did Mr. Schoen ever tell you that Mr. Bennett told him, in

8  a conversation between him and others, that BAWAG would be

9  getting an additional 400 to $500 million?

10  A.  I have no recollection of that.

11  Q.  And you and Mr. Schoen have a relationship that goes back

12  well before this particular deal, correct?

13  A.  That's correct.

14  Q.  And you've worked together on a number of transactions,

15  correct?

16  A.  Yes, we had.

17  Q.  And ordinarily he shares with you, or you expect him to

18  share with you information that he deems to be material,

19  correct?

20  A.  I would.

21  Q.  By the way, you testified that you were surprised to see

22  the amount of money that Mr. Grant was due to receive.

23  A.  That is correct.

24  Q.  Had you known that hundreds of millions of dollars were

25  going to BAWAG and 75 to $100 million were going to

Capdcol3                    Westra – cross

1   Mr. Dittmer, would you have expected Mr. Grant to receive less?

2   A.  I can't really state that because I don't know from where

3   those monies would have come.

4   Q.  If you knew they were coming from the proceeds, would you

5   have expected it to be less?

6   A.  Again, it would depend upon whether they were coming from

7   the proceeds otherwise payable to RGHI.

8   Q.  So if you knew the money was coming from RGHI's proceeds,

9   you would have expected Grant to receive less, correct?

10  A.  I want to make sure I understand your question.

11          Are you asking whether if I knew that the money --

12  first of all, if I knew that money was being paid to Dittmer

13  and to BAWAG and if I knew that money was coming from proceeds

14  otherwise due to RGHI, would I expect Mr. Grant, as a

15  50 percent owner of RGHI, to receive less?  Is that the

16  question?

17  Q.  Yes.

18  A.  I would expect him to receive less unless those monies were

19  coming from Mr. Bennett's share.

20  Q.  Now, separate from any conversation with Mr. Schoen, you

21  knew that Mr. Dittmer had an interest in the proceeds, correct?

22  A.  I did not.

23  Q.  Let me show you what's been marked for identification as

24  Defense Exhibit 403.

25          (Pause)

1        THE COURT:  Question?

2   Q.  This is an e-mail you received from Dan Gewirtz on

3   February 28, 2004, correct?

4   A.  That's correct.

5        MR. BACH:  We offer it.

6        MR. CHERNOFF:  Objection, your Honor.

7        THE COURT:  Yes, sir.

8        MR. CHERNOFF:  It is an e-mail that apparently

9   attaches a news article.  I don't know what the news article is

10  being offered for, whether it is true.

11       If Mr. Bach wanted to ask Mr. Westra questions about

12  whether he read this or whether he knew of it, that is fine,

13  but the news article, which I haven't read, should not be

14  admitted.

15       MR. BACH:  We will offer it for the purpose that he

16  received it and saw it, but we are not offering it for the

17  truth.

18       MR. CHERNOFF:  Your Honor, it is either in or out.  We

19  object to the article.

20       THE COURT:  What about the article, please, Mr. Bach?

21       MR. BACH:  We are not offering the contents of the

22  article for its truth.  We are offering it to show that

23  Mr. Westra received it and was aware of what the article said.

24       THE COURT:  How can you say that he was aware of what

25  it said if you don't ask him?

Capdcol3                        Westra - cross

1          MR. BACH:  I just want to ask him if he saw an article

2     that said this.  I am not going to ask him whether he believed

3     the article to be true or not.

4          THE COURT:  Mr. Chernoff.

5          MR. CHERNOFF:  Why don't we take it up after Mr. Bach

6     asks those questions because I don't think he had that

7     foundation.

8          MR. BACH:  I didn't hear that.

9          THE COURT:  Ask the questions as foundation is what

10     counsel is saying.

11          MR. BACH:  OK.

12          THE COURT:  All right.  Go ahead.

13     BY MR. BACH:

14     Q.  Mr. Westra, this is an e-mail addressed to you, Mr. Tabor

15     and Conrad Bahlke at the Weil, Gotshal law firm, correct?

16     A.  Yes.

17     Q.  And it was sent to you by Daniel Gewirtz on February 28,

18     2004, correct?

19     A.  That is correct.

20     Q.  And this was during the period in which your law firm had

21     been retained to look at Refco and conduct due diligence on it,

22     correct?

23     A.  Yes.

24     Q.  And as part of that due diligence your team was looking for

25     sources of public information that might shed light on Refco,

1   correct?

2   A.  That's correct.

3   Q.  And they would forward to you those pieces of public

4   information that they felt you should see, correct?

5   A.  That is correct.

6   Q.  Did you receive this?

7   A.  I don't have any recollection of it, no.

8   Q.  But it has your name on it, correct?

9   A.  It is.

10  Q.  You have no reason to doubt you received it, correct?

11  A.  As I said, I have no recollection either way.

12  Q.  Do you have any reason to doubt that you received it?

13  A.  I have no reason to doubt it.  I don't know.

14          MR. BACH:  We offer it.

15          THE COURT:  The other question you were supposed to

16  ask is whether or not he read it.

17          MR. BACH:  Ah.

18  Q.  Was it your habit to review material that your colleagues

19  conducting due diligence sent to you?

20  A.  Generally, yes.

21  Q.  Did you -- we offer it.

22          THE COURT:  That is not the question, is it?

23          MR. BACH:  I will ask the next question.

24  Q.  Did you review this article when you received it?

25  A.  Yes.  I said I have no recollection of ever receiving the

1    e-mail; therefore, I can't have any recollection of having read

2    the article.

3    Q.  But it was your habit, correct, to read these articles?

4    A.  As I testified earlier, it is generally my habit to read

5    e-mails that were sent to me by people doing diligence for me.

6             MR. BACH:  We offer it.

7             MR. CHERNOFF:  Your Honor, we have no objection if it

8    is admitted for the purpose only that it was sent to the

9    witness and that the article was not -- it is not being offered

10   for the truth of its content.

11            THE COURT:  The document, 403, is received, ladies and

12   gentlemen, for the purpose that it was sent to the witness.  It

13   is certainly not being received for the truth of the article

14   that is attached.

15            (Defendant's Exhibit 403 received in evidence)

16            MR. BACH:  It is being offered, Judge, consistent with

17   his habit for reviewing these types of materials.

18            THE COURT:  The same thing.

19            MR. BACH:  Can we put it up on the screen, please.

20            MR. CHERNOFF:  With the limiting instruction, I'm

21   sorry, that the witness didn't read the article.  If it is

22   being offered for the fact that it was sent to him, I don't

23   know why we are going through it.

24            THE COURT:  I think the jury has heard the witness'

25   testimony that he has no recollection of receiving the e-mail

2321

Capdcol3                          Westra – cross

1    or the article.

2              Let's move it along.

3              MR. SCHWARTZ:  Your Honor, may we have a very brief

4    sidebar?

5              THE COURT:  Sure.

6              Mr. Reporter, if you would.

7              (Continued on next page)

Capdcol3                         Westra - cross

1             (At the sidebar)

2             THE COURT:  Counsel.

3             MR. SCHWARTZ:  Your Honor, we have the testimony that

4    is admissible to prove that someone acted consistently with his

5    habit.  The fact that he has no recollection, which is what you

6    just referenced to the jury, is fine.  But we are entitled to

7    argue that he acted consistently with his habit, and I think

8    what you just charged the jury kind of takes that away from us.

9             The government is objecting to habit testimony.  The

10   rule of evidence specifically permits it for the fact --

11            THE COURT:  That question was just answered.

12            MR. SCHWARTZ:  But it is permitted for fact that he

13   read it.  And the government is saying -- he keeps jumping up

14   saying that he doesn't remember reading it.  We are not saying

15   he remembers reading it.  We are saying he read it.

16            The jury has been told he has no recollection by the

17   Court, as if that's what's important here.  His recollection is

18   not important here.

19            THE COURT:  I was only responding to the government

20   saying -- one of you, I don't remember, I assume it was

21   Mr. Chernoff saying that he had gap.  My point is the jury

22   heard it.

23            MR. SCHWARTZ:  I'm not in any way complaining about

24   what your Honor -- what your point was, your Honor, but I think

25   that the jury may have the misimpression that if he doesn't

Capdcol3                          Westra - cross

1    remember it, it doesn't matter anymore.  And I think they

2    should be told that habit testimony is admissible and they can

3    give it whatever weight they want.

4            THE COURT:  They are going to be told that at the end

5    and I'm certain Mr. Bach is going to get that in again as he

6    goes forward.  But he did -- the question was asked and the

7    answer was given, it was your habit, and that was after his

8    general habit was testified to.

9            MR. SCHWARTZ:  OK.

10           MR. CHERNOFF:  Your Honor, my only objection related

11   to what was just on this, that I am just wondering, in light of

12   the fact that we just had five hypotheticals and now we are

13   moving to questions about an article that the witness doesn't

14   remember that the defense put into evidence.  Now it is clear

15   they are going to argue it is habit to review it.  But all I am

16   saying, for the sake of moving this examination along --

17           MR. SCHWARTZ:  It is nice to have the sake of moving

18   the examination along.  We are entitle to cross-examine a

19   witness who just said that he didn't know that Dittmer was

20   getting paid --

21           THE COURT:  Kids, let's not.  Off the record.

22           (Discussion off the record)

23           (Continued on next page)

24

25

1            (In open court)

2            THE COURT:  Mr. Bach.

3   BY MR. BACH:

4   Q.  Dan Gewirtz writes:  "Gentlemen, Ed Domingo found an

5   article on Refco you will find interesting."

6            Do you see that?

7   A.  Yes.

8   Q.  And let's take a look at page 407, and blow up the first

9   paragraph under the word "body."

10           It says:  "Tom Dittmer, the widely known and

11  controversial figure who has been at the center of the futures

12  industry as head of Refco Group Limited for more than 20 years,

13  has given up his 51 percent ownership stake in the privately

14  held firm for what one source described as a 'carrier' interest

15  that would provide him a payout should Refco sell itself or

16  issue shares in a public offering."

17           Did I read that correctly?

18  A.  You did.

19  Q.  And, Mr. Westra, if you had acted consistently with your

20  habit, this is an article that you would have read, correct?

21  A.  That's correct.

22  Q.  Let's switch topics.

23           You told the jury about a conversation you had with

24  Joe Collins in which Mr. Collins communicated to you that

25  Mr. Grant had a desire to stay in the deal, correct?

Capdcol3                          Westra - cross

1    A.  Correct.

2    Q.  And Mr. Grant was one of the owners of Refco through RGHI,

3    correct?

4    A.  That's correct.

5    Q.  And what Mr. Collins had conveyed to you was that Mr. Grant

6    wanted to be an ongoing equity participant, correct?

7    A.  That's correct.

8    Q.  Meaning he wanted to have a piece of the rollover equity in

9    the New Refco just like Phil Bennett did, correct?

10   A.  Not of the same magnitude but he wanted an ongoing equity

11   interest.

12   Q.  Yes.  Not of the same magnitude, but of the same type, that

13   is, a piece of rollover equity, correct?

14   A.  I don't think it was ever specified as to what the

15   investment would be, but, conceptually, yes, he would have a

16   piece of the ongoing entity.

17   Q.  And you understood that to be as an ongoing equity

18   participant, correct?

19   A.  Correct.

20   Q.  He wasn't asking to make a cash investment in Refco,

21   correct?

22   A.  I don't recall how the investment would have been funded.

23   Q.  OK.  And this was brought up at the beginning of the

24   discussions about how this deal would take place, correct?

25   A.  I don't recall when it was brought up.

Capdcol3                    Westra - cross

1    Q.  But this was a time when you were discussing with

2    Mr. Collins and Mr. Bennett what the terms of this deal would

3    be, correct?

4    A.  Well, it was obviously brought up before the agreement was

5    signed.  As I testified, I don't recall when.

6    Q.  So you don't recall if this conversation was at the

7    beginning, when people were discussing what the basic terms of

8    the deal would be, or later as the deal progressed; you have no

9    memory of that?

10   A.  No.  No, I don't.

11   Q.  And no one -- no one at Mayer Brown ever told you that Tone

12   Grant was going to get hundreds of millions of dollars in cash

13   out of this deal, correct?

14   A.  That's correct.

15   Q.  This conversation was about an equity interest, correct?

16   A.  That's correct.

17   Q.  And the leveraged buyout transaction that we've been

18   discussing closed on August 5th in 2004, is that correct?

19   A.  That's correct.

20   Q.  And the day before, on August 4th, there was an event known

21   as a preclosing, correct?

22   A.  That is correct.

23   Q.  And that's where important documents are laid out on tables

24   so that the lawyers and parties can look at them and people can

25   sign what they have to sign, correct?

Capdcol3                    Westra - cross

1    A.  That's correct.

2    Q.  And you were at that preclosing event, correct?

3    A.  For part of it, yes.

4    Q.  And when you were there for part of it, you ran into a man

5    named Tone Grant, right?

6    A.  Yes, I did.

7    Q.  And you and Mr. Grant have a common interest in Ivy League

8    football, correct?

9    A.  We do.

10   Q.  And you and Mr. Grant had a discussion about Ivy League

11   football at that event, correct?

12   A.  We did.

13   Q.  And there is no doubt in your mind that Mr. Grant was

14   actually at that closing where documents were laid out to be

15   signed, correct?

16   A.  He was certainly there for part of that preclosing.

17   Q.  OK.  And after that you and Mr. Grant went out for dinner

18   together that night, correct?

19   A.  No.

20   Q.  The next night?

21   A.  Pardon me?

22   Q.  The next night.

23   A.  No.

24   Q.  When did you and Mr. Grant go out to dinner?

25   A.  It was sometime after closing.

Capdcol3                    Westra - cross

1  Q.  OK.  But you arranged at the closing to meet each other for

2  dinner?

3  A.  I don't think we arranged it at the closing.  I think it

4  was sometime after that night.  Actually, it was dinner in

5  Chicago, not New York.

6  Q.  OK.  And after that closing, all of the basic deal

7  documents were put together in something called a closing

8  binder, is that right?

9  A.  That's correct.

10  Q.  And it was lawyers at your firm who put that together,

11  correct?

12  A.  It was lawyers at our firm and Mayer Brown.

13  Q.  Your firm was the -- represented the buyer in this

14  transaction, correct?

15  A.  That's correct.

16  Q.  And typically it is the buyer who puts together the closing

17  binder, correct?

18  A.  As I say, it is a collective exercise of both -- of counsel

19  on both sides of the transaction.

20  Q.  But in any event, in that closing binder was a copy of the

21  stock Purchase Agreement that was signed by Phillip Bennett, on

22  the one hand, and Mr. Grant, on the other hand, correct?

23  A.  That is correct.

24  Q.  And your law firm certainly had possession of that closing

25  binder and all the materials inside, correct?

1   A.  You are asking me if we had possession of the binder after

2   it was assembled, or are you asking if we had possession of the

3   agreement to which you are referring?

4   Q.  You didn't have possession of the binder before the binder

5   was assembled, correct?

6   A.  No.  I'm trying to answer your question.

7           Are you asking if we had possession of the binder

8   after it was prepared?

9   Q.  Yes.  After the binder was put together and prepared, your

10  law firm had a copy of it, correct?

11  A.  Correct.

12  Q.  Let me show you what's been marked for identification as

13  Defense Exhibit 1010.

14          Mr. Westra, is this a copy of the cover of that binder

15  and its table of contents?

16  A.  It appears to be.

17          MR. BACH:  We offer it.

18          MR. CHERNOFF:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 1010 received in evidence)

21          MR. BACH:  Can we pull it up?

22  Q.  On the cover it says, "Acquisition of New Refco Group

23  Limited, August 5, 2004."  Do you see that?

24  A.  Yes.

25  Q.  At the top it lists your client, Thomas H. Lee Partners,

1    correct?

2    A.   Correct.

3    Q.   Can we turn to Bates page 006.  And blow up Roman 4 and

4    just under it.

5         Roman numeral 4 refers to the Tone Grant purchase

6    transactions, correct?

7    A.   Yes.

8    Q.   And the first item on that list is "Stock Purchase

9    Agreement, dated as of August 2, 2004, by and between Phillip

10   R. Bennett and Tone N. Grant," correct?

11   A.   That's correct.

12   Q.   There is no doubt in your mind that your law firm received

13   this binder and this document, correct?

14   A.   You're asking me if there is any doubt in my mind that my

15   law firm had the binder with this in it.  The answer to that is

16   no, I certainly did.

17   Q.   Sir, can we blow up down at the bottom of the page, blow up

18   the footer.

19        This is a Weil, Gotshal & Manges footer, correct?

20   A.   Yes.

21   Q.   Your law firm prepared the table of contents for this,

22   correct?

23   A.   It appears to have.

24   Q.   Now, after -- you can take that down.

25        After the LBO closed, your law firm went on to

Capdcol3                    Westra – cross

1   represent the New Refco entity in connection with an initial

2   public offering of stock, correct?

3   A.  As I testified earlier, we were co-counsel with Mayer

4   Brown.

5   Q.  But you were the lead counsel on that, correct?

6   A.  We were co-counsel.  I would say we probably had the

7   greater responsibility.

8   Q.  Is it not fair to say, sir, that your firm took the lead on

9   the initial public offering?

10  A.  I just testified that we were co-counsel with Mayer Brown

11  and that we probably had the primary responsibility.

12  Q.  You took the lead, right?

13  A.  I don't know how else I could say it.

14  Q.  Mr. Westra, you testified at a prior proceeding in

15  March 2009 under oath, correct?

16  A.  I don't recall the exact date to which you are referring.

17  I had certainly testified in prior proceedings before.

18  Q.  And you were asked this question and gave --

19          MR. CHERNOFF:  Can we have a sidebar, your Honor?

20          THE COURT:  Yes.

21          (Continued on next page)

22

23

24

25

Capdcol3                        Westra - cross

1           (At the sidebar)

2           MR. BACH:  (Indicating to the Court).

3           THE COURT:  Counsel.

4           MR. CHERNOFF:  Your Honor, I am really sorry to have

5    to ask for a sidebar on this but I've got to put my foot down.

6    This is not an inconsistent statement.  He asked the witness

7    three times were you the lead counsel.  He said we were

8    co-counsel, we had the primary responsibility.

9           Now Mr. Bach wants to offer this for an inconsistent

10   statement that it appears he said we took the lead?  The

11   witness never said we were the lead counsel in any prior

12   proceeding that I am aware of.  He said we are co-counsel.  He

13   either took the lead or he had primary responsible is what he

14   just said.  This is not an inconsistent statement, and I can't

15   believe that Mr. Bach is going to read this to the jury.  It is

16   improper.

17          THE COURT:  What about the part where he says we were

18   co-counsel?

19          MR. BACH:  I will read that to him, too, but he is

20   denying that he took the lead.

21          MR. CHERNOFF:  He was asked, were you lead counsel.

22          MR. BACH:  Do you want me to ask him if he took the

23   lead?  I will rephrase the question.

24          MR. CHERNOFF:  No, we should move on.  He has already

25   answered that he took primary responsibility.  This is the most

Capdcol3                         Westra – cross

1    silly thing to have happening on further questioning of this

2    witness or even a sidebar about.

3              THE COURT:  I think it is just –– I don't know why we

4    are doing this.  I will let you read it but you have to read

5    the whole thing.

6              MR. BACH:  Absolutely.

7              THE COURT:  Let's go.

8              (Continued on next page)

Capdcol3                         Westra - cross

1              (In open court)

2    BY MR. BACH:

3    Q.  At a prior proceeding in May 2009, you were asked the

4    following questions and gave the following answers:

5    "Q  After the LBO, your law firm continued to do work in

6    connection with the Refco acquisition, correct?

7    "A  Both me and Mayer Brown did, yes.

8    "Q  Your firm took lead on the initial public offering of stock

9    about a year later, right?

10   "A  We took the lead.  We were co-counsel.  We took the lead.

11   That's correct."

12            MR. CHERNOFF:  I just couldn't hear Mr. Bach when he

13   said "we were co-counsel."

14            THE COURT:  I told you you had to read the whole

15   thing.

16            MR. BACH:  I read the whole thing and he read part of

17   it again.

18   BY MR. BACH:

19   Q.  Your firm also took the lead in the bond offering that was

20   conducted at about the same time as the LBO, correct?

21   A.  Well, you've just made a presumption in what you've said.

22   As I have said before, the IPO, we were co-counsel.  We took

23   the primary responsibility.  If you want to call that lead, I

24   don't see the distinction but that is fine.

25   Q.  You called it the lead, correct?

Capdcol3                    Westra - cross

1    A.  I'm simply telling you that I see no distinction between

2    the two statements I have made.

3          With respect to the bond offering, we were counsel to

4    the company in that, too, yes.

5    Q.  And you took the lead in that -- your firm took the lead in

6    that, too, correct?

7    A.  We were primarily responsible for that transaction as well.

8    Q.  At that same prior proceeding you were asked this question

9    and you gave this answer under oath:

10   "Q  Your firm took the lead in a bond offering that was related

11   to the LBO, correct?

12   "A  Yes, they did."

13         Were you asked that question and did you give that

14   answer?

15   A.  If it is the testimony, the answer is yes.

16         As I just said, I see no distinction between saying we

17   were primarily responsible and we took the lead.  It means the

18   same thing.

19   Q.  Now, in connection with your work, your firm's work on the

20   leveraged buyout transaction, your firm did nothing to cause

21   that Tone Grant stock Purchase Agreement to be disclosed to the

22   public bond investors, correct?

23   A.  That is correct.  We were not aware of it.

24   Q.  And in connection with the IPO transaction, your firm did

25   nothing to cause the disclosure of that Tone Grant stock

1   Purchase Agreement to the public investors, correct?

2   A.   The answer is the same.  We did not -- we weren't aware of

3   it.

4   Q.   But it was in the closing binder that was in your office

5   and of which your law firm prepared the table of contents,

6   correct?

7   A.   Along with 90 other documents and it was in contravention

8   of representations and warranties in the Purchase Agreement.

9          MR. BACH:  I move to strike the last answer.

10          THE COURT:  I'll permit it.

11   BY MR. BACH:

12   Q.   Mr. Westra, you testified that you reviewed a flow of funds

13   memorandum in connection with this transaction, correct?

14   A.   Correct.

15   Q.   And the government showed you a different flow of funds

16   memorandum that showed payments going to an entity called

17   Desana?

18   A.   That's correct.

19   Q.   And also listed an overdraft, correct?

20   A.   Correct.

21   Q.   And you said that that was a flow of funds memorandum that

22   you didn't see, correct?

23   A.   I had said I did not see it until after the collapse of

24   Refco.

25   Q.   Right.  While you were working on the deal at the time,

1    this is a document that you did not see, correct?

2    A.   Not to my recollection, no.

3    Q.   And you don't expect to see, Mr. Westra, flow of funds

4    memos for what a parent holding company does with proceeds of

5    the sale after it receives them, correct?

6    A.   Typically, no.

7    Q.   And -- typically no.   Thank you.

8              In connection with the bond offering, did your firm

9    cause copies of Refco's financial statements to be disclosed to

10   the public?

11   A.   Well, the company caused them to be disclosed.

12   Q.   And for how many years back?

13   A.   I don't recall but I presume it was three years back.

14   Q.   And based on your experience, isn't it a fact that three

15   years' worth of financial statements are always disclosed in

16   connection with public bond offerings?

17   A.   Yes.

18   Q.   And based on your experience, isn't it a fact that three

19   years' worth of financial statements are always disclosed in

20   connection with an initial public offering?

21   A.   If the company has been around for three years, yes.

22   Q.   As part of your due diligence, did you look at litigations

23   and enforcement matters that Refco was involved in?

24   A.   Some of them, yes.

25   Q.   Was one of the matters that you looked at the Sedona

Capdcol3                    Westra – cross

1    matter?

2    A.   Yes.

3    Q.   And you and your firm wanted to learn more about that,

4    correct?

5    A.   That's correct.

6    Q.   And you had conversations with Joe Collins about it,

7    correct?

8    A.   We did.

9    Q.   And you had conversations with Dennis Klejna about it,

10   correct?

11   A.   That's correct.

12   Q.   And through your conversations with Mr. Collins, you

13   learned that Refco, as an entity, had some exposure in the

14   Sedona investigation, correct?

15   A.   That's correct.

16   Q.   Meaning it could be asked to pay a penalty, correct?

17   A.   Among other things.

18   Q.   Meaning it could be found to have engaged in a violation of

19   the securities laws, correct?

20   A.   That's correct.

21   Q.   Mr. Collins made that clear to you, correct?

22            MR. CHERNOFF:  Objection.

23            THE COURT:  Sustained.

24   Q.   You discussed that with Mr. Collins, correct?

25            MR. CHERNOFF:  Hearsay.

Capdcol3                          Westra - cross

1    BY MR. BACH:

2    Q.  You discussed that with Mr. Collins?

3           THE COURT:  I'm sorry, Mr. Bach.

4           MR. BACH:  I asked if he discussed something with

5    Mr. Collins.

6           THE COURT:  And the objection was hearsay.

7           MR. BACH:  It goes to Mr. Collins' state of mind.

8           THE COURT:  Would you two talk off the record, please,

9    for a minute.

10           (Counsel conferred)

11    BY MR. BACH:

12    Q.  You asked Mr. Collins questions about the Sedona

13    investigation?

14    A.  Yes.

15    Q.  And he responded to your questions, correct?

16    A.  Yes.

17    Q.  And you learned that there were individuals --

18           MR. CHERNOFF:  Objection.

19    Q.  You learned in the course your due diligence --

20           MR. CHERNOFF:  Objection.

21    Q.  -- that there were individuals --

22           MR. CHERNOFF:  Mr. Bach has just tried to shield.  It

23    calls for hearsay and in the course of due diligence, that is a

24    problem.

25           THE COURT:  Why is this not hearsay?

Capdcol3                    Westra - cross

1            MR. BACH:  Because this was explored by looking at his

2    documents in his due diligence.  That these were facts --

3            THE COURT:  Why is it not hearsay?

4            MR. BACH:  I don't see how --

5            MR. CHERNOFF:  The documents are also hearsay.  I

6    don't know what the witness has reviewed or what this is about,

7    but it clearly calls for hearsay.

8            THE COURT:  It sounds like it is hearsay.

9            MR. BACH:  Can we have a sidebar about it?

10           THE COURT:  Oh, sure.

11           MR. BACH:  I am engaged in --

12           THE COURT:  What?  Yes?

13           MR. BACH:  Yes.

14           THE COURT:  All right.  Let's go.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Capdcol3                         Westra - cross

1           (At the sidebar)

2           MR. BACH:  I think I can do this -- I'll try and do it

3      quickly without getting into the contents of the conversations,

4      but I do want to show certain conversations occurred.  And I'll

5      try and honor Mr. Chernoff's concerns by not getting into the

6      content.  Although I think all of this goes to Mr. Collins'

7      state of mind because --

8           THE COURT:  But the state of mind can't be that -- I

9      don't see how you establish through hearsay the fact that there

10     were certain, let's say, individuals who were going to be

11     deposed in the Sedona matter and then somehow attribute that

12     hearsay fact to Mr. Collins.

13          MR. BACH:  Because I think the issue --

14          THE COURT:  What is it you are asking this witness?

15          MR. BACH:  The issue -- I think one of the issues

16     that's going to come up in this case is whether information was

17     communicated to Weil, Gotshal about the risks associated with

18     the Sedona investigation by Mr. Collins or whether they were

19     misled about it.  And I am trying to make clear that there was

20     an open book between Mr. Collins and Weil Gotshal --

21          THE COURT:  But it doesn't matter what you are trying

22     to make clear.  If you are asking for hearsay, you can't do it.

23          MR. BACH:  I won't ask about things that were said; I

24     will just ask if conversations took place.

25          THE COURT:  Why is that different?

1          MR. BACH:  Because I am not going to elicit anything

2     that was said.  I am just going to elicit events.

3          THE COURT:  Conversations that took place about what?

4          MR. BACH:  About due diligence connected to this

5     investigation.  I am going to say you had a conversation with

6     Mr. Collins.  Documents were provided for your review.  I need

7     to show what the conduct was here.

8          MR. SCHWARTZ:  It is more than that, your Honor.  The

9     argument is if the government is going to make the argument

10    that he misled him about the Sedona investigation while he was

11    with Weil, Gotshal, the fact that Weil, Gotshal communicates to

12    him things that he knows already about the Sedona investigation

13    that are the material events about the Sedona investigation,

14    for example, that individuals are being investigated, that

15    disproves the government's case that he misled them because he

16    knew they already knew it.  There are things that he doesn't

17    have to tell them if he hears that they know it.  That's not

18    hearsay.

19         MR. CHERNOFF:  Your Honor, Sedona was not part of this

20    witness' examination, so I don't know what Mr. --

21         MR. BACH:  It is coming up through his colleague,

22    Mr. Tabor.

23         THE COURT:  What's that got to do with this guy's

24    examination?

25         MR. SCHWARTZ:  Because we don't get him back, Judge.

1    They are not going to bring him back.  And if they are going to

2    prove through Tabor that Tabor felt misled about material facts

3    about Sedona, the fact that he and Mr. Collins had

4    conversations about those very things and Collins could

5    understand that he already knew things about Sedona through his

6    due diligence means that there was no misrepresentations.

7           MR. CHERNOFF:  Let me cut this short, your Honor, by

8    saying that if they get into that in connection with Mr. Tabor,

9    if Mr. Westra has competent evidence on that, we will

10   absolutely bring him back.

11          THE COURT:  All right.

12          MR. CHERNOFF:  This discussion of what he learns in

13   due diligence, he had conversations, he reviewed documents, and

14   then he knew that it was --

15          MR. BACH:  I won't do the and then you knew.  We will

16   preserve our objection, but I am entitled to inquire about

17   actions he took in the course of his due diligence.

18          THE COURT:  What actions were you going to ask him?

19          MR. BACH:  Did you review documents?  Did you review

20   correspondence?

21          THE COURT:  We already know that.

22          MR. BACH:  No, we don't know that.

23          MR. CHERNOFF:  Not about Sedona we don't.

24          THE COURT:  OK.  So you say, did you review documents

25   and correspondence about Sedona.  Then what?

1          MR. BACH:  I then am going to ask him did you speak to

2    this person about it, this person about it and this person

3    about it, and then I am done.

4          THE COURT:  All right.  If that is what you want,

5    let's go.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Mr. Bach.

3              MR. BACH:  Thank you.

4    BY MR. BACH:

5    Q.  Mr. Westra, in the course of your due diligence, you

6    reviewed a correspondence file maintained by Mayer Brown that

7    included its correspondence with the SEC about the Sedona

8    investigation, correct?

9    A.  Yes.

10   Q.  And in addition to speaking to Mr. Collins and Mr. Klejna

11   about the Sedona investigation, you spoke to Bill McLucas at

12   Wilmer Cutler law firm about the investigation, correct?

13   A.  No.

14   Q.  A colleague of yours at the Weil, Gotshal firm spoke to

15   Mr. McLucas, correct?

16   A.  Yes.

17   Q.  And you and your colleague Mr. Tabor reported to

18   Mr. Collins the results of that call, correct?

19   A.  I don't recall.

20   Q.  The night before the Lee deal closed, you and Jay Tabor

21   called Joe Collins and related to him the contents of the call

22   that a Weil, Gotshal partner had with Mr. McLucas at the firm,

23   correct?

24   A.  I don't recall that conversation.

25   Q.  You also had a source within the SEC that you contacted for

Capdcol3                    Westra - cross

1  information about the Sedona investigation, correct?

2  A.  Not to my knowledge.

3  Q.  You contacted a former SEC commissioner about the Sedona

4  investigation, correct?

5  A.  Are you referring to the gentleman who was our partner at

6  Weil, Gotshal?

7  Q.  Yes.

8  A.  Yes.

9  Q.  That is Mr. Sporkin, correct?

10  A.  Correct.

11  Q.  And your client, TH Lee, had a source within the SEC,

12  correct?

13  A.  Not that I recall.

14  Q.  Let me show you what's been marked as Defendant's Exhibit

15  420.

16          (Pause)

17          This is an e-mail that you sent to your partner Tom

18  Roberts on June 3, 2004, correct?

19  A.  That's correct.

20          MR. BACH:  We offer it.

21  A.  Pardon me?

22          MR. BACH:  We offer it.

23          THE COURT:  I'm sorry.  I think that is directed to

24  me.

25          THE WITNESS:  I'm sorry.

1          MR. CHERNOFF:  No objection, your Honor.

2          THE COURT:  Received.

3          (Defendant's Exhibit 420 received in evidence)

4          MR. BACH:  Can we bring that up?  Blow it up.

5     Q.  If you look at the top, that is an e-mail that you sent,

6     correct?

7     A.  That's correct.

8     Q.  And it's going to Tom Roberts, who is your partner who had

9     a relationship with Mr. McLucas, correct?

10    A.  Correct.

11    Q.  And it is also to Jay Tabor, correct?

12    A.  That's correct.

13         MR. BACH:  And let's blow up the first sentence of the

14    text.

15         It says:  "Lee is getting pretty close with Refco and

16    we expect to Mon." (Monday).  "We have gotten reasonably

17    comfortable with the SEC inquiry we discussed before in part

18    because of a source within the SEC Lee was able to access."

19         Do you see that?

20    A.  I do.

21    Q.  You can bring that down.

22         You also testified, Mr. Westra, that in connection

23    with your work on this transaction, you reviewed financial

24    statements prepared by Refco, correct?

25    A.  Correct.

Capdcol3                    Westra - cross

1   Q.  And you looked at some of the footnotes relating to

2   related-party transactions, correct?

3   A.  That's correct.

4   Q.  And when you look at footnotes about related-party

5   transactions, you rely on accountants and outside auditors to

6   make sure those footnotes are fair and accurate and reported in

7   accordance with generally accepted accounting principles,

8   correct?

9   A.  That's correct.

10  Q.  And your client, Thomas H. Lee, had engaged KPMG, a large

11  accounting firm, to do accounting due diligence in this case,

12  correct?

13  A.  That's correct.

14  Q.  And you knew than they had gotten together with Refco's

15  accountants, the Grant Thornton firm, to look at the accounting

16  work that had been done for Refco, correct?

17  A.  That's correct.

18  Q.  Now, when you talked about how you convened a board meeting

19  in October 2005, at about the time of Refco's -- news about

20  Refco became public, correct?

21  A.  I didn't convene a meeting.  A meeting was convened.

22  Q.  A meeting was convened and you attended, correct?

23  A.  Correct.

24  Q.  Let me show you what's been marked Defense Exhibit 232.

25          (Pause)

1        THE COURT:  Question.

2   BY MR. BACH:

3   Q.  Question:  This is a draft press release that your firm

4   circulated in advance of the board meeting, correct?

5   A.  This looks like it.  Let me just read who the parties are a

6   moment, please.

7   Q.  Sure.

8   A.  Yes, that's correct.

9        MR. BACH:  We offer it.

10       MR. CHERNOFF:  No objection.

11       THE COURT:  Received.

12       (Defendant's Exhibit 232 received in evidence)

13       MR. BACH:  Can we put it up.  Blow up the middle

14  paragraph that says "please find below."

15  Q.  Do you see how it refers to a 4:00 board meeting?

16  A.  Yes.

17  Q.  And then -- and that's on October 9th, correct?  If you

18  look at --

19  A.  The middle of the sentence, October 9th, Sunday, yes.

20  Q.  And if you go to the next paragraph, it says "Privileged

21  and confidential, October 9th, 2:27."

22       What we have here is a draft press release that your

23  firm has prepared in anticipation of announcing to the public

24  the problems at Refco, correct?

25  A.  That's correct.

1   Q.  And, by the way, this draft press release says nothing

2   about the impact of the problems on Refco's financial

3   statements, correct?

4   A.  I'm sorry, you're asking whether -- I didn't understand the

5   question, I'm sorry.  Repeat that, please?

6   Q.  The press release does not articulate any impact of the

7   problems that have been discovered on Refco's financial

8   statements, correct?

9   A.  Let me just read a moment, please.  It states that the

10  company will likely delay filing its quarterly financial

11  report, and it goes on to say that it cannot estimate when its

12  report will be due because the investigation is ongoing.

13          So to answer your question specifically, there is no

14  specific reference to the effect upon the financial statements,

15  but there is a clear indication the company's financial

16  statements are being closely examined, and they may not be

17  accurate.

18  Q.  And what it says is that the date, the schedule is going to

19  be extended, correct?  The financials may not be done?

20  A.  It says it cannot state when the filing will be made

21  because they don't know what statement they will provide.

22  Q.  In fact, it wasn't until the 4:00 board meeting that a

23  determination was going to be made that the events at Refco had

24  an impact on its financial?

25  A.  That's not true at all.

CAPPCOL4                          Westra - cross

1    Q.  When you started working on this trans -- Sir, in press

2    releases to the public, you have to disclose all material

3    information?

4    A.  That's correct.

5    Q.  But you knew that there was going to impact -- If you knew

6    at the time that there was going to be an impact on Refco's

7    financial statements, that would have been included in your

8    firm's press release, correct?

9    A.  This press release makes it very clear that the company's

10   financial statements are going to be in disorder, and we don't

11   know if we're going to be able to file our 10Q.

12   Q.  It says that, but it doesn't say that there is going to be

13   any material impact on the financial statements, correct?

14   A.  I think that anyone who read this press release would

15   understand that.

16   Q.  By the time you got to the -- withdrawn.

17         When you started working on this transaction, you had

18   already had a career that involved about 30 leveraged buyout

19   transactions, correct?

20   A.  No, I did many more than that.

21   Q.  Many more than that.  You had been a senior partner in a

22   law firm, correct?

23   A.  Yes.

24   Q.  In fact, you were on Weil Gotshal's management committee?

25         MR. CHERNOFF:  Can we move this along, your Honor?

1          THE COURT:  Let's go, Mr. Bach, please.

2          MR. BACH:  I'm finishing.  I'm done.

3   Q.  And you considered -- You had an opportunity to meet and

4   interact with Mr. Bennett throughout your work, correct?

5   A.  Yes, I did.

6   Q.  And you considered him to be the most impressive chief

7   executive officer that you had ever met in your entire career,

8   until October 2005, correct?

9   A.  As I've testified before, I found him to be a very

10  impressive person, whether he was the most impressive person, I

11  don't know what I said before, but he was a very, very

12  impressive CEO.

13         MR. BACH:  Thank you.

14         THE COURT:  Redirect counsel, please?

15         MR. CHERNOFF:  The government waives redirect.  Thank

16  you, your Honor.

17         THE COURT:  Thank you.  You may step down, sir.

18  Counsel, ladies and gentlemen, we'll take a lunch break now.

19  Would you follow the normal instruction -- I'm going to let the

20  witness run out ahead.

21         THE WITNESS:  Thank you very much.  I appreciate that.

22         THE COURT:  I think he's going to the airplane.  Run,

23  run, run.

24         Please follow the normal instructions.  Please leave

25  your folders on the chairs, take your pads into the jury room.

CAPPCOL4                       Westra – cross

1    Don't discuss the case among yourselves.  Do not do any

2    research.  Do not get rained on.  Please return at 2:15.  Enjoy

3    your lunch.  I'll look for a weather report.  Thank you, ladies

4    and gentlemen.

5              (Jury exits)

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   A F T E R N O O N   S E S S I O N

2                            2:20 P.M.

3           THE COURT:  Good afternoon, counsel.  May we bring the

4      jurors in.

5           MR. CHERNOFF:  Yes, our witness is, of course, here.

6           THE COURT:  Thank you.

7           (Jury enters)

8           THE COURT:  Welcome back, ladies and gentlemen.  It

9      didn't look like you got rained on.

10          JUROR:  Not at all.

11          THE COURT:  Does it look like it's going to rain?

12          JUROR:  Yes.

13          JUROR:  No.

14          JUROR:  What do you mean "looks like"?

15          JUROR:  It's damp.

16          THE COURT:  That's unattractive.  All right.  Why

17     don't you be seated.  We continue with the government's case.

18          MR. CHERNOFF:  Your Honor, the government calls Jay

19     Tabor.

20          THE COURT:  Thank you.

21      RUSSELL JAY TABOR,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24          THE COURT:  Mr. Chernoff?

25          MR. CHERNOFF:  Thank you, your Honor.

CAPPCOL4                          Westra - cross

1    DIRECT EXAMINATION

2    BY MR. CHERNOFF:

3    Q.  Good afternoon, Mr. Tabor.

4    A.  Good afternoon.

5    Q.  Sir, what do you do for a living?

6    A.  I'm a lawyer.

7    Q.  Where did you go to law school?

8    A.  Harvard.

9    Q.  And prior to that, where did you go to college?

10   A.  Oklahoma Christian.

11   Q.  What did you major in there?

12   A.  I was an American studies major, which is a combination of

13   history and political science.

14   Q.  And what year did you graduate from law school?

15   A.  1990 from law school.

16   Q.  What kind of law did you start to practice after you

17   graduated?

18   A.  Corporate, mergers and acquisitions, private equity.

19   Q.  And did you spend time at the law firm Weil Gotshal as an

20   associate lawyer?

21   A.  Yes, I did.

22   Q.  How many years did you work there as an associate?

23   A.  In total, about three-and-a-half years.

24   Q.  What office of the Weil firm were you working in?

25   A.  The Dallas office.

CAPPCOL4                          Tabor - direct

1    Q.  And did there come a time that you came back to the Weil

2    firm as a partner in the firm?

3    A.  When I actually came back, I was still technically an

4    associate for about half a year, and then I made partner.

5    Q.  And how many years, sir, have you now been a partner at the

6    Weil firm?

7    A.  It will be 14 years as of the end of this year.

8    Q.  Do you still work out of the Dallas office?

9    A.  I do.

10   Q.  What is the primary concentration of your practice there?

11   A.  I concentrate really on mergers and acquisitions and

12   private equity.

13   Q.  In your work on mergers and acquisitions and private equity

14   have you, sir, represented a client called Thomas H. Lee

15   Partners?

16   A.  Yes, I have.

17   Q.  When was the first time you represented Thomas H. Lee?

18   A.  In 2004.

19   Q.  And how did that come about?

20   A.  Jim Westra, who was at the time a senior partner in the

21   firm's Boston office, called me, I believe, in February of 2004

22   and asked me if I could get involved in a transaction that had

23   already been going to some extent.

24   Q.  And what was the transaction that you were asked to work on

25   at the time?

CAPPCOL4                         Tabor - direct

1   A.   It was the potential acquisition of Refco by Thomas Lee

2   Partners.

3   Q.   And what form was that acquisition going to take?

4   A.   Well, it was going to be a leveraged buyout, as we call it.

5   Q.   And did you work on the leveraged buyout at Refco until it

6   was completed?

7   A.   Yes.

8   Q.   What was your role as a partner in the firm working on this

9   transaction?

10  A.   Well, I would say I was the primary day-to-day partner.

11  Jim Westra was the senior, very strategic guy.  When there were

12  big strategic decisions to be made, he participated.  He

13  participated in some key negotiations.  I was the guy who,

14  day-to-day, did the partner work necessary to get the deal

15  done.

16  Q.   And in doing that work, did you participate in the due

17  diligence the firm did?

18  A.   Yes, I did.

19  Q.   And did you also participate in negotiating the various

20  contracts and letters that were entered into between Refco and

21  Thomas H. Lee?

22  A.   Yes, I did.

23  Q.   Was Refco represented by a law firm in connection with

24  these events and transaction?

25  A.   Yes.

1    Q.   Which firm?

2    A.   Mayer Brown.

3    Q.   And who was the lead lawyer for Mayer Brown in charge of

4    the representation?

5    A.   It was Joe Collins.

6    Q.   Did you interact with Mr. Collins?

7    A.   Yes.

8    Q.   Did you communicate with him by phone?

9    A.   Yes.

10   Q.   And by e-mail?

11   A.   Yes.

12   Q.   And did you meet with him in person?

13   A.   On occasion, yes.

14   Q.   Based on your interactions with Mr. Collins, how would you

15   describe his role beyond the leader of the team for Mayer

16   Brown?

17   A.   Well, in addition to being the leader of the team, sort of

18   the Jim Westra role, I would say he also played, at least early

19   on in the transaction, the day-to-day lead partner role, sort

20   of like I did, up through the time that we signed the letter of

21   intent when he brought some other partners in to help.

22   Q.   And did you come to develop an understanding as to

23   Mr. Collins' relationship with his client, Refco?

24   A.   Yes.  My understanding was he had worked for quite a few

25   years for Refco and had done a bunch of things for them; so he

1   was very familiar with Refco.

2   Q.  And, by the way, did you interact with other lawyers from

3   Mayer Brown in the course of this work that you can recall?

4   A.  I did.  Not at first, but once we got to the letter of

5   intent stage and were trying to negotiate the final agreement,

6   I did interact with some others.

7   Q.  Who do you recall working with from Mayer Brown on this

8   deal?

9   A.  Angela Lang was a partner who was brought in, and I think

10  Gail Saracco also.

11  Q.  And do you have an understanding of what the specialty of

12  Ms. Lang was?

13  A.  I believe she was a mergers and acquisitions lawyer.

14  Q.  And Miss Saracco?

15  A.  I believe the same.

16  Q.  And so how would you compare Mr. Collins' role in the

17  transactions to Ms. Lang and Ms. Saracco's?

18  A.  Well, early on in the transaction, he was the -- as far as

19  I could tell, the sole Mayer Brown partner who was involved.

20  So he was doing day-to-day stuff, as well as more strategic

21  stuff.

22          Once we actually had a letter of intent signed and

23  were working to sign the definitive contract, I would say he

24  stepped into more of a strategic role, and Ms. Lang and

25  Ms. Saracco did more of the day-to-day work in terms of trying

1    to hammer out the actual terms of the agreement.

2    Q.  Now, based on your observations of Mr. Collins at work,

3    would you say that he had a hands-on or a hands-off style of

4    work?

5    A.  I'd say he was very hands on, which we knew was helpful in

6    trying to get this deal done.

7    Q.  And were there other lawyers for Refco, outside of the

8    Mayer Brown attorneys, who had some involvement in this

9    transaction?

10   A.  There was.  The company's in-house general counsel, Dennis

11   Klejna, was involved in some pieces of it.

12   Q.  What kind of pieces was Mr. Klejna involved in?

13   A.  It was primarily two things that I recall.  One was

14   regulatory matters in terms of we were doing diligence on Refco

15   with respect to various regulatory proceedings they'd been

16   involved with over the years.

17        Back in the 1990s, there had been a bunch of fines and

18   so forth that they paid.  Mr. Klejna had been brought in and,

19   as far as we could tell, was attempting to clean up a lot of

20   the regulatory stuff.  So we were working with him to do

21   diligence on the regulatory matters that the company had been

22   subject to.  So that was one step -- or one piece, rather.

23        The other piece, I would say once we had a deal signed

24   and were moving towards closing, there were a number of

25   regulatory approvals that had to be obtained in various

CAPPCOL4                        Tabor - direct

1    jurisdictions, and Mr. Klejna was very involved in that as

2    well.

3    Q.  So how did Mr. Klejna's role contrast with Mr. Collins?

4    A.  I would say Mr. Collins was much more of the deal lawyer,

5    and Mr. Klejna was consulted on specific diligence pieces and

6    on overall regulatory pieces.

7    Q.  Now, did you also interact with executives from Refco in

8    connection with your work on this transaction?

9    A.  I did some, yes.

10   Q.  Who do you recall?

11   A.  Phillip Bennett, Robert Trosten.

12   Q.  And they were the CEO and the CFO respectively?

13   A.  That's correct.

14   Q.  What was Mr. Bennett's role?

15   A.  He was, I would say, the lead person driving the

16   transaction from a business standpoint, and he was very hands

17   on, as well, I would say.

18   Q.  And Mr. Trosten's role?

19   A.  He was, as you said, the chief financial officer, and I

20   dealt less with him.  There were some diligence matters and

21   diligence calls that I know that he was on that I was on.  I

22   don't believe I ever met him personally, that I can recall at

23   least.  That's why I dealt with him somewhat less.

24   Q.  Now, let me direct your attention to when you first were

25   asked by Mr. Westra to work on this transaction.  When,

1  approximately, was it that you got involved?

2  A.   Sometime in February of 2004.

3  Q.   And when you began working on this transaction, were other

4  Weil lawyers already assigned to it, or let me say and other

5  Weil lawyers were already working on it?

6  A.   Yes.

7  Q.   Do you remember roughly how many lawyers and what they were

8  doing at that point in time?

9  A.   Well, it was a handful.  I don't remember exactly how many,

10  but we had associates who were physically visiting the data

11  room that had been put together in New York, and they were

12  doing diligence review in that data room.

13  Q.   We've heard a little bit in this trial about a data room,

14  but what do you mean by that term?

15  A.   Well, it's -- or at least this one was a physical room

16  where a bunch of documents relating to Refco were put in the

17  room and organized under various headings in order for

18  potential buyers and their advisers to be able to come in and

19  start reviewing things.

20  Q.   And so what were the Weil attorneys, the associate lawyers,

21  doing when they visited this data room?

22  A.   They were reviewing various documents.  The type of

23  documents that fall into the legal diligence category, they

24  were looking at.

25  Q.   And are there other types of due diligence that were being

1    done?

2    A.  I don't know specifically at this point in time whether

3    they were being done, but in this transaction in general, yes.

4    Q.  What were the other types that came to be done on this?

5    A.  Accounting diligence, there's benefits, employee benefits

6    diligence, there's tax diligence, and then what I call just

7    general business diligence.

8    Q.  And do you remember some of the accountants or other firms

9    that were involved in those aspects of diligence?

10   A.  Well, KPMG was involved definitely on the accounting side,

11   and I believe they were also involved on some regulatory

12   capital issues and things like that for this business.  I

13   believe Mercer was involved in the benefits side.  KPMG was

14   also involved in the tax side, I believe.  There may have been

15   others.

16   Q.  And do these other firms that are doing other sorts of

17   diligence also make use of the data room?

18   A.  In some cases, yes.  I don't recall specifically whether

19   there was a lot of accounting and tax stuff in this data room

20   or not.

21   Q.  Who decides what is in the data room?

22   A.  Well, it's generally put together by a team on behalf of

23   the seller.  Usually involving bankers, business people,

24   sometimes lawyers that assemble things that they think will be

25   helpful to a potential buyer.

1   Q.  And is it fair to say that some of the point of going to

2   the data room is to find out what might be missing?

3   A.  Well, I think the review was in the data room, and that

4   doesn't necessarily tell you what's missing.  That's why after

5   you review that, go ask questions to figure out if there are

6   other things that are applicable.

7   Q.  And is that what the Weil attorneys who were doing due

8   diligence when you joined were seeking to do?

9   A.  Yes, they were reviewing what was in the data room.

10  Q.  Mr. Tabor, let me ask you about -- there's a stack of

11  documents I'm going to be asking you about there in front of

12  you, and on top I think should be Government Exhibit 179.  Do

13  you have that?

14  A.  I see it, yes.

15            MR. CHERNOFF:  And can we bring it up, Mr. Smith?

16  Q.  Now, Mr. Tabor, do you see at the footer of this

17  document -- First of all, there's some Bates numbers that

18  appear to reflect this was a document produced from the Weil

19  Gotshal & Manges law firm files?

20  A.  I see the WGM down there, if that's what that means.

21  Q.  And then in the actual document footer, there is the name

22  Gewirtz.  Was there a Mr. or Ms. Gewirtz working on this

23  transaction?

24  A.  Yes, there was.  Dan Gewirtz, at this point in time really

25  was the senior corporate associate working on the transaction.

CAPPCOL4                        Tabor - direct

1          MR. CHERNOFF:  Let me ask Mr. Smith to take us up to

2     the top of the first page.

3     Q.  You see there again the initials of the firm next to the

4     word "draft"?

5     A.  I do.

6     Q.  And the date of February 20th, 2004?

7     A.  I do.

8     Q.  This says, "Project Royce, open diligence issues."

9          Project Royce was the code name for this particular

10    potential deal?

11    A.  Yes.

12    Q.  Mr. Tabor, prior to the collapse of Refco, do you remember

13    ever receiving Mr. Gewirtz's draft that we see on the screen?

14    A.  No, I do not.

15         MR. CHERNOFF:  Let me ask Mr. Smith if we could flip

16    to the next page, towards the bottom, paragraph 12.

17    Q.  Mr. Tabor, there's a reference here to minor points to keep

18    track of, and then there are five items.  Do you see those?

19    A.  I do.

20    Q.  Now, Mr. Tabor, in the time since the collapse of Refco,

21    fair to say you've heard a lot about the Proceeds Participation

22    Agreement?

23    A.  Well, I didn't hear about it until years after the collapse

24    of Refco, but yes, eventually I did.

25    Q.  Now, here there's a reference in (e) to a copy of the

Proceeds Participation Agreement between Refco Group, Limited,

LLC, and DF Capital, Inc.; do you see that?

A.  Yes, I see it.

Q.  Do you recall at any time in your work on this transaction

an attorney for Weil asking you or bringing to your attention

that there was a Proceeds Participation Agreement?

A.  No, I do not.

Q.  And do you remember anyone sharing with you a conclusion

that this was only a minor point to keep track of?

A.  No, I do not.

Q.  Let me ask you now to take a look at Government

Exhibit 180, which should be next in the pile there?

A.  Okay.  I see it.

Q.  And look at the lower right-hand corner.  Do you see the

initials WGM again?

A.  Yes.

Q.  And the other footer refers to notes on a certain subject?

A.  Yes, notes on Refco Group, Limited.

          MR. CHERNOFF:  Your Honor, the government offers 180.

          MR. SCHWARTZ:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 180 received in evidence)

Q.  And so, Mr. Tabor, if you could take a look at this

document, is it fair to say this document is undated?  It's two

pages.

1    A.  Yes, I don't see a date on it.

2    Q.  Prior to the collapse of Refco, do you remember ever seeing

3    this document?

4    A.  No.

5    Q.  What does this appear to be, as you look at it, based on

6    your understanding of the Refco Group, Limited?

7    A.  It appears to be a description of terms in a limited

8    liability company agreement, or at least a draft of it.

9    Q.  You use the term limited liability agreement -- or limited

10   liability company agreement, I meant to say.  Also known as an

11   LLC agreement?

12   A.  Yes.

13   Q.  What is that, sir?

14   A.  When the entity that's involved is a limited liability

15   company, or an LLC, the LLC agreement is the basic governing

16   document.  It's kind of like that's the constitution of the

17   entity that governs the rights and the obligations of the

18   owners.

19   Q.  Now, as we look at the outline here, if we could move to

20   the, I guess, second hollow bullet point there beginning

21   "Company and holders," and it says, "Company and holder of

22   voting membership shares not allowed to vote to permit company

23   to issue any new shares of any class, except as contemplated by

24   Proceeds Participation Agreement dated as of July 12, 2002,

25   between company and DF Capital, Inc."  And then in parenthesis

1    in italics, "Get copy of?"

2              Mr. Tabor, did anyone ever ask you whether you needed

3    to get a copy of the Proceeds Participation Agreement?

4    A.  No.

5    Q.  And based on what we've now looked at on this document, do

6    you have any better idea of who it was that created this

7    document or how it came to be in the Weil files?

8    A.  I can only assume it was some Weil associate that did this.

9    I don't know for sure which one.

10   Q.  And so at any time in the due diligence, did anyone bring

11   to your attention that there may have been language in the LLC

12   agreement concerning a Proceeds Participation Agreement?

13   A.  I want to be sure I understand one thing.  When you say the

14   LLC agreement, if I understood you correctly, my understanding

15   was we never saw in the data room anything that purported to be

16   an executed LLC agreement, that we did see a draft of

17   something.

18   Q.  So let me ask you about that.  You said you were trying to

19   get a copy of the LLC agreement?

20   A.  That's right.

21   Q.  And what was your understanding of what was available to

22   you at the outset of your efforts?

23   A.  Well, there was something in the data room -- When I say

24   available to us, I don't believe we were allowed to make copies

25   or anything like that, but there was something in the data room

1   that was described to me as an unsigned draft, I guess, or an

2   unsigned version of an LLC agreement that did not appear to be

3   the one that was actually being operated under.

4          It had some wrong parties in it.  It had some wrong

5   manager; so it didn't appear to be the actual LLC agreement.

6   Q.  And so when you learned that the LLC agreement that was

7   being made available was unsigned and apparently incorrect, did

8   you ask that anything be done about that?

9   A.  Yes, we asked to receive whatever was the actual LLC

10  agreement that the company had been operating under.

11  Q.  And do you remember who your requests were directed to?

12  A.  Well, this -- at a later point in the process, when we were

13  moving towards signing a definitive agreement, the conversation

14  was directed with Mr. Collins.

15  Q.  And did Mr. Collins eventually provide you with an LLC

16  agreement --

17  A.  Yes.

18  Q.  -- that purported to be the one in effect?

19  A.  Yes.

20  Q.  Did that LLC agreement that he provided you make any

21  reference to the Proceeds Participation Agreement that we see

22  here in this document?

23  A.  No, it did not.

24  Q.  And so coming back to -- I'll ask you more about that

25  later, but coming back to Government Exhibit 180, does this

1    outline reveal to you which -- Let me back up.

2            The LLC agreements were amended from time to time?

3    A.   That's my understanding, yes.

4    Q.   And then they're given numbers, third, fourth, fifth?

5    A.   That's typical.

6    Q.   This outline doesn't tell us, I gather, which one it's

7    referring to?

8    A.   That's right.

9    Q.   All right.  We can -- We'll come back to the LLC agreement

10   later, but we can put that aside.

11           We've just been talking about references in two

12   documents that I've shown you to a Proceeds Participation

13   Agreement.  Does that term, in and of itself, have any

14   significance to you?  Is that a standard kind of agreement?

15   A.   I had never heard of a proceed -- anything called a proceed

16   participation agreement up to the time I was working on Refco,

17   nor since have I ever seen anything called that in any other

18   deals I've ever worked on.

19   Q.   You later you said learned about the Proceeds Participation

20   Agreement after the collapse of Refco?

21   A.   Yes.

22   Q.   How did you first learn about it?

23   A.   I was asked questions about it in an interview that the

24   examiner did.

25   Q.   And you were shown it at that time?

1   A.  I was.

2   Q.  Who was the examiner who was interviewing you?

3   A.  They were lawyers who were working for the examiner.  I

4   don't recall who they were.

5   Q.  What do you mean by "the examiner"?

6   A.  My understanding, this is very general and not firsthand,

7   was that there was an examiner that was appointed to look at a

8   bunch of things surrounding the collapse of Refco, and that

9   examiner hired lawyers and other professionals to do that.

10  Q.  Going back to the legal due diligence, what were the other

11  principal areas of contracts or legal matters that you were

12  trying to get answers to, find out about in legal due

13  diligence?

14  A.  Well, there are a number of categories.  In legal diligence

15  we look at litigation the company may be party to, to try to

16  figure out if there are things that are problematic there.  We

17  look at certain regulatory matters, and then we look at

18  contracts, a number of different kinds of contracts.  But

19  basically what we're focused on in legal diligence is material

20  contracts.

21       MR. SCHWARTZ:  Your Honor, is he going to be

22  testifying about this case or about his general practices?

23       MR. CHERNOFF:  Mr. Tabor, I'll ask you to focus your

24  questions on just what you were looking for, as you recall it,

25  in the legal due diligence in relation to this particular

CAPPCOL4                    Tabor - direct

1    transaction.

2    A.   Okay.  The things I've mentioned so far we were looking for

3    in this particular transaction.  With respect to contracts, we

4    were looking for what I've referred to as material contracts

5    because a company like Refco can have thousands and thousands

6    of contracts, and the lawyers doing diligence typically don't

7    look at every single one, or we didn't look at every single

8    one.  I apologize.

9              MR. SCHWARTZ:  Your Honor?

10             THE COURT:  All right.

11             MR. SCHWARTZ:  Same objection.

12   A.   We did not look at every -- attempt to look at every single

13   contract.  What we did want to do was identify what were the

14   important or material contracts and those can fall into a

15   number of categories.  If there are any sort of contracts or

16   arrangements with related parties, affiliates of the company,

17   those we viewed as material regardless of how big they were,

18   and we asked for all of them.

19             We also, beyond that, asked for and wanted to review

20   any contracts that related essentially to the ownership of this

21   company, who owns it and what their rights are.  Beyond that,

22   there were -- we attempted to prioritize by what was really

23   important.

24             We asked the company what they thought were their

25   important contracts.  We asked representatives of the company

1    to identify those for us, and then ultimately, in the purchase

2    agreement that we negotiated, we got representations as to

3    particular categories.

4            For instance, if there was any contract that required

5    for a payment to be made that was more than $5 million, then

6    that, by definition, was material and had to be listed and

7    shown to us.  That's just one example.

8    Q.  And, Mr. Tabor, when you mentioned the purchase agreement,

9    was that the full name of that, the equity purchase and merger

10   agreement?

11   A.  That's correct, yes.

12   Q.  And so we've been calling that the EPMA in this trial.  I

13   may use that term to reference it.

14   A.  Okay.

15   Q.  So you said that you were interested in finding out about

16   any contracts between related parties.  What do you mean by

17   related parties?  What were you looking at?

18   A.  Well, that would be contracts between Refco on the one hand

19   and people who controlled Refco or their affiliates on the

20   other hand.

21   Q.  And when you say the people who controlled Refco, do you

22   mean the owners?

23   A.  Yes.

24   Q.  What did you understand was the ownership of Refco at the

25   point that you joined the transaction?

CAPPCOL4                    Tabor - direct

1   A.   We understood that 90 percent of it was owned by an entity

2   called RGHI and 10 percent was owned by this entity we called

3   BAWAG, that was a subsidiary of an Austrian bank.

4   Q.   And what about the ownership of RGHI, who owned that?

5   A.   Our understanding was it was 50 percent owned by Phil

6   Bennett and 50 percent owned by Tone Grant.

7   Q.   And let me just ask Mr. Smith if we quickly bring up

8   Government Exhibit 815, and take a look at that, Mr. Tabor.

9   Does that represent the ownership structure as you understood

10  it and as you described it?

11  A.   Yes, this is what we understood.

12  Q.   At any time in doing your due diligence, did you learn

13  anything about another interest that BAWAG had in Refco and its

14  equity?

15  A.   No, we did not.

16  Q.   And did you, yourself, from anyone during your due

17  diligence learn about an ownership interest about something

18  called the Desana Foundation?

19  A.   No.

20  Q.   Or DF Capital?

21  A.   No.

22          MR. CHERNOFF:   Thank you, Mr. Smith.

23  Q.   So you said that there were attorneys from Weil in the data

24  room focusing on what else needed to be asked for, and I'm

25  focusing on, I guess, in the time period -- Well, what was the

1   time period where the data room was still being assessed, if

2   you know?

3   A.  People were active in the data room in February, maybe

4   going into the early part of March; that by that time, I

5   believe we had reviewed essentially what was in the data room

6   from the legal perspective.

7   Q.  And had the Weil team identified additional topics or

8   additional things it wanted to receive?

9   A.  Well, additional things to receive and also additional

10  things to ask questions about as to whether they were

11  applicable or not here.

12  Q.  And so who in that time period were these questions

13  addressed to?

14  A.  I think early on in the time period, we were still routing

15  questions through CSFB, the investment banker for Refco.

16  Q.  When you say early on in the time period, what do you have

17  in mind?

18  A.  I mean in February, the first part of March, I believe we

19  were doing that.

20  Q.  And did that change?

21  A.  It did eventually, yes.

22  Q.  How so?

23  A.  Well, as we were getting later in March, we attempted to

24  route some questions to the company and to Mr. Collins to

25  determine sort of what might be missing in the data room and

1    whether there were other major categories of things they were

2    going to have to be reviewing.

3    Q.  And when did that start happening?

4    A.  Well, it was --

5    Q.  Roughly speaking?

6    A.  Well, certainly in the last ten days or so of March we were

7    attempting to set up a conference or a call with Refco

8    management to go through some of those questions.

9    Q.  And, Mr. Tabor, focusing on the period March 2004, do you

10   recall speaking to any representatives of Refco or the counsel

11   for Refco regarding due diligence requests?

12   A.  Yes.

13   Q.  Who do you remember speaking to in the month of March?

14   A.  Well, there were two different conversations.  Which one

15   are you referring to?

16   Q.  Let's take the first one.  And I'll call that the first

17   March due diligence call, and I'll call the other one the

18   second March due diligence call.

19   A.  Okay.  The first March due diligence call was between me

20   and Mr. Collins.

21   Q.  And the second?

22   A.  It was a broader group.  It included certainly me, but

23   Mr. Bennett, Mr. Trosten, I believe, Mr. Klejna, and I believe

24   Mr. Collins; although I can't say so with a hundred percent

25   certainty.

CAPPCOL4                         Tabor - direct

1   Q.  Let me ask you about the first due diligence call in more

2   specific detail.  You said that was a call between yourself and

3   Mr. Collins?

4   A.  That's right.

5   Q.  And what date are you able to fix on that call?

6   A.  I believe it was the 23rd of March.  I can't be one hundred

7   percent positive that it was 23rd versus 20-something, right

8   around that, but I believe it's the 23rd.

9   Q.  And what did you review or consider in reaching the

10  conclusion that it was March 23rd?

11  A.  Well, I made notes of the conversation.

12  Q.  And were those notes dated?

13  A.  Yes.

14  Q.  With what date?

15  A.  It appears to be March 23.  It's definitely

16  March 20-something, and I believe it's 23rd.

17  Q.  You said that you took notes of those -- of both those

18  calls, but I'm going to ask you about the notes of the first

19  call.

20  A.  Okay.

21  Q.  But am I correct you took notes on both of them?

22  A.  Yes, that's correct.

23  Q.  Did you, by the way, date the note of the second March due

24  diligence call?

25  A.  I did.

1  Q.  What was the date -- and referring to your notes, what date

2  did you affix to that?

3  A.  That was March 30th.

4  Q.  Let me pause before I ask you more about your notes in

5  particular, and ask you about your note-taking practices.

6          How is it that you take notes when you're working on a

7  deal like the one we have here?

8  A.  Well, I would say my practices are inconsistent because my

9  notes, when I take them, are just for my own benefit, to help

10 me remember things when I feel like it's helpful.  There's a

11 lot of scribbling, a lot of short-handing, and I sometimes take

12 sort of stream-of-consciousness notes some days, also, which

13 looking back on years later, are difficult to make much out of.

14 So there's really not a particular practice that I use, I

15 suppose.

16 Q.  And do you take notes during meetings or conversations or

17 jot them down afterwards?

18 A.  Well, generally, if I'm going to take notes of a

19 conversation, I do it when the conversation is going on, and

20 that certainly was the case with respect to these two.

21 Q.  And is there any sort of rhyme or reason as to when you

22 take notes and when you don't?

23 A.  Just when I think it's helpful for me.  Once again, the

24 notes are just for me, not for anybody else.

25 Q.  And do you generally date all your notes or are they mostly

CAPPCOL4                           Tabor - direct

1    undated?

2    A.   I would say they're mostly undated.

3    Q.   So how is it you keep track of the notes, if you do, when

4    you're working on transactions?

5    A.   Once again, they're just for my own benefit.  So if I feel

6    like I need to date something, I do.  If not, if I don't feel

7    that I need to, I don't.  It's just for my own benefit.

8    Q.   Is there any other way that you sort of physically keep

9    track of them so they're in some kind of order?

10   A.   Well, yeah.  What I -- Yes.  What I typically do is take

11   notes in a legal pad and, for the most part, I'll start with

12   one legal pad, and I'll fill it up, and I'll move on to the

13   next.  Then after it's filled up, I may not be one hundred

14   percent consistent with that, but that's generally what I do.

15   Q.   And so you mean you have one legal pad per deal?

16   A.   Well, no.  Typically there are several.  I start out with

17   one.  It gets filled up.  Whenever it gets filled up, then I

18   usually start another, and so on.

19   Q.   Until?

20   A.   Until the deal's done.

21   Q.   And so when you travel, do you carry the notebook for any

22   deal you're working on with you or --

23   A.   I do.  If I think there's a realistic possibility I may be

24   doing something on a particular deal, I bring the note pad for

25   that deal with me.

1    Q.  Mr. Tabor, I'm going to walk up a document and ask you to

2    take a look at what's been marked as Government Exhibit 781.

3    That's 781, if I didn't say it.

4    A.  Okay.

5    Q.  Do you recognize 781?

6    A.  Yes.

7    Q.  What do you recognize it to be?

8    A.  A book of my Refco notes.

9           MR. CHERNOFF:  Your Honor, the government offers 781.

10          MR. SCHWARTZ:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 781 received in evidence)

13   Q.  And so if you could just hold up the documents in front of

14   you.  Is that your original set of notes?

15   A.  Yes, these are the originals.

16   Q.  And is this the first book in the series of books that

17   you -- I'm using the term book, but let me back up.  You said

18   it was a legal pad?

19   A.  Right.

20   Q.  Could you hold that up again?  Is this the first of the

21   pads that you filled up in connection with your work on the

22   Refco deal?

23   A.  Yes.

24   Q.  Okay.  I'm going to ask you to turn to -- Did you have a

25   chance to look at these before you testified today?

CAPPCOL4                         Tabor - direct

1    A.  Yes.

2    Q.  And did you place certain tabs on them relative to the

3    testimony that you're going to be asked to give?

4    A.  Yes.

5    Q.  I think if you flip to Tab A?

6    A.  Okay.

7    Q.  Does that page in the pad correspond to any of the subjects

8    we've been discussing?

9    A.  Yes.  These are the notes from the first March

10   conversation, the one with Mr. Collins.

11          MR. CHERNOFF:  And, Mr. Smith, it's Bates No. 85.

12   Q.  Okay.  No offense, Mr. Tabor, but fair to say we'll need

13   your help reading some of these notes?

14   A.  My mother was a third grade teacher, and she thinks she

15   failed.  But they are a little messy, I admit.

16   Q.  We see up in the left-hand corner the date that you made

17   reference to?

18   A.  Yes.

19   Q.  And you said you thought it said March 23rd, '04?

20   A.  Yes.

21   Q.  Is there something else you think it might also say?

22   A.  It's March 20-something for sure, and I think that's three.

23   Q.  And so I'm going to ask you questions now about this

24   conversation, which I'm calling the first March due diligence

25   call, the call you had with Mr. Collins.  And to the extent you

1    need to make reference to the exhibit, to the notes, let me

2    know that you need to do that before answering, or otherwise,

3    just answer my questions as you recollect the matters I'll be

4    asking about.

5    A.   Okay.

6    Q.   And by the way, did you take these particular notes during

7    the telephone conference with Mr. Collins, or did you jot them

8    down afterwards?

9    A.   No, I took these during the call.

10   Q.   Why were you speaking to Mr. Collins on March 23rd, 2004?

11   A.   Well, as we got into the last part of March, we had long

12   since finished the review of the diligence materials in the

13   data room.  We were still doing some work, but the client was

14   trying to figure out whether it was really going to go forward

15   with this deal, and one thing they wanted us to do was to

16   figure out how much diligence work we really had left to do if

17   they wanted to go forward.

18        So we were attempting to arrange a call with the

19   management of Refco to go through various categories, to see if

20   things were applicable that we didn't have or to see if those

21   things weren't applicable and we would not have diligence to do

22   on them.

23        We were trying to set that up a variety of ways, we

24   asked the banker, CSFB, to set it up.  I think our client was

25   trying to set it up, and I spoke with Mr. Collins with the idea

1   of trying to push that forward and helping us set that up, and

2   also helping us get some more information also.

3   Q.  And how did the conversation go?  What did you say to him

4   and what did he say to you, if you recollect?

5   A.  I don't recall what the first words were.  I do recall that

6   I brought up the general subject, and Mr. Collins said that he

7   would push to try to get us responses to the diligence

8   questions that we had.

9   Q.  What was discussed next?

10  A.  We talked about a number of specific categories of

11  diligence, particularly things relating to contract matters.

12  The first category that I recall was debt, and actually,

13  really, two types.  The first was debt that Refco might owe to

14  third parties, and so I asked him whether there was such debt

15  that was not already in the data room.

16          And I recall that he responded that he was essentially

17  certain that there was no other debt not in the data room, but

18  he would confirm.

19          MR. CHERNOFF:  And, Mr. Smith, we can take down the

20  exhibit, unless Mr. Tabor wants to make reference to it.  Thank

21  you.

22  Q.  So Mr. Collins said he would find out whether there was any

23  other debt that wasn't in the data room?

24  A.  Right, that he was -- as I recall, said he was essentially

25  certain that there wasn't any.

1   Q.  And why were you asking Mr. Collins about that particular

2   subject?

3   A.  One of the things we wanted to know in this deal, as part

4   of our legal diligence, is what the company owed to others in

5   terms of debt.  And our client, from a business perspective,

6   wanted to know it also.

7   Q.  You said you wanted to know what money the company owed to

8   others, and did you also want to know what money the company

9   might be owed?

10  A.  Yes, and that was really the second question I asked him,

11  and that was --

12  Q.  Please, go ahead.

13  A.  -- was debt that other people owed to Refco.  So where

14  Refco was owed money by others, and I recall that he confirmed

15  that the only debt owed to Refco was ordinary customer

16  receivables arising in the ordinary course, and that this had

17  been gone through between the company and the accountants.

18          MR. CHERNOFF:  May I have a moment, your Honor?

19          THE COURT:  Yes, sir.

20  Q.  You said that you were concerned about debt owed to Refco.

21  What particular concerns did you have about debt owed to Refco

22  as you were doing due diligence?

23  A.  Well, we just needed to understand what it was, really, to

24  help our client make sure that their valuation of this company

25  was proper.  We would need to understand how much it was, who

CAPPCOL4                         Tabor - direct

1   it was owed by.

2            So whether -- you know, if it was owed by an

3   affiliate, a related party, for instance, that would be

4   something we would be more sensitive to than if it was owed by,

5   you know, General Electric to this company.

6   Q.  And why were you more interested in finding out in

7   particular about a related-party debt to Refco?

8   A.  Any kind of related-party transaction was something that we

9   wanted to know about, regardless of the size.  Are you asking

10  me why that is?

11  Q.  Why that was in this deal?

12            MR. SCHWARTZ:  Objection.

13            THE COURT:  Why that was in this deal?  Is that the

14  same objection?

15            MR. SCHWARTZ:  Yes, your Honor.  You're familiar with

16  the objection.

17            THE COURT:  Overruled.  You may answer, sir.

18            THE WITNESS:  Okay.

19            MR. SCHWARTZ:  And we're familiar with the ruling.

20  A.  In this deal, we were concerned about related-party

21  transactions primarily for two reasons.  One, if something's

22  with a related party, the concern in this case, rather, was

23  that it might not be an on an arm's-length basis.

24            So it could either be the case that the transaction

25  was unfair to Refco, so essentially it's cheating Refco or

CAPPCOL4                     Tabor - direct

1   sucking value out of Refco.  The other possibility would be

2   that it was too favorable to Refco, in order to prop up Refco

3   to make it look better than it actually was.

4          So those were the reasons that anything with related

5   parties, we were really focused on, be it debt or otherwise.

6   But in this case I would say this question related to any debt,

7   whether it was owed by unrelated parties or not.

8   Q.  And at this time, had you been made aware of any

9   related-party debt from RGHI to Refco?

10  A.  Yes.  We knew about one piece of related-party debt that I

11  believe was a little over a hundred million dollars that was

12  owed by RGHI.  It was in the CSFB reports.  I think it was in

13  the financials; so everybody knew about it.

14  Q.  And that's all you were told about with respect to

15  related-party debt?

16  A.  That's right.

17  Q.  And so you said Mr. Collins said there was no debt owed to

18  Refco other than what is owed or was owed by Refco customers?

19  A.  That's right.

20  Q.  What did you understand that to mean?

21  A.  Just they're customer accounts receivable or receivables

22  arising in the ordinary course.

23  Q.  What else were you -- What else did you inquire about of

24  Mr. Collins in this call?

25  A.  Well, I asked him about stock options or similar items,

1    which would be basically any right that somebody has to get an

2    ownership interest in this company, if they could get stock or

3    equity in this company by a contract, an option or otherwise.

4    So I asked him if there were any of those.

5    Q.  And why were you asking Mr. Collins about that?

6    A.  Well, from a legal perspective, we needed to be able to

7    confirm the ownership of this company, know who owned it, to be

8    sure that our client was going to get the ownership percentage

9    that it had bargained for.

10           And to the extent there were any contracts under which

11   somebody else had the right to get an interest, we would

12   certainly want to understand those economics, or our client

13   would.  We would need to be able to explain the economics to

14   our client.

15   Q.  And after you asked Mr. Collins whether there was any

16   entity that had the options to acquire equity in Refco, what

17   did he tell you?

18   A.  He said Mr. Bennett confirmed that there were none.

19   Q.  Did Mr. Collins tell you then, or at any point, that a

20   BAWAG-related entity called DF Capital had an option to convert

21   an interest in the proceeds of a Refco sale into actual equity

22   in the company?

23   A.  No.

24   Q.  Was anything like that mentioned to you?

25   A.  No, it was not.

1  Q.  Mr. Tabor, I think you said, by the way, that Mr. Collins

2  was representing Refco in connection with this leveraged

3  buyout, correct?

4  A.  Yes.

5  Q.  What about Phil Bennett, the CEO, did he personally have

6  representation?

7  A.  I understood that Mr. Collins was representing him also.

8  Q.  And what about RGHI, did RGHI have a lawyer?

9  A.  My understanding was that Mr. Collins was representing

10 RGHI.

11 Q.  In this first March due diligence call, did you and

12 Mr. Collins also talk about any agreements or arrangements that

13 Refco had in particular with Mr. Bennett?

14 A.  Yes, with Mr. Bennett or RGHI or other affiliates of Refco

15 or of Mr. Bennett or RGHI.  So this really goes back to the

16 related-party question I mentioned a minute ago.  I asked a

17 specific question about that.

18 Q.  And what were you told?

19 A.  As I recall, Mr. Collins said he had confirmed with

20 Mr. Bennett that there were not any such relationships other

21 than Mr. Bennett's compensation that he got in the ordinary

22 course.

23 Q.  And, again, let me ask you why you were posing those

24 particular questions?

25         MR. SCHWARTZ:  Objection.

1           THE COURT:  Overruled.  You may answer, sir.

2    A.  It's really the same two reasons that I mentioned a little

3    bit ago.  Trying to make sure that Refco was not either being

4    taken advantage of, to have value sucked out of it, or was not

5    being propped up somehow because these were not arm's-length

6    transactions with unrelated parties.

7    Q.  And so after you asked Mr. Collins about any arrangements

8    or contracts with Mr. Bennett, RGHI, Refco, what did he tell

9    you?

10   A.  My recollection is that he said that he had confirmed with

11   Mr. Bennett that there were not any, other than Mr. Bennett's

12   compensation arrangements.

13   Q.  Did Mr. Collins ever tell you in that conversation, or

14   otherwise, that at the end of each fiscal year, recent years,

15   Refco and RGHI had participated in loan transactions to

16   temporarily reduce the debt owed by RGHI to Refco?

17   A.  No, he did not.

18   Q.  And did Mr. Collins in this conversation, or ever, tell you

19   that the end of every fiscal year, in recent years, Refco had

20   guaranteed obligations of RGHI in the hundreds of millions of

21   dollars?

22   A.  No.

23   Q.  What about indemnification agreements, did Mr. Collins tell

24   you then, or at any time, that Refco had indemnification

25   agreements relating to loans made to RGHI in the amounts of

1   hundreds of millions of dollars?

2   A.  No.

3   Q.  How did this first call -- Anything else that you recall

4   talking about during the first March due diligence call?

5   A.  I know we talked about a few other categories of things.

6   I'd have to refresh my memory by looking at my notes, though,

7   on the other ones.

8   Q.  Please do.  Go ahead and take a moment to look at your

9   notes.  I think you said you put Tab A at the relevant page?

10  A.  And just to be clear, I did not need to refresh my memory

11  regarding one thing, which is, we talked about an SEC

12  investigation, but there were other categories of things that,

13  if you want me to mention them, I will have to refresh my

14  memory.

15  Q.  Well, before you do that, let me just ask you quickly what

16  SEC investigation you talked about?

17  A.  There was something referred to as the Sedona matter, which

18  was an ongoing investigation of Refco by the SEC, and it's

19  clearly something, as part of our diligence, we wanted to get

20  our arms around, to the extent we could.

21          And one of the reasons for the call with Mr. Collins

22  was to try to see if we could push forward diligence on that,

23  and I recall he told me that we would have to schedule

24  something separately on that.

25  Q.  Okay.  And go ahead and take a moment to look at your

CAPPCOL4                    Tabor – direct

1    notes, and let us know if there are any other topics that you

2    recall, having been refreshed from your notes, were discussed

3    in this first March due diligence call?

4    A.   Okay.  We talked about acquisition agreements that the

5    company has, where Refco had acquired other companies.  We went

6    through some of those specifically to make sure that we knew

7    about all of them, that they were in the data room.

8         We talked about joint venture agreements, some of the

9    same things, just trying to make sure we knew about all of

10   them.  We talked customer contracts and what forms were

11   generally used.

12   Q.   And, Mr. Tabor, how did the conversation, the call with

13   Mr. Collins end?

14   A.   Mr. Collins indicated he would try to help us set up the

15   other call we'd been trying to set up with management of Refco

16   on diligence matters, and he also mentioned at the end, as I

17   recall, that we have to deal with the Sedona matter separately.

18   Q.   And so was an additional due diligence call setup?

19   A.   It was eventually, yes.

20   Q.   And that's what I was referring to as the second March due

21   diligence call?

22   A.   Yes.

23   Q.   And who do you recall participating in that?

24   A.   Well, Mr -- in addition to myself, Mr. Collins,

25   Mr. Trosten, Mr. Klejna, and I believe Mr. Collins; although, I

CAPPCOL4                        Tabor - direct

1    cannot say with one hundred percent certainty.

2    Q.  Did you take notes of that phone conversation?

3    A.  I did, yes.

4    Q.  I think I asked you that already, but just to be clear, let

5    me walk up to you Government Exhibit 782.  Do you recognize

6    what's before you as Government Exhibit 782?

7    A.  Yes, I do.

8    Q.  What do you recognize it to be?

9    A.  Another book of my Refco notes.

10            MR. CHERNOFF:  Your Honor, the government offers 782.

11            MR. SCHWARTZ:  Defense has no objection.

12            THE COURT:  Received.

13            (Government's Exhibit 782 received in evidence)

14   Q.  And, Mr. Tabor, I think you placed a Tab B at the top with

15   respect to the notes of this call?

16   A.  That's correct.

17   Q.  And, actually, we have on the screen before us, this says

18   "Book No. 2"?

19   A.  That's right.

20            MR. CHERNOFF:  Okay.  If we could just advance,

21   Mr. Smith, to Bates No. 140.

22   Q.  And, Mr. Tabor, just to be clear, the original documents

23   you have before you don't have these Bates numbers on them that

24   I'm using?

25   A.  Right.

1  Q.  Okay.  We're just calling those out because we've added

2  them to the copies.

3           And so what's before you on the screen are the

4  beginning of your notes of that call?

5  A.  Correct.

6  Q.  And what date did you put on the notes of this call?

7  A.  March 30th.

8  Q.  2004?

9  A.  2004, yes.

10  Q.  And so there's a mention that it's a diligence call with

11  Dennis Klejna, Rob Trosten and Phillip?

12  A.  Correct.

13  Q.  And if Mr. Collins was in this, you didn't report him at

14  the top of the notes?

15  A.  That's right.

16  Q.  What happened?  How did this call begin?  What was

17  discussed?

18  A.  I remember we discussed a number of diligence topics.  I

19  believed the first one was debt of the company, and I recall

20  asking whether Refco had debt that we had not already seen or

21  that was not already in the data room.

22  Q.  Do you remember who responded to that question?

23  A.  Mr. Bennett did.

24  Q.  And what did he say?

25  A.  I recall him saying that there wasn't anything we hadn't

1    seen.  He did mention, I recall, a $16 million piece of

2    intercompany debt, but it really was not debt of Refco.  It was

3    some outside parties.  It was various Refco entities within the

4    wholly owned group, one of them owed the other one $16 million,

5    as I recall.

6    Q.  And so is that what's known as debt within the consolidated

7    group?

8    A.  Yes.

9    Q.  Okay.  And what else was discussed in this call?

10             MR. CHERNOFF:  We can take down the exhibit,

11   Mr. Smith.

12   Q.  But if you do need to refer to your notes, just let us know

13   and we'll bring them up.

14   A.  I think there were a number of things discussed.  Some that

15   come to mind immediately, I asked about agreements among the

16   various owners of Refco.  So if people who owned direct --

17   Refco, directly or indirectly, had agreements among themselves,

18   I asked about those.

19             And I recall Mr. Bennett responded that there were not

20   any such agreements in place among the owners that in any way

21   would impact Refco.

22   Q.  What did you understand that to mean?

23   A.  That whatever arrangements they had among themselves would

24   not in any way impact the company our client was trying to buy.

25   Q.  In this conversation on March 30th, did anyone tell you

1    about the proceeds participation act, and the right it gave

2    BAWAG to exercise an option on the equity of Refco?

3    A.  Just to be clear, you said "proceeds participation act."

4    You mean agreement?

5    Q.  I'm sorry.  Agreement, thank you.

6    A.  No, nobody mentioned that agreement.

7    Q.  Were you told about any agreement under which Refco

8    received $467 million from BAWAG?

9    A.  No, we were not.

10   Q.  How about an agreement by RGHI -- between RGHI and the

11   BAWAG-related entity requiring the $350 million of debt owed by

12   RGHI be retired by Refco?

13   A.  No, we were not told about that.

14   Q.  Were you told about any agreements among the owners that

15   could block the sale of Refco?

16   A.  No, I was not.

17   Q.  During this second March due diligence call, did you again

18   ask about shareholder loans or options?

19   A.  I certainly asked about shareholder -- when you say --

20   stock options or things like that I asked about, if that's what

21   you're referring to.  So in other words, the same category that

22   I had talked to Mr. Collins about before.

23        In other words, does anybody have some right to become

24   an owner of this company.

25   Q.  And what were you told?

1    A.  I was told that none of that stuff existed.

2    Q.  And during this second March due diligence call, did you

3    ask about the existence of material contracts?

4    A.  Yes.

5    Q.  What were you told?

6    A.  Well, we were told that there weren't any such contracts,

7    other than what was in the data room.

8    Q.  And why were you asking about material contracts on this

9    call?

10           MR. SCHWARTZ:  Objection.

11   A.  We wanted --

12           THE COURT:  Overruled.  Same ruling.

13   A.  We wanted to understand what the important contracts were

14   that the company had so that we could look at them from a legal

15   perspective, and also, so that our client could understand it

16   economically.

17   Q.  And when you asked about material contracts, again, did

18   anyone make reference to the indemnification agreements, the

19   guarantees or the loan agreements that I made mention of a few

20   questions back?

21   A.  No.

22   Q.  Now, Mr. Tabor, did there come a time when your client,

23   Lee, did provide Refco with a letter of intent?

24   A.  Yes, they drafted one, yes.

25   Q.  And what, briefly, is a letter of intent?

CAPPCOL4                    Tabor - direct

1    A.  It's a short version of an agreement, which largely is not

2    legally binding, which just lays out the parameters of the deal

3    that you will work towards.

4    Q.  And you say you provided Refco with a draft.  Who drafted

5    it?

6    A.  I believe the first draft was actually done by Mr. Westra,

7    while I was off doing something else, but I worked on it also.

8    Q.  And after you provided the draft to Refco, how did the

9    process unfold?

10   A.  Well, there were some discussions.  I recall we got

11   comments to the letter, and ultimately sat down and met about

12   it to try to hammer it out.

13   Q.  How many meetings did you attend?

14   A.  Well, I attended two meetings that were in person, and just

15   to be clear, as I sit here now, I believe that we delivered the

16   draft after the first meeting.  I think we had a meeting, and

17   then we delivered the draft, and then we had another meeting.

18   Q.  Tell us about the first meeting.  Where did that take

19   place?

20   A.  It took place in New York, at Thomas Lee's office.

21   Q.  And do you recall when it took place?

22   A.  Yes.  It was April the 9th, 2004.

23   Q.  Who attended this first meeting on the letter of intent?

24   A.  On the Refco side, it was Phil Bennett and Joseph Collins.

25   On the Lee side, there were a number of Lee people, including

1    Scott Schoen and Scott Jaeckel, and a couple of others.  And

2    Jim Westra and me, and I think there were bankers, Sandler

3    O'Neill had a representative there.

4    Q.  And what was discussed at this first meeting on the letter

5    of intent on April 9?

6    A.  Certain basic deal parameters that would have to be agreed

7    to if we were going to try to move forward to actually get a

8    letter of intent done.

9    Q.  Do you recall what the deal parameters were?

10   A.  Certainly recall a couple of significant ones that were

11   discussed.

12   Q.  Which were those?

13   A.  Okay.  One was the Lee people wanted to make very clear

14   that, going forward, if a deal got done, there could be no more

15   intercompany loans -- or I'm sorry, shareholder loans or things

16   like that.  So no more loans made to shareholders or similar

17   transactions with shareholders.  That would all have to be

18   cleaned up.  So that's -- Go ahead.

19                 (Continued on next page)

20

21

22

23

24

25

1    Q.  Let me stop you there.

2              When you say no more shareholder loans, you were

3    referring to the loans you were told about between RGHI and

4    Refco in the amount of 100 million, approximately?

5    A.  Right, that that would have to be repaid, done away with,

6    and there couldn't be any more of those going forward.

7    Q.  What was the next subject?

8              Actually, I'm sorry.  Why were you demanding that in

9    this meeting?

10   A.  Well, from our client's perspective --

11             MR. SCHWARTZ:  Objection.

12             THE COURT:  The same answer.

13             You may answer.

14   A.  From our client's perspective, they wanted to make sure

15   that going forward if they did the deal, this was going to be a

16   stand-alone company.  It was not going to be engaging in

17   transactions with shareholders or other related parties, and it

18   would have cleaned up any transaction that existed which they

19   knew about.

20   Q.  Before I interrupted you, you were about to mention the

21   next subject.

22   A.  Yes.  The next subject was that there was supposedly $500

23   million of excess cash that this company had that it, as was

24   claimed to us, could have distributed out but didn't.  So the

25   money was still sitting in the company.  And I recall that

1    Mr. Bennett indicated that if that money was going to stay in

2    the company, then Lee was going to have to pay for it, so it

3    was going to increase the purchase price; they would have to

4    pay for that.

5            Lee had no interest in just buying cash.  So there was

6    discussion about whether there could be assurances obtained

7    that the money really was excess cash, really was not needed

8    for this business in any way, and if we could figure out a way

9    to confirm that, then perhaps the money could be distributed

10   out before the closing -- distributed out to the old Refco

11   owners before the closing.

12   Q.  And by the way, Mr. Tabor, did you yourself take any notes

13   at this April 9th meeting on the Letter of Intent?

14   A.  I don't believe so.

15           MR. CHERNOFF:  Let me just pause for a minute and ask

16   that Mr. Smith bring up Government Exhibit 320, which we offer

17   pursuant to our handwriting stipulation.

18           THE COURT:  Received.

19           (Government's Exhibit 320 received in evidence)

20           MR. CHERNOFF:  And pursuant to our stipulation that

21   this is the handwriting of the defendant, I will ask,

22   Mr. Smith, if you could just highlight, actually, first just

23   the top of the notes, which say "April 9, 2004 meeting at TH

24   Lee."

25   Q.  Mr. Tabor, you said that this meeting was in fact at TH

1    Lee's New York offices?

2    A.  Yes, it was.

3    Q.  And Mr. Smith has highlighted, "500m, comfort on how

4    business can still be" -- well, I'll skip that.

5           There is a reference now to a "Segregation Solution."

6           What was the segregation solution?  Was that something

7    that was discussed?

8    A.  It was discussed conceptually that somehow maybe this 500

9    million could be essentially put on a shelf, so just segregated

10   from everything else.  The company wasn't using it, wasn't

11   relying on it any way.  So if it could be segregated between

12   the time the deal was essentially agreed to and the closing,

13   which was going to be sometime later, then maybe Lee could get

14   comfort that it really was extra money, that it was excess

15   cash.

16          MR. CHERNOFF:  And, Mr. Smith, if you could just

17   highlight the next item after "Segregation Solution," and I

18   believe that is "Shareholder Loans."

19   Q.  That was the other topic you referred to?

20   A.  Yes.

21          MR. CHERNOFF:  Thank you, Mr. Smith.

22   Q.  Now, you said there was a follow-up meeting, maybe after a

23   draft was circulated, on April 15th?

24   A.  That's right.

25   Q.  And who do you recall attending that meeting?

Capdcol5                    Tabor - direct

1   A.  I believe it was the same group of people.  Certainly from

2   the Refco side, it was Mr. Bennett and Mr. Collins.  I believe

3   it was the same people from the Lee side and as well as from

4   the Weil side, Mr. Westra and me.

5   Q.  And so what was the main purpose of this meeting, as you

6   understood it?

7   A.  Well, this meeting was intended actually to try to hammer

8   out the language of the Letter of Intent, so it was much more

9   of a lawyer participation meeting because we were trying to

10  actually finalize the language of the Letter of Intent.

11  Q.  How long did this meeting last?

12  A.  Well, I think the clients stayed for a few hours, but after

13  they left Mr. Collins and I stayed and continued to work on the

14  Letter of Intent.  And ultimately Mr. Collins had to leave for

15  something, and I took the Letter of Intent, went back to my

16  office here in New York, and actually created a new draft of it

17  that night and sent it around to Mr. Collins and others.

18  Q.  And as a result of all of this work that you were doing

19  with Mr. Collins, with your client, etc., was there ultimately

20  a finalized Letter of Intent that was reached?

21  A.  Yes.  Over the next few days after that meeting we finished

22  it.

23  Q.  Let me ask you to take a look at what's before you marked

24  Government Exhibit 1003, in evidence.

25          And if you flip, Mr. Tabor, to the pages that in the

1    lower right-hand corner are marked 92, 91.

2               You see, sir, this is an executed copy of the Letter

3    of Intent agreement?

4    A.  Yes, I see that.

5    Q.  And this agreement is from your client, Thomas H. Lee

6    Partners, represented by Mr. Schoen, to Phillip Bennett at

7    Refco?

8    A.  That's right.

9    Q.  And we see from the signature page, 92, that it was signed

10   by Mr. Bennett on behalf of both Refco and the Refco Group

11   Holdings, Inc., RGHI, on April 19th?

12   A.  Correct.

13   Q.  Let me ask you to take a quick look at page 3 of the Letter

14   of Intent.

15              Is there some reference here in the agreement that you

16   negotiated with Mr. Collins concerning the shareholder loans

17   that you had been told about?

18   A.  Yes.

19   Q.  What is that?

20   A.  Well, in Clause 4 in Section 3, it provides that "Any

21   existing shareholder loans will be terminated prior to closing

22   and funded with cash otherwise payable to the sellers, and all

23   existing agreements, contracts or arrangements between the

24   company and the sellers or their affiliates will be terminated

25   (other than employment obligations," and so forth.

Capdcol5                    Tabor - direct

1   Q.  And looking down to Roman Numeral 3, there is reference to

2   120 million that was accrued for distribution, it says, and not

3   more than 12 million will be distributed in cash, which leaves

4   108 million.

5            Was that the amount you were told was the existing

6   debt from RGHI to Refco?

7   A.  I believe that's what we thought it was at the time, yeah,

8   I think.

9   Q.  And is there reference here in the contract, in paragraph

10  3, to the 500 million we have been talking about in excess

11  working capital?

12  A.  Yes.  In this sentence I see a reference to the 500

13  million.

14  Q.  And there is discussion about the mechanic that's going to

15  be used to confirm that that is actually excess working

16  capital?

17  A.  Correct.

18  Q.  And while you were negotiating this document face-to-face

19  with Mr. Collins, you and he alone, did he say anything

20  different to you about any of these subjects that we see in

21  paragraph 3?

22  A.  No.

23  Q.  Now, at the time that this Letter of Intent was executed on

24  April 19th, was the due diligence complete?

25  A.  No.  There were still a number of items that we were

1   working on.

2   Q.  Were some of those memorialized in Exhibit C to this

3   document?  That's Exhibit 300 in the lower right-hand corner,

4   if that helps you find it.

5   A.  Yes.  I recall we attempted to list the pending diligence

6   items as of that time.

7   Q.  So we see here, number 2 refers to "Debt."  Intercompany

8   debt.  That was something you, I think, talked about?

9   A.  Right.  This was the $16 million fully internal piece of

10  debt that Mr. Bennett told us about on the call on the 30th.

11          MR. CHERNOFF:  Mr. Smith, could we highlight number 6.

12  Q.  You were still seeking indemnification arrangements?

13  A.  Correct.

14  Q.  Number 7, you are still seeking shareholder agreements?

15  A.  I think this was really referring to shareholder agreements

16  where Refco was less than a hundred percent owner of some

17  entity, so that is sort of subsidiaries where there might be

18  another owner also.

19  Q.  Let's go to the next page.  The last paragraph says:

20  "Material Contracts.  Please confirm that there are no other

21  contracts considered material by management that have not been

22  supplied."

23          Fair to say you were still looking for those, too?

24  A.  Yes.

25  Q.  Now, by the way, Exhibit C, the outstanding diligence

1    requests -- I'm sorry.  It is called the "Pending Due Diligence

2    Request," "Pending Legal, Financing and Tax Due Diligence

3    Request," did Exhibit C include all of items you had been

4    asking Mr. Collins for back in the first due diligence call on

5    March 23rd?

6    A.  There were a number of things that we had asked Mr. Collins

7    about on that first March call that were no longer on our list

8    because we had gotten confirmation that they weren't

9    applicable.

10   Q.  So between your call on March 23rd and this Exhibit C being

11   signed on April 19, some items came off the list, your due

12   diligence list?

13   A.  Right.  There were things that we were not asking for here

14   because we had been told that they were not applicable or

15   didn't exist.

16   Q.  And with respect to material contracts or indemnification

17   arrangements, which were two of the requests particularly in

18   Exhibit C, did you receive any further information from Refco

19   on those subjects?

20   A.  Yes.  Ultimately, we got a memo as to the absence of any

21   additional material contracts.

22   Q.  As you went forward from the Letter of Intent signing with

23   respect to these pending requests, who were you addressing your

24   due diligence requests to?

25   A.  Well, at the time we signed the Letter of Intent we agreed

Capdcol5                        Tabor - direct

1   that Mr. Collins would take the lead in trying to get us

2   responses on the things that were still on our list.  So we

3   were dealing largely with Mr. Collins.

4   Q.  And you said you got a confirmation that there were no such

5   indemnification obligations?

6   A.  Yes, we did.

7   Q.  And no such material contracts?

8   A.  Correct.

9   Q.  Let's look, please, at Exhibit 704.

10  A.  OK.

11  Q.  And do you see this is an e-mail addressed to you and

12  cc'ing others from Surrel Richards?

13  A.  Yes.

14  Q.  Was he a lawyer at Mayer Brown?

15  A.  I actually thought this was Mr. Collins' assistant but it

16  was somebody who worked with Mr. Collins at Mayer Brown.

17              MR. CHERNOFF:  The government offers 704, your Honor.

18              MR. SCHWARTZ:  No objection.

19              THE COURT:  Received.

20              (Government's Exhibit 704 received in evidence)

21  BY MR. CHERNOFF:

22  Q.  So, Mr. Tabor, this was an e-mail that you received from

23  someone at Mayer Brown, and we see below that sort of globe,

24  "From Joseph Collins."

25  A.  I'm sorry.  Oh, yes.  I see the "From Joseph Collins."

Capdcol5                        Tabor - direct

1    Q.  And this is to you, copying Mr. Bennett and Ms. Lang, at

2    Mayer Brown, among others?

3    A.  Correct.

4    Q.  "Subject, Project Royce Due Diligence; Indemnification."

5    Do you see the subject there?

6    A.  Yes, I do see it.

7    Q.  And the top of the screen has it up, too, whichever is

8    easier to look at.  We are trying to highlight them as I call

9    them out.

10   A.  OK.

11   Q.  Turn to the next page, and let's look at the attachment to

12   the e-mail.  You see this is a memorandum from Mr. Collins to

13   yourself, dated May 6, 2004?

14   A.  Yes.

15   Q.  This is the advice you received concerning the Exhibit C

16   request for indemnification obligations?

17   A.  Yes.  We understood this to be a response to that request.

18   Q.  OK.  It says, "We have been advised by Refco that there are

19   no significant indemnification obligations which have not been

20   disclosed already."

21        Correct?

22   A.  Yes, I see that.

23   Q.  Now, we already discussed the fact that you were never told

24   about indemnification obligations concerning loans that RGHI

25   had taken that Refco was indemnifying third parties against?

1    A.  Correct.

2    Q.  And you were never told about the Proceeds Participation

3    Agreement, correct?

4    A.  Correct.

5    Q.  Let me ask that we put flip to Government Exhibit 1504.

6    And just looking at the first page, this is the Proceeds

7    Participation Agreement, correct?

8    A.  Yes.

9    Q.  Let me ask that we take a look at page 13, which is Bates

10   No. 265.

11          And, Mr. Tabor, do you see here there is an article

12   called, "Indemnification of DFI?"

13   A.  Yes.

14   Q.  And I'll read it:  "Indemnification of DFI.  The

15   company" --

16          And, Mr. Tabor, just flip back, if you would follow

17   with me, to page 2, Bates No. 63 -- I am going to skip that,

18   which defines the company?

19   A.  Yes, I see it.

20   Q.  Do you see the company is defined as Refco Group Limited?

21   A.  Yes.

22   Q.  And, sorry, go back to page 13.  It says:  "The company

23   agrees to indemnify each of DFI indemnified parties against,

24   and agrees to hold each of them harmless from, any and all

25   losses incurred or suffered by them relating to or arising out

Capdcol5                    Tabor - direct

1   of or in connection with any third-party claim in which DFI or

2   a DFI indemnified party is named as a party, arising out of any

3   material inaccuracy in any representation or material breach

4   of, or failure duly to perform or observe, any material

5   warranty, covenant, or other agreement made by the company in

6   this agreement."

7           Mr. Tabor, this is an indemnification agreement that

8   the company made indemnifying DFI, correct?

9   A.  Yes.

10  Q.  And did Mr. Collins tell you that this indemnification of

11  DFI was in effect at the time that he sent you that memo?

12  A.  No.

13  Q.  Let me ask you to look at Government Exhibit 705.

14          Again, Mr. Tabor, do you see on the cover this is --

15  the first page, rather, this is an e-mail from someone at Mayer

16  Brown to yourself, and it says "From Joseph Collins" under the

17  e-mail addresses?

18  A.  I don't actually see it on the screen yet, and I for some

19  reason don't seem to be able to put my hands on it here.

20  Q.  I'm sorry.  Let me walk it up to you.

21  A.  I found it.  I'm sorry.  I found it.

22          Yes.  What you described is correct.

23          MR. CHERNOFF:  Your Honor, the government offers 705.

24          MR. SCHWARTZ:  No objection.

25          THE COURT:  Received.

1          (Government's Exhibit 705 received in evidence)

2     BY MR. CHERNOFF:

3     Q.  So, Mr. Tabor, this appears to be an e-mail you received

4     from -- or on behalf of Mr. Collins on May 6th of 2004,

5     correct?

6     A.  Correct.

7     Q.  And let's turn to the next page.

8          Attached appears to be a memorandum to you, Mr. Tabor,

9     from Mr. Collins on May 6th.  I'll read it out:  "Project Royce

10    Due Diligence; Material Contracts."

11         "We were advised by Refco management that all material

12    contracts were either in the data room or are being produced in

13    response to the requests in Exhibit C to the Letter of Intent."

14    A.  I see that, yes.

15    Q.  And at the time that Mr. Collins sent you this memo on

16    May 6th, had he told you or did he after that tell you about a

17    contract that resulted in Refco receiving $467 million from a

18    BAWAG-related entity?

19    A.  No.

20    Q.  And how about a contract that gave a BAWAG-related entity

21    the right to acquire 27.2 percent of Refco's equity?

22    A.  No.

23    Q.  How about an agreement through which the BAWAG-related

24    entity could block the sale you were negotiating?

25    A.  No.

1    Q.  Mr. Tabor, did you continue to pursue diligence requests

2    with Refco after receiving that correspondence from

3    Mr. Collins?

4    A.  When you say did we continue to pursue diligence requests,

5    you mean with respect to material contracts?

6    Q.  No.  I just meant general.

7    A.  This was on May 6th.  I think there were still some

8    requests that were pending and still being under pursuit

9    until -- they still were under pursuit until closer to the

10   signing of the agreement.

11   Q.  Let me ask you to look at Government Exhibit 706.

12   A.  OK.

13   Q.  And do you recognize this as an e-mail from Adam Nelson, at

14   Weil, to Joseph Collins from May 13, 2004?

15   A.  Yes.

16           MR. CHERNOFF:  Your Honor, the government offers 706.

17           MR. SCHWARTZ:  No objection, your Honor.

18           THE COURT:  Received.

19           (Government's Exhibit 706 received in evidence)

20   BY MR. CHERNOFF:

21   Q.  And, Mr. Tabor, if you give me a moment, I am just going to

22   read out the part beginning "Joe."

23           "Joe, attached is a list" -- actually, it just says,

24   "Attached is list of outstanding diligence items/questions,

25   reflecting the status of our diligence as of today.  I have

1    included on this list both items that are currently

2    outstanding, as well as questions that have arisen from the

3    items we have recently reviewed.  Please give me a call if you

4    would like to discuss or let me know if you have any questions.

5              "Best, Adam."

6              And, Mr. Tabor, you are copied on this e-mail as well,

7    correct?

8    A.  Yes.

9    Q.  Let's look at the attachment that is dated, do you see up

10   in the right-hand corner, your law firm's initials and May 13,

11   2004?

12   A.  Yes.

13   Q.  So this is titled "Outstanding Legal Due Diligence Items."

14   I want to focus on number 5.

15             It says:  "Voting agreements, stockholder agreements

16   or any other material agreements relating to the relationships

17   between RGHI, Refco Group Holdings, BAWAG Overseas and Refco

18   Group Limited."

19             And let me ask you with reference to these outstanding

20   requests, were you at this time -- do you recall whether you

21   were still trying to obtain the current LLC agreement for

22   Refco?

23   A.  That's right.  We didn't have the actual LLC agreement at

24   this time.

25   Q.  So in this e-mail you're asking again -- or your colleague

1    is asking again, Mr. Collins, for this LLC agreement?

2    A.  Yes.  I think that request in number 5 certainly picks up

3    the LLC agreement.

4    Q.  Let me -- I want to back up a little bit and ask you to

5    look at Government Exhibit 721.

6              MR. CHERNOFF:  Your Honor, I lost track of time.

7    Should we --

8              THE COURT:  Would you like to take a little break now,

9    friends?

10             A JUROR:  Yes.

11             THE COURT:  All right.  It sounds like a yes.

12             Let's take the break.  You'll follow the usual rules.

13   Take your pads with you.  Leave your exhibits.  Don't discuss

14   the case.

15             Thank you, friends.

16             (Jury not present)

17             THE COURT:  Thank you, folks.  Off the record.

18             (Discussion off the record)

19             (Recess)

20             THE CLERK:  Jurors entering.

21             (Jury present)

22             THE COURT:  Thank you.  Won't you be seated.

23             We continue with the direct examination of the

24   witness.

25             Mr. Chernoff.

 1              MR. CHERNOFF:  Thank you, your Honor.

 2   BY MR. CHERNOFF:

 3   Q.  So, Mr. Tabor, before the break I just began to ask you to

 4   look at Government Exhibit 721.

 5   A.  OK.

 6   Q.  And this appears to be an e-mail from yourself to various

 7   people and then forwarded on by Daniel Gewirtz?

 8   A.  I believe it was an e-mail from Dan Gewirtz to a number of

 9   people that I then forwarded to some people at Lee.

10   Q.  Thank you.  Right.

11              MR. CHERNOFF:  The government offers 721, your Honor.

12              MR. SCHWARTZ:  No objection.

13              THE COURT:  Thank you.  Received.

14              (Government's Exhibit 721 received in evidence)

15   BY MR. CHERNOFF:

16   Q.  And so, Mr. Tabor, this is an e-mail that was sent on

17   March 10, 2004 from your colleague, Mr. Gewirtz?

18   A.  Correct.

19   Q.  And it is sent to all --

20   A.  I'm sorry.  It was not sent from my colleague on that day.

21   It was forwarded by me on that date.  I may have misspoke.

22   Q.  I think I asked you the question in a way that caused you

23   to do that.  Sorry.

24              Mr. Gewirtz composed this on February 27 that you

25   forwarded on on March 10?

Capdcol5                           Tabor - direct

1    A.  Correct.

2    Q.  So Mr. Gewirtz is addressing this correspondence to someone

3    named Paul Kromwyk at CSFB, the investment banker on this deal,

4    right?

5    A.  Correct.

6    Q.  I will just read out, if we could focus on the middle,

7    where it says, "Owners of Refco Group Limited, LLC."

8            And your colleague Mr. Gewirtz writes:  "We saw an

9    unexecuted copy of the parent company LLC agreement and noted

10   that the signatory members to the LLC agreement were two

11   corporations and an LLC (Refco Group Holdings, Inc., Refco

12   Group Holdings LLC and BAWAG Oversees, Inc.).  We would like to

13   see the corporate documentation for such entities as well as

14   view any arrangements among the members, such as shareholders

15   agreements or other contractual arrangements.  We would also

16   like to see the executed parent company LLC agreement and a

17   capitalization chart."

18           Mr. Tabor, was this one of the efforts that you

19   testified about earlier to get a signed copy, an executed copy

20   of the Refco LLC agreement?

21   A.  Yes.  This was one of the efforts.

22   Q.  At that time addressed to --

23   A.  At that time, yes.

24   Q.  Let me ask you to look now at Government Exhibit 707, which

25   should be next there.

Capdcol5                        Tabor - direct

1   A.  OK.

2   Q.  And this is an e-mail from Adam Nelson, at the Weil firm,

3   to Joseph Collins, among others?

4   A.  Yes.

5           MR. CHERNOFF:  The government offers 707.

6           MR. SCHWARTZ:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 707 received in evidence)

9   BY MR. CHERNOFF:

10  Q.  And, Mr. Tabor, this e-mail is now dated -- we are now at

11  May 19, 2004?

12  A.  Correct.

13  Q.  And your colleague, Mr. Nelson, wrote:  "Joe and Paul."

14          Do you remember Paul Koury as a lawyer at Mayer Brown?

15  A.  I do, yes.

16  Q.  And he is there in the addressees in this e-mail?

17  A.  Yes.

18  Q.  With Mr. Collins.

19          "Joe and Paul, as we discussed on the call yesterday,

20  attached is our list of outstanding diligence, reflecting all

21  of the open items as of today.  Note that we still need to

22  review some of the recently provided items in detail and, as we

23  do, we may have additional questions," etc.

24          Let me ask you to flip to the next page.  "Outstanding

25  Business and Legal Diligence" is how this is titled.  It has

1   got 17 items.  And you see that the first one says, "Amended

2   LLC Agreement for Refco Group Limited, LLC evidencing removal

3   of Refco Group Holdings, LLC and indicating current managers."

4          What were you asking for here?  What was Weil asking

5   for here, Mr. Tabor?

6   A.  We were just asking for the operative LLC agreement because

7   we still didn't have it at this point.

8   Q.  And what, by the way, was meant by "Evidencing removal of

9   Refco Group Holdings LLC?"

10  A.  This was just referring to some of the stuff that was

11  screwed up in the draft we saw in the data room, because it had

12  this entity, which we understood didn't exist anymore as one of

13  the members, among other things that were incorrect, but it

14  also wasn't executed.

15  Q.  Refco Group Holdings LLC is not Refco Group Holdings Inc.?

16  A.  That's right.  Different entity.

17  Q.  OK.  Let me ask you to look now at Government Exhibit 708.

18          Do you recognize this as another e-mail from Adam

19  Nelson to Mr. Collins, copying yourself, among others?

20  A.  Yes.

21          MR. CHERNOFF:  The government offers 708, your Honor.

22          MR. SCHWARTZ:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 708 received in evidence)

25  BY MR. CHERNOFF:

Capdcol5                    Tabor - direct

1    Q.  And just take a look at the "Outstanding Business and Legal

2    Diligence" that is attached, page 2 of this exhibit.

3            Here it says, in number 1, that you are still looking

4    for this amended LLC agreement, correct?

5    A.  That's correct.

6    Q.  And now it says at the end in bold, "J. Collins to

7    prepare."

8            Do you have any understanding of why it said that?

9    A.  Yes.  At this point we had been told that whatever was the

10   operative LLC agreement that the company had been existing

11   under was not in existence anyplace in writing.  I mean, they

12   were going to have to actually prepare a version of it and have

13   it executed, and so Mr. Collins said he would do that.

14   Q.  OK.  So I'm going to step away from that sequence of events

15   for a moment leaving off on May 20th, and let me -- actually,

16   I'm sorry.  Let me ask you to look at Government Exhibit 710,

17   and I will ask you if you recognize that as the memo to you

18   from Mr. Collins on June 2nd?

19   A.  Yes, I do.

20           MR. CHERNOFF:  The government offers 710, your Honor.

21           MR. SCHWARTZ:  No objection.

22           THE COURT:  Received.

23           (Government's Exhibit 710 received in evidence)

24   BY MR. CHERNOFF:

25   Q.  And so, Mr. Tabor, in this memorandum, Mr. Collins attaches

1    the Fourth Amended LLC Agreement, which you understood to be

2    the one you were trying to get?

3    A.   Yes.  That's right.

4    Q.   I will just read the first item:

5              "Jay, attached are the following documents:

6              "1.   Fourth Amended and Restated Limited Liability

7    Company Agreement of Refco Group Limited, LLC which evidences

8    the withdrawal of Refco Group Holdings LLC and the status of

9    Phillip R. Bennett and Joseph Murphy as managers."

10             And, Mr. Tabor, why are Mr. Bennett and Mr. Murphy

11   being referenced as managers at this point?

12   A.   My understanding is that they had been acting in the

13   capacity as managers but whatever the draft LLC agreement was

14   that existed in the data room didn't list them as managers, so

15   that needed to be fixed.

16   Q.   And this entity Refco Group Holdings LLC that no longer

17   existed was apparently withdrawn from the LLC?

18   A.   Yes.

19   Q.   And so having received this Fourth Amended LLC Agreement

20   from Mr. Collins, with respect to this issue, did you believe

21   you had gotten what you needed?

22   A.   Well, I think at this point he sent us one that didn't yet

23   have the signature pages, but we understood this was the final

24   one.  We just had to get the signature pages attached.

25   Q.   So did you ask for the signature page?

1   A.  Well, I think we had already understood we would be getting

2   those, and he ultimately sent them to us.

3   Q.  I will ask you to look at Government Exhibit 502, and is

4   that a fax from Mr. Collins to your colleague Mr. Nelson with

5   the signature page?

6   A.  Yes.

7            MR. CHERNOFF:  The government offers 502.

8            MR. SCHWARTZ:  No objection.

9            THE COURT:  Received.

10           (Government's Exhibit 502 received in evidence)

11  BY MR. CHERNOFF:

12  Q.  Mr. Tabor, now I want to show you Government Exhibit 501-O,

13  which is in evidence, and this is a document that's also called

14  The Fourth Amended and Restated Limited Liability Company

15  Agreement of Refco Group Limited LLC.

16  A.  OK.

17  Q.  And look at the back of this document.

18           Do you see on page 25, this is an executed copy with

19  signatures from Mr. Bennett, for Refco Group Holdings,

20  Mr. Bennett himself for BAWAG Overseas, Inc., and Mr. Bennett

21  from RGH -- well, Refco Group Holdings LLC?

22  A.  Yes.

23  Q.  Have you had an opportunity to review 501-O?

24  A.  Yes, I have.

25  Q.  When was the first time you saw 501-O?

Capdcol5                        Tabor - direct

1   A.  It was years after the collapse of Refco.

2   Q.  So was this signed copy of The Fourth Amended and Restated

3   Limited Liability Company Agreement ever provided to you by

4   Mr. Collins?

5   A.  No.

6          MR. CHERNOFF:  Your Honor, at this time we offer

7   Government Exhibits 170 through 174, which contain excerpts of

8   Government Exhibit 501-O and Government Exhibit 710.

9          THE COURT:  Any objection?

10          MR. SCHWARTZ:  No objection.

11          THE COURT:  Thank you.  Received.

12          (Government's Exhibits 170 - 174 received in evidence)

13          MR. CHERNOFF:  Could we bring up Government Exhibit

14   170.

15   Q.  So, Mr. Tabor, have you had a chance to look at this slide

16   and the other ones I just made reference to?

17   A.  Yes, I have.

18   Q.  And so the top excerpt refers to Government Exhibit 170.

19   That's the agreement you were provided by Mr. Collins and

20   subsequently provided with a signature page for in June of

21   2004, correct?

22   A.  I'm sorry.  Did you say the top one is that?  I want to

23   make sure --

24   Q.  I'm sorry.  Thank you.

25          The bottom one, Government Exhibit 710.

Capdcol5                        Tabor - direct

1    A.  Right.

2    Q.  And the top one is 501, the exhibit we just looked at, also

3    The Fourth Amended and Restated Limited Liability Company

4    Agreement that you were never provided with?

5    A.  Correct.

6    Q.  So the exhibit makes reference to the executed Fourth

7    Amended LLC, and what Mr. Collins sent to Thomas H. Lee,

8    through you, their lawyer, correct?

9    A.  Correct.

10   Q.  Do you see, first of all, with respect to the date of what

11   Mr. Collins sent to you reflects a date of January 1, 2003?

12   A.  Right.

13   Q.  And the one that is in evidence as Government Exhibit 170

14   was dated February 27, 2003?

15   A.  Yes, I see that.

16          MR. CHERNOFF:  Can we have the next one, Mr. Smith?

17   Q.  Now, Mr. Tabor, do you see that the executed agreement that

18   you did not receive makes reference to a company sale?

19   A.  Yes.

20   Q.  As item number L.

21   A.  Correct.

22   Q.  And the company sale is defined here to include -- I'm

23   picking up on the second box -- "Sale of all the shares, or

24   substantially all of the assets, of one or more of the

25   following entities:  Refco Group Holdings Inc., BAWAG Overseas,

Capdcol5                         Tabor - direct

1   or DF Capital, a Delaware corporation."

2   A.  Yes.  I see that.

3   Q.  Now, in the one that Mr. Collins sent to you, is that

4   definition of company sale, which makes reference to DF

5   Capital, deleted?

6   A.  Yes.  There is no such definition there.

7   Q.  And instead Item L is now the designated amount?

8   A.  Correct.

9           MR. CHERNOFF:  Could we have 172, Mr. Smith?

10  Q.  And so, Mr. Tabor, the executed agreement which you did not

11  receive, here it is little R defines "Holding Company" to mean,

12  among other things, number 3, "DF Capital, Inc., a Delaware

13  corporation."

14  A.  Yes, I see that.

15  Q.  In the LLC Agreement, the Fourth Amended that Mr. Collins

16  sent to you, in Item P, "Holding Company" is also defined,

17  correct?

18  A.  Correct.

19  Q.  But there is no reference to DF Capital, Inc., here?

20  A.  No, there is not.

21          MR. CHERNOFF:  Could we have the next one, 173,

22  Mr. Smith?  Thank you.

23  Q.  In the executed Fourth Amended LLC Agreement, which you did

24  not receive, "Participation Agreement," in double A, means,

25  "The Proceeds Participation Agreement dated as of July 12, 2002

1   between the company and DF Capital Inc."

2   A.  Yes.  I see that.

3   Q.  In the one that Mr. Collins sent you, the space between

4   "non-voting member" and "person" no longer carries any

5   reference to the Proceeds Participation Agreement?

6             MR. SCHWARTZ:  Objection only to the phrase "no

7   longer," your Honor.  We concede there are different -- if he

8   is using verbs like "no longer" or verbs like "deleted," we

9   object.  The comparison is fine.

10            MR. CHERNOFF:  I apologize.  I will rephrase it.

11            THE COURT:  Yes, sir.

12  BY MR. CHERNOFF:

13  Q.  In the agreement which you received, Mr. Tabor, there is no

14  reference here between "non-voting members" and "person" to

15  Participation Agreement, meaning the Proceeds Participation

16  Agreement?

17  A.  That's correct.

18  Q.  And, in fact, in Government Exhibit 710, the LLC agreement

19  you received, there is no reference whatsoever to the Proceeds

20  Participation Agreement?

21  A.  That's also correct.

22  Q.  And there is no reference whatsoever in that document to DF

23  Capital, Inc., is there?

24  A.  No, there is not.

25  Q.  Could we go to 174.  Thank you, Mr. Smith.

1         And the top on the executed Fourth Amended LLC

2    Agreement that is Government Exhibit 501, there is a definition

3    here of assignment of membership shares.  Do you see that?

4    A.  Yes.  I see that.

5    Q.  It begins:  "Except as provided in the Participation

6    Agreement," correct?

7    A.  Yes.

8    Q.  Well, with respect to the bottom slide, what Mr. Collins

9    sent to you, there is no reference to the Participation

10   Agreement in this section?

11   A.  That's correct.

12   Q.  Thank you, Mr. Tabor.  You can put those aside.

13         Let me ask that you take a look at Government Exhibit

14   810A.

15         MR. CHERNOFF:  And, your Honor, we offer that.

16         MR. SCHWARTZ:  No objection.

17         THE COURT:  Received.

18         (Government's Exhibit 810A received in evidence)

19   BY MR. CHERNOFF:

20   Q.  So, Mr. Tabor, this appears to be a memorandum from

21   Mr. Collins to his clients, Mr. Bennett and Mr. Trosten, dated

22   January 22, 2004, so backing up on the calendar.

23         Did you ever receive this memo?

24   A.  No.

25   Q.  And I'm just going to read a portion of it, beginning with:

Capdcol5                    Tabor - direct

1    "Attached is a preliminary draft of the LLC Agreement which

2    would become effective upon closing of the proposed

3    transaction.  To assist your review a marked copy of the

4    enclosed which reflects all proposed changes from the present

5    LLC agreement."  I guess it should say "is enclosed."  Or maybe

6    I am wrong on that.  It says, "A number of points need your

7    consideration."

8            And the first one says:  "DF Capital.  All the DF

9    required charges and references were removed, including the

10   distribution policy in Section 9(c)."

11   A.  I see that.

12   Q.  Attached -- if you take a look at 810B, and we offer that

13   as the attachment to this memorandum, your Honor.

14           MR. SCHWARTZ:  I have no objection.

15           THE COURT:  Received.

16           (Government's Exhibit 810B received in evidence)

17   BY MR. CHERNOFF:

18   Q.  You see there a draft of what's called the Fifth Amended

19   and Restated Limited Liability Company Agreement.

20   A.  Yes, I see that.

21   Q.  And, Mr. Tabor, you had never received this draft of what

22   would be a Fifth Amended and Restated LLC Agreement?

23   A.  No, I did not.

24   Q.  Let me ask that we look at 810C, which I had failed to

25   bring up but we offer it.

Capdcol5                    Tabor - direct

1              MR. SCHWARTZ:  Sorry, your Honor.  Just one moment.

2              THE COURT:  Yes, sir.

3              (Pause)

4              MR. SCHWARTZ:  No objection, your Honor.

5              THE COURT:  Received.

6              (Government's Exhibit 810C received in evidence)

7              MR. CHERNOFF:  If we could bring that up on the

8       screen.

9       Q.  And so, Mr. Tabor, this appears to be an e-mail from

10      Ms. Radatz to Mr. Collins that is responding to an e-mail from

11      Mr. Collins to Ms. Radatz in which she asks, "Could you please

12      send me and Rob Trosten at Refco a copy of the Third Amended

13      Limited Liability Company Agreement of Refco Group Limited LLC,

14      dated July 12, 2003 (I believe).  Thanks."

15             Mr. Tabor, March 2004 is, of course, when due

16      diligence was underway in this deal?

17      A.  Yes, it was.

18      Q.  And Ms. Radatz writes back to Mr. Collins:  "Joe, I found

19      the agreement and send it to Mr. Trosten with a bcc to you.  It

20      is dated July 12, 2002.  You should know that I found several

21      different documents which are all Fourth Amended and Restated

22      LLC for Refco Group.  You have one, Pete has one, and so does

23      Kellie.  Karen."

24             Mr. Tabor, you never received this e-mail from

25      Mr. Collins, did you?

Capdcol5                     Tabor - direct

1    A.   No, I didn't.

2    Q.   After you received the LLC agreements and the other

3    materials we have been talking about, fair to say there came a

4    time when your client entered into the Equity Purchase Merger

5    Agreement with Refco?

6    A.   That's right.

7    Q.   And that was on about June 8, 2004?

8    A.   That's correct.

9    Q.   Let me ask you to take a look at Government Exhibit 1005.1,

10   which is what I will call the EPMA.

11   A.   OK.

12   Q.   Let me ask you this.  This is, I'll just represent to you,

13   the final document.  Do you see, it is signed in the back.

14        What was the process in drafting this documents, to

15   the extent you were involved?

16   A.   Well, it was a process that extended over some period,

17   because I believe early on CSFB had supplied us with some

18   version of a Purchase Agreement.  But once we negotiated

19   essentially this deal, at least to the Letter of Intent stage,

20   it was clear that our deal was going to be a lot different from

21   the agreement they had provided.  So we took their version as a

22   base and kind of created a new form.  So we had Weil prepare a

23   draft and send it to Mayer Brown, and then there was back and

24   forth over a period of time until we got to the point on

25   June 8th of being prepared to sign it.

1   Q.  Who was principally responsible on the Lee side for the

2   draft?

3   A.  On the Lee side was Weil, Gotshal, I would say.

4   Q.  I meant, who at Weil, Gotshal?

5   A.  I would say I was principally responsible, and certainly

6   Adam Nelson and other senior associates were helping me.

7   Q.  And what about on the Refco side, who was principally

8   respond for drafting it?

9           MR. SCHWARTZ:  Objection, your Honor.  How would he

10  know that?

11  BY MR. CHERNOFF:

12  Q.  Mr. Tabor, did you have -- I will lay a foundation, your

13  Honor.

14          Mr. Tabor, did you deal with lawyers from Mayer Brown,

15  representing Refco, who were drafting the EPMA?

16  A.  Yes, I did.

17  Q.  Did you deal with them extensively?

18  A.  Yes.

19  Q.  Who principally did you deal with?

20  A.  Well, I'd say on day-to-day drafting, it was probably

21  Angela Lang more than anybody else.  So after we finished the

22  Letter of Intent and produced a draft of this, we dealt more

23  often than not with Angela, although there were negotiations

24  where we were trying to resolve issues and Mr. Collins was

25  involved as well.  And I certainly had separate conversations

Capdcol5                       Tabor - direct

1    with him about some of the provisions in there as well.

2    Q.  What, if any, relationship is there between the EPMA and

3    the Letter of Intent?

4    A.  I think the EPMA attempts to embody what we describe in the

5    Letter of Intent in more detail, in a way that's fully fleshed

6    out and is legally binding.

7    Q.  And, Mr. Tabor, I am going to skip around this document a

8    little bit because we've heard testimony about it before, but

9    let me ask you about a couple of provisions in 1005.1.

10         First of all, page 6 carries representations and

11   warranties.  Were these things that you helped negotiate?

12   A.  Yes.

13   Q.  And what is the purpose of the representation -- what was

14   your purpose in seeking the language that's in the

15   representations and warranties that are made here by the

16   counterparty?

17   A.  We wanted the counterparty in a legally binding manner to

18   represent certain things about itself, most of which we already

19   had been told, but to put it in black and white so that we

20   could have legal recourse if those things were wrong.

21   Q.  And among the representations and warranties, I will just

22   ask that we skip ahead to Schedule 3.5, which is the

23   representations -- I'm sorry, we can skip that one.  Let's go

24   to 3.9, Mr. Smith.

25   A.  3.9?

Capdcol5                          Tabor - direct

1   Q.  Yes.  3.9 I believe is a representation that Refco had made

2   with respect to its financial statements.

3   A.  Correct.

4   Q.  Let me ask you to take a look at what we'll bring up on the

5   screen as Government Exhibit 6006.

6   A.  OK.

7   Q.  Do you see that's the financial statement for fiscal year

8   2003 of Refco, audited by Grant Thornton?

9   A.  Yes.

10  Q.  And if you could look to page 12.

11  A.  OK.

12  Q.  In Note "i" is there a representation there with respect to

13  the related-party debt RGHI owed Refco in the amount of 105

14  million, according to this statement?

15  A.  Right.  This was the loan that we had discussed before.  I

16  think the amount may have varied slightly from time to time but

17  it was a little over 100 million.

18  Q.  Let me ask you to look at Government Exhibit 6007, if you

19  would bring that up.

20      And is this the audited financial statements for year

21  ending 2004 for Refco, audited by Grant Thornton?

22  A.  Yes.

23  Q.  And if you can flip through the document -- do you have it?

24  A.  Yes.  I put the wrong one aside.

25  Q.  If you just flip to page 12.  In this footnote on

1   related-party transactions, this contains the representation

2   that the related-party debt has now been paid off, correct?

3   A.  I see that, yes.

4   Q.  Now, did you yourself look at these two audited financial

5   statements in connection with this LBO transaction?

6   A.  I certainly remember looking at the 2003 financials in the

7   early stages of our diligence or at some point in our

8   diligence.  I don't specifically remember looking at the 2004

9   financials but I may have.

10  Q.  Why did you look at the 2003 financials?

11           MR. SCHWARTZ:  Objection, your Honor.

12           THE COURT:  The same objection?

13           MR. SCHWARTZ:  Yes.  And I anticipate the ruling.

14           THE COURT:  The same ruling.

15           You may answer it, sir.

16           THE WITNESS:  OK.

17  A.  We wanted to see what debt was disclosed, and we wanted to

18  look at footnotes because the footnotes disclose things like

19  related-party transactions.

20  Q.  Now, with respect to the -- going back to the EPMA, with

21  respect to the representations and warranties --

22           I think we can take that down, Mr. Smith.  Thank you.

23           -- fair to say that most of the representations and

24  warranties provide for schedules to be attached to the EPMA in

25  which disclosure of relevant items can be made?

Capdcol5                        Tabor - direct

1    A.  Yes, that's right.

2    Q.  Let me ask you with respect to the schedules in this EPMA,

3    who drafted them?

4    A.  I don't know specifically who drafted them.  I know they

5    were sent to us by someone at Mayer Brown.

6    Q.  And I'll ask you to take a look at Government Exhibit 711,

7    which I'll offer.

8            MR. SCHWARTZ:  To which we will not object to.

9            THE COURT:  Received.

10           (Government's Exhibit 711 received in evidence)

11   BY MR. CHERNOFF:

12   Q.  Mr. Tabor, do you see that this is an e-mail to Mr. Westra,

13   to yourself, copying Mr. Collins, from Paul Koury at the Mayer

14   Brown firm?

15   A.  Yes.

16   Q.  And it states on the next page:  "Attached, please find a

17   clean and black line version of the revised schedules to the

18   Equity Purchase Agreement.

19           "Please note that these schedules are being delivered

20   simultaneously to our client and internally at MBR&M for review

21   and are therefore subject to further comments."

22   A.  Yes, I see that.

23   Q.  And, by the way, Mr. Tabor, at this point had the law firm

24   Mayer, Brown & Platt changed its name to Mayer, Brown, Rowe &

25   Maw?

Capdcol5                          Tabor - direct

A.   That is my understanding.

Q.   And attached follow, as is represented in the e-mail, what

appear to be draft versions of the schedules that were

ultimately included in the EPMA?

A.   Yes, that's right.

                    (Continued on next page)

CAPPCOL6                          Tabor - direct

1    BY MR. CHERNOFF:

2    Q.   Let me go back to the EPMA for a moment, Government

3    Exhibit 1005.1, Page 23, and you'll see an Article 5 there

4    concerning covenants?

5    A.   Yes.

6    Q.   Was this language that your client saw?  Oh, sorry.  Let me

7    just wait for it to come up on the screen.  Page 23.  That

8    should be Bates 46, if that's better.  Okay.

9         And in the middle of the page, Mr. Tabor, do you see

10   language here that concerns the distribution of funds to

11   include the 500 million in excess working capital that we

12   talked about and the payoff of the purported amount of debt

13   from RGHI to Refco?

14   A.   Yes, I see that.

15   Q.   And was this language your client sought?

16   A.   Yes.

17   Q.   Do you recall whether you discussed the funds'

18   disbursements -- these funds' disbursements with Mr. Collins

19   specifically?

20   A.   When you say "these funds' disbursements," do you mean the

21   distribution or dividend and how it was going to be funded --

22   Q.   Yes.

23   A.   -- partially out of the debt, the elimination of the debt

24   from shareholder?  Yes, I do recall discussing that with him.

25        MR. CHERNOFF:  Could we bring up Government

CAPPCOL6                        Tabor - direct

1    Exhibit 321, which we'll offer pursuant to our stipulation

2    concerning the handwriting of the defendant?

3                THE COURT:  Received.

4                (Government's Exhibit 321 received in evidence)

5                MR. CHERNOFF:  Your Honor, may I just read this

6    because this is in the handwriting of the defendant.

7                "Refco/Royce, April 16th, 2004, telephone from Jay

8    Tabor.  Okay to distribute the 120 million accrual for client,"

9    et cetera.  And then there's a reference to 12 million in cash.

10   A.  Yes.

11   Q.  That was the amount that was going to be used -- I'm sorry,

12   the 120 minus the 12 to pay off all of the purported debt from

13   RGHI?

14   A.  That's right.

15   Q.  Let's look at section 1005.1 of the EPMA, please, which is

16   Page 28.  Government Exhibit 1005.1.  Did I misspeak?  Okay.

17   Segregation of funds.

18             Mr. Tabor, is this the language that you sought with

19   respect to setting aside or segregated the half a billion

20   dollars in purported excess working capital?

21   A.  Yes, it is.

22   Q.  Did you have an understanding that after the signing of

23   this agreement, Refco was going to set up a segregated account?

24   A.  Yes.

25   Q.  Did anyone ever tell you that this account was actually

1    funded by a $390 million overdraft that Refco took from –– that

2    was given by BAWAG?

3    A.  No.

4    Q.  Let me now ask you, I think there's an excerpt of your

5    notes at Government Exhibit 702.  Do you have that document

6    before you?

7    A.  Yes.

8              MR. CHERNOFF:  Government offers 702.  Can I ask a

9    question while you ––

10             MR. SCHWARTZ:  You can have the document.  No

11   objection.

12             THE COURT:  Received.

13             (Government's Exhibit 702 received in evidence)

14   Q.  I'm sorry, Mr. Tabor.  I've lost track of where I was.  Let

15   me back up.

16             I want to focus on the period right before the closing

17   because I'm going to ask you about a specific transaction.  Let

18   me just ask you about the period leading up to the actual

19   closing where the deal was signed.

20   A.  I'm sorry, I just want to make sure you understand the

21   difference between the signing and closing.  They're two

22   different point of times.

23   Q.  I'm sorry.  In my haste, I misspoke.  Just before the

24   signing of the EPMA.

25   A.  Okay.

CAPPCOL6                    Tabor - direct

1   Q.  Not the closing.

2   A.  Okay.

3   Q.  Could you describe what that period was like terms of the

4   work being done?

5   A.  It was really busy.  We were trying to finalize this EPMA,

6   as you refer to it, and various things that went with it.

7   There were -- This was the point in time where we also got a

8   request from Mr. Collins, the subject of these notes that you

9   asked me to look at.

10  Q.  And did you have a discussion around that time with concern

11  to -- with respect to Mr. Bennett's co-owner of RGHI and of

12  Refco, Tone Grant?

13  A.  Yes, we did.

14  Q.  What was Tone Grant's role in the company at that time?

15  A.  Well, as we understood it, he was a 50 percent owner of

16  RGHI, but we did not really think he had a role in the company,

17  as far as operations.

18  Q.  And what did your client require with respect to Mr. Grant?

19  A.  They required that Mr. Grant's ownership be completely

20  extinguished, that essentially Mr. Bennett buy him out so that

21  Mr. Grant would no longer be an owner of RGHI going forward

22  and, therefore, no longer an indirect owner of Refco.

23  Q.  And what, if any, requests did you receive before the EPMA

24  was signed with respect to Mr. Grant?

25  A.  Well, Mr. Collins called me and asked if Lee might

CAPPCOL6                    Tabor – direct

1    reconsider that requirement because, as I recall, he said that

2    Mr. Grant believed that this company was very attractive; that

3    there might be an initial public offering coming down the road.

4    He didn't really want to sell.

5            And so Mr. Collins indicated that the concern was that

6    if they had to buy him out, or if Mr. Bennett did, they would

7    not be able to do so at a price that was reasonable; that it

8    would be an unreasonable price, or something to that effect.

9    Q.  And when you had this discussion with Mr. Collins, was that

10   on the phone or in person?

11   A.  No, it was on the phone.

12   Q.  And did you take notes of that conversation?

13   A.  Yes.

14   Q.  And that's what's been admitted as Government Exhibit 702?

15   A.  Correct.

16   Q.  How did you and your client react to the request

17   Mr. Collins was making on behalf of Mr. Grant?

18   A.  I took it -- I told Mr. Collins I would take it up with the

19   Thomas Lee guys, and I did.  And they reacted very negatively,

20   basically indicating it was a non-starter.

21   Q.  And did you communicate that back to Mr. Collins?

22   A.  I did.

23   Q.  Did you have an understanding as to whether Mr. Bennett

24   then proceeded to buy out Mr. Grant?

25   A.  Yes.  The EPMA required that that happen as a condition to

1   closing, and we negotiated to get a certificate from Mr. Grant

2   indicating he no longer had an ownership interest as of the

3   closing.

4   Q.  You said you negotiated to get a certificate?

5   A.  Yes, that was a closing condition built into the EPMA to

6   get that certificate.

7   Q.  Did you ask Mr. Collins whether you could see the actual

8   agreement with Mr. Grant?

9   A.  At some point leading up to the closing, I asked him if he

10  intended to share it with us, and he indicated that he did not.

11  He pointed me back to the provisions in the EPMA that indicated

12  we would get a certificate from Mr. Grant saying he no longer

13  had an interest.

14  Q.  Let me ask you to look at Government Exhibit 1005.29 and

15  tell me when you're there.

16  A.  I'm there.

17  Q.  Is that the certificate you received concerning Mr. Grant's

18  being bought out, as I'll say?

19  A.  Yes.

20          MR. CHERNOFF:  Government offers 1005.29.

21          MR. SCHWARTZ:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 1005.29 received in evidence)

24  Q.  Let me now show you Government Exhibit 1005.28, which I

25  believe is in evidence.  This is titled:  A stock purchase

CAPPCOL6                        Tabor - direct

1    agreement?

2    A.  Yes, I see it.

3    Q.  And did you see it's between Mr. Bennett and Mr. Grant?

4    A.  Yes.

5    Q.  This is the agreement you'd asked Mr. Collins if you could

6    have, and he said he didn't intend to share it with you?

7    A.  That's right.

8    Q.  When was the first time you saw this stock purchase

9    agreement between Mr. Bennett and Mr. Grant?

10   A.  It was years after Refco blew up.

11   Q.  And let me ask you to look at Page 2, which makes reference

12   to a cash amount which is defined as $4 million plus the

13   estimated tax amount.

14   A.  Yes.

15   Q.  What was your reaction upon learning that Mr. Grant only

16   received $4 million plus an estimated tax amount for his

17   ownership interest in Refco?

18             MR. SCHWARTZ:  Objection, misstates the document.

19             MR. CHERNOFF:  May I have a moment, your Honor?

20             THE COURT:  Yes.

21             MR. CHERNOFF:  I think I understand the objection,

22   your Honor.

23   Q.  Mr. Tabor, is there also a deferred amount that's

24   referenced on Page 2?

25   A.  Yes, there is.

CAPPCOL6                        Tabor - direct

1    Q.  I won't ask you to calculate it, but with respect to the

2    cash amount of $4 million that Mr. Grant -- plus the estimated

3    tax amount that Mr. Grant was receiving, how did you react upon

4    learning of this document, of its provisions?

5             MR. SCHWARTZ:  Objection to his reaction.

6    Q.  Let me be more focused.  What was your reaction in the

7    context of what you'd understood about the deal for Mr. Grant's

8    interest in Refco?

9             MR. SCHWARTZ:  Objection.

10            THE COURT:  Basis, please?

11            MR. SCHWARTZ:  Relevance, your Honor.  He's already

12   stated what he expected.  The document speaks for itself.  His

13   reaction has no relevance, no relevance to any issue.

14            THE COURT:  I think he's entitled to say whether it

15   was consistent or inconsistent, right?

16            MR. CHERNOFF:  Shall I rephrase, your Honor, and try

17   it again?

18            THE COURT:  Yes.

19   Q.  When you learned of this document, did it comport with your

20   understanding of what Mr. Grant would receive, based on your

21   discussions and negotiations of the deal with Refco?

22   A.  No.

23   Q.  How not?

24   A.  I had understood from Mr. Collins that it was going to be

25   difficult to negotiate a purchase with Mr. Grant at a price

1   that was reasonable, and we understood that Mr. Grant owned

2   half of RGHI, which owned 90 percent of Refco, which our client

3   was paying a ton of money for, so we expected this to be

4   hundreds of millions of dollars.

5   Q.  And who was representing RGHI and Mr. Bennett in the buyout

6   of Mr. Grant?

7   A.  I think Mr. Collins was.

8          MR. CHERNOFF:  Could we bring up Government

9   Exhibit 1250C.  In case that's not in, we offer it as the

10  billing records from Mr. Collins.

11         MR. SCHWARTZ:  No objection.

12         THE COURT:  Received.

13         (Government's Exhibit 1250C received in evidence)

14         MR. CHERNOFF:  And could we -- Let me just pose a

15  question to the witness.

16  Q.  Mr. Tabor, do you see this is a detailed report by matter?

17  I know this is not your firm, but this is the kind of thing

18  that lawyers use to keep track of their hours when they work

19  with clients?

20  A.  It looks like it to me.

21         MR. CHERNOFF:  Let me ask Mr. Smith if we could go to

22  Bates number ending 773 and 774.  And, sorry, if we could zoom

23  back out, Mr. Smith.  And if we could just highlight on the

24  right-hand -- actually, the bottom part of the screen there's

25  some dates that begin with July 15th.  It's actually above

1     that, July 13th.

2              And I'll just note for the record, your Honor, that on

3     July 13th, and I apologize I'm reading from the screen because

4     I don't have my highlighted version, it says "Various comps on

5     open issues including Grant agreement."

6              The next entry, July 14th.  Thank you, Mr. Smith.

7     "Comps regarding and revising Grant agreement."

8              July 15th, "Reviewing and revising Grant's agreement."

9              And then I think the next page is 774 and the middle

10    of the page, around July 26th, "Changes to credit agreement and

11    Grant agreement."  Thank you, Mr. Smith.

12    Q.  The Grant stock purchase agreement that we've just been

13    looking at, did it come to your attention at some point that

14    that agreement made it into the closing binder that was

15    prepared in connection with this deal?

16    A.  Yes, it did.

17    Q.  Were you aware, prior to the collapse of Refco, that that

18    was in the closing binder?

19    A.  No.

20    Q.  Had you ever seen the Grant stock purchase agreement prior

21    to the collapse at Refco?

22    A.  No.

23    Q.  Had anyone brought it to your attention that it was on a

24    shelf in a closing binder at Weil?

25    A.  No.

1   Q.  Let me now advance ahead to the closing itself.  What

2   generally had to be done between the signing of the EPMA and

3   the closing?

4   A.  A number of things.  There were regulatory approvals that

5   had to be obtained, financing had to be completed, and there

6   were various documents had to be delivered at closing that had

7   to be completed, cleared with the other side and executed and

8   delivered.

9   Q.  And did you have any role in that?

10  A.  Yes, I did.

11  Q.  What was your role?

12  A.  I was the main partner on the Weil side; so I was overall

13  responsible.

14  Q.  And where did that closing take place?

15  A.  It took place in Weil's office here in New York.

16  Q.  Now, skipping ahead with some large chunks of time.  After

17  this closing, there was ultimately an IPO in which Refco stock.

18  The Refco majority now being told by Thomas H. Lee, was sold to

19  the public?

20  A.  That's correct.

21  Q.  And did you go any legal work for Thomas H. Lee, any

22  significant work from the time of the closing to the IPO?

23  A.  Not other than there were some mechanical restructurings

24  that needed to be done to get entities in the right form to do

25  the IPO, and that had all been pre-negotiated as part of the

1    LBO and the shareholder agreement with Mr. Bennett.

2              So I did oversee that work, but it was mechanical.  It

3    wasn't the offering work itself.

4    Q.  And were you still, at that time, working out of the firm's

5    Dallas office?

6    A.  Yes.

7    Q.  After the closing, did your firm do additional work for

8    Refco?

9    A.  After the LBO closing?

10   Q.  Yes.

11   A.  Yes, I believe we worked on the IPO.  "We" as a firm.

12   Q.  And after the collapse of Refco, did your firm continue to

13   represent Thomas H. Lee in connection with other matters?

14   A.  Yes.

15   Q.  Have you, yourself, been personally involved in any of

16   those representations of Thomas H. Lee?

17   A.  Not subsequent to the blowup of Refco, no.

18   Q.  And, Mr. Tabor, have you given depositions and other

19   testimony in connection with the litigation following the

20   collapse of Refco?

21   A.  Yes.

22   Q.  Did there come a time after the events we've been talking

23   about, after the closing of the LBO, that you learned that the

24   defendant, Mr. Collins, was disputing whether you and he had

25   ever had a conversation about due diligence on or about

1   March 23rd, 2004?

2   A.  Yes.  I learned that years later, as part of some

3   proceeding.

4   Q.  Have you personally seen or heard any of his testimony on

5   that subject?

6   A.  No, I have not.

7            MR. CHERNOFF:  Your Honor, at this time, the

8   government offers prior testimony of the defendant, Government

9   Exhibit 2206 and 2207.

10            THE COURT:  Yes, sir.  Received.

11            (Government's Exhibit 2206, 2207 received in evidence)

12            MR. CHERNOFF:  Prior testimony of Joseph Collins:

13   "Q. There were some drafting sessions in connection with

14   something called a letter of intent on April 9 and April 15,

15   2004.  Did you attend those?

16   "A. Yes, I did.

17   "Q. Who was present at those meetings?

18   "A. I believe that -- I can't name every person there.  I know

19   Mr. Bennett attended, I attended.  At the first meeting, I

20   believe Lawrence Goldberg and Joe Beluso from Credit Suisse

21   were there, and Mr. Westra and Mr. Tabor were there.

22   Mr. Schoen, I believe Mr. Jaeckel from Lee was there, and there

23   were a few other participants from Lee that I don't know, and

24   an investment banker for Lee that I can't remember.

25   "Q. You mentioned Mr. Tabor and Mr. Westra.  Were those both

1  lawyers for Weil Gotshal, the law firm representing Lee, who

2  testified at this proceeding?

3  "A. Yes, they were.

4  "Q. Had you ever met them before these April meetings?

5  "A. No, that was the first time I met them.

6  "Q. Had you ever spoken with them on the phone previously?

7  "A. No, I hadn't.  That was the first time.

8  "Q. What about in March of that year, had you ever spoken with

9  them on the phone or met with them in March of 2004?

10  "A. No, I didn't."

11          Your Honor, I'm now on Government Exhibit 2207, prior

12  testimony of Joseph Collins:

13  "Q. You heard Mr. Tabor testify that he had been on phone calls

14  with you about diligence in March; do you remember that?

15  "A. I remember that, yes.

16  "Q. Were you involved in any phone calls with him about

17  diligence in March?

18  "A. No, I was not."

19          Your Honor, Government Exhibit 2205 is videotaped

20  testimony of the defendant, which we offer.  We have a

21  transcript prepared from that videotape.

22          THE COURT:  Received.

23          (Government's Exhibit 2205 received in evidence)

24          THE COURT:  And are you offering the transcript as an

25  aid or as evidence itself?

1           MR. CHERNOFF:  I think as evidence itself because it

2     was prepared by the reporter.

3           THE COURT:  Thank you.

4           MR. CHERNOFF:  And so Mr. Levy is handing that out,

5     and then we're going to play the videotape.

6           THE COURT:  Does everybody have one, friends?

7           MR. CHERNOFF:  Thank you, your Honor.

8           (Video being played)

9           MR. CHERNOFF:  Thank you, your Honor.

10    BY MR. CHERNOFF:

11    Q.  Mr. Tabor, at the time that you learned that Mr. Collins

12    was in certain litigation disputing that you had a

13    March 2004 -- March 23rd, 2004, conversation about due

14    diligence, where were those note pads that I've provided you

15    with today?

16    A.  They were in custody of Weil lawyers in New York who had

17    had them since shortly after the blowup back in 2005.

18    Q.  And did you have some understanding that, by that point,

19    copies of them had been produced to various parties in

20    litigation from the bankruptcy of Refco?

21    A.  That was my understanding, yes.

22    Q.  And the copies had been produced to the U.S. Attorney's

23    Office?

24    A.  Yes.

25    Q.  And your billing records for that same time period, you had

CAPPCOL6                    Tabor - direct

1    furnished to the same parties?

2    A.   That's my understanding.

3    Q.   Let me ask you about your billing records.  What do those

4    generally reflect?

5    A.   When you say what do they reflect, you mean --

6    Q.   Why do you have them?  What do you put in the detail?

7    What's your purpose --

8    A.   They're descriptions.  They're ultimately used for bills

9    that get sent to clients.

10   Q.   And do you enter on them details about the kind of work you

11   did on a given day?

12   A.   Ordinarily, if I bill any time on a given day, I'll put

13   some description of what I was doing.

14   Q.   And why do you put that kind of detail?

15   A.   Just so the client can see what they're paying us for, if

16   we're billing them for something.

17   Q.   Now, in preparation for your testimony today, did I ask you

18   to sit with me and Postal Inspector Clark, who's actually

19   stepped out at the moment, to review those note pads?

20   A.   Yes.

21   Q.   And did I ask you to compare your original note pads with

22   the billing records that you prepared and kept during the same

23   time period that we looked at?

24   A.   Yes, you did.

25   Q.   And did I ask you to compare your notes to the detail you

CAPPCOL6                          Tabor - direct

1   entered in the billing records to see if there was any

2   correspondence between the two sets of documents that reflected

3   a chronology?

4   A.  Yes.

5   Q.  And did you, in fact, tab up those two note pads with

6   respect to some potentially relevant entries?

7   A.  I did I put some tabs.

8   Q.  Okay.  Let me ask you to take out the first book or first

9   note pad.  I should say Government Exhibit 781.

10  A.  I'm trying to find the pad with tabs.

11          THE COURT:  Is that the one in the corner?

12  A.  There it is.

13  Q.  And if you could hold it up, please?

14  A.  Okay.

15  Q.  Since the time that you had it, there's been some nylon

16  ties added into the holes to keep that together?

17  A.  Yes.  Since the time that I last had this, it was in actual

18  pads.  I mean, the pages have been taken out, but the ties have

19  been added to --

20  Q.  So that somewhere between when you had it and when in the

21  copies were provided, the pad was taken apart?

22  A.  Right.

23  Q.  For whatever purpose, to be copied or whatever?

24  A.  Right.

25  Q.  Okay.  So let me ask you now to look at the first tab.

1          MR. CHERNOFF:  And, Mr. Smith, this is Bates number

2    049, and can we also bring up Government Exhibit 178.  We'll

3    try to do it side by side.  Page 642 on the Bates numbers

4    and -- I'm sorry, before we do that, let's just leave that

5    first page up just a minute.

6    Q.  Mr. Tabor, Government Exhibit 178 is a bill from Weil

7    Gotshal to Thomas Lee Partners dated August 9, 2004?

8    A.  Okay.

9    Q.  Do you see that?  I don't know if you have the document.

10   A.  Yes.  Yes, I see it.

11   Q.  And that's for professional services rendered in connection

12   with project Royce for the period through July 31st, 2004,

13   correct?

14   A.  Correct.

15          MR. CHERNOFF:  Government offers 178.

16          MR. SCHWARTZ:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 178 received in evidence)

19          MR. CHERNOFF:  And, Mr. Smith, if we could advance

20   ahead to 642.

21   Q.  So looking, when we're there, Mr. Tabor, what, if anything,

22   in your notes, if you can read them to us --

23   A.  Yeah.

24   Q.  -- relates to the time you entered for February 27, 2004?

25   A.  Again, the date on these notes, February 27th, I refer to

2454

CAPPCOL6                        Tabor - direct

1   the call with the Lee company.  I mentioned George, Scott

2   Schoen and Max, those are all Lee people.

3   Q.  And when you say the date on the notes, that's in the upper

4   left-hand corner?

5   A.  Yes.

6   Q.  February 27th?

7   A.  Right.

8   Q.  Okay.  Tab 2A, is that the next page in this note pad?

9   A.  Yes.

10  Q.  And we're going to bring up the billing records from

11  March 1st, 2004, and so what, if anything, on the notes that

12  you tabbed --

13          MR. CHERNOFF:  I'm sorry, Mr. Smith.  It's 050 on the

14  notes.  And, your Honor, the print is a little small on the

15  side by side; so we'll make an effort to blow it up.

16          THE COURT:  Yes, sir.

17  Q.  Mr. Tabor, what, if anything, on the notes on the left-hand

18  side relate to time that you billed in the billing records on

19  the right-hand side, and tell us where to find that and

20  we'll --

21  A.  Yeah, just one second.

22  Q.  Absolutely.

23  A.  Okay.  This -- On the -- I think we're on a different page

24  here, though, because I think it should be the 1st of March.  I

25  don't see any time for me on that page, for the 1st of March.

CAPPCOL6                          Tabor - direct

1    Q.  Sorry.  We might be on the wrong page.

2              MR. CHERNOFF:  Could we go to 45, Mr. Smith.

3    Q.  And at the top, you'll see your time for March 1st.

4    A.  There we go.

5    Q.  And we'll blow that up.

6    A.  So the initial part of the time description there,

7    "preparing for and participating in telephone conference with

8    Westra and Conrad Bahlke regarding regulatory compliance

9    diligence."

10   Q.  A little slower, Mr. tabor.  Our court reporter is typing

11   as fast as she can.

12   A.  The language saying, "Prepare for and participate in

13   telephone conference with Westra -- with J. Westra and C.

14   Bahlke regarding regulatory compliance and diligence."  So

15   that, really the first four or five lines there of that

16   description --

17   Q.  Yes.

18   A.  -- are referring to this conference call with the Weil

19   group.

20   Q.  With the Weil group on the left-hand side?

21   A.  Yes.

22   Q.  Okay.  Now, if you could keep turning through that note pad

23   in order.  I think about five pages, six pages on, you have a

24   Tab 2B?

25   A.  Correct.

1              MR. CHERNOFF:  Okay.  And we can leave the same

2     billing records up.  What, if anything on the page -- I'm

3     sorry, Mr. Smith.  It's Page 55 on the Bates.  We're there.

4     Great.

5     Q.  What, if anything, on what you tabbed as 2B relates to

6     detail that you entered on the billing records?

7     A.  The last part of it, starting about five or six lines up,

8     it says, "Telephone conference with D. Klejna, J. Westra and C.

9     Bahlke and others regarding litigation and compliance matters."

10    Q.  And I'm sorry --

11    A.  It stops there; so it's --

12             MR. CHERNOFF:  Could we blow that up on the billing

13    records?  Oh, we can't blow it up.  All right.  Too much data

14    on the screen.

15    Q.  What on the notes does that relate to, Mr. Tabor?

16    A.  That's relating to this page and several pages that follow

17    that describe our conversation with Dennis Klejna at the

18    company about various compliance matters.

19    Q.  Okay.  So it looks like, at the top, your conference call

20    with, but you forgot to write who it was with?

21    A.  I didn't write who it was with.  Once again, these were

22    just for my own benefit.

23    Q.  Of course.  And then the language that follows on the next

24    few pages relates to this conference call with Mr. Westra,

25    Mr. Klejna and the others that you mentioned?

1    A.   Right.

2              MR. SCHWARTZ:   Could we have Bates numbers so the

3    record is clear?

4              MR. CHERNOFF:   Yes, Mr. Schwartz.

5    Q.   How many pages of notes relate to that?

6    A.   It's the last thing -- let's see, one, two, three, four

7    pages.  The last thing is regarding the SEC where it says you

8    can't tell --

9              MR. CHERNOFF:   That's Bates 555 to 558.

10             MR. SCHWARTZ:   Your Honor, if we could have a

11   reference to the date that he read from, the billing records.

12             THE COURT:   From the billing records?

13             MR. SCHWARTZ:   Yes.

14             THE COURT:   The date on the billing records, sir, was

15   that --

16             THE WITNESS:   It's March 1st.

17             THE COURT:   -- March 1?

18             THE WITNESS:   Yes.

19             MR. CHERNOFF:   Thank you, your Honor.  Okay.

20   Q.   So we were on Bates 58, for our reference.  If you could

21   turn three pages further into the note pad, I think there you

22   tabbed a three?

23   A.   Yes.

24   Q.   And let me ask --

25             MR. CHERNOFF:   That's Bates number 61, Mr. Smith.

CAPPCOL6                        Tabor - direct

1    Q.   And let me ask you to flip -- Actually, let me ask you what

2    you recall the notes in three relating to?

3    A.   I actually had gone through a version of these time records

4    and tabbed the time records, but that's not what I have here

5    with me.  So I apologize because I'd have to go through and

6    figure out which time record --

7    Q.   Oh, I have your tabs here so I can bring them up on the

8    screen; so that wasn't clear.

9             MR. CHERNOFF:  So let me bring up 646, Mr. Smith, on

10   the time records, and I think here we could focus in on the

11   time that was billed by Mr. Silverberg on March 5th.

12   A.   Right.

13   Q.   And what about the entry Mr. Silverberg made on March 5th

14   relates to your notes?

15   A.   Well, these are notes of the same conversation regarding

16   the tax structure of the transaction.  Mr. Silverberg is a tax

17   partner at Weil.  So I had notes of this conversation that

18   included the tax people at KPMG, as well as some of the Lee

19   people, and Mr. Silverberg discussing the tax transactions

20   structure.

21   Q.   And Mr. Silverberg billed some time, as we see here on the

22   billing records, that refers to telephone conferences with

23   Mr. Westra and yourself?

24   A.   Right.  And with the client and KPMG and others.

25             MR. CHERNOFF:  Okay.  Now, I want to advance one page,

1   Mr. Smith, on the billing records to 647.

2   Q.  And this is the same date for time on March 5th, 2004, that

3   we just saw for Mr. Silverberg, correct?

4   A.  That's correct.

5   Q.  Did you bill any time for the work that you were doing with

6   Mr. Silverberg that day?

7   A.  No, I didn't bill time for that call.

8   Q.  Did you forget, or you intentionally didn't bill it?

9   A.  I don't recall, as I sit here now.  It's not uncommon that

10  I do something without starting my clock.  I'm careful not to

11  bill things unless I work on them, but people usually don't

12  complain if I do something and don't start my clock.

13  Q.  So whatever work you did with Mr. Silverberg that day was

14  not charged to the client?

15  A.  That's right.

16  Q.  Now, on the March 5th billing records, you did bill some

17  work that you did on this matter, correct?

18  A.  That's correct.

19  Q.  And I think as you -- If you move ahead in your note pad

20  three pages, you've placed a Tab 4?

21  A.  Correct.

22  Q.  Do you see that?

23       MR. CHERNOFF:  And that's Bates number 64 on the

24  notes, Mr. Smith.  I'm sorry.

25  Q.  Okay.  So what, if anything, on the notes we see on the

CAPPCOL6                     Tabor - direct

1    left-hand relate to the time that you billed on March 5th of

2    2004?

3    A.   The highlighted entry portion there, it says, "Prepare for

4    and participate in call with Refco management regarding" --

5              THE COURT:  Slowly.

6    A.   -- "diligence" -- I'm sorry?

7              THE COURT:  Slowly.  "Diligence."

8    A.   Okay.  I'm sorry.  "Regarding diligence, regulatory capital

9    matters."

10   Q.   And we see that in the billing records.  What in your notes

11   relate to that time billed on March 5th?

12   A.   The notes that start here that show that the names of the

13   people at the top and say "regulatory capital call" and go to

14   the next few pages.

15   Q.   And the reference to Rob and Phil, I gather, are Robert

16   Trosten and Phillip Bennett of the Refco company?

17   A.   Correct.

18   Q.   And then you wrote "capital call to" --

19   A.   "Regulatory capital call," yes.

20   Q.   Okay.  And in the pages that follow in this note pad,

21   there's some notes concerning that call?

22   A.   Yes.  It looks like one, two, three, four, five, six -- six

23   pages.

24   Q.   I think that takes us to Bates number 69, for the record.

25   A.   Right.

1    Q.  Okay.  So let's turn two pages further from that, where I
2    believe you posted a Tab 5.
3           MR. CHERNOFF:  And this is Bates No. 72, Mr. Smith.
4    A.  Correct.
5           MR. CHERNOFF:  And I'll ask that you bring up the
6    billing detail for time you billed on March 9, 2004.  This is
7    Bates 648, Mr. Smith.  Okay.
8    A.  Okay.
9    Q.  I'm not going to ask you to read those notes, but tell me
10   what here relates to time you billed to your client on
11   March 9th?
12   A.  Well, if you look at the top of this page, I know it's hard
13   to see, it says, "Call with KPMG Francois," and then there's
14   other stuff here that talks about Conrad, and it goes into a
15   discussion of regulatory capital.
16          That corresponds to the billing entry for the 9th, or
17   at least the first part of it.  "Telephone conference with," it
18   should be "C. Bahlke," Conrad Bahlke, and "F," that's Francois,
19   "Cooke of KPMG regarding regulatory capital requirements."
20   Q.  Okay.  Now, I want you to turn ahead further into this note
21   pad.  We're still in the first note pad, correct?
22   A.  Correct.
23   Q.  And Tab 6 is the same one you tabbed Tab A with reference
24   to our conversation earlier about the phone call you had with
25   the defendant on March 23rd, correct?

1   A.  Correct.

2           MR. CHERNOFF:  And if we could just bring up the

3   March 23rd notes.  I'm sorry, Bates number 85.  We can take

4   down the right-hand side to make room here.

5   Q.  These March 23rd notes, Mr. Tabor, is this another instance

6   where you failed to bill your client any time for this work?

7   A.  That's right.

8   Q.  What were you doing on March 23rd?  Were you in Dallas, in

9   New York?  What do you recall?

10  A.  I was in New York, mainly at a client's offices in

11  meetings.

12  Q.  A different client?

13  A.  Yes, a different client.

14  Q.  And approximately how many hours did you work that day for

15  another client in New York?

16  A.  Well, I think there were two different ones.  I know one

17  was over eight hours, and I think the other one was two or

18  three hours.

19  Q.  And your answer, I assume, is based on your review of your

20  billing records from March 23rd?

21  A.  Correct.

22  Q.  And so however much time you spent on the March 23rd call,

23  you did not bill your client for that particular phone call?

24  A.  That's right.  Although, I see some other people mention me

25  in billing records, but I didn't bill anything.

CAPPCOL6                        Tabor - direct

1    Q.  And looking at the notes, this is what you described

2    earlier today as the conversation on due diligence, that was

3    just yourself and Mr. Collins?

4    A.  That's right.

5    Q.  And you began by writing, "Joe will push to get responses

6    to our open requests"?

7    A.  Correct.

8    Q.  I think a little further down on this page it says, "Joe

9    confirms that"?

10   A.  Yes.

11   Q.  Something, what does that say?

12   A.  Company confirmed -- I'm sorry, "Joe confirms that

13   company," it says "no payee."  I meant, "not payee of debt

14   other than customer receivables arising in ordinary course of

15   business, receivables on balance sheet -- on balance sheet from

16   customers in ordinary course, company has gone through with

17   accountants."

18   Q.  Great.

19            MR. CHERNOFF:  Mr. Smith, could we just highlight also

20   the word "debt" up there by one.

21   Q.  Mr. Tabor, let's look at the next page of these notes,

22   Bates 86.  What in your notes here relate to what you told us

23   you remember of your conversation with Mr. Collins on that

24   date, March 23rd, 2004?

25   A.  No. 5 at the bottom, which is "stock options, et cetera."

1    Q.  And that was the part of the conversation where you asked

2    whether anyone had an option or any entity had an option to

3    acquire stock or equity in Refco?

4    A.  Right.

5    Q.  And you wrote, "Joe says Phil confirms none exist"?

6    A.  Right.

7    Q.  Let's take a look at the next page, please, Bates 87.

8    Anything here that relates to the topics you told us you

9    recalled discussing with Mr. Collins on March 25th?

10   A.  Yes, Item 6.

11         MR. CHERNOFF:  Can we highlight Item 6, Mr. Smith?

12   Q.  And what does that say or --

13   A.  Yeah, I use abbreviations, but "K" is contract,

14   "contract/arrangements with Phil/RGHI or affiliates.  Joe

15   confirmed with Phil that none exist other than Phil's Comp.

16   arrangements," and that says, "make sure no written comp

17   exists, question mark, Joe confirms" -- I'm sorry.  I need to

18   repeat that last part.  "Make sure no written comp agreement

19   exists, question mark, Joe confirms."

20         MR. CHERNOFF:  And could we look at the next page,

21   Mr. Smith, Page 88.

22   Q.  Are we still on notes concerning the call to Mr. Collins?

23   A.  Yes.

24   Q.  What were you talking about in reference to these notes?

25   A.  We were just going through the list of the acquisitions

1   that Refco had done that we had seen documents for in the data

2   room to make sure that we had seen everything.

3   Q.  And the next page, Page Bates 89.  Still part of the

4   conversation, still notes on it?

5   A.  Yes.

6   Q.  Let's look at Page 90, is this the last page of notes that

7   you have on that --

8   A.  Yes.

9   Q.  -- conversation?  And what here in the notes relate to what

10  you told us you remember about how the conversation wound up?

11  A.  Two things.  The language at the top, it says, "Joe to

12  arrange for call with Dennis K," Dennis Klejna, "and Rob T,"

13  Rob Trosten, "as well to go over remaining diligence questions

14  to be scheduled separately."

15          That was the call I had mentioned that we were trying,

16  for various reasons, to get set up.  So that's the first part.

17  Q.  And the second part?

18  A.  "Still need to get info re: SEC inquiry status, background,

19  et cetera.  This to be scheduled separately."  That's referring

20  to the Sedona matter we talked about.

21  Q.  Is this the end of the notes you took on your March 23rd

22  call with Mr. Collins?

23  A.  Yes.

24  Q.  And to be clear, this appears to be what Mr. Collins

25  testified, and what we just saw on the screen, as never having

CAPPCOL6                        Tabor - direct

1   occurred?

2   A.   That's my understanding.

3            MR. CHERNOFF:  Your Honor, I have a few more entries

4   in the next notebook.  I can try to finish them.

5            THE COURT:  What do you want to do, ladies and

6   gentlemen, do you want to finish the entries and then break or

7   what?

8            JUROR:  Finish.

9            THE COURT:  Finish the entries.

10           MR. CHERNOFF:  Thank you, your Honor.

11           THE COURT:  Thank you, ladies and gentlemen.

12  Q.   Okay.  So, Mr. Tabor, with respect to relations in time and

13  the chronology of the note pad, mine is pulled apart, but if

14  you could just hold up the first notebook, 781, we're now at

15  the end of that on the course of notes that you took on this

16  deal?

17  A.   Right.

18  Q.   And going to Exhibit 782, is that next note pad that you

19  took, book No. 2?

20           MR. CHERNOFF:  This is in evidence, and I'll ask

21  Mr. Smith to bring up the page.  Thank you, Mr. Smith.

22  A.   Okay.

23  Q.   You have book No. 2?

24  A.   Yes.

25  Q.   And is this the next book that you -- I keep saying "book,"

1  but the next note pad you picked up to take notes on the Royce

2  deal?

3  A.  Yes.

4  Q.  Okay.  I think one page in, on Tab 7, which is Bates number

5  140, you took some notes that you talked about earlier today

6  because this was also Tab B relating to the March 30th call

7  with Refco, correct?

8  A.  Correct.

9  Q.  And this is the call that you think Mr. Collins may well

10  have been on, but you're not a hundred percent sure?

11  A.  That's right.  I'm not a hundred percent sure.

12  Q.  And we see that you listed as a participants Dennis Klejna,

13  Mr. Trosten and Phillip which I presume is Bennett?

14  A.  Correct.

15          MR. CHERNOFF:  And let me ask you now if we could

16  bring up on the billing records the time on Page 58.  Here, if

17  we could highlight the time on March 30th for Mr. Tabor.

18  Q.  Mr. Tabor, one of the titles that you billed on on

19  March 30th relates to the call that you took notes on on

20  March 30th?

21  A.  It's language -- I think it's difficult for you to

22  highlight it precisely there, but starting in the line that you

23  highlighted after the semi colon, it says, "Telephone

24  conference with P. Bennett, R. Trosten, D. Klejna, C. Bahlke

25  and D. Gewirtz regarding diligence items."

1   Q.  And let's look back at the notes now.

2              MR. CHERNOFF:  If we could, for the sake of blowing up

3   the notes, take down the billing records.

4   Q.  You testified earlier today about the subjects that were

5   discussed in the March 30th call.  Just take us briefly through

6   the notes and tell us what entries here relate to the subjects

7   you told us were discussed on the call?

8   A.  Okay.  Very briefly, "debt," and we've got confirmation

9   from Mr. Bennett that there wasn't any, except that had been

10  provided to us, and he mentioned the $16 million wholly

11  internal piece.

12  Q.  Let's talk about that, the debt.  That's where you wrote 16

13  million and wholly?

14  A.  "Interco," just among the Refco companies themselves, not

15  with shareholders.

16  Q.  Okay.  Next page is Bates 141, anything there?

17  A.  Yes.  At the top of the page, "agreements among owners."

18  Q.  And how did the notes you took there relate to what you

19  told us you talked about on March 30th with the Refco

20  representatives?

21  A.  There's some scribbling here, but if you look at the left

22  margin, it says "fairly standard agreements," and then there's

23  an arrow that says "not impacting Refco at all, only a remote

24  entity through which Phil, Grant, BAWAG own interest in Refco,

25  RGHI."  I think what I wrote down is like mistaken because they

1    didn't all own an interest in RGHI.

2    Q.  Page 3, which is Bates 142, and what, if anything, on this

3    page consists of notes that relate to the subject you told us

4    were discussed in the call?

5    A.  I don't think we talked about any of this stuff earlier.

6    Q.  "Customer K" relates to customer contracts?

7    A.  Correct.

8    Q.  Go ahead and look at the next page, 143.  What were you

9    talking about as your notes reflect here?

10   A.  I don't think -- None of the stuff I mentioned earlier, I

11   think, is relevant for these, for this page of notes.

12   Q.  These were other due diligence requests?

13   A.  Other things we asked about.

14   Q.  144, anything there that you talk about, or are these just

15   other routine notes?

16   A.  These are other intellectual property and real estate and

17   things like that, there was other categories of things.

18   Q.  Okay.  And the next one, page 45?

19   A.  No. 11.

20   Q.  Mmm, hmm.

21   A.  "No outstanding stock options, warrants, et cetera" at the

22   top of the page there.

23   Q.  And remind us what you told us you talked about that

24   relates to that entry on your notes?

25   A.  I asked if there were any stock options or other rights

1   anybody had to become an owner of Refco, and Mr. Bennett said

2   that there were no such rights.

3   Q.  Next page, Page 46, please?

4   A.  No. 14 at the top of the page.

5   Q.  Yes?

6   A.  "No other material contracts," and then it says, "No

7   contracts, arrangements between company and Phil or his

8   affiliates except for compensation he gets in ordinary course,"

9   and I have an arrow, something, "salary, check what bonuses he

10  gets, no employment agreement as such, question, no."

11  Q.  Thank you.  Page 47?

12  A.  This is bottom of 46 and top of -- and all this on 47 deals

13  with the SEC investigation.

14  Q.  The Sedona matter?

15  A.  The Sedona matter, yes.

16  Q.  And tell me when we get to the end of your notes on that

17  call?

18  A.  That's the last page that's on the screen there.

19  Q.  Page 47?

20  A.  Yes.

21  Q.  Okay.  So let me ask you now to flip one, two, three -- six

22  more pages into this note pad.  You placed a Tab 8, I believe,

23  and I'll ask that we bring up in the billing records,

24  Government Exhibit 178, Bates number 659.

25          MR. SCHWARTZ:  Do you have the Bates number for the

1    notes, your Honor?

2              MR. CHERNOFF:   Bates number 155.

3    Q.  And so, Mr. Tabor, you've got the tab in front of you, so

4    I'll just start with the question while we're pulling it up.

5              Is there something here on your notes, Tab 8, Bates

6    155, that relates to time you billed on April 2nd, 2004?

7    A.  All right.  If you look at the bottom of the page, I know

8    there's a reference to March 30, but that was referring to a

9    memo about something related to March 30, but then there is a

10   reference to Scott Jaeckel, call with Mark, that's Mark

11   Silverberg, and Paul, Paul Lowry, of KPMG.  If you go to the

12   next page, I think I list their names again.

13   Q.  That is Bates 156?

14   A.  Yeah, Mark and Paul, me, and Jaeckel, that's Scott Jaeckel.

15   And this was -- we then went into issues about tax structure

16   and getting the asset manager worked out and other things.  It

17   was all structured.

18   Q.  And so are you able to fix a date on this call with respect

19   to the billing records?

20   A.  Yes.  If you look at the time entry for 4-2, about halfway

21   down, telephone conference with S. Jaeckel, Mark -- M.

22   Silverberg and P. Lowry regarding tax structure.

23   Q.  And that's P. Lowry, Paul Lowry from KPMG?

24   A.  Right.

25   Q.  Flip two more pages into note pad two.  It's Bates 158 on

1  Tab 9, and on the billing records, if we could bring up Bates

2  661.

3          And, Mr. Tabor, when you compare your notes to the

4  billing records, are you able to fix a date on these notes,

5  this telephone conference, based on what you wrote down?

6  A.  Yes.  Is the fifth -- 5th of April.  Bear with me.

7  Q.  What is it you wrote on the notes on the left-hand side

8  that relates to the time you billed on the 5th of April?

9  A.  This, if you look there, the last part of the four, five

10  entry, "telephone conference with THL people and J. Westra

11  regarding term sheet and structure memorandum."

12  Q.  And does that relate to something you wrote on the notes on

13  the left-hand side here, 158?

14  A.  Yes, I mean, this is a call.  It also mentions Paul Lowry

15  included, in which I don't think I mentioned in my billing

16  records, but we talked about the structure memo, the blocker

17  entities, and so forth.  This is all tax structure stuff.

18  Q.  Let me ask you to turn a few more pages into note pad two,

19  Page 10, that's Bates number 7 -- 171.

20          MR. CHERNOFF:  And then, Mr. Smith, on the billing

21  records, 662, if we could focus on April 8th.  Thank you,

22  Mr. Smith.

23  A.  Okay.

24          (Continued on next page)

25

Capdcol7                        Tabor - direct

1          MR. CHERNOFF:  And could we bring up April 8th?

2          Thank you, Mr. Smith.

3  BY MR. CHERNOFF:

4  Q.  OK.  So, Mr. Tabor, what did you write here in the notes

5  that you are able to relate to the time you billed Thomas H.

6  Lee on April 8th?

7  A.  These are notes from a telephone conference we had with the

8  Lee people where they informed us of an intended meeting to

9  take place and who was going to be present.

10  Q.  And who did they tell you was going to be present and how

11  was that reflected in your notes?

12  A.  Well, it said, Bennett, his guys, Sandro O'Neil, which was

13  a banker, and they mentioned Joseph Collins, Joe.

14  Q.  Let me ask you now to -- and, Mr. Smith, could we bring up

15  on the notes page 663.

16          I will ask you to look at the time you bill on

17  April 9th.

18          Now, Mr. Tabor, this was the meeting you testified

19  about in connection with the Letter of Intent that was held in

20  New York on April 9th?

21  A.  Right.  The first of the two meetings we had face-to-face.

22  Q.  Now, that meeting, as you testified, concerned sort of

23  big-picture issues?

24  A.  That's right.

25  Q.  And you didn't take any notes at that meeting, correct?

Capdcol7                        Tabor - direct

1   A.  I don't believe so.  I hadn't seen them.

2   Q.  Nothing in this book?

3   A.  No.  That's correct.

4   Q.  And who, again, from the Refco side attended that meeting?

5   A.  Mr. Bennett, Mr. Collins.

6   Q.  And in the time entry -- and we saw Mr. Collins' notes from

7   that meeting, correct?

8   A.  Correct.

9   Q.  In the time entry, though, you only mentioned Mr. Bennett?

10  A.  Correct.

11  Q.  OK.  The last I'll ask you about, sir.

12  A.  OK.

13  Q.  If you flip further into notepad 2, where you placed a tab

14  12.  And that's Bates No. 186.

15         I'll ask that we also bring up on the billing records

16  Bates 667.  And we have it.

17         What on the notes, on the left-hand side of the

18  screen, relates to the time you billed on April 16, 2004?

19  A.  The notes on the left-hand side -- recall, this is the day

20  after we had had our last meeting on the Letter of Intent, so

21  we are finalizing the Letter of Intent.  And I turned to

22  preparing a to-do list going forward.  The first item is Letter

23  of Intent signed, and then a bunch of other stuff we needed to

24  start doing in order to try to complete the transaction once we

25  signed the Letter of Intent.  So this was my beginning of a

 1   memo or to-do list on action items.

 2   Q.  And, again, with reference to the time that you billing on

 3   April 16th, this was the meeting you described where there was

 4   a lot of negotiation and drafting of the Letter of Intent and

 5   you and Mr. Collins stayed after the clients left?

 6   A.  That was on the 15th, correct.  It was the night before

 7   this.  So this was the 16th, which was Friday, and we were

 8   finalizing things, but I was also starting to turn my attention

 9   to what we needed to do going forward.

10            So if you look at the last part of the time entry?

11   Q.  Yes.

12   A.  The work on action items, memorandum for signing documents.

13            So that's what's reflected in these notes in the

14   left-hand side.

15   Q.  OK.

16   A.  And for the next several pages -- or next couple of pages,

17   I guess.

18   Q.  It looks like you got, I won't try to read them, but items

19   1 through 7 on this page?

20   A.  On this page, yes.

21   Q.  If we can go to the next page, Bates 187, you have 8A and

22   the letters go through I.

23   A.  I think the notes stop on this page.

24   Q.  And where, roughly, do they stop with relation --

25   A.  At the bottom of the page.

Capdcol7                              Tabor - direct

1    Q.  OK.  And then, Mr. Tabor, there are other notes that follow

2    before you complete the pages now in notepad 2, which is

3    Government Exhibit 782?

4    A.  Right.

5    Q.  OK.  Finally, I want to walk up to you Government Exhibits

6    783, 784, 785 and 786 and, sir, are these the notepads, 3, 4,

7    5 and 6 that you continued to bill out page by page as you

8    worked on this transaction?

9    A.  Well, yeah, there are clearly four others here, so it looks

10   like a total of six, and one of them I say "Closing Related;" I

11   don't have a number on it.  But and there is four and five --

12   Q.  Let me, just for the record, you were discussing Government

13   Exhibit 783?

14   A.  Right.

15          Then you said three, four, five and six.  This one

16   does not say three.  I --

17   Q.  784 is number four?

18   A.  Yes.  Number four.

19   Q.  785 is number five?

20   A.  Correct.  And 786 is number six.

21   Q.  OK.  So we've got, one, two and then an unnumbered one and

22   four, five and six?

23   A.  Correct.

24   Q.  Are these all the notepads that you recall filling out,

25   saving, and producing in connection with your work on the

Capdcol7                          Tabor - direct

 1   transaction with Refco?

 2   A.  Yes.

 3              MR. CHERNOFF:  Your Honor, the government offers 783,

 4   784, 785, 786.

 5              MR. SCHWARTZ:  No objection.

 6              (Government's Exhibits 783 - 786 received in evidence)

 7              MR. CHERNOFF:  I have no further questions.

 8              I thank the Court for staying late

 9              THE COURT:  And we thank the jurors for staying late.

10              We will break for the night now, ladies and gentlemen.

11   Your coffee will be ready at 9:30.

12              Please follow the normal rules.  Don't discuss the

13   case with anyone.  Don't do any research on the case.  Take

14   your notepads and leave your folders.

15              Thank you again for your diligence.  I hope you don't

16   get rained on on the way home.  Have a pleasant evening.

17              (Continued on next page)

18

19

20

21

22

23

24

25

Capdcol7

1                    (Jury not present)

2                    THE COURT:  Anything else on the record, gents?

3                    MR. CHERNOFF:  I have a very quick just request to

4       make without -- maybe Mr. Tabor can be excused.

5                    Sir, just step out of the courtroom itself.

6                    THE COURT:  Mr. Tabor, may I ask you to go into one of

7       the witness rooms out there just until the jurors go down in

8       the elevator, please.  We promise we won't leave you there.

9                    (Witness not present)

10                   THE COURT:  Won't you be seated, friends.

11                   MR. CHERNOFF:  Your Honor, I will be very brief.

12                   But just during the cross-examination of Mr. Westra

13      today there were two things that I thought were in

14      contravention of the understandings we had reached in the

15      pretrial rules.  Mr. Westra was asked whether typically it's

16      the buyer who prepares the closing binders and typically

17      whether you see a flow of funds memo or not.  We obviously are

18      supposed to be keeping this to what people did in this deal and

19      not eliciting expert testimony from fact witnesses who are

20      lawyers.

21                   So I will just ask that the defense be particularly

22      attentive to that in the cross-examination of Mr. Tabor.

23                   MR. SCHWARTZ:  I will be particularly attentive to

24      that during the cross-examination of Mr. Tabor.

25                   MR. CHERNOFF:  Thank you, Mr. Schwartz.

Capdcol7

1              THE COURT:  I would expect nothing else.

2              Anything else?

3              MR. CHERNOFF:  No, your Honor.  Thank you.

4              THE COURT:  Thank you, gents.

5              MR. SCHWARTZ:  Your Honor, there is just one issue.

6   It is just a question of timing.

7              THE COURT:  Do you want to be on the record?

8              MR. SCHWARTZ:  It doesn't matter.

9              THE COURT:  Well, then, let me excuse the reporter.

10             MR. SCHWARTZ:  Vinny, go home.

11             THE COURT:  So there.  Thank you.

12             (Discussion off the record)

13             (Adjourned to 10:00 a.m., Friday, October 26, 2012)

14

15

16

17

18

19

20

21

22

23

24

25

2480

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    JAMES WESTRA
 4    Direct By Mr. Chernoff . . . . . . . . . . .2252
 5    Cross By Mr. Bach  . . . . . . . . . . . . .2303
 6    RUSSELL JAY TABOR
 7    Direct By Mr. Chernoff . . . . . . . . . . .2355
 8                        GOVERNMENT EXHIBITS
 9    Exhibit No.                              Received
10     179   . . . . . . . . . . . . . . . . . .2268
11     501-O   . . . . . . . . . . . . . . . . .2275
12     1005.28   . . . . . . . . . . . . . . . .2280
13     180   . . . . . . . . . . . . . . . . . .2366
14     781   . . . . . . . . . . . . . . . . . .2380
15     782   . . . . . . . . . . . . . . . . . .2392
16     320   . . . . . . . . . . . . . . . . . .2400
17     704   . . . . . . . . . . . . . . . . . .2407
18     705   . . . . . . . . . . . . . . . . . .2411
19     706   . . . . . . . . . . . . . . . . . .2412
20     721   . . . . . . . . . . . . . . . . . .2415
21     707   . . . . . . . . . . . . . . . . . .2417
22     708   . . . . . . . . . . . . . . . . . .2418
23     710   . . . . . . . . . . . . . . . . . .2419
24     502   . . . . . . . . . . . . . . . . . .2421
25     170 - 174   . . . . . . . . . . . . . . .2422
```

 1    810A     . . . . . . . . . . . . . . . . . .2426

 2    810B     . . . . . . . . . . . . . . . . . .2427

 3    810C     . . . . . . . . . . . . . . . . . .2428

 4    711    . . . . . . . . . . . . . . . . . . .2434

 5    321    . . . . . . . . . . . . . . . . . . .2437

 6    702    . . . . . . . . . . . . . . . . . . .2438

 7    1005.29    . . . . . . . . . . . . . . . . .2441

 8    1250C    . . . . . . . . . . . . . . . . . .2444

 9    2206, 2207    . . . . . . . . . . . . . . . .2448

10    2205    . . . . . . . . . . . . . . . . . . .2449

11    178    . . . . . . . . . . . . . . . . . . .2453

12    783 - 786    . . . . . . . . . . . . . . . .2477

13                        DEFENDANT EXHIBITS

14    Exhibit No.                             Received

15    400, Page 23502    . . . . . . . . . . . . .2307

16    224    . . . . . . . . . . . . . . . . . . .2312

17    403    . . . . . . . . . . . . . . . . . . .2320

18    1010    . . . . . . . . . . . . . . . . . . .2329

19    420    . . . . . . . . . . . . . . . . . . .2347

20    232    . . . . . . . . . . . . . . . . . . .2349

21

22

23

24

25