UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                            :

UNITED STATES OF AMERICA,          :

    - v. -                          :      S2 07 Cr. 1170 (LAP)

JOSEPH P. COLLINS,             :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney for the
 Southern District of New York

Harry A. Chernoff,
Michael A. Levy,
Edward A. Imperatore,
Assistant United States Attorneys

     - Of Counsel -

## Table of Contents

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A.  The Fraud at Refco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   B.  Collins's Participation in the Fraud at Refco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  The Presentence Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.  Application of the Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   A.  Loss Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   B.  Jeopardizing the Safety and Soundness of a Financial Institution . . . . . . . . . . . . . . . . 17

   C.  Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   D.  Use of a Special Skill/Abuse of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   E.  Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      1.  The Testimony Collins Gave at His First Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      2.  A Two-Level Enhancement Is Warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II.  Application of the Section 3553(a) Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   A.  Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      1.  Collins Played a Primary and Indispensable Role in the Fraud . . . . . . . . . . . . . . . 30

      2.  Collins Was Aware of the Underlying Fraud and His Conduct
         Otherwise Caused the Theft of $2.4 Billion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      3.  Collins Personally Benefitted from the Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   B.  History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   C.  The Need To Afford Adequate Deterrence and To Provide Just Punishment. . . . . . . . . . 37

III.  Fine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

UNITED STATES OF AMERICA,                           :

    - v. -                                          :        S2 07 Cr. 1170 (LAP)

JOSEPH P. COLLINS,                                  :

                        Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Joseph P. Collins, scheduled for July 15, 2013, and in response to the defendant's sentencing memorandum (cited herein as "Mem.").

On November 13, 2012, after a four-week trial, a jury convicted Collins of seven counts: conspiracy to commit securities fraud, wire fraud, bank fraud, and to make false filings with the Securities and Exchange Commission ("SEC"); two counts of securities fraud; two counts of false SEC filings; and two counts of wire fraud. The evidence at trial showed, as did the evidence at his first trial,[1] that Collins was a critical actor in one of the biggest bankruptcies and frauds in American financial history. Thousands of victims suffered stock market losses totaling billions of dollars in the collapse of Refco. The fraud could not have succeeded the way it did

---

[1]    Collins's first trial in this case was before the Honorable Leonard B. Sand and then the Honorable Robert P. Patterson, and will be referred to herein as "*Collins I*" and citations to the transcript will be cited as "*Collins I* Tr.*"* The transcript from the trial before this Court ("*Collins II*") will be cited as "Tr."

without Joseph Collins as the legal face of the conspiracy, lending the prestige of his professional position and his law firm to help his top client lie and cheat its way through a leveraged buy-out and an initial public offering.  Collins's considered conduct, spread out of the course of years, is disgraceful to the legal profession.

In the face of these facts – without any acknowledgment of responsibility, after having given perjurious testimony, and following the imposition of a seven-year sentence by the senior jurist who presided over Collins's first sentencing – it requires audacity to request a non-custodial sentence.   Collins does so in a sentencing memorandum that grossly understates the central and indispensable role that he played in this scheme.  He juxtaposes his version of the Government's case with his divining of the jury's conclusions to achieve the most minimal account of his offense conduct.  In doing so, Collins ignores the basic legal principle that this Court will sentence him based on the real offense conduct that a preponderance of the evidence proves, not based on speculation as to how the jury must have resolved the case given the defendant's view of the trial record and jury instructions.

Collins's crimes call for a substantial custodial sentence.  The current Probation Office recommendation of five years' imprisonment, while only somewhat lower than the sentence imposed by Judge Patterson, is, however, we respectfully submit, too low to accomplish the statutory sentencing objectives.[2]

---

[2]   After *Collins I,* the Probation Office recommended a sentence of seven years' imprisonment, prior to Judge Patterson's determination that Collins had obstructed justice.  This was the sentence that Judge Patterson imposed.  The current Presentence Investigation Report does not reveal why the Probation Office has now recommended a five year sentence (again, without reaching a judgment as to whether Collins obstructed justice).

## FACTUAL BACKGROUND

I.     The Offense Conduct

The following discussion of the offense conduct first sets forth in Section A the broad outlines of the fraud and then, in Section B, Collins's personal participation in it.

A.     The Fraud at Refco

As the essentially undisputed evidence at trial demonstrated, from at least 1997 through 2005, Refco – then the largest independent futures merchant (Tr. 292) – engaged in a massive accounting fraud aimed at concealing losses suffered in connection with the operation of its business.  Refco's concealment of its true financial condition was a two-step process.  First, Refco pushed losses off of its own books and onto the books of its parent company, Refco Group Holdings, Inc. ("RGHI"), by disguising the losses as debt owed by RGHI to Refco.  (Tr. 1173).  This related-party debt owed by RGHI to Refco was referred to at trial as "the Hole," because it was used, in effect, to bury Refco's operational losses.  (Tr. 949, 959, 1205, 1252).

Second, Refco hid the Hole from its auditors.  Rather than permit its auditors to see that Refco was owed a huge related-party debt by RGHI – an amount that Refco's auditors would likely have deemed uncollectible and required Refco to write off as a loss, since RGHI had no ability to pay it – Refco disguised the true nature of the debt through a regular series of circular, round-trip loans.  (Tr. 1129-40, 1197-98).  Each year, just before Refco's annual books were closed, Refco loaned an amount equal to the Hole to various customers, who then loaned the money to RGHI, which then used the money to pay off the related-party debt owed to Refco.  (Tr. 776-78; GX 2-A).  The result of this simultaneous and circular series of transactions was that the large related-party debt owed to Refco by RGHI was removed from Refco's books and replaced

with several smaller debts owed to Refco by its customers.  (Tr. 1145-47).  These smaller debts owed to Refco by its customers appeared to the auditors to be an ordinary part of Refco's business and were not at risk of being deemed uncollectible.  (*Id.*).  However, mere days or weeks after the round-trip loans were executed – once the annual books that the auditors would see were closed – the entire series of loans was reversed, putting the enormous related-party debt owed by RGHI to Refco back into place.  (Tr. 778).

By 2004, the Hole had grown to approximately $1.1 billion.  (Tr. 1173).  And while Refco had been able to conceal its losses successfully, it was not able to weather those losses without financial assistance.  (Tr. 741, 744, 798-99).  Thus, in 1999, RGHI – which had, to that point, been the 100 % owner of Refco – was forced to sell off 10 % of Refco to an Austrian bank commonly known by the acronym, BAWAG.  (Tr. 798-99; 1954-55).  As part of that same transaction, BAWAG also made a loan that was convertible, at BAWAG's election, into another 10 % ownership stake in Refco.  (*Id.*).  In exchange for this 10 % ownership interest, and the ability to take another 10 % ownership interest, BAWAG infused Refco with nearly $200 million in much-needed capital.  (Tr. 1229-30, 1955).

In 2002, Refco again turned to BAWAG for badly needed capital.  (Tr. 1232).  This time, BAWAG infused more than $450 million.  (Tr. 1260-63).  But rather than purchase an additional ownership interest outright, which would have brought BAWAG's interest in Refco above a threshold that would have subjected it to American regulations, BAWAG purchased instead the right to share in the proceeds of an eventual sale of Refco to a buyer.  (Tr. 1230-34; GX 1504).  Pursuant to this Proceeds Participation Agreement ("PPA") between BAWAG and Refco, Refco agreed to attempt to sell itself, and BAWAG – in exchange for its approximately $450 million

-4-

payment – was given the right to approximately 27 % of the proceeds of such a sale.  (GX 1503, 1504; Tr. 1630).  BAWAG was also given the right, should it want, to convert its proceeds participation right into a simple 27 % ownership interest in Refco.  (Tr. 1610).  As a result of the 1999 and 2002 transactions, BAWAG held, in effect, 47 % of the economic interest in Refco.

In 2004, Refco and RGHI found a buyer in the private equity firm, Thomas H. Lee Partners ("THL Partners").  (Tr. 285).  Told about neither the $1.1 billion Hole that had accumulated as a result of Refco's operational losses, nor the $450 million cash infusion that had been taken from BAWAG two years earlier to help fill it, THL Partners was swindled into purchasing a 57 % ownership interest in Refco, with RGHI retaining the remaining 43 %.  (Tr. 343, 362, 390-91).  THL Partners structured their purchase as a leveraged buyout, using approximately $500 million of its own funds, and securing approximately $1.4 billion more in loans from banks and the sale of bonds to investors.  (GX 830; Tr. 335-42).  Refco's losses, the Hole in which those losses were hidden, and the lifeline obtained from BAWAG through the PPA were all hidden from the banks and bondholders, just as they were hidden from THL Partners.  (Tr. 411-19; GX 1008, 5008).

In 2005, approximately one year after THL Partners completed its leveraged buyout of Refco, Refco held an initial public offering in which it sold approximately $500 million worth of its shares to the public.  (Tr. 445-50).  Concealed from the investing public – as it had been (and was still being) concealed from THL Partners, the lending banks, and the bondholders – were the Hole, the operational losses buried in the Hole, and the $450 million transaction with BAWAG that Refco had executed in 2002 to stay afloat.  (*Id*.).

Finally, in October 2005, the fraud at Refco was revealed and the company swiftly

-5-

collapsed into bankruptcy.  An employee that THL Partners had placed in the accounting department discovered what remained of the related-party debt.  (Tr. 453-54).  Upon investigation, THL Partners determined (correctly) that Refco's financial statements for the preceding years should not be relied upon and, consistent with the obligations of a public company, issued a press release announcing as much.  (Tr. 458-59, 462-64; GX 1012).  The news caused Refco's counterparties to refuse to transact business with it and, within days, Refco declared bankruptcy.  (Tr. 464-66).

### B.    Collins's Participation in the Fraud at Refco

The fraud at Refco was perpetrated by, among others, Refco owners Philip Bennett (who was also chief executive officer) and Tone Grant, Refco chief financial officer Robert Trosten, Refco senior executive Santo Maggio, and – as proven beyond a reasonable doubt at trial – Refco's chief outside counsel, Joseph Collins.  Collins was aware of the Hole, oversaw the preparation of the round-trip loan documents that hid the Hole from Refco's auditors, and, in 2004 and 2005, concealed from THL Partners, the banks, the bondholders, and the investing public both the Hole and the 2002 PPA transaction with BAWAG that would have revealed the Hole.

As the evidence at trial showed, Collins' history with Refco went back decades.  Collins helped to incorporate Refco in 1985 (GX 1470.98), and represented Refco, RGHI, and Bennett throughout the subsequent years (Tr. 1106-08).  By the time of the events described above, Collins was Refco's primary outside counsel (Tr. 1106-08; GX 850), and Refco-related work accounted for more than half of Collins's entire practice (Tr. 2679-2720).

In the years prior to 2000, Collins had proved on at least two occasions that he was

prepared to cross legal and ethical lines on behalf of his largest client.  In testimony given at Collins's first trial, and read back to the jury at the second trial, Maggio explained that, in 1993, Collins had given him advice on how to confuse and mislead the Commodities Futures Trading Commission ("CFTC") in connection with a CFTC inquiry into misconduct by Maggio.  (Tr. 696-701).  Several years later, when Refco customer Victor Niederhoffer suffered spectacular trading losses, leaving his broker, Refco, on the hook for tens of millions of dollars in losses, Collins helped Bennett and Grant mislead the public by telling a Chicago Tribune reporter that Refco had suffered no losses at all in the episode.  (Tr. 734-40, 2183-84; GX 132, 302, 420).  Thus, by 2000, Collins had established himself as someone who could be trusted when legal assistance was needed to help perpetuate the fraud at Refco.  (Tr. 696, 704-06, 860, 881-82, 942).

By 2000, Bennett, Trosten, and Maggio had been pushing losses into the Hole for several years, and had been hiding the Hole from Refco's auditors through annual round-trip loans.  (Tr. 817).  Up to that point, however, the loans had been undocumented.  (Tr. 817-18).  In 2000, for the first time, Refco's customers insisted that the loans be documented.  (Tr. 818-19).  Responsibility for finding a lawyer who could document the first two legs of the round-trip loans fell to Maggio.  (Tr. 820).

Maggio testified that he recognized that anyone familiar with Refco – particularly, anyone who realized that Refco and RGHI had separate books that did not consolidate for accounting purposes – would necessarily be suspicious of these year-end loan transactions that, in effect, transferred money from Refco to RGHI through an intermediary (the intermediary being guaranteed a risk-free profit) and then reversed the transactions days later.  (Tr. 942). Nonetheless, based on his confidence in Collins's willingness to participate in fraud for Refco,

Maggio chose not a new lawyer, unfamiliar with Refco, but Collins, a lawyer who was singularly familiar with Refco's operations.  (Tr. 821-22).  Collins performed the work without objection. Collins and his law firm prepared these round-trip loan documents – the documents that hid the Hole from Refco's auditors – each year thereafter, and more than once per year in 2004 and 2005.  (GX 2000.1(a)-(f), GX 2000.2(a)-(f), GX 2000.3(a)-(f), GX 2001.1(a)-(f), GX 2001.2(a)-(f), GX 2002.1(a)-(f), 2002.2(a)-(f), 2002.3(a)-(f), 2003.1(a)-(f), 2003.2(a)-(f), 2004.1(a)-(f), 2004.3(a)-(f), 2004.4(a)-(f), 2004.5(a)-(f), 2004.6(a)-(f), 2005.1(a)-(f), 2005.2(a)-(f), 2005.3(a)-(f)).  And, as the evidence showed overwhelmingly, Collins did so while fully aware of the existence of the Hole.

    Direct evidence of Collins's knowledge of the Hole came from two sources.  First, Refco CFO Robert Trosten testified that he discussed the Hole with Collins in 2002.  Specifically, Trosten was asked by Refco's tax accountants to obtain a legal opinion confirming that what was then $700 million in related-party debt owed by RGHI to Refco was, among other things, enforceable and collectible.  (Tr. 1206-07).[3]  Trosten testified that he discussed the $700 million related-party debt with Collins, who – giving no indication that this large related-party debt was previously unknown to him – supplied the necessary confirmation.  (Tr. 1208-11).

    Second, during the course of the THL Partners leveraged buyout of Refco in 2004, Collins participated in Refco owner Philip Bennett's negotiations with former Refco owner Thomas Dittmer to buy out a carried interest in Refco that Dittmer still held.  (Tr. 1670-71).  In attempting to drive down Dittmer's asking price, Bennett truthfully revealed to Dittmer's lawyer,

---

    [3]  The related-party debt – which was not illegal, in and of itself – was not concealed from Refco's tax accountants, who were unaware that the existence of the debt was being concealed from Refco's auditors.  (Tr. 1205-06).

Earl Melamed, that Refco was saddled with the $1.1 billion Hole.  (Tr. 1696-1697).  Melamed

thereafter had two separate telephone conversations with Collins – who was representing

Bennett, RGHI, and Refco in the Dittmer negotiations – in which Melamed openly discussed the

$1.1 billion related-party debt owed by RGHI to Refco.  (Tr. 1740-43, 1777-80).   In fact,

Collins's own notes of one of the conversations include the words "debt of RGHI," followed

immediately by "$1B figure."  (GX 327).

      Added to this direct evidence of Collins's knowledge of the Hole was overwhelming

circumstantial evidence of Collins's knowledge, including the following:

- Collins was well aware that even though Refco was portraying itself to the world as thriving and profitable, RGHI had twice turned to BAWAG for large capital infusions, selling off almost 50 % of the economic interest in Refco in the process.  (Tr. 1231, 1234).

- In 2003, Maggio became the subject of an unrelated SEC investigation into illegal trading in the stock of a company called Sedona.  (Tr. 857). Angered by the fact that Refco's lawyers, Wilmer Hale, had told him to find separate representation, Maggio threatened Collins that if Collins would not agree to represent him jointly with Refco, Maggio would expose what a "piece of shit" and "house of mirrors" Refco was.  (Tr. 859-64).  Collins expressed no surprise at this description of Refco and quickly agreed to Maggio's demand for joint representation.  (Tr. 864).

- Collins was aware that Refco stakeholders were receiving payouts from the 2004 THL Partners transaction that, absent knowledge of the Hole, were inconceivably small.  For example, unaware of the Hole, THL Partners president Scott Schoen reasonably estimated that RGHI owner Tone Grant would receive hundreds of millions of dollars from the deal.  (Tr. 421-22).  But because $1.1 billion in transaction proceeds were secretly being used to pay off RGHI's related-party debt, Grant received – as Collins knew – only $4 million.  (GX 1005.28).[4]  Similarly, Melamed testified that before Bennett truthfully revealed to him the existence of the

---

   [4] Collins's own law partners, far less familiar with Refco than Collins, found the size of this number sufficiently inexplicable that they asked Collins for permission to discuss the issue with Bennett.  (GX 805).

Hole, he estimated that former Refco owner Thomas Dittmer's 25 % carried interest in Refco would entitle Dittmer to as much as $500 million from the transaction. (Tr. 1684; GX 865). But after Bennett revealed the existence and impact of the Hole, Dittmer accepted – as Collins knew – only approximately $22 million for his 25 % share of the transaction proceeds. (GX 913; Tr. 1760-61).

• Further, as to the Dittmer negotiations, although Collins was not present at the meeting in which Bennett truthfully revealed the existence of the Hole to Melamed (Tr. 1687-88), Collins was actively involved in the Dittmer negotiations, and so it is inconceivable that Bennett believed that Melamed would not repeat Bennett's statements about the Hole to Collins, particularly since Bennett did not even ask Melamed to keep them in confidence. (Tr. 1941). The inescapable inference is that Bennett knew his statements about the Hole would be repeated to Collins, but did not care because Collins was already in the know.

It was with this knowledge of the Hole that Collins participated in 2004 and 2005 in the denouement of the fraudulent scheme – the unloading of Refco on THL Partners, the bank lenders, the bondholders, and, ultimately, the investing public. Collins participated in concealing the Hole from these investors by, among other things, taking part in meetings with THL Partners at which THL Partners was expressly told that no related-party debt existed. (Tr. 324-27, 357-60). But, more importantly, Collins engaged in elaborate efforts to conceal from THL Partners the existence of the PPA, a document that evidenced the $450 million lifeline that Refco had been forced to take from BAWAG in 2002, and that risked alerting anyone aware of its existence to Refco's true financial condition. (Tr. 1284-87 (testimony by Trosten about need to keep PPA secret from THL Partners)).

Collins was well aware that the PPA was a document that was required to be provided to THL Partners during the course of THL Partners' extensive due diligence efforts. Various provisions of the Equity Merger and Purchase Agreement ("EPMA") – the sales contract with THL Partners – plainly called for the disclosure of the PPA to THL Partners. (GX 1005.1 at

-10-

§§ 3.3, 3.5, 3.12, 3.15; Tr. 3076-79 (Government summation discussing applicability of each section)).  Moreover, lawyers from BAWAG expressly confronted Collins and Bennett, telling them that the PPA should be disclosed to THL Partners.  (Tr. 1958-61; 2005-13).  In response to detailed (and heated) assertions from one BAWAG attorney as to the reasons why the existence of the PPA had to be disclosed pursuant to the EPMA, Collins offered no logic for his position that the PPA would not be disclosed, but simply insisted that it would not be. (Tr. 2008-13).

Collins similarly offered no explanation to his own law partners about why the PPA would not be disclosed; without one to offer, he simply hid the existence of the PPA from them as well.  Collins expressly forbade BAWAG attorney, Jason Berger, from revealing the existence of the PPA to Collins's own law partners, reprimanding Berger on three separate occasions when Berger accidentally violated Collins's insistence on secrecy.  (Tr. 2059-66).  When Collins's law partners questioned Collins about the details that Berger had accidentally revealed, Collins responded in whatever ways he could to repair the breach and maintain the necessary secrecy.  In one such instance, when Collins was questioned by a law partner about statements that Berger had made about a large, unknown transaction involving BAWAG (namely, the PPA), Collins lied and responded that Berger "simply do[es] not understand the deal." (GX 1811).  In another instance, when it came to Collins's attention that Berger had again hinted to one of Collins's law partners about the existence of the PPA, Collins emailed Bennett that Berger had "screwed up big time and disclosed the DFC deal [the transaction that would secretly extinguish the PPA] to everyone on our side.  I will fill you in and believe the rep[er]cussions can be limited."  (GX 1954).

In addition to withholding the PPA when he knew the EPMA required its production – and hiding the PPA from his own law partners to ensure that they would not disclose it – Collins lied directly to THL Partners' counsel, Weil, Gotshal, and Manges, when asked for categories of documents that would have included the PPA.  In both telephone calls and emails with THL Partners' attorneys, Collins represented that there were no undisclosed stock option grants, contracts between Refco and its affiliates, indemnification agreements, or material contracts, even though the PPA was all of these things and, as Collins well knew, had not been disclosed. (GX 704, 705, 781).

Finally, Collins went so far as to doctor Refco's Limited Liability Company Agreement ("LLC Agreement") – the company's charter – in order to remove references to the PPA before providing the document to THL Partners.  As the evidence showed, the LLC Agreement was amended from time to time, and the extant version of the LLC Agreement at the time of the THL Partners transaction was the Fourth Amended LLC Agreement.  (GX 501-O).  This Fourth Amended version of the LLC Agreement included numerous references to the PPA and to DF Capital, an entity that BAWAG had created for purposes of entering into the PPA.  (*Id*.).  But when THL Partners asked for the most recent version of the LLC Agreement, Collins doctored the agreement, sending THL Partners a new Fourth Amended version of the LLC Agreement from which Collins had removed all references to the PPA and DF Capital.  (GX 170-74; *compare* GX 501-O *with* GX 710).

As noted in the preceding section, the conspirators – including Collins – were successful in fraudulently closing the THL Partners' leveraged buyout without revealing the Hole or Refco's financial condition.  In doing so, they completed a multi-billion dollar swindle of THL Partners,

the lending banks, and the bond purchases.  Within a year, Collins and his co-conspirators carried the fraud to a new set of victims, foisting shares of Refco on the investing public with no reference in Refco's disclosure documents – documents worked on by Collins – to the PPA, the Hole, or Refco's true financial condition.  (Tr. 445-50).  Through this fraudulent IPO, Refco raised more than $500 million in funds from a duped public.  (Tr. 445-50; GX 5006).

Finally, in August 2005, THL Partners discovered RGHI's outstanding related-party debt to Refco – smaller than it had been, but exactly the type of loose string that Collins and his co-conspirators had been endeavoring to conceal in order to prevent the unraveling of the entire fraud.  Although lacking a full understanding of the portent of its discovery, THL Partners quickly established that the hidden related-party debt was significant and called into question all of Refco's financial statements.  Against the advice of Collins – who suggested telling regulators that the discovery had "no material impact on Refco's financial statements" (GX 840) – THL Partners truthfully disclosed its discovery and warned the public that Refco's prior financial statements could no longer be relied upon.  The company was bankrupt within a week, causing massive losses for all of the various individuals and entities who had been fraudulently induced into investing in Refco.

## II.   The Presentence Investigation Report

In connection with Collins's sentencing, the Probation Office has prepared a Presentence Investigation Report (the "PSR") which calculates Collins's Sentencing Guidelines offense level as 49, resulting in a sentencing range at the statutory maximum, 95 years' imprisonment, calculated as follows:

- •   A base offense level of 7 pursuant to § 2B1.1(a).  (PSR ¶ 95).

-13-

- An increase of 30 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(P) because the loss amount directly attributable to the defendant's criminal conduct was more than $400,000,000.  (PSR ¶ 96).

- An increase of 6 levels pursuant to U.S.S.G. § 2B1.1(b)(2)© because the offense involved more than 250 victims.  (PSR ¶ 97).

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(10)© because the offense involved sophisticated means.  (PSR ¶ 98).

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(15)(B)(i)[5] because the defendant substantially jeopardized the safety and soundness of a financial institution.  (PSR ¶ 99).[6]

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.3 because the defendant abused a position of trust and used a special skill in a manner that significantly facilitated the commission or concealment of the offense.  (PSR ¶ 101).

As the Probation Office indicates (PSR ¶ 86), the Government also believes that the defendant's offense level should be increased by two levels pursuant to U.S.S.G. § 3C1.1 because the defendant attempted to obstruct justice through perjured testimony at his first trial. *See* U.S.S.G. § 3C1.1 (calling for an upward adjustment of two levels where "(A) the defendant

---

[5]  The PSR appears to contain a typographic error in citing U.S.S.G. § 2B1.1(b)(14) instead of § 2B1.1(b)(15).

[6]  The Government notes that the defendant also qualifies for this enhancement under the several other criteria contained in the Guidelines, namely that defendant (i) derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, and (ii) substantially endangered the solvency or financial security of an organization that was, during the time of the offense, (a) a publicly traded company; and (b) had 1,000 or more employees.  *See* U.S.S.G. § 2B1.1(b)(15)(A), (B).

-14-

willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; and (ii) a closely related offense.").  The Probation Office deferred to the Court to determine the applicability of this enhancement and did not include obstruction of justice in its calculation or sentencing recommendation.  (PSR ¶ 102).

## ANALYSIS

### I.   **Application of the Sentencing Guidelines**

In this case, the sentence called for by the Sentencing Guidelines is obviously a significant marker of the seriousness of the offenses committed by Collins.  As noted above, Collins has an offense level of 49 (even before an adjustment for obstruction of justice), six levels above the highest offense level in the Guidelines, and therefore the Guidelines actually call for a sentence of life imprisonment.  *See* U.S.S.G. § Ch. 5, Pt. A.  Because Collins is not charged with any offense that carries a maximum term of life imprisonment, his Guideline Range is computed by adding the applicable statutory maximums on all counts of conviction, which results in a Guideline Sentence of 95 years' imprisonment. *See* U.S.S.G. § 5G1.2(d).  While the Guidelines themselves are of course not controlling, the fact that Collins's advisory range is off the charts, and significantly so, reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to his conduct.

As he did following his first trial, Collins disputes nearly all of the Probation Office's

judgments as to the applicable Sentencing Guidelines.[7]   He does not, however, "undertake an analysis of the relevant Guidelines calculation, but rather refers] the Court to Exhibit A" (Mem. 26 n. 3), his letters to the Probation Office setting forth his numerous objections.[8]  The Government will here discuss briefly each of the enhancements recommended by Probation, and then will discuss the obstruction enhancement that arises from Collins's false testimony at the first trial.

### A.   Loss Amount

The losses suffered by the victims of Collins and his co-conspirators are staggering. More than $2.4 billion was stolen from victims in 2004-2005 ($512 million from THL Partners, plus $600 million from bond holders, plus $800 million in bank debt, plus $583 million from the IPO).  Even more staggering are the losses that remained uncompensated following liquidation and forfeiture: even after all of Refco's assets were liquidated, and after hundreds of millions of dollars were forfeited by BAWAG and returned to victims, the losses still total more than $1.5 billion, with Refco's creditors still short approximately $890 million, THL Partners $191 million and the IPO victims approximately $500 million.[9]

In response to the relevant enhancement, Collins weakly contends that "it is not clear that his conduct included knowing involvement in the main accounting fraud."  (Mem. Ex. A2 at 14).

---

[7]  All but one, including the obstruction enhancement, were assessed by Judge Patterson at Collins's last sentence; Judge Patterson declined to impose the sophisticated means enhancement because the Court found it to be duplicative of the special skills enhancement. Collins did not appeal the sentence or any of its components.

[8]  We will refer to the first letter contained in Exhibit A, dated March 11, 2013, as "A1" and to the second letter contained in Exhibit A, dated October 16, 2009, as "A2."

[9]  These numbers were provided to the Government by counsel for the victims in connection with the sentencing following *Collins I.*

As we set forth above, the facts elicited at trial dictated otherwise.  Indeed, the loss that Collins's conspiracy caused exceeds the Guidelines' maximum loss enhancement threshold by $2 billion.[10] Accordingly, the base offense level of seven is increased by thirty levels.

**B.    Jeopardizing the Safety and Soundness of a Financial Institution**.

Section 2B1.1(b)(14)(B) provides for a four-level increase on one of two grounds.  First, such an increase is warranted if an offense "substantially endangered the safety and soundness of a financial institution."[11]  The Application Note relating to this provision includes a non-exhaustive list of factors to be considered by the Court in determining whether an offense had such an impact on a financial institution.  Among other things, the Court is to consider whether the financial institution became insolvent as a result of the offense,  U.S.S.G. § 2B1.1, CMT. n.12(A), which, of course, Refco did.

Section 2B1.1(b)(14)(B) also applies to Collins because his offense conduct "substantially endangered the solvency or financial security" of Refco, which is a separate ground upon which U.S.S.G. § 2B1.1(b)(14)(B) can be imposed – one that Collins completely ignores.  The enhancement can be applied for conduct that "substantially endangered [] solvency or financial security" of a company where the company "(i) was a publicly traded company; or (II) had 1,000 or more employees."  This enhancement "reflects the Commission's determination that such an offense undermines the public's confidence in the securities and investment market much in the same manner as an offense that jeopardizes the safety and soundness of a financial

---

[10]  Even if Collins's perspective on the case were credited – that the jury determined that he was merely responsible for defrauding THL Partners – the loss to THL Partners of $512 million would not alter the Guidelines loss analysis, which results in a thirty-level enhancement for any loss of $400 million or greater.

[11]  Collins does not dispute that Refco was a financial institution.

institution undermines the public's confidence in the banking system.  This prong also reflects

the likelihood that an offense that endangers the solvency or financial security of an employer of

this size will similarly affect a substantial number of individual victims, without requiring the

court to determine whether the solvency or financial security of each individual victim was

substantially endangered." U.S.S.G., App. C, amend. 647.  The Application Note includes a non-

exhaustive list of factors to be considered by the Court in determining whether an offense had

such an impact on a company, including whether the company filed for bankruptcy protection,

"suffered a substantial reduction in the value of its equity securities," "substantially reduced its

workforce," "substantially reduced its employee pension benefits," and/or became "delisted from

its primary listing exchange." *See* U.S.S.G. § 2B1.1, cmt. n.12(B)(ii).

Refco was publicly traded, had over 1,000 employees, was delisted from the New York

Stock Exchange, and was put out of business, with all the attendant consequences for its

employees, as a result of the disclosure of the RGHI receivable.  Because Collins helped conceal

the RGHI receivable, an act that enabled Refco to become a public company in the first place,

such conduct "endangered the solvency or financial security" of Refco and warrants a two-level

enhancement pursuant to U.S.S.G. § 2B1.1(b)(14)(B).[12]

Collins contends in response that his offense conduct did not cause Refco's insolvency;

Refco was already insolvent and "the crime in essence involved an attempt to hide its

insolvency."  (Mem. Ex. A at 15).   In other words, Collins contends that because a receivable

---

[12]  Because U.S.S.G. § 2B1.1(b)(14)(c) provides that the cumulative adjustment of
U.S.S.G. § 2B1.1(b)(14) and U.S.S.G. § 2B1.1(b)(2)(c) (relating to the total number of victims)
is eight levels, and because Collins is subject to a six-level enhancement under U.S.S.G.
§ 2B1.1(b)(2)(c), Collins's sentence may only be increased by an additional two levels under
U.S.S.G. § 2B1.1(b)(14).

was already being hidden at the time that he joined the conspiracy, his role in vastly expanding that receivable is irrelevant.  This is akin to arguing that it is not criminal to shoot someone who is already seriously injured.  Of course, it cannot be said whether Refco would have gone bankrupt had the fraudulent conduct ceased at the time Collins joined it, rather than accelerating significantly, but the fact of the initial receivable does not insulate Collins from the damage his conduct Collins caused to the solvency and the financial security of Refco.  This enhancement would properly apply even if Refco had somehow *not* ultimately become insolvent.

### C.   Sophisticated Means

Although Collins did not object to this enhancement at his first sentencing (Mem. Ex A2 at 14), he does so now because, he asserts, his conduct did not "rise to the level of sophisticated means."  (Mem. Ex. A1 at 5).  His objection is frivolous.  In comparison to the typical garden-variety fraud prosecuted in our courts, Collins's conduct outstrips the requirement for this Guidelines enhancement significantly.  As the Application Note states, the enhancement applies for merely the following example: "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, Application Note 8(B).  Moreover, as the Application Note plainly states, "Conduct such as *hiding assets or transactions*, or both, *through the use of fictitious entities, corporate shells*, or offshore financial accounts also ordinarily indicates sophisticated means."  *Id.*  (emphasis added).  The numerous ways in which Collins hid receivables from his victims meets and exceeds the test for sophisticated means, as Probation correctly found.  PSR ¶ 98.

### D.   Use of a Special Skill/Abuse of Trust

Collins's objection to an enhancement for special skill is equally merciless.  Citing no legal support, Collins baldly asserts that the "special skill" adjustment that U.S.S.G. § 3B1.3 provides cannot be applied because it is duplicative of the "sophisticated means" enhancement applicable under U.S.S.G. § 2B1.1(b)(9)©.  (Mem. 26 n.3 (citing Appendix A)).  Collins is wrong.

The "special skill" adjustment and the "sophisticated means" enhancement are not duplicative: they have two distinct purposes and address two different concerns for punishment.  "The purpose of the special skill enhancement is to punish those criminals who use their special talents to commit crime.  In contrast, the sophisticated means . . . enhancement[ is] designed to target criminals who engage in complicated criminal activity . . . ."  *United States* v. *Rice*, 52 F.3d 843, 851 (10th Cir. 1995).  Accordingly, the "special skill" adjustment applies even where the offense committed is not particularly complex or intricate because it is blameworthy for a person – like a lawyer – to use a special skill to commit crime even if the crime is a simple one.  Conversely, the "sophisticated means" enhancement applies to complicated criminal schemes because it is blameworthy for a person to commit or conceal a crime through complexity and intricacy even if no "special skill" is utilized.  The fact that Collins used his special skill as a lawyer to commit his offenses, and the fact that his offenses were also complicated and intricate, does not mean that these enhancements involve duplicative punishment.  It means that his offenses had separate features – use of a special skill on the one hand and deployment of complexity and intricacy on the other – that merit separate measures of punishment.  Indeed, this is undoubtedly why the Guidelines do not proscribe the application of both enhancements even

-20-

though in many circumstances the Guidelines will do so if there is overlap.[13]

Additionally, an adjustment pursuant to U.S.S.G. § 3B1.3 is also appropriate because Collins abused a position of trust in connection with his crimes.  Section 3B1.3 applies when a defendant "abuse[s] a position of public or private trust . . . in a manner that significantly facilitated the concealment of the offense." U.S.S.G. § 3B1.3  As mentioned above, the Second Circuit in the *Stewart* case recently affirmed the importance of considering whether an attorney has committed his crime by using his "privileged status as a lawyer to facilitate [his] violation of the law." *United States* v. *Stewart*, 590 F.3d 93, 148 & n.37 (2d Cir. 2009).  Collins clearly abused a position of trust when he repeatedly lied to potential Refco investors and their representatives.

### E.  Obstruction of Justice

At Collins's first trial, Collins testified on his own behalf for five days, half of which was spent on direct examination.  During his testimony, Collins disputed essentially every allegation against him.  In response to the Government's evidence, Collins attempted to offer innocent explanations for his conduct and accused a number of the Government's witnesses of lying.  Collins, however, was contradicted in almost full measure by the testimony of other witnesses and an extensive documentary record, substantially the same evidence that the Government adduced during his second trial.  In convicting Collins in *Collins I*, the jury plainly found that Collins's testimony was not truthful, and Judge Patterson found that Collins had perjured himself in several salient respects.

---

[13] *See*, *e.g.*, U.S.S.G. § 2B1.1 cmt. n.8(C) (stating that "if the conduct that forms the basis for an enhancement [for sophisticated means] is the only conduct that forms the basis for an adjustment under § 3C1.1 (Obstruction of Justice), do not apply the adjustment under § 3C1.1").

### 1. The Testimony Collins Gave at His First Trial

During trial in *Collins I*, Collins repeatedly gave false testimony about matters material to the outcome of the trial.  For example, the parties vigorously disputed Collins's knowledge of the size of the receivable owed by RGHI to Refco and for good reason: knowledge that the receivable owed by RGHI to Refco was more than $1 billion, significantly higher than reported in the company's financial statements, and would remain even after the completion of the leveraged buyout ("LBO") would plainly satisfy the knowledge elements of the securities, wire and bank fraud charges filed against Collins.  Collins's testimony was clear on this point. Collins, in a manner that could not possibly be attributed to confusion, mistake, or faulty memory, denied that he knew the true size of the RGHI receivable in 2004 or at any previous time.  (*See*, *e.g.*, *Collins I* Tr. 3495-96, 3570-72, 3637, 4285, 4286, 4478).  The Government's evidence that Collins knew the true size of the RGHI receivable included, among other things, Earl Melamed's testimony about discussions he had with Collins about the true size of the receivable (including notes of a July 2004 conversation in Collins's handwriting), the Dittmer buyout agreement that specified that $300 million of the receivable would remain after the close of the LBO, Trosten's conversation with Collins in 2002 about the true size of the receivable, and Collins's involvement in the round trip loan transactions from 2000 through 2005.  Collins's testimony and the Government's evidence were in direct conflict.

Collins's testimony regarding the PPA was likewise riddled with material falsehoods.  In response to overwhelming evidence both that knowledge of the PPA would have affected the investment decisions of the LBO participants and that Collins and Bennett entered into an agreement not to disclose the PPA, Collins claimed that he believed that the PPA did not need to

be disclosed and offered several bases for this purported belief.  The documentary evidence at trial starkly contradicted his claims.

For example, Collins testified that the PPA was an agreement between RGHI and DF Capital and that Refco was not a party to the agreement.  (*See generally Collins I* Tr. 3648-61). He made this claim even though Refco signed the agreement and RGHI did not; Refco gave DF Capital the right to a portion of the proceeds of a sale of Refco and RGHI did not; Refco gave DF Capital the option to convert its right to participate in the proceeds of a sale of Refco into shares of Refco and RGHI did not; and Refco issued an indemnification to DF Capital under the terms of the agreement and RGHI did not.  (GX 1504).  The covenants, representations, and other obligations imposed upon Refco under the terms of the agreement numbered in the dozens, as the Government demonstrated on cross-examination (GX 1504-Y; *Collins II* Tr. 2725-65), and yet Collins insisted that Refco was not a party to the agreement.

In further support of his claim that the PPA was really an agreement with RGHI, Collins lied about the nature of a guarantee that RGHI conferred on DF Capital for the performance of Refco under the PPA.  Collins testified on re-cross-examination as follows:

> Q.    Mr. Collins, under the proceeds participation agreement, under the terms of the agreement itself Refco had obligations of   performance, correct?
>
> A.    That is correct.
>
> Q.    There was also a guarantee affiliated with that agreement, correct?
>
> A.    That is correct.
>
> Q.    And we've seen a bunch of guarantees in this case. A guarantee is something that says if the person who has the obligation in the first instance can't perform, then someone

else will come in and perform on behalf of that person, correct?

A.   It's late in the hour. You don't need a lecture on the number of different types of guarantees. There's guarantees of performance, payment; there's -- you know, if you point me to a particular guarantee, I'll talk about it.

Q.   Mr. Collins, we have the time for you to be as accurate as you can be.

A.   My recollection of the guarantee that was part of the PPA was that it was absolute, unconditional guarantee of payment and performance. There was no obligation whatsoever for any default. *The party who had the guarantee could just go straight to Refco Group Holdings.*

THE COURT: If it so determined.

THE WITNESS: If it so determined, right.

THE COURT: But what about under the terms of the PPA as it's referred to? Was there an obligation under the PPA for the parties to make a payment and receive payment under the PPA? In other words, was there an obligation between Refco and the DF Capital that Refco would make payment first?

THE WITNESS: No, your Honor.

THE COURT: There was no obligation under the contract for Refco to make payment?

THE WITNESS: There was an obligation, your Honor, but it had no money to satisfy that obligation.

(*Collins I* Tr. 4501-02) (emphasis added).  Of course, the guarantee made plain that it was not the

case that Refco "could just go straight to Refco Group Holdings."  Rather, the "effectiveness" of

the guarantee was "subject to the condition that DFI shall have given five business days' notice

to the Guarantor [RGHI] that a demand for performance of the Obligations has been made and

that the Company [Refco] has failed to perform such Obligations within three business days

-24-

thereafter."  (GX 1504) (Bates number MB02069389)).

Collins also claimed on direct examination that the PPA did not need to be disclosed because it was effectively nullified by the June 8, 2004 signing of the Reversion Rights Agreement.  (*Collins I* Tr. 3772-76).  But the Reversion Rights Agreement explicitly contemplated that the PPA would be in effect until the closing of the buyback of the DF Capital interest, which did not occur until August 4, 2004.  (DX 501 (Section 2.2) (referring to "the Proceeds Participation Agreement in existence immediately prior to the DFC Closing")).  John Sullivan, a lawyer with McDermott Will & Emery who negotiated the buyback of the DF Capital interest on BAWAG's behalf, testified in both *Collins I* and *Collins II* that he understood that all of his client's rights under the PPA were in effect until August 4, 2004. (*Collins I* Tr. 2082, 2088; *Collins II* Tr. 1987-88).  After extensive cross-examination, even Collins admitted that his testimony on direct examination was not accurate. (*Collins I* Tr. 4430-32).

Collins likewise testified that the PPA did not need to be disclosed because the signing of the June 8, 2004 Reversion Rights Agreement assured that the PPA would be terminated prior to the close of the LBO.  Collins rested this claim on language in the recitals section of the agreement that read: "WHEREAS . . . Desana will sell to RGHI and RGHI will purchase from Desana, prior to the Merger Closing, all of the outstanding stock of DFC." (DX 501).  But as the Government demonstrated on cross-examination of Collins, these recitals were not incorporated into the rest of the document.  (*Collins I* Tr. 4123-25).  As the defendant knew from having drafted other agreements for Refco that explicitly incorporated recitals into the main agreement, (1504-S (Section 1)), the recitals in the Reversion Rights Agreement were not binding.

## 2.   A Two-Level Enhancement Is Warranted

The Government respectfully submits that the proof is overwhelming that Collins committed perjury.  Indeed, in a sentencing determination not challenged on appeal, Judge Patterson imposed the two-level enhancement for obstruction of justice, finding that Collins had perjured himself in a number of instances, particularly in connection with his testimony concerning the PPA. (Jan. 14, 2010 Tr. 55, 70-72, 77-78).

The law relating to the imposition of an adjustment for obstruction of justice on the basis of perjured testimony at trial is well settled.  A defendant commits perjury for the purposes of U.S.S.G. § 3C1.1 when he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States* v. *Dunnigan*, 507 U.S. 87, 93 (1993).  In determining whether to apply U.S.S.G. § 3C1.1 on the basis of perjured testimony, a district court must make independent findings based on a review of the record.  *See id.* at 96 .  "While it is preferable for a district judge to address each element of the alleged perjury in a separate and clear finding . . . . it is sufficient . . . if . . . the court makes a finding . . . that encompasses all of the factual predicates for a finding of perjury." *Id.*

 The instances of Collins's false testimony share several salient characteristics.  *First*, in each instance, Collins's testimony was directly contradicted by overwhelming evidence.  In several instances, Collins's testimony lacked even facial credibility.  Collins's testimony contradicted itself at times.

*Second*, in each instance, Collins intended his testimony.  This was plain in part from the clarity of the answers he gave on direct examination.  Collins did not equivocate when he denied

that he knew the true size of the RGHI receivable in 2004 (or at any previous time), or when he claimed that he believed that the PPA did not need to be disclosed for various reasons.  His testimony on these matters was also comprehensive.  There is no risk that his answers were somehow blurted out or that they reflect inadvertent remarks.  On the contrary, Collins's testimony on these points was stated firmly, clearly, and repeatedly.

Collins's testimony was plainly the result of careful deliberation.  He spent a considerable amount of time preparing his trial testimony.  Indeed, Collins testified about the extent of his preparation, which included being prepared not only by his own counsel with the Cooley firm but also by three lawyers with the Williams & Connolly firm, which represented Mayer Brown in connection with civil litigation brought against that firm in connection with Collins's conduct.  (*Collins I* Tr.  4408).  While such extensive preparation is perfectly appropriate, such preparation also reduced the likelihood that Collins's statements were somehow the result of confusion, mistake, or faulty memory.  It is also significant that Collins is himself a lawyer who is a product of a top-flight legal education and who practiced at the highest levels of the legal profession, a profession in which attention to detail and care with words is paramount.  In these circumstances, there can be no doubt that Collins meant what he said when he testified.

*Third*, in each instance, Collins's false testimony was material.  As in *Collins II*, the aforementioned issues were all matters that were vigorously disputed at trial in *Collins I.*  These matters were vigorously disputed because their resolution was material to the outcome of the trial.  These issues directly concerned the elements of the charges against Collins.  As a lawyer in his own right and someone well prepared for his trial, Collins appreciated the significance of the resolution of these issues to the trial.

In these circumstances, the Government respectfully submits Collins gave false testimony concerning material matters with the willful intent to provide that testimony, warranting a two-level adjustment for obstruction of justice.

Accordingly, Collins's total offense level is 51.

## II.    Application of the Section 3553(a) Factors

A central theme in Collins's sentencing memorandum is his assertion that "[i]t is impossible to know from the verdict itself exactly what conclusions the jury reached concerning Joseph Collins's role in the Refco fraud."  (Mem. 29).  The point is irrelevant: the jury does not determine the facts at sentencing  – the Court does.  And, as is well settled, the Court is not bound by jurors' conclusions and may even consider evidence of acquitted acts (although we rely on none here).[14]  We decline Collins's invitation to debate his construct of the most minimal role that could still legally support the jury's verdict.  The point of sentencing is not to speculate as to what the jury must have thought, but to examine what the evidence against the defendant shows.

_____

[14]  In determining offense conduct and relevant conduct, a sentencing Court considers whether the Government has proven the defendant's guilt by a preponderance of the evidence.  In making this determination, the Court is free to rely on charged conduct, even where there has been an acquittal.  *See United States* v. *Watts*, 519 U.S. 148, 156-57 (1997); *United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 92-93 (2d Cir. 1999).  In making its factual findings, a "sentencing court remains entitled to rely on any type of information known to it."  *United States* v. *Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992) (citing *United States* v. *Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)).  As such, in rendering sentence, a district court may rely upon information gleaned from the evidence adduced at trial, *see United States* v. *Sisti*, 91 F.3d 305, 312 (2d Cir. 1996), including evidence regarding conduct underlying charges as to which the defendant was acquitted, so long as the Government has proven that conduct by a preponderance of the evidence.  *See Watts*, 519 U.S. at 156-57.  As the Supreme Court has held: "[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157; *see also United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

A.    The Nature and Circumstances of the Offense

The crimes Collins committed with Bennett, Grant, Trosten, Maggio, and others were, simply put, breathtaking.  Collins's fraudulent legal maneuvers helped fleece investors and lenders of billions of dollars and, even today, the uncompensated losses – in addition to those suffered by the thousands of Refco employees who lost their jobs – amount to nearly $1.5 billion. Unlike some other giant frauds in our nation's financial history, the fraud here was not simply one where loss was calculated by the drop in the stock price as a result of disclosure of the criminal conduct (i.e., market capitalization reduction) and where there can be an argument that factors unrelated to Collins's conduct resulted in the losses.  Here, the $2.4 billion loss figure directly and demonstrably resulted from lies told personally by Bennett and Collins to the victims of this fraud.  The offense conduct was serious, multi-faceted, costly to individual and institutional investors across the country, and damaging to investor confidence in general.  By any measure – the seriousness and extent of the illegal conduct, the amount of losses, the impact on the victims of the offense – Collins's conduct was egregious.

In asking that the Court impose a non-custodial sentence, Collins counters with three arguments.  He contends he "did not plan or initiate any aspect of the fraud" but rather played merely "a secondary role" in it.  (Mem. 1).  He argues that he "was not aware of and did not participate in the accounting fraud perpetrated by other Refco defendants." (Mem. 27).  And he asserts that he did not "personally receive or even attempt to receive, any profits from the fraud." (Mem. 1).

As set forth below, these arguments suffer three principal deficits.  First, they minimize Collins's role in a way that does not find support in the record and that suggests a gap in

-29-

culpability of a size that is similarly inconsistent with the record.  Indeed, Collins ignores

completely one critical aspect in which his conduct was more grave than his coconspirators,

namely, he was acting as a lawyer.  As important, whatever difference in culpability may exist

between Collins and one or more of his coconspirators, Collins's conduct rises to a level that

demands a significant sentence of incarceration.

### 1.  Collins Played a Primary and Indispensable Role in the Fraud

Collins's claim that he "did not plan or initiate any aspect of the fraud" but rather played

a secondary role, is both inconsistent with the trial record and significantly understates Collins's

role in the fraud.  The conspiracy needed a lawyer to do the legal work and be the legal face that

the conspiracy required to succeed, and Collins played that starring role for years.  It may have

been a simple matter for him and his associates to prepare the documentation of the round-trip

loans that was necessary to conceal Refco's enormous receivable, but it was also critical to the

success of the conspiracy that a lawyer with Collins's prestige and position be Refco's counsel in

this critical matter.

Certainly that was a key factor in the defrauding of THL Partners.  Collins, with

Bennett, was very much at the center of planning and initiating the scheme to conceal the PPA.

As set forth in more detail above, it was Bennett and Collins, sitting side-by-side, who explained

(Bennett speaking) to John Sullivan, one of the lawyers for BAWAG, that the PPA was not being

disclosed to THL Partners because to do so would "drive the price down" and "complicate the

deal."  (Tr. 1959).   In a subsequent meeting with both Sullivan and Jason Berger, another

BAWAG lawyer, it was Collins who testily insisted that the PPA would not be disclosed even

though Berger raised with him several reasons why it should have been.  It was Collins who kept

the PPA secret from his colleagues.  And when BAWAG's lawyers inadvertently made reference to the buyback of the PPA interest to one of those colleagues, it was Collins who advised Bennett that "McDermott screwed up big time" and that "repreccusions [sic] can be limited" and then promptly scolded Berger, warning him not to do it again.  To say that Collins was not part of the planning or initiation of the concealment of the PPA blinks reality.

Likewise, with respect to all aspects of the fraud, Collins's role was primary, not secondary.  Collins was not merely a scrivener who drafted documents hidden away in a windowless room.  Collins was on the front lines of the fraud, lying directly to the victims and their representatives.  Accordingly, when Jay Tabor of Weil, Gotshal spoke with Collins in March 2004 and asked him questions that indisputably called for the disclosure of the PPA, the indemnities and guarantees, and the true size of the receivable owed by RGHI to Refco, Collins – and Collins alone -- lied.  And when Tabor asked for a then-current copy of Refco's Limited Liability Company Agreement, it was Collins who made up a phony document that omitted references to the PPA and DF Capital.  Collins was plainly a central part of the fraud and primary player in it.

Indeed, more than being a primary participant, he was an *indispensable* one.  Put simply, the Refco fraud could not have occurred without the defendant – without a lawyer who was willing to sacrifice his profession's ethics to commit a crime.  Two key details from the evidence illustrate the point.  When Dittmer's lawyers resisted Bennett's offer to buy Dittmer out unless Dittmer received a representation from Bennett concerning the accuracy of the financial information he provided about the company, including that $300 million in related party RGHI debt would remain after the LBO closed, Refco needed a lawyer who would be willing to

negotiate such a representation *at the same time* that he was telling lawyers for investors in the LBO that the RGHI related party debt would be zero after the LBO.  Without a lawyer willing to compromise his ethics in such a way – without a lawyer willing to participate in a fraud – Dittmer's interest might not have been bought out, the LBO might not have occurred, and the LBO investors (and public investors later) might not have been victimized.

Likewise, when BAWAG's lawyers expressed the view that the representations and warranties in the EPMA called for the disclosure of the PPA, the language of the EPMA was changed such that BAWAG did not have to stand by them, paving the way for the completion of the buyout of the PPA interest.  Refco needed a lawyer involved in the transaction who was willing to work out language that accomplished BAWAG's removal while at the same time being aware that his client, who *was* standing behind the representations and warranties, was committing a fraud by doing so.  Without a lawyer willing to participate in a crime in this way, BAWAG's interests might not have been bought out, the LBO might not have happened, and, again, the LBO investors (and public investors later) might not have been victimized.

Collins's role as the lawyer in this fraud sets him apart from his coconspirators, but not in a way that should mitigate his punishment, as Collins proposes.  Among the participants in the Refco conspiracy, Collins stood alone as someone who used his status as a lawyer to commit his crimes.  Because of Collins's stature and long history with the company, and the involvement of his internationally recognized law firm, his statements on behalf of the company carried particular credibility with the victims of the fraud.   The Government respectfully submits that Collins deserves a significant sentence of incarceration because he, unlike any of the other participants in the fraud, "used [his] privileged status as a lawyer to facilitate [his] violation of

the law." *Stewart*, 590 F.3d at 148.[15]

### 2. Collins Was Aware of the Underlying Accounting Fraud and His Conduct Otherwise Caused the Theft of $2.4 Billion

Collins's contention that he deserves a non-custodial sentence because he was not a

"knowing participate in Refco's fraud" (Mem. 2) is similarly faithless to the record.  As set forth

in detail above, the Government proved at trial that Collins knew that the related-party debt owed

by RGHI to Refco was greater than what was reported in its financial statements and to the

investors in the LBO and the investing public.  The Government's plentiful evidence that Collins

knew the true size of the RGHI receivable included, among other things: Earl Melamed's

testimony about discussions he had with Collins about the true size of the receivable; Collins's

handwritten notes of one of the conversations; the Dittmer buyout agreement Collins negotiated

that specified that $300 million of the receivable would remain after the close of the LBO;

Trosten's testimony of his conversation with Collins in 2002 about the true size of the receivable;

and Collins's involvement in the round trip loan transactions from 2000 through 2005, as

explained by Maggio.

Collins's extensive discussion of the "meaning of the verdict" and whether there is a

---

[15]  In *United States* v. *Stewart*, the Second Circuit stated that the sentencing court should have considered the question of whether, in light of the fact that Stewart "was an experienced and dedicated lawyer acting as such when she broke the law in the manner that she did, her punishment should have been greater than it was."  *Stewart,* 590 F.3d at 148.  Noting that Stewart had argued that "she did no more than serve as zealous advocate for her client," the Circuit observed that such belief "if indeed she harbored it, gave her no license to violate the law."  *Id*.  The Circuit further indicated that the sentencing court should have explained "to what extent the sentence reflected the seriousness of the crimes of conviction in light of the fact that Stewart was engaged as a member of the bar when she committed them."  *Id*.  The Circuit made clear the import of such an inquiry by noting that the sentence the Government had appealed "tested the boundaries" of a reasonable sentence in light of the fact that, among other things, "Stewart used her privileged status as a lawyer to facilitate her violation of the law."  *Id*. at 146.

possibility that the jury convicted Collins without finding that he was aware of the "underlying accounting fraud" is of no moment.  The Government introduced overwhelming evidence that Collins possessed such knowledge.  This evidence was sufficient to support a verdict and certainly sufficient for the Court to rely on it for the purposes of sentencing.   But Collins continues to advance the dubious story he tried to sell to the jury: that somehow Collins's highly intelligent and thoroughly crooked co-conspirators recklessly put an honest man in the heart of their conspiracy, where he remained ignorant of the fraud swirling around him.

Moreover, Collins's offense conduct was not limited to a single, aberrant act in an otherwise unblemished career.  The defendant lied for Refco again and again, over the span of years.  This is a crime that involves not just significant amounts of money, but significant amounts of time.  As the Honorable Victor M. Marrero has observed in sentencing a defendant convicted of securities fraud:

> [T]he common white collar appeal for leniency tends to understate the gravity of the underlying offenses by compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior.  There is a fallacy in this argument.  It distorts the record, as illustrated by the case at hand.  During the course of over three years covered by the offense for which he has been convicted in this case, [the defendant] committed dozens if not hundreds of acts of dishonesty and fraud.  . . . In fact and under law, each of these thefts constitutes a distinct crime for which an offender could be prosecuted by federal or state authorities.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 309 (S.D.N.Y. 2009).

Collins's lies over a sustained period affected thousands of victims.  As would be expected in a fraud of this scope, the many thousands of victims included individuals from all backgrounds and walks of life.  As the Court will recall of the few witnesses on this topic at trial,

-34-

the victims included Russell Schaub, an ordinary investor from Long Island who lost the entirety

of his personal investment in Refco stock (Tr. 604-05 (describing his anger when he learned that

he "lost an enormous sum of money for me" because of Refco's fraud)); Bob Sydow, who

invested and lost, on behalf of the Gates Foundation, nearly $4 million in Refco bonds (Tr. 662);

and Francisco Duque of TIAA-CREF, which lost millions of dollars of pension funds invested on

behalf of teachers and university employees (Tr. 610-11).  That Collins never met or interacted

with these victims, but was able to defraud them from afar, renders his participation in Refco's

fraud no less egregious.

### 3.  Collins Personally Benefitted from the Fraud

Finally, Collins's contention that he did not receive "profits from the fraud" is of limited

help to him.  There is no question that other participants in the scheme profited more from their

participation in the scheme – and in some cases substantially more.  But that others profited more

than Collins does not meant that Collins did not profit at all.  For whatever reasons, Collins was

willing to play his part in his client's fraud for far less money.  But his proceeds were not

insignificant.  Collins benefitted tremendously from his participation in the scheme because

Refco was by far his largest and most significant client, which plainly and positively affected his

compensation, not to mention his standing in the legal community.  From 1998 through 2005,

Collins billed $36 million in fees to Refco.  (Tr. 2688; GX 1255).  Over the same period, he

billed a mere $10 million to his next largest clients.  (GX 1255).  Thus, during this period,

Collins billed 3.5 times more to Refco than to his next largest clients.  And while Collins had

between 40 and 60 clients other than Refco during this period, during most years he invoiced

more time to Refco than to all of his other clients combined.  (GX 1257, 1262).  As both

common sense dictates and the evidence at trial demonstrated, these billings mattered to Collins's compensation, which totaled approximately $13.5 million during the period of the fraud.  (*See, e.g.,* GX 1256; Tr. 2698-70).  Moreover, the fact that some of Collins's Refco billings were for "legitimate legal work," (Mem. 28) is of course irrelevant: if Collins was willing to do Refco's illegitimate work, Refco obviously was going to reward him with its lucrative legitimate work as well.  It was by doing the illegitimate work that Collins was able to keep Refco's legitimate work flowing.

### B.  History and Characteristics of the Defendant

Collins submits several letters from lawyers who worked with the defendant, both within and outside of his firm.  "Excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."  *United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003).   Of course, it was precisely this reputation that Collins traded on to commit the charged fraud.  Collins also points to the service he has rendered to the bar in various leadership positions.  Sadly, it only contributes to cynicism within the profession when leaders of the bar engage in criminal conduct and will not accept responsibility for their actions.

Collins also submits numerous sincere and detailed letters from many who know him outside of his professional life.  The Government does not dispute the importance of considering Collins's personal history and his good works.  Indeed, it is particularly tragic, both for the defendant and for those who admire him, when a defendant with Collins's personal attributes is proven to have engaged in the kind of serious criminal conduct here at issue.   Judge Patterson

was suitably impressed by Collins's personal characteristics, and the Court made clear at

sentencing:

> "[T]he defense papers show an extraordinary man.  He has shown
> characteristics that are things to which we all should aspire to. . . .
> [I]n addition to raising his family . . . [h]e's assisted a young man
> who, in addition to taking in his sister's or his wife's sister's family
> into the home, he took in a son of a classmate of one of his boys
> and raised him in the household and turned his life around.  He has
> also been very active in education of a young lady from Eritrea and
> assisted her in getting education.  He's been very active in certain
> schools in the Chicago area in assisting students to improve."

(Transcript, Jan. 14, 2010, at 81).  Addressing the defendant, Judge Patterson also stated:

> ". . . I want to tell you that I really respect you as a person, and the
> things you have done in your life that have been for other people.
> They are in the highest Christian tradition and I admire you for it.
> You are better than I have ever done.  I have never taken anyone
> into my home and raised them that way.  It shows a wonderful
> attitude.  And something that I admire very much."

(Transcript, Jan. 14, 2010, at 107).  Nevertheless, notwithstanding Judge Patterson's highly

favorable view of the defendant with respect to this sentencing factor, upon weighing all of the

relevant sentencing factors in combination, Judge Patterson imposed a sentence of seven years'

imprisonment.

### C.   The Need To Afford Adequate Deterrence and To Provide Just Punishment

The factors the Court must consider in imposing sentence under Section 3553(a) include

the need for the sentence to "provide just punishment for the offense" and to "afford adequate

deterrence to criminal conduct"   18 U.S.C. § 3553(a)(2)(A) and (B).  The Government submits

that a substantial term of imprisonment is necessary, and indeed vital, to provide just punishment

and to achieve the goal of general deterrence in this case.

The need for a significant sentence for purposes of general deterrence is probably best

demonstrated by the positions taken by the defendant throughout this case and now at sentencing. From opening to summation, the defendant made it one of his primary themes at trial – if not his primary theme – that he should be treated differently because he is a lawyer.  The trial was rife with the suggestion that somehow a lawyer's relationship with, and obligations to, his client make the demarcation of right and wrong – of legal and illegal – murky, confused, or simply different than it is for non-lawyers.  And now, at sentencing, Collins characterizes his conduct as having, at most, merely "crossed the line in honoring his client's wishes with respect to the PPA" (Mem. 33; *see also* Mem. 35 ("We respectfully submit that Collins's role should be considered in the context of cases of other lawyer-defendants who . . . crossed a line by following a client's instructions.").  But the obligation to be a zealous advocate for a client does not confer upon the lawyer a licence to violate the law.  To the extent that there may well be other corporate lawyers who, like Collins, apparently believe that the line between right and wrong, legal and illegal, is somehow obscured by their status as a lawyer, such lawyers need be informed that they are flatly wrong.  Lawyers like Collins must be given the incentive to locate and to stay on the right side of that line.  A significant custodial sentence will serve that end.

Indeed, given the nature of Collins's conduct,  a significant term of imprisonment is necessary.  Collins did not creep or barely cross the line between right and wrong.  Collins blew past that line through repeated lies over a period of years in relation to a multi-faceted scheme that resulted directly in the theft of $2.4 billion, all the while enjoying the benefits of being a lawyer at a top firm, with all of the associated perquisites of compensation and reputation.  It is difficult to find many cases involving conduct by a lawyer that was as egregious as Collins's and

that resulted in the theft of as much money.[16]   This case will be a benchmark for attorneys who are tempted to perpetrate frauds on behalf of their clients.   Were Collins to receive the non-custodial sentence he seeks, not only would there be no resulting deterrence for lawyers to avoid committing crime at the level that Collins did, but there would be no deterrence of lawyers contemplating less egregious, unlawful conduct.   If even crimes of the magnitude of Collins's could produce a non-custodial sentence, what, in Collins's view, must a lawyer do to face imprisonment?

The goal of general deterrence in this case is important to the integrity of the capital markets.   Robert Khuzami, the then-Director of Enforcement for the SEC submitted a letter in connection with Collins's sentencing that underscores the impact of Collins's crimes and the importance of meeting the goal of general deterrence in this case:

> Financial frauds such as Refco's can call into question the integrity
> of the nations's capital markets.   When those frauds are actively
> and knowingly assisted by attorneys or other professionals, the

---

[16]   A reasonably close analogy has arisen recently in this District in the sentencing of Donna Guerin, a Jenkens & Gilchrest attorney convicted in the massive tax shelter scheme at issue in *United States* v. *Daugerdas et al.,* S3 09 Cr. 581 (WHP).   In sentencing Guerin to a term of 96 months' imprisonment. the Honorable William H. Pauley III made the following remarks: "[T]he sanctity of an oath is central to the sound administration of justice.   We are a nation of laws, and lawyers are entrusted with great responsibility to ensure that the laws are faithfully discharged.   When an attorney violates her oath to uphold the law, she undermines our entire system of justice.   This tax shelter fraud conspiracy was breathtaking in its scope and in the damage it caused the nation, nearly $8 billion in fraudulent tax benefit claims and more than $1.5 billion in lost tax revenue to the United States.   It corrupted numerous professionals, including attorneys, accountants, and financial advisers.   It involved some of our largest financial accounting and legal firms, including Deutsche Bank, BDO Seidman, and Jenkens & Gilchrest.   Because of the complexity of the scheme, its success relied on the unethical and criminal behavior of highly educated, highly compensated professionals, like Ms. Guerin.   Lawyers and accountants became willing tools for the ultra-wealthy to avoid paying their fair share of taxes, and these professionals flagrantly violated their oaths in order to line their pockets."   (Transcript, March 1, 2013, *United States* v. *Daugerdas et al.,* S3 09 Cr. 581 (WHP), at 48-49).

> damage can be especially severe.  The Commission and investors
> rely on such gatekeepers.  In many instances, questionable
> practices and attempted frauds have been thwarted by professionals
> who refused to countenance their clients' wrongful conduct.  In
> contrast, Collins not only failed to stop his client's fraud, but
> actively assisted in it.  Even though he was a partner in one of the
> nation's largest and most sophisticated law firms, Collins made
> sure that Refco's reports did not disclose the massive related party
> indebtedness and the pervasive related party transactions of which
> he was well aware.  His involvement in Refco's filings with the
> Commission gave the company's disclosures to potential investors
> a veneer of legitimacy.  The negative impact of his misconduct on
> the public's perception of the integrity of the securities markets
> cannot be denied and should be considered in determining his
> sentence.

(Letter of Robert S. Khuzami, dated October 8, 2009 (attached hereto as Exhibit A)).

Having played a critical role in one of the most devastating frauds in American financial history, Collins will not accept responsibility for his crimes and indeed minimizes his role at every opportunity.  This Court's sentence will demonstrate to the profession and to the public that attorneys will be held to an appropriately high standard, not the low standard that Collins has set for himself and the bar.  Again and again, the defendant lied to other lawyers, he lied to investors, and then he lied from the witness stand.  A suitably severe sentence must follow.

## III.   Fine

While a fine is no substitute for the punishment of imprisonment, a substantial fine is warranted here as well. The relevant statute states: "If any person derives pecuniary gain from the offense . . . the defendant may be fined not more than the greater of twice the gross gain . . . unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process."  18 U.S.C. § 3571(d).  In determining the amount of a fine, several factors should be considered under the Guidelines, including that the combined sentence promote

-40-

respect for the law, provide just punishment, and afford adequate deterrence.  U.S.S.G.

§ 5E1.2(d).  The Court should also consider any collateral consequences of conviction, including

civil obligations, and any restitution that arises.  *Id.*  The Court should also consider the costs to

the government of a term of imprisonment or other sentence costs, and any other "pertinent

equitable considerations." *Id*.  "The amount of the fine should always be sufficient to ensure that

the fine, taken together with other sanctions imposed, is punitive." *Id.*

The Probation Office did not recommend that Collins be fined because of the enormous

restitution anticipated, PSR at 45, but, as Collins explains in his memorandum, consistent with

the positions it previously took and Judge Patterson's related rulings, the Government is not now

seeking restitution or forfeiture.  Accordingly, a substantial fine is warranted.

### Conclusion

The Government respectfully submits that, for the reasons explained above, Collins

should be sentenced to a substantial term of imprisonment.

Dated:  New York, New York
     June 17, 2013

           Respectfully submitted,

           PREET BHARARA
           United States Attorney
           Southern District of New York

           /s/ Harry A. Chernoff
By: _____
           Harry A. Chernoff
           Michael A. Levy
           Edward A. Imperatore
           Assistant United States Attorneys
           (212) 637-2481/2346/2327