D7f9cols1                          Sentence

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                               07 CR 1170 (LAP)

 5    JOSEPH P. COLLINS,

 6                   Defendant.

 7    ------------------------------x

 8                                          New York, N.Y.
                                            July 15, 2013
 9                                          2:33 p.m.

10

      Before:
11
                         HON. LORETTA A. PRESKA
12
                                            District Judge
13

14                         APPEARANCES

15    PREET BHARARA
           United States Attorney for the
16         Southern District of New York
      HARRY A. CHERNOFF
17    MICHAEL LEVY
      EDWARD IMPERATORE
18         Assistant United States Attorneys

19    COOLEY LLP
           Attorneys for Defendant
20    WILLIAM SCHWARTZ
      JONATHAN BACH
21

22

23

24

25

D7f9cols1                         Sentence

1                (In open court; case called)

2                THE COURT:  United States against Joseph Collins.

3                Is the government ready?

4                MR. CHERNOFF:  Yes.  Harry Chernoff for the

5       government.  With me at counsel table is AUSA Michael Levy,

6       AUSA Edward Imperatore, Postal Inspector Katherine Searles, and

7       Postal Inspector Edward Clark.  Good afternoon.

8                THE COURT:  Good afternoon.

9                Is the defense ready?

10               MR. SCHWARTZ:  Yes, your Honor.  William Schwartz for

11      Joseph Collins, together with Jonathan Bach.

12               THE COURT:  Good afternoon, Mr. Schwartz.

13               MR. CHERNOFF:  I'm sorry, your Honor.  I meant Robert

14      Clark.  In my haste, I changed his first name.

15               THE COURT:  I knew that.

16               MR. CHERNOFF:  Sorry, your Honor.

17               THE COURT:  Mr. Schwartz, have you and your client had

18      adequate time to review the presentence report?

19               MR. SCHWARTZ:  We have, your Honor.

20               THE COURT:  Is there any reason it should not be made

21      part of the record?

22               MR. SCHWARTZ:  There is not, your Honor.

23               We've sent you the objections that we have, in

24      particular, objection to the presentence report relying on

25      Mr. Collins having somehow been involved in fraud involving a

D7f9cols1                          Sentence

1    revolving loan, counts of which were dropped from the

2    indictment.

3            THE COURT:  Have you had a chance to confer with the

4    government on this one?

5            MR. SCHWARTZ:  We have not, your Honor.  We have not

6    conferred.

7            THE COURT:  Is this something you want to be heard on

8    now or are you asking for a modification of the report?  What

9    would you like?

10           MR. SCHWARTZ:  I would ask that your Honor not rely on

11   that part of the report and make that clear on the record.

12           THE COURT:  Mr. Chernoff.

13           MR. CHERNOFF:  Your Honor, we don't rely on that

14   allegation so we have no problem with the defense suggestion.

15           THE COURT:  Granted.

16           Are there other objections to the presentence report

17   that you would like to be heard on?

18           MR. SCHWARTZ:  No, your Honor.

19           THE COURT:  Thank you.

20           With respect to the offense level computation, I

21   accept the findings of the presentence report set forth at

22   paragraphs 93 through 107 which conclude that a total offense

23   level of 49 is appropriate.

24           With respect to the defendant's criminal history, I

25   accept the findings of the presentence report set forth at

D7f9cols1                    Sentence

1   paragraphs 108 through 110 which conclude that a criminal

2   history category of I is appropriate.

3            I have the defense sentencing memorandum, a very large

4   package of defense letters, a smaller unbound package of

5   defense letters, the government's sentencing memorandum, and

6   the defense reply sentencing memorandum.

7            Are there any additional materials I should be looking

8   at?

9            MR. CHERNOFF:  No, your Honor.

10           MR. SCHWARTZ:  No, your Honor.

11           THE COURT:  Very well.

12           Mr. Schwartz, would you like to speak on behalf of

13   Mr. Collins.

14           MR. SCHWARTZ:  Yes, your Honor.

15           THE COURT:  Before you start, counsel, I'd like to

16   thank you both for the most impressive sentencing materials.

17   They are probably some of the best -- they are certainly some

18   of the best I've ever seen.  They might be the best.

19           MR. SCHWARTZ:  Your Honor, I know it's often said by

20   judges whom I have talked to and whom I know that the most

21   difficult thing someone in your Honor's position has to do is

22   to sentence someone.  It's less often said, but equally true,

23   that the most difficult thing someone in my position has to do

24   is stand before the Court and urge upon the Court why the

25   sentence should not be a severe one.  And that's particularly

1    true in this case, your Honor.

2            No one can possibly know a defendant the way a

3    criminal defense lawyer gets to know a defendant, particularly

4    in a case like this that has stretched over so many years.  I

5    have seen Mr. Collins in circumstances that I would hope that

6    none of us would ever have to go through.  And, of course, in

7    his case there is a particular empathy because we share a

8    profession and I would say, your Honor, we share a love of that

9    profession.  I have spent thousands of hours with him and with

10   his family not just learning the substance of the case but

11   understanding the substance of the man.  And what makes this

12   sentence particularly difficult for me, and I think for

13   Jonathan, is after representing him since October 2005, almost

14   eight years, is our abiding belief in his innocence.

15           We've made, as your Honor has noted, a very extensive

16   sentencing submission to the Court in which we give the Court

17   an extended view of how we interpreted the jury's verdict and

18   how we see the evidence in the case.  And I'm not going to

19   rehearse that here today again, your Honor.  I'm not going to

20   delve into the facts of the case except to say the following.

21   It was clear to us watching this jury that this was not a

22   simple verdict, an easy verdict for them to render.  And

23   whatever happened here, whatever their verdict means or doesn't

24   mean, the one thing that I think is absolutely true in this

25   case about a fraud where investors were defrauded of billions

D7f9cols1                    Sentence

1   of dollars, is that whatever it is the jury decided Joseph

2   Collins did or did not do -- and I think in this case the words

3   "did not do" are appropriate -- he did not act in any sense out

4   of greed or self-interest.  And immediately that puts this case

5   on a different footing from almost any case I have ever been

6   involved with.  And I would dare say virtually any white collar

7   case in which your Honor has rendered a sentence, particularly

8   one involving a massive fraud.

9        There simply was no evidence that he either sought to

10  or did benefit from the crime that was committed at Refco.  It

11  would not only be inconsistent with the evidence in this case

12  to suggest to the contrary, your Honor, but it's inconsistent

13  with the character of the man who has been presented to you in

14  the 140-some-odd letters that we supplied to the Court.

15       It's inconsistence with the extraordinary way in which

16  he has given away his money to causes that he has deemed

17  worthy.  Very often and mostly quietly.  And inconsistent with

18  the extraordinary good deeds that I'll talk a little more

19  about.

20       This case, as your Honor can imagine, has had an

21  enormous impact.  And what I'm going to talk about is the man

22  who, unfortunately, while we have tried to have your Honor get

23  to know him as well as we do, I want to make sure that we

24  convey the feelings we have about him.

25       This case has taken an enormous toll on his life.  It

D7f9cols1                      Sentence

1   was over six years ago when he was –– when we received a call

2   from the United States Attorney's Office and were told that

3   somebody whom we had perceived as a witness in their case had

4   now become a target of the case.  And he has managed those six

5   years, despite the toll, to go through this with enormous

6   equanimity, never bowing to the pressure, always moving

7   forward.

8           His career is over.  I think your Honor can tell from

9   the letters from his family and the letters from his colleagues

10  what the law and the practice of law meant to him and what he

11  had achieved in the profession.  That ended with his indictment

12  in December 2007, as did his standing in the profession.  Never

13  to be recovered.

14          I think, your Honor, that that loss is far more

15  significant to Joe Collins, from what I know of the man, than

16  the loss of the earning power that went with that.

17          Now I also understand that in every case, as I have

18  done in the past, and others, a lawyer stands here and says

19  that the case is having an enormous impact on the man.  What's

20  extraordinary in this case is how Joe Collins reacted to the

21  events that took place in his life and what that says about his

22  character, both before and after Refco.  It speaks volumes for

23  who he is.

24          Your Honor has the letters from the Chicago Jesuit

25  Academy.  In December when Joe Collins took a leave of absence

 1    from Mayer Brown he resigned his partnership after his first

 2    conviction, December 2007, faced with time on his hands,

 3    something he had never had before.  He knew how to fill it.

 4    And he volunteered that time to give it away in a most

 5    extraordinary way, in a way that has had an impact on the lives

 6    of many young people who have gone through that academy in the

 7    six years that he's been there three days a week.  It is

 8    something that often defendants might do because they fear this

 9    day and they want to have something positive to say to the

10    Court.  But I think that your Honor can tell from the other

11    letters about Mr. Collins that that had nothing to do with it.

12    In fact, Jonathan and I did not even know that Joe had done

13    this until sometime after he began volunteering, which is also

14    consistent with the quiet way in which he's led his life.  But

15    that act, fill my time by giving to others even while I'm under

16    the most immense personal pressure that can be imagined, is

17    consistent with the way he's lived his entire life.

18            It's consistent with taking in a young, troubled high

19    school student who was a friend of one of his sons, to save him

20    in his senior year of high school by allowing him and helping

21    him live in the Collins family when his home had fallen apart

22    and to somehow manage to survive because of Joe Collins and

23    move on to college and a career.

24            It is consistent with giving both money and time for

25    an Eritrean refugee trying to find her place in the country and

1  not just letting it go with a few dollars towards her high

2  school education but taking her under his wing as a mentor and

3  having an impact that would change her life.

4           It's consistent with Joe Collins offering to be a

5  foster parent for another friend of one of his sons when that

6  friend's family, when there was a death in the family.

7           It's consistent with Joe Collins quietly paying for

8  the funeral of a parent of one of his sons classmates, without

9  telling even his wife, so that that woman who had lived a

10 troubled life could be buried in dignity.

11          That's the Joe Collins that I know, your Honor.

12 That's the Joe Collins that volunteered to work at the Chicago

13 Jesuit Academy when he had time on his hands.

14          Now, there is no way to summarize in a few words what

15 the letters say about him.  One of the things that struck me

16 over the weekend as I was rereading them was the repetition of

17 certain words.  I don't have them all, but here are some:

18 Humility, church, faith, generosity, giving, family, integrity,

19 role model.  140 people who used those words over and over

20 again whose lives have been changed.

21          Let me talk about his family.  Joe Collins was a

22 lawyer who sometimes billed up to 2500 hours a year.  We all

23 know what that is like.  Hopefully we don't know it too often.

24 But what does his family say, and friends of the family?  He

25 never missed a game of any of his sons.  He never missed an

D7f9cols1                        Sentence

1    event that was important to them.  He never missed being there

2    when they needed him to show him the way.  He did not miss

3    Steve Lake's SATs when he felt it was required for him to sit

4    outside so that Steve wouldn't run away.  Joe Collins has given

5    himself to his family in a way that is just extraordinary.

6          You've seen the impact from their letters, and from

7    the letters of his daughters-in-law, on his sons.

8          Your Honor, this sentencing takes place exactly at the

9    time where he's able to begin to have the same kind of impact

10   on his grandchildren, and we ask that your Honor consider that

11   in passing sentence today.

12         You've heard from his wife of 40 years, his childhood

13   sweetheart, about this extraordinary relationship.  And Mary

14   Pat has been here through two trials and stood by Joe every

15   inch of the way.  And that relationship is a testament not just

16   to Mary Pat but to Joseph Collins and what he inspires in

17   people.

18         We who are parents can only hope that some day we can

19   hear the things from our children said about us that Joseph

20   Collins' children have said about him.

21         You've heard, your Honor, from his colleagues at the

22   bar, both his adversaries and his cocounsel.  And one of the

23   words that pops out of all of their letters is integrity.  He

24   was perceived by the people that he worked with day in and day

25   out as being a lawyer of the highest -- not only skill but

1    integrity.

2           We've heard from his partners -- and what often

3    happens in these cases, your Honor, there is no reason -- of

4    course, someone might argue there are legal interests that are

5    aligned, but there is no reason for the partners to have said

6    what they have said about him other than from the deepest of

7    feelings.  Mayer Brown faces crippling lawsuits as a result of

8    Refco.  Are his partners bitter?  His partners are anything but

9    bitter.  They are supportive in the most deep personal way.

10   And that, your Honor, is because Joe Collins touched them

11   through his many years of partnership the way he touched us

12   through the years that we represented him.

13          Those partners, including two former assistant U.S.

14   attorneys, one of whom, like I, was privileged to serve in this

15   office, those partners say only the most extraordinary things

16   about him.  As do his friends.  Whether it's going back to

17   childhood or to the incredible relationships that he made at

18   college, including with a friend of mine, Ted Wells.  They all

19   have come forward to talk about Joe and what their perception

20   of Joe was as a leader in the college, as someone who, even at

21   the time, was clear that he -- he felt that there was service

22   to be done in a college that emphasized service.  And, your

23   Honor, as someone who went to college at the same time as Joe,

24   I can tell you that putting on the uniform of the United States

25   military was not an easy thing to do when Joe was in college.

D7f9cols1                          Sentence

1     And I've read a little bit about Holy Cross during that period.

2     It was not an easy thing to do there.  And Joe Collins proudly

3     served his country in the ROTC and then later proudly served

4     his country as a captain in the Air Force because service is in

5     every fiber of his being.

6           Generosity.  The statistics that were provided to the

7     Court about Joe's giving are also extraordinary.  Always

8     approaching, sometimes exceeding ten percent of his after-tax

9     income.  That is simply amazing.  But that was simply to pay

10    back institutions that had helped him along the way,

11    institutions that he felt were helping others and touching

12    others.  But it didn't stop there.

13          Every spare moment of Joe Collins' life has been

14    filled with service.  Service to those less fortunate than he

15    is.  I think Steve Lake has an extraordinary letter in which he

16    says at the end -- this is the young man whom he took into his

17    house at the most desperate time of his life, and he uses the

18    word generosity.  "Put simply, without Mr. Collins' extreme

19    generosity and inspiring example I would not be where I am

20    today.  Indeed, I do not know where I would be."

21          That's just Joe.

22          Or the boy, David, at Chicago Jesuit Academy, again,

23    somebody that Joe would not have told us about had they not

24    written their letters.  Joe didn't tell us about any of those

25    things.  It's only -- because he doesn't do that.  It's only

1   through our conversations with Mary Pat that we were able to

2   learn some of this.

3          The boy David, a troubled fifth grader.  His uncle had

4   recently committed suicide, come from the same difficult

5   neighborhood on the west side of Chicago that the school is

6   located in that Joe has to drive an hour-and-a-half to get to

7   and is the site -- the area of many violent crimes, including

8   murders.  The timing of Joe's assistance to this young boy,

9   David, is unbelievable.  It was right before, right during, and

10  right after his trial in this courtroom.  And as the letters

11  attest, he has had impact on David that none of the other 45

12  volunteers in that school have ever had.

13         But Joe is also the kind of person who doesn't insist,

14  I'm here, I want to tutor, I want to council.  As your Honor

15  has seen from those letters, he performs janitorial duties.

16  Whatever is needed, Joe Collins is there, without complaint --

17  in fact, not only without complaint, with pride to do, to make

18  the world a better place.

19         You know I know him well enough to know -- although we

20  have never discussed this -- many of the letters talk about him

21  as a man of faith and a deeply, deeply devout catholic.  That I

22  have seen.  And I know him well enough to know that he quietly,

23  to himself, believes that these good works are some day going

24  to be taken into account by another judge on another day.  And

25  I also know Joe well enough to know that he does not in any way

D7f9cols1                          Sentence

1    presume to guess how they will be weighted in that judgment.

2             But your Honor I've represented him in this world.

3    And your Honor has to judge him in this world.  If ever there

4    was a moment for someone's life and good acts to be taken into

5    account in this world, it's on this judgment day.  We ask the

6    Court to please sentence Joe Collins to a noncustodial

7    sentence.

8             THE COURT:  Thank you, Mr. Schwartz.

9             Mr. Collins, would you like to speak on your own

10   behalf.

11            THE DEFENDANT:  Yes, your Honor.

12            THE COURT:  Yes, sir.  Would you do it now, please.

13            THE DEFENDANT:  I would like to thank my friends and

14   my family, especially my wife, for all the support and prayers

15   they have provided during this ordeal.

16            THE COURT:  Thank you.

17            Does the government wish to be heard?

18            MR. CHERNOFF:  Yes, your Honor.  Thank you.

19            THE COURT:  Yes, sir.

20            MR. CHERNOFF:  Your Honor, I just want to comment

21   briefly on a couple points that were made in the defense papers

22   and also in the presentation here this afternoon.

23            The question of Mr. Collins' motivation has been

24   squarely litigated in the context of the sentencing and also

25   before the jury.  And the assertion that Mr. Collins did not

D7f9cols1                    Sentence

1    benefit from having Refco as his most important client, the

2    client that resulted in favorable compensation calculations.

3    We walked through before this jury, and as set forward in the

4    trial transcript, all the formulas that the firm used in

5    compensating him and all the hours that were billed by

6    Mr. Collins and by other lawyers at his firm to Refco.  It's

7    clear that his financial incentive was not as great as some of

8    the people who were also convicted of these crimes.  But it is

9    hard to imagine how one could conclude that he had no incentive

10   to do all of this work for all of this time and not just the

11   work that resulted in the charged offenses but all of the other

12   work from Refco that came with it and that Mr. Collins

13   benefited from and that his firm benefited from year after

14   year.

15          We've heard a lot of negative things, understandably,

16   expressed by the defense at trial and sentencing about the more

17   responsible perpetrators at Refco:  Mr. Bennett, Mr. Trosten,

18   Mr. Maggio, Mr. Grant.  But these were Joseph Collins' clients.

19   Those were the men, this was the company that was his primary

20   client, his primary focus over the many years that he worked

21   for Refco and over the many years that he committed these

22   crimes.  This wasn't an aberrational act.  This was something

23   that occurred year after year.

24          It's been suggested that the jury may have concluded

25   that Mr. Collins' failure to disclose the PPA was alone what he

D7f9cols1                    Sentence

did wrong here.  And your Honor will recall that the way the

government presented that argument at the first trial was

squarely debated in this trial in the context of the jury

charge.  And the government never argued the case to this jury,

never argued that the PPA alone was the problem here, that it

was simply a difference of view as to whether something needed

to be disclosed, perhaps an honest disagreement among lawyers.

          This is how the defense has tried to interpret the

jury verdict.  And yet, the Court will ultimately decide what

the offense conduct was here by the preponderance standard.

And we have overwhelmingly presented the case, far surpassed

the standard, calling witness after witness that showed that

Joseph Collins could not have been ignorant of the hole; not

only because of direct conversations but because of documents

he worked on with lawyers like Earl Melamed involving the

buyouts of Mr. Grant, Mr. Dittmer, that showed that there had

to be this kind of a hole or else the relatively small amount

of money that they were taking out of the deal could not be

explained.

          Joseph Collins knew this company well enough to know

that the hole existed from the documents he worked on, from the

conversations he had, and that was why he laid down a line in

disclosing the PPA, and fought with the other lawyers from

BAWAG who wanted to disclose it -- who thought it should be

disclosed.

D7f9cols1                    Sentence

1              Your Honor, at sentencing it is difficult for all of

2     us to participate in the process to see a lengthy sentence

3     imposed on the defendant whose family and friends are in the

4     courtroom.  This is a crime, though, where -- and I should note

5     so the Court knows from prior correspondence, we have updated

6     victims about this case and about these proceedings with our

7     web-based notification procedures.  This is a case where the

8     victims number in the thousands and the losses number in the

9     billions.  And if the victims actually did come to court we

10    couldn't do it in this courthouse.  We did call a couple of

11    victims at trial as sort of illustrative examples.  Your Honor

12    will recall the money that was lost by the pension fund

13    TIAA-CREF, Mr. Schaub an individual investor who lost thousands

14    of dollars of his own money investing in Refco.  And I can

15    imagine how dispirited and how pessimistic and maybe how

16    cynical some of the investors in this company must feel after

17    the many years that it has taken to bring all the defendants to

18    justice, to bring Mr. Collins to this point.

19             And I would suggest, as we've argued in our papers,

20    that that pessimism, the cynicism is extremely strong here

21    because Mr. Collins is an attorney, because, as the Court has

22    determined in adopting the probation office's recommendation

23    with respect to use of a special skill, he employed his skills

24    as an attorney, as an attorney for an extremely prestigious

25    firm, a man with tremendous professional accomplishments, and

1    he employed those skills to deceive others and to steal from

2    the victims in this case.

3            The lies that Mr. Collins engaged in in this case are

4    not just limited to the indictment.  They are limited to his

5    prior testimony.  And the defense suggests that because Judge

6    Patterson imposed obstruction on a different point than the

7    government had advanced, that he somehow decided that none of

8    the other points merited obstruction.  And I would suggest that

9    the Court just didn't reach those points because the judge,

10   Judge Patterson, had made a finding with respect to this more

11   narrow point, which the defense is correct, we're not relying

12   on.

13           Mr. Collins, in the first trial, took the stand -- and

14   was on the stand I think for five days, between direct and

15   cross-examination -- and denied every aspect of the charges,

16   denied knowing about the hole, called the government's

17   witnesses liars.  I think for a whole bunch of reasons he

18   decided to handle this trial differently.  But that doesn't

19   mean that his attempt to obstruct justice in the first trial

20   can be put aside.

21           I think, although none of us were there at the first

22   trial -- I mean at the prosecution table and your Honor -- to

23   observe Mr. Collins' demeanor, we saw some of that in the hour

24   or so of civil deposition testimony that followed that

25   obstruction enhancement, the imposition of it, in which

1    Mr. Collins continued his obstructive conduct.

2            MR. SCHWARTZ:  Preceded.

3            MR. CHERNOFF:  Sorry.

4            And so for that reason when we look at the prior trial

5    testimony which we submitted to your Honor and consider the

6    defendant's testimony under oath with regard to these matters

7    we would ask that the Court consider imposing the obstruction

8    enhancement and increasing the guidelines level from 49 to 51.

9            THE COURT:  I think I've already ruled because I made

10   the finding, didn't I?  There was no obstruction enhancement in

11   the presentence report, and for that reason I did not -- not

12   for that reason, but I certainly did not impose one.

13           MR. CHERNOFF:  Understood, your Honor.

14           I didn't know if the Court had made --

15           THE COURT:  Yes, sir.

16           MR. CHERNOFF:  If I could just have a moment?

17           THE COURT:  Yes, sir.

18           (Pause)

19           MR. CHERNOFF:  Mr. Levy just points out I'm not sure

20   that the more recent PSR recited this language.  In the PSR

21   from the first trial, the probation office said it would defer

22   the finding to the Court, as is their practice.  That language

23   I don't think was in the more recent PSR, and I guess I just

24   didn't know --

25           THE COURT:  I actually thought it was.  At paragraph

D7f9cols1                         Sentence

1    102, "there was no enhancement imposed."

2            MR. CHERNOFF:  Yes, your Honor.

3            So we thought that that was the probation office again

4    deferring to the Court.  But I understand your Honor's ruling.

5            THE COURT:  Yes, sir.

6            MR. CHERNOFF:  And so in light of the defendant's

7    conduct, his use of a special skill, sophisticated nature of

8    this scheme, the duration that it occurred over, the sheer

9    number of victims and loss, the need to deter this kind of

10   conduct among all actors in the capital markets but

11   particularly corporate lawyers, the government requests that

12   your Honor impose a substantial term of imprisonment.

13           Thank you.

14           THE COURT:  Thank you.

15           Mr. Schwartz, do you wish to comment further?

16           MR. SCHWARTZ:  No, your Honor.

17           THE COURT:  Very well.  Then counsel I think it's

18   clear by now that I have calculated the guidelines that are

19   applicable and certainly take them into account.

20           With respect to the paragraph 3553(a) factors, looking

21   first at the nature and circumstances of the offense.  As we

22   have discussed, the guidelines calculations here are

23   technically correct.  They result in a guidelines range that is

24   several notches below the bottom of the guidelines chart,

25   indicating a life sentence or 95 years if one considers the

D7f9cols1                                    Sentence

 1   statutory maximums.

 2          Such a prescription illustrates, "the harm that

 3   guideline calculations can visit on human beings if not cabined

 4   by common sense." United States v. Adelson, 44 is F.Supp. 2d

 5   506, 512 (S.D.N.Y. 2006).

 6          Off the record.

 7          (Discussion off the record).

 8          There is no doubt that the offenses of conviction here

 9   were serious offenses in which major businesses and banks and

10   untold thousands of investors lost millions and millions of

11   dollars.  Certainly Mr. Collins' role in the Refco fraud was an

12   indispensable role, that of preparing legal documents over

13   years for the transactions planned by company insiders to

14   effect the fraud.

15          Although critical, however, Mr. Collins' role was of a

16   different magnitude and clearly less culpable than that of the

17   other defendants.  Unlike those defendants, Mr. Collins did not

18   devise, plan, or initiate any aspect of the fraud.

19          While that fact is probably not unheard of in fraud

20   cases, what takes this case far outside the heartland of fraud

21   cases, and particularly fraud cases involving lawyers, is that

22   Mr. Collins did not personally receive or even attempt to

23   receive any profit from the fraud.  His lack of any intended or

24   actual personal gain from the fraud distinguishes him from the

25   other Refco defendants and from most other white collar

D7f9cols1                          Sentence

1   offenders in this district.

2          It is undisputed that Mr. Collins' only income during

3   the period of the charged conspiracy was his law firm

4   partnership income.  I certainly acknowledge the government's

5   point that without a client such as Refco that income might

6   well have been less, probably would have been.  However, the

7   income he did receive was consistent with the income

8   partners -- other partners earned at similar types of law firms

9   and other than the general presence of the Refco client there

10  is no evidence that the amount of his partnership share from

11  the firm was dependent directly on fees from Refco.  In

12  contrast, the other Refco defendants ranged from Mr. Bennett

13  who stood to make one billion dollars down to Mr. Maggio who

14  made a mere $20 million.  Accordingly, I find that the total

15  offense level far overstates the nature and circumstances of

16  the offense.

17         With respect to the history and characteristics of the

18  defendant, it can fairly be said that but for this matter

19  Mr. Collins is a certifiable saint.  I echo Judge Rakoff's

20  recognition of Mr. Gupta's prior good works in saying that I

21  have "Never encountered a defendant whose prior history

22  suggests such extraordinary devotion, not just to humanity but

23  to individual human beings in their time of need."  And I say

24  that having been here over 20 years.  And unlike so many of the

25  defendants we see, Mr. Collins has worked for his church, his

D7f9cols1                         Sentence

family, his schools, and numerous other deserving organizations

that work to better individuals' lives for decades.  This was

not a postarrest conversion.  Far from it.  As counsel stated

this afternoon, every spare moment of his life has been filled

with service to his family, his country, his church, his

schools, and other deserving organizations.

        As Mr. Collins' brother Austin writes, "Joe not only

takes his religion seriously, he lives it in the best and most

productive way possible.  Joe walks the talk."

        Mr. Collins has been a generous donor to charitable

causes.  I note, as counsel has, that during the period of the

charged conspiracy his charitable giving approached or exceeded

ten percent of his after-tax income.  His generosity, however,

has extended far beyond institutional giving.  Over many years

he has repeatedly and continuously given of his own time and

energy in bringing about tangible change in the lives of

others.

        We know, for example, that Mr. Collins took in his

sister and her two young children to his home following her

divorce.  The letters of both children make it clear that they

regard Mr. Collins as a parents.

        As counsel has noted, he also took into his home

Stephen Lake, a Loyola classmate of his son.  Stephen's mother

was an alcoholic and incapable of caring for him.  And but for

Mr. Collins, Stephen would have become a ward of the state and

24

D7f9cols1                       Sentence

1   had to leave Loyola in his senior year.  Stephen was a troubled

2   young man and needless to say the experience was challenging

3   for the Collins family.  But, for Stephen Lake it was

4   transformative.  He writes, "Almost immediately I went from

5   living in an environment of fear and abuse to living in a warm

6   and loving home.  Mr. Collins provided for my care and support,

7   a selfless and heroic act in and I've itself.  He also provided

8   me with the kind of role model I'd never had; knowing him

9   changed the entire trajectory of my life."

10        Stephen became a member of the Collins family, doing

11  his chores and participating in family events.  Mr. Collins

12  mentored him in his studies, helped him to prepare for his SATs

13  and helped him look at colleges.  Stephen eventually completed

14  college and is now a successful young man working with the

15  Chicago Board of Trade.  He writes, "Mr. Collins taught me how

16  to treat others.  First and foremost, the way he and

17  Mrs. Collins treated me was remarkable.  The way Mr. Collins

18  treated others also made an impression on me.  Although he was

19  a successful lawyer, he would accord everyone the same dignity

20  and respect.  Most importantly, coming as I did from a broken

21  and dysfunctional home, Mr. Collins showed me what a true

22  family man looked like.  Put simply, without Mr. Collins'

23  extreme generosity and inspiring example, I would not be where

24  I am today.  Indeed, I don't know where I would be."

25        Mr. Collins has long been an active participant in

D7f9cols1                          Sentence

LINK Unlimited, an educational sponsorship program serving
economically disadvantaged African-American youth in Chicago.
Through that program Mr. Collins made a commitment to
contribute to costs of private secondary education for Azmera
Berhe, who, with her family, was a refugee from civil war in
Eritrea.  Just as importantly as school, however, Mr. Collins
came to know Azmera's entire family.  She writes, "Joseph not
only mentored me but I became almost like a daughter and truly
felt they incorporated me into their family.  I was included
and welcomed with open arms in many family occasions such as
Thanksgiving, Christmas and weddings.  Joseph came to my home.
He met my family.  We shared meals of Eritrean food.  He
greatly admired my parents.  Joseph introduced me to a life
where hard work, passion, and dedication were what determines
success in life rather than being a victim of circumstance."

          Although Collins' obligations under LINK Unlimited
ended when Azmera started college, he continued to support her
and advise her and assist when she could not afford tuition.
The first package she received when she went to college was
from the Collins family and contained a new laptop.  She has
since graduated from the University of Illinois with a degree
in community health.

          Similarly, the Collinses have been active supporters
of Boys Hope/Girls Hope of Chicago, a scholarship program
serving at-risk children from Chicago's poorest neighborhoods.

D7f9cols1                    Sentence

1   The Collinses' son Christopher introduced them to Boys

2   Hope/Girls Hope when he spent a year working there as a house

3   parent.  Mrs. Collins serves as an unpaid program coordinator

4   and a mentor and tutor to students.  And Mr. Collins has not

5   only supported the program financially but has given his time

6   to mentoring graduates.

7          Patrick's Hughes, executive director of Boys

8   Hope/Girls Hope writes that Mr. and Mrs. Collins are "the kind

9   of support you can count on to help our scholars when they need

10  it most."

11         Like the defendant in United States v. Adelson,

12  Mr. Collins' "good deeds were not performed to gain status or

13  enhance his image."  As in Adelson, "most were unknown to all

14  but a few people until the time of his sentencing."  This is in

15  stark contrast to many of the white collar defendants we see in

16  this Court who put their names on fancy buildings, which of

17  course is a very worthy cause, but it brings with it a certain

18  enhanced status.  That was not the path which Mr. Collins has

19  followed for all of these years.  The example that's already

20  been noted by counsel was that Mr. Collins paid for the funeral

21  of the mother of one of the Collinses' sons' classmates,

22  because the family could not pay for the funeral.  Until the

23  pastor mentioned it, Mrs. Collins didn't know he had done that.

24         Mr. Collins has supported numerous other institutions

25  both financially and with his own time and effort, including

D7f9cols1                       Sentence

1   the College of Holy Cross and New York University, both of

2   which he attended, Dominican College, Notre Dame University,

3   and Loyola Academy, the last of which his sons attended.

4          As counsel has also noted, following his indictment

5   Mr. Collins remained true to form.  Of course, he left the

6   practice of law and since then has devoted his time to his

7   family and the service of his community.  Since January 2008,

8   the month following his indictment, Mr. Collins has worked

9   three days a week as a volunteer and tutor at Chicago Jesuit

10  Academy, a full scholarship middle school located in a rough

11  neighborhood on Chicago's West Side.  Nearly all of the school

12  students come from minority, single-parent families and almost

13  all live at or below the poverty line.  When he is not actively

14  tutoring students, Mr. Collins willingly turns his hand to

15  office work, sweeping up, organizing supplies, or whatever else

16  might assist the school in performing its valuable mission.

17         Matthew Lynch, the school's president, describes

18  Mr. Collins as "One of our most reliable volunteers and

19  effective tutors.  Joe is unfailingly kind, self-effacing and

20  generous.  He graciously does whatever job needs doing.  Given

21  the modest resources of our school, that means Joe's jobs vary

22  from cleaning up messes to tedious filing work, to the critical

23  work of tutoring a child in need.  For over six years Joe has

24  done it all quietly, thoughtfully, and extremely well."

25         Mr. Lynch also points out that there are far easier

and more comfortable opportunities open to Mr. Collins and
said, "We are far from his home and we're in a neighborhood
that most Chicagoans do their best to avoid.  The neighborhood
that surrounds our school struggles under the weight of
material poverty, gangs, drugs, and violence.  While Joe has
been a volunteer, we've had a volunteer mugged while walking to
our building at 9:00 a.m.  In October 2011 two people were shot
an killed within a block of the school while school was in
session.  Two of our students, who are brothers, lost their
biological father when he was shot less than four blocks from
our school.  There are safer places to volunteer but Joe
believes in what we do and wants to help despite the risks."

          As counsel has noted, Mr. Collins had notable success
with a particularly troubled CJA student whom he had regularly
counseled on a one-to-one basis for some months, leading up to
and since the recent trial.  Clara Chu, volunteer coordinator
for CJA, describes the change that Mr. Collins' patience and
compassion have brought about for this child.  "For one
particular fifth grader this year..." who she calls David but
isn't his real name "...this additional assistance has made a
remarkable difference in his success.  For background, David's
uncle, a relative he considered close, committed suicide in the
summer of 2012 just before David was to begin his time at CJA.
The fall quarter was, needless to say, a difficult transition.
David made threats of self-harm, was admitted to a psychiatric

center for children for three weeks, and even when he returned

in November showed signs of depression and need for high levels

of attention.  Mr. Collins has been our reliable go-to

volunteer to help this young man obtain the attention he needs

with care and compassion.  Mr. Collins has helped David in a

way that none of our other 45 volunteers has been able to.  It

has been remarkable to watch them develop an understanding and

David knows that he can count on Mr. Collins.  Whether helping

to lead a seventh grade field trip, preparing senior students

for their high school scholarship interviews, tutoring students

like David, or handling janitorial or administrative tasks,

Joseph Collins is an invaluable asset, our most dependable

volunteer, and an integral part of our school community."

        In reviewing in my mind the letters, I do note what

counsel noted, that certain words appear continuously

throughout a hundred something letters:  Humility, church,

generosity, giving, integrity, role model.  Thus, in

considering Mr. Collins' history and characteristics, I find

his lifelong good works and charity to be extraordinary.

        With respect to the seriousness of the offense.  As I

noted above, this was indeed a serious offense imposing

financial losses on businesses and individuals of hundreds of

millions of dollars and, as the government points out in its

submission, raising doubts about the integrity of the capital

market system.

D7f9cols1                          Sentence

1              As noted above, however, the certain nature and

2      circumstance of this defendant's offense are outside the

3      heartland of these types of serious offenses because of his

4      secondary role and because of the lack of any direct financial

5      gain.

6              As the government has pointed out, deterrence is

7      indeed a very important consideration in any sentencing but

8      particularly in white collar sentencings.  I can say with great

9      certainty, based on his past history, that there is no need for

10     incarceration to protect the public from future crimes from

11     this defendant.

12             General deterrence, however, is also a very important

13     consideration in these cases.  In considering the need for

14     incarceration for general deterrence, I adopt Judge Rakoff's

15     sentiment in the Gupta case that, "Common sense suggests that

16     most business executives fear even a modest prison term to a

17     degree that more hardened types might not.  Thus, a modest

18     prison term should be sufficient but not more than necessary

19     for this purpose."

20             In United States v. Kipnis, No. 05 CR 727 (N.D. Ill.

21     Dec. 10, 2007), the Court noted that, "for a lawyer who is not

22     motivated by personal gain, the collateral consequences of

23     conviction provided general deterrence."

24             In addressing the defendant, the Kipnis Court noted,

25     "In looking at all that you have lost from where you were in

D7f9cols1                         Sentence

1    life, I think that is a significant deterrent to others who are

2    thinking about engaging in a fraud the way that you have done

3    so, by drafting documents and not receiving a penny and helping

4    others to get money."

5            See also Adelson, 441 F.Supp. 2d at 514.  "There is

6    considerable evidence that even relatively short sentences can

7    have a strong deterrent effect on prospective white collar

8    offenders."

9            Here, Mr. Collins has lost his law license and his

10   considerable standing in the legal community.  To illustrate

11   the very long fall from grace, I note the letter of Hector

12   Gonzalez, formerly an Assistant United States Attorney in this

13   district and a former Mayer Brown partner, as he sums up the

14   partners' view of Mr. Collins.  "Joe is, simply put, a good

15   man.  During the more than twelve years that I've known Joe, I

16   never had a reason to call into question the settings on his

17   moral compass.  Joe has never given me the slightest reason to

18   question his integrity.  It is also fair to say that I am not

19   alone in holding that opinion.  At Mayer Brown, Joe had a

20   reputation for honesty, integrity, and fair play, among both

21   lawyers and stuff."

22           Similarly, Vincent Connelly, a former Assistant United

23   States Attorney in Chicago where he was chief of special

24   prosecutions is a senior partner at Mayer Brown who worked

25   closely with Mr. Collins on Refco litigation matters.  He

describes work on a "bet the ranch" trial for Refco during

which he consulted Mr. Collins throughout.  He found that

Mr. Collins consistently offered only ethical and responsible

advice.  "Never did he seek even a borderline advantage for the

client if it wasn't well within appropriate boundaries of

proper advocacy."

          Mr. Connelly observes, "Prior to working at Mayer

Brown I was a federal prosecutor in Chicago for ten years.  I

don't think that experience provides me with any special

insight into human nature.  But along with the following 25

years as a white collar criminal defense practitioner, it at

least affords me a filter to observe lawyers who try to do the

right thing and those who don't.  Throughout the hundreds of

times Joe and I had to make decisions and plan a course of

action, he always was guided by doing what was proper and

aboveboard."

          Along with losing his standing in the legal community,

Mr. Collins has also lost his ability to make a living.  He

also faces a civil lawsuit that threatens to bankrupt him and

his family.  His future earning power has been destroyed as he

and his wife enter their mid 60s with no income and probably no

assets.  Thus, I conclude that in this case a lengthy prison

sentence is not necessary for general deterrence of similarly

situated individuals tempted to commit similar crimes

particularly in light of the collateral consequences suffered

D7f9cols1                        Sentence

1   by Mr. Collins.

2            The paragraph (d) factors of providing education or

3   vocational training are not relevant here.

4            I've taken into account the paragraph 3, 4, and 5

5   factors.

6            With respect to paragraph 6, the need to avoid

7   unwarranted sentencing disparities.  I acknowledge the serious

8   sentences received by the Refco insiders in this case;

9   Mr. Bennett was sentenced to 16 years and Mr. Grant to 10

10  years.  As we know, Mr. Maggio has passed away and Mr. Trosten

11  has not been sentenced.

12           Of course I am to look not only to the defendants in

13  this case but to similar cases around the country.  In doing

14  so, I am persuaded that there will be no perceived disparity

15  between the sentence given to Mr. Collins and the sentences

16  received by other similarly situated white collar defendants.

17           I've already made reference to United States v. Kipnis

18  and I look also to United States v. Graham, No. 06 CR 137 (D.

19  Conn. April 30, 2009) where the defendant lawyer was said to

20  have drafted the contracts to document the sham transactions in

21  a fraud case and then to have hidden evidence from the auditors

22  and the regulators.  He was convicted of all 16 counts charged.

23  As here, the guidelines called for life in prison.  But judge

24  Droney emphasized, "an important factor here that is different

25  from so many other corporate fraud prosecution's is that

1    Mr. Graham did not personally gain in a direct way from his

2    criminal conduct and his motivation was not one of obtaining

3    direct personal gain." Judge Droney also noted that Graham,

4    "Did not have as active or central a role as other

5    participants."

6           The Court's been pointed to other white collar

7    sentencings in this district, Mr. Ebbers and others.  In most

8    of these cases, those defendants were the business people who

9    not only planned, devised and initiated the fraud but enjoyed

10   enormous financial gains from those frauds.  The case of Donna

11   Guerin is said to be a "reasonably close analogy" to this one.

12   She was an attorney recently sentenced for her sales of

13   fraudulent tax shelters in United States v. Daugerdas.  The

14   analogy, however, is poor.  As Judge Pauley noted at sentencing

15   Ms. Guerin's motivation was her "lust for money" and she sought

16   and received "stunning multimillion dollar compensation for her

17   crimes."As Judge Pauley stated at sentencing, "For Ms. Guerin,

18   it apparently has always been about the money.  Even with all

19   the money she amassed, there is not a single letter submitted

20   to the Court on her behalf showing any meaningful commitment to

21   public service or charity beyond her college sorority that

22   encompassed activities like driving an elderly alumna to a

23   reunion celebration.  In short, there are very few mitigating

24   circumstances here, just unchecked avarice.  It is against that

25   backdrop that the Court is prepared to impose sentence on

D7f9cols1                        Sentence

1    Ms. Guerin at this time."

2            Judge Pauley's sentencing remarks in Guerin emphasize

3    the distinctions between Mr. Collins and the heartland of fraud

4    defendants in his lack of personal gain, his limited role, and

5    his enormous and continuing prior charitable works.

6            Finally, as to restitution.  The government does not

7    seek restitution here because of the overwhelming difficulty in

8    locating victims and calculating loss.

9            Taking all of those factors into account, counsel, it

10   is my intention to impose a sentence of incarceration of a year

11   and a day, followed by a period of two years of supervised

12   release.

13           It is my intention to impose only the special

14   condition of providing the probation officer with access to any

15   requested financial information.

16           It is not my intention to impose a fine.

17           As I mentioned, restitution and forfeiture are not

18   sought here.

19           It is my intention to impose the mandatory $700

20   special assessment and to delete the drug testing requirement.

21           Is there any reason, counsel, such a sentence should

22   not be imposed?

23           MR. CHERNOFF:  No, your Honor.

24           MR. SCHWARTZ:  No, your Honor.

25           THE COURT:  Very well.

1          Mr. Collins, you're sentenced, sir, to a period of a

2     year and a day incarceration.  Following that time you'll spend

3     a period of two years on supervised release.  During that

4     period you'll comply with all of the standard terms and

5     conditions of supervised release.  Among them are that you not

6     commit another federal, state, or local crime; you not

7     illegally possess a controlled substance; and you not possess a

8     firearm or other destructive device.  In addition to those and

9     all of the other standard terms and conditions of supervised

10    release, you will also provide the probation officer with

11    access to any requested financial information.  In light of the

12    lack of any substance abuse history, the drug testing

13    requirement is deleted.

14         And finally, sir, I must impose and do impose the

15    mandatory $700 special assessment and that should be paid

16    promptly.

17         It is my duty to inform you, sir, that unless you've

18    waived it, you have the right to appeal this sentence and you

19    might have the right to appeal in forma pauperis, as a poor

20    person, with the waiver of certain fees and expenses.

21         Mr. Schwartz.

22         MR. SCHWARTZ:  May I have a second, your Honor?

23         THE COURT:  Yes, sir.

24         (Pause)

25         MR. SCHWARTZ:  We would request that your Honor grant

1    bail in this case pending appeal.  I'm prepared to make an

2    argument if your Honor wants me to be heard at this time.

3            THE COURT:  Does the government oppose bail pending

4    appeal?

5            MR. CHERNOFF:  Yes, your Honor.

6            THE COURT:  Mr. Schwartz.

7            MR. SCHWARTZ:  First, your Honor, I'll just note as

8    background that by the time the appeal gets heard in this case

9    and decided Mr. Collins may well have served his entire

10   sentence.  If he gets a year and a day and fifteen percent off

11   for good time, he will be out in less than a year.  Given the

12   amount of time that the last appeal took and in a similar case

13   which your Honor is aware that I had where there was a sentence

14   of a year and a day, I believe he will have finished his

15   sentence.

16           There are -- as your Honor notes, the standard --

17   obviously, I take it I don't need to address whether

18   Mr. Collins is a danger to the community.

19           THE COURT:  You can move on, Mr. Schwartz.

20           MR. SCHWARTZ:  Your Honor, we have a couple of issues

21   on appeal that I think present substantial issues for the

22   Second Circuit, even though I know, given this Court's prior

23   rulings, you might disagree.  But your Honor is also aware that

24   whether you agree or not is not determinative of whether the

25   issue is substantial.

D7f9cols1                          Sentence

1          First, having to do with the Court's charge of

2    conscious avoidance.  Two different judges have heard this

3    trial and one decided to give that charge, your Honor, and the

4    other didn't.  We think that on its face raises on the same

5    facts the question of whether the charge was properly given.

6          I will note that conscious avoidance was clearly in

7    the forefront of the jury's mind as they deliberated.

8          One of their last -- it may have even been their last

9    note prior to verdict raised three different questions

10   surrounding conscious avoidance, whether I think -- I think it

11   was whether Mr. Collins -- an overt act could be conscious

12   avoidance, whether they could consider conscious avoidance --

13   whether you could have agreed to have been in a conspiracy

14   through conscious avoidance, and whether conscious avoidance

15   could be considered for intent as well as for knowledge.

16         So clearly there were at least some jurors who were

17   inclined to see this as a conscious avoidance case.  And what

18   makes this case, we think, not a conscious avoidance case.  I

19   think, respectfully, where the Court erred, is that what

20   Mr. Collins is stated to have done and what the government

21   argued in the charging conferences is to have not done; in

22   other words, to have been aware of a number of facts that

23   should have led him to conclude a crime was committed but then

24   not asked questions.  So the affirmative act that's required --

25   conscious avoidance requires; one, that you have a knowledge of

such -- a sufficient enough knowledge so that you can be

presumed to know that there's something that's very wrong and

then to take an act to avoid finding things out.

And I think what the government argued to the Court

was that essentially Mr. Collins didn't ask questions when he

could have asked questions.  So we think that the charge was

not properly given.

But even if your Honor was correct in charging the

jury on conscious avoidance, we asked at the time that your

Honor charge the jury on the issue that -- charge the jury that

conscious avoidance is not recklessness.

And the Supreme Court has spoken to the issue of

recklessness in conscious avoidance in Global-Tech Appliances,

Inc. v. SEB S.A at 131 S. Ct. 2060, 2011.  Your Honor, I do not

have the U.S. citation yet.

(Continued on next page)

1          MR. SCHWARTZ:  But, I think what the Court says here

2     is pretty dramatic, and it's why we believe a conscious

3     avoidance is not reckless charge should have been given.

4          It says that conscious avoidance charge has two basic

5     requirements.  They call it willful blindness --

6          THE COURT:  Slowly.  Slowly.

7          MR. SCHWARTZ:  The Court refers to willful blindness,

8     but I think it's what we call conscious avoidance.

9          The requirements are that the defendant must

10    subjectively believe there is a high probability that a fact

11    exists; and two, the defendant must take deliberate actions to

12    avoid learning that fact.

13         Again, quoting from the Court:  We think these

14    requirements give willful blindness an appropriately limiting

15    scope that surpasses recklessness and negligence.  Under this

16    formulation, a willfully blind defendant is one who takes

17    deliberate actions to avoid confirming a high probability of

18    wrongdoing and can almost be said to have actually known the

19    critical facts.  By contrast, a reckless defendant is one who

20    merely knows of a substantial and unjustified risk of such

21    wrongdoing.  And a negligent defendant is one who should have

22    known of a similar risk.

23         We think given that standard and given what the case

24    was about, which were facts from which one could argue did he

25    know or did he not or was it merely a substantial probability,

D7f3col2                              Sentence

1    that the jury should have been told recklessness is not enough.

2    And it would have enabled the defense, your Honor, in

3    summation, to really point out and go into the facts as being

4    possible recklessness, but not a conscious avoidance.

5    Something I had to avoid doing, given the Court's charge.

6          If the Second Circuit agrees with us, that -- your

7    Honor did charge it was not negligence, but if they agree it

8    was not negligence and it was not recklessness, then the entire

9    conviction will be reversed, so we've also satisfied that

10   element.

11         In addition, your Honor, given the conscious avoidance

12   charge, and the importance of that charge to the jury's

13   deliberation -- and I'll remind the Court, I believe the last

14   thing that Mr. Chernoff did in his rebuttal summation was read

15   the charge to the jury, the Court's charge on conscious

16   avoidance, which was a very powerful thing to do given the

17   circumstances in this case.

18         We believe that we should have been permitted to call

19   an expert to place into context what a lawyer does and what the

20   kinds of facts are that are available to a lawyer in the normal

21   practice of law, so that the jury could have determined whether

22   those facts had relevance with respect to what we think was its

23   determination that Mr. Collins consciously avoided, and didn't

24   ask questions that he probably properly should have asked.

25         And in our proffer to the Court, we had set forth the

D7f3col2                        Sentence

1    kinds of things that we think would go, for example, if the

2    jury were to have decided -- and as you know from our

3    submission, I don't believe this is where the case was

4    decided -- but if they were to have decided the case on the

5    failure to ask questions about the back-to-back loans, they

6    would have been told by an expert that a lawyer isn't always

7    privy to every document in a transaction, and not always privy

8    to why a client does something.  That would have been something

9    that would have helped them to evaluate conscious avoidance.

10          Finally, your Honor, we respectfully suggest that we

11   believe that the Court erred in not permitting the expert to

12   testify with respect to the facts and circumstances surrounding

13   the materiality of the proceeds participation agreement, and to

14   have given his opinion that the PPA would not have

15   significantly altered the mix of information available to

16   investors in a way that was material.  Whether that would have

17   ultimately been couched in use of the word, what use of the

18   world "material" or not is something we didn't get to litigate.

19   And we had proposed different alternatives to the Court.

20          But the fact is that materiality, as we argued during

21   the trial, for all the counts in which Mr. Collins was

22   convicted, is an element.  And is an element that must be

23   objectively determined.  And that it would have been useful to

24   the jury to have heard how a lawyer, who was engaged in

25   transactions such as this for his entire career, our proffered

1   expert, would have interpreted the facts and circumstances

2   surrounding the proceeds participation agreement.

3           So, on that ground as well, your Honor, we think there

4   is a substantial issue about which I'm sure your Honor does not

5   agree with the conclusion that we reach, but the Second Circuit

6   may well, in which this conviction could be reversed.  And we

7   ask your Honor to grant Mr. Collins bail pending a

8   determination.

9           THE COURT:  Thank you.  Mr. Levy.

10          MR. LEVY:  Thank you, your Honor.

11          Your Honor, if I could first take up the issue of the

12  length of Mr. Collins' sentence.  It is, as your Honor is

13  aware, not a part of the standard under Section 3143 whether or

14  not the defendant may have served his sentence by the time the

15  appeal has run.  The standard is relatively simple.  The

16  defendant needs to show that he's not a risk of flight, and I

17  think it's fair to say that the government is not contending

18  that he is.  And then he also needs to show that the appeal

19  raises a substantial question of law.  So the issue of whether

20  or not his sentence is going to run by the end is really not a

21  part of the analysis.

22          Let me address in reverse order the points that the

23  defense counsel has made.  The issue of the expert is really

24  not a substantial question of law by any stretch of the

25  imagination.  That is a discretionary decision of your Honor.

D7f3col2                        Sentence

1   It was a decision that was made correctly.  It is understood

2   that the defense disagrees with the decision, but the

3   possibility that the Second Circuit is going to conclude that

4   your Honor abused her discretion by determining that an expert

5   in matters of legal practice was unnecessary and should be

6   precluded in this case is really not a realistic possibility.

7   The Second Circuit -- I think it would be difficult to find a

8   decision in which the Second Circuit has done something like

9   that.

10          Moving to conscious avoidance.  Although on the

11   surface it presents an issue that is somewhat meatier, the

12   Second Circuit has in recent weeks reached what is essentially

13   everything that the defendant proposes to make the basis for

14   the appeal.

15          With respect to whether or not a conscious avoidance

16   instruction in this case was appropriate at all, the Second

17   Circuit very recently said in United States v. Cuti, C-U-T-I.

18   It is a published opinion, but it is recent enough that I don't

19   think it has a full citation yet.  It's 2013 WL 3197796.  And

20   in that case, the Second Circuit said that the District Court

21   did not err in giving a conscious avoidance instruction.  And

22   specifically it said that the defendant's purported lack of

23   knowledge defense, despite the defendant's deep involvement in

24   the transactions that effectuated the fraud, all but invited

25   the conscious avoidance charge.

```
1              It is identical here.  This defendant claimed that he

2    was unaware of the nature of the transactions that he

3    personally participated in.  And the Second Circuit has just

4    recently said that invites a conscious avoidance instruction.

5    So there is no substantial issue there.

6              As for Global-Tech --

7              THE COURT:  I was going to ask you whether that Court

8    gave the it is not recklessness charge.

9              MR. LEVY:  I don't know.  I don't believe that came up

10   in Cuti.  But, also within the last couple of weeks in United

11   States v. Goffer, G-O-F-F-E-R, also published but also too

12   recent to have a F.3d citation, it's 2013 WL 3285115.  The

13   Second Circuit addressed this issue of whether an

14   anti-recklessness language needs to be included in a conscious

15   avoidance instruction.  They said it did not.  The language

16   from this opinion:  Kimmelman urges us to believe -- I'm sorry.

17             Kimmelman alleges that the District Court erred in

18   declining to amend its jury instructions to accord with the

19   Supreme Court's ruling in Global-Tech.  Specifically, Kimmelman

20   contends that the Global-Tech decision required the jury

21   charges indicate that, quote, the mental state of recklessness

22   is insufficient for a finding of conscious avoidance, closed

23   quote.  Because Global-Tech did not alter the conscious

24   avoidance standard, we hold that the District Court's refusal

25   to amend the jury instructions to accord with Global-Tech was
```

D7f3col2                           Sentence

1  not error.

2          So, the Second Circuit has within the last couple of

3  weeks resolved all of the issues having to do with conscious

4  avoidance that this defendant would raise on appeal.  Given

5  that, he has no substantial issue to raise on appeal.  And the

6  government submits that bail should be denied.

7          THE COURT:  Mr. Schwartz.

8          MR. SCHWARTZ:  I apologize to the Court because I have

9  not read the opinion that Mr. Levy has just referred to.  But I

10  think that the Court has from time to time reversed on

11  conscious avoidance, and I think it is a very fact-intensive

12  inquiry they make.

13          What I was suggesting about Global-Tech is

14  particularly where there is not an affirmative act as opposed

15  to an affirmative non-act, and you're seeking from the evidence

16  to have an inference both that the defendant had knowledge of

17  the probability of wrongdoing and that the non-act was an act,

18  it is in that circumstance that a recklessness charge is

19  appropriate.

20          THE COURT:  Anything else?

21          MR. SCHWARTZ:  No, thank you, your Honor.

22          MR. LEVY:  No, your Honor.  Thank you.

23          THE COURT:  Thank you.

24          As the government concedes, Mr. Collins is not likely

25  to flee or be a danger to the community.  I do find, though,

D7f3col2                         Sentence

1    that there is a substantial issue for appeal on all of these

2    matters, and accordingly, bail pending appeal will be granted

3    on the same conditions as it is now.

4              What else?

5              MR. SCHWARTZ:  One more request, your Honor.  We would

6    request that in the judgment the Court recommend to the Bureau

7    of Prisons that Mr. Collins serve his time at the federal

8    satellite prison camp in Oxford, Wisconsin, which is just a few

9    hours from Mrs. Collins' home outside of Chicago.

10             THE COURT:  Yes, sir.  Anything further?

11             MR. SCHWARTZ:  No, your Honor.

12             THE COURT:  Thank you, counsel.  Good afternoon.  Good

13   afternoon, sir.

14             MR. CHERNOFF:  I'm sorry, your Honor.  The government

15   would just move to dismiss the underlying indictment and open

16   counts.

17             THE COURT:  So ordered.

18                          o0o

19

20

21

22

23

24

25